**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BARDY DIAGNOSTICS, INC.,<br><br>Plaintiff and Counter-Defendant,<br><br>v.<br><br>IRHYTHM TECHNOLOGIES, INC.,<br><br>Defendant and Counter-Plaintiff. | ) | C.A. No. 24-1355-JDW |

# JOINT CLAIM CONSTRUCTION BRIEF

Philip A. Rovner (#3215)
Andrew M. Moshos (#6685)
POTTER ANDERSON
& CORROON LLP P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
amoshos@potteranderson.com

*Attorneys for Plaintiff*
*Bardy Diagnostics, Inc.*

November 26, 2025

Brian P. Egan (#6227)
Megan E. Dellinger (#5739)
E. Paul Steingraber (#7459)
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
began@morrisnichols.com
mdellinger@morrisnichols.com
esteingraber@morrisnichols.com

*Attorneys for Defendant*
*iRhythm Technologies, Inc.*

# TABLE OF CONTENTS


I. REPRESENTATIVE CLAIMS ....... 1

A. Bardy Asserted Patents ....... 1

B. iRhythm Asserted Patents ....... 4

II. AGREED-UPON CONSTRUCTIONS ....... 6

III. DISPUTED CONSTRUCTIONS ....... 6

A. Bardy Asserted Patents ....... 6

1. Term 1: "the processor is configured to process the electrocardiographic signals sensed" ....... 6

a. Bardy's Opening Position ....... 7

b. iRhythm's Answering Position ....... 9

c. Bardy's Reply Position ....... 13

d. iRhythm's Sur-Reply Position ....... 18

2. Term 2: "wireless transceiver" ....... 21

a. Bardy's Opening Position ....... 22

b. iRhythm's Answering Position ....... 26

c. Bardy's Reply Position ....... 29

d. iRhythm's Sur-Reply Position ....... 32

3. Term 3: "vertically aligned" ....... 33

a. Bardy's Opening Position ....... 34

b. iRhythm's Answering Position ....... 36

c. Bardy's Reply Position ....... 42

d. iRhythm's Sur-Reply Position ....... 43

4. Term 4: "removably secured" ....... 46

a. Bardy's Opening Position ....... 46

b. iRhythm's Answering Position ....... 47

c. Bardy's Reply Position ....................................................50

d. iRhythm's Sur-Reply Position ..........................................51

5. Term 5: "distal" / "proximal", ...............................................................53

a. Bardy's Opening Position ................................................53

b. iRhythm's Answering Position ........................................59

c. Bardy's Reply Position ....................................................62

d. iRhythm's Sur-Reply Position ..........................................67

B. iRhythm Asserted Patents .......................................................................................69

1. Term 6: "electrical connection" ..............................................................69

a. iRhythm's Opening Position ............................................69

b. Bardy's Answering Position ............................................71

c. iRhythm's Reply Position ................................................79

d. Bardy's Sur-Reply Position .............................................83

2. Term 7: "[electrical connection] extending from the physiological data collection circuit to the electrode" ('734 Patent, cl. 1); "[electrical connection] extending linearly from the physiologic data collection circuit" ('554 Patent, cl. 1); and "[first substrate layer] extends horizontally away from the housing" ('277 Patent, cl. 1) (collectively, the "Extending From Terms") ..................................85

a. iRhythm's Opening Position ............................................86

b. Bardy's Answering Position ............................................88

c. iRhythm's Reply Position ................................................92

d. Bardy's Sur-Reply Position .............................................95

3. Term 8: "extending at least partially below the housing"..........................96

a. iRhythm's Opening Position ............................................96

b. Bardy's Answering Position ............................................97

c. iRhythm's Reply Position ................................................99

d. Bardy's Sur-Reply Position ....................101

4. Term 9: "configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user" ....................103

a. iRhythm's Opening Position ....................103

b. Bardy's Answering Position ....................104

c. iRhythm's Reply Position ....................111

d. Bardy's Sur-Reply Position ....................114

5. Term 10: "the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer" ....................116

a. iRhythm's Opening Position ....................116

b. Bardy's Answering Position ....................117

c. iRhythm's Reply Position ....................118

d. Bardy's Sur-Reply Position ....................119

6. Term 11: "electrical contact with" ....................121

a. iRhythm's Opening Position ....................121

b. Bardy's Answering Position ....................122

c. iRhythm's Reply Position ....................129

d. Bardy's Sur-Reply Position ....................131

# I. REPRESENTATIVE CLAIMS

## A. Bardy Asserted Patents

**U.S. Patent No. 12,161,473 Patent (the "'473 Patent"), Claim 1:**

**1.** A wearable electrocardiography monitoring device, comprising:

a flexible backing including a strip comprising:

a first face and a second face, wherein a portion of the first face is covered in adhesive to adhere the strip to skin of a patient,

a first end section,

a second end section opposite the first end section, and

a mid-section between the first end section and the second end section, wherein the mid-section is narrower than the first end section and the second end section;

a flexible circuit mounted to the second face of the strip, the flexible circuit comprising a first circuit trace and a second circuit trace;

a first electrocardiographic electrode and a second electrocardiographic electrode, wherein the first electrocardiographic electrode and the second electrocardiographic electrode are configured to sense electrocardiographic signals, wherein the first electrocardiographic electrode and the second electrocardiographic electrode are coupled to the flexible circuit, wherein the first electrocardiographic electrode is conductively exposed at the first face along the first end section of the strip, wherein the second electrocardiographic electrode is conductively exposed at the first face along the second end section of the strip, wherein the first circuit trace is electrically coupled to the first electrocardiographic electrode, wherein the second circuit trace is electrically coupled to the second electrocardiographic electrode, and wherein the first electrocardiographic electrode includes an inline resistor;

a battery **vertically aligned**[1] with a sealed housing, wherein the sealed housing includes rounded edges on a top surface, wherein

[1] This claim term appears in claims 1, 15, 20, and 23 of the '473 Patent and claims 9, 14, 20, 23,

the sealed housing is coupled to the flexible backing, and wherein the sealed housing includes a processor, wherein the processor is electrically coupled to the first electrocardiographic electrode, the second electrocardiographic electrode, and the battery, wherein **the processor is configured to process the electrocardiographic signals sensed**[2] via the first electrocardiographic electrode and the second electrocardiographic electrode; and

a **wireless transceiver**[3], wherein the wireless transceiver draws power from the battery.

**U.S. Patent No. 12,285,261 (the "'261 Patent"), Claim 1:**

**1.** A moisture-resistant electrocardiography monitor, comprising:

an electrocardiography monitor recorder, comprising:

a wearable housing molded out of one or more materials and sealed against moisture;

a plurality of electrical contacts protruding from the wearable housing;

a seal coupling positioned on the wearable housing and surrounding the electrical contacts; and

electronic circuitry provided within the wearable housing, the electronic circuitry further comprising:

an electrocardiographic front end circuit under a control of a micro-controller and adapted to sense cardiac electrical potential differentials through electrocardiographic electrodes via some of the electrical contacts, which are provided to the micro-controller as an analog signal;

the micro-controller configured to sample the analog signal; and

---

and 28 of U.S. Patent No. 12,171,562 (the "'562 Patent").

[2] This claim term appears in claims 1, 8, and 15 of the '473 Patent and claims 8 and 15 of the '562 Patent.

[3] This claim term appears in claims 1, 8, and 15 of the '473 Patent and claims 8 and 15 of the '562 Patent.

a memory electrically interfaced with the micro-controller and operable to store the samples; and

an extended wear electrode patch, comprising:

a flexible backing comprising a plurality of adhesive contact surfaces;

the electrocardiographic electrodes, each comprised on one of the adhesive contact surfaces;

a receptacle affixed to a non-contacting surface of the flexible backing into which the wearable housing can be **removably secured**[4], the receptacle comprising a compartment within which a component interfaced to the electronic circuitry is positioned via some of the electrical contacts, wherein the component is a battery;

a plurality of electrical pads positioned on the receptacle, each of the pads configured to interface with one of the electrical contacts when the wearable housing is secured within the receptacle; and

a moisture-resistant seal formed on the receptacle and surrounding the electrical pads, wherein the moisture-resistant seal mates the seal coupling when the wearable housing is secured within the receptacle.

**<u>U.S. Patent No. 12,310,735 (the "'735 Patent"), Claim 1:</u>**

**1.** An electrocardiography monitor, comprising:

a battery;

a non-conductive receptacle configured to house the battery;

a housing comprising rounded edges along a top surface, wherein the housing engages the non-conductive receptacle and the non-conductive receptacle is configured to receive the housing, wherein the battery is positioned between the housing and a bottom surface of the non-conductive receptacle;

a patient feedback button located on the top surface of the housing;

an electrographic front end circuit to sense electrocardiographic signals;

[4] This claim term appears in claims 1 and 10 of the '261 Patent.

a **distal**[5] electrocardiography electrode coupled to a distal end of a flexible circuit and a **proximal**[6] electrocardiography electrode coupled to a proximal end of the flexible circuit, wherein the flexible circuit is coupled to a flexible backing and the flexible backing is configured to adhere to skin of a patient's chest; and

a microcontroller secured by the housing, wherein the microcontroller is interfaced to the electrocardiographic front end circuit to sample the electrocardiographic signals.

## B. iRhythm Asserted Patents

**U.S. Patent No. 12,133,734 (the "'734 Patent"), Claim 1:**

**1.** An electronic device for long-term adhesion to a user, the device comprising:

a housing comprising a physiologic data collection circuit, the housing positioned over a flexible layer extending from the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, wherein the flexible layer comprises a polymer upper layer overlying an **electrical connection**[7], the electrical connection **extending from the physiologic data collection circuit to the electrode**[8], the polymer upper layer adhered to a polymer lower layer underlying the electrical connection;

a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user, the lower adhesive layer **extending at least partially below the housing**[9]; and

---

[5] This claim term appears in claims 1 and 11 of the '735 Patent.

[6] This claim term appears in claims 1 and 11 of the '735 Patent.

[7] This claim term appears in claim 1 of the '734 Patent and claim 1 of U.S. Patent No. 12,274,554 (the "'554 Patent").

[8] This claim term appears in claim 1 of the '734 Patent, claim 1 of the '554 Patent, and claim 1 of the '277 Patent.

[9] This claim term appears in claim 1 of the '734 Patent.

wherein the housing is **configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user**[10].

**U.S. Patent No. 12,303,277 (the "'277 Patent"), Claim 1:**

**1.** An electronic device for long-term adhesion to a user, the device comprising:

a housing comprising a physiologic data collection circuit;

an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user;

an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and

wherein the first substrate layer is positioned over the electrode and **extends horizontally away from the housing**[11] beyond a boundary of the electrode; and

wherein **the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer**[12].

**U.S. Patent No. 12,245,859 (the "'859 Patent"), Claim 1:**

**1.** A physiological monitoring device configured to monitor cardiac rhythm data of a patient, the physiological monitoring device comprising:

a first housing portion and a second housing portion, wherein the first housing portion detachably couples to the second housing portion;

---

[10] This claim term appears in claim 1 of the '734 Patent.

[11] This claim term appears in claim 1 of the '734 Patent, claim 1 of the '554 Patent, and claim 1 of the '277 Patent.

[12] This claim term appears in claim 1 of the '277 Patent.

a first spring contact configured to electrically couple a battery to a circuit board assembly housed within the first housing portion;

a flexible substrate coupled to the second housing portion, wherein the flexible substrate comprises a border portion that is thinner than an interior portion of the flexible substrate;

an electrode embedded within a portion of the flexible substrate and configured to detect physiological signals of the patient to obtain the cardiac rhythm data; and

a flexible electrode trace embedded in the flexible substrate and configured to electrically couple the electrode to the circuit board assembly, wherein at least a portion of the flexible electrode trace is in **electrical contact with**[13] a second spring contact, and wherein the second spring contact is further configured to electrically couple the flexible electrode trace to the circuit board assembly.

## II. AGREED-UPON CONSTRUCTIONS

| Claim Term | Agreed-Upon Construction |
|---|---|
| "non-contacting surface"<br><br>'261 Patent, cls. 1, 10 (Bardy Patent) | "surface that does not contact a patient's skin" |

## III. DISPUTED CONSTRUCTIONS

### A. Bardy Asserted Patents

#### 1. Term 1: "the processor is configured to process the electrocardiographic signals sensed"

| "the processor is configured to process the electrocardiographic signals sensed" ('562 Patent, cls. 8, 15; '473 Patent, cls. 1, 8, 15) | |
|---|---|
| **Bardy's Construction** | **iRhythm's Construction** |
| "processor in the device is specifically configured to process the electrocardiographic signals sensed" | Governed by 35 U.S.C. § 112(f). |

[13] This claim term appears in claim 1 of the '859 Patent and claim 1 of U.S. Patent No. 12,245,860 (the "'860 Patent").

| | |
|---|---|
| | Function: process the sensed electrocardiographic signals<br><br>Structure: Indefinite for lacking structure. The specification discloses no algorithm for performing the claimed function. |

**a. Bardy's Opening Position**

Defendant contends this term is governed by 35 U.S.C. §112(f)[14] and is also indefinite. Section 112 only applies if the term "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *See, e.g.*, *Microchip Tech., Inc. v. Aptiv Servs. US, LLC*, No. 1:23-CV-00778-JDW, 2024 WL 3444616, at *2 (D. Del. July 15, 2024) (citing *MTD Prod. Inc. v. Iancu*, 933 F.3d 1336, 1341 (Fed. Cir. 2019)).

Defendant cannot satisfy this burden. A POSITA would have understood the claimed processor connotes a structure, such that §112(f) does not apply. As such, the Court should hold that this term is not a mean-plus-function term and apply the construction of a "processor in the device [that] is specifically configured to process the electrocardiographic signals sensed."

Starting with the claim language, this term does not use the phrase "means for," and thus there is a presumption that §112(f) does not apply. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) ("[F]ailure to use the word 'means' also creates a rebuttable presumption—this time that § 112, para. 6 does not apply."). Defendant cannot overcome this presumption because the claims themselves connote sufficient structure of the claimed "processor."

Defendant's position is also contrary to the Court's prior rulings. For example, this Court explained that "for the most part, courts have ultimately concluded that 'processor' terms failed to

[14] 35 U.S.C. §112(f) was referred to as 35 U.S.C. §112(6) before the AIA changed the statutory naming convention.

invoke Section 112, paragraph 6." *Techno View IP, Inc. v. Facebook Techs., LLC*, No. CV 17-386-CFC-CJB, 2018 WL 6427874, at *4 (D. Del. Dec. 7, 2018). "It has been observed that 'in many instances, the term 'processor' itself connotes sufficient structure and is not a 'nonce' or 'functional' word that is subject to the limitations of Section 112, paragraph 6.'" *Id.* So to here, the term "processor" connotes enough structure to avoid implicating §112(f).

To the extent the structure of the claimed processor is not immediately apparent from the plain language of the claims, the operations and input-output structure of the claimed processor confirm that Defendant cannot overcome the presumption that § 112(f) does not apply. *See Cleveland Med. Devices Inc. v. ResMed Inc.*, No. CV 22-794-GBW, 2023 WL 7128925, at *9 (D. Del. Oct. 30, 2023) (Where "the claims themselves state the objections and operations of the processor and provide an input-output structure," §112(f) does not apply); *see also Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("What is important is ... that the term, as the name for structure, has a reasonably well understood meaning in the art.").

Claim 1 of the '562 Patent recites a "sealed housing [that] includes a processor." Ex. A ('562 Patent), cl. 1. The processor "is electrically coupled to the first electrocardiographic electrode" and "is configured to process the electrocardiographic signals sensed via the first electrocardiographic electrode and the second electrocardiographic electrode." Ex. A, cl. 1. Here, Claim 1 couples the processor with both a location and function. For the function, the processor receives electrocardiographic signals as an input, which are then processed. When read as a whole, a POSITA would have readily understood that the processor is an electronic component. The specification confirms the claim language by stating that the "processor is positioned on one of the first or second end sections and is housed separate from the battery." Ex. A, 5:1-2.

After determining that this term does not invoke Section 112(f), this Court should construe the processor according to Federal Circuit precedent as a "processor in the device [that] is ***specifically*** configured to process the electrocardiographic signals sensed." *See, e.g.*, *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012); *In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014); *Acclarent, Inc. v. Ford Albritton, IV*, IPR2017-00498, Paper 40 at 11, 14 (P.T.A.B. July 9, 2018) ("[P]recedent makes clear that the 'configured to' phrase itself connotes the narrower meaning" of "designed to" or "constructed to" rather than the broader meaning of "capable of" or "suitable for.").

**b. iRhythm's Answering Position**

Bardy cites the Federal Circuit's *en banc Williamson* decision for the proposition that there is a presumption against applying § 112(f)[15] to terms that do not recite "means for." (*Supra* Section III.A.1.a.) But Bardy ignores the key holding in *Williamson* that § 112(f) controls if a skilled artisan would not understand the words of the claim "to have a sufficiently definite meaning as the name for structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (*en banc*). In particular, the *en banc Williamson* court explained that certain "nonce word[s]" are "tantamount to using the word 'means,'" including terms such as "mechanism," "element," "device," and "module." *Id.* at 1350. Subsequent Federal Circuit precedent established other nonce words. *See, e.g.*, *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1343 (Fed. Cir. 2019) ("mechanical control *assembly*" invokes § 112(f)); *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1375 (Fed. Cir. 2020) ("*logic* to modify" invokes § 112(f)).

---

[15] *Williamson* addressed § 112, ¶ 6, which was the pre-AIA equivalent to § 112(f). Because Bardy's asserted patents are governed by the AIA, iRhythm will use § 112(f) to refer to both pre-AIA § 112, ¶ 6 and AIA § 112(f).

Just like these nonce words, the "processor" term at issue here can trigger § 112(f), as the Federal Circuit has held at least twice. In *WSOU Investments LLC v. Google LLC*, No. 2022-1064, 2023 WL 6531525, at *4 (Fed. Cir. Oct. 6, 2023) ("*WSOU I*"), the Federal Circuit applied § 112(f) to the claim term "collaborative application management *processor* configured to manage collaborative applications." The court explained that, although there is no "categorical rule" whether "processor" invokes § 112(f), § 112(f) applied because the specification did not discuss "any 'processor' whatsoever," and the claim lacked detail as to "*how* the processor" performs the claimed function of "manag[ing] collaborative applications." *Id.* The Federal Circuit explained, "[t]his is the epitome of functional claiming: a black box that captures any and all structures that fulfill the function, just as if 'means' was used." *Id.*

In *WSOU Investments LLC v. Google LLC*, No. 2022-1063, 2023 WL 6889033, at *3 (Fed. Cir. Oct. 19, 2023) ("*WSOU II*"), in relation to the claim term "processor configured to provide a pre-emptive user output,"[16] the court explained that while the specification disclosed a "processor," according to the specification, the processor could be any software, hardware, or combination thereof. *Id.* at *4. Section 112(f) thus applied, because the "'processor' is so generically and functionally described as to fail to convey a sufficiently definite meaning as a name for a structure." *Id.*

Like in *WSOU I* and *WSOU II*, the claims here define the processor by the function it performs—processing the sensed electrocardiographic signals. Neither the claims nor the specification provide any structure for the recited processor, and Bardy identifies no structure at all. As in *WSOU I*, the term "processor" is just a "black box that captures any and all structures

[16] Although it involved the same parties, *WSOU II* addressed different patents than the patent at issue in *WSOU I*.

that fulfill the function, just as if 'means' was used." *WSOU I*, 2023 WL 6531525, at *4. And just as in *WSOU II*, the "processor" here is "so generically and functionally described as to fail to convey a sufficiently definite meaning as a name for a structure." *WSOU II*, 2023 WL 6889033, at *4. The Court should therefore apply § 112(f) to the claim term "the processor is configured to process the electrocardiographic signals sensed."

Bardy cites two district court cases and argues that the alleged "operations and input-output structure" of the claimed "processor" impart structure to the term. (*Supra* Section III.A.1.a.) But Bardy does not identify any "operations and input-output structure" in the claims, and there is none. The claims recite only the function of processing signals, and Bardy's cases do not apply. (*See id.* (citing *Techno View IP, Inc. v. Facebook Techs.*, *LLC*, No. CV 17-386-CFC-CJB, 2018 WL 6427874, at *4 (D. Del. Dec. 7, 2018); *Cleveland Med. Devices Inc. v. ResMed Inc.*, No. CV 22-794-GBW, 2023 WL 7128925, at *9 (D. Del. Oct. 30, 2023)).) Regardless, post-*Williamson* Federal Circuit cases—including *Williamson* itself—consistently decline to apply the "inputs and outputs" rationale to exempt a functional term from § 112(f). *See, e.g.*, *Optis Cellular Tech., LLC v. Apple Inc.*, 139 F.4th 1363, 1382-83 (Fed. Cir. 2025); *Fintiv, Inc. v. PayPal Holdings, Inc.*, 134 F.4th 1377, 1383-84 (Fed. Cir. 2025); *Egenera*, 972 F.3d at 1374-75; *Williamson*, 792 F.3d at 1351.[17]

Bardy also argues that the claim specifies the "function" and "location" of the processor. (*Supra* Section III.A.1.a.) But Bardy cites no law for the position that the alleged "function" and "location" impart structure to a term otherwise subject to § 112(f). Indeed, with respect to the

[17] Bardy cites *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) as well, but this pre-*Williamson* case simply stated that whether the term has a well understood meaning in the art is relevant to the § 112(f) inquiry, and does not address the relevance of any input-output structure.

alleged "function," it is black letter law that "purely functional claim language . . . provides no structure." *Fintiv*, 134 F.4th at 1383. And even if "location" were relevant (it is not), the claim does *not* specify the "location" of the processor—it only recites function. The *specification* language that Bardy cites, "processor is positioned on one of the first or second end sections and is housed separate from the battery," is not a *claim* requirement. (*See supra* Section III.A.1.a. (citing '562 patent at 5:1-2).)

Because § 112(f) applies, the Court must proceed to the next step to decide "whether the specification discloses sufficient structure that corresponds to the claimed function." *Williamson*, 792 F.3d at 1351. "If the function is performed by a general-purpose computer or microprocessor," as is the case here, the law "requires that the specification disclose the *algorithm* that the computer performs to accomplish that function." *Fintiv*, 134 F.4th at 1384 (citing *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1007 (Fed. Cir. 2021)) (emphasis added).

Bardy does not identify any alleged algorithm for performing the claimed function. Thus, Bardy offers no counter-argument that if § 112(f) applies, the term is indefinite as the specification fails to disclose the corresponding algorithm. *See WSOU II*, 2023 WL 6889033, at *4. Regardless, the specification does not disclose an algorithm for processing the sensed electrocardiographic signals. While the specification describes aspects of such processing, such as quantizing and digitizing the signal, buffering the signal, and compressing the signal ('473 patent at 14:63-15:6), it does not describe *how* these processing steps are done using algorithms. For example, the specification does not explain the rules for quantization or the algorithm for compression. To the extent that Bardy points to an unspecified "electronic component" as the structure (*supra* Section III.A.1.a.), an electronic component is not an *algorithm*, which is what the specification must disclose under the law. Therefore, the "processor" term is indefinite. *See Williamson*, 792 F.3d

at 1352 ("If the patentee fails to disclose adequate corresponding structure, the claim is indefinite.").

To the extent the Court disagrees that this term is subject to § 112(f), the Court should not rewrite this term to insert the word "specifically" as Bardy proposes ("processor in the device is *specifically* configured to process the electrocardiographic signals sensed"). (*See supra* Section III.A.1.a.) Adding a "specifically" requirement to "configured to" "risks importing a state of mind element into the patent" that is irrelevant in patent infringement. *Trove Brands, LLC v. CamelBak Prods., LLC*, 756 F. Supp. 3d 760, 781 (N.D. Cal. 2024) (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1353 (Fed. Cir. 2001)). Contrary to the PTAB decision that Bardy cites, the Federal Circuit has declined to construe "configured to" as "designed to." *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 41-42 (Fed. Cir. 2020). The *Aspex* and *Giannelli* decisions that Bardy cite did not insert any "specifically" requirement into the claims. *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012); *In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014).

**c. Bardy's Reply Position**

iRhythm fails to carry its burden to establish that: (i) §112(f) applies to this claim term; or (ii) that this claim term is indefinite. To determine whether §112(f) applies, the Federal Circuit "has long recognized the importance of the presence or absence of the word 'means.'" *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). The claims do not use the phrase "means for," and thus there is a presumption that §112(f) does not apply. *Id.* To overcome the presumption, the burden rests with iRhythm, who must "demonstrate[] that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.*; *see also Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016) ("In determining whether this presumption has been rebutted, the

challenger must establish by a preponderance of the evidence that the claims are to be governed by § 112, ¶ 6."). iRhythm fails to overcome this presumption.

iRhythm provides no evidence that a person of ordinary skill would ***not*** have understood the term "processor" to "have a sufficiently definite meaning as the name for structure." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018) ("[T]he essential inquiry remains 'whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.'"). iRhythm first responds that "processor" is a nonce word. However, iRhythm's cited cases and conclusory allegations, which Bardy addresses below, are not intrinsic or extrinsic evidence as to what a person of ordinary skill would have understood. Tellingly, iRhythm's analysis of §112(f) includes only one citation to the '562 Patent (which Bardy originally provided) and passing references to the claim language. Without evidence as to the knowledge of those skill in the art, iRhythm cannot satisfy its burden.

The facts here are like those of *Zeroclick*. 891 F.3d 1003 (Fed. Cir. 2018). There, the defendant "argued that the limitations must be construed under § 112, ¶ 6, but provided no evidentiary support for that position." *Id.* at *1007–08. Thus, the defendant "failed to carry its burden, and the presumption against the application of § 112, ¶ 6 to the disputed limitations remained unrebutted." *Id.* at *1008. This failure to provide affirmative evidence on this point is fatal. *See, e.g.*, *L2 Mobile Techs. LLC v. TCL Elecs. Holdings Ltd.*, No. 1:22-CV-01306-JDW, 2024 WL 986918, at *6 (D. Del. Mar. 7, 2024) ("Although TCL makes arguments to the contrary, it offers no evidence, even though the burden rests with it to demonstrate that the term is means-plus-function."); *Wirtgen Am., Inc. v. Caterpillar, Inc.*, No. 1:17-CV-00770-JDW-MPT, 2023 WL 2456090, at *3 (D. Del. Mar. 10, 2023) ("Caterpillar has not offered any evidence that 'indication and setting devices' fails to recite a definite structure or recites function without structure.").

Additionally, the district court in *Zeroclick*, as iRhythm does here, removed the term "processor" from the context of the claims and improperly treated the term as a nonce word. 891 F.3d at 1008. The context of the claimed processor as a whole, a point ignored by iRhythm, makes clear the claimed structure. *Id.* ("[T]he court's analysis removed the terms from their context, which otherwise strongly suggests the plain and ordinary meaning."); *see also Aptiv Techs. Ltd. v. Microchip Tech., Inc.*, No. 1:23-CV-00307-JDW, 2024 WL 3400109, at *8 (D. Del. July 12, 2024) ("The question is whether the claim as a whole—not particular words in it—connotes a structure that a POSITA would understand."). The same is true for iRhythm's analysis here.

iRhythm also argues that "the 'processor' term at issue ***can*** trigger §112(f)," but fails to establish that it does. Here, iRhythm ignores the numerous cases finding the term "processor" does not invoke § 112(f). "[F]or the most part, courts have ultimately concluded that 'processor' terms failed to invoke Section 112, paragraph 6." *Techno View IP, Inc. v. Facebook Techs., LLC*, No. CV 17-386-CFC-CJB, 2018 WL 6427874, at *4 (D. Del. Dec. 7, 2018); *see, e.g.*, *Align Tech., Inc. v. 3Shape*, No. CV 17-1648-LPS, 2021 WL 2320139, at *7 (D. Del. June 7, 2021) ("[T]he 'processor' terms do not invoke § 112 ¶ 6 because the word 'processor,' as used in these terms, connotes sufficient structure and is not a 'nonce' or 'functional' word.").

This approach to construing "processor" terms is not unique to this district. *XR Commc'ns, LLC v. D-Link Sys., Inc.*, No. 8:17-CV-00596-DOC-JDE, 2022 WL 2288913, at *7 (C.D. Cal. Jan. 27, 2022), report and recommendation adopted, 2022 WL 2291747 (C.D. Cal. Apr. 18, 2022) ("Ample authority of the Federal Circuit thus supports finding that the term "processor" connotes structure.") (citing *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320–21 (Fed. Cir. 2004)); *see also Nomadix, Inc. v. Hosp. Core Servs. LLC*, No. 14-CV-08256, 2016 WL 344461, at *5–*8 (C.D. Cal. Jan. 27, 2016) ("Here, the claim term 'processor' is a structural term that cannot

be reasonably disputed."); *Odyssey Wireless, Inc. v. Apple, Inc.*, No. 15-CV-1735, 2016 WL 3055900, at *12 (S.D. Cal. Mar. 30, 2016) (citing cases); *Quanergy Sys., Inc. v. Velodyne Lidar, Inc.*, No. 15-CV-05251, 2017 WL 4410174, at *16–*19 (N.D. Cal. Oct. 4, 2017); *SyncPoint Imaging v. Nintendo of Am. Inc.*, No. 2:15-cv-00247-JRG-RSP, 2016 WL 55118 (E.D. Tex. Jan. 5, 2016); *Fisher-Rosemount Sys., Inc. v. ABB Ltd.*, No. 4:18-CV-000178, 2019 WL 6830806, at *16 (S.D. Tex. Dec. 12, 2019).

iRhythm cites two outlier cases where §112(f) applied to the term "processor." Both cases can be distinguished from the current case. In one, the court reasoned that the term "processor" in "collaborative application management processor" was used as "a black box that captures any and all structures that fulfill the function." *WSOU Invs. LLC v. Google LLC*, No. 2022-1064, 2023 WL 6531525, at *4 (Fed. Cir. Oct. 6, 2023) ("*WSOU I*"). There, the court found that the claims failed to "describe how this processor interacts with the other claimed components in a way that might inform the structural character of the limitation." *Id.* This reasoning does not apply to the "processor" term in this case.

First, the '562 Patent does not fail to describe how the "processor" interacts with other claimed components. Rather, as Claim 1 recites, the processor is electrically coupled to a first electrode, a second electrode, and a battery. Ex. A ('562 Patent), cl. 1. The electrodes sense electrocardiography signals and the "processor is configured to process the electrocardiographic signals." *Id.* The '562 Patent's specification and other claims provide further details about the processor structure and how the processor interacts with other claimed components, which help define its structure. *See* Ex. A, 11:17-12:17, Figures 9, 11. Claim 8 sets forth that: (1) the processor is included in the housing; (2) the processor is electrically coupled to the electrodes; and (3) a

battery, which is "disposed between the processor and the skin of the patient," "provide[s] power to the processor." Ex. A, cl. 8.

Based on the claim language and clear disclosure in the specification, this case is more akin to *Cleveland Medical Devices Inc. v. ResMed Inc.*, No. CV 22-794-GBW, 2023 WL 7128925 (D. Del. Oct. 30, 2023). There, the claimed "processor" was connected to an internal airflow sensor from which it received airflow data and a wireless radio. *Id.* at *10. Notably, this court held that §112(f) did not apply and distinguished the facts from *WSOU I*. *Id.* ("This is not a situation where the 'claims do not describe how this processor interacts with the other claimed components in a way that might inform the structural character of the limitation.'") (citing *Cleveland Med. Devices Inc.*, 2023 WL 7128925, at *4). The same is true here and this Court should reach the same conclusion as the court in *Cleveland Medical Devices*.

In *WSOU Investments LLC v. Google LLC*, the term "processor" "refer[ed] to hardware, software, or ***essentially anything*** else that could perform the claimed functions." No. 2022-1063, 2023 WL 6889033, at *3 (Fed. Cir. Oct. 19, 2023) ("*WSOU II*"). Based on this "vague understanding," the court found that §112(f) applied because the term was used "so broadly as to generically be any structure that manipulates data." *Id.* at *4.

The claims at issue in this case provide ample description of the processor in relation to the housing, the electrodes, and the battery. Ex. A, cls. 1, 8, 15. The claims also clearly state that the processor "is configured to process the electrocardiographic signals sensed via the first electrocardiographic electrode and the second electrocardiographic electrode." *Id.* Unlike *WSOU II*, the '562 Patent does not use processor "so broadly as to generically be any structure."

iRhythm fails to rebut the presumption that §112(f) does not apply because the term "means" is not used. iRhythm also fails to provide any evidence that a person of ordinary skill

would not understand that the term "processor" has sufficiently definite means and structure. The Court should hold that §112(f) does not apply to the "processor" term and that the term is not indefinite.

To the extent that §112(f) does not apply, iRhythm provides no alternative construction. iRhythm, instead, responds that the Court should not insert "specifically" into the claim term. To address iRhythm's arguments, Bardy is amendable to a slight modification of its construction to either a "processor in the device configured to process the electrocardiographic signals" or a "processor in the device designed to process the electrocardiographic signals."

**d. iRhythm's Sur-Reply Position**

Bardy argues that "processor" is a "name for structure." (*Supra* Section III.A.1.c.) The Federal Circuit explained that "[t]here is no categorical rule that 'processor' is or is not structural," and whether "processor" is a name for structure depends on the context of the patents. *WSOU I*, 2023 WL 6531525, at *4. As iRhythm has explained, the "processor" is "so generically and functionally described [in the context of Bardy's patents] as to fail to convey a sufficiently definite meaning as a name for a structure." *WSOU II*, 2023 WL 6889033, at *4.[18]

Bardy asserts that the specification informs the structure of the "processor" term. (*Supra* Section III.A.1.c.) But Bardy does not even attempt to identify any such corresponding structure, even in the event that the term is subject to § 112(f). This silence confirms there is no such structure in the specification. Bardy's argument that iRhythm has not met its burden by "affirmative[ly]"

---

[18] To the extent that Bardy asserts that the Court cannot consult legal authorities and must rely on expert testimony instead, Bardy is wrong. Courts routinely cite earlier § 112(f) cases to conclude that the same nonce words are subject to § 112(f). *See, e.g.*, *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1006-07 (Fed. Cir. 2021) (citing *Williamson* to apply § 112(f) to a "module" term); *XR Commc'ns, LLC v. ARRIS Sols., Inc.*, No. 2022-1125, 2023 WL 3529830, at *2-3 (Fed. Cir. May 18, 2023) (citing *Egenera* to apply § 112(f) to a "logic" term).

citing the intrinsic evidence is unavailing. (*Id.* (citing *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018) and two district court cases).) Bardy concedes that the specification refers to "processor" *only once*, and iRhythm addressed that evidence. (*Id.*) Indeed, the single reference that the "processor is positioned on one of the first or second end sections and is housed separate from the battery" ('473 patent at 5:1-3) offers no details as to the structure or algorithm of the processor itself, confirming that the "processor" term is "generically and functionally described." *WSOU II*, 2023 WL 6889033, at *4.

Bardy's argument relying on "the context of the claims" also fails. (*See supra* Section III.A.1.c.) The claims recite that the "processor" is "electrically coupled to" some other components (the electrodes and the battery) and configured to perform processing. But simply describing "certain inputs and outputs at a very high level," as is the case here, does not "inform the structural character" of the term. *Williamson*, 792 F.3d at 1351 (Fed. Cir. 2015) (*en banc*). In *Williamson*, while the claimed "distributed learning control module" was for "receiving communications" from a source and "relaying the communications" to a destination, the Federal Circuit did not find sufficient structure in that claim language. *Id.* at 1351-52. Likewise, the high-level claim language of electrical coupling and processing here does not impart structure to the "processor" term.

Bardy does not cite *any* Federal Circuit decision exempting the term "processor" from § 112(f). Instead, Bardy cites a number of district court cases (*supra* Section III.A.1.c.), while ignoring other, more analogous, district court decisions that applied § 112(f). For example, in *St. Isidore Research, LLC v. Comerica Inc.*, No. 15-cv-1390-JRG-RSP, 2016 WL 4988246, at *14-16 (E.D. Tex. Sept. 18, 2016), the court applied § 112(f) to the term "processor configured to verify the authenticity" because the claim defined the processor "only by the function that it performs,"

and the specification did not "detail the objectives and operations" of the processor. Here, Bardy's claims similarly define the processor only by its function ("process the electrocardiographic signals sensed"). And the single reference to "processor" in the specification describing its *positioning* (discussed above) does not explain the "objectives and operations" of the processor. *See also Parity Networks, LLC v. ZyXEL Commc'ns, Inc.*, No. 20-CV-697-JVS (KESx), 2020 WL 8569299, at *11 (C.D. Cal. Dec. 22, 2020) ("packet processor" is subject to § 112(f)); *Syneron Med. Ltd. v. Invasix, Inc.*, No. 16-CV-00143-DOC-KES, 2018 WL 4696971, at *14 (C.D. Cal. Aug. 24, 2018), *report and recommendation adopted*, 2018 WL 11351325 (C.D. Cal. Sept. 28, 2018) ("processor . . . configured to[] control RF energy" is subject to § 112(f)); *Velocity Pat. LLC v. FCA US LLC*, No. 13-CV-8419, 2018 WL 4214161, at *7 (N.D. Ill. Sept. 4, 2018) ("processor subsystem" is subject to § 112(f)).

Moreover, Bardy's district court cases do not apply. As iRhythm has explained, Bardy does not identify any input-output structures in the claims as *Techno View*, *Cleveland Medical*, or *Align Technology* have found, and thus they are inapt. Regardless, post-*Williamson*, the Federal Circuit has consistently declined to apply the "inputs and outputs" rationale to exempt a functional term from § 112(f). (*See supra* Section III.A.1.b.)[19]

---

[19] Bardy's out-of-district cases do not apply, either. *XR Communications* distinguished the "baseband processor" at issue (processor "in the context of wireless devices") from a "general purpose computer," which is claimed in Bardy's patents here. *XR Commc'ns*, 2022 WL 2288913, at *7, 9. In *Nomadix*, the processor was involved in detailed network operations such as "browser redirection" and "connection handshake," as opposed to the generic processing here. *Nomadix*, 2016 WL 344461, at *5-8. In *Odyssey, Quanergy, SyncPoint,* and *Fisher-Rosemount*, the intrinsic evidence explained the "objectives and operations" of the claimed processors in sufficient detail that allowed one of ordinary skill in the art to understand the "structural arrangements" of the processors. *Odyssey*, 2016 WL 3055900, at *12; *Quanergy Sys.*, 2017 WL 4410174, at *16-19; *SyncPoint*, 2016 WL 55118, at *18; *Fisher-Rosemount*, 2019 WL 6830806, at *16. As discussed above, the claims and specification here do not provide such details.

Finally, Bardy's attempt to distinguish *WSOU I* and *WSOU II* fails. Bardy argues that the claims here include more details of how the processor "interacts" with other components compared to *WSOU I*. (*Supra* Section III.A.1.c.) They do not. Like the processors in *WSOU I* that processed messages from an "inbox," the processor here processes signals from the electrodes. 2023 WL 6531525, at *1-2. These "high level" descriptions are insufficient to impart structure. *See Williamson*, 792 F.3d at 1351-52. Bardy also argues that its patents do not describe the processor as "essentially anything" that could perform the claimed functions as in *WSOU II*. (*Supra* Section III.A.1.c.) But the single reference in the specification describes the positioning of the processor and does not limit the processor to any specific hardware or software.

To the extent the Court disagrees that § 112(f) applies, the Court should not adopt Bardy's proposed constructions. Bardy acknowledges that there is no support for the word "specifically" in its proposed construction. (*Id.*) And Bardy's two new proposals are also problematic. The first one, "processor in the device configured to process the electrocardiographic signals," ignores the claim term "sensed" and adds new "in the device" language that is not in the claim. The second one, "processor in the device designed to process the electrocardiographic signals," has the same issues and also improperly rewrites "configured to" as "designed to." *See Nevro*, 955 at 41-42 (declining to construe "configured to" as "designed to").

**2. Term 2: "wireless transceiver"**

| **"wireless transceiver"<br>('562 Patent, cls. 8, 15; '473 Patent, cls. 1, 8, 15)** | |
|---|---|
| **Bardy's Construction** | **iRhythm's Construction** |
| Plain and ordinary meaning, *i.e.*, a component that can transmit wirelessly | component that transmits electrocardiographic signals wirelessly |

**a. Bardy's Opening Position**

Defendant's proposed construction attempts to limit "wireless transceiver" to components that must transmit electrocardiographic signals wirelessly. This construction—which excludes embodiments from the specification, and is therefore improper—is divorced from the claim language itself, the specification, and contrary to the law. Further, Defendant's proposal cuts against the general rule that claims are given their plain and ordinary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). There are only two exceptions to this rule: (1) when the patentee acts as its own lexicographer or (2) when the patentee disavows the full scope of a claim term. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The claimed "wireless transceiver" does not fall within either exception. Accordingly, the Court should reject Defendant's proposed construction and instead apply the plain and ordinary meaning, which is a component that ***can***, but is not required, to wirelessly transmit electrocardiographic signals.

**(1) Defendant improperly limits the type of transmission**

Defendant improperly narrows "wireless transceiver" beyond the plain language by requiring the transceiver to ***wirelessly transmit*** electrocardiographic signals. The same evidence discussed regarding the type of data, which is addressed below, supports Bardy's position that a wireless transceiver encompasses other components that do not wirelessly transmit data.

Claim 8 of the '562 Patent simply recites a "wireless transceiver":

A wearable electrocardiography monitoring device, comprising:

> …a battery;
> a wireless transceiver;
> a button configured to be pressed to mark an event…;

There is no requirement that the transceiver "transmits electrocardiographic signals wirelessly" as proposed by Defendant. Ex. A, cl. 8. Defendant's proposed construction would

insert unclaimed limitations into Claim 8 by requiring (i) wireless transmission and (ii) of electrocardiographic signals. Defendant's proposed construction is at odds with the specification and the claims of the '562 Patent.

Figure 3 of the '562 Patent shows a system for remote interfacing of an extended wear electrocardiography and physiological sensor monitor 12. The specification describes, with reference to Figure 3, that the stored electrocardiographic data can be offloaded by connecting monitor recorder 14 to download station 125 via a wired connection. Ex. A, 6:54-62 (see annotations in Figure 3 below). In this manner, one can retrieve the stored electrocardiographic monitoring data (*i.e.*, ECG signals) for further diagnostic analysis. Ex. A, 6:62-7:50.




Ex. A, Figure 3 (annotated).

The specification further describes that the wearable monitor ***can*** be equipped with a wireless transceiver. Ex. A, 8:41-43, 15:53-61. The wireless transceiver is described in the specification of the '562 Patent as wirelessly communicating with "other wearable physiology and activity sensors 131…that measure or monitor data physical to the patient's body, such as heart rate, temperature, blood pressure, and so forth; physical states, such as movement, sleep, footsteps,

and the like; and performance, including calories burned, or estimated blood glucose level." Ex. A, 8:1-16; 8:41-55, 12:33-47, Figure 3.

The specification of the '562 Patent clearly encompasses embodiments where wireless transmission is not required (or available): "Initially, the download station 125 is connected to the monitor recorder 14 (step 151), such as by physically interfacing to a set of terminals 128 on a paired receptacle 127 or by wireless connection, if available." Ex. A, 15:52-55.

Moreover, the inventors' choice of different claim language in Claims 8 and 15 of the '562 Patent should not be interpreted to cover the same subject matter. For example, Claim 8 simply recites a "wireless transceiver" while Claim 15 recites "a wireless transceiver configured to communicate at least a portion of the electrocardiographic signals." Ex. A, *compare* cl. 8 *with* cl. 15. Reading the more narrow language of "wireless transceiver" expressly recited in Claim 15 into Claim 8 destroys the inventors' attempt to provide differing claim scope through the use of different language, and has been rejected by the Federal Circuit. *See, e.g.*, *Tandon Corp. v. Int'l Trade Comm'n.*, 831 F.2d 1017, 1023 (Fed Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.").

The intrinsic evidence confirms that the claimed wireless transceiver can, but is not required to, wirelessly transmit information. For this reason, the Court should apply the plain and ordinary meaning of a wireless transceiver—"a component that can transmit wirelessly."

**(2) Defendant improperly limits the type of data that is transmitted**

Defendant further narrows "wireless transceiver" beyond the plain language by requiring the transceiver to transmit electrocardiographic signals. In one example, Claim 8 of the '562 Patent recites a "wireless transceiver" ***without*** claiming any additional limitations and ***without*** requiring the transceiver to transmit a specific type of information (*e.g.*, the otherwise claimed

electrocardiographic signals). Ex. A, cl. 8; *cf* cl. 15 (specifically claiming a wireless transceiver configured to communicate at least a portion of the electrocardiographic signals). Defendant's proposed construction would insert unclaimed limitation into Claim 8 by requiring the wireless transceiver to transmit electrocardiographic signals.

Claim 15 further highlights the flaws with Defendant's construction. Defendant's construction would render language of Claim 15 superfluous by requiring a transceiver to transmit electrocardiographic signals and also communicate at least a portion of electrocardiographic signals. *See, e.g.*, *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 429 (Fed. Cir. 2016) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored."). In view of the claim language, Defendant's construction is improper.

The detailed description also weighs against Defendant's proposed construction (and in favor of Bardy's suggestion of plain and ordinary meaning) because Defendant's proposed construction excludes embodiments in the specification. Specifically, the '562 Patent states that the wireless transceiver can "provide data ***or other information*** to, or receive data or other information from, an interfacing wearable physiology and activity sensor, or wearable or mobile communications devices for relay to a further device." Ex. A, 4:28-34. This other information is expressly set forth in the specification as physical to the patient's body, physical states, and performance, and not electrocardiographic signals. Ex. A, 8:1-16. By covering components that must "transmit[] electrocardiographic signals wirelessly," Defendant's proposed construction excludes embodiments where a wireless connection is not available (*see* Ex. A, 15:52-55) and where ***only*** other information, such as blood pressure, footsteps, or calories burned, is wirelessly transmitted. Ex. A, 8:1-16, Figure 3. This is improper. *See, e.g.*, *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) (The Federal Circuit "normally do[es] not interpret claim terms in a

way that excludes embodiments disclosed in the specification."); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996) (finding that a claim interpretation that excludes a preferred embodiment is "rarely, if ever, correct").

The '562 and '473 Patents consistently disclose a wireless transceiver that can transmit other data—without transmitting electrocardiographic signals. Ex. A, 12:33-35 ("The circuitry 60 of the monitor recorder 14 includes a wireless transceiver 69 that can provides wireless interfacing 35 capabilities."); 8:43-49 (explaining that the device "could wirelessly interface with the monitor recorder 14, which could either provide data or other information to, or receive data or other information from an interfacing device"); *see also* Ex. B ('473 Patent), 8:43-49, 12:33-35.

The intrinsic evidence confirms that the claimed wireless transceiver can, but is not required to, transmit electrocardiographic signals. For this reason, the Court should reject Defendant's attempt to insert unclaimed subject matter into the claims and instead apply the plain and ordinary meaning of a wireless transceiver—"a component that can transmit wirelessly."

**b. iRhythm's Answering Position**

This claim term presents two disputes: (1) whether the claim term "wireless transceiver" must actually transmit or need only be capable of it, and (2) what it must transmit. It is plain from the claims and the specification that the wireless transceiver must actually transmit, and the only information identified in the claims for wireless transmission are electrocardiographic signals.

First, the specification makes clear that the "wireless transceiver" is a component that actually transmits electrocardiographic signals wirelessly. It discloses that "the monitor recorder 14 can [] be equipped with a wireless transceiver" that provides a "wireless[] interface." ('473 patent at 8:41-54.) The wireless transceiver "communicates at least a portion of the electrocardiographic signals" to connected computing devices. (*Id.* at 4:53-55.) Importantly, the specification never discloses an idle wireless transceiver that never transmits data, and a redundant

component without any functionality is contrary to the patents' goal of reducing the size and the cost of monitoring devices. (*See id.* at 2:31, 3:41.) As Bardy admits, "[t]he wireless transceiver is described in the specification . . . as wirelessly communicating with" other devices. (*Supra* Section III.A.2.a.1.) Therefore, the wireless transceiver must actually transmit. There is no written description for any wireless transceiver that is only capable of transmitting, but never actually transmits anything. Contrary to Bardy's assertion, the Court must consider the guidance from the specification even in the absence of lexicography or disavowal. *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F. 3d 1359, 1363-64 (Fed. Cir. 2016) (explaining that the *en banc Phillips* court rejected any requirement for "explicit redefinition or disavowal").

Bardy's argument that the wireless transceiver does not need to actually transmit because the specification discloses a wired connection as another option does not make sense. (*Supra* Section III.A.2.a.(1).) The specification describes a wired connection as an *alternative* to a wireless transceiver. For example, the specification states that "the download station 125 is connected to the monitor recorder 14 (step 151), such as by physically interfacing to a set of terminals 128 on a paired receptable 127 *or* by wireless connection." ('473 patent at 15:52-55; *see also id*. at 7:24-25 ("communications link . . . , whether wired *or* wireless"); *id*. at 7:34-39 (describing communication "over a wired *or* wireless connection.").) The specification describes that a device has *either* a wired connection *or* a wireless transceiver. *See August Tech. Corp. v. Camtek, Ltd.*, 655 F. 3d 1278, 1285 (Fed. Cir. 2011) ("The mere fact that there is an alternative embodiment disclosed in the asserted patent that is not encompassed by [the] claim construction does not outweigh the language of the claim."); *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 708 (Fed. Cir. 2020) ("When the patent describes multiple embodiments, every claim does not

need to cover every embodiment."). Regardless, even the wired connection of the specification actually transmits information—it is not mere surplusage.

Second, the claims make clear that the wireless transceiver actually transmits, and it actually transmits at least electrocardiographic signals. Claims 1, 8 and 15 of the '473 patent and claims 8 and 15 of the '562 patent are directed to a "wearable electrocardiography monitoring device" that has a "first electrocardiographic electrode" and a "second electrocardiographic electrode" "configured to sense electrocardiographic signals," and a "processor" "configured to process the [sensed] electrocardiographic signals." The claimed monitoring device also comprises a "wireless transceiver." Because each claim is focused on sensing, processing, and transmitting electrocardiographic signals, and identifies nothing else capable of transmission, the only possible purpose of the "wireless transceiver" is to transmit electrocardiographic signals. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) ("[T]he context in which a term is used in the asserted claim can be highly instructive" in claim construction.).

Bardy argues the specification discusses data types other than electrocardiography signals, such as "heart rate, temperature, blood pressure, . . . movement, sleep, footsteps, . . . calories burned or estimated blood glucose level." (*Supra* Section III.A.2.a.(1); '473 patent at 8:3-10.) But the claims singularly focus on sensing, processing, and communicating *electrocardiographic* signals, not these other data types. *See Apple*, 949 F.3d at 708 ("When the patent describes multiple embodiments, every claim does not need to cover every embodiment."). In any event, iRhythm's proposed construction ("component that transmits electrocardiographic signals wirelessly") does not preclude transmission of additional types of data by the wireless transceiver.

Bardy argues that independent claim 15 of the '562 patent recites "a wireless transceiver configured to communicate at least a portion of the electrocardiographic signals," while other

independent claims do not recite such communication. (*Supra* Section III.A.2.a.) But claim differentiation is "only an aid to interpretation and [is] not conclusive." *Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008). It is "not a hard and fast rule and will be overcome by a contrary construction dictated by the written description." *Id.* For example, in *Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*, the court construed "communications path" in an independent claim to be wired communications only, even though the dependent claims expressly recited wired communications, because the intrinsic evidence supported that understanding. 824 F.3d 999, 1003-04 (Fed. Cir. 2016). Here, similarly, the recitation in a single element of claim 15 that the wireless transceiver transmit electrocardiographic signals does overcome the clear indication in other claims, and in the specification, that it is electrocardiographic signals that the wireless transceiver must transmit, and that such signals are the only types of data mentioned elsewhere in the claims capable of wireless transmission.[20]

**c. Bardy's Reply Position**

iRhythm does not provide any basis to deviate from the plain and ordinary meaning of the term "wireless transceiver." In its response, iRhythm poses two questions it believes are dispositive to determining the meaning of "wireless transceiver": (1) whether the claim term "wireless transceiver" must actually transmit or need only be capable of it, and (2) what the

[20] Claim differentiation does not apply also because claim 15 is not otherwise identical to other claims. "[T]hat the claims are presumed to differ in scope does not mean that every limitation must be distinguished from its counterpart in another claim, but only that at least one limitation must differ." *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000). Thus, the "wireless transceiver" limitation in claim 15 does not need to be distinguished from counterpart "wireless transceiver" limitations in other claims. Instead, claim 15 recites other unique claim limitations. (*See* '562 patent, cl. 15 ("a button disposed on the top surface of the sealed housing" and "a battery disposed between the processor and the skin").)

transceiver must transmit. The answer to both of these questions favors Bardy's proposed plain and ordinary construction.

Some claims simply recite a wireless transceiver (Ex. A, cls. 1, 8). Other claims require the wireless transceiver to communicate at least a portion of the electrocardiographic signals (Ex. A, cl. 15). The plain language of the claims and the differences between the claims support a construction wherein the "wireless transceiver" is only capable of communicating "without requiring that any [wireless transceiver] components be 'active' or 'enabled.'" *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010). The Federal Circuit has made clear that "to infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating' in the described mode." *Id.* at 1204–05. The '562 and '473 Patent claims are non-method, apparatus claims, "which do not require the performance of any method steps." *Id.* The mere existence of a wireless transceiver that is capable of wireless transmission is the correct construction. This is confirmed by dependent claims that actually require wireless transmission. *See, e.g.*, Ex. A, cl. 3 (reciting further requirements of the wireless transceiver such that it is configured to communicate with an external device via various wireless protocols); Ex. B ('473 Patent), cl. 3 (same).

This Court has also confirmed that claim language reciting components that may be configured to perform certain functions describes a capability, not active operation. I*n TQ Delta, LLC v. 2Wire, Inc.*, the court considered claim language reciting an apparatus and a transceiver configured to perform specific functions. Civ. A. No. 13-1835-RGA, 2021 WL 2649739, at *5 (D. Del. June 18, 2021). The court concluded that "nothing in the claim language here indicates that the functions of the apparatus or transceiver provided in the source code need to be "active" in order to meet the claim limitation, because the invention can perform the recited functionality

without rewriting the code." *Id.* Like the claims in *TQ Delta*, the independent claims of the '473 and '562 Patents (*i.e.*, claims 1, 8, and 15) do not require a wireless transmitter to perform the process of transmitting data.

Regarding the second question iRhythm poses, "what [the wireless transceiver] must transmit," Bardy disagrees that the wireless transceiver is limited to transmitting at least electrocardiographic signals. First, the claims themselves do not require any specific information to be transmitted wirelessly (with the exception of Claim 15 of the '562 Patent). Second, the specification of the '562 and '473 Patents disclose a wireless transceiver that is capable of transmitting electrocardiographic signals ***or*** several other types of data, without requiring the transmission of electrocardiographic signals. Ex. A, 12:33-35 (disclosing a wireless transceiver that can provide wireless capabilities generally); 8:43-49 ("which could either provide data or other information to, or receive data or other information from an interfacing device"); Ex. B, 8:43-49, 12:33-35 (same). iRhythm's proposed construction is also untenable given that, for example, independent Claim 15 of the '562 Patent specification narrows and requires the claimed "wireless transceiver" to "communicate" at least a portion of the electrocardiographic signals. *Compare* Ex. A, cl. 15, *with* Ex. A, cls. 1, 8; *see, e.g.*, *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so." (citing *Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (construing claim to avoid rendering 30 degree claim limitation superfluous))); *see also Gen. Am. Transp. Corp. v. Cryo–Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (rejecting district court's claim construction because it rendered superfluous the claim requirement for openings adjacent to the end walls).

iRhythm's non-infringement-driven construction, which attempts to insert unclaimed subject matter into the claims, should be rejected. Instead, the Court should adopt Bardy's plain and ordinary meaning of a wireless transceiver: "a component that can transmit wirelessly."

**d. iRhythm's Sur-Reply Position**

Bardy does not dispute that the specification consistently describes the wireless transceiver as a component that actually transmits data. Indeed, Bardy does not cite a single example in the specification where the wireless transceiver is an idle component that does not perform any function. The ECG monitoring devices described in the specification are only useful if the ECG data collected by the sensors are transmitted to the outside for processing. And because the claims recite a wireless transceiver instead of a wired one, such data must be transmitted wirelessly.

Bardy cites *Finjan* and *TQ Delta* for the position that the claims recite "capability and not actual operation." (*Supra* Section III.A.2.c.) Those cases involved the question whether software components needed to be active to infringe and found infringement because the code for the claimed software functionalities existed in the accused products and could be easily enabled with a "key" or a "message." *Finjan*, 626 F.3d at 1203-05; *TQ Delta*, 2021 WL 2649739, at *4-6. That is not the question here. Here, the question is how to properly construe a claim term that indisputably relates to hardware. On that question, courts have construed "transceiver" as a component that actually performs transmission. *See, e.g.*, *Sensormatic Elecs. Corp. v. WG Sec. Prods., Inc.*, No. 04-CV-167, 2005 WL 6218781, at *7 (E.D. Tex. Nov. 22, 2005) (construing "transceiver" as "a device which performs both transmitting and receiving functions").

Bardy then repeats its previous argument that the specification discloses transmission of data types other than electrocardiographic signals. (*Supra* Section III.A.2.c.) But as iRhythm has explained, each claim is focused on sensing, processing, and transmitting *electrocardiographic signals*, and nothing else. Thus, the only purpose of the "wireless transceiver" *in the claims* is to

transmit electrocardiographic signals. In addition, iRhythm's proposed construction does not exclude transmission of other types of data.

Bardy makes two claim differentiation arguments based on (1) dependent claims 3 of the '473 and '562 patents and (2) independent claim 15 of the '562 patent. (*Id.*) Dependent claim 3 is narrower than the respective claim 1 not because it requires actual transmission, but because it limits the transmission protocols to "Wi-Fi, mobile phone communication standards, or Bluetooth." ('473 patent, cl. 3; '562 patent, cl. 3.) As to claim 15 of the '562 patent, it simply states the wireless transmission requirement more explicitly than the other claims. Bardy does not address *Ruckus Wireless* which construed "communications path" in an independent claim to be wired communications only, even though the dependent claims explicitly recited wired communications. 824 F.3d at 1003-04.

Bardy cites *Elekta* and *General American* to argue that constructions rendering limitations "superfluous" are disfavored. But both *Elekta* and *General America* started with the plain meanings of the claim language, and used claim differentiation only to confirm those understandings. *Elekta*, 214 F.3d at 1307; *Gen. Am.*, 93 F.3d at 770. When the plain meaning is clear, as is the case here, claim differentiation is "not a hard and fast rule." *Regents of Univ. of Cal.*, 517 F.3d at 1375.

### 3. Term 3: "vertically aligned"

| **"vertically aligned"<br>('473 Patent, cls. 1, 15, 20, 23; '562 Patent, cls. 9, 14, 20, 23, 28)** | |
|---|---|
| **Bardy's Construction** | **iRhythm's Construction** |
| Plain and ordinary meaning | aligned along a patient's sternal midline when worn |

**a. Bardy's Opening Position**

The Court should apply the plain and ordinary meaning to "vertically aligned," which has no relation to being "aligned along a patient's sternal midline when worn" as Defendant proposes. Instead, the plain language of the claims and corresponding detailed description confirm that "vertically aligned" is used to describe the relationship between components on the device, not placement of the device itself vis-à-vis a user's skeletal structure. Defendant again fails to establish either exception to the general rule that claims are given their plain and ordinary meaning. *See Thorner*, 669 F.3d at 1365.

A POSITA would have understood that "vertically aligned" refers to the components on the device as reflected in the plain language of the claims. Claim 7 of the '562 Patent recites an electrocardiography monitoring device, "wherein ***the battery*** is vertically aligned with ***the wireless transceiver***." Ex. A, cl. 7. Likewise, Claim 9 of the '562 Patent recites an electrocardiography monitoring device, "wherein ***the battery*** is vertically aligned with ***the sealed housing***." Ex. A, cl. 9. These two examples are representative of every instance that "vertically aligned" is used in the claims. *See, e.g.*, Ex. A, cls. 20, 21, 23; *see also* Ex. B, cls. 1, 7, 9. The plain language of "vertically aligned" does not require, and is irrespective of, the position of the monitoring device on the patient. Based on the claim language alone, no person of ordinary skill in the art would have understood "vertically aligned" to include the unclaimed limitation of the "patient's sternal midline" that Defendant advances with its construction.

The figures of the '562 Patent confirm the plain and ordinary meaning of "vertically aligned" as referring to the components of the device, regardless of whether the device is being worn by a patient. Referring to Figure 6, electrode patch 15 includes a battery is contained within battery compartment 36, which "is formed on the bottom surface of the non-conductive receptacle 25." Ex. A, 10:37-42, Figure 6 (reproduced and annotated below). Monitor recorder 14 of Figure

7, which can include a wireless transceiver, engages non-conductive receptable 25 of electrode patch 15. Based on the structure depicted in Figures 6 and 7, for example, a POSITA would have understood, as recited by the claims, that when engage (1) the battery is vertically aligned with the wireless transceiver and (2) the battery is vertically aligned with the sealed housing.




Figure 6




Figure 7




Figure 4

Defendant cannot overcome the plain and ordinary meaning of the claim language by identifying a singular embodiment in the specification describing the ***placement*** of the device on the body, when such a limitation is not claimed. In this one embodiment, the specification states that the "wearable monitor sits centrally (in the midline) on the patient's chest along the sternum." Ex. B, 4:12-14; *see also* Ex. B, Figure 2. But this does not describe the claimed vertical alignment, nor does it redefine the plain and ordinary meaning of vertical alignment to somehow be in relation to the unclaimed sternal midline.

The specification's description of the placement of the device on the patient is unrelated to the claim term (*i.e.*, vertically aligned) that Defendant is construing. In other words, Defendant is attempting to use the placement of the ***device*** on the body to insert unclaimed elements and restrict

the positions of the ***components*** in relation to each other, when such a physical orientation is unclaimed. Again, the claims recite "vertically aligned" to describe the position of the battery in relation to either the transceiver or housing. Ex. A, cl. 7 (reciting, "wherein the battery is vertically aligned with the wireless transceiver"), cl. 9 (reciting, "wherein the battery is vertically aligned with the sealed housing").

Even if this disclosure is considered, Defendant's proposed construction excludes embodiments in the specification because the device as claimed is not required to be "aligned along a patient's sternal midline when worn." Instead, the '562 Patent states that the device can be placed "***anywhere*** within the general region of the sternum." Ex. A, 10:5-7; *see also,* Ex. B, 4:21-23 ("[T]he patient is free to place an electrode patch ***anywhere within the general region*** of the sternum."). In another example, the '562 Patent states the device can be placed "in a location at the sternal midline 16 (or immediately to ***either side*** of the sternum 13"). Ex. A, 6:32-34. Defendant's construction excludes the embodiment where the monitor is placed "immediately to either side of the sternum 13." Such a read is disfavored. *See SimpleAir, v. Sony*, 820 F.3d at 429.

In sum, Defendant's proposed construction (1) adds unclaimed limitations related to device placement to restrict position of the components and (2) excludes embodiments disclosed in the specification. Thus, the Court should apply the plain and ordinary meaning and reject Defendant's attempt to limit the term "vertically aligned."

**b. iRhythm's Answering Position**

The claims require that the battery is "vertically aligned" with a sealed housing and "vertically aligned" with the wireless transceiver. ('473 patent, cls. 1, 15, 20, 23; '562 patent, cls. 9, 14, 20, 23, 28.) Bardy proposes plain and ordinary meaning for this term, but "vertically" has no meaning without an orientation. New Oxford American Dictionary defines "vertical" as "at right angles to a horizontal plane" or "in a direction . . . such that the top is directly above the

bottom." Ex. 2, *New Oxford American Dictionary* (3d. ed. 2010) at 1923; *see also Lo v. Microsoft Corp.*, No. 2:07-CV-322, 2009 WL 2960427, at *6 (E.D. Tex. June 11, 2009) (construing "vertical" to mean "straight up, which is 90 degrees from horizontal"). The term "vertically aligned" requires knowledge of the orientation so that "vertically" may be understood. Without reference to the orientation of the device, "vertically" can mean any of the x, y, z axes as shown below, or anything in between.

Fig. 4.




('473 patent at Fig. 4 (annotation added).) In other words, without an orientation, "vertical" would have more than one possible meaning:







(*Id.* (annotation added).) Therefore, the court must define "vertically aligned" to avoid confusion to the jury. *See Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009) ("[T]he court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury.")

iRhythm proposes that the orientation of "vertical" be understood with reference to a patient's sternal midline when the device is worn, because it is consistent with the disclosure in the specification. First, although the specification does not use or define the word "vertical" or "vertically," these terms are consistently understood to mean a top-to-bottom direction. *See, e.g.*, Ex. 2, *New Oxford American Dictionary* (3d. ed. 2010) at 1923 ("in a direction . . . such that the top is directly above the bottom"). Figures 1 and 2 depict the vertical (top-to-bottom) orientation—along a patient's sternal midline. The specification further confirms that the direction along the sternal midline is the vertical (top-to-bottom) orientation: "wearable monitor 12 sits centrally (in the midline) on the patient's chest along the sternum 13 oriented *top-to-bottom*." ('473 patent at

6:16-19 (emphasis added); *see also id.* at 6:32-39 ("The placement of the wearable monitor in a location at the sternal midline").)

Fig. 1.




Fig. 2.




(*Id.* at Figs. 1, 2 (annotation added).)

Defining "vertically" this way is consistent with the claim requirement "a battery vertically aligned with a sealed housing." Figure 6 of the specification shows the location of the "battery compartment 36" before the sealed housing is installed. (*Id.* at 10:20-42.)




(*Id.* at Fig. 6 (annotation added).) When installing the sealed housing, with the help of the cavity 58 in the housing (shown on the left), the battery is aligned with the sealed housing along the

longitudinal axis of the device (the direction along a patient's sternal midline when worn), so that they do not move sideways with respect to each other:




(*Id.* at Figs. 4, 7 (annotation added).)[21]

Moreover, using the device's placement on the patient's body to define "vertically" is appropriate because device placement is central to the alleged invention. *See Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346, 1352 (Fed. Cir. 2020) ("A patent's statement of the described invention's purpose informs the proper construction of claim terms."). Placing the device electrodes in proximity to the heart is necessary for measuring electrocardiographic signals. (*See* '473 patent at 6:8-49.) The specification emphasizes the importance of placing the device along the sternal midline: "The placement of the wearable monitor 12 in a location at the sternal midline 16 . . . significantly improves the ability of the wearable monitor 12 to cutaneously sense cardiac electric signals . . . while simultaneously facilitating comfortable long-term wear for many weeks." (*Id.* at 6:32-39.)

---

[21] The specification does not disclose how the battery is "vertically aligned" with the *wireless transceiver* as recited in other claims. But "vertically aligned" should have the same meaning in the context of aligning the battery with the transceiver. *See In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016) ("the same phrase in different claims of the same patent should have the same meaning").

Bardy argues that the claim does not require placement of the device on a user's body, asserting that the "vertically aligned" claim language only describes the "relationship between components" of the device. (*Supra* Section III.A.3.a.) iRhythm's proposed construction does not add any placement requirement to the claim. Instead, the construction "aligned along a patient's sternal midline when worn" simply clarifies how the components are aligned "*when*" the device is worn, and the construction can be readily understood even when a device is placed on a table since user instructions will explain how to place the device on the body. This construction is necessary to give meaning to the "relationship between components" because the word "vertically" itself does not indicate an orientation, as discussed above.

Bardy also argues that the specification does not require strict alignment with the sternal midline. (*Id.* (citing the specification's discussions of "general region of the sternum" and "immediately to *either side* of the sternum").) But the patents' stated goal is to "minimize the side-to-side movement of the wearable monitor 12 in the left- and right-handed directions during wear." ('473 patent at 10:62-66.) Even if the device moves slightly to the left or right, the alignment of the components (*e.g.*, the battery with respect to the housing) does not change—they are still aligned along a patient's sternal midline.

By proposing the plain and ordinary meaning, Bardy eliminates the word "vertically" from the claim and improperly broadens the claim scope to cover any alignment regardless of the orientation. Bardy asserts that "a POSITA would have understood" the meaning of "vertically aligned" from Figures 6 and 7. (*Supra* Section III.A.3.a.) But Figures 6 and 7 do not show any vertical direction, and the jury would not be able to discern the vertical direction simply from looking at the figures. Thus, the Court should construe "vertically aligned" as "aligned along a patient's sternal midline when worn."

#### c. Bardy's Reply Position

iRhythm does not provide any basis to deviate from the plain and ordinary meaning of the term "vertically aligned." Rather, iRhythm's proposed construction improperly rewrites "vertically aligned" to depend on how the device is worn, rather than on how its components are arranged. The claim language itself, which recites that the battery is "vertically aligned with" the housing and with the wireless transceiver, describes how those components are arranged relative to one another, not how the device sits on a person. Nothing in the claims or specification places an anatomical limitation on the placement of the claimed internal components, and a person of ordinary skill in the art would understand that "vertically aligned" means that the claimed components share a common vertical axis, such that they are stacked or arranged one above the other, not positioned side-by-side on the same horizontal plane.

The battery, transceiver, and sealed housing are aligned on the vertical axis relative one another and that relationship remains constant regardless of how the device is later positioned. iRhythm attempts to soften its non-infringement driven construction by asserting that its proposed construction "does not add any placement requirement to the claim[,]" but rather "clarifies how the components are aligned '*when*' the device is worn." *Supra* Section III.A.3.b (emphasis in original). That purported "clarification" is entirely divorced from iRhythm's proposal, which expressly adds a limitation regarding the wearing of the device.

iRhythm's reference to supposed "user instructions" is both unsupported and irrelevant. iRhythm does not identify any actual instruction, document, or evidence showing that a user is told to orient the device in any particular way. This vague reference to "user instructions" is not part of the record and cannot inform the meaning of "vertically aligned." Claim construction must be based on the claims, specification, and prosecution history—not on speculative extrinsic materials that have not been identified. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-15 (Fed. Cir.

2005). Even if such instructions existed and were tied to the claims, they would merely describe how a user might wear a device, not redefine the claimed structural relationship between its internal components. iRhythm's proposal should be rejected and the plain meaning of the term governs.

iRhythm further contends that because the specification provides one benefit of ***one embodiment*** of the claimed device (i.e., to "minimize the side-to-side movement of the wearable monitor 12 in the left- and right-handed directions during wear" (*see* Ex. B, 10:62-66)), the term "vertically aligned" must be construed to require that the device be aligned along a patient's sternal midline when worn." This is unduly limiting. The cited passage identifies a ***goal*** of the embodiment, not a limitation of the claims. The specification explains that the monitor can be placed "anywhere within the general region of the sternum" and even "immediately to either side of the sternum," confirming that the invention is not restricted to perfect alignment along the midline as iRhythm's proposed construction requires. Ex. A, 4:21-23, 6:32-34, 10:5-7. A stated purpose cannot narrow otherwise clear claim language. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012) ("We do not read limitations from the specification into claims; we do not redefine words.").

The claims describe a fixed, structural relationship between components, not a conditional orientation that varies with context. iRhythm's proposed construction improperly adds unclaimed limitations and is nothing more than a not-so-subtle attempt to secure a non-infringement position.

#### d. iRhythm's Sur-Reply Position

Bardy repeatedly states that the "vertically aligned" term describes "how [the] components are arranged relative to one another," (*supra* Section III.A.3.c.) but it tellingly never explains what "vertically aligned" actually means for the components recited in the claims. Bardy's broad assertion that the components only need to "share ***a*** common vertical axis" (*id.*) demonstrates the very problem here—it does not explain *which* vertical axis that is, as there are multiple possible

vertical axes (as shown below). Nor does it explain what it means to "share" an axis. Bardy asks the Court to leave this claim construction issue unresolved. But it is the Court that construes the claims, not the parties' experts or the jury. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).




As iRhythm has explained, only the vertical direction shown on the right above is consistent with the intrinsic evidence. The claim requirement "a battery vertically aligned with a sealed housing" makes sense with this understanding of the vertical direction, as shown below. The battery and the housing, however, are *misaligned* in the direction perpendicular to the chest of the patient.



Bardy argues that iRhythm's construction "adds a limitation regarding the wearing of the device." (*Supra* Section III.A.3.c.) It does not. iRhythm's construction uses the body of the patient only as a reference point for the vertical direction and does not require actual wearing of the device. Courts routinely use such external reference points to define terms. *See, e.g.*, *Rackable Sys., Inc. v. Super Micro Comput., Inc.*, No. 05-CV-3561 PJH, 2006 WL 3065577, at *6 (N.D. Cal. Oct. 27, 2006) (construing "front" as "a panel designed to face forward *when placed in a rack*," explaining that there must be some "objective anchor" for understanding the claim scope) (emphasis added); *Julius Zorn, Inc. v. Medi Mfg., Inc.*, No. 15-CV-02734-GPC-RBB, 2017 WL 960413, at *9 (S.D. Cal. Mar. 13, 2017) (construing "flat central region" as "a central region . . . that is level *when laid out*") (emphasis added).

iRhythm explained that "the construction can be readily understood even when a device is placed on a table since user instructions will explain how to place the device on the body." (*Supra* Section III.A.3.b.) Bardy's complaint that user instructions are not part of the record misses the point. (*Supra* Section III.A.3.c.) iRhythm simply explained that with its proposed construction, one can ascertain the arrangement of components even without actual wearing of the device. In any event, the specification repeatedly provides instructions as to how the device is worn. ('473 patent at Figs. 1, 2, 4:14-20 ("The placement of the wearable monitor in a location at the sternal midline . . ."), 6:32-39 ("The placement of the wearable monitor 12 in a location at the sternal midline 16 . . ."), 9:67-10:5, 10:62-66.) iRhythm's claim construction is consistent with the specification's instructions.

Finally, while the specification does not require "perfect alignment along the midline" (*supra* Section III.A.3.c.), that does not undermine the importance of the sternal midline as the reference point to define the vertical direction. Again, the only way that the specification defines

the vertical direction is by referencing the sternal midline in Figures 1 and 2. Construing "vertically aligned" using the sternal midline is thus appropriate.

#### 4. Term 4: "removably secured"

| "removably secured"<br>('261 Patent, cls. 1, 10) | |
|---|---|
| **Bardy's Construction** | **iRhythm's Construction** |
| Plain and ordinary meaning, i.e., secured such that it may be removed | secured such that it may be removed without destruction |

##### a. Bardy's Opening Position

The parties agree that a POSITA would have understood "removably secured" to mean "secured such that it may be removed." However, Defendant's addition of the two-word phrase "without destruction" improperly limits the claim scope by importing features that are neither claimed nor contemplated by the intrinsic evidence. Defendant cannot articulate any basis to deviate from the plain and ordinary meaning, nor have they identified any support in the specification or prosecution history for their unduly limiting proposal. Thus, this claim term should be given its plain and ordinary meaning (*i.e.*, secured such that it may be removed).

The '261 Patent only uses "removable secured" in one claim limitation: "a receptacle affixed to a non-contacting surface of the flexible backing into which the wearable housing can be ***removably secured***." Ex. C ('261 Patent), cl. 1; *see also* Ex. C, cl. 10 (reciting "a receptacle affixed to a non-contacting surface of the flexible backing into which the wearable housing can be removably secured"). Consistent with this language, the specification states that the monitor recorder "removably snaps into a receptacle on the electrode patch." Ex. C, 4:57-63. Neither the claims nor the specification describe or even disclose "without destruction" as Defendant advances here, and the aforementioned "snapping" would encompass both snapping that requires an element of breaking and snapping that does not.

To the extent that Defendant relies on the specification's disclosure of "reusable," another unclaimed limitation, this approach also fails. The specification states that "monitor recorder 14 removably and reusably snaps into an electrically non-conductive receptacle 25 during use." Ex. C, 11:44-54. Not only is "reuseable" unique from the Defendant's construction of "without destruction," but also, a POSITA would have understood "removable" to be a completely different concept from "reuseable."

In an illustrative example, the '261 Patent discloses an electrode patch. *See, e.g.*, Ex. C, Figure 6 (illustrating electrode patch 15). The electrode patch ***is removable*** from the patient's skin. Ex. C, 12:29-36 ("[T]he worn out electrode patch 15 is removed from the skin, [and] a new electrode patch 15 is adhered to the skin."), 11:36-40 ("[T]abs 24 can respectively extend an additional 8 mm to 12 mm beyond the distal and proximal ends of the flexible backing 20 to facilitate with adhering the electrode patch 15 to or removing the electrode patch 15 from the sternum 13."). However, the electrode patch is ***not reuseable***—the electrode patch is disposable. Ex. C, 12:9 ("The electrode patch 15 is intended to be disposable."), 16:31-33. This example shows that the '261 Patent independently uses "removable" from "reuseable." Any potential use of "reusable" in the specification to describe the device to limit the claim term of "removably" should be ignored.

The Court should apply the plain and ordinary meaning and construe "removably secured" to mean "secured such that it may be removed," consistent with the plain and ordinary meaning of this phrase.

**b. iRhythm's Answering Position**

Claims 1 and 10 of the '261 patent each recite "a receptacle . . . into which the wearable housing can be removably secured." For example, Figure 4 shows a "receptacle 25" with a "retention catch 26." ('473 patent at 9:37-41.) And Figure 5 shows a corresponding "retention

detent 53" of the wearable housing. (*Id.* at 9:58-62.) Thus, the housing can be "snapped" into the receptacle and "unsnapped" from the receptacle in a non-destructive manner. (*Id.* at 9:28-29, 10:12-19.)

Fig. 4.




Fig. 5.




(*Id.* at Figs. 4, 5 (annotation added).)

Bardy asserts that "removably secured" allows destruction. (*Supra* Section III.A.4.a.) But the plain and ordinary meaning of "removable" is that something can be taken off without breaking it. Otherwise "anything can be removed if one is willing to destroy the device to remove it." *Neonatal Prod. Grp., Inc. v. Shields*, No. 13-2601-DDC-KGS, 2016 WL 1746788, at *9 (D. Kan. May 3, 2016) ("destruction is not contemplated by the patent's language" of "removable"). Indeed, the Federal Circuit has applied this ordinary meaning to rule that "removably secured" in the context of car seats means the "seat and base can be separated" "such that the seat *remains functional*." *Dorel Juv. Grp., Inc. v. Graco Child.'s Prods., Inc.*, 429 F.3d 1043, 1046 (Fed. Cir. 2005) (emphasis added).

The specification consistently describes the interaction between the "removably secured" components of the claims (the housing of the monitor recorder and its receptacle) as non-destructive—specifically, a snapping/unsnapping relationship. It states that "the monitor recorder

14 is *securely received* into the non-conductive receptacle 25, that is, *snapped into place* . . ." ('473 patent at 10:29-31 (emphasis added).) After one use, the "monitor recorder 14 is *merely unsnapped* from a worn out electrode patch 15 . . . and the same monitor recorder 14 is snapped into the new electrode patch 15 to reinitiate and continue the ECG monitoring."). (*Id.* at 10:12-19 (emphasis added).) The specification describes this interaction as one where "[t]he monitor recorder 14 *removably and reusably* snaps into an electrically non-conductive receptacle 25 during use." (*Id.* at 9:28-29 (emphasis added).)

Moreover, "[a] patent's statement of the described invention's purpose informs the proper construction of claim terms." *Kaken*, 952 F.3d at 1352. The specification here repeatedly emphasizes the importance of making the wearable housing reusable. ('473 patent at 6:57-62 ("The monitor recorder 14 is a reusable component that can be fitted during patient monitoring into a non-conductive receptacle . . . and later removed for offloading of stored ECG data or to receive revised programming."), 9:64-67 ("The electrode patch 15 is intended to be disposable. The monitor recorder 14, however, is reusable and can be transferred to successive electrode patches 15 to ensure continuity of monitoring.").) It would defeat the patent's purpose of reusing the monitor recorder if it is destroyed upon removal from the receptacle.

Bardy argues that "removable" is different from "reusable." (*Supra* Section III.A.4.a.) But "removable" is non-destructive whether one reuses it or not. Indeed, in Bardy's electrode patch example (*id.*), the electrode patch is not destroyed after removal, even though there is no intention to reuse it. (*See* '473 patent at 10:12-19.)

Thus, the Court should construe "removably secured" as "secured such that it may be removed without destruction."

### c. Bardy's Reply Position

iRhythm does not provide any basis to deviate from the plain and ordinary meaning of the term "removably secured." iRhythm fails to identify any support in the specification or claims for the concept "without destruction." As a result, iRhythm attempts to reframe the issue and shift the burden onto Bardy to prove the plain and ordinary meaning. The Court should ignore this improper approach. iRhythm also relies on the specification's disclosure of "reusable" to limit this term. But this feature is not claimed and should not be imported into the claims.

iRhythm improperly shifts the burden by arguing that "Bardy asserts that 'removably secured' allows destruction." The general rule is that claims are given their plain and ordinary meaning, and removably secured, in this dispute, provides no reason to deviate.

iRhythm's proposed construction inserts "without destruction"—a concept that is completely absent from the '261 Patent claims and specification. Bardy highlighted this issue in its opening brief and iRhythm fails to identify any responsive evidence.

iRhythm does respond that the '261 Patent "emphasizes the importance of making the wearable housing reusable." However, as iRhythm cites, a "patent's statement of the described invention's purpose informs the proper construction ***of claim terms***." *Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346, 1352 (Fed. Cir. 2020). The term "reusable" is not claimed. In essence, iRhythm's proposed construction limits "removably" to include "without destruction" and attempts to capture an unclaimed limitation.

"Removably" and "without destruction" are distinct concepts that the '261 Patents uses differently throughout the specification. *Compare* Ex. C ('261 Patent), 11:36-40 (describing the removable electrode, which is not reuseable), *with* Ex. C, 4:57-63 (describing the removable monitor recorder, which is reuseable). While Bardy detailed this difference, iRhythm responds that "'removable' is non-destructive whether one reuses it or not" and the "electrode patch is not

destroyed." *See Supra* Section III.A.4.b. These are unsupported conclusions divorced from the specification. The specification is silent on whether the electrode patch is destroyed during removal, and iRhythm does not dispute Bardy's original point—"removable" is a distinct concept from "reusable," and "reusable" is not claimed.

iRhythm's reliance on a non-binding District of Kansas case is unavailing. Even if relevant, *Neonatal Product Group, Inc. v. Shields*, No. 13-2601-DDC-KGS, 2016 WL 1746788 (D. Kan. May 3, 2016) is inapplicable. There, "the Court decline[d] to include the remaining portion of plaintiff's proposed construction because the words 'as part of ordinary use' ***lack support in the patent's language***." *Id.* at *10. iRhythm does the same here. Its proposed construction adds "without destruction," which lacks support in the patent's language. Ultimately, the court held "removable" to mean "designed to be removed," which aligns with Bardy's proposal, not iRhythm's improperly limiting construction that includes "without destruction." *Id.* at *9.

**d. iRhythm's Sur-Reply Position**

Bardy does not address the Federal Circuit's construction of the same term "removably secured" to require that the components "remain[] functional." *Dorel*, 429 F.3d at 1046. The construction in *Dorel* makes sense because the plain meaning of "removable" does not contemplate destruction. *Neonatal*, 2016 WL 1746788, at *9. Contrary to Bardy's assertion that Rhythm "fails to identify any support in the specification . . . for the concept 'without destruction,'" iRhythm explained that the specification's repeated reference to non-destructive snapping and unsnapping is consistent with the plain meaning of "removably secured." (*Supra* Section III.A.4.b.)

Bardy argues that iRhythm inserts the "without destruction" concept and "shifts the burden" onto Bardy to prove the plain and ordinary meaning. (*Supra* Section III.A.4.c.) To the contrary, it is Bardy's proposal (which allows destruction during removal) that deviates from the

plain meaning. iRhythm's construction simply follows the default rule of giving the term its plain and ordinary meaning.

Bardy concedes that a "statement of the described invention's purpose" is relevant to claim construction, *Kaken*, 952 F.3d at 1352, but argues that the specification uses "reusable" instead of the claim term "removably." (*Supra* Section III.A.4.c.) The law, however, does not require that the patent's statement of purpose use the exact claim term. Indeed, in *Kaken*, the Federal Circuit used the specification's discussion of penetrating a nail plate—a concept not expressly claimed—to inform the construction of the claim term "treating a subject having onychomycosis." 952 F.3d at 1350-52. Here, the specification's discussion of reusability—the opposite of allowing destruction—reinforces the plain meaning of "removably" which precludes destruction. (*See supra* Section III.A.4.b.)[22]

Bardy's attempt to distinguish *Neonatal* misses the point. It does not dispute the reasoning in *Neonatal* that "removable" would be meaningless if "destroy[ing] the device to remove it" is allowed. 2016 WL 1746788, at *9. While the court in *Neonatal* declined to add an additional requirement "as part of ordinary use" to the claim construction, *id.*, that phrase is not part of iRhythm's proposed claim construction here.

[22] Bardy also argues that "removable" and "without destruction" are distinct concepts in the specification. (*Supra* Section III.A.4.c.) But Bardy does not point to a single example where the removed component (whether it is the electrode or the monitor recorder) is destroyed as a result of removal.

### 5. Term 5: "distal" / "proximal"[23,24]

| "distal" / "proximal"<br>('735 Patent, cls. 1, 11) | |
|---|---|
| **Bardy's Construction** | **iRhythm's Construction** |
| Plain and ordinary meaning | Indefinite, but in the alternative, "distal and proximal relative to the housing" |

#### a. Bardy's Opening Position

##### (1) "distal"

There is nothing ambiguous about the term "distal." The claim language and the overwhelming amount of intrinsic evidence inform those skilled in the art about the scope of the invention. *See, e.g.*, *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014) (holding patents indefinite only when the "claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention"). In view of such evidence, Defendant cannot meet its clear and convincing burden of proof that the claim term "distal" is indefinite. Therefore, this Court should reject Defendant's arguments and hold that "distal" is not indefinite and apply the plain and ordinary meaning.

---

[23] Bardy contends that "distal" and "proximal" are two distinct terms and cannot reasonably be construed as a single claim term with identical constructions. Accordingly, for purposes of counting the number of claim terms in dispute in this Joint Claim Construction Brief, Bardy's position is that iRhythm has also proposed 6 terms for construction. The parties were unable to reach agreement on this point during the meet and confer process.

[24] iRhythm believes that "distal" and "proximal" are two related terms that present a common claim construction issue. Claim 1 of the '735 Patent recites "a distal electrocardiography electrode" and "a proximal electrocardiography electrode." iRhythm contends that the "distal" and "proximal" terms rise and fall together, and are indefinite for the same reason. Even if they are not indefinite, a construction of "distal and proximal relative to the housing" would provide clarification for both terms. Indeed, Bardy itself is grouping allegedly similar terms together and referring to those terms as "The Extending From Terms," referenced as Terms 7(a)-7(c) above.

### (a) "distal" is not indefinite

The claims of the '735 Patent recite "a ***distal*** electrocardiography electrode coupled to a ***distal*** end of a flexible circuit." Ex. D ('735 Patent), cl. 1. Here, a POSITA would have readily understood that "distal" is simply used to identify the electrode at a specific (*i.e.*, one) end of the electrocardiography monitor. The use and meaning of "distal" makes sense because the '735 Patent claims more than one electrode and more than one end of the flexible circuit. *See,* Ex. D. ***Without*** using descriptive terms, such as "distal," a POSITA would not have been able to discern which electrode the claims are referring to; the term "distal" is synonymous with "a first" (whereas the other electrode, or proximal electrode, is synonymous with "a second electrode").

When viewed in the context of the specification, which matches the plain claim language, the plain meaning of "distal" becomes even more clear. The '735 Patent first uses "distal" to identify the "distal end of the electrode patch." Ex. D, 5:63-66. The specification then consistently uses this term to reference one end of the device. For example, the adhesive may be provided "only on the ***distal end 30*** and the proximal end 31" of the flexible backing. Ex. D, 8:27-32; *see also* Ex. D, Figure 5 (reproduced below, identifying the distal end 30 of the flexible backing 15).




Ex. D, Figure 5 (annotated).

In another example, the ’735 Patent states that the “***distal ECG electrode 38*** and proximal ECG electrode 39 are respectively coupled to the distal and proximal ends of the flexible circuit 32.” Ex. D, 8:45-48. Again, this description algins with the Figures and the claims and informs those skilled in the art of the scope of the invention. Figure 7 shows distal ECG electrode 38 that is coupled to the distal end of flexible circuit 32. Ex. D; *see* Ex. D, Figure 7 (reproduced below, identifying the ECG electrode 38 on the distal end of the flexible backing). The intrinsic evidence shows that “distal” is not indefinite and that “distal” is used to identify an end or an electrode.




Ex. D, Figure 7 (annotated).

Undermining Defendant’s position, Defendant itself is well aware of the use of this term, as it uses “distal” the same way in its own patents. For example, Defendant describes an embodiment as having “support layer 202 [that] is anchored to the subject’s skin by both the proximal portion of adhesive 240 and the ***distal*** portion of adhesive 240.” Ex. E (U.S. Patent Pub. No. 2022/0039719), [0136]. Just as Bardy does, Defendant uses “distal” to identify a first portion of the device separate from a second, different portion. As evident from its own patents, Defendant, and the industry as a whole, know what the term “distal” means.

The claim language in combination with the detailed description go far beyond informing those skilled in the art with reasonable certainty. Rather, “distal” is unmistakably used to describe one end of the device. For these reasons, Defendant cannot meet its burden of establishing “distal” as indefinite under the high bar of its clear and convincing standard.

**(b) This Court should apply the plain and ordinary**

Based on the same claim language and intrinsic evidence, the Court should also reject Defendant's alternative position that requires "distal" to be "relative to the housing." The '735 Patent consistently identifies a distal end ***without*** "relative to the housing" in either the claims or the specification. Inserting this limitation into the claims would improperly narrow the scope beyond the plain language and any intrinsic evidence of the specification.

Furthermore, Defendant's own patents cut against its arguments. In this case, Defendant asserts U.S. Patent No. 12,274,554 (the "'554 Patent") against Bardy. Ex. F ('554 Patent). Claim 1 of the '554 Patent recites a "flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing." Ex. F, cl. 1. This claim element is notable for two reasons. First, Defendant again uses the term "distal" to describe a portion of the device. Second, Defendant specifies that the electrode is positioned "distal ***from the housing***." Ex. F, cl. 1. This differs from Bardy's '735 Patent, which ***does not*** use "distal" as a position from the housing. Defendant cannot use its own patent as a source of argument to insert unclaimed limitations into Bardy's patent, and Defendant's attempts to limit Bardy's patents to iRhythm's disclosure should be rejected. Thus, the Court should apply the plain and ordinary meaning in view of the unambiguous use of "distal."

**(2) "proximal"**

Like the term "distal," there is nothing ambiguous about the term "proximal." Both the claim language and intrinsic evidence inform those skilled in the art about the scope of the invention. *See, e.g.*, *Nautilus*, 572 U.S. at 901. Again, Defendant cannot meet its burden. The Court should reject Defendant's arguments and hold that "proximal" is not indefinite and apply the plain and ordinary meaning. Finally, as Defendant proposes the same construction for "distal"

and "proximal," which inherently mean the opposite, Bardy incorporates its arguments above regarding why "distal" is neither indefinite nor requires any construction.

**(a) "proximal" is not indefinite**

The '735 Patent initially recites "a ***proximal*** electrocardiography electrode coupled to a ***proximal*** end of the flexible circuit." Ex. D, cl. 1. Reading the plain language, a POSITA would have readily understood that "proximal" simply identifies a specific electrode (*i.e.*, the proximal electrode) at a specific end (*i.e.*, the proximal end) of the electrocardiography monitor. Again, the use and meaning of "proximal" makes sense because the '735 Patent also claims a distal electrode at the distal end of the flexible circuit. *See,* Ex. D, cl. 1. ***Without*** using these descriptive terms, a POSITA would not have been able to discern what electrode the claims are identifying.

The specification matches the plain claim language. The '735 Patent uses "proximal" to identify the "[t]he proximal end of the electrode patch." Ex. D, 5:66-2. This term is then used consistently used throughout the specification to identify one end of the device. For example, the adhesive may be provided "only on the distal end 30 and the proximal end 31" of the flexible backing. Ex. D, 8:27-32; *see also* Ex. D, Figure 5 (reproduced below, identifying the proximal end 31 of the flexible backing 15).




Ex. D, Figure 5 (annotated).

In another example, the ’735 Patent states that the “distal ECG electrode 38 and proximal ECG electrode 39 are respectively coupled to the distal and proximal ends of the flexible circuit 32.” Ex. D, 8:45-48. Again, this description algins with the Figures and the claims and informs those skilled in the art of the scope of the invention. Figure 7 shows the proximal ECG electrode 39 that is coupled to the proximal end of the flexible circuit 32. Ex. D, 8:45-48; *see also* Ex. D, Figure 7 (reproduced below, identifying the proximal ECG electrode 39 on the proximal end of the flexible backing).




Ex. D, Figure 7 (annotated).

Defendant uses “proximal” the same way in its own patents. Defendant describes an embodiment as having “support layer 202 [that] is anchored to the subject’s skin by both the ***proximal*** portion of adhesive 240 and the distal portion of adhesive 240.” Ex. E, [0136]. Just as Bardy does, Defendant use “proximal” to identify a portion of the device. As evident from its own patents, Defendant know what is means to use “proximal.”

The plain language of the claims and the detailed description inform those skilled in the art with reasonable certainty. Like “distal,” the term “proximal” is used to describe one electrode at one end of the device. For these reasons, Defendant cannot meet it burden of establishing “proximal” as indefinite under the high bar of its clear and convincing standard.

**(b) This Court should apply the plain and ordinary**

Based on the same claim language and intrinsic evidence, the Court should also reject Defendant’s alternative position that requires “proximal” to be “relative to the housing.” The ’735

Patent consistently identifies a proximal end ***without*** "relative to the housing" in either the claims or the specification. Inserting this limitation into the claims would improperly narrow the scope beyond the plain language and any intrinsic evidence of the specification. Thus, the Court should apply the plain and ordinary meaning in view of the unambiguous use of "proximal."

**b. iRhythm's Answering Position**

The terms "distal" and "proximal" are not absolute terms. Rather, they are terms of relative position that "necessarily call[] for a comparison" to some reference point. *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395 (Fed. Cir. 2016). Indeed, "distal" and "proximal" are commonly understood to mean "situated away from" or "situated nearer to" a reference point. Ex. 2, *New Oxford American Dictionary* (3d. ed. 2010) at 504, 1407.

But here, the claims recite "distal electrocardiography electrode" and "proximal electrocardiography electrode" without reference to what they are distal or proximal to. Where the claim terms do not "provide objective boundaries for those of skill in the art," such terms are indefinite. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

The specification discloses a design where the majority of components, including the "housing," are on "the proximal end," and the other end of the device is consistently referred to as "the distal end." For example, as Bardy acknowledges (*supra* Sections III.A.5.a.(1)(a), III.A.5.a.(2)(a)), Figure 6 shows a "distal end 30" and a "proximal end 31" of the device. ('473 patent at 11:3-4.)




(*Id.* at Fig. 6 (annotation added).) Similarly, Figure 8 discloses the two electrodes, referring to them as the "proximal ECG electrode 39" (under the housing and other components) and the "distal ECG electrode 38." (*Id.* at 11:17-20.)

Fig. 8.




(*Id.* at Fig. 8 (annotation added).)

iRhythm's alternative construction seeks to preserve the specification's consistent orientation for distal and proximal, as can be seen in Figure 4, where it is clear that after installation of the housing, the proximal end of the device sits under the housing and the distal end is farther away from the housing:

Fig. 4.




(*Id.* at Fig. 4 (annotation added); *see also id.* at 6:28-29 ("The proximal end of the electrode patch 15, located under the monitor recorder 14).)

Thus, to the extent "proximal" and "distal" have any definite meanings, they refer to "distal and proximal relative to the housing," as iRhythm proposes. *See Zimmer Surgical, Inc. v. Stryker Corp.*, No. 16-CV-679-RGA, 2018 WL 3038515, at *10 (D. Del. June 19, 2018) (construing "distal end" and "proximal end" as: "Distal refers to what is closest to the surgical site. Proximal refers to what is furthest away from the surgical site"). Without such orientation, these terms are indefinite for lack of objective boundaries.

Bardy argues that "distal" electrode simply means a "first" electrode and "proximal" electrode simply means a "second" electrode. (*Supra* Section III.A.5.a.(1)(a).) But Bardy's interpretation reads the words "distal" and "proximal" out of the claims. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim."). The Court should not permit Bardy's improper rewriting of claims.

Bardy argues that iRhythm's construction inserts a "housing" requirement. (*Supra* Section III.A.5.a.(1)(b), Section III.A.5.a.(2)(b).) Contrary to Bardy's assertion, the claims already require a "housing." ('735 patent, cls. 1 ("a housing comprising rounded edges along a top surface"), 11

(same).) iRhythm's construction simply uses an existing claimed component—the housing—as a reference point to clarify the meanings of "distal" and "proximal." Without that reference point, "distal" and "proximal" would be impossible to understand.

Finally, Bardy points to the use of the term "distal" in an iRhythm patent publication (U.S. Pub. No. 2022/0039719) and an iRhythm patent (U.S. Patent No. 12,274,554). (*Supra* Sections III.A.5.a.(1)(a), III.A.5.a.(1)(b).) But the '719 patent publication uses the terms "distal portion" and "proximal portion" in the *specification*, not in the *claims*. There is no definiteness requirement for the specification. In any event, the '719 patent publication discloses a reference point for "distal portion" and "proximal portion"—the "hinge portion." (Bardy Ex. E, [0136] ("the hinge portion 1001 of support layer 202 is anchored to the subject's skin by both the proximal portion of adhesive 240 and the distal portion of adhesive 240").) As to the '554 patent, claim 1 recites "a position distal from the housing," which proves iRhythm's point. Claim 1 of the '554 patent is not indefinite because it provides the point of reference to understand "distal" (*i.e.*, it is "distal from the housing"). By contrast, Bardy's claim lacks any reference point, and is either indefinite or should be construed by reference to the housing, consistent with the rest of the intrinsic record.

Thus, the Court should find the terms "distal" and "proximal" indefinite, or alternatively construe them as "distal and proximal relative to the housing."

**c. Bardy's Reply Position**

iRhythm fails to satisfy its clear and convincing burden to establish indefiniteness of these two terms. iRhythm contradicts the plain language of the claims and the specification to improperly argue that "distal" and "proximal" are terms requiring another noun to judge their position against.

To the contrary, the claims themselves and the specification are clear when using these two terms to simply identify which of two electrodes the claim is referring to. iRhythm's alternative

construction is also incorrect because it imports the requirement of "distal" and "proximal" to be "relative to the housing" into the claims.

**(1) iRhythm does not satisfy its clear and convincing burden to establish that "distal"/"proximal" are indefinite**

The plain language of the claims does not recite a relative position but rather identifies a specific electrode, contrary to iRhythm's attempts to manufacture a noninfringement position. In view of the plain language, which matches the specification, a person of ordinary skill would have understood the scope of the invention without issue.

iRhythm argues that "distal" is indefinite because the term does not reference what it is distal to. But "distal" is not used as a relative term, rather it is used in combination with the term "proximal" to refer to the two claimed electrodes. Ex. D ('735 Patent), cl. 1 (reciting "a ***distal*** electrocardiography electrode coupled to a ***distal*** end of a flexible circuit" and "a proximal electrocardiography electrode coupled to a proximal end of the flexible circuit"). The same is true for the "proximal" limitation.

The specification supports this plain reading of the claims. *See, e.g.*, Ex. D, 8:45-48 ("A ***distal ECG electrode 38*** and proximal ECG electrode 39 are respectively coupled to the distal and proximal ends of the flexible circuit."), 8:45–48 ("A distal ECG electrode 38 and ***proximal ECG electrode 39*** are respectively coupled to the distal and proximal ends of the flexible circuit."), Figure 5 (identifying the distal electrode and the proximal electrode).

Contrary to its arguments, iRhythm's cited cases illustrate why these two terms are not indefinite. In *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395 (Fed. Cir. 2016), the Federal Circuit recognized that the term "reduced area of contact" was one of degree because "it necessarily calls for a comparison against some baseline." But in view of the specification, the court held that "reduced area of contact" was not indefinite. *Id.* at 1397. The court's analysis is

notable for two reasons. First, *Liberty Ammunition* provides an example of an actual relative term. Unlike the term at issue in *Liberty Ammunition*, "distal" is decidedly ***not*** a relative term and ***does not*** "call[] for a comparison against some baseline." *Id.* at 1395. So too for proximal.

Second, the Federal Circuit held that the trial court's construction was incorrect "because it does not properly capture the specification's discussion." *Id.* In view of the '735 Patent's clear specification support, iRhythm fails to establish that "distal" is indefinite even as a relative term, which it is not. *See id.* at 1396 ("[T]erms of degree are not 'inherently indefinite' in light of the Supreme Court's decision."); *see, e.g.*, Ex. D, 8:45-48, Figure 5.

iRhythm's reliance on *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014) fares no better. There, the asserted patent claimed, "providing to the content display system a set of instructions … in an ***unobtrusive manner*** that does not distract a user." *Id.* at 1368. The Federal Circuit held "unobtrusive manner" as indefinite because the term "is highly subjective and, on its face, provides little guidance to one of skill in the art." *Id.* at 1371. "The hazy relationship between the claims and the written description fail[ed] to provide the clarity that the subjective claim language needs." *Id.* at 1372. However, the term "distal" is not "highly subjective," and the '735 Patent's specification matches the plain language of the claims. *See also* Ex. E (U.S. Patent Pub. No. 2022/0039719), [0136] (using "distal" to identify a "distal portion of adhesive"). Further, iRhythm does not provide any evidence that those skilled in the art would not have been informed about the scope of the invention with reasonable certainty.

Thus, iRhythm has failed to prove, by clear and convincing evidence, that the "claims, read in light of the specification … fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *See, e.g.*, *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S.

898, 901 (2014). iRhythm's indefiniteness argument should be rejected for failing to carry its high burden.

**(2) iRhythm's alternative construction is improper as it imports unclaimed limitations**

With its alternative construction, iRhythm is not "seek[ing] to preserve the specification's consistent orientation." *Supra* Section III.A.5.b. iRhythm, instead, attempts to import a limitation (*i.e.*, associating distal with a position relative to the housing) that is neither claimed nor described in the specification. While iRhythm's proposed construction does find support in Figures 4 and 6, adopting this construction would limit the claims to a depicted, and undescribed, embodiment. At no point does the '735 Patent associate the term "distal" with a position relative to the housing. The Court should reject iRhythm's position and adopt the plain and ordinary meaning.

Tellingly, iRhythm does not point to any claim language or specification disclosure to support its construction that "distal" must be "relative to the housing." Because no intrinsic evidence supports its construction, iRhythm cites examples where "the proximal end of the device sits under the housing and the distal end is farther from the housing." But none of these examples link the term "distal" with the housing. Just because the housing happens to be located away from the distal end does not mean that "distal" ***must*** be relative to the housing, which is what iRhythm advances with its unsupported and unduly limiting construction.

iRhythm's reliance on *Zimmer Surgical, Inc. v. Stryker Corp.*, No. CV 16-679-RGA, 2018 WL 3038515 (D. Del. June 19, 2018), is unavailing. This case illustrates iRhythm's citations to bare conclusions without providing any context or the analyzing the court's analysis. In *Zimmer Surgical* the term "distal" was not a disputed term. *Id.* at *10 (The "parties agree[d] that … 'distal' refers to the end closest toward the surgical site."). Even worse, *Zimmer Surgical* led to the ***opposite result*** of iRhythm's position. Here, iRhythm argues that "the distal end is farther away

from the housing." In *Zimmer Surgical*, the "'distal' [end] refers to the end closest toward the surgical site." *Id.* While iRhythm provides an inconsistent position within its own argument, the '735 Patent is clear. *See, e.g.*, Ex. D, 8:45-48, Figure 5. The term "distal" is not used as a relative term or associated with the housing—the term simply identifies an electrode.

iRhythm also argues that its proposed construction does not insert a housing requirement because "the claims already require a 'housing.'" iRhythm misses the point. Neither party disputes that Claim 1 recites a housing, but the claim is clear that there is not a claimed relationship between that housing and the electrodes. Indeed, Claim 1 ***does not*** require or use the term "distal" as ***relative*** to the housing as iRhythm proposes. iRhythm's illogical argument can be shown through illustrative examples. Namely, Claim 1 reciting a "battery" does not mean that "distal" is relative to the battery. iRhythm's proposed construction inserts a requirement for "distal" to be relative the housing without an explanation as to why.

Finally, iRhythm argues that its own use of "distal" in the '554 patent is not indefinite "because it provides the point of reference to understand 'distal' (*i.e.*, it is 'distal from the housing')." A comparison between this use and the '735 Patent illustrates the crux of the issue. The '554 patent uses "distal" as a relative term by claiming "an electrode positioned on the bottom of the flexible layer ***at a position distal from the housing***." Ex. F ('554 Patent), cl. 1. In contrast, the '735 Patent simply uses distal to identify an electrode: "a distal electrocardiography electrode coupled to a distal end of a flexible circuit." Ex. D, cl. 1. iRhythm appears to be reading ***its own unrelated claim limitation*** into the claims in this case. Nothing in the specification or claims supports this attempt.

The Court should reject iRhythm's improper construction, which is driven solely by a non-infringement position that is divorced from the intrinsic evidence, and adopt Bardy's plain and ordinary construction for the terms "distal" and "proximal."

**d. iRhythm's Sur-Reply Position**

The crux of Bardy's argument is asking the Court to ignore the words "distal" and "proximal" in the claims, and construe "distal [] electrode" and "proximal [] electrode" as "first electrode" and "second electrode" instead. (*See supra* Section III.A.5.c.(1) ("'distal' . . . is used in combination with the term 'proximal' to refer to the two claimed electrodes").) The law does not allow such rewriting of the claims. *See Bicon*, 441 F.3d at 950 ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").

Bardy's citation to *Liberty* demonstrates the very indefiniteness problem here—the terms "necessarily call[] for a comparison against some baseline." *Liberty*, 835 F.3d at 1395. Just like the relative term "reduced area" in *Liberty*, the "proximal" electrode here means it is relatively closer to a reference point than the "distal" electrode. (*See* Ex. 2, New Oxford American Dictionary (3d. ed. 2010) at 504, 1407 ("proximal" means "situated *nearer* to" a reference point) (emphasis added).) Bardy ignores the specification's disclosure of such a reference point (the housing) and fails to identify any other reference point to avoid the indefiniteness problem.[25]

Bardy argues that, in the specification, "the housing *happens to* be located away from the distal end." (*Supra* Section III.A.5.c.(2) (emphasis added).) But in the specification, the key distinction between the proximal end and the distal end is their relative distances from the housing.

---

[25] Bardy does not dispute *Interval Licensing*'s statement of the black letter law that the intrinsic evidence must "provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). That *Interval Licensing* addressed a "subjective" term is irrelevant to the question here.

The distal end does not just "happen[]" to be away from the housing (which, if true, would imply that "distal" and "proximal" are being used arbitrarily and are thus indefinite when used in the claims). Rather, being farther away from the housing is the defining feature of the distal end.

Fig. 4.




Bardy's attempt to distinguish *Zimmer* misses the point. *Zimmer* demonstrates that "distal" and "proximal" must be understood with a reference point, which in that case was the "surgical site." 2018 WL 3038515, at *10. Indeed, other courts have recognized that "distal" and "proximal" must be construed with respect to a reference point. *See, e.g.*, *DePuy Synthes Prods., Inc. v. Globus Med., Inc.*, No. 14-CV-11-RGA, 2015 WL 3430095, at *5-6 (D. Del. May 28, 2015) (defining "distal portion" as "[a] part of the bone coupling assembly located *farther from the surgeon* than the proximal portion" and defining "proximal portion" as "[a] part of the bone coupling assembly located c*loser to the surgeon* than the distal portion") (emphases added); *Whirlpool Corp. v. TST Water, LLC*, No. 15-CV-1528-JRG, 2016 WL 3959811, at *12 (E.D. Tex. July 22, 2016) (using "end piece wall" as the reference point to define "distal" and "proximal"); *Stryker Corp. v. Poseidon Surgical, LLC*, No. 16-cv-1199, 2018 WL 2355175, at *7 (W.D. Mich. May 24, 2018) ("Proximal and distal describe the orientation of the manifold housing ends relative to some external reference point").

As iRhythm has explained, the reference point identified in the specification and included in iRhythm's construction—the housing—is already in the claims. While the claim also recites

other components like a "battery" (*see supra* Section III.A.5.c.(2)), the housing is the only reference point disclosed in the specification. And contrary to Bardy's assertion, iRhythm is not "reading its own unrelated claim limitation into the claims in this case." (*Id.*) iRhythm simply explained that the iRhythm '554 patent does not have the same indefiniteness problem because it expressly recites a reference point.

## B. iRhythm Asserted Patents

### 1. Term 6: "electrical connection"

| "electrical connection" ('734 Patent, cl. 1; '554 Patent, cl. 1) | |
|---|---|
| **iRhythm's Construction** | **Bardy's Construction** |
| Plain and ordinary meaning | "wire" |

#### a. iRhythm's Opening Position

U.S. Patent Nos. 12,133,734 (the "'734 patent"), 12,274,554 (the "'554 patent"), and 12,303,277 (the "'277 patent"), assigned to iRhythm, share a common specification and a common priority date, May 12, 2010. They have the same title: "Device Features and Design Elements for Long-Term Adhesion."[26]

As the common specification explains, prior to the disclosed invention, cardiac rhythm monitoring "devices ha[d] not been designed that can withstand longer-term adhesion," such as over 24 hours, which is essential to allow for use during normal, daily activities (such as sports), which reduced patient compliance and limited accurate diagnosis. ('734 patent at 1:63-65.) Among other ways of achieving long-term adhesion, the '734, '554, and '277 patents describe,

[26] A person of ordinary skill in the art would have at least a bachelor's degree in electrical engineering, electrophysiology, biomedical engineering, or an equivalent degree, and at least two to three years of experience designing wearable monitors that detect physiological signals with mechanical and/or electrical elements.

and claim, an inventive patch comprising a multi-layer polymer or substrate design and a housing configured to tilt relative to the lower adhesive layer, which improve the comfort and flexibility of the device (allowing for everyday use) without affecting the function of the electrical connection that is essential for collecting physiologic signals. (*See, e.g.*, '734 patent, cl. 1; '554 patent, cl. 1; '277 patent, cl. 1.; '734 patent at 1:49-2:3, 10:10-16, Figs. 4A, 4B.)



FIG. 4B

('734 patent at Figs. 4B.)

Each independent claim of the '734 and '554 patents recites: "An electronic device for long-term adhesion to a user," which comprises "a housing" positioned over "a flexible layer." ('734 patent, cl. 1; '554 patent, cl. 1.) The "housing" comprises a "physiologic data collection circuit." (*Id.*) The "flexible layer" comprises "a polymer upper layer" and "a polymer lower layer," and "an electrical connection" between and upper and lower layers. (*Id.*) The "electrical connection" extends from the "physiologic data collection circuit" to an "electrode." (*Id.*)

Bardy contends that the "electrical connection" is limited to a "wire." It is not. The specification makes clear that "wiring 120" is only one possible example of an "electrical connection": "Wiring 120 or *other suitable electrical connections* can connect the electrodes 124, 126 with the electrical components 108 of the housing." (*Id.* at 8:49-51 (emphasis added).) The Federal Circuit has "repeatedly warned against confining the claims to" specific embodiments in

the specification. *SIPCO, LLC v. Emerson Elec. Co.*, 980 F.3d 865, 872 (Fed. Cir. 2020) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (*en banc*)). The Court should not adopt a construction of "electrical connection" that is limited to the "wiring" embodiment in the specification.

Indeed, the plain and ordinary meaning of "electrical connection" is not limited to a wire. Rather, electrical *conductivity* determines whether an electrical connection exists. *See* Ex. 1, *Modern Dictionary of Electronics* (7th ed. 1999) (defining "connection" as "The attachment of two or more component parts so that conduction can take place between them").[27] Even Bardy's own patent uses the term "electrical connection" to describe something other than wires—including "electrical contacts" and "electrical pads": "A set of *electrical contacts 56* protrude from the bottom surface of the sealed housing 50 and are arranged in alignment with the *electrical pads 34* provided on the bottom surface of the non-conductive receptacle 25 to establish *electrical connections* between the electrode patch 15 and the monitor recorder 14." (U.S. Patent No. 12,161,473 (the '473 patent) at 10:52-57 (emphases added).)

The Court should reject Bardy's proposed construction, and construe "electrical connection" as having its plain and ordinary meaning.

**b. Bardy's Answering Position**

By advancing the plain and ordinary meaning, Defendant attempts to broadly capture subject matter that it did not invent. The Court should reject this approach and adopt Bardy's

---

[27] *See also Cellport Sys., Inc. v. Peiker Acustic GmbH & Co. KG*, 847 F. Supp. 2d 1293, 1310 (D. Colo. 2012) (construing "electrically interconnected" as "a connection between two devices that allows the transfer of electrical signals"); *Abbott Diabetes Care Inc. v. Roche Diagnostics Corp.*, No. C04-02123 MJJ, 2007 WL 1239220, at *8 (N.D Cal. Apr. 27, 2007) (construing "electrical contact" to mean "connected or positioned in such a way that electricity can flow between").

proposed construction—a wire. First, Defendant itself previously argued—and agreed with Bardy's position—that the disclosure of the '734 patent is specifically directed to wires. *See, e.g.*, Ex. G (Appeal Brief dated July 7, 2017), 7-8 (limiting Kumar's disclosure to a wire). Second, the '734 patent makes clear that the claimed electrical connection is a wire. Every single embodiment in the '734 patent discloses only a floating wire to connect the electrode to the physiologic data collection circuit, and the specification touts the advantages of using a wire in this way.

Defendant's citation to a throwaway description of "other suitable connections" and a ***1999 dictionary*** cannot permit Defendant to capture subject matter beyond what the '734 patent actually disclosed as its invention. *See Brita LP v. ITC*, No. 2024-1098, 2025 WL 2922550, at *4 (Fed. Cir. 2025) (holding that the claims did not cover "filter media" where the specification disclosed only "carbon-block filter media," explaining that "the only working examples" and "specific formulations" described carbon blocks, confirming "inventors were only in possession" of that structure). Nothing in the specification suggests that any other connection was contemplated, and there is simply no evidence that the inventors considered other types of connections to fall within the scope of what they invented; rather, the specification consistently and exclusively describes the use of wires and the advantages that accompany the use of those wires. It is axiomatic that "the claims cannot be of broader scope than the invention that is set forth in the specification." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)). To allow for any construction other than "wire" for this term would run afoul of this basic principle of claim construction.

**(1) Defendant limited the disclosure of the '734 patent to a wire**

Defendant previously argued that the electrical connection is a wire. This is a classic example in which Defendant took a narrow approach during prosecution for validity but now broadly interprets the same disclosure for infringement. This approach has been repeatedly

rejected by the Federal Circuit. *See, e.g.*, *Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1381 (Fed. Cir. 2021) (explaining that the Federal Circuit has "repeatedly rejected" efforts to twist claims "one way to avoid [invalidity] and another to find infringement"). Defendant's argument during prosecution, which is supported by the disclosure of the '734 patent, limit the term "electrical connection" to a wire. The Federal Circuit has long held that disclaimer exists where an applicant has disavowed a certain meaning to obtain its patent. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). "Prosecution disclaimer operates as a form of estoppel to ensure that a patentee may not construe claims one way in order to obtain the patent and then, in an infringement suit, attempt to construe the same claims another way." *In re VTran Media Techs., LLC, Pat. Litig.*, No. MDL 1948, 2009 WL 2169155, at *2 (E.D. Pa. July 17, 2009) (citing *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005)).

On January 23, 2014, Defendant filed U.S. Patent Application 14/162,656 (the "'656 Application"). The '656 Application is in the same family as the '859 and '860 Patents. During prosecution, the Patent Office rejected the claims of the '656 Application in view of U.S. Patent Publication No. 2012/0310070 to Kumar et al. ("Kumar"). Kumar is in the same family as the '734 and '554 patents, which are the at-issue patents for this claim term. While prosecuting the '656 Application, Defendant consistently argued that Kumar's electrical connection—which shares the same disclosure as the '734 and '554 patents—is limited to a wire.

In response to a Final Office Action, Defendant argued that Kumar does not disclose electrode traces. Defendant explained that "Kumar is directed towards an electronic device for long-term adhesion to a mammal, however Kumar does not disclose electrode traces." Ex. H (Response to Final Office Action), 6. Moreover, "Kumar describes at length ***the advantages of utilizing wires in their device***, because wires are stretchable. One skilled in the art would

understand an electrode trace to be non-stretchable, thus there is no motivation to combine the electrode trace of Libbus with the device of Kumar." *Id.*; Ex. G, 7-8 ("Kumar describes at length the advantages of utilizing wires in their device, because wires are stretchable.") (citing Kumar, [0033], [0070]–[0071]), 9.

Furthermore, in an Interview on February 27, 2015, Defendant again defined the scope of Kumar's wire-related invention. There, "Examiner agreed that with [*sic*] the wires found in Kumar were not electrode traces and would not readily use electrode traces." Ex. I (Applicant-Initiated Interview Summary dated February 27, 2015), 2.

Just like the court in *On Demand* where "the specification repeatedly reinforced the narrow meaning, and even distinguished devices embodying a broader understanding of the term," here the specification not only reinforced the narrow construction (*see* next section), but also, the applicant's own prosecution distinguished its claims over the specification's focus on the wire. *Honeywell Int'l, Inc. v. Nikon Corp.*, 589 F. Supp. 2d 433, 446 (D. Del. 2008), supplemented, 642 F. Supp. 2d 322 (D. Del. 2009) (*citing On Demand*, 442 F.3d at 1340).

To expand the scope of its patents beyond what it actually invented, Defendant has taken different positions for validity and infringement. Rather than adhere to the positions it articulated to the Patent Office during prosecution, Defendant turns around and attempts to improperly broaden the scope of this disclosure, the Kumar disclosure here in the '734 patent, to read its claims more broadly for infringement. However, this is contrary to the position previously taken, and it now attempts to capture "electrode traces" when asserting its claims, the very subject matter that Defendant argued Kumar "does not disclose" and "would not readily use" during prosecution. It should come as no surprise that Bardy's accused device utilizes "electrical traces" and not wires.

**(2) The '734 patent's electrical connection is a wire**

Consistent with Bardy's proposed construction—and what Defendant argued during prosecution—the disclosure of the '734 patent makes clear that the electrical connection is a wire. *See e.g.*, '734 Patent, 5:42-45, 8:61-65, 9:11-15, Figure 1A. Defendant's claims cannot be broader than the actual invention, in particular where the expansion of claim scope would encompass subject matter that not only appears nowhere in the specification, but would actually defeat the purpose of the invention. *See Howmedica Osteonics v. Tranquil Prospects*, 401 F.3d 1367, 1372 (Fed. Cir. 2005) (rejecting a construction that would "defeat the purpose of the invention").

The '734 patent discloses a patch with housing 102. '734 patent, 7:31-32, Figure 1. Wiring 102 connects electrodes 124, 126 with the electrical components 108. *Id.* at 8:49-51. Moreover, "***wire 120*** positioned in the enclosures 110, 114, 116 or in the tube or channel may move relative thereto in order to remain flexible within the housing." *Id.* at 8:59-61. Based on this structure, "the flexible channels or tubes are formed within the device housing so that the housing, as it is being stretched, does not affect the ability of the components, ***such as wires***, that may connect more rigid structures, to move or elongate." *Id.* at 8:61-65. In reference to Figure 1, "***wire 120*** is straight with a direct line of connection between the electrodes 124, 126 and the electronics 108." *Id.* at 8:66-9:1; *see also id.* at 9:5-9.




FIG. 1

'734 patent, Figure 1.

The embodiments of Figures 1A through 1F exclusively depict the electrical connection as a wire. The remaining disclosure is similarly limiting, identifying a wire as the sole electrical connection in every single embodiment. *See, e.g.*, *id.* at 5:42-45 ("A device may also include ***a first wire*** connecting the first electrode and the processor or an electronic memory and ***a second wire*** connecting the second electrode and the processor or an electronic memory."), 9:11-15 ("In order to address the possible dislocation or breakage of the wire 120, the length or shape of the wire 120 may be selected to permit patch flexion to occur with little risk of wire 120 pulling from the electrode or electronics."), Figure 2B (showing the wire), Figure 6B, Figure 7B.

In addition to identifying a wire across embodiments, the '734 patent explicitly highlights the advantages in using a wire. For example, in the embodiments of Figure 4B and 5C, the patch may flex. *Id.* at 9:8-11. "[T]o address the possible dislocation or breakage of the wire 120, the length or shape of the wire 120 may be selected to permit patch flexion to occur with little risk of wire 120 pulling from the electrode or electronics." *Id.* at 9:11-15. "When the patch 100 is attached to a mammal, ***the slack in the wiring 120*** allows the patch 100 to flex while not placing stress on the wiring 120." *Id.* at 9:22-25; *see also id.* at 9:60-65 (describing Figures 2B and 2C where "the slack in the wiring 120 can be placed at or proximal to the hinge portions 194, 196 to allow for bending at the hinge portions 194, 196 without pulling or breaking the wiring 120").

In *On-Demand*, the Federal Circuit narrowed the ordinary definition of "customer" based on repeated references in the specification to "customer" as a "retail consumer" and an explanation of how the invention operated. 442 F.3d at 1339–40. Likewise, the consistent use of "wire" throughout the specification is the only mechanism described to connect the physiologic data collection circuit to the electrode. "Whether [the applicants] were aware of other means to [connect these two components] or not, [they] limited themselves to the [connection] cited

repeatedly throughout the specification." *In re VTran Media*, 2009 WL 2169155, at *8 (citing *On-Demand*). In sum, the '734 patent exclusively discloses a wire and describes the advantages of using a wire, and only the advantages of using a wire. *See, e.g.*, '734 Patent, 5:41-64, 8:58-65.

*General American Transport Corp. v. Cryo-Trans, Inc.* is also instructive. 93 F.3d 766 (Fed. Cir. 1996). There, the Federal Circuit reversed the district court's construction that openings "adjacent" to the side walls could also be openings "adjacent" to the end walls. *Id.* at 770. The Federal Circuit instead construed the term to mean unique openings that were provided to each of the four walls. *Id.* The specification identified the advantages to this structure and the corresponding embodiment "is not just the preferred embodiment of the invention; it is the *only* one described." *Id.* (emphasis in original); *see also Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (construing a claim term consistent with the advantages as "important to the invention" when "[n]o other, broader concept was described as embodying the applicant's invention, or shown in any of the drawings, or presented for examination").

So too here, the embodiment of the '734 patent having a wire is not just the preferred embodiment, "it is the *only* one described." *Gen. Am.*, 93 F.3d at 770. Moreover, the '734 patent touts the advantages of having a wiring in its device—which Defendant itself emphasized during prosecution. Here, the evidence demonstrates that the advantages of Defendant's invention derive from the structure of the wire. *See, e.g.*, '734 Patent, 9:1-25; *see also id.* at 8:10-12 (describing how the "housing 102 can float above the adhered portions, allowing for increased flexibility of the patch"). Bardy's construction is rooted in the disclosure of the '734 patent while Defendant provides an infringement-driven construction that divorces the claims from the actual invention.

**(3) Defendant's arguments are unpersuasive**

Each of Defendant's argument are unpersuasive and cannot overcome the intrinsic and extrinsic evidence that support Bardy's construction. First, Defendant argues that Bardy confines

the claims to specific embodiments in the specification because wiring is "only one possible example." Not so. Bardy construes the term "electrical connection" consistent with the specification, which is a "fundamental rule of claim construction." *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) (collecting cases). Under Federal Circuit precedent, claims cannot go beyond the disclosed embodiments when "the specification, claim, or prosecution history made clear that the invention was limited to a particular structure." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908–09 (Fed. Cir. 2004). Here, the evidence makes clear that "electrical connection" in the claimed invention must be a wire.

And tellingly, Defendant does not point to any embodiment ***or*** provide a single example of these mysterious "other suitable electrical connections" because none exist. '734 Patent, 8:49-51. Again, the '734 patent describes wiring as the only example and consistently highlights the advantages to this structure. Bardy's construction is not limiting—it is consistent with the specification, which is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315; *see also Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013) (rejecting a construction because the "specification never teaches an embodiment constructed" according to the proposed structure).

Second, Defendant cites a dictionary as extrinsic evidence while ignoring the abundance of intrinsic evidence related to this claim term. Moreover, the dictionary was published in ***1999***—more than a decade earlier than the alleged 2010 priority date of the '734 patent. *See, e.g.*, *Phillips*, 415 F.3d at 1313 (explaining that claims are construed at the time of the effective filing date of the patent application). Finally, Defendant cites Bardy's patent (*i.e.*, U.S. Patent No. 12,161,473), which is not relevant to the claim term at issue. But even so, Bardy's patent weighs against Defendant's argument. Unlike the '734 patent, Bardy expressly discloses different types of

electrical connections (including circuit traces) and does not rely on the advantages of wires for its invention. Moreover, Bardy's patent was first filed three years ***after*** the alleged priority of the '734 patent. For these reasons, the Court should adopt Bardy's proposal and construe "electrical connection" as limited to a wire and excluding the electrical traces that Defendant itself admitted were not contemplated by the '734 patent.

**c. iRhythm's Reply Position**

Bardy does not dispute that the plain meaning of "electrical connection" encompasses more than just a "wire." Nor does it dispute that the specification expressly states that the electrical connection can be not only a wire, but also "other suitable electrical connections." ('734 patent at 8:49-51.) Contrary to Bardy's assertion (*supra* Section III.B.1.b.(3)), the specification does not need to provide an exhaustive list of the other suitable electrical connections, as "a specification need not disclose what is well known in the art." *Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018). As iRhythm has explained and the specifications of both parties' asserted patents confirm, there were many well-known types of electrical connections, such as plugs, pins, pads, springs, etc. (*Supra* Section III.B.1.a.; *infra* III.B.2.a.(1).)

Bardy points to portions of the specification that describe wires as an example of electrical connections. (*Supra* Section III.B.1.b.(2).) But limiting "electrical connection" to a wire would violate the Federal Circuit's repeated warning against confining the claims to specific embodiments, especially given the specification's explicit teaching that "other suitable electrical connections" may be used. *See SIPCO, LLC v. Emerson Elec. Co.*, 980 F.3d 865, 872 (Fed. Cir. 2020). Bardy argues that the specification discloses the advantage of having "slack" in the wiring. (*Supra* Section III.B.1.b.(2).) But "[a]dvantages described in the body of the specification, if not included in the claims, are not *per se* limitations to the claimed invention." *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003). Indeed, having slack in the wiring

is only one of the many features in the patent that improved upon existing medical monitoring devices. (*See* ’734 patent at 1:49-50.) And wires are not the only type of “electrical connections” that can be designed with slack. Thus, these statements “do not indicate that the invention can only be used in such a manner.” *Brookhill-Wilk*, 334 F.3d at 1301.

*On Demand* and *General American* do not apply. In *On Demand Machine Corp. v. Ingram Industries., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006), the court limited the term “customer” to retail customers because the specification distinguished the invention from machines “not specifically designed to be consumer operated.” No such express statement exists in the ’734 and ’554 patents. In *General American Transport Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996), the court analyzed the plain language of the claim “openings . . . adjacent each of said side walls and end walls” to conclude that each opening is a distinct opening. While the court looked to the specification to confirm that plain meaning, it did not use a preferred embodiment in the specification to deviate from that meaning. *Id.* Here, neither the claim language nor the specification limits “electrical connections” to just a wire. Indeed, as explained above, the specification explicitly teaches that the electrical connection can be “other suitable electrical connections.” (’734 patent at 8:49-51.) Therefore, the plain meaning of “electrical connection” controls here.

Bardy’s remaining arguments center on the prosecution history of a *later-filed* iRhythm application (Appl. No. 14/162,656) that belongs to a *different patent family* for its statements regarding the ’734 and ’554 patents (referred to as the “Kumar” prior art[28]). (*Supra* Section III.B.1.b.(1).)

---

[28] Kumar is U.S. Patent Pub. No. 2012/0310070, which shares a specification with the ’734 and ’554 patents.

First, statements made during prosecution of a later, unrelated patent are not relevant to the interpretation of claims of an earlier patent "simply because the applications had a common assignee." *Abbott Lab'ys v. Dey, L.P.*, 287 F.3d 1097, 1105 (Fed. Cir. 2002). The Federal Circuit decision in *Malvern Panalytical Inc. v. TA Instruments-Waters LLC*, 85 F.4th 1365 (Fed. Cir. 2023) addressed the very situation here. There, the patentee tried to overcome a prior art rejection by arguing that its own earlier patent contained "a purely manual guiding system." *Id.* at 1370. When construing the claims of the earlier patent, the Federal Circuit declined to limit the claim term "guiding mechanism" to manual guiding because, while the two applications were commonly assigned, they did not have a "familial relationship." *Id.* at 1370, 1375. Just like in *Malvern*, the later-filed iRhythm application does not have a familial relationship with the '734 and '554 patents at issue. The prosecution of the later-filed application is thus irrelevant to the claim construction of the '734 and '554 patents.[29]

Regardless, even if the prosecution history is considered, it "often lacks the clarity of the specification" and is "less useful for claim construction purposes." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*). This is particularly true where, as here, "an applicant abandons its unsuccessful argument," and thus "the prosecution history lacks the clarity necessary to establish prosecution disclaimer." *Malvern*, 85 F.4th at 1376. The applicant of the later iRhythm application not only abandoned the argument, but abandoned the *entire application*. (Ex. 6, '656 Application Notice of Abandonment.) Thus, the statement that Bardy cites does not establish any clear disavowal or disclaimer.

---

[29] The two patents in *Malvern* had an even closer relationship than the two iRhythm applications here. In *Malvern*, the earlier patent was subject to a supplementation reexamination, where the prosecution history of the later patent was submitted in an information disclosure statement ("IDS"). 85 F.4th at 1370. The court concluded that even the IDS was not enough to render the prosecution history relevant. *Id.* at 1375.

Finally, even if what was said is fully credited, the prosecution statement did not limit "electrical connection" to a "wire." Applicant only pointed to the "advantages of utilizing wires" disclosed in the specification to rebut the examiner's position on motivations to combine, and did not narrowly define "electrical connection" as a wire, as the law requires for disavowal of claim scope. (Bardy Ex. H at 6); *see Purdue Pharma LP v. Endo Pharms. Inc.*, 438 F. 3d 1123, 1136 (Fed. Cir. 2006) (requiring "clear and unmistakable disavowal of [claim] scope"). Even assuming the statement "Kumar does not disclose electrode traces" (Bardy Ex. H at 6) were relevant, which it is not, that sentence did not preclude other types of electrical connections that were well known in the art, such as plugs, pins, pads, springs, etc.

Bardy also argues that the Modern Dictionary of Electronics and Bardy's own patent do not inform the plain meaning of "electrical connection" simply because they were a few years apart from the '734 and '554 patents. (*Supra* Section III.B.1.b.(3).) It is inconceivable, however, that the meaning of this simple concept changed in any significant way in the matter of a few years. Indeed, a 2010 dictionary defined "connection" similarly to the 1999 Modern Dictionary of Electronics. (*Compare* Ex. 1, *Modern Dictionary of Electronics* (7th ed. 1999) (defining "connection" as "The attachment of two or more component parts so that conduction can take place between them") *with* Ex. 3, *New Oxford American Dictionary* (3d. ed. 2010) (defining "connection" as "the placing of parts of an electric circuit in contact so that a current may flow").)

The Court should reject Bardy's "wire" construction and construe "electrical connection" to have its plain and ordinary meaning. *See ID Image Sensing LLC v. OmniVision Techs., Inc.*, C.A. No. 20-136-RGA, 2021 WL 5206262, at *3 (D. Del. Nov. 9, 2021) ("This term does not need additional construction beyond what the claim already provides. The meaning of this term in the context of the claim is clear and readily understandable to the jury. Thus, I apply the plain and

ordinary meaning, which is, as always, the default in claim construction.") (citing *Philllips*, 415 F.3d at 1316).[30]

**d. Bardy's Sur-Reply Position**

iRhythm largely ignores the intrinsic record for this term, evidence which overwhelmingly supports Bardy's construction. Importantly, iRhythm itself characterized the specification of the '734 patent and stated that "Kumar [the '734 patent disclosure] does not disclose electrode traces." Ex. H, 6. iRhythm's attempt to minimize the prosecution history (and its own statements to the USPTO about the scope of its patents) should be ignored or at least discounted. Adopting iRhythm's plain and ordinary construction would allow iRhythm to capture subject matter beyond what the '734 patent discloses. This is improper and should be denied.

iRhythm argues that Bardy's construction confines the claims "to specific embodiments." *Supra* Section III.B.1.c. Not so. Bardy's construction is not limited "to specific embodiments"—it is the ***only*** embodiment disclosed, which reflects the proper scope of the invention. The Federal Circuit has long held that a patent owner is not entitled to subject matter beyond its disclosure. *See, e.g.*, *Brita LP v. ITC*, No. 2024-1098, 2025 WL 2922550, at *4 (Fed. Cir. 2025); *Howmedica Osteonics v. Tranquil Prospects*, 401 F.3d 1367, 1372 (Fed. Cir. 2005) (rejecting a construction that "defeat[s] the purpose of the invention"). There is no evidence in the record to support iRhythm's expansion of the '734 patent beyond what the inventors actually invented.

iRhythm does not dispute that a "wire" is the ***only*** electrical connection disclosed in the '734 patent. Nor does iRhythm dispute that the '734 patent details advantages of the described wire over other forms of electrical connections. This is unsurprising in view of the intrinsic

---

[30] The court's analysis in *ID Image Sensing*, which applied "plain and ordinary meaning" to each of the four disputed terms in that case, is equally applicable to iRhythm's "plain and ordinary" constructions proposed for all other disputed terms addressed herein.

evidence, which illustrates the importance and benefits of a wire. *See* '734 patent, 5:42-45, 8:61-9:1-15, 9:22-25, 9:60-65, Figures 1A, 2B, 6B. Rather than address this intrinsic evidence, iRhythm relies solely on the phrase "other suitable electrical connections." '734 patent, 8:49-51. But iRhythm does not—because it cannot—identify any "other" electrical connection disclosed in the '734 patent, and this single all-encompassing phrase cannot save an otherwise limited disclosure. The intrinsic evidence makes clear that the electrical connection is a wire.

Regarding the prosecution history, iRhythm incorrectly argues that its statements are "irrelevant." *Supra* Section III.B.1.c. This argument should be ignored. iRhythm characterized the specification of the '734 patent and addressed the key dispute between the parties. Moreover, *Malvern Panalytical Inc. v. TA Instruments-Waters LLC*, 85 F.4th 1365, 1367 (Fed. Cir. 2023) is distinguishable. There, the plaintiff asserted two patents and the court improperly considered statements about terms made during prosecution of a third, unrelated patent, separate and apart from the disclosure of the patents in the case. *Id.* at 1371. Here, iRhythm's application was rejected in view of Kumar. Kumar is related to the '734 patent and shares the same specification as the '734 and '554 patents, which are the at-issue patents for this claim term. iRhythm's representations to the USPTO and public about the scope of Kumar's disclosure and meaning of terms is relevant to the claim construction dispute here. iRhythm should be held to its statements.

iRhythm alleged that the prosecution history "often lacks the clarity of the specification." *Supra* Section III.B.1.c. But here, not only is the prosecution history crystal clear but so is the specification. iRhythm's argument is exactly why Bardy's construction is necessary. iRhythm points to electrical traces as satisfying the claimed "electrical connection." This position is directly contradicted by iRhythm's prosecution admission—"***Kumar does not disclose electrode traces***."

Ex. H, 6. Whether iRhythm abandoned this application has no effect on this admission. The prosecution history here is clear and the Court should ignore iRhythm's argument to the contrary.

iRhythm is attempting to capture subject matter that it did not invent and the Court should reject these attempts. The Court should adopt Bardy's proposal, which is supported by the intrinsic evidence and iRhythm's previous arguments, and construe "electrical connection"—consistent with the specification and iRhythm's own representations—as a wire.

**2. Term 7: "[electrical connection] extending from the physiological data collection circuit to the electrode" ('734 Patent, cl. 1); "[electrical connection] extending linearly from the physiologic data collection circuit" ('554 Patent, cl. 1); and "[first substrate layer] extends horizontally away from the housing" ('277 Patent, cl. 1) (collectively, the "Extending From Terms")**

| The Extending From Terms | | |
|---|---|---|
| **Term** | **iRhythm's Construction** | **Bardy's Construction** |
| **7(a) "[electrical connection] extending from the physiologic data collection circuit to the electrode"**<br><br>**7(b) "[electrical connection] extending linearly from the physiologic data collection circuit"**<br><br>**('734 Patent, cl. 1; '554 Patent, cl. 1)** | Plain and ordinary meaning | "originating at the physiological data collection circuit and continuing directly to the electrode without intervening components" |
| **7(c) "[first substrate layer] extends horizontally away from the housing"**<br><br>**('277 Patent, cl. 1)** | Plain and ordinary meaning | "originates at the housing and continues outward" |

**a. iRhythm's Opening Position**

**(1) "[electrical connection] extending from the physiologic data collection circuit to the electrode" / "[electrical connection] extending linearly from the physiologic data collection circuit" ('734 Patent, cl. 1; '554 Patent, cl. 1)**

Claim 1 of the '734 patent recites "the electrical connection extending from the physiologic data collection circuit to the electrode." ('734 patent, cl. 1.) Claim 1 of the '554 patent recites "the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device." ('554 patent, cl. 1.)

The plain meanings of these terms are clear—they describe the spatial arrangement of the electrical connection between the physiologic data collection circuit and the electrode. Bardy, however, attempts to insert the requirements of "directly" and "without intervening components" that do not exist in the claim. In *Toro Co. v. Ingersoll-Rand Co.*, 545 F. Supp. 2d 933, 949-51 (D. Minn. 2008), the court rejected a proposed construction of the claim term "extending between the loader arms and the attachment" that would preclude intervening structures such as a cross bar. The court explained that "the commonly understood meaning of the phrase 'extending between' neither requires nor precludes the existence of any intervening structure." *Id.* at 951. Just like the "extending between" language in *Toro*, here the "extending from" language does not preclude intervening components.

The Federal Circuit has repeatedly rejected similar attempts to insert "directly" or "without intervening components" requirements in claim construction. *See, e.g.*, *Wash World Inc. v. Belanger Inc.*, 131 F.4th 1360, 1371-72 (Fed. Cir. 2025) (the claim term "dependingly mounted" "is not limited to direct connections . . . and, instead, permits the presence of intervening structures," even when the specification discloses only an embodiment with direct connections); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342-43 (Fed. Cir. 2013) ("The

district court erred . . . in construing the term 'connected to' in claim 45 to require a *direct* connection between the A-frame and the mounting frame."); *Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1270-71 (Fed. Cir. 2010) (holding that "coupled to . . ." should be construed broadly so as to allow an indirect attachment).

Moreover, by imposing the "direct" and "without intervening components" requirements, Bardy ignores the nature of electrical connections and deviates from the plain meaning as understood by a person of ordinary skill in the art. Intervening components along the path of an electrical connection, such as plugs, pins, pads, springs, etc., would not interrupt the electrical connection so long as these components are electrically conductive. *See MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 151-52 (Fed. Cir. 2011) (the plain meaning of "electrically coupled" is broad and includes "indirect modes" of "electrical connection").

Even Bardy elsewhere confirms that the plain and ordinary meaning of "extending […]" does not include the extra phrases "continuing directly" and "without intervening components" that Bardy seeks to impose here. As discussed below, Bardy proposes to construe "[first substrate layer] extends horizontally away from the housing" in claim 1 of the '277 patent as "originates at the housing and continues outward."

Finally, Bardy's proposed claim construction has two other problems. First, Bardy is rewriting "extending from" as "originating at." But the plain meaning of "extending from" does not have an origination requirement—the electrical connection simply needs to extend in a direction away from the physiologic data collection circuit. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("Courts cannot rewrite claim language."). Bardy's proposed construction also introduces ambiguity because it is unclear whether "originating at" requires that the electrical connection start from inside the "physiologic data

collection circuit," or start at the periphery of the "physiologic data collection circuit." Second, claim 1 of the '554 includes the additional "linearly" limitation. By proposing the same construction for the two different terms, Bardy ignores the "linearly" language that is uniquely present in the '554 patent claim. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").

**(2) "[first substrate layer] extends horizontally away from the housing" ('277 Patent, cl. 1)**

As discussed above, Bardy improperly rewrites "extends from" as "originates at." The plain meaning of the "extends" term does not have an origination requirement and the "originates at" language only creates ambiguity where none exists in the claim. The Court should construe this term as having its plain and ordinary meaning.

**b. Bardy's Answering Position**

The "extending from" terms include "[electrical connection] extending from the physiologic data collection circuit to the electrode," "[electrical connection] extending linearly from the physiologic data collection circuit" ('734 patent, cl. 1 and '554 patent, cl. 1), and "[first substrate layer] extends horizontally away from the housing" ('277 patent, cl. 1).

In every embodiment disclosed in the shared specification of the '734, '554, and '277 patents, the electrical connection "originates at" the physiological data collection circuit or housing and does not include any intervening components along the electrical connections' extension (in part, because the electrical connection is exclusively described as a wire, without intervening components). Additionally, the first substrate layer originates at and continues outward in every embodiment disclosed in the '277 patent. Consistent with this intrinsic disclosure, Bardy proposes construing the "extending from" terms in claim 1 of the '734 patent and '554 patent as "originating at the physiological data collection circuit and continuing directly to the electrode without

intervening components," and the corresponding "extending from" term in claim 1 of the '277 patent to mean "originates at the housing and continues outward." Bardy's proposed constructions are fully supported by the intrinsic record and should be adopted.

Defendant's interpretation of the plain and ordinary meaning reduces "extending ***from***," "extending linearly ***from***," and "extends horizontally away ***from***" to mean "extending in a direction ***away*** from," but that understanding is far too vague to provide any meaningful guidance or clarity. For example, it would be inaccurate to say that the piers at Penn's Landing are "extending from" New Jersey simply because they exist somewhere between Camden and Philadelphia. Instead, the piers are "extending from" Philadelphia because they originate at Philadelphia's shoreline. The shared specification of the '734, '554, and '277 patents does not support Defendant's overly broad interpretation.

Further, Defendant argues that Bardy is changing the claim terms by "imposing the 'direct' and 'without intervening components' requirements," but Bardy is simply clarifying what the claim terms mean. The patents' specification confirms that the "extending from" terms require a direct and continuous connection between the physiologic data collection circuit, or housing, and the electrodes. The specification explains that "[w]iring 120 or other suitable electrical connections can connect the electrodes 124, 126 with the electrical components 108 of the housing." '734 Patent, 8:49-51. In Figure 1, the electrical connection, or wire, is "straight with a direct line of connection between the electrodes 124, 126 and the electronics 108." *Id.* at 8:66-9:1.




FIG. 1

’734 Patent, Figure 1 (annotated).

As noted above, every embodiment and every figure in the specification illustrates the electrical connection “originating at” the physiologic data collection circuit or housing “and continuing directly to the electrode without intervening components.” *See, e.g.*, Figures 1, 1B-1C, 1F, 6B, 9A (annotated below).



FIG. 1B



FIG. 1C

’734 Patent, Figures 1B-1C (electrical connection shown in green and origination point indicated by red circle).




FIG. 1F

’734 Patent, Figure 1F (origination point indicated by red circle).




FIG. 9A

’734 Patent, Figure 9A (electrical connection shown in green and origination point indicated by red circle).

Finally, a review of the prosecution history of a closely related family member of the ’734 patent, U.S. Patent App. No. 16/723,208 (the “’208 Application”), is instructive to the claim construction analysis. Specifically, during prosecution of the ’208 Application—ultimately issued as U.S. Patent No. 11,141,091 (the “’091 patent”), which immediately precedes the ’734 patent in this patent family—Defendant made arguments distinguishing prior art that disclosed “electrical connections [that] take a meandering path to get to each sensor, potentially introducing artifacts to the data collection.” Ex. J (U.S. App. No. 16/723,208, Applicant’s Arguments dated Oct. 16, 2020), 7-8. Thus, Defendant itself distinguished its claims from the prior art because the electrical connections extend in a direct and uninterrupted manner to the electrodes (i.e., “continuing directly

to the electrode without intervening components" as Bardy proposes). Defendant cannot propose a construction here that is different from the arguments it made to obtain their allowance during prosecution. *See Omega Eng'g, Inc.*, 334 F.3d at 1324; *In re VTran Media Techs.,* 2009 WL 2169155, at *2 (citing *Chimie*, 402 F.3d at 1384). Accordingly, this Court should adopt Bardy's proposed construction for the "extending from" terms.

**c. iRhythm's Reply Position**

**(1) "[electrical connection] extending from the physiologic data collection circuit to the electrode" / "[electrical connection] extending linearly from the physiologic data collection circuit" ('734 Patent, cl. 1; '554 Patent, cl. 1)**

Bardy does not point to anything in the plain meaning of "extending from" that requires a "direct" connection or precludes "intervening components." It fails to address *Toro Co. v. Ingersoll-Rand Co.*, which explained that "the commonly understood meaning of the phrase 'extending between' neither requires nor precludes the existence of any intervening structure." 545 F. Supp. 2d 933, 949-51 (D. Minn. 2008). As explained in iRhythm's opening brief, the Federal Circuit has consistently rejected the insertion of "direct" connection requirements not otherwise in the claim. (*Supra* Section III.B.2.a.(1) (citing *Wash World Inc. v. Belanger Inc.*, 131 F.4th 1360, 1371-72 (Fed. Cir. 2025); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342-43 (Fed. Cir. 2013); *Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1270-71 (Fed. Cir. 2010)).)

Bardy instead argues that the specification discloses a few examples where the electrical connection is a wire that directly connects the physiological data collection circuit to the electrode. (*Supra* Section III.B.2.b.) (citing '734 patent at Figs. 1, 1B, 1C, 1F, 9A).) But as explained above, the specification explicitly teaches that the electrical connection can be not only a wire, but also "other suitable electrical connections." ('734 patent at 8:49-51.) It is black letter law that

"[e]mbodiments in the specification—even if there is only one embodiment—cannot limit the scope of the claims absent the patentee's 'words or expressions of manifest exclusion or restriction.'" *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 967 (Fed. Cir. 2022). No such "manifest exclusion or restriction" exists here. The specification broadly states that the electrical connection "can connect the electrodes . . . with the electrical components," without requiring a "direct" connection. ('734 patent at 8:49-51.) Indeed, the specification states that in one example (Figure 1), the electrical connection "is straight with a *direct line of connection* between the electrodes . . . and the electronics," implying that an *indirect line of connection* is possible in other examples. (*Id.* at 8:66-9:1 (emphasis added).) In other words, "the inventors knew how to limit the term when they so desired, and chose not to do so." *Wyeth v. Impax Lab'ys, Inc.*, 526 F. Supp. 2d 474, 480 (D. Del. 2007); *see also MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 151-52 (Fed. Cir. 2011) (there are "indirect modes" of "electrical connection").

Bardy argues that during the prosecution of a related iRhythm patent, the applicant distinguished the Haines reference, arguing that Haines disclosed electrical connections that "take a meandering path to get to each sensor." (*Supra* Section III.B.2.b.) As is clear from Haines' figure cited in the prosecution (shown below), the purpose of that statement was to explain that the electrical path was meandering, instead of forming a straight line. Nothing in that statement suggested that an indirect connection is outside the claim scope or that the claims preclude "intervening components." Thus, no "clear and unmistakable disavowal of [claim] scope" exists here. *Purdue*, 438 F. 3d at 1136.




(Bardy Ex. J at 7-8.)

Bardy takes issue with iRhythm's interpretation of the term, arguing that "extending from" is not simply "away from." (*Supra* Section III.B.2.b.) It argues that the piers at Penn's Landing in Philadelphia extend from Pennsylvania, not from New Jersey which is on the other side of the Delaware River, even when the piers are away from New Jersey. (*Id.*) Bardy, however, misinterprets iRhythm's position. iRhythm explained that under the plain meaning of "extending from," "the electrical connection simply needs to extend in a direction away from the physiologic data collection circuit." (*Supra* Section III.B.2.a.(1).) Even in Bardy's Penn's Landing example, this interpretation makes sense because the piers *extend in a direction away* from Pennsylvania, not from New Jersey.

Finally, Bardy never explains what "originating at" means in its proposed construction. The term "originating at" introduces ambiguity rather than clarifying the meaning of "extending from." (*Id.*) The Court should construe this term to have its plain and ordinary meaning.

**(2) "[first substrate layer] extends horizontally away from the housing" ('277 Patent, cl. 1)**

As discussed above, Bardy never explains what "originating at" means in its proposed construction. The term "originating at" introduces ambiguity rather than clarifying the meaning of "extending from." (*Supra* Section III.B.2.a.(1).) Bardy's proposed construction also rewrites

the claim language by deleting the word "horizontally." The Court should construe this term to have its plain and ordinary meaning.

**d. Bardy's Sur-Reply Position**

The case iRhythm relies on to support its construction, *Toro Co. v. Ingersoll-Rand Co., Ltd.*, is inapposite. 545 F. Supp. 2d 933 (D. Minn. 2008). The claim term at issue there was "extending ***between***" not "extending ***from***," a difference iRhythm ignores. If anything, *Toro* supports Bardy's construction by providing another example where "extending from" means originating at a reference point and continuing outward without intervening components or breaks. Specifically, the court in *Toro* pointed to the patent owner's statements made during prosecution regarding "an operator … ***extending*** his arms straight out ***from*** his shoulders in an attempt to stretch and reach the controls." *Id.* at 952 (emphasis added). Like the operators arms in *Toro*, which originate at his shoulders and "stretch and reach," or continue, directly outwards from his shoulders to the controls, the electrical connection originates at the physiological data collection circuit and continues to the electrode without intervening components.

iRhythm failed to address the "originating at" language in Bardy's proposed construction, and instead asserts that "Bardy never explains what 'originating at' means." *Supra* Section III.B.2.c(1). This is incorrect. Bardy provided numerous examples from the '734, '554, and '277 patents' specifications supporting its construction, and even offered an illustrative analogy. *Supra* Section III.B.2.b. Using that analogy, iRhythm seemingly agrees with Bardy that, at Penn's Landing, "the piers extend in a direction away from Pennsylvania, ***not from*** New Jersey." *Supra* Section III.B.2.c(1) (emphasis added). The only way iRhythm's concession can be reconciled is to acknowledge that the term "extending from" necessarily requires a physical origination point, whether that be the Pennsylvania shoreline or the physiologic data collection circuit. Accordingly, this Court should adopt Bardy's proposed construction.

For the same reasons, the Court should adopt Bardy's construction for "[first substrate layer] extends horizontally away from the housing" ('277 patent, cl. 1) to mean "originates at the housing and continues outward."

### 3. Term 8: "extending at least partially below the housing"

| "extending at least partially below the housing" ('734 Patent, cl. 1) | |
|---|---|
| **iRhythm's Construction** | **Bardy's Construction** |
| Plain and ordinary meaning | "adhesive that extends partially, but not completely, below the housing" |

#### a. iRhythm's Opening Position

Claim 1 of the '734 patent recites "a lower adhesive layer . . . extending at least partially below the housing." ('734 patent, cl. 1.) The plain meaning of "extending *at least* partially below the housing" is clear—extending partially below the housing *or more than* partially below the housing. The "at least" language sets forth a lower bound, not an upper bound. *See Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1581 (Fed. Cir. 1995) (the phrase "at least" means "as the minimum," and sets forth a "lower limit of a range"); *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) ("Use of the phrase 'at least one' means that there could be only one or more than one."); *SZ DJI Tech. Co. v. Autel Robotics USA LLC*, No. 16-cv-706-LPS, 2019 WL 6840357, at *5 (D. Del. Dec. 16, 2019) (the phrase "at least about 3 cm" is "used to describe the minimum distance"). Bardy's contention that the adhesive cannot extend completely below the housing violates the plain meaning of the phrase "at least." *See AC Techs. S.A. v. Amazon.com, Inc.*, 912 F.3d 1358, 1366 (Fed. Cir. 2019) (storing "at least one piece" of a file is broad enough to cover storing the entire file).

Indeed, the specification discloses that the adhesive can extend either partially or completely below the housing. For example, Figure 5B shows an example where the "flaps 154,

156" (which comprises the adhesive that adheres to the skin) extend partially below the "housing 102." ('734 patent at 11:22-30.)




FIG. 5B

(*Id.* at Fig. 5B.) In Figure 6B of the specification, however, the adhesive extends completely below the housing:




FIG. 6B

(*Id.* at Fig. 6B.) Thus, Bardy's proposed construction is wrong because it excludes an embodiment in the specification. *See Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1220 (Fed. Cir. 2020) ("[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment."). The Court should construe this term as having its plain and ordinary meaning.

**b. Bardy's Answering Position**

Defendant's plain and ordinary construction proposes a meaning that is not present in the specification or intrinsic record.

Defendant's overly broad construction of "extending at least partially below the housing" to mean "extending partially below the housing *or more than* partially below the housing" is at

odds with the ’734 patent’s specification and figures. Every embodiment in the specification either has no adhesive below the housing (*see, e.g.*, ’734 Patent, Fig. 1B) or adhesive below only a portion of the housing (*see, e.g.*, ’734 Patent, Figs. 5B-5C).

Defendant alleges that there is a single embodiment purportedly showing the adhesive extending completely below the housing: Figure 6B. Defendant’s Opening Br., at 7. However, “FIG. 6B is a cross-section of the patch of FIG. 6A,” (’734 Patent, 7:3), and Figure 6A is clear that “the flaps 154, 156 may be augmented by a connector segment 607 used to join the flaps together. The connector segment 607 can extend below the housing 102, but remain unattached to the housing 102.” ’734 Patent, 12:66-13:3. While the specification does describe this butterfly shape in one embodiment as having the bottom surface “covered with adhesive,” it is clear from Figure 6A that connector segment 607 does not extend completely below the housing. Further, the specification goes on to describe how holes 614 and 616 are present to “minimize the potential for undesired sticking.” *Id.* at 13:18-33.

The single embodiment identified by Defendant does not disclose adhesive completely below the housing. *See id.* at Fig. 6A (annotated below, showing connector segment 607 and flap 156 annotated in green and housing 108 annotated in yellow). In this embodiment, from below looking up, more than half of the housing does not have any adhesive below it.




FIG. 6A

’734 Patent, Figure 6A (annotated).

There is no embodiment in the ’734 patent specification that discloses the adhesive extending completely below the housing. As such, Bardy’s proposed construction does not exclude an embodiment in the specification, but rather captures the specification’s consistent teaching that adhesive lies only partially beneath the housing while maintaining an unattached, floating portion of the housing. This construction is true to the advantages of a “floating housing” touted throughout the specification. *See, e.g.*, ’734 patent, 9:65-10-16, 11:3-11, 11:39-50. It is Defendant that seeks to impermissibly construe the claim to have a “broader scope than the invention that is set forth in the specification.” *On Demand Mach. Corp.*, 442 F.3d at 1340 (citing *Phillips*, 415 F.3d at 1303). The Court should adopt Bardy’s construction of “extending at least partially below the housing.”

**c. iRhythm’s Reply Position**

Bardy does not dispute that the plain meaning of “at least” defines a lower bound, not an upper bound. (*See supra* Section III.B.3.a. (citing *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1581 (Fed. Cir. 1995); *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999)).) Nor does it

address the Federal Circuit's holding that "at least" a portion can mean the entirety. *See AC Techs. S.A. v. Amazon.com, Inc.*, 912 F.3d 1358, 1366 (Fed. Cir. 2019) (storing "at least one piece" of a file is broad enough to cover storing the entire file). Therefore, unlike Bardy's proposed construction, the claim term covers the scenario where the adhesive extends *completely* below the housing.

Bardy points to examples in the specification where the adhesive is below a portion of the housing. (*Supra* Section III.B.3.b.) These examples in the specification, however, "cannot limit the scope of the claims." *Apple*, 25 F.4th at 967. And as iRhythm has explained, Figure 6B actually discloses adhesive extending completely below the housing:



FIG. 6B

('734 patent at Fig. 6B (annotation added).) Bardy argues that Figure 6B is a "cross-section" view that does not show adhesive extending completely below the housing. (*Supra* Section III.B.3.b.) But Bardy itself relies on a cross section view elsewhere, alleging that the cross section view in Figure 9A can show one layer completely covering another, with respect to the "extends horizontally beyond a boundary" term (discussed below in Section III.B.5.b.).



FIG. 9A

(*Infra* Section III.B.5.b. (citing '277 patent at Fig. 9A).) And its attempt to limit the teaching of one figure (Figure 6B) by pointing to a different figure (Figure 6A) fails. When describing Figures

6A and 6B, the specification makes clear that the "connector segment" (layer with adhesive) "can extend *below the housing 102*," not below just a portion of the housing. ('734 patent at 12:1-3 (emphasis added).) And the "butterfly shape" shown in Figure 6A is only a non-limiting example of the shape of that connector segment.

Bardy also argues that the specification discloses the advantages of a "floating housing." (*Supra* Section III.B.3.b.) But the adhesive can extend completely below the housing without affecting the floating housing design. The claim only requires the adhesive to be "below" the housing, not attached to the housing. Thus, the housing can "float" above the adhesive layer as long as there is a gap between the housing and the adhesive layer underneath, even if the adhesive extends completely below the housing. Figure 6B, shown above, is an example of such a design.

Thus, the Court should reject Bardy's "not completely" requirement and construe "extending at least partially below the housing" to have its plain and ordinary meaning.

**d. Bardy's Sur-Reply Position**

iRhythm's Reply makes clear that it seeks to capture subject matter it did not invent. For some patents, the term "at least" can encompass "the entirety." Here, however, the context makes clear that the claim term should be construed, as Bardy proposes—"adhesive that extends partially, but not completely, below the housing."

Bardy's construction is not at odds with the Federal Circuit's holding in *AC Techs. S.A. v. Amazon.com, Inc.*, 912 F.3d 1358 (Fed. Cir. 2019). There, the court upheld the PTAB's construction of "at least one piece" to mean "more than one piece, and thus all of the pieces of an entire file." *Id.* at 1365. This is not a bright-line rule as iRhythm asserts. Rather, the Federal Circuit reasoned that because the same claim "requires storage of ***all pieces of a complete file*** as a complete file," "the claims themselves specifically contemplate storage and copying of multiple pieces of a file." *Id.* at 1366 (emphasis added). The court also explained that "[t]he specification

further supports the Board's claim construction" because "[i]t contemplates 'distribution of the entire data,' not merely specific pieces." *Id.*

Here, there is not a single embodiment in the '734 patent that discloses adhesive extending completely below the housing. In fact, such a construction is antithetical to the stated advantages of the invention (*i.e.*, allowing the rigid housing to float above the skin of the wearer). '734 patent, 13:23-31. iRhythm maintains its argument that "Figure 6B actually discloses adhesive extending completely below the housing," despite the '734 patent explicitly stating that "FIG. 6B is a ***cross-section*** of the patch of FIG. 6A[.]" '734 patent, 7:1-3. iRhythm treats a two-dimensional cross-section (Figure 6B) as if it discloses some non-existent three-dimensional structure (*supra* Section III.B.3.c), contrary to the express relationship between Figures 6A and 6B. '734 patent, 7:1-3. This relationship matters, as Bardy did not arbitrarily combine unrelated figures, but instead relied on the specification's explicit linkage between Figures 6A and 6B and their respective relevance to the claim term. iRhythm's mischaracterization of its own specification to manufacture support for its construction should be rejected. iRhythm does not dispute that Figure 6A does not depict an adhesive extending completely below the housing, but rather acknowledges the "butterfly shape" of that adhesive connector segment. *Supra* Section III.B.3.c.

Ultimately, iRhythm's support for its proposed construction amount to nothing more than attorney argument and should be rejected. iRhythm has not identified any support in the '734 patent's specification that discloses the adhesive extending completely below the housing, and iRhythm should not now be able to insert this overly broad interpretation designed to bake its non-infringement arguments into claim construction.

### 4. Term 9: "configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user"

| "configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user" ('734 Patent, cl. 1) | |
|---|---|
| **iRhythm's Construction** | **Bardy's Construction** |
| Plain and ordinary meaning | Indefinite<br><br>or<br><br>"specifically designed to move into or out of a sloping relationship relative to the adhesive layer contacting the skin in response to movement of the user" |

#### a. iRhythm's Opening Position

Claim 1 of the '734 patent recites that "the housing is configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user." ('734 patent, cl. 1.) For example, one benefit of allowing the tilting is that "if the person wearing the device rolls over (as shown in FIG. 4A) or is involved in activities that can otherwise cause movement of the skin (as shown in FIG. 4B)," the device stays adhered to the body. (*Id.* at 10:10-16.)




FIG. 4A




FIG. 4B

(*Id.* at Figs. 4A, 4B.)

The phrase "tilt at an angle" has a clear meaning. *See, e.g.*, *Cloud Farm Assocs., L.P. v. Volkswagen Grp. of Am., Inc.*, No. 10-cv-502-LPS, 2012 WL 3069405, at *4-5, 11-12 (D. Del. July 27, 2012) (construing "preventing tilting . . ." as "to stop . . . tilting" without further construing the term "tilting"). And the specification informs a person of ordinary skill in the art of the scope of the term "with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). The term is not indefinite as Bardy asserts.

The alternative construction that Bardy proposes, "specifically designed to move into or out of a sloping relationship relative to the adhesive layer contacting the skin in response to movement of the user," is also wrong. Nothing in the intrinsic evidence imposes a "specifically designed" requirement and "configured to" does not mean "specifically designed to." *See Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 41-42 (Fed. Cir. 2020) (rejecting proposed construction of "configured to" as "designed to"); *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1356 (Fed. Cir. 2020) (the phrase "adapted to" does not require "a particular intent or objective" of the manufacturer). The "specifically design" phrase also introduces ambiguity as to how specific the designer's intent must be. The next part in Bardy's proposed language, "move into or out of a sloping relationship," is also ambiguous. It is not clear what causes the "mov[ing]" and what "a sloping relationship" requires.

Thus, the Court should construe this term as having its plain and ordinary meaning.

**b. Bardy's Answering Position**

The term "configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user" is indefinite because it fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *See Nautilus Inc. v. Biosig Inst., Inc.*, 572 U.S. 898, 901 (2014). First, the term "tilt" does not appear in the specification, and neither the '734 patent nor its prosecution history provides any definition, context, or example from which a person

of ordinary skill in the art could discern the claim term's "plain and ordinary meaning." Second, a substantially similar claim term involving "configured to tilt" was rejected as lacking support in the specification in a closely related family member of the '734 patent further highlighting why the term is indefinite. After reading the claims, specification, and prosecution history, a POSITA is left to guess the meaning of the "configured to tilt" claim term.

As a preliminary matter, the only intrinsic evidence that Defendant cites for this claim term is Figures 4A and 4B of the '734 patent specification. Defendant's Opening Br., at 8-9. However, Figures 4A and 4B are not in the provisional application to which the '734 patent claims priority. While Welch Allyn disagrees that these figures support Defendant's plain and ordinary meaning arguments, to the extent Defendant contends that the only support for this claim term is found in Figures 4A and 4B, the '734 patent is not entitled to claim priority to the '081 application's priority date of May 12, 2010. *See Evolved Wireless, LLC v. Apple, Inc.*, Civ. A. Nos. 15-542-JFB-SRF, 15-543-JFB-SRF, 15-544-JFB-SRF, 15-545-JFB-SRF, 15-546-JFB-SRF, 15-547-JFB-SRF, at *4 (Feb. 21, 2019) ("A reference patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of the provisional application provides support for the claims in the reference patent in compliance with § 112, ¶ 1.") (citing *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015)).

**(1) The '734 patent's specification and prosecution history confirm that the term "configured to tilt at an angle" is indefinite**

Defendant does not identify any support in the '734 patent's specification that suggests the meaning of the phrase "configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user." Nor does Defendant provide an explanation of the meaning of the claim term despite asserting that "[t]he phrase 'tilt at an angle' has a clear meaning." Instead, Defendant merely states that "the specification informs a person of ordinary skill in the art of the scope of the

term 'with reasonable certainty'" but does not even attempt to point to any disclosure in the '734 patent's specification or any other intrinsic evidence to support this argument, nor does Defendant provide any indication of what that scope is. This is likely because there is no evidence that supports Defendant's proposal.

A review of the prosecution history of a closely related family member of the '734 patent, U.S. Patent App. No. 16/723,208 (the "'208 application"), is instructive. Specifically, during prosecution of the '208 application—ultimately issued as the '091 patent, which immediately precedes the '734 patent in this patent family— Defendant filed a claim set adding substantially the same "configured to tilt" claim term at issue here. *See* Ex. K (U.S. Patent App. No. 16/723,208 Final Office Action dated December 11, 2020), 2-3. The examiner rejected the claims containing the tilt language finding that they lacked 35 U.S.C. § 112 support:

> These claims set forth that the housing is configured to tilt; however, ***the term 'tilt' is never set forth in the disclosure***. Applicant references paragraphs [0008] and [0077] of the PG Pub to support the limitation, but such ***support is not seen in those paragraphs or the identified drawing figures***. Therefore, ***the meaning of the term with respect to the capability of the housing is unclear*** and lacks enablement.

Ex. K, 3. In response, Defendant canceled the claims in the '208 application, seemingly acquiescing to the examiner's rejection. The tilt language is presently at issue not because Defendant proved that the specification supports the tilt limitation, but rather because a different examiner examined the application that issued as the '734 patent. When Defendant sought claims reciting the "tilt" limitation for a second time, unlike with the '208 application, Defendant did not direct the new examiner to any disclosure in the specification that supports the tilt language (because there is none). Ex. L ('811 application, Preliminary Amendment dated June 29, 2021), 3. Claims with the tilt limitation ultimately slipped by the new examiner and issued, but these claims should now be deemed indefinite.

Like the examiner for the '208 application, the Court should find the term "configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user" unsupported by the specification and indefinite.

**(2) Defendant's proposed construction is factually and legally unsupported**

Because Defendant cannot point to any intrinsic evidence that supports its proposed construction, Defendant manufactures a purported benefit of allowing tilting. Specifically, Defendant argues that by allowing tilting, the device may stay adhered to the skin if the user rolls over or engages in activities that cause the skin to move. Defendant's Opening Br., at 8. However, the '734 patent does not include any such disclosure, nor is this claimed (had the applicant wanted to claim such a configuration, they could have attempted to do so). What the '734 patent actually states is that "[t]he flexible sections can thus adhere to the body if the underlying portion of the body is stretched and/or contracted ***while the floating section is free to move above the skin***, for example if the person wearing the device rolls over." '734 Patent, 10:10-16. "Floating" and "move above" do not reasonably mean "tilt." Thus, the '734 patent may contemplate a "floating" housing that "moves above" a user's skin, but the '734 patent does not contemplate a housing that "tilts at an angle." '734 Patent, 10:10-16.

The case Defendant cites does not support Defendant's construction either. In *Cloud Farm Associates, L.P. v. Volkswagen Group of America, Inc.*, C.A. No. 10–502–LPS, 2012 WL 3069405 (D. Del. July 27, 2012), the court explained that the patent at issue provided support for the plain and ordinary meaning of the claim term "prevent movement of the piston and further tilting of the body of the vehicle." However, *Cloud Farm* relates to a different patent, with a different specification, and a different set of intrinsic evidence, such that it is irrelevant to the issue at hand under *Phillips*. The court pointed to support in the specification when rejecting the patent owner's

proposed construction, such as disclosure regarding a "vehicle tilt [that] reaches a predetermined limit," "preventing the piston 31 from moving upward [thereby] restraining any further tilt of the body of the vehicle," and "upon sensing of excessive tilt, the opening in the plate is closed so that fluid flow is shut off." *Cloud Farm Assocs., L.P.*, 2012 WL 3069405, at *5. Unlike the patent in *Cloud Farm*, the '734 patent specification does not recite "tilt" a single time, much less go so far as defining predetermined tilting limits.

Further, the term "tilt at an angle," for example, ordinarily connotes rotation around a hinge or pivot point. But the portion of the specification that Defendant relies on discloses only a "floating" housing, which by definition precludes being fixedly attached to any point. In contrast, as shown in Figures 5A through 5C, as the body of the patch begins to bend concave to conform to the convex curvature of the user's chest (i.e., the right and left end of the patch bend higher than the center of the body of the patch) the housing moves vertically away from the user's skin.



FIG. 5A



FIG. 5B



FIG. 5C

'734 Patent, Figures 5A-5C (annotated). The term "tilt at an angle" does not mean a purely vertical translation under any reasonable interpretation. The existence of multiple possible interpretations of what it means to be "configured to tilt at an angle" only highlights the claim term's ambiguity. Defendant's failure to provide any explanation as to what the "plain and ordinary meaning" is, further exacerbates this problem. Further, the specification is devoid of any description of how the ***housing*** is "configured to tilt." The specification describes selective use of adhesive under the housing and the use of hinge portions between housing 102 and wings 114, which allow the housing to float above the skin. The specification, however, does not describe how the housing is configured to tilt. In sum, Defendant's reliance on "tilt" introduces a concept found nowhere in the '734 patent specification and unsupported by any intrinsic evidence. The ambiguity among these possible interpretations underscores why a "plain meaning" construction cannot resolve the dispute. Bardy's proposed construction provides the only definition consistent with the '734 patent's disclosure and the real-world mechanics of the device.

**(3) Bardy's proposed alternative construction aligns with the '734 patent's disclosure**

Bardy's proposed construction is consistent with the '734 patent's disclosure, and an analysis of Bardy's proposed construction piece-by-piece makes this clear. ***First***, the meaning of "configured to" has been repeatedly and consistently confirmed by the Federal Circuit to be synonymous with narrower phrases such as "adapted to," "made to," and "designed to." *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) ("In common parlance, the phrase 'adapted to' is frequently used to mean 'made to,' 'designed to,' or 'configured to[.]'"). Accordingly, Bardy's proposed construction of "specifically designed to …" is proper. *Id.* (construing the term "adapted to" to mean "designed or configured to accomplish the specific objective, not simply that they can be made to serve that purpose").

***Second***, Bardy's proposed construction for the claim term "tilt at an angle relative to the lower adhesive layer in response to movement of the user" to mean "move into or out of a sloping relationship relative to the adhesive layer contacting the skin in response to movement of the user" aligns with the disclosure in the '734 patent, including even the portion Defendant identifies as support for its own construction. As shown in Figures 4A and 4B, the housing appears to lift vertically away from, and float above, the user's skin.




'734 Patent, Figures 4A-4B.

Specifically, the "housing 102 can float above the adhered portions, allowing for increased flexibility of the patch." '734 Patent, 8:10-12. The human body's surface does not move uniformly; one side of the chest may bend more than the other causing one side of the patch to bend more than the other side. When that occurs, the housing naturally assumes a *sloping* orientation relative to the adhesive layer: one edge rises slightly higher than the opposite edge, creating a non-parallel relationship. This relative movement (vertical and asymmetric) is exactly what the '734 patent depicts and describes, and it is what Bardy's construction captures.

Moreover, the '734 patent uses other, precise terms elsewhere to describe relative motion when intended. For example, "floating" and "moving above the skin," which underscores the ambiguity of "tilt." This inherent ambiguity further demonstrates that the Court cannot rely on an undefined "plain and ordinary meaning," and instead must construe the term to resolve the parties' dispute. Accordingly, the Court should adopt Bardy's proposed construction.

**c. iRhythm's Reply Position**

Bardy concedes that this term is not indefinite by discussing the specification's disclosure for the "tilt at an angle" term at length. For example, Bardy *agrees with* iRhythm that Figures 4A and 4B describe an angle (what Bardy calls a "sloping relationship") formed between the housing and the adhesive layer:




(*Supra* Section III.B.4.b.(3) (citing '734 patent at Figs. 4A, 4B).) Bardy even explains that the angle forms because "one side of the chest may bend more than the other . . . side." (*Id.*) As a result, "one edge [of the housing] rises slightly higher than the opposite edge, creating a non-parallel relationship." (*Id.*) In addition to Figures 4A and 4B, Bardy also cites Figure 5C, which shows the angle between the housing (102) and adhesive layer (156) in a cross section view:




FIG. 5C

('734 patent at Fig. 5C (annotation added).)

Bardy argues that the specification does not disclose "rotation around a hinge or pivot point" required by the term "tilt at an angle." (*Supra* Section III.B.4.b.(2).) But this is exactly what Figure 5C discloses: the structure in Figure 5C includes a "hinge portion[] 196" that allows for "bending" and formation of an angle. ('734 patent at 9:60-64.)

Thus, Bardy contradicts its own argument that the "floating housing" design in the specification only involves a vertical movement, not a tilting movement. (*See supra* Section III.B.4.b.(2).) As shown in Figures 5A-5C, as the housing (102) moves away from the skin, the tilting angle forms as a result.




('734 patent at Figs. 5A, 5C (modified and annotation added).)

Bardy argues that the specification does not refer to the "tilting" term. (*Supra* Section III.B.4.b.(2).) But a term is not indefinite simply because "the precise words used in the patent's specification are not [] used in the [patent's] claims." *SDS USA, Inc. v. Ken Specialties, Inc.*, 107 F. Supp. 2d 574, 579 (D.N.J. 2000).

Bardy argues that when examining a different iRhythm application, a different examiner rejected the "tilt at an angle" limitation on enablement grounds. (*Supra* Section III.B.4.b.(1).) As an initial matter, the '734 patent at issue here is presumed to be valid and definite, regardless of the view of a different examiner when examining a different patent. Moreover, whether the claim limitation is *enabled* is irrelevant to the *definiteness* issue here, as enablement is a different inquiry under a different subsection of § 112. *See Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350 (Fed. Cir. 1999) ("[D]efiniteness and enablement are analytically distinct requirements [of validity], even though both concepts are contained in 35 U.S.C. § 112."). The same office action did raise an indefiniteness rejection on a different claim limitation, not the "tilt at an angle" limitation. (Bardy Ex. K at 3.) Thus, even that examiner did not believe that the "tilt at an angle" limitation was indefinite.[31]

Bardy also raises a priority date issue that has nothing to do with claim construction. It argues that Figures 4A and 4B that iRhythm cites as description for the "tilt at an angle" limitation were not in the provisional application. (*Supra* Section III.B.4.b.) Thus, according to Bardy, the claim here is not entitled to the priority date of the provisional application. (*Id.*) Although the Court need not address the priority date issue at this stage, Bardy's argument fails regardless. The

---

[31] Moreover, the examiner of the '734 patent, Examiner Antiskay, eventually also took over the examination of that different iRhythm application. (*Compare* Ex. 4, '091 Patent Notice of Allowance *with* Ex. 5, '734 Patent Notice of Allowance.) So Examiner Antiskay was fully aware of this prosecution history when he granted the '734 patent.

provisional application described the same "hinge" design that allows the housing to tilt at an angle relative to the adhesive layer. (*See, e.g.*, Provisional Appl. No. 61/334,081 at [0008] ("[T]he flexible sections adhere to the body if the underlying portion of the body is stretched and/or contracted while the floating section is free to move above the skin. The adhered flexible areas may provide a hinge behavior allowing the adhered flexible areas to move under the rigid area during contraction and move away during stretching of the underlying body.").)

As to Bardy's alternative construction ("specifically designed to move into or out of a sloping relationship . . ."), Bardy cites no case that suggests inserting "specifically" into the claim is appropriate. Adding a "specifically" requirement to "configured to" "risks importing a state of mind element into the patent" that is irrelevant in patent infringement. *Trove Brands, LLC v. CamelBak Prods., LLC*, 756 F. Supp. 3d 760, 781 (N.D. Cal. 2024) (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1353 (Fed. Cir. 2001)). And the Federal Circuit has previously rejected the replacement of "configured to" with "designed to." *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 41-42 (Fed. Cir. 2020). The *Aspex* decision that Bardy cites stated that "adapted to" can mean either "'designed to[]' ***or*** 'configured to,'" confirming that "designed to" and "configured to" have different meanings. *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) (emphasis added).

The Court should reject Bardy's indefiniteness argument and construe this term to have its plain and ordinary meaning.

**d. Bardy's Sur-Reply Position**

iRhythm misstates the law in its Reply. iRhythm did not cite any legal authority for its proposition that "Bardy concedes that this term is not indefinite by discussing the specification's disclosure for the [term] at length." *Supra* Section III.B.4.c. Courts in this District have recognized "that the submission of a proposed construction for a claim term does not amount to a

waiver of a later indefiniteness challenge." *TQ Delta, LLC v. 2Wire, Inc.*, 373 F. Supp. 3d 509, 523 (D. Del. 2019) (quoting *Leader Techs., Inc. v. Facebook, Inc.*, 770 F. Supp. 2d 686, 708 (D. Del. 2011)) (internal citations omitted). No concession has occurred here.

iRhythm's arguments lack consistent or coherent support in the intrinsic evidence. iRhythm's Opening Brief cited two figures (Figure 4A-4B) and one sentence from the '734 patent specification as support for its construction. *Supra* Section III.B.4.a (citing '724 patent, Figs. 4A-4B, 10:10-16). The figures and disclosure contain no reference to a tilting, hinging, or pivoting feature, or any housing that is designed to reorient itself in such a manner. In its Reply, however, iRhythm abandons the limited evidence it originally relied on and shifts to a new theory, asserting that a so-called "hinge design" supposedly "allows the housing to tilt at an angle relative to the adhesive layer." *Supra* Section III.B.4.c. iRhythm highlighted this "hinge design" when discussing the '081 provisional application's purported support for the '734 patent. iRhythm now points to the '081 provisional application as the source of this "hinge design." But the disclosure in the '081 provisional on which iRhythm now relies is entirely different from the sentence and figures it cited in its Opening Brief. In its Opening Brief, iRhythm did not refer to, much less cite, any disclosure regarding a hinge. Nor does any such hinge design appear in Figures 4A-4B, the only intrinsic evidence iRhythm originally identified in support of its construction. Nothing in those figures suggests that the housing is capable of such reorientation. This shifting reliance, including a significant expansion of its relied-upon evidence, underscores that iRhythm is backfilling its construction rather than applying a construction grounded in the intrinsic record.

Fundamentally, iRhythm fails to identify any evidence where the housing is described as being configured to move into an angled orientation relative to the adhesive layer. The only

structure that flexes or deforms in the '734 patent is the ***flexible layer***. iRhythm's construction improperly conflates bending of the flexible material with the housing configuration.

Finally, *Aspex* does not distinguish between the phrases "adapted to," "made to," "designed to," and "configured to," but rather characterizes the terms as synonymous. *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012). iRhythm's argument that *Aspex* confirms that "designed to" and "configured to" "have different meanings" is yet another misstatement of the law. *Supra* Section III.B.4.c. Accordingly, based on a correct reading of the case law and the intrinsic evidence, Bardy's proposed construction should be adopted.

### 5. Term 10: "the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer"

| "the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer" ('277 Patent, cl. 1) | |
|---|---|
| **iRhythm's Construction** | **Bardy's Construction** |
| Plain and ordinary meaning | "the second substrate layer entirely covers, and extends beyond the peripheral edge of, the first substrate layer" |

#### a. iRhythm's Opening Position

The claim language at issue has two requirements: "the second substrate layer" is (1) "*positioned over* the first substrate layer" and (2) "extends horizontally beyond a boundary of the first substrate layer." The plain meaning of "positioned over" is clear—one component is located above another. Yet Bardy attempts to replace "positioned over" with "entirely covers" in disregard of the original claim language. The phrase "positioned over" does not require a complete covering. Such rewriting of claim language is not permitted. *See Helmsderfer*, 527 F.3d at 1383 ("Courts cannot rewrite claim language."). Similarly, Bardy's rewriting of "extends horizontally

beyond a boundary" to "extends beyond a peripheral edge" excludes the term "horizontally" and improperly changes the meaning of the claim term.

Thus, the Court should reject Bardy's proposed construction and construe this term as having its plain and ordinary meaning.

**b. Bardy's Answering Position**

As a common theme, Defendant again proposes a plain and ordinary construction to broadly capture subject matter that it did not invent. This approach should be rejected, and the Court should adopt Bardy's proposed construction: "the second substrate layer entirely covers, and extends beyond the peripheral edge of, the first substrate layer."

The '277 patent provides several embodiments, which exclusively show the first layer to (1) entirely cover the second layer and (2) extend beyond the peripheral edge of the second layer. One example is shown below in Figure 9A. "[A]s the patch 900 is worn over a period of time, the layers 901, 902, 903 can be sequentially removed." '277 Patent, 14:3-5. Figures 10A to 10B provide a similar embodiment, which "include[s] multiple portions of adhesive to help adhere the layer to both the skin and the patch itself." *Id.* at 14:8-11.




FIG. 9A

'277 Patent, Figure 9A.

Figure 9A is also described in the summary section of the '277 patent. Namely, the '277 patent provides "an electronic device that has a patch including a housing containing an electronic component." '277 Patent, 3:59-61. The device includes "a first adhesive strip extending around the perimeter of the patch and a second adhesive strip ***extending around the perimeter*** of the first

adhesive strip." *Id.* at 3:63-65. Additionally, "the first adhesive cover over the first adhesive strip and a second adhesive cover over the second adhesive strip." *Id.* at 3:65-4:1. Here, the embodiment of the '277 patent having these features is "the *only* one described." *Gen. Am.*, 93 F.3d at 770. Bardy's proposed construction captures both of these concepts—the first layer covering the second layer and extending beyond the peripheral edge of the second layer.

Rather than address this disclosure, Defendant ignores the entirety of the '277 patent. Defendant does not provide a single citation to the '277 patent and only includes a conclusory position that the plain meaning is clear. Thus, the Court should adopt Bardy's proposed construction as consistent with the specification: "the second substrate layer entirely covers, and extends beyond the peripheral edge of, the first substrate layer."

**c. iRhythm's Reply Position**

Bardy does not point to anything in the plain meaning of this term that requires the second substrate to "entirely cover[]" the first substrate. Instead, as iRhythm has explained, neither the "positioned over" language nor the "extends horizontally beyond a boundary of" language requires complete covering of the first substrate. (*Supra* Section III.B.5.a.)

Bardy argues that the specification discloses an example where the second layer entirely covers the first layer:




FIG. 9A

(*Supra* Section III.B.5.b. (citing '277 patent at Fig. 9A).) Again, this example in the specification "cannot limit the scope of the claims." *Apple*, 25 F.4th at 967. Moreover, the specification discloses another example immediately after Figure 9A, where the upper layer *does not* entirely

cover the lower layer (as shown in the highlighted area) but still "extends horizontally beyond a boundary of" of the lower layer.




FIG. 10A

('277 patent at Fig. 10A (annotation added).)

Bardy also cites the summary of invention which references "a second adhesive strip *extending around the perimeter* of the first adhesive strip." (*Supra* Section III.B.5.b. (citing '277 patent at 3:63-65).) This language confirms that the second substrate only needs to extend beyond the boundary of the first substrate, and does not need to completely cover the first substrate.

As explained in iRhythm's opening brief, Bardy's proposed construction is problematic also because it removes the word "horizontally" from the claim and suggests that the second layer can extend beyond any edge of the first layer, not just "horizontally." (*Supra* Section III.B.5.a.) Thus, the Court should reject Bardy's "entirely covers" and "peripheral edge" requirements and construe this term to have its plain and ordinary meaning.

**d. Bardy's Sur-Reply Position**

Bardy previously established how each embodiment of the '277 patent provides a second layer that entirely covered the first layer. Bardy's Answer, 21 (citing '277 patent Figure 9A, 3:65-4:1). iRhythm does not dispute Bardy's cited embodiments but argues that Bardy's construction is an example that "cannot limit the scope of the claims." *Supra* Section III.B.5.c. Bardy's construction reflects the proper scope of the claims in view of the specification. Furthermore,

iRhythm cites to Figure 10A and argues that the '277 patent allegedly discloses an example "where the upper layer ***does not*** entirely cover the lower layer." *Supra* Section III.B.5.c.

iRhythm misunderstands Figure 10A. Bardy's proposed construction is: "the second substrate layer entirely covers … the ***first substrate layer***." In its example, iRhythm identifies an embodiment where the second substrate layer does not entirely cover the ***housing***—not the first substrate layer. The housing in Figure 10A, which is annotated below in yellow, is the layer that is nearest to the electrical components. '277 Patent, Figure 10A, 7:31-41. Even more, Figure 10A aligns with Bardy's construction. The second layer (*e.g.*, 1003) entirely covers each layer that is positioned below the second layer, including the first layer (*e.g.*, 1001 or 1002).




FIG. 10A

'277 patent, Figure 10A (annotated).

iRhythm provides only a conclusory response to Bardy's argument how each embodiment of the '277 patent provides a second layer that extends beyond the peripheral edge of the first layer. *Supra* Section III.B.5.c. The Court should adopt Bardy's proposed construction.

### 6. Term 11: "electrical contact with"

| "electrical contact with"<br>('859 Patent, cl. 1; '860 Patent, cl. 1) | |
|---|---|
| **iRhythm's Construction** | **Bardy's Construction** |
| Plain and ordinary meaning | Indefinite<br><br>or<br><br>"in physical contact with or in capacitive connection with" |

#### a. iRhythm's Opening Position

U.S. Patent Nos. 12,245,859 (the "'859 patent") and 12,245,860 (the "'860 patent"), assigned to iRhythm, share a common specification and a common priority date, January 24, 2013. They have the same title: "Physiological Monitoring Device."

As the common specification explains, prior art cardiac rhythm monitoring devices required improvements in the areas of "[s]ignal quality," "device adhesion," and "ease of disassembly," among others. ('859 patent at 2:60-3:23.) The '859 and '860 patents describe and claim such improvements, including a novel button design with a support post that reduces unwanted noise in the cardiac signal, and a pair of springs that allow for easier disassembly compared to conventional soldering, which allow components of the device to be reused. (*See, e.g.*, '859 patent, cl. 1; '860 patent, cl. 1; '859 patent at 7:7-11, 16:2-10.)

Claim 1 of the '859 patent and claim 1 of the '860 patent each recites: "at least a portion of the flexible electrode trace is in *electrical contact with* a second spring contact" (emphasis added). ('859 patent, cl. 1; '860 patent, cl. 1.) "[E]lectrical contact" is a commonly understood term. *See* Ex. 1, *Modern Dictionary of Electronics* (7th ed. 1999) (defining "contact" as a "juncture point" to provide "a complete path for current flow"). Indeed, many courts have addressed "electrical contact" or similar terms and had no issue discerning their plain and ordinary meanings.

*See, e.g.*, *Abbott Diabetes Care*, 2007 WL 1239220, at *8 (construing "electrical contact" to mean "connected or positioned in such a way that electricity can flow between"); *Cellport Sys.*, 847 F. Supp. 2d at 1310 (construing "electrically interconnected" as "a connection between two devices that allows the transfer of electrical signals"). A person of ordinary skill in the art would understand the scope of the term "electrical contact with" "with reasonable certainty." *Nautilus*, 572 U.S. at 910. The term is not indefinite as Bardy asserts.

The alternative construction that Bardy proposes, "in physical contact with or in capacitive connection with," is also wrong. The first part of the proposed construction replaces "electrical contact" with "physical contact," which has a different meaning. Merely having a physical contact does not mean the two components are connected electrically. As discussed above, an electrical contact requires electrical *conductivity*. *See Helmsderfer*, 527 F.3d at 1383 ("Courts cannot rewrite claim language."). The second part of the proposed construction adds a concept "capacitive connection" that is ambiguous and appears nowhere in the specification. *See Phillips*, 415 F.3d at 1315 ("[C]laims must be read in view of the specification, of which they are a part," and the specification "is the single best guide to the meaning of a disputed term").

Thus, the Court should construe this term as having its plain and ordinary meaning.

**b. Bardy's Answering Position**

The term "electrical contact with" is indefinite because it fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *See Nautilus*, 572 U.S. at 901. This conclusion follows from two points. First, the term "electrical contact" does not appear in the specification, and thus the specification offers no guidance for those skilled in the art to understand the claim term. Second, the use of other terms in the '859 patent highlights why the term "electrical contact with" is indefinite. After reading the claims, specification, and prosecution history, a POSITA is left to guess the scope of the claims. This is improper.

**(1) The term "electrical contact with" is absent from the specification**

The '859 patent recites "a portion of the flexible electrode trace [that] is in ***electrical contact with*** a second spring contact." '859 Patent, cl. 1. This term does not appear anywhere in the specification. Instead, the '859 patent describes the electrode trace "in physical contact with" a spring contact. The specification also describes "skin-contacting" (*id.* at 2:65), "electrically connected" (*id.* at 5:1-2, 7:64-67), and "electrically couple" (*id.* at cl. 1). While using a myriad of terms, not once does the specification describe the amorphous "electrical contact with" term.

With regard to this physical connection, Figure 1B of the '859 patent shows an exploded view of a monitoring device that includes flexible body 110 with electrode traces 311, 312. *Id.* at Figure 1B (identifying electrode traces); 13:43-45. To receive and transmit cardiac signals from the patient to printed circuit board 120, each electrode trace "include[s] an electrode interface portion 310 and an electrocardiogram circuit interface portion 313." *Id.* at 13:45-55.




FIG. 1B

’859 patent, Figure 1B (annotated).

The “ECG circuit interface portions 313 are in ***physical contact*** with spring fingers 237 and provide electrical communication with PCBA 120 when device 100 or zoomed-in device portion 101 is assembled.” *Id.* at 13:45-55. This structure is shown below in Figure 3D. Spring fingers 237 are attached to the printed circuit board, and the spring fingers physically contact the ECG circuit interface portions 313 to receive the cardiac signals. *Id.* at 13:45-55. This disclosure is the only support for the claimed interaction between the trace and the second spring contact.

These other arrangements are also described, electrically connected being described as the conductive path that is provided (*id.* at 7:64-67, 15:30-35), electrically coupling accounting for other intervening components (*id.* at cl. 1, 22). However, because “electrical contact with” is not

used once in the specification, which Defendant fails to address, the specification provides no guidance to those skilled in the art as to the meaning of the claim term.




FIG. 3D

’859 Patent, Figure 3D.

**(2) The ’859 patent establishes that “electrical contact with” is indefinite**

There is no evidence in the specification to support any meaning of the term “electrical contact with.” But that is not all. The ’859 patent’s use of ***other terms*** throughout the claims and specification, including “electrically couple” and “physical contact,” demonstrates why a POSITA would not understand this term with reasonable certainty. Thus, the term is indefinite.

Claim 1 of the ’859 patent recites “electrically couple.” In one example, claim 1 recites “at least a portion of the flexible electrode trace is in ***electrical contact with*** a second spring contact, and wherein the second spring contact is further configured to ***electrically couple*** the flexible electrode trace to the circuit board assembly.” *Id.* at cl. 1. Based on this language, a POSITA would have understood that claim 1 is reciting different concepts: (1) a trace “in electrical contact with” a second spring (2) where the second spring “electrically couple[s]” the trace to the

circuit board. In other words, "electrical contact with" cannot mean the same thing as "electrically couple." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("[D]ifferent claim terms are presumed to have different meanings."); *see also Forest Lab'ys., Inc. v. Abbott Lab'ys.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001). This is not a case where a party argues a term is unclear, rather, the specification uses a number of combinations of terms to describe different arrangements, but fails to leave space into which this term, electrically connect, can fit.

This is reinforced by the inventor's use of "electrically couple" in other limitations. Claim 2 recites "a first spring contact configured to ***electrically couple*** a battery to a circuit board assembly." *Id.* at cl. 1. In the description, the '859 patent explains that "[b]attery holder 150 also positions batteries appropriately 160 to provide for adequate compression of spring contacts 236. Use of battery holder 150 in conjunction with spring contacts 235 and 236 allows for batteries 160 to be electrically connected to PCBA 120." *Id.* at 15:28-33.




**FIG. 5B**

'859 Patent, Figure 5B.

Moreover, to interpret "electrical contact with" to mean in physical contact would render the word "electrical" superfluous. Similarly, to interpret "electrical contact with" to mean electrically connected or electrically coupled would render the word "contact" superfluous. The applicant made the affirmative decision to use both "electrical" and "contact with," and whatever this choice means is the path the parties are forced to navigate now.

Additionally, those skilled in the art would have also understood that "electrical contact with" cannot mean "physical contact." Claim 2 of the '859 patent recites "wherein the second spring contact is in ***physical contact*** with an electrocardiogram circuit interface." *Id.* at cl. 2. Here, claim 2 is further narrowing the second spring contact: claim 1 requires "at least a portion of the flexible electrode trace is in electrical contact with a second spring contact" and claim 2 requires that "the second spring contact is in physical contact with an electrocardiogram circuit interface." *Id.* at cls. 1, 2. *Liebel-Flarsheim*, 358 F.3d at 910 ("[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest.").

Providing no guidance, the claim and the specification cloud any meaning of "electrical contact" with the use of "electrically couple" and "physical contact." Based on the specification and claims, those skilled in the art would have understood that "electrical contact" cannot have the same meaning as "electrically couple" or "physical contact." But then those skilled in the art are left to guess the meaning—which is the crux of the issue. And without any description, or a single use of "electrical contact" in the specification, the term in indefinite.

**(3) Defendant's evidence is unpersuasive**

Without addressing the issues raised by the intrinsic evidence, Defendant cites to extrinsic evidence in case law to support its position. This evidence does not provide those skilled in the art with reasonable certainty. First, Defendant cites a dictionary. Again, the dictionary was published more than a decade earlier than the alleged priority date of the '734 patent. *See e.g.*, *Phillips*, 415 F.3d at 1313 (explaining that claims are construed at the time of the effective filing date of the patent application); *see also Novartis Pharms. Corp. v. Eon Labs Mfg., Inc.*, 363 F.3d 1306, 1310 (Fed. Cir. 2004) ("As our predecessor court explained, '[o]ne need not arbitrarily pick and choose from the various accepted definitions of a word to decide which meaning was

intended.'") (citing *Liebscher v. Boothroyd,* 46 C.C.P.A. 701, 258 F.2d 948, 951 (CCPA 1958)); *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003) (refusing to consider extrinsic evidence not from the time of the filing of the patent because such sources "are not contemporaneous with the patent, do not reflect the meanings that would have been attributed to the words in dispute by persons of ordinary skill in the art as of the grant of the [] patent, and for those reasons are not considered in our de novo claim construction analysis").

Moreover, putting aside that claim construction is a case-specific inquiry, Defendant cites to non-analogous cases. The cases had different fact patterns, involved patents with different specifications, did not consider the same term, and indefiniteness was not at issue. In *Abbott Diabetes Care Inc. v. Roche Diagnostics Corp.*, the "parties' dispute concern[ed] the reference electrode component"—not the term "electrical contact with." No. C04-02123 MJJ, 2007 WL 1239220, at *8–10 (N.D Cal. Apr. 27, 2007). Likewise, the term at issue in *Cellport System, Inc. v. Peiker Acustic GmbH & Co. KG* was "electronically interconnected," which is decidedly also not the term at issue in this case. 847 F. Supp. 2d 1293, 1310 (D. Colo. 2012). The facts also differ because the court "found more than 35 instances throughout the Specification where the term or a similar term is used." *Id.* Here, the specification of the '859 patent does not use the term "electrical contact with" a single time.

In sum, Defendant's reliance on an outdated dictionary and two wildly disparate cases does not refute the intrinsic evidence demonstrating that "electrical contact with" is indefinite.

**(4) Bardy's alternative construction**

To the extent that this Court does not find the term "electrical contact with" as indefinite, the Court should construe this term to mean "in physical contact with or in capacitive connection with." Here, Bardy's proposal balances the description in the specification with the rules of claim construction. Specifically, claim 1 recites "electrically coupled" while claim 2 recites "physical

contact." Because each of these terms are presumed to have different meanings, Bardy's construction at least provides some guidance for this term—a term that is key to infringement and validity of the '859 and '860 patents. For these reasons, Defendant's vague plain and ordinary proposal leaves the parties to guess on the claim scope throughout this case.

### c. iRhythm's Reply Position

As iRhythm has explained, a POSITA would understand that an "electrical contact" is a contact that conducts electricity. (*Supra* Section III.B.6.a. (citing *Abbott Diabetes Care Inc. v. Roche Diagnostics Corp.*, No. C04-02123 MJJ, 2007 WL 1239220, at *8 (N.D. Cal. Apr. 27, 2007) (construing "electrical contact" to mean "connected or positioned in such a way that electricity can flow between")).)[32]

Bardy readily identifies disclosure of the claimed "electrical contact" in the specification, which confirms the term is not indefinite. Claim 1 of the '859 patent and claim 1 of the '860 patent each recites: "at least a portion of the flexible electrode trace is in *electrical contact with* a second spring contact." ('859 patent, cl. 1; '860 patent, cl. 1 (emphasis added).) Bardy concedes that the "spring fingers 237" in Figure 3D provide an example of the "claimed interaction between the trace and the second spring contact." (*Supra* Section III.B.6.b.(1).) These "spring fingers 237"

---

[32] Bardy does not dispute that *Abbot* construed "electrical contact" to mean "connected or positioned in such a way that electricity can flow between," regardless of whether that term was in dispute. *Abbott*, 2007 WL 1239220, at *8. And *Cellport*'s construction of a similar term, "electronically interconnected," informs the meaning of "electrical contact." *Cellport Sys., Inc. v. Peiker Acustic GmbH & Co. KG*, 847 F. Supp. 2d 1293, 1310 (D. Colo. 2012). Contrary to Bardy's assertion, the meaning of the term did not change during the decade before 2010. (*Compare* Ex. 1, *Modern Dictionary of Electronics* (defining "contact" as a "juncture point" to provide "a complete path for current flow") *with* Ex. 3, *New Oxford American Dictionary* (defining "contact" as "a connection for the passage of an electric current from one thing to another").)

form an "electrical contact" that conducts electricity, as they provide the "electrical communication with [the printed circuit board assembly] 120." ('859 patent at 13:45-51.)




FIG. 3D

(*Id.* at Fig. 3D.)

Despite the well-understood meaning of "electrical contact" and the clear disclosure in the specification, Bardy argues that this term is indefinite. Bardy first argues that the specification does not refer to "electrical contact" verbatim. (*Supra* Section III.B.6.b.(1).) But a term is not indefinite simply because "the precise words used in the patent's specification are not [] used in the [patent's] claims." *SDS*, 107 F. Supp. 2d at 579. Bardy then argues that the patents' reference to other concepts such as "electrically couple" and "physical contact" renders the "electrical contact" term indefinite because the patents "fail[] to leave space into which this term . . . can fit." (*Supra* Section III.B.6.b.(2).) To the contrary, the patents use the terms "electrically couple" and "physical contact" in harmony with the term "electrical contact." For example, claim 1 recites that "the second spring contact is further configured to *electrically couple* the flexible electrode trace to the circuit board assembly." That electrical coupling is exactly the result of the "electrical contact" between the second spring contact and the electrode trace. As to "physical contact," the parties *agree on* its distinction from "electrical contact": an "electrical contact" must conduct electricity instead of merely making a physical contact. (*See id.* ("to interpret 'electrical contact

with' to mean in physical contact would render the word 'electrical' superfluous"); *supra* Section III.B.6.a. ("Merely having a physical contact does not mean the two components are connected electrically.").) Thus, there is no doubt as to what "electrical contact" and "physical contact" respectively mean.

Bardy's alternative construction "in physical contact with or in capacitive connection with" cannot be correct because it has conceded that "electrical contact" is different from "physical contact." Indeed, Bardy concedes that "those skilled in the art would have [] understood that 'electrical contact with' cannot mean 'physical contact.'" (*Supra* Section III.B.6.b.(2).) And Bardy does not identify any support, intrinsic or otherwise, for the phrase "in capacitive connection with."

The Court should reject Bardy's indefiniteness argument and construe "electrical contact with" to have its plain and ordinary meaning.

**d. Bardy's Sur-Reply Position**

iRhythm argues that the specification "confirms [that] the term is not indefinite." *Supra* Section III.B.6.c. But the specification does not use the term "electrical contact," and iRhythm cites to no instances of the term "electrical contact." Rather, iRhythm misleadingly cites the specification to argue that "'spring fingers 237' form an 'electrical contact' that conducts electricity, as they provide the 'electrical communication with [the printed circuit board assembly] 120.'" *Supra* Section III.B.6.c (citing '859 patent, 13:45-51). It is undeniable that the '859 specification never uses "electrical contact" but instead uses "physical contact" to describe the spring fingers: "ECG circuit interface portions 313 are in ***physical contact*** with spring fingers 237." '859 patent, 13:45-51 (emphasis added). Without using "electrical contact," the specification offers no guidance for those skilled in the art to understand this term.

iRhythm does not dispute that "electrical contact" must have a different meaning than "electrically couple" or "physical contact." For example, when distinguishing "physical contact," iRhythm clarifies that "an 'electrical contact' must conduct electricity instead of merely making a physical contact." *Supra* Section III.B.6.c. While the parties appear to agree, this distinction does not inform those skilled in the art as to the scope of "electrical contact," rendering the term indefinite.

To the extent that this Court does not find this term indefinite, the Court should construe this term to mean "in physical contact with or in capacitive connection with." This proposal includes physical contact consistent with the specification ('859 patent, 13:45-51), permitting the flow of direct current, and capacitive connection, permitting the flow of alternating current.

POTTER ANDERSON & CORROON LLP

*/s/ Philip A. Rovner*

Philip A. Rovner (#3215)
Andrew M. Moshos (#6685)
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
*provner@potteranderson.com*
*amoshos@potteranderson.com*

Jeffrey R. Gargano
Melissa M. Haulcomb
Jared R. Lund
Rebekah Hill
K&L GATES LLP
70 W. Madison St., Suite 3300
Chicago, IL 60602
(312) 372-1121

Erik J. Halverson
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, CA 94111
(415) 882-8238

*Attorneys for Plaintiff*
*Bardy Diagnostics, Inc.*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

Brian P. Egan (#6227)
Megan E. Dellinger (#5739)
E. Paul Steingraber (#7459)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
began@morrisnichols.com
mdellinger@morrisnichols.com
esteingraber@morrisnichols.com

J. David Hadden
Allen Wang
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
(650) 988-8500

Melanie L. Mayer
FENWICK & WEST LLP
401 Union Street, 5th Floor
Seattle, WA 98101
(206) 389-4510

Robert Edward Counihan
FENWICK & WEST LLP
902 Broadway, 18th Floor
New York, NY 10010
(212) 430- 2600

Min Wu
FENWICK & WEST LLP
555 California Street, Suite 12
San Francisco, CA 94104
(415) 875-2300

*Attorneys for Defendant*
*iRhythm Technologies, Inc.*

November 26, 2025
12579166