# Exhibit 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| BARDY DIAGNOSTICS, INC., | ) | |
| | ) | |
| Plaintiff, Counter-Defendant | ) | |
| | ) | C.A. No. 24-1355-JDW |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| IRHYTHM TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant, Counter-Plaintiff. | ) | |

**PLAINTIFF BARDY DIAGNOSTICS, INC.'S FIRST AMENDED
ANSWER AND COUNTERCLAIMS TO DEFENDANT IRHYTHM
TECHNOLOGIES, INC.'S THIRD AMENDED COUNTERCLAIMS**

Plaintiff Bardy Diagnostics, Inc. ("Bardy" or "Plaintiff"), by and through its undersigned counsel, hereby answers Defendant iRhythm Technologies, Inc.'s ("iRhythm" or "Defendant") Third Amended Counterclaims and asserts counterclaims as follows.

The headings in iRhythm's Counterclaims are reproduced herein for the convenience of the reader. To the extent such headings include or infer allegations, they are denied.

## NATURE OF THE ACTION

1.       This is a civil action arising under the patent laws of the United States, 35 U.S.C. § 1 et seq., including specifically 35 U.S.C. § 271, seeking relief arising from Bardy's infringement of U.S. Patent Nos. 12,133,734 (the "'734 patent"), 12,245,859 (the "'859 patent"), 12,245,860 (the "'860 patent"), 12,274,554 (the "'554 patent"), and 12,303,277 (the "'277 patent") (collectively, the "iRhythm Asserted Patents").

**ANSWER:** Bardy admits that the Counterclaims purport to state a cause of action for patent infringement of the '734 patent, the '859 patent, the '860 patent, the '554 patent, and the '277 patent. Bardy denies that any such claim is meritorious.

2.       iRhythm is the owner by assignment of the '734 patent. A copy of the '734 patent is attached as Exhibit 1. A copy of the '734 patent is attached as Exhibit 1.

1

**ANSWER:** Bardy admits that Exhibit 1 contains a copy of U.S. Patent No. 12,133,734. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 2 and therefore denies them.

3.      iRhythm is the owner by assignment of the '859 patent. A copy of the '859 patent is attached as Exhibit 11.

**ANSWER:** Bardy admits that Exhibit 11 contains a copy of U.S. Patent No. 12,245,859. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 3 and therefore denies them.

4.      iRhythm is the owner by assignment of the '860 patent. A copy of the '860 patent is attached as Exhibit 12.

**ANSWER:** Bardy admits that Exhibit 12 contains a copy of U.S. Patent No. 12,245,860. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 4 and therefore denies them.

5.      iRhythm is the owner by assignment of the '554 patent. A copy of the '554 patent is attached as Exhibit 15.

**ANSWER:** Bardy admits that Exhibit 15 contains a copy of U.S. Patent No. 12,274,554. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 5 and therefore denies them.

6.      iRhythm is the owner by assignment of the '277 patent. A copy of the '277 patent is attached as Exhibit 18.

**ANSWER:** Bardy admits that Exhibit 18 contains a copy of U.S. Patent No. 12,303,277. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 6 and therefore denies them.

## THE PARTIES

7.      iRhythm is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 699 8th Street, Suite 600, San Francisco, CA 94103.

2

1604412217.1

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 7 and therefore denies them.

8.     On information and belief, Bardy is a corporation organized and existing under the laws of the State of Delaware since 2013.

**ANSWER:** Admitted.

9.     On information and belief, Bardy has its principal place of business at 220 120th Ave NE, Suite 100, Bellevue, WA 98005.

**ANSWER:** Admitted.

## JURISDICTION AND VENUE

10.     This action arises under the patent laws of the United States, 35 U.S.C. § 1, et seq., including specifically 35 U.S.C. § 271.

**ANSWER:** Bardy admits that the Counterclaim purports to state a claim under 35 U.S.C. § 1, et seq., including specifically 35 U.S.C. § 271. Bardy denies that any such claim is meritorious.

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER:** Admitted.

12.     On information and belief, as a corporation organized and existing under the laws of the state of Delaware, Bardy has substantial and continuous contacts with Delaware and has committed acts of infringement in Delaware sufficient to confer personal jurisdiction over Bardy. This Court also has personal jurisdiction over Bardy at least by virtue of Bardy filing the instant action in this Court.

**ANSWER:** The allegations contained in paragraph 12 contain legal conclusions to which no answer is required. To the extent a response is required, Bardy admits that it is a corporation organized and existing under the laws of the state of Delaware. Further, Bardy admits that this Court has personal jurisdiction over Bardy at least by virtue of Bardy filing the instant action in this Court. Bardy denies the remaining allegations contained in this paragraph.

13.    On information and belief, Bardy is a commercial entity that makes, uses, advertises, offers for sale, and/or sells ECG monitors and ECG monitoring services. On information and belief, Bardy manufactures, makes, uses, advertises, offers for sale, and/or sells the Carnation Ambulatory Monitor (the "CAM patch").

**ANSWER:** Bardy admits that it is a commercial entity that makes, uses, advertises, offers

for sale, and/or sells the CAM patch. Bardy otherwise denies the allegations in this paragraph.

14.    On information and belief, Bardy sells and offers to sell ECG monitors and ECG monitoring services, including the CAM patch, throughout the United States, including in this judicial district.

**ANSWER:** Bardy admits that it sells and offers to sell the CAM patch. Bardy otherwise

denies the allegations in this paragraph.

15.    On information and belief, Bardy makes the CAM patch available to healthcare providers and patients in Delaware.

**ANSWER:** Admitted.

16.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b) because Bardy is incorporated in the State of Delaware and therefore resides in this judicial district.

**ANSWER:** Admitted.

## BARDY AND BARDY'S CARNATION AMBULATORY MONITOR

17.    On information and belief, Bardy is an ambulatory ECG monitoring solutions company founded in 2013, around 7 years after iRhythm was founded in 2006 and after iRhythm had already launched the Zio XT monitor. *See* https://www.bardydx.com/.

**ANSWER:** Bardy admits that it was founded in 2013 and that it provides ambulatory ECG

monitoring solutions. Bardy lacks knowledge or information sufficient to form a belief as to the

truth of the remainder of the allegations in paragraph 16 and therefore denies them.

18.    On information and belief, Bardy received FDA approval for the CAM patch no earlier than Dec. 22, 2014. *See* https://www.accessdata.fda.gov/cdrh_docs/pdf14/K143067.pdf.

**ANSWER:** Bardy admits that it received FDA clearance for the CAM patch on December

22, 2014. Bardy otherwise denies the allegations in this paragraph.

4

19.      On information and belief, Bardy publicly launched and began commercializing the 2-day CAM patch in the United States no earlier than 2015.

**ANSWER:** Denied.

20.       On information and belief, Bardy continues to manufacture, use, sell, and offer to sell the 2-day CAM patch in the United States.

**ANSWER:** Admitted.

21.      On information and belief, Bardy publicly launched and began commercializing the 7-day CAM patch in the United States no earlier than 2015.

**ANSWER:** Denied.

22.      On information and belief, Bardy continues to manufacture, use, sell, and offer to sell the 7-day CAM patch in the United States.

**ANSWER:** Admitted.

23.      On information and belief, Bardy publicly launched and began commercializing the 14-day CAM patch in the United States on or around January 23, 2020. *See* Exhibit 2, Bardy Diagnostics, Inc., "Bardy Diagnostics Announces Commercial Launch of the 14-day Carnation Ambulatory Monitor (CAM) Patch," PR Newswire (Jan. 23, 2020), https://www.prnewswire.com/news-releases/bardy-diagnostics-announces-commercial-launchof-the-14-day-carnation-ambulatory-monitor-cam-patch-300991978.html.

**ANSWER:** Bardy admits that it publicly launched the 14-day CAM patch on or around

January 23, 2020. Bardy otherwise denies the allegations in this paragraph.

24.      On information and belief, Bardy continues to manufacture, use, sell, and offer to sell the 7-day CAM patch in the United States.

**ANSWER:** Admitted.

25.      The CAM patch is an ambulatory ECG monitor that adheres to a user's chest. *See, e.g.*, Exhibit 3, https://www.hillrom.com/en/products/cam-patch/.



**ANSWER:** Bardy admits that the CAM patch is an ambulatory ECG monitor that adheres to a user's chest. Bardy further admits that it describes the CAM patch on its website, accessible at https://www.hillrom.com/en/products/cam-patch/. Bardy otherwise denies the allegations in this paragraph.

26.    As shown below, the CAM patch includes electrodes that capture p-wave signals, "which enables differentiation between different types of atrial, as well as ventricular, arrhythmias." *Id.*; *see also* Exhibit 4, https://www.bardydx.com/wp-content/uploads/2023/06/DWG000781B-CAM-Instructions-for-Use.pdf. The CAM patch includes a purportedly "proprietary circuit" in a housing that is electronically connected to an electrode located on the patch. Exhibit 5, https://www.bardydx.com/wpcontent/uploads/2022/12/DN000601A-14Day-Half-fold-CAM-Brochure.pdf.

1604412217.1



**ANSWER:** Bardy admits that the website https://www.hillrom.com/en/products/cam-patch/ states that "The CAM Patch is a long-term ambulatory ECG monitor that has been clinically proven to identify arrhythmias. It is engineered to optimize p-wave signal capture, which enables differentiation between different types of atrial, as well as ventricular, arrhythmias." Bardy further admits that the website https://www.bardydx.com/wp-content/uploads/2022/12/DN000601A-14Day-Half-fold-CAM-Brochure.pdf is a brochure for the Carnation Ambulatory Monitor[TM] that states, "Proprietary circuit design enabling optimal signal-to-noise." Bardy otherwise denies the allegations in this paragraph.

27.    On information and belief, and according to Bardy, the CAM patch provides a "[d]urable" adhesion that can last "[u]p to 2, 7, or 14 days." *See* Exhibit 4.



| ITEM | SPECIFICATION |
| --- | --- |
| **Performance Characteristics** | |
| ECG channels | 1 channel |
| Recording capacity | Up to 2, 7, or 14 days |
| Recording format | Continuous |
| Service life | Up to 2, 7, or 14 days |
| Shelf life | 24 months |

**ANSWER:** Bardy admits that its CAM patch can adhere to a patient for up to at least 14 days. Bardy otherwise denies the allegations in this paragraph.

28.     On information and belief, and according to Bardy, the CAM patch "captures P-wave signals" from the heart using electrodes and transmits those to a purportedly "[p]roprietary circuit" located on the patch. Exhibit 5; *see also* Exhibit 6, https://www.bardydx.com/wp-content/uploads/2023/07/DN000697B-BDx_CAM_SpecSheet.pdf.

**ANSWER:** Bardy admits that Exhibit 5 purports to be a brochure for the CAM patch that states, "Designed to be placed along the sternum — over the heart — to optimize P-wave signal capture, the CAM Patch results in improved ECG clarity, providing more information about heart rhythm that may lead to more clinically-actionable diagnoses compared to leading ECG monitors in the industry." Bardy further admits that Exhibit 5 states, "Proprietary circuit design enabling optimal signal-to-noise." Bardy otherwise denies the allegations in this paragraph.

29.     Given the facts alleged in this counterclaim, both stated above and set forth below and in Exhibit 7, 13, 14, 16, 17, and 19 Bardy's CAM patch directly infringes the claims of the iRhythm Asserted Patents, literally or under the doctrine of equivalents.

**ANSWER:** Denied.

### FIRST COUNTERCLAIM: PATENT INFRINGEMENT OF

### U.S. PATENT NO. 12,133,734

30.     iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 28 of Section I of iRhythm's Counterclaims and Answer.

1604412217.1

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 29 as its answers to paragraph 30.

31.     The '734 patent duly and legally issued on November 5, 2024.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 and therefore denies them.

32.     iRhythm owns all right, title, and interest in the '734 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 and therefore denies them.

33.     Bardy makes, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim chart attached as Exhibit 7, Bardy directly infringes at least claim 1 of the '734 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in the United States. Bardy otherwise denies the allegations in this paragraph.

34.     Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '734 patent.

**ANSWER:** Denied.

35.     On information and belief, Bardy has had knowledge of the '734 patent since at least February 28, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the '734 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel referencing the '734 patent on February 28, 2025. Bardy otherwise denies the allegations in this paragraph.

36.     On information and belief, Bardy has had knowledge that the CAM patch infringes at least claim 1 of the '734 patent since at least February 28, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 7 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

1604412217.1

37.    On information and belief, despite having knowledge of the '734 patent and knowledge that the CAM patch infringes at least claim 1 of the '734 patent since at least February 28, 2025, Bardy has continued to make, use, sell, and offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

38.    Bardy has willfully infringed the '734 patent by continuing to make, use, offer to sell, and sell the CAM patch in the United States after having knowledge of the '734 patent and knowledge that the CAM patch infringes at least claim 1 of the '734 patent.

**ANSWER:** Denied.

39.    As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

40.    This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '734 patent.

**ANSWER:** Denied.

41.    Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

42.    As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

## SECOND COUNTERCLAIM: PATENT INFRINGEMENT OF

## U.S. PATENT NO. 12,245,859

43.    iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 41 of Section I of iRhythm's Counterclaims and Answer.

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 42 as its answer to paragraph 43.

44.    The '859 patent duly and legally issued on March 11, 2025.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44 and therefore denies them.

45.     iRhythm owns all right, title, and interest in the '859 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 and therefore denies them.

46.     Bardy makes, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim chart attached as Exhibit 13, Bardy directly infringes at least claim 1 of the '859 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in the United States. Bardy otherwise denies the allegations in this paragraph.

47.     Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '859 patent.

**ANSWER:** Denied.

48.     On information and belief, Bardy has had knowledge of the '859 patent since at least March 21, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the '859 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel referencing the '859 patent on March 21, 2025. Bardy otherwise denies the allegations in this paragraph.

49.     On information and belief, Bardy has had knowledge that the CAM patch infringes at least claim 1 of the '859 patent since at least March 21, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 13 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

50.     On information and belief, despite having knowledge of the '859 patent and knowledge that the CAM patch infringes at least claim 1 of the '859 patent since at least March 21, 2025, Bardy has continued to make, use, sell, and offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

1604412217.1

51.     Bardy has willfully infringed the '859 patent by continuing to make, use, offer to sell, and sell the CAM patch in the United States after having knowledge of the '859 patent and knowledge that the CAM patch infringes at least claim 1 of the '859 patent.

**ANSWER:** Denied.

52.     As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

53.     This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '859 patent.

**ANSWER:** Denied.

54.     Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

55.     As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

### THIRD COUNTERCLAIM: PATENT INFRINGEMENT OF

### U.S. PATENT NO. 12,245,860

56.     iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 54 of Section I of iRhythm's Counterclaims and Answer.

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 55 as its answers to paragraph 56.

57.     The '860 patent duly and legally issued on March 11, 2025.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 57 and therefore denies them.

58.     iRhythm owns all right, title, and interest in the '860 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58 and therefore denies them.

59.    Bardy makes, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim chart attached as Exhibit 14, Bardy directly infringes at least claim 1 of the '860 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in the United States. Bardy otherwise denies the allegations in this paragraph.

60.    Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '860 patent.

**ANSWER:** Denied.

61.    On information and belief, Bardy has had knowledge of the '860 patent since at least March 21, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the '860 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel referencing the '860 patent on March 21, 2025. Bardy otherwise denies the allegations in this paragraph.

62.    On information and belief, Bardy has had knowledge that the CAM patch infringes at least claim 1 of the '860 patent since at least March 21, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 14 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

63.    On information and belief, despite having knowledge of the '860 patent and knowledge that the CAM patch infringes at least claim 1 of the '860 patent since at least March 21, 2025, Bardy has continued to make, use, sell, and offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

64.    Bardy has willfully infringed the '860 patent by continuing to make, use, offer to sell, and sell the CAM patch in the United States after having knowledge of the '860 patent and knowledge that the CAM patch infringes at least claim 1 of the '860 patent.

**ANSWER:** Denied.

65.     As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

66.     This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '860 patent.

**ANSWER:** Denied.

67.     Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

68.     As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

## FOURTH COUNTERCLAIM: PATENT INFRINGEMENT OF

## U.S. PATENT NO. 12,274,554

69.     iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 67 of Section I of iRhythm's Counterclaims and Answer.

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 68 as its answers to paragraph 69.

70.     The '554 patent duly and legally issued on April 15, 2025.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70 and therefore denies them.

71.     iRhythm owns all right, title, and interest in the '554 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 and therefore denies them.

1604412217.1

72.     Bardy makes, imports, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim charts attached as Exhibits 16 and 17, Bardy directly infringes at least claims 1 and 4 of the '554 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in

the United States. Bardy otherwise denies the allegations in this paragraph.

73.     Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '554 patent.

**ANSWER:** Denied.

74.     On information and belief, Bardy has had knowledge of the issued claims of the '554 patent since at least March 21, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the allowed claims of U.S. Patent Application No. 18/936,888, now issued as the claims of the '554 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel

referencing U.S. Patent Application No. 18/936,888 on March 21, 2025. Bardy further admits that

Exhibit C to the March 21, 2025, letter is titled "Allowed Claims of U.S. Patent Application

18/936,888." Bardy otherwise denies the allegations in this paragraph.

75.     On information and belief, Bardy has also had knowledge of the '554 patent since at least April 22, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the '554 patent.

**ANSWER:** Denied.

76.     On information and belief, Bardy has had knowledge that the CAM patch infringes at least claims 1 and 4 of the '554 patent since at least March 21, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 16 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

77.     On information and belief, Bardy has also had knowledge that the CAM patch infringes at least claims 1 and 4 of the '554 patent since at least April 22, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 17 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

78.     On information and belief, despite having knowledge of the '554 patent and knowledge that the CAM patch infringes at least claims 1 and 4 of the '554 patent since at least

15

March 21, 2025, Bardy has continued to make, use, sell, import, and/or offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

79.    On information and belief, despite having further knowledge of the '554 patent and knowledge that the CAM patch infringes at least claims 1 and 4 of the '554 patent since at least April 22, 2025, Bardy has continued to make, use, sell, import, and/or offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

80.    Bardy has willfully infringed the '554 patent by continuing to make, use, offer to sell, import, and/or sell the CAM patch in the United States after having knowledge of the '554 patent and knowledge that the CAM patch infringes at least claims 1 and 4 of the '554 patent.

**ANSWER:** Denied.

81.    As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

82.    This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '554 patent.

**ANSWER:** Denied.

83.    Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

84.    As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

### FIFTH COUNTERCLAIM: PATENT INFRINGEMENT OF

### U.S. PATENT NO. 12,303,277

85.    iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 84 of Section I of iRhythm's Counterclaims and Answer.

16

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 84 as its answers to paragraph 85.

86.    The '277 patent duly and legally issued on May 20, 2025.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86 and therefore denies them.

87.    iRhythm owns all right, title, and interest in the '277 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 and therefore denies them.

88.    Bardy makes, imports, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim chart attached as Exhibit 19, Bardy directly infringes at least claim 1 of the '277 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in the United States. Bardy otherwise denies the allegations in this paragraph.

89.    Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '277 patent.

**ANSWER:** Denied.

90.    On information and belief, Bardy has had knowledge of the '277 patent since at least May 20, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the '277 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel referencing the '277 patent on May 20, 2025. Bardy otherwise denies the allegations in this paragraph.

91.    On information and belief, Bardy has had knowledge that the CAM patch infringes at least claim 1 of the '277 patent since at least May 20, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 19 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

92.     On information and belief, despite having knowledge of the '277 patent and knowledge that the CAM patch infringes at least claim 1 of the '277 patent since at least May 20, 2025, Bardy has continued to make, use, sell, import, and/or offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

93.     Bardy has willfully infringed the '277 patent by continuing to make, use, offer to sell, import, and/or sell the CAM patch in the United States after having knowledge of the '277 patent and knowledge that the CAM patch infringes at least claim 1 of the '277 patent.

**ANSWER:** Denied.

94.     As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

95.     This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '277 patent.

**ANSWER:** Denied.

96.     Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

97.     As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

## RESPONSE TO RELIEF REQUESTED

As to all Relief Requested in the Counterclaims, Bardy denies that iRhythm is entitled to any relief as alleged or otherwise. All other allegations in the Counterclaims not specifically admitted or denied are hereby denied.

1604412217.1

## BARDY'S AFFIRMATIVE DEFENSES

Bardy incorporates by reference the claims detailed in its First Amended Complaint. Without conceding that any of the following necessarily must be pleaded as an affirmative defense, or that any of the following is not already at issue by virtue of the foregoing denials, and without prejudice to Bardy's right to plead and assert additional defenses as discovery into the facts of the matter warrant, Bardy asserts the following affirmative defenses:

### FIRST DEFENSE: NON-INFRINGEMENT ('734 PATENT)

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '734 patent. Bardy incorporates by reference the allegations of Count I of its Non-Infringement Counterclaim, below.

### SECOND DEFENSE: NON-INFRINGEMENT ('859 PATENT)

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '859 patent. Bardy incorporates by reference the allegations of Count II of its Non-Infringement Counterclaim, below.

### THIRD DEFENSE: NON-INFRINGEMENT ('860 PATENT)

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '860 patent. Bardy incorporates by reference the allegations of Count III of its Non-Infringement Counterclaim, below.

### FOURTH DEFENSE: NON-INFRINGEMENT ('554 PATENT)

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the

1604412217.1

'554 patent. Bardy incorporates by reference the allegations of Count IV of its Non-Infringement Counterclaim, below.

## FIFTH DEFENSE: INVALIDITY ('734 PATENT)

The claims of the '734 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count V of its Invalidity Counterclaim, below.

## SIXTH DEFENSE: INVALIDITY ('859 PATENT)

The claims of the '859 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count VI of its Invalidity Counterclaim, below.

## SEVENTH DEFENSE: INVALIDITY ('860 PATENT)

The claims of the '860 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count VII of its Invalidity Counterclaim, below.

## EIGHTH DEFENSE: INVALIDITY ('554 PATENT)

The claims of the '554 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count VIII of its Invalidity Counterclaim, below.

1604412217.1

**NINTH DEFENSE: [RESERVED]**

**TENTH DEFENSE: PROSECUTION LACHES**

iRhythm's claims are barred, in whole or in part, by prosecution laches. This doctrine may "render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution." *Symbol Techs., Inc. v. Lemelson Med, Educ. & Rsch. Found.*, 422 F.3d 1378, 1385 (Fed. Cir. 2005). While "[t]here are legitimate grounds for refiling a patent application which should not normally be grounds for a holding of laches," prosecution laches should apply in "egregious cases of misuse of the statutory patent system." *Id.* Such an egregious case is found here.

iRhythm filed the '081 application, to which the '734 patent purportedly claims priority, on May 12, 2010. The patent application from which the '734 patent issued was filed 11 years later on June 25, 2021. iRhythm filed U.S. Provisional Patent Application No. 61/756,326, to which the '859 and '860 patents purportedly claim priority, on January 23, 2013. The patent applications from which the '859 and '860 patents issued were filed 11.5 years later on July 29, 2024, and July 30, 2024, respectively.

Notably, for the first time in the application that led to the '734 patent, iRhythm filed and obtained claims directed to a "tilt" limitation, but the "tilt" limitation is not disclosed in the specification and was never claimed in any issued patent in the family in the 14 years of prosecuting this patent family.

With respect to the patent family that led to the issuance of the '859 and '860 patents and the patent family that led to the issuance of the '554 and '277 patents, iRhythm consistently sought claim coverage directed to an ECG monitor with two flexible wings and an electrode on each wing. Then, for the first time in the applications that led to the '859, '860, '554, and '277 patents, and well after Bardy released its CAM Patch, iRhythm broadened the scope of its claims with respect

21

to the electrode limitations in a plain attempt to cover Bardy's product that iRhythm now accuses of infringement.

Bardy was significantly prejudiced by iRhythm's delay at least because it made a substantial investment in and continued to independently develop the CAM patch, with no possibility of having notice of the expanded claim scope that now includes the tilt limitation ('734 patent), and the broadened electrode structure ('859, '860, '554, and '277 patents). These limitations were not disclosed in the specification of any earlier applications, making it impossible for Bardy to anticipate or avoid potential infringement. For at least the reasons set forth above, the iRhythm Asserted Patents are unenforceable under the doctrine of prosecution laches.

## ELEVENTH DEFENSE: PROSECUTION HISTORY ESTOPPEL

iRhythm is estopped from asserting any interpretation of any claims of the iRhythm Asserted Patents that covers the accused CAM patch as such scope was surrendered during, and/or is inconsistent with any statements, representations, or admissions made during prosecution of the patent applications that resulted in the iRhythm Asserted Patents or any applications related thereto.

## TWELFTH DEFENSE: GOOD FAITH

Bardy has engaged in all relevant activities in good faith, thereby precluding iRhythm, even if it prevails, from recovering its reasonably attorneys' fees or costs under 35 U.S.C. § 285.

## THIRTEENTH DEFENSE: DEDICATION TO THE PUBLIC

The relief sought by iRhythm is barred, in whole or in part, because iRhythm dedicated to the public all methods, systems, and products disclosed in the iRhythm Asserted Patents but not literally claimed therein.

### FOURTEENTH DEFENSE: LIMITATIONS ON DAMAGES AND COSTS

iRhythm's claim for damages is barred, in whole or in part, by at least 35 U.S.C. § 286. Further, iRhythm's claims for damages for alleged infringement of the iRhythm Asserted Patents are limited under 35 U.S.C. § 287 because iRhythm has failed to adequately marks its patented products. As a result, iRhythm is not entitled to damages for any alleged infringement that occurred before iRhythm gave actual notice of alleged infringement to Bardy. To the extent any claim of the iRhythm Asserted Patents are invalid, iRhythm is barred from recovering costs by 35 U.S.C. § 288.

### FIFTEENTH DEFENSE: NO EXCEPTIONAL CASE FOR DEFENDANT

Bardy has not engaged in any conduct that would make this an exceptional case that would entitle iRhythm to an award of attorneys' fees or enhanced damages.

### SIXTEENTH DEFENSE: NON-INFRINGEMENT ('277 PATENT)

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '277 patent. Bardy incorporates by reference the allegations of Count IX of its Non-Infringement Counterclaim, below.

### SEVENTEENTH DEFENSE: INVALIDITY ('277 PATENT)

The claims of the '277 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count X of its Invalidity Counterclaim, below.

### EIGHTEENTH DEFENSE: UNENFORCEABILITY ('554 PATENT)

The '554 patent is unenforceable due to inequitable conduct. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). Upon information and belief, and before taking full discovery, Theodore Lopez and David Schmidt committed inequitable

23

conduct during prosecution of the '554 patent with a specific intent to deceive the United States Patent and Trademark Office ("USPTO"). Mr. Lopez committed inequitable conduct by withholding the Expert Declaration of Jason Heikenfeld and the full English translation of JP 2004-121360 from the USPTO during prosecution of U.S. Patent Application No. 18/936,888 (the "'888 application"), which issued as the '554 patent. Dr. Schmidt committed inequitable conduct by withholding the Expert Declaration of Jason Heikenfeld and failing to acquire and submit the full English translation of JP 2004-121360 to the USPTO during prosecution of '888 application, despite his awareness that such a translation existed within his client's possession.

On information and belief, Mr. Lopez knew about the Expert Declaration of Jason Heikenfeld (the "Heikenfeld Declaration") and the English translation of JP 2004-121360 (the "full English translation of Matsumura") because he reviewed and supervised five of iRhythm's *inter partes* review petitions (collectively, the "iRhythm IPRs"), which were submitted to the USPTO during the pendency of the '888 application. In the iRhythm IPRs, iRhythm challenged the validity of patents directed to and claiming ECG monitors based directly on the Heikenfeld Declaration and full English translation of Matsumura. Dr. Schmidt likewise knew of the Heikenfeld Declaration and full English translation of Matsumura during the pendency of the '888 application. The withheld information is "but-for" material to the patentability of the claims of the '888 application. Finally, a specific intent to deceive the USPTO by Mr. Lopez and Dr. Schmidt is the single most reasonable inference.

Defendant directly benefited from its failure to submit this "but-for" material information. At the time of filing the '888 application, Mr. Lopez and Dr. Schmidt collaborated to obtain patents to assert against Bardy in this litigation. Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality would have stood in the way of Defendant's ability to obtain

24

the claim scope it did via the issuance of the '554 patent. Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately stand in the way of Defendant's ability to assert additional patents against Bardy by the June 2, 2025 deadline to amend the pleadings in this case. To obtain the '554 patent in an expedited manner to assert against Bardy (*e.g.*, the '888 application was filed on October 4, 2024 and issued on May 12, 2025 as the '554 patent), Mr. Lopez and Dr. Schmidt colluded to withhold information that was but for material to the claims of the '888 application. iRhythm's own litigation materials from the USPTO.

### A.    The Duty to Disclose Information Material to Patentability

Under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." Individuals associated with the filing and prosecution of a patent application include "*[e]ach attorney* or agent who prepares or prosecutes the application" and "[e]very other person who is *substantively involved in the preparation or prosecution of the application* and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c). Under MPEP 2001.06(c), an applicant that pursues subject matter that "is or has been involved in litigation and/or a trial proceeding, or the litigation and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the examiner." This section includes a requirement to disclose *inter partes* review proceedings and *any material information arising therefrom*. *See* MPEP 2001.06(c).

**B.**     **The Duty of Disclosure Applied to Dr. Schmidt and Mr. Lopez**

The duty of disclosure applied to Dr. Schmidt because he was the prosecuting attorney for the '888 application. On October 4, 2024, iRhythm filed the '888 application, which issued as the '554 patent. iRhythm is the applicant on the Application Data Sheet, which was signed by David R. Schmidt, who is listed on the Power of Attorney. The correspondence address is Knobbe, Martens, Olson & Bear, LLP at 2040 Main Street, Fourteenth Floor, Irvine California, United States. Moreover, Dr. Schmidt testified that he was involved in the prosecution of the '888 application. *See* Deposition Transcript of David Schmidt Transcript (Sept. 12, 2025) (Ex. B) at 30:13-15 ("Q. And were you involved in the prosecution of the '554 patent? A. Yes."). Mr. Lopez also owed a duty of disclosure at least regarding the '888 application. Namely, Mr. Lopez, as iRhythm's Director of Global Intellectual Property, owed a duty of disclosure because he was substantively involved in the preparation and prosecution of the '888 application, stemming from his role in the company, the applicant of the '888 application. This is supported at least by "Knobbe, Martens, Olson & Bear LLP's Privilege Log in Response to Subpoena." (Ex. A). Between May 13, 2022, and November 28, 2024, Mr. Lopez and Dr. Schmidt exchanged numerous communications described as "[l]egal advice from counsel regarding patent prosecution." *See* Ex. A at 1-7. For example, on October 1, 2024, three days prior to the filing of the '888 application, Dr. Schmidt sent Mr. Lopez an "[e]mail communication reflecting legal advice from counsel regarding patent prosecution." Ex. A at 6.

The testimony of Dr. Schmidt also establishes that Mr. Lopez was substantively involved in the preparation and prosecution of the '888 application. First, Dr. Schmidt testified that Mr. Lopez was responsible for supervising the prosecution of iRhythm's portfolio. Ex. B at 44:8-12. Second, Dr. Schmidt testified that Mr. Lopez was responsible for approving patent claims in applications to be filed with the USPTO, including the patent claims that iRhythm now asserts

against Bardy. Ex. B at 22:5-15 ("Q. [W]ho was your contact at iRhythm that you were sending drafts to of claims? … I interacted with Mark Day at iRhythm and then also Ted Lopez."). Dr. Schmidt also testified that Mr. Lopez approved the claims in the '554 patent (*i.e.*, the '888 application) for filing with the USPTO. Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. *Ted Lopez*.").

Mr. Lopez's practice of receiving claims from Dr. Schmidt, and approving those claims to be filed, is evident from Dr. Schmidt's testimony. For the '734 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 24:20-25 ("Q. All right. Turning back to the '734 patent, which is Exhibit 1 to your deposition, do you recall who at iRhythm approved the claims for filing? … probably *Ted Lopez*, so probably both of them."). For the '859 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 27:13-28:5 ("Q. Who approved the claim set [of the '859 patent] to be filed? A. *Ted Lopez*."). For the '860 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 28:17-29:8 ("Q. And do you recall who approved the claims to be filed? A. *Ted Lopez*."). For the '277 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. *Ted Lopez*.").

In addition to approving claims to be filed, Dr. Schmidt testified that he regularly communicates with Mr. Lopez regarding iRhythm patent prosecution. Ex. B at 36:21-24.

In sum, Dr. Schmidt's testimony aligns with the privilege log and supports Mr. Lopez's substantial involvement in the preparation and prosecution of each patent that iRhythm now asserts. Therefore, under 37 C.F.R. § 1.56, Mr. Lopez owed a duty of candor to the USPTO at least with regard to the '888 application, which issued as the '554 patent.

**C.    Dr. Schmidt and Mr. Lopez Knew About the Heikenfeld Declaration and the Full English Translation of Matsumura But Did Not Disclose Either During Prosecution of the '888 Application**

Dr. Schmidt was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura while prosecuting the '888 application, which issued as the '554 patent. On December 24, 2024, iRhythm filed five *inter partes* review petitions, which challenged U.S. Patent No. 8,214,007 (IPR2024-00378); U.S. Patent No. 8,214,007 (IPR2024-00377); U.S. Patent No. 9,155,484 (IPR2024-00376); U.S. Patent No. 8,965,492 (IPR2024-00374); and U.S. Patent No. 10,159,422 (IPR2024-00363). The iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura. Matsumura was a primary reference in the IPRs and the subject of substantial analysis and claim charting. More specifically, across the five iRhythm IPRs, Matsumura was used as a reference in twelve of the nineteen grounds that iRhythm advanced. The extensive use of Matsumura in the iRhythm IPRs is likewise seen in the Heikenfeld Declaration (attached as Ex. C).

Dr. Schmidt testified that he was aware of the iRhythm IPRs. Ex. B at 54:3-7 ("Q. And are you aware that iRhythm filed Inter Partes Reviews against patents asserted in the Welch Allyn case? MR. BUNKER: You can answer that yes or no. THE WITNESS: Yes."). Dr. Schmidt further testified that he reviewed these IPRs, including the Heikenfeld Declaration. Ex. B at 56:15-19 ("Q. Have you reviewed those IPRS? … THE WITNESS: Yes, very briefly."), 57:9-18 ("Q. Were you aware that iRhythm also submitted an expert declaration as part of its IPRs against Welch Allyn? … THE WITNESS: Yes. BY MS. BEANE: Q. Did you review that declaration? … THE WITNESS: Not in any great detail."). Although Dr. Schmidt reviewed the iRhythm IPRs, which relied upon the full English translation of Matsumura as key reference—a reference that is "but-for" material to claims that the Dr. Schmidt was currently prosecuting on behalf of iRhythm—Dr. Schmidt did not locate this reference from his client, whom he knew had a copy of this reference,

and he did not submit this reference to the USPTO. Ex. B at 58:2-6 ("Q. And just to confirm, you don't recall informing the USPTO as part of the '888 application about the English translation of JP2004-121360, correct? … THE WITNESS: No, I don't recall that."). Nor did Dr. Schmidt obtain this reference from the PTAB's website, https://ptacts.uspto.gov/ptacts/ui/home, which contained public copies of all of the exhibits that accompanied iRhythm's IPR filings.

Neither the Heikenfeld Declaration, the full English translation of Matsumura, or the iRhythm IPRs were submitted to the USPTO during prosecution of the '888 application. Dr. Schmidt, however, had notice that specific information existed (*i.e.*, the Heikenfeld Declaration, the full English translation of Matsumura, and the iRhythm IPRs) which may have been material to the patentability of the claims he was prosecuting in the '888 application, which were filed on behalf of iRhythm.

Upon information and belief, Mr. Lopez was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura during the time he supervised prosecution of the '888 application, which issued as the '554 patent. Mr. Lopez, as iRhythm's Director of Global Intellectual Property, supervised and was involved in filing the iRhythm IPRs. As mentioned above, the iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura.

The Heikenfeld Declaration extensively characterizes Matsumura, opines on changes that would have been obvious to a person of ordinary skill, and also characterizes the state of the art. In one example, Heikenfeld opines that "a POSA would understand that [Matsumura's] conductive gel 5 can detect 'bioelectric potentials' for transmission 'through the conductive material 2 and the hooks 3' because the conductive gel 5 is embedded in second sheet 4." Ex. C, ¶482. Heikenfeld further concludes that these conductive gels are ECG electrodes. Ex. C, ¶560. Heikenfeld also

opined that "Matsumura teaches that second sheet 4 and first sheet 1 are both made of 'an insulating material' such as 'polyethylene foam, polyurethane foam, or polyurethane sheet.'" Ex. C, ¶865. The over 500 pages of the Heikenfeld Declaration includes material information that should have been submitted to the USPTO to satisfy the duty of disclosure.

The '888 application was filed on October 4, 2024, and issued on May 12, 2025. *See* Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. ***Ted Lopez***."). The iRhythm IPRs were filed on December 24, 2024, while the '888 application was pending. Mr. Lopez concurrently supervised the prosecution of the '888 application and the iRhythm IPRs. Thus, Mr. Lopez was aware of both the Heikenfeld Declaration and the full English translation of Matsumura during prosecution of the '888 application. Mr. Lopez failed to disclose this same material information while actively pursuing similar subject matter in iRhythm's patent applications that he was substantively involved in overseeing.

Despite Mr. Lopez overseeing prosecution of subject matter that fell squarely within the disclosure of the full English translation of Matsumura and is now asserted against Bardy, Mr. Lopez did not send the full English translation of Matsumura to his prosecution counsel, Dr. Schmidt. Ex. B at 52:17-20 ("Q. At any point during the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360? A. No.").

### D. Both the Heikenfeld Declaration and the English Translation of Matsumura Are "But-For" Material to At Least Claim 1 of the '554 Patent

Upon information and belief, Mr. Lopez and Dr. Schmidt each breached their duty of disclosure and committed inequitable conduct during prosecution of the '554 patent by withholding material information from the USPTO. Mr. Lopez and Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration, which discussed the scope and content of the prior art and various reasons why certain references would have been combined,

30

and also the full English translation of Matsumura. Both the Heikenfeld Declaration and the full

English translation of Matsumura are "but-for" material to the patentability of the claims of the

'554 patent, including, for example, claim 1. Issued claim 1 of the '554 patent recites:

> An electronic device for long-term adhesion to a user, the device comprising:

> a housing comprising a physiologic data collection circuit, the housing positioned over a flexible layer extending from beneath the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, wherein the flexible layer comprises a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection;

> a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer; and

> a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user.

'554 Patent at cl. 1.

The Notice of Allowance stated that the prior art allegedly was silent on "the flexible layer

being made of two layers (upper and lower layers), its composition (polymers), and where

everything is located on the overall electronic device with respect to the other components." Notice

of Allowance (March 5, 2025) (Ex. D) at 4. Moreover, the Notice of Allowance stated that "[e]ach

of the layers and components were well-known individually at the time of invention." Ex. D at 4.

The Notice of Allowance is predicated on the lack of disclosure of these layers and components in

a single reference and on a lack of reason to combine these well-known disclosures. Based on these

features, the USPTO issued a Notice of Allowance.

The "but-for" materiality of the Heikenfeld Declaration in demonstrated in an example

claim chart. *See* Heikenfeld Declaration Chart (Ex. E). Because discovery is ongoing, the

Heikenfeld Declaration Chart provides a non-limiting example that illustrates the "but-for" materiality of the Heikenfeld Declaration. The left column reproduces each element of claim 1 of the '554 patent. The middle column cites the Heikenfeld Declaration, which characterizes Matsumura and cites to prior art reference Matsumura. The right column cites to the reasons for allowance in the Notice of Allowance, thereby showing how the full English translation of Matsumura and the Heikenfeld Declaration characterizing the same is material to the USPTO's allowance of the '554 patent. The Heikenfeld Declaration was not cited during prosecution of the '888 application despite being in iRhythm's possession before the '888 application issued as the '554 patent.

The "but-for" materiality of the full English translation of Matsumura is also demonstrated in an example claim chart. *See* '554 Matsumura Chart (Ex. F). Again, discovery is ongoing, and thus the '554 Matsumura Chart provides a non-limiting example that illustrates the "but-for" materiality of the full English translation of Matsumura. The left column reproduces each element of claim 1 of the '554 patent while the right column includes exemplary disclosure of the full English translation of Matsumura. The full English translation of Matsumura was not cited during prosecution of the '888 application despite being in iRhythm's possession before the '888 application issued.

The USPTO's recent grant of an *ex parte* reexamination of the '554 patent further supports the "but-for" materiality of the Heikenfeld Declaration and the full English translation of Matsumura. Namely, on September 8, 2025, an *ex parte* reexamination request of the '554 patent was filed. Request for *Ex Parte* Reexamination of the '554 Patent (Ex. G) at 1. Ground III relied on the full English translation of Matsumura, and alleged that Matsumura raised a ***substantial new question of patentability*** as to claim 1 of the '554 patent. Ex. G at 9, 63-70.

The USPTO found, on October 17, 2025, that "Matsumura raises an SNQ [or "substantial new question" of patentability] as to claim 1 of the '554 patent." Order Granting Request for *Ex Parte* Reexamination of the '554 Patent (Ex. H) at 13. Moreover, the USPTO states that "[t]here is a substantial likelihood that a reasonable examiner would consider at least the above teachings, i.e., first and second sheets and acrylic adhesive as taught by Matsumura important in determining the patentability of the claims." Ex. H at 15-16. The USPTO's findings confirm the but-for materiality of the entire disclosure of Matsumura and its English translation, the very disclosure and the English translation that Mr. Lopez withheld from the USPTO, despite being aware of the reference, as evidenced by his prior familiarity with it from iRhythm's IPRs.

### E.    A Specific Intent to Deceive the USPTO by Mr. Lopez and Dr. Schmidt is the Single Most Reasonable Inference

At any point during prosecution of the '888 application, either Mr. Lopez or Dr. Schmidt could have satisfied the duty of candor to the USPTO and disclosed the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura. The USPTO has a form for disclosing references during patent prosecution, called an Information Disclosure Statement ("IDS"), and iRhythm disclosed other references using an IDS form. For example, iRhythm submitted an IDS on February 6, 2025, disclosing other references, but not the iRhythm IPRs, Heikenfeld Declaration, or the English translation of Matsumura. Ex. I (Information Disclosure Statement of February 6, 2025). This IDS was signed by Dr. Schmidt. The single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '888 application and intended to deceive the USPTO by withholding such materials. This inference is supported by several considerations.

*First*, Mr. Lopez and Dr. Schmidt are sophisticated actors familiar with the duty to disclose material information to the USPTO under MPEP 2001.06(c) and 37 C.F.R. § 1.56. Both Dr. Schmidt and Mr. Lopez are registered patent attorneys, familiar with the rules for materiality. Dr. Schmidt has worked in patent prosecution for fourteen years and responded to "probably over a thousand" office actions and drafted hundreds of applications. Ex. B at 11:25-12:3. And, Mr. Lopez is an "[i]ntellectual Property attorney with 20+ years of experience protecting innovation and building patent portfolios, including preparing and executing strategic intellectual property plans for implementing business priorities and imperatives." *See* LinkedIn of Mr. Lopez (available at https://www.linkedin.com/in/theodore-lopez-92a420a/).

*Second*, iRhythm's submitted the foreign language version of Matsumura while withholding the full English translation. During prosecution of the '888 application, iRhythm submitted a foreign language version of Matsumura with only the English-translated abstract, demonstrating that iRhythm was aware of Matsumura's relevance to the pending claims. *See* Information Disclosure Statement of Nov. 4, 2024 (Ex. K) at 34 (citing JP 2004-121360 as Cite. No. 956). This IDS submission was signed by Dr. Schmidt. iRhythm advantageously used the full English translation of Matsumura in related litigation across its petitions while withholding the same during prosecution of its patent applications. This intentional decision leads to a single most reasonable inference that the withholding of the full English translation of Matsumura was intentional.

*Third*, iRhythm directly benefited from its failure to submit the "but-for" material information. By October of 2024 (when the '888 application was filed), Defendant was already the subject of a four-patent lawsuit from Bardy's sister company, Welch Allyn, for similar infringing activities as in this case. In search of a response to that pending litigation, Mr. Lopez

and Dr. Schmidt collaborated to obtain patents and assert them against Bardy. Namely, Dr. Schmidt testified that he monitored Bardy's portfolio and added limitations specifically to cover Bardy's CAM Patch. Ex. B at 64:11-66:20 ("Q. Okay, do you know whether the limitation was also added to cover the Bardy cam product? … Yes, it is my personal belief that that does cover the Bardy cam."), 59:14-20 ("Do you monitor Bardy Diagnostics' patent portfolio? … Yes."). Moreover, to increase the speed of prosecution, Mr. Lopez and Dr. Schmidt filed the '888 application under Track One, which requires a fee for the USPTO to prioritize the application. Ex. B at 64:11-66:20 ("Q. And the application that led to the '554 patent was filed with a Track 1 request, correct? A. Yes, I see a Track 1 prioritized examination request. Q. What are some of the advantages of a Track 1 request? … THE WITNESS: The main advantage is speed. Track 1 requests are essentially a pay-for-play program with the USPTO where you pay an additional fee so the USPTO will process the application more quickly.").

Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality of the withheld information would have either significantly delayed the prosecution of the '888 application or inhibited the claims of the '554 patent from issuing as they currently stand. These actions were driven by these two individuals' awareness that the Court in this case had a deadline of June 2, 2025, to amend its pleadings. As a result, Mr. Lopez and Dr. Schmidt were incentivized ***not*** to submit material information to avoid delaying the issuance of the '554 patent.

In sum, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately hinder iRhythm's ability to obtain and assert additional patents in this case, including, for example, the '554 patent. To avoid that delay and to obtain the '554 patent in an

expedited manner to assert against Bardy, Mr. Lopez and Dr. Schmidt colluded to withhold iRhythm's own litigation materials from the USPTO.

Based on these considerations, the single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '554 patent and he intended to deceive the USPTO by withholding such materials.

## NINETEENTH DEFENSE: UNENFORCEABILITY ('277 PATENT)

The '277 patent is unenforceable due to inequitable conduct. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). Upon information and belief, and before taking full discovery, Mr. Lopez and Dr. Schmidt committed inequitable conduct during prosecution of the '277 patent with a specific intent to deceive the USPTO. Mr. Lopez committed inequitable conduct by withholding the Heikenfeld Declaration and full English translation of Matsumura from the USPTO during prosecution of U.S. Patent Application No. 18/806,584 (the "'584 application"), which issued as the '277 patent. Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration and failing to acquire and submit the full English translation of Matsumura to the USPTO during prosecution of '584 application, despite his awareness that such a translation existed within his client, iRhythm's, possession.

On information and belief, Mr. Lopez knew about the Heikenfeld Declaration and the full English translation of Matsumura because he reviewed and supervised the iRhythm IPRs, which were submitted to the USPTO during the pendency of the '584 application. In the iRhythm IPRs, iRhythm challenged the validity of patents directed to and claiming ECG monitors based directly on the Heikenfeld Declaration and full English translation of Matsumura. Dr. Schmidt likewise knew of the Heikenfeld Declaration and full English translation of Matsumura during the pendency of the '584 application. The withheld information is "but-for" material to the patentability of the

36

claims of the '584 application. Finally, a specific intent to deceive the USPTO by Mr. Lopez and Dr. Schmidt is the single most reasonable inference.

Defendant directly benefited from its failure to submit this "but-for" material information. At the time of filing the '584 application, Mr. Lopez and Dr. Schmidt collaborated to obtain patents to assert against Bardy in this litigation. Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality would have stood in the way of Defendant's ability to obtain the claim scope it did via the issuance of the '277 Patent. Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately stand in the way of Defendant's ability to assert additional patents against Bardy by the June 2, 2025 deadline to amend the pleadings in this case. To obtain the '277 Patent in an expedited manner to assert against Bardy (*e.g.*, the '277 application was filed on August 15, 2024 and issued on May 20, 2025 as the '277 patent), Mr. Lopez and Dr. Schmidt colluded to withhold information that was but for material to the claims of the '584 application. iRhythm's own litigation materials from the USPTO.

### A.    The Duty to Disclose Information Material to Patentability

Under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." Individuals associated with the filing and prosecution of a patent application include "***[e]ach attorney*** or agent who prepares or prosecutes the application" and "[e]very other person who is ***substantively involved in the preparation or prosecution of the application*** and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c). Under MPEP 2001.06(c), an applicant that pursues subject matter that "is or has been involved in litigation and/or a trial proceeding, or the litigation

and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the examiner." This section includes a requirement to disclose *inter partes* review proceedings and ***any material information arising therefrom***. *See* MPEP 2001.06(c).

### B.        The Duty of Disclosure Applied to Dr. Schmidt and Mr. Lopez

The duty of disclosure applied to Dr. Schmidt because he was the prosecuting attorney for the '584 application. On August 15, 2024, iRhythm filed the '584 application, which issued as the '277 patent. iRhythm is the applicant on the Application Data Sheet, which was signed by David R. Schmidt, who is listed on the Power of Attorney. The correspondence address is Knobbe, Martens, Olson & Bear, LLP at 2040 Main Street, Fourteenth Floor, Irvine California, United States. Moreover, Dr. Schmidt testified that he was involved in the prosecution of the '584 application. *See* Ex. B at 31:25-32:9 ("Q. Were you involved in the prosecution of this patent application? A. Yes."). Mr. Lopez also owed a duty of disclosure at least regarding the '584 application. Namely, Mr. Lopez, as iRhythm's Director of Global Intellectual Property, owed a duty of disclosure because he was substantively involved in the preparation and prosecution of the '584 application, stemming from his role in the company, the applicant of the '584 application. This is supported at least by "Knobbe, Martens, Olson & Bear LLP's Privilege Log in Response to Subpoena." (Ex. A). Between May 13, 2022, and November 28, 2024, Mr. Lopez and Dr. Schmidt exchanged numerous communications described as "[l]egal advice from counsel regarding patent prosecution." *See* Ex. A at 1-7.

The testimony of Dr. Schmidt also establishes that Mr. Lopez was substantively involved in the preparation and prosecution of the '584 application. First, Dr. Schmidt testified that Mr. Lopez was responsible for supervising the prosecution of iRhythm's portfolio. Ex. B at 44:8-12. Second, Dr. Schmidt testified that Mr. Lopez was responsible for approving patent claims in

applications to be filed with the USPTO, including the patent claims that iRhythm now asserts against Bardy. Ex. B at 22:5-15 ("Q. [W]ho was your contact at iRhythm that you were sending drafts to of claims? … I interacted with Mark Day at iRhythm and then also Ted Lopez."). Dr. Schmidt also testified that Mr. Lopez approved the claims in the '277 patent (*i.e.*, the '584 application) for filing with the USPTO. Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. *Ted Lopez*.").

Mr. Lopez's practice of receiving claims from Dr. Schmidt, and approving those claims to be filed, is evident from Dr. Schmidt's testimony. For the '734 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 24:20-25 ("Q. All right. Turning back to the '734 patent, which is Exhibit 1 to your deposition, do you recall who at iRhythm approved the claims for filing? … probably *Ted Lopez*, so probably both of them."). For the '859 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 27:13-28:5 ("Q. Who approved the claim set [of the '859 patent] to be filed? A. *Ted Lopez*."). For the '860 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 28:17-29:8 ("Q. And do you recall who approved the claims to be filed? A. *Ted Lopez*."). For the '554 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. *Ted Lopez*.").

In addition to approving claims to be filed, Dr. Schmidt testified that he regularly communicates with Mr. Lopez regarding iRhythm patent prosecution. Ex. B at 36:21-24.

In sum, Dr. Schmidt's testimony aligns with the privilege log and supports Mr. Lopez's substantial involvement in the preparation and prosecution of each patent that iRhythm now asserts. Therefore, under 37 C.F.R. § 1.56, Mr. Lopez owed a duty of candor to the USPTO at least with regard to the '584 application, which issued as the '277 patent.

**C.    Dr. Schmidt and Mr. Lopez Knew About the Heikenfeld Declaration and the Full English Translation of Matsumura But Did Not Disclose Either During Prosecution of the '888 Application**

Dr. Schmidt was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura while prosecuting the '584 application, which issued as the '277 patent. On December 24, 2024, iRhythm filed five *inter partes* review petitions, which challenged U.S. Patent No. 8,214,007 (IPR2024-00378); U.S. Patent No. 8,214,007 (IPR2024-00377); U.S. Patent No. 9,155,484 (IPR2024-00376); U.S. Patent No. 8,965,492 (IPR2024-00374); and U.S. Patent No. 10,159,422 (IPR2024-00363). The iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura. Matsumura was a primary reference in the IPRs and the subject of substantial analysis and claim charting. More specifically, across the five iRhythm IPRs, Matsumura was used as a reference in twelve of the nineteen grounds that iRhythm advanced. The extensive use of Matsumura in the iRhythm IPRs is likewise seen in the Heikenfeld Declaration (attached as Ex. C).

Dr. Schmidt testified that he was aware of the iRhythm IPRs. Ex. B at 54:3-7 ("Q. And are you aware that iRhythm filed Inter Partes Reviews against patents asserted in the Welch Allyn case? MR. BUNKER: You can answer that yes or no. THE WITNESS: Yes."). Dr. Schmidt further testified that he reviewed these IPRs, including the Heikenfeld Declaration. Ex. B at 56:15-19 ("Q. Have you reviewed those IPRS? … THE WITNESS: Yes, very briefly."), 57:9-18 ("Q. Were you aware that iRhythm also submitted an expert declaration as part of its IPRs against Welch Allyn? … THE WITNESS: Yes. BY MS. BEANE: Q. Did you review that declaration? … THE WITNESS: Not in any great detail."). Although Dr. Schmidt reviewed the iRhythm IPRs, which relied upon the full English translation of Matsumura as key reference—a reference that is "but-for" material to claims that the Dr. Schmidt was currently prosecuting on behalf of iRhythm—Dr. Schmidt did not locate this reference from his client, whom he knew had a copy of this reference,

40

and he did not submit this reference to the USPTO. Ex. B at 58:2-6 ("Q. And just to confirm, you don't recall informing the USPTO as part of the '888 application about the English translation of JP2004-121360, correct? … THE WITNESS: No, I don't recall that."). Nor did Dr. Schmidt obtain this reference from the PTAB's website, https://ptacts.uspto.gov/ptacts/ui/home, which contained public copies of all of the exhibits that accompanied iRhythm's IPR filings.

Neither the Heikenfeld Declaration, the full English translation of Matsumura, or the iRhythm IPRs were submitted to the USPTO during prosecution of the '584 application. Dr. Schmidt, however, had notice that specific information existed (*i.e.*, the Heikenfeld Declaration, the full English translation of Matsumura, and the iRhythm IPRs) which may have been material to the patentability of the claims he was prosecuting in the '584 application, which were filed on behalf of iRhythm.

Upon information and belief, Mr. Lopez was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura during the time he supervised prosecution of the '584 application, which issued as the '277 patent. Mr. Lopez, as iRhythm's Director of Global Intellectual Property, supervised and was involved in filing the iRhythm IPRs. As mentioned above, the iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura.

The Heikenfeld Declaration extensively characterizes Matsumura, opines on changes that would have been obvious to a person of ordinary skill, and also characterizes the state of the art. In one example, Heikenfeld opines that "a POSA would understand that [Matsumura's] conductive gel 5 can detect 'bioelectric potentials' for transmission 'through the conductive material 2 and the hooks 3' because the conductive gel 5 is embedded in second sheet 4." Ex. C, ¶482. Heikenfeld further concludes that these conductive gels are ECG electrodes. Ex. C, ¶560. Heikenfeld also

opined that "Matsumura teaches that second sheet 4 and first sheet 1 are both made of 'an insulating material' such as 'polyethylene foam, polyurethane foam, or polyurethane sheet.'" Ex. C, ¶865. The over 500 pages of the Heikenfeld Declaration includes material information that should have been submitted to the USPTO to satisfy the duty of disclosure.

The '584 application was filed on August 15, 2024, and issued on May 20, 2025. *See* Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. ***Ted Lopez.***"). The iRhythm IPRs were filed on December 24, 2024, while the '584 application was pending. Mr. Lopez concurrently supervised the prosecution of the '584 application and the iRhythm IPRs. Thus, Mr. Lopez was aware of both the Heikenfeld Declaration and the full English translation of Matsumura during prosecution of the '584 application. Mr. Lopez failed to disclose this same material information while actively pursuing similar subject matter in iRhythm's patent applications that he was substantively involved in overseeing.

Despite Mr. Lopez overseeing prosecution of subject matter that fell squarely within the disclosure of the full English translation of Matsumura and is now asserted against Bardy, Mr. Lopez did not send the full English translation of Matsumura to his prosecution counsel, Dr. Schmidt. Ex. B at 52:17-20 ("Q. At any point during the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360? A. No.").

### D. Both the Heikenfeld Declaration and the English Translation of Matsumura Are "But-For" Material to At Least Claim 1 of the '277 Patent

Upon information and belief, Mr. Lopez and Dr. Schmidt each breached their duty of disclosure and committed inequitable conduct during prosecution of the '277 patent by withholding material information from the USPTO. Mr. Lopez and Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration, which discussed the scope and content of the prior art and various reasons why certain references would have been combined,

42

and also the full English translation of Matsumura. Both the Heikenfeld Declaration and the full English translation of Matsumura are "but-for" material to the patentability of the claims of the '277 patent, including, for example, claim 1. Issued claim 1 of the '277 patent recites:

> An electronic device for long-term adhesion to a user, the device comprising:
>
> a housing comprising a physiologic data collection circuit;
>
> an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user;
>
> an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and
>
> wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and
>
> wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer.

'277 Patent at cl. 1.

The "but-for" materiality of the full English translation of Matsumura is demonstrated in an example claim chart. *See* '277 Matsumura Chart (Ex. L). Again, discovery is ongoing, and thus the '277 Matsumura Chart provides a non-limiting example that illustrates the "but-for" materiality of the full English translation of Matsumura. The left column reproduces each element of claim 1 of the '277 patent while the right column includes exemplary disclosure of the full English translation of Matsumura. The full English translation of Matsumura was not cited during prosecution of the '584 application despite being in iRhythm's possession before the '584 application issued.

The USPTO's recent grant of an *ex parte* reexamination of the '277 patent further supports the "but-for" materiality of the Heikenfeld Declaration and the full English translation of Matsumura. Namely, on September 8, 2025, an *ex parte* reexamination request of the '277 patent

was filed. Request for *Ex Parte* Reexamination of the '277 Patent (Ex. M) at 1. Ground II relied on the full English translation of Matsumura, and alleged that Matsumura raised a ***substantial new question of patentability*** as to claim 1 of the '277 patent. Ex. M at 7, 33-42.

The USPTO found, on October 17, 2025, that "Matsumura raises an SNQ [or "substantial new question" of patentability] as to claim 1 of the '277 patent." Order Granting Request for *Ex Parte* Reexamination of the '277 Patent (Ex. N) at 14. Moreover, the USPTO states that "[t]here is a substantial likelihood that a reasonable examiner would consider at least the above teachings, i.e., first and second sheets and acrylic adhesive as taught by Matsumura important in determining the patentability of the claims." Ex. N at 15. The USPTO's findings confirm the but-for materiality of the entire disclosure of Matsumura and its English translation, the very disclosure and the English translation that Mr. Lopez withheld from the USPTO, despite being aware of the reference, as evidenced by his prior familiarity with it from iRhythm's IPRs.

### E.    A Specific Intent to Deceive the USPTO by Mr. Lopez and Dr. Schmidt is the Single Most Reasonable Inference

At any point during prosecution of the '584 application, either Mr. Lopez or Dr. Schmidt could have satisfied the duty of candor to the USPTO and disclosed the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura. The USPTO has a form for disclosing references during patent prosecution, called an IDS, and iRhythm disclosed other references using an IDS form. For example, iRhythm submitted an IDS on January 27, 2025, disclosing other references, but not the iRhythm IPRs, Heikenfeld Declaration, or the English translation of Matsumura. Ex. O (Information Disclosure Statement of January 27, 2025). This IDS was signed by Dr. Schmidt. The single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '584 application

44

and intended to deceive the USPTO by withholding such materials. This inference is supported by several considerations.

*First*, Mr. Lopez and Dr. Schmidt are sophisticated actors familiar with the duty to disclose material information to the USPTO under MPEP 2001.06(c) and 37 C.F.R. § 1.56. Both Dr. Schmidt and Mr. Lopez are registered patent attorneys, familiar with the rules for materiality. Dr. Schmidt has worked in patent prosecution for fourteen years and responded to "probably over a thousand" office actions and drafted hundreds of applications. Ex. B at 11:25-12:3. And, Mr. Lopez is an "[i]ntellectual Property attorney with 20+ years of experience protecting innovation and building patent portfolios, including preparing and executing strategic intellectual property plans for implementing business priorities and imperatives." *See* LinkedIn of Mr. Lopez (available at https://www.linkedin.com/in/theodore-lopez-92a420a/).

*Second*, iRhythm's submitted the foreign language version of Matsumura while withholding the full English translation. During prosecution of the '584 application, iRhythm submitted a foreign language version of Matsumura with only the English-translated abstract, demonstrating that iRhythm was aware of Matsumura's relevance to the pending claims. *See* Information Disclosure Statement (Aug. 15, 2024) (Ex. P) at 33 (citing JP 2004-121360 as Cite No. 924). This IDS submission was signed by Dr. Schmidt. iRhythm advantageously used the full English translation of Matsumura in related litigation across its petitions while withholding the same during prosecution of its patent applications. This intentional decision leads to a single most reasonable inference that the withholding of the full English translation of Matsumura was intentional.

*Third*, iRhythm directly benefited from its failure to submit the "but-for" material information. By August of 2024 (when the '584 application was filed), Defendant was already the

subject of a four-patent lawsuit from Bardy's sister company, Welch Allyn, for similar infringing activities as in this case. In search of a response to that pending litigation, Mr. Lopez and Dr. Schmidt collaborated to obtain patents and assert them against Bardy. Namely, Dr. Schmidt testified that he monitored Bardy's portfolio and added limitations specifically to cover Bardy's CAM Patch. Ex. B at 64:11-66:20 ("Q. Okay, do you know whether the limitation was also added to cover the Bardy cam product? … Yes, it is my personal belief that that does cover the Bardy cam."), 59:14-20 ("Do you monitor Bardy Diagnostics' patent portfolio? … Yes."). Moreover, to increase the speed of prosecution, Mr. Lopez and Dr. Schmidt filed the '584 application under Track One, which requires a fee for the USPTO to prioritize the application. Ex. B at 64:11-66:20 ("Q. What are some of the advantages of a Track 1 request? … THE WITNESS: The main advantage is speed. Track 1 requests are essentially a pay-for-play program with the USPTO where you pay an additional fee so the USPTO will process the application more quickly.").

Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality of the withheld information would have either significantly delayed the prosecution of the '584 application or inhibited the claims of the '277 patent from issuing as they currently stand. These actions were driven by these two individuals' awareness that the Court in this case had a deadline of June 2, 2025, to amend its pleadings. As a result, Mr. Lopez and Dr. Schmidt were incentivized ***not*** to submit material information to avoid delaying the issuance of the '277 patent.

In sum, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately hinder iRhythm's ability to obtain and assert additional patents in this case, including, for example, the '277 patent. To avoid that delay and to obtain the '277 Patent in an

46

expedited manner to assert against Bardy, Mr. Lopez and Dr. Schmidt colluded to withhold iRhythm's own litigation materials from the USPTO.

Based on these considerations, the single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '277 patent and he intended to deceive the USPTO by withholding such materials.

## OTHER DEFENSES RESERVED

Bardy reserves the right to assert any additional defenses, at law or equity, that may be available now or in the future based on discovery or any factual investigation in this case.

## BARDY'S COUNTERCLAIMS

Bardy Diagnostics, Inc. ("Bardy") hereby asserts the following counterclaims against iRhythm Technologies, Inc. ("iRhythm").

## THE PARTIES

1.      Bardy is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 220 120th Ave NE, Suite 100, Bellevue, WA.

2.      As alleged by iRhythm in paragraph 7 of iRhythm's Third Amended Counterclaims and Answer (ECF No. 52), iRhythm is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 699 8th Street, Suite 600, San Francisco, CA 94103.

## NATURE OF THE ACTION

3.      Bardy brought this action against iRhythm for the infringement of the U.S. Patent No. 12,161,473 (the "'473 Patent"), U.S. Patent No. 12,171,562 (the "'562 Patent"), U.S. Patent No. 12,285,261 (the "'261 patent"), and U.S. Patent No. 12,310,735 (the "'735 Patent") (collectively, the "Bardy Asserted Patents").

4.      iRhythm counterclaimed for a finding of infringement of the U.S. Patent Nos. 12,133,734 (the "'734 patent"), 12,245,859 (the "'859 patent), 12,245,860 (the "'860 patent"), and 12,274,554 (the '554 patent"), 12,303,277 (the "'277 patent") (collectively, the "iRhythm Asserted Patents") by Bardy.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over Bardy's Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

6.      The Court may properly exercise personal jurisdiction over iRhythm at least because iRhythm is deemed to reside in this judicial district by virtue of being incorporated in the State of Delaware, and because iRhythm has asserted the iRhythm Asserted Patents against Bardy in the Counterclaims in this jurisdiction.

7.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and/or 1400, and because iRhythm has asserted the iRhythm Asserted Patents against Bardy in the Counterclaims in this jurisdiction.

## COUNT I: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 12,133,734

8.      Bardy incorporates by reference the allegations in Paragraphs 1-7 of these Counterclaims as though fully set forth herein.

9.      In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '734 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

10.      Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '734 patent.

48

11.     By way of example, and not by way of limitation, the '734 patent recites "wherein the housing is configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user." '734 patent, cl. 1. The CAM patch does not include a housing that is "configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user," as required by claim 1 of the '734 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '734 patent.

12.     As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '734 patent.

13.     A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '734 patent is therefore necessary and appropriate to resolve this controversy.

14.     iRhythm knew or should have known that Bardy has not and is not in any way infringing the '734 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

## COUNT II: DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF U.S. PATENT NO. 12,245,859

15.     Bardy incorporates by reference the allegations in Paragraphs 1-14 of these Counterclaims as though fully set forth herein.

16.     In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '859 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

17.    Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '859 patent.

18.    By way of example, and not by way of limitation, the CAM patch does not have the claimed spring contacts as required by claim 1 of the '859 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '859 patent.

19.    As evidenced by the allegations in the iRhythm Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '859 patent.

20.    A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '859 patent is therefore necessary and appropriate to resolve this controversy.

21.    iRhythm knew or should have known that Bardy has not and is not in any way infringing the '859 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

## COUNT III: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 12,245,860

22.    Bardy incorporates by reference the allegations in paragraphs 1-21 of these Counterclaims as though fully set forth herein.

23.    In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '860 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

24.    Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '860 patent.

25.    By way of example, and not by way of limitation, the CAM patch does not have the claimed spring contacts as required by claim 1 of the '860 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '860 patent.

26.    As evidenced by the allegations in the iRhythm Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '860 patent.

27.    A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '860 patent is therefore necessary and appropriate to resolve this controversy.

28.    iRhythm knew or should have known that Bardy has not and is not in any way infringing the '860 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

**COUNT IV: DECLARATORY JUDGMENT OF
NON-INFRINGEMENT OF U.S. PATENT NO. 12,274,554**

29.    Bardy incorporates by reference the allegations in Paragraphs 1-28 of these Counterclaims as though fully set forth herein.

30.    In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '554 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

1604412217.1

31.     Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '554 patent.

32.     By way of example, and not by way of limitation, the CAM patch does not include the claimed "electrical connection" as required by claim 1 of the '554 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '554 patent.

33.     As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '554 patent.

34.     A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '554 patent is therefore necessary and appropriate to resolve this controversy.

35.     iRhythm knew or should have known that Bardy has not and is not in any way infringing the '554 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

## COUNT V: DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 12,133,734

36.     Bardy incorporates by reference the allegations in Paragraphs 1-35 of these Counterclaims as though fully set forth herein.

37.     Bardy maintains that each and every claim of the '734 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

38.     As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '734 patent.

39.     By way of example, and not by way of limitation, the claims of the '734 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent No. 7,206,630 (Ex. Q); U.S. Patent Publication No. 2008/0139953 (Ex. R); and/or U.S. Patent Publication No. 2002/0082491 (Ex. S).

40.     A judicial declaration that the claims of the '734 patent are invalid is therefore necessary and appropriate to resolve this controversy.

## COUNT VI: DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 12,245,859

41.     Bardy incorporates by reference the allegations in Paragraphs 1-40 of these Counterclaims as though fully set forth herein.

42.     Bardy maintains that each and every claim of the '859 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

43.     As evidenced by the allegations in the iRhythm Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '859 patent.

44.     By way of example, and not by way of limitation, the claims of the '859 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent No. 7,206,630 (Ex. Q); U.S. Patent Publication No. 2008/0139953 (Ex. R); and/or U.S. Patent Publication No. 2002/0082491 (Ex. S).

45.     A judicial declaration that the claims of the '859 patent are invalid is therefore necessary and appropriate to resolve this controversy.

## COUNT VII: DECLARATORY JUDGMENT OF
## INVALIDITY OF U.S. PATENT NO. 12,245,860

46.      Bardy incorporates by reference the allegations in Paragraphs 1-45 of these Counterclaims as though fully set forth herein.

47.      Bardy maintains that each and every claim of the '860 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

48.      As evidenced by the allegations in the iRhythm Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '860 patent.

49.      By way of example, and not by way of limitation, the claims of the '860 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent No. 7,206,630 (Ex. Q); U.S. Patent Publication No. 2008/0139953 (Ex. R); and/or U.S. Patent Publication No. 2002/0082491 (Ex. S).

50.      A judicial declaration that the claims of the '860 patent are invalid is therefore necessary and appropriate to resolve this controversy.

## COUNT VIII: DECLARATORY JUDGMENT OF
## INVALIDITY OF U.S. PATENT NO. 12,274,554

51.      Bardy incorporates by reference the allegations in Paragraphs 1-50 of these Counterclaims as though fully set forth herein.

52.      Bardy maintains that each and every claim of the '554 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

53.      As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '554 patent.

54.    By way of example, and not by way of limitation, the claims of the '554 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent No. 7,206,630 (Ex. Q); U.S. Patent Publication No. 2008/0139953 (Ex. R); and/or U.S. Patent Publication No. 2002/0082491 (Ex. S).

55.    A judicial declaration that the claims of the '554 patent are invalid is therefore necessary and appropriate to resolve this controversy.

## COUNT IX: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 12,303,277

56.    Bardy incorporates by reference the allegations in Paragraphs 1-55 of these Counterclaims as though fully set forth herein.

57.    In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '277 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

58.    Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '277 patent.

59.    By way of example, and not by way of limitation, the CAM patch does not include the claimed "wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer" as required by claim 1 of the '277 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '277 patent.

60.    As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '277 patent.

61.    A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '277 patent is therefore necessary and appropriate to resolve this controversy.

62.    iRhythm knew or should have known that Bardy has not and is not in any way infringing the '277 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

<u>**COUNT X: DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 12,303,277**</u>

63.    Bardy incorporates by reference the allegations in Paragraphs 1-62 of these Counterclaims as though fully set forth herein.

64.    Bardy maintains that each and every claim of the '277 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

65.    As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '277 patent.

66.    By way of example, and not by way of limitation, the claims of the '277 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent No. 7,206,630 (Ex. Q); U.S. Patent Publication No. 2008/0139953 (Ex. R); and/or U.S. Patent Publication No. 2002/0082491 (Ex. S).

67.    A judicial declaration that the claims of the '277 patent are invalid is therefore necessary and appropriate to resolve this controversy.

<u>**COUNT XI: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. 12,274,554**</u>

68.    Bardy incorporates by reference the allegations in Paragraphs 1-67 of these Counterclaims as though fully set forth herein.

56

69.    The '554 patent is unenforceable due to inequitable conduct. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). Upon information and belief, and before taking full discovery, Theodore Lopez and David Schmidt committed inequitable conduct during prosecution of the '554 patent with a specific intent to deceive the United States Patent and Trademark Office ("USPTO"). Mr. Lopez committed inequitable conduct by withholding the Expert Declaration of Jason Heikenfeld and the full English translation of JP 2004-121360 from the USPTO during prosecution of U.S. Patent Application No. 18/936,888 (the "'888 application"), which issued as the '554 patent. Dr. Schmidt committed inequitable conduct by withholding the Expert Declaration of Jason Heikenfeld and failing to acquire and submit the full English translation of JP 2004-121360 to the USPTO during prosecution of '888 application, despite his awareness that such a translation existed within his client, iRhythm's, possession.

70.    On information and belief, Mr. Lopez knew about the Expert Declaration of Jason Heikenfeld (the "Heikenfeld Declaration") and the English translation of JP 2004-121360 (the "full English translation of Matsumura") because he reviewed and supervised five of iRhythm's *inter partes* review petitions (collectively, the "iRhythm IPRs"), which were submitted to the USPTO during the pendency of the '888 application. In the iRhythm IPRs, iRhythm challenged the validity of patents directed to and claiming ECG monitors based directly on the Heikenfeld Declaration and full English translation of Matsumura. Dr. Schmidt likewise knew of the Heikenfeld Declaration and full English translation of Matsumura during the pendency of the '888 application. The withheld information is "but-for" material to the patentability of the claims of the '888 application. Finally, a specific intent to deceive the USPTO by Mr. Lopez and Dr. Schmidt is the single most reasonable inference.

71.     Defendant directly benefited from its failure to submit this "but-for" material information. At the time of filing the '888 application, Mr. Lopez and Dr. Schmidt collaborated to obtain patents to assert against Bardy in this litigation. Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality would have stood in the way of Defendant's ability to obtain the claim scope it did via the issuance of the '554 patent. Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately stand in the way of Defendant's ability to assert additional patents against Bardy by the June 2, 2025 deadline to amend the pleadings in this case. To obtain the '554 patent in an expedited manner to assert against Bardy (*e.g.*, the '888 application was filed on October 4, 2024 and issued on May 12, 2025 as the '554 patent), Mr. Lopez and Dr. Schmidt colluded to withhold information that was but for material to the claims of the '888 application. iRhythm's own litigation materials from the USPTO.

### A.     The Duty to Disclose Information Material to Patentability

72.     Under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." Individuals associated with the filing and prosecution of a patent application include "*[e]ach attorney* or agent who prepares or prosecutes the application" and "[e]very other person who is **substantively involved in the preparation or prosecution of the application** and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c). Under MPEP 2001.06(c), an applicant that pursues subject matter that "is or has been involved in litigation and/or a trial proceeding, or the litigation and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising

therefrom must be brought to the attention of the examiner." This section includes a requirement to disclose *inter partes* review proceedings and ***any material information arising therefrom***. *See* MPEP 2001.06(c).

**B.    The Duty of Disclosure Applied to Dr. Schmidt and Mr. Lopez**

73.    The duty of disclosure applied to Dr. Schmidt because he was the prosecuting attorney for the '888 application. On October 4, 2024, iRhythm filed the '888 application, which issued as the '554 patent. iRhythm is the applicant on the Application Data Sheet, which was signed by David R. Schmidt, who is listed on the Power of Attorney. The correspondence address is Knobbe, Martens, Olson & Bear, LLP at 2040 Main Street, Fourteenth Floor, Irvine California, United States. Moreover, Dr. Schmidt testified that he was involved in the prosecution of the '888 application. *See* Deposition Transcript of David Schmidt Transcript (Sept. 12, 2025) (Ex. B) at 30:13-15 ("Q. And were you involved in the prosecution of the '554 patent? A. Yes."). Mr. Lopez also owed a duty of disclosure at least regarding the '888 application. Namely, Mr. Lopez, as iRhythm's Director of Global Intellectual Property, owed a duty of disclosure because he was substantively involved in the preparation and prosecution of the '888 application, stemming from his role in the company, the applicant of the '888 application. This is supported at least by "Knobbe, Martens, Olson & Bear LLP's Privilege Log in Response to Subpoena." (Ex. A). Between May 13, 2022, and November 28, 2024, Mr. Lopez and Dr. Schmidt exchanged numerous communications described as "[l]egal advice from counsel regarding patent prosecution." *See* Ex. A at 1-7. For example, on October 1, 2024, three days prior to the filing of the '888 application, Dr. Schmidt sent Mr. Lopez an "[e]mail communication reflecting legal advice from counsel regarding patent prosecution." Ex. A at 6.

74.    The testimony of Dr. Schmidt also establishes that Mr. Lopez was substantively involved in the preparation and prosecution of the '888 application. First, Dr. Schmidt testified

that Mr. Lopez was responsible for supervising the prosecution of iRhythm's portfolio. Ex. B at 44:8-12. Second, Dr. Schmidt testified that Mr. Lopez was responsible for approving patent claims in applications to be filed with the USPTO, including the patent claims that iRhythm now asserts against Bardy. Ex. B at 22:5-15 ("Q. [W]ho was your contact at iRhythm that you were sending drafts to of claims? … I interacted with Mark Day at iRhythm and then also Ted Lopez."). Dr. Schmidt also testified that Mr. Lopez approved the claims in the '554 patent (*i.e.*, the '888 application) for filing with the USPTO. Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. *Ted Lopez*.").

75.     Mr. Lopez's practice of receiving claims from Dr. Schmidt, and approving those claims to be filed, is evident from Dr. Schmidt's testimony. For the '734 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 24:20-25 ("Q. All right. Turning back to the '734 patent, which is Exhibit 1 to your deposition, do you recall who at iRhythm approved the claims for filing? … probably *Ted Lopez*, so probably both of them."). For the '859 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 27:13-28:5 ("Q. Who approved the claim set [of the '859 patent] to be filed? A. *Ted Lopez*."). For the '860 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 28:17-29:8 ("Q. And do you recall who approved the claims to be filed? A. *Ted Lopez*."). For the '277 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. *Ted Lopez*.").

76.     In addition to approving claims to be filed, Dr. Schmidt testified that he regularly communicates with Mr. Lopez regarding iRhythm patent prosecution. Ex. B at 36:21-24.

77.     In sum, Dr. Schmidt's testimony aligns with the privilege log and supports Mr. Lopez's substantial involvement in the preparation and prosecution of each patent that iRhythm

60

now asserts. Therefore, under 37 C.F.R. § 1.56, Mr. Lopez owed a duty of candor to the USPTO

at least with regard to the '888 application, which issued as the '554 patent.

### C. Dr. Schmidt and Mr. Lopez Knew About the Heikenfeld Declaration and the Full English Translation of Matsumura But Did Not Disclose Either During Prosecution of the '888 Application

78.     Dr. Schmidt was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the

full English translation of Matsumura while prosecuting the '888 application, which issued as the

'554 patent. On December 24, 2024, iRhythm filed five *inter partes* review petitions, which

challenged U.S. Patent No. 8,214,007 (IPR2024-00378); U.S. Patent No. 8,214,007 (IPR2024-

00377); U.S. Patent No. 9,155,484 (IPR2024-00376); U.S. Patent No. 8,965,492 (IPR2024-

00374); and U.S. Patent No. 10,159,422 (IPR2024-00363). The iRhythm IPRs included several

exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura.

Matsumura was a primary reference in the IPRs and the subject of substantial analysis and claim

charting. More specifically, across the five iRhythm IPRs, Matsumura was used as a reference in

twelve of the nineteen grounds that iRhythm advanced. The extensive use of Matsumura in the

iRhythm IPRs is likewise seen in the Heikenfeld Declaration (attached as Ex. C).

79.     Dr. Schmidt testified that he was aware of the iRhythm IPRs. Ex. B at 54:3-7 ("Q.

And are you aware that iRhythm filed Inter Partes Reviews against patents asserted in the Welch

Allyn case? MR. BUNKER: You can answer that yes or no. THE WITNESS: Yes."). Dr. Schmidt

further testified that he reviewed these IPRs, including the Heikenfeld Declaration. Ex. B at 56:15-

19 ("Q. Have you reviewed those IPRS? … THE WITNESS: Yes, very briefly."), 57:9-18 ("Q.

Were you aware that iRhythm also submitted an expert declaration as part of its IPRs against Welch

Allyn? … THE WITNESS: Yes. BY MS. BEANE: Q. Did you review that declaration? … THE

WITNESS: Not in any great detail."). Although Dr. Schmidt reviewed the iRhythm IPRs, which

relied upon the full English translation of Matsumura as key reference—a reference that is "but-

61

for" material to claims that the Dr. Schmidt was currently prosecuting on behalf of iRhythm—Dr.
Schmidt did not locate this reference from his client, whom he knew had a copy of this reference,
and he did not submit this reference to the USPTO. Ex. B at 58:2-6 ("Q. And just to confirm, you
don't recall informing the USPTO as part of the '888 application about the English translation of
JP2004-121360, correct? … THE WITNESS: No, I don't recall that."). Nor did Dr. Schmidt obtain
this reference from the PTAB's website, https://ptacts.uspto.gov/ptacts/ui/home, which contained
public copies of all of the exhibits that accompanied iRhythm's IPR filings.

80.    Neither the Heikenfeld Declaration, the full English translation of Matsumura, or
the iRhythm IPRs were submitted to the USPTO during prosecution of the '888 application. Dr.
Schmidt, however, had notice that specific information existed (*i.e.*, the Heikenfeld Declaration,
the full English translation of Matsumura, and the iRhythm IPRs) which may have been material
to the patentability of the claims he was prosecuting in the '888 application, which were filed on
behalf of iRhythm.

81.    Upon information and belief, Mr. Lopez was aware of the iRhythm IPRs, the
Heikenfeld Declaration, and the full English translation of Matsumura during the time he
supervised prosecution of the '888 application, which issued as the '554 patent. Mr. Lopez, as
iRhythm's Director of Global Intellectual Property, supervised and was involved in filing the
iRhythm IPRs. As mentioned above, the iRhythm IPRs included several exhibits, including the
Heikenfeld Declaration and the full English translation of Matsumura.

82.    The Heikenfeld Declaration extensively characterizes Matsumura, opines on
changes that would have been obvious to a person of ordinary skill, and also characterizes the state
of the art. In one example, Heikenfeld opines that "a POSA would understand that [Matsumura's]
conductive gel 5 can detect 'bioelectric potentials' for transmission 'through the conductive

material 2 and the hooks 3' because the conductive gel 5 is embedded in second sheet 4." Ex. C, ¶482. Heikenfeld further concludes that these conductive gels are ECG electrodes. Ex. C, ¶560. Heikenfeld also opined that "Matsumura teaches that second sheet 4 and first sheet 1 are both made of 'an insulating material' such as 'polyethylene foam, polyurethane foam, or polyurethane sheet.'" Ex. C, ¶865. The over 500 pages of the Heikenfeld Declaration includes material information that should have been submitted to the USPTO to satisfy the duty of disclosure.

83.    The '888 application was filed on October 4, 2024, and issued on May 12, 2025. *See* Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. ***Ted Lopez***."). The iRhythm IPRs were filed on December 24, 2024, while the '888 application was pending. Mr. Lopez concurrently supervised the prosecution of the '888 application and the iRhythm IPRs. Thus, Mr. Lopez was aware of both the Heikenfeld Declaration and the full English translation of Matsumura during prosecution of the '888 application. Mr. Lopez failed to disclose this same material information while actively pursuing similar subject matter in iRhythm's patent applications that he was substantively involved in overseeing.

84.    Despite Mr. Lopez overseeing prosecution of subject matter that fell squarely within the disclosure of the full English translation of Matsumura and is now asserted against Bardy, Mr. Lopez did not send the full English translation of Matsumura to his prosecution counsel, Dr. Schmidt. Ex. B at 52:17-20 ("Q. At any point during the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360? A. No.").

**D.    Both the Heikenfeld Declaration and the English Translation of Matsumura Are "But-For" Material to At Least Claim 1 of the '554 Patent**

85.    Upon information and belief, Mr. Lopez and Dr. Schmidt each breached their duty of disclosure and committed inequitable conduct during prosecution of the '554 patent by withholding material information from the USPTO. Mr. Lopez and Dr. Schmidt committed

inequitable conduct by withholding the Heikenfeld Declaration, which discussed the scope and content of the prior art and various reasons why certain references would have been combined, and also the full English translation of Matsumura. Both the Heikenfeld Declaration and the full English translation of Matsumura are "but-for" material to the patentability of the claims of the '554 patent, including, for example, claim 1. Issued claim 1 of the '554 patent recites:

> An electronic device for long-term adhesion to a user, the device comprising:

> a housing comprising a physiologic data collection circuit, the housing positioned over a flexible layer extending from beneath the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, wherein the flexible layer comprises a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection;

> a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer; and

> a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user.

'554 Patent at cl. 1.

86.    The Notice of Allowance stated that the prior art allegedly was silent on "the flexible layer being made of two layers (upper and lower layers), its composition (polymers), and where everything is located on the overall electronic device with respect to the other components." Notice of Allowance (March 5, 2025) (Ex. D) at 4. Moreover, the Notice of Allowance stated that "[e]ach of the layers and components were well-known individually at the time of invention." Ex. D at 4. The Notice of Allowance is predicated on the lack of disclosure of these layers and components in a single reference and on a lack of reason to combine these well-known disclosures. Based on these features, the USPTO issued a Notice of Allowance.

64

87.    The "but-for" materiality of the Heikenfeld Declaration in demonstrated in an example claim chart. *See* Heikenfeld Declaration Chart (Ex. E). Because discovery is ongoing, the Heikenfeld Declaration Chart provides a non-limiting example that illustrates the "but-for" materiality of the Heikenfeld Declaration. The left column reproduces each element of claim 1 of the '554 patent. The middle column cites the Heikenfeld Declaration, which characterizes Matsumura and cites to prior art reference Matsumura. The right column cites to the reasons for allowance in the Notice of Allowance, thereby showing how the full English translation of Matsumura and the Heikenfeld Declaration characterizing the same is material to the USPTO's allowance of the '554 patent. The Heikenfeld Declaration was not cited during prosecution of the '888 application despite being in iRhythm's possession before the '888 application issued as the '554 patent.

88.    The "but-for" materiality of the full English translation of Matsumura is also demonstrated in an example claim chart. *See* '554 Matsumura Chart (Ex. F). Again, discovery is ongoing, and thus the '554 Matsumura Chart provides a non-limiting example that illustrates the "but-for" materiality of the full English translation of Matsumura. The left column reproduces each element of claim 1 of the '554 patent while the right column includes exemplary disclosure of the full English translation of Matsumura. The full English translation of Matsumura was not cited during prosecution of the '888 application despite being in iRhythm's possession before the '888 application issued.

89.    The USPTO's recent grant of an *ex parte* reexamination of the '554 patent further supports the "but-for" materiality of the Heikenfeld Declaration and the full English translation of Matsumura. Namely, on September 8, 2025, an *ex parte* reexamination request of the '554 patent was filed. Request for *Ex Parte* Reexamination of the '554 Patent (Ex. G) at 1. Ground III relied

on the full English translation of Matsumura, and alleged that Matsumura raised a ***substantial new question of patentability*** as to claim 1 of the '554 patent. Ex. G at 9, 63-70.

90.     The USPTO found, on October 17, 2025, that "Matsumura raises an SNQ [or "substantial new question" of patentability] as to claim 1 of the '554 patent." Order Granting Request for *Ex Parte* Reexamination of the '554 Patent (Ex. H) at 13. Moreover, the USPTO states that "[t]here is a substantial likelihood that a reasonable examiner would consider at least the above teachings, i.e., first and second sheets and acrylic adhesive as taught by Matsumura important in determining the patentability of the claims." Ex. H at 15-16. The USPTO's findings confirm the but-for materiality of the entire disclosure of Matsumura and its English translation, the very disclosure and the English translation that Mr. Lopez withheld from the USPTO, despite being aware of the reference, as evidenced by his prior familiarity with it from iRhythm's IPRs.

### E.     A Specific Intent to Deceive the USPTO by Mr. Lopez and Dr. Schmidt is the Single Most Reasonable Inference

91.     At any point during prosecution of the '888 application, either Mr. Lopez or Dr. Schmidt could have satisfied the duty of candor to the USPTO and disclosed the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura. The USPTO has a form for disclosing references during patent prosecution, called an Information Disclosure Statement ("IDS"), and iRhythm disclosed other references using an IDS form. For example, iRhythm submitted an IDS on February 6, 2025, disclosing other references, but not the iRhythm IPRs, Heikenfeld Declaration, or the English translation of Matsumura. Ex. I (Information Disclosure Statement of February 6, 2025). This IDS was signed by Dr. Schmidt. The single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the

then-pending claims of the '888 application and intended to deceive the USPTO by withholding such materials. This inference is supported by several considerations.

92.     ***First***, Mr. Lopez and Dr. Schmidt are sophisticated actors familiar with the duty to disclose material information to the USPTO under MPEP 2001.06(c) and 37 C.F.R. § 1.56. Both Dr. Schmidt and Mr. Lopez are registered patent attorneys, familiar with the rules for materiality. Dr. Schmidt has worked in patent prosecution for fourteen years and responded to "probably over a thousand" office actions and drafted hundreds of applications. Ex. B at 11:25-12:3. And, Mr. Lopez is an "[i]ntellectual Property attorney with 20+ years of experience protecting innovation and building patent portfolios, including preparing and executing strategic intellectual property plans for implementing business priorities and imperatives." *See* LinkedIn of Mr. Lopez (available at https://www.linkedin.com/in/theodore-lopez-92a420a/).

93.     ***Second***, iRhythm's submitted the foreign language version of Matsumura while withholding the full English translation. During prosecution of the '888 application, iRhythm submitted a foreign language version of Matsumura with only the English-translated abstract, demonstrating that iRhythm was aware of Matsumura's relevance to the pending claims. *See* Information Disclosure Statement of Nov. 4, 2024 (Ex. K) at 34 (citing JP 2004-121360 as Cite. No. 956). This IDS submission was signed by Dr. Schmidt. iRhythm advantageously used the full English translation of Matsumura in related litigation across its petitions while withholding the same during prosecution of its patent applications. This intentional decision leads to a single most reasonable inference that the withholding of the full English translation of Matsumura was intentional.

94.     ***Third***, iRhythm directly benefited from its failure to submit the "but-for" material information. By October of 2024 (when the '888 application was filed), Defendant was already

the subject of a four-patent lawsuit from Bardy's sister company, Welch Allyn, for similar infringing activities as in this case. In search of a response to that pending litigation, Mr. Lopez and Dr. Schmidt collaborated to obtain patents and assert them against Bardy. Namely, Dr. Schmidt testified that he monitored Bardy's portfolio and added limitations specifically to cover Bardy's CAM Patch. Ex. B at 64:11-66:20 ("Q. Okay, do you know whether the limitation was also added to cover the Bardy cam product? … Yes, it is my personal belief that that does cover the Bardy cam."), 59:14-20 ("Do you monitor Bardy Diagnostics' patent portfolio? … Yes."). Moreover, to increase the speed of prosecution, Mr. Lopez and Dr. Schmidt filed the '888 application under Track One, which requires a fee for the USPTO to prioritize the application. Ex. B at 64:11-66:20 ("Q. And the application that led to the '554 patent was filed with a Track 1 request, correct? A. Yes, I see a Track 1 prioritized examination request. Q. What are some of the advantages of a Track 1 request? … THE WITNESS: The main advantage is speed. Track 1 requests are essentially a pay-for-play program with the USPTO where you pay an additional fee so the USPTO will process the application more quickly.").

95.     Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality of the withheld information would have either significantly delayed the prosecution of the '888 application or inhibited the claims of the '554 patent from issuing as they currently stand. These actions were driven by these two individuals' awareness that the Court in this case had a deadline of June 2, 2025, to amend its pleadings. As a result, Mr. Lopez and Dr. Schmidt were incentivized ***not*** to submit material information to avoid delaying the issuance of the '554 patent.

96.     In sum, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow

prosecution and ultimately hinder iRhythm's ability to obtain and assert additional patents in this case, including, for example, the '554 patent. To avoid that delay and to obtain the '554 patent in an expedited manner to assert against Bardy, Mr. Lopez and Dr. Schmidt colluded to withhold iRhythm's own litigation materials from the USPTO.

97.     Based on these considerations, the single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '554 patent and he intended to deceive the USPTO by withholding such materials.

## COUNT XII: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. 12,303,277

98.     Bardy incorporates by reference the allegations in Paragraphs 1-97 of these Counterclaims as though fully set forth herein.

99.     The '277 patent is unenforceable due to inequitable conduct. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). Upon information and belief, and before taking full discovery, Mr. Lopez and Dr. Schmidt committed inequitable conduct during prosecution of the '277 patent with a specific intent to deceive the USPTO. Mr. Lopez committed inequitable conduct by withholding the Heikenfeld Declaration and full English translation of Matsumura from the USPTO during prosecution of U.S. Patent Application No. 18/806,584 (the "'584 application"), which issued as the '277 patent. Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration and failing to acquire and submit the full English translation of Matsumura to the USPTO during prosecution of '584 application, despite his awareness that such a translation existed within his client, iRhythm's, possession.

100.    On information and belief, Mr. Lopez knew about the Heikenfeld Declaration and the full English translation of Matsumura because he reviewed and supervised the iRhythm IPRs,

which were submitted to the USPTO during the pendency of the '584 application. In the iRhythm IPRs, iRhythm challenged the validity of patents directed to and claiming ECG monitors based directly on the Heikenfeld Declaration and full English translation of Matsumura. Dr. Schmidt likewise knew of the Heikenfeld Declaration and full English translation of Matsumura during the pendency of the '584 application. The withheld information is "but-for" material to the patentability of the claims of the '584 application. Finally, a specific intent to deceive the USPTO by Mr. Lopez and Dr. Schmidt is the single most reasonable inference.

### A.     The Duty to Disclose Information Material to Patentability

101.    Under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." Individuals associated with the filing and prosecution of a patent application include "*[e]ach attorney* or agent who prepares or prosecutes the application" and "[e]very other person who is *substantively involved in the preparation or prosecution of the application* and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c). Under MPEP 2001.06(c), an applicant that pursues subject matter that "is or has been involved in litigation and/or a trial proceeding, or the litigation and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the examiner." This section includes a requirement to disclose *inter partes* review proceedings and *any material information arising therefrom*. *See* MPEP 2001.06(c).

**B.    The Duty of Disclosure Applied to Dr. Schmidt and Mr. Lopez**

102.    The duty of disclosure applied to Dr. Schmidt because he was the prosecuting attorney for the '584 application. On August 15, 2024, iRhythm filed the '584 application, which issued as the '277 patent. iRhythm is the applicant on the Application Data Sheet, which was signed by David R. Schmidt, who is listed on the Power of Attorney. The correspondence address is Knobbe, Martens, Olson & Bear, LLP at 2040 Main Street, Fourteenth Floor, Irvine California, United States. Moreover, Dr. Schmidt testified that he was involved in the prosecution of the '584 application. *See* Ex. B at 31:25-32:9 ("Q. Were you involved in the prosecution of this patent application? A. Yes."). Mr. Lopez also owed a duty of disclosure at least regarding the '584 application. Namely, Mr. Lopez, as iRhythm's Director of Global Intellectual Property, owed a duty of disclosure because he was substantively involved in the preparation and prosecution of the '584 application, stemming from his role in the company, the applicant of the '584 application. This is supported at least by "Knobbe, Martens, Olson & Bear LLP's Privilege Log in Response to Subpoena." (Ex. A). Between May 13, 2022, and November 28, 2024, Mr. Lopez and Dr. Schmidt exchanged numerous communications described as "[l]egal advice from counsel regarding patent prosecution." *See* Ex. A at 1-7.

103.    The testimony of Dr. Schmidt also establishes that Mr. Lopez was substantively involved in the preparation and prosecution of the '584 application. First, Dr. Schmidt testified that Mr. Lopez was responsible for supervising the prosecution of iRhythm's portfolio. Ex. B at 44:8-12. Second, Dr. Schmidt testified that Mr. Lopez was responsible for approving patent claims in applications to be filed with the USPTO, including the patent claims that iRhythm now asserts against Bardy. Ex. B at 22:5-15 ("Q. [W]ho was your contact at iRhythm that you were sending drafts to of claims? … I interacted with Mark Day at iRhythm and then also Ted Lopez."). Dr. Schmidt also testified that Mr. Lopez approved the claims in the '277 patent (*i.e.*, the '584

71

application) for filing with the USPTO. Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. ***Ted Lopez.***").

104.    Mr. Lopez's practice of receiving claims from Dr. Schmidt, and approving those claims to be filed, is evident from Dr. Schmidt's testimony. For the '734 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 24:20-25 ("Q. All right. Turning back to the '734 patent, which is Exhibit 1 to your deposition, do you recall who at iRhythm approved the claims for filing? … probably ***Ted Lopez***, so probably both of them."). For the '859 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 27:13-28:5 ("Q. Who approved the claim set [of the '859 patent] to be filed? A. ***Ted Lopez.***"). For the '860 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 28:17-29:8 ("Q. And do you recall who approved the claims to be filed? A. ***Ted Lopez.***"). For the '554 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. ***Ted Lopez.***").

105.    In addition to approving claims to be filed, Dr. Schmidt testified that he regularly communicates with Mr. Lopez regarding iRhythm patent prosecution. Ex. B at 36:21-24.

106.    In sum, Dr. Schmidt's testimony aligns with the privilege log and supports Mr. Lopez's substantial involvement in the preparation and prosecution of each patent that iRhythm now asserts. Therefore, under 37 C.F.R. § 1.56, Mr. Lopez owed a duty of candor to the USPTO at least with regard to the '584 application, which issued as the '277 patent.

**C.    Dr. Schmidt and Mr. Lopez Knew About the Heikenfeld Declaration and the Full English Translation of Matsumura But Did Not Disclose Either During Prosecution of the '888 Application**

107.    Dr. Schmidt was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura while prosecuting the '584 application, which issued as the '277 patent. On December 24, 2024, iRhythm filed five *inter partes* review petitions, which

challenged U.S. Patent No. 8,214,007 (IPR2024-00378); U.S. Patent No. 8,214,007 (IPR2024-00377); U.S. Patent No. 9,155,484 (IPR2024-00376); U.S. Patent No. 8,965,492 (IPR2024-00374); and U.S. Patent No. 10,159,422 (IPR2024-00363). The iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura. Matsumura was a primary reference in the IPRs and the subject of substantial analysis and claim charting. More specifically, across the five iRhythm IPRs, Matsumura was used as a reference in twelve of the nineteen grounds that iRhythm advanced. The extensive use of Matsumura in the iRhythm IPRs is likewise seen in the Heikenfeld Declaration (attached as Ex. C).

108.    Dr. Schmidt testified that he was aware of the iRhythm IPRs. Ex. B at 54:3-7 ("Q. And are you aware that iRhythm filed Inter Partes Reviews against patents asserted in the Welch Allyn case? MR. BUNKER: You can answer that yes or no. THE WITNESS: Yes."). Dr. Schmidt further testified that he reviewed these IPRs, including the Heikenfeld Declaration. Ex. B at 56:15-19 ("Q. Have you reviewed those IPRS? … THE WITNESS: Yes, very briefly."), 57:9-18 ("Q. Were you aware that iRhythm also submitted an expert declaration as part of its IPRs against Welch Allyn? … THE WITNESS: Yes. BY MS. BEANE: Q. Did you review that declaration? … THE WITNESS: Not in any great detail."). Dr. Schmidt testified that he was not aware of having the full English translation of Matsumura during prosecution of at least the '888 application. Ex. B at 52:17-20 ("Q. At any point during the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360? A. No."). However, because Dr. Schmidt reviewed the iRhythm IPRs, which relied upon the full English translation of Matsumura as key reference—a reference that is "but-for" material to claims that the Dr. Schmidt was currently prosecuting—Dr. Schmidt should have located this reference from his client, whom he knew had a copy of this reference, and submitted it to the USPTO. But Dr. Schmidt did not submit these

materials to the USPTO. Ex. B at 58:2-6 ("Q. And just to confirm, you don't recall informing the USPTO as part of the '888 application about the English translation of JP2004-121360, correct? … THE WITNESS: No, I don't recall that.").

109.    Neither the Heikenfeld Declaration, the full English translation of Matsumura, or the iRhythm IPRs were submitted to the USPTO during prosecution of the '584 application. Dr. Schmidt, however, had notice that specific information existed (*i.e.*, the Heikenfeld Declaration, the full English translation of Matsumura, and the iRhythm IPRs) which may have been material to the patentability of the claims he was prosecuting in the '584 application, which were filed on behalf of iRhythm.

110.    Upon information and belief, Mr. Lopez was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura during the time he supervised prosecution of the '584 application, which issued as the '277 patent. Mr. Lopez, as iRhythm's Director of Global Intellectual Property, supervised and was involved in filing the iRhythm IPRs. As mentioned above, the iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura.

111.    The Heikenfeld Declaration extensively characterizes Matsumura, opines on changes that would have been obvious to a person of ordinary skill, and also characterizes the state of the art. In one example, Heikenfeld opines that "a POSA would understand that [Matsumura's] conductive gel 5 can detect 'bioelectric potentials' for transmission 'through the conductive material 2 and the hooks 3' because the conductive gel 5 is embedded in second sheet 4." Ex. C, ¶482. Heikenfeld further concludes that these conductive gels are ECG electrodes. Ex. C, ¶560. Heikenfeld also opined that "Matsumura teaches that second sheet 4 and first sheet 1 are both made of 'an insulating material' such as 'polyethylene foam, polyurethane foam, or polyurethane sheet.'"

74

Ex. C, ¶865. The over 500 pages of the Heikenfeld Declaration includes material information that should have been submitted to the USPTO to satisfy the duty of disclosure.

112.    The '584 application was filed on August 15, 2024, and issued on May 20, 2025. *See* Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. ***Ted Lopez.***"). The iRhythm IPRs were filed on December 24, 2024, while the '584 application was pending. Mr. Lopez concurrently supervised the prosecution of the '584 application and the iRhythm IPRs. Thus, Mr. Lopez was aware of both the Heikenfeld Declaration and the full English translation of Matsumura during prosecution of the '584 application. Mr. Lopez failed to disclose this same material information while actively pursuing similar subject matter in iRhythm's patent applications that he was substantively involved in overseeing.

113.    Despite Mr. Lopez overseeing prosecution of subject matter that fell squarely within the disclosure of the full English translation of Matsumura and is now asserted against Bardy, Mr. Lopez did not send the full English translation of Matsumura to his prosecution counsel, Dr. Schmidt. Ex. B at 52:17-20 ("Q. At any point during the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360? A. No.").

**D.    Both the Heikenfeld Declaration and the English Translation of Matsumura Are "But-For" Material to At Least Claim 1 of the '277 Patent**

114.    Upon information and belief, Mr. Lopez and Dr. Schmidt each breached their duty of disclosure and committed inequitable conduct during prosecution of the '277 patent by withholding material information from the USPTO. Mr. Lopez and Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration, which discussed the scope and content of the prior art and various reasons why certain references would have been combined, and also the full English translation of Matsumura. Both the Heikenfeld Declaration and the full

English translation of Matsumura are "but-for" material to the patentability of the claims of the '277 patent, including, for example, claim 1. Issued claim 1 of the '277 patent recites:

> An electronic device for long-term adhesion to a user, the device comprising:
>
> a housing comprising a physiologic data collection circuit;
>
> an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user;
>
> an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and
>
> wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and
>
> wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer.

'277 Patent at cl. 1.

115.    The "but-for" materiality of the full English translation of Matsumura is demonstrated in an example claim chart. *See* '277 Matsumura Chart (Ex. L). Again, discovery is ongoing, and thus the '277 Matsumura Chart provides a non-limiting example that illustrates the "but-for" materiality of the full English translation of Matsumura. The left column reproduces each element of claim 1 of the '277 patent while the right column includes exemplary disclosure of the full English translation of Matsumura. The full English translation of Matsumura was not cited during prosecution of the '584 application despite being in iRhythm's possession before the '584 application issued.

116.    The USPTO's recent grant of an *ex parte* reexamination of the '277 patent further supports the "but-for" materiality of the Heikenfeld Declaration and the full English translation of Matsumura. Namely, on September 8, 2025, an *ex parte* reexamination request of the '277 patent was filed. Request for *Ex Parte* Reexamination of the '277 Patent (Ex. M) at 1. Ground II relied

on the full English translation of Matsumura, and alleged that Matsumura raised a ***substantial new question of patentability*** as to claim 1 of the '277 patent. Ex. M at 7, 33-42.

117.    The USPTO found, on October 17, 2025, that "Matsumura raises an SNQ [or "substantial new question" of patentability] as to claim 1 of the '277 patent." Order Granting Request for *Ex Parte* Reexamination of the '277 Patent (Ex. N) at 14. Moreover, the USPTO states that "[t]here is a substantial likelihood that a reasonable examiner would consider at least the above teachings, i.e., first and second sheets and acrylic adhesive as taught by Matsumura important in determining the patentability of the claims." Ex. N at 15. The USPTO's findings confirm the but-for materiality of the entire disclosure of Matsumura and its English translation, the very disclosure and the English translation that Mr. Lopez withheld from the USPTO, despite being aware of the reference, as evidenced by his prior familiarity with it from iRhythm's IPRs.

### E.    A Specific Intent to Deceive the USPTO by Mr. Lopez and Dr. Schmidt is the Single Most Reasonable Inference

118.    At any point during prosecution of the '584 application, either Mr. Lopez or Dr. Schmidt could have satisfied the duty of candor to the USPTO and disclosed the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura. The USPTO has a form for disclosing references during patent prosecution, called an IDS, and iRhythm disclosed other references using an IDS form. For example, iRhythm submitted an IDS on January 27, 2025, disclosing other references, but not the iRhythm IPRs, Heikenfeld Declaration, or the English translation of Matsumura. Ex. O (Information Disclosure Statement of January 27, 2025). This IDS was signed by Dr. Schmidt. The single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '584 application

and intended to deceive the USPTO by withholding such materials. This inference is supported by several considerations.

119.    ***First***, Mr. Lopez and Dr. Schmidt are sophisticated actors familiar with the duty to disclose material information to the USPTO under MPEP 2001.06(c) and 37 C.F.R. § 1.56. Both Dr. Schmidt and Mr. Lopez are registered patent attorneys, familiar with the rules for materiality. Dr. Schmidt has worked in patent prosecution for fourteen years and responded to "probably over a thousand" office actions and drafted hundreds of applications. Ex. B at 11:25-12:3. And, Mr. Lopez is an "[i]ntellectual Property attorney with 20+ years of experience protecting innovation and building patent portfolios, including preparing and executing strategic intellectual property plans for implementing business priorities and imperatives." *See* LinkedIn of Mr. Lopez (available at https://www.linkedin.com/in/theodore-lopez-92a420a/).

120.    ***Second***, iRhythm's submitted the foreign language version of Matsumura while withholding the full English translation. During prosecution of the '584 application, iRhythm submitted a foreign language version of Matsumura with only the English-translated abstract, demonstrating that iRhythm was aware of Matsumura's relevance to the pending claims. *See* Information Disclosure Statement (Aug. 15, 2024) (Ex. P) at 33 (citing JP 2004-121360 as Cite No. 924). This IDS submission was signed by Dr. Schmidt. iRhythm advantageously used the full English translation of Matsumura in related litigation across its petitions while withholding the same during prosecution of its patent applications. This intentional decision leads to a single most reasonable inference that the withholding of the full English translation of Matsumura was intentional.

121.    ***Third***, iRhythm directly benefited from its failure to submit the "but-for" material information. By August of 2024 (when the '584 application was filed), Defendant was already the

subject of a four-patent lawsuit from Bardy's sister company, Welch Allyn, for similar infringing activities as in this case. In search of a response to that pending litigation, Mr. Lopez and Dr. Schmidt collaborated to obtain patents and assert them against Bardy. Namely, Dr. Schmidt testified that he monitored Bardy's portfolio and added limitations specifically to cover Bardy's CAM Patch. Ex. B at 64:11-66:20 ("Q. Okay, do you know whether the limitation was also added to cover the Bardy cam product? … Yes, it is my personal belief that that does cover the Bardy cam."), 59:14-20 ("Do you monitor Bardy Diagnostics' patent portfolio? … Yes."). Moreover, to increase the speed of prosecution, Mr. Lopez and Dr. Schmidt filed the '584 application under Track One, which requires a fee for the USPTO to prioritize the application. Ex. B at 64:11-66:20 ("Q. What are some of the advantages of a Track 1 request? … THE WITNESS: The main advantage is speed. Track 1 requests are essentially a pay-for-play program with the USPTO where you pay an additional fee so the USPTO will process the application more quickly.").

122.    Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality of the withheld information would have either significantly delayed the prosecution of the '584 application or inhibited the claims of the '277 patent from issuing as they currently stand. These actions were driven by these two individuals' awareness that the Court in this case had a deadline of June 2, 2025, to amend its pleadings. As a result, Mr. Lopez and Dr. Schmidt were incentivized ***not*** to submit material information to avoid delaying the issuance of the '277 patent.

123.    In sum, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately hinder iRhythm's ability to obtain and assert additional patents in this case, including, for example, the '277 patent. To avoid that delay and to obtain the '277 Patent in

an expedited manner to assert against Bardy, Mr. Lopez and Dr. Schmidt colluded to withhold iRhythm's own litigation materials from the USPTO.

124.    Based on these considerations, the single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '277 patent and he intended to deceive the USPTO by withholding such materials.

## RELIEF REQUESTED

WHEREFORE, Bardy requests that the Court enter a judgment in its favor granting the following relief:

A.    Dismissing iRhythm's Counterclaims with prejudice;

B.    Denying all relief requested by iRhythm;

C.    Granting all relief requested by Bardy;

D.    Declaring that Bardy has not infringed the iRhythm Asserted Patents;

E.    Declaring that the iRhythm Asserted Patents are invalid;

F.    Declaring that this is an exceptional case, and awarding Bardy its reasonable attorneys' fees, costs, and expenses pursuant to 35 U.S.C. § 285; and

G.    Such other and further relief as this Court deems just and proper under the circumstances.

## JURY DEMAND

Bardy demands trial by jury on all issues so triable.

OF COUNSEL:                              POTTER ANDERSON & CORROON LLP

Jeffrey R. Gargano
Melissa M. Haulcomb                      By:  /s/ Philip A. Rovner
Jared R. Lund                                 Philip A. Rovner (#3215)
Rebekah Hill                                  Andrew M. Moshos (#6685)
K&L GATES LLP                                 1313 North Market Street
70 W. Madison St., Suite 3300                 Hercules Plaza, 6th Floor
Chicago, IL 60602                             Wilmington, DE  19801
(312) 372-1121                                (302) 984-6000
                                              provner@potteranderson.com
                                              amoshos@potteranderson.com
Erik J. Halverson
K&L GATES LLP
4 Embarcadero Center, Suite 1200         *Attorneys for Plaintiff Bardy Diagnostics, Inc.*
San Francisco, CA 94111
(415) 882-8200

Dated: December 10, 2025

# Exhibit A

**Knobbe, Martens, Olson & Bear LLP's Privilege Log in Response to Subpoena**

*Bardy Diagnostics, Inc. v. iRhythm Technologies, Inc.*, C.A. No. 24-cv-1355 (JDW)

| No. | Control No. | Bates No. | Author(s) | Recipient(s) | Date | Privilege Basis | Description |
|---|---|---|---|---|---|---|---|
| 1 | KMOB00002475 | KM0000382 | David Schmidt | Ted Lopez; Mark Day; Damien Howard; Eiko Fukuda | 9/17/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 2 | KMOB00002479 | KM0000384-KM0000385 | David Schmidt; Ted Lopez | Ted Lopez; Mark Day; Damien Howard; Eiko Fukuda; David Schmidt | 9/17/2024 – 9/18/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 3 | KMOB00003034-KMOB00003035 | N/A | David Schmidt | Ted Lopez | 4/23/2024 | Attorney-Client Privilege | Email and memo attachment reflecting legal advice from counsel regarding patent analysis |
| 4 | KMOB00003319-KMOB00003320 | N/A | David Schmidt | Ted Lopez; Mark Day; Damien Howard | 5/28/2024 | Attorney-Client Privilege | Email and memo attachment reflecting legal advice from counsel regarding patent analysis |
| 5 | KMOB00003397 | N/A | David Schmidt | Ted Lopez | 7/21/2024 | Attorney-Client Privilege | Memo reflecting legal advice from counsel regarding patent analysis |
| 6 | KMOB00003786 | KM0000888 | David Schmidt; Damien Howard | Ted Lopez; Mark Day; Heidi Archer | 11/28/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |

| No. | Control No. | Bates No. | Author(s) | Recipient(s) | Date | Privilege Basis | Description |
|---|---|---|---|---|---|---|---|
| 7 | KMOB00004147 | KM0001382; KM0001397 | David Schmidt | Ted Lopez; Mark Day | 4/25/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 8 | KMOB00004155 | KM0001444; KM0001459 | David Schmidt | Ted Lopez; Mark Day | 2/7/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 9 | KMOB00004184 | KM0001499; KM0001512 | David Schmidt | Ted Lopez; Mark Day | 7/31/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 10 | KMOB00004189 | KM0001556; KM0001572 | David Schmidt; Damien Howard | Ted Lopez; Mark Day; Heidi Archer | 9/14/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 11 | KMOB00004397 | KM0001709; KM0001723 | David Schmidt | Ted Lopez; Mark Day | 6/2/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 12 | KMOB00004403 | KM0001767; KM0001781 | David Schmidt | Ted Lopez; Mark Day | 6/20/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 13 | KMOB00004420 | KM0001818; KM0001833 | David Schmidt; Damien Howard | Ted Lopez; Mark Day | 8/3/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 14 | KMOB00004424 | KM0001887; KM0001901 | David Schmidt | Ted Lopez; Mark Day | 7/13/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 15 | KMOB00004427 | KM0001938; KM0001952 | David Schmidt | Ted Lopez | 8/14/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |

| No. | Control No. | Bates No. | Author(s) | Recipient(s) | Date | Privilege Basis | Description |
|-----|-------------|-----------|-----------|--------------|------|-----------------|-------------|
| 16 | KMOB00004441 | KM0002002; KM0002016 | David Schmidt | Ted Lopez | 7/6/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 17 | KMOB00004444 | KM0002057; KM0002064 | David Schmidt | Ted Lopez; Michael Straightiff | 5/13/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 18 | KMOB00004447 | KM0002104; KM0002120 | David Schmidt | Ted Lopez | 8/24/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 19 | KMOB00004452 | KM0002163; KM0002178 | David Schmidt | Ted Lopez; Mark Day | 8/24/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 20 | KMOB00004454 | KM0002222; KM0002237 | David Schmidt; Damien Howard | Ted Lopez; Mark Day | 9/13/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 21 | KMOB00004469 | KM0002279; KM0002295 | David Schmidt; Damien Howard | Ted Lopez; Mark Day | 8/31/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 22 | KMOB00004477 | KM0002329; KM0002345 | David Schmidt; Damien Howard | Ted Lopez; Mark Day | 9/27/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 23 | KMOB00004482 | KM0002381; KM0002396 | David Schmidt; Damien Howard | Ted Lopez | 10/2/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |

| No. | Control No. | Bates No. | Author(s) | Recipient(s) | Date | Privilege Basis | Description |
|---|---|---|---|---|---|---|---|
| 24 | KMOB00004493 | KM0002435; KM0002451 | David Schmidt; Damien Howard | Ted Lopez; Mark Day | 11/15/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 25 | KMOB00004505 | KM0002486; KM0002502 | David Schmidt; Damien Howard | Ted Lopez | 11/22/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 26 | KMOB00004507 | KM0002541; KM0002542; KM0002557 | David Schmidt | Ted Lopez | 11/15/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 27 | KMOB00004511 | KM0002594; KM0002610 | David Schmidt | Ted Lopez | 1/11/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 28 | KMOB00004521 | KM0002657; KM0002673 | David Schmidt; Damien Howard | Ted Lopez | 2/9/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 29 | KMOB00004540 | KM0002710; KM0002718 | David Schmidt | Mark Day; Michael Straightiff | 6/8/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 30 | KMOB00004541 | KM0002769; KM0002777 | David Schmidt | Mark Day; Michael Straightiff | 6/8/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 31 | KMOB00004543 | KM0002822; KM0002835; KM0002836 | David Schmidt | Ted Lopez; Mark Day | 2/22/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 32 | KMOB00004551 | KM0002883; KM0002899 | David Schmidt | Ted Lopez; Mark Day | 1/19/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |

| No. | Control No. | Bates No. | Author(s) | Recipient(s) | Date | Privilege Basis | Description |
|---|---|---|---|---|---|---|---|
| 33 | KMOB00004576 | KM0002931; KM0002939 | David Schmidt | Mark Day; Michael Straightiff | 6/24/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 34 | KMOB00004613 | KM0002982; KM0002996 | David Schmidt | Ted Lopez; Mark Day | 4/1/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 35 | KMOB00004631 | KM0003022 | David Schmidt; Keith Lim | Mark Day | 9/18/2021 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 36 | KMOB00004648 | KM0003071; KM0003086 | David Schmidt | Ted Lopez; Mark Day | 5/3/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 37 | KMOB00004650 | KM0003141; KM0003156 | David Schmidt; Damien Howard | Ted Lopez; Mark Day | 5/22/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 38 | KMOB00004664 | KM0003186; KM0003195 | David Schmidt | Mark Day; Michael Straightiff | 7/1/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 39 | KMOB00004704 | KM0003224; KM0003233 | David Schmidt | Mark Day; Michael Straightiff; Stacey Halpern | 7/15/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 40 | KMOB00004708 | KM0003269; KM0003284 | David Schmidt | Ted Lopez; Mark Day; Heidi Archer | 8/24/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 41 | KMOB00004720 | KM0003332; KM0003347 | David Schmidt | Ted Lopez; Mark Day; Heidi Archer | 9/4/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |

| No. | Control No. | Bates No. | Author(s) | Recipient(s) | Date | Privilege Basis | Description |
|-----|-------------|-----------|-----------|--------------|------|-----------------|-------------|
| 42 | KMOB00004727 | KM0003366 | David Schmidt | Ted Lopez; Mark Day; Heidi Archer | 10/1/2024 | Attorney-Client Privilege | Email communication reflecting legal advice from counsel regarding patent prosecution |
| 43 | KMOB00004737 | KM0003402; KM0003410 | David Schmidt; Keith Lim | Mark Day | 2/2/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 44 | KMOB00004739 | KM0003429; KM0003438 | David Schmidt; Keith Lim | Mark Day; Michael Straightiff | 7/23/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 45 | KMOB00004741 | KM0003481; KM0003496 | David Schmidt | Ted Lopez; Mark Day; Heidi Archer; Eiko Fukuda | 10/18/2024 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 46 | KMOB00004764 | KM0003532; KM0003541 | David Schmidt | Mark Day; Michael Straightiff | 8/17/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 47 | KMOB00004767 | KM0003588; KM0003598 | David Schmidt | Mark Day; Michael Straightiff | 8/24/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 48 | KMOB00004781 | KM0003644; KM0003654 | David Schmidt | Mark Day; Michael Straightiff | 9/27/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 49 | KMOB00004786 | KM0003694; KM0003704 | David Schmidt; Keith Lim | Mark Day; Michael Straightiff | 9/6/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 50 | KMOB00004793 | KM0003742; KM0003752 | David Schmidt | Mark Day; Michael Straightiff | 10/25/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |

| No. | Control No. | Bates No. | Author(s) | Recipient(s) | Date | Privilege Basis | Description |
|---|---|---|---|---|---|---|---|
| 51 | KMOB00004795 | KM0003792; KM0003803 | David Schmidt | Mark Day; Michael Straightiff | 11/11/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 52 | KMOB00004797 | KM0003832; KM0003843 | David Schmidt | Mark Day; Michael Straightiff | 12/3/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 53 | KMOB00004841 | KM0003887; KM0003899 | David Schmidt; Keith Lim | Mark Day; Michael Straightiff | 1/26/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 54 | KMOB00004843 | KM0003939; KM0003951 | David Schmidt | Mark Day; Michael Straightiff | 1/12/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 55 | KMOB00004847 | KM0003990; KM0004002 | David Schmidt; Keith Lim | Mark Day; Michael Straightiff | 2/20/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 56 | KMOB00004853 | KM0004043; KM0004055; KM0004056 | David Schmidt; Keith Lim | Mark Day; Michael Straightiff | 3/6/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 57 | KMOB00004857 | KM0004098; KM0004099; KM0004113 | David Schmidt | Mark Day; Michael Straightiff | 3/10/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 58 | KMOB00004859 | KM0004164; KM0004178 | David Schmidt | Mark Day; Michael Straightiff; Ted Lopez; Nicole Greene | 3/17/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 59 | KMOB00004871 | KM0004228; KM0004242 | David Schmidt | Mark Day; Ted Lopez | 5/23/2023 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |

7

| No. | Control No. | Bates No. | Author(s) | Recipient(s) | Date | Privilege Basis | Description |
|---|---|---|---|---|---|---|---|
| 60 | KMOB00005175 | KM0004278; KM0004285 | David Schmidt; Keith Lim | Mark Day; Michael Straightiff | 4/27/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 61 | KMOB00005192 | KM0004312; KM0004319 | David Schmidt; Keith Lim | Mark Day | 4/9/2022 | Attorney-Client Privilege | Legal advice from counsel regarding patent prosecution |
| 62 | KMOB00005322 | N/A | David Schmidt | Mark Day | 12/20/2019 | Attorney-Client Privilege | Email reflecting legal advice from counsel regarding patent prosecution |

| Name | Title/Legal Qualification; Employer |
|---|---|
| Heidi Archer | Paralegal; iRhythm Technologies, Inc. |
| Mark Day | Chief Technology Officer; iRhythm Technologies, Inc. |
| Eiko Fukuda | Legal Assistant; Knobbe Martens, LLP |
| Nicole Greene | Vice President/Attorney; iRhythm Technologies, Inc. |
| Stacey Halpern | Partner/Attorney; Knobbe Martens, LLP |
| Damien Howard | Partner/Attorney; Knobbe Martens, LLP |
| Keith Lim | Associate/Attorney; Knobbe Martens, LLP |
| Ted Lopez | Director/Attorney; iRhythm Technologies, Inc. |
| David Schmidt | Partner/Attorney; Knobbe Martens, LLP |
| Michael Straightiff | Vice President; iRhythm Technologies, Inc. |



**Planet Depos**
**We Make It Happen™**

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

# Transcript of David R. Schmidt

**Date:** September 12, 2025
**Case:** Bardy Diagnostics, Inc. -v- iRhythm Technologies, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4   BARDY DIAGNOSTICS, INC.,     |

 5                                 |

 6                  Plaintiff,     |

 7                                 |

 8          vs.                    |  Case No.: 24-1355 (JDW)

 9                                 |

10   IRHYTHM TECHNOLOGIES, INC.,   |

11                                 |

12                  Defendant.     |

13                                 |

14   _____ |

15    HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

16        VIDEOTAPED DEPOSITION OF DAVID R. SCHMIDT

17                    Irvine, California

18              Friday, September 12, 2025

19

20   Job No. 599958

21   Reported by:

22   Cathy A. Wood, RDR, RMR, CRR

23   CSR No. 2825

24   (Also licensed in Nevada, Washington,

25    Texas and Illinois)
```

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                    11

| | | |
|---|---|---|
| 1 | biomedical engineering, also from Wisconsin, and then a | 09:37:16 |
| 2 | JD from Notre Dame. | 09:37:17 |
| 3 | Q.   You received the masters' degrees in 2007 and | 09:37:21 |
| 4 | 2009? | 09:37:23 |
| 5 | A.   Yeah, I think that's about right. | 09:37:24 |
| 6 | Q.   And your Ph.D. was also in 2009? | 09:37:26 |
| 7 | A.   2009, yeah.  Actually, I think my bachelor's | 09:37:29 |
| 8 | was December of 2003. | 09:37:33 |
| 9 | Q.   Okay. | 09:37:34 |
| 10 | A.   Yeah. | 09:37:35 |
| 11 | Q.   You might have to update your LinkedIn. | 09:37:35 |
| 12 | Okay.  And then did you join Knobbe Martens | 09:37:42 |
| 13 | right after you graduated from law school? | 09:37:44 |
| 14 | A.   I did. | 09:37:49 |
| 15 | Q.   And when you joined Knobbe, did you start in | 09:37:50 |
| 16 | this Irvine office? | 09:37:55 |
| 17 | A.   I did, yeah.  And I was also a summer associate | 09:37:56 |
| 18 | here in 2011. | 09:37:59 |
| 19 | Q.   When you started, had you already passed the | 09:38:01 |
| 20 | Patent Bar? | 09:38:04 |
| 21 | A.   No, I hadn't. | 09:38:05 |
| 22 | Q.   Okay.  When did you take the Patent Bar exam? | 09:38:06 |
| 23 | A.   Just before the end of my second year.  So | 09:38:09 |
| 24 | right around August, September of 2014. | 09:38:12 |
| 25 | Q.   And how long have you worked in patent | 09:38:22 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                        12

| | | |
|---|---|---|
| 1 | prosecution? | 09:38:25 |
| 2 | A.   Counting being a summer associate, I guess | 09:38:27 |
| 3 | about 15 years, 14. | 09:38:29 |
| 4 | Q.   When you started at Knobbe, I guess -- does | 09:38:35 |
| 5 | Knobbe have a patent prosecution-specific practice area? | 09:38:39 |
| 6 | A.   Yeah.  And we do patent litigation and patent | 09:38:45 |
| 7 | prosecution.  Our associates typically will pick one or | 09:38:47 |
| 8 | the other, but they can also work in both. | 09:38:50 |
| 9 | Q.   And what did you choose? | 09:38:52 |
| 10 | A.   At the beginning, I did both litigation and | 09:38:53 |
| 11 | prosecution. | 09:38:55 |
| 12 | Q.   About how much of your time, percentage-wise, | 09:38:57 |
| 13 | was spent on prosecution versus litigation? | 09:39:01 |
| 14 | A.   Initially, probably more like 75, 80 percent | 09:39:04 |
| 15 | prosecution, and then I did litigation for a number of | 09:39:07 |
| 16 | years and eventually just went more so on the | 09:39:11 |
| 17 | prosecution side. | 09:39:14 |
| 18 | Q.   And today, what does your practice mix look | 09:39:15 |
| 19 | like? | 09:39:19 |
| 20 | A.   It's primarily in the area of patent | 09:39:20 |
| 21 | prosecution and strategic portfolio management.  I also | 09:39:22 |
| 22 | do a fair amount of due diligence work and then also | 09:39:25 |
| 23 | sort of enforcement activity, so what we would call | 09:39:29 |
| 24 | pre-litigation type work. | 09:39:32 |
| 25 | Q.   Has your patent prosecution work focused on any | 09:39:38 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Transcript of David R. Schmidt

Conducted on September 12, 2025                    21

| | | |
|---|---|---|
| 1 | as Exhibit 1 to your deposition which is US Patent | 09:51:18 |
| 2 | 12,133,734.  Do you recognize the '734 patent? | 09:51:21 |
| 3 | A.   I do. | 09:51:29 |
| 4 | Q.   Okay.  Is the '734 patent one that you helped | 09:51:30 |
| 5 | prosecute on behalf of iRhythm? | 09:51:35 |
| 6 | A.   Now, in defining prosecution, do you mean just | 09:51:38 |
| 7 | handle it with the USPTO or are you also inclusive of | 09:51:42 |
| 8 | drafting the application? | 09:51:49 |
| 9 | Q.   We'll start with whether or not you drafted the | 09:51:50 |
| 10 | application. | 09:51:54 |
| 11 | A.   Okay.  I did not draft the application, but I | 09:51:55 |
| 12 | did prosecute it before the USPTO. | 09:51:58 |
| 13 | Q.   Okay.  And by prosecuting it before the USPTO, | 09:52:01 |
| 14 | do you mean that you were involved in the Office Action | 09:52:06 |
| 15 | responses? | 09:52:10 |
| 16 | A.   Correct. | 09:52:12 |
| 17 | Q.   Do you remember how many Office Action | 09:52:13 |
| 18 | responses you were involved with drafting with respect | 09:52:16 |
| 19 | to the '734 patent? | 09:52:20 |
| 20 | A.   I don't think there were any, I don't -- if I | 09:52:29 |
| 21 | recall correctly. | 09:52:32 |
| 22 | Q.   So what was your involvement in the prosecution | 09:52:39 |
| 23 | of the '734 patent? | 09:52:44 |
| 24 | A.   I interacted with the patent examiner to push | 09:52:47 |
| 25 | the case forward. | 09:52:50 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Transcript of David R. Schmidt

Conducted on September 12, 2025                    22

| | | |
|---|---|---|
| 1 | Q.   Okay.  Who drafted the claims, if you recall, | 09:52:51 |
| 2 | that were involved in the application that led to the | 09:52:58 |
| 3 | '734 patent? | 09:53:00 |
| 4 | A.   I drafted those claims. | 09:53:02 |
| 5 | Q.   And who was your contact at iRhythm that you | 09:53:09 |
| 6 | were sending drafts to of claims? | 09:53:14 |
| 7 | MR. BUNKER:  Again, I don't think counsel's | 09:53:17 |
| 8 | question is asking for this and you may answer that | 09:53:19 |
| 9 | question, but I'll just caution you not to reveal any | 09:53:21 |
| 10 | communications that you might have had with any people | 09:53:25 |
| 11 | at iRhythm regarding the prosecution. | 09:53:28 |
| 12 | THE WITNESS:  I can reveal the people? | 09:53:31 |
| 13 | MR. BUNKER:  Correct. | 09:53:33 |
| 14 | THE WITNESS:  I interacted with Mark Day at | 09:53:34 |
| 15 | iRhythm and then also Ted Lopez. | 09:53:37 |
| 16 | BY MS. BEANE: | 09:53:41 |
| 17 | Q.   Okay.  During the prosecution, I guess before | 09:53:42 |
| 18 | the '734 patent issued on November 5th of 2024, did you | 09:53:54 |
| 19 | have any communication with any attorney at Fenwick & | 09:54:00 |
| 20 | West? | 09:54:04 |
| 21 | MR. BUNKER:  You can answer that yes or no. | 09:54:06 |
| 22 | THE WITNESS:  2024, no. | 09:54:12 |
| 23 | BY MS. BEANE: | 09:54:22 |
| 24 | Q.   Have you had communications with attorneys at | 09:54:23 |
| 25 | Fenwick & West? | 09:54:25 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Transcript of David R. Schmidt

Conducted on September 12, 2025                    24

| | | |
|---|---|---|
| 1 | MR. BUNKER:  Why don't we go off the record and | 09:55:56 |
| 2 | discuss that question and we'll be back very briefly, | 09:56:00 |
| 3 | very quickly. | 09:56:04 |
| 4 | MS. BEANE:  That's fine. | 09:56:05 |
| 5 | THE VIDEOGRAPHER:  We are going off the record, | 09:56:06 |
| 6 | the time is 9:56 a.m. | 09:56:07 |
| 7 | (Brief recess was taken.) | 09:56:14 |
| 8 | THE VIDEOGRAPHER:  We are back on the record at | 09:58:14 |
| 9 | 9:58 a.m. | 09:58:15 |
| 10 | BY MS. BEANE: | 09:58:18 |
| 11 | Q.  Was the general subject matter of the email | 09:58:20 |
| 12 | that you had with Fenwick & West attorneys about patent | 09:58:23 |
| 13 | prosecution or the litigation matter? | 09:58:28 |
| 14 | A.  Patent prosecution. | 09:58:32 |
| 15 | Q.  And was the general subject matter of the phone | 09:58:38 |
| 16 | call also patent prosecution? | 09:58:41 |
| 17 | MR. BUNKER:  You may answer that. | 09:58:44 |
| 18 | THE WITNESS:  Yes. | 09:58:46 |
| 19 | BY MS. BEANE: | 09:58:52 |
| 20 | Q.  All right.  Turning back to the '734 patent | 09:58:58 |
| 21 | which is Exhibit 1 to your deposition, do you recall who | 09:59:00 |
| 22 | at iRhythm approved the claims for filing? | 09:59:07 |
| 23 | A.  For filing, I believe it was Mark Day, but | 09:59:14 |
| 24 | given the timing here, also probably Ted Lopez, so | 09:59:20 |
| 25 | probably both of them. | 09:59:25 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                    27

| | | |
|---|---|---|
| 1 | MS. BEANE:  We're going to come back to some of | 10:02:46 |
| 2 | the patents.  You can put the patents aside, but we'll | 10:02:48 |
| 3 | come back to them. | 10:02:53 |
| 4 | BY MS. BEANE: | 10:02:56 |
| 5 | Q.   Okay.  We're marking as Exhibit 2 to your | 10:02:56 |
| 6 | deposition what's been marked as -- or Exhibit 2 to your | 10:02:58 |
| 7 | deposition which is US Patent 12,245,859.  Do you | 10:03:04 |
| 8 | recognize this patent? | 10:03:09 |
| 9 | A.   I do. | 10:03:13 |
| 10 | (Exhibit No. 2 was marked for | 10:03:14 |
| 11 | identification.) | 10:03:14 |
| 12 | BY MS. BEANE: | 10:03:14 |
| 13 | Q.   Were you involved in the prosecution of the | 10:03:21 |
| 14 | application that led to the '859 patent? | 10:03:24 |
| 15 | A.   Yes. | 10:03:33 |
| 16 | Q.   Did you draft the claims of the '859 patent? | 10:03:33 |
| 17 | A.   I would need to double-check.  I have | 10:03:39 |
| 18 | collaborated on that claim. | 10:04:04 |
| 19 | Q.   When you say "that claim," do you mean all of | 10:04:06 |
| 20 | the claims? | 10:04:08 |
| 21 | A.   Yes, all the claims. | 10:04:10 |
| 22 | Q.   And who did you collaborate with? | 10:04:12 |
| 23 | MR. BUNKER:  You can answer that question. | 10:04:18 |
| 24 | THE WITNESS:  Damien Howard. | 10:04:20 |
| 25 | /// | |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                    28

| | | |
|---|---|---|
| 1 | BY MS. BEANE: | 10:04:26 |
| 2 | Q. What is Damien Howard's technical background? | 10:04:26 |
| 3 | A. Electrical engineering. | 10:04:31 |
| 4 | Q. Who approved the claim set to be filed? | 10:04:44 |
| 5 | A. Ted Lopez. | 10:04:49 |
| 6 | Q. Do you recall whether you received any office | 10:04:53 |
| 7 | actions as part of the '859 patent prosecution? | 10:04:56 |
| 8 | A. I think that Damien handled these. I think | 10:05:05 |
| 9 | there was an Office Action, but I'm not sure. | 10:05:08 |
| 10 | We typically go by our matter codes, so I don't | 10:05:11 |
| 11 | know all the patent numbers offhand. | 10:05:15 |
| 12 | Q. Okay. But your recollection, at least as you | 10:05:17 |
| 13 | sit here today, is that if there was an Office Action, | 10:05:25 |
| 14 | that Mr. Howard would have handled that? | 10:05:30 |
| 15 | A. I'm not sure. I'm not sure who this one was | 10:05:35 |
| 16 | assigned to. | 10:05:38 |
| 17 | MS. BEANE: All right. You've been handed | 10:06:07 |
| 18 | what's been marked Exhibit 3 to your deposition which is | 10:06:09 |
| 19 | US Patent 12,245,860. | 10:06:12 |
| 20 | (Exhibit No. 3 was marked for | 10:06:16 |
| 21 | identification.) | 10:06:16 |
| 22 | BY MS. BEANE: | 10:06:16 |
| 23 | Q. Do you recognize this document? | 10:06:17 |
| 24 | A. I do. | 10:06:18 |
| 25 | Q. And were you involved in the prosecution of the | 10:06:22 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                    29

| | | |
|---|---|---|
| 1 | '860 patent? | 10:06:24 |
| 2 | A.   Yes. | 10:06:26 |
| 3 | Q.   What was your involvement? | 10:06:28 |
| 4 | A.   I collaborated on the claim strategy with | 10:06:39 |
| 5 | Damien Howard. | 10:06:41 |
| 6 | Q.   And do you recall who approved the claims to be | 10:06:49 |
| 7 | filed? | 10:06:52 |
| 8 | A.   Ted Lopez. | 10:06:59 |
| 9 | Q.   Did you prepare the IDS that was submitted with | 10:07:06 |
| 10 | the application for the '860 patent? | 10:07:13 |
| 11 | A.   I think if Damien was handling this, Damien | 10:07:18 |
| 12 | would have prepared the IDS. | 10:07:22 |
| 13 | Q.   Do you recall whether you signed the IDS or | 10:07:38 |
| 14 | whether Damien signed it? | 10:07:41 |
| 15 | A.   I don't recall. | 10:07:43 |
| 16 | Q.   Do you typically sign the documents that are | 10:07:46 |
| 17 | being filed on behalf of iRhythm at the Patent Office? | 10:07:48 |
| 18 | A.   I signed for the cases that I am handling and | 10:07:52 |
| 19 | then my colleagues will sign for the cases that they are | 10:07:56 |
| 20 | handling. | 10:07:59 |
| 21 | Q.   Okay.  So if you signed the IDS that was | 10:08:01 |
| 22 | submitted as part of the '860 patent application, is it | 10:08:05 |
| 23 | fair for me to assume that you prepared the IDS? | 10:08:10 |
| 24 | A.   If I signed the IDS, I was involved in | 10:08:14 |
| 25 | preparation of the IDS, but there may be other people | 10:08:19 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                    30

| | | |
|---|---|---|
| 1 | who helped prepare the IDS. | 10:08:22 |
| 2 | Q.   Okay.  Fair enough. | 10:08:25 |
| 3 | MS. BEANE:  All right. | 10:08:29 |
| 4 | THE WITNESS:  Thank you. | 10:08:38 |
| 5 | BY MS. BEANE: | 10:08:40 |
| 6 | Q.   All right.  You've been handed a document | 10:08:41 |
| 7 | that's marked Exhibit 4 to your deposition which is US | 10:08:42 |
| 8 | Patent 12,274,554.  Do you recognize this document? | 10:08:45 |
| 9 | A.   I do. | 10:08:53 |
| 10 | (Exhibit No. 4 was marked for | 10:08:54 |
| 11 | identification.) | 10:08:54 |
| 12 | BY MS. BEANE: | 10:08:55 |
| 13 | Q.   And were you involved in the prosecution of the | 10:08:56 |
| 14 | '554 patent? | 10:09:00 |
| 15 | A.   Yes. | 10:09:16 |
| 16 | Q.   Was anybody else involved? | 10:09:29 |
| 17 | A.   I don't know for sure, but I think Damien | 10:09:33 |
| 18 | Howard may have also been involved. | 10:09:37 |
| 19 | Q.   Who approved the claims to be filed of the '554 | 10:09:45 |
| 20 | patent? | 10:09:48 |
| 21 | A.   Ted Lopez. | 10:09:53 |
| 22 | Q.   Do you recall when you first received | 10:10:11 |
| 23 | instructions with respect to filing the application that | 10:10:12 |
| 24 | led to the '554 patent? | 10:10:17 |
| 25 | MR. BUNKER:  You may answer that yes or no. | 10:10:20 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Transcript of David R. Schmidt

Conducted on September 12, 2025                    31

| | | |
|---|---|---|
| 1 | THE WITNESS:  No, I don't recall a specific | 10:10:27 |
| 2 | date. | 10:10:28 |
| 3 | BY MS. BEANE: | 10:10:28 |
| 4 | Q.   Would it have been close to the time that it | 10:10:29 |
| 5 | was filed? | 10:10:32 |
| 6 | A.   I don't know for certain, but likely, yes. | 10:10:38 |
| 7 | Q.   And why do you think that's likely? | 10:10:43 |
| 8 | A.   Once we have instructions to file a patent | 10:10:45 |
| 9 | application, we typically don't delay for very long. | 10:10:48 |
| 10 | Q.   Do you know who prepared the IDS that was | 10:11:05 |
| 11 | submitted with the '554 patent application? | 10:11:08 |
| 12 | A.   I'm not sure who signed the IDS, but whoever | 10:11:11 |
| 13 | signed the IDS would have been involved in the | 10:11:15 |
| 14 | preparation of the IDS, so -- and that would be in | 10:11:17 |
| 15 | combination with assistants -- patent assistants at our | 10:11:21 |
| 16 | firm. | 10:11:26 |
| 17 | Q.   Is it fair to say that that answer is true for | 10:11:33 |
| 18 | all of the iRhythm patents that you've been involved | 10:11:37 |
| 19 | with prosecuting? | 10:11:41 |
| 20 | A.   Can you please clarify the question? | 10:11:44 |
| 21 | Q.   I'll just strike it.  I'll just ask again when | 10:11:45 |
| 22 | we get to the next patent. | 10:11:48 |
| 23 | A.   Okay. | 10:11:50 |
| 24 | Q.   It's no problem. | 10:11:51 |
| 25 | All right, handing you a document that's been | 10:12:07 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Transcript of David R. Schmidt

Conducted on September 12, 2025                    32

| | | |
|---|---|---|
| 1 | marked Exhibit 5 to your deposition which is US Patent | 10:12:10 |
| 2 | 12,303,277.  Do you recognize this document? | 10:12:13 |
| 3 | A.   Yes. | 10:12:21 |
| 4 | (Exhibit No. 5 was marked for | 10:12:21 |
| 5 | identification.) | 10:12:21 |
| 6 | BY MS. BEANE: | 10:12:21 |
| 7 | Q.   Were you involved in the prosecution of this | 10:12:22 |
| 8 | patent application? | 10:12:25 |
| 9 | A.   Yes. | 10:12:37 |
| 10 | Q.   Did you draft the claims? | 10:12:38 |
| 11 | A.   I think they were drafted in collaboration with | 10:12:46 |
| 12 | Damien Howard, but I don't know for sure. | 10:12:49 |
| 13 | Q.   Who at iRhythm approved the filing of the | 10:12:56 |
| 14 | claims? | 10:12:59 |
| 15 | A.   Ted Lopez. | 10:13:04 |
| 16 | Q.   And who prepared the IDS with respect to the | 10:13:12 |
| 17 | '277 patent? | 10:13:15 |
| 18 | A.   Whoever signed the IDS, it's same answer as | 10:13:17 |
| 19 | before. | 10:13:21 |
| 20 | Q.   Okay.  Great.  I'm handing you a document | 10:13:21 |
| 21 | that's been marked Exhibit 6 to your deposition which is | 10:13:54 |
| 22 | US Patent 12,408,856.  Do you recognize this document? | 10:13:58 |
| 23 | A.   I do. | 10:14:06 |
| 24 | Q.   Were you involved in the prosecution of the 856 | 10:14:08 |
| 25 | patent? | 10:14:11 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                    36

| | | |
|---|---|---|
| 1 | instruction. | 10:19:43 |
| 2 | BY MS. BEANE: | 10:19:44 |
| 3 | Q.   And are you going to follow your counsel's | 10:19:45 |
| 4 | instruction? | 10:19:47 |
| 5 | A.   I will. | 10:19:48 |
| 6 | Q.   Okay.  Do you recall when you received | 10:19:48 |
| 7 | instructions to file the application that led to the | 10:19:59 |
| 8 | '856 patent? | 10:20:01 |
| 9 | MR. BUNKER:  You may answer that yes or no. | 10:20:03 |
| 10 | THE WITNESS:  Not specifically. | 10:20:08 |
| 11 | BY MS. BEANE: | 10:20:10 |
| 12 | Q.   Generally? | 10:20:10 |
| 13 | A.   Probably in early summer or late spring. | 10:20:13 |
| 14 | (Discussion off the record.) | 10:20:18 |
| 15 | MS. BEANE:  Sorry. | 10:20:26 |
| 16 | THE WITNESS:  Sorry, let me clarify that.  It | 10:20:27 |
| 17 | would have been in the spring. | 10:20:29 |
| 18 | BY MS. BEANE: | 10:20:31 |
| 19 | Q.   And that's because it was filed in May? | 10:20:31 |
| 20 | A.   I just double-checked the date, yeah. | 10:20:33 |
| 21 | Q.   Great.  Did you receive instructions to file | 10:20:37 |
| 22 | the '856 patent application from Mr. Lopez? | 10:20:45 |
| 23 | MR. BUNKER:  Uh, you may answer that. | 10:20:55 |
| 24 | THE WITNESS:  Yes. | 10:20:57 |
| 25 | /// | |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Transcript of David R. Schmidt

Conducted on September 12, 2025                              44

| | | |
|---|---|---|
| 1 | BY MS. BEANE: | 10:41:19 |
| 2 | Q.    Do you recall communicating with Mr. Lopez | 10:41:20 |
| 3 | about iRhythm patent prosecution before Mr. Lopez was | 10:41:22 |
| 4 | employed with iRhythm? | 10:41:26 |
| 5 | MR. BUNKER:  You can answer that yes or no. | 10:41:28 |
| 6 | THE WITNESS:  No. | 10:41:30 |
| 7 | BY MS. BEANE: | 10:41:30 |
| 8 | Q.    Does Mr. Lopez supervise the prosecution of | 10:41:45 |
| 9 | iRhythm's patent portfolio? | 10:41:48 |
| 10 | MR. BUNKER:  Objection to form.  Objection, | 10:41:51 |
| 11 | lacks foundation. | 10:41:53 |
| 12 | THE WITNESS:  Yes. | 10:41:55 |
| 13 | BY MS. BEANE: | 10:41:55 |
| 14 | Q.    Sorry, if you could take out the '554 patent | 10:42:22 |
| 15 | which is Exhibit 4. | 10:42:43 |
| 16 | A.    (Witness complies). | 10:43:03 |
| 17 | Q.    All right.  You've been handed a document | 10:43:03 |
| 18 | marked Exhibit 9 which I will represent to you is the | 10:43:05 |
| 19 | printout of the file wrapper documents and transaction | 10:43:11 |
| 20 | history for US application 18/936,888. | 10:43:21 |
| 21 | Is application 18,936,888 the application | 10:43:27 |
| 22 | number that corresponds to the '554 patent? | 10:43:32 |
| 23 | A.    Yes, I see that on the face of the patent, | 10:43:39 |
| 24 | yeah. | 10:43:41 |
| 25 | /// | |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                              52

| | | |
|---|---|---|
| 1 | language? | 10:59:47 |
| 2 | A.   I believe so, yes.  That's a Japanese patent | 10:59:48 |
| 3 | application. | 10:59:52 |
| 4 | Q.   When this IDS was submitted, did you have the | 10:59:58 |
| 5 | English translation of this Japanese reference? | 11:00:05 |
| 6 | A.   I don't know. | 11:00:14 |
| 7 | Q.   Have you ever heard of a reference referred to | 11:00:18 |
| 8 | as Matsumura? | 11:00:20 |
| 9 | A.   I can't recall. | 11:00:30 |
| 10 | Q.   At any point during the prosecution of the '888 | 11:00:33 |
| 11 | patent, are you aware of having an English translation | 11:00:35 |
| 12 | of Cite No. 956, which is JP2004-121360? | 11:00:42 |
| 13 | MR. BUNKER:  Objection to form. | 11:00:49 |
| 14 | Did you mean '888 application, Counsel? | 11:00:50 |
| 15 | MS. BEANE:  Yes, I did.  Let me ask it again. | 11:00:54 |
| 16 | BY MS. BEANE: | 11:00:57 |
| 17 | Q.   At any point during the prosecution of the '888 | 11:00:58 |
| 18 | application, are you aware of having an English | 11:01:02 |
| 19 | translation of Cite No. 956 which is JP2004-121360? | 11:01:04 |
| 20 | A.   No. | 11:01:17 |
| 21 | Q.   If you had an English translation of that | 11:01:20 |
| 22 | document, would you have submitted it to the patent | 11:01:23 |
| 23 | office? | 11:01:27 |
| 24 | MR. BUNKER:  Objection to form. | 11:01:28 |
| 25 | THE WITNESS:  I don't know. | 11:01:34 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                              54

| | | |
|---|---|---|
| 1 | THE WITNESS:  I am. | 11:03:39 |
| 2 | BY MS. BEANE: | 11:03:39 |
| 3 | Q.   And are you aware that iRhythm filed Inter | 11:03:40 |
| 4 | Partes Reviews against patents asserted in the Welch | 11:03:43 |
| 5 | Allyn case? | 11:03:43 |
| 6 | MR. BUNKER:  You can answer that yes or no. | 11:03:51 |
| 7 | THE WITNESS:  Yes. | 11:03:53 |
| 8 | BY MS. BEANE: | 11:03:53 |
| 9 | Q.   When did you become aware of IPR? | 11:03:53 |
| 10 | MR. BUNKER:  Counsel, I'm gonna stop the | 11:03:56 |
| 11 | deposition here.  You're asking questions about the | 11:03:59 |
| 12 | Welch Allyn litigation which is not the litigation for | 11:04:01 |
| 13 | which the subpoena was served on Mr. Schmidt. | 11:04:03 |
| 14 | Further, my understanding is there is no | 11:04:05 |
| 15 | cross-use between those two cases.  So if we're gonna | 11:04:07 |
| 16 | continue down this path asking about the Welch Allyn | 11:04:10 |
| 17 | litigation, we'll have to pause so I can seek a | 11:04:14 |
| 18 | protective order, and we will.  Or you can move on to | 11:04:15 |
| 19 | other areas. | 11:04:15 |
| 20 | MS. BEANE:  It has to do with the Matsumura | 11:04:16 |
| 21 | reference and the art and the knowledge of the Matsumura | 11:04:16 |
| 22 | reference so it is relevant to this deposition. | 11:04:25 |
| 23 | MR. BUNKER:  And how is that relevant to the | 11:04:28 |
| 24 | issues that are pending in the case for which you served | 11:04:30 |
| 25 | your subpoena? | 11:04:32 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                          56

| | | |
|---|---|---|
| 1 | (Discussion off the record.) | 11:05:37 |
| 2 | THE VIDEOGRAPHER:  We are back on the record. | 11:08:10 |
| 3 | The time is 11:08 a.m. | 11:08:12 |
| 4 | MR. BUNKER:  My apologies, Counsel, if you | 11:08:14 |
| 5 | could reask your question. | 11:08:16 |
| 6 | MS. BEANE:  Not a problem. | 11:08:18 |
| 7 | BY MS. BEANE: | 11:08:19 |
| 8 | Q.   When did you become aware of the IPRs iRhythm | 11:08:19 |
| 9 | filed against the Welch Allyn patent? | 11:08:25 |
| 10 | A.   I don't remember a specific date. | 11:08:28 |
| 11 | Q.   Do you know whether it was around the time they | 11:08:32 |
| 12 | were filed? | 11:08:34 |
| 13 | A.   I think it was sometime after the time they | 11:08:36 |
| 14 | were filed. | 11:08:38 |
| 15 | Q.   Have you reviewed those IPRS? | 11:08:44 |
| 16 | MR. BUNKER:  Objection to form. | 11:08:47 |
| 17 | You can answer that yes or no, if you | 11:08:48 |
| 18 | understand. | 11:08:50 |
| 19 | THE WITNESS:  Yes, very briefly. | 11:08:51 |
| 20 | BY MS. BEANE: | 11:08:56 |
| 21 | Q.   And are you aware that iRhythm relied in those | 11:08:56 |
| 22 | IPRs against the Welch Allyn patents on a reference | 11:09:01 |
| 23 | called Matsumura? | 11:09:05 |
| 24 | MR. BUNKER:  Objection to form. | 11:09:08 |
| 25 | You can answer that yes or no. | 11:09:09 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Transcript of David R. Schmidt

Conducted on September 12, 2025                          57

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't recall. | 11:09:11 |
| 2 | BY MS. BEANE: | 11:09:12 |
| 3 | Q.  Did you know that iRhythm submitted an English | 11:09:12 |
| 4 | translation of JP2004-121360 in its IPRs against Welch | 11:09:15 |
| 5 | Allyn? | 11:09:25 |
| 6 | MR. BUNKER:  You can answer that yes or no. | 11:09:26 |
| 7 | THE WITNESS:  Not that I can recall. | 11:09:28 |
| 8 | BY MS. BEANE: | 11:09:34 |
| 9 | Q.  Were you aware that iRhythm also submitted an | 11:09:34 |
| 10 | expert declaration as part of its IPRs against Welch | 11:09:37 |
| 11 | Allyn? | 11:09:41 |
| 12 | MR. BUNKER:  You can answer that yes or no. | 11:09:42 |
| 13 | THE WITNESS:  Yes. | 11:09:45 |
| 14 | BY MS. BEANE: | 11:09:47 |
| 15 | Q.  Did you review that declaration? | 11:09:48 |
| 16 | MR. BUNKER:  Objection to form. | 11:09:51 |
| 17 | You can answer that yes or no. | 11:09:52 |
| 18 | THE WITNESS:  Not in any great detail. | 11:09:55 |
| 19 | BY MS. BEANE: | 11:09:58 |
| 20 | Q.  Are you aware the expert declaration | 11:09:58 |
| 21 | characterized the reference JP2004-121360? | 11:10:00 |
| 22 | MR. BUNKER:  Objection to form. | 11:10:09 |
| 23 | You can answer that. | 11:10:10 |
| 24 | THE WITNESS:  No. | 11:10:12 |
| 25 | /// | |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Transcript of David R. Schmidt

Conducted on September 12, 2025                                    58

| | | |
|---|---|---|
| 1 | BY MS. BEANE: | 11:10:15 |
| 2 | Q. And just to confirm, you don't recall informing | 11:10:37 |
| 3 | the Patent Office as part of the '888 application about | 11:11:01 |
| 4 | the English translation of JP2004-121360, correct? | 11:11:08 |
| 5 | MR. BUNKER: Objection to form. | 11:11:17 |
| 6 | THE WITNESS: No, I don't recall that. | 11:11:19 |
| 7 | BY MS. BEANE: | 11:11:24 |
| 8 | Q. And as you sit here today, knowing that iRhythm | 11:11:24 |
| 9 | has an English translation of that document, are you | 11:11:30 |
| 10 | planning to submit it as part of future IDSs for iRhythm | 11:11:35 |
| 11 | prosecution? | 11:11:40 |
| 12 | MR. BUNKER: Objection to form. Objection, | 11:11:41 |
| 13 | lacks foundation. | 11:11:42 |
| 14 | THE WITNESS: I will have to consult with the | 11:11:46 |
| 15 | clients, so I don't know at this point, but probably. | 11:11:48 |
| 16 | BY MS. BEANE: | 11:11:55 |
| 17 | Q. Why do you say probably? | 11:11:55 |
| 18 | MR. BUNKER: Objection to form. And calls for | 11:11:56 |
| 19 | speculation. | 11:12:01 |
| 20 | I'm gonna instruct you not to answer as the | 11:12:01 |
| 21 | substance may reveal attorney-client privileged | 11:12:04 |
| 22 | communications. | 11:12:09 |
| 23 | MS. BEANE: Okay. I don't think it does, but | 11:12:28 |
| 24 | okay. | 11:12:46 |
| 25 | /// | |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                                    59

| | | |
|---|---|---|
| 1 | BY MS. BEANE: | 11:12:52 |
| 2 | Q.  Are you gonna follow your attorney's | 11:12:53 |
| 3 | instruction not to answer what you meant by "probably" | 11:12:54 |
| 4 | in your previous statement? | 11:12:58 |
| 5 | A.  I will. | 11:13:01 |
| 6 | MS. BEANE:  On what basis is that privileged? | 11:13:07 |
| 7 | MR. BUNKER:  Because you're asking him about a | 11:13:10 |
| 8 | hypothetical, what me might do in the future, which can | 11:13:12 |
| 9 | only be based on what he's done with the past.  You're | 11:13:14 |
| 10 | asking about past patterns and practices with his | 11:13:18 |
| 11 | clients; therefore, likely to reveal substance of the | 11:13:22 |
| 12 | communications with his client. | 11:13:26 |
| 13 | BY MS. BEANE: | 11:13:56 |
| 14 | Q.  Are you familiar with Bardy Diagnostics? | 11:13:56 |
| 15 | A.  Yes. | 11:13:58 |
| 16 | Q.  Do you monitor Bardy Diagnostics' patent | 11:14:03 |
| 17 | portfolio? | 11:14:08 |
| 18 | MR. BUNKER:  Objection to form. | 11:14:09 |
| 19 | You can answer that yes or no. | 11:14:09 |
| 20 | THE WITNESS:  Yes. | 11:14:11 |
| 21 | BY MS. BEANE: | 11:14:11 |
| 22 | Q.  Do you do that at the direction of your client | 11:14:27 |
| 23 | iRhythm? | 11:14:29 |
| 24 | MR. BUNKER:  I'm gonna instruct you not to | 11:14:35 |
| 25 | answer as the answer may reveal the substance of | 11:14:36 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                          63

| | | |
|---|---|---|
| 1 | Q.    Okay.  And it was filed, according to | 11:22:26 |
| 2 | Exhibit 12, on June 29th, 2021, correct? | 11:22:35 |
| 3 | A.    That's right.  And that's also the same date by | 11:22:46 |
| 4 | my signature on Exhibit 14. | 11:22:49 |
| 5 | Q.    On page 3 of the preliminary amendment, it | 11:23:07 |
| 6 | indicates that no new matter has been added, correct? | 11:23:11 |
| 7 | A.    Correct. | 11:23:15 |
| 8 | Q.    Before you add claims, do you review the | 11:23:19 |
| 9 | specification to ensure that the claims have proper 112 | 11:23:22 |
| 10 | support? | 11:23:27 |
| 11 | A.    Yes. | 11:23:27 |
| 12 | Q.    And new -- sorry -- New Claim 45 on page 2 | 11:23:31 |
| 13 | recites, "Wherein the housing is configured to tilt at | 11:23:50 |
| 14 | an angle relative to the adhesive layer in response to | 11:23:53 |
| 15 | movement of the user." | 11:23:57 |
| 16 | A.    So you meant Claim 46, right? | 11:24:02 |
| 17 | Q.    Yes, I did, sorry. | 11:24:05 |
| 18 | A.    Okay.  Yes, that is -- what you have recited is | 11:24:15 |
| 19 | the last limitation of New Claim 46. | 11:24:18 |
| 20 | Q.    Do you recall why that limitation was added? | 11:24:22 |
| 21 | A.    Yes. | 11:24:29 |
| 22 | Q.    Why? | 11:24:31 |
| 23 | MR. BUNKER:  You can answer that to the extent | 11:24:33 |
| 24 | you can do so without revealing the substance of any | 11:24:34 |
| 25 | privileged communications you may have had with iRhythm. | 11:24:37 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                    64

| | | |
|---|---|---|
| 1 | Do you want to take a break? | 11:24:45 |
| 2 | THE WITNESS:  Yeah. | 11:24:47 |
| 3 | THE VIDEOGRAPHER:  We are going off the record | 11:24:48 |
| 4 | at 11:24 a.m. | 11:24:50 |
| 5 | (Brief recess was taken.) | 11:25:36 |
| 6 | THE VIDEOGRAPHER:  We are back on the record at | 11:30:37 |
| 7 | 11:31 a.m. | 11:31:12 |
| 8 | MR. BUNKER:  Counsel, if you could just repeat | 11:31:16 |
| 9 | the question so it's clear in the transcript. | 11:31:17 |
| 10 | BY MS. BEANE: | 11:31:20 |
| 11 | Q.   Yes.  So I said, Do you recall why that | 11:31:21 |
| 12 | limitation was added, referring to the last limitation | 11:31:23 |
| 13 | of Claim 46, and you said yes and I said why? | 11:31:26 |
| 14 | MR. BUNKER:  And you can answer that to the | 11:31:31 |
| 15 | extent you can do so without revealing the substance of | 11:31:33 |
| 16 | any attorney-client communications you had with iRhythm. | 11:31:36 |
| 17 | THE WITNESS:  Right.  So the motivation behind | 11:31:40 |
| 18 | the claim was to get additional claim scope that we | 11:31:41 |
| 19 | don't already have in the portfolio and then also to | 11:31:45 |
| 20 | cover the iRhythm Zio, which I believe it does. | 11:31:48 |
| 21 | (Reporter clarification.) | 11:31:55 |
| 22 | THE WITNESS:  The product is called the Zio, | 11:31:55 |
| 23 | Z-I-O. | 11:31:55 |
| 24 | BY MS. BEANE: | 11:32:09 |
| 25 | Q.   Is that the Zio monitor? | 11:32:10 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Transcript of David R. Schmidt

Conducted on September 12, 2025                    65

| | | |
|---|---|---|
| 1 | A.    Uh, I think this would cover that. | 11:32:14 |
| 2 | MR. BUNKER:  Uh, you may reveal -- you may | 11:32:21 |
| 3 | answer that to the extent that you're talking about your | 11:32:26 |
| 4 | opinions at that time. | 11:32:28 |
| 5 | THE WITNESS:  Yeah, my opinion is that this | 11:32:32 |
| 6 | would cover the Zio monitor and I believe other versions | 11:32:34 |
| 7 | of the Zio. | 11:32:40 |
| 8 | BY MS. BEANE: | 11:32:43 |
| 9 | Q.    And by other versions, are you referring to the | 11:32:43 |
| 10 | XT or AT? | 11:32:46 |
| 11 | A.    Correct. | 11:32:50 |
| 12 | Q.    Okay.  So in your answer previously, you | 11:32:50 |
| 13 | testified, in part, that you were trying to get claim | 11:33:04 |
| 14 | scope to cover iRhythm's Zio and when you used Zio in | 11:33:10 |
| 15 | that answer, you mean Zio Monitor, Zio Monitor XT and | 11:33:15 |
| 16 | Zio AT? | 11:33:21 |
| 17 | A.    That's right, iRhythm has multiple products, | 11:33:23 |
| 18 | but they're all related.  So there's overlapping | 11:33:26 |
| 19 | technology in each of the products which is why I think | 11:33:31 |
| 20 | this would cover all three. | 11:33:34 |
| 21 | Q.    Okay, do you know whether the limitation was | 11:33:36 |
| 22 | also added to cover the Bardy cam product? | 11:34:00 |
| 23 | MR. BUNKER:  You can answer that to the extent | 11:34:04 |
| 24 | you can do so without revealing any communications that | 11:34:07 |
| 25 | you had with I or anybody at iRhythm. | 11:34:09 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David R. Schmidt
Conducted on September 12, 2025                                   66

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yes, it is my personal belief | 11:34:16 |
| 2 | that that does cover the Bardy cam. | 11:34:18 |
| 3 | BY MS. BEANE: | 11:34:31 |
| 4 | Q.   What did you mean when you wrote "configured to | 11:34:32 |
| 5 | tilt"? | 11:34:35 |
| 6 | MR. BUNKER:  Objection to form. | 11:34:36 |
| 7 | THE WITNESS:  It's a limitation directed | 11:34:39 |
| 8 | towards a feature of the device whereby the central | 11:34:41 |
| 9 | portion can move relative to the skin while the user is | 11:34:46 |
| 10 | moving around or flexing their body. | 11:34:50 |
| 11 | BY MS. BEANE: | 11:35:05 |
| 12 | Q.   How does the Bardy cam patch do that? | 11:35:07 |
| 13 | MR. BUNKER:  Objection to form. | 11:35:10 |
| 14 | THE WITNESS:  My understanding is that the | 11:35:14 |
| 15 | Bardy cam has a flexible underlying layer and then a | 11:35:17 |
| 16 | housing that is attached to that layer.  And then it | 11:35:23 |
| 17 | can -- as the human, you know, or, I guess, an animal, | 11:35:27 |
| 18 | whatever the user is, moves around, that housing can | 11:35:32 |
| 19 | tilt relative to the underlying surface of the -- of the | 11:35:37 |
| 20 | device. | 11:35:41 |
| 21 | BY MS. BEANE: | 11:35:52 |
| 22 | Q.   Have you tried one on to determine whether that | 11:35:53 |
| 23 | happens? | 11:35:56 |
| 24 | MR. BUNKER:  Objection to form. | 11:35:57 |
| 25 | THE WITNESS:  Are you asking about trying on a | 11:35:59 |

# Exhibit C

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

iRhythm, Inc.

Petitioner,

v.

Welch Allyn, Inc.

Patent Owner

_____

U.S. Patent No. 8,214,007

U.S. Patent No. 8,965,492

U.S. Patent No. 9,155,484

U.S. Patent No. 10,159,422

_____

**EXPERT DECLARATION OF JASON HEIKENFELD**

I, Dr. Jason Heikenfeld, hereby declare and state as follows:

## I.    INTRODUCTION

1.    I am submitting this declaration in connection with iRhythm Technologies, Inc.'s ("Petitioner") Petitions for Inter Parties Review of claims 1–8, 10–15, 29, 31–35, 37–39, and 43–45 of U.S. Patent No. 8,214,007 (the "'007 patent") (Ex. 1001); claims 1–8 and 11–14 of U.S. Patent No. 8,965,492 (the "'492 patent") (Ex. 1003); claims 1–8, 11, 12, and 15–20 of U.S. Patent No. 9,155,484 (the "'484 patent") (Ex. 1005); and claims 1–7, 9–12, and 14–20 of U.S. Patent No. 10,159,422 (the "'422 patent") (Ex. 1007) (the '007 patent, '492 patent, '484 patent, and '422 patent; collectively, "the Challenged Patents" and the identified claims of the Challenged Patents collectively, "the Challenged Claims"), before the Patent Trial and Appeal Board of the United States Patent Office (the "Board").  I have been asked by Petitioner to provide information and opinions regarding the level of skill of a person of ordinary skill in the art ("POSA") for the inventions claimed in the Challenged Patents, the general knowledge of such a person at the time of the filing of the applications for the Challenged Patents, the status of the documents relied upon by the Petition, the scope and content of the documents described by the Petition, technical information relating to the Challenged Patents, and whether the claimed inventions in the Challenged Patents would have been obvious to a POSA in view of the grounds asserted by the Petitioner.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 2

## II.    QUALIFICATIONS

2.    Information concerning my professional background, including my education, experience, and publications, are set forth below.  Additional information is provided in my current curriculum vitae, attached as Exhibit 1010.

3.    I received a Bachelor of Science (B.S.) in electrical engineering from the University of Cincinnati in 1998 and a Doctor of Philosophy (Ph.D.) in electrical engineering in 2001, also from the University of Cincinnati.

4.    I currently hold the titles of Professor of Electrical Engineering, Professor of Biomedical Engineering, and Director of the Novel Devices Laboratory at the University of Cincinnati.  In this capacity, I have taught courses including Semiconductor Devices, Optics for Engineers, Biomedical Engineering Seminar, and other electrical and computer engineering courses.

5.    In these capacities, I oversee a range of clinical, research and teaching activities in the field of rapid prototyping, electronic materials, microfluidics, electrofluidics, biosensors, electronic displays, flexible electronics, and optics.  I have also published widely on topics related to sweat and to interstitial fluid monitoring in the human body and have developed models for both the technology behind wearable biosensing devices and the physiology that provides signals to wearable biosensing devices.  I have both academic and industry experience in flexible and wearable electronics and in biosensors, where I have been a leading

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 3

academic authority world-wide. In my most recent research, I am focused on biosensors for cardiovascular diseases such as heart failure.

6.    In addition, I have extensive published research relating to the design, operation, and performance of medical devices used in the monitoring of physiological signals, analytes, and/or biofluids. Specifically, my publication record includes titles such as *Adhesive RFID Sensor Patch for Monitoring of Sweat Electrolytes*, 62 IEEE Trans. Biomed. Eng. 1457 (2015); *Wearable Sensors: Modalities, Challenges, and Prospects*, 18 Lab on a Chip 217 (2018); *Accessing Analytes in Biofluids for Peripheral Biochemical Monitoring*, 37 Nature Biotech. 407 (2019); and *Continuous Molecular Monitoring of Human Dermal Interstitial Fluid with Microneedle-Enabled Electrochemical Aptamer Sensors*, 23 Lab on a Chip 3289 (2023).

7.    I have worked on numerous projects involving wearable medical devices that monitor various analytes and physiological signals. Nearly all of my wearable medical device work has involved flexible electronics that place electrodes onto the body, including dry electrodes, gel electrodes, iontophoresis electrodes, working and counter and reference electrodes, ion-selective electrodes, and enzymatic electrodes, and heart-rate measurement electrodes. These devices also require electrode leads or traces and electronics and data processing and communication modules. These projects include, but are not limited to, extensive

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 4

research and professional publications on topics including various strategies for detecting glucose and ethanol levels in blood-correlated sweat, monitoring phenylalanine, cortisol, and drugs in biofluids such as interstitial fluid, and using adhesive sensor patches for monitoring sweat electrolytes. I have also co-authored a book-length treatment of fluid dynamics and engineering principles behind "lab-on-a-chip" devices. The book is entitled ELECTROWETTING (2019) and is a comprehensive introduction to the theoretical and practical aspects of fluid manipulation technologies, written to inform academic and industry interests alike.

8.    Beyond this, I have been an invited presenter at innumerable academic and professional conferences around the world, where I have given talks with titles such as: "Eccrine Sweat Biomonitoring: Addressing Fundamental Challenges that Advance the Frontiers of Biosensing," ApplySci's Wearable Tech + Digital Health + NeuroTech Conference in Palo Alto, CA, February 26–27, 2018;; and "A Leap Beyond the Wearable's of Today: Non-Invasive Biomarker Sensing Through Sweat" at Point-of-Care Conference, San Diego, CA, USA, 2015. Each of these relates to wearable devices that monitor analytes and other physiological signals.

9.    I am also the co-founder of Kilele Health Inc., a company devoted to advancing molecular monitoring devices beyond glucose and diabetes to new applications in cardiovascular diseases such as heart failure. In this role, I regularly interface with cardiologists treating patients with heart disorders. I am also a co-

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 5

founder of HydroLabs Inc., a private company creating technologies and systems for the measurement and analysis of bodily hydration.

10.    In addition, I was a co-founder and Member of the Board and Chair of Scientific Advisory Board for Eccrine Systems, a biotechnology company that was developing advanced sweat sensors for personalized medicine.   Prior to its intellectual property being acquired by Epicore Biosystems, Eccrine was developing a wearable, "skin-like" microfluidic patch that could capture eccrine sweat and then assay that sweat for various biochemical markers.

11.    In addition, during the period of 2000 through 2003, I was actively practicing the development of printed circuit board technologies applied to electronic displays, performing the fabrication myself and in communication with leading industry experts such as Pete Zeigler of Dupont Microcircuit Materials and Charles Price of CW Price Screen Printing equipment.  At that time, I was aware of the materials and methods utilized for circuit creation using carbon, silver, copper, insulators, markings, and other printed circuit board materials.

12.    I have also been the recipient of numerous awards and honors for my research and teaching.  In 2023, I was elected to Fellow Status at both the American Institute for Medical and Biological Engineering and Institute of Electrical and Electronics Engineers.  These represent the highest levels of professional recognition for biomedical engineers and also for electrical engineers in their respective fields.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 6

In 2019, I received the CEAS Research Award, which is the highest career research award bestowed by the University of Cincinnati's College of Engineering.  In 2018, I received the Ohio Faculty Council Technology Commercialization Award, which is given to only one faculty statewide per year.  In 2015, I was given the Ernst and Young Edge Award for the Ohio Valley region and in 2014, I was elected to the rank of Fellow at the National Academy of Inventors.

13.    I have been listed as an inventor on over one hundred patents and patent publications in the past ten years, mostly directed to detecting and measuring physiological signals, body analytes, or biofluids.

## III.    DOCUMENTS AND MATERIAL REVIEWED

14.    I have reviewed the Challenged Patents and their prosecution histories (Exs. 1001–1008, respectively).  In addition, I have also reviewed the Petitions and both current and historical industry documentation related to electrophysiology and cardiac monitoring and related to flexible wearable electronics and on-body electrode materials, including all exhibits filed herewith.  In preparation of this declaration, I relied on my knowledge of electrical and biomedical engineering, my professional experience, and the exhibits filed herewith.

15.    My work on this case is being billed at a rate of $500 per hour, with reimbursement for actual expenses.  My compensation is not contingent upon the outcome of these *inter partes* reviews.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 7

## IV. ELECTROCARDIOGRAPHIC MONITORING AND DEFIBRILLATION TECHNOLOGIES

16.    Below I describe the state of electrocardiographic body-worn sensor devices as of November 1, 2006, which is the filing date of the '007 patent and the priority date claimed by the '492, '484, and '422 patents. I also summarize the development of technologies underlying the features and methods recited in the Challenged Claims as of November 1, 2006.

### A. Electrocardiograms (ECGs or EKGs) Are a Long-Known, Well-Understood Medical Technique

17.    Physicians have analyzed their patients' heart rhythms for centuries—even before they had a way to reliably track and interpret the meaning of that rhythm. Ex. 1020 (Jan Adamec & Richard Adamec, *ECG Holter, Guide to Electrocardiographic Interpretation* (2008)) at vii. Electrocardiograms (ECGs or EKGs) were captured for the first time in the late 1880s using a mercury capillary electrometer. Ex. 1021 (Gautham Kalahasty et al., *A Brief History of Remote Cardiac Monitoring*, 5 Cardiac Electrophysiology Clinics 275 (2013)) at 275–76. After making a number of improvements to the early ECGs, Dr. Willem Einthoven won a Nobel Prize in Medicine in 1924 for his development of the first practical ECG monitor. *Id.* at 276.

18.    From that point on, physicians have used ECGs to evaluate and monitor patients' heart health. *See, e.g.*, Ex. 1020; Ex. 1022 (Edward K. Chung, *Ambulatory*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 8

*Electrocardiography Holter Monitor Electrocardiography* (1979)) at 3–12; Ex. 1023 (U.S. Patent Publication No. 2006/0224072 ("Shennib") (filed March 31, 2005)) at [0005]–[0006].

19.     ECGs work by measuring the electrical activity which controls the heartbeat. *See, e.g.*, Ex. 1024 (NLM, *In brief: What is an electrocardiogram (ECG)?*, *available at* https://www.ncbi.nlm.nih.gov/books/NBK536878/).   These electrical signals originate from the sinoatrial node in the right atrium of the heart before spreading out throughout the heart muscle tissue. *Id.* These small electrical impulses in the tissue causes the atria and then the ventricles to contract. *Id.* In a healthy heart, the rhythm caused by these electrical impulses is known as a normal sinus rhythm. *See, e.g.*, Ex. 1022 at 5. The sinus rhythm of a heart with irregularities differs from that of normal, healthy hearts, meaning that ECGs can be used to identify irregularities in heart rate and heart rhythm as well as other potential health concerns. *Id.* at 3–12.

20.     The movement of these electrical signals throughout the heart can be measured on the surface of a patient's skin. *Id.* Over a half-century before the invention date, 12-electrode ECG was standardized. Ex. 1025 (Majd AlGhatrif & Joseph Lindsay, *A Brief Review: History to Understand Fundamentals of Electrocardiography*, 2 J. Community Hosp. & Internal Med. Persps. 14383 (2012)). These earlier, "12-lead" ECGs used ten "electrodes" (a type of conductor) to

9

measure these electrical signals: six on the patient's chest, two on each of the patient's forearms, and two on each of the patient's calves.    Ex. 1024.    These electrodes were purposefully positioned on the surface of the patients' skin to provide a three-dimensional view of the heart's electrical activity.    The positions of the electrodes correspond to ECG vectors that trace the direction, magnitude, and sense of the electrical activity.    *See, e.g.*, Ex. 1026 (Robert P. Grant, *Spatial Vector Electrocardiography*, Circulation Vol. II, 676 (Nov. 1950)) at 677.    The vectors detected by the electrodes are transmitted via cables to an ECG machine which converts the signals into an ECG readout.    Ex. 1024.

21.    A typical ECG readout includes several distinct waves: the P-wave, Q-wave, R-wave, S-wave, and the T-wave.    *See, e.g.*, Ex. 1027 (ACLS Medical Training, *The Basics of ECG*, *available at* https://www.aclsmedicaltraining.com/basics-of-ecg/).    Physicians can interpret one of more of these waves to derive a patient's heart rate and rhythm.    *Id.*    The P-wave represents the atrial electrical activity, while the Q, R, S, and T waves all represent ventricular electrical activity.    *Id.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 10



Ex. 1028 (Euan A. Ashley & Josef Niebauer, *Cardiology Explained* (2004), *available at* https://www.ncbi.nlm.nih.gov/books/NBK2204/).

22.   Well before the priority date of the Challenged Patents, physicians used several methods of ECG cardiac monitoring, including screening, short-term monitoring, intermittent monitoring, and long-term monitoring.  Ex. 1029 (Am. Coll. Cardiology, Am. Heart Ass'n Task Force on Practice Guidelines, *ACC/AHA Guidelines for Ambulatory Electrocardiography: Executive Summary and Recommendations* 100 Circulation 886 (1999), *available at*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 11

https://www.ahajournals.org/doi/full/10.1161/01.cir.100.8.886).  There are various devices that can be used for each different method of cardiac monitoring.  *Id.*

**B.    The Evolution of Portable Physiological Monitors Decades Prior to the Priority Date**

23.    The first practical ECG monitor—weighing several hundred pounds—was developed in the 1920s.  Ex. 1021 at 276.  Recognizing the commercial potential of ECG, the industry quickly sought to reduce and miniaturize these monitors.  *Id.* While there were many reasons to reduce the size of stationary ECGs used solely in clinical settings, the commercial and clinical benefits of reducing the size of ECGs became even more salient when long-term, portable ECG recording devices were invented by Dr. Norman Holter in 1949 and released for commercial production in 1962.  *Id.*; *see also* Ex. 1022 at 3; Ex. 1020 at xi.  These devices became known as "Holter monitors," versions of which are still commonly used today.  *Id.*  By the early 1960s, the size had decreased enough that Holter monitors were both clinically viable and commercially available.  *Id.*   One way that this size reduction was achieved was by incorporating transistors, *i.e.*, semiconductor devices that can act as electronic switches and amplifiers that control or alter current or voltage flow, into the Holter monitor.  Ex. 1021 at 276.  The size of the Holter monitor continued to be reduced throughout the 1960s.  By 1969, Holter *mini*monitors (the size of a cigarette package) were being commercially produced.  Ex. 1030 (Mike Cadogan, *Norman J. Holter* (2022), *available at* https://litfl.com/norman-j-holter/).

12

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 12

24.    Holter monitors were widely adopted, in part due to clinical reports demonstrating the usefulness of long-term ECG monitoring.    Ex. 1031 (Joel Morganroth, *Ambulatory Holter Electrocardiography: Choice of Technologies and Clinical Uses*, Anals. of Internal. Med. (1985)) at 74.  By 1979, there were a number of medical uses, referred to as indications, for the use of Holter monitor electrocardiography.    These indications included "[d]iagnosis of cardiac arrhythmias," "[e]valuation of symptoms . . . to correlate with actual arrhythmias," "[d]iagnosis of myocardial ischemia," "[e]valuation of anti-arrhythmic drug therapy," and "[e]valuation of artificial pacemaker function." Ex. 1022 at 228, Table 2.  By the early 1980s, the incorporation of transistors and other technologies made it possible for the size of portable ECG monitors to continue to shrink while at the same time their functionality improved.  Ex. 1031 at 74; Ex. 1032 (Nitish V. Thakor, *From Holter Monitors to Automatic Defibrillators: Developments in Ambulatory Arrhythmia Monitoring*, IEEE Transactions on Biomed. Eng'g, 770 (1984)) at 775–76.  Reducing the size and improving the wearability of longer-term ECG monitors, such as the Holter monitor, has been, and continues to be, an industry focus since long-term ECG monitoring was first conceived of decades ago.

### C.    Wearable ECG Monitors Were Well Known Prior to the Priority Date

25.    Prior to November 1, 2006, wearable ECG monitors that allowed for longer monitoring periods were well known in the industry.  As the Challenged

13

Patents and other prior art references explain, most of these devices comprised, *inter alia*, disposable sensors (*e.g.*, ECG electrodes), electrical traces/wiring, reusable electrical components, portable batteries, wireless communication functionalities, printed circuit boards, and some form of resistor.

26.    First, prior to November 1, 2006, wearable devices with disposable sensors—including ECG electrodes—which could be fixed to the patient's body were widely known. *See, e.g.*, Ex. 1001 at 1:20–25 ("Typically . . . [s]ensors, such as, ECG electrodes, are affixed to the patient's body, such as with tape"), 1:34–36 ("typically . . . monitor includes a sensor, which generally makes direct or indirect contact with an individual's chest"), 9:5–11 (noting the "ConMed Cleartrace line of ECG electrodes including the model 1700 Cleartrace electrode manufactured by the ConMed Corp. of Utica, N.Y. or similar type electrodes made by the 3M Corp. of St. Paul, Minn."); Ex. 1003 at 1:40–44, 1:53–55, 9:29–33 (same); Ex. 1005 at 1:44–48, 1:58–59, 9:32–38 (same); Ex. 1007 at 1:58–63, 2:4–7, 9:57–63 (same); Ex. 1023 at [0011] ("The patches (electrodes) employed with these monitors are disposable."), [0007] ("instruments typically use 5 or more ECG electrodes attached to the chest at one end and connected to a portable device at the other end"); WO 2008/005015 A1 ("Shennib PCT") (Ex. 1033) (filed July 5, 2006) at [0009] ("ECG patches (electrodes) used with such prior art ECG monitors are disposable and replaced frequently for extended monitoring"), [0008] ("miniature electronic package

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 14

attached to the patient's chest via two to three electrodes"); U.S. Patent No. 6,454,708 ("Ferguson") (Ex. 1034) (issued Sept. 24, 2002) at 4:41–44 ("a portable remote patient telemonitoring system which collects vital signs (health parameter) data from a patient using a disposable sensor device attached to the patient"), 4:62–63 ("first component is an adhesive, cordless, disposable sensor band with electrode patches").  Making the electrodes—which contact the patient's skin—disposable helped ensure that the wearable device is hygienic, as noted below.

27.    Second, prior to November 1, 2006, wearable devices including electrical traces or wiring (also known as leads) on flexible substrates that connected the electrodes to the device electronics, were widely known.  *See, e.g.*, Ex. 1023 at [0014] (discussing a prior art patch that is a "flexible, nominally flat planer form having integral gel electrodes, a sticky-back rear surface, [and] an internal flex circuit"), [0035] ("The electronic assembly of the patch is formed of a flexible circuit substrate 20 with trace extensions to the electrodes 21, 22, 23"); Ex. 1034 at 8:57–58 ("[t]he signal processing circuitry 12 receives the sensor data from traces 14"), 9:44–48 ("[r]espiration data . . . may also be collected using a printed carbon on flextrate resistance band sensor 19 located on the left hand side of the chest"), 10:35–40 ("[t]he PCB is connected to a flexible substrate which has printed circuit traces 14 providing connections to the electrodes and the connector 13'").  These electrical traces are small, allowing for the device to be miniaturized without needing to use

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 15

large or cumbersome individual electrical wires, such as those used in Holter monitors.

28.    Third, prior to November 1, 2006, wearable devices including a reusable electronic component used to interpret the signals received by the sensor were widely known. *See, e.g.*, Ex. 1023 at [0011] ("The patches (electrodes) employed with these monitors are disposable. However, the electronic base unit is reusable as it is loaned to patients as part of the diagnostic service provided by the clinic."); Ex. 1034 at 6:12–14 ("the smart card also houses the sensor band's electronics so that the electronics may be reusable from one sensor band to the next"). Reusing some electronic components of the wearable device is more economical and more environmentally sound.

29.    Fourth, prior to November 1, 2006, wearable devices including portable batteries and wireless connectivity were widely known. *See, e.g.*, Ex. 1001 at 1:20–27 ("Typically a battery operated monitor can be hung on a belt, shoulder strap, or carried by a patient using some other similar hanging arrangement. . . . After a fixed interval of time, or at a low battery indication, the batteries can be replaced or recharged"), 1:28–32 (discussing the Micropaq wireless patient monitor, manufactured by Welch Allyn, Inc., as "[o]ne example of a portable patient monitor") (emphasis added); Ex. 1023 at [0010] ("These monitors may have a display to inform the patient if and how many events have been recorded and the

16

status of the battery life"), [0022] ("a preformatted report is automatically generated by the patch and transmitted wirelessly to a generic reporting device such as a printer or a wireless network system using infrared or RF signals"); Ex. 1034 at 8:57–62 ("The signal processing circuitry 12 receives the sensor data from traces 14 and a directly connected thermistor (not shown) and is powered by, e.g., an alkaline manganese battery pack (not shown) designed to permit the sensor band 10 to collect vital signs data for approximately 30 hours"), 18:64–65 (noting that "[o]ff the shelf wireless technology options may be used for the wireless transmissions" of the vital signs from the sensor band); U.S. Patent No. 6,238,338 ("DeLuca") (Ex. 1015) (issued May 29, 2001) at 3:20–29 ("[biosignals] are transmitted via wireless communication links 16 to a control station 22").  Wireless transmissions were performed using an antenna, such as a transceiver or transmitter.  Ex. 1034 at 4:1-2, 6:49-50, Figs. 4A, 4B; Ex. 1023 at [0046] ("using radio frequency (RF) transmitter…using standard RF protocols such as Bluetooth® and IEEE802®").

30.    Fifth, prior to November 1, 2006, *printed* circuit boards were widely known and used in wearable medical devices as described above in this Section.  *See, e.g.*, Ex. 1035 (R.S. Khandpur, *Printed Circuit Boards: Design, Fabrication, Assembly, and Testing* (2006)) at 3 (noting that the screen printing technique was used to print "silver paste conductors and graphite resistors . . . onto ceramic substrate" as early as the end of World War II"; noting that "[i]t was [the screen-

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 17

printing] technique that ushered in the commercial use of printed circuits"), 4 ("When the completed board provides mechanical support and all necessary electrical connections to the components, it is essentially a Printed Wiring Board or Printed Circuit Board. The term *printed* became popular because the conductive areas are often generated by means of a printed process like screen printing . . . ."), 283 (explaining that "[t]he majority of PCBs produced worldwide are screen printed" because, while "less precise" than other methods, it is "comparatively cheap and simple"), 659 (defining "Printed Circuit" as a "[c]ircuit where the interconnections between components, terminals, subassemblies, etc., are made by conductive strips (traces) that have been printed or etched onto an insulating board"); *see also* Ex. 1036 (AAMI, *Cardiac monitors, heart rate meters, and alarms*, ANSI/AAMI EC13:2002 (2002)) ("EC-13") at 4 (referencing a "printed trace").

31.    Sixth, prior to November 1, 2006, wearable devices including resistors, which protected both the patient and the device from unwanted electrical discharge, were widely known. *See, e.g.*, Ex. 1001 at 1:53–57 (noting that medical grade monitors are required to be able to "survive multiple defibrillation cycles of at least 360 joules" and that "[c]onventionally, this requirement has been met by one or more power resistors situated in series with the wire leads of a fixed or portable physiological monitor"); Ex. 1015 at 4:57–64 ("all input stage connections to the ASIC 36 are protected against electrostatic discharge by the circuit formed by the

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 18

current limiting series resistors Rin and Rdrive with their respective diode connected JFETs, D1, D2, D3. This arrangement maintains a low leakage path under normal operating conditions, while providing a current path during over-voltage conditions"); U.S. Patent No. 4,280,507 ("Rosenberg") (Ex. 1018) (issued July 28, 1981) at 1:19–27 (noting that "[m]ost EKG machines are equipped with internal circuits that bypass the front end amplifiers in the presence of a defibrillation pulse, but full protection of the machine requires that voltage limiting means be included in each of the leads from the machine to the electrodes attached to the patient's body").

### D. The Use of Disposable Components, Including Disposable Electrodes, Was Well-Established by the Priority Date

32. The use of disposable electrodes or sensors in wearable monitoring devices was common long before the Challenged Patents were filed. *See, e.g.*, Ex. 1037 (P.J.B. Hubner, *Which Disposable Chest Electrode?*, British Med. J., 507 (Aug. 30, 1969)) at 510. Because electrodes are in direct contact with the skin of a patient, re-usable electrodes need to be thoroughly cleaned after each patient to prevent cross contamination of infectious diseases. *Id.*; *see also* Ex. 1038 (V. Trend et al., *Are ECG Welsh cup electrodes effectively cleaned?*, 14 J. Hosp. Infection 325 (1989)) at 331. Even with thorough cleaning, the risk of cross-contamination cannot be eliminated. Ex. 1038. Disposable electrodes, which are disposed after use by a single patient, provide a solution to this hygienic problem.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 19

33.    As ECG technology evolved, disposable electrodes continued to be preferred because of the reduced risk of cross-contamination between patients.  For example, U.S. Patent No. 4,763,660 ("Kroll") (Ex. 1013) (issued August 16, 1998) reiterates this benefit:

> The invention further provides an electrode belt device that is disposable, which is an improvement over prior art devices which typically require much maintenance and care.    Additionally, its ***disposability is particularly beneficial in a medical setting, wherein the possibility of transfer of communicable diseases from patient to patient is of great concern***.

*Id.* at 1:66–2:7 (emphasis added).

34.    Mechanisms to affix disposable electrodes were also well-known because the electrodes needed to be readily removable and attachable to the other components without damaging either the electrodes themselves or the other components.  For example, as acknowledged by the Challenged Patents, the "snap-on" design for disposable electrodes was well-known long before its 2006 filing date.  Ex. 1001 at 9:5–11.  Both ConMed and 3M Corp. at that time commercially produced a snap-on electrode.  *Id.*; *see also* Ex. 1032 at 771, Fig. 1 (titled "Schematic of a disposable ECG electrode").  Thus, by the early 2000s, it was common practice for wearable monitors to use disposable, snap-on electrodes in conjunction with other non-disposable components.  *See, e.g.*, U.S. Patent Publication No. 2003/0069510 ("Semler") (Ex. 1039) (filed October 4, 2001) at [0035], [0046], Fig.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 20

5 (discussing use of snap connectors to attach a monitoring device to 12-lead recorders); Ex. 1040 (*Devices@FDA: Dexcom STS Continuous Monitors*, U.S. Food & Drug Admin. (2005), *available at* https://www.accessdata.fda.gov/scripts/cdrh/devicesatfda/index.cfm?db=pma&id=320251) at 30 ("Labeling").

35.    Besides the electrodes, other components of pre-2006 wearable devices were also designed to be disposable, to further optimize for factors such as hygiene or cost.  Ex. 1013 at 2:4–7 ("Because the belt device and its components are designed for individual patient use, risks that are inherent in multiple patient use devices are minimized."); Ex. 1039 at [0017] (disclosing a monitor that is "meant for limited-term use" and thus is "extremely inexpensive to manufacture" and "may be disposed of, e.g. discarded or recycled, much like a disposable flash camera" after the recorded data is collected from the device), [0035] ("within the spirit and scope of the present invention, some or all of the circuitry including the electrodes, the flex circuit, the memory and/or processor chip and the batteries may be integrated into a thin, laminar configuration"), [0051] (discussing an ECG monitoring device that "minimizes the circuitry required to implement the required functionality in a tiny, thin, planar flexible expanse that—due to its low cost—may be readily disposed of or recycled after use"); Ex. 1023 at [0035], cl. 1 (a disposable patch that includes a "flexible circuit substrate 20 with trace extensions to the electrodes 21, 22, 23, and

21

to the battery 35"). The popularity of disposable components increased as the costs of electrical components decreased and recycling programs for those parts became more viable.

### E.    Industry Standards as of November 1, 2006

36.    As acknowledged by the Challenged Patents, prior to November 1, 2006, a number of industry standards relevant to wearable physiological monitoring devices had been promulgated. *See, e.g.*, Ex. 1001 at 4:21–24 (referencing the European Unions' Medical Device Directive and the EC-13 standard for electrocardiographs), 11:39–41 ("The high pass filter causes the input to be AC coupled from a roll off frequency of about 0.05 Hz, as specified by industry ECG standards."), 14:25–30 ("Standard EC13 addresses the ability of an ECG monitor to display and process ECG signals in a satisfactory manner while connected to a patient on whom an electrosurgical device is being used."), 14:30–32 (noting that without the suppression required by EC-13, "the high RF output of an electrosurgical device can render ECG monitoring impossible and or render the monitor unusable."). These standards required that, to achieve compliance, wearable devices contain certain features and/or functionalities. As described by the Challenged Patents, these standards included as requirements, among other things, many of the features that had been well known in the field, such as those described in Sections IV.C–D above.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 22

37.    The Challenged Patents reference the Association for the Advancement of Medical Instrumentation's (AAMI) EC-13 standard, which was published in 2002.  EC-13 describes disposable ECG electrodes, affixed to the patient's body, as well known in the art.  *See, e.g.*, Ex. 1036 at 60 ("The characteristics of disposable electrodes have been studied extensively by UBTL [(a Division of the University of Utah Research Institute under the sponsorship of the U.S. Food and Drug Administration's then Bureau of Medical Devices)] (Schoenberg, et al., 1979)"); *id* at 48–49 ("This device is attached to the body through ECG electrodes"); *see also id.* at 68 (citing EC-12, a standard concerning "pre-gelled ECG disposable electrodes," and dated 1991).  Another relevant standard is AAMI's EC-82 standard, which was published in 1999.  Ex. 1041 (AAMI, *Ambulatory Electrocardiographs*, ANSI/AAMI EC38:1998 (1998)) ("EC-38").

38.    The EC-13 standard requires protection of both the patient and the device from electrical shock.  Ex. 1036 at 55 ("Defibrillator overload protection is necessary for most cardiac monitors" because "***any given monitor might be used on patients potentially requiring defibrillation***.") (emphasis added).  In particular, the EC-13 standard specifically requires that wearable devices can survive "multiple defibrillation cycles of at least 360 joules."  Ex. 1001 at 1:53–55; Ex. 1036 at 18, Table 4; *see also* Ex. 1041 at 45 (noting the maximum selectable deliverable energy of defibrillators ranges from 250 to 360 joules).  The EC-13 standard explains that

23

the device should "continue to function after exposure to the short-duration high voltages of a defibrillator discharge" and discusses mechanisms for doing so. Ex. 1036 at 55. This is an important consideration because patients often undergo longer-term ECG monitoring because they are at suspected to have an increased risk of heart conditions which may require defibrillation.

39.     Further, the EC-13 standard describes "[e]lectrosurgical interference suppression [ESIS] [t]he ability to display and process ECG signals in a satisfactory manner while connected to a patient on whom an electrosurgical device is being used. Without such suppression, the high RF output of an electrosurgical device renders ECG monitoring impossible." *Id.* at 3. EC-13 also teaches "pacer pulse detector rejection of fast ECG signals" and "[p]acemaker pulse appearance in auxiliary output." *Id.* at 9.

40.     In addition, EC-13 explains that "common mode rejection" is the "[a]bility of a differential amplifier to reject common mode voltage." *Id.* at 3, 64, Table 4; *see also* Ex. 1041 at 3. Common mode voltage is any "[u]ndesired voltage of identical amplitude and phase applied to both inputs of a differential amplifier" that would be otherwise detected by the amplifier. Ex. 1036 at 3, 64, Table 4; *see also* Ex. 1042 (David Prutchi & Michael Norris, *Design and Development of Medical Electronic Instrumentation* (2005)) at 3. Common Mode Rejection Ratio (CMRR) is the ability of a differential amplifier to not pass (reject) the portion of

24

the signal common to both the positive and negative inputs. Ex. 1036 at 64. Such common mode rejection and other filtering mechanisms can remove or reduce interfering electrical signals typically surrounding the patient during use of the ECG device (such as lighting or other electrical instruments). *Id.* at 3, 64, Table 4; Ex. 1042 at 3.

41.    Lastly, "portable and battery-powered ECG monitors" were already so widely known that they were explicitly included in the scope of the EC-13 standard, Ex. 1036 at 1, and the EC-38 standard, *see, e.g.*, Ex. 1041 at 8 Table 2, 42.

42.    The EC-13 standard demonstrates that wearable devices—including the components and functions discussed above—were widely known in the industry by 2002.

### F.    Resistive Protection and Resistive Traces

43.    Using electrical resistance for protection of both the device and the patient was also widely known before November 1, 2006. As discussed above, the importance of including such protection in ECG monitors was well-understood because patients who require long-term monitoring are at an increased risk of experiencing a cardiac event, such as a sudden cardiac arrest. *See* Section IV.E., *supra*. It was an industry requirement that ECG monitors were capable of withstanding the surplus electrical discharge associated with defibrillation. *See* Section IV.E., *supra* (discussing the EC-13 standard). This requirement is

25

acknowledged by the background sections of the Challenged Patents, which note that "[a]nother problem is related to the ***requirement that a medical grade monitor survive multiple defibrillation cycles*** of at least 360 joules." *See, e.g.*, Ex. 1001 at 1:53-55 (emphasis added). A POSA would understand that 360 Joules is the maximum amount of energy that would be delivered by a defibrillator. *See, e.g.*, Ex. 1036 at 55 ("The American National Standard . . . specifies a maximum selectable deliverable energy [for a defibrillator] in the range of 250 joules (J) to 360 J"). In addition to its use in cardiac monitoring, ECG is also widely used during surgeries that require general anesthesia for patients; these surgeries often use electrosurgical equipment or in some way introduce a risk of defibrillation. The broad field of use for ECG and prior art electrical resistance protection of the device and the patient is not limited to any particular patient population and is, therefore, widely appreciated across medical devices.

44.     There were multiple known ways of incorporating electric resistance as protection as of November 1, 2006. While the Challenged Patents note that "[c]onventionally, this requirement has been met by one or more power resistors situated in series with the wire leads of a fixed or portable physiological monitor," this was not the only approach available to a POSA at the time. *See, e.g.*, Ex. 1001 at 1:55–57. One approach was to use leads of "electrically conductive carbon loaded polymer" where the "distributed resistance of each polymer lead" was sufficient to

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 26

provide protection from any excess electrical current. Ex. 1018 at 1:36–45. A POSA would understand that the terms "lead" and "trace" are often used interchangeably because signal traces connect the components on a printed circuit board much like lead wires functioned in the early days of ECG technology. *See* Ex. 1035 at 642 ("Conductor: A single conductive path in conductive pattern. A PCB has at least one layer of conductors. *Synonyms:* path, trace.").

45.    This approach is further highlighted in Kroll, which notes that lead strips are comprised of "a flexible conductive ink compound having a conductive filler . . . [p]referably . . . of a preselected conductivity to provide a certain total lead strip resistance so that each strip 34 serves as a current limiter." Ex. 1013 at 5:4–11, Fig. 4. A POSA reading this disclosure would understand that the flexible conductive ink described in Kroll was printed on a flexible circuit board. *See, e.g.*, Ex. 1035 at 255 ("The basic function of the laminate is to provide mechanical support for electronic components and to interconnect them electrically . . . They can be simply described as products obtained by pressing layers of a filler material impregnated with resin under heat and pressure. The resulting thin, insulating material, which is the mixture of filler (reinforcement) and resin on which all conductors and components are mounted, is called *base material* [which] can be either rigid or flexible material."); *see also* Section IV.C, *supra*. Thus, the lead strips in Kroll are electrical traces. *See* Ex. 1035 at 659 (defining a "printed circuit" as one

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 27

in which the "interconnections" are "made by conductive strips (traces) that have been printed or etched onto an insulating board").

46.     Another approach was to use "a small, flat surface mount resistor soldered to input trace 34 on top of circuit board 28."  Ex. 1019 (WO 1987/01024 A1) ("Dunseath") (filed August 21, 1986) at 25:24–26:12.  This can be used to "provide adequate protection for some types of integrated circuit amplifiers such as CMOS devices which are sensitive to large input voltages rather than currents."  *Id.* at 5:31-6:2.

47.     Importantly, resistance in the traces on a body-worn physiological device has a twofold protective effect.  It helps protect the patient from shock from the device and it helps to protect the device from the effects of an outside shock.  In fact, any approach to limiting current using resistive material to protect the patient from shock would also protect the body-worn device from excess electrical current because the electrical resistance operates to limit the flow of current in *either* direction (flowing from the device toward the patient, or from the patient's skin toward the device).  *See, e.g.*, Ex. 1043 (Roger A. Freedman & Hugh D. Young, *University Physics* (15th ed. 2019) at 816–17 (noting that the resistivity of a conductor depends on the properties of the conductor material), 819–20 (noting that current always flows in the direction of decreasing electric potential or voltage).  Further, a resistor functions the same regardless of the direction of current flow

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 28

through it: for a given amount of current through a resistor or voltage drop across the resistor the resulting power dissipation, currents, and voltage drops are identical regardless of direction of current flow. *Id.* Therefore, any resistor that simply has the proper range of resistance would protect the body-worn device from excess electrical current (*e.g.*, Ex. 1001 at 7:46-48 ("in a range between about 1 kilo ohm to about 10 kilo ohms," or other ranges depending on the specific electronics used in an ECG device)).

48. Further, consistent with the industry goal of reducing the size of body-worn monitoring devices, a POSA would have prioritized approaches of limiting current that were small and compact. *See, e.g.*, *id.* at 1:57–59 ("The problem [with the conventional approach of using resistors in series] is that the physical volume of conventional power resistors is too large for use in a compact monitor application."). Rosenberg and Kroll have a similar result (*i.e.*, reducing the size of the devices) by incorporating the resistance into the traces or leads or the device, rather than using conventional resistors on the printed circuit board of the device. *See* Ex. 1018 at 1:36–45; Ex. 1013 at 5:4–11.

## V.    RELEVANT LEGAL STANDARDS

49. I have been asked to provide my opinions as to whether the Challenged Claims of the Challenged Patents would have been obvious to a POSA at the time of the filing date of the Challenged Patents.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 29

### A.    Scope of an *Inter Partes* Review

50.    I understand that the scope of issues which are to be considered in an

*inter partes* review are limited to those grounds disclosed in the Petitions on which

it requests the Board institute review.

### B.    Claim Construction

51.    I have been informed and understand that for purposes of this

proceeding, the claim terms subject to *inter partes* review are to be "construed using

the same claim construction standard that would be used to construe the claim in a

civil action under 35 U.S.C. § 282(b), including construing the claim in accordance

with the ordinary and customary meaning of such claim as understood by [a POSA]

and the prosecution history pertaining to the patent."  37 C.F.R. § 42.100(b).  For

purposes of these Petitions, the Challenged Claims are interpreted according to their

plain and ordinary meaning.

### C.    Obviousness

52.    It is my understanding that a claim is obvious under 35 U.S.C. § 103 if

the claimed subject matter as a whole would have been obvious to a POSA at the

time of the alleged invention.  I also understand that, in an obviousness analysis, the

POSA is presumed to have knowledge of all material prior art.

53.    In considering obviousness, I understand that one must determine the

scope and content of the prior art.  I understand that, in order to be considered as

30

prior art to the challenged patent, a prior art reference must be reasonably related to the claimed invention of the challenged patent.  A reference is reasonably related if it is in the same field as the claimed invention or is from another field to which a POSA would look to solve a known problem.  If a reference relates to the same problem as the claimed invention, that supports use of the reference as prior art in an obviousness analysis.

54.    I understand that a patent claim composed of several elements is not proven obvious simply because each of its elements was independently known in the prior art.  It is my understanding that, in evaluating obviousness, it is relevant whether there is a reason that would have prompted a POSA to combine the elements or concepts from the prior art in the same way as in the claimed invention.  There is no single way to define the line between true inventiveness on one hand (which is patentable) and the application of common sense and ordinary skill to solve a problem on the other hand (which is not patentable).  For example, market forces or other design incentives may be what produced a change, rather than true inventiveness.

55.    It is my understanding that several rationales may be applied for combining references or modifying a reference to show obviousness of claimed subject matter.  These rationales include: combining prior art elements according to known methods to yield predictable results; simple substitution of one known

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 31

element for another to obtain predictable results; a predictable use of prior art
elements according to their established functions; applying a known technique to a
known device (method or product) ready for improvement to yield predictable
results; choosing from a finite number of identified, predictable solutions, with a
reasonable expectation of success; and some teaching, suggestion, or motivation in
the prior art that would have led one of ordinary skill to modify a prior art reference
or to combine prior art teachings to arrive at the claimed invention. Additionally, I
understand that the claimed subject matter is obvious if it would have been obvious
to a POSA in view of his/her general knowledge, *i.e.*, in light of all knowledge
conveyed by the prior art as defined by statute and case law.

## VI.    PERSON OF ORDINARY SKILL IN THE ART ("POSA")

56.    It is my understanding that when interpreting the claims of the patents,
I must do so based on the perspective of one of ordinary skill in the art in the same
field as the challenged patent at the time of the invention. The earliest claimed
priority date for the Challenged Patents is November 1, 2006.

57.    It is my opinion that one of ordinary skill in the art in the field of body-
worn physiological monitors in 2006 would have had at least a Bachelor's degree in
electrical engineering, electrophysiology, biomedical engineering, or an equivalent
degree, and at least two to three years of experience designing wearable monitors
that detect physiological signals with mechanical and/or electrical elements.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 32

Alternatively, a POSA with respect to the technology described by the challenged patent could have had less education with more experience and vice versa.

## VII.  THE '007 PATENT

58.    The '007 patent is titled "Body Worn Physiological Sensor Device Having a Disposable Electrode Module."  It was filed November 1, 2006.  The stated field of art is "physiological monitor[s]" generally and more specifically "body worn physiological monitor[s]."  Ex. 1001 at 1:7–8.

### A.    Overview of the '007 Patent

59.    As discussed above in Section IV, by the November 2006 priority date, the field of body-worn physiological monitoring was well-established.

60.    The '007 patent describes a physiological monitor that is worn on the patient's body.  According to the '007 patent, the body-worn monitor could be attached to the patient's skin in the same way a BAND-AID® is applied.  *Id.* at 5:41–44.  Commercially available adhesive, such as a "1.6 mm adhesive foam from Scapa Medical of Bedfordshire, UK" could be used for this purpose, for example.  *Id.* at 5:41–46.

61.    The body-worn monitor described by the '007 patent consists of two primary components: a "communication-computation module," which is reusable, and a sensor module, which is disposable.  *Id.* at Abstract, 4:9–11.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 33

62.    Figure 1B below shows a side view of these two components of the body-worn heart monitor (100): the disposable module (110) in red and the reusable "communication computation module" (102) in blue.



*Id.* at Fig. 1B (annotated).

63.    The communication-computation module (102) is "mechanically attach[ed]" to the "top surface of the disposable electrode module" (110) via a retention clip (104), enabling it to receive signals from the disposable module. *Id.* at 2:32–35, 4:58–62.  The communication-computation module performs "real-time physiological analysis of the physiological signals" and transmits the result of the physiological analysis "via a radio transmission to a remote radio receiver." *Id.* at Abstract, 2:23–45.

64.    Each of the communication-computation module and the disposable electrode module include a number of elements, as shown by Figure 2 below.  The reusable communication-computation module (102) includes: a cover (201), a communications and computation printed circuit board assembly (202), and a base (203). *Id.* at 6:28–30.  The disposable electrode module (110) includes a "flat planar

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 34

insulating/adhesive member" (105) which has "a plurality of openings that are each sized to receive electrode gels" (103). *Id.* at 5:21–26. Commercially available electrode gels at the time, such as type LT00063 hydrogel supplied by Tyco Healthcare, are suitable for use as the disclosed electrode gels (103). *Id.* at 7:4–7. The insulating member (105) "provides a bottom side cover for the flexible printed circuit layer" (101) and helps to adhere the disposable electrode module to the patient's body. *Id.* at 5:26–28.

65.    The '007 patent also describes a variety of commercially available snap-on electrodes. *Id.* at 9:5-14. Specifically, "the ConMed Cleartrace line of ECG electrodes including the model 1700 Cleartrace electrode manufactured by the ConMed Corp. of Utica, N.Y. or similar type electrodes made by the 3M Corp. of St. Paul, Minn." *Id.*

66.    The disposable electrode module also includes batteries (204) which are used to power the communication-computation module (102). *Id.* at 5:23–24. The batteries (204) "can be mounted under respective battery flaps" (205) "arranged on opposite sides of the flexible printed circuit layer" (101). *Id.* at 5:57–59. Commercially available battery covers (107), such as the model 2990 from the Keystone Electronics Corp., were used to provide protection for the batteries (204). *Id.* at 5:63–65.

35



**FIG.2**

*Id.* at Fig. 2 (annotated).

67.    The flexible circuit board (101) of the disposable ECG module (110) includes a number of additional components.  The flexible circuit board (101) is formed on a substrate (406) of commercially available material, *e.g.*, MYLAR®, which is a trademarked type of commonly used polyester film.  *See, e.g.*, *id.* at 6:40–41.  The flexible circuit board (101) also includes a conductive surface (404) which is "[t]ypically" a "circular or square conductive surface."  *Id.* at 6:58–59.  The '007 patent refers to the combination of the conductive surface (404) and an electrode gel (103) as an electrode (109).  *Id.* at 6:46–57.  "Conductive surface 404 can also be viewed as the electrode portion of a half cell and electrode gel 103 can be considered to be the electrolyte portion of a half cell."  *Id.*  Additionally, the flexible circuit

36

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 36

board (101) includes "resistive traces" (412, 413) used to protect the reusable communication-computation module from "potentially damaging defibrillation energy" in the event that the patient requires defibrillation due to a cardiac event. *Id.* at 7:34–45.

68.   The "resistive traces" connect the components which measure physiological signals (*i.e.*, the electrode gels and the conductive surface) to the electrical connection of the communication-computation module.  *Id.* at 7:22–33. The "resistive traces" can be made from materials of "determinable electrical resistance" such as resistive metals, carbon, silver ink, powders, or paints.  *Id.* at 7:28–33.

### B.   Summary of the Claims of the '007 Patent

69.   Claim 1 of the '007 patent is set forth below with the elements labeled for reference:

| Elements Designation | Element |
|---|---|
| 1(pre) | A body worn patient monitoring device comprising: |
| 1(a) | a disposable module including a plurality of electrical connections, |
| 1(b) | said electrical connections adapted to be couplable to a skin surface to measure physiological signals, |
| 1(c) | at least one of said electrical connections comprising a half cell, |

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 37

| 1(d) | the disposable module including a disposable module connector; |
| 1(e) | a power source to power the body worn patient monitoring device; |
| 1(f) | a communication-computation module being removable and reusable, |
| 1(g) | having a communication-computation module connector to receive physiological signals from the disposable module via said disposable module connector, the communication-computation module including: |
| 1(h) | a microprocessor to actively monitor the patient and to perform a real-time physiological analysis of the physiological signals, said analysis determining an occurrence of a predetermined physiological event, and |
| 1(i) | a radio circuit to communicate, upon determination of the predetermined physiological event, a result of the physiological analysis on the occurrence of the predetermined physiological event, via a radio transmission to a remote radio receiver, |
| 1(j) | wherein the disposable module is mechanically and electrically coupled directly to the communication-computation module |
| 1(k) | and the body worn patient monitoring device including the disposable module and the communication-computation module is adapted to be directly non-permanently affixed to the skin surface of the patient; and |
| 1(l) | at least one series current-limiting resistor configured to protect the communication-computation module, |
| 1(m) | the at least one series current-limiting resistor being screened on a flexible substrate, |
| 1(n) | the at least one series current-limiting resistor being in the form of resistive traces. |

*Id.* at cl. 1.

38

70.    Claim 2 of the '007 patent depends from claim 1 and further requires "the plurality of electrical connections to the body comprise at least one of direct electrical connections to the body and indirect electrical connections to the body." *Id.* at cl. 2.

71.    Claim 3 of the '007 patent depends on claims 1 and 2 and further requires "wherein the indirect electrical connections to the body comprise capacitive connections to the body." *Id.* at cl. 3.

72.    Claim 4 of the '007 patent depends from claim 1 and further requires "the body worn patient monitoring device comprises an ECG monitor and at least two of the electrical connections are ECG electrodes." *Id.* at cl. 4.

73.    Claim 5 of the '007 patent depends from claim 4 and further requires "the ECG electrodes comprise a material screened onto the flexible substrate." *Id.* at cl. 5.

74.    Claim 6 of the '007 patent depends from claim 5 and further requires "the at least one series current-limiting resistor protects the communication-computation module during a patient defibrillation event." *Id.* at cl. 6.

75.    Claim 7 of the '007 patent depends from claim 4 and further requires "the mechanical interface from the at least one series current-limiting resistor to the EGG electrode includes a filleted edge." *Id.* at cl. 7.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 39

76.    Claim 8 of the '007 patent depends from claim 4 and further requires "the mechanical interface from the at least one series current-limiting resistor to the EGG electrode comprises overlapped layers." *Id.* at cl. 8.

77.    Claim 10 of the '007 patent depends from claim 1 and further requires "an insulating material overlaying the at least one series current-limiting resistor to prevent arcing." *Id.* at cl. 10.

78.    Claim 11 of the '007 patent depends from claims 1, 4, and 5 and further requires that "the EGG electrodes are formed substantially in the shape of an annulus." *Id.* at cl. 11.

79.    Claim 12 of the '007 patent depends from claims 1, 4, 5, and 11 and further requires that "the annulus comprises a conductive link." *Id.* at cl. 12.

80.    Claim 13 of the '007 patent depends from claim 5 and further requires "the substrate is shaped to allow placement on the patient to monitor at least one of a set of standard ECG vectors while simultaneously reducing motion and muscle artifact in the corresponding ECG vector signal." *Id.* at cl. 13.

81.    Claim 14 of the '007 patent depends from claim 1 and further requires "the power source is a renewable power source internal to the body worn device." *Id.* at cl. 14.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 40

82.    Claim 15 of the '007 patent depends from claim 1 and further requires "the power source comprises a rechargeable battery or a one time use battery." *Id.* at cl. 15.

83.    Claim 29 of the '007 patent depends from claim 1 and further requires "the body worn device includes circuit protection to allow the device to survive multiple defibrillation cycles of at least 360 joules." *Id.* at cl. 29.

84.    Claim 31 of the '007 patent depends from claim 29 and further requires "a plurality of components of the circuit protection are distributed between the disposable module and the communication-computation module." *Id.* at cl. 31.

85.    Claim 32 of the '007 patent depends from claim 1 and further requires "a high pass filter with a selectable corner frequency to filter the physiological signals." *Id.* at cl. 32.

86.    Claim 33 of the '007 patent depends from claims 1 and 32 and further requires "the corner frequency is selected by a switch selectable resistance." *Id.* at cl. 33.

87.    Claim 34 of the '007 patent depends from claims 1 and 32 and further requires "the corner frequency is selected by one or more switching capacitors switched a rate higher than the corner frequency of a low pass anti-aliasing filter." *Id.* at cl. 34.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 41

88.     Claim 35 of the '007 patent depends from claims 1 and 32 and further requires "the high pass filter is implemented in software running on the microprocessor." *Id.* at cl. 35.

89.     Claim 37 of the '007 patent depends from claim 1 and further requires "the communication-computation module includes circuit components configured to detect failure of contact of one or more of the electrical connections with the skin surface of the patient." *Id.* at cl. 37.

90.     Claim 38 of the '007 patent depends from claim 1 and further requires "the communication-computation module is protected from external high energy signals by electro-surgical isolation suppression circuits." *Id.* at cl. 38.

91.     Claim 39 of the '007 patent depends from claim 1 and further requires "an algorithm running on a microprocessor in the body worn device causes the body worn device to enter a low power mode that disables at least one circuit of the body worn device, from the end of a 'T wave' at the end of one heart beat to the beginning of a 'P wave' at the beginning of the next heart beat, to save power." *Id.* at cl. 39.

92.     Claim 43 of the '007 patent depends from claim 1 and further requires "the radio circuit communicates an unprocessed physiological signal." *Id.* at cl. 43.

93.     Claim 44 of the '007 patent depends from claim 1 and further requires "the radio circuit communicates a result of the physiological analysis at a predetermined time." *Id.* at cl. 44.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 42

94.    Claim 45 of the '007 patent is set forth below with the elements labeled

for reference:

| Elements Designation | Element |
|---|---|
| 45(pre) | A body worn patient monitoring device comprising: |
| 45(a) | a disposable module including a plurality of electrical connections, |
| 45(b) | the electrical connections adapted for electrical coupling to a skin surface to receive physiological signals, |
| 45(c) | the disposable module including a disposable module connector; |
| 45(d) | a power source to power the body worn patient monitoring device; |
| 45(e) | a communication-computation module, having a communication-computation module connector to receive the physiological signals from the disposable module via the disposable module connector, the communication-computation module including: |
| 45(f) | a microprocessor to actively monitor a patient and to perform a real-time physiological analysis of the physiological signals, the analysis determining an occurrence of a predetermined ECG event, |
| 45(g) | a radio circuit to communicate an unprocessed physiological signal or a result of the physiological analysis, at a predetermined time or on an occurrence of a predetermined event, via a radio transmission to a remote radio receiver, and |
| 45(h) | wherein the disposable module has a mechanical and electrical coupling to the communication-computation module, |

43

| 45(i) | forming the body worn patient monitoring device as a single unit that is adapted to be directly and non-permanently affixed to the skin surface of the patient; and |
|-------|-----|
| 45(j) | at least one series current-limiting resistor configured to protect the communication-computation module, |
| 45(k) | the at least one series current-limiting resistor being screened on a flexible substrate, |
| 45(l) | the at least one series current-limiting resistor being in the form of resistive traces. |

*Id.* at cl. 45.

## VIII. PROSECUTION HISTORY OF THE '007 PATENT

95.    I have reviewed the file history of U.S. Patent Application No. 11/591,619 (the "'619 application") from which the '007 patent issued.  I provide below a brief (non-exhaustive) summary of its relevant parts.

96.    The '619 application was filed on November 1, 2006.  Ex. 1002 (U.S. Patent No. 8,214,007 Prosecution History) at 983.

97.    Throughout prosecution of the '619 application, the Examiner made repeated rejections of the elected claims based on substantive prior art grounds, resulting in five rejections before the '007 patent issued.  *See id.* at 648-55 (December 12, 2008 Office Action); 585–90 (July 20, 2009 Office Action); 294–301 (March 16, 2010 Office Action); 227–34 (September 13, 2010 Office Action); 160–67 (March 2, 2011 Office Action).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 44

98.    In an attempt to overcome the first four of these rejections, the Patent Owner amended the pending claims to recite that the body worn patient monitoring device: performs an "analysis determining an occurrence of a predetermined physiological event," *id.* at 390 (Response to July 20, 2009 Final Office Action); 358 (Supplemental Response to July 20, 2009 Final Office Action), includes a communication-computation module that is "removable and reusable," *id.* at 270 (Amendment and Response to March 16, 2010 Non-Final Office Action), a radio circuit that communicates "upon determination of the predetermined physiological event," *id.*, and "at least one series current-limiting resistor configured to protect the communication-computation module, the at least one series current-limiting resistor being screened in the form of resistive traces on a flexible substrate," *id.* at 204 (Amendment and Response to September 13, 2010 Non-Final Office Action).  These amendments were not sufficient to overcome the prior art before the Examiner.  *Id.* at 227 (September 13, 2010 Office Action).

99.    In the fifth rejection, the Examiner rejected all pending claims under 35 U.S.C. § 103 over U.S. Patent Publication No. 2005/0245839 ("Stivoric") in view of U.S. Patent Publication No. 2007/0270678 ("Fadem"), U.S. Patent Publication No. 2002/0106709 ("Potts"), U.S. Patent Publication No. 2005/0206518 ("Welch") and U.S. Patent No. 6,623,312 ("Merry").  *Id.* at 160 (March 2, 2011 Final Office Action).

45

100.   In response, Patent Owner further amended claims 1 and 59 to recite "the at least one series current-limiting resistor being in the form of resistive traces." *Id.* at 134, 145 (Amendment and Response to March 2, 2011 Final Office Action). As support for this amendment, Patent Owner stated that the resistive traces in the claimed invention "replace the bulky power resistors needed by prior art monitors." *Id.* at 147–48 (Amendment and Response to March 2, 2011 Final Office Action) .

101.   To distinguish from Merry, Patent Owner argued that Merry's resistors are "actually mounted on the printed circuit board" whereas the amended claims recite resistors "in the form of resistive traces." *Id.* at 148.

102.   In addition, the Examiner had cited another prior art patent, U.S. Patent No. 6,539,613 ("Ulmer"), to show that it was "well known in the art to form resistors into a substrate via embedding and depositing said resistor into a substrate." *Id.* at 168 (March 2, 2011 Final Office Action).  Without identifying any reason for the distinction, Patent Owner argued that the "resistors disclosed in Ulmer are not in the form of resistive traces" as required by the amended claim language. *Id.* at 148 (Amendment and Response to March 2, 2011 Final Office Action).  The applicant's argument is not detailed and, in my opinion, does not clearly explain a distinction between the claim and the prior art.

103.   However, in view of the claim amendments, the claims were allowed on March 12, 2012. *Id.* at 24–28 (Notice of Allowability).  As the reason for

46

allowance, the Examiner stated only that "[t]he closest prior art . . . fails to disclose the claimed invention, neither in combination nor alone, since neither reference discloses a body worn patient monitoring device comprising a disposable module including at least one series current-limiting resistor being in the form of resistive traces." *Id.* at 26–27.

104. The '619 application issued as the '007 patent on July 3, 2012. Ex. 1001.

## IX.    THE '492 PATENT

### A.    Overview of the '492 Patent

105. The '492 patent is titled "Body Worn Physiological Sensor Device Having a Disposable Electrode Module." It was filed May 2, 2014. The stated field of art is "physiological monitor[s]" generally and more specifically "body worn physiological monitor[s]." Ex. 1003 at 1:27–28. The disclosure of the '492 patent is substantively identical to that of the earlier filed '007 patent.

### B.    Summary of the Claims of the '492 Patent

106. Claim 1 of the '492 patent is set forth below with the elements labeled for reference:

| Elements Designation | Element |
|---|---|
| 1(pre) | A body-worn patient monitoring device comprising: |

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 47

| 1(a) | a flexible printed circuit layer made from an insulating material and defining a substrate; |
|------|--------------------------------------------------------------------------------------------|
| 1(b) | at least one electrode disposed onto a surface of the substrate; |
| 1(c) | at least one connection pad; |
| 1(d) | at least one electrical trace extending between the at least one connection pad and a conductive surface of the [at] least one electrode, |
| 1(e) | the at least one electrical trace being made at least in part from a resistive material; and |
| 1(f) | an insulating layer covering the flexible printed circuit layer. |

*Id.* at cl. 1.

107.   Claim 2 of the '492 patent depends from claim 1 and further requires "the at least one electrical trace includes a filleted portion formed at the electrode." *Id.* at cl. 2.

108.   Claim 3 of the '492 patent depends from claim 2 and further requires "at least one battery mounted on the flexible circuit layer." *Id.* at cl. 3.

109.   Claim 4 of the '492 patent depends from claim 3 and further requires "a retention member to provide mechanical support for the at least one battery and to enable an electrical connection with the conductive surface of the at least one electrode." *Id.* at cl. 4.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 48

110.   Claim 5 of the '492 patent depends from claim 1 and further requires "an ECG monitor having a programmed microprocessor and a plurality of electrical connections to measure patient heartbeat signals." *Id.* at cl. 5.

111.   Claim 6 of the '492 patent depends from claim 1 and further requires "the at least one electrode includes an electrode gel and a conductive surface, thereby creating a half cell." *Id.* at cl. 6.

112.   Claim 7 of the '492 patent is set forth below with the elements labeled for reference:

| Elements Designation | Element |
|---|---|
| 7(pre) | A body-worn patient monitoring device comprising: |
| 7(a) | a disposable electrode portion; and |
| 7(b) | a reusable communication module, |
| 7(c) | the disposable electrode portion comprising a flexible printed circuit layer made from an insulating material and defining a substrate, |
| 7(d) | at least two electrodes being disposed onto a surface of the substrate |
| 7(e) | and electrical traces defined between the at least two electrodes and a connection pad, |
| 7(f) | wherein the reusable communication and computation module comprises a housing containing a processor and a wireless communication unit, |

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 49

| 7(g) | and in which the reusable communication module is releasably attached to the disposable electrode portion by at least one latching clip. |
|------|-----------------------------------------------------------------------------------------------------------------------------------------|

*Id.* at cl. 7.

113.    Claim 8 of the '492 patent depends from claim 7 and further requires "the electrodes are integrated into the flexible printed circuit layer of the disposable portion of the device." *Id.* at cl. 8.

114.    Claim 11 of the '492 patent depends from claim 7 and further requires "the electrical traces are screened onto the flexible printed circuit layer." *Id.* at cl. 11.

115.    Claim 12 of the '492 patent depends from claim 11 and further requires "an insulating layer applied onto the electrical traces." *Id.* at cl. 12.

116.    Claim 13 of the '492 patent depends from claims 7, 11, and 12 and further requires "the insulating layer is screen printed onto the electrical traces of the flexible printed circuit layer." *Id.* at cl. 13.

117.    Claim 14 of the '492 patent depends from claim 7 and further requires that "each electrode includes an electrode gel and a conductive surface defining a half cell." *Id.* at cl. 14.

## X. PROSECUTION HISTORY OF THE '492 PATENT

118.    I have reviewed the file history of U.S. Patent Application No. 14/268,666 (the "'666 application") from which the '492 patent issued.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 50

119.   The '666 application was filed on May 2, 2014 and ultimately claims priority to the '619 application.  Ex. 1004 (U.S. Patent No. 8,214,007 Prosecution History) at 57, 61.   Facing no substantive prior art rejections over any cited references, the Examiner issued a Notice of Allowance on October 14, 2014, stating that "[t]he closest prior art fails to disclose a high voltage circuit protection for a body worn monitor comprising the steps of determining a print pattern and thickness of a first and a second material, wherein each material has a resistivity to be printed on said substrate." *Id.* at 26 (Notice of Allowability).

120.   The '666 application issued as the '492 patent on February 24, 2015. Ex. 1003.

## XI.   THE '484 PATENT

### A.   Overview of the '484 Patent

121.   The '484 patent is titled "Body Worn Physiological Sensor Device Having a Disposable Electrode Module."  It was filed January 13, 2015.  The stated field of art is "physiological monitor[s]" generally, and more specifically, "body worn physiological monitor[s]."  Ex. 1005 at 1:31–31.  The disclosure of the '484 patent is substantively identical to that of the earlier filed '007 patent.

### B.   Summary of the Claims of the '484 Patent

122.   Claim 1 of the '484 patent is set forth below with the elements labeled for reference:

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 51

| Elements Designation | Element |
|---|---|
| 1(pre) | A body-worn physiological sensor comprising: |
| 1(a) | a computation-communication module including a housing retaining a processor; |
| 1(b) | a flexible circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals, |
| 1(c) | said computation-communication module being attached to the flexible circuit layer; |
| 1(d) | an adhesive covering at least a portion of the flexible circuit layer; and |
| 1(e) | a protective covering that protects the adhesive. |

*Id.* at cl. 1.

123.    Claim 2 of the '484 patent depends from claim 1 and further requires that "the flexible circuit layer has traces of determinable electrical resistance." *Id.* at cl. 2.

124.    Claim 3 of the '484 patent depends from claim 2 and further requires "the traces on the flexible circuit layer are configured to electrically couple the computation-communication module to the flexible circuit layer, thereby forming a disposable module connector." *Id.* at cl. 3.

125.    Claim 4 of the '484 patent depends from claim 1 and further requires "the traces on the flexible circuit layer are at least partially covered by a non-removable insulating covering." *Id.* at cl. 4.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 52

126.    Claim 5 of the '484 patent depends from claim 1 and further requires that "the flexible circuit layer further comprises a plurality of openings sized to receive electrode gels." *Id.* at cl. 5.

127.    Claim 6 of the '484 patent depends from claim 1 and further requires "a hard-wired communication cable." *Id.* at cl. 6.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 53

128.    Claim 7 of the '484 patent is set forth below with the elements labeled for reference:

| Elements Designation | Element |
|---|---|
| 7(pre) | A body-worn patient monitoring device comprising: |
| 7(a) | a disposable electrode portion comprising: a flexible printed circuit layer made from an insulating material and defining a substrate, |
| 7(b) | at least two electrodes being disposed onto a surface of the substrate, |
| 7(c) | electrical traces defined between the at least two electrodes, and |
| 7(d) | a connection pad; |
| 7(e) | a reusable communication module comprising: a housing containing a processor, and |
| 7(f) | a wireless communication unit, and |
| 7(g) | in which the reusable communication module is releasably attached to the disposable electrode portion by at least one latching clip; and |
| 7(h) | a hard-wired communication cable. |

*Id.* at cl. 7.

129.    Claim 8 of the '484 patent depends from claim 7 and further requires that "the electrodes are integrated into the flexible circuit layer of the disposable electrode portion." *Id.* at cl. 8.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 54

130.    Claim 11 of the '484 patent depends from claim 7 and further requires that "the electrical traces are screened onto the flexible printed circuit layer." *Id.* at cl. 11.  Claim 12 of the '484 patent depends from claim 11 and further requires "an insulating layer applied onto the electrical traces." *Id.* at cl. 12.

131.    Claim 15 of the '484 patent is set forth below with the elements labeled for reference:

| Elements Designation | Element |
|---|---|
| 15(pre) | A body-worn physiological sensor comprising: |
| 15(a) | a computation-communication module including a housing retaining a processor; |
| 15(b) | a flexible printed circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals, |
| 15(c) | the computation-communication module being attached to the flexible printed circuit layer; |
| 15(d) | an adhesive covering at least a portion of the flexible printed circuit layer; and |
| 15(e) | a protective covering for the flexible printed circuit layer. |

*Id.* at cl. 15.

132.    Claim 16 of the '484 patent depends from claim 15 and further requires that "the protective covering includes at least one opening for electrode gels." *Id.* at cl. 16.  Claim 17 of the '484 patent depends from claim 15 and further requires that

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 55

"the flexible printed circuit layer includes openings sized to receive electrode gels." *Id.* at 17.

133.  Claim 18 of the '484 patent depends from claim 15 and further requires that "the protective covering is non removable and made from an insulating material." *Id.* at cl. 18.

134.  Claim 19 of the '484 patent depends from claim 15 and further requires that "the computation communication module is releasably attached to the flexible printed circuit layer." *Id.* at cl. 19.

135.  Claim 20 of the '484 patent depends from claim 15 and further requires that "the protective covering covers the adhesive." *Id.* at cl. 20.

## XII.  PROSECUTION HISTORY OF THE '484 PATENT

136.  I have reviewed the file history of U.S. Patent Application No. 14/595,815 (the "'815 application") from which the '484 patent issued.

137.  The '815 application was filed on January 13, 2015, and ultimately claims priority to the '619 application.  Ex. 1006 (U.S. Patent No. 9,155,484 Prosecution History) at 68.

138.  The Examiner rejected claims 7–14 based on the judicially created doctrine of non-statutory double patenting given the claims of the previously issued '484 patent.  *Id.* at 65 (March 4, 2015 Non-Final Office Action).  Patent Owner filed

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 56

a Terminal Disclaimer to overcome this double patenting rejection. *Id.* at 44, 51 (Amendment and Response to March 4, 2015 Non-Final Office Action).

139.   In the same office action, the Examiner also rejected claims 1–6 and 15–20 as filed under pre-AIA 35 U.S.C. § 102(b) as anticipated by U.S. Patent Publication No. 2004/0030258 ("Williams"). *Id.* at 63 (March 4, 2015 Non-Final Office Action).  In response, the Patent Owner amended claims 1 and 15 to recite that the computation-communication module "include[es] a housing retaining a processor" and is "attached to the flexible circuit layer." *Id.* at 45 (Amendment and Response to March 4, 2015 Non-Final Office Action).  While making that change, the Patent Owner stated that "[s]upport for the foregoing amendment is found in the as filed application; see, at a minimum, Fig. 2, as well as paragraphs [0044], [0049]." *Id.* at 49.

140.   On June 10, 2015, the Examiner issued a notice of allowance, stating a reason for allowance that was identical to the reason offered for the '492 patent: "[t]he closest prior art (as cited by [the '666 application]) fails to disclose a high voltage circuit protection for a body worn monitor comprising the steps of determining a print pattern and thickness of a first and a second material, wherein each material has a resistivity to be printed on said substrate." *Id.* at 25 (Corrected Notice of Allowability).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 57

141.  The '815 application issued as the '484 patent on October 13, 2015. Ex. 1005.

## XIII. THE '422 PATENT

### A.  Overview of the '422 Patent

142.  The '422 patent is titled "Body Worn Physiological Sensor Device Having a Disposable Electrode Module." It was filed January 26, 2018. The stated field of art is "physiological monitor[s]" generally and more specifically "body worn physiological monitor[s]." Ex. 1007 at 1:44–46. The disclosure of the '422 patent is substantively identical to that of the earlier filed '007 patent.

### B.  Summary of the Claims of the '422 Patent

143.  Claim 1 of the '422 patent is set forth below with the elements labeled for reference:

| Elements Designation | Element |
|---|---|
| 1(pre) | A method for manufacturing a body-worn physiological sensor, the method comprising: |
| 1(a) | providing a disposable substrate made from an insulating material, said substrate comprising: |
| 1(b) | a flexible printed circuit board layer made from the insulating material; |
| 1(c) | at least two electrodes disposed on the disposable substrate; and |

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 58

| 1(d) | conductive traces defined between the at least two electrodes; |
|------|-----------------------------------------------------------------|
| 1(e) | providing a computation-communication module, said module comprising: |
| 1(f) | a housing; |
| 1(g) | a processor disposed in the housing; and |
| 1(h) | attaching the computation-communication module to the disposable substrate. |

*Id.* at cl. 1.

144.   Claim 2 of the '422 patent depends from claim 1 and further requires "providing conductive traces in the flexible circuit layer." *Id.* at cl. 2.

145.   Claim 3 of the '422 patent depends from claim 2 and further requires that "the conductive traces are configured on the flexible circuit layer to electrically couple with the attached computation-communication module." *Id.* at cl. 3.

146.   Claim 4 of the '422 patent depends from claim 1 and further requires "providing a plurality of openings in the flexible printed circuit board layer, the openings being sized for receiving electrode gels." *Id.* at cl. 4.

147.   Claim 5 of the '422 patent depends from claim 1 and further requires that "the computation-communication module is releasably attached to the disposable substrate." *Id.* at cl. 5.

148.   Claim 6 of the '422 patent depends from claim 1 and further requires "providing a radio circuit in the computation-communication module." *Id.* at cl. 6.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 59

149.   Claim 7 of the '422 patent depends from claim 3 and further requires "at least partially covering the conductive traces with an insulating covering." *Id.* at cl. 7.

150.   Claim 9 of the '422 patent depends from claim 1 and further requires "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate." *Id.* at cl. 9.

151.   Claim 10 of the '422 patent depends from claims 1 and 3 and further requires "screening the conductive traces onto the flexible printed circuit board layer." *Id.* at cl. 10.

152.   Claim 11 of the '422 patent depends from claim 9 and further requires that "each electrode includes an electrode gel and a conductive surface defining a half cell." *Id.* at cl. 11.

153.   Claim 12 of the '422 patent depends from claims 1, 9, and 11 and further requires that "the disposable substrate is crescent shaped and in which the body-worn physiological sensor is worn on the chest of a patient." *Id.* at cl. 12.

154.   Claim 14 of the '422 patent is set forth below with the elements labeled for reference:

| Elements Designation | Element |
|---|---|
| 14(pre) | A body-worn physiological sensor made by the process of: |

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 60

| 14(a) | providing a disposable substrate made from an insulating material, said substrate comprising: |
|-------|-----------------------------------------------------------------------------------------------|
| 14(b) | a flexible printed circuit board layer made from an insulating material; |
| 14(c) | at least two electrodes disposed on the disposable substrate; and |
| 14(d) | conductive traces defined between the at least two electrodes; |
| 14(e) | providing a computation-communication module, said module comprising: |
| 14(f) | a housing; |
| 14(g) | a processor disposed in the housing; and |
| 14(h) | attaching the computation-communication module to the disposable substrate. |

*Id.* at cl. 14.

155.   Claim 15 of the '422 patent depends from claim 14 and further requires "providing the conductive traces in the flexible printed circuit board layer." *Id.* at cl. 15.

156.   Claim 16 of the '422 patent depends from claim 15 and further requires "configuring the conductive traces in the flexible printed circuit board layer to electrically couple with the attached computation-communication module." *Id.* at cl. 16.

157.   Clam 17 of the '422 patent depends from claim 14 and further requires that "the computation-communication module is releasably attached to the disposable substrate." *Id.* at cl. 17.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 61

158.   Claim 18 of the '422 patent depends from claim 14 and further requires "providing the computation-communication module with a radio circuit." *Id.* at cl. 18.

159.   Claim 19 of the '422 patent depends from claim 16 and further requires "at least partially covering the conductive traces with an insulating covering." *Id.* at cl. 19.

160.   Claim 20 of the '422 patent depends from claim 20 and further requires "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate." *Id.* at cl. 20.

## XIV.  PROSECUTION HISTORY OF THE '422 PATENT

161.   I have reviewed the file history of U.S. Patent Application No. 15/880,712 (the "'712 application") from which the '422 patent issued.

162.   The '712 application was filed on January 26, 2018 and ultimately claims priority to the '619 application.  Ex. 1008 (U.S. Patent No. 10,159,422 Prosecution History) at 177.

163.   In an office action dated June 29, 2018, the Examiner allowed claims 1–13 and rejected claim 14–20 based on the judicially created doctrine of non-statutory double patenting given the claims of previously issued U.S. Patent No. 9,433,366.  *Id.* at 137–38 (June 29, 2018 Non-Final Office Action).  Patent Owner

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 62

filed a Terminal Disclaimer to overcome the double-patenting rejection of claims 14–20. *Id.* at 123, 125 (Response to June 29, 2018 Non-Final Office Action).

164.   On August 24, 2018, the Examiner issued a Notice of Allowance, stating as the reason for allowability was that the closest prior art "fails to disclose, suggest and/or teach the claimed invention since the reference is silent in regards to a monitoring device having a disposable electrode module comprising a flexible circuit layer an insulating member having an opening on opposing sides of the module, each opening sized to receive an electrode gel, in combination with the other claimed elements" *Id.* at 17 (Notice of Allowability).

165.   The '712 application issued as the '422 patent on December 25, 2018. Ex. 1007.

## XV.   SUMMARY OF PRIOR ART

### A.   Jensen

166.   U.S. Patent Publication No. 2003/0149349 to Jensen ("Jensen") (Ex. 1011) (filed December 18, 2002) is a U.S. patent application that published on August 7, 2003, and which claims priority to a December 18, 2001, U.S. provisional patent application.  I understand that Jensen is prior art to the Challenged Patents pursuant to 35 U.S.C. § 102(a), (b) and (e).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 63

167.   Like the Challenged Patents, Jensen teaches a body-worn physiological monitor that collects and wirelessly transmits physiological data, such as ECG or heart rate signals.  *Id.* at Abstract, [0014], [0029], [0032]–[0033].

168.   The body-worn physiological monitor described in Jensen as a "smart patch" includes a "disposable sensor assembly" (73) and a "re-usable (non-disposable) portion" as shown by Figure 5 below.  *Id.* at [0042]–[0043].



*Id.* at Fig. 5 (annotated) (disposable sensor assembly shown in red and the reusable portion shown in blue).

169.   The disposable sensor assembly (73) includes: disposable sensor pad electrodes (1 and 2) which can be coated with a conductive adhesive gel, cover tape

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 64

(39) used to protect the coated surface of the sensor pads, and connective material (42). *Id.* at [0042].

170.    The reusable portion includes a flexible circuit assembly (36), a bottom and top casing (37 and 34, respectively), and two aesthetic covers (35). *Id.* at [0040], [0043].

171.    The flexible circuit assembly (36) of the reusable portion contains copper wiring traces that connect the entire circuit (41) to the sensor contacts (71 and 72), as well as to a rechargeable power resource such as a Lithium coin cell (9). *Id.* at [0040]. The Lithium coin cell (9) is attached to the flexible circuit assembly (36) with two small nickel- or gold-plated steel clips (74 and 75). *Id.* at [0043]. Jensen also teaches that the "flexible circuit assembly" (36) includes resistors (24 and 25) and "programmable logic" for "perform[ing] measurement and processing of sensed data." *Id.* at [0014], [0032], [0040], Fig. 2.

172.    Jensen also describes a variety of electrical components, such as processors, resistors, and transmitters. For example, Jensen describes that "[t]he resultant signal, at the output of driver 18, may either be input directly to transmitter 7, or may be input into microcontroller 10. Microcontroller 10 runs a conventional program that may perform further analysis and can also encode a data stream output to the transmitter 7." *Id.* at [0032]. Microcontroller 10 can be used to process data using one or more signal processing algorithms. One signal processing algorithm

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 65

titled "Beat Reporting" is when a "[m]icrocontroller simply sends transmission that tells of the occurrence of a beat." *Id.* at [0037]. "No data protocol [is] necessary," meaning that this is "[s]imply a transmission to say there was a beat." *Id.* Another signal processing algorithm is titled "Logged Event Reporting" in which the "[m]icrocontroller sends a packet periodically containing a log of all data points since last data transmission." *Id.* Using this algorithm the device can "[s]tore and forward handling yields system efficiencies." *Id.*

173. Jensen also describes that "transmitter 7 may transmit in a variety of modulation and/or keying methods via antenna 8, especially when used in conjunction with microcontroller 10." *Id.* at [0033]. The transmitter may be an "RF transmitter." *Id.*

174. In addition, Jensen teaches that the body-worn monitor may include a piezoelectric respiration sensor (81) with leads (86) that provide the electrical signal output. *Id.* at [0047].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 66



figure 9

*Id.* at Fig. 9. The sensor (81) is "constructed of insert type rivets or similar fasteners 85 that hold an elastic coupler 83 in tension with a Penwall Corp. Kynar TM piezoelectric strip 84." *Id.* at [0047]. These components of the piezoelectric respiration sensor (81) may be fastened with a suitable adhesive, such as, *e.g.*, epoxy or cyanoacrylate, at glue joints (82). *Id.*

**B.    Kroll**

175.   U.S. Patent No. 4,763,660 to Kroll et al. is a United States patent that issued on August 16, 1988. Kroll was filed on March 13, 1987 as a continuation of an application filed December 10, 1985. I understand that Kroll is prior art to the Challenged Patents pursuant to 35 U.S.C. § 102(a), (b), and (e).

176.   Kroll discloses a body-worn disposable and flexible electrode assembly like those found in the Challenged Patents, which it described as an "electrode belt" that is used to transfer "electrical signals between predetermined patient body

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 67

locations and the medical therapeutic and diagnostic apparatus." Ex. 1013 at Abstract. The body-worn electrodes described by Kroll may be positioned in a way which would allow for the collection of ECG signals. *Id.* at 10:58–65 (claiming a device in which "contact areas conform with standard pre-cordial positions for 'twelve-lead' electrocardiographic devices"), 14:44–47 (claiming the selection of location of the device so that its positioning "coincide[s] with standard precordial locations for 'twelve-lead' electrocardiographic applications").

177. The body-worn monitor disclosed by Kroll is described as a "flexible and disposable electrode belt" (20), which is shown below in Figure 4:



*Id.* at Fig. 4. The main body (21) of Kroll's electrode belt has a proximal end (30) and a terminal end (19). *Id.* at 4:48–51. A notch (13) disposed on the top lateral

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 68

edges of the device (20) or an aperture (14) are used to properly align the electrode belt on the patient's body. *Id.* at 4:52–58.

178.   Both the main body (21) and the adjustable side members (22) of the electrode belt described by Kroll include electrodes (35 and 33, respectively). *Id.* at 4:51–52, 4:67–68.  Both the main body electrodes (35) and side member electrodes (33) "transmit and receive electric signals" from the lead strip (34). *Id.* at 5:1–4. Kroll also describes the following:

> The lead strips 34 and electrode portions, discussed below, are of a flexible conductive ink compound having a conductive filler having Silver, Aluminum, or compounds thereof, or of a similarly suitable material.  Preferably, the ink deposit is of a preselected conductivity to provide a certain total lead strip resistance so that each strip 34 serves as a current limiter to protect a patient from shock due to malfunction of the device 20 or of a complementary medical device.

*Id.* at 5:4-13; *see also id.* at Fig. 4.

179.   As shown in Figure 5 below, Kroll teaches that lead strip 34 (current-limiting resistor) extends from and overlaps electrode 35 that includes a matrix 42 composed of a conductive ink compound. *Id.* at 5:17–19, 23–27.  "The conductive ink compound used in the matrix lines 42 is ***generally*** the same as that utilized in the lead strips 34," meaning that Kroll discloses that matrix lines 42 and lead strips both can be or cannot be made of the same material. *Id.* at 5:31-33 (emphasis added).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 69



FIG. 5

*Id.* at Fig. 5. Kroll also teaches that lead strip 34 (current-limiting resistor) is lined

with insulation and base support layer 44 and inner patient insulation layer 40. *Id.*

at 5:44-50, Fig. 6. Both layers 44 and 40 are made of a polyester laminate which is

the same material in the trademarked product Mylar. *Id.*

### C. Matsumura

180. Japanese Patent Publication No. 2004-121360 to Matsumura

("Matsumura") (Ex. 1012) (filed September 30, 2002) is a Japanese patent

application that published on April 22, 2004. I understand that Matsumura is prior

art to the Challenged Patents pursuant to 35 U.S.C. § 102(a) and (b).

181. Like the Challenged Patents, Matsumura discloses a body-worn

physiological monitor, which it describes as a "bioelectric potential detector having

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 70

a waterproof structure." *Id.* at [0001]. The bioelectric potential detector described by Matsumura "can be used as an electrocardiogram detector that is worn on the subject's chest to detect electrocardiogram signals." *Id.* at [0024].

182. Matsumura's bioelectric potential detector (11) includes two components: "a disposable bioelectrode pad for detecting bioelectric potentials, and a reusable signal processor for processing the bioelectric potential signals detected by the bioelectrode pad." *Id.* at [0007]. Figure 1 below indicates the disposable bioelectrode pad (7) (shown in red) and the reusable signal processor (10) (shown in blue):



iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 71

*Id.* at Fig. 1 (annotated). The bioelectrode pad (7) and the signal processor (10) "can be easily attached and detached before and after use." *Id.* at [0016].

183. The disposable bioelectrode pad (7) includes: a first sheet (1), a conductive material (2), a hook (3), a second sheet (4), a conductive gel (5) a third sheet (6), double-sided adhesive tape (9), and a release sheet (8) which is removed before the bioelectric potential detector (11) is attached to the patient's skin. *Id.*

184. The first sheet (1) is made out of an insulating material and has an adhesive applied to the back of the sheet. *Id.* at [0017]. At the center of the first sheet (1) are two holes (1a) through which the protruding portions of the hooks (3) are inserted. *Id.* The second sheet (4) is also made out of an insulating material and has an adhesive applied to the back of the sheet. *Id.* at [0018]. The second sheet (4) has two openings (4a) "into which the conductive gel 5 is inserted." *Id.* An optional third sheet (6) may be used to cover the adhesive surface of the second sheet (4).

185. Two pieces of conductive material (2) and two hooks (3) are arranged between the first sheet (1) and the second sheet (4) "to transmit the bioelectric potentials detected by the conductive gel 5." *Id.* at [0019]. Both ends of the rod-shaped pieces of conductive material (2) have two holes (2a). *Id.* The protruding portions of the hook (3) are inserted into the holes (2a) at one end; the holes at the other end are "for contacting the conductive gel 5." *Id.* This configuration allows

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 72

the bioelectric potentials detected by the conductive gel (5) to be transmitted through the two pieces of conductive material (2) and the hooks (3). *Id.*

186.   The disposable bioelectrode pad (7) also includes an insulating double-sided adhesive tape (9) which is used to fix the bioelectric pad (7) and the signal processor (1). *Id.* at [0024].  The tape (9) includes a hole (9a) through which the hook (3) can be inserted and a release sheet (9b) that is removed so that the reusable signal processor (10) can be attached to the disposable electrode pad (7). *Id.*

**D.    Ozguz**

187.   U.S. Patent Publication No. 2005/0096513 to Ozguz ("Ozguz") (Ex. 1014) (filed December 6, 2004) is a U.S. patent application that published on May 5, 2005.  I understand that Ozguz is prior art to the Challenged Patents pursuant to 35 U.S.C. § 102(a) and (b).

188.   Like the Challenged Patents, Ozguz teaches a "sensor system comprising a thin flexible ambulatory/self contained bio-sensor module in a form similar to an adhesive bandage for sensing physiologically modulated signals from the body." *Id.* at [0003].  The sensor system disclosed by Ozguz may be used to detect and digitize a number of physiological characteristics, including an EKG. *Id.* at [0044].

189.   The sensor system (30) described by Ozguz includes a sensor module (10) shown in red below.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 73



**FIG. 2A**

*Id.* at Fig. 2A (annotated). The described system (3) "can incorporate continuous transmission by RF signals 40 to a device 45 having a receiver, data storage, and/or means for analyzing the data." *Id.* at [0039]. To do so, an antenna (50) must be "metalized onto [the] flexible substrate 55 for transmitting and/or receiving RF signals." *Id.*

190. As shown by Figure 3B below, the sensor module (10) of the system (30) includes a flexible substrate (55) and thin flexible silicon substrates (60, 65, 70) which are bonded to the flexible substrate (55) by an anisotropic epoxy layer (75). *Id.* A "flexible, thin battery 105 overlays the silicon substrates 60, 65, 70 and their respective ICs 71, 72, 73." *Id.* at [0048].

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 74**



**FIG. 3B**

*Id.* at Fig. 3B.

191.  Each of the thin flexible silicon substrates (60, 65, 70) include integrated circuits (71, 72, 73).  *Id.* at [0039].  "While the silicon substrates 60, 65, 70 are shown separately with separate respective ICs 71, 72, 73, it is to be expressly understood that the ICs 71, 72, 73, can be integrated as one IC on a single silicon substrate."  *Id.* at [0042].  The integrated circuits (71, 72, 73) include "a microprocessor 175, a ROM 180 for storing a program to be implemented, a RAM

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 75

185 for storing of data, and a transmitter or transceiver 190 for transmitting data by RF signals to a remote receiver." *Id.* at [0058].

192.   The metallization (77) is "applied to the flexible substrate 55" and extends both "between the anisotropic layer 75 and the flexible substrate 55" and "to the electrodes 80 disposed on an underside 85 of the flexible substrate 55 for contact with the skin 15 of the subject body 20." *Id.* at [0039].   The metallization (77) connects the integrated circuits (71, 72, 73) to each other, to the electrodes (80), and to the antenna (50). *Id.* This design "permit[s] flexure about both a longitudinal and a transverse axis, and twisting of the sensor module about a longitudinal axis 120" as shown in annotated Figure 3E below. *Id.* at [0050].



*Id.* at Fig. 3E (annotated).

### E.    DeLuca

193.   U.S. Patent No. 6,238,338 to DeLuca is a U.S. patent that issued on May 29, 2001 and was filed on July 19, 1999.  Ex. 1015.  I understand that DeLuca is prior art to the Challenged Patents pursuant to 35 U.S.C. § 102 (a), (b) and/or (e).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 76

194.   Like the Challenged Patents, DeLuca discloses "a biosignal monitoring system including a plurality of sensors for disposition in predetermined positions on the body of a test subject." *Id.* at 1:33–35.  The detector taught by DeLuca includes "contact surfaces shaped and arranged to detect a particular biosignal generated in the body, a sensor transceiver, a sensor antenna, a voltage supply, and a microprocessor." *Id*. at 1:36–40.

195.   DeLuca discloses that incoming biosignals are subjected to a "signal conditioning stage 56 which further amplifies and band-pass filters the signal so that it is of suitable voltage range and bandwidth for conversion [by] the A/D converter 57." *Id.* at 4:66–5:2.  The signal conditioning process (56) takes place on the "microprocessor chip 35 having an Application Specific Integrated Circuit (ASIC) portion 36," *id.* at 3:36–37, as noted by Figure 5 below.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 77



**FIG. 5**

*Id.* at Fig. 5.

196.    DeLuca teaches that the "signal conditioning stage" "includes a hi-pass filter 56*a*, an amplifier 56*b*, a lo-pass filter 56*c*, and an anti-aliasing filter 56*d*." *Id.* at 5:1–4. "Each of the filter modules 56*a*, 56*c* and 56*d* is a switched-capacitor filter circuit whose cut-off frequency is determined by the clock frequency at which the filter is switched." *Id.* at 5:4–7.

78



**FIG. 7**

*Id.* at Fig. 7.  In the signal conditioning stage 56, "[t]he signal output from the input stage 55 is first coupled to the hi-pass filter 56*a* which removes any DC component present in the signal before amplification."  *Id.* at 5:9–12.

197.   DeLuca specifically teaches that "[t]he gain and band-pass filters cut-off frequency parameters can be externally programmed via the communications link 16 established with the Control Stage section 59 of the ASIC 36.  Because of the wide selection range of these [gain and band-pass filters' cut -off frequency] parameters, the gain and bandwidth of any biosignal can be optimized for a given application."  *Id*. at 5:43–48.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 79

F.    Harland

198.    The article "Electric potential probes—new directions in the remote sensing of the human body" ("Harland") was published by C.J. Harland, T.D. Clark, and R.J. Prance in the Journal *Measurement Science and Technology* in 2002.  Ex. 1016 (C.J. Harland et al., *Electric potential probes—new directions in the remote sensing of the human body,* 13 J. Meas. Sci. Technol. 163, (2002)).  I understand that Harland is prior art to the Challenged Patents pursuant to 35 U.S.C. § 102 (b).

199.    Harland discusses the development and use of "a new class of sensor— the ultra-high impedance electric potential sensor"—which can be used as an "alternative" to "traditional contact electrodes (for ECGs and EEGs)."  *Id.* at 164. Harland's ultra-high impedance electric potential sensors "allow the remote (non-contact) detection of electric potentials generated by currents flowing in the body." *Id*.

200.    A "[b]lock diagram of a typical electric potential sensor showing the probe electrode and the feedback, guard and input bias circuits of the electrometer amplifier" is shown below in Figure 1.  *Id.* at 165.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 80



*Id.* at Fig. 1.

201.  The electric potential sensor shown above in Figure 1 is "in the remote off-body mode of operation with no electrical contact to the body." *Id.* at 165. According to Harland, in this "remote, off-body detection" operation, these electrodes "form capacitive coupling to the body under measurement." *Id*. at 164; *see also id.* at Fig. 1.

### G.  Thompson

202.  U.S. Patent No. 6,223,080 to Thompson ("Thompson") (Ex. 1017) (issued April 24, 2001) was filed on October 28, 1998.  I understand that Thompson is prior art to the Challenged Patents pursuant to 35 U.S.C. § 102 (a), (b) and/or (e).

203.  Thompson discloses "solutions to one or more problems existing in the prior art respecting circuitry design having lower power consumption, particularly

81

with respect to implantable medical devices," such as pacemakers. *Id.* at 3:33–37. Specifically, Thompson's invention relates to "the use of multiple digital signal processors in [ ] circuit designs to reduce power consumption." *Id*. at 1:20–23.

204.    Thompson discloses a processor that operates in a "high speed processing mode" "[o]nly during [the] QRS complex" of the cardiac cycle. *Id.* at 18:3–5. "During the remainder of the cardiac cycle the [waveform] processor" disclosed by Thompson "may be 'idling along' at a much lower clock frequency." *Id.* at 18:5–7. Thompson notes that the idling of the processor during some interval of the heartbeat allows the supply voltage level to be reduced, meaning "the objective of reduced power consumption is realized." *Id*. at 18:13–14.

## XVI.  THE CHALLENGED CLAIMS OF THE '007 PATENT ARE UNPATENTABLE OVER JENSEN AND THE PRIOR ART

205.    In my opinion, claims 1, 2, 4–8, 10–15, 29, 31, 37, 38, and 43–45 of the '007 patent are obvious under pre-AIA § 103 over Jensen, Kroll, and General Knowledge of a Person of Ordinary Skill in the Art.

206.    In my opinion, claims 32–35 of the '007 patent are obvious under pre-AIA § 103 over Jensen, Kroll, DeLuca, and General Knowledge of a Person of Ordinary Skill in the Art.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 82

207. In my opinion, claims 2 and 3 of the '007 patent are obvious under pre-AIA § 103 over Jensen, Kroll, Harland, and General Knowledge of a Person of Ordinary Skill in the Art.

208. In my opinion, claim 39 of the '007 patent is obvious under pre-AIA § 103 over Jensen, Kroll, Thompson, and General Knowledge of a Person of Ordinary Skill in the Art.

### A. Jensen Ground 1: Obvious Over Jensen, Kroll, and General Knowledge of a Person of Ordinary Skill in the Art

#### 1. *A POSA would have been motivated to combine Jensen and Kroll*

209. A POSA would have found it obvious to combine the devices and methods of Jensen with Kroll's teaching of "resistive traces" or "resistive leads."

210. Jensen and Kroll disclose flexible, body-worn devices used to collect and monitor a patient's physiological data, including ECG data. Ex. 1011 at Abstract, [0013]–[0014], [0029]–[0030]; Ex. 1013 at Abstract, 1:11–15, 1:37–45, 1:59–61, 2:41–47.

211. A POSA developing a flexible, body-worn device for monitoring ECG data at this time would have understood the benefits of limiting the current the device could transmit. *See* Section IV.E–F, *supra*. As discussed above, resistive materials which limit the current transmitted would function to limit current in either direction (*i.e.*, either towards or away from the patient's body) and thus would protect both

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 83

the patient and the device, depending on the source of the excess electrical current. *See* Section IV.F, *supra*.

212.   Kroll describes and teaches a solution to the known risk of electrical overload.  Specifically, Kroll teaches incorporating electrical lead strips of a known resistivity to limit the current transmitted between the worn device and the patient, thereby preventing excess current from being transmitted between the device and the patient.  Ex. 1013 at 5:1–13.  Although Kroll discusses this solution in the context of protecting a patient from electrical "shock" caused by the worn device or a "complementary medical device," a POSA would have understood that it would be advantageous to limit the current transmitted in *either* direction (either toward the body to protect the patient or away from the body to protect the device).  *See* Sections IV.E–F, *supra*.  Moreover, a POSA would have understood that using a resistive material to limit the current transmitted in one direction (*i.e.*, toward the body, protecting the patient) would also limit the current transmitted in the other direction (*i.e.*, toward the device, protecting the device) depending on the source of the excess current.  *Id.*  Thus, Kroll's resistive lead strips would protect both the patient and the sensitive electronics inside the device from shock, such as that caused by a defibrillator.

213.   Accordingly, a POSA would have understood that the resistive lead strips or traces of Kroll would both (1) protect patients from shock and (2) protect

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 84

the sensitive electronics inside the device from shock caused by a defibrillator. *See, e.g.*, Ex. 1018 at 1:19–27; *see also* Sections IV.C, IV.E, *supra*.

214.    These same considerations taught in Kroll apply to Jensen, which also discloses a wearable monitor; that is, a POSA driven by a desire to protect patients from potential shock and to ensure the long-term viability of Jensen's reusable module against potential defibrillation would have been motivated to incorporate Kroll's teaching of resistive "lead strips" into Jensen's device.

215.    In addition, a POSA developing a flexible, body-worn device at this time would have sought to reduce the size of the device to increase the commercial and clinical viability of the device. *See* Section IV.B., *supra*.  Reducing the size of the wearable devices serves two purposes: reduce the costs of monitors and improve their wearability. *See* Ex. 1044 (Bruce R. Bowman & Edward Schuck, "*Medical Instruments and Devices Used in the Home*," CRC Press LLC (2000)) at 87.2 ("Convenience for the user is also extremely important in encouraging use of a device.  Applications that require devices to be portable must certainly be light enough to be carried.").

216.    Jensen specifically expressed a desire for its device to be thin.  Ex. 1011 at [0030] ("It is intended . . . that the present invention act as a totally self-contained sensor that is thin, being less than 6 or 7 mm in thickness, low in mass and may be applied to the skin much like a bandage, with self-adhesive pads and sensor materials

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 85

on the skin-contact side of the invention."). Modifying Jensen to include Kroll's resistive lead strips formed with ink deposits ink (rather than the larger, conventional resistors on Jensen's circuit assembly) would further Jensen's stated goal of reducing the size of the device.

217. Further, a POSA would have had a reasonable expectation of success in implementing Kroll's resistive leads on Jensen's device without undue experimentation. A POSA would have expected combining Kroll's teaching of resistive traces/leads with Jensen's device (to produce the intended current-limiting effect) to involve only a minimal modification of Jensen's design. Specifically, only a minimal modification to the method and materials used to form electrical traces. It would have been conventional that Jensen would consider printed electronic inks for the amalgam, the insulators, the solder, the solder masking, or for the circuit markings typically found on printed circuits. *See, e.g.*, Ex. 1035 at 3 (noting screen printing had been used to "print[] silver paste conductors and graphite resistors" onto substrates since the end of World War II). Materials such as silver and carbon are typically printed because of cost and/or difficulty in patterning using methods like photolithography. *See id.* at 287 ("The [screen printing] technique is particularly adopted for low cost print and etch plated printed board"). Further, the flexible circuit assembly of Jensen's device would easily be adjusted for the disclosed resistance of Kroll's traces to ensure the traces produce the intended current-limiting

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 86

effect.  Kroll states that the stated resistance of approximately 1000 ohms "allows for signals transmission throughout the lead strip 34 and also ***provid[es] the above-mentioned current limiter qualities*** as is preferred for this invention."  Ex. 1013 at 5:13–17 (emphasis added).  This modification would not only produce a functional device, but it would also further Jensen's stated goals.  *See* Ex. 1035 at 2 (noting one advantage of using a printed circuit board is that "[t]he size of component assembly is reduced with a corresponding decrease in weight").  Nothing in the art suggests otherwise.   Additionally, this change could be easily implemented using the conventionally known and widely used technique of screen-printing.  *See* Section IV.C., *supra*.

### 2.     Independent Claim 1

218.   In my opinion, claim 1 of the '007 patent is rendered obvious by Jensen in combination with Kroll.

### i.     Preamble 1[pre]

219.   The preamble of claim 1 recites "[a] body worn patient monitoring device comprising."

220.   In my opinion, to the extent that the preamble is limiting, Jensen discloses the preamble of claim 1 of the '007 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 87

221.  Jensen discloses a "self-contained, self-attached" device (referred to as a "'smart bandage' or 'smart patch'") capable of measuring physiological signals including ECG or EKG.  Ex. 1011 at [0012]–[0013]; *see also id.* at Fig. 5.

> It is the function of the present invention to either a) electrically detect the occurrence of R events in the QRS complex of the EKG signal, and/or b) continuously sample the EKG signal, perform signal processing and calculation upon the data contained within those signals, and provide a transmitted data signal for reception by any variety of different receivers.  According to this invention, these components are incorporated into a self-contained assembly that adhesively mounts to the torso of a person or mammal.

*Id.* at [0029].

222.  Demonstrating the compatibility of their teachings, Kroll also discloses "a body-worn patient monitoring device" capable of measuring physiological signals, such as ECG or EKG signals:

> This invention relates to a device and method for receiving and transmitting electrical signals to and from a patient.  Particularly, this invention relates to a disposable, flexible and layered electrode belt, also referred to as a "belt", for placement and use on the body of a patient and also for use with medical diagnostic and therapeutic devices.

Ex. 1013 at 1:9–15.  Thus, in my opinion, both Jensen and Kroll disclose a body worn patient monitoring device.

### ii.    Limitation [1a]

223.  Limitation [1a] of the '007 patent recites "a disposable module including a plurality of electrical connections."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 88

224.   In my opinion, Jensen discloses limitation [1a] of the '007 patent.

225.   The device disclosed by Jensen includes a disposable module, referred to as the "disposable sensor assembly 73," which includes "disposable sensor pads," labeled 1 and 2, respectively.  Ex. 1011 at [0041]–[0042], Fig. 5.  Jensen teaches that the "disposable sensor pads," are coated with "a conductive adhesive on the circuit side [*i.e.*, the side contacting flexible circuit assembly 36] and a conductive adhesive-gel that is made using a silver amalgam as found in off-the-shelf EKG sensor pads."  *Id.* at [0041].  A silver amalgam, as being taught by Jensen, is a mixture of silver and some other material and, in the case of electrodes used in wearable devices and flexible circuits, is conventionally a screen printed layer of an ink or paste made of silver particles along with a binder material such as acrylic or vinyl that holds the silver particles together and to the substrate on which the amalgam is printed on.  Ex. 1035 at 495 ("Composition of Solder Pastes").

226.   As shown in Figure 5 below, Jensen teaches that disposable sensor pads 1 and 2 make electrical contact with sensor contacts 71, 72 of flexible circuit assembly 36 through the "conductive adhesive on the circuit side."  Ex. 1011 at [0040]–[0041], Fig. 5.

227.   Also as shown in Figure 5 below, Jensen teaches that disposable sensor pads 1 and 2 make electrical contact with a patient's skin through the "conductive adhesive-gel" found on the skin side.  *Id.* at [0041], Fig. 5.

89

228. Because of the conductive material coating both sides of the disposable sensor pads, the electricity from the sensor contacts 71, 72 creates an electrical connection with the disposable sensor pads 1, 2 and the patient's skin. *Id.*; *see also id.* at [0042].



*Id.* at Fig. 5 (annotated).

229. Specifically, electrical connections are formed at each of the disposable sensor pads 1 and 2 so that the skin resistance between the two sensor pads can be measured. This is disclosed by Jensen, which recites:

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 90

> [H]eart-rate signals are collected from left and right sensor pads, 1 & 2.
> The signal from pad 2 is connected to the circuit ground, while the
> signal from pad 1 provides EKG signal input to a high gain amplifier 4
> and acts as a triggering load for power-on detect circuit 3 *once skin*
> *resistance* is measured *across the sensors*.  Logic driver 29, when
> enabled, supplies a switched supply voltage to disable and enable the
> operation of amplifier circuit section 4, filter circuit section 5 and data-
> slicer circuit section 6.  With the use of switched supply voltage driver
> 29, power from the system power source 9 is conserved *whenever the*
> *sensors 1, 2 are **not** in contact with the user's skin.*

*Id.* at [0031] (emphases added); *see also id.* at [0036], Figs. 1–3.  Thus, Jensen

describes a "disposable module," *i.e.*, the disposable sensor assembly 73 that

includes "a plurality of electrical connections" in the form of disposable sensor pads

1, 2.

230.   A POSA would understand that Jensen's disposable sensor pads form

a plurality of electrical connections between the skin surface, at which the electrical

potential is detected, and the flexible circuit assembly.  Specifically, a POSA would

recognize that a disposable electrode pad fundamentally comprises a plurality of

electrical connections insofar as it must form an electrical connection with the

patient's skin and must form an electrical connection with another component of a

monitoring device to allow signal recording/processing.   This technique—

determining the electrical activity of the heart by measuring skin resistance between

electrodes and transferring those signals—is a fundamental principle of ECG.  *See*

Section IV.A., *supra*.  A POSA would recognize Jensen's body worn monitor—

which includes disposable sensor pads that form electrical connections with the

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 91**

patient's skin and with the flexible circuit assembly—as comprising "a plurality of electrical connections." *See* Section IV.A., *supra*. Thus, in my opinion, Jensen discloses "a disposable module including a plurality of electrical connections."

### iii.    Limitation [1b]

231.   Limitation [1b] of the '007 patent recites "said electrical connections adapted to be couplable to a skin surface to measure physiological signals."

232.   In my opinion, Jensen discloses limitation [1b] of the '007 patent.

233.   As discussed above with respect to Element [1a], Jensen's device includes a plurality of electrical connections made using the disposable sensor pad electrodes 1, 2 which are used to measure the skin resistance between the two sensor pads. Ex. 1011 at [0041]–[0042], Fig. 5; *see also* Section XVI.A.2.ii, *supra*. As discussed above, electrodes must be on the patient's skin to obtain an ECG reading and, therefore, the "electrical connections" of Jensen's device (*i.e.*, sensor pads 1 and 2) are "adapted to be couplable to a skin surface to measure physiological signals." *See* Sections IV.A, XVI.A.2.ii, *supra*.

234.   Jensen explicitly teaches that the disclosed device is "applied to the skin much like a bandage, with self-adhesive pads and sensor materials on the skin-contact side of the invention." Ex. 1011 at [0030]. Jensen also notes that a "[heart rate monitoring] chest band only functions when **good electrical contact is established to the skin**." *Id.* at [0007] (emphasis added); *see also id.* at [0005]. A

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 92

POSA reading this disclosure would understand that the Jensen's sensor pads, which are both adhesive and conductive, are couplable to a skin surface to measure physiological signals (such as EKG signals) because they are both electrically and physically coupled to the patient's skin.

235.   Thus, in my opinion, Jensen discloses "said electrical connections adapted to be couplable to a skin surface to measure physiological signals."

### iv.    Limitation [1c]

236.   Limitation [1c] of the '007 patent recites "at least one of said electrical connections comprising a half cell."

237.   In my opinion, Jensen discloses limitation [1c] of the '007 patent.  The '007 patent explains that "[i]n conventional terms of art," the term "half cell" refers to "the combination of electrode and electrolyte," and that the term "electrode" is used interchangeably with "half cell" within the disclosure.  Ex. 1001 at 6:48–55. The '007 patent further states that an electrode—*i.e.*, a half cell—typically comprises (1) a conductive surface and (2) an electrode gel.  *Id.* at 6:55–57.

238.   Jensen discloses a "half cell."  As discussed above, Jensen's sensor pads 1, 2 form electrical connections with the patient's skin.  Further, the sensor pads 1, 2 are coated with a "***conductive*** adhesive-***gel*** that is made using a [commercially available] silver amalgam as found in off-the-shelf EKG sensor pads, such as those sold by 3M Corporation."  Ex. 1011 at [0041] (emphases added); *see, e.g.*, Ex. 1035

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 93

at 495 ("Composition of Solder Pastes"). Thus, in my opinion, Jensen discloses a "half cell" as defined by the '007 patent.

239. Moreover, a POSA would understand from Jensen's disclosure that the sensor pads form electrical connections comprising half cells at the point of contact with the patient's skin. As explained above in Section IV.D., disposable electrodes comprising (1) a conductive surface and (2) an electrode gel were well known in the art. *See* Section IV.D., *supra.* Indeed, these well-known and widely commercially available electrodes often included "conductive adhesive-gel that is made using a silver amalgam." *Cf.* Ex. 1011 at [0041]. A POSA would therefore understand that Jensen's sensor pads form a plurality of electrical connections comprising half cells at the point of contact with the patient's skin, as it is described in the '007 patent. *Cf.* Ex. 1001 at 6:48–57.

240. Thus, in my opinion, Jensen discloses that "at least one of said electrical connections comprising a half cell."

### v.    Limitation [1d]

241. Limitation [1d] of the '007 patent recites "the disposable module including a disposable module connector."

242. In my opinion, Jensen discloses limitation [1d] of the '007 patent. Jensen discloses a "disposable module connector" in the form of the conductive

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 94

adhesive which coats the circuit side of the disposable sensor pads.  Ex. 1011 at [0041].



*Id.* at Fig. 5 (annotated).

243.  Jensen's device is comprised of both a "disposable sensor assembly" and a reusable "flexible circuit assembly."  *Id.* at [0040]–[0043].  To assemble the complete device, the reusable flexible circuit assembly "has a location on the bottom side for the disposable sensor assembly 73 to be applied."  *Id.* at [0043].  That application is achieved through the "conductive adhesive" on the top surface of sensor pads 1 and 2.

95

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 95**

244.    A POSA would understand that the conductive adhesive coating on the circuit side of the sensor pads adheres to the location on the bottom side of the reusable flexible circuit assembly in order to connect the disposable sensor pads to the reusable flexible circuit assembly.  Thus, in my opinion, Jensen discloses "the disposable module including a disposable module connector."

### vi.    Limitation [1e]

245.   Limitation [1e] of the '007 patent recites "a power source to power the body worn patient monitoring device."

246.    In my opinion, Jensen discloses limitation [1e] of the '007 patent. Jensen discloses "a power source to power the body worn patient monitoring device" in the form of a battery.  Jensen discloses that the disclosed device "contains all necessary electronic circuitry, including [ ] a battery or other power source."  *Id.* at [0014].  Specifically, Jensen discloses that the device's power source could be any of a "lithium coin cell 9" or a "rechargeable type of power source, or a solar cell." *Id.* at [0040].  A POSA would understand any of these contemplated options to be a "power source" to power Jensen's device.  Thus, in my opinion, Jensen discloses "a power source to power the body worn patient monitoring device."

### vii.    Limitation [1f]

247.   Limitation [1f] of the '007 patent recites "a communication-computation module being removable and reusable."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 96

248.   In my opinion, Jensen discloses limitation [1f] of the '007 patent.
Jensen's device includes a "transmitter" (used for communication) and a
"microcontroller" (used for computation).   Ex. 1011 at [0032]–[0033].   Jensen
teaches that its microcontroller "runs a conventional program that may perform
further analysis and can also encode a data stream output to the transmitter." *Id.*
at [0032].   Jensen also teaches that its transmitter may transmit "encoded data
message[s]" "via antenna." *Id.* at [0033].

249.   Jensen teaches that the "electronic circuit" of Jensen includes the
transmitter and the microcontroller. *Id.* at [0036], Fig. 3.   The electronic circuit is
part of a "flexible circuit assembly" containing copper wiring to connect the entire
circuit to the sensor contacts and the power source. *Id.* at [0040].   Flexible circuit
assembly, which includes the electronic circuit containing the communication-
computation module, is part of the "re-usable (non-disposable)" portion of Jensen's
device. *Id.* at [0043].   Jensen's re-usable portion is separable and removable from
the "disposable sensor assembly" portion. *Id.* at [0042]–[0044].

250.   The use of transmitters and microcontrollers to process and transmit
collected data would have been well known and understood by a POSA at the time
of the purported invention. *See, e.g.,* Ex. 1035 at 88 (noting that "[m]icrocontrollers
have been available for a long time"); Ex. 1045 (Bert-Uwe Köhler et al., *The
Principles of Software QRS Detection*, IEEE Eng. Med. & Bio. (2002)) at 42 (noting

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 97

that "[t]he rapid development of powerful microcomputers promoted the widespread application of software QRS detection algorithms in cardiological devices"). A POSA reading Jensen's disclosures would readily understand that Jensen's description of a "microcontroller" and a "transmitter" as part of a removable and reusable component of the device would constitute a "communication-computation module being removable and reusable" as claimed by the '007 patent. Thus, in my opinion, Jensen discloses "a communication-computation module being removable and reusable." Therefore, in my opinion, Jensen discloses the claimed "communication-computation module being removable and reusable."

### viii.    Limitation [1g]

251. Limitation [1g] of the '007 patent recites "having a communication-computation module connector to receive physiological signals from the disposable module via said disposable module connector, the communication-computation module including."

252. In my opinion, Jensen discloses limitation [1g] of the '007 patent. As explained above in section XVI.A.2.v, Jensen discloses a "disposable module connector," *viz.* the top surface of disposable sensor pad electrodes 1 and 2 which are coated in a conductive adhesive.

253. Jensen teaches that "[t]he sensor contacts 71, 72 make . . . contact with sensor pads 1 and 2" in order to receive EKG data. Ex. 1011 at [0041]. Jensen also

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 98

teaches that those "disposable sensor pad electrodes . . . are coated with a conductive adhesive on the circuit side and a conductive adhesive gel." *Id.* Thus, the sensor contacts 71, 72 are the "computation-communication module connectors" that receive physiological signals from the disposable module via the disposable module connector. The physiological signals are sent to the transmitter and microcontroller. *Id.* at [0032].

254.   In my opinion as a POSA at the time of the invention of the '007 patent, Jensen's sensor contacts 71 and 72 constitute a "communication-computation module connector to receive physiological signals [*i.e.*, electrical impulses] from the disposable module connector [*i.e.*, top surface of sensor pads 1 and 2]." Thus, in my opinion, Jensen discloses "having a communication-computation module connector to receive physiological signals from the disposable module via said disposable module connector."

### ix.    Limitation [1h]

255.   Limitation [1h] of the '007 patent recites "a microprocessor to actively monitor the patient and to perform a real-time physiological analysis of the physiological signals, said analysis determining an occurrence of a predetermined physiological event."

256.   In my opinion, Jensen discloses limitation [1h] of the '007 patent. As explained above, Jensen's device includes a microcontroller which performs a

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 99

"physiological analysis" on collected data: "The device of the present invention contains all necessary electronic circuitry, including sensors, a battery or other power source, and a microcontroller and/or other programmable logic circuitry that perform measurement and processing of sensed data, where said processed data are subsequently stored internally and/or transmitted to other equipment by wireless means." *Id.* at [0014]. When data is input into the microcontroller, Jensen's device "runs a conventional program that may perform further analysis and can also encode a data stream output to the transmitter." *Id.* at [0032]. A POSA would understand from the disclosure of the '007 patent that microcontroller could be the same as a microprocessor or could include a microprocessor. *See, e.g.*, Ex. 1001 at 11:48–50 ("A microprocessor, such as microprocessor 512, is defined herein as synonymous and interchangeable with the terms 'microcomputer', 'microcontroller', and 'microprocessor'").

257.    Jensen further teaches the processing of a signal and performing a "mean pulse value" calculation to alert a patient "when a predetermined mean pulse value is achieved." Ex. 1011 at [0011]. The physiological analysis may comprise, for example, detecting "the occurrence of R events in the QRS complex of the EKG signal." *Id.* at [0029]. Jensen states that "*[o]nce* [the] microcontroller [ ] identifies the data as having a heart beat pulse, (a clearly identifiable waveform with a distinctive shape and a high signal amplitude compared to typical ambient noise

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 100

from the sensor), **then** the program analyzes the data in a number of optional ways." *Id.* at [0037] (emphases added). Thus, detection of the R-event is the "predetermined physiological event" that precedes a real-time physiological analysis.

258. For example, Jensen's device has the capability to perform "**conventional** programmatic signal analysis to create and transmit different data records" including, for example, processing the signal and performing a "[r]olling [a]verage [h]eart-rate" calculation to determine "the rolling average of the heart-rate for the last n beats." *Id.* at [0037], Table 1 (emphasis added). Jensen also discloses notifying patients when the microcontroller determines that a predetermined set value for a certain calculation has been achieved. *See id.* at [0011].

259. Thus, in my opinion, Jensen discloses "a microprocessor to actively monitor the patient and to perform a real-time physiological analysis of the physiological signals, said analysis determining an occurrence of a predetermined physiological event," as claimed by the '007 patent.

### x.   *Limitation [1i]*

260. Limitation [1i] of the '007 patent recites "a radio circuit to communicate, upon determination of the predetermined physiological event, a result of the physiological analysis on the occurrence of the predetermined physiological event, via a radio transmission to a remote radio receiver."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 101

261.    In my opinion, Jensen discloses limitation [1i] of the '007 patent.  As discussed above, Jensen's device includes a microcontroller which performs a "physiological analysis" on collected data based on determination of a predetermined physiological event.

262.    Jensen further teaches that the microcontroller can "encode a data stream output to the transmitter" which transmits "in a variety of modulation and/or keying methods via antenna."  Ex. 1011 at [0032]–[0033].  Jensen further recites "[d]ata modulation methods in an RF transmitter that are easily implemented."  *Id.* at [0033].  A POSA would understand that "RF" means radio frequency, such that the transmitter disclosed by Jensen uses a radio circuit to make the transmission.  *Id.* at [0033]–[0034]; Ex. 1023 at [0050].

263.    Jensen further discloses the transmission of a result of the physiological analysis (which occurs upon the predetermined physiological event, as explained above) via radio circuit.  *Id.* at [0031]–[0035].  Jensen teaches that the transmitter may "transmit in a variety of modulation and/or keying methods via antenna 8, especially when used in conjunction with microcontroller 10, whereby the microcontroller 10 may enable and disable the transmitter carrier, and also send encoded data streams."  *Id.* at [0033].  Specifically, for example, the transmitter data may be "composed into an encoded data message and output by the program that

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 102

that microcontroller 10 executes." *Id.* In other words, the transmitter may transmit the result of the microcontroller's analysis using a radio frequency. *Id.*

264. Thus, in my opinion, Jensen discloses a "radio circuit to communicate, upon determination of the predetermined physiological event, a result of the physiological analysis on the occurrence of the predetermined physiological event, via a radio transmission to a remote radio receiver."

### xi.    Limitation [1j]

265. Limitation [1j] of the '007 patent recites "wherein the disposable module is mechanically and electrically coupled directly to the communication-computation module."

266. In my opinion, Jensen discloses limitation [1j] of the '007 patent. As explained above, Jensen teaches a "disposable module connector" in the form of the conductive adhesive which coats the circuit (*i.e.*, top) side of the disposable sensor pads. Ex. 1011 at [0041]; *see also id.* at Fig. 5 (annotated). As further explained above, Jensen teaches a "communication-computation module connector" in the form of sensor contacts 71 and 72, which receive the physiological signals from the disposable module connector. *Id.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 103



*Id.* at Fig. 5 (annotated).

267.    Jensen's device is comprised of both a "disposable sensor assembly" and a reusable "flexible circuit assembly."  *Id.* at [0040]–[0043].  To assemble the complete device, the reusable flexible circuit assembly "has a location on the bottom side for the disposable sensor assembly 73 to be applied."  *Id.* at [0043].

268.    It is my opinion that a POSA would understand that the conductive adhesive coating on the circuit side of the sensor pads adheres to the location on the bottom side of the reusable flexible circuit.  Additionally, a POSA would understand that the function of the conductive adhesive interface with the sensor pads would be

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 104

to form a physical (*i.e.*, mechanical) coupling and an electrical (*i.e.*, conductive) coupling between the disposable sensor assembly and the reusable flexible circuit assembly.

269.   Thus, in my opinion, Jensen discloses "wherein the disposable module is mechanically and electrically coupled directly to the communication-computation module."

### xii.    Limitation [1k]

270.   Limitation [1k] of the '007 patent recites "and the body worn patient monitoring device including the disposable module and the communication-computation module is adapted to be directly non-permanently affixed to the skin surface of the patient."

271.   In my opinion, Jensen discloses limitation [1k] of the '007 patent.  As discussed above, Jensen's reusable flexible circuit assembly and disposable sensor assembly are mechanically and electrically coupled.  *Supra* Section XVI.A.2.xii.

272.   Jensen's disposable module is similarly mechanically and electrically coupled to the patient's skin surface by "a conductive adhesive-gel that is made using a silver amalgam as found in off-the-shelf EKG sensor pads."  Ex. 1011 at [0041]. Jensen teaches that, by operation of this conductive adhesive gel, the disposable sensor assembly of the disclosed device is intended to be "applied to the skin much like a bandage, with self-adhesive pads and sensor materials on the skin-contact side

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 105

of the invention." *Id.* at [0030]; *see also id.* at [0031]. In my opinion, a POSA reading Jensen would understand that Jensen discloses "the body worn patient monitoring device including the disposable module and the communication-computation module is adapted to be directly non-permanently affixed to the skin surface of the patient."

273. Jensen further teaches that this element is standard in the art: "Existing art related to the field of this invention require[s] that . . . in the case of standard, clinical EKG hardware, individual sensors be bonded to the skin with adhesive." *Id.* at [0005]. Thus, in my opinion, Jensen discloses that "the body worn patient monitoring device including the disposable module and the communication-computation module is adapted to be directly non-permanently affixed to the skin surface of the patient."

### xiii.    Limitation [1l]

274. Limitation 1[*l*] of the '007 patent recites "at least one series current-limiting resistor configured to protect the communication-computation module."

275. In my opinion, the combination of Jensen and Kroll, in view of the knowledge of a POSA, renders obvious limitation [1*l*] of the '007 patent. Jensen discloses a communication-computation module and that the flexible circuit assembly of the communication-computation module includes "copper wiring [ ] to

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 106

connect the entire circuit." Ex. 1011 at [0031]–[0033], [0040], [0043]; *supra,* Sections XVI.A.2.vii–ix.

276. Kroll discloses at least one series current-limiting resistor. Kroll's device includes circuits comprising "lead strips" which "transmit and receive electric signals to and from the terminal end [ ] of the belt." Ex. 1013 at 5:1–4. Kroll teaches that these "lead strips" are composed of a preselected "flexible conductive ink compound having a conductive filler having Silver, Aluminum, or compounds thereof, or of a similarly suitable material" where the ink compound is of "a preselected conductivity to provide a certain total lead strip resistance." *Id.* at 5:4–10. Kroll further teaches that the composition of the "lead strips" allows them to serve as "a current limiter to protect a patient from shock due to malfunction of the device [ ] or of a complementary medical device." *Id.* at 5:8–13, 5:31–33.

277. As explained above, it would have been obvious to a POSA to combine Kroll's teaching of resistive traces with the device disclosed by Jensen because Kroll's resistive traces would help to safeguard Jensen's communication-computation module from excess electricity generated in the event of defibrillation. *See* Section XVI.A.1, *supra.* Further, it is my opinion that a POSA would have had a reasonable expectation of success in accomplishing this combination because it would have comprised only a minor design change, requiring only a reconfiguration of the device's amplifier to account for the trace resistance. *Id.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 107

278.    Furthermore, a POSA seeking to make or use Jensen's device would understand that Kroll's teaching of screen-printed resistive ink to protect the patient would improve the longevity and reduce the size of a body-worn monitoring device. These teachings comport with Jensen's stated desire to create a low form-factor, body worn patient monitoring device.  *See* Section XVI.A.1, *supra*.  A POSA would immediately understand that Kroll's conductive "lead strips" would function to limit current in both directions and not just toward the patient, thereby protecting both the device and its wearer.  *See* Section IV.F., *supra*.  Moreover, given the demonstrated industry-wide desire to reduce the size of monitoring devices, Kroll's current-limiting solution, which adds little to no extra size, would be preferred by a POSA when designing a body-worn monitoring device.

279.    Thus, it is my opinion that the limitation "at least one series current-limiting resistor configured to protect the communication-computation module" would have been obvious to a POSA in view of the combination of Jensen and Kroll.

### xiv.    Limitation [1m]

280.    Limitation [1m] of the '007 patent recites "the at least one series current-limiting resistor being screened on a flexible substrate."

281.    In my opinion, the combination of Jensen and Kroll, in view of the knowledge of a POSA, renders obvious limitation [1m] of the '007 patent.  Jensen discloses a communication-computation module that incorporates a "flexible circuit

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 108

assembly." Ex. 1011 at [0040]. The disclosed "flexible circuit assembly" includes "copper wiring traces to connect the entire circuit 41 to the sensor contacts 71, 72 and, for example, Lithium coin cell 9." *Id.* at [0040]. Thus, Jensen teaches the claimed "flexible substrate," on which traces connect the circuit components.

282. Kroll teaches the use of "lead strips" which "transmit and receive electric signals to and from the terminal end [ ] of the belt." Ex. 1013 at 5:1–4. Kroll teaches that these "lead strips" are composed of a "flexible conductive ink compound having a conductive filler" where the ink compound is of preselected conductivity. *Id.* at 5:4–6, 5:8–9. Kroll teaches that the "conductive filler" of the ink compound contains "Silver, Aluminum, or compounds thereof, or [is composed] of a similarly suitable material." *Id.* at 5:4–8. The "lead strips" are printed on an "insulation and base support layer" which is "preferably comprised of a thin . . . polyester laminate and serves as [ ] a base for the silk screened conductive ink used in the matrix lines 42 and lead strips 34." *Id.* at 5:37–42.

283. Kroll further teaches that the resistive "lead strips" serve as "a current limiter to protect a patient from shock due to malfunction of the device [ ] or of a complementary medical device." *Id.* at 5:8–13, 5:31–33. A "complementary medical device" includes, for example, a defibrillator, which would be used on the patient if necessary due to a cardiac event. Patients undergoing body worn

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 109

physiological monitoring are often at an increased risk of experiencing an acute cardiac episode necessitating defibrillation.

284.   In my opinion, it is obvious from Kroll's disclosure that the "lead strips" are created by screening the ink compound onto the device.  Screen printing was a preferred method of manufacturing a circuit board at the time.  *See, e.g.*, *id.* at 5:23–27, 5:31–33, 5:37–42.  Screen printing is preferred because it allows a greater degree of control in printing and thus is cost-effective, which is important when expensive materials such as silver are being used.  *See* Ex. 1035 at 296 ("Printing Process.  The circuit patterns are screen printed on the substrate by two ways: (1) Manual screen printing process, and (2) Automatic or semi-automatic screen printing process."); *see also* Ex. 1013 at 5:23–42 ("Each electrode 35 has a conductive grid 56 which is comprised of a matrix of approximately 0.050 inch wide lines 42 of conductive ink compound applied to an insulation and base support layer 44 **preferably by means of a silk screen process.**") (emphasis added); *see also* Ex. 1013 at 5:4–8.

285.   Furthermore, a POSA seeking to make or use Jensen's device would understand that Kroll's teaching of screen-printed resistive ink to protect the patient would improve the longevity and reduce the size of a body-worn monitoring device. These teachings comport with Jensen's stated desire to create a low form-factor, body worn patient monitoring device.  *See* Section XVI.A.1, *supra.*  A POSA would

110

immediately understand that Kroll's conductive "lead strips" would function to limit current in *both* directions and not just toward the patient, thereby protecting both the device and its wearer. *See* Section IV.F., *supra*. Moreover, given the demonstrated industry-wide desire to reduce the size of monitoring devices, Kroll's current-limiting solution, which adds little to no extra size, would be preferred by a POSA when designing a body-worn monitoring device.

286. In my opinion, a POSA would have had a reasonable expectation of success in combining Kroll's teaching of resistive traces with Jensen's device because screening the "lead strips" taught by Kroll onto the "flexible circuit assembly" taught by Jensen would be a simple matter of replacing one known component, *i.e.*, the copper traces of Jensen's device, with another, *i.e.*, the conductive ink, which would be routine and predictable for a POSA. *See* Section XVI.A.1, *supra*.

287. Thus, it is my opinion that the limitation "the at least one series current-limiting resistor being screened on a flexible substrate" would have been obvious to a POSA in view of the combination of Jensen and Kroll.

### *xv.    Limitation [1n]*

288. Limitation [1n] of the '007 patent recites "the at least one series current-limiting resistor being in the form of resistive traces."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 111

289.    In my opinion, the combination of Jensen and Kroll, in view of the knowledge of a POSA, renders obvious limitation [1n] of the '007 patent.    As discussed above with respect to limitation [1m], Kroll teaches the existence of "lead strips" made of "flexible conductive ink compound having a conductive filler having Silver, Aluminum, or compounds thereof, or of a similarly suitable material" in which the "ink deposit is of a preselected conductivity to provide a certain total lead strip resistance" in order for each lead strip to serve as a "current limiter."  Ex. 1013 at 5:4–13.

290.    A POSA would understand Kroll's disclosure of "lead strips" as referring to a "trace" as recited by the '007 patent.  A POSA would understand that the terms "lead strip" and "trace" are often used interchangeably because signal traces connect the components on a printed circuit board much like lead wires functioned in the early days of ECG technology.  *See* Ex. 1035 at 642 ("Conductor: A single conductive path in conductive pattern.  A PCB has at least one layer of conductors.  *Synonyms:* path, trace."); *id.* at 665 ("defining "trace" as "[a] single conductive path in a conductive pattern").  Further, a POSA would have understood the term "*resistive* trace" to simply refer to a lead strip, trace, wire, etc. which has a specific resistance, as taught by Kroll.  *See, e.g.*, *Id.* at 665 (defining "trace"); Ex. 1013 at 5:4–21.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 112

291.    As explained above, a POSA seeking to make or use the apparatus taught by Jensen would have looked to the teachings of Kroll to protect the device and its user, and to achieve a slimmer profile.  *See* Sections XVI.A.1, XVI.A.2.xiii-xiv, *supra*.  In my opinion, a POSA would have had a reasonable expectation of success in combining Kroll's teaching of resistive traces with Jensen's device.  *Id.*

292.    Thus, it is my opinion that the limitation "at least one series current-limiting resistor being in the form of resistive traces," would have been obvious to a POSA in view of the combination of Jensen and Kroll.

### 3.    *Dependent Claim 2*

293.    Claim 2 of the '007 patent depends directly from claim 1 and additionally requires that "the plurality of electrical connections to the body comprise at least one of direct electrical connections to the body and indirect electrical connections to the body."

294.    In my opinion, claim 2 of the '007 patent is rendered obvious by Jensen and Kroll for all the reasons discussed above with respect to claim 1 as well as because Jensen teaches the additional limitation of claim 2.  *See* Section XVI.A.2, *supra*.

295.    A POSA would understand the term "direct electrical connection" to mean that the conductors make physical contact with the skin, for example through a wet electrode or a dry electrode (and the moisture that naturally exists on the skin).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 113

*See, e.g.*, Ex. 1018 at 1:19–27; *cf.* Ex. 1019 at 26:13–24 (describing the ground contact as being "a direct connection" to the patient's skin); *see also* Sections IV.C, IV.E., *supra*. Sensor pads 1 and 2 of Jensen are in contact with the patient's skin. Ex. 1011 at [0030]–[0031]. Thus, Jensen's sensor pads form a direct electrical connection with the patient's body.

296. For these reasons, it is my opinion that a POSA would understand that Jensen discloses "the plurality of electrical connections to the body compris[ing] at least one of direct electrical connections to the body and indirect electrical connections to the body" and, therefore, that the combination of Jensen and Kroll renders obvious claim 2 of the '007 patent.

### 4.    *Dependent Claim 4*

297. Claim 4 of the '007 patent depends from claim 1 and further requires that "the body worn patient monitoring device comprises an ECG monitor and at least two of the electrical connections are ECG electrodes."

298. In my opinion, claim 4 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Jensen teaches the additional limitation of claim 4. *See* Section XVI.A.2, *supra.*

299. A POSA would understand that the terms "ECG" and "EKG" are synonymous and often used interchangeably. *See, e.g.*, Ex. 1046 (Brian Burkhardt,

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 114

*The Future of Electrocardiograph Telemetry Systems*, Int'l Telemetering Conference Proceedings (2004)).

300.    Jensen extensively discusses the usefulness of its disclosed device for EKG monitoring.  *See, e.g.*, Ex. 1011 at [0029], [0031].  As one specific example, Jensen teaches a "self-attached device that integrates other sensors together with heart-rate/EKG electronic sensors."  *Id.* at [0012].  Jensen also teaches that "at least two of the electrical connections are ECG electrodes."  Jensen's device includes "sensor pad electrodes 1 and 2 [which] are coated with a conductive adhesive . . . as found in off-the-shelf EKG sensor pads."  *Id.* at [0041].  In other words, a POSA would understand that Jensen's sensor pad electrodes 1 and 2 are two connections which are ECG electrodes, as required by the additional limitation of claim 4.

301.    For these reasons, it is my opinion that a POSA would understand that Jensen discloses "the body worn patient monitoring device compris[ing] an ECG monitor and at least two of the electrical connections are ECG electrodes" and, therefore, that the combination of Jensen and Kroll renders obvious claim 4 of the '007 patent.

### 5.    *Dependent Claim 5*

302.    Claim 5 of the '007 patent depends from claims 1 and 4 and additionally requires that "the ECG electrodes comprise a material screened onto the flexible substrate."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 115

303.    In my opinion, claim 5 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claims 1 and 4 as well as because each of Jensen and Kroll teaches the additional limitation of claim 5.  *See* Section XVI.A.4, *supra*.

304.    Jensen discloses a device comprising a "flexible circuit assembly" which includes "copper wiring traces to connect the entire circuit 41 to the sensor contacts 71, 72" as well as other components.  Ex. 1011 at [0040].

305.    Kroll teaches that "each [ECG] electrode 35 has a conductive grid . . . applied to an insulation and base support layer 44 preferably by means of a silk screen process," *i.e.*, a flexible substrate.  *See, e.g.*, Ex. 1013 at 5:23–42, Fig. 5. Kroll further explains:

> ***Each electrode 35 has a conductive grid 56 which is comprised of a matrix of approximately 0.050 inch wide lines 42 of conductive ink compound applied to an insulation and base support layer 44 preferably by means of a silk screen process.***  The conductive ink is a silver compound generally used in the electronics industry. . . .  The conductive ink compound used in the matrix lines 42 is generally the same as that utilized in the lead strips 34.  Apertures 43 in the conductive ink matrix 42 form the grid configuration.  The grid configuration itself is provided both for proper electrical function as well as to reduce the amount of ink used while obtaining maximum function.  The insulation and base support layer 44 is preferably comprised of a thin approximately 0.001 inch polyester laminate and ***serves as both a base for the silk screened conductive ink used in the matrix lines 42 and lead strips 34***, and as an electrical insulator.

*Id.* at 5:23–42 (emphases added).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 116

306.   A POSA seeking to make or use the device disclosed in Jensen would have known that electrodes could be attached to the base layer of the "flexible circuit assembly 36" of Jensen's device through screen printing.   As discussed above, screen printing was a preferred process for manufacturing circuits in the industry at the time of the purported invention of the '007 patent.  *See, e.g.*, Ex. 1035 at 283 (noting that "screen printing is a [ ] cheap and simple method" that is used to produce "[t]he majority of PCBs produced worldwide"); *see also id.* at 3 (noting that screen printing of "printed silver paste conductors and graphite resistors" was "commonly associated with [2006]'s hybrid circuit technology" and "was [the] technique that ushered in the commercial use of printed circuits").

307.   For these reasons, it is my opinion that a POSA would understand that Kroll discloses "ECG electrodes compris[ing] a material screened onto the flexible substrate" and, therefore, that the combination of Jensen and Kroll renders obvious claim 5 of the '007 patent.

### 6.    *Dependent Claim 6*

308.   Claim 6 of the '007 patent depends from claims 1, 4, and 5 and additionally requires that the "at least one series current-limiting resistor protects the communication-computation module during a patient defibrillation event."

309.   In my opinion, claim 6 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claims

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 117

1, 4, and 5 as well as because Kroll teaches the additional limitation of claim 6. *See* Section XVI.A.5, *supra*.

310.   Jensen's device includes a communication-computation module (the "flexible circuit assembly 36"). *See* Section XVI.A.2.vii, *supra*. The disclosed "flexible circuit assembly" includes both a "microcontroller 10" which is "used to perform further analysis" of the collected data (*i.e.*, computation) and a "transmitter 7" used to transmit the collected data (*i.e.*, communication). *Id.*; *see also* Ex. 1011 at [0032].

311.   Kroll discloses "lead strips 34," which comprise a conductive ink compound "of a preselected conductivity to provide a certain total lead strip resistance so that each strip 34 serves as a current limiter to protect a patient from shock due to malfunction of the device 20 or of a complementary medical device." Ex. 1013 at 5:4–13. In my opinion, a POSA would know that the same ink deposits that protect the patient from shock will also at the same time protect the device from shock. *See, e.g.*, Ex. 1043 at 816–17 (noting that the resistivity of a conductor depends on the properties of the conductor material), 819–20 (noting that current always flows in the direction of decreasing electric potential or voltage); *see also* Ex. 1018 at 1:36–45; Section IV.F., *supra.*

312.   As acknowledged by the '007 patent, there were existing medical standards that required "medical grade monitor[s]" to be able to "survive multiple

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 118

defibrillation cycles of at least 360 joules." Ex. 1001 at 1:53–55, 10:19–29; *see also* Section IV.E., *supra;* Ex. 1001 at 7:46–48 (the '007 patent disclosing that "the resistances of the protective resistive traces be in a range between about 1 kilo ohm to about 10 kilo ohms"; the stated resistance of Kroll's lead strips fall within this range). In the prior art, this requirement was generally met by including some type of resistor(s) in the wearable device. *See* Section IV.C., *supra.*

313.   For these reasons, it is my opinion that a POSA would understand that Kroll discloses that the "at least one series current-limiting resistor protect[ing] the communication-computation module during a patient defibrillation event" and, therefore, that the combination of Jensen and Kroll renders obvious claim 6 of the '007 patent.

### 7.    *Dependent Claim 7*

314.   Claim 7 of the '007 patent depends from claims 1 and 4 and requires that the "mechanical interface from the at least one series current-limiting resistor to the EGG electrode includes a filleted edge."

315.   In my opinion, claim 7 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claims 1 and 4 as well as because Jensen teaches the additional limitation of claim 7. *See* Section XVI.A.4, *supra*.

316.   The '007 patent explains:

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 119

According to one solution to the above noted arcing problem, as shown in FIG. 4B, *a rounded (fillet) section 430 of carbon trace* can be added at the interface to conductive surface 404. *A fillet or "tear drop" shape causes the carbon trace to become gradually wider* as it connects to conductive surface 404 and relieves the electrical potential stress at the interface.

Ex. 1001 at 8:37–43 (emphases added).



**FIG.4B**

*Id.* at Fig. 4B.

317.   Because the circuitry/traces of a device mechanically connect "the at least one series current-limiting resistor" and "the EGG electrode," the "mechanical interface" is the circuitry/trace of Jensen's device and the "filleted edge" is the "tear drop shape" taught by Jensen.  Both of these understandings are in line with the disclosure of the '007 patent.

318.   Jensen discloses a device comprising a "flexible circuit assembly" which includes "copper wiring traces to connect the entire circuit 41 to the sensor contacts 71, 72" as well as other components.  Ex. 1011 at [0040], Fig. 5.  In my opinion, a POSA would understand that the traces disclosed by Jensen gradually get wider to mechanically connect to the filleted sensor contacts, 71 and 72, because,

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 120

where the end of the trace is connected to the filleted sensor contacts 71, 72, the trace

is wider than where the trace is connected to circuit 41.  This is illustrated in Figure

5 of Jensen:



*Id.* at Fig. 5 (annotated).  Furthermore, it is my opinion that a POSA would have

understood that the traces would eventually get wider to mechanically connect to the

filleted sensor contact 71, 72, because this was considered a best practice from the

perspective of electrical and mechanical reliability at the time of the invention of the

'007 patent.  *See, e.g.*, Ex. 1035 at 195 (using the terms "fillet" and "teardrop"

synonymously); *id.* at 224–43 (stating that "[t]he general shape of solder pads should

be tear-like).

319.   In my opinion, in combining the "resistive trace" taught by Kroll with

the device disclosed by Jensen, as discussed above, a POSA would use the

underlying shape of the trace of Jensen, which includes the claimed "filleted edge."

*See* Section XVI.A.1, *supra.*

320.   For these reasons, it is my opinion that a POSA would understand that

Jensen discloses that the "mechanical interface from the at least one series current-

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 121

limiting resistor to the EGG electrode includes a filleted edge" and, therefore, that the combination of Jensen and Kroll renders obvious claim 7 of the '007 patent.

### 8.    *Dependent Claim 8*

321.    Claim 8 of the '007 patent depends from claims 1 and 4 and additionally requires that "the mechanical interface from the at least one series current-limiting resistor to the EGG electrode comprises overlapped layers."

322.    In my opinion, claim 8 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claims 1 and 4 as well as because Kroll teaches the additional limitation of claim 8. *See* Section XVI.A.4, *supra.*

323.    As discussed previously in Section XVI.A.2.xiii, Kroll discloses "at least one series current-limiting resistor," in the form of lead strips 34.

324.    Kroll teaches that "lead strips 34 [shown in green] extend from each electrode 33, 35 [shown in red] to the terminal end 19" and overlap electrode 35 that includes a conductive grid 56 (shown in orange) "comprised of a matrix of approximately 0.050 inch wide lines 42 of conductive ink compound applied to an insulation and base support layer 44 preferably by means of a silk screen process" as shown below by Figure 5.  Ex. 1013 at 5:17–21, 5:23–27, Fig. 5.  Kroll further teaches that the "conductive ink compound used in the matrix lines 42 is ***generally***

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 122

the same as that utilized in the lead strips 34." *Id.* at 5:23–27, 5:31–33 (emphasis added).



FIG. 5

*Id.* at Fig. 5 (annotated).

325. A POSA reading Kroll would understand its stated preference for screen-printing. Screen printing of circuits is accomplished by printing overlapping layers of ink, one at a time, to make up the different components. *Cf* Ex. 1035 at 211, Fig. 5.16. Such overlapping layers of ink can be, but do not necessarily need to be, composed of the same compounds. Thus, a POSA would have understood matrix lines 42 and lead strip 34 as overlapping layers that can be made of different materials.

326. For these reasons, it is my opinion that a POSA would understand that Kroll discloses "the mechanical interface from the at least one series current-limiting

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 123

resistor to the EGG electrode comprises overlapped layers" and, therefore, that the combination of Jensen and Kroll renders obvious claim 8 of the '007 patent.

### 9.    Dependent Claim 10

327.    Claim 10 of the '007 patent depends from claim 1 and additionally requires "an insulating material overlaying the at least one series current-limiting resistor to prevent arcing."

328.    In my opinion, claim 10 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Jensen and Kroll teach the additional limitation of claim 10. *See* Section XVI.A.2, *supra.*

329.    In addition to teaching the "at least one series current-limiting resistor," *see* Section XVI.A.2.xiii, *supra*, Jensen discloses "aesthetic covers 35 [which] may be constructed from Mylar sheet," Ex. 1011 at [0043].    These aesthetic covers "enclose the entire top side of the flexible circuit assembly 36" which "contains the copper wiring traces to connect the entire circuit 41 to the sensor contacts 71, 72." Ex. 1011 at [0040], [0043].    Thus, the aesthetic covers 35 are placed on top of the copper wiring traces.

330.    In my opinion, a POSA would understand from Jensen's disclosure that the aesthetic covers 35 are an insulating material that overlay the traces to prevent arcing.  Jensen discloses that the "aesthetic covers 35 may be constructed from Mylar

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 124**

sheet" and "enclose the entire top side of the flexible circuit assembly 36." *Id.* at

[0043]. Mylar is a well-known insulating material. *See, e.g.*, Ex. 1047 (Patrick J.

Nolan, *Sterile Medical Device Package Development*, Standard Handbook of

Biomedical Eng'g & Design (2004)) at 23.10 ("The material most commonly used

for flexible packaging applications is oriented polyester (e.g., Mylar™), which is

used as a base for properties such as dimensional stability, heat resistance, and

strength with an adhesively laminated seal layer such as low-density polyethylene,

which provides the film structure with heat scalability.").

331. Additionally, Kroll discloses an "inner patient insulation layer 40" that

"serves to insulate the patient's skin from electric current or voltage in the electrode

lead strips 34" and an "insulation and base support layer 44" which is bonded to the

"inner patient insulation layer 40" via "an adhesive or a lamination process." Ex.

1013 at 5:43–50. Kroll further teaches that both the "inner patient insulation layer

40" and the "insulation and base support layer 44" are comprised of "polyester

laminate." *Id.* at 5:37–42, 5:44–47.



*Id.* at Fig. 6 (annotated).

125

332.    As shown above by Figure 6, Kroll's "inner patient insulation layer 40" and "insulation and base support layer 44" both overlay the "lead strip 34." Because Mylar has long been used for electrical insulation, a POSA would understand that polyester laminate has the necessary insulation to prevent the lead strip 34 from jumping a connection (*i.e.*, "arcing"). Ex. 1048 (Lawrence R. Dallett & William E. Donaldson, *Plastics and Adhesives: A Guide to Their Physical Properties and Uses*, U.S. Dep't of Com. (1956)) at 13–14.

333.    For these reasons, it is my opinion that a POSA would understand that Jensen and Kroll disclose "an insulating material overlaying the at least one series current-limiting resistor to prevent arcing" and, therefore, that the combination of Jensen and Kroll renders obvious claim 10 of the '007 patent.

### 10.    *Dependent Claim 11*

334.    Claim 11 of the '007 patent depends from claims 1, 4, and 5 and additionally requires that "the EGG electrodes are formed substantially in the shape of an annulus."

335.    In my opinion, claim 11 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claims 1, 4, and 5 as well as because Jensen teaches the additional limitations of claim 11. *See* Sections XVI.A.5, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 126

336.   The '007 patent explicitly defines "annulus," stating that, "[u]nder this definition, an annulus can include substantially square shapes, substantially rectangular shapes, substantially circular shapes" including "a substantially 'U' shaped surface as described by a single closed curve."  Ex. 1001 at 6:64–7:3.

337.   As previously discussed, Jensen discloses that "sensor pad electrodes 1 and 2" are at least two ECG electrodes.  *See* Section XVI.A.2.ii, *supra*.  Sensor pads 1, 2 each define a region between a single closed curve (shown in orange below), as shown below in the annotated version of Figure 5 of Jensen.



Ex. 1011 at Fig. 5 (annotated).

338.   For these reasons, it is my opinion that Jensen discloses that "the [ECG] electrodes are formed substantially in the shape of an annulus" and, therefore, that the combination of Jensen and Kroll renders obvious claim 11 of the '007 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 127

### 11. Dependent Claim 12

339.   Claim 12 of the '007 patent depends from claims 1, 4, 5, and 11, and additionally requires that "the annulus comprises a conductive link."

340.   In my opinion, claim 12 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claims 1, 4, 5, and 11 as well as because Jensen teaches the additional limitation of claim 12.  *See* Section XVI.A.10, *supra.*

341.   As discussed above, sensor pad electrodes 1 and 2 of Jensen are formed substantially in the shape of an annulus.  *See* Section XVI.A.10, *supra.*  The disposable sensor pads 1, 2, also form an electrical connection (conductive link) with sensor contacts 71, 72 of the flexible circuit assembly through the conductive adhesive on the circuit side of the annulus.  Ex. 1011 at [0041].



*Id.* at Fig. 5 (annotated).

128

342.    For these reasons, it is my opinion that Jensen discloses that "the annulus comprises a conductive link" and, therefore, that the combination of Jensen and Kroll renders obvious claim 12 of the '007 patent.

### 12.    Dependent Claim 13

343.    Claim 13 of the '007 patent depends from claims 1 and 5 and additionally requires that "the substrate is shaped to allow placement on the patient to monitor at least one of a set of standard ECG vectors while simultaneously reducing motion and muscle artifact in the corresponding ECG vector signal."

344.    In my opinion, claim 13 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claims 1 and 5 as well as because Kroll teaches the additional limitation of claim 13. *See* Sections XVI.A.5, *supra.*

345.    Kroll teaches "a plurality of predetermined contact areas for receiving and transmitting electrical signals," and that these "predetermined contact areas" may be "arranged having one at each corner of the body structure and six centrally placed in the body structure to form a generally curvilinear pattern whereby said contact areas conform **with standard precordial positions for 'twelve-lead' electrocardiographic devices**." Ex. 1013 at cls. 1, 13 (emphasis added).  In my opinion, a POSA would have understood that placement at "standard

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 129

EKG . . . electrode locations" as disclosed by Kroll would measure standard EKG vectors. *See* Section IV.A., *supra*.

346. In my opinion, a POSA would have known to place the wearable monitor of Jensen in one of these standard locations, which were widely known in the field, to minimize motion and muscle artifact in the corresponding ECG vector signals. Use of specific electrode placements to reduce the motion and muscle artifacts that interfered with EKG recording was well-known in the art. *See, e.g.*, Ex. 1049 (N.V. Thakor & J.G Webster, *Electrode studies for the long-term ambulatory ECG*, Med. & Biol. Eng. & Comput. (1985)) at 116 (noting that "the motion artefact can be reduced and larger QRS amplitude can be obtained by selective placement of electrodes"), 120; *see also* Ex. 1031 at 74 (referring to the "conventional Holter recorder [which] samples ECG data comparable to data *recorded by leads V1 and V5 of the standard 12-lead ECG*") (emphasis added).

347. In light of Kroll's teaching of "standard precordial positions," it is my opinion that a POSA would have known to place the wearable monitor of Jensen in one of these standard locations that were well-known in the field to minimize "motion and muscle artifact in the corresponding ECG vector signals" and thus optimize the quality of the EKG recordings. In fact, Jensen even alludes to such standard placement locations. Ex. 1011 at [0007] (noting one problem with prior art devices is that "very vigorous activity" would cause the wearable device to "slip

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 130

down from the ***optimum pick-up location***" resulting in "erratic EKG readings")
(emphasis added).

348.   For these reasons, it is my opinion that a POSA would understand that
Kroll discloses that "the substrate is shaped to allow placement on the patient to
monitor at least one of a set of standard ECG vectors while simultaneously reducing
motion and muscle artifact in the corresponding ECG vector signal" and, therefore,
that the combination of Jensen and Kroll renders obvious claim 13 of the '007 patent.

### *13.    Dependent Claim 14*

349.   Claim 14 of the '007 patent depends from claim 1 and additionally
requires that "the power source is a renewable power source internal to the body
worn device."

350.   In my opinion, claim 14 of the '007 patent is rendered obvious by
Jensen in combination with Kroll for all the reasons discussed above with respect to
claim 1 as well as because Jensen teaches the additional limitation of claim 14.  *See*
Section XVI.A.2, *supra.*

351.   Jensen teaches that the "flexible circuit assembly" is connected to a
"rechargeable type of power source," or a "solar cell."  Ex. 1011 at [0040].  In my
opinion, a POSA would have understood that a "rechargeable type of power source"
is the same as a "renewable power source."  Jensen also teaches that this power
source is "internal to the body worn device" disclosed by Jensen, as it would replace

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 131**

the Lithium coin cell battery (9) which is located internally in Jensen's device as shown by annotated Figure 5 below.



*Id.* at Fig. 5 (annotated); *see also id.* at [0040].

352.   For these reasons, it is my opinion that a POSA would understand that Jensen discloses that "the power source is a renewable power source internal to the body worn device" and, therefore, that the combination of Jensen and Kroll renders obvious claim 14 of the '007 patent.

### 14.    Dependent Claim 15

353.   Claim 15 of the '007 patent depends from claim 1 and additionally requires that "the power source comprises a rechargeable battery or a one time use battery."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 132

354.   In my opinion, claim 15 of the '007 patent is rendered obvious by

Jensen in combination with Kroll for all the reasons discussed above with respect to

claim 1 as well as because Jensen teaches the additional limitation of claim 15.  *See*

Section XVI.A.2, *supra.*

355.   Jensen, for example, teaches that the "flexible circuit assembly" is

connected to a "Lithium coin cell 9," which is also known as a "coin battery."

Ex. 1011 at [0040].   In my opinion, a POSA would have understood that the

"Lithium coin cell" battery disclosed by Jensen is a "one-time use battery."  *See* Ex.

1042 at 386 ("Power for the circuit is obtained from a single nonrechargeable 3-V

lithium battery").

356.   As disclosed above, Jensen also teaches that the "flexible circuit

assembly" may be connected to a "rechargeable type of power source," or a "solar

cell."  *Id.* at [0040].   Thus, Jensen discloses that the power source comprises "a

rechargeable battery," as required by claim 15.

357.   For these reasons, it is my opinion that a POSA would understand that

Jensen discloses that "the power source comprises a rechargeable battery or a one

time use battery" and, therefore, that the combination of Jensen and Kroll renders

obvious claim 15 of the '007 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 133

### 15. *Dependent Claim 29*

358. Claim 29 of the '007 patent depends from claim 1 and additionally requires that "the body worn device includes circuit protection to allow the device to survive multiple defibrillation cycles of at least 360 joules."

359. In my opinion, claim 29 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Kroll teaches the additional limitation of claim 29. *See* Section XVI.A.2, *supra.*

360. Kroll discloses "lead strips 34" composed of a conductive ink compound of a "preselected conductivity to provide a certain total lead strip resistance so that each strip 34 serves as a current limiter to protect a patient from shock due to malfunction of the device 20 or of a complementary medical device." Ex. 1013 at 5:4–13. The composition of the conductive filler used results in a lead strip resistance of approximately 1,000 ohms, which "allows for signals transmission" and provides "current limiter qualities." *Id.* at 5:4–17. In my opinion, a POSA would understand that the same current-limiting component (*i.e.,* the ink deposits) that protects the patient from shock would also function to help protect the device from shock at the same time. *See, e.g.*, Ex. 1043 at 816–17 (noting that the resistivity of a conductor depends on the properties of the conductor material), 819–

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 134

20 (noting that current always flows in the direction of decreasing electric potential or voltage); *see also* Ex. 1018 at 1:36–45; Section IV.F., *supra.*

361.   As acknowledged by the '007 patent, there were existing medical standards that required "medical grade monitor[s]" to be able to "survive multiple defibrillation cycles of at least 360 joules." Ex. 1001 at 1:53–55, 10:19–29; *see also* Section IV.E., *supra;* Ex. 1001 at 7:46–48 (the '007 patent disclosing that "the resistances of the protective resistive traces be in a range between about 1 kilo ohm to about 10 kilo ohms"; the stated resistance of Kroll's lead strips fall within this range).

362.   For these reasons, it is my opinion that a POSA would understand that Kroll discloses "the body worn device includes circuit protection to allow the device to survive multiple defibrillation cycles of at least 360 joules" and, therefore, that the combination of Jensen and Kroll renders obvious claim 29 of the '007 patent.

### 16.    *Dependent Claim 31*

363.   Claim 31 of the '007 patent depends from claims 1 and 29 and additionally requires that "a plurality of components of the circuit protection are distributed between the disposable module and the communication-computation module."

364.   In my opinion, claim 31 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 135

claims 1 and 29 as well as because Kroll teaches the additional limitation of claim 31. *See* Section XVI.A.15, *supra.*

365.    As discussed above, Kroll discloses "at least one series current-limiting resistor", *viz.* the "lead strips" are intended to "serve[] as a current limiter to *protect a patient from shock due to malfunction of the device*." Ex. 1013 at 5:8–12 (emphasis added); *see* Sections XVI.A.2.xiii–xv, *supra.*    In my opinion, a POSA would understand from Kroll's disclosure that the same current-limiting component (*i.e.,* the ink deposits) that protect the patient from shock would also function to protect the device from shock at the same time. *See, e.g.*, Ex. 1043 at 816–17 (noting that the resistivity of a conductor depends on the properties of the conductor material), 819–20 (noting that current always flows in the direction of decreasing electric potential or voltage); *see also* Ex. 1018 at 1:36–45; Section IV.F., *supra.*

366.    In order for the "current-limiting resistor" taught by Kroll to provide circuit and patient protection, the "lead strips" must be placed or distributed between the electrodes on the disposable module (which is fixed to the patient's body) and the communication module (which houses the sensitive electronics). A POSA would understand that during defibrillation, current could move through the patient's skin, through the lead strips/traces and into the communication-computation module. A POSA would similarly understand that, in the case of device malfunction, for example, electrical current would travel in the opposite direction: from the

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 136

communication-computation module, through the disposable module to the patient's skin.

367.    As previously discussed, a POSA at the time of the invention of the '007 patent would have been motivated to protect the electronics of the device at least to ensure the necessary monitoring can be completed.  For example, it was well known in the art that excess electrical current had the potential to ruin the electronic components.  *See, e.g.*, Ex. 1035 at 37 (noting that thermistors can be used as "excess current limiters" as protection "against over-heating").  A POSA would also have been motivated to ensure the electronics of the device were protected to allow for the reuse of the electronic components of the monitor.  *See, e.g.*, *id.* at 625 ("Electronic components can be re-used after disassembly for economic and ecological reasons.  However, the cost of disassembling, testing and selling the reusable electronic components has to be seen in relation to the cost of a new product.").  A POSA would understand that distributing the series current-limiting resistors between the electrodes on the disposable module (in contact with the patient) and the communication-computation module (housing the electronics) would be a way to achieve such protection.

368.    For these reasons, it is my opinion that a POSA would understand that the combination of Jensen and Kroll discloses "a plurality of components of the circuit protection are distributed between the disposable module and the

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 137

communication-computation module" and, therefore, that the combination of Jensen and Kroll renders obvious claim 31 of the '007 patent.

### 17. *Dependent Claim 37*

369.   Claim 37 of the '007 patent depends from claim 1 and further requires that "the communication-computation module includes circuit components configured to detect failure of contact of one or more of the electrical connections with the skin surface of the patient."

370.   In my opinion, claim 37 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Jensen teaches the additional limitation of claim 37. *See* Section XVI.A.2, *supra.*

371.   Jensen discloses a "[l]ogic driver 29," which "supplies a switched supply voltage to disable and enable the operation of" various processing modules. Ex. 1011 at [0031]. Jensen further teaches that "[w]ith the use of switched supply voltage driver 29, power from the system power source 9 is conserved whenever the sensors 1, 2 are not in contact with the user's skin," meaning that Jensen's device is able to detect the failure of contact of the sensors 1, 2. *Id.*

372.   For these reasons, it is my opinion that Jensen discloses that "the communication-computation module includes circuit components configured to detect failure of contact of one or more of the electrical connections with the skin

138

surface of the patient" and, therefore, that the combination of Jensen and Kroll renders obvious claim 37 of the '007 patent.

### 18.    Dependent Claim 38

373.   Claim 38 of the '007 patent depends from claim 1 and additionally requires that "the communication-computation module is protected from external high energy signals by electro-surgical isolation suppression circuits."

374.   In my opinion, claim 38 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Kroll teaches the additional limitation of claim 38. *See* Section XVI.A.2, *supra.*

375.   Kroll discloses "lead strips 34" comprised of a conductive ink compound of a "preselected conductivity to provide a certain total lead strip resistance so that each strip 34 serves as a current limiter to protect a patient from shock due to malfunction of the device 20 or of a complementary medical device." Ex. 1013 at 5:4–13.   In my opinion, a POSA would understand that circuits containing the same current-limiting component (*i.e.,* the ink deposits) that protects the patient from shock would also help to protect the device from interference from an electrosurgical unit, thus forming "electrosurgical isolation suppression circuits. *See generally*, Ex. 1036; *see also* Ex. 1043 at 816–17 (noting that the resistivity of a conductor depends on the properties of the conductor material), 819–20 (noting that

139

current always flows in the direction of decreasing electric potential or voltage); *see also* Ex. 1018 at 1:36–45; Section IV.F., *supra.*

376. As acknowledged by the '007 patent, there were existing medical standards that required "medical grade monitor[s]" to be able to "survive multiple defibrillation cycles of at least 360 joules." Ex. 1001 at 1:53–55, 10:19–29; *see* Ex. 1036 at 18, Table 4, 55 (imposing requirement that wearable device be able to survive "multiple defibrillation cycles of at least 360 joules" and noting that such protection was especially important for cardiac monitors); Ex. 1001 at 14:25–30 (the challenged '007 patent acknowledging that techniques to protect devices from electrosurgical interference were well known in the art stating "AAMI standard EC13 on Electrosurgical Interference Suppression (ESIS). Standard EC13 addresses the ability of an ECG monitor to display and process ECG signals in a satisfactory manner while connected to a patient on whom an electrosurgical device is being used"); *see also* Sections IV.C, IV.E–F, *supra.*

377. For these reasons, it is my opinion that a POSA would understand that Kroll discloses "the communication-computation module is protected from external high energy signals by electro-surgical isolation suppression circuits" and, therefore, that the combination of Jensen and Kroll renders obvious claim 38 of the '007 patent.

140

### 19.    *Dependent Claim 43*

378.    Claim 43 of the '007 patent depends from claim 1 and additionally requires that "the radio circuit communicates an unprocessed physiological signal."

379.    In my opinion, claim 43 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Jensen teaches the additional limitation of claim 43. *See* Section XVI.A.2, *supra.*

380.    Jensen discloses a "radio data transmission" and a "microcontroller," which is responsible for making that transmission. Ex. 1011 at Abstract, [0037], Table 1. Jensen further teaches that signals detected by sensors 1, 2 are "input directly to transmitter 7, or may be input into microcontroller 10." *Id.* at [0032]. In my opinion, it would be obvious to a POSA that unprocessed data must be communicated in addition to processed data, at least because the doctor and the patient may want to see the raw data, especially in the case that a cardiac event occurs. *Cf.* Ex. 1034 at cl. 7 (disclosing an interface which "permits the user to select at least one of unprocessed health parameter data and summary data for display to the user of the remote monitoring system").

381.    For these reasons, it is my opinion that a POSA would understand that Jensen discloses "the radio circuit communicates an unprocessed physiological

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 141

signal" and, therefore, that the combination of Jensen and Kroll renders obvious claim 43 of the '007 patent.

### 20.    Dependent Claim 44

382.    Claim 44 of the '007 patent depends from claim 1 and additionally requires that "the radio circuit communicates a result of the physiological analysis at a predetermined time."

383.    In my opinion, claim 44 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Jensen teaches the additional limitation of claim 44. *See* Section XVI.A.2, *supra.*

384.    Jensen teaches that the information collected by the body worn device is "sent by radio data transmission to any variety of outside receiving equipment"; Jensen's "microcontroller" is responsible for making that transmission. Ex. 1011 at Abstract, [0037], Table 1. Jensen further teaches a method of signal processing referred to as "Logged Event Reporting" in which the "[m]icrocontroller sends a packet periodically containing a log of all data points since last transmission." *Id.* at [0037], Table 1. In my opinion, a POSA would understand that a periodic transmission is transmitted on a predetermined periodicity (*i.e.*, "at a predetermined time").

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 142

385.   For these reasons, it is my opinion that a POSA would understand that Jensen discloses "the radio circuit communicates a result of the physiological analysis at a predetermined time" and, therefore, that the combination of Jensen and Kroll renders obvious claim 44 of the '007 patent.

### 21.   Independent Claim 45

386.   In my opinion, claim 45 of the '007 patent is rendered obvious by Jensen in combination with Kroll.

### i.    Limitation 45[pre]

387.   Limitation 45[pre] of the '007 patent recites "a body worn patient monitoring device comprising."

388.   As discussed above with respect to claim 1, it is my opinion that Jensen discloses the claimed "body worn monitoring device."   *See* Section XVI.A.2.i, *supra*.

### ii.   Limitation [45a]

389.   Limitation [45a] of the '007 patent recites "a disposable module including a plurality of electrical connections."

390.   As discussed above with respect to claim 1, it is my opinion that Jensen discloses "a disposable module including a plurality of electrical connections."  *See* Section XVI.A.2.ii, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 143

### iii.    Limitation [45b]

391.    Limitation [45b] of the '007 patent recites "the electrical connections adapted for electrical coupling to a skin surface to receive physiological signals."

392.    As discussed above with respect to claim 1, it is my opinion that Jensen discloses "the electrical connections adapted for electrical coupling to a skin surface to receive physiological signals." *See* Section XVI.A.2.iii, *supra.*

### iv.    Limitation [45c]

393.    Limitation [45c] of the '007 patent recites "the disposable module including a disposable module connector."

394.    As discussed above with respect to claim 1, it is my opinion that Jensen discloses "the disposable module including a disposable module connector." *See* Section XVI.A.2.v, *supra.*

### v.    Limitation [45d]

395.    Limitation [45d] of the '007 patent recites "a power source to power the body worn patient monitoring device."

396.    As discussed above with respect to claim 1, it is my opinion that Jensen discloses "a power source to power the body worn patient monitoring device." *See* Section XVI.A.2.vi, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 144

### vi.    Limitation [45e]

397.   Limitation [45e] of the '007 patent recites "a communication-computation module, having a communication-computation module connector to receive the physiological signals from the disposable module via the disposable module connector, the communication-computation module including."

398.   As discussed above with respect to claim 1, it is my opinion that Jensen discloses "a communication-computation module, having a communication-computation module connector to receive the physiological signals from the disposable module via the disposable module connector, the communication-computation module." *See* Sections XVI.A.2.vii–viii, *supra.*

### vii.    Limitation [45f]

399.   Limitation [45f] of the '007 patent recites "a microprocessor to actively monitor a patient and to perform a real-time physiological analysis of the physiological signals, the analysis determining an occurrence of a predetermined ECG event."

400.   It is my opinion that Jensen teaches limitation [45f] of the '007 patent. Jensen's device includes a microcontroller which performs a "physiological analysis" on collected data: "[t]he device of the present invention contains all necessary electronic circuitry, including sensors, a battery or other power source, and a microcontroller and/or other programmable logic circuitry that perform

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 145**

measurement and processing of sensed data, where said processed data are subsequently stored internally and/or transmitted to other equipment by wireless means." Ex. 1011 at [0014]. If the microcontroller of Jensen's device receives data input, it "runs a conventional program that may perform further analysis and can also encode a data stream output to the transmitter." *Id.* at [0032].

401.  It is my opinion that a POSA would understand that, by disclosing a microcontroller that processes data, Jensen also discloses a microprocessor. For example, Jensen teaches a microprocessor that is intended to "electrically detect the occurrence of R events in the QRS complex of the EKG signal." *Id.* at [0029]; *see also* Ex. 1001 at 11:48–50 ("A microprocessor, such as microprocessor 512, is defined herein as synonymous and interchangeable with the terms 'microcomputer', 'microcontroller', and 'microprocessor'."). Jensen further explains that "[o]nce microcontroller 10 identifies the data as having a heart beat pulse, (a clearly identifiable waveform with a distinctive shape and a high signal amplitude compared to typical ambient noise from the sensor), then the program analyzes the data in a number of optional ways. . . .  The microcontroller has the capability of performing conventional programmatic signal analysis to create and transmit different data records." Ex. 1011 at [0037].

402.  Thus, it is my opinion that that Jensen discloses "a microprocessor to actively monitor a patient and to perform a real-time physiological analysis of the

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 146

physiological signals, the analysis determining an occurrence of a predetermined ECG event."

### viii.    Limitation [45g]

403.   Limitation [45g] of the '007 patent recites "a radio circuit to communicate an unprocessed physiological signal or a result of the physiological analysis, at a predetermined time or on an occurrence of a predetermined event, via a radio transmission to a remote radio receiver."

404.   Jensen teaches "[a] microcontroller . . . [that] converts the heart-rate data information into one of multiple data output formats, which are sent by radio data transmission to any variety of outside receiving equipment." *Id.* at Abstract. Jensen discloses that:

> Transmitter 7 may transmit in a variety of modulation and/or keying methods via antenna 8, especially when used in conjunction with microcontroller 10, whereby the microcontroller 10 may enable and disable the transmitter carrier, and also send encoded data streams. Data modulation methods in an RF transmitter that are easily implemented include the well understood methods of On-Off Keying (OOK), phase or frequency shift keying.

*Id.* at [0033]. Jensen further discloses a method of signal processing referred to as "Logged Event Reporting" in which the "[m]icrocontroller sends a packet periodically containing a log of all data points since last transmission." *Id.* at [0037], Table 1. It is my opinion that a POSA would understand that physiological analysis would need to be performed by the microcontroller to obtain the "log of all data

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 147

points" prior to transmission under this method.  Additionally, a POSA would understand that sending these results "periodically" would occur at "predetermined times" as determined by the algorithm.  *See id.*

405.   Therefore, it is my opinion that the combination of Jensen and Kroll discloses "a radio circuit to communicate an unprocessed physiological signal or a result of the physiological analysis, at a predetermined time or on an occurrence of a predetermined event, via a radio transmission to a remote radio receiver" and thus renders limitation [45g] obvious.

### ix.    Limitation [45h]

406.   Limitation [45h] of the '007 patent recites "wherein the disposable module has a mechanical and electrical coupling to the communication-computation module."

407.   As discussed with respect to claim 1, it is my opinion that Jensen discloses that "the disposable module has a mechanical and electrical coupling to the communication-computation module."  *See* Section XVI.A.2.xi, *supra.*

### x.    Limitation [45i]

408.   Limitation [45i] of the '007 patent recites "forming the body worn patient monitoring device as a single unit that is adapted to be directly and non-permanently affixed to the skin surface of the patient."

148

409.   As discussed with respect to claim 1, it is my opinion that Jensen discloses "forming the body worn patient monitoring device as a single unit that is adapted to be directly and non-permanently affixed to the skin surface of the patient." *See* Section XVI.A.2.xii, *supra.*

### xi.    Limitation [45j]

410.   Limitation [45j] of the '007 patent recites "at least one series current-limiting resistor configured to protect the communication-computation module."

411.   As discussed with respect to claim 1, it is my opinion that the combination of Jensen and Kroll discloses "at least one series current-limiting resistor configured to protect the communication-computation module" and, therefore, renders limitation [45j] obvious. *See* Section XVI.A.2.xiii, *supra.*

### xii.    Limitation [45k]

412.   Limitation [45k] of the '007 patent recites "the at least one series current-limiting resistor being screened on a flexible substrate."

413.   As discussed with respect to claim 1, it is my opinion that the combination of Jensen and Kroll discloses "the at least one series current-limiting resistor being screened on a flexible substrate" and, therefore, renders limitation [45k] obvious. *See* Section XVI.A.2.xiv, *supra.*

149

### xiii.    Limitation [45l]

414.    Limitation [45l] of the '007 patent recites "the at least one series current-limiting resistor being in the form of resistive traces."

415.    As discussed with respect to claim 1, it is my opinion that the combination of Jensen and Kroll discloses "the at least one series current-limiting resistor being in the form of resistive traces" and, therefore, renders limitation [45l] obvious. *See* Section XIV.A.2.xv, *supra*.

## B.    Jensen Ground 2: Obvious Over Jensen, Kroll, DeLuca, and General Knowledge of a Person of Ordinary Skill in the Art

### 1.    A POSA would have combined Jensen, Kroll, and DeLuca

416.    For all the reasons discussed above in Section XVI.A.1, a POSA would have been motivated to combine the devices and methods of Jensen with Kroll's teaching of "resistive traces" or "resistive leads" and would have had a reasonable expectation of success in doing so.  Additionally, a POSA would have also looked to incorporate DeLuca's signal conditioning filters into the microcontroller of the device.  Signal filtering was a well-known step in the Pan-Tompkins QRS detection algorithm, which was widely known and used for electronically detecting heartbeat signals from EKG data well before the date of the invention of the '007 patents.  *See* Ex. 1050 (Jiapu Pan & Willis J. Tompkins, *A Real-Time QRS Detection Algorithm*, BME-22 IEEE Transactions on Biomed. Eng'g 230 (1985)).  Jensen teaches that a bandpass filter is used as a part of the signal conditioning on its device.  Ex. 1011

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 150

at [0036]. A POSA seeking to make Jensen's device, which can "perform signal processing and calculation upon data contained within [EKG] signals" onboard, would have sought to implement a signal-filtering algorithm (like the Pan-Tompkins algorithm) to reliably detect patient heartbeats. *See, e.g.*, Ex. 1045 at 42–54; *see also* Ex. 1050 at 230. Thus, in order to implement a signal filtering algorithm, a POSA would have looked to DeLuca, which describes in great detail an implementation of that algorithm's bandpass filters.

417. Further, a POSA would have had a reasonable expectation of success in implementing DeLuca's signal conditioning filters on Jensen's device without undue experimentation. In order to do so, a POSA would only need to modify Jensen's existing switchable, tunable, bandpass filter to result in the specific bandpass filtering configuration taught by DeLuca, which would result in minimal overall design impact. In my opinion, a POSA would know how to make this modification and nothing in the art suggests that this modification would not work or could not be implemented using well-known manufacturing techniques at the time.

### 2. Dependent Claim 32

418. Claim 32 of the '007 patent depends from claim 1 and additionally requires "a high pass filter with a selectable corner frequency to filter the physiological signals."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 151

419.  In my opinion, claim 32 of the '007 patent is rendered obvious by Jensen in combination with Kroll and/or Jensen, Kroll, and DeLuca for all the reasons discussed above with respect to claim 1 as well as because each of Jensen and DeLuca teaches the additional limitation of claim 32.  *See* Section XVI.A.2, *supra.*

420.  As previously discussed, a POSA would have looked to combine DeLuca's specific "signal conditioning" filters with Jensen's device, which discloses a tunable, switchable bandpass filter.  *See* Section XVI.B.1, *supra*; Ex. 1011 at [0032], [0036]–[0037], [0049].

421.  Jensen discloses that "[s]ignals from the sensors 1& 2 are amplified by the amplifier circuit section 4.  The amplified signal is then bandpass filtered by filter circuit section 5."  Ex. 1011 at [0032].  Jensen's circuit section 5 "is set to operate at a particular gain value by the gain setting resistors 21, and then fed into switched capacitor filter 11."  *Id.* at [0036].  A POSA would understand that "switched capacitor filter" is a "high pass filter with a selectable corner frequency to filter the physiological signals," and that Jensen therefore discloses the dependent limitation of claim 32.  *See* Ex. 1051 (Roubik Gregorian & William E. Nicholson, Jr., *A Switched-Capacitor High-Pass Filter*, 27 IEEE Transactions on Circuits and Sys. 226 (1980)) at 229.

152

422.   Additionally, or alternatively, DeLuca teaches a "signal conditioning stage 56 which further amplifies and band-pass filters the signal so that it is of suitable voltage range and bandwidth for conversion [by] the A/D converter." Ex. 1015 at 4:66–5:2. DeLuca discloses that "the signal conditioning stage 56 includes a hi-pass filter 56*a*." *Id.* at 5:2–3. "Each of the filter modules 56*a*, 56*c* and 56*d* is a switched-capacitor filter circuit whose cut-off frequency [*i.e.*, corner frequency] is determined by the clock frequency at which the filter is switched." *Id.* at 5:4–7.

423.   As discussed above, it is my opinion that a POSA would have recognized that DeLuca's band-pass filtering disclosures are consistent with the Pan-Tompkins QRS detection algorithm.

424.   For these reasons, it is my opinion that it would have been obvious to combine DeLuca's teaching of a high-pass filter with a selectable corner frequency with Jensen's disclosure of bandpass filtering, meaning that the combination of Jensen, Kroll, and DeLuca renders obvious claim 32 of the '007 patent.

### 3.     *Dependent Claim 33*

425.   Claim 33 of the '007 patent depends from claims 1 and 32 and additionally requires that "the corner frequency is selected by a switch selectable resistance."

426.   In my opinion, claim 33 of the '007 patent is rendered obvious by Jensen in combination with Kroll and/or Jensen, Kroll, and DeLuca for all the

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 153

reasons discussed above with respect to claims 1 and 32 as well as because each of Jensen and DeLuca teaches the additional limitation of claim 33.  *See* Section XVI.B.2, *supra.*

427.   Jensen discloses that "[f]requency divider 15 outputs filter control signals that modify the bandpass characteristics of [the switched capacitor] filter 11." Ex. 1011 at [0036].  DeLuca teaches that "the signal conditioning stage 56 includes a hi-pass filter 56a" and that "[e]ach of the filter modules 56*a*, 56*c* and 56d is a switched-capacitor filter circuit whose cut-off frequency [*i.e.*, corner frequency] is determined by the clock frequency at which the filter is switched." Ex. 1015 at 5:2–7.

428.   In my opinion, a POSA would understand that a switched-capacitor filter circuit, such as that taught by Jensen and by DeLuca, and a switched circuit including physical resistors are interchangeable methods for filtering.  Ex. 1052 (J. Terry Caves et al., *Sampled Analog Filtering Using Switched Capacitors as Resistor Equivalents,* 12 IEEE Journal of Solid-State Circuits 592 (1977)) at 599.  A POSA would therefore recognize that Jensen teaches the dependent limitation of claim 33.

429.   Additionally, or alternatively, for these reasons, it is my opinion that it would have been obvious to combine DeLuca's teaching of a high-pass filter with a switch-selectable corner frequency with Jensen's disclosure of bandpass filtering,

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 154

meaning that the combination of Jensen, Kroll, and DeLuca renders obvious claim 33 of the '007 patent.

### 4.    Dependent Claim 34

430.    Claim 34 of the '007 patent depends from claims 1 and 32 and further requires that "the corner frequency is selected by one or more switching capacitors switched a rate higher than the corner frequency of a low pass anti-aliasing filter."

431.    In my opinion, claim 34 of the '007 patent is rendered obvious by Jensen in combination with Kroll and/or Jensen, Kroll, and DeLuca for all the reasons discussed above with respect to claims 1 and 32 as well as because each of Jensen and DeLuca teaches the additional limitation of claim 34.  *See* Section XVI.B.2, *supra.*

432.    Jensen explicitly discloses a "switched capacitor filter 11" as an element of its "filter circuit section 5." Ex. 1011 at [0036].  The output of switched capacitor filter 11 has "bandpass cutoff frequencies of typically 1.5 Hz at the low-end and 17 Hz at the high-end." *Id.* at [0037].  DeLuca teaches that "the signal conditioning stage 56 includes a hi-pass filter 56*a*" and that "[e]ach of the filter modules 56*a*, 56*c* and 56*d* is a switched-capacitor filter circuit whose cut-off frequency [*i.e.*, corner frequency] is determined by the clock frequency at which the filter is switched." Ex. 1015 at 5:2–7.  DeLuca further discloses that "[t]he signal

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 155

output from the input stage 55 is first coupled to the hi-pass filter 56*a* which removes any DC component present in the signal before amplification." *Id.* at 5:9–12.

433.    In my opinion, a POSA would recognize that the corner-frequency of the high-pass filter disclosed by either Jensen or DeLuca would be selected by one or more switching capacitors switched at a rate higher than the corner frequency of the low-pass filter.  Ex. 1042 at 76 ("Commercial switched-capacitor ICs based on the same principle offer complete or nearly complete high-order filters in small, inexpensive packages.  By switching the capacitor at around 100 times the corner frequency, these filters can attain a good approximation of theoretical performance.").

434.    A POSA would therefore recognize that Jensen teaches the dependent limitation of claim 34.  Additionally, or alternatively, for these reasons, as well as the reasons discussed above with respect to claim 32, it is my opinion that it would have been obvious to combine DeLuca's teaching of a high-pass filter with a selectable corner frequency selected by one or more switching capacitors switched at a rate higher than that of a low-pass anti-aliasing filter with Jensen's disclosure of bandpass filtering, meaning that the combination of Jensen, Kroll, and DeLuca renders obvious claim 34 of the '007 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 156

5.    *Dependent Claim 35*

435.    Claim 35 of the '007 patent depends from claims 1 and 32 and further

require that "the high pass filter is implemented in software running on the

microprocessor."

436.    In my opinion, claim 35 of the '007 patent is rendered obvious by

Jensen in combination with Kroll and DeLuca for all the reasons discussed above

with respect to claims 1 and 32 as well as because DeLuca teaches the additional

limitation of claim 35.    *See* Section XVI.B.2, *supra.*

437.    DeLuca teaches that the "operating parameters" of a "signal

conditioning stage 56 can be externally programmed via the communications link

16 established with the control stage section 59 of the ASIC 36." Ex. 1015 at 5:35–

42.

438.    In my opinion, a POSA would have understood that DeLuca's ASIC

could have also implemented the signal processing steps using software.  At the time

of the invention of the '007 patent, heartbeat detection algorithms that included the

use of one or more digital filters on a microprocessor were well known in the art.

Ex. 1045 at 42–43 (noting publication of a number of algorithms based on digital

filters).  For example, implementing digital filters in software was a feature of the

Pan-Tompkins QRS Detection Algorithm, which was well-known.  *Id.*  Therefore,

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 157

in my opinion, a POSA would have understood that the high-pass filter of DeLuca could easily be implemented using software, rather than using physical circuits.

439.   For these reasons, as well as the reasons discussed above with respect to claim 32, it is my opinion that it would have been obvious to combine DeLuca's teaching of a high-pass filter with a selectable corner frequency implemented in software running on the microprocessor with Jensen's disclosure of bandpass filtering, meaning that the combination of Jensen, Kroll, and DeLuca renders obvious claim 35 of the '007 patent.

## C.    Jensen Ground 3: Obvious Over Jensen, Kroll, Harland, and General Knowledge of a Person of Ordinary Skill in the Art

### 1.    *A POSA would have combined Jensen, Kroll, and Harland*

440.   For the same reasons as discussed above, a POSA would have been motivated to combine Kroll's teaching of resistive traces with Jensen's device.  *See* Section XVI.A.1, *supra*.  Furthermore, for the same reasons as discussed above, a POSA would have had a reasonable expectation of success in combining Kroll's teaching of resistive traces with Jensen's device.  *Id.*  A POSA would have also looked to incorporate Harland's teaching of a capacitive sensor probe into Jensen's device in order to reduce the skin irritation that a patient may experience.  "[G]el substances and the adhesives [used] to fix the electrodes on the body can provoke dermal irritation and even allergies."  Ex. 1053 (Klaus-Peter Hoffmann & Roman Ruff, *Flexible dry surface-electrodes for ECG long-term monitoring* 5739 (2007)).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 158

Concerns over dermal tolerability of electrodes would be more prevalent in devices that are intended to be worn for an extended period of time, such as the device disclosed in Jensen.  *Id.*

441.  Harland teaches a solution to the problem of dermal tolerability. Harland discloses "fixed sensor probe electrodes which form capacitive coupling to the body under measurement."  Ex. 1016 at 164.  These electrodes allow for measurement of ECG signals "without direct electrical contact" and permit recording of "the very highest quality ECG at any point on the body surface, even from the fingertips."  *Id.*  In my opinion, a POSA would recognize the benefit of capacitive electrodes in abating potential dermal irritation because these electrodes do not require the use of potentially skin-irritating gels or adhesives.  Therefore, a POSA would have looked to Harland for specific details on implementing this technology in Jensen's device.

442.  In my opinion, a POSA would have had a reasonable expectation of success in implementing Harland's capacitive electrode on Jensen's device without undue experimentation.  The primary design change would be to modify the analog front end amplifiers, resistors, and/or capacitors to optimize for the difference in electrical impedances between the electrode and the body for a capacitive coupling like Harland as opposed to a direct coupling.  All of the electronic components and methods necessary for a POSA to be successful in making this modification would

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 159

have been commercially available at the time of the invention of the '007 patent.
*See* Ex. 1016 at 165 (noting that the "development of the electronics required for
these sensors has been discussed in detail in previous publications"). There is
nothing in the art to suggest that this modification would not work, and this
modification would not be difficult to implement using well-known manufacturing
techniques at the time of the invention.

### 2.    *Dependent Claim 2*

443.  Claim 2 of the '007 patent depends directly from claim 1 and
additionally requires that "the plurality of electrical connections to the body
comprise at least one of direct electrical connections to the body and indirect
electrical connections to the body."

444.  As discussed previously, it is my opinion that Jensen discloses claim 2
of the '007 patent. Additionally or alternatively, it is further my opinion that claim
2 of the '007 patent is rendered obvious by Jensen in combination with Kroll for all
the reasons discussed above with respect to claim 1 as well as because Harland
teaches the additional limitation of claim 2. *See* Section XVI.A.2, *supra*.

445.  A POSA would understand that an "indirect electrical connection" to
the body is one in which the conductor(s) do not make actual contact with the skin.
*See, e.g.*, Ex. 1054 (Tsuyoshi Kato et al., *An Application of Capacitive Electrode for
Detecting Electrocardiogram of Neonates and Infants*, 2006 Int'l Conf. of the IEEE

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 160

Eng'g Med. & Bio. (2006)) at 919.  The '007 patent explains that one example of an "indirect" electrical connection with the patient's body is "by capacitive coupling." Ex. 1001 at 4:13–19.

446.   Harland discloses ultra-high impedance electric potential sensors that "allow the remote (non-contact) detection of electric potentials generated by currents flowing in the body."  Ex. 1016 at 164.  In the "remote, off-body detection" application, these electrodes "form capacitive [*i.e.*, indirect] coupling to the body under measurement."  *Id.*  As explained above, it would have been obvious to a POSA to modify Jensen to include at least one such capacitive electrode.  *See* Section XVI.C.1, *supra*.  As modified, the device of Jensen would therefore include at least one indirect connection to the body.  And, as explained above, the electrical connection between the patient's skin and the sensor contacts of Jensen's device are an example of an "direct electrical connection."  Ex. 1011 at [0041]; *see* Section XVI.3, *supra*.

447.   For these reasons, it is my opinion that a POSA would understand that Harland discloses "the plurality of electrical connections to the body compris[ing] at least one of direct electrical connections to the body and indirect electrical connections to the body" and, therefore, that the combination of Jensen, Kroll, and Harland renders obvious claim 2 of the '007 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 161

### 3.    *Dependent Claim 3*

448.    Claim 3 of the '007 patent depends from claims 1 and 2 and additionally requires that "the indirect electrical connections to the body comprise capacitive connections to the body."

449.    In my opinion, claim 3 of the '007 patent is rendered obvious by Jensen in combination with Kroll and Harland for all the reasons discussed above with respect to claims 1 and 2 as well as because Harland teaches the additional limitation of claim 3. *See* Section XVI.C.2, *supra*.

450.    Harland discusses the development and use of "a new class of sensor—the ultra-high impedance electric potential sensor" as an "alternative" to "traditional contact electrodes (for ECGs and EEGs)." Ex. 1016 at 164. The ultra-high impedance electric potential sensors disclosed by Harland "allow the remote (non-contact) detection of electric potentials generated by currents flowing in the body." *Id*. In the "remote, off-body detection" application, these electrodes "form capacitive coupling to the body under measurement." *Id*.

451.    For these reasons, it is my opinion that it would have been obvious to a POSA to modify the device taught by Jensen to so that "the indirect electrical connections to the body comprise capacitive connections to the body" and, therefore, that the combination of Jensen, Kroll, and Harland renders obvious claim 3 of the '007 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 162

### D.    Jensen Ground 4: Obvious Over Jensen, Kroll, Thompson, and General Knowledge of a Person of Ordinary Skill in the Art

#### 1.    A POSA would have combined Jensen, Kroll, and Thompson

452.    For the same reasons as discussed above, a POSA would have been motivated to combine Kroll's teaching of resistive traces with Jensen's device.  *See* Section XVI.A.1, *supra*.  Furthermore, for the same reasons as discussed above, a POSA would have had a reasonable expectation of success in combining Kroll's teaching of resistive traces with Jensen's device.  *See id.*

453.    In my opinion, a POSA would have also looked to incorporate Thompson's teaching of a periodic low power mode based on the electrical signals of a heartbeat with Jensen's device.  The utility of a battery-powered, wearable device is limited by its battery-life and the size and composition of the battery is limited by the dimensional requirements of a body-worn physiological monitor.  Therefore, in my opinion, a POSA would seek to optimize power consumption as a means of prolonging the battery life of the device and extending the period for which the device can collect data.

454.    Jensen presents one of the possible solutions for optimizing power consumption of the device by limiting the depletion of the battery: using a "switched supply voltage driver 29" so that "power from the system power source 9 is conserved whenever the sensors 1, 2 are not in contact with the user's skin."  Ex. 1011 at [0031].  In addition to Jensen's solution, however, there were many other

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 163

techniques for optimizing battery life of which a POSA would have been aware, including the use of a periodic low power mode. *See, e.g.*, U.S. Patent Publication No. 2003/0055460 ("Owen") (Ex. 1055) (filed May 31, 2002) at [0019] ("By having the processor operate in a low-power consumption mode, the invention reduces the amount of power consumed by the defibrillator. As a result, a power supply will last longer in the defibrillator of the present invention than in its conventional counterparts.").

455. In my opinion, a POSA would by default always consider, and where feasible adapt, additional power conservation solutions that would conserve power while the device was operational. Such solutions would allow battery usage to be even more efficient, thereby allowing for a reduction in the overall size of the batteries—and thus the size of the devices—as desired by the industry. *See* Section IV.B., *supra.*

456. Thompson discloses an approach to power conservation by limiting processing time to certain portions of the heartbeat waveform. In one embodiment, Thompson discloses that "[o]nly during a QRS complex, for example, does waveform analysis processor 520 operate in a high speed processing mode at a relatively high frequency. During the remainder of the cardiac cycle [*i.e.*, during the TP interval] the DSP processor 520 may be 'idling along' at a much lower clock frequency. . . . In addition to the lower clock speed utilized for different portions of

164

the cardiac cycle, one skilled in the art will recognize that in accordance with the other aspects of the present invention, as the speed is reduced, the supply voltage level ($V_{DD}$) may also be reduced accordingly.  Thus, the objective of reduced power consumption is realized." Ex. 1017 at 18:3–14.

457.   In my opinion, a POSA would have had a reasonable expectation of success in implementing Thompson's low power mode on Jensen's device without undue experimentation.  It would only require reprogramming of onboard firmware and/or software to do so.  Therefore, it is my opinion that a POSA would know how to combine Thompson's low power mode with Jensen's design with little to no design impact.  Further, there is nothing in the art to suggest that this modification would not work.

### 2.    *Dependent Claim 39*

458.   Claim 39 of the '007 patent depends from claim 1 and additionally requires that "an algorithm running on a microprocessor in the body worn device causes the body worn device to enter a low power mode that disables at least one circuit of the body worn device, from the end of a 'T wave' at the end of one heart beat to the beginning of a 'P wave' at the beginning of the next heart beat, to save power."

459.   In my opinion, claim 39 of the '007 patent is rendered obvious by Jensen in combination with Kroll and Thompson for all the reasons discussed above

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 165

with respect to claim 1 as well as because Thompson teaches the additional limitation of claim 39.  *See* Section XVI.A.2, *supra*.

460.   The device disclosed by Thompson conserves power by operating in a low power mode from the end of one S-wave of the patient's heartbeat until the commencement of the next Q-wave, meaning Thompson's device operates in a high-power mode only during the QRS interval.  Ex. 1017 at 18:3–14.  In my opinion, a POSA would understand that Thompson's low power mode is active for a period that includes the period "from the end of a 'T wave' at the end of one heartbeat to the beginning of a 'P wave' at the beginning of the next heartbeat," as shown by the annotated figure below.



iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 166

461.    Furthermore, for the reasons discussed above in Section XVI.C.1, it is my opinion that a POSA would also recognize that this low power mode could be implemented on Jensen's microprocessor. *Id*.

462.    For these reasons, it is my opinion that it would have been obvious to a POSA to modify the device taught by Jensen to include "an algorithm running on a microprocessor in the body worn devices causes the body worn device to enter a low power mode that disables at least one circuit of the body worn device, from the end of a 'T wave' at the end of one heart beat to the beginning of a 'P wave' at the beginning of the next heart beat, to save power" and, therefore, that the combination of Jensen, Kroll, and Thompson renders obvious claim 39 of the '007 patent.

## XVII. THE CHALLENGED CLAIMS OF THE '007 PATENT ARE UNPANTEABLE OVER MATSUMURA AND THE PRIOR ART

### A.    Matsumura Ground 1: Obvious Over Matsumura, Kroll, and General Knowledge of a Person of Ordinary Skill in the Art

463.    Additionally and alternatively, it is my opinion that claims 1, 2, 4–6, -8, 10-15, 29, 31 37, 38, and 43–45. of the '007 patent are obvious under pre-AIA § 103 over Matsumura, Kroll, and General Knowledge of a Person of Ordinary Skill in the Art.

167

### 1.    A POSA would have been motivated to combine Matsumura and Kroll

464.    In my opinion, a POSA would have found it obvious to combine the devices and methods of Matsumura and Kroll.

465.    Matsumura and Kroll both disclose body-worn devices used to collect and monitor a patient's physiological data, including specifically EKG data. Ex. 1012 at [0024], [0031], Fig. 2; Ex. 1013 at Abstract, 1:11–15, 1:37–45, 1:60. Kroll explicitly teaches that its disclosed device is "flexible." Ex. 1013 at 4:27–30 (describing the "*flexible* and disposable electrode belt 10 [ ] used to receive and transmit an electric current or voltage from and to the body of a patient") (emphasis added). In my opinion, a POSA would understand that Matsumura's "bioelectrode pad" is flexible. Matsumura teaches that its "bioelectrode pad" is preferably composed of sheets made from "polyethylene foam, polyurethane foam, or polyurethane sheet," which are all materials that a POSA would recognize as "flexible." Ex. 1012 at [0017]. Indeed, the use of flexible polyethylene and polyurethane to create flexible, wearable medical devices was well known in the art at the time of the purported invention. *See, e.g.*, Ex. 1047 at 23.11; Ex. 1056 (Tilak Shah, *Polyurethane Thin-Film Welding for Medical Device Applications*, Med. Device and Diagnostic Indus. (2002)) at 2.

466.    Matsumura teaches a "bioelectric potential detector," which is "worn on the subject's chest to detect electrocardiogram signals," Ex. 1012 at [0024], and

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 168

which "determines whether the detected electrocardiogram of the subject (patient) is abnormal, such as an arrhythmia or an abnormal heart rate," *id.* at [0037]. Specifically, Matsumura's device "wirelessly transmits the bioelectric potential detected . . . to inform medical staff or family members of the bioelectric potential information, so that they can quickly treat and cope with a sudden change in condition." *Id.* at [0041].

467.   In my opinion, a POSA developing a flexible, body-worn device for monitoring ECG data at this time—such as the device disclosed in Matsumura— would have sought to incorporate the "resistive trace" of Kroll for at least two reasons.

468.   First, a POSA would recognize that Kroll's teaching of a solution to electrical overload would be beneficial for Matsumura's device. Specifically, Kroll discloses using electrical lead strips of a known resistivity to limit the current transmitted between the worn device and the patient. Ex. 1013 at 5:1–13. Kroll discusses the use of the lead strips in the context of protecting a patient from "shock," from the worn device or "a complementary medical device." *Id.* In my opinion, a POSA would have understood that it would be beneficial to limit the current transmitted in either direction (whether towards or away from the patient's body). *See* Ex. 1035 at 644 ("**Current-carrying capacity:** The maximum current which can be carried continuously, under specified conditions, by a conductor without

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 169

causing degradation of electrical or mechanical properties of the printed circuit board."). Kroll's resistive lead strips would help to (i) protect the patient from shock due to electricity from the device, and (ii) protect the sensitive electronics inside the device from shock due to electricity outside of the device, such as that caused by a defibrillator.

469.    Matsumura's device is a wearable monitor to which these same considerations apply. Thus, in my opinion, a POSA would have been motivated to incorporate Kroll's teaching of resistive "lead strips" with the body-worn monitoring device disclosed by Matsumura in order to protect the patient from potential shock and to ensure the long-term viability of the device by protecting the circuitry of the body-worn device against a possible defibrillation.

470.    Second, consistent with industry efforts at the time, a POSA would seek to reduce the size of Matsumura's device to the extent possible. *See* Section III.C., *supra; see also* Ex. 1044 at 87.2 ("Convenience for the user is also extremely important in encouraging use of a device. Applications that require devices to be portable must certainly be light enough to be carried."). A POSA would understand that using the resistive lead strips, as taught by Kroll, would provide the means to reduce the physical size of the reusable portions of Matsumura's wearable device, which Matsumura also seeks to waterproof. Ex. 1012 at [0006]. In my opinion, a POSA would know that using the resistive lead strips made of an ink compound as

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 170

taught in Kroll would reduce the overall size of Matsumura's monitoring device by not having to rely on any conventional resistors in its signal processor. *See* Ex. 1035 at 1–2 (noting that "us[e] [of] printed circuit boards" allows for "[t]he size of component assembly [to be] reduced with a corresponding decrease in weight," among other benefits).

471. Further, it is my opinion that a POSA would have had a reasonable expectation of success in combining the teachings of Matsumura and Kroll because doing so would involve using the screen-printing technique which was well-known for printed circuit board manufacture. *See* Section IV.C, *supra*. At the time of invention of the Challenged Patents, printing ink—such as disclosed by Kroll—onto a circuit board was well-known. *See* Ex. 1035 at 296 ("Printing Process. The circuit patterns are screen printed on the substrate by two ways: (1) Manual screen printing process, and (2) Automatic or semi-automatic screen printing process."); *see also* Section IV.C, *supra*. Nothing in the art suggests that this modification would not work, as screen printing was a standard way to manufacture many types of printed circuit boards. *Id.* Further, this modification would not be difficult to implement using well-known manufacturing techniques because, as discussed above, screen-printing of printed circuit boards was well-known.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 171

### 2.    Independent Claim 1

472.    In my opinion, claim 1 of the '007 patent is rendered obvious by Matsumura in combination with Kroll.

### i.    Preamble 1[pre]

473.    The preamble of claim 1 recites "[a] body worn patient monitoring device comprising."

474.    In my opinion, to the extent that the preamble is limiting, Matsumura discloses the preamble of claim 1 of the '007 patent.  Matsumura discloses a body worn patient monitoring device that it refers to as a "bioelectric potential detector" which "can be used as an electrocardiogram detector that is worn on the subject's chest to detect electrocardiogram signals." *See, e.g.*, Ex. 1012 at Abstract, [0024]. Kroll also discloses a body-worn patient monitoring device. *See, e.g.*, Ex. 1013 at 1:11–15 (describing invention as "a disposable, flexible and layered electrode belt . . . for placement and use on the body of a patient and also for use with medical diagnostic and therapeutic devices").

475.    Thus, in my opinion, Matsumura and Kroll disclose "[a] body worn patient monitoring device."

### ii.    Limitation [1a]

476.    Limitation [1a] of the '007 patent recites "a disposable module including a plurality of electrical connections."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 172

477.    In my opinion, Matsumura discloses limitation [1a] of the '007 patent. Matsumura's body-worn device (*i.e.*, "bioelectric potential detector") includes a "***disposable*** bioelectrode pad" which uses "conductive gel 5" to detect bioelectric potentials and form electrical connections with the patient's skin.  Ex. 1012 at [0016] (emphasis added); *see also id.* at [0007]–[0008], [0014], [0019], Figs. 1–2.  As shown by annotated Figure 1 below, Matsumura discloses two pieces of "conductive material 2" which form electrical connections to the signal processor through the interface between holes 2a and hooks 3.  *Id.* at [0019].  Matsumura also discloses two pieces of "conductive gel 5" which form electrical connections with the patient's skin and detect bioelectric potentials.  *Id.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 173



*Id.* at Fig. 1 (annotated).

478.  Thus, in my opinion, Matsumura and Kroll render obvious "a disposable module including a plurality of electrical connections."

### *iii.    Limitation [1b]*

479.  Limitation [1b] of the '007 patent recites "said electrical connections adapted to be couplable to a skin surface to measure physiological signals."

480.  In my opinion, Matsumura discloses limitation [1b] of the '007 patent. As discussed above, Matsumura discloses "conductive gel[s] 5" which detect and transmit bioelectric potentials detected at the patient's skin surface and "conductive

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 174

material 2" which transmits the detected bioelectric potential to the signal processor

10." *See* Section XVII.A.2.ii, *supra*; Ex. 1012 at [0018]–[0019].

481.    Matsumura teaches that its "bioelectric potential detector" is couplable

to the patient's skin to measure physiological signals and teaches a protocol for

doing so.    Ex. 1012 at [0024].    The "conductive gel 5" is inserted through "two

openings 4a on the left and right sides" of second sheet.    *Id.* at [0018].    Then, an

"adhesive, such as acrylic adhesive for example, is applied to the back surface of the

second sheet 4."    *Id.*    In order to attach the bioelectric potential detector to a patient,

"the release tape 8 is peeled off from the bioelectrode pad 7 and the detector is

attached to the subject."    *Id.* at [0024].    Peeling off the release tape 8 exposes second

sheet 4 (*i.e.*, the bottom of bioelectric pad 7), which allows the adhesive layer to

adhere the bioelectric pad to the patient's skin.    *See also id.* at [0022] (describing

making second sheet 4 "less adhesive to the living body" by covering center with

optional third sheet 6).

482.    In my opinion, a POSA would understand that "conductive gel" enables

Matsumura's device to detect "bioelectric potentials," which are then transmitted

"through the conductive material 2 and the hooks 3."    *Id.* at [0019].    In my opinion,

a POSA would understand that the conductive gel 5 can detect "bioelectric

potentials" for transmission "through the conductive material 2 and the hooks 3"

because the conductive gel 5 is embedded in second sheet 4.    Thus, in my opinion,

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 175

Matsumura discloses that "said electrical connections [are] adapted to be couplable
to a skin surface to measure physiological signals."

### iv.    Limitation [1c]

483.    Limitation [1c] of the '007 patent recites "at least one of said electrical
connections comprising a half cell."

484.    In my opinion, Matsumura discloses limitation [1c] of the '007 patent.

485.    Matsumura discloses that "conductive gel 5" may be produced from
components such as an "acrylic hydrophilic polymer, glycerin, and water."    *Id.*
at [0018].    Matsumura further discloses that the conductive gel 5 contacts
"conductive material 2" which may be "coated with conductive Ag/AgCl."    *Id.*
at [0019]–[0020].    In my opinion, a POSA would understand that conductive gels
comprising an acrylic hydrophilic polymer, glycerin, and water, and contacting a
silver/silver-chloride conductive surface comprise a "half cell."    Ex. 1001 at 6:48–
57 (explaining that the term "electrode" is used interchangeably with "half cell"
within the disclosure and that an electrode—*i.e.*, a half cell—typically comprises (1)
a conductive surface and (2) an electrode gel).

486.    Thus, in my opinion, Matsumura discloses "at least one of said
electrical connections comprising a half cell."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 176

### v.    Limitation [1d]

487.   Limitation [1d] of the '007 patent recites "the disposable module including a disposable module connector."

488.   In my opinion, Matsumura discloses limitation [1d] of the '007 patent. As shown by annotated Figure 2 below, Matsumura's disposable bioelectrode pad 7—the claimed "disposable module"—incorporates two "hooks 3" that connect to "hook engagement portion[s] 10a on the bottom surface of the signal processor 10." Ex. 1012 at [0019], [0024].



*Id.* at Fig. 2 (annotated).

489.   Thus, in my opinion, Matsumura discloses "the disposable module including a disposable module connector."

177

### vi.    Limitation [1e]

490.   Limitation [1e] of the '007 patent recites "a power source to power the body worn patient monitoring device."

491.   In my opinion, the teachings of Matsumura as understood by a POSA would render obvious limitation [1e] of the '007 patent.

492.   As previously discussed, the use of onboard power sources in wearable monitoring devices was well-known at the time of the invention of the Challenged Patents.  *See* Section IV.C.*, supra.*  This is also noted by Matsumura which explains that prior art wireless monitors included "a power source."  Ex. 1012 at [0004] (prior art device comprising "conduction portion (equivalent to an electrode element), a power source, a potential difference detection portion, and a wireless transmitting/receiving portion").  In my opinion, a POSA would have understood Matsumura's device to include an onboard power source because, without one, the device would otherwise be unable to make the wireless transmissions discussed.  For example, Matsumura teaches that its device wirelessly transmits bioelectric potential signals from the signal processor to another device.  *See, e.g.*, *id.* at Abstract, [0011], [0025] (monitor transmits "processed bioelectric potential signal . . . wirelessly").  Absent a power source integrated into the device, such wireless transmission would not be possible.

178

493.    Thus, in my opinion, Matsumura in view of a POSA discloses "a power source to power the body worn patient monitoring device."

### vii.    Limitation [1f]

494.    Limitation [1f] of the '007 patent recites "a communication-computation module being removable and reusable."

495.    In my opinion, Matsumura discloses limitation [1f] of the '007 patent. Matsumura teaches a "reusable signal processor 10." *Id.* at [0016]; *see also id.* at [0008], [0014], [0025], Figs. 1–2.  Matsumura teaches that its "reusable signal processor 10" is "detachable" (*i.e.*, removable) from the disposable bioelectrode pad 7" with "hooks 3." *Id.*  Matsumura teaches that its reusable signal processor incorporates components for communication: "a circuit for modulating the processed bioelectric potential signal and transmitting it wirelessly, and a loop antenna" and components for communication: "a processing circuit for filtering and amplifying detected bioelectric potential signals" and "a memory for storing the processed bioelectric potential signal." *Id.* at [0025].

496.    Thus, in my opinion, Matsumura discloses "a communication-computation module being removable and reusable."

### viii.    Limitation [1g]

497.    Limitation [1g] of the '007 patent recites "having a communication-computation module connector to receive physiological signals from the disposable

179

module via said disposable module connector, the communication-computation module including."

498.   In my opinion, Matsumura discloses limitation [1g] of the '007 patent. As discussed above, in Section XVII.A.2.v, Matsumura discloses that "hooks 3" (on the disposable bioelectrode pad 7) connect to "hook engagement portion 10a on the bottom surface of the signal processor 10" thus forming a mechanical and electrical connection between the disposable bioelectrode pad 7 and the signal processor 10. Ex. 1012 at [0024]; *see also id.* at [0008], [0014], Fig. 2 (shown below).  Matsumura teaches that "the bioelectric potentials detected by the conductive gel 5 are transmitted through the conductive material 2 ***and the hooks 3.***"  *Id.* at [0019] (emphasis added).



iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 180

*Id.* at Fig. 2 (annotated).

499.   Thus, in my opinion, Matsumura discloses "having a communication-computation module connector to receive physiological signals from the disposable module via said disposable module connector, the communication-computation module."

### ix.    Limitation [1h]

500.   Limitation [1h] of the '007 patent recites "a microprocessor to actively monitor the patient and to perform a real-time physiological analysis of the physiological signals, said analysis determining an occurrence of a predetermined physiological event."

501.   In my opinion, Matsumura discloses limitation [1h] of the '007 patent. Matsumura teaches a "signal processor 10" which "incorporates *a processing circuit* for filtering and amplifying detected bioelectric potential signals."  *Id.* at [0025] (emphasis added).  Additionally, Matsumura teaches that the signal processor is used to monitor the patient's detected ECG signals and "determine[s] whether or not the detected electrocardiogram of the subject (patient) is in an abnormal state, such as an arrhythmia or an abnormal heart rate." *Id.* at [0032], [0037].

502.   Thus, in my opinion, Matsumura specifically teaches a communication-computation module capable of actively monitoring the patient and performing a

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 181

real-time physiological analysis of the occurrence of a predetermined physiological
(*i.e.*, cardiac) event.

### x.    Limitation [1i]

503.    Limitation [1i] of the '007 patent recites "a radio circuit to
communicate, upon determination of the predetermined physiological event, a result
of the physiological analysis on the occurrence of the predetermined physiological
event, via a radio transmission to a remote radio receiver."

504.    In my opinion, Matsumura discloses limitation [1i] of the '007 patent.
Matsumura teaches a communication-computation module ("signal processor 10")
that incorporates "a circuit for modulating the processed bioelectric potential signal
and transmitting it wirelessly," as well as a "loop antenna." *Id.* at [0025].
Matsumura discloses that the signal processor is used to monitor the patient's
detected ECG signals and determines whether a predetermined physiological event,
such as "an arrhythmia or an abnormal heart rate," occurs and, if so, "alarm
information is sent to the portable terminal 33." *Id.* at [0037]; *see also*
Section VI.B.2.ix., *supra.*

505.    Matsumura further teaches that the "electrocardiogram signals received
by the receiver 31 are transmitted via a communication line 32 to a portable terminal
33 carried by family members or medical staff" as shown by Figure 7 below.  Ex.
1012 at [0036].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 182



*Id.* at Fig. 7.

506.  Thus, in my opinion, Matsumura discloses "a radio circuit to communicate, upon determination of the predetermined physiological event, a result of the physiological analysis on the occurrence of the predetermined physiological event [*e.g.*, arrhythmia, abnormal heart rate], via a radio transmission to a remote radio receiver."

### xi.    Limitation [1j]

507.  Limitation [1j] of the '007 patent recites "wherein the disposable module is mechanically and electrically coupled directly to the communication-computation module."

508.  In my opinion, Matsumura discloses limitation [1j] of the '007 patent. Matsumura's bioelectrode pad ("disposable module") is coupled (both physically and electrically) to the disclosed signal processor ("communication-computation module") by the engagement of "hooks 3" that are "inserted into a hook engagement

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 183

portion 10a on the bottom surface of the signal processor 10" as shown in Figure

5(b) below. *Id.* at [0024].



*Id.* at Fig. 5(b). Matsumura further discloses that this coupling is reinforced by

"adhesive tape 9," which ensures that the components remain in contact throughout

use. *Id.* at [0024], Fig. 5(b). The "hooks 3" directly contact the "reusable signal

processor 10" because they are inserted through "holes 9a" in the "adhesive tape 9."

*Id.* at [0016], [0023]–[0024]; *see also id.* at Fig. 2. Thus, in my opinion, Matsumura

discloses that "the disposable module is mechanically and electrically coupled

directly to the communication-computation module."

### xii.    Limitation [1k]

509.  Limitation [1k] of the '007 patent recites "and the body worn patient

monitoring  device  including  the  disposable  module  and  the  communication-

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 184

computation module is adapted to be directly non-permanently affixed to the skin surface of the patient."

510.    In my opinion, Matsumura discloses limitation [1k] of the '007 patent. Matsumura describes a method for attaching the disclosed bioelectric potential detector (which includes the bioelectrode pad and the reusable signal processor) to the patient so that it "can be used as an electrocardiogram detector that is worn on the subject's chest to detect electrocardiogram signals." *Id.* at [0024], Fig. 2. Specifically, Matsumura teaches:

> When attaching the bioelectric potential detector to a patient, the release sheet 9b is peeled off from the adhesive tape 9, the protruding portion of the hooks 3 protruding from the adhesive tape 9 is inserted into a hook engagement portion 10a on the bottom surface of the signal processor 10, the release tape 8 is peeled off from the bioelectrode pad 7 and the detector is attached to the subject. The bioelectric detector 11 can be used as an electrocardiogram detector that is worn on the subject' chest to detect electrocardiogram signals.

*Id.* at [0024]. Matsumura further discloses that an optional "third sheet 6" may be used to "make[] it easier to use the bioelectrode pad 7 in terms of **attaching it to and detaching it from** the biometric surface [*i.e.*, the skin] by making the center of the back surface of the second sheet 4 less adhesive to the living body," meaning the pad may be attached and detached from the patient's body. *Id.* at [0022] (emphasis added). Thus, in my opinion, Matsumura discloses that "the body worn patient monitoring device including the disposable module and the communication-

185

computation module is adapted to be directly non-permanently affixed to the skin surface of the patient."

### xiii.    Limitation [1l]

511.    Limitation [1l] of the '007 patent recites "at least one series current-limiting resistor configured to protect the communication-computation module."

512.    In my opinion, the combination of Matsumura and Kroll discloses limitation [1l] of the '007 patent.

513.    As discussed above in Section XVII.A.1, a POSA would have looked to combine Kroll's "resistive traces" with Matsumura's "bioelectric potential detector."

514.    Kroll teaches at least one series current-limiting resistor. Kroll's device includes circuits comprising "lead strips" which "transmit and receive electric signals to and from the terminal end [ ] of the belt." Ex. 1013 at 5:1–4. Kroll's "lead strips" are composed of a preselected "flexible conductive ink compound having a conductive filler having Silver, Aluminum, or compounds thereof, or of a similarly suitable material" and "[p]referably  the ink deposit is of a preselected conductivity to provide a certain total lead strip resistance so that each strip [ ] serves as a current limiter to protect a patient from shock due to malfunction of the device [ ] or of a complementary medical device." *Id.* at 5:4–13.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 186

515.   As explained above, it is my opinion that a POSA would have known that the "resistive trace" of Kroll on a flexible, wearable medium would help safeguard Matsumura's signal processor/communication-computation module in the event of a patient being defibrillated.  *See* Section XVII.A.1, *supra*.  As the '007 patent acknowledges, there were existing medical standards that required "medical grade monitor[s]" to be able to "survive multiple defibrillation cycles of at least 360 joules." Ex. 1001 at 1:53–55, 10:19–29.  In my opinion, a POSA would understand the EC-13 standard to require resistors that protect the communication-computation module during a defibrillation shock, which is typically 360 Joules.  *See* Section IV.E., *supra*.

516.   Thus, in my opinion, the combination of Matsumura and Kroll discloses "at least one series current-limiting resistor configured to protect the communication-computation module."

### xiv.   Limitation [1m]

517.   Limitation [1m] of the '007 patent recites "the at least one series current-limiting resistor being screened on a flexible substrate."

518.   In my opinion, the combination of Matsumura and Kroll discloses limitation [1m] of the '007 patent.  Matsumura discloses a disposable bioelectrode pad composed of materials such as "polyethylene foam, polyurethane foam, or polyurethane sheet." Ex. 1012 at [0017]–[0018], [0022].  In my opinion, a POSA

187

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 187

would recognize polyethylene foam, polyurethane foam, or polyurethane sheet as "flexible" materials.  *See, e.g.*, Ex. 1047 at 23.11; Ex. 1056 at 2.

519.    In my opinion, it would have been obvious to a POSA that Matsumura's flexible substrate includes electrical connections, *i.e.*, traces.  And Kroll teaches the use of resistive traces or "lead strips" that are comprised of a "conductive ink compound" applied to a base layer "by means of a silk screen process."  Ex. 1013 at 5:23–27, 5:37–42.  As discussed above, a POSA would have understood "silk screen process" to refer to screen printing.  Ex. 1035 at 661 (noting that "[s]creen [p]rinting" is "[a]lso called silk screening").  A POSA would have understood that this change would simply require the substitution of well-known component, *i.e.*, Silver/Silver Chloride, for another, *i.e.*, Carbon ink.  Further, the carbon ink used in Kroll would have been readily available to a POSA from the same sources as the Silver/Silver Chloride previously used.  Ex. 1057 (Creative Materials, *Medical Device Specialty Inks and Films*, *available at* http://www.creativematerials.com/literature/medical_device.pdf, *archived at Wayback Machine* (https://web.archive.org/web/20060508230449/http://www.creativematerials.com/literature/medical_device.pdf) (May 8, 2006)); *see also* Ex. 1058 (Aoife Morrin et al., *Electrochemical Characterization of Commercial and Home-Made Screen-Printed Carbon Electrodes*, 36 Anal. Letters, 2021 (2003)) at 2023–24.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 188

520.   Thus, it is my opinion that it would have been obvious to a POSA to combine Matsumura's teaching of a communication-computation module on a flexible  printed medium with Kroll's teaching of resistive traces screened on a flexible, wearable medium, and, therefore, the limitation "the at least one series current-limiting resistor being screened on a flexible substrate" would have been obvious in view of the combination of Matsumura and Kroll.

### xv.    Limitation [1n]

521.   Limitation [1n] of the '007 patent recites "the at least one series current-limiting resistor being in the form of resistive traces."

522.   In my opinion, the combination of Matsumura and Kroll discloses limitation [1n] of the '007 patent.

523.   Kroll discloses circuits composed of "flexible conductive ink compound having a conductive filler, having Silver, Aluminum, or compounds thereof, or of a similarly suitable material" and further that the ink deposit is "[p]referably . . . of a preselected conductivity to provide a certain total lead strip resistance so that each strip 34 serves as a current limiter to protect a patient from shock due to malfunction of the device 20 or of a complementary device." Ex. 1013 at 5:4–13.

524.   A POSA would understand Kroll's disclosure of "lead strips" as referring to a "trace" as recited by the '007 patent.  A POSA would understand that

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 189

the terms "lead" and "trace" are often used interchangeably. Ex. 1035 at 642 ("Conductor: A single conductive path in conductive pattern. A PCB has at least one layer of conductors. *Synonyms:* path, trace."). Further, a POSA would have understood the term "*resistive* trace" to simply refer to a lead, trace, wire, etc. which has a specific resistance. *See, e.g.*, Ex. 1013 at 5:4–21.

525. Thus, in my opinion, it would have been obvious to a POSA to combine Matsumura's teaching of a communication-computation module on a flexible printed medium with Kroll's teaching of resistive traces on a flexible printed medium, thus disclosing the limitation "the at least one series current-limiting resistor being in the form of resistive traces."

### 3.    *Dependent Claim 2*

526. Claim 2 of the '007 patent depends from claim 1 and additionally requires that "the plurality of electrical connections to the body comprise at least one of direct electrical connections to the body and indirect electrical connections to the body."

527. In my opinion, claim 2 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Matsumura teaches the additional limitation of claim 2. *See* Section XVII.A.2, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 190

528.   Matsumura teaches that, after release tape 8 is removed, bioelectrode pad 7 of Matsumura is placed on the patient's skin.  Ex. 1012 at [0007]–[0008], [0014], [0016], Figs. 1-2.   Accordingly, Matsumura discloses "direct electrical connections to the body."

529.   Similarly, in Kroll's device, the conductive gel pads form a direct electrical connection with the patient's skin.  Ex. 1013 at 5:53–55.



Ex. 1012, Fig. 1 (annotated).  Accordingly, Kroll also discloses "direct electrical connections to the body."

530.   For these reasons, it is my opinion that a POSA would understand that Matsumura discloses "the plurality of electrical connections to the body compris[ing] at least one of direct electrical connections to the body and indirect

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 191

electrical connections to the body" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 2 of the '007 patent.

### 4.    Dependent Claim 4

531.    Claim 4 of the '007 patent depends from claim 1 and further requires that "the body worn patient monitoring device comprises an ECG monitor and at least two of the electrical connections are ECG electrodes."

532.    In my opinion, claim 4 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Matsumura teaches the additional limitation of claim 4.  *See* Section XVII.A.2, *supra.*

533.    Matsumura discloses a bioelectric potential detector 11 that "can be used as an **electrocardiogram detector** that is worn on the subject's chest to detect electrocardiogram signals" using conductive gels 5.  Ex. 1012 at [0024] (emphasis added); *see also id.* at [0018].  Matsumura also teaches that "at least two of the electrical connections are ECG electrodes."  Matsumura discloses two "conductive gels 5," which comprise two ECG electrodes.  *See* Section XVII.A.2.iv, *supra.*

534.    For these reasons, it is my opinion that Matsumura discloses "the body worn patient monitoring device comprises an ECG monitor and at least two of the electrical connections are ECG electrodes" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 4 of the '007 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 192

### 5.    *Dependent Claim 5*

535.    Claim 5 of the '007 patent depends from claims 1 and 4 and additionally requires that "the ECG electrodes comprise a material screened onto the flexible substrate."

536.    In my opinion, claim 5 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claims 1 and 4 as well as because Matsumura teaches the additional limitation of claim 5.  *See* Sections XVII.A.4, *supra.*

537.    Matsumura discloses that its disclosed "bioelectrode pad" is preferably composed of sheets made out of "polyethylene foam, polyurethane foam, or polyurethane sheet," which are all materials that a POSA would recognize as "flexible."  Ex. 1012 at [0017]–[0018]; Section XVII.A.2.xiv, *supra*; Ex. 1047 at 23.11; Ex. 1056 at 2.

538.    Kroll teaches a means of attaching ECG electrodes onto a flexible substrate.  Specifically, Kroll teaches that "[e]ach electrode 35 has a conductive grid . . . applied to an insulation and base support layer 44 preferably by means of a silk screen process."  Ex. 1013 at 5:23–27.  In my opinion, A POSA would have known to use the "silk screen process" taught by Kroll to attach "electrodes 35" to Matsumura's "bioelectrode pad."  As discussed above, screen printing was a preferred process for manufacturing circuits in the industry at the time of the

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 193

invention of the '007 patent. *See* Ex. 1035 at 283 (noting that "screen printing is a [ ] cheap and simple method" that is used to produce "[t]he majority of PCBs produced worldwide").

539.   For these reasons, it is my opinion that the combination of Matsumura and Kroll discloses "the ECG electrodes comprise a material screened onto the flexible substrate" and, therefore, renders obvious claim 5 of the '007 patent.

### 6.    *Dependent Claim 6*

540.   Claim 6 of the '007 patent depends from claims 1, 4, and 5 and additionally requires that the "at least one series current-limiting resistor protects the communication-computation module during a patient defibrillation event."

541.   In my opinion, claim 6 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claims 1, 4, and 5 as well as because the combination of Matsumura and Kroll teaches the additional limitation of claim 6. *See* Section XVII.A.5, *supra.*

542.   Matsumura discloses a communication-computation module: the reusable signal processor includes a "processing circuit" of the bioelectrical potential signal and a "circuit for modulating . . . and transmitting" the bioelectrical potential signal). Ex. 1012 at [0025].

543.   Kroll discloses using ink deposits to form "lead strips 34" which "provide a certain total lead strip resistance so that each strip 34 serves as a current

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 194

limiter to protect a patient from shock due to malfunction of the device 20 or of a complementary medical device." Ex. 1013 at 5:8–13.

544.   In my opinion, a POSA would understand that these same ink deposits that protect the patient from shock would also—at the same time—protect the monitoring device during a defibrillation event. *See, e.g.*, Ex. 1043 at 816–17 (noting that the resistivity of a conductor depends on the properties of the conductor material), 819–20 (noting that current always flows in the direction of decreasing electric potential or voltage); *see also* Ex. 1018 at 1:36–45; Section IV.F., *supra*.  As discussed above, it was well-known long before 2007 that body-worn devices must be capable of protecting both the patient and the wearable device from unwanted electrical discharge, such as from a defibrillation of the patient or from surplus electrical discharges from the device.  *See* Sections IV.C, IV.E–F., *supra*.

545.   Further, as the '007 patent acknowledges, there were existing medical standards that required "medical grade monitor[s]" to be able to "survive multiple defibrillation cycles of at least 360 joules."  Ex. 1001 at 1:53–55, 10:19–29.   A POSA would understand this to require resistors that protect the communication-computation module during a defibrillation shock, which is typically 360 Joules.  *See* Section IV.F, *supra*.

546.   For these reasons, it is my opinion that the combination of Matsumura and Kroll renders obvious claim 6 of the '007 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 195

### 7.    *Dependent Claim 8*

547.    Claim 8 of the '007 patent depends from claims 1 and 4 and additionally requires that "the mechanical interface from the at least one series current-limiting resistor to the EGG electrode comprises overlapped layers."

548.    In my opinion, claim 8 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claims 1 and 4 as well as because the combination of Matsumura and Kroll teaches the additional limitation of claim 8.  *See* Section XVII.A.2.4, *supra.*

549.    As discussed above in Section XVII.A.2.xiii, Kroll discloses "at least one series current-limiting resistor," in the form of lead strips 34.

550.    Kroll further teaches that "lead strips 34" (shown in green) "extend from each electrode 33, 35 [shown in red] to the terminal end 19" and overlap electrode 35 that includes a conductive grid 56 (shown in orange) "comprised of a matrix of approximately 0.050 inch wide lines 42 of conductive ink compound applied to an insulation and base support layer 44 preferably by means of a silk screen process" as shown below by Figure 5.  Ex. 1013 at 5:17–21, 5:23–27, Fig. 5. Kroll further teaches that the "conductive ink compound used in the matrix lines 42 is generally the same as that utilized in the lead strips 34."  *Id.* at 5:23–27, 5:31–33.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 196



FIG. 5

*Id.* at Fig. 5 (annotated).

551.   It is my opinion that a POSA at the time of the invention of the '007 patent would understand that the lead strips 34 and the matrix lines 42 were both screen-printed, as it was the standard technique for manufacturing circuit boards in the industry at the time.  *See* Ex. 1035 at 283 (noting that "screen printing is a [ ] cheap and simple method" that is used to produce "[t]he majority of PCBs produced worldwide").  Screen printing of circuits is accomplished by printing overlapping layers of ink, one at a time, to make up the different components.  *Cf.  id.* at 211, Fig. 5.16.  Such overlapping layers of ink can be, but do not necessarily need to be, composed of the same compounds.  Thus, a POSA would have understood matrix lines 42 and lead strip 34 as overlapping layers that can be made of either the same or different materials.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 197

552.   For these reasons, it is my opinion that Kroll discloses "the mechanical interface from the at least one series current-limiting resistor to the EGG electrode comprises overlapped layers" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 8 of the '007 patent.

### 8.   Dependent Claim 10

553.   Claim 10 of the '007 patent depends from claim 1 and additionally requires "an insulating material overlaying the at least one series current-limiting resistor to prevent arcing."

554.   In my opinion, claim 10 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Kroll teaches the additional limitation of claim 10.  *See* Section XVII.A.2, *supra.*

555.   In addition to teaching the "at least one series current-limiting resistor," *see* Section XVII.A.2.xiii *supra*, Kroll discloses that lead strip 34 (current-limiting resistor) is lined with insulation and base support layer 44 and inner patient insulation layer 40.  Ex. 1013 at 5:43–50.  Kroll further discloses that both the "inner patient insulation layer 40" and the "insulation and base support layer 44" are comprised of "polyester laminate."  *Id.* at 5:37–42, 5:44–47.

198



*Id.* at Fig. 6 (annotated).

556.    As shown above by Figure 6, Kroll's "inner patient insulation layer 40" and "insulation and base support layer 44" both overlay the "lead strip 34." Because Mylar has long been used for electrical insulation, a POSA would understand that polyester laminate has the necessary resistance to prevent the electric current coursing through lead strip 34 from jumping a connection (*i.e.*, "arcing"). Ex. 1048 at 13–14.

557.    For these reasons, it is my opinion that a POSA would understand that Kroll discloses "an insulating material overlaying the at least one series current-limiting resistor to prevent arcing" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 10 of the '007 patent.

### 9.    *Dependent Claim 11*

558.    Claim 11 of the '007 patent depends from claims 1, 4, and 5 and further requires that "the EGG electrodes are formed substantially in the shape of an annulus."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 199

559. In my opinion, claim 11 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claims 1, 4, and 5 as well as because Matsumura teaches the additional limitation of claim 11. *See* Section XVII.A.5, *supra.*

560. The '007 patent explicitly defines the term "annulus" and notes that "[u]nder this definition, an annulus can include . . . substantially rectangular shapes with rounded corners." Ex. 1001 at 6:23–63, 6:64-7:1. As previously discussed, the two conductive gels 5 of Matsumura are ECG electrodes. Ex. 1012 at [0019]; *see also* Section XVII.A.4, *supra.* The conductive gels 5 disclosed by Matsumura are substantially rectangular shapes with rounded corners, as shown below in Figure 1 of Matsumura.



Ex. 1012 at Fig. 1 (annotated).

561. For these reasons, it is my opinion that a POSA would understand that Matsumura discloses "the EGG electrodes are formed substantially in the shape of an annulus" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 11 of the '007 patent.

200

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 200

### 10.    Dependent Claim 12

562.   Claim 12 of the '007 patent depends from claims 1, 4, 5, and 11 and further requires that "the annulus comprises a conductive link."

563.   In my opinion, claim 12 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claims 1, 4, 5, and 11 as well as because Matsumura teaches the additional limitation of claim 10.  *See* Section XVII.A.9, *supra.*

564.   As discussed above with respect to claim 11, Matsumura teaches conductive gels 5 that are formed substantially in the shape of an annulus.  *See* Section XVII.A.9, *supra.*   Matsumura's conductive gels 5 detect bioelectric potentials and transmit them through a portion of conductive material 2 (*i.e.*, a conductive link) that contacts the annulus formed by conductive gel 5.  Ex. 1012 at [0019].

565.   For these reasons, it is my opinion that a POSA would understand that Matsumura discloses that "the annulus comprises a conductive link" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 12 of the '007 patent.

### 11.    Dependent Claim 13

566.   Claim 13 of the '007 patent depends from claims 1 and 5 and additionally requires that "the substrate is shaped to allow placement on the patient

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 201

to monitor at least one of a set of standard ECG vectors while simultaneously reducing motion and muscle artifact in the corresponding ECG vector signal."

567. In my opinion, claim 13 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claims 1 and 5 as well as because the combination of Matsumura and Kroll teach the additional limitation of claim 13. *See* Section XVII.A.5, *supra.*

568. Matsumura teaches that "bioelectric potential detector 11 can be used as an electrocardiogram detector that is worn on the subject's chest to detect electrocardiogram signals." Ex. 1012 at [0024].

569. Kroll teaches that the "disposable electrode belt" attached to the patient's body has "a plurality of predetermined contact areas for receiving and transmitting electrical signals," and that these "predetermined contact areas" may be "arranged having one at each corner of the body structure and six centrally placed in the body structure to form a generally curvilinear pattern whereby said contact areas conform *with standard precordial positions for 'twelve-lead' electrocardiographic devices*." Ex. 1013 at cls. 1, 13 (emphasis added). In my opinion, a POSA would have understood that placement at "standard EKG . . . electrode locations," as taught by Kroll, would measure standard ECG vectors.

570. Thus, a POSA would have known to place the bioelectrical potential detector 11 of Matsumura in one of the standard locations taught by Kroll. Further,

202

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 202

a POSA would have understood that the standard locations taught by Kroll were well known in the field because they were locations where motion and muscle artifact in the corresponding ECG vector signals were minimized.  Use of specific electrode placements to reduce the motion and muscle artifacts that interfered with EKG recording was well-known in the art.  *See, e.g.*, Ex. 1049 at 116 (noting that "the motion artefact can be reduced and larger QRS amplitude can be obtained by selective placement of electrodes"), 120; *see also* Ex. 1031 at 74 (referring to the "conventional Holter recorder [which] samples ECG data comparable to data *recorded by leads V1 and V5 of the standard 12-lead ECG*") (emphasis added).

571.   Thus, in my opinion, a POSA would understand that the combination of Matsumura and Kroll discloses that "the substrate is shaped to allow placement on the patient to monitor at least one of a set of standard ECG vectors while simultaneously reducing motion and muscle artifact in the corresponding ECG vector signal" and, therefore, renders claim 13 obvious.

### 12.    *Dependent Claim 14*

572.   Claim 14 of the '007 patent depends from claim 1 and additionally requires that "the power source is a renewable power source internal to the body worn device."

573.   In my opinion, claim 14 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 203

respect to claim 1 as well as because a POSA would understand that "the power
source is a renewable power source internal to the body worn device." *See*
Section XVII.A.2, *supra*.

574.    In my opinion, a POSA have understood that a power source could be
a renewable power source.  Different types of renewable power sources, such as
rechargeable batteries or one-time use batteries, were well known in the rechargeable
batteries were well-known and commonly used at the time of the invention of the
'007 patent.  *Compare* Ex. 1042 at 386 ("Power for the circuit is obtained from a
single nonrechargeable 3-V lithium battery"), *with* Ex. 1036 at 7 (specifying that
manufacturers of devices that include rechargeable batteries must disclose certain
information, *e.g.*, charging time).

575.    Thus, in my opinion a POSA would understand that the combination of
Matsumura and Kroll renders obvious dependent claim 14.

### 13.    *Dependent Claim 15*

576.    Claim 15 of the '007 patent depends on claim 1 and additionally
requires that "the power source comprises a rechargeable battery or a one time use
battery."

577.    In my opinion, claim 15 of the '007 patent is rendered obvious by
Matsumura in combination with Ozguz and Kroll for all the reasons discussed above
with respect to claim 1 as well as because a POSA would understand that "the power

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 204

source comprises a rechargeable battery or a one time use battery." *See* Section XVII.A.2, *supra.*

578.  In my opinion, a POSA have understood that a power source could be a renewable power source.  Different types of renewable power sources, such as rechargeable batteries or one-time use batteries, were well known and commonly used at the time of the invention of the '007 patent.  *Compare* Ex. 1042 at 386 ("Power for the circuit is obtained from a single nonrechargeable 3-V lithium battery"), *with* Ex. 1036 at 7 (specifying that manufacturers of devices that include rechargeable batteries must disclose certain information, *e.g.*, charging time).

579.  Thus, in my opinion a POSA would understand that the combination of Matsumura and Kroll renders obvious dependent claim 15.

### 14.    *Dependent Claim 29*

580.  Claim 29 of the '007 patent depends from claim 1 and additionally requires that "the body worn device includes circuit protection to allow the device to survive multiple defibrillation cycles of at least 360 joules."

581.  In my opinion, claim 29 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Kroll teaches the additional limitation of claim 29.  *See* Section XVII.A.2, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 205

582.    Kroll teaches "lead strips 34" which are composed of a conductive ink compound of a "preselected conductivity" in order to "provide a certain total lead strip resistance so that each strip 34 serves as a current limiter to protect a patient from shock due to malfunction of the device 20 or of a complementary medical device." Ex. 1013 at 5:4–13.

583.    In my opinion, a POSA would understand that these same ink deposits that protect the patient from shock would also—at the same time—help protect the monitoring device during a defibrillation event. *See, e.g.*, Ex. 1043 at 816–17 (noting that the resistivity of a conductor depends on the properties of the conductor material), 819–20 (noting that current always flows in the direction of decreasing electric potential or voltage); *see also* Ex. 1018 at 1:36–45 (disclosing leads made of "electrically conductive carbon loaded polymer" where the "distributed resistance of each polymer lead is sufficient to protect the EKG machine from defibrillation pulses"); Section IV.F., *supra*. As discussed above, it was well-known long before 2007 that body-worn devices must be capable of protecting both the patient and the wearable device from unwanted electrical discharge, such as from a defibrillation of the patient or from surplus electrical discharges from the device. *See* Sections IV.C, IV.E–F., *supra*.

584.    Further, as the '007 patent acknowledges, there were existing medical standards that required "medical grade monitor[s]" to be able to "survive multiple

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 206

defibrillation cycles of at least 360 joules." Ex. 1001 at 1:53–55, 10:19–29.  A POSA would understand this to require resistors that protect the communication-computation module during a defibrillation shock, which is typically 360 Joules.

585.   For these reasons, it is my opinion that Kroll discloses "the body worn device includes circuit protection to allow the device to survive multiple defibrillation cycles of at least 360 joules" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 29 of the '007 patent.

### 15.    *Dependent Claim 31*

586.   Claim 31 of the '007 patent depends from claims 1 and 29 and additionally requires that "a plurality of components of the circuit protection are distributed between the disposable module and the communication-computation module."

587.   In my opinion, claim 31 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claims 1 and 29 as well as because Kroll teaches the additional limitation of claim 31.  *See* Section XVII.A.14, *supra.*

588.   As discussed above, Kroll discloses "at least one series current-limiting resistor configured to protect the communication-computation module."  *See* Section XVII.A.2.xiii, *supra.*  In my opinion, a POSA would understand the Kroll's current-limiting resistor helps protect the monitoring device from a defibrillation

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 207

event.  In order for Kroll's lead strips (*i.e.*, the claimed "current-limiting resistor") to provide protection for Matsumura's reusable signal processor (*i.e.*, the claimed "communication-computation module"), the lead strips must be placed or distributed between the electrodes on the disposable module (which is fixed to the patient's body) and the communication module (which houses the sensitive electronics). Notably, if the resistive strips were used as circuit protection with the intention of protecting the patient, the placement of the lead strips could be the same.

589.   For these reasons, it is my opinion that the combination of Matsumura and Kroll discloses "a plurality of components of the circuit protection are distributed between the disposable module and the communication-computation module" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 31 of the '007 patent.

### 16.    *Dependent Claim 37*

590.   Claim 37 of the '007 patent depends from claim 1 and additionally requires that "the communication-computation module includes circuit components configured to detect failure of contact of one or more of the electrical connections with the skin surface of the patient."

591.   In my opinion, claim 37 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 208

respect to claim 1 as well as because Matsumura teaches the additional limitation of claim 37. *See* Section XVII.A.2, *supra.*

592. Matsumura teaches a sensor that "alerts medical staff or the like when an abnormality occurs in the bioelectric potential signals detected by the bioelectric potential detector." Ex. 1012 at [0001]. Specifically, Matsumura teaches that "[i]n the signal processor 10 of the bioelectric potential detector 11, . . . it is determined whether or not the detected electrocardiogram of the subject (patient) is in an abnormal state, such as an arrhythmia or an abnormal heart rate measured from the electrocardiogram" and an alarm may be triggered if such an abnormal state occurs. *Id.* at [0032].

593. In my opinion, a POSA would understand that Matsumura's signal processor would include circuit components that would detect failure of contact of one or more of the electrical connections with the skin surface of the patient. For example, a POSA would understand that if Matsumura's signal processor were capable of detecting arrhythmias, then it would be capable of detecting asystole—the "flat line"—which would occur if all of the electrodes lost contact with the patient's skin. *See* Ex. 1049 at 118–20 (accounting for the "missing data" when electrodes failed to adhere to the patient's skin for the duration of testing).

594. For these reasons, it is my opinion that Matsumura discloses that "the communication-computation module includes circuit components configured to

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 209

detect failure of contact of one or more of the electrical connections with the skin surface of the patient" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 37 of the '007 patent.

### 17.    Dependent Claim 38

595.    Claim 38 of the '007 patent depends from claim 1 and additionally requires that "the communication-computation module is protected from external high energy signals by electro-surgical isolation suppression circuits."

596.    In my opinion, claim 38 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Kroll teaches the additional limitation of claim 39. *See* Section XVII.A.2, *supra*.

597.    Kroll teaches "lead strips 34" which are composed of a conductive ink compound of a "preselected conductivity" to "provide a certain total lead strip resistance so that each strip 34 serves as a current limiter to protect a patient from shock due to malfunction of the device 20 or of a complementary medical device." Ex. 1013 at 5:4–13.

598.    In my opinion, a POSA would understand that circuits containing these same ink deposits that protect the patient from shock would also—at the same time—help protect the monitoring device from interference from an electrosurgical unit, thus forming "electrosurgical isolation suppression circuits."    during a

210

defibrillation event.  *See, e.g.*, Ex. 1043 at 816–17 (noting that the resistivity of a conductor depends on the properties of the conductor material), 819–20 (noting that current always flows in the direction of decreasing electric potential or voltage); *see also* Ex. 1018 at 1:36–45; (disclosing leads made of "electrically conductive carbon loaded polymer" where the "distributed resistance of each polymer lead is sufficient to protect the EKG machine from defibrillation pulses"); Section IV.F., *supra*.  As discussed above, it was well-known long before 2007 that body-worn devices must be capable of protecting both the patient and the wearable device from unwanted electrical discharge, such as from a defibrillation of the patient or from surplus electrical discharges from the device.  *See* Sections IV.C, IV.E–F., *supra*.  Further, as the '007 patent acknowledges, techniques to protect devices from electrosurgical interference were well known in the art: "AAMI standard EC13 on Electrosurgical Interference Suppression (ESIS).  Standard EC13 addressed the ability of an ECG monitor to display and process ECG signals in a satisfactory manner while connected to a patient on whom an electroSurgical device is being used."  Ex. 1001 at 14:25–30; *see generally*, Ex. 1036.

599.   For these reasons, it is my opinion that a POSA would understand that Kroll discloses "the communication-computation module is protected from external high energy signals by electro-surgical isolation suppression circuits" and, therefore,

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 211

that the combination of Matsumura and Kroll renders obvious claim 38 of the '007 patent.

### 18.    *Dependent Claim 43*

600.    Claim 43 of the '007 patent depends from claim 1 and additionally requires that "the radio circuit communicates an unprocessed physiological signal."

601.    In my opinion, claim 43 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Matsumura teaches the additional limitation of claim 43.  *See* Section XVII.A.2, *supra.*

602.    Matsumura teaches that the detected "bioelectric potential signals are wirelessly transmitted" from detector 10 to a receiver 22a, 23a, 31, that "determines if the bioelectric signals are in an abnormal state."  Ex. 1012 at [0013]; *see also* [0031], [0037], Figs. 7–8.  In my opinion, a POSA would have understood this to mean that detector 10 merely detects the signal and transmits it to the receiver 22a, 23a, 31 for processing, meaning that the signal remains unprocessed until it is received by receiver 22a, 23a, 31.  *See id.* at [0032] (teaching that the detected electrocardiogram data can be processed in either the "signal processor 10 of the bioelectric potential detector 11, the portable monitor 22, *or* the central monitor 23" to determine whether or not an abnormal state has been detected) (emphasis added).  Further, a POSA would have understood that access to the unprocessed detected

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 212

signals would have been standard at the time, because doctors would want to evaluate the unmanipulated, raw data in the event of an abnormal event or cardiac incident. *Cf.* Ex. 1034 at cls. 6, 76.

603.   For these reasons, it is my opinion that a POSA would understand that Matsumura discloses "the radio circuit communicates an unprocessed physiological signal" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 43 of the '007 patent.

### 19.    *Dependent Claim 44*

604.   Claim 44 of the '007 patent depends from claim 1 and additionally requires that "the radio circuit communicates a result of the physiological analysis at a predetermined time."

605.   In my opinion, claim 44 of the '007 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Matsumura and Kroll teach the additional limitation of claim 44. *See* Section XVII.A.2, *supra.*

606.   Matsumura teaches "a circuit built into the signal processor 10," for "filtering and amplifying detected bioelectric potential signals," and "wirelessly transmit[ing] the bioelectric potential signals using a loop antenna" to a "portable monitor 22 for each subject (patient)." Ex. 1012 at [0003], [0025], [0031]. As Matsumura explains, "signal processor 10" of the "bioelectric potential detecting

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 213

device 11" may determine an abnormality in the electrocardiogram such as arrhythmia or abnormal heart rate, and "[w]hen the state is changed, the alarm information is transmitted." *Id.* at [0037]-[0038]. The transmission "may be performed directly from the signal processor 10." *Id.* at [0039]. Thus, the transmission occurs at a predetermined time based on the change in state of the electrocardiogram.

607.    This disclosure is consistent with what a POSA would have known about the design controls for regulatory approval of medical devices, such as bioelectric potential detecting devices. Transmission timing would have been a part of these design controls; continuous or even excessive transmission would have negative effects on critical device features including power consumption, data integrity, and failure modes. A POSA would have understood that predetermined timing for transmission was a fundamental aspect of these devices. Known thresholds upon which timing could have been based included the following: data accumulation into a data packet, periodic or scheduled transmission timing, or a physiological threshold. In addition to Matsumura's explicit disclosure of transmission at a predetermined time based on a physiological threshold, it would also have been obvious to a POSA to consider other thresholds for transmission at predetermined times. For these reasons, it is my opinion that Matsumura discloses that "the radio circuit communicates a result of the physiological analysis at a

214

predetermined time" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 44 of the '007 patent.

### 20.    Independent Claim 45

608.   In my opinion, claim 45 of the '007 patent is rendered obvious by Matsumura in combination with Kroll.

### i.    Preamble 45[pre]

609.   Limitation 45[pre] of the '007 patent recites "a body worn patient monitoring device comprising." As discussed above with respect to Claim 1, it is my opinion that Matsumura discloses a body worn monitoring device. *See* Section XVII.A.2.i.

### ii.    Limitation [45a]

610.   Limitation [45a] of the '007 patent recites "a disposable module including a plurality of electrical connections." As discussed above with respect to Claim 1, it is my opinion that Matsumura discloses a disposable module including a plurality of electrical connections. *See* Section XVII.A.2.ii, *supra.*

### iii.    Limitation [45b]

611.   Limitation [45b] of the '007 patent recites "the electrical connections adapted for electrical coupling to a skin surface to receive physiological signals." As discussed above with respect to claim 1, it is my opinion that Matsumura

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 215

discloses that "the electrical connections [are] adapted for electrical coupling to a skin surface to receive physiological signals." *See* Section XVII.A.2.iii, *supra.*

### iv.    Limitation [45c]

612.    Limitation [45c] of the '007 patent recites "the disposable module including a disposable module connector." As discussed above with respect to claim 1, it is my opinion that Matsumura discloses a disposable module including a disposable module connector. *See* Section XVII.A.2.v, *supra.*

### v.    Limitation [45d]

613.    Limitation [45d] of the '007 patent recites "a power source to power the body worn patient monitoring device." As discussed above with respect to claim 1, it is my opinion that Matsumura discloses a power source to power the body worn patient monitoring device. *See* Section XVII.A.2.vi, *supra.*

### vi.    Limitation [45e]

614.    Limitation [45e] of the '007 patent recites "a communication-computation module, having a communication-computation module connector to receive the physiological signals from the disposable module via the disposable module connector, the communication-computation module including." As discussed above with respect to claim 1, Matsumura discloses a communication-computation module, having a communication-computation module connector to

216

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 216

receive the physiological signals from the disposable module via the disposable module connector. *See* Section XVII.A.2.vii–viii, *supra.*

### vii.    Limitation [45f]

615.    Limitation [45f] of the '007 patent recites "a microprocessor to actively monitor a patient and to perform a real-time physiological analysis of the physiological signals, the analysis determining an occurrence of a predetermined ECG event."

616.    In my opinion, limitation [45f] of the '007 patent is obvious in view of a POSA's knowledge.

617.    Matsumura discloses using a "signal processor 10" that continuously detects signals to "determine[] whether or not the detected electrocardiogram of the subject (patient) is in an abnormal state, such as an arrhythmia or an abnormal heart rate measured from the electrocardiogram, and if an abnormal state occurs, the portable monitor 22 and the central monitor 23 are set to trigger an alarm." Ex. 1012 at [0032]; *see also id.* at [0040].  In my opinion, a POSA would interpret the phrase "abnormal state" to mean a predetermined event that is programmed into the signal processor.

618.    For these reasons, in my opinion, Matsumura, in view of the knowledge of a POSA, renders obvious "a microprocessor to actively monitor a patient and to

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 217

perform a real-time physiological analysis of the physiological signals, the analysis determining an occurrence of a predetermined ECG event."

### viii.    Limitation [45g]

619.    Limitation [45g] of the '007 patent recites "a radio circuit to communicate an unprocessed physiological signal or a result of the physiological analysis, at a predetermined time or on an occurrence of a predetermined event, via a radio transmission to a remote radio receiver."

620.    As discussed with respect to claim 44 and limitation [45f], it is my opinion that the Matsumura discloses limitation 45[g] of the '007 patent. *See* Sections XVII.A.19, XVII.A.20.viii, *supra.*  To the extent that Matsumura does not explicitly disclose communication of an unprocessed physiological signal on the occurrence of a predetermined event, it is my opinion that it would be obvious to a POSA to implement such functionality on Matsumura's device.  At the time of the invention of the '007 patent, it was well-known that a monitoring device could perform some various functionality, such as sounding an alarm for the patient, based on the occurrence of a predetermined event.  *See, e.g.*, Ex. 1015 at 9:57–10:18 (discussing different types of events that could trigger an alarm or the logging of data).  Thus, additionally and alternatively, it is my opinion that Matsumura, in view of the knowledge of a POSA, renders obvious "a radio circuit to communicate an unprocessed physiological signal or a result of the physiological analysis, at a

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 218

predetermined time or on an occurrence of a predetermined event, via a radio transmission to a remote receiver."

### ix.    Limitation [45h]

621.   Limitation [45h] of the '007 patent recites "wherein the disposable module has a mechanical and electrical coupling to the communication-computation module."  As discussed with respect to claim 1, it is my opinion that Matsumura discloses and renders obvious that "the disposable module has a mechanical and electrical coupling to the communication-computation module."  *See* Section XVII.A.2.xi, *supra.*

### x.    Limitation [45i]

622.   Limitation [45i] of the '007 patent recites "forming the body worn patient monitoring device as a single unit that is adapted to be directly and non-permanently affixed to the skin surface of the patient."  As discussed with respect to claim 1, it is my opinion that Matsumura discloses forming the body worn patient monitoring device as a single unit that is adapted to be directly and non-permanently affixed to the skin surface of the patient.  *See* Section XVII.A.2.xii, *supra.*

### xi.    Limitation [45j]

623.   Limitation [45j] of the '007 patent recites "at least one series current-limiting resistor configured to protect the communication-computation module."  As discussed with respect to claim 1, it is my opinion that the combination of

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 219

Matsumura and Kroll discloses and renders obvious "at least one series current-limiting resistor configured to protect the communication-computation module." *See* Section XVII.A.2.xiii, *supra*.

### xii.    Limitation [45k]

624.    Limitation [45k] of the '007 patent recites "the at least one series current-limiting resistor being screened on a flexible substrate."  As discussed with respect to claim 1, it is my opinion that the combination of Matsumura and Kroll discloses and renders obvious "the at least one series current-limiting resistor being screened on a flexible substrate."  *See* Section XVII.A.2.xiv, *supra*.

### xiii.    Limitation [45l]

625.    Limitation [45l] of the '007 patent recites "the at least one series current-limiting resistor being in the form of resistive traces."  As discussed with respect to claim 1, it is my opinion that the combination of Matsumura and Kroll discloses and renders obvious "the at least one series current-limiting resistor being in the form of resistive traces."  *See* Section XVII.A.2.xv, *supra*.

## B.    Matsumura Ground 2: Obvious Over Matsumura, Ozguz, Kroll, and General Knowledge of a Person of Ordinary Skill in the Art

626.    Additionally and alternatively, it is my opinion that claims 1, 2, 4, 5, 14, 15, and 43–45 of the '007 patent are obvious under pre-AIA § 103 over

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 220

Matsumura, Ozguz, Kroll, and General Knowledge of a Person of Ordinary Skill in the Art.

### 1.    A POSA would have combined Matsumura, Kroll, and Ozguz

627.    For the same reasons as discussed above, a POSA would have been motivated to combine Kroll's teaching of "resistive traces" with Matsumura's device and would have had a reasonable expectation of success in doing so.    *See* Section XVII.A.1, *supra*.

628.    Like Matsumura, Kroll, and the Challenged Patents, Ozguz teaches a flexible, wearable device for monitoring physiological signals, including ECG or EKG signals.    Ex. 1012 at [0024], [0031], Fig. 2; Ex. 1014 at [0003], [0010], [0017], [0046]–[0050], Figs. 1, 2A.

629.    Matsumura discloses a "circuit," "signal processor," and "wireless transmitter" used to detect, process, and wirelessly transmit bioelectric signals.    Ex. 1012 at [0025].    However, Matsumura does not discuss the specific circuit design or architecture used to perform these functions.

630.    To the extent that the proper circuit design or architecture was not within the knowledge of a skilled artisan, an appropriate circuit design is disclosed by Ozguz.    Ozguz discloses an architecture and design of "circuitry (71, 72, 73)" which includes a "microprocessor" and "transmitter" that perform the same functions as those same components in Matsumura.    Thus, in my opinion, a POSA

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 221

would have looked to the integrated circuits disclosed by Ozguz—which incorporate a "microprocessor 175, a ROM 180 for storing a program to be implemented, a RAM 185 for storing of data, and a transmitter or transceiver"—in order to achieve Matsumura's "signal processor." Ex. 1014 at [0058]; *see also id.* at [0039]. Further, it is my opinion that a POSA would have looked to Ozguz's teaching of a radio circuit to achieve the wireless "signal transmitter" taught by Matsumura. *Id.* at [0039]–[0040], [0042], [0048], [0058], Figs. 3A–3C.

631.  In addition to its teaching of the architecture and design of the circuit, Ozguz teaches several advantages that would have motivated a POSA to incorporate its teachings into Matsumura's detector.

632.  *First*, Ozguz teaches a "bio-sensor system" which is "unobtrusive," "self-contained," and "permits a subject person to not only be at home or work, but also to remain unencumbered by cords." *Id.* at [0008], [0014]. Ozguz's teaching of "unobtrusive" and "self-contained" circuitry would be helpful in achieving Matsumura's goal of providing a "cable-free and compact" detector. Ex. 1012 at [0006].

633.  *Second*, Ozguz teaches that the "small size and wireless aspects of the instant sensor module avoid the noise that normally sullies the signal of past systems." Ex. 1014 at [0009]. Ozguz achieves this result by including a sensor module with "an integral power supply such that the signal remains clean and free

222

from noise." *Id.* A POSA would thus be motivated to incorporate the circuit components of Ozguz into Matsumura to avoid noise levels and more "accurately detect electromagnetic" signals. *Id.*

634. *Third*, in addition to wirelessly transmitting detected signals, Ozguz teaches using a hard-wired connection and a non-volatile memory "in case power is lost to the sensor module." *Id.* at [0040]. Matsumura's bioelectrical potential detector 11 includes "a memory for storing the processed bioelectric potential signal." Ex. 1012 at [0025]. A POSA would have looked to modify Matsumura's memory with Ozguz's non-volatile memory to ensure the storage of any detected signals from being lost if the sensor loses power. But doing so may necessitate the storage of a large number of detected signals. To efficiently transmit this large number of stored signals, Ozguz teaches the use of a hard-wired connection through port 86. Ex. 1014 at [0040]. A POSA would have also understood that port 86 could be used to recover the stored signal data of Ozguz, even if power is never restored. Accordingly, a POSA would look to add connection "port 86" taught by Ozguz to Matsumura's bioelectrical potential detector 11. By adding this communication port inside of Matsumura's signal processor 10, a POSA could maintain Matsumura's watertight structure while allowing the option of a hard-wired connection to download stored data "in case power is lost to the sensor module."

223

635.   Further, it is my opinion that a POSA combining the teachings of
Matsumura, Ozguz, and Kroll would have had a reasonable expectation of success
in doing so.  A POSA would have been able to incorporate Kroll's resistive traces
and Ozguz's circuitry design into Matsumura's detector with minimal design impact
using methods such as screen-printing, a well-known technique for printed circuit
board manufacture.  *See* Ex. 1035 at 283 (noting that "screen printing is a [ ] cheap
and simple method" that is used to produce "[t]he majority of PCBs produced
worldwide").  Nothing in the art suggested that this would not work.

### 2.    *Independent Claim 1*

636.   In my opinion, claim 1 of the '007 patent is rendered obvious by
Matsumura in combination with Ozguz and Kroll.

### i.    *Preamble 1[pre]*

637.   As explained above, it is my opinion that preamble 1[pre] of the '007
patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.
*See* Section XVII.A.2.i, *supra*.

### ii.    *Limitation [1a]*

638.   As explained above, it is my opinion that limitation [1a] of the '007
patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.
*See* Section XVII.A.2.ii, *supra*.

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 224**

### iii.    Limitation [1b]

639.   As explained above, it is my opinion that limitation [1b] of the '007

patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.

*See* Section XVII.A.2.iii, *supra.*

### iv.    Limitation [1c]

640.   As explained above, it is my opinion that limitation [1c] of the '007

patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.

*See* Section XVII.A.2.iv, *supra.*

### v.    Limitation [1d]

641.   As explained above, it is my opinion that limitation [1d] of the '007

patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.

*See* Section XVII.A.2.v, *supra.*

### vi.    Limitation [1e]

642.   As explained above, it is my opinion that limitation [1e] of the '007

patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.

*See* Section XVII.A.2.vi, *supra.*

643.   Additionally, and alternatively, it is my opinion that it would have been

obvious to a POSA to modify Matsumura with the teachings of Ozguz to include "a

power source to power the body worn patient monitoring device."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 225

644.    For the reasons discussed above, a POSA seeking to make or use the invention disclosed by Matsumura would have looked to Ozguz's teachings of specific circuit design and structure and would have been motivated to combine the battery taught by Ozguz with the device taught by Matsumura. *See* Section XVII.B.1, *supra*. Ozguz also discloses a "flexible, thin battery" to power a body worn sensor module. Ex. 1014 at [0048], Figs. 3A–3C. A POSA would have sought to incorporate Ozguz's battery into Matsumura's device for the same reasons as discussed above. *Id.*

645.    Thus, it is my opinion that the combination of Matsumura, Ozguz, and Kroll also renders obvious the limitation "a power source to power the body worn patient monitoring device."

### vii.    Limitation [1f]

646.    As explained above, it is my opinion that limitation [1g] of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA. *See* Section XVII.A.2.vii, *supra*.

### viii.    Limitation [1g]

647.    As explained above, it is my opinion that limitation [1f] of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA. *See* Section XVII.A.2.viii, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 226

### ix.    Limitation [1h]

648.    As explained above, it is my opinion that limitation [1h] of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA. *See* Section XVII.A.2.ix, *supra.*

649.    Additionally, and alternatively, it is my opinion that it would have been obvious to a POSA to modify Matsumura with the teachings of Ozguz to include "a microprocessor to actively monitor the patient and to perform a real-time physiological analysis of the physiological signals, said analysis determining an occurrence of a predetermined physiological event."

650.    Ozguz discloses flexible silicon substrates with respective integrated circuits that include a "microprocessor 175," said microprocessor configured to process data collected by the electrodes.  Ex. 1014 at [0058], [0039].  Ozguz further discloses that "it is to be expressly understood that the I[ntegrated] C[ircuit]s 71, 72, 73 can be integrated as one IC on a single silicon substrate."  *Id.* at [0042].  As explained above, a POSA would have sought to combine Ozguz's teachings related to circuit design and construction with Matsumura's disclosed monitoring device. *See* Section XVII.B.1, *supra.*  Thus, in my opinion, the combination of Matsumura and Ozguz discloses "a microprocessor to actively monitor the patient and to perform a real-time physiological analysis of the physiological signals, said analysis determining an occurrence of a predetermined physiological event."

227

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 227

### x.    Limitation [1i]

651.   As explained above, it is my opinion that limitation [1i] of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA. *See* Section XVII.A.2.x, *supra.*

652.   Additionally, and alternatively, it is my opinion that it would have been obvious to a POSA to modify Matsumura with the teachings of Ozguz to include "a radio circuit to communicate, upon determination of the predetermined physiological event, a result of the physiological analysis on the occurrence of the predetermined physiological event, via a radio transmission to a remote radio receiver."   As previously discussed, wearable devices which detected and communicated the occurrence of physiological events were standard in the art at the time.  *See, e.g.*, Ex. 1041 at 1 (including within the standard's scope all parts of devices necessary to "provide summaries of rhythms, conduction disturbances, and displacements of the ST segment").

653.   Ozguz teaches the use of a radio circuit to wirelessly transmit signal from the body-worn device to a remote receiver during monitoring.   Ex. 1014 at [0039]–[0040], [0042], [0057].   Ozguz notes that its system "can incorporate continuous transmission by RF [radio frequency] signals 40 to a device 45 having a receiver" and that to achieve this embodiment, the device should include "at least one antenna 50" metallized onto a flexible substrate.  *Id.* at [0039].   Ozguz thus

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 228

teaches a "communication-computation module" that continuously transmits information to a remote receiver through a radio circuit. Further, it is my opinion that a POSA would have been motivated to combine incorporate Ozguz's teachings into Matsumura's detector for all the reasons discussed above. *See* Section XVII.B.1, *supra.*

654. For those reasons, as well as the reasons stated above in Section XVII.A.2.x, it is my opinion that the combination of Matsumura, Kroll, and Ozguz renders obvious "a radio circuit to communicate, upon determination of the predetermined physiological event, a result of the physiological analysis on the occurrence of the predetermined physiological event, via a radio transmission to a remote radio receiver."

### xi.    Limitation [1j]

655. As explained above, it is my opinion that limitation [1j] of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA. *See* Section XVII.A.2.xi, *supra.*

### xii.    Limitation [1k]

656. As explained above, it is my opinion that limitation [1k] of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA. *See* Section XVII.A.2.xii, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 229

### xiii.    Limitation [1l]

657.   As explained above, it is my opinion that limitation [1*l*] of the '007

patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.

*See* Section XVII.A.2.xiii, *supra*.

### xiv.    Limitation [1m]

658.   As explained above, it is my opinion that limitation [1m] of the '007

patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.

*See* Section XVII.A.2.xiv, *supra*.

659.   Additionally, and alternatively, it is my opinion that it would have been

obvious to a POSA to modify Matsumura with the teachings of Ozguz and Kroll to

include "at least one series current-limiting resistor being screened onto a flexible

substrate."

660.   In my opinion, as discussed above, it would have been obvious to a

POSA to combine Matsumura's flexible bioelectrode pad with the specific

integrated circuits taught by Ozguz.   *See* Section XVI.B.1, *supra*; Ex. 1014

at [0039], [0042], [0058].  Further, it would also be obvious to combine the resulting

device with Kroll's "lead strips" for the reasons discussed above.   *See*

Section XVII.A.1.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 230

661.  Thus, in my opinion, the limitation "the at least one series current-limiting resistor being screened on a flexible substrate" would have been obvious to a POSA in view of the combination of Matsumura, Ozguz, and Kroll.

### xv.    Limitation [1n]

662.  As explained above, it is my opinion that limitation [1n] of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA. *See* Section XVII.A.2.xv, *supra.*

663.  Additionally and alternatively, in my opinion, the combination of Matsumura, Ozguz, and Kroll discloses limitation [1n] of the '007 patent.  As discussed above with respect to limitation [1m], Kroll teaches the existence of "lead strips" made of "flexible conductive ink compound having a conductive filler, having Silver, Aluminum, or compounds thereof, or of a similarly suitable material" in which the "ink deposit is of a preselected conductivity to provide a certain total lead strip resistance" in order for each lead strip to serve as a "current limiter."  Ex. 1013 at 5:4–13.

664.  A POSA would understand Kroll's disclosure of "lead strips" as referring to a "trace" as recited by the '007 patent.  A POSA would understand that the terms "lead" and "trace" are often used interchangeably because signal traces connect the components on a printed circuit board much like lead wires functioned in the early days of ECG technology.  *See* Ex. 1035 at 642 ("Conductor: A single

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 231

conductive path in conductive pattern.  A PCB has at least one layer of conductors.  *Synonyms:* path, trace.").   Further, a POSA would have understood the term "*resistive* trace" to simply refer to a lead, trace, wire, etc. which has a specific resistance, as taught by Kroll.  *See, e.g.*, Ex. 1013 at 5:4–21.

665.   As explained above, a POSA seeking to make or use the device taught by Matsumura would have looked to the teachings of Kroll to protect the device and its user, and to achieve a slimmer profile.  *See* Sections XVII.A.1, XVII.A.2.xiii–xv, *supra*.  In my opinion, a POSA would have had a reasonable expectation of success in combining Kroll's teaching of resistive traces with Matsumura's device.

666.   Thus, in my opinion, the limitation "the at least one series current-limiting resistor being in the form of resistive traces" would have been obvious to a POSA in view of the combination of Matsumura, Ozguz, and Kroll.

### 3.    *Dependent Claim 2*

667.   Claim 2 of the '007 patent depends from claim 1 and additionally requires that "the plurality of electrical connections to the body comprise at least one of direct electrical connections to the body and indirect electrical connections to the body."

668.   As explained above, it is my opinion that claim 2 of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.  *See* Section XVII.A.3., *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 232

669.    Additionally, and alternatively, it is my opinion that claim 2 of the '007 patent is rendered obvious by Matsumura in combination with Kroll and Ozguz. Ozguz discloses "electrodes 80" that are "held secured against" a patient's "skin 15 by. . . adhesive pad 91," meaning that electrodes 80 have a direct electrical connection to the body.  Ex. 1014 at [0043], [0045].

670.    For these reasons, it is my opinion that a POSA would understand that each of Matsumura, Ozguz, and Kroll discloses "the plurality of electrical connections to the body compris[ing] at least one of direct electrical connections to the body and indirect electrical connections to the body" and, therefore, that the combination of Matsumura, Ozguz, and Kroll renders obvious claim 2 of the '007 patent. *See also* XVII.B.2.

### 4.    *Dependent Claim 4*

671.    Claim 4 of the '007 patent depends from claim 1 and further requires that "the body worn patient monitoring device comprises an ECG monitor and at least two of the electrical connections are ECG electrodes."

672.    As explained above, it is my opinion that claim 4 of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.  *See* Section XVII.A.4, *supra.*

673.    Additionally, and alternatively, it is my opinion that claim 4 of the '007 patent is rendered obvious by Matsumura in combination with Kroll and Ozguz.

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 233**

674.  In my opinion, claim 4 of the '007 patent is rendered obvious by Matsumura in combination with Ozguz and Kroll for all the reasons discussed above with respect to claim 1 as well as because Matsumura and Ozguz teach the additional limitation of claim 4.  *See* Section XVII.B.2, *supra.*

675.  Matsumura specifically teaches the use of its disclosed bioelectric potential detector 11 "as an **electrocardiogram detector** that is worn on the subject's chest to detect electrocardiogram signals" using conductive gels 5.  Ex. 1012 at [0024]; *see also id.* at [0018].  Matsumura also teaches that "at least two of the electrical connections are ECG electrodes."  Matsumura discloses two "conductive gels 5," which comprise two ECG electrodes.  *See* Section XVII.A.2.iv, *supra*.

676.  Ozguz extensively discusses the usefulness of its disclosed device for EKG monitoring.  *See, e.g.*, Ex. 1014 at [0017], [0044].  A POSA would understand that the terms "ECG" and "EKG" are synonymous and often used interchangeably. *See, e.g.*, Ex. 1046.  Ozguz also teaches that "at least two of the electrical connections are ECG electrodes."  Ozguz's device includes three "electrodes 80 disposed on an underside 85 of the flexible substrate 55 for contact with the skin 15 of the subject body 20."  Ex. 1014 at [0039].

234

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 234



**FIG. 3B**

*Id.* at Fig. 3B.

677.   For these reasons, it is my opinion that a POSA would understand that each of Matsumura and Ozguz discloses "the body worn patient monitoring device comprises an ECG monitor and at least two of the electrical connections are ECG electrodes" and, therefore, that the combination of Matsumura, Ozguz, and Kroll renders obvious claim 4 of the '007 patent.

235

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 235

### 5.    *Dependent Claim 5*

678.    Claim 5 of the '007 patent depends from claims 1 and 4 and additionally requires that "the ECG electrodes comprise a material screened onto the flexible substrate."

679.    As explained above, it is my opinion that claim 5 of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.  *See* Section XVII.A.5, *supra.*

680.    Additionally, and alternatively, it is my opinion that claim 5 of the '007 patent is rendered obvious by Matsumura in combination with Kroll and Ozguz.

681.    In my opinion, claim 5 of the '007 patent is rendered obvious by Matsumura in combination with Ozguz and Kroll for all the reasons discussed above with respect to claims 1 and 4 as well as because Matsumura, Ozguz and Kroll teach the additional limitation of claim 5.  *See* Section XVII.B.2., *supra.*

682.    Matsumura teaches that its disclosed "bioelectrode pad" is preferably composed of sheets made out of "polyethylene foam, polyurethane foam, or polyurethane sheet," which are all materials that a POSA would recognize as "flexible."  Ex. 1012 at [0017]; *see also* Section XVII.A.5, *supra.*

683.    Ozguz teaches that electrodes 80 are "disposed on an underside 85 of the flexible substrate 55."  Ex. 1014 at [0039].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 236

684.   Kroll teaches a means of attaching ECG electrodes onto a flexible substrate.  Specifically, Kroll teaches screening onto "an insulation and base support layer 44", *i.e.*, a flexible substrate.  *See, e.g.*, Ex. 1013 at 5:22–42, Fig. 5.  Kroll explains that

> *Each electrode 35 has a conductive grid 56 which is comprised of a matrix of approximately 0.050 inch wide lines 42 of conductive ink compound applied to an insulation and base support layer 44 preferably by means of a silk screen process.*  The conductive ink is a silver compound generally used in the electronics industry. The conductive ink compound used in the matrix lines 42 is generally the same as that utilized in the lead strips 34.   Apertures 43 in the conductive ink matrix 42 form the grid configuration.   The grid configuration itself is provided both for proper electrical function as well as to reduce the amount of ink used while obtaining maximum function.   The insulation and base support layer 44 is preferably comprised of a thin approximately 0.001 inch polyester laminate and *serves as both a base for the silk screened conductive ink used in the matrix lines 42 and lead strips 34*, and as an electrical insulator.

*Id.* at 5:23–42 (emphases added).

685.   In my opinion, A POSA would have known to use the "silk screen process" of Kroll to attach "electrodes 35" to the "bioelectrode pad" of Matsumura and "flexible substrate 55" of Ozguz.  As discussed above, screen printing is one of the preferred processes for manufacturing circuits in the industry.  *See* Section IV.C, *supra*.  Accordingly, in my opinion, a POSA would have chosen screen printing as the means of affixing ECG electrodes to the rest of the circuit of the device because the most stable ECG electrodes use Silver/Silver Chloride, which is typically screen

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 237

printed.  *Id.*  And as Kroll's disclosure demonstrates, the use of screen printing specifically to affix ECG electrodes to the circuit of a body-worn patient monitoring device was known in art at the time of the invention.  Thus, in my opinion, a POSA would have had a reasonable expectation of success in achieving this combination.

686.   For these reasons, it is my opinion that a POSA would understand that each of Matsumura, Ozguz, and Kroll discloses "the ECG electrodes comprise a material screened onto the flexible substrate" and, therefore, that the combination of Matsumura, Ozguz and Kroll renders obvious claim 5 of the '007 patent.

### 6.    *Dependent Claim 14*

687.   Claim 14 of the '007 patent depends from claim 1 and additionally requires that "the power source is a renewable power source internal to the body worn device."

688.   As explained above, it is my opinion that claim 14 of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.  *See* Section XVII.A.12, *supra.*

689.   Additionally, and alternatively, it is my opinion that claim 14 of the '007 patent is rendered obvious by Matsumura in combination with Kroll and Ozguz.

690.   In my opinion, claim 14 of the '007 patent is rendered obvious by Matsumura in combination with Ozguz and Kroll for all the reasons discussed above with respect to claim 1 as well as because Ozguz teaches that "the power source is a

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 238

renewable power source internal to the body worn device." *See* Section XVII.B.2., *supra*.

691.    Ozguz teaches that the "sensor module 10" includes a "flexible, thin battery 105" that "overlays the silicon substrates 60, 65, 70 and their respective [integrated circuits] 71, 72, 73." Ex. 1014 at [0048]. In my opinion, a POSA would understand that the battery disclosed by Ozguz would be any type of small battery that was known in the art at the time. Both rechargeable batteries and one-time use batteries were known in the art at the time. *Compare* Ex. 1042 at 386 ("Power for the circuit is obtained from a single nonrechargeable 3-V lithium battery"), *with* Ex. 1036 at 7 (specifying that manufacturers of devices that include rechargeable batteries must disclose certain information, *e.g.*, charging time).

692.    Thus, in my opinion a POSA would understand that the combination of Matsumura, Ozguz, and Kroll renders obvious dependent claim 14.

### 7.    *Dependent Claim 15*

693.    Claim 15 of the '007 patent depends on claim 1 and additionally requires that "the power source comprises a rechargeable battery or a one time use battery."

694.    As explained above, it is my opinion that claim 15 of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA. *See* Section XVII.A.13, *supra*.

239

695.    Additionally, and alternatively, it is my opinion that claim 15 of the '007 patent is rendered obvious by Matsumura in combination with Kroll and Ozguz.

696.    In my opinion, claim 15 of the '007 patent is rendered obvious by Matsumura in combination with Ozguz and Kroll for all the reasons discussed above with respect to claim 1 as well as because Ozguz teaches that "the power source comprises a rechargeable battery or a one time use battery." *See* Section XVII.B.2., *supra*.

697.    Ozguz teaches that the sensor module 10 includes a "flexible, thin battery 105" that "overlays the silicon substrates 60, 65, 70 and their respective [integrated circuits] 71, 72, 73." Ex. 1014 at [0048]. In my opinion, a POSA would understand that the battery disclosed by Ozguz would be any type of small battery that was known in the art at the time. Disposable batteries of appropriate size were known in the art at the time. *Compare* Ex. 1042 at 386 ("Power for the circuit is obtained from a single nonrechargeable 3-V lithium battery"), *with* Ex. 1036 at 7 (specifying that manufacturers of devices that include rechargeable batteries must disclose certain information, *e.g.*, charging time).

698.    Thus, in my opinion a POSA would understand that the combination of Matsumura, Ozguz, and Kroll renders obvious dependent claim 15.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 240

### 8.   *Dependent Claim 43*

699.   Claim 43 of the '007 patent depends from claim 1 and additionally requires that "the radio circuit communicates an unprocessed physiological signal."

700.   As explained above, it is my opinion that claim 43 of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA.  *See* Section XVII.A.18, *supra.*

701.   Additionally, and alternatively, it is my opinion that claim 43 of the '007 patent is rendered obvious by Matsumura in combination with Kroll and Ozguz.

702.   Ozguz teaches a sensor module that wirelessly transmits the detected signals using "an integral RF transmitter."  Ex. 1014 at [0006].  In my opinion, a POSA would understand that those signals could be either processed or unprocessed physiological data because a POSA would have understood that access to the unprocessed detected signals would have been standard at the time, because doctors would want to evaluate the unmanipulated, raw data in the event of an abnormal event or cardiac incident.  *Cf.* Ex. 1034 at cls. 6, 76; *see also* Section XVII.A.18, *supra*.

703.   For these reasons, it is my opinion that a POSA would understand that Ozguz discloses "the radio circuit communicates an unprocessed physiological signal" and, therefore, that the combination of Matsumura, Ozguz, and Kroll renders obvious claim 43 of the '007 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 241

### 9.    *Dependent Claim 44*

704.    Claim 44 of the '007 patent depends from claim 1 and additionally requires that "the radio circuit communicates a result of the physiological analysis at a predetermined time."

705.    As explained above, it is my opinion that claim 44 of the '007 patent is obvious over Matsumura and Kroll in view of the knowledge of a POSA. *See* Section XVII.A.19, *supra.*

706.    Additionally, and alternatively, it is my opinion that claim 44 of the '007 patent is rendered obvious by Matsumura in combination with Kroll and Ozguz.

707.    Ozguz teaches a sensor module where "data is collected through the skin for a predetermined period of time" and then transmitted wirelessly through an "RF transmitter." Ex. 1014 at [0006], [0017]. In my opinion, a POSA would understand that a transmission following the collection of data for a "predetermined period of time" is a transmission that occurs at a predetermined periodicity (*i.e.*, at a predetermined time).

708.    For these reasons, it is my opinion that a POSA would understand that Ozguz discloses that "the radio circuit communicates a result of the physiological analysis at a predetermined time" and, therefore, that the combination of Matsumura, Ozguz, and Kroll renders obvious claim 44 of the '007 patent.

242

### 10.    Dependent Claim 45

709.    In my opinion, claim 45 of the '007 patent is rendered obvious by Matsumura in combination with Kroll and Ozguz.

### i.    Preamble 45[pre]

710.    Limitation 45[pre] of the '007 patent recites "[a] body worn patient monitoring device comprising."   As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this preamble obvious. *See* Section XVII.A.20.i, *supra.*

### ii.    Limitation [45a]

711.    Limitation [45a] of the '007 patent recites "a disposable module including a plurality of electrical connections."  As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious.  *See* Section XVII.A.20.ii, *supra.*

### iii.    Limitation [45b]

712.    Limitation [45b] of the '007 patent recites "the electrical connections adapted for electrical coupling to a skin surface to receive physiological signals." As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious.  *See* Section XVII.A.20.iii, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 243

#### iv.     Limitation [45c]

713.   Limitation [45c] of the '007 patent recites "the disposable module including a disposable module connector."  As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious. *See* Section XVII.A.20.iv, *supra.*

#### v.     Limitation [45d]

714.   Limitation [45d] of the '007 patent recites "a power source to power the body worn patient monitoring device."  As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious. *See* Section XVII.A.20.v, *supra.*

#### vi.     Limitation [45e]

715.   Limitation [45e] of the '007 patent recites "a communication-computation module, having a communication-computation module connector to receive the physiological signals from the disposable module via the disposable module connector, the communication-computation module including."  As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious.  *See* Section XVII.A.20.vi, *supra.*

#### vii.     Limitation [45f]

716.   Limitation [45f] of the '007 patent recites "a microprocessor to actively monitor a patient and to perform a real-time physiological analysis of the

244

physiological signals, the analysis determining an occurrence of a predetermined ECG event." As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious. *See* Section XVII.A.20.vii, *supra.*

717. Additionally, and alternatively, it is my opinion that limitation [45f] of the '007 patent is obvious in view of the combination of Matsumura, Kroll, and Ozguz because Ozguz discloses limitation [45f]. Ozguz teaches a "microprocessor" 175 that processes electrocardiogram signals that are continuously detected. Ex. 1014 at [0042], [0044], [0058]. In my opinion, a POSA would understand Ozguz's disclosures to refer to real-time physiological analysis to determine an occurrence of a predetermined event. *See Id.* at [0040] (discussing the "continuous transmission of [RF] signals 40 to a remote device 45 *during monitoring*") (emphasis added), [0039] (specifying that the remote device 45 includes "a means for analyzing the data"), [0020] (disclosing "software" to be used with the "separate data receiving and/or processing and analysis device"). It would be obvious to a POSA that, as part of its analysis, Ozguz's device would determine the occurrence of a predetermined event. At the time of the invention of the '007 patent, it was well-known that a monitoring device could perform such functionality, such as sounding an alarm for the patient, based on the occurrence of a predetermined event. *See, e.g.*, Ex. 1015 at

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 245

9:57–10:18 (discussing different types of events that could trigger an alarm or the logging of data).

718. For these reasons, it is my opinion, that Ozguz discloses "a microprocessor to actively monitor a patient and to perform a real-time physiological analysis of the physiological signals, the analysis determining an occurrence of a predetermined ECG event."

### viii.    Limitation [45g]

719. Limitation [45g] of the '007 patent recites "a radio circuit to communicate an unprocessed physiological signal or a result of the physiological analysis, at a predetermined time or on an occurrence of a predetermined event, via a radio transmission to a remote radio receiver." As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious. *See* Section XVII.A.20.viii, *supra*.

720. Additionally, and alternatively, it is my opinion that limitation [45g] of the '007 patent is obvious in view of the combination of Matsumura, Ozguz, and Kroll for all the reasons set forth with respect to claim 1. *See* Section XVII.B.2.x, *supra*.

### ix.    Limitation [45h]

721. Limitation [45h] of the '007 patent recites "wherein the disposable module has a mechanical and electrical coupling to the communication-computation

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 246

module." As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious. *See* Section XVII.A.20.ix, *supra.*

### x. Limitation [45i]

722. Limitation [45i] of the '007 patent recites "forming the body worn patient monitoring device as a single unit that is adapted to be directly and non-permanently affixed to the skin surface of the patient." As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious. *See* Section XVII.A.20.x, *supra.*

### xi. Limitation [45j]

723. Limitation [45j] of the '007 patent recites "at least one series current-limiting resistor configured to protect the communication-computation module." As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious. *See* Section XVII.A.20.xi, *supra*.

### xii. Limitation [45k]

724. Limitation [45k] of the '007 patent recites "the at least one series current-limiting resistor being screened on a flexible substrate." As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious. *See* Section XVII.A.20.xii, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 247

### xiii.    Limitation [45l]

725.    Limitation [45l] of the '007 patent recites "the at least one series current-limiting resistor being in the form of resistive traces."  As explained above, it is my opinion that Matsumura and Kroll in view of a POSA's knowledge render this limitation obvious.  *See* Section XVII.A.20.xiii, *supra.*

### C.    Matsumura Ground 3: Obvious Over Matsumura, Ozguz, Kroll, DeLuca, and General Knowledge of a Person of Ordinary Skill in the Art

726.    Additionally, and alternatively, it is my opinion that claims 32–35 of the '007 patent are obvious under pre-AIA § 103 over Matsumura, Ozguz, Kroll, DeLuca, and General Knowledge of a Person of Ordinary Skill in the Art.

### 1.    A POSA would have combined Matsumura, Ozguz, Kroll, and DeLuca

727.    As discussed above, it is my opinion that a POSA would have been motivated to combine Ozguz's disclosures of specific circuits and electronic components and Kroll's teaching of "resistive traces" with Matsumura's device and would have had a reasonable expectation of success in doing so.  *See* Section XVII.B.1, *supra.*

728.    Additionally, in my opinion, a POSA would have also sought to incorporate DeLuca's teaching of signal conditioning filters into the signal processor of Matsumura's device.  Both DeLuca and Matsumura teach a wearable, flexible

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 248

device for monitoring physiological data, including EKG data. Ex. 1012 at [0024], [0031], Fig. 2; Ex. 1015 at 1:6-9, 1:11-15, 2:1-4, 3:30-39.

729.  Matsumura teaches a "circuit," "signal processor," and "wireless transmitter" used to detect, process, and wirelessly transmit bioelectric signals. Ex. 1012 at [0025]. Specifically, Matsumura discloses that its device is capable of detecting anomalous heartbeat signals on the device. *See id.* at [0032] ("In the signal processor 10 of the bioelectric potential detector 11, . . . it is determined whether or not the detected electrocardiogram of the subject (patient) is in an abnormal state"). However, Matsumura does not discuss the particular electronic configurations to be used to perform this task.

730.  In my opinion, a POSA would understand that to "determine whether or not the detected electrocardiogram of the subject (patient) is in an abnormal state," the incoming analog signals would need to be processed and would have looked to any number of well-known algorithms to help perform this task. Many well-known algorithms could be used to accomplish this task, such as the "Pan-Tompkins Algorithm." *See generally*, Ex. 1050. In my opinion, a POSA, accordingly, would have looked to deploy the Pan-Tompkins algorithm or a similar signal conditioning algorithm on Matsumura's device and would have looked to Deluca to determine how to perform this signal conditioning step on Matsumura's device because

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 249

DeLuca discloses an implementation of bandpass filters in great detail. *See generally*, Ex. 1015 at 4:65–6:9.

731. Further, it is my opinion that a POSA would have had a reasonable expectation of success in implementing DeLuca's signal conditioning filters on Matsumura's device without undue experimentation. A POSA would know how to combine DeLuca's specific bandpass filtering configuration with Matsumura's device with minimal design impact because it has been known in the art for decades that the switched-capacitor filter circuit and a switched circuit including physical resistors are interchangeable methods for filtering. *See* Ex. 1052 at 592. Nothing in the art suggests that this modification would not work. *Id.* Nor would this modification be difficult to implement using well-known manufacturing techniques at the time of the invention.

## 2. *Dependent Claim 32*

732. Claim 32 of the '007 patent depends from claim 1 and additionally requires that "a high pass filter with a selectable corner frequency to filter the physiological signals."

733. In my opinion, claim 32 of the '007 patent is rendered obvious by Matsumura in combination with Ozguz, Kroll, and DeLuca for all the reasons discussed above with respect to claim 1 as well as because DeLuca teaches the additional limitation of claim 32. *See* Section XVII.A.2, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 250

734.   In my opinion, a POSA would have looked to incorporate DeLuca's "signal conditioning" filters into Matsumura's device so that Matsumura's device could detect a heartbeat accurately in order to "determine whether or not the detected electrocardiogram of the subject (patient) is in an abnormal state." *See* Section XVII.C.1, *supra*; Ex. 1012 at [0032].

735.   Matsumura teaches a "circuit," "signal processor," and "wireless transmitter" used to detect, process, and wirelessly transmit bioelectric signals. Ex. 1012 at [0025]. DeLuca teaches a "signal conditioning stage 56 which further amplifies and band-pass filters the signal so that it is of suitable voltage range and bandwidth for conversion [by] the A/D converter." Ex. 1015 at 4:66–5:2. Specifically, DeLuca teaches that "the signal conditioning stage 56 includes a hi-pass filter 56*a*." *Id.* at 5:2–3. "Each of the filter modules 56*a*, 56*c* and 56*d* is a switched-capacitor filter circuit whose cut-off frequency [*i.e.*, corner frequency] is determined by the clock frequency at which the filter is switched." *Id.* at 5:4–7.

736.   In my opinion, as explained above, a POSA would have recognized that DeLuca's band-pass filtering disclosures are consistent with the Pan-Tompkins QRS detection algorithm and it would have been obvious to combine DeLuca's high-pass filter with a selectable corner frequency with Matsumura's signal processing and heartbeat detection functionality. *See* Section XVII.C.1, *supra*.

251

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 251

737.    For these reasons, it is my opinion that DeLuca teaches "a high pass filter with a selectable corner frequency to filter the physiological signals" and, therefore, that the combination of Matsumura, Ozguz, Kroll, and DeLuca renders obvious claim 32 of the '007 patent.

### 3.    Dependent Claim 33

738.    Claim 33 of the '007 patent depends from claims 1 and 32 and additionally requires that "the corner frequency is selected by a switch selectable resistance."

739.    In my opinion, claim 33 of the '007 patent is rendered obvious by Matsumura in combination with Ozguz, Kroll, and DeLuca for all the reasons discussed above with respect to claims 1 and 32 as well as because DeLuca teaches the additional limitation of claim 33. *See* Sections XVII.C.2, *supra.*

740.    DeLuca teaches that "the signal conditioning stage 56 includes a hi-pass filter 56*a*." Ex. 1015 at 5:2-3. "Each of the filter modules 56*a*, 56*c*, and 56*d*, is a switched-capacitor filter circuit whose cut-off frequency [*i.e.*, corner frequency] is determined by the clock frequency at which the filter is switched." *Id.* at 5:4-7. To the extent that the claim requires a switch selectable resistance in a resistor—rather than in a switched capacitor—that configuration would be obvious to a POSA in view of DeLuca's disclosures. In my opinion, a POSA would understand that a switched-capacitor filter circuit and a switched circuit including physical resistors

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 252

are interchangeable methods for filtering; their interchangeability has been known in the art for decades.  *See* Ex. 1052.

741.   For these reasons, it is my opinion that DeLuca teaches that "the corner frequency is selected by a switch selectable resistance" and, therefore, that the combination of Matsumura, Ozguz, Kroll, and DeLuca renders obvious claim 33 of the '007 patent.

### 4.    *Dependent Claim 34*

742.   Claim 34 of the '007 patent depends from claims 1 and 32 and additionally requires that "the corner frequency is selected by one or more switching capacitors switched a rate higher than the corner frequency of a low pass anti-aliasing filter."

743.   DeLuca teaches that "the signal conditioning stage 56 includes a hi-pass filter 56*a*, an amplifier 56*b*, a lo-pass filter 56*c*, and an anti-aliasing filter 56*d*." Ex. 1015 at 5:2–4.  "Each of the filter modules 56*a*, 56*c* and 56*d*, is a switched-capacitor filter circuit whose cut-off frequency [*i.e.*, corner frequency] is determined by the clock frequency at which the filter is switched."  *Id.* at 5:4-7.  "The signal output from the input stage 55 is first coupled to the hi-pass filter 56*a* which removes any DC component present in the signal before amplification."  *Id.* at 5:9-12.  In my opinion, a POSA would recognize that the corner-frequency of the high-pass filter

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 253

would be selected by one or more switching capacitors switched a rate higher than the corner frequency of the low-pass filter.  Ex. 1042 at 76.

744.   In my opinion, claim 34 of the '007 patent is rendered obvious by Matsumura in combination with Ozguz, Kroll, and DeLuca for all the reasons discussed above with respect to claims 1 and 32 as well as because DeLuca teaches the additional limitation of claim 34.  *See* Sections XVII.C.2, *supra.*

745.   For these reasons, it is my opinion that DeLuca teaches that "the corner frequency is selected by one or more switching capacitors switched a rate higher than the corner frequency of a low pass anti-aliasing filter" and, therefore, that the combination of Matsumura, Ozguz, Kroll, and DeLuca renders obvious claim 34 of the '007 patent.

### 5.    *Dependent Claim 35*

746.   Claim 35 of the '007 patent depends from claims 1 and 32 and additionally requires that "the high pass filter is implemented in software running on the microprocessor."

747.   In my opinion, claim 35 of the '007 patent is rendered obvious by Matsumura in combination with Ozguz, Kroll, and DeLuca for all the reasons discussed above with respect to claims 1 and 32 as well as because DeLuca teaches the additional limitation of claim 35.  *See* Section XVII.C.2, *supra.*

254

748.   DeLuca teaches a "signal conditioning stage," in which the "operating parameters" "can be externally programmed" through the ASIC 36.  Ex. 1015 at 5:35-42.  In my opinion, a POSA would have understood that DeLuca's ASIC could also have implemented the signal conditioning filters using software because heartbeat detection algorithms using digital filters on a microprocessor were well-known in the art at the time of the invention of the '007 patent.  Ex. 1045.  For example, the well-known Pan-Tompkins QRS Detection Algorithm implemented digital filters using software.  Ex. 1050 at 232.  In my opinion, a POSA would have understood that the high-pass filter of DeLuca could easily be implemented using software rather than using physical circuits.

749.   For these reasons, it is my opinion that DeLuca teaches that "the high pass filter is implemented in software running on the microprocessor" and, therefore, that the combination of Matsumura, Ozguz, Kroll, and DeLuca renders obvious claim 35 of the '007 patent.

### D.   Matsumura Ground 4: Obvious Over Matsumura, Ozguz, Kroll, Harland, and General Knowledge of a Person of Ordinary Skill in the Art

750.   Additionally, and alternatively, it is my opinion that claims 2 and 3 of the '007 patent are obvious under pre-AIA § 103 over Matsumura, Ozguz, Kroll, Harland, and General Knowledge of a Person of Ordinary Skill in the Art.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 255

### 1.    A POSA would have combined Matsumura, Ozguz, Kroll, and Harland

751.    As discussed above, it is my opinion that a POSA would have been motivated to combine Ozguz's disclosures of specific circuits and electronic components and Kroll's teaching of "resistive traces" with Matsumura's device and would have had a reasonable expectation of success in doing so.    *See* Section XVII.B.1, *supra.*

752.    Additionally, a POSA would have looked to incorporate Harland's teaching of a capacitive sensor probe into Matsumura's device.

753.    Matsumura teaches the use of a conductive gel that includes "glycerin, and water." Ex. 1012 at [0018].  In my opinion, a POSA would recognize that "gel substances and the adhesives [used] to fix the electrodes on the body can provoke dermal irritation and even allergies."  Ex. 1053 at 5739.  This concern is more prevalent for a device such as Matsumura's because it is intended to be worn for an extended period of time.  *Id.*; *see also* Ex. 1012 at [0031] (patient wears Matsumura's device "at all times"), [0033].

754.    Harland teaches a solution to this problem of dermal tolerability by using "fixed sensor probe electrodes which form capacitive coupling to the body under measurement." Ex. 1016 at 164.  Harland's electrodes allow for measurement of ECG signals "without direct electrical contact" and permit recording of "the very highest quality ECG at any point on the body surface, even from the fingertips."  *Id.*

256

In my opinion, a POSA would recognize the benefit of capacitive electrodes in abating potential dermal irritation because these electrodes do not require the use of potentially skin-irritating gels or adhesives, which was a known problem in long-term ECG monitoring. *See generally*, Ex. 1053 at 5742. Thus, in my opinion, a POSA would have looked to Harland's teaching for specific details in order to implement this technology in Matsumura's device. Ex. 1016 at 164.

755. Further, it is my opinion that a POSA would have had a reasonable expectation of success in implementing Harland's capacitive electrode on Matsumura's device without undue experimentation. All of the electronic components and methods necessary for a POSA to be successful in making this modification would have been commercially available at the time of the invention of the '007 patent. *See* Ex. 1016 at 165 (noting that the "development of the electronics required for these sensors has been discussed in detail in previous publications"). A POSA would know how to combine Harland's capacitive electrode with Matsumura's design with minimal design impact and nothing in the art suggests that this modification would not work. Further, as discussed above, this modification would not be difficult to implement using well-known manufacturing techniques at the time of invention.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 257

## 2. *Dependent Claims 2 and 3*

756.    Claim 2 of the '007 patent depends from claim 1 and additionally requires that "the plurality of electrical connections to the body comprise at least one of direct electrical connections to the body indirect electrical connections to the body."  Claim 3 of the '007 patent depends from claims 1 and 2 and additionally requires that "the indirect electrical connections to the body comprise capacitive connections to the body."

757.    As explained previously, in my opinion, claim 2 of the '007 patent is rendered obvious by Matsumura in combination with Kroll and/or Kroll and Ozguz. Section XVII.B.3, *supra*.  Matsumura teaches that, after release tape 8 is removed, bioelectrode pad 7 of Matsumura is placed on the patient's skin, thereby forming a "direct electrical connection."  Ex. 1012 at [0007]-[0008], [0014], [0016], Figs. 1-2. Kroll also discloses that conductive gel pads form a direct electrical connection with the patient's skin.  Ex. 1013 at 5:53-55.  Additionally, in my opinion, Matsumura, Kroll, and Ozguz render claim 2 obvious.  A POSA would understand that an "indirect electrical connection" to the body is one in which the conductor(s) do not make actual contact with the skin.  *E.g.*, Ex. 1054 at 919.  The '007 patent explains that one example of an "indirect" electrical connection with the patient's body is "by capacitive coupling."  Ex. 1001 at 4:13-19.  Harland discloses ultra-high impedance electric potential sensors that "allow the remote (non-contact) detection of electric

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 258

potentials generated by currents flowing in the body." Ex. 1016 at 164. In the "remote, off-body detection" application, these electrodes "form capacitive [*i.e.*, indirect] coupling to the body in the measurement." *Id.* As explained above, it would have been obvious to a POSA to modify Matsumura to include at least one such capacitive electrode. Section XVII.D.1, *supra*. As modified, the device of Matsumura would include at least one indirect connection to the body, thereby meeting the dependent limitation of claim 2.

758. In my opinion, claim 3 of the '007 patent is rendered obvious by Matsumura in combination with Ozguz, Kroll, and Harland for all the reasons discussed above with respect to claims 1 and 2 as well as because Harland teaches the additional limitation of claim 3. *See* Section XVII.B.2, *supra*. Harland discusses the development and use of "a new class of sensor—the ultra-high impedance electric potential sensor" as an "alternative" to "traditional contact electrodes (for ECGs and EEGs)." Ex. 1016 at 164. The ultra-high impedance electric potential sensors disclosed by Harland "allow the remote (non-contact) detection of electric potentials generated by currents flowing in the body." *Id.* In the "remote, off-body detection" application, these electrodes "form capacitive coupling to the body under measurement." *Id.*

759. For these reasons, it is my opinion that Harland teaches that "the plurality of electrical connections to the body comprise at least one of direct

259

electrical connections to the body and indirect electrical connections to the body" and, therefore, that the combination of Matsumura, Kroll, Ozguz, and Harland renders obvious claim 2 of the '007 patent.  It is further my opinion that Harland teaches "the indirect electrical connections to the body comprise capacitive connections to the body" and, therefore, that the combination of Matsumura, Ozguz, Kroll, and Harland renders obvious claim 3 of the '007 patent.

### E.    Matsumura Ground 5: Obvious Over Matsumura, Ozguz, Kroll, Thompson, and General Knowledge of a Person of Ordinary Skill in the Art

760.    Additionally, and alternatively, it is my opinion that claim 39 of the '007 patent is obvious under pre-AIA § 103 over Matsumura, Ozguz, Kroll, Thompson, and General Knowledge of a Person of Ordinary Skill in the Art.

### 1.    A POSA would have combined Matsumura, Ozguz, Kroll, and Thompson

761.    As discussed above, it is my opinion that a POSA would have been motivated to combine Ozguz's disclosures of specific circuits and electronic components and Kroll's teaching of "resistive traces" with Matsumura's device and would have had a reasonable expectation of success in doing so.  *See* Section XVII.B.1, *supra.*

762.    In my opinion, a POSA would have also looked to incorporate Thompson's teaching of a periodic low power mode based on the electrical signals of a heartbeat with Matsumura's device.  The utility of a battery-powered, wearable

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 260

device is limited by its battery-life and the size and composition of the battery is limited by the dimensional requirements of a body-worn physiological monitor. Therefore, in my opinion, a POSA would seek to optimize power consumption as a means of prolonging the battery life of the device and extending the period for which the device can collect data.

763.    Due to this concern, a POSA would have been aware of techniques for optimizing battery life, including the use of a periodic low power mode. *See, e.g.*, Ex. 1055 at [0019] ("By having the processor operate in a low-power consumption mode, the invention reduces the amount of power consumed by the defibrillator. As a result, a power supply will last longer in the defibrillator of the present invention than in its conventional counterparts."). In my opinion, a POSA would have sought out additional power conservation solutions that would conserve power while the device was operational. Such solutions would allow battery usage to be even more efficient allowing for a reduction in the overall size of the batteries—and thus the size of the devices—as desired by the industry. *See* Section IV.C–D, *supra*.

764.    Thompson discloses an approach to power conservation by limiting processing time to certain portions of the heartbeat waveform. In one embodiment, Thompson discloses that "[o]nly during a QRS complex, for example, does waveform analysis processor 520 operate in a high speed processing mode at a relatively high frequency. During the remainder of the cardiac cycle [*i.e.*, during the

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 261

TP interval] the DSP processor 520 may be 'idling along' at a much lower clock frequency. . . . In addition to the lower clock speed utilized for different portions of the cardiac cycle, a POSA would recognize that in accordance with the other aspects of the present invention, as the speed is reduced, the supply voltage level ($V_{DD}$) may also be reduced accordingly.  Thus, the objective of reduced power consumption is realized." Ex. 1017 at 18:3–14.

765.  In my opinion, a POSA would have had a reasonable expectation of success in implementing Thompson's low power mode on Matsumura's device without undue experimentation.  It would only require reprogramming of onboard software to do so.  Therefore, it is my opinion that a POSA would know how to combine Thompson's low power mode with Matsumura's design with little to no design impact.  Further, there is nothing in the art to suggest that this modification would not work.

## 2.    *Dependent Claim 39*

766.  Claim 39 of the '007 patent depends from claim 1 and additionally requires "an algorithm running on a microprocessor in the body worn device causes the body worn device to enter a low power mode that disables at least one circuit of the body worn device, from the end of a 'T wave' at the end of one heart beat to the beginning of a 'P wave' at the beginning of the next heart beat, to save power."

262

767.   In my opinion, claim 39 of the '007 patent is rendered obvious by Matsumura in combination with Ozguz, Kroll, and Thompson for all the reasons discussed above with respect to claim 1 as well as because Thompson teaches the additional limitation of claim 39.  *See* Section XVII.B.2, *supra.*

768.   The device disclosed by Thompson conserves power by operating in a low power mode from the end of one S-wave of the patient's heartbeat until the commencement of the next Q-wave, meaning Thompson's device operates in a high-power mode only during the QRS interval.  Ex. 1017 at 18:3–14.  In my opinion, a POSA would understand that Thompson's low power mode is active for a period that includes the period "from the end of a 'T wave' at the end of one heartbeat to the beginning of a 'P wave' at the beginning of the next heartbeat," as shown by the annotated figure below.  *Id.*; *see* Section IV.A., *supra*.



iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 263

769.    Furthermore, for the reasons discussed above in Section XVI.C.1, it is my opinion that a POSA would also recognize that this low power mode could be implemented on Matsumura's microprocessor.

770.    For these reasons, it is my opinion that Thompson teaches "an algorithm running on a microprocessor in the body worn device causes the body worn device to enter a low power mode that disables at least one circuit of the body worn device, from the end of a 'T wave' at the end of one heart beat to the beginning of a 'P wave' at the beginning of the next heartbeat, to save power" and, therefore, that the combination of Matsumura, Ozguz, Kroll, and Thompson renders obvious claim 39 of the '007 patent.

## XVIII.    THE CHALLENGED CLAIMS OF THE '492 PATENT ARE UNPATENTABLE

### A.    Ground 1: Obvious Over Matsumura, Kroll, and General Knowledge of a Person of Ordinary Skill in the Art

771.    In my opinion, claims 1–3, 5–8, and 11–14 of the '492 patent are obvious under pre-AIA § 103 over Matsumura, Kroll, and General Knowledge of a Person of Ordinary Skill in the Art.

#### 1.    *A POSA had motivation to combine Matsumura and Kroll*

772.    For the reasons set forth above in Section XVII.A.1, with reference to the '007 patent, a POSA would have had motivation to combine the teachings of

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 264

Matsumura and Kroll and would have had a reasonable expectation of success in doing so.

### 2.    Independent Claim 1

773.   In my opinion, claim 1 of the '492 patent is rendered obvious by Matsumura in combination with Kroll.

### i.    Preamble 1[pre]

774.   The preamble of claim 1 recites "[a] body-worn patient monitoring device comprising."

775.   In my opinion, to the extent the preamble is limiting, Matsumura discloses the preamble of claim 1 of the '492 patent.

776.   Matsumura discloses "a waterproof bioelectric potential detector" that is able to "measure [a patient's] electrocardiograms" and alert medical staff or family members "if the condition of the subjects/patients suddenly changes."   Ex. 1012 at [0006].   Matsumura further teaches that the disclosed "bioelectric potential detector" includes:

> a disposable bioelectrode pad for detecting bioelectric potentials, and a reusable signal processor for processing the bioelectric potential signals detected by the bioelectrode pad, and determining whether the bioelectric potential signals are in an abnormal state and wirelessly transmitting alarm information notifying at a minimum that the bioelectric potential signals are in an abnormal state if the bioelectric potential signals are in an abnormal state

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 265

*Id.* at [0014].

777.    Kroll also discloses a body worn patient monitoring device.    Kroll recites:

> This invention relates to a device and method for receiving and transmitting electrical signals to and from a patient. Particularly, this invention relates to a disposable, flexible, and layered electrode belt, also referred to as a "belt", for placement and use on the body of a patient and also for use with medical diagnostic and therapeutic devices.

Ex. 1013 at 1:9–15.

778.    Thus, in my opinion, each of Matsumura and Kroll discloses "[a] body-worn patient monitoring device."

### ii.    Limitation [1a]

779.    Limitation [1a] recites "a flexible printed circuit layer made from an insulating material and defining a substrate."

780.    In my opinion, Matsumura discloses limitation [1a] of the '492 patent.

781.    Matsumura teaches a "bioelectrode pad" composed of sheets "made of an insulating material . . . for example, polyethylene foam, polyurethane foam, or polyurethane sheet."    Ex. 1012 at [0017]; *see also id.* at [0018], [0022].    In my opinion, a POSA would recognize polyethylene and polyurethane as flexible materials.    Ex. 1047 at 23.11; Ex. 1056 at 2.    Additionally, it is my opinion that a POSA would have known that a circuit layer *must* be formed on an insulating

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 266

material.  *See e.g.*, Ex. 1035 at 659 (defining "Printed Circuit Board" as "[a]n insulating material onto which an electronic circuit has been printed or etched").

782.   Matsumura discloses that its bioelectrode pad includes two pieces of "conductive material 2" which "can be a carbon sheet or a PET sheet coated with ***conductive Ag/AgCl***."  Ex. 1012 at [0019]–[0020] (emphasis added).  At the time of the invention of the Challenged Patents, it was well-known that silver and/or silver chloride electrodes, connectors, or traces could be created using the screen printing technique.  *See* Ex. 1035 at 3 (noting screen printing had been used to "print[] silver paste conductors and graphite resistors" onto substrates since the end of World War II).  Thus, a POSA would modified the conductive material disclosed by Matsumura to form a flexible printed circuit layer made from an insulating material and defining a substrate.

783.   It would have been obvious to replace the two pieces of insulating material coated with conductive Ag/AgCl with a single, flexible sheet of insulating material that contained printed-ink, conductive traces, as shown below.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 267



Ex. 1012 at Fig. 1 (annotated).  In my opinion, a POSA would have been motivated to make this change to reduce the manufacturing costs associated with manufacturing the parts:  it is cheaper to cut out one part (as opposed to two) and it is cheaper to coat a defined area of the insulating material (as opposed to coating the insulating material in its entirety).  Further, a POSA would have had a reasonable expectation of success so doing because screen-printing was well-known in the art at the time.  *See* Ex. 1035 at 3 (noting screen printing had been used to "print[] silver paste conductors and graphite resistors" onto substrates since the end of World War II).

784.   Thus, in my opinion, a POSA would understand that, as modified, this sheet with printed traces replacing Matsumura's conductive material 2 would

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 268

comprise a flexible printed circuit layer made from an insulating material and defining a substrate.  Therefore, it is my opinion that Matsumura, in view of the knowledge of a POSA, renders obvious "a flexible printed circuit layer made from an insulating material and defining a substrate."

### iii.    Limitation [1b]

785.   Limitation [1b] of the '492 patent recites "at least one electrode disposed onto a surface of the substrate."

786.   In my opinion, Matsumura discloses limitation [1b] of the '492 patent.

787.   Matsumura discloses "conductive gel[s] 5" (the claimed "electrodes") that are used to detect bioelectrical potentials.  Ex. 1012 at [0019].  These "conductive gel[s]" are placed in openings 4a in "second sheet" 4, meaning that, when Matsumura's device was modified as explained above, the conductive gels would make contact with the printed sheet of conductive material.  Ex. 1012 ¶¶ [0018]–[0019].  Thus, when modified, the conductive gels 5 are disposed on a surface of the substrate (*i.e.*, the insulating sheet with printed traces replacing conductive material 2)., as shown below by annotated Figure 1.  *Id.* at [0018]–[0019].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 269



Ex. 1012, Fig. 1 (annotated).

788.  Thus, in my opinion, Matsumura discloses "at least one electrode disposed onto a surface of the substrate."

### iv.    Limitation [1c]

789.  Limitation [1c] of the '492 patent recites "at least one connection pad."

790.  In my opinion, Matsumura and Kroll, in view of the knowledge of a POSA, render obvious limitation [1c] of the '492 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 270

791.   As discussed above, a POSA would have implemented Matsumura's conductive material 2 by printing traces on a single sheet of insulating material.  *See* Section XVIII.A.2.ii, *supra.*

792.   In my opinion, a POSA would understand that where Matsumura's hooks contact the traces of the flexible printed circuit layer (inserted between the first and second sheets) constitutes a "connection pad" Because it forms an electrical connection between the signal processor 10 and traces leading to the electrodes 5. Ex. 1003 at 7:44-55; *see* Ex. 1035 at 656 (defining "pad" as "[a] portion of the conductive area of which components, terminals, traces, etc., are mechanically attached").

271



Ex. 1012, Fig. 1 (annotated).

793.   Thus, in my opinion, the combination of Matsumura and Kroll renders obvious "at least one connection pad."

### v.   Limitation [1d]

794.   Limitation [1d] of the '492 patent recites "at least one electrical trace extending between the at least one connection pad and a conductive surface of the at least one electrode."

795.   In my opinion, Matsumura, in view of the knowledge of a POSA, renders obvious limitation [1d] of the '492 patent.

272

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 272

796.    As discussed above, it is my opinion that a POSA would have been motivated to combine the two pieces of conductive material 2 into a single, printed sheet, forming a flexible circuit layer on which Kroll's lead strips (*i.e.*, the claimed "resistive traces") are printed.  *See* Section XVIII.A.2.ii, *supra*.  As modified, one end of the printed traces would contact conductive gel 5 (the electrodes) and the other end would contact the hooks 3 at the connection pad.  *See* Section XVIII.A.2.iv, *supra*.  In my opinion, a POSA would have understood that, as modified, Matsumura includes at least one electrical trace extending between the connection pad and a conductive surface of the electrode.

797.    Thus, in my opinion, the combination of Matsumura and Kroll, in view of the knowledge of a POSA, discloses "at least one electrical trace extending between the at least one connection pad and a conductive surface of the [at] least one electrode."

### vi.    Limitation [1e]

798.    Limitation [1e] of the '492 patent recites "the at least one electrical trace being made at least in part from a resistive material."

799.    In my opinion, Matsumura and Kroll, in view of the knowledge of a POSA, render obvious limitation [1e] of the '492 patent.

800.    Matsumura teaches a flexible, disposable bioelectrode pad 7 that includes conductive material 2 (*i.e.*, traces).  Ex. 1012 at [0016].  For the reasons

273

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 273

discussed above with reference to limitation [1a], it would have been obvious to replace conductive material 2 with a single sheet of insulating material that contained printed (ink) electrical traces. *See* Section XVIII.A.2.ii, *supra.*

801.   Kroll teaches resistive traces composed of a "flexible conductive ink compound having a conductive filler having Silver, Aluminum, or compounds thereof, or of a similarly suitable material." Ex. 1013 at 5:4–8. Kroll further teaches that "[p]referably, the ink deposit is of a preselected conductivity to provide a certain total lead strip resistance so that each strip 34 serves as a current limiter to protect a patient from shock due to malfunction of the device 20 or of a complementary medical device." *Id.* at 5:8–13.  As discussed above, it is my opinion that a POSA would have understood the printed ink lead strips taught by Kroll to be referring to traces as described by the '492 patent. *See* Ex. 1035 at 665 ("Traces: The metallic conductive strips that provide connections between components, terminals, etc., on printed circuits.").

802.   Further, as explained above, it is my opinion that POSA would have sought to incorporate Kroll's "resistive trace" into Matsumura's device, as modified, in order to help protect Matsumura's device in the event of a patient being defibrillated. *See* Section XVII.A.1, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 274

803.    Thus, in my opinion, it would have been obvious to a POSA to combine Matsumura's wearable monitor with Kroll's teaching of resistive traces to meet "the at least one electrical trace being made at least in part from a resistive material."

### vii.    Limitation [1f]

804.    Limitation [1f] of the '492 patent recites "an insulating layer covering the flexible printed circuit layer."

805.    In my opinion, Matsumura discloses limitation [1f] of the '492 patent. As discussed above, a POSA would have modified Matsumura's conductive material 2 to comprise printed ink traces on a single flexible sheet. *See* Section XVIII.A.2.ii, *supra.* Matsumura teaches a second sheet 4 that is "made of insulating material that does not allow moisture to penetrate" and which has "two openings . . . into which the conductive gel 5 is inserted." Ex. 1012 at [0018]. Thus, Matsumura's "second sheet 4" therefore comprises an insulating layer covering the flexible printed circuit layer.

806.    Additionally, or alternatively, Matsumura teaches that first sheet 1, that covers bioelectrode pad 7, "should be made of an ***insulating material*** that does not allow moisture to penetrate, for example, polyethylene foam, polyurethane foam, or polyurethane sheet is preferred." *Id.* at [0017] (emphasis added). As modified and combined with Kroll, Matsumura's device discloses a second sheet 4 and/or first sheet 1 (the claimed "insulating layer") that covers the modified, printed sheet of

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 275

conductive material 2 (the claimed "flexible printed circuit layer") as modified by the teachings of Kroll. Thus, in my opinion, the combination of Matsumura and Kroll, in view of the knowledge of a POSA, also discloses "an insulating layer covering the flexible printed circuit layer."

### 3. Dependent Claim 2

807. Claim 2 of the '492 patent depends from claim 1 and additionally requires that "the at least one electrical trace includes a filleted portion formed at the electrode."

808. In my opinion, claim 2 of the '492 patent is rendered obvious by Matsumura and Kroll for all the reasons discussed above with respect to claim 1 as well as because the additional limitation of claim 2 would have been obvious to a POSA. *See* Section XVIII.A.2, *supra.*

809. As discussed above, it would have been obvious to modify Matsumura's conductive material to comprise printed ink traces on a flexible, insulating substrate. *See* Section XVIII.A.2.ii, *supra.*

810. In my opinion, a POSA would know that, when printing ink traces on a flexible circuit board, it is desirable that contacts—such as the contact between Matsumura's conductive material 2 and electrode 5, or between Matsumura's conductive material 2 and hook 3—should be "tear-like" or "filleted" to ensure a good conductive connection. *See* Ex. 1035 at 195 (including, as "[s]tandard pad

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 276

shapes" "Teardrop pads (with fillet radius)" and "Teardrop pads (with straight side
fillets)"); *id.* at 442–43 (noting that "[t]he general shape of solder pads should be
tear-like").

811.   Thus, in my opinion, Matsumura and Kroll, in view of the knowledge
of a POSA, render obvious "the at least one electrical trace includes a filleted portion
formed at the electrode" and, therefore, that the combination of Matsumura and Kroll
renders obvious claim 2 of the '492 patent.

### 4.    *Dependent Claim 3*

812.   Claim 3 of the '492 patent depends from claims 1 and 2 and further
requires "at least one battery mounted on the flexible circuit layer."

813.   In my opinion, claim 3 of the '492 patent is rendered obvious by
Matsumura and Kroll for all the reasons discussed above with respect to claims 1
and 2 as well as because the additional limitation of claim 2 would have been obvious
to a POSA.  *See* Section XVIII.A.3, *supra.*

814.   Matsumura teaches a monitor that transmits the "processed bioelectric
potential signal . . . wirelessly."  Ex. 1012 at [0025].  As explained by Matsumura,
prior art wireless monitors included "a power source."  *Id.* at [0004] (prior art device
comprising "conduction portion (equivalent to an electrode element), a power
source, a potential difference detection portion, and a wireless transmitting/receiving
portion").  In my opinion, a POSA would have understood Matsumura's device to

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 277

implicitly require a battery as an onboard power source to allow for wireless transmissions because otherwise the device would be inoperable. *See* Ex. 1003 at 1:39–51 (discussing prior art portable patient monitors with onboard batteries which allow them to be worn for extended periods of time); *see also* Ex. 1035 at 106, Table 3.1 (identifying battery as common electronic component of printed circuit board). It was well known at the time that batteries could be rechargeable or disposable. *See* Ex. 1003 at 1:45–46 (noting that "[a]fter a fixed interval of time, or at a low batter indication, the batteries can be ***replaced or recharged***") (emphasis added). In my opinion, it would be obvious to a POSA that if a disposable battery were to be used, it would be obvious to incorporate the *disposable* battery into the *disposable* flexible circuit layer.

815.   Thus, in my opinion, Matsumura and Kroll, in view of the knowledge of a POSA, render obvious "at least one battery mounted on the flexible circuit layer" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 3 of the '492 patent.

### 5.    *Dependent Claim 5*

816.   Claim 5 of the '492 patent depends from claim 1 and additionally requires that the body-worn patient monitoring device "compris[es] an ECG monitor having a programmed microprocessor and a plurality of electrical connections to measure patient heartbeat signals."

278

817.   In my opinion, claim 5 of the '492 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Matsumura teaches the additional limitation of claim 5.  *See* Section XVIII.A.2, *supra.*

818.   Both Matsumura and Kroll teach wearable devices for monitoring physiological signals, including ECG or EKG signals that measure a patient's heartbeat.  *See* Ex. 1012 at [0024], [0031]; Ex. 1013 at 1:11–15, 1:37–45.

819.   Matsumura, in particular, teaches "bioelectric potentials detected by the conductive gel 5," said bioelectric potentials including "electrocardiogram signals" that are detected while the detector is "worn on the patient's chest."  Ex. 1012 at [0019], [0024].  Matsumura's conductive gel 5 forms electrical connections to the patient's body.  *See* Section IV.A., *supra.*  Therefore, in my opinion, Matsumura discloses "an ECG monitor having . . . a plurality of electrical connections to measure patient heartbeat signals."

820.   Additionally, Matsumura discloses a "signal processor 10," which can "determine[] whether or not the detected electrocardiogram of the subject (patient) is in an abnormal state, such as an arrhythmia or an abnormal heart rate."  Ex. 1012 at [0032]; *see also id.* at [0037].  In my opinion, a POSA would understand that Matsumura's disclosed "signal processor 10," is a microprocessor that is programmed to identify abnormal heart rates.  *See* Ex. 1035 at 82 ("The function of

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 279

the microprocessor is to manipulate data in accordance with the instructions stored in the memory."). Accordingly, in my opinion, a POSA would recognize that Matsumura discloses "an ECG monitor having a programmed microprocessor."

821. For these reasons, it is my opinion the combination of Matsumura and Kroll discloses that the body-worn patient monitoring device "compris[es] an ECG monitor having a programmed microprocessor and a plurality of electrical connections to measure patient heartbeat signals" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 5 of the '492 patent.

### 6.    *Dependent Claim 6*

822. Claim 6 of the '492 patent depends from claim 1 and additionally requires "the at least one electrode includes an electrode gel and a conductive surface, thereby creating a half cell."

823. In my opinion, claim 6 of the '492 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 1 as well as because Matsumura teaches the additional limitation of claim 6. *See* Section XVIII.A.2, *supra.*

824. Matsumura teaches that "conductive gel 5" may be produced from components such as an "acrylic hydrophilic polymer, glycerin and water." Ex. 1012 at [0018]. Matsumura further explains that conductive gel 5 contacts a portion of "conductive material 2," which may be "coated with conductive Ag/AgCl

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 280

[Silver/Silver Chloride]." *Id.* at [0019]–[0020]. In my opinion, a POSA would understand that conductive gel 5 (*i.e.*, electrode gel), which comprises an acrylic hydrophilic polymer, glycerin and water, and which contacts a portion of conductive material 2 (*i.e.*, conductive surface) whose surface is made of silver/silver chloride comprises a "half cell." *See, e.g.*, Ex. 1003 at 7:3–5 ("In conventional terms of art, the combination of electrode and electrolyte and ECG electrode is typically referred to as a half cell."). Accordingly, in my opinion, a POSA would know that Matsumura's conductive gel 5 and/or a portion of conductive material 2, when modified as explained above, form electrical connections comprising a half cell at the point of contact with the patient's skin.

825. For these reasons, it is my opinion that a POSA would understand that Matsumura discloses "the at least one electrode includes an electrode gel and a conductive surface, thereby creating a half cell" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 6 of the '492 patent.

### 7. Independent Claim 7

826. In my opinion, claim 7 of the '492 patent is rendered obvious by Matsumura in combination with Kroll.

### i. Preamble 7[pre]

827. The preamble of claim 7 recites "[a] body-worn patient monitoring device comprising."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 281

828.   As described with respect to claim 1, to the extent the preamble is limiting, it is my opinion that the combination of Matsumura and Kroll discloses the "body-worn patient monitoring device" of claim 7 of the '492 patent.  *See* Section XVIII.A.2.i, *supra*.

### ii.    Limitation [7a]

829.   Limitation [7a] recites "a disposable electrode portion."

830.   In my opinion, Matsumura discloses limitation [7a] of the '492 patent.

831.   Matsumura teaches "a disposable bioelectrode pad 7" that includes a disposable "conductive gel[s] 5" (the claimed "electrodes") used to detect bioelectrical potentials.  Ex. 1012 at [0016], [0019].

832.   Thus, in my opinion, Matsumura discloses "a disposable electrode portion."

### iii.    Limitation [7b]

833.   Limitation [7b] recites "a reusable communication module."

834.   In my opinion, Matsumura discloses limitation [7b] of the '492 patent.

835.   Matsumura teaches a "***reusable signal processor*** for processing and wirelessly transmitting the bioelectric potential signals detected by the bioelectrode pad."  *Id.* at [0013] (emphasis added); *see also id.* at [0008], [0014], [0016], [0025], Figs. 1–2.  Matsumura specifically teaches that "the signal processor is economical ***because*** it is reusable."  *Id.* at [0016] (emphasis added).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 282

836. Matsumura discloses that the reusable signal processor includes components that allow for communication, stating: "The signal processor 10 incorporates a processing circuit for filtering and amplifying detected bioelectric potential signals, a memory for storing the processed bioelectric potential signal, a circuit for modulating the processed bioelectric potential signal and transmitting it wirelessly, and a loop antenna." *Id.* at [0025].

837. Thus, in my opinion, Matsumura discloses "a reusable communication module."

### iv.    Limitation [7c]

838. Limitation [7c] recites "the disposable electrode portion comprising a flexible printed circuit layer made from an insulating material and defining a substrate."

839. In my opinion, the combination of Matsumura and Kroll, in view of the knowledge of a POSA, renders obvious limitation [7c] of the '492 patent.

840. Matsumura teaches a disposable bioelectrode pad 7 (the claimed flexible printed circuit layer) with conductive gel 5 (the claimed electrode). Matsumura discloses that bioelectrode pad 7 is comprised of sheets "made of an insulating material" such as "polyethylene foam, polyurethane foam, or polyurethane sheet." *Id.* at [0017]–[0018], [0022]. As discussed above, it is my opinion that a POSA would have used the same manufacturing technique and the

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 283

well-known technique of screen printing in order to replace Matsumura's two separate pieces of conductive material 2 with a single flexible sheet comprising insulating material containing printed-ink traces (*i.e.*, a printed circuit board). *See* Section XVIII.A.2.ii, *supra*; Ex. 1035 at 659 ("Printed Circuit Board:  An insulating material onto which an electronic circuit has been printed or etched.").  When modified in that way, it is my opinion that a POSA would recognize that the flexible printed circuit layer made from an insulating material and defining a substrate would be part of Matsumura's disposable electrode portion.  Ex. 1012 at [0016]–[0018].

841.   Thus, in my opinion, the combination of Matsumura and Kroll discloses "the disposable electrode portion comprising a flexible printed circuit layer made from an insulating material and defining a substrate."

### v.    Limitation [7d]

842.   Limitation [7d] recites "at least two electrodes being disposed onto a surface of the substrate."

843.   As discussed above with respect to Claim 1, it is my opinion that Matsumura discloses "at least two electrodes being disposed onto a surface of the substrate."  *See* Section XVIII.A.2.iii, *supra*.

### vi.    Limitation [7e]

844.   Limitation [7e] recites "electrical traces defined between the at least two electrodes and a connection pad."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 284

845.   As discussed above with respect to Claim 1, it is my opinion that the
combination of Matsumura and Kroll discloses "electrical traces defined between
the at least two electrodes and a connection pad."  *See* Section XVIII.A.2.v, *supra.*

### vii.    Limitation [7f]

846.   Limitation [7f] recites "wherein the reusable communication and
computation module comprises a housing containing a processor and a wireless
communication unit."

847.   In my opinion, the combination of Matsumura and Kroll discloses
limitation [7f] of the '492 patent.

848.    Matsumura teaches that its "bioelectric potential detector 11" includes
a "reusable signal processor 10" which is "detachable [from the bioelectrode pad 7]
with hooks."  Ex. 1012 at [0008], [0014], [0016], [0025], Figs. 1–2.  The reusable
signal processor incorporates components for communication: "a circuit for
modulating the processed bioelectric potential signal and transmitting it wirelessly,
and a loop antenna."  *Id.* at [0025].  Matsumura further teaches that the reusable
signal processor includes components which allow for computation, such as a
"processing circuit for filtering and amplifying detected bioelectric potential
signals" and "a memory for storing the processed bioelectric potential signal."  *Id*.
All components which comprise the signal processor 10 are contained within the
closed, waterproof housing of the signal processor.  *Id.*

285

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 285

849.    Thus, in my opinion, the combination of Matsumura and Kroll discloses that "the reusable communication and computation module comprises a housing containing a processor and a wireless communication unit."

### viii.    Limitation [7g]

850.    Limitation [7g] recites "in which the reusable communication module is releasably attached to the disposable electrode portion by at least one latching clip."

851.    In my opinion, Matsumura discloses limitation [7g] of the '492 patent.

852.    Matsumura teaches a "bioelectric potential detector 11 [that] is composed of a disposable bioelectrode pad 7 and a reusable signal processor 10." *Id.* at [0008], [0014], [0016], [0025], Figs. 1–2. Specifically, Matsumura teaches that the disposable bioelectrode pad includes a "conductive gel 5" (*i.e.*, the claimed "disposable electrode portion"), *see id.* at [0016], [0018]–[0019], and that the reusable signal processor includes a wireless transmitter, *id.* at [0031]–[0032], [0034]. Matsumura further teaches that the "bioelectrode pad 7 and the signal processor 10 are detachable with hooks" as shown by annotated Figure 4(b) below. *Id.* at [0016].

286

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 286



*Id.* at Fig. 4(b) (annotated).

853.   In my opinion, a POSA would understand that "hook 3" of Matsumura renders obvious use of a latch clip as disclosed by the '492 patent. Both latches and snaps were commonly known and used in the art at the time. *See, e.g.*, Ex. 1003 at 9:27–39; *see also* Section IV.D, *supra*. A POSA would have understood a snap mechanism and a latch mechanism to be interchangeable for the purpose of attaching two components of a medical device such as a body-worn monitor. *See, e.g.*, Ex. 1039 at [0046], Fig. 5 (discussing use of snap connectors to attach a monitoring device to 12-lead recorders); Ex. 1040 at 30 ("Labeling" (providing instructions for use of a body-worn glucose monitoring device which uses a latch to attach the STS Transmitter and the STS Sensor Pod, two components of the device)).

287

854.   Thus, in my opinion, a POSA would understand that the combination of Matsumura and Kroll discloses that "the reusable communication module is releasably attached to the disposable electrode portion by at least one latching clip."

### 8.    Dependent Claim 8

855.   Claim 8 of the '492 patent depends from claim 7 and additionally requires that "the electrodes are integrated into the flexible printed circuit layer of the disposable portion of the device."

856.   In my opinion, claim 8 of the '492 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 7 as well as because Matsumura teaches the additional limitation of claim 8.  *See* Section XVIII.A.7, *supra.*

857.   Matsumura teaches that conductive gels 5 (the claimed electrodes) are integrated into the disposable bioelectrode pad 7 (the claimed disposable portion) of bioelectric potential detector 11.  Ex. 1012 at [0016].  Specifically, when modified as discussed above, Matsumura's bioelectrode pad 7 is composed, in part, of the sheet containing printed traces with which the electrodes make contact.  *Id.* at [0019].  In my opinion, a POSA would understand that the electrodes are bonded together with the other components of the disposable bioelectrode pad 7, including the sheet of conductive material 2, with which the electrodes make contact.  *See* Ex. 1035 at 659 ("Printed Wiring: A conductive pattern within or bonded to the surface of a base

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 288

material intended for point-to-point connection of separate components and not containing printed components.").

858. For these reasons, it is my opinion Matsumura discloses that "the electrodes are integrated into the flexible printed circuit layer of the disposable portion of the device" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 8 of the '492 patent.

### 9. *Dependent Claim 11*

859. Claim 11 of the '492 patent depends from claim 7 and additionally requires that "the electrical traces are screened onto the flexible printed circuit layer."

860. In my opinion, claim 11 of the '492 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 7 as well as because Kroll teaches the additional limitation of claim 11. *See* Section XVIII.A.7, *supra.*

861. As discussed above, it is my opinion that it would have been obvious to a POSA to modify Matsumura's conductive material 2 to comprise printed ink traces on a single sheet of flexible, insulating material. *See* Section XVIII.A.2.ii, *supra.* Further, it is my opinion that a POSA would understand printing ink onto a circuit board to be a form of screening, meaning that incorporating Kroll's ink traces on the flexible printed circuit layer of Matsumura would yield electrical traces that

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 289

are screened. *See, e.g.*, Ex. 1035 at 296 ("Printing Process. The circuit patterns are screen printed on the substrate by two ways: (1) Manual screen printing process, and (2) Automatic or semi-automatic screen printing process."); *see also* Sections IV.C., XVIII.A.2.ii, *supra*.

862. For these reasons, it is my opinion that a POSA would understand Kroll to disclose that "the electrical traces are screened onto the flexible printed circuit layer" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 11 of the '492 patent.

### 10.    *Dependent Claim 12*

863. Claim 12 of the '492 patent depends from claims 7 and 11 and additionally requires "an insulating layer applied onto the electrical traces."

864. In my opinion, claim 12 of the '492 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claims 7 and 11 as well as because Matsumura teaches the additional limitation of claim 12. *See* Section XVIII.A.9, *supra.*

865. As discussed above, the combination of Matsumura and Kroll teaches "electrical traces." *See* Section XVIII.A.2.vi, *supra*. Additionally, Matsumura teaches that second sheet 4 and first sheet 1 are both made of "an insulating material" such as "polyethylene foam, polyurethane foam, or polyurethane sheet." Ex. 1012

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 290

at [0017]–[0019], Fig. 1. Matsumura also teaches that second sheet 4 and first sheet 1 are applied onto conductive material 2. *Id*.

866. For these reasons, it is my opinion that Matsumura discloses "an insulating layer applied onto the electrical traces" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 12 of the '492 patent.

### 11. Dependent Claim 13

867. Claim 13 of the '492 patent depends from claims 7, 11, and 12 and additionally requires that "the insulating layer is screen printed onto the electrical traces of the flexible printed circuit layer."

868. In my opinion, claim 13 of the '492 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claims 7, 11, and 12 as well as because Matsumura teaches the additional limitation of claim 13. *See* Section XVIII.A.10, *supra*.

869. In my opinion, it would have been obvious to a POSA to modify Matsumura and Kroll such that "the insulating layer is screen printed onto the electrical traces of the flexible printed circuit layer" because screen printing was a well-known and common method of manufacturing a printed circuit board. Ex. 1035 at 352 (noting that one of the functions served by a solder mask is "[a]ct[ing] as an insulating barrier between closely placed tracks"). Further, a POSA would have

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 291

understood that insulating layers such as solder mask (*i.e.*, solder resist) were commonly applied using either screen printing or photoprinting. *Id.* at 353.

870.   For these reasons, it is my opinion that Matsumura discloses that "the insulating layer is screen printed onto the electrical traces of the flexible printed circuit layer" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 13 of the '492 patent.

### 12.   *Dependent Claim 14*

871.   Claim 14 of the '492 patent depends from claim 7 and additionally requires that "each electrode includes an electrode gel and a conductive surface defining a half cell."

872.   In my opinion, claim 14 of the '492 patent is rendered obvious by Matsumura in combination with Kroll for all the reasons discussed above with respect to claim 7 as well as because Matsumura teaches the additional limitation of claim 14. *See* Section XVIII.A.7, *supra.*

873.   Matsumura teaches that "conductive gel 5" may be produced from components such as an "acrylic hydrophilic polymer, glycerin and water." Ex. 1012 at [0018].  Matsumura further explains that conductive gel 5 contacts a portion of "conductive material 2," which may be "coated with conductive Ag/AgCl [Silver/Silver Chloride]."  *Id.* at [0019]–[0020].  In my opinion, a POSA would understand that conductive gel 5 (*i.e.*, electrode gel), which comprises an acrylic

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 292

hydrophilic polymer, glycerin and water, and which contacts a portion of conductive material 2 (*i.e.*, conductive surface) whose surface is made of silver/silver chloride comprises a "half cell" as claimed by claim 6 of the '492 patent. Accordingly, in my opinion, a POSA would know that Matsumura's conductive gel 5 and/or a portion of conductive material 2 form electrical connections comprising a half cell at the point of contact with the patient's skin.

874. For the same reasons as discussed above in Section XVIII.A.6 with respect to claim 6 of the '492 patent, it is my opinion that a POSA would understand that Matsumura discloses that "each electrode includes an electrode gel and a conductive surface defining a half cell" and, therefore, that the combination of Matsumura and Kroll renders obvious claim 14 of the '492 patent.

**B.    Ground 2: Obvious Over Jensen, Kroll, and General Knowledge of a Person of Ordinary Skill in the Art**

875. Additionally, in my opinion, claims 1–6 are obvious over Jensen and Kroll.

### 1.    *A POSA had motivation to combine Jensen and Kroll*

876. For the reasons set forth above in Section XVI.A.1, with reference to the '007 patent, a POSA would have had motivation to combine the teachings of Jensen and Kroll and would have had a reasonable expectation of success in doing so.

293

## 2.    Independent Claim 1

877.    In my opinion, claim 1 of the '492 patent is rendered obvious by Jensen in combination with Kroll.

### i.    Limitation 1[pre]

878.    The preamble of claim 1 recites "[a] body-worn patient monitoring device comprising."

879.    In my opinion, to the extent that the preamble is limiting, Jensen discloses the preamble of claim 1 of the '492 patent.  Jensen discloses a "self-contained, self-attached" device (referred to as a "'smart bandage' or 'smart patch'") capable of measuring physiological signals including ECG.  Ex. 1011 at [0012], [0013], [0029]; *see also id.* at Fig. 5.  Jensen explains that:

> It is the function of the present invention to either a) electrically detect the occurrence of R events in the QRS complex of the EKG signal, and/or b) continuously sample the EKG signal, perform signal processing and calculation upon the data contained within those signals, and provide a transmitted data signal for reception by any variety of different receivers.  According to this invention, these components are incorporated into a self-contained assembly that adhesively mounts to the torso of a person or mammal.

*Id.* at [0029].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 294

880.   Demonstrating the compatibility of their teachings, Kroll also discloses

"a body worn patient monitoring device," as recited in the preamble of claim 1 of

the '492 patent.  Kroll recites:

> This invention relates to a device and method for receiving
> and transmitting electrical signals to and from a patient.
> Particularly, this invention relates to a disposable, flexible
> and layered electrode belt, also referred to as a "belt", for
> placement and use on the body of a patient and also for use
> with medical diagnostic and therapeutic devices.

Ex. 1013 at 1:9–15.

881.   Thus, in my opinion, both Jensen and Kroll disclose "a body-worn

patient monitoring device."

### ii.     Limitation [1a]

882.   Limitation [1a] recites "a flexible printed circuit layer made from an

insulating material and defining a substrate."

883.   In my opinion, Jensen discloses limitation [1a] of the '492 patent.

884.   Jensen discloses a "flexible circuit assembly 36, 50" containing an

electrical circuit.  Ex. 1011 at [0040], [0043], [0046], Figs. 5, 8.  In the embodiment

of Figure 5, the claimed flexible printed circuit layer is flexible circuit assembly 36;

in the embodiment of Figure 8, the claimed flexible printed circuit layer is flexible

circuit 50.  *Id.*    Flexible circuit 50 and flexible circuit 36 are analogous and would

contain similar components including sensor contacts 71, 72.  In my opinion, a

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 295

POSA reading Jensen would recognize that the "flexible circuit assembly" of Jensen defines a substrate on which traces, electronics, and sensor contacts 71, 72 are placed because if Jensen's "flexible circuit assembly were not made of an insulating material, the electronics 41, 52 on the surface would short circuit. *See* Ex. 1043 at 798 (explaining that while the dielectric breakdown in capacitors can lead to short circuits, this can be prevented by the use of insulating materials with high dielectric strength).

885.    In my opinion, a POSA would further understand that Jensen's flexible circuit assembly (the claimed "flexible printed circuit layer") ***must*** be made from an insulating material.  If the circuit(s) were printed on a conductive material, then electrical current—rather than traveling through printed traces—would pass diffusely across the entire surface.  For this reason, printed circuits boards are defined as "an ***insulating*** material onto which an electronic circuit has been printed or etched."  *See e.g.*, Ex. 1035 at 659 (defining "Printed Circuit Board" as "[a]n insulating material onto which an electronic circuit has been printed or etched").  Further, as explained above, it is my opinion that a POSA would have been motivated to combine Kroll's teaching of resistive traces with Jensen's device.  *See* Sections XVIII.B.1, XVI.A.1 *supra*.

886.    Accordingly, in my opinion, a POSA would understand that Jensen's disclosure of a "flexible circuit assembly," comprises a "flexible printed circuit layer

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 296

made form an insulating material and defining a substrate," as required by limitation

[1a] of the '492 patent.

### iii.    Limitation [1b]

887.    Limitation [1b] of the '492 patent recites "at least one electrode

disposed onto a surface of the substrate."

888.    In my opinion, Jensen discloses limitation [1b] of the '492 patent.

889.    Jensen discloses a "disposable sensor assembly," which includes

"disposable sensor pad electrodes 1 and 2."  Ex. 1011 at [0041]–[0042].  Jensen's

sensor pad electrodes 1 and 2 are conductive and couplable to a skin surface to

measure physiological signals such as ECG signals.  *Id.* at [0041].  As depicted in

Figure 7 below, Jensen's sensor pad electrodes 1 and 2 are disposed on the lower

surface of flexible circuit assembly 36.



297

*Id.* at Fig. 7 (annotations added); *see also id.* at [0045]. Further, a POSA would

understand that, while not included in the diagram of Fig. 8, the sensor pad electrodes

would also be disposed on the lower surface of flexible circuit assembly 50 in the

embodiment of Figure 8 in the same way they are shown in Fig. 7.



*Id.* at Fig. 8 (annotations added).

890.   Accordingly, in my opinion, Jensen discloses limitation [1b] of the '492

patent.

### iv.    Limitation [1c]

891.   Limitation [1c] of the '492 patent recites "at least one connection pad."

892.   In my opinion, Jensen discloses limitation [1c] of the '492 patent.

893.   Jensen, in the embodiment of Figure 8, discloses two flexible printed

circuits 49 and 50 which comprise a substrate for the reusable computation-

communication module and a substrate for the disposable module, respectively. *Id.*

at [0046], Fig. 8. According to Jensen, the circuits are connected by pads 48, which

are "matched on both circuits." *Id.* at [0046], Fig. 8A.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 298



*Id.* at Fig. 8A (annotated).

894.   In my opinion, a POSA would recognize that the two substrates could be configured to comprise, respectively, one reusable substrate 49 which would house the valuable electronics for the computation-communication module, and one disposable substrate 50 which would be closer to the patient's skin and would contain sensor contacts and traces. Ex. 1011 at [0044]–[0046]. Jensen also teaches that, in the embodiment of Figure 8, the two flexible circuits 49, 50 are connected by pads 48, which are matched on both circuits. *Id.* at [0046]. A POSA would understand that the pads on the disposable, printed circuit board substrate of Jensen, 50, are the claimed connection pads because they form a connection between the power source, *i.e.*, coin cell 9, and the electrical traces that lead to sensor contacts 71, 72. Ex. 1003 at 7:44–55; *see* Ex. 1035 at 656 (defining "pad" as "[a] portion of the conductive area of which components, terminals, traces, etc., are mechanically

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 299

attached"). Therefore, it is my opinion that a POSA would know that Jensen discloses limitation [1c] of the '492 patent.

### v.    Limitation [1d]

895.   Limitation [1d] of the '492 patent recites "at least one electrical trace extending between the at least one connection pad and a conductive surface of the [at] least one electrode."

896.   In my opinion, Jensen discloses limitation [1d] of the '492 patent.

897.   As depicted in Figure 5 (as annotated below), Jensen discloses "a flexible circuit assembly 36 that contains the copper wiring traces to connect the entire circuit 41 to the sensor contacts 71, 72" of electrode "sensor pads 1 and 2." Ex. 1011 at [0040]–[0041].



*Id.* at Fig. 5 (annotated).

898.    In my opinion, a POSA would understand that, in the embodiment of Figure 8, the connection created by Jensen's traces extends from the electrode sensor pads 1, 2 to connection pad 48. *See Id.,* Figs. 8, 8a (below); *see also* Ex. 1035 at 664

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 300

("Surface Mounting: The electrical connection of components to the surface of a conductive pattern").



Ex. 1011, Figs. 8, 8a. Specifically, a POSA would understand that, for signals from sensor contacts 71, 72 to reach the electrical circuits located on substrate 49, traces **must** extend between the connection pad and a conductive surface of at least one electrode. Thus, in my opinion, a POSA would understand that Jensen teaches electrical traces between at least one connection pad and a conductive surface of the at least one electrode.

### vi.     Limitation [1e]

899.   Limitation [1e] of the '492 patent recites "the at least one electrical trace being made at least in part from a resistive material."

900.   In my opinion, the combination of Jensen and Kroll renders limitation [1e] of the '492 patent obvious in view of the knowledge of a POSA.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 301

901.   Jensen discloses a flexible circuit assembly 36, 49, 50, which includes "copper wiring traces to connect the entire circuit." Ex. 1011 at [0040].

902.   Kroll teaches that conductive traces on a body-worn patient monitoring device may be made of a resistive material to protect both the patient and the device against shock.   Specifically, Kroll discloses circuits composed of a "flexible conductive ink compound having a conductive filler having Silver, Aluminum, or compounds thereof, or of a similarly suitable material.  Preferably the ink deposit is of a preselected conductivity to *provide a certain total lead strip resistance* so that *each strip 34 serves as a current limiter to protect* a patient from shock due to malfunction of the device 20 or of a complementary medical device." Ex. 1013 at 5:4–13 (emphasis added).  Kroll therefore teaches printed ink leads.  Moreover, because the printed ink leads are configured to function as a "current limiter," a POSA would understand that Kroll teaches that those printed ink leads are made of a "resistive material." *Id.*

903.   As set forth in Sections XVIII.B.1 and XVI.A.1, *supra*, in my opinion, a POSA would have been motivated to combine Kroll's teaching of resistive traces with Jensen's device both to assure the viability of Jensen's flexible circuit assembly in the event of a patient being defibrillated, *and* because implementing Kroll's "resistive traces" on Jensen's printed circuit assembly would enable a POSA to remove any resistors on the electronics circuit 41 of Jensen's "smart patch," thereby

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 302

reducing the overall size (and wearability) of the device. Further, and also as recited above, it is my opinion that a POSA would have had a reasonable expectation of success in combining Kroll's resistive traces with Jensen's device.

904. Therefore, it is my opinion that Jensen and Kroll, in view of the knowledge of a POSA, render obvious limitation [1e] of the '492 patent.

### vii.    Limitation [1f]

905. Limitation [1f] of the '492 patent recites "an insulating layer covering the flexible printed circuit layer."

906. In my opinion, Jensen discloses limitation [1f] of the '492 patent.

907. Jensen discloses "an insulating layer covering the entire flexible printed circuit layer"; Jensen's "smart patch" includes "an electronic circuit . . . sandwiched **between layers of insulating material** and cover plastics." Ex. 1011 at Abstract (emphasis added). More particularly, Jensen discloses that the entire top side of the flexible circuit assembly 36 is "enclose[d]" and "sealed" by "[t]op casing 34 and two aesthetic covers 35" constructed of Mylar®. *Id.* at [0043]. A POSA would recognize that "Mylar" is the trade name for a well-known insulating material. *See, e.g.*, Ex. 1047 at 23.10 ("The material most commonly used for flexible packaging applications is oriented polyester (e.g., Mylar™), which is used as a base for properties such as dimensional stability, heat resistance, and strength with an

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 303

adhesively laminated seal layer such as low-density polyethylene, which provides the film structure with heat scalability.").

908.  A POSA would understand that, in the in the embodiment of Figure 8, flexible circuit 50 would similarly be entirely covered and enclosed by aesthetic covers 35 and by top case 34 and bottom case 37.  Ex. 1011 at [0043], [0045], Fig. 8;



Ex. 1011 at Fig. 8.  A POSA would understand aesthetic covers 35 and/or top casing 34 to be insulating covers for flexible circuit 50.  Additionally or alternatively, Jensen discloses that disposable sensor pads may optionally include "non-conductive connecting material 42" which covers the lower surface of the flexible circuit assembly 36, 50.  This connecting material 42 also comprises an insulating cover for the flexible printed circuit layer.

909.  Accordingly, in my opinion, Jensen discloses limitation [1f] of the '492 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 304

### 3.    *Dependent Claim 2*

910.    Claim 2 of the '492 patent depends from claim 1 and further requires that "the at least one electrical trace includes a filleted portion formed at the electrode."

911.    In my opinion, a POSA would understand that Jensen discloses the additional limitation of claim 2.

912.    The '492 patent explains that a "fillet or 'tear drop' shape causes the carbon trace to become gradually wider as it connects to [the] conductive surface." Ex. 1003 at 8:62–64.

913.    Jensen teaches "copper wiring traces to connect the entire circuit 41 to the sensor contacts 71, 72" whose edges are shaped as fillets.  Ex. 1011 at [0040], Fig. 5.  In my opinion, a POSA reviewing Figure 5 of the '492 patent would recognize that the traces must gradually get wider to mechanically connect to the filleted sensor contacts 71, 72.  As shown in the annotated version of Jensen's Figure 5 below, the end of the trace connected to the fillet shaped sensor contact is wider than that connected to entire circuit 41.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 305



*Id.* at Fig. 5 (annotated).

914.   Further, it is my opinion that, when incorporating the "resistive trace" of Kroll, a POSA would not alter the shape of the electric trace taught by Jensen, which includes a "filleted edge."   The benefits of Kroll's resistive traces that would have motivated a POSA to implement them on Jensen's device (*i.e.*, shock protection, no need for inclusion of bulky resistors on surface of circuitry), *see supra* Sections XVIII.B.1, XVI.A.1, would be achieved by simply replacing Jensen's copper traces with the printed ink traces.   Additionally, it is my opinion that POSA would have no reason to modify the placement or shape of Jensen's traces, especially because, when printing ink traces on a flexible circuit board, it is desirable that contacts should be "tear-like" or "filleted" to ensure a good conductive connection. *See* Ex. 1035 at 195 (including, as "[s]tandard pad shapes," "Teardrop pads (with fillet radius)" and "Teardrop pads (with straight side fillets)"), 442–43 (noting that "[t]he general shape of solder pads should be tear-like").

306

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 306

915.    Because Jensen discloses the additional limitation of claim 2, and the combination of Jensen and Kroll renders obvious independent claim 1 from which it depends, in my opinion, *see* Section  XVIII.B.2, *supra*, claim 2 of the '492 patent is obvious over the combination of Jensen and Kroll.

### 4.    *Dependent Claim 3*

916.    Claim 3 of the '492 patent depends from claims 1 and 2 and additionally requires "at least one battery mounted on the flexible circuit layer."

917.    In my opinion, Jensen discloses the dependent limitation of claim 3 of the '492 patent.

918.    Jensen describes a "Lithium coin cell 9 [*i.e.*, a battery] attaches to flexible circuit assembly 36 with two small nickel or gold plated steel clips 74, 75." Ex. 1011 at [0043].  The steel clips, 74 and 75, are used to mount the battery to the bottom of the flexible circuit assembly, as shown in the excerpted version of Figure 5 below.  The flexible circuit assembly 36 is, in my opinion, the claimed "flexible circuit layer" of the '492 patent.  *See* Section XVIII.B.2.ii, *supra*.



iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 307

Ex. 1011 at Fig. 5.

919.   Because Jensen discloses the additional limitation of claim 3 and the combination of Jensen and Kroll renders obvious claims 1 and 2 from which claim 3 depends, *see* Section XVIII.B.3, *supra*, in my opinion, claim 3 of the '492 patent is obvious over the combination of Jensen and Kroll.

### 5.    *Dependent Claim 4*

920.   Claim 4 of the '492 patent depends directly from claim 3 and indirectly from claims 1 and 2.  Claim 4 adds the dependent limitation "including a retention member to provide mechanical support for the at least one battery and to enable an electrical connection with the conductive surface of the at least one electrode."

921.   In my opinion, Jensen teaches the dependent limitation of claim 4 of the '492 patent.

922.   Jensen discloses "two small nickel or gold plated steel clips 74, 75," which attach "Lithium coin cell 9" to the "flexible circuit assembly 36."  Ex. 1011 at [0043].   In my opinion, Jensen's steel clips constitute the claimed retention members; the Lithium coin cell is the claimed battery.  *Id.*  Steel clips 74 and 75 mechanically attach the Lithium coin cell 9 to the flexible circuit assembly 36.  *Id.* The "nickel or gold plated steel clips 74, 75" also electrically connect the Lithium coin cell to the flexible circuit assembly 36, which includes "sensor contacts 71, 72

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 308

[that] ***make electrical contact with*** [***electrode***] ***sensor pads*** 1 and 2." *Id.* at [0041], [0043] (emphasis added).

923.   Because Jensen discloses the additional limitation of claim 4, and the combination of Jensen and Kroll renders obvious claims 1, 2, and 3 from which claim 4 depends, *see* Section XVIII.B.4, *supra*, in my opinion, claim 4 of the '492 patent is obvious over the combination of Jensen and Kroll.

### 6.    *Dependent Claim 5*

924.   Claim 5 of the '492 patent depends from claim 1 and additionally requires "an ECG monitor having a programmed microprocessor and a plurality of electrical connections to measure patient heartbeat signals."

925.   In my opinion, Jensen discloses the dependent limitation of claim 5 of the '492 patent.

926.   Both Jensen and Kroll teach wearable devices for monitoring physiological signals, including ECG (*i.e.*, EKG) signals that measure a patient's heartbeat.  *See* Ex. 1011 at [0029]–[0031]; Ex. 1013 at 1:11–15, 1:37–45.  Jensen, in particular, discloses that "heart-rate signals are collected from left and right [electrode] sensor pads, 1 & 2."  Ex. 1011 at [0031], [0041].  Thus, in my opinion, Jensen teaches an "ECG monitor having . . . a plurality of electrical connections to measure patient heartbeat signals."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 309

927.   Jensen further discloses a wearable device with a programmed microprocessor.  In particular, Jensen's device includes a "microcontroller," which "runs a conventional program that may perform further analysis and can also encode a data stream output to the transmitter."  *Id.* at [0032]; Ex. 1003 at 12:3–5 ("A microprocessor, such as microprocessor 512, is defined herein as synonymous and interchangeable with the terms 'microcomputer', 'microcontroller', and 'microprocessor'.").  One such program that may be run on Jensen's microcontroller is one for "detect[ing] the occurrence of R events in the QRS complex of the EKG [*i.e.*, ECG] signal."  Ex. 1011 at [0029], [0037].  Thus, in my opinion, Jensen teaches an "ECG monitor having a programmed microprocessor."

928.   Because Jensen discloses the additional limitation of claim 5, and the combination of Jensen and Kroll renders obvious independent claim 1 from which claim 5 depends, *see* Section  XVIII.B.2, *supra*, in my opinion, claim 5 of the '492 patent is obvious over the combination of Jensen and Kroll.

### 7.    *Dependent Claim 6*

929.   Claim 5 of the '492 patent depends from claim 1 and additionally requires that "the at least one electrode includes an electrode gel and a conductive surface, thereby creating a half cell."

930.   In my opinion, Jensen discloses the dependent limitation of claim 6 of the '492 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 310

931.    Jensen teaches that, on the side of the disposable assembly that contacts the patient's skin, electrode sensor pads 1, 2 are coated with a "conductive adhesive-gel that is made using a silver amalgam as found in off-the-shelf EKG sensor pads, such as those sold by 3M Corporation."  Ex. 1011 at [0041].  A POSA would understand that EKG sensor pads are a conductive surface and that silver amalgam (which typically is silver/silver-chloride) and a conductive gel (electrode gel) containing an electrolyte comprise a "half cell."  *See, e.g.*, Ex. 1003 at 7:3–5 ("In conventional terms of art, the combination of electrode and electrolyte and ECG electrode is typically referred to as a half cell.").  Thus, in my opinion, Jensen discloses that "the at least one electrode includes an electrolyte gel and a conductive surface, thereby creating a half cell."

932.    Because Jensen discloses the additional limitation of claim 6, and the combination of Jensen and Kroll renders obvious independent claim 1 from which claim 6 depends, *see* Section XVIII.B.2, *supra*, in my opinion, claim 6 of the '492 patent is obvious over the combination of Jensen and Kroll.

## C.    Ground 3: Obvious Over Jensen, Matsumura, Kroll, and General Knowledge of a Person of Ordinary Skill in the Art

933.    Additionally, in my opinion, claims 7, 8, and 11–14 of the '492 patent are obvious under pre-AIA § 103 over Jensen, Matsumura, Kroll, and General Knowledge of a Person of Ordinary Skill in the Art.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 311

### 1.    A POSA had motivation to combine Jensen, Matsumura, and Kroll

934.    For the reasons set forth above in Sections XVI.A.1 and XVII.A.1, with reference to the '007 patent, a POSA would have had motivation to combine the teachings of Jensen and Matsumura with Kroll, respectively, and would have had a reasonable expectation of success in doing so.

935.    In addition, a POSA would have had motivation to combine the teachings of Jensen and Matsumura.

936.    Jensen, Matsumura, and Kroll all teach wearable devices for monitoring physiological signals, including, for example, ECG (*i.e.*, EKG) signals. *See* Ex. 1011 at [0029]–[0030]; Ex. 1012 at [0024], [0031]; Ex. 1013 at 1:11–15, 1:37–45.

937.    Maintaining hygiene and reducing cross contamination is important for medical devices that directly contact a patient's body.  That is even more true for devices that are intended to be worn constantly such that they are in contact with a patient's body for a long period of time.  A medical device that is fully disposable addresses this concern.  However, a fully disposable medical device is not always feasible as when, for example, the device includes expensive electronic equipment.  Indeed, as early as the 1980s—in the midst of the "plastics revolution"—hospitals and healthcare systems began to see the high costs of fully disposable medical devices as a concern.  *See, e.g.*, Ex. 1059 (V.W. Greene, *Reuse of Disposable*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 312

*Medical Devices: Historical and Current Aspects*, 7 Infection Control & Hosp. Epidemiology 508 (1986)). For this reason (*i.e.*, the need to balance hygienic concerns with issues of cost), certain medical devices are designed to include both disposable and reusable parts.

938. The device taught by Jensen is one example of a device that balances this concern with both disposable and reusable components. Jensen's device comprises a disposable sensor assembly, which includes a peel-off cover and disposable sensor pad electrodes. Ex. 1011 at [0042], Fig. 5. The remainder of Jensen's device is reusable, including the bottom and top casing, the flexible circuit assembly to which the disposable sensor pad electrodes are attached and the aesthetic cover. *Id.* at [0043].

939. In my opinion, a POSA would have known that reuse would require carefully cleaning each of these reusable components for hygienic purposes. But, as was known at the time of the purported invention of the '492 patent, "[e]ven with thorough cleaning, a risk of cross-contamination cannot be eliminated." *See, e.g.*, Ex. 1038 at 331. Given this perpetual concern, a POSA would have been motivated to seek out ways to make more parts of the device disposable while also isolating the reusable portions to limit the risk of contamination.

940. Matsumura teaches a specific way to achieve these goals. Like Jensen, Matsumura teaches a device comprising both reusable and disposable parts.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 313

However, Matsumura's design fully insulates the reusable portions from the patient's skin using multiple layers. Matsumura further encloses the reusable portion within a single housing. As Matsumura explains, "[t]he bioelectrode pad [7] is hygienic because it is disposable" and includes multiple sheets (first sheet 1, second sheet 4, and third sheet 3) that isolate the reusable part of the device from the patient while still maintaining an electrical connection between the disposable electrodes (conductive gels 5), which make contact with the patient's skin, and the reusable component, which does not. Ex. 1012 at [0016], Fig. 5.

941. Figure 2 of Matsumura (reproduced below) shows this isolation: only the disposable bioelectrode pad 7 touches the patient's skin. Reusable signal processor 11 is kept completely separated from the patient's skin by multiple sheets.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 314



[FIGURE 2]

*Id.* at Fig. 2.

942. A POSA seeking to use or make the device taught by Jensen would have looked to Matsumura and sought to modify Jensen similarly, to include a disposable layer that electrically connects the electrodes (Jensen's sensor pad electrodes 1, 2) to the circuitry in the reusable component (electronic circuitry 41 and coin cell 9), while still preserving the separation from the patient's skin.

943. A POSA would have also been motivated to modify Jensen with Matsumura's teaching of a waterproof structure. The device taught by Jensen is

315

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 315

"sealed on top" using an "o-ring" and several "aesthetic covers." In my opinion, a POSA would recognize that this sealing technique taught by Jensen is prone to seepage through the top, bottom, and slot in the smart patch through which the flexible circuit assembly extends. Apparently recognizing this risk, Jensen relies on a "sealant [that] is applied to the slot 80, once assembled." Ex. 1011 at [0045]. Jensen therefore acknowledges that, even after assembly, the device is not fully sealed.

944. Matsumura teaches an improved waterproofed structure that is completely sealed upon assembly and permits patients to wear the monitor both during and immediately after showering. Ex. 1012 at [0027], [0033]. Matsumura explains that there are multiple advantages of doing so, each of which, in my opinion, would have been familiar to a POSA.

945. Matsumura explains that from a clinical perspective, a continuously wearable monitor that a patient need not remove to shower or bathe provides the advantage of uninterrupted monitoring. *Id.* at [0002]. This waterproofed design thus permits monitoring during a shower or bath when a patient's "heart may be strained, resulting in tachycardia or arrhythmia." *Id.* It also permits monitoring "immediately after showering or bathing," when a patient's "body temperature drops suddenly, which puts a strain on the body and may cause sudden changes in condition, such as dizziness, anemia, or arrhythmia." *Id.* Thus, incorporating Matsumura's waterproof

316

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 316

structure into Jensen would allow Jensen's smart patch to be worn continuously, including during or immediately after showering, conferring the attendant improvements in the scope of patient monitoring.

946.    To achieve a waterproofed structure, Matsumura teaches (i) housing the electronics, such as the microprocessor and wireless transmitter, in an enclosed, reusable casing (signal processor 10), and (ii) placing the electrodes (conductive gel 5), sensor contacts and traces (conductive material 2), and interface with the reusable module (hooks 3) in a separate, disposable bioelectrode pad 7 that uses an insulating sheet to cover the electrodes and sensor contacts entirely.  This insulating sheet contains two small holes through which hooks 3 electrically and mechanically connect the disposable electrodes to the reusable housing containing signal processor 10. *See id.* at [0015], [0019], [0027], [0041].

947.    In my opinion, a POSA would have sought to modify Jensen similarly, to achieve the waterproof structure taught by Matsumura.  In particular, a POSA seeking to make or use the device taught by Jensen, in view of Matsumura's disclosures, would have enclosed electronic circuit 41 and coin cell 9 of Jensen in a separate housing composed of top case 34 and bottom case 37, while placing the sensor pad electrodes 1, 2, sensor contacts 71, 72, and copper traces in the disposable sensor assembly 73 that could be entirely covered by a single aesthetic cover to ensure waterproofing.  Further, in my opinion, this modification would not be

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 317

difficult to implement using well-known manufacturing techniques at the time of the invention.

948.   It is also my opinion that a POSA would have had a reasonable expectation of success in modifying Jensen's device as described herein without undue experimentation.  Both Jensen and Matsumura teach wearable, self-contained ECG monitors for patient applications.  Further, both Jensen and Matsumura have similar disposable and reusable component breakdown: disposable parts include the electrodes used to detect ECG signals, and reusable parts include a processor and a wireless transmitter.  *Compare id.* at Fig. 1, *with* Ex. 1011 at Fig. 5.

949.   While Jensen discloses an embodiment in which the printed circuit assembly 30 that includes the electronics is separated from disposable sensor pads 31 and 32, it lacks the hygienic and waterproofing benefits taught by Matsumura. Ex. 1011 at [0044], Fig. 6.  The modification in view of Matsumura would preserve the electrical traces and sensor contacts 71, 72 on sensor pads 31, and 32 but enclose the remaining reusable portions of the device inside a separate housing.  As the processing circuitry within the housing would still be connected to the same electrical traces and sensor contacts, a POSA would have expected the modified device to retain the same monitoring functionality.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 318

### 2.    Independent Claim 7

950.    In my opinion, claim 7 of the '492 patent is rendered obvious by Jensen in view of Matsumura and Kroll.

#### i.    Limitation 7[pre]

951.    The preamble of claim 7 recites "[a] body-worn patient monitoring device comprising."

952.    In my opinion, to the extent the preamble is limiting, each of Jensen, Matsumura, and Kroll discloses the preamble of claim 1 of the '492 patent.

953.    Jensen discloses a body-worn patient monitoring device. *See id.* at [0012], [0014], [0029]. Matsumura also discloses a body-worn patient monitoring device, which it refers to as a "bioelectric potential detector." *See* Ex. 1012 at Abstract, [0006], [0007], [0014]. Kroll also discloses a body-worn patient monitoring device. *See* Ex. 1013 at 1:11–15.

954.    Thus, in my opinion, the combination of Jensen, Matsumura, and Kroll discloses "[a] body-worn patient monitoring device."

#### ii.    Limitation [7a]

955.    Limitation [7a] recites "a disposable electrode portion."

956.    In my opinion, Jensen discloses limitation [7a] of the '492 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 319

957.    Jensen discloses "[electrode] sensor pads 1 and 2" (the electrode portion).  Ex. 1011 at [0041].  Jensen further teaches that the electrode sensor pads 1 and 2 are part of the "disposable sensor assembly 73."  *Id* at [0042].

958.    Thus, in my opinion, the combination of Jensen, Matsumura, and Kroll discloses "a disposable electrode portion."

### iii.    Limitation [7b]

959.    Limitation [7b] recites "a reusable communication module."

960.    In my opinion, Jensen discloses limitation [7b] of the '492 patent.

961.    Jensen teaches a "re-usable (non-disposable) portion" of its body-worn patient monitoring device.  *Id.* at [0043].  Jensen further discloses a radio frequency transmitter (*i.e.*, a "communication module") that "may transmit in a variety of modulation and/or keying methods via antenna 8."  *Id.* at [0032].  In my opinion, a POSA would understand that the transmitter 7 is located on the re-usable (non-disposable) portion of Jensen.

962.    Thus, in my opinion, the combination of Jensen, Matsumura, and Kroll discloses "a reusable communication module."

### iv.    Limitation [7c]

963.    Limitation [7c] recites "the disposable electrode portion comprising a flexible printed circuit layer made from an insulating material and defining a substrate."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 320

964. In my opinion, the combination of Jensen and Matsumura, in view of the knowledge of a POSA, discloses limitation [7c] of the '492 patent.

965. As discussed above with reference to claim 1, Section XVIII.B.2.ii, Jensen teaches a flexible printed circuit layer made from an insulating material and defining a substrate.

966. Moreover, and as set forth in section XVIII.C.1, above, it is my opinion that a POSA would have looked to isolate and waterproof the reusable portions of Jensen (*i.e.*, electronics circuit 41 and battery 9) from the patient's skin, as taught by Matsumura. To do so, a POSA would have modified Jensen by incorporating portions of flexible circuit assembly 36 into the disposable sensor assembly 73, as taught by Matsumura. Specifically, a POSA would have sought to move the flexible circuit assembly 36, electrical traces, and sensor contacts 71, 72 to the disposable sensor assembly; electronics circuity 41 (including the microcontroller and wireless transmitter) would be kept in Jensen's reusable portion. This is the same configuration that is taught in Matsumura: Matsumura's signal processor 10 (including microprocessor and wireless transmitter) are in the reusable portion while hook 3 (electrical traces), conductive material 2 (sensor contacts) are in the flexible, disposable bioelectrode pad 7. Ex. 1012 at [0015], [0019].

967. In my opinion, a POSA would have understood this modification to Jensen as beneficial in at least two respects. *First*, it would improve the efficiency

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 321

of the cleaning process and the safety of the medical device by making more parts of the device disposable and, simultaneously, further isolating the reusable components to limit contamination risk. *Second*, it would afford Jensen's smart patch a waterproof structure that would allow said smart patch to be worn continuously, including during or immediately after showering.

968. In my opinion, and as noted above, a POSA would have had a reasonable expectation of success in rearranging Jensen's components according to Matsumura's teaching without undue experimentation, at least because these were well known components, already known in the art to be disposable. For example, other printed references available at the time of the purported invention of the '492 patent already taught electrical traces and sensor contacts that are part of a disposable assembly. *See, e.g.*, Ex. 1014 at [0048] (disposable bio-sensor module includes "electrodes 80 are located on a lower surface 85 of the flexible substrate 55 and are connected through the flexible substrate 55 to the metallization 77"); Ex. 1023 at [0035] (disposable ECG patch includes "flexible circuit substrate 20 with trace extensions to the electrodes 21, 22, 23").

969. Thus, in my opinion, the combination of Jensen, Matsumura, and Kroll discloses "the disposable electrode portion comprising a flexible printed circuit layer made from an insulating material and defining a substrate."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 322

### v. Limitation [7d]

970. Limitation [7d] recites "at least two electrodes being disposed onto a surface of the substrate."

971. In my opinion, Jensen discloses limitation [7d] of the '492 patent.

972. Jensen discloses "[a] disposable sensor assembly," which includes "disposable sensor pad electrodes 1 and 2." Ex. 1011 at [0041]–[0042]. The sensor pad electrodes are disposed on the lower surface of flexible assembly 36, as shown in Figure 7, reproduced below.



*Id.* at Fig. 7.

973. Thus, in my opinion, the combination of Jensen, Matsumura, and Kroll discloses "at least two electrodes being disposed onto a surface of the substrate."

### vi. Limitation [7e]

974. Limitation [7e] recites "electrical traces defined between the at least two electrodes and a connection pad."

975. In my opinion, Jensen discloses limitation [7e] of the '492 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 323

976.   Jensen disclose a "flexible circuit assembly 36 that contains the copper wiring traces to connect the entire circuit 41 to the sensor contacts 71, 72" of electrode sensor pads 1, 2.  *Id.* at [0040]–[0041].  In my opinion, a POSA reading Jensen's disclosure would understand that the connection that is created by the Jensen's traces extends from the electrode sensor pads 1, 2 to a connection pad 48, as demonstrated in the annotated version of Jensen's Figure 5 below. *Id.* at [0040]. *See also* Section XVIII.B.2.iv–v.



*Id.* at Fig. 5 (annotated).

977.   Thus, in my opinion, a POSA would understand that the combination of Jensen, Matsumura, and Kroll discloses "electrical traces defined between the at least two electrodes and a connection pad."

### vii.    Limitation [7f]

978.   Limitation [7f] recites "wherein the reusable communication and computation module comprises a housing containing a processor and a wireless communication unit."

979.   In my opinion, Jensen discloses limitation [7f] of the '492 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 324

980.  Jensen discloses a "transmitter" for communication (*i.e.*, a communication module) and a "microcontroller" for computation (*i.e.*, a computation module).  *Id.* at [0032].  Jensen's microcontroller "runs a conventional program that may perform further analysis and can also encode a data stream output to the transmitter."  *Id.*  Jensen's transmitter, may be an RF transmitter that transmits data wirelessly, via an "antenna."  *Id.* at [0033].  The transmitter and microcontroller are encased, that is housed, by a top casing 34 and a bottom casing 37.  *Id.* at [0043].  The encasing is depicted in the annotated version of Jensen's Figure 8 reproduced below, wherein the top casing 34 is shown in blue and the bottom casing 37 is shown in red.



*Id.* at Fig. 8 (annotated).

981.  Thus, in my opinion, the combination of Jensen, Matsumura, and Kroll discloses that "the reusable communication and computation module comprises a housing containing a processor and a wireless communication unit."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 325

### viii.    Limitation [7g]

982.    Limitation [7g] recites "in which the reusable communication module is releasably attached to the disposable electrode portion by at least one latching clip."

983.    For the reasons set forth in Sections XVIII.C.2.i–vii, in my opinion, the combination of Jensen and Matsumura discloses limitations 7[pre]–[7f] of the '492 patent.

984.    In my opinion, the combination of Jensen and Matsumura also renders obvious limitation [7g] of the '492 patent.

985.    As noted above, *see* sections XVIII.C.2.iii–v, Jensen discloses a reusable communication-computation module and a disposable sensor assembly including disposable sensor pad electrodes.    Matsumura similarly discloses a "reusable signal processor 10" with a wireless transmitter and a "disposable bioelectrode pad 7" with "conductive gel 5" (electrode portion).  Ex. 1012 at [0016]; *see also id.* at [0008], [0014], Figs. 1–2.  "The bioelectrode pad 7 and the signal processor 10 are detachable with hooks."  *Id.* at [0016].  This is depicted in Figure 4(b) of Matsumura, which is reproduced below.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 326



*Id.* at Fig. 4(b) (annotated).

986.   Both latches and snaps were commonly known and used in the art at the time.  *See, e.g.*, Ex. 1003 at 9:27–39; *see also* Section IV.D, *supra*.  A POSA would have understood a snap mechanism and a latch mechanism to be interchangeable for the purpose of attaching two components of a medical device such as a body-worn monitor.  *See, e.g.*, Ex. 1039 at [0046], Fig. 5 (discussing use of snap connectors to attach a monitoring device to 12-lead recorders); Ex. 1040 at 30 ("Labeling" (providing instructions for use of a body-worn glucose monitoring device which uses a latch to attach the STS Transmitter and the STS Sensor Pod, two components of the device)).

987.   Thus, a POSA reading the disclosure of the '492 patent would understand the '492 patent to use the term "latch clip" or "latching clip" interchangeably with the term "snap on."  Snap mechanisms were commonly used

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 327

in the art to attach two components of a medical device such as a body worn monitor. *See Id*.

988.   Therefore, in my opinion, the combination of Jensen, Matsumura, and Kroll renders obvious that "the reusable communication module is releasably attached to the disposable electrode portion by at least one latching clip."

989.   For all the reasons discussed in this Section as well as in Section XVIII.B.2 above, it is my opinion that the combination of Jensen, Matsumura, and Kroll renders obvious claim 7 of the '492 patent.

### 3.    *Dependent Claim 8*

990.   Claim 8 of the '492 patent depends from claim 7 and additionally requires that "the electrodes are integrated into the flexible printed circuit layer of the disposable portion of the device."

991.   In my opinion, claim 8 of the '492 patent is rendered obvious by Jensen in combination with Matsumura and Kroll for all the reasons discussed above with respect to claim 7 as well as because Jensen and Matsumura teach the additional limitation of claim 8.  *See* Section XVIII.C.2, *supra.*

992.   Jensen discloses "disposable sensor pad electrodes 1 and 2." Ex. 1011 at [0041], Fig. 5.  As explained above, *see* Section XVIII.C.1, it would have been obvious to a POSA to modify Jensen in view of Matsumura's teachings so that

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 328

portions of the flexible printed circuit layer would be part of the disposable sensor assembly of Jensen.

993.    For these reasons, it is my opinion that a POSA would understand that Jensen and Matsumura together disclose that "the electrodes are integrated into the flexible printed circuit layer of the disposable portion of the device" and, therefore, that the combination of Jensen, Matsumura, and Kroll renders obvious claim 8 of the '492 patent.

### 4.    *Dependent Claim 11*

994.    Claim 11 of the '492 patent depends from claim 7 and additionally requires that "the electrical traces are screened onto the flexible printed circuit layer."

995.    In my opinion, claim 11 of the '492 patent is rendered obvious by Jensen in combination with Matsumura and Kroll for all the reasons discussed above with respect to claim 7 as well as because Jensen and Kroll teach the additional limitation of claim 11.  *See* Section XVIII.C.2, *supra.*

996.    As noted previously herein, *see* Section XVIII.C.2.vi *supra*, Jensen discloses "a flexible circuit assembly 36 that contains the copper wiring traces to connect the entire circuit 41 to the sensor contacts 71, 72."  Ex. 1011 at [0040]; *see also id.* at [0041].

329

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 329

997.   Kroll teaches the use of a printed ink comprised of a material with a given resistance.  Ex. 1013 at 5:8–12.  A POSA would understand that printing ink onto a circuit board would be a form of screening.  *See, e.g.*, Ex. 1035 at 296 ("Printing Process.  The circuit patterns are screen printed on the substrate by two ways: (1) Manual screen printing process, and (2) Automatic or semi-automatic screen printing process.").

998.   Thus, in my opinion, a POSA would understand that Kroll's ink traces on a flexible printed circuit layer of Jensen would yield electrical traces that are screened.

999.   For these reasons, it is my opinion that a POSA would understand that the combination of Jensen and Kroll discloses that "the electrical traces are screened onto the flexible printed circuit layer" and, therefore, that the combination of Jensen, Matsumura, and Kroll renders obvious claim 11 of the '492 patent.

### 5.   *Dependent Claim 12*

1000. Claim 12 of the '492 patent depends from claims 7 and 11 and additionally requires "an insulating layer applied onto the electrical traces."

1001. In my opinion, claim 12 of the '492 patent is rendered obvious by Jensen, Matsumura, and Kroll for all the reasons discussed above with respect to claims 7 and 11 as well as because Jensen teaches the additional limitation of claim 12.  *See* Section XVIII.C.4, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 330

1002. Jensen discloses an insulating layer covering the flexible printed circuit later.  Specifically, Jensen discloses that the entire top side of flexible circuit assembly 36 is "enclose[d]" and "sealed" by top casing 34 and aesthetic cover 35, as shown in the excerpt of Jensen's figure 5 below.  Ex. 1011 at [0043].



*Id.* at Fig. 5.

1003. The flexible printed circuit layer of Jensen also discloses electrical traces.  *See* Section XVIII.C.2.vi, *supra*.  Thus, it is my opinion that a POSA would understand aesthetic covers 35 and/or top casing 34 of Jensen to comprise an insulating layer for the electrical traces of flexible circuit 36.

1004. For these reasons, it is my opinion that a POSA would understand that Jensen discloses "an insulating layer applied onto the electrical traces" and,

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 331

therefore, that the combination of Jensen, Matsumura, and Kroll renders obvious claim 12 of the '492 patent.

### 6.    *Dependent Claim 13*

1005. Claim 13 of the '492 patent depends from claims 7, 11, and 12 and additionally requires that "the insulating layer is screen printed onto the electrical traces of the flexible printed circuit layer."

1006. In my opinion, claim 13 of the '492 patent is rendered obvious by Jensen, Matsumura, and Kroll for all the reasons discussed above with respect to claims 7, 11, and 12 as well as because Jensen teaches the additional limitation of claim 13. *See* Section XVIII.C.5, *supra.*

1007. In my opinion, it would have been obvious to a POSA to modify Matsumura and Kroll such that "the insulating layer is screen printed onto the electrical traces of the flexible printed circuit layer" because screen printing an insulating layer was a well-known and common method of manufacturing a printed circuit board. Ex. 1035 at 352 (noting that one of the functions served by a solder mask is "[a]ct[ing] as an insulating barrier between closely placed tracks"). Further, a POSA would have understood that insulating layers such as solder mask (*i.e.*, solder resist) were commonly applied using either screen printing or photoprinting. *Id.* at 353.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 332

1008. For these reasons, it is my opinion that a POSA would understand that Jensen discloses that "the insulating layer is screen printed onto the electrical traces of the flexible printed circuit layer" and, therefore, that the combination of Jensen, Matsumura, and Kroll renders obvious claim 13 of the '492 patent.

### 7.    Dependent Claim 14

1009. Claim 14 of the '492 patent depends from claim 7 and additionally requires that "each electrode includes an electrode gel and a conductive surface defining a half cell."

1010. In my opinion, claim 14 of the '492 patent is rendered obvious by Jensen, Matsumura, and Kroll for all the reasons discussed above with respect to claim 7 as well as because Jensen teaches the additional limitation of claim 14. *See* Section XVIII.C.2, *supra.*

1011. On the side that contacts the patient's skin, Jensen's electrode sensor pads 1, 2 are coated with "conductive adhesive-gel that is made using silver amalgam as found in off-the-shelf EKG sensor pads, such as those sold by 3M Corporation." Ex. 1011 at [0041].  A POSA would understand that EKG sensor pads (conductive surface) comprising a silver amalgam (usually silver-silver chloride) and a conductive adhesive gel (electrode gel) containing an electrolyte comprise a create "half cell."  *See, e.g.*, Ex. 1003 at 7:3–5 ("In conventional terms of art, the

combination of electrode and electrolyte and ECG electrode is typically referred to as a half cell.").

1012. For these reasons, it is my opinion that a POSA would understand that Jensen discloses that "each electrode includes an electrode gel and a conductive surface defining a half cell" and, therefore, that the combination of Jensen, Matsumura, and Kroll renders obvious claim 14 of the '492 patent.

## XIX.  THE CHALLENGED CLAIMS OF THE '484 PATENT ARE UNPATENTABLE

1013. In my opinion, claims 1–5 and 15–20 of the '484 patent are obvious under pre-AIA § 103 over Matsumura and general knowledge of a POSA.

1014. Additionally, and alternatively, in my opinion, claims 1–5, 15, 17, 18 and 20 of the '484 patent are obvious under pre-AIA § 103 over Jensen and the general knowledge of a POSA.

1015. Additionally, and alternatively, in my opinion, claims 1–8, 15, 19, and 20 of the '484 patent are obvious under pre-AIA § 103 over Ozguz and the general knowledge of a POSA.

1016. Additionally, and alternatively, claims 6–8, 11, and 12 of the '484 patent are obvious under pre-AIA § 103 over Matsumura in combination with Ozguz and the general knowledge of a POSA.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 334

### A.    Ground 1: Obvious Over Matsumura and General Knowledge of a POSA

#### 1.    Independent Claim 1

1017. In my opinion, claim 1 of the '484 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA.

#### i.    Preamble 1[pre]

1018. The preamble of claim 1 recites "a body-worn physiological sensor comprising."

1019. In my opinion, to the extent the preamble is limiting, Matsumura discloses the preamble of claim 1 of the '484 patent.

1020. Matsumura discloses a body-worn physiological sensor, which it calls a "bioelectric potential detector." Ex. 1012 at Abstract, [0006], [0014]. The detector is worn on the body and can sense physiological signals such as electrocardiogram (ECG/EKG) signals. *Id.* at [0024], Figs. 2, 6.

1021. Thus, in my opinion, Matsumura discloses "a body-worn physiological sensor."

#### ii.    Limitation [1a]

1022. Limitation [1a] recites "a computation-communication module including a housing retaining a processor."

1023. In my opinion, Matsumura discloses limitation [1a] of the '484 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 335

1024. Matsumura discloses a "reusable signal processor 10," which is a module. *Id.* at [0016]; *see also id.* at [0008], [0014], [0025], Figs. 1–2. Matsumura's reusable "signal processor 10" incorporates components for computation: a "processing circuit for filtering and amplifying detected bioelectric potential signals" and "a memory for storing the processed bioelectric potential signal." *Id.* at [0025]. The reusable signal processor also incorporates components for communication: "a circuit for modulating the processed bioelectric potential signal and transmitting it wirelessly, and a loop antenna." *Id.* Accordingly, Matsumura discloses a computation-communication module.

1025. Matsumura's computation-communication module (*i.e.*, "reusable signal processor 10") that includes the "processing circuit" and "loop antenna" is enclosed in housing 10c, as depicted in Figure 4(a) (reproduced below). *Id.* at [0016], [0025], [0027], [0029], Fig. 4(a). Indeed, retaining "processing circuit" and "loop antenna" in housing 10c ensures that Matsumura's device is waterproof. *Id.*



*Id.* at Fig. 4(a).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 336

1026. Thus, in my opinion, Matsumura discloses "a computation-communication module including a housing retaining a processor."

### iii.     Limitation [1b]

1027. Limitation [1b] recites "a flexible circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals."

1028. In my opinion, Matsumura discloses limitation [1b] of the '484 patent.

1029. . The "bioelectric potential detector 11" includes "bioelectrode pad 7" composed of first and second sheets 1, 4, "made of insulating material," such as "polyethylene foam, polyurethane foam, or polyurethane sheet." *Id.* at [0017], [0018], [0024]. In my opinion, a POSA would recognize that each of those materials—polyethylene foam, polyurethane foam, or polyurethane sheet—are flexible polymers. *See, e.g.*, Ex. 1047 at 23.11; Ex. 1056 at 2. Thus, Matsumura's bioelectrode pad is a flexible circuit layer because it includes conductive material 2 which forms an electrical connection between the computation-communication module and conductive gel 5 which contacts the patient's skin.

1030. In order to measure physiological signals such as electrocardiogram, Matsumura's bioelectrode pad 7 is coupled to the skin surface of a subject, as is depicted in Figure 2 (reproduced below).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 337



Ex. 1012 at Fig. 2.  Matsumura also teaches that "[t]he bioelectric potential

detector 11 can be used as an electrocardiogram detector that is worn on the

subject's chest to detect electrocardiogram signals."  *Id.* at [0024]

1031.  Thus, in my opinion, a POSA would recognize that Matsumura

discloses "a flexible circuit layer configured to be coupled to a skin surface to

measure physiological signals."

### iv.    *Limitation [1c]*

1032.  Limitation [1c] recites "said computation-communication module

being attached to the flexible circuit layer."

1033.  In my opinion, Matsumura discloses limitation [1c] of the '484 patent.

1034.  Matsumura discloses that bioelectrode pad 7 (flexible circuit layer) and

the signal processor 10 (computation-communication module) are attached with

"hooks."  *Id.* at [0016].   Specifically, Matsumura's disposable bioelectrode pad

338

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 338

includes "two hooks 3" that connect to "hook engagement portion 10a on the bottom surface of the signal processor" in order to attach the computation-communication module to the flexible circuit layer, as shown in the annotated version of Matsumura's Figure 2 below. *Id.* at [0019], [0024], Fig. 2.



*Id.* at Fig. 2 (annotated).

1035. Thus, in my opinion, Matsumura discloses "said computation-communication module being attached to the flexible circuit layer."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 339

### v.    Limitation [1d]

1036. Limitation [1d] recites "an adhesive covering at least a portion of the flexible circuit layer."

1037. In my opinion, Matsumura discloses limitation [1d] of the '484 patent.

1038. Matsumura teaches that "[t]he bioelectrode pad 7 is provided with a double-sided adhesive tape 9 with, for example, acrylic adhesive coated on both sides of the nonwoven fabric at the center of the surface of the first sheet 1." *Id.* at [0023]. As shown below, the adhesive tape (*i.e.*, a first "adhesive covering"; shown in blue) covers at least a portion of first sheet 1 of the bioelectrode pad 7 (*i.e.*, the "flexible circuit layer").

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 340



*Id.* at Fig. 1 (annotated).

1039. Additionally, or alternatively, Matsumura's bioelectrode pad 7 also includes second sheet 4, whose back surface is covered with an "adhesive, such as acrylic adhesive" (*i.e.*, a second "adhesive covering"). *Id.* at [0018]. This second "adhesive covering" therefore also covers "portion[s] of the flexible circuit layer."

1040. Thus, in my opinion, Matsumura discloses "an adhesive covering at least a portion of the flexible circuit layer."

341

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 341

### vi.    Limitation [1e]

1041. Limitation [1e] recites "a protective covering that protects the adhesive."

1042. In my opinion, Matsumura discloses limitation [1e] of the '484 patent.

1043. Matsumura discloses that adhesive tape 9 (first "adhesive covering"; *see* Section XIX.A.1.v, *supra*) is attached to and covered by bottom surface of the housing of signal processor 10 (first "protective covering").  Ex. 1012 at [0024]. Additionally, or alternatively, adhesive tape (first "adhesive covering") is covered by "release sheet 9b" (first "protective covering") that is "peeled off from the adhesive tape 9" prior to signal processor 10 being hooked and attached to bioelectrode pad 7. *Id.*



iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 342

*Id.* at Fig. 2 (annotated with blue to show "[f]irst "protective covering[s] and "[f]irst adhesive covering").

1044. Additionally, and alternatively, and as illustrated in green in the preceding image, Matsumura also discloses a "release tape 8 . . . attached to the back surface of the bioelectrode pad 7 [the "flexible circuit layer"]." *Id.* at [0024]. This release tape 8 is a second "protective covering" that covers portions of the adhesive on the back surface of the second sheet 4 (second "adhesive covering") and is "peeled off from the bioelectrode pad 7" when attaching the bioelectric potential detector to the body. *Id.*; *see also id.* at Fig. 2 (annotated version *supra*, preceding paragraph).

1045. Thus, in my opinion, Matsumura discloses "a protective covering that protects the adhesive."

### 2.    *Dependent Claim 2*

1046. Claim 2 of the '484 patent depends from claim 1 and additionally requires that "the flexible circuit layer has traces of determinable electrical resistance."

1047. In my opinion, claim 2 of the '484 patent is obvious over Matsumura in view of a POSA's general knowledge for all the reasons discussed above with respect to claim 1 as well as because a POSA would understand Matsumura to disclose the additional limitation of claim 2. *See* Section XIX.A.1, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 343

1048.  Matsumura discloses that a "hook 3" electrically connects a first portion of "conductive material 2" to "engagement portion[s] 10a" of signal processor 10. Ex. 1012 at [0019], [0024]; *see also id.* at Fig. 1.  A second portion of "conductive material 2" directly contacts "conductive gel[s] 5" (electrodes) and transmits the detected bioelectrical potential through the first portion of "conductive material 2" to signal processor 10.  *Id.* at [0019], Fig. 1.  Accordingly, in my opinion, a POSA would have understood hook 3 and a first portion of conductive material to be a "trace" because they are conductors on a printed circuit board.  *Cf.* Ex. 1035 at 129 (using "trace" and "conductor" interchangeably).

1049.  Matsumura further teaches that "conductive material 2" "can be a carbon sheet or a PET sheet coated with conductive Ag/AgCl"; "hook 3 may also be made of a stainless-steel stud, carbon stud, or Ag/AgCl." Ex. 1012 at [0020]–[0021]. Accordingly, a POSA would have understood that hook 3 and a first portion of conductive material 2, and the materials taught by Matsumura, have a determinable electrical resistance.   Indeed, **every** substance has a determinable electrical resistance—it is a physical property.  *See, e.g.*, Ex. 1060 (Robert A. Millikan & E.S. Bishop, *Elements of Electricity* (1917)) at 53 ("Electrical Resistance. . . .  [E]very particular substance has its own characteristic power of transmitting electrical currents").

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 344

1050. For these reasons, it is my opinion that a POSA would understand that Matsumura discloses that "the flexible circuit layer has traces of determinable electrical resistance" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 2 of the '484 patent.

### 3.    Dependent Claim 3

1051. Claim 3 of the '484 patent depends from claims 1 and 2 and additionally requires that "the traces on the flexible circuit layer are configured to electrically couple the computation-communication module to the flexible circuit layer, thereby forming a disposable module connector."

1052. In my opinion, claim 3 of the '484 patent is rendered obvious by Matsumura in view of the knowledge of a POSA for all the reasons discussed above with respect to claims 1 and 2 as well as because Matsumura discloses the additional limitation of claim 3. *See* Section XIX.A.2, *supra*.

1053. As noted above, *supra* Section XIX.A.1.iv, Matsumura discloses traces on the flexible circuit layer. Matsumura's disposable bioelectrode pad 7 (*i.e.*, the "flexible circuit layer") includes "two hooks 3" that electrically couple or connect to "hook engagement portion 10a on the bottom surface of the signal processor" (*i.e.*, the "communication-computation module). Ex. 1012 at [0019], [0024], Fig. 2. Once received from the electrodes, "the bioelectric potentials detected . . . are transmitted through the conductive material 2 and the hooks 3." *Id.* at [0019].

345

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 345

Accordingly, Matsumura discloses that hook 3 and a first portion of conductive material 2 (traces) are configured to electrically couple the signal processor 10 (computation-communication module) to bioelectrode pad 7 (flexible circuit layer), thereby forming a disposable module connector (hook 3 located on disposable bioelectrode pad 7).

1054. For these reasons, it is my opinion that Matsumura discloses that "the traces on the flexible circuit later are configured to electrically couple the computation-communication module to the flexible circuit layer, thereby forming a disposable module connector" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 3 of the '484 patent.

### 4.    *Dependent Claim 4*

1055. Claim 4 of the '484 patent depends from claim 1 and additionally requires that "the traces on the flexible circuit layer are at least partially covered by a non-removable insulating covering."

1056. In my opinion claim 4 of the '484 patent is rendered obvious by Matsumura in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 1 as well as because Matsumura discloses the additional limitation of claim 4. *See* Section XIX.A.1, *supra*.

1057. Matsumura discloses a first sheet 1 that covers hook 3 and a first portion conductive material 2. Ex. 1012 at [0019]. "[F]irst sheet 1 should be made of an

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 346

insulating material that does not allow moisture to penetrate, for example, polyethylene foam, polyurethane foam, or polyurethane sheet is preferred." *Id* at [0017]. An example of this is shown in Figure 4(b) of Matsumura (reproduced below) with bottom portion of hook 3 being covered by first sheet 1, and top portion of conductive material 2 being is covered by first sheet 1.



*Id.* at Fig. 4(b) (annotated).

1058. For these reasons, it is my opinion that Matsumura discloses that "the traces on the flexible circuit layer are at least partially covered by a non-removable insulating covering" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 4 of the '484 patent.

### 5.    *Dependent Claim 5*

1059. Claim 5 of the '484 patent depends from claim 1 and additionally requires that "the flexible circuit layer further comprises a plurality of openings sized to receive electrode gels."

347

1060. In my opinion claim 5 of the '484 patent is rendered obvious by Matsumura in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 1 as well as because Matsumura discloses the additional limitation of claim 5. *See* Section XIX.A.1, *supra*.

1061. Matsumura discloses that "second sheet 4" of bioelectrode pad 7 "is provided with two openings 4a on the left and right sides into which the conductive [*i.e.*, electrode] gel 5 is inserted." Ex. 1012 at [0018]. As shown in Figure 1 (reproduced below), openings 4a are sized to receive conductive gels 5.



iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 348

*Id.* at Fig. 1 (annotated).

1062. For these reasons, it is my opinion that a POSA would understand that Matsumura discloses that "the flexible circuit layer further comprises a plurality of openings sized to receive electrode gels" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 5 of the '484 patent.

### 6.    Independent Claim 15

1063. In my opinion, claim 15 of the '484 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA.

### i.    Preamble 15[pre]

1064. The preamble of claim 15 recites "a body-worn physiological sensor."

1065. As described with respect to claim 1, to the extent that the preamble is limiting, it is my opinion that Matsumura discloses "a body-worn physiological sensor." *See* Section XIX.A.1.i, *supra*.

### ii.    Limitation [15a]

1066. Limitation [15a] recites "a computation-communication module including a housing retaining a processor."

1067. As explained with respect to claim 1, it is my opinion that Matsumura discloses "a computation-communication module including a housing retaining a processor." *See* Section XIX.A.1.ii, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 349

### iii.    Limitation [15b]

1068. Limitation [15b] recites "a flexible printed circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals."

1069. As described with respect to Claim 1, in my opinion, Matsumura discloses a flexible circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals. *See* Section XIX.A.1.iii, *supra*. The circuit layer of Matsumura comprises "two pieces of conductive material 2," which "can be a carbon sheet or a PET sheet [which are insulating materials] coated with conductive Ag/AgCl." Ex. 1012 at [0019]–[0020], Fig. 1. It would have been obvious to a POSA how to form this flexible circuit layer as a flexible "printed circuit" layer.

1070. Specifically, in my opinion, it would have been obvious to a POSA to use well-known techniques to replace the two pieces of insulating material coated with conductive Ag/AgCl with a single, flexible sheet of insulating material containing printed-ink conductive traces as shown below.

350

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 350



*Id.* at Fig. 1 (modified). A POSA would have been motivated to do so because this modification would simplify the manufacture and assembly of the wearable device. The method disclosed by Matsumura would require cutting two separate pieces of insulating material and coating each of those two pieces in their entirety, requiring a significant amount of expensive conductive ink to do so. The proposed modification, however, would require cutting only one piece of insulating material and would require coating only specific portions of the insulating material with the conductive ink, as shown above, thereby reducing the cost of manufacturing. .

1071. In my opinion this would be a routine design choice that would improve, at minimum, efficiency of manufacture and assembly. Matsumura already

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 351

discloses silver/silver chloride (Ag/AgCl) conductive material, which a POSA would understand could easily be printed on the single piece of flexible, insulating material. *Id.* at [0020]–[0021]; *see also, e.g.*, Ex. 1035 at 296 ("Printing Process. The circuit patterns are screen printed on the substrate by two ways: (1) Manual screen printing process, and (2) Automatic or semi-automatic screen printing process."). Thus, in my opinion, this modification would have been well within the skill of a POSA.

1072. A POSA would recognize that, so modified, Matsumura's conductive material would comprise a flexible printed circuit, which, combined with Matsumura's insulating second sheet 4, would form a flexible printed circuit layer. Ex. 1012 at [0017]–[0018].

1073. Moreover, in my opinion, a POSA would recognize that, as modified, the sheet of conductive material situated between first sheet 1 and second sheet 4 is a component of disposable bioelectrode pad. Accordingly, a POSA would understand that the modified sheet of conductive materials is configured to be coupled to a skin surface of a subject to measure physiological signals. *E.g.*, *id.* at [0024] (describing attaching bioelectrode pad to skin).

1074. Thus, in my opinion, Matsumura discloses "a flexible printed circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 352

### iv.    Limitation [15c]

1075. Limitation [15c] recites "the computation-communication module being attached to the flexible printed circuit layer."

1076. As explained with respect to claim 1, it is my opinion that Matsumura discloses "the computation-communication module being attached to the flexible printed circuit layer." *See* Section XIX.A.1.iv, *supra*. The computation-communication module (signal processor 10) is attached to the flexible printed circuit layer via hooks 3 and engagement portions 10a. *See* Ex. 1012 at [0019], [0024].



*Id.*, Fig. 2 (annotated).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 353

### v.    Limitation [15d]

1077.  Limitation [15d] recites "an adhesive covering at least a portion of the flexible printed circuit layer."

1078.  In my opinion, Matsumura discloses limitation [15d] of the '484 patent.

1079.  As described above, *supra* Section XIX.A.1.v, Matsumura discloses multiple adhesive coverings that meet this element, even if the flexible printed circuit is modified as described in limitation [15b], *supra* Section XIX.A.6.iii. Alternatively, and additionally, Matsumura discloses "an adhesive covering at least a portion of the flexible printed circuit layer" specific to the modified printed circuit layer 2.

1080.  As explained with respect to limitation [15b], a POSA would have been motivated to combine Matsumura's conductive material 2 into a single, printed circuit layer on a flexible, insulating substrate.  *See* Section XIX.A.6.iii, *supra*.  As modified, the flexible printed circuit would be placed between Matsumura's first sheet 1 and second sheet 4.  *Id.*  Matsumura discloses that bottom surface of first sheet 1 is coated with "an adhesive or glue, such as an acrylic adhesive" to ensure bonding between it and conductive material 2.  Ex. 1012 at [0017]; *see also id.* at [0018] (same).  The adhesives on the inner surfaces of first sheet 1 would therefore form "an adhesive covering at least a portion of the flexible printed circuit layer."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 354

1081. Additionally, or alternatively Matsumura discloses a third sheet 6 which may "cover the center of the back surface of the second sheet 4," Ex. 1012 ¶ [0022], which is the bottom of the flexible printed circuit layer. In my opinion, a POSA would understand that the third sheet 6 is bonded to the second sheet using an adhesive because an adhesive "is applied to the back surface of the second sheet 4" and the third sheet 6 would be in contact with the back surface of the second sheet. Ex. 1012 at [0018]. The other sheets of the bioelectrode pad are similarly attached to one another using adhesive. Ex. 1012 at [0017].

1082. Thus, in my opinion, Matsumura discloses "an adhesive covering at least a portion of the flexible printed circuit layer."

### vi.    Limitation [15e]

1083. Limitation [15e] recites "a protective covering for the flexible printed circuit layer."

1084. In my opinion, Matsumura discloses limitation [15e] of the '484 patent.

1085. As explained with respect to limitation [15b], a POSA would have been motivated to combine Matsumura's conductive material 2 into a single, printed circuit layer on a flexible, insulating substrate. *See* Section XIX.A.6.iii, *supra*. As modified, the flexible printed circuit would have been placed between Matsumura's first sheet 1 and second sheet 4. *Id.* Matsumura discloses that first sheet 1 is "made of [ ] insulating material that does not allow moisture to penetrate." Ex. 1012

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 355

at [0017]; *see also id.* at [0018] (same).  Therefore, the first sheet 1 would function as a "protective covering" for the flexible circuit layer 2 as modified.

1086. Additionally, or alternatively, Matsumura discloses that "third sheet 6, made, for example of polyethylene or the like, may be provided to cover the center of the back surface of the second sheet 4."  Ex. 1012 [0022].  In my opinion, a POSA would understand that third sheet 6 is a protective cover because it adheres to and partially covers the bottom surface of the modified printed circuit layer 2.

1087. Thus, in my opinion, Matsumura discloses "a protective covering for the flexible printed circuit layer."

### 7.    *Dependent Claim 16*

1088. Claim 16 depends from claim 15 and further requires that "the protective covering includes at least one opening for electrode gels."

1089. In my opinion, claim 16 of the '484 patent is rendered obvious by Matsumura in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 15 as well as because Matsumura discloses the additional limitation of claim 16.  *See* Section XIX.A.6, *supra*.

1090. As described above with respect to limitation [15e], Matsumura discloses "protective coverings," including third sheet 6.  In my opinion, it would have been obvious to a POSA to modify third sheet 6 to extend its width and include openings for electrode gels 5, as shown below.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 356



*Id.* at Fig. 1 (modified).  This would be a simple change because third sheet 6 is a

cut sheet that is placed in the device when assembled both as disclosed by

Matsumura and when modified as suggested above.  The method of manufacturing

would not change simply by extending the width of third sheet and including

openings for electrode gels.  Further, as modified, third sheet 6 would still serve its

stated purpose of making the center of the back surface of the flexible printed circuit

layer less adhesive to the body.  Ex. 1012 at [0022].

1091. For this reason, it is my opinion that Matsumura teaches "the protective

covering includes at least one opening for electrode gels" and, therefore, that

Matsumura, in view of the general knowledge of a POSA, renders obvious claim 16

of the '484 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 357

### 8.     *Dependent Claim 17*

1092. Claim 17 depends from claim 15 and further requires that "the flexible printed circuit layer includes openings sized to receive electrode gels."

1093. In my opinion, claim 17 of the '484 patent is rendered obvious by Matsumura in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 15 as well as because Matsumura discloses the additional limitation of claim 17.  *See* Section XIX.A.6, *supra*.

1094. As explained with respect to limitation [15b], a POSA would have been motivated to combine Matsumura's conductive material 2 into a single, printed circuit layer on a flexible, insulating substrate; this flexible printed circuit would be inserted between first sheet 1 and second sheet 4.  *See* Section XIX.A.6.iii, *supra*.

1095. As modified, the flexible printed circuit layer would include flexible printed circuit (substitute for conductive material 2) and second sheet.  *Id.* Matsumura discloses that "second sheet 4" of bioelectrode pad 7 "is provided with two openings 4a on the left and right sides into which the conductive gel 5 is inserted."  Ex. 1012 at [0018].  As shown in Figure 1, openings 4a are sized to receive conductive gels 5.  *Id.* at Fig. 1.

1096. For these reasons, it is my opinion that a POSA would understand that Matsumura discloses "the flexible printed circuit layer includes openings sized to

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 358

receive electrode gels" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 17 of the '484 patent.

### 9.    Dependent Claim 18

1097. Claim 18 depends from claim 15 and further requires that "the protective covering is non removable and made from an insulating material."

1098. In my opinion claim 18 of the '484 patent is rendered obvious by Matsumura in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 15 as well as because a POSA would understand that Matsumura discloses the additional limitation of claim 18. *See* Section XIX.A.6, *supra*.

1099. As noted above, Matsumura's first sheet 1 (made from an insulating material) is a protective covering. Ex. 1012 at [0017]. Additionally, as noted above, third sheet 6 (made from polyethylene, which is an insulating material) is a protective covering. *Id.* at [0022]; Ex. 1047 at 23.10 ("The material most commonly used for flexible packaging applications is oriented polyester (e.g., Mylar™), which is used as a base for properties such as dimensional stability, heat resistance, and strength with an adhesively laminated seal layer such as low-density polyethylene, which provides the film structure with heat scalability"). In my opinion, a POSA would have understood that, once assembled, first sheet 1 and third sheet 6 are "non removable" from the rest of the bioelectrode pad 7. Specifically, a POSA would

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 359

have understood that for first sheet 1, which made of "polyethylene foam,
polyurethane foam, or polyurethane sheet," to "not allow moisture to penetrate," it
would need to be bonded to the remainder of bioelectrode pad 7, Ex. 1012 at [0018],
and that third sheet 6 would be bonded to the bottom surface of the modified flexible
printed circuit layer 2 via adhesive, *id.* at [0018], [0022].

1100. For these reasons, it is my opinion that Matsumura discloses that "the
protective covering is non removable and made from an insulating material" and,
therefore, that Matsumura, in view of the general knowledge of a POSA, renders
obvious claim 18 of the '484 patent.

### 10.    Dependent Claim 19

1101. Claim 19 depends from claim 15 and additionally requires that "the
computation communication module is releasably attached to the flexible printed
circuit layer."

1102. In my opinion claim 19 of the '484 patent is rendered obvious by
Matsumura in view of the knowledge of a POSA for all the reasons discussed above
with respect to claim 15 as well as because Matsumura discloses the additional
limitation of claim 19.  *See* Section XIX.A.6, *supra*.

1103. Matsumura discloses that "[t]he bioelectrode pad 7 and the signal
processor 10 are detachable with hooks. . . . [T]he reusable signal processor and the
disposable bioelectrode can be easily attached and detached before and after use."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 360

Ex. 1012 at [0016].  Accordingly, Matsumura discloses that signal processor 10 (computation-communication module) is releasably attached to disposable bioelectrode 7.

1104. Thus, it is my opinion that Matsumura discloses that "the computation communication module is releasably attached to the flexible printed circuit layer" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 19 of the '484 patent.

### 11.    *Dependent Claim 20*

1105. Claim 20 depends from claim 15 and additionally requires that "the protective covering covers the adhesive."

1106. In my opinion claim 20 of the '484 patent is rendered obvious by Matsumura in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 15 as well as because Matsumura discloses the additional limitation of claim 20.  *See* Section XIX.A.11, *supra*.

1107. As modified, Matsumura's first sheet 1 (on the top surface) and third sheet 6 (on the bottom surface) are bonded to the flexible printed circuit by an adhesive.    Section XIX.A.6.iii, *supra*; Ex. 1012 at [0017]–[0018], [0022]. Accordingly, each of Matsumura's protective coverings (first sheet 1 and third sheet 6) covers an adhesive.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 361

1108. For these reasons, it is my opinion that a POSA would understand that Matsumura discloses that "the protective covering covers the adhesive" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders claim 20 obvious.

**B.    Ground 2: Obvious Over Jensen and General Knowledge of a POSA**

*1.    Independent Claim 1*

1109. In my opinion, claim 1 of the '484 patent is rendered obvious by Jensen in view of the general knowledge of a POSA.

*i.    Preamble 1[pre]*

1110. The preamble of claim 1 recites "a body-worn physiological sensor comprising."

1111. In my opinion, to the extent the preamble is limiting, Jensen discloses the preamble of claim 1 of the '484 patent.

1112. Jensen discloses a body worn "smart patch" "that integrates . . . heart-rate/EKG electronic sensors," which are physiological sensors. Ex. 1011 at [0012]; *see also id.* at [0013].

1113. Thus, in my opinion, Jensen discloses "a body-worn physiological sensor."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 362

## ii.    Limitation [1a]

1114. Limitation [1a] recites "a computation-communication module including a housing retaining a processor."

1115. In my opinion, Jensen discloses limitation [1a] of the '484 patent.

1116. Jensen discloses an electronics circuit 41 that includes a "microcontroller" for computation and a "transmitter" for communication. *Id.* at [0032]–[0033]. Jensen's microcontroller "runs a conventional program that may perform further analysis and can also encode a data stream output to the transmitter." *Id.* at [0032]. Jensen's transmitter may communicate data via an "antenna." *Id.* at [0033]. Accordingly, Jensen discloses a computation-communication module. In the embodiment of Figure 8, Jensen discloses multiple electronics circuits 41, 52. *Id.* at [0046], Fig. 8. A POSA would understand that the components of electronics circuit 41 (computation-communication module) could be located on electronics circuit 52.

1117. Jensen further explains that the "computation-communication module" includes a housing that retains a processor. As shown in the annotated version of Jensen's Figure 7 below, "[t]op case 34 [shown in blue below] mounts onto bottom case 37 [shown in pink below]" forming a housing that encloses electronics circuit 52. *Id.* at [0045]. As part of electronics circuitry, Jensen discloses "a microcontroller and/or other programmable logic circuitry that perform

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 363

measurement and processing of sensed data." *Id.* at [0014]. Jensen also teaches that the microcontroller can "run[] a conventional program that may perform further analysis and can also encode a data stream output to the transmitter." *Id.* at [0032]. The microcontroller (processor), along with other electronics circuitry 52, is disposed in the housing formed from top case 34 (shown below in blue) and bottom case 37 (shown below in red). Ex. 1005 at 12:7–9 ("A microprocessor, such as microprocessor 512, is defined herein as synonymous and interchangeable with the terms 'microcomputer', 'microcontroller', and 'microprocessor').



Ex. 1011 at Fig. 8 (annotated).

1118. Thus, in my opinion, Jensen discloses "a computation-communication module including a housing retaining a processor."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 364

### iii.    Limitation [1b]

1119. Limitation [1b] recites "a flexible circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals."

1120. In my opinion, Jensen discloses limitation [1b] of the '484 patent.

1121. The "smart patch" disclosed by Jensen may be "applied to the skin much like a bandage, with self-adhesive pads and sensor materials on the skin-contact side of the invention." *Id.* at [0030]. The "smart patch" is attached to the skin through sensor pads 1, 2 that collect heart-rate signals. *Id.* at [0031], [0041]. Sensor pads 1, 2 are electrically connected to sensor contacts 71, 72 located on flexible circuit assembly 36. *Id.* at [0040]–[0041], [0043], Fig. 5. In my opinion, a POSA would understand that flexible printed circuit 50 in the embodiment of Figure 8 is analogous to flexible circuit assembly 36, and that flexible printed circuit 50 is also attached to the skin through disposable sensor pads 1, 2. *Id.* at Fig. 8. In my opinion, a POSA would recognize that the printed circuit layer 101 of the '492 patent is also configured to be coupled to the skin by means of an adhesive layer 105 that sits between the patient's skin and the flexible printed circuit layer 101. *See* Ex. 1005, Fig. 2. Accordingly, Jensen discloses a flexible circuit layer that is coupled through disposable sensor pads 1, 2 to a skin surface of a subject to measure heart-rate signals, which are physiological signals.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 365

1122. Thus, in my opinion, Jensen discloses "a flexible circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals.

### iv.    Limitation [1c]

1123. Limitation [1c] recites "said computation-communication module being attached to the flexible circuit layer."

1124. In my opinion, Jensen discloses limitation [1c] of the '484 patent.

1125. Jensen discloses that its computation-communication module (*i.e.*, electronics circuit 41 that contains a "microcontroller" for computation and a "transmitter" for communication) is connected and attached to flexible circuit assembly 50. *Id.* at [0032]–[0033], [0045]–[0046], Figs. 8, 8A.

1126. A POSA reviewing the embodiment of Jensen's Figure 8 would understand that the electronics circuit comprising a "microcontroller" and "transmitter" could be located on electronics circuit 52. *Id.* As shown in Figure 8 below, computation-communication module 52 resides on flexible circuit 49, which is attached to flexible circuit layer 50.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 366



*Id.* at Fig. 8 (annotated).

1127. Thus, in my opinion, Jensen discloses "said computation-communication module being attached to the flexible circuit layer."

### v.     *Limitation [1d]*

1128. Limitation [1d] recites "an adhesive covering at least a portion of the flexible circuit layer."

1129. In my opinion, Jensen discloses limitation [1d] of the '484 patent.

1130. Jensen discloses sensor pads 1, 2 that are coated with an adhesive "on the circuit side" that is adhered to the flexible layer. Ex. 1011 ¶¶ [0040]–[0042]. "[T]he disposable sensor pad electrodes 1 and 2 are coated with a conductive adhesive on the circuit side and a conductive adhesive-gel that is made using a silver amalgam as found in off-the-shelf EKG sensor pads, such as those sold by 3M

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 367

Corporation." *Id.* at [0041]. The conductive adhesive covers at least a portion of the flexible circuit layer 36. *Id.* Fig. 5.

1131. A POSA would understand that, in the embodiment of Figure 8, sensor pad electrodes 1, 2 would be mounted to the bottom surface of flexible circuit layer 50 in the same way.



*Id.* at Fig. 8 (annotated).

1132. Additionally or alternatively, Jensen discloses an adhesive to attach aesthetic covering 35 to the top surface of the flexible circuit assembly, noting that "two aesthetic covers 35 may be constructed from Mylar sheet" and "enclose the entire top side of the flexible circuit assembly 36." Ex. 1011 at [0043]. In my opinion, a POSA would have understood that an aesthetic cover would also be included in the embodiment of Figure 8, and that an adhesive would be used to attach

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 368

flexible circuit assembly 50 to aesthetic covering 35. *Id.* at [0032]–[0033]. Accordingly, the adhesive covers at least a portion of flexible circuit assembly (36, 50) on top on which aesthetic covering 35 is placed.

1133. Thus, in my opinion, Jensen discloses "an adhesive covering at least a portion of the flexible circuit layer."

### vi.    Limitation [1e]

1134. Limitation [1e] recites "a protective covering that protects the adhesive."

1135. In my opinion, Jensen discloses limitation [1e] of the '484 patent.

1136. Jensen discloses that the sensor pads 1, 2 coated with a conductive adhesive and are surrounded by a "protective cover tape 39." *Id.* at [0041]. As shown in Jensen's Figure 5 reproduced below, "[t]he pads, when they are first installed, typically come pre-applied to a peel- off cover 39 that protects the conductive surface of sensor pads 1 and 2 until ready for use." *Id.* at [0042].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 369



*Id.* at Fig. 5 (annotated).  This peel-off cover 39 protects all of the sensor pad component, including the adhesive covering on those sensor pads.

1137. Additionally, or alternatively, aesthetic covering 35 protects the adhesive used to attach the covering to flexible circuit assembly 36, 50.  As explained with reference to limitation [1d], *supra*, a POSA would understand that aesthetic covering 35 must be affixed to flexible circuit assembly by an adhesive.  Thus, the aesthetic covering itself would become a "protective covering" relative to the adhesive.

1138. Thus, in my opinion, Jensen discloses "a protective covering that protects the adhesive."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 370

## 2.    *Dependent Claim 2*

1139. Claim 2 depends from claim 1 and further requires that "the flexible circuit layer has traces of determinable electrical resistance."

1140. In my opinion, claim 2 of the '484 patent is obvious over Jensen in view of a POSA's general knowledge for all the reasons discussed above with respect to claim 1 as well as because a POSA would understand Jensen to disclose the additional limitation of claim 2. *See* Section XIX.B.1, *supra*.

1141. Jensen discloses "flexible circuit assembly 36 that contains the copper wiring traces to connect the entire circuit 41 to the sensor contacts 71, 72." Ex. 1011 at [0040].   A POSA would understand that flexible circuit assembly 50 of the embodiment of Figure 8 would have the same structure.   A POSA would have understood that the copper in the wiring trace has a determinable electrical resistance.   Indeed, **every** substance has a determinable electrical resistance—it is a physical property.   *See, e.g.*, Ex. 1060 at 53 ("Electrical Resistance. . . .   [E]very particular substance has its own characteristic power of transmitting electrical currents").

1142. For these reasons, it is my opinion that a POSA would understand that Jensen discloses that "the flexible circuit layer has traces of determinable electrical resistance" and, therefore, that Jensen, in view of the general knowledge of a POSA, renders obvious claim 2 of the '484 patent.

371

### 3.    *Dependent Claim 3*

1143.  Claim 3 of the '484 patent depends from claims 1 and 2 and additionally requires that "the traces on the flexible circuit layer are configured to electrically couple the computation-communication module to the flexible circuit layer, thereby forming a disposable module connector."

1144.  In my opinion claim 3 of the '484 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claims 1 and 2 as well as because Jensen discloses the additional limitation of claim 3.  *See* Section XIX.B.2, *supra*.

1145.  In one embodiment, Jensen discloses two flexible printed circuits 49, 50, which a POSA would understand could comprise, respectively, the substrate for the reusable computation-communication module and the substrate for the disposable module.  Ex. 1011 at [0045]–[0046], Fig. 8.  Jensen further explains that the circuits are connected (*i.e.*, "electrically coupled") by pads 48, which are "matched on both circuits."  *Id.* at [0046].

372



*Id.* at Fig. 8A (annotated).

1146. A POSA would understand that pads on the disposable, printed circuit board substrate of Jensen, 50, are formed by traces that run to sensor contacts because printed circuit board substrate of the embodiment of Figure 8A is analogous to the flexible circuit layer 36 of the embodiment of Figure 5.

1147. It is my opinion that Jensen discloses that "the traces on the flexible circuit later are configured to electrically couple the computation-communication module to the flexible circuit layer, thereby forming a disposable module connector" and, therefore, that Jensen, in view of the general knowledge of a POSA, renders obvious claim 3 of the '484 patent.

373

### 4.    *Dependent Claim 4*

1148.   Claim 4 of the '484 patent depends from claim 1 and additionally requires that "the traces on the flexible circuit layer are at least partially covered by a non-removable insulating covering."

1149.   In my opinion claim 4 of the '484 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 1 as well as because Jensen discloses the additional limitation of claim 4. *See* Section XIX.B.1, *supra*.

1150.   As noted above, Jensen discloses "flexible circuit assembly 36 that contains the copper wiring traces to connect the entire circuit 41 to the sensor contacts 71, 72." Ex. 1011 at [0040].

1151.   The traces are covered by "two aesthetic covers 35" that are part of the device's "re-usable (non-disposable) portion." *Id.* at [0043].  This is shown at least in Figure 7 of Jensen.



*Id.* at Fig. 7 (annotated).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 374

1152. A POSA would have understood that aesthetic cover 35 insulates the flexible circuit assembly 36 (or 50) and its traces, and that the aesthetic cover would be utilized in any embodiment of Jensen, including the embodiment of Figure 8.

1153. It is therefore my opinion that Jensen discloses that "the traces on the flexible circuit layer are at least partially covered by a non-removable insulating covering" and, therefore, that Jensen, in view of the general knowledge of a POSA, renders obvious claim 4 of the '484 patent.

### 5.    *Dependent Claim 5*

1154. Claim 5 of the '484 patent depends from claim 1 and further requires that "the flexible circuit layer further comprises a plurality of openings sized to receive electrode gels."

1155. In my opinion claim 5 of the '484 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 1 as well as because the additional limitation of claim 5 would have been obvious to a POSA. *See* Section XIX.B.1, *supra*.

1156. In my opinion it would have been obvious to a POSA to modify Jensen such that "the flexible circuit layer further comprises a plurality of openings sized to receive electrode gels." Commercially available electrode gels were known in the art at the time of the claimed invention. *See, e.g.*, Ex. 1011 at [0041] (describing "off-the-shelf EKG sensor pads, such as those sold by 3M Corporation"). A POSA

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 375

would have recognized that it could integrate these commercially available, disposable electrodes into the invention of Jensen by including recesses or openings to accommodate those commercially available electrode gels. A POSA would have been motivated to modify Jensen in this manner for at least two reasons. First, relying on commercially available electrodes (rather than creating a novel electrode 'from scratch') would ease manufacturing and assembly. Second, providing a recess would help to prevent movement of the electrode gels, which was known in the art (*e.g.*, by recessing gels in a cup geometry). Ex. 1061 (Maeona K. Jacobs, *Sources of Measurement Error in Noninvasive Electronic Instrumentation*, 13 Nursing Clinics N. Am. 573 (1978)) at 578–79 ("If a portion of the electrode loses contact with the skin, current flow across it is altered because, in effect, the size of the interface changes. Current flow may be altered further if movement allows the conductive medium to dry"); *see also* Ex. 1062 (Michael R. Neuman, *Biopotential Electrodes*, Medical Instrumentation (3d ed. 1998)) at 203–04.

### 6.    *Independent Claim 15*

1157. In my opinion, claim 15 of the '484 patent is rendered obvious by Jensen in view of the general knowledge of a POSA.

#### i.    *Preamble 15[pre]*

1158. The preamble of claim 15 recites "a body-worn physiological sensor."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 376

1159. As described with respect to claim 1, to the extent that the preamble is limiting, it is my opinion that Jensen discloses "a body-worn physiological sensor." *See* Section XIX.B.1.i, *supra*.

### ii.    Limitation [15a]

1160. Limitation [15a] recites "a computation-communication module including a housing retaining a processor."

1161. As explained with respect to claim 1, it is my opinion that Jensen discloses "a computation-communication module including a housing retaining a processor." *See* Section XIX.B.1.ii, *supra*.

### iii.    Limitation [15b]

1162. Limitation [15b] recites "a flexible printed circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals."

1163. As explained with respect to Claim 1, it is my opinion that Jensen discloses "a flexible circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals." *See* Section XIX.B.1.iii, *supra*. A POSA would understand that Jensen's flexible circuit layer 36, 50 is fashioned as a flexible printed circuit board, and would therefore understand that Jensen discloses a flexible printed circuit layer. *Cf.* Ex. 1035 at 4–5 (defining printed circuit board as comprising base of insulating material and conductors).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 377

### iv.    Limitation [15c]

1164. Limitation [15c] recites "the computation-communication module being attached to the flexible printed circuit layer."

1165. As explained with respect to claim 1, it is my opinion that Jensen discloses "the computation-communication module being attached to the flexible printed circuit layer." *See* Section XIX.B.1.iv, *supra*.

### v.    Limitation [15d]

1166. Limitation [15d] recites "an adhesive covering at least a portion of the flexible printed circuit layer."

1167. In my opinion, Jensen discloses limitation [15d] of the '484 patent.

1168. Jensen discloses sensor pads 1, 2, that are coated with an adhesive "on the circuit side" that is then adhered to the flexible circuit layer. Ex. 1011 at [0040]–[0042]. The adhesive covers at least a portion of the flexible circuit layer. *Id.*; *see also id.* at Fig. 5. "[T]he disposable sensor pad electrodes 1 and 2 are coated with a conductive adhesive on the circuit side and a conductive adhesive-gel that is made using a silver amalgam as found in off-the-shelf EKG sensor pads, such as those sold by 3M Corporation." *Id.* at [0041]. In my opinion, a POSA would understand that, in the embodiment of Figure 8, the sensor pad electrodes 1, 2 would be mounted to the bottom surface of flexible circuit 36, 50 with an adhesive in the same way.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 378

1169. Additionally, or alternatively, a POSA would have understood that an adhesive would be used to attach an aesthetic covering 35 to the top surface of the flexible circuit assembly 36. *See* Section XIX.B.1.v, *supra*; Ex. 1011 at [0043], [0045]. Accordingly, in my opinion, a POSA would also understand that the adhesive covers at least a portion of the flexible circuit assembly 36, 50 (*i.e.*, the portion on top of which aesthetic covering is placed).

1170. Thus, in my opinion, Jensen discloses "an adhesive covering at least a portion of the flexible printed circuit layer."

### vi.    Limitation [15e]

1171. Limitation [15e] recites "a protective covering for the flexible printed circuit layer."

1172. In my opinion, Jensen discloses limitation [15e] of the '484 patent.

1173. Jensen discloses that "two aesthetic covers 35 may be constructed from Mylar sheet, for example, and enclose the entire top side of the flexible circuit assembly 36." Ex. 1011 at [0043], Fig. 7.

1174. In my opinion, a POSA would understand that such aesthetic covers would be utilized in all of the embodiments of Jensen, and that "aesthetic covers 35" of Jensen are a "protective covering" for the top surface of Jensen's flexible printed circuit layer 36, 50. A POSA would recognize that Mylar—or a similar material— would isolate the flexible circuit assembly from the elements and would insulate the

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 379

device electrically because Mylar is a well-known insulating material. *See* Ex. 1047 at 23.10 ("The material most commonly used for flexible packaging applications is oriented polyester (e.g., Mylar™), which is used as a base for properties such as dimensional stability, heat resistance, and strength with an adhesively laminated seal layer such as low-density polyethylene, which provides the film structure with heat scalability").



*Id.* at Fig. 7 (annotated).



*Id.* at Fig. 8 (annotated).

1175. Additionally, or alternatively, Jensen discloses that sensor pads 1, 2 attached to a flexible circuit assembly 36, 50 are surrounded by a "protective cover

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 380

tape 39." *Id.* at [0041]. "The pads, when then they are first installed, typically come pre-applied to a peel-off cover 39 that protects the conductive surface of sensor pads 1 and 2 until ready for use." *Id.* at [0042]. The protective cover tape 39 protects the bottom surface of the flexible circuit assembly 36, 50 (the flexible printed circuit layer). For wearable medical devices, all surfaces that are placed over skin for prolonged periods of time should be kept clean and hygienic, and therefore protective tape 39 would protect any exposed surfaces facing the skin such as sensor pads 1 and 2, bottom case 37, and flexible circuit assembly 36, 50.

1176. Thus, it is my opinion that Jensen discloses "a protective covering for the flexible printed circuit layer."

### 7.    *Dependent Claim 17*

1177. Claim 17 depends from claim 15 and additionally requires that "the flexible printed circuit layer includes openings sized to receive electrode gels."

1178. In my opinion, claim 17 of the '484 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 15 as well as because the additional limitation of claim 17 would have been obvious to a POSA. *See* Section XIX.B.6, *supra*.

1179. Commercially available electrode gels were known in the art at the time of the claimed invention. *E.g.*, Ex. 1011 at [0041] (describing "off-the-shelf EKG sensor pads, such as those sold by 3M Corporation"). A POSA would have

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 381

recognized that it could integrate these commercially available disposable electrodes
into the invention of Jensen by including recesses or openings to accommodate those
commercially available electrode gels.   A POSA would have been motivated to
modify Jensen in this manner for at least two reasons.  First, relying on commercially
available electrodes (rather than creating a novel electrode 'from scratch') would
ease manufacturing and assembly.  Second, providing a recess would help to prevent
movement of the electrode gels, which was known in the art (*e.g.*, by recessing gels
in a cup geometry).  Ex. 1061 at 578–79 ("If a portion of the electrode loses contact
with the skin, current flow across it is altered because, in effect, the size of the
interface changes.  Current flow may be altered further if movement allows the
conductive medium to dry"); *see also* Ex. 1062 at 203–04.

1180. For these reasons, it is my opinion that Jensen discloses that "the
flexible printed circuit layer includes openings sized to receive electrode gels" and,
therefore, that Jensen, in view of the general knowledge of a POSA, renders obvious
claim 20 of the '484 patent.

### 8.    *Dependent Claim 18*

1181. Claim 18 depends from claim 15 and additionally requires that "the
protective covering is non-removable and made from an insulating material."

1182. In my opinion, claim 18 of the '484 patent is rendered obvious by
Jensen in view of the knowledge of a POSA for all the reasons discussed above with

382

respect to claim 15 as well as because the additional limitation of claim 18 would have been obvious to a POSA. *See* Section XIX.B.6, *supra*.

1183. As disclosed above, Jensen teaches discloses protective covering for the flexible printed circuit layer, including "two aesthetic covers 35 [which] may be constructed from Mylar sheet." *See* Section XIX.B.6.vi, *supra*; Ex. 1011 at [0043]. In my opinion, a POSA would recognize that Mylar is an insulating material, *see* Ex. 1047 at 23.10 ("The material most commonly used for flexible packaging applications is oriented polyester (e.g., Mylar™), which is used as a base for properties such as dimensional stability, heat resistance, and strength with an adhesively laminated seal layer such as low-density polyethylene, which provides the film structure with heat scalability"), and that aesthetic covers 35 are therefore a "protective material." A POSA would further understand that Mylar protective covers were not removable from disposable substrate 50, and would be discarded with the disposable substrate 50 after each use (and after it was detached from the communication-computation module) for hygienic reasons.

1184. For these reasons, it is my opinion that Jensen discloses that "the protective covering is non-removable and made from an insulating material" and, therefore, that Jensen, in view of the general knowledge of a POSA, renders obvious claim 18 of the '484 patent.

383

### 9.    *Dependent Claim 20*

1185.  Claim 20 depends from claim 15 and additionally requires that "the protective covering covers the adhesive."

1186. In my opinion, claim 20 of the '484 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 15 as well as because Jensen discloses the additional limitation of claim 20.  *See* Section XIX.B.6, *supra*.

1187. Jensen discloses a "protective cover tape 39" that surrounds sensor pads 1, 2 coated with a conductive adhesive attached to flexible circuit assembly 36, 50. Ex. 1011 at [0041]; *see also id.* at [0042].  This cover tape therefore "covers the adhesive."

1188. Additionally, or alternatively, aesthetic covering 35 protects the adhesive used to attach the covering to flexible circuit assembly 36, 50.  *See* Section XIX.B.1.iv, *supra*; Ex. 1011 at [0043], [0045].  Thus, aesthetic covering 35 also "covers the adhesive."

1189. For these reasons, it is my opinion that Jensen discloses that "the protective covering covers the adhesive" and, therefore, that Jensen, in view of the general knowledge of a POSA, renders obvious claim 20 of the '484 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 384

### C.    Ground 3: Obvious Over Ozguz and General Knowledge of a POSA

#### 1.    Independent Claim 1

1190. In my opinion, claim 1 of the '484 patent is rendered obvious by Ozguz in view of the general knowledge of a POSA.

### i.    Preamble 1[pre]

1191. The preamble of claim 1 recites "a body-worn physiological sensor comprising."

1192. In my opinion, to the extent the preamble is limiting, Ozguz discloses the preamble of claim 1 of the '484 patent.

1193. Ozguz discloses "a thin flexible ambulatory/self contained bio-sensor module in a form similar to an adhesive bandage for sensing physiologically modulated signals from the body."  Ex. 1014 at [0003].

1194. Thus, in my opinion, Ozguz discloses "a body-worn physiological sensor."

### ii.    Limitation [1a]

1195. Limitation [1a] recites "a computation-communication module including a housing retaining a processor."

1196. In my opinion, Ozguz discloses limitation [1a] of the '484 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 385

1197. Ozguz's sensor module 10 includes "flexible silicon substrates 60, 65, 70 having respective integrated circuits 71, 72, 73 [which] are bonded to the flexible substrate 55." *Id.* at [0039]. Thin silicon substrates 60, 65, 70 can include a communication module: "transmitter or transceiver 190 for transmitting data by RF signals to a remote receiver." *Id.* at [0058]. Ozguz states that "it is to be expressly understood that the ICs 71, 72, 73, can be integrated as one IC on a single silicon substrate." *Id.* at [0042].

1198. Ozguz's thin silicon substrates 60, 65, 70 may also include a computation module: "a microprocessor 175" for processing signals and "controlling input, storage, and analysis of the collected data." *Id.* at [0041], [0044], [0058]. Accordingly, Ozguz discloses a communication-computation module.



*Id.* at Fig. 2A.

1199. Ozguz also discloses that the "computation-communication module" includes "a housing retaining a processor." In particular, Ozguz discloses that the

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 386**

"flexible, thin battery 105 overlays the silicon substrates 60, 65, 70 and their respective ICs 71, 72, 73." *Id.* at [0048]. Circuits 71, 72, and 73 can be integrated into a single circuit on a single silicon substrate. *Id.* at [0039], [0042]. Overlay 105 houses the computation-communication module formed by flexible substrate 55 and components bonded to it, such as flexible silicon substrates 60, 65, 70, integrated circuits 71, 72, 73, and antenna 50. *Id.* A "microprocessor 175" can be "incorporated into thin silicon substrates 60, 65, 70." *Id.* at [0058].

1200. Thus, in my opinion, Ozguz discloses "a communication-computation module including a housing retaining a processor."

### iii.    Limitation [1b]

1201. Limitation [1b] recites "a flexible circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals."

1202. In my opinion, Ozguz discloses limitation [1b] of the '484 patent.

1203. Ozguz discloses that "flexible substrate 55" includes metallization 77 that interconnects integrated circuits 71, 72, 73 and other components to form a circuit layer. *Id.* at [0039]. "[E]lectrodes 80" (shown below) are "disposed on an underside 85 of the flexible substrate 55 for contact with the skin 15 of the subject body 20." *Id.* These electrodes are used to "detect . . . physiological characteristics such as an EKG (from the heart)." *Id.* at [0044]. Accordingly, Ozguz discloses a

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 387

flexible circuit layer (flexible substrate 55) configured to be coupled to a skin surface of a subject to measure physiological signals (such as EKG).



*Id.* at Fig. 3E (annotated).

1204. Thus, in my opinion, Ozguz discloses "a flexible circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals.

### iv.    Limitation [1c]

1205. Limitation [1c] recites "said computation-communication module being attached to the flexible circuit layer."

1206. In my opinion, Ozguz discloses limitation [1c] of the '484 patent.

1207. As noted previously, a microprocessor 175 and a transmitter or transceiver 190 forming the computation-communication module are incorporated into "flexible silicon substrates 60, 65, 70 having respective integrated circuits 71, 72, 73." *See* Section XIX.C.1.ii, *supra*; *see also* Ex. 1014 at [0039], [0058]. The

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 388

"thin flexible silicon substrates 60, 65, 70 having respective integrated circuits 71, 72, 73 are bonded to the flexible substrate 55 by an anisotropic epoxy layer 75 or the like." Ex. 1014 at [0039]. Ozguz specifically contemplates that these separate "ICs 71, 72, 73 can be integrated as one IC on a single silicon substrate." *Id.* at [0042].

1208. Therefore, in my opinion, Ozguz discloses "said computation-communication module being attached to a flexible circuit layer."

### v.    Limitation [1d]

1209. Limitation [1d] recites "an adhesive covering at least a portion of the flexible circuit layer."

1210. In my opinion, Ozguz discloses limitation [1d] of the '484 patent.

1211. Ozguz discloses "[a]dhesive pads 91 [*i.e.*, the claimed "adhesive covering"] are also disposed on the underside 85 of flexible substrate [55]" (*i.e.*, the claimed "flexible circuit layer"). *Id.* at [0049].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 389



FIG. 3B

*Id.* at Fig. 3B (annotated).

1212. Additionally, or alternatively, Ozguz discloses an "anisotropic epoxy 75," (*i.e.*, the claimed "adhesive layer") which covers at least part of flexible substrate 55 (*i.e.*, the claimed "flexible circuit layer). *Id.* at [0046]; *see also id.* at Fig. 3B (reproduced below). The anisotropic epoxy is an adhesive that bonds silicon 60, 65, 70 with flexible substrate 55. *Id.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 390



*Id.* at Fig. 3B (annotated).

1213. Thus, in my opinion, Ozguz discloses "an adhesive covering at least a portion of the flexible circuit layer."

### vi.    Limitation [1e]

1214. Limitation [1e] recites "a protective covering that protects the adhesive."

1215. In my opinion, Ozguz discloses limitation [1e] of the '484 patent.

1216. Ozguz discloses a "protective cover 115" (shown in red below), which covers "adhesive pads 91" (shown in blue below). *See id.* at [0049].

391

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 391



**FIG. 3C**

*Id.* at Fig. 3C (annotated).

1217. Additionally, or alternatively, Ozguz discloses an overlying battery 105 (protective covering; shown in red below) that is shaped in a way that it overlays silicon 60, 65, 70 and anisotropic epoxy 75 (adhesive) as well as flexible substrate 55. *Id.* at [0048].



**FIG. 3A**

392

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 392

*Id.* at Fig. 3A (annotated).

1218. Thus, in my opinion, Ozguz discloses "a protective covering that protects the adhesive."

### 2.    Dependent Claim 2

1219. Claim 2 of the '484 patent depends from claim 1 and additionally requires that "the flexible circuit layer has traces of determinable electrical resistance."

1220. In my opinion, claim 2 of the '484 patent is obvious over Ozguz in view of a POSA's general knowledge for all the reasons discussed above with respect to claim 1 as well as because a POSA would understand Ozguz to disclose the additional limitation of claim 2. *See* Section XIX.C.1, *supra*.

1221. Ozguz discloses that "metallization 77 further extends through the flexible substrate 55 and connects the [integrated circuits] ICs 71, 72, 73 to the electrodes 80 disposed on an underside 85 of the flexible substrate 55." Ex. 1014 at [0039]. In my opinion, a POSA would understand metallization 77 to be traces. *See, e.g.*, Ex. 1035 at 129 (using "trace" and "conductor" interchangeably).

1222. Further, in my opinion, a POSA would have understood that metallization—which is a metal—must have a determinable electrical resistance. Indeed, *every* substance has a determinable electrical resistance—it is a physical

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 393

property.  *See, e.g.*, Ex. 1060 at 53 ("Electrical Resistance. . . .  [E]very particular substance has its own characteristic power of transmitting electrical currents").

1223.  For these reasons, it is my opinion that a POSA would understand that Ozguz discloses that "the flexible circuit layer has traces of determinable electrical resistance" and, therefore, that Ozguz, in view of the general knowledge of a POSA, renders obvious claim 2 of the '484 patent.

### 3.    *Dependent Claim 3*

1224.  Claim 3 of the '484 patent depends from claims 1 and 2 and additionally requires that "the traces on the flexible circuit layer are configured to electrically couple the computation-communication module to the flexible circuit layer, thereby forming a disposable module connector."

1225.  In my opinion claim 3 of the '484 patent is rendered obvious by Ozguz in view of the knowledge of a POSA for all the reasons discussed above with respect to claims 1 and 2 as well as because Ozguz discloses the additional limitation of claim 3.  *See* Section XIX.C.2, *supra*.

1226.  As noted previously, Ozguz discloses "a computation-communication module being attached to the flexible circuit layer."  *See* Section XIX.C.1.iv, *supra*. Ozguz further discloses that "metallization 77" is "applied to flexible substrate 55" and "interconnects the ICs 71, 72, 73" on flexible silicon 60, 65, 70 "to each other and to the antenna 50."  Ex. 1014 at [0039].  Accordingly, Ozguz discloses

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 394

conductive traces on the flexible circuit layer to electrically couple with the attached computation-communication module.

1227. In my opinion, a POSA would understand metallization 77 to form the claimed "disposable module connector."  Ozguz discloses that some portions of sensor module 10 are "remov[ed] after each use," while other portions are "used repeatedly." *Id.* at [0049].  In my opinion, a POSA would know that "thin flexible silicon 60, 65, 70," with incorporated "microprocessor 175" and "transmitter [or transceiver] 190" (computation-communication module), would be a portion of sensor module that can be used repeatedly to reduce costs and minimize waste. *Id.* at [0046], [0049], [0058].  On the other hand, flexible substrate 55, whose underside 85 is in contact with a patient's skin, would be a portion of sensor module that a POSA would dispose of to prevent any infections from spreading because of repeated use.  In view of these considerations, metallization 77—connecting flexible substrate 55 (a disposable portion) to microprocessor 175 and transmitter or transceiver 190 (the computation-communication module)—would therefore be a disposable module connector.

1228. For these reasons, it is my opinion that Ozguz discloses that "the traces on the flexible circuit later are configured to electrically couple the computation-communication module to the flexible circuit layer, thereby forming a disposable

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 395

module connector" and, therefore, that Ozguz, in view of the general knowledge of a POSA, renders obvious claim 3 of the '484 patent.

### 4. Dependent Claim 4

1229. Claim 4 of the '484 patent depends from claim 1 and additionally requires that "the traces on the flexible circuit layer are at least partially covered by a non-removable insulating covering."

1230. In my opinion claim 4 of the '484 patent is rendered obvious by Ozguz in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 1 as well as because Ozguz discloses the additional limitation of claim 4. *See* Section XIX.C.1, *supra*.

1231. Ozguz discloses a flexible power source 105, which covers the entire flexible circuit layer (including metallization 77). Ex. 1014 at [0048]. This is shown below in Figure 3A of Ozguz.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 396



*FIG. 3A*

*Id.* at Fig. 3A (annotated).

1232. A POSA would understand that the "flexible, thin battery 105" is not removable and must be insulating to prevent shorts due to unintended contact with other components. *Id.* at [0048].

1233. For these reasons, it is my opinion that Ozguz discloses that "the traces on the flexible circuit layer are at least partially covered by a non-removable insulating covering" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 4 of the '484 patent.

397

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 397

### 5.    *Dependent Claim 5*

1234. Claim 5 depends from claim 1 and additionally requires that "the flexible circuit layer further comprises a plurality of openings sized to receive electrodes."

1235. In my opinion claim 5 of the '484 patent is rendered obvious by Ozguz in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 1 as well as because claim 5 would have been obvious to a POSA. *See* Section XIX.C.1, *supra*.

1236. Ozguz discloses a sensor module 10 that includes "electrodes 80 disposed on an underside 85 of the flexible substrate 55 for contact with the skin 15 of the subject body 20." Ex. 1014 at [0039]. In my opinion, it would have been obvious to a POSA to modify Ozguz's "flexible substrate 55" to form openings in the bottom of the flexible substrate to receive electrode gels. This modification would comprise a simple design change from Ozguz's disclosed construction (in which the electrodes are integrated into "flexible substrate 55"). *Id.*

1237. A POSA would have been motivated to make this change to make Ozguz's device compatible with a variety of commercial, pre-gelled, adhesive, disposable electrodes, such as those manufactured by 3M and well-known in the field, or else to mechanically stabilize a non-commercial gel in Ozguz's device. *See, e.g.*, Ex. 1011 at [0041] (referring to well-known, off-the-shelf electrodes

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 398

manufactured "by 3M Corporation").  Relying on commercially available electrodes (rather than creating a novel electrode 'from scratch') would ease manufacturing and assembly.  Further, providing a recess would help to prevent movement of the electrode gels, which was known in the art (*e.g.*, by recessing gels in a cup geometry).  Ex. 1061 at 578–79 ("If a portion of the electrode loses contact with the skin, current flow across it is altered because, in effect, the size of the interface changes.  Current flow may be altered further if movement allows the conductive medium to dry"); *see also* Ex. 1062 at 203–04.

### 6.    *Dependent Claim 6*

1238.  Dependent claim 6 depends from claim 1 and additionally requires "a hard-wired communication cable."

1239.  In my opinion claim 6 of the '484 patent is rendered obvious by Ozguz in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 1 as well as because Ozguz discloses the additional limitation of claim 5.

1240.  Ozguz discloses that sensor module 10 can include a "port 86."  Ex. 1014 at [0040].  Port 86 connects to "a mating connection 87" of a wire that "physically connect[s] the sensor module 10 to the [computer] 88."  *Id.*  This is shown in Figure 2B of Ozguz.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 399



FIG. 2B

*Id.* at Fig. 2B (annotated).

1241. For these reasons, it is my opinion that Ozguz discloses a "hard-wired communication cable" and, therefore, that Ozguz, in view of the general knowledge of a POSA, renders obvious claim 6 of the '484 patent.

### 7.    Independent Claim 7

#### i.    Preamble 7[pre]

1242. The preamble of claim 7 recites "a body-worn patient monitoring device."

1243. In my opinion, to the extent that the preamble is limiting, Ozguz discloses the preamble of claim 1 of the '484 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 400

1244. Ozguz discloses "a sensor system comprising a thin flexible ambulatory/self contained bio-sensor module in a form similar to an adhesive bandage for sensing physiologically modulated signals from the body." *Id.* at [0003]. Figure 2A of Ozguz shows sensor module 10 (shown in red) being worn on the body of a patient. *Id.* at [0038]–[0039].



**FIG. 2A**

*Id.* at Fig. 2A (annotated).

1245. Thus, in my opinion, Ozguz discloses "a body-worn patient monitoring device."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 401

### ii.    Limitation [7a]

1246. Limitation [7a] of the '484 patent recites "a disposable electrode portion comprising."

1247. In my opinion, Ozguz discloses limitation [7a] of the '484 patent.

1248. As noted above, Ozguz discloses that some portions of sensor module 10 are "remov[ed] after each use," while other portions are "used repeatedly." *See* Section XIX.C.3, *supra* (citing Ex. 1014 at [0049]). A POSA would understand that "flexible substrate 55", whose underside is in direct contact with the patient's skin, would be a portion of the sensor module that a POSA would discard/dispose of for hygienic reasons. *Id.* Accordingly, the flexible substrate 55 is a "disposable electrode portion."

1249. Thus, in my opinion, Ozguz discloses "a disposable electrode portion."

### iii.    Limitation [7b]

1250. Limitation [7b] recites "a flexible printed circuit layer made from an insulating material and defining a substrate."

1251. In my opinion, Ozguz discloses limitation [7b] of the '484 patent.

1252. Ozguz discloses that "flexible substrate 55" includes "metallization 77" that interconnects "integrated circuits 71, 72, 73" and other components to form a circuit board layer. Ex. 1014 at [0039].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 402

1253. Ozguz further discloses that flexible substrate 55 is made of an insulating material, "preferably in the form of a polyimide, and is electrically non-conductive and flexible. However other flexible non-conducting substrates can be substituted." *Id.* at [0046]. A POSA would have recognized that Ozguz's flexible substrate 55 comprises a flexible printed circuit board and, therefore, comprises a flexible printed circuit layer. *Cf.* Ex. 1035 at 4–5 (defining printed circuit board's essential components as base of insulating material and conductors).

1254. Thus, in my opinion, Ozguz discloses "a flexible printed circuit layer made from an insulating material and defining a substrate."

### iv.    Limitation [7c]

1255. Limitation [7c] recites "at least two electrodes being disposed onto a surface of the substrate."

1256. In my opinion, Ozguz discloses limitation [7c] of the '484 patent.

1257. Ozguz teaches that sensor module 10 includes "electrodes 80 disposed on an underside 85 of the flexible substrate 55 for contact with the skin 15 of the subject body 20." Ex. 1014 at [0039].

403



*Id.* at Fig. 3E (annotated).

1258. Thus, in my opinion, Ozguz discloses "at least two electrodes being disposed on to a surface of the substrate."

### v.    *Limitation [7d]*

1259. Limitation [7d] recites "electrical traces defined between the at least two electrodes, and a connection pad."

1260. In my opinion, Ozguz discloses limitation [7d] of the '484 patent.

1261. Ozguz discloses that "metallization 77 further extends through the flexible substrate 55 and connects the [integrated circuits] ICs 71, 72, 73 to the electrodes 80 disposed on an underside 85 of the flexible substrate 55. . . ." *Id.* at [0039]. In my opinion, a POSA would understand metallization 77 to be electrical traces. *See* Section XIX.C.2, *supra*. *See, e.g.*, Ex. 1035 at 129 (using "trace" and "conductor" interchangeably).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 404

1262. Ozguz further discloses "a pair of electrodes 90" that "extend longitudinally relative to the sensor module 10" and which contact the metallization. Ex. 1014 at [0043].



*Id.* at Fig. 3B (annotated).

1263. Ozguz also teaches "a connection pad." Specifically, the electrodes 80 "located on a lower surface 85 of flexible substrate 55" and "metallization 77" on the upper surface of flexible substrate 55 are electrically connected through "flexible substrate 55." *Id.* at [0048]. A POSA would understand that the portion of metallization that connects the electrodes to the overlying silicon circuit of Ozguz is a connection pad. *Id.*; *see also* Ex. 1035 at 656 (defining "pad" as "[a] portion of

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 405

the conductive area of which components, terminals, traces, etc., are mechanically

attached").

1264. Thus, in my opinion, Ozguz discloses "electrical traces defined

between the at least two electrodes, and a connection pad."

### vi.    Limitation [7e]

1265. Limitation [7e] recites "a reusable communication module,

comprising."

1266. In my opinion, a POSA would recognize that Ozguz discloses

limitation [7e] of the '484 patent.

1267. As noted above, Ozguz discloses a communication module: "flexible

silicon 60, 65, 70 having respective integrated circuits 71, 72, 73" with "transmitter

or transceiver 190 for transmitting data by RF signals to a remote receiver"

(communication module) and "microprocessor 175." *See* Section XIX.C.1.ii, *supra*;

Ex. 1014 at [0046], [0058]; *see also* Ex. 1014 at [0039].

1268. A POSA would know that "flexible silicon 60, 65, 70 having respective

integrated circuits 71, 72, 73" with "transmitter or transceiver 190" (communication

module) and "microprocessor 175" would be a portion of sensor module 10 that

would be used repeatedly to reduce costs and minimize waste. *See* Section XIX.C.3,

*supra*.   This portion can be "sterilized in an autoclave" for repeated use, as

contemplated by Ozguz.  Ex. 1014 at [0049].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 406

1269. Accordingly, in my opinion, a POSA would recognize that Ozguz discloses "a reusable communication module."

### vii.     Limitation [7f]

1270. Limitation [7f] recites "a housing containing a processor."

1271. In my opinion, Ozguz discloses limitation [7f] of the '484 patent.

1272. Ozguz discloses "microprocessor 175" that is "incorporated into thin silicon substrates 60, 65, 70." *Id.* at [0058]. Sensor module 10 includes a "flexible, thin battery 105" that "overlays the silicon substrates 60, 65, 70 and their respective ICs 71, 72, 73." *Id.* at [0048]. On the other side, "silicon substrates 60, 65, 70" are disposed on "flexible substrate 55." *Id.* at [0039]. Microprocessor 175 of the communication module is therefore housed between overlay 105 and "flexible substrate 55." *Id.* Accordingly, Ozguz's processor is contained in a housing formed by the flexible battery 105 and flexible substrate 55.

1273. Thus, in my opinion, Ozguz discloses "a housing containing a processor."

### viii.     Limitation [7g]

1274. Limitation [7g] recites "a wireless communication unit, and in which the reusable communication module is releasably attached to the disposable electrode portion by at least one latching clip."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 407

1275. In my opinion, a POSA would recognize that Ozguz discloses limitation [7g] of the '484 patent.

1276. Ozguz discloses that sensor module 10 functions as a wireless data collection device. *Id.* at Abstract. To that end, "silicon substrates 60, 65, 70" located on flexible substrate 55 incorporate "transmitter or transceiver 190 for transmitting data by RF signals to a remote receiver." *Id.* at [0058].

1277. As noted above, Ozguz discloses a "disposable electrode portion" and a "reusable communication module." *See* Sections XIX.C.7.ii, XIX.C.7.vi, *supra*. In my opinion, a POSA would have understood that the disposable electrode portion and reusable communication module must be releasably attached to one another so that the disposable portion may be discarded and the reusable component may be "sterilized in an autoclave" for repeated use, as contemplated by Ozguz. Ex. 1014 at [0049]. A POSA would have further recognized that latching is one of a finite number of options for mechanically attaching "disposable electrode portion" and "reusable communication module" together.

1278. Both latches and snaps were commonly known and used in the art at the time. *See, e.g.*, Ex. 1005 at 9:32–44; *see also* Section IV.D, *supra.*

1279. In my opinion, a POSA would have understood a snap mechanism and a latch mechanism to be interchangeable for the purpose of attaching two components of a medical device such as a body-worn monitor. *See, e.g.*, Ex. 1039

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 408

at [0046] (discussing use of snap connectors to attach a monitoring device to 12-lead recorders), Fig. 5; Ex. 1040 at 30 ("Labeling").

1280. Thus, in my opinion, Ozguz and the general knowledge of a POSA render obvious "a wireless communication unit, and in which the reusable communication module is releasably attached to the disposable electrode portion by at least one latching clip."

### ix.     Limitation [7h]

1281. Limitation [7h] recites "a hard-wired communication cable."

1282. In my opinion, Ozguz discloses limitation [7h] of the '484 patent.

1283. As shown in Figure 2B, Ozguz teaches "a port 86 on the sensor module 10 and a mating connection 87 connected to a PC 88 for physically connecting the sensor module 10 to the PC 88 or other processor for downloading, analyzing, and archiving collected data." Ex. 1014 at [0040].

409



*Id.* at Fig. 2B (annotated).

1284. This hard-wired connection, along with a non-volatile memory in Ozguz's device, can be used "in case power is lost to the sensor module." *Id.* at [0040].

1285. Thus, in my opinion, Ozguz discloses "a hard-wired communication cable."

### 8.    *Dependent Claim 8*

1286. Dependent claim 8 depends from claim 7 and additionally requires that "the electrodes are integrated into the flexible circuit layer of the disposable electrode portion."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 410

1287. In my opinion, claim 8 of the '484 patent is rendered obvious by Ozguz in view of the general knowledge of a POSA for all the reasons discussed above with respect to claim 7 as well as because Ozguz teaches the additional limitation of claim 8. *See* Section XIX.C.7, *supra*.

1288. Ozguz discloses "sensor module 10" which includes "electrodes 80 disposed on an underside 85 of the flexible substrate 55 for contact with the skin 15 of the subject body 20." Ex. 1014 at [0039].



*Id.* at Fig. 3E (annotated).

1289. Thus, it is my opinion that Ozguz discloses that "the electrodes are integrated into the flexible circuit layer of the disposable electrode portion" and, therefore, that the combination of Ozguz and the general knowledge of a POSA renders obvious claim 8 of the '484 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 411

### 9.    *Independent Claim 15*

1290. In my opinion, claim 15 of the '484 patent is rendered obvious by Ozguz in view of the general knowledge of a POSA.

### i.    *Preamble 15[pre]*

1291. The preamble of claim 15 recites "a body-worn physiological sensor."

1292. As described with respect to claim 1, to the extent that the preamble is limiting, it is my opinion that Ozguz discloses "a body-worn physiological sensor." *See* Section XIX.C.1.i, *supra*.

### ii.    *Limitation [15a]*

1293. Limitation [15a] recites "a computation-communication module including a housing retaining a processor."

1294. As explained with respect to claim 1, it is my opinion that Ozguz discloses "a computation-communication module including a housing retaining a processor." *See* Section XIX.C.1.ii, *supra*.

### iii.    *Limitation [15b]*

1295. Limitation [15b] recites "a flexible printed circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals."

1296. As explained with respect to Claim 1, it is my opinion that Ozguz discloses "a flexible printed circuit layer configured to be coupled to a skin surface

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 412

of a subject to measure physiological signals." *See* Sections XIX.C.1.iii, XIX.C.7.ii,

*supra*.

### iv.    Limitation [15c]

1297. Limitation [15c] recites "the computation-communication module

being attached to the flexible printed circuit layer."

1298. As explained with respect to claim 1, it is my opinion that Ozguz

discloses "the computation-communication module being attached to the flexible

printed circuit layer." *See* Section XIX.C.1.iv, *supra*.

### v.    Limitation [15d]

1299. Limitation [15d] recites "an adhesive covering at least a portion of the

flexible printed circuit layer."

1300. As explained above with respect to claim 1, it is my opinion that Ozguz

discloses "an adhesive covering at least a portion of the flexible printed circuit

layer." *See* Section XIX.C.1.v, *supra*.

### vi.    Limitation [15e]

1301. Limitation [15e] recites "a protective covering for the flexible printed

circuit layer."

1302. In my opinion, Ozguz discloses limitation [15e] of the '484 patent.

1303. As described previously above, Ozguz discloses a "protective

covering." *See* Section XIX.C.1.vi, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 413

1304. Ozguz discloses that "protective cover 115" (shown in red below) covers the "underside 85" of "flexible substrate 55" (shown in blue below). Ex. 1014 at [0039], [0048]–[0049].



*Id.* at Fig. 3C (annotated).

1305. Additionally, or alternatively, Ozguz discloses an overlying battery 105 (protective covering) that is shaped in a way that overlays silicon 60, 65, 70 and anisotropic epoxy 75 (adhesive) as well as flexible substrate 55. *Id.* at [0048].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 414



**FIG. 3A**

*Id.* at Fig. 3A (annotated).

1306. Thus, in my opinion, Ozguz discloses "a protective covering for the flexible printed circuit layer."

### 10.    *Dependent Claim 19*

1307. Claim 19 depends from claim 15 and additionally requires that "the computation communication module is releasably attached to the flexible printed circuit layer."

1308. In my opinion, claim 19 of the '484 patent is rendered obvious by Ozguz in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 15 as well as because a POSA would understand Ozguz as disclosing the additional limitation of claim 19.  *See* Section XIX.C.9, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 415

1309. Ozguz discloses that some portions of sensor module 10 are "remov[ed] after each use," while other portions are "used repeatedly." Ex. 1014 at [0049]. A POSA would know that "flexible silicon 60, 65, 70" with incorporate "microprocessor 175" and "transmitter or transceiver 190" (computation-communication module), would be a portion of sensor module that can be used repeatedly to reduce costs and minimize waste. On the other hand, flexible substrate 55, whose underside 85 is in contact with a patient's skin, would be a portion of sensor module that a POSA would seek to discard/dispose of to prevent any infections from spreading as a result of repeated use. Ozguz therefore discloses that the disposable flexible printed circuit layer is releasably attached from the portions of Ozguz that would be reused, such as "microprocessor 175" and "transmitter or transceiver 190" (computation-communication module).

1310. For these reasons, it is my opinion that a POSA would understand that Ozguz discloses that "the computation communication module is releasably attached to the flexible printed circuit layer" and, therefore, that Ozguz, in view of the general knowledge of a POSA, renders obvious claim 19 of the '484 patent.

### 11.    Dependent Claim 20

1311. Claim 20 depends from claim 15 and additionally requires that "the protective covering covers the adhesive."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 416

1312. In my opinion, in addition to teaching all of the limitations of claim 15, Ozguz teaches that "the protective covering covers the adhesive" for the reasons set forth above with respect to claim 1. *See* Section XIX.C.1.vi, *supra*.

### D.    Ground 4: Obvious Over Matsumura, Ozguz, and General Knowledge of a Person of Ordinary Skill in the Art

#### 1.    *A POSA Would Have Been Motivated to Combine Matsumura and Ozguz*

1313. For the reasons set forth above in Section XVII.B.1, with reference to the '007 patent, a POSA would have had motivation to combine the teachings of Matsumura and Ozguz.

#### 2.    *Dependent Claim 6*

1314. Claim 6 depends from claim 1 and additionally requires "a hard-wired communication cable."

1315. In my opinion, in addition to teaching all of the limitations of claim 1, the combination of Matsumura and Ozguz renders obvious "a hard-wired communication cable." *See* Section XIX.A.1, *supra*.

1316. In the first instance, a POSA seeking to make or use Matsumura's invention would have recognized that a device capable only of wireless communication would present downsides. *Cf.* Ex. 1012 at [0025], [0036]. Specifically, a POSA would recognize a number of likely situations would limit the ability of the device to transfer important patient health information wirelessly,

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 417

including, for example: the wireless communication module could break, the battery could die, firmware installation could be required during manufacturing before wireless communication would be possible, or wireless communication networks could be subject to interference or interruption. Accordingly, in my opinion, it would have been obvious to a POSA to include a hard-wired communication cable as a backup to the wireless communication module in Matsumura.

1317. To the extent that it would not have been obvious to include a hard-wired communication cable as a backup to wireless communications, Ozguz discloses "a sensor module 10 adhered to the skin 15 of a subject body 20" that can wirelessly transmit detected signals to a remote receiver device. Ex. 1014 at [0038]–[0039]. As shown in Figure 2B, Ozguz also teaches "a port 86 on the sensor module 10 and a mating connection 87 connected to a PC 88 for physically connecting the sensor module 10 to the PC 88 or other processor for downloading, analyzing, and archiving collected data." *Id.* at [0040].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 418



*Id.* at Fig. 2B (annotated).

1318. As noted above, *see* Section XVII.B.1, *supra*, this hard-wired connection can be used to efficiently transmit a large quantity of detected signals stored in non-volatile memory "in case power is lost to the sensor module." Ex. 1014 at [0040]. The hard-wired connection can also be used to recover data in case power is never restored to the sensor module. In my opinion, a POSA would have looked to add "port 86" of Ozguz to the bioelectric potential detector 11 taught by Matsumura to be connected to "mating connection 87."

1319. Thus, it is my opinion that Matsumura and Ozguz together disclose that "a hard-wired communication cable" and, therefore, that the combination of Matsumura and Ozguz renders obvious claim 6 of the '484 patent.

419

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 419

### 3.    Independent Claim 7

1320. In my opinion, claim 7 of the '484 patent is rendered obvious the combination of Matsumura and Ozguz.

#### i.    Preamble 7[pre]

1321. The preamble of claim 7 recites "a body-worn patient monitoring device."

1322. In my opinion, to the extent that the preamble is limiting, Matsumura and Ozguz disclose the preamble of claim 1 of the '484 patent.

1323. Matsumura discloses a body-worn patient monitoring device which it refers to as a "bioelectric potential detector."  Ex. 1012 at Abstract, [0006], [0014].

1324. Ozguz also discloses a body-worn patient monitoring device.  Ex. 1014 at [0003], [0010].

1325. Thus, in my opinion, each of Matsumura and Ozguz discloses "a body-worn patient monitoring device."

#### ii.    Limitation [7a]

1326. Limitation [7a] of the '484 patent recites "a disposable electrode portion comprising."

1327. In my opinion, Matsumura discloses limitation [7a] of the '484 patent.

420

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 420

1328. As shown in Matsumura's Figure 1, reproduced below, Matsumura discloses that "disposable bioelectrode pad 7" includes "conductive gel 5" (electrode portion) used to detect bioelectrical potentials. Ex. 1012 at Abstract, [0016], [0018].



*Id.* at Fig. 1 (annotated).

1329. Thus, in my opinion, Matsumura discloses "a disposable electrode portion."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 421

### iii.    Limitation [7b]

1330. Limitation [7b] recites "a flexible printed circuit layer made from an insulating material and defining a substrate."

1331. In my opinion, a POSA would recognize that Matsumura renders obvious limitation [7b] of the '484 patent.

1332. It would have been obvious to a POSA to modify Matsumura's conductive material 2 to comprise a flexible printed circuit layer configured to be coupled to a skin surface of a subject to measure physiological signals. *See* Section XIX.A.6.iii, *supra*. The circuit layer of Matsumura comprises "two pieces of conductive material 2," which "can be a carbon sheet or a PET sheet [which are insulating material] coated with conductive Ag/AgCl." Ex. 1012 at [0019]–[0020], Fig 1. A POSA would recognize that, as modified, Matsumura's conductive material would comprise a flexible printed circuit made from an insulating material and which, if combined with second sheet 4, would form a flexible printed circuit layer and define a substrate. *Id.* at [0017]–[0018].

1333. Thus, in my opinion, a POSA would recognize Matsumura renders obvious "a flexible printed circuit layer made from an insulating material and defining a substrate."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 422

### iv.    Limitation [7c]

1334. Limitation [7c] recites "at least two electrodes being disposed onto a surface of the substrate."

1335. In my opinion, Matsumura discloses limitation [7c] of the '484 patent.

1336. Matsumura discloses "disposable bioelectrode pad 7" that includes "conductive gel[s] 5" (electrodes) used to detect bioelectrical potentials.  These "conductive gel[s]" are disposed in two openings 4a in second sheet 4.  *Id.* at [0018]– [0019].  A POSA would recognize that the electrodes are bonded together with the other components of the disposable bioelectrode pad, including the sheet of conductive material 2 with which the electrodes make contact.   *Id.* at [0019]. Conductive gels 5 (electrodes) are therefore disposed on a surface of "disposable bioelectrode pad 7" (disposable substrate) of Matsumura.  *Id.* at [0018]–[0019].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 423



*Id.* at Fig. 1 (annotated).

1337. Thus, in my opinion, Matsumura discloses "at least two electrodes being disposed on to a surface of the substrate."

### v.    *Limitation [7d]*

1338. Limitation [7d] recites "electrical traces defined between the at least two electrodes, and a connection pad."

1339. In my opinion, Matsumura renders obvious limitation [7d] of the '484 patent.

1340. As explained above, a POSA would have been motivated to combine conductive material 2 onto a single, printed sheet, thereby forming a flexible printed

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 424

circuit. *See* Section XIX.D.3.iii, *supra*. As modified, traces run "between the at least two electrodes" (*i.e.,* the conductive gels 5). Specifically, there is an electrical connection from one electrode to the printed trace it contacts; from the printed trace to the hook at its end; from the hook to the signal processor; from the signal processor to the other hook; from the other hook down the length of the other electrical trace; and from the other electrical trace to the other electrode.

1341. A POSA would understand that where Matsumura's hooks contact the traces of the flexible printed circuit layer constitutes a connection pad because it forms an electrical connection between the signal processor 10 and the traces leading to the electrodes 5. *See* 1012 at [0019]; Ex. 1035 at 656 (defining "pad" as "[a] portion of the conductive area of which components, terminals, traces, etc., are mechanically attached").

1342. Thus, in my opinion, Matsumura discloses "electrical traces defined between the at least two electrodes and a connection pad."

### vi.    Limitation [7e]

1343. Limitation [7e] recites "a reusable communication module comprising."

1344. In my opinion, Matsumura discloses limitation [7e] of the '484 patent.

1345. Matsumura discloses a "reusable signal processor" which is a module that is "detachable with hooks" from disposable bioelectrode portion 7. Ex. 1012 at

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 425

[0016]; *see also id.* at [0008], [0014], [0025], Figs. 1–2. The reusable signal processor incorporates components for computation: a "processing circuit for filtering and amplifying detected bioelectric potential signals" and "a memory for storing the processed bioelectric potential signal." *Id.* at [0025]. The reusable signal processor also incorporates components for communication: "a circuit for modulating the processed bioelectric potential signal and transmitting it wirelessly, and a loop antenna." *Id.*

1346. Thus, in my opinion, Matsumura discloses "a reusable communication module."

### vii.    Limitation [7f]

1347. Limitation [7f] recites "a housing containing a processor."

1348. In my opinion, Matsumura discloses limitation [7f] of the '484 patent.

1349. Matsumura discloses that reusable "signal processor 10" is enclosed in housing 10c which can be "easily attached and detached" to bioelectrode pad 7. *Id.* at [0025], [0027], [0029], [0041]. "[S]ignal processor 10 incorporates a processing circuit for filtering and amplifying detected bioelectric potential signals." *Id.* at [0025]. The processing circuit is disposed within housing 10c to ensure signal processor 10 is waterproof. *Id.* at [0025], [0027], [0029].

1350. Thus, in my opinion, Matsumura discloses "a housing containing a processor."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 426

### viii.    Limitation [7g]

1351. Limitation [7g] recites "a wireless communication unit, and in which the reusable communication module is releasably attached to the disposable electrode portion by at least one latching clip."

1352. In my opinion, a POSA would understand that Matsumura discloses limitation [7g] of the '484 patent.

1353. Matsumura discloses that "reusable signal processor 10" is "easily attached and detached" with hook 3 (releasably attached) to disposable bioelectrode pad 7 that includes conductive gels 5 (disposable electrode portion). *Id.* at [0016]; *see also id.* at [0008], [0014], [0025], Figs. 1–2. The reusable signal processor incorporates components for wireless communication: "a circuit for modulating the processed bioelectric potential signal and transmitting it wirelessly, and a loop antenna" (wireless communication unit). *Id.* at [0025]. This is illustrated in Matsumura's Figure 4(b), reproduced below.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 427



*Id.* at Fig. 4(b) (annotated).

1354. It is also my opinion that the "hook 3" of Matsumura would render obvious the use of a latch clip, for the reasons set forth with respect to limitation [7g] of the '492 patent. *See* Section XVIII.A.7.viii, *supra*; *see also* Ex. 1039 at [0046], Fig. 5 (discussing use of snap connectors to attach a monitoring device to 12-lead recorders); Ex. 1040 at 30 ("Labeling").

1355. Thus, in my opinion, Matsumura and the general knowledge of a POSA render obvious "a wireless communication unit, and in which the reusable communication module is releasably attached to the disposable electrode portion by at least one latching clip."

### ix.    Limitation [7h]

1356. Limitation [7h] recites "a hard-wired communication cable."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 428

1357. For the reasons set forth above with respect to dependent claim 6, in my opinion, Matsumura in view of Ozguz renders obvious limitation [7h] of the '484 patent. *See* Section XIX.D.2, *supra*.

### 4.    Dependent Claim 8

1358. Dependent claim 8 depends from claim 7 and additionally requires that "the electrodes are integrated into the flexible circuit layer of the disposable electrode portion."

1359. In my opinion, claim 8 of the '484 patent is rendered obvious by Matsumura in view of Ozguz for all the reasons discussed above with respect to claim 7 as well as because Matsumura teaches the additional limitation of claim 8. *See* Section XIX.D.3, *supra*.

1360. Matsumura discloses that "second sheet 4" of bioelectrode pad 7 "is provided with two openings 4a on the left and right sides into which the conductive gel 5 is inserted." Ex. 1012 at [0018]. As shown in Figure 1, annotated and reproduced below, openings 4a are sized to receive conductive gels 5, which are integrated into the bioelectrode pad when assembled. *Id.* at Fig. 1. A POSA would understand that the electrodes are bonded together with the other components of the disposable bioelectrode pad 7, including the sheet of conductive material with which the electrodes make contact. *Id.* at [0019].

429



*Id.* at Fig. 1 (annotated).

1361. Thus, it is my opinion that Matsumura discloses that "the electrodes are integrated into the flexible circuit layer of the disposable electrode portion" and, therefore, that the combination of Matsumura and Ozguz renders obvious claim 8 of the '484 patent.

### 5.    *Dependent Claim 11*

1362. Dependent claim 11 depends from claim 7 and additionally requires that "the electrical traces are screened onto the flexible printed circuit layer."

1363. In my opinion, claim 11 of the '484 patent is rendered obvious by Matsumura in view of Ozguz for all the reasons discussed above with respect to

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 430

claim 7 as well as because Matsumura teaches the additional limitation of claim 11.
*See* Section XIX.D.3, *supra*.

1364. As noted above, Matsumura discloses "electrical traces" in the form of portions of conductive material 2 made of Silver/Silver Chloride. Ex. 1012 at [0019]–[0021]. A POSA would understand printing ink onto a circuit board to be a form of screening. In the industry, screening the standard way to attach electrical traces made of Silver/Silver Chloride, such as those as disclosed in Matsumura, to a flexible printed circuit board. *See* Ex. 1035 at 4 (identifying screen printing as one of the printing processes by which "conductive areas are usually generated" in the art).

1365. Printing Ag/AgCl ink traces on the flexible printed circuit layer of Matsumura, per the modification suggested above, would yield electrical traces that are screened.

1366. Thus, it is my opinion that Matsumura discloses that "the electrical traces are screened onto the flexible printed circuit layer" and, therefore, that the combination of Matsumura and Ozguz renders obvious claim 11 of the '484 patent.

### 6.    *Dependent Claim 12*

1367. Dependent claim 12 depends from claims 11 and 7 and additionally requires "an insulating layer applied onto the electrical traces."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 431

1368. In my opinion, claim 12 of the '484 patent is rendered obvious by Matsumura in view of Ozguz for all the reasons discussed above with respect to claims 11 and 7 as well as because Matsumura teaches the additional limitation of claim 12. *See* Section XIX.D.5, *supra*.

1369. As explained above, a POSA would modify Matsumura's conductive material 2 to form a single sheet of printed-ink traces between first sheet 1 and second sheet 4. *See* Section XIX.D.3.iii, *supra*. Matsumura teaches that first sheet 1 and second sheet 4 are both "made of an insulating material." Ex. 1012 at [0017]–[0018].

1370. Thus, it is my opinion that Matsumura discloses "an insulating layer applied onto the traces" and, therefore, that the combination of Matsumura and Ozguz renders obvious claim 12 of the '484 patent.

## XX.  THE CHALLENGED CLAIMS OF THE '422 PATENT ARE UNPATENTABLE

1371. In my opinion, claims 1–7, 9–11, and 14–20 of the '422 patent are obvious under pre-AIA § 103 over Matsumura in view of the knowledge of a POSA.

1372. Additionally and alternatively, in my opinion, claims 1–7, 9, 11, 12, and 14–20 of the '422 patent are obvious under pre-AIA § 103 over Jensen in view of the general knowledge of a POSA or Matsumura.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 432

1373. Additionally and alternatively, in my opinion, claims 1–3, 5, 6, 9, 11, 12, 14–18, and 20 are obvious under pre-AIA § 103 over Ozguz in view of the general knowledge of a POSA.

### A.    Ground 1: Obvious Over Matsumura in View of the General Knowledge of a POSA

#### 1.    Independent Claim 1

1374. In my opinion, claim 1 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA.

#### i.    Preamble 1[pre]

1375. The preamble of claim 1 of the '422 patent recites "[a] method for manufacturing a body-worn physiological sensor, the method comprising."

1376. In my opinion, to the extent the preamble is limiting, Matsumura discloses the preamble of claim 1 of the '422 patent.

1377. Matsumura teaches a "bioelectric potential detector . . . for detecting bioelectric potentials." Ex. 1012 at Abstract, [0007], [0014]. Matsumura further teaches the components needed to assemble the disclosed bioelectric potential detector. *Id.* at [0016], Figs. 1–2 (showing exploded and assembled views of the detector). In my opinion, a POSA would have understood that well-known methods could be used to manufacture Matsumura's bioelectric potential detector according to the components, materials, and assembly disclosed by Matsumura.

433

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 433

1378. Thus, in my opinion, Matsumura discloses "[a] method for manufacturing a body-worn physiological sensor."

### ii.    Limitation [1a]

1379. Limitation [1a] recites "providing a disposable substrate made from an insulating material, said substrate comprising."

1380. In my opinion, Matsumura discloses limitation [1a] of the '422 patent.

1381. Matsumura discloses a "bioelectric potential detector 11" that is composed of, in part, a "disposable bioelectrode pad 7." *Id.* at [0016]. In my opinion, a POSA would recognize that the "bioelectrode pad" defines a substrate. A POSA would have understood the term "substrate" to mean a material that provides some type of support.

1382. Matsumura teaches that the bioelectrode pad (the claimed substrate) "is composed of a first sheet 1, a conductive material 2, a hook 3, a second sheet 4, a conductive gel 5, a third sheet 6, and double-sided adhesive tape 9." *Id.* at [0016]. Matsumura further teaches that the first sheet 1 and the second sheet 4 (the claimed insulating material) "should be made of [an] *insulating material* that does not allow moisture to penetrate" such as "polyethylene foam, polyurethane foam, or polyurethane sheet." *Id.* at [0017]–[0018] (emphasis added). As discussed in greater detail below, with reference to limitation [1b], a POSA would have been motivated to modify Matsumura's disposable bioelectrode pad 7, to replace

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 434

conductive material 2 with another sheet of insulating material with printed conductive traces (*i.e.*, lines of conductive ink). This modification would result in *three* sheets of insulating material bonded together, forming the claimed disposable substrate made from an insulating material.

1383. Thus, in my opinion, Matsumura discloses "providing a disposable substrate made from an insulating material, said substrate comprising."

### iii.    Limitation [1b]

1384. Limitation [1b] recites "a flexible printed circuit board layer made from the insulating material."

1385. In my opinion, Matsumura renders obvious limitation [1b] of the '422 patent.

1386. Matsumura teaches a "bioelectrode pad" which is a flexible circuit layer configured to be coupled to a skin surface of a patient. *Id.* at [0019]–[0020]. Matsumura's flexible circuit layer includes "two pieces of conductive material 2," which "can be a carbon sheet or a PET sheet coated with conductive Ag/AgCl." *Id.* PET is both an "insulating material," *id.* at [0019]–[0020], and a "flexible material," Ex. 1047 at 23.10; Ex. 1056 at 2.

1387. In my opinion, it would have been obvious to a POSA to use well-known techniques to replace the two pieces of insulating material coated with conductive Ag/AgCl with a single, flexible sheet of insulating material that

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 435

contained printed-ink conductive traces on its surface. *See generally*, Section XIX.A.6.iii, *supra*. The proposed modification is depicted in the following figure:



Ex. 1012 at Fig. 1 (annotated). *First*, at the time of the invention of the Challenged Patents, it was well-known that silver and/or silver paste could be applied using the screen-printing technique. *See* Ex. 1035 at 3 (noting that screen printing had been used to "print[] silver paste conductors and graphite resistors" onto substrates since the end of World War II). Using screen printing to apply the Ag/AgCl would require significantly less material than would be needed to coat the sheet with AgCl, thus significantly reducing manufacturing costs. *Compare id.* at 363 ("Methods of Applying Conformal Coatings"), *with id.* at 287–92 ("Screen Printing"). Thus, a

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 436

POSA would have understood that the Ag/AgCl coating taught by Matsumura would have been screen printed onto the conductive material 2 to form traces and would have had a reasonable expectation of success in doing so using the well-known method of screen printing.

1388. *Second*, a POSA reading Matsumura would have been motivated to replace the two pieces of insulating material coated with conductive Ag/AgCl with a single, flexible sheet of insulating material that contained printed-ink conductive traces, as shown below, in order to reduce the manufacturing costs associated with manufacturing the parts.



Ex. 1012 at Fig. 1 (annotated). A POSA would have had a reasonable expectation

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 437

of success so doing because the exact same manufacturing technique could be used to create the one conductive piece as was used to create the two conductive pieces.

1389. In my opinion, when modified as explained above, Matsumura's conductive material would comprise a flexible printed circuit, which combined with second sheet 4, would form a flexible printed circuit layer made from the insulating material. Ex. 1012 at [0017]–[0018].

1390. Thus, in my opinion, Matsumura discloses "a flexible printed circuit board layer made from the insulating material."

### iv.    Limitation [1c]

1391. Limitation [1c] recites "at least two electrodes disposed on the disposable substrate."

1392. In my opinion, Matsumura renders obvious limitation [1c] of the '422 patent.

1393. Matsumura discloses "conductive gel[s] 5" (the claimed "electrodes") that are used to detect bioelectrical potentials. *Id.* at [0019]. These "conductive gel[s]" are placed in openings 4a on the "second sheet" 4 and make contact with a portion of the conductive material 2 (modified as described above and depicted below), meaning the conductive gels are disposed on a surface of the first sheet or second sheet, as shown below by annotated Figure 1. *Id.* at [0018]–[0019].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 438



*Id.* at Fig. 1 (annotated).

1394. Therefore, in my opinion, a POSA would understand that conductive gels 5 are disposed on the disposable substrate, which is the disposable bioelectrode pad 7, modified by a POSA as discussed above. *See* Section XX.A.1.iii, *supra.*

1395. Thus, in my opinion, Matsumura renders obvious "at least two electrodes disposed on the disposable substrate."

### v.    *Limitation [1d]*

1396. Limitation [1d] recites "conductive traces defined between the at least two electrodes."

1397. In my opinion, Matsumura renders limitation [1d] of the '422 patent obvious in view of the general knowledge of a POSA.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 439

1398. In my opinion, a POSA would have been motivated to combine conductive material 2 onto a single, printed sheet, forming a flexible printed circuit layer. *See* Section XX.A.1.iii, *supra*. In this modified device, the printed traces would contact conductive gel 5, *i.e.*, the electrodes, at one end. At the other end, the printed traces would contact hooks 3. Ex. 1012 at [0019], [0024], Fig. 1.



*Id.* at Fig. 1 (annotated). The traces therefore run "between the at least two electrodes" (conductive gels) in the following manner: there is an electrical connection from one electrode to the printed trace it contacts; from the printed trace to the hook at its end; from the hook to the signal processor; from the signal processor to the other hook; from the other hook down the length of the other

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 440

electrical trace; and, finally, from the other electrical trace to the other electrode.

The following, simplified schematic illustrates this relationship:



1399. Thus, in my opinion, Matsumura, in view of the general knowledge of a POSA, renders obvious "conductive traces defined between the at least two electrodes."

### vi.    Limitation [1e]

1400. Limitation [1e] recites "providing a computation-communication module, said module comprising."

1401. In my opinion, Matsumura discloses limitation [1e] of the '422 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 441

1402. Matsumura teaches a "reusable signal processor for processing and wirelessly transmitting the bioelectric potential signals detected by the bioelectrode pad." *Id.* at [0013]; *see also id.* at [0008], [0014], [0016], [0025], Figs. 1–2.

1403. Matsumura discloses that the reusable signal processor includes components that allow for communication, stating: "The signal processor 10 incorporates a processing circuit for filtering and amplifying detected bioelectric potential signals, a memory for storing the processed bioelectric potential signal, a circuit for modulating the processed bioelectric potential signal and transmitting it wirelessly, and a loop antenna." *Id.* at [0025]

1404. Notably, Matsumura teaches that the reusable signal processor (the claimed computation-communication module) includes both components used for computation (*i.e.*, the processing circuit and memory) and components used for communication (*i.e.*, the modulating/transmitting circuit and the loop antenna). *Id.*

1405. Thus, in my opinion, Matsumura discloses "providing a computation-communication module."

### vii.    Limitation [1f]

1406. Limitation [1f] recites "a housing."

1407. In my opinion, Matsumura discloses limitation [1f] of the '422 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 442

1408. Matsumura teaches that "reusable signal processor 10" is enclosed in a

housing 10c which can be "easily attached and detached" to bioelectrode pad 7. *Id.*

at [0016], [0025], [0027], [0029].



*Id.* at Fig. 4(a).

1409. Thus, in my opinion, Matsumura discloses "a housing."

### viii.    Limitation [1g]

1410. Limitation [1g] recites "a processor disposed in the housing."

1411. In my opinion, Matsumura discloses limitation [1g] of the '422 patent.

1412. Matsumura teaches that signal processor 10 (the claimed computation-

communication module) "incorporates a processing circuit for filtering and

amplifying detected bioelectric potential signals." *Id.* at [0025]. That processing

circuit (the claimed processor) is disposed within the housing 10c of the signal

processor 10. *Id.* at [0025], [0027]. This ensures that "the entire bioelectric potential

detector 11 is waterproofed." *Id.* at [0027]; *see also id.* at [0029].

443

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 443

1413. Thus, in my opinion, Matsumura discloses "a processor disposed in the housing."

### ix.    Limitation [1h]

1414. Limitation [1h] recites "attaching the computation-communication module to the disposable substrate."

1415. In my opinion, Matsumura discloses limitation [1h] of the '422 patent.

1416. Matsumura teaches that reusable signal processor 10 includes housing 10c which encloses a processing circuit.  *Id.* at [0025], [0027], [0029].  Matsumura further teaches that the reusable signal processor (the claimed computation-communication module) is attached to disposable bioelectrode pad 7, which includes the disposable printed circuit board (*i.e.*, the claimed disposable substrate) using hooks 3.  *Id.* at [0016], [0027], [0029].  Specifically, as shown below, Matsumura discloses that the disposable bioelectrode pad includes "two hooks 3" that connect to "hook engagement portion 10a on the bottom surface of the signal processor."  *Id.* at [0019], [0024], Fig. 2.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 444



*Id.* at Fig. 2 (annotated).

1417. Thus, in my opinion, Matsumura discloses "attaching the computation-communication module to the disposable substrate."

### 2.    *Dependent Claim 2*

1418. Claim 2 of the '422 patent depends from claim 1 and additionally requires "providing conductive traces in the flexible circuit layer."

1419. In my opinion, claim 2 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 445

above with respect to claim 1 as well as because Matsumura teaches the additional limitation of claim 2.  *See* Section XX.A.1, *supra.*

1420.  In my opinion, as discussed above, a POSA would have been motivated to modify the conductive material 2 of Matsumura to comprise a single, flexible, insulating substrate with printed-ink conductive traces.  *See* Section XX.A.1.iii, *supra.*  In my opinion, so modified, Matsumura would "provid[e] conductive traces in the flexible circuit layer."  *Id.*; *see also* Ex. 1035 at 642 ("Conductor: A single conductive path in conductive pattern.  A PCB has at least one layer of conductors.  *Synonyms:* path, trace.").  Therefore, Matsumura, in view of the general knowledge of a POSA, renders obvious claim 2 of the '422 patent.

### 3.    *Dependent Claim 3*

1421.  Claim 3 of the '422 patent depends from claims 1 and 2 and additionally requires that "the conductive traces are configured on the flexible circuit layer to electrically couple with the attached computation-communication module."

1422.  In my opinion, claim 3 of the '422 patent is rendered obvious by Matsumura for all the reasons discussed above with respect to claims 1 and 2 as well as because Matsumura teaches the additional limitation of claim 3.  *See* Sections XX.A.2, *supra.*

1423.  As discussed above, it is my opinion that a POSA would have been motivated to modify Matsumura's conductive material 2 to comprise a single,

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 446

flexible, insulating substrate with printed ink conductive traces. *See* Section XX.A.1.iii, *supra*. So modified, hooks 3 are disposed on the surface of the flexible printed circuit board layer. Ex. 1012 at Fig. 1. Matsumura's printed ink traces form a connection pad and transmit signals through these hooks 3 to the computation-communication module, therefore creating an electrical connection. *Id.* at [0019]–[0020]; *see also* Ex. 1035 at 656 (defining "pad" as "[a] portion of the conductive area of which components, terminals, traces, etc., are mechanically attached").

1424. For these reasons, it is my opinion Matsumura discloses that "the conductive traces are configured on the flexible circuit layer to electrically couple with the attached computation-communication module" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 3 of the '422 patent.

### 4. Dependent Claim 4

1425. Claim 4 of the '422 patent depends from claim 1 and additionally requires "providing a plurality of openings in the flexible printed circuit board layer, the openings being sized for receiving electrode gels."

1426. In my opinion, claim 4 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed

447

above with respect to claim 1 as well as because Matsumura teaches the additional limitation of claim 4.  *See* Section XX.A.1, *supra.*

1427. In my opinion, a POSA would have been motivated to modify the conductive material 2 to form a flexible printed circuit layer as described above.  *See* Section XX.A.1.iii, *supra.*  Matsumura's flexible printed circuit layer, as modified, would include flexible printed circuit—*i.e.*, the substitute for conductive material 2—and second sheet 4.  *Id.*  Second sheet 4 is also an insulating, protective covering. *Id.*  Matsumura teaches that the bioelectrode pad 7 is comprised, in part, of a second sheet 4.  Ex. 1012 at [0016].  Matsumura further teaches that "second sheet 4 . . . is provided with two openings 4a on the left and right sides into which the conductive gel 5 is inserted."  *Id.* at [0018].  Annotated Figure 1 of Matsumura, shown below, shows that these openings 4a in second sheet 4 are sized to receive conductive gels 5 (the claimed electrode gels).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 448



*Id.* at Fig. 1. (annotated).

1428. For these reasons, it is my opinion that Matsumura discloses "providing a plurality of openings in the flexible printed circuit board layer, the openings being sized for receiving electrode gels" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 4 of the '422 patent.

### 5.    *Dependent Claim 5*

1429. Claim 5 of the '422 patent depends from claim 1 and additionally requires that "the computation-communication module is releasably attached to the disposable substrate."

1430. In my opinion, claim 5 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 449

above with respect to claim 1 as well as because Matsumura teaches the additional limitation of claim 5.  *See* Section XX.A.1, *supra*.

1431. Matsumura teaches that "[t]he bioelectrode pad 7," which includes the flexible printed circuit board layer, and "the signal processor 10 are detachable with hooks" and thus "the reusable signal processor and the disposable bioelectrode can be easily attached and detached before and after use." Ex. 1012 at [0016].  Thus, the signal processor 10 (the claimed computation-communication module) is releasably attached to the disposable bioelectrode pad 7 (the claimed disposable substrate).

1432. For these reasons, it is my opinion that Matsumura discloses that "the computation-communication module is releasably attached to the disposable substrate" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 5 of the '422 patent.

### 6.    *Dependent Claim 6*

1433. Claim 6 of the '422 patent depends from claim 1 and additionally requires "providing a radio circuit in the computation-communication module."

1434. In my opinion, claim 6 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed above with respect to claim 1 as well as because Matsumura teaches the additional limitation of claim 6.  *See* Section XX.A.1, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 450

1435. Matsumura teaches signal processor 10 (the claimed computation-communication module) that includes "a circuit for modulating the processed bioelectric potential signal and transmitting it wirelessly, and a loop antenna." Ex. 1012 at [0025].

1436. In my opinion, a POSA would understand that a loop antenna is a type of radio antenna, meaning that a circuit that is used to transmit wirelessly using a loop antenna would be a radio circuit. Ex. 1063 (Jaehoon Kim, *Implanted Antennas for Medical Wireless Communications: Characterizations, Designs and Performance Evaluations* (2005) (Ph. D. dissertation, Univ. Cal. L.A.).

1437. For these reasons, it is my opinion that a POSA would understand that Matsumura discloses "providing a radio circuit in the computation-communication module" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 6 of the '422 patent.

### 7. *Dependent Claim 7*

1438. Claim 7 of the '422 patent depends from claims 1, 2, and 3 and additionally requires "at least partially covering the conductive traces with an insulating covering."

1439. In my opinion, claim 7 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 451

above with respect to claims 1, 2, and 3 as well as because Matsumura teaches the additional limitation of claim 7.  *See* Sections XX.A.1–3, *supra.*

1440. In my opinion, as discussed above, a POSA would have modified Matsumura's conductive material 2 to comprise a single sheet of flexible, insulating material with printed-ink traces.  *See* Section XX.A.1.ii, *supra.*  In my opinion, a POSA would have understood that this modified conductive material circuit board would be situated between first sheet 1 and second sheet 4.  Matsumura further discloses that both the first sheet and second sheet are "made of insulating material that does not allow moisture to penetrate," *i.e.*, a "covering."  Ex. 1012 at [0017]–[0018].

1441. For these reasons, it is my opinion that Matsumura discloses "at least partially covering the conductive traces with an insulating covering" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 7 of the '422 patent.

### 8.    *Dependent Claim 9*

1442. Claim 9 of the '422 patent depends from claim 1 and additionally requires "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate."

1443. In my opinion, claim 9 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 452

above with respect to claim 1 as well as because Matsumura teaches the additional limitation of claim 9. *See* Section XX.A.1, *supra.*

1444. Matsumura teaches that disposable bioelectrode pad 7—which includes the flexible printed circuit board layer—includes, in part, conductive gels 5. Ex. 1012 at [0016]. Conductive gels 5 are used to detect bioelectric potentials. *Id.* at [0019]. Matsumura discloses that the conductive gels (the claimed electrodes) are disposed in two openings 4a between first sheet 1 and second sheet 4 of bioelectrode pad 7 (the claimed flexible printed circuit board layer). *Id.* at [0018]–[0019]. In my opinion, a POSA would understand that the conductive gels 5 (electrodes) are bonded to the other components of the flexible circuit board layer (*e.g.*, modified conductive material 2). *See, e.g.*, Ex. 1035 at 421 ("The individual layers [of a multi-layer PCB board] are arranged and bonded by placing them in a pressing tool to prevent misalignment of the layers."). Thus, the conductive gels 5 are integrated into the flexible printed circuit board layer as shown below by Figure 1.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 453



Ex. 1012 at Fig. 1. (annotated).

1445. For these reasons, it is my opinion that Matsumura discloses that "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 9 of the '422 patent.

### 9.    *Dependent Claim 10*

1446. Claim 10 of the '422 patent depends from claims 1, 2, and 3 and additionally requires "screening the conductive traces onto the flexible printed circuit board layer."

1447. In my opinion, claim 10 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 454

above with respect to claims 1, 2, and 3 as well as because Matsumura renders obvious the additional limitation of claim 10. *See* Sections XX.A.1–3, *supra.*

1448. In my opinion, as discussed above, a POSA would have been motivated to modify conductive material 2 to form a flexible printed circuit. *See* Section XX.A.1.iii, *supra.* In the industry at the time of the invention of the '422 patent, screening was the standard way to attach electrical traces made of Silver/Silver Chloride, such as those as disclosed in Matsumura, to a flexible printed circuit board. *See, e.g.*, Ex. 1035 at 283 (noting that "screen printing is a [ ] cheap and simple method" that is used to produce "[t]he majority of PCBs produced worldwide"), 3 (noting that the screen printing of "printed silver paste conductors and graphite resistors" was "commonly associated with [2006]'s hybrid circuit technology" and "was [the] technique that ushered in the commercial use of printed circuits").

1449. For these reasons, it is my opinion that a POSA would understand that Matsumura discloses that "screening the conductive traces onto the flexible printed circuit board layer" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 10 of the '422 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 455

### 10.    Dependent Claim 11

1450. Claim 11 of the '422 patent depends from claims 1 and 9 and additionally requires that "each electrode includes an electrode gel and a conductive surface defining a half cell."

1451. In my opinion, claim 11 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed above with respect to claims 1 and 9 as well as because Matsumura teaches the additional limitation of claim 11. *See* Section XX.A.8, *supra.*

1452. Matsumura discloses that "conductive gel 5 is produced from components such as an acrylic hydrophilic polymer, glycerin, and water." Ex. 1012 at [0018]. Matsumura further discloses that the conductive gel contacts a second portion of "conductive material 2," which can be "coated with conductive Ag/AgCl." *Id.* at [0019]–[0020].

1453. In my opinion, a POSA would understand that conductive gels comprising an acrylic hydrophilic polymer, glycerin, and water, and contacting a silver/silver-chloride conductive surface comprise a "half cell." *See, e.g.*, Ex. 1007 at 7:28–38 (explaining that the term "electrode" is used interchangeably with "half cell" within the disclosure and that an electrode—*i.e.*, a half cell—typically comprises (1) a conductive surface and (2) an electrode gel).

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 456

1454. For these reasons, it is my opinion that a POSA would understand that Matsumura discloses that "each electrode includes an electrode gel and a conductive surface defining a half cell" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 11 of the '422 patent.

### 11. Independent Claim 14

1455. In my opinion, claim 14 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA.

### i. Preamble 14[pre]

1456. The preamble of claim 14 recites "[a] body-worn physiological sensor made by the process of." As described with respect to claim 1, to the extent the preamble is limiting, it is my opinion that Matsumura renders obvious the "body-worn physiological sensor" made by the process claimed by the '422 patent. *See* Section XX.A.1.i, supra.

### ii. Limitation [14a]

1457. Limitation [1a] recites "providing a disposable substrate made from an insulating material, said substrate comprising."

1458. As described with respect to claim 1, it is my opinion that Matsumura discloses "providing a disposable substrate made from an insulating material." *See* Section XX.A.1.ii, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 457

### iii.    Limitation [14b]

1459. Limitation [14b] recites "a flexible printed circuit board layer made from an insulating material."

1460. As described with respect to claim 1, it is my opinion that Matsumura, in view of the general knowledge of a POSA, renders obvious "a flexible printed circuit board layer made from an insulating material."    *See* Section XX.A.1.iii, *supra*.

### iv.    Limitation [14c]

1461. Limitation [14c] recites "at least two electrodes disposed on the disposable substrate."

1462. As described with respect to claim 1, it is my opinion that Matsumura, in view of the general knowledge of a POSA, renders obvious "at least two electrodes disposed on the disposable substrate." *See* Section XX.A.1.iv, *supra*.

### v.    Limitation [14d]

1463. Limitation [14d] recites "conductive traces defined between the at least two electrodes."

1464. As described with respect to claim 1, it is my opinion that Matsumura and a POSA's general knowledge render obvious "conductive traces defined between the at least two electrodes." *See* Section XX.A.1.v, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 458

### vi.    Limitation [14e]

1465. Limitation [14e] recites "providing a computation-communication module, said module comprising."

1466. As described with respect to claim 1, it is my opinion that Matsumura discloses the claimed "computation-communication module." *See* Section XX.A.1.vi, *supra.*

### vii.    Limitation [14f]

1467. Limitation [14f] recites "a housing."

1468. As described with respect to claim 1, it is my opinion that Matsumura discloses "a housing." *See* Section XX.A.1.vii*, supra.*

### viii.    Limitation [14g]

1469. Limitation [14g] recites "a processor disposed in the housing."

1470. As described with respect to claim 1, it is my opinion that Matsumura discloses "a processor disposed in the housing." *See* Section XX.A.1.viii, *supra.*

### ix.    Limitation [14h]

1471. Limitation [14h] recites "attaching the computation-communication module to the disposable substrate."

1472. As described with respect to claim 1, it is my opinion that Matsumura discloses "attaching the computation-communication module to the disposable substrate." *See* Section XX.A.1.ix, *supra.*

459

### 12.    *Dependent Claim 15*

1473. Claim 15 of the '422 patent depends from claim 14 and additionally requires "providing the conductive traces in the flexible printed circuit board layer."

1474. In my opinion, claim 15 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed above with respect to claim 14 as well as because Matsumura teaches the additional limitation of claim 15. *See* Section XX.A.11, *supra.*

1475. As described above with respect to claim 2, it is my opinion that Matsumura discloses "providing the conductive traces in the flexible printed circuit board layer" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 15 of the '422 patent. *See* Section XX.A.2, *supra.*

### 13.    *Dependent Claim 16*

1476. Claim 16 of the '422 patent depends from claims 14 and 15 and additionally requires that "configuring the conductive traces in the flexible printed circuit board layer to electrically couple with the attached computation-communication module."

1477. As described above with respect to claim 3, it is my opinion that that Matsumura discloses "configuring the conductive traces in the flexible printed circuit board layer to electrically couple with the attached computation-communication module" and, therefore, that Matsumura, in view of the general

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 460

knowledge of a POSA, renders obvious claim 16 of the '422 patent. *See* Section XX.A.3, *supra*.

### 14. *Dependent Claim 17*

1478. Claim 17 of the '422 patent depends from claim 14 and additionally requires that "the computation-communication module is releasably attached to the disposable substrate."

1479. In my opinion, claim 17 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed above with respect to claim 14 as well as because Matsumura teaches the additional limitation of claim 17. *See* Section XX.A.11, *supra*.

1480. As described above with respect to claim 5, it is my opinion that Matsumura discloses that "the computation-communication module is releasably attached to the disposable substrate" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 17 of the '422 patent. *See* Section XX.A.5, *supra*.

### 15. *Dependent Claim 18*

1481. Claim 18 of the '422 patent depends from claim 14 and additionally requires "providing the computation-communication module with a radio circuit."

1482. In my opinion, claim 18 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed

461

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 461

above with respect to claim 14 as well as because Matsumura, in view of the general knowledge of a POSA, teaches the additional limitation of claim 18. *See* Section XX.A.11, *supra.*

1483. As described above with respect to claim 6, it is my opinion that Matsumura discloses "providing the computation-communication module with a radio circuit" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 18 of the '422 patent. *See* Section XX.A.6, *supra.*

### 16.    *Dependent Claim 19*

1484. Claim 19 of the '422 patent depends from claims 14, 15, and 16 and additionally requires "at least partially covering the conductive traces with an insulating covering."

1485. In my opinion, claim 19 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed above with respect to claims 14, 15, and 16 as well as because Matsumura teaches the additional limitation of claim 19. *See* Section XX.A.13, *supra.*

1486. As described above with respect to claim 7, it is my opinion that Matsumura discloses "at least partially covering the conductive traces with an insulating covering" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 19 of the '422 patent. *See* Section XX.A.7, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 462

### 17.    *Dependent Claim 20*

1487. Claim 20 of the '422 patent depends from claim 14 and additionally requires "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate."

1488. In my opinion, claim 20 of the '422 patent is rendered obvious by Matsumura in view of the general knowledge of a POSA for all the reasons discussed above with respect to claim 14 as well as because Matsumura teaches the additional limitation of claim 20.  *See* Section XX.A.11, *supra.*

1489. As described above with respect to claim 9, it is my opinion that Matsumura discloses "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate" and, therefore, that Matsumura, in view of the general knowledge of a POSA, renders obvious claim 20 of the '422 patent.  *See* Section XX.A.8, *supra.*

### B.    Ground 2: Obvious Over Jensen and the General Knowledge of Person of Ordinary Skill in the Art or Matsumura

### 1.    *A POSA had motivation to combine Jensen and Matsumura*

1490. For the reasons set forth above in Section XVIII.C.1, with reference to the '492 patent, a POSA would have had motivation to combine the teachings of Jensen and Matsumura and would have had a reasonable expectation of success in doing so.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 463

## 2.    *Independent Claim 1*

1491. In my opinion, claim 1 of the '422 patent is rendered obvious by Jensen in view of the general knowledge of a POSA and/or Matsumura.

### i.    *Preamble 1[pre]*

1492. The preamble of claim 1 of the '422 patent recites "[a] method for manufacturing a body-worn physiological sensor, the method comprising."

1493. In my opinion, to the extent the preamble is limiting, Jensen, in view of the general knowledge of a POSA, discloses the preamble of claim 1 of the '422 patent.

1494. Jensen teaches a body worn "smart patch" "that integrates . . . heart-rate/EKG electronic sensors to measure respiration, temperature, and/or other physiological or environmental parameters."   Ex. 1011 at [0012]; *see also id.* at [0013], [0051].  Jensen discloses that:

> The entire assembly may be designed in such a way that it is easily assembled in a set of progressive operations whereby reels or rolls of die-cut cover materials, along with the pre-assembled electronics, are applied by machine operation to the inner circuitry and connections, yielding a final product that may be more easily mass-produced than if handling and hand operations were required.

464

*Id.* at [0043].  It is my opinion that a POSA would have used well-known methods to manufacture Jensen's "smart patch" based on Jensen's disclosure of components, materials, and assembly techniques.

1495. Thus, in my opinion, a POSA would understand that Jensen discloses "[a] method for manufacturing a body-worn physiological sensor."

### ii.    Limitation [1a]

1496. Limitation [1a] recites "providing a disposable substrate made from an insulating material, said substrate comprising."

1497. In my opinion, Jensen, in view of the general knowledge of a POSA, renders obvious limitation [1a] of the '422 patent.

1498. Jensen discloses multiple embodiments, including the embodiment of Figure 5 and the embodiment of Figure 8.  Ex. 1011, Figs. 5, 8.  The embodiment of Jensen's Figure 5 includes a "disposable sensor assembly 73," and a separate flexible circuit assembly 36 (which incorporates sensor contacts 71 and 72 and processing circuit 41).  *Id.* ¶¶ [0040]-[0042], Fig. 5.  Figure 8 shows an alternative embodiment that comprises two flexible circuits 49, 50 instead of one.  *Id.* ¶ [0046], Fig. 8.

In my opinion, a POSA would understand that the embodiment of Figure 8 is simply a variation on the embodiment of Figure 5, and in particular, that the features of flexible circuit assembly 36 (*e.g.*, sensor contacts 71, 72, and the copper wiring

465

traces connecting them to the entire circuit) would be included on Figure 8's flexible substrate 50 because flexible substrate 50 is the closest to the patient.

1499. Further, it is my opinion that it would have been obvious for a POSA to configure Jensen's device to include a disposable substrate made from an insulating material. Specifically, in the embodiment of Jensen's Figure 8, Jensen teaches a means of "mechanical connection of inter-related circuits using two flexible printed circuits 49, 50." *Id.* at [0046], Fig. 8 (annotated, depicted below). A POSA would recognize that flexible printed circuit 50 would be analogous to Jensen's flexible printed circuit 36. However, given two flexible circuits, a POSA would have been motivated to make the circuit closest to the patient's skin, flexible circuit 50, disposable, while keeping flexible printed circuit 49 non-disposable. This configuration would have ensured that the components of the device most proximal to the patient's skin (and including the lowest cost materials) were disposable, thereby promoting hygiene generally.



iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 466

*Id.* at Fig. 8 (annotated).

*1500.* In my opinion, it would have been obvious for a POSA to distribute valuable components on top of flexible circuit assembly 49 (in circuit 52) instead of being kept below or within it, to allow for the components closest to the skin to be disposable. This redistribution would allow reuse of the most expensive components (electronic circuitry 52 and/or coin cell 9), while making components closest to the surface of the skin (sensor contacts 71, 72 and copper traces, which would be located on flexible printed circuit layer 50) disposable. As noted above, this redistribution of components would improve both the hygiene and waterproofing properties of Jensen's device, while avoiding the cost of disposing of valuable electronic circuitry 52 or coin cell 9. *See* Section XVIII.C.1, *supra.* Given that modern wearable devices commonly used a combination of disposable and reusable components, including the use of disposable flexible printed circuit boards, a POSA would have been able to modify the layout of Jensen's device with a reasonable expectation of success. Ex. 1012 at [0007]; *see* Section XVIII.C.1, *supra*; *see also* Section IV.C–D, *supra.*

1501. Thus, in my opinion, Jensen, in view of the general knowledge of a POSA, renders obvious "providing a disposable substrate made from an insulating material, said substrate comprising."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 467

1502. Additionally, or alternatively, it is my opinion that a POSA would have looked to modify Jensen in view of the teachings of Matsumura. For the same reasons as discussed above, a POSA would have been motivated to modify Jensen in view of Matsumura to make sensor contacts 71, 72 and flexible circuit assembly 36 part of the disposable sensor assembly 73, which would add an additional layer of protection and separation between the patient's skin and the reusable components, such as electronics 41 and battery 9. As discussed earlier in this section, this modification would be beneficial to improve the hygiene of the Jensen's device as well as help to waterproof Jensen's design by isolating Jensen's circuitry and battery in an enclosed housing and allowing the traces and sensor contacts to be fully covered, as taught by Matsumura.

1503. In my opinion, a POSA would recognize that the "flexible circuit assembly" of Jensen 36, 50 includes a substrate on which "copper wiring traces" are formed as well as that the "flexible circuit assembly" is made of insulating material on which the traces, electronics, and sensor contacts 71, 72 are placed, or else the various electrical components on the flexible circuit assembly would short circuit. Flexible circuit assemblies were commonly made of an insulating material, such as Mylar. *See* Ex. 1007 at 8:49–55, 9:35–38, 11:48–50; Ex. 1011 at [0043].

1504. Thus, in my opinion, Jensen alone and/or the combination of Jensen and Matsumura teaches "a disposable substrate made from an insulating material."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 468

### iii.    Limitation [1b]

1505. Limitation [1b] recites "a flexible printed circuit board layer made from the insulating material."

1506. In my opinion, Jensen discloses limitation [1b] of the '422 patent.

1507. Jensen teaches a "flexible circuit assembly" 36, 50 containing an electrical circuit 41. Ex. 1011 at [0040], [0043], Figs. 5, 8. In my opinion, a POSA would recognize that the "flexible circuit assembly" of Jensen defines a substrate (*i.e.*, "a substrate that supports one or more electrical connections to a patient's body"), Ex. 1003 at Abstract, on which "copper wiring traces" are formed, *see* Ex. 1011 at [0040]. In my opinion, a POSA would recognize that the "flexible circuit assembly" is made of insulating material on which the traces, electronics, and sensor contacts 71, 72 are placed. Ex. 1035 at 4–5.

1508. It is further my opinion that a POSA would understand that Jensen's flexible circuit assembly (the claimed "flexible printed circuit layer") ***must*** be made from an insulating material. If the circuit(s) were printed on a conductive material, then electrical current—rather than traveling through printed traces—would pass diffusely across the entire surface. For this reason, printed circuits boards definitionally include a base comprised of "insulating material." *See, e.g.*, *id.*

1509. Jensen also discloses "a flexible printed" circuit assembly. Ex. 1011 at [0044], [0046]. In my opinion, a POSA would understand that screen printing is

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 469

one of the preferred methods of manufacturing a circuit board. *See* Ex. 1035 at 296 ("Printing Process. The circuit patterns are screen printed on the substrate by two ways: (1) Manual screen printing process, and (2) Automatic or semi-automatic screen printing process."); *see also* Ex. 1013 at 5:23–42 ("Each electrode 35 has a conductive grid 56 which is comprised of a matrix of approximately 0.050 inch wide lines 42 of conductive ink compound applied to an insulation and base support layer 44 ***preferably by means of a silk screen process.***") (emphasis added); *see also* Ex. 1013 at 5:4–8. Screen printing is preferred because it allows a greater degree of control in printing and thus is cost-effective, which is important when expensive materials such as silver are being used. *Id.*; *see also* Section IV.C., *supra*.

1510. Thus, in my opinion, Jensen discloses "a flexible printed circuit board layer made from the insulating material."

### iv.    Limitation [1c]

1511. Limitation [1c] recites "at least two electrodes disposed on the disposable substrate."

1512. In my opinion, Jensen discloses limitation [1c] of the '422 patent.

1513. Jensen discloses a "disposable sensor assembly," which includes "sensor contacts 71 and 72." Ex. 1011 at [0041]–[0042]. Jensen's sensor pad contacts 72 and 72 are electrodes; they are conductive and couplable to a skin surface via sensor pads 1 and 2 to measure physiological signals such as ECG signals. *Id.*

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 470**

at [0041]. The sensor pad electrodes are disposed on the lower surface of flexible assembly 36, as shown in Figure 7. A POSA would recognize that the sensor contacts 71, 72 would be disposed on the surface of disposable substrate 50 of the embodiment of Figure 8; and that sensor pads 1,2 would also be disposed on the lower surface of disposable substrate 50 (analogous to substrate 36), as shown below.



*Id.* at Fig. 8 (annotated).

1514. Thus, in my opinion, Jensen discloses "at least two electrodes disposed on the disposable substrate."

### v.    *Limitation [1d]*

1515. Limitation [1d] recites "conductive traces defined between the at least two electrodes."

1516. In my opinion, Jensen discloses limitation [1d] of the '422 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 471

1517. Jensen discloses a "flexible circuit assembly 36 that contains the copper wiring traces to connect the entire circuit 41 to the sensor contacts 71, 72" of electrode sensor pads 1, 2. *Id.* at [0040]–[0041]. In my opinion, a POSA reading Jensen's disclosure would understand that the connection that is created by the "copper wiring traces" extends from the electrode sensor pads 1, 2 to a processing circuit as demonstrated in the annotated version of Jensen's Figure 5 below.



*Id.* at Fig. 5 (annotated).

1518. Further, in my opinion, a POSA would understand that the same traces and sensor contacts would be included on disposable substrate 50 in the embodiment of Jensen's Figure 8.

1519. Thus, in my opinion, Jensen discloses "conductive traces defined between the at least two electrodes."

### vi.    Limitation [1e]

1520. Limitation [1e] recites "providing a computation-communication module, said module comprising."

1521. In my opinion, Jensen discloses limitation [1e] of the '422 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 472

1522. Jensen discloses a "microcontroller" for computation and a "transmitter" for communication. *Id.* at [0032]. Jensen's microcontroller "runs a conventional program that may perform further analysis and can also encode a data stream output to the transmitter." *Id.* Jensen's transmitter may communicate data via an "antenna." *Id.* at [0033]. A POSA would understand that the computation-communication module of Jensen would be included on non-disposable substrate 49 in the embodiment shown in Figure 8 of Jensen.

1523. Thus, in my opinion, Jensen discloses "providing a computation-communication module."

### vii. Limitation [1f]

1524. Limitation [1f] recites "a housing."

1525. In my opinion, Jensen discloses limitation [1f] of the '422 patent.

1526. As shown in the annotated version of Jensen's Figure 8 below, "top case 34" (shown in blue) mounts onto "bottom case 37", forming a housing that encloses electronics circuit 52. *Id.* at [0044]–[0046].

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 473



*Id.* at Fig. 8 (annotated).

1527. Thus, in my opinion, Jensen discloses "a housing."

### viii.    Limitation [1g]

1528. Limitation [1g] recites "a processor disposed in the housing."

1529. In my opinion, Jensen discloses limitation [1g] of the '422 patent.

1530. As explained above, Jensen discloses a housing. *See* Section XX.B.2.vii, *supra*.

1531. As part of electronics circuitry 41, Jensen discloses "a microcontroller and/or other programmable logic circuitry that perform measurement and processing of sensed data." Ex. 1011 at [0014]. Jensen also teaches that the microcontroller can "run[] a conventional program that may perform further analysis and can also encode a data stream output to the transmitter." *Id.* at [0032]. In the embodiment of Figure 8 shown below, a POSA would understand that the microcontroller

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 474

(processor), along with other electronics circuitry, would be circuitry 52, located on the non-disposable substrate 49, and would be disposed in the housing formed from top case 34 and bottom case 37. Ex. 1007 at 12:37–39 ("A microprocessor, such as microprocessor 512, is defined herein as synonymous and interchangeable with the terms 'microcomputer', 'microcontroller', and 'microprocessor'").



Ex. 1011 at Fig. 8 (annotated).

1532. Thus, in my opinion, Jensen discloses "a processor disposed in the housing."

### ix.    Limitation [1h]

1533. Limitation [1h] recites "attaching the computation-communication module to the disposable substrate."

1534. In my opinion, Jensen discloses limitation [1h] of the '422 patent.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 475

1535. Jensen teaches that computation-communication module, which includes 49, and disposable substrate 50 are "heat re-flowed together, melting the tinning metal, to connect the two circuits." *Id.* at [0046], Fig. 8A. Similarly, a POSA would have been familiar with a "variety of possibilities for providing terminations," many of which would have formed a releasable attachment between two substrates. Ex. 1035 at 449, 451.



Ex. 1011 at Fig. 8A (annotated).

1536. Thus, in my opinion, Jensen discloses "attaching the computation-communication module to the disposable substrate."

### 3.    *Dependent Claim 2*

1537. Claim 2 of the '422 patent depends from claim 1 and additionally requires "providing conductive traces in the flexible circuit layer."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 476

1538. In my opinion, claim 2 of the '422 patent is rendered obvious by Jensen in view of the general knowledge of a POSA for all the reasons discussed above with respect to claim 1 as well as because Jensen teaches the additional limitation of claim 2.  *See* Section XX.B.2, *supra.*

1539. Jensen teaches a "flexible circuit assembly 36 that contains the copper wiring traces that connect the entire circuit 41 to the sensor contracts."  Ex. 1011 at [0040].  As described above, these traces would be found in the embodiment of Figure 8.  *See* Section XX.B.2.v.

1540. For these reasons, it is my opinion that Jensen discloses "providing conductive traces in the flexible circuit layer" and, therefore, that Jensen, in view of the general knowledge of a POSA, renders obvious claim 2 of the '422 patent.

### 4.    *Dependent Claim 3*

1541. Claim 3 of the '422 patent depends from claims 1 and 2 and additionally requires that "the conductive traces are configured on the flexible circuit layer to electrically couple with the attached computation-communication module."

1542. In my opinion, claim 3 of the '422 patent is rendered obvious by Jensen in view of the general knowledge of a POSA for all the reasons discussed above with respect to claims 1 and 2 as well as because Jensen teaches the additional limitation of claim 3.  *See* Section XX.B.3, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 477

1543. In one embodiment, Jensen discloses two flexible printed circuits 49, 50, which comprise, respectively, the substrate for the reusable computation-communication module and the substrate for the disposable module. Ex. 1011 at [0045]–[0046], Fig. 8. Jensen further explains that the circuits are connected (*i.e.*, "electrically coupled") by pads 48, which are "matched on both circuits." *Id.* at [0046], Fig. 8A. A POSA would understand that the pads on the disposable, printed circuit board substrate of Jensen, 50, are connected to sensor contacts 71, 72 through printed traces. A POSA would similarly understand that the pads on the reusable substrate of Jensen 49 are connected ("electrically coupled") to computation-communication module 52 through printed traces. This arrangement would be necessary to transmit detected biosignals from the sensor contacts to the communication-computation module.

1544. For these reasons, it is my opinion Jensen discloses that "the conductive traces are configured on the flexible circuit layer to electrically couple with the attached computation-communication module" and, therefore, that Jensen, in view of the general knowledge of a POSA, renders obvious claim 3 of the '422 patent.

## 5. *Dependent Claim 4*

1545. Claim 4 of the '422 patent depends from claim 1 and additionally requires "providing a plurality of openings in the flexible printed circuit board layer, the openings being sized for receiving electrode gels."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 478

1546. In my opinion, claim 4 of the '422 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 1 as well as because Jensen teaches the additional limitation of claim 4. *See* Section XX.B.2, *supra.*

1547. Jensen teaches that "disposable sensor pad electrodes 1 and 2" are disposed on the lower surface of flexible assembly 36. Ex. 1011 at [0041], Fig. 7. As described above, A POSA would understand that flexible substrate 50 is analogous to flexible substrate 36, and includes the same disposable sensor pad electrodes. XX.B.2.ii.

1548. Matsumura teaches a "second sheet 4 . . . [that] is provided with two openings 4a on the left and right sides into which the conductive gel 5 is inserted." Ex. 1012 at [0018]. In my opinion, it would have been obvious to a POSA to incorporate the openings of Matsumura into Jensen's flexible assembly 36, 50 and for electrodes sensor pad electrodes 1 and 2 to connect to the flexible assembly 36, 50 through the plurality of openings.

1549. Commercially available electrode gels were known in the art at the time of the claimed invention. *See, e.g.*, Ex. 1011 at [0041] (describing "off-the-shelf EKG sensor pads, such as those sold by 3M Corporation"). A POSA would have recognized that it could integrate these commercially available disposable electrodes into the invention of Jensen by including recesses or openings to accommodate those

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 479

commercially available electrode gels. A POSA would have been motivated to modify Jensen in this manner for at least two reasons. First, relying on commercially available electrodes (rather than creating a novel "from scratch") would ease manufacturing and assembly. Second, providing a recess would help to structurally stabilize the electrode gels, which was known in the art (*e.g.*, by recessing gels in a cup geometry). Ex. 1061 at 578–79 ("If a portion of the electrode loses contact with the skin, current flow across it is altered because, in effect, the size of the interface changes. Current flow may be altered further if movement allows the conductive medium to dry"); *see also* Ex. 1062 at 203–04.

1550. For these reasons, it is my opinion Jensen discloses "providing a plurality of openings in the flexible printed circuit board layer, the openings being sized for receiving electrode gels" and, therefore, Jensen, in view of the knowledge of a POSA, renders obvious claim 4 of the '422 patent.

### 6. *Dependent Claim 5*

1551. Claim 5 of the '422 patent depends from claim 1 and additionally requires that "the computation-communication module is releasably attached to the disposable substrate."

1552. In my opinion, claim 5 of the '422 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 480

to claim 1 as well as because Jensen teaches the additional limitation of claim 5. *See* Section XX.B.2, *supra.*

1553. As previously discussed, Jensen discloses that the computation-communication module on substrate 49 is attached to the disposable module on substrate 50 at connection 48. *See* Section XX.B.2.ix, *supra.* It would have been obvious to a POSA to make the attachment between substrate 49 and substrate 50 a "releasable attachment," for example by using adhesives that could be removed with solvents or heat. Similarly, a POSA would have been familiar with a "variety of possibilities for providing terminations," many of which would have formed a releasable attachment between two substrates, including the detachable hooks of Matsumura. Ex. 1035 at 449, 451.

1554. For these reasons, it is my opinion Jensen discloses that "the computation-communication module is releasably attached to the disposable substrate" and, therefore, Jensen, in view of the knowledge of a POSA, renders obvious claim 5 of the '422 patent.

### 7. *Dependent Claim 6*

1555. Claim 6 of the '422 patent depends from claim 1 and additionally requires "providing a radio circuit in the computation-communication module."

1556. In my opinion, claim 6 of the '422 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 481

to claim 1 as well as because Jensen teaches the additional limitation of claim 6.  *See* Section XX.B.2, *supra.*

1557.  Jensen teaches a circuit that includes a radio frequency transmitter 7 (the claimed radio circuit) that "may transmit in a variety of modulation and/or keying methods via antenna 8."  Ex. 1011 at [0033]; *see also id.* at [0039].

1558.  For these reasons, it is my opinion that Jensen discloses "providing a radio circuit in the computation-communication module" and, therefore, that Jensen, in view of the knowledge of a POSA, renders obvious claim 6 of the '422 patent.

### 8.  *Dependent Claim 7*

1559.  Claim 7 of the '422 patent depends from claims 1, 2, and 3 and additionally requires "at least partially covering the conductive traces with an insulating covering."

1560.  In my opinion, claim 7 of the '422 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claims 1, 2, and 3 as well as because Jensen teaches the additional limitation of claim 7.  *See* Sections XX.B.4, *supra.*

1561.  Jensen discloses a "smart patch" that "has an electronic circuit . . . sandwiched between layers of insulating material and cover plastics."  Ex. 1011 at Abstract.  Jensen specifically teaches the entire top side of "flexible circuit assembly 36 that contains the copper wiring traces" is "enclose[d]" and "sealed" by top casing

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 482

34 and aesthetic covers 35 which "may be constructed from Mylar sheet," a common insulating material. *Id.* at [0040], [0043]. Figure 5 of Jensen, shown below, demonstrates this arrangement. *Id.* at [0043].



*Id.* at Fig. 5 (annotated).

1562. A POSA would have understood that aesthetic cover 35 insulates the flexible circuit assembly 36 and its traces, and that the aesthetic cover would be utilized in any embodiment of Jensen, including the embodiment of Figure 8.

1563. In my opinion, a POSA would understand aesthetic covers 35 and/or top casing 34 to be insulating covers for flexible circuit 36 containing the "copper wiring trace."

1564. For these reasons, it is my opinion that a POSA would understand that Jensen discloses "at least partially covering the conductive traces with an insulating

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 483

covering" and, therefore, that Jensen, in view of the knowledge of a POSA, renders obvious claim 7 of the '422 patent.

### 9. *Dependent Claim 9*

1565. Claim 9 of the '422 patent depends from claim 1 and additionally requires "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate."

1566. In my opinion, claim 9 of the '422 patent is rendered obvious by Jensen in combination with Matsumura for all the reasons discussed above with respect to claim 1 as well as because Jensen teaches the additional limitation of claim 9. *See* Section XX.B.2, *supra*. Jensen discloses a "disposable sensor assembly" that includes "disposable sensor pad electrodes 1 and 2." Ex. 1011 at [0041]–[0042]. As shown in Figure 7 below, Jensen further discloses that the sensor pad electrodes 1, 2 are disposed on the lower surface of flexible assembly 36.



*Id.* at Fig. 7.

1567. A POSA would understand that the same sensor pad electrodes would be integrated into flexible substrate 50 of the embodiment of Figure 8 of Jensen.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 484

1568. In my opinion, a POSA would have understood that having sensor pad electrodes 1, 2 disposed of on flexible-circuit assembly 73 would be a form of integration.

1569. For these reasons, it is my opinion that Jensen discloses that "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate" and, therefore, that Jensen renders obvious claim 9 of the '422 patent.

### 10.    Dependent Claim 11

1570. Claim 11 of the '422 patent depends from claims 1 and 9 and additionally requires that "each electrode includes an electrode gel and a conductive surface defining a half cell."

1571. In my opinion, claim 11 of the '422 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claims 1 and 9 as well as because Jensen teaches the additional limitation of claim 11. *See* Sections XX.B.9, *supra.*

1572. Jensen discloses that electrode sensor pads 1, 2 are coated with "conductive adhesive-gel that is made using a silver amalgam as found in off-the-shelf EKG sensor pads, such as those sold by 3M Corporation" on the side of the sensor pad that contacts the patient's skin.  Ex. 1011 at [0041].  The '422 patent

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 485

describes the term "half cell" comprising (1) a conductive surface and (2) an electrode gel. Ex. 1007 at 5:55–57.

1573. In my opinion, a POSA would understand that EKG sensor pads (conductive surface) comprising a silver amalgam (usually silver-silver chloride) and a conductive gel (electrode gel) containing an electrolyte comprise a "half cell." Thus, it is my opinion that a POSA would know that Jensen's electrodes define a half cell as defined by the '422 patent.

1574. For these reasons, it is my opinion that a POSA would understand that Jensen discloses that "each electrode includes an electrode gel and a conductive surface defining a half cell" and, therefore, that the Jensen, in view of the knowledge of a POSA, renders obvious claim 11 of the '422 patent.

### 11.    *Dependent Claim 12*

1575. Claim 12 of the '422 patent depends from claims 1, 9, and 11 and additionally requires that "the disposable substrate is crescent shaped and in which the body-worn physiological sensor is worn on the chest of a patient."

1576. In my opinion, claim 12 of the '422 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claims 1, 9, and 11 as well as because Jensen teaches the additional limitation of claim 12. *See* Sections XX.B.10, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 486

1577. Jensen explains that EKG electronic-rate sensors are generally placed on the chest of a patient. Ex. 1011 at [0006]–[0007]. Jensen teaches that its "smart patch" is similarly applied to "the skin much like a bandage." *Id.* at [0030]. In my opinion, given Jensen's disclosure of the placement of the "smart patch" on the patient's chest, it would have been obvious for a POSA to make the disposable sensor assembly crescent shaped in order to better fit the curvature of the patient's body.

1578. For these reasons, it is my opinion that a POSA would understand that Jensen renders obvious that "the disposable substrate is crescent shaped and in which the body-worn physiological sensor is worn on the chest of a patient" and, therefore, that Jensen, in view of the knowledge of a POSA, renders obvious claim 12 of the '422 patent.

### 12. *Independent Claim 14*

1579. In my opinion, claim 14 of the '422 patent is rendered obvious by Jensen in view of the general knowledge of a POSA and/or Matsumura.

### i. *Preamble 14[pre]*

1580. The preamble of claim 14 recites "[a] body-worn physiological sensor made by the process of."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 487

1581. As described above with respect to claim 1, it is my opinion that, to the extent the preamble is limiting, Jensen discloses a "body-worn physiological sensor" made by the process claimed by the '422 patent.  *See* Section XX.B.2.i, *supra.*

### ii.    Limitation [14a]

1582. Limitation [14a] recites "providing a disposable substrate made from an insulating material, said substrate comprising."

1583. In my opinion, as described above with respect to claim 1, Jensen discloses "providing a disposable substrate made from an insulating material." *See* Section XX.B.2.ii, *supra.*

### iii.    Limitation [14b]

1584. Limitation [14b] recites "a flexible printed circuit board layer made from an insulating material."

1585. In my opinion, as described above with respect to claim 1, Jensen discloses "a flexible printed circuit board layer made from an insulating material." *See* Section XX.B.2.iii, *supra.*

### iv.    Limitation [14c]

1586. Limitation [14c] recites "at least two electrodes disposed on the disposable substrate."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 488

1587. In my opinion, as described above with respect to claim 1, Jensen discloses "at least two electrodes disposed on the disposable substrate." *See* Section XX.B.2.iv, *supra.*

### v.    Limitation [14d]

1588. Limitation [14d] recites "conductive traces defined between the at least two electrodes."

1589. In my opinion, a described above with respect to claim 1, Jensen discloses "conductive traces defined between the at least two electrodes." *See* Section XX.B.2.v*, supra.*

### vi.    Limitation [14e]

1590. Limitation [14e] recites "providing a computation-communication module, said module comprising."

1591. In my opinion, as described above with respect to claim 1, Jensen discloses the claimed "computation-communication module." *See* Section XX.B.2.vi, *supra.*

### vii.    Limitation [14f]

1592. Limitation [14f] recites "a housing."

1593. In my opinion, as described above with respect to claim 1, Jensen discloses "a housing." *See* Section XX.B.2.vii, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 489

### viii.    Limitation [14g]

1594. Limitation [14g] recites "a processor disposed in the housing."

1595. In my opinion, as described above with respect to claim 1, Jensen discloses "a processor disposed in the housing." *See* Section XX.B.2.viii, *supra.*

### ix.    Limitation [14h]

1596. Limitation [14h] recites "attaching the computation-communication module to the disposable substrate."

1597. In my opinion, as described above with respect to claim 1, Jensen discloses "attaching the computation-communication module to the disposable substrate." *See* Section XX.B.2.ix, *supra.*

### 13.    Dependent Claim 15

1598. Claim 15 of the '422 patent depends from claim 14 and additionally requires "providing the conductive traces in the flexible printed circuit board layer."

1599. In my opinion, claim 15 of the '422 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 14 as well as because Jensen teaches the additional limitation of claim 15. *See* Section XX.B.12, *supra.*

1600. As described with respect to claim 2, it is my opinion that Jensen discloses "providing the conductive traces in the flexible printed circuit board layer"

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 490

and, therefore, that Jensen renders obvious claim 15 of the '422 patent.  *See*
Section XX.B.3, *supra.*

### 14.     Dependent Claim 16

1601. Claim 16 of the '422 patent depends from claims 14 and 15 and
additionally requires that "configuring the conductive traces in the flexible printed
circuit board layer to electrically couple with the attached computation-
communication module."

1602. In my opinion, claim 16 of the '422 patent is rendered obvious by
Jensen in view of the knowledge of a POSA for all the reasons discussed above with
respect to claims 14 and 15 as well as because Jensen teaches the additional
limitation of claim 16.  *See* Section XX.B.13 *supra.*

1603. As described with respect to claim 3, it is my opinion that Jensen
discloses "configuring the conductive traces in the flexible printed circuit board
layer to electrically couple with the attached computation-communication module"
and, therefore, that Jensen renders obvious claim 16 of the '422 patent.  *See*
Section XX.B.14, *supra.*

### 15.     Dependent Claim 17

1604. Claim 17 of the '422 patent depends from claim 14 and additionally
requires that "the computation-communication module is releasably attached to the
disposable substrate."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 491

1605. In my opinion, claim 17 of the '422 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 14 as well as because Jensen teaches the additional limitation of claim 17. *See* Section XX.B.12 *supra.*

1606. As described with respect to claim 5, it is my opinion that a POSA would understand that Jensen discloses "the computation-communication module is releasably attached to the disposable substrate" and, therefore, that Jensen renders obvious claim 17 of the '422 patent. *See* Section XX.B.6, *supra.*

### 16.    *Dependent Claim 18*

1607. Claim 18 of the '422 patent depends from claim 14 and additionally requires "providing the computation-communication module with a radio circuit."

1608. In my opinion, claim 18 of the '422 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claim 14 as well as because Jensen teaches the additional limitation of claim 18. *See* Section XX.B.12, *supra.*

1609. As described with respect to claim 6, it is my opinion that Jensen discloses "providing the computation-communication module with a radio circuit" and, therefore, that Jensen renders obvious claim 18 of the '422 patent. *See* Section XX.B.7, *supra.*

492

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 492

### 17.    *Dependent Claim 19*

1610. Claim 19 of the '422 patent depends from claims 14, 15, and 16 and additionally requires "at least partially covering the conductive traces with an insulating covering."

1611. In my opinion, claim 19 of the '422 patent is rendered obvious by Jensen in view of the knowledge of a POSA for all the reasons discussed above with respect to claims 14, 15, and 16 as well as because Jensen teaches the additional limitation of claim 19.  *See* Section XX.B.14, *supra*.

1612. As described above with respect to claim 7, it is my opinion that a POSA would understand that Jensen discloses "at least partially covering the conductive traces with an insulating covering" and, therefore, that Jensen renders obvious claim 19 of the '422 patent.  *See* Section XX.B.8, *supra*.

### 18.    *Dependent Claim 20*

1613. Claim 20 of the '422 patent depends from claim 14 and additionally requires "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate."

1614. In my opinion, claim 20 of the '422 patent is rendered obvious by Jensen in combination with Matsumura for all the reasons discussed above with respect to claim 14 as well as because Jensen teaches the additional limitation of claim 20.  *See* Section XX.B.12, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 493

1615. As described above with respect to claim 9, it is my opinion that Jensen discloses "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate." *See* Section XX.B.9, *supra.*

### C. Ground 3: Obvious Over Ozguz in view of the General Knowledge of a Person of Ordinary Skill in the Art

#### 1. Independent Claim 1

1616. In my opinion, claim 1 of the '422 patent is rendered obvious by Ozguz in view of the general knowledge of a POSA.

#### i. Preamble 1[pre]

1617. The preamble of claim 1 of the '422 patent recites "[a] method for manufacturing a body-worn physiological sensor, the method comprising."

1618. In my opinion, to the extent the preamble is limiting, Ozguz discloses the preamble of claim 1 of the '422 patent.

1619. Ozguz teaches "a sensor system comprising a thin flexible ambulatory/self contained bio-sensor module in a form similar to an adhesive bandage for sensing physiologically modulated signals from the body, and a method of making such a sensor system and module." Ex. 1014 at [0003]. In my opinion, a POSA would have used well-known methods to manufacture Ozguz's "bio-sensor" based on Ozguz's disclosure of components, materials, and assembly techniques.

1620. Thus, in my opinion, Ozguz discloses "[a] method for manufacturing a body-worn physiological sensor."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 494

### ii.    Limitation [1a]

1621. Limitation [1a] recites "providing a disposable substrate made from an insulating material, said substrate comprising."

1622. In my opinion, Ozguz discloses limitation [1a] of the '422 patent.

1623. Ozguz discloses that sensor module 10 is "made disposable and [is] discarded after monitoring a particular subject body 20 for purposes of good hygiene." *Id.* at [0049].

1624. As shown by Figure 2A below, Ozguz includes a "flexible substrate 55" on which at least one antenna 50 is metalized and to which "thin flexible silicon substrates 60, 65, 70 having respective integrated circuits 71, 72, 73 are bonded." *Id.* at [0039]. Circuits 71, 72, and 73 can be integrated into a single circuit. *Id.* at [0042].



*Id.* at Fig. 2A. Ozguz discloses that flexible substrate 55 is made of an insulating material, "preferably in the form of a polyimide, and is electrically non-conductive

495

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 495

and flexible.  However other flexible non-conducting substrates can be substituted." *Id.* at [0046].  "Furthermore, the adhesive pads 91 can be formed of double-sided adhesive for application before and removal after each use so that the sensor module can be used repeatedly."  *Id.* at [0049].

1625.  Thus, in my opinion, Ozguz discloses "providing a disposable substrate made from an insulating material, said substrate comprising."

### iii.    Limitation [1b]

1626.  Limitation [1b] recites "a flexible printed circuit board layer made from the insulating material."

1627.  In my opinion, Ozguz discloses limitation [1b] of the '422 patent.

1628.  Ozguz discloses that flexible substrate 55 includes metallization 77 that interconnects integrated circuits 71, 72, 73 and other components to form a circuit board layer.  *Id.* at [0039].

1629.  In my opinion, a POSA would have understood substrate 55 to be a printed circuit layer on which components or materials are printed, such as metallization 77, because screen printing was a preferred method of manufacturing a circuit board at the time of the invention of the '422 patent.  *See* Ex. 1035 at 296 ("Printing Process.  The circuit patterns are screen printed on the substrate by two ways: (1) Manual screen printing process, and (2) Automatic or semi-automatic screen printing process."); *see also* Ex. 1013 at 5:23–42 ("Each electrode 35 has a

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 496

conductive grid 56 which is comprised of a matrix of approximately 0.050 inch wide lines 42 of conductive ink compound applied to an insulation and base support layer 44 ***preferably by means of a silk screen process.***") (emphasis added); *see also* Ex. 1013 at 5:4–8.  Screen printing was and is preferred because it allows a greater degree of control in printing and thus is cost-effective, which is important when expensive materials such as silver are being used.  *Id.*; *see also* Section IV.C., *supra*.

1630. Ozguz further discloses that flexible substrate 55 is made of an insulating material, "preferably in the form of a polyimide, and is electrically non-conductive and flexible.  However other flexible non-conducting substrates can be substituted."  Ex. 1014 at [0046].

1631. Thus, in my opinion, Ozguz discloses "a flexible printed circuit board layer made from the insulating material."

### iv.    Limitation [1c]

1632. Limitation [1c] recites "at least two electrodes disposed on the disposable substrate."

1633. In my opinion, Ozguz discloses limitation [1c] of the '422 patent.

1634. As demonstrated by annotated Figure 3E below, Ozguz discloses that sensor module 10 includes *at least* "electrodes 80 disposed on an underside 85 of the flexible substrate 55 for contact with the skin 15 of the subject body 20."  *Id.* at [0039].

497

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 497



**FIG. 3E**

*Id.* at Fig. 3E (annotated). As discussed above, Ozguz discloses that flexible substrate 55 is disposable. *Id.* at [0049]; *see also* Section XIX.C.1.ii., *supra.* Ozguz further discloses "a pair of electrodes 90" that "extend longitudinally relative to the sensor module 10." Ex. 1014 at [0043], Fig. 2.

1635. Thus, in my opinion, Ozguz discloses "at least two electrodes disposed on the disposable substrate."

### v.    Limitation [1d]

1636. Limitation [1d] recites "conductive traces defined between the at least two electrodes."

1637. In my opinion, Ozguz discloses limitation [1d] of the '422 patent.

1638. Ozguz discloses that "metallization 77 further extends through the flexible substrate 55 and connects the [integrated circuits] ICs 71, 72, 73 to the electrodes 80 disposed on an underside 85 of the flexible substrate 55." *Id.* at [0039]; *see also id.* at [0048]. A POSA would understand metallization 77 is conductive

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 498

traces because the metallization is a conductive material that connects components of the flexible circuit.



*Id.* at Fig. 3B (annotated).

1639. Thus, in my opinion, Ozguz discloses "conductive traces defined between the at least two electrodes."

### vi.    Limitation [1e]

1640. Limitation [1e] recites "providing a computation-communication module, said module comprising."

1641. In my opinion, Ozguz discloses limitation [1e] of the '422 patent.

1642. Ozguz discloses that sensor module 10 includes "flexible silicon substrates 60, 65, 70 having respective integrated circuits 71, 72, 73 [that] are bonded to the flexible substrate 55." *Id.* at [0039]. These thin silicon substrates 60, 65, 70 can include a "transmitter or transceiver 190 for transmitting data by RF signals to a

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 499

remote receiver" (*i.e.*, a communication module). *Id.* at [0058]. Ozguz discloses that "it is to be expressly understood that the ICs 71, 72, 73, can be integrated as one IC on a single silicon substrate." *Id.* at [0042].

1643. Ozguz also discloses that thin silicon substrates 60, 65, 70 can also include "a microprocessor 175" for processing signals and "controlling input, storage, and analysis of the collected data" (*i.e.*, a computation module). *Id.* at [0041], [0044], [0058].

1644. Thus, in my opinion, Ozguz discloses "providing a computation-communication module."

### vii.    Limitation [1f]

1645. Limitation [1f] recites "a housing."

1646. In my opinion, Ozguz discloses limitation [1f] of the '422 patent.

1647. Ozguz discloses a "flexible, thin battery 105 overlays the silicon substrates 60, 65, 70 and their respective [integrated circuits] ICs 71, 72, 73." *Id.* at [0048]. The battery overlay 105 (shown in blue below) is shaped in a way that houses the computation-communication module formed by flexible substrate 55 and components bonded to it, such as flexible silicon substrates 60, 65, 70, integrated circuits 71, 72, 73, and antenna 50. *Id.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 500



**FIG. 3A**

*Id.* at Fig. 3A (annotated).

1648. Thus, in my opinion, Ozguz discloses "a housing."

### viii. Limitation [1g]

1649. Limitation [1g] recites "a processor disposed in the housing."

1650. In my opinion, Ozguz discloses limitation [1g] of the '422 patent.

1651. Ozguz discloses a "microprocessor 175" that is "incorporated into the thin silicon substrates 60, 65, 70." *Id.* at [0058]. As noted above, battery overlay 105 houses "the silicon substrates 60, 65, 70 and their respective ICs 71, 72, 73." *Id.* at [0048]; *see also* Section XX.C.1.vii, *supra.*

1652. Thus, in my opinion, Ozguz discloses "a processor disposed in the housing."

501

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 501**

### ix.    Limitation [1h]

1653. Limitation [1h] recites "attaching the computation-communication module to the disposable substrate."

1654. In my opinion, Ozguz discloses limitation [1h] of the '422 patent.

1655. As noted above, Ozguz discloses a disposable "flexible substrate 55." Ex. 1014 at [0046], [0048]; *see also* Sections XX.C.1.ii, XX.C.1.iii, *supra.* Silicon 60, 65, 70, which include both transmitter or transceiver 190 (for communication) and microprocessor 175 (for computation), are bonded to the flexible substrate 55. Ex. 1014 at [0046], [0058].  Ozguz discloses that "it is to be expressly understood that the ICs 71, 72, 73, can be integrated as one IC on a single silicon substrate." *Id.* at [0042].

1656. Thus, in my opinion, Ozguz discloses "attaching the computation-communication module to the disposable substrate."

### 2.    Dependent Claim 2

1657. Claim 2 of the '422 patent depends from claim 1 and additionally requires "providing conductive traces in the flexible circuit layer."

1658. In my opinion, claim 2 of the '422 patent is disclosed or rendered obvious by Ozguz for all the reasons discussed above with respect to claim 1 as well as because Ozguz discloses or teaches the additional limitation of claim 2.  *See* Section XX.C.1, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 502

1659. Ozguz discloses that "metallization 77 further extends through the flexible substrate 55 and connects the [integrated circuits] ICs 71, 72, 73 to the electrodes 80 disposed on an underside 85 of the flexible substrate 55." Ex. 1014 at [0039]. A POSA would understand metallization 77 is conductive traces because the metallization is a conductive material that connects components of the flexible circuit.

1660. For these reasons, it is my opinion that a POSA would understand that Ozguz discloses or renders obvious "providing conductive traces in the flexible circuit layer."

### 3.    Dependent Claim 3

1661. Claim 3 of the '422 patent depends from claims 1 and 2 and additionally requires that "the conductive traces are configured on the flexible circuit layer to electrically couple with the attached computation-communication module."

1662. In my opinion, claim 3 of the '422 patent is rendered obvious by Ozguz for all the reasons discussed above with respect to claims 1 and 2 as well as because Ozguz discloses the additional limitation of claim 3. *See* Section XX.C.2, *supra.*

1663. Ozguz discloses that "metallization 77 is applied to the flexible substrate 55" and "interconnects the ICs 71, 72, 73" on flexible silicon 60, 65, 70 "to each other and to the antenna 50." Ex. 1014 at [0039]. As discussed above, Ozguz teaches that microprocessor 175 and transmitter or transceiver 190

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 503**

(computation-communication module) are incorporated into flexible silicon layers 60, 65, 70. *Id.* at [0058]; *see also* Section XX.C.1.vi, *supra*. Ozguz discloses that "it is to be expressly understood that the ICs 71, 72, 73, can be integrated as one IC on a single silicon substrate." Ex. 1014 at [0042].

1664. For these reasons, it is my opinion that Ozguz discloses that "the conductive traces are configured on the flexible circuit layer to electrically couple with the attached computation-communication module."

### 4.    *Dependent Claim 5*

1665. Claim 5 of the '422 patent depends from claim 1 and additionally requires that "the computation-communication module is releasably attached to the disposable substrate."

1666. In my opinion, claim 5 of the '422 patent is rendered obvious for all the reasons discussed above with respect to claim 1 as well as because the combination of Ozguz and Matsumura teach the additional limitation of claim 5. *See* Section XX.C.1, *supra*.

1667. Ozguz discloses that "the adhesive pads 91 can be formed of double-sided adhesive ***for application before and removal after each use*** so that the sensor module can be used repeatedly" and notes that "[t]he sensor module can be sterilized in an autoclave . . . ***between uses***." Ex. 1014 at [0049] (emphases added). Thus, Ozguz teaches that some components of sensor module 10 are reusable and that those

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 504

components are releasably attached to other disposable components, such as adhesive pad 91. *Id*. In my opinion, a POSA would know that "flexible silicon 60, 65, 70" with incorporated "microprocessor 175" and "transmitter or transceiver 190" (the claimed computation-communication module), would be a portion of sensor module that can be used repeatedly to reduce costs and minimize waste.

1668. Matsumura teaches a way to connect reusable and disposable components of a sensor module. Matsumura discloses that "[t]he bioelectrode pad 7 and the signal processor 10 are detachable with hooks" and "the reusable signal processor and the disposable bioelectrode can be easily attached and detached before and after use." Ex. 1012 at [0016]. In my opinion, a POSA would have had a reasonable expectation of success in modifying Ozguz's sensor module based on this disclosure of Matsumura without undue experimentation, and would have been motivated to do so. *See* Section XIX.D.1, *supra*. Both Ozguz and Matsumura disclose wearable, self-contained ECG monitors. *See* Ex. 1014 at [0003]; Ex. 1012 at Abstract, [0006], [0014]. Additionally, it is my opinion that a POSA would have recognized that Ozguz and Matsumura could have similar disposable and reusable parts; the disposable parts for both include the electrodes used to detect ECG signals and the reusable parts for both include the processor and transmitter. *See* Sections XX.A.1.ii, XX.A.1.vi; XX.C.1.ii, XX.C.1.vi, *supra*. Further, Matsumura teaches using hooks to connect and release the disposable and reusable components

505

which is a common mechanical approach taken in the art.  Ex. 1012 at [0024], [0027].

1669. For these reasons, it is my opinion the combination of Ozguz and Matsumura renders obvious "the computation-communication module is releasably attached to the disposable substrate."

### 5.    *Dependent Claim 6*

1670. Claim 6 of the '422 patent depends from claim 1 and additionally requires "providing a radio circuit in the computation-communication module."

1671. In my opinion, claim 6 of the '422 patent is rendered obvious by Ozguz for all the reasons discussed above with respect to claim 1 as well as because Ozguz teaches the additional limitation of claim 6.  *See* Section XX.C.1, *supra.*

1672. As previously discussed, Ozguz discloses "circuitry 170 that could be incorporated into the thin silicon substrates 60, 65, 70" which "will include . . . a transmitter or transceiver 190 for transmitting data by [radio frequency] RF signals to a remote receiver."  Ex. 1014 at [0058].

1673. For these reasons, it is my opinion that Ozguz discloses "providing a radio circuit in the computation-communication module."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 506

### 6.  Dependent Claim 9

1674. Claim 9 of the '422 patent depends from claim 1 and additionally requires "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate."

1675. In my opinion, claim 9 of the '422 patent is rendered obvious by Ozguz for all the reasons discussed above with respect to claim 1 as well as because Ozguz teaches the additional limitation of claim 9.  *See* Section XX.C.1, *supra.*

1676. Ozguz discloses that sensor module 10 includes three "electrodes 80 disposed on an underside 85 of the flexible substrate 55 for contact with the skin 15 of the subject body 20."  Ex. 1014 at [0039].  As previously discussed, flexible substrate 55 is disposable.  *Id.* at [0049]; *see also* Section XX.C.1.ii, *supra.*



Ex. 1014 at Fig. 3E (annotated).

1677. For these reasons, it is my opinion Ozguz discloses "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 507

### 7.    *Dependent Claim 11*

1678. Claim 11 of the '422 patent depends from claims 1 and 9 and additionally requires "an electrode gel and a conductive surface defining a half cell."

1679. In my opinion, claim 11 of the '422 patent is rendered obvious by Ozguz and the general knowledge of a POSA for all the reasons discussed above with respect to claims 1 and 9 as well as because the additional limitation of claim 11 would be obvious to a POSA. *See* Sections XX.C.1, XX.C.6, *supra*.

1680. As described above *supra* Section XX.C.6, Ozguz includes integrated electrode sensor contacts on its bottom surface. A POSA would recognize that Ozguz's device uses "dry electrodes." Dry electrodes, which do not use electrode gel or paste, are notoriously susceptible to motion artifacts, which limit the performance of systems that use them. *See, e.g.*, Ex. 1064 (J. Mühlsteff et al., *Wearable approach for continuous ECG – and Activity Patient-Monitoring*, 1 26th Proc. Int'l Conf. of IEEE Eng'g in Med. & Biol. Soc'y 2184 (2004)) at 2187. A POSA therefore would have been motivated to modify Ozguz's bottom surface to include an electrode gel and a conductive surface defining a half cell as a means of improving the quality of the ECG signal.

1681. Commercially available electrode gels were known in the art at the time of the claimed invention. *See, e.g.*, Ex. 1011 at [0041] (describing "off-the-shelf EKG sensor pads, such as those sold by 3M Corporation"). A POSA would have

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 508

recognized that it could integrate these commercially available disposable electrodes into the invention of Ozguz with a reasonable expectation of success. Integrating such gels into the device would result in an "electrode gel and a conductive surface defining a half cell."

1682. For these reasons, it is my opinion that Ozguz and a POSA's general knowledge render obvious "an electrode gel and a conductive surface defining a half cell."

### 8. *Dependent Claim 12*

1683. Claim 12 of the '422 patent depends from claims 1, 9, and 11 and additionally requires that "the disposable substrate is crescent shaped and in which the body-worn physiological sensor is worn on the chest of a patient."

1684. In my opinion, claim 12 of the '422 patent is rendered obvious by Ozguz for all the reasons discussed above with respect to claims 1, 9, and 11 as well as because Ozguz teaches the additional limitation of claim 12. *See* Section XX.C.7, *supra.*

1685. Ozguz discloses that sensor module 10 is attached to the patient's chest. Ex. 1014 at [0038], Fig. 2A. In my opinion, given the placement of sensor module 10 on the patient's chest, it would have been obvious for a person of skill in the art to make Ozguz's disposable sensor assembly crescent shaped to better fit the curvature of the patient's body.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 509

1686. For these reasons, it is my opinion that Ozguz renders obvious that "the disposable substrate is crescent shaped and in which the body-worn physiological sensor is worn on the chest of a patient."

### 9.    Independent Claim 14

1687. In my opinion, claim 14 of the '422 patent is rendered obvious by Ozguz in view of the general knowledge of a POSA.

### i.    Preamble 14[pre]

1688. The preamble of claim 14 recites "[a] body-worn physiological sensor made by the process of."

1689. As described above with respect to claim 1, it is my opinion that, to the extent the preamble is limiting, Ozguz discloses a "body-worn physiological sensor" made by the process claimed by the '422 patent. *See* Section XX.C.1.i, *supra.*

### ii.    Limitation [14a]

1690. Limitation [1a] recites "providing a disposable substrate made from an insulating material, said substrate comprising."

1691. In my opinion, as described above with respect to claim 1, Ozguz discloses "providing a disposable substrate made from an insulating material." *See* Section XX.C.1.ii, *supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 510

### iii.    Limitation [14b]

1692. Limitation [14b] recites "a flexible printed circuit board layer made from an insulating material."

1693. In my opinion, as described above with respect to claim 1, Ozguz discloses "a flexible printed circuit board layer made from an insulating material." *See* Section XX.C.1.iii*, supra.*

### iv.    Limitation [14c]

1694. Limitation [14c] recites "at least two electrodes disposed on the disposable substrate."

1695. In my opinion, as described above with respect to claim 1, Ozguz discloses "at least two electrodes disposed on the disposable substrate." *See* Section XX.C.1.iv, *supra.*

### v.    Limitation [14d]

1696. Limitation [14d] recites "conductive traces defined between the at least two electrodes."

1697. In my opinion, a described above with respect to claim 1, Ozguz discloses "conductive traces defined between the at least two electrodes." *See* Section XX.C.1.v*, supra.*

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 511

### vi.    Limitation [14e]

1698. Limitation [14e] recites "providing a computation-communication module, said module comprising."

1699. In my opinion, as described above with respect to claim 1, Ozguz discloses the claimed "computation-communication module." *See* Section XX.C.1.vi, *supra*.

### vii.    Limitation [14f]

1700. Limitation [14f] recites "a housing."

1701. In my opinion, as described above with respect to claim 1, Ozguz discloses "a housing." *See* Section XX.C.1.vii, *supra*.

### viii.    Limitation [14g]

1702. Limitation [14g] recites "a processor disposed in the housing."

1703. In my opinion, as described above with respect to claim 1, Ozguz discloses "a processor disposed in the housing." *See* Section XX.C.1.viii, *supra*.

### ix.    Limitation [14h]

1704. Limitation [14h] recites "attaching the computation-communication module to the disposable substrate."

1705. In my opinion, as described above with respect to claim 1, Ozguz discloses "attaching the computation-communication module to the disposable substrate." *See* Section XX.C.1.ix, *supra*.

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 512

### 10.    *Dependent Claim 15*

1706. Claim 15 of the '422 patent depends from claim 1 and additionally requires "providing the conductive traces in the flexible printed circuit board layer."

1707. In my opinion, claim 15 of the '422 patent is rendered obvious by Ozguz for all the reasons discussed above with respect to claim 14 as well as because Ozguz discloses or renders obvious the additional limitation of claim 15. *See* Section XX.C.9, *supra.*

1708. As described with respect to Claim 2, it is my opinion that Ozguz discloses or renders obvious "providing the conductive traces in the flexible printed circuit board layer." *See* Section XX.C.2, *supra.*

### 11.    *Dependent Claim 16*

1709. Claim 16 of the '422 patent depends from claims 14 and 15 and additionally requires that "configuring the conductive traces in the flexible printed circuit board layer to electrically couple with the attached computation-communication module."

1710. In my opinion, claim 16 of the '422 patent is rendered obvious by Ozguz for all the reasons discussed above with respect to claims 14 and 15 as well as because Ozguz discloses the additional limitation of claim 16. *See* Section XX.C. 10, *supra.*

**iRhythm, Inc. / Welch Allyn, Inc.**
**Exhibit 1009**
**Page 513**

1711. As described above with respect to Claim 3, it is my opinion that Ozguz discloses "configuring the conductive traces in the flexible printed circuit board layer to electrically couple with the attached computation-communication module." *See* Section XX.C.3*, supra.*

### 12.    *Dependent Claim 17*

1712. Claim 17 of the '422 patent depends from claim 14 and additionally requires that "the computation-communication module is releasably attached to the disposable substrate."

1713. In my opinion, claim 17 of the '422 patent is rendered obvious by Ozguz in combination with Matsumura for all the reasons discussed above with respect to claim 14 as well as because the combination of Ozguz and Matsumura teaches the additional limitation of claim 17.  *See* Section XX.C.9, *supra.*

1714. As described above with respect to claim 5, it is my opinion that the combination of Ozguz and Matsumura teaches that "the computation-communication module is releasably attached to the disposable substrate."  *See* Section XX.C.4, *supra.*

### 13.    *Dependent Claim 18*

1715. Claim 18 of the '422 patent depends from claim 14 and additionally requires "providing the computation-communication module with a radio circuit."

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 514

1716. In my opinion, claim 18 of the '422 patent is rendered obvious by Ozguz for all the reasons discussed above with respect to claim 14 as well as because Ozguz discloses the additional limitation of claim 18. *See* Section XX.C.9, *supra.*

1717. As described above with respect to claim 6, it is my opinion that Ozguz discloses "providing the computation-communication module with a radio circuit." *See* Section XX.C.5*, supra.*

### 14.    *Dependent Claim 20*

1718. Claim 20 of the '422 patent depends from claim 14 and additionally requires "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate."

1719. In my opinion, claim 20 of the '422 patent is rendered obvious by Ozguz for all the reasons discussed above with respect to claim 14 as well as because Ozguz teaches the additional limitation of claim 20. *See* Section XX.C.9, *supra.*

1720. As described above with respect to claim 9, it is my opinion that Ozguz discloses "integrating at least two electrodes into the flexible printed circuit board layer of the disposable substrate." *See* Section XX.C.6, *supra.*

## XXI.  CONCLUSION

1721. For all of the reasons I discussed above, it is my opinion that claims 1–8, 10–15, 29, 31–35, 37–39, and 43–45 of the '007 patent; claims 1–8 and 11–14 of

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 515

the '492 patent; claims 1–8, 11, 12, and 15–20 of the '484 patent; and 1–7, 9–12, and 14–20 of the '422 patent are unpatentable.

1722. I reserve the right to change, amend, and/or supplement my opinions as necessary in response to new information and evidence made available to me, additional scientific analysis that leads me to conclude that supplementation is necessary, new issues that may arise, and any additional discovery, arguments, evidence, or testimony presented in this matter.

1723. I reserve the right to supplement my opinions in the future to respond to any arguments that the Patent Owner raises and to consider new information as it becomes available to me.

1724. I declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the full knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States code.

Dated:  December 20, 2024            ___ *Jason Heikenfeld* _____

Jason Heikenfeld

iRhythm, Inc. / Welch Allyn, Inc.
Exhibit 1009
Page 516

# Exhibit D

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 20995 | 7590 | 03/05/2025 |

Knobbe, Martens, Olson & Bear, LLP
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
|---|
| ANTISKAY, BRIAN MICHAEL |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3794 | |

DATE MAILED: 03/05/2025

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/936,888 | 11/04/2024 | Uday N. Kumar | IRHYM.002C9 | 6165 |

TITLE OF INVENTION: DEVICE FEATURES AND DESIGN ELEMENTS FOR LONG-TERM ADHESION

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1290 | $0.00 | $0.00 | $1290 | 06/05/2025 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 40% the amount of undiscounted fees, and micro entity fees are 20% the amount of undiscounted fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

PTOL-85 (Rev. 11/23)

# PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), by mail or fax, or via the USPTO patent electronic filing system.

| By mail, send to: | Mail Stop ISSUE FEE<br>Commissioner for Patents<br>P.O. Box 1450<br>Alexandria, Virginia 22313-1450 | By fax, send to: | (571)-273-2885 |

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications. **Because electronic patent issuance may occur shortly after issue fee payment, any desired continuing application should preferably be filed prior to payment of this issue fee in order not to jeopardize copendency.**

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| 20995 | 7590 | 03/05/2025 |

Knobbe, Martens, Olson & Bear, LLP
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via the USPTO patent electronic filing system or by facsimile to (571) 273-2885, on the date below.

| | (Typed or printed name) |
| | (Signature) |
| | (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/936,888 | 11/04/2024 | Uday N. Kumar | IRHYM.002C9 | 6165 |

TITLE OF INVENTION: DEVICE FEATURES AND DESIGN ELEMENTS FOR LONG-TERM ADHESION

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1290 | $0.00 | $0.00 | $1290 | 06/05/2025 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| ANTISKAY, BRIAN MICHAEL | 3794 | 600-391000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/AIA/122 or PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/AIA/47 or PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐ Issue Fee ☐ Publication Fee (if required)

4b. Method of Payment: (Please first reapply any previously paid fee shown above)

☐ Electronic Payment via the USPTO patent electronic filing system ☐ Enclosed check ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

| Authorized Signature _____ | Date _____ |
| Typed or printed name _____ | Registration No. _____ |

PTOL-85 Part B (11/23) Approved for use through 03/31/2026    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oꜰꜰɪᴄᴇ

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/936,888 | 11/04/2024 | Uday N. Kumar | IRHYM.002C9 | 6165 |

| | | |
|---|---|---|
| 20995          7590          03/05/2025 | EXAMINER | |
| Knobbe, Martens, Olson & Bear, LLP | ANTISKAY, BRIAN MICHAEL | |
| 2040 MAIN STREET | | |
| FOURTEENTH FLOOR | ART UNIT | PAPER NUMBER |
| IRVINE, CA 92614 | 3794 | |

DATE MAILED: 03/05/2025

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 11/23)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013).

https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf

Routine uses of the information in this record may include disclosure to:

1) law enforcement, in the event that the system of records indicates a violation or potential violation of law;

2) a federal, state, local, or international agency, in response to its request;

3) a contractor of the USPTO having need for the information in order to perform a contract;

4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record;

5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record;

6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations;

7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals;

8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c));

9) the Office of Personnel Management (OPM) for personnel research purposes; and

10) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.

| *Notice of Allowability* | Application No. 18/936,888 | Applicant(s) Kumar et al. | |
|---|---|---|---|
| | Examiner Brian M Antiskay | Art Unit 3794 | AIA (FITF) Status No |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>Terminal Disclaimer (02/19/20250</u>.
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>2-7,9-13 and 15-16</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐All    b) ☐ Some*    c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail No. _____
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____
4. ☑ Interview Summary (PTO-413), Paper No./Mail Date. _____

5. ☑ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____

| /BRIAN M ANTISKAY/ Examiner, Art Unit 3794 | /JOSEPH A STOKLOSA/ Supervisory Patent Examiner, Art Unit 3794 |
|---|---|

Application/Control Number: 18/936,888                                           Page 2
Art Unit: 3794

# DETAILED ACTION

## Notice of Pre-AIA or AIA Status

The present application is being examined under the pre-AIA first to invent provisions. Claims 2-7, 9-13, and 15-16 are currently pending.

## Terminal Disclaimer

The terminal disclaimer filed on 02/19/2025 disclaiming the terminal portion of any patent granted on this application which would extend beyond the expiration date of 11,141,091 has been reviewed and is accepted. The terminal disclaimer has been recorded.

## EXAMINER'S AMENDMENT

An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

Authorization for this examiner's amendment was given in an interview with David Schmidt on 02/19/2025.

*The application has been amended as follows*:

2. (Currently Amended) An electronic device for long-term adhesion to a user, the device comprising:

a housing comprising a physiologic data collection circuit, the housing positioned over a flexible layer extending <u>from beneath</u> ~~beyond~~ the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, wherein the flexible layer comprises [[an]] <u>a polymer</u> upper layer

Application/Control Number: 18/936,888                                    Page 3
Art Unit: 3794

overlying an electrical connection, the electrical connection extending <u>linearly</u> from the physiologic data collection circuit to the electrode <u>when viewed from above the electronic device</u>, the <u>polymer</u> upper layer adhered to a <u>polymer</u> lower layer underlying the electrical connection;

<u>a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer;</u> and

a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user.

8. (Canceled)

9. (Currently Amended)  The electronic device of claim 2, wherein the physiologic data collection circuit is configured to collect cardiac rhythm data from the user.

10. (Currently Amended) The electronic device of claim 2, wherein the <u>polymer</u> upper layer extends horizontally away from the housing beyond a boundary of the electrode.

11. (Currently Amended) The electronic device of claim 2, further comprising an upper adhesive layer positioned over the <u>polymer</u> upper layer.

13. (Currently Amended) The electronic device of claim 12, wherein the upper adhesive layer extends horizontally away from the housing beyond a boundary of the <u>polymer</u> upper layer.

14. (Canceled)

16. (Currently Amended) The electronic device of claim 2, wherein the lower adhesive <u>layer</u> does not extend below the housing.

Application/Control Number: 18/936,888                                              Page 4
Art Unit: 3794

### *Reasons for Allowance*

*The following is an examiner's statement of reasons for allowance*:

The closest prior art of record does not disclose nor render obvious the presently claimed invention. The prior art of record is silent on the flexible layer being made of two layers (upper and lower layers), its composition (polymers), and where everything is located on the overall electronic device with respect to the other components. Each of the layers and components were well-known individually at the time of invention, however, the total combination of elements would not have been assembled as claimed (above) without the express use of the Applicant's original disclosure as a blueprint for doing so.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Brian M Antiskay whose telephone number is (571)270-5179. The examiner can normally be reached M-F 10am-6pm EST.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

Application/Control Number: 18/936,888                                    Page 5
Art Unit: 3794

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Joseph Stoklosa can be reached on 571-272-1213. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be obtained from Patent Center. Unpublished application information in Patent Center is available to registered users. To file and manage patent submissions in Patent Center, visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more information about Patent Center and https://www.uspto.gov/patents/docx for information about filing in DOCX format. For additional questions, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/BRIAN M ANTISKAY/
Examiner, Art Unit 3794

/JOSEPH A STOKLOSA/
Supervisory Patent Examiner, Art Unit 3794

# Exhibit E

| Claim 1 | Expert Decl. of Jason Heikenfeld | Reasons for Allowance |
|---|---|---|
| **1[pre].** An electronic device for long-term adhesion to a user, the device comprising: | "Matsumura discloses a body-worn physiological monitor." ¶181. | |
| **1[a].** a housing comprising a physiologic data collection circuit, the housing positioned over a flexible layer extending from beneath the housing, | "Matsumura teaches a 'signal processor 10' which 'incorporates *a processing circuit* for filtering and amplifying detected bioelectric potential signals.'" ¶501 (original emphasis). "Matsumura teaches that its 'bioelectrode pad' is preferably composed of sheets made from 'polyethylene foam, polyurethane foam, or polyurethane sheet,' which are all materials that a POSA would recognize as 'flexible.'" ¶465. | "[W]here everything is located on the overall electronic device." |
| **1[b].** the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, | "In my opinion, a POSA would understand that the conductive gel 5 can detect 'bioelectric potentials' for transmission 'through the conductive material 2 and the hooks 3' because the conductive gel 5 is embedded in second sheet 4." ¶482. "[C]onductive gels 5 of Matsumura are ECG electrodes." ¶560. | "[W]here everything is located on the overall electronic device." |
| **1[c].** wherein the flexible layer comprises a polymer upper layer overlying an electrical connection, | "Matsumura teaches that second sheet 4 and first sheet 1 are both made of 'an insulating material' such as 'polyethylene foam, polyurethane foam, or polyurethane sheet.' Matsumura also teaches that second sheet 4 and first sheet 1 are applied onto conductive material 2." ¶865. | "[F]lexible layer being made of two layers (upper and lower layers) [and] its composition (polymers)." |
| **1[d].** the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, | "In my opinion, a POSA would understand that where Matsumura's hooks contact the traces of the flexible printed circuit layer (inserted between the first and second sheets) constitutes a 'connection pad' Because it forms an electrical connection between the signal processor 10 and traces leading to the electrodes 5." ¶792. | "[W]here everything is located on the overall electronic device." |

| Claim 1 | Expert Decl. of Jason Heikenfeld | Reasons for Allowance |
|---|---|---|
| **1[e].** the polymer upper layer adhered to a polymer lower layer underlying the electrical connection; | "Thus, Matsumura's 'second sheet 4' therefore comprises an insulating layer covering the flexible printed circuit layer." ¶805. | "[F]lexible layer being made of two layers (upper and lower layers) [and] its composition (polymers)." |
| **1[f].** a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer; and | "The first sheet (1) is made out of an insulating material and has an adhesive applied to the back of the sheet." ¶¶184, 854.<br><br><br><br>¶852; *see also* claim 1[f] (charted below) | "[F]lexible layer being made of two layers (upper and lower layers) [and] its composition (polymers)." |
| **1[g].** a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user. | "Matsumura's bioelectrode pad 7 also includes second sheet 4, whose back surface is covered with an 'adhesive, such as acrylic adhesive.'" ¶1039. "Peeling off the release tape 8 exposes second sheet 4 (*i.e.*, the bottom of bioelectric pad 7), which allows the adhesive layer to adhere the bioelectric pad to the patient's skin." ¶481. | "[F]lexible layer being made of two layers (upper and lower layers) [and] its composition (polymers)." |

2

# Exhibit F

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| **1[pre].** An electronic device for long-term adhesion to a user, the device comprising: | *Matsumura* discloses an electronic device for long-term adhesin to a user.<br><br>Specifically, *Matsumura* discloses "a bioelectric potential detector that can measure bioelectric potential (electrocardiograms)." Matsumura, Abstract. Further, "[t]he bioelectric potential detector 11 can be used as an electrocardiogram detector that is worn on the subject's chest to detect electrocardiogram signals." *Id.*, ¶24.<br><br>*Matsumura* explains that the "subject (patient) ***wears the bioelectric potential detector 11 on his/her chest at all times*** to detect electrocardiogram signals." *Id.*, ¶36. In this way, "the subject can take a shower or a bath 21 while wearing the waterproof bioelectric potential detector 11." *Id.*, ¶38.<br><br>*Matsumura* explains that an "adhesive, such as acrylic adhesive for example, is applied to the back surface of the second sheet 4." *Id.*, ¶18. Release sheet 8 is "peeled off" to expose the adhesive back surface of the second sheet 4, which is applied to directly to the patient's skin. *Id.*, ¶16; *see also id.* Figure 2 (below). |

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | <br>Matsumura, Fig. 2 (annotated yellow indicating release sheet 8, and blue indicating the adhesive back). |
| **1[a].** a housing comprising a physiologic data collection circuit, | *Matsumura* discloses a housing comprising a physiologic data collection circuit.<br><br>Specifically, *Matsumura* explains that "the housing of signal processor 10[,]" is "the part that transmits bioelectric potential from the bioelectrode pad 7 to the signal processor 10" contained within the housing.  Matsumura, ¶27.<br><br>Figure 4 shows "housing 10c" (annotated in red below).  *Id.*, Figure 4. |

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | <br><br>*Id.*, Figure 4 (annotated).<br><br>*Matsumura* discloses that "[t]he signal processor 10 incorporates a processing circuit for filtering and amplifying detected bioelectric potential signals, a memory for storing the processed bioelectric potential signal, a circuit for modulating the processed bioelectric potential signal and transmitting it wirelessly, and a loop antenna.  Furthermore, the housing of the signal processor 10 is waterproof."  Matsumura, ¶25. |
| **1[b].**  the housing positioned over a flexible layer extending from beneath the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, | *Matsumura* discloses the housing positioned over a flexible layer extending from beneath the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing.<br><br>As discussed above with respect to claim 1[a], *Matsumura* discloses that signal processor 10ch includes housing 10c. *See* cl. 1[a].<br><br>*Matsumura* further discloses a "bioelectrode pad 7 [] composed of a first sheet 1, a conductive material 2, a hook 3, a second sheet 4, a conductive gel 5, a third sheet 6, and double-sided adhesive tape 9."  Matsumura, ¶16. |

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | First sheet 1 and second sheet 4 "should be made of an insulating material that does not allow moisture to penetrate, for example, polyethylene foam, polyurethane foam, or polyurethane sheet." *Id.*, ¶¶17-18. Insulating materials such as polyethylene foam, polyurethane foam, or polyurethane sheet are flexible materials.<br><br>"Between the first sheet 1 and the second sheet 4, two pieces of conductive material 2 and two hooks 3 are arranged to transmit the **bioelectric potential detected by the conductive gel 5**, which is placed in the openings 4a of the second sheet 4." *Id.*, ¶19. Accordingly, conductive gel 5 (annotated in purple) is an electrode.<br><br><br>*Id.*, Figure 1 (annotated red indicating housing, and purple indicating conductive gel). |

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | Accordingly, *Matsumura* discloses housing 10c (e.g., a housing) positioned over the bioelectrode pad (e.g., flexible layer), which extends from beneath the housing. Further, *Matsumura* discloses electrode gel 5 (e.g., electrodes) that are positioned on the bottom of the bioelectrode pad and towards an outer edge of bioelectrode pad 7, not underneath the housing (e.g., at a position distal to the housing). |
| **1[c].** wherein the flexible layer comprises a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection; | *Matsumura* discloses a flexible layer comprising a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection.<br><br>**First**, *Matsumura* discloses a flexible layer comprising a polymer upper layer overlying an electrical connection. *Matsumura* discloses a "bioelectrode pad 7 [] composed of a first sheet 1, a conductive material 2, a hook 3, a second sheet 4, a conductive gel 5, a third sheet 6, and double-sided adhesive tape 9." Matsumura, ¶16.<br><br>First sheet 1 and second sheet 4 "should be made of an insulating material that does not allow moisture to penetrate, for example, ***polyethylene foam, polyurethane foam, or polyurethane sheet***." *Id.*, ¶¶17-18.<br><br>**Second**, *Matsumura* discloses the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection.<br><br>As shown in Figure 1 below, first sheet 1 (e.g., upper polymer layer) overlays electrode gel 5, conductive material 2, and hooks 3 (e.g., electronic connection), and these three components extend linearly from the signal processor (e.g., housing). For example, *Matsumura* discloses "The pieces of ***conductive material 2 are rod-shaped***, one end of which has two holes 2a for contacting the conductive gel 5 and the other end of which has two holes 2a through which the protruding portions of the hook 3 are inserted. The two hooks 3 are arranged so that the protruding portions of the hook 3 can be inserted through the holes 2a and 1a from the back side of the conductive material 2. |

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | With this configuration, the ***bioelectric potential detected by the conductive gel 5 are transmitted through the conductive material 2 and the hooks 3***." *Id.*, ¶19.<br><br>Each of these components are disclosed in Figure 1, as shown below.<br><br><br><br><div align="right">*Id.*, Figure 1 (annotated).</div> |
| **1[d].** a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer; and | *Matsumura* discloses a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer.<br><br>For example, *Matsumura* explains that "an adhesive or glue, such as an acrylic adhesive for example, is applied to the back surface of the first sheet 1" and "adhesive or glue, such as acrylic adhesive for example, is applied to the surface of the second sheet 4. The adhesive, such as acrylic adhesive for example, is applied to the back surface of the second sheet 4." Matsumura, ¶18. As shown in Figure 4, for example, the adhesive applied to the back surface of the first sheet 1 and the adhesive applied |

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | to the surface of second sheet 4 make up the connecting adhesive layer (indicated by red boxes) that adhere first sheet 1 (e.g., polymer upper layer) to second sheet 4 (e.g., polymer lower layer). <br><br>  <br><br> *Id.*, Figure 4(b) (annotated green indicating first sheet, blue indicating second sheet, and red boxes indicating connecting adhesive layer). |
| **1[e].** a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user. | *Matsumura* discloses a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user. <br><br> For example, the "adhesive, such as acrylic adhesive, for example, [that] is applied to the back surface of the second sheet 4" is a lower adhesive layer that adheres the electronic device to a user. <br><br> Specifically, *Matsumura* explains that release sheet 8 is a sheet of material that is attached to the back surface of second sheet 4 and removed before use. *Id.*, ¶16. Release sheet 8 is "peeled off" to expose the adhesive back surface of the second sheet 4, which is applied to directly to the patient's skin. *Id.*, ¶16; *see also id.* Figure 2 (below). |

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | <br><br>Matsumura, Figure 2 (annotated yellow indicating release sheet 8, and blue indicating the adhesive back).<br><br>Accordingly, *Matsumura* discloses a lower adhesive layer (e.g., adhesive, such as acrylic adhesive) positioned on second sheet 4 (e.g., the polymer lower layer portion of the flexible layer), that adheres the device to a user. |

# Exhibit G

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re U.S. Patent No.:  12,274,554  )
)
Date of Issue:  April 15, 2025  )
)
Name of Patentee: Kumar et al.  )
)
Serial No.:  18/936,888  )
)  Group Art Unit:  Not yet assigned
)
Filed:  Nov. 4, 2024  )  Examiner:  Not yet assigned
)
Title:  Device features  )  Box:  *Ex Parte* Reexam
and design  )
elements for  )
long-term  )
adhesion  )
_____)

## REQUEST FOR *EX PARTE* REEXAMINATION
## OF U.S. PATENT NO. 12,274,554

Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Examiner:

Reexamination under 35 U.S.C. § 302 and 37 C.F.R. § 1.510 is hereby requested for claims 1 to 12 of U.S. Patent No. 12,274,554 (the "'554 patent"), which issued on April 15, 2024, to iRhythm Technologies, Inc., the applicant and assignee of record.

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554

## TABLE OF CONTENTS

I.    CLAIMS FOR WHICH REEXAMINATION IS REQUIRED ........................1

II.   OTHER PROCEEDINGS..............................................................1

III.  PAYMENT OF FEES .................................................................1

IV.   TECHNOLOGY OF THE '554 PATENT ......................................2

    A.    Technological Overview ...................................................2

    B.    The '554 Patent ..........................................................3

    C.    Prosecution History ......................................................5

V.    LEVEL OF ORDINARY SKILL ..................................................7

VI.   CLAIM CONSTRUCTION .........................................................7

VII.  IDENTIFICATION OF PATENTS AND PRINTED PUBLICATIONS
THAT PROVIDE SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY ..8

    A.    Substantial New Questions of Patentability................................9

VIII. GROUND I ..........................................................................12

    A.    Overview of *Bly* ...........................................................12

    B.    *Bly* Renders Claims 1–12 Obvious ........................................15

IX.   GROUND II..........................................................................38

    A.    Overview of *Baker* ........................................................38

    B.    *Bly* in View of *Baker* Renders Claims 1–12 Obvious................................39

X.    GROUND III.........................................................................61

    A.    Overview of *Matsumura* ..................................................61

    B.    *Matsumura* Anticipates or Renders Obvious Claim 1 ................................63

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

XI.    CONCLUSION...............................................................................................71

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

## TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| Ex. 1001 | The '554 patent |
| Ex. 1002 | U.S. Patent Application 18/936,888 |
| Ex. 1003 | U.S. Pub. No. 2009/0076363 to Bly et al. ("*Bly*") |
| Ex. 1004 | U.S. Patent No. 8,214,007 to Baker et al. ("*Baker*") |
| Ex. 1005 | Japanese Patent Publication No. JP2004-121360 to Matsumura ("*Matsumura*") |
| Ex. 1006 | English Translation of Japanese Patent Publication No. JP2004/121360 to Matsumura ("*Matsumura*") |
| Ex. 1007 | U.S. Pub. No. 2003/0069510 to Semler ("*Semler*") |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

## I.      CLAIMS FOR WHICH REEXAMINATION IS REQUIRED

Reexamination is requested for claims 1 to 12 of the '554 patent (the "Challenged Claims") of the '554 patent.  A copy of the '554 patent is enclosed as Ex. 1001.  Requestor is not aware of any certificate of correction or reexamination certificate for the '554 patent.  The Challenged Claims are anticipated or at least rendered obvious by prior art not relied upon during examination of the '554 patent, including the references in this request, U.S. Patent Publication No. 2009/0076363 to Bly et al. ("*Bly*"), U.S. Patent No. 8,214,007 to Baker et al. ("*Baker*"), and Japanese Patent Publication No. JP2004-121360 to Matsumura ("*Matsumura*").

## II.     OTHER PROCEEDINGS

The '554 patent is presently asserted in *Bardy Diagnostics, Inc. v. iRhythm Technologies, Inc.*, 1:24-cv-01355 (D. Del.  Dec. 10, 2024).

## III.    PAYMENT OF FEES

The appropriate fee for this Request for *ex parte* reexamination is included herewith.  Requestor does not believe that any additional fees are required. However, if any additional charges are due, Requestor hereby authorizes the fees be charged to Deposit Account 02-1818.

1

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

## IV.    TECHNOLOGY OF THE '554 PATENT

### A.    Technological Overview

The '554 patent provides an electronic device for long-term adhesion to a mammal.  Ex. 1001, Abstract.  Specifically, the device records signals from electrodes located on the device.  *Id.*, 2:12-11-13.  These signals are converted to digital signals and stored.  *Id.*, 2:18-24.  Such patient monitoring devices were known well before the priority of the '554 patent.

For example, adherent patient devices that collect patient data, such as electrocardiogram signals, and include exterior structures having a protective cover were well-known before May of 2010.  *See* Ex. 1003, ¶12.  Such patches commonly include an adhesive to adhere the device to the patient's skin.  *Id.*, ¶84.  Additionally, electrodes disposed on the bottom of the device sense patient data.  *Id.*, ¶57.

And, because the electrode-skin contacts are critical for proper signal acquisition, devices often include features to promote patient compliance and decrease stress forces on the adhesive.  For example, patient devices are configured to move with the skin of the patient in relation to the electronics.  *See, e.g.*, *id.*, ¶84 (explaining that the patient device includes a gap, which allows to the device to "conform to the skin and not be restricted by structures supported with the tape, for example rigid structures such as the printed circuitry board"), *see also id.*, ¶101 (detailing an air gap between the adhesive portion and the electronic module "to

2

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

provide patient comfort"). Accordingly, device electronics within a housing can move, or tilt, in relation to the adhesive layer that conforms to the patient's skin.

In the same example, the patient device includes a protective cover that supports the electrodes on the bottom surface and protects the electrical components. *Id.*, ¶72. To allow for long term monitoring, the device and the corresponding cover, adhesive, and electrical components, are specifically designed for long-term wear. *Id.*, ¶48. The devices further include various layers to provide additional support or enhance breathability to the skin. *Id.*, ¶¶76, 84-86, Figure 1J1.



*Id.*, Figure 1I1 (annotated).

### B.    The '554 Patent

The '554 patent issued from U.S. App. No. 18/936,888 on April 15, 2025. Ex. 1001 at Title Page. The '554 patent states that its technical field includes "devices worn on a body for monitoring, recording, reporting and/or treating the

3

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

person wearing the device." *Id.*, 1:39-43.  Structurally, the '554 patent describes a

device with an external housing, external patch strip, internal electrical circuit, and

various adhesive and polymeric layers.  *Id.*, 7:31-33, 13:66-14:14.  The patch

includes an adhesive to adhere the device to the user's skin and electrodes

"positioned on a bottom surface of the patch" to obtain physiological data.  *Id.*, 3:60-

62, 8:1-2.  Additionally, an external layer (i.e., the housing) surrounds the internal

contents of the device and the patch.  *Id.*, 7:31-46.  The device is designed with

"various flexible portions and/or hinged portions can compensate for stress[] caused

as the skin stretches or bends" such that the device "can provide long-term adhesion

to the skin."  *Id.*, 13:23-31.



Ex. 1001, Figure 1C (annotated).

4

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

### C.    Prosecution History

The '554 Patent was filed on November 4, 2024 with claim 1.  Ex. 1002, 347. On December 11, 2024, Applicant filed a preliminary amendment cancelling claim 1 and adding new claims 2 to 16.  Preliminary Amendment (Dec. 11, 2024), 2-3. The preliminary amendment mooted the non-final Office Action rejection that the examiner issued on December 20, 2024 regarding claim 1 only.  Non-Final Office Action (Dec. 20, 2024).  Applicant filed a terminal disclaimer on February 19, 2025, with respect to U.S. Patent No. 11,141,091.  Terminal Disclaimer (Feb. 19, 2025). Then, on March 9, 2025, the Patent Office issued a Notice of Allowance including an examiner's amendment, noting that Applicant approved the examiner's amendment during an interview.  Notice of Allowance (Mar. 9, 2025), 6.  The examiner's amendment amended the sole independent claim as follows:

"An electronic device for long-term adhesion to a user, the device comprising:

a housing comprising a physiologic data collection circuit, the housing positioned over a flexible layer extending <u>from beneath</u> ~~beyond~~ the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, wherein the flexible layer comprises [[an]] <u>a polymer</u> upper layer overlying an electrical connection, the electrical connection extending <u>linearly</u> from the physiologic data collection circuit to the electrode <u>when viewed from above the electronic device</u>, the <u>polymer</u> upper layer adhered to a <u>polymer</u> lower layer underlying the electrical connection;

5

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

> a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer; and
>
> a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user."

Notice of Allowance (Mar. 9, 2025), 6-7. The Patent Office stated that "[t]he closest prior art of record does not disclose nor render obvious the presently claimed invention. The prior art of record is silent on the flexible layer being made of two layers (upper and lower layers), its composition (polymers), and where everything is located on the overall electronic device with respect to the other components. Each of the layers and components were well-known individually at the time of invention, however, the total combination of elements would not have been assembled as claimed (above) without the express use of the Applicant's original disclosure as a blueprint for doing so." Notice of Allowance (Mar. 9, 2025), 8.

However, as set forth herein, the polymer upper and polymer lower layers with the electrical connection between the adhesive layers, and the claimed patch as a whole, are nothing more than routine and well-understood structural components that have been used in patient-adhesive devices. The references relied upon in this paper present evidence that further confirm that the claimed electronic device for long-term adhesion to a user configuration is well-known in the art.

6

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

## V.    LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art ("POSITA") is a hypothetical person who is presumed to know the relevant prior art and has ordinary creativity when interpreting and combining prior art.  *In re Coutts*, 726 F. App'x 791, 796 (Fed. Cir. 2018); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420-21 (2007).

With respect to the '554 patent, a POSITA, as of May 2010, had, among other attributes, a bachelor's degree in electrical engineering, electrophysiology, biomedical engineering, or an equivalent degree, and at least two to three years of experience designing wearable monitors that detect physiological signals with mechanical and/or electrical elements.  Additional experience may substitute for education and vice versa.  Such a POSITA would have had knowledge of design considerations known in the industry and would have been familiar with then-existing products and solutions.

## VI.    CLAIM CONSTRUCTION

During a reexamination proceeding, claims must be interpreted according to the "broadest reasonable interpretation" standard (the "BRI standard").  *In re NTP, Inc.*, 654 F.3d 1268, 1374-75, 99 U.S.P.Q.2d 1500 (Fed. Cir. 2011).  The Federal Circuit explains that "[t]he broadest reasonable interpretation of a claim term may be the same as or broader than the construction of a term under the *Phillips*

7

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554

standard." *Facebook, Inc. v. Pragmatus AV, LLC*, 582 F. App'x 864, 869 (Fed. Cir. 2014) (non-precedential).

The analysis presented below renders the Challenged Claims anticipated or at least obvious under ***any*** claim construction that might be applied as the broadest reasonable interpretation of the claim terms.

## VII. IDENTIFICATION OF PATENTS AND PRINTED PUBLICATIONS THAT PROVIDE SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY

This Request for Reexamination of claims 1 to 12 of the '554 patent is based on substantial new questions of patentability as summarized above and set forth below in detail. The prior art cited herein was not relied upon to reject the claims of the '554 patent during prosecution.

Under 35 U.S.C. § 303, the director determines whether a request for reexamination raises a "substantial new question of patentability." "The existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office." *Id.*; *see also In re Swanson*, 540 F.3d 1368, 1380 (Fed. Cir. 2008) ("[A] reference may present a substantial new question even if the examiner considered or cited a reference for one purpose in earlier proceedings.").

8

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

Requestor submits that Grounds I, II, and III, identified below, based on the relied-on references as identified in the chart, raise substantial new questions of patentability of the '554 patent.

| Ground | Challenged Claims | Basis | Prior Art |
|--------|-------------------|-------|-----------|
| I | 1 to 12 | §103 | *Bly* |
| II | 1 to 12 | §103 | *Bly* in view of *Baker* |
| III | 1 | §102/§103 | *Matsumura* |

### A.    Substantial New Questions of Patentability

A substantial new question of patentability exists when the prior art "presents a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the application that resulted in the patent for which reexamination is requested."  M.P.E.P.  § 2216.  As shown below, the prior art relied upon by Requestor teaches each element of the challenged claims.

Additionally, the law requires a "common sense" approach to examining whether the claimed invention is obvious to a person skilled in the art.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419-22 (2007).  "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."  *Id.*, 416.  For example, when "there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

solutions," those circumstances tend to support the conclusion that a person of ordinary skill will have "good reason to pursue the known options within his or her technical grasp." *Id.*, 421.  Finally, claims of a patent are obvious if they are a rearrangement of known features that perform as expected.  *Id.*, 420-21.

While certain family members of the *Bly* reference used herein were submitted to the USPTO during prosecution of the '554 patent, neither *Bly* nor any family members of *Bly* were used in an actual rejection.  Moreover, the family members were submitted in Information Disclosure Statements with over one thousand other references.  *See, e.g.*, Ex. 1002, 1546 (submitting a family member of *Bly*, U.S. Patent No. 8,795,174, within a list of 1,100 references, Cite No. 319).  Given the volume of references submitted, it is not surprising that the relevance of *Bly* to the patentability was overlooked.  Indeed, it is proper to rely on references cited during prosecution when, as here, there is a demonstrated applicability of the reference to the patentability of the claims, thereby establishing a substantial new question of patentability.  *See In re Swanson*, 540 F.3d 1368, 1375-76 (2008); *see also Ecto World, LLC v. RAI Strategic Holdings, Inc*, IPR2024-01280, Paper 13 at *7 (P.T.A.B. May 19, 2025) (precedential) (indicating that 325(d) may not apply where "the IDS that includes the asserted prior art contains over 1,000 references, which is over 40 times the size of a typical IDS").

10

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

During prosecution of the '554 Patent, Applicant submitted *Baker*; however, neither *Baker* nor any family members were used in an actual rejection. Also, *Baker* (like *Bly*) was submitted in a thirty-five page Information Disclosure Statements with over 1,000 other references. *See, e.g.*, Ex. 1002 at 1544 (submitting *Baker* within a list of 1,110 references, Cite No. 253). Again, given the volume of references submitted, it is not surprising that the relevance of *Baker* to the patentability of the '554 patent was overlooked. It is proper to rely on references cited during prosecution when there is a demonstrated applicability of the reference to the patentability of the claims, thereby establishing a substantial new question of patentability. *See In re Swanson*, 540 F.3d at 1375-76.

The English translation of *Matsumura* was not cited, and therefore not relied on, during prosecution of the '554 patent. Only the Japanese language version was cited in an IDS of over 1,000 other references, and never used in an actual rejection. *See, e.g.*, Ex. 1002 at 1569 (submitting *Baker* within a list of 1,110 references, Cite No. 956). Like with *Bly* and *Baker* above, it is not surprising that the relevance of *Matsumura* to the patentability of the '554 patent was overlooked given the large volume of references submitted, and given that the applicant never submitted a certified English translation of *Matsumura* to the USPTO. It is proper to rely on references cited during prosecution when there is a demonstrated applicability of the

11

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

reference to the patentability of the claims, thereby establishing a substantial new

question of patentability.  *See In re Swanson*, 540 F.3d at 1375-76.

## VIII.  GROUND I

### A.    Overview of *Bly*

*Bly* was filed as a non-provisional application on September 12, 2008, which

stemmed from two provisional applications filed September 14, 2007, and May 23,

2008.  Ex. 1003 at Title Page.  *Bly* published as U.S. Patent Application Publication

No. 2009/0076363 on March 19, 2009.  *Id.*  Thus, the publication of *Bly* is prior art

to the '554 patent, which has a claimed priority date of May 12, 2010, under 35

U.S.C.  § 102(b).  Ex. 1001 at page 2 (noting the priority date for the '554 patent).

References within the statutory terms of 35 U.S.C.A.  § 102 qualify as prior

art for an obviousness determination only when analogous to the claimed invention.

*See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).  Two separate tests define the

scope of analogous prior art: (1) whether the art is from the same field of endeavor,

regardless of the problem addressed, and (2) if the reference is not within the field

of the inventor's endeavor, whether the reference is reasonably pertinent to the

particular problem with which the inventor is involved.  *Id.*

*Bly* is from the same field of endeavor as the '554 patent:  extended-wear,

body-worn monitoring devices. Ex. 1001 at 1:40-46; Ex. 1003, ¶5.  Both references

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

describe devices that adhere to a patient for long term patient monitoring.  Ex. 1001

at Title Page; Ex. 1003 at Title Page.

*Bly* is also directed to a problem facing the inventors of the '554 patent.

Specifically, *Bly* describes an adherent monitoring device, which provides enhanced

comfort to the patient.  *Id.*, ¶8 ("In at least some instances, devices that are worn by

the patient may be somewhat uncomfortable, which may lead to patients not wearing

the devices and not complying with direction from the health care provider, such

that data collection may be less than ideal.").  Similarly, the '554 patent provides a

device to "withstand longer-term adhesion[,] [recognizing] there is a need to

implement device features and design elements that have the ability to enhance the

likelihood of adhesion of a device to a human body for 24 hours or more."  Ex. 1001

at 1:64-2:5.  *Bly's* patient monitoring system is shown in Figure 1A below.



FIG. 1A

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

Exhibit 1003, Figure 1A.

The device includes adherent patch 110 with breathable tape 110T and gel cover 180. Ex. 1003, ¶¶12-22, Figure 1J1. Moreover, *Bly's* system includes cover 162, which serves to "protect the electronic components, and … the electronics housing 160." *Id.*, ¶172. The "[p]atient side 110A comprises adhesive 116A to adhere the patch 110 and adherent device 100 to patient P. Electrodes 112A, 112B, 112C and 112D are affixed to adherent patch 110." *Id.*, ¶57.



Ex. 1003, Figure 1J1 (annotated).

To ensure a proper connection between the adhesive layer and the skin of the patient, *Bly's* device includes a gap that extends between the breathable tape (i.e., the polymer lower layer in annotated Figure 1J1) and printed circuit board 120. *Id.*, ¶15. This gap "allow[s] the tape to adhered to the body to conform to the skin and

14

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

not be restricted by structures supported with the tape, for example rigid structures

such as the printed circuitry board." *Id.* Additionally, the gap allows the rigid

structure to move in relation to the adhesive portion, which increases patient

comfort. *Id.*, ¶101. In reference to Figure 1I1, *Bly* explains that "[a]ir gap 169 allows

adherent patch 110 and breathable tape 110T to remain supple and move, for

example bend, with the skin of the patient with minimal flexing and/or bending of

printed circuit board 120 and electronic components 130." *Id.*, Figure 1I1,

reproduced below, identifies air gap 169 as the yellow layer.



Ex. 1003, Figure 1I1 (annotated).

### B. *Bly* Renders Claims 1–12 Obvious

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| **1[pre].** An electronic device for long-term adhesion to a user, the device comprising: | *Bly* discloses an electronic device for long-term adhesion to a user.<br><br>For example, *Bly's* disclosure "may be applicable to many applications in which physiological monitoring and/or therapy is used for ***extended periods***, for example wireless ***physiological monitoring for extended periods***." Ex. 1003, ¶5.<br><br>In particular, *Bly* discloses a "patch configured for patient comfort, such that the patch can be ***worn and/or tolerated by*** |

15

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | *the patient for extended periods, for example 90 days or more*. The patch may be *worn continuously for at least seven days, for example 14 days*, and then replaced with another patch." *Id.*, ¶48.<br><br>Figure 1A shows that "[a]dherent device 100 can be *adhered to a patient* P at many locations, for example thorax T of patient P." *Id.*, ¶49.<br><br><br><br>Ex. 1003, Figure 1A (annotated). |
| **1[a].** a housing comprising a physiologic data collection circuit, | *Bly* discloses an electronic device for long-term adhesion that includes a housing comprising a physiologic data collection circuit.<br><br>For example, *Bly* discloses "the adherent device comprises an *electronics housing* adhered to at least one of the electronics components or the printed circuit board, such that the electronics housing is disposed between the cover and electronics components. The electronics housing may comprise a waterproof encapsulant to protect the printed circuit board and the electronic components from moisture and/or mechanical forces." Ex. 1003, ¶21.<br><br>The "electronics housing 160 may comprise a water proof material, for example a sealant adhesive such as epoxy or silicone coated over the electronics components and/or PCB." *Id.*, ¶72. |

16

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
|  | Specifically, "[i]n many embodiments, an electronics housing 160 may be disposed under cover 162 to protect the electronic components, and in some embodiments electronics housing 160 may comprise an encapsulant over the electronic components and PCB." *Id.*, ¶72. |
|  |   *Id.*, Figure 1J (annotated). |
|  | For example, as shown in Figure 1D, "[e]lectronic components 130 can be connected to flex PCB 120 and/or mounted thereon. In some embodiments, electronic components 130 can be mounted on the additional PCB's [120A, 120B, 120C, 120D]. Electronic components 130 comprise components to ***take physiologic measurements***, transmit data to remote center 106 and receive commands from remote center 106." *Id.*, ¶¶59-60. |
|  |   *Id.*, Figure 1D (annotated). |
|  | *Bly* discloses the electronics housing 160 comprising the electronic components 130 and further discloses "the electrodes are connected to the PCB with a flex connection, for |

17

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | example trace 123A of flex PCB 120, so as to provide strain relive between the electrodes 112A, 112B, 112C and 112D and the PCB." *Id.*, ¶91; *see also id.*, Figure 1D.<br><br>*Bly* also discloses "ECG circuitry 138 can generate electrocardiogram signals and data from two or more of electrodes 112A, 112B, 112C and 112D in many ways." *Id.*, ¶70; *see also id.*, Figure 1D.<br><br>Accordingly, *Bly* discloses a housing 160 comprising electronic components 130, as well as various circuits for collecting physiological data.<br><br><br>FIG. 1I<br><br>*Id.*, Figure 1I. |
| **1[b].** the housing positioned over a flexible layer extending from beneath the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, | *Bly* discloses the housing positioned over a flexible layer extending from beneath the housing.<br><br>For example, Figure 1J illustrates housing 160 positioned over patch 110. Patch 110 is a flexible layer extending from beneath the housing.<br><br><br>FIG. 1J<br><br>Ex. 1003, Figure 1J (annotated). |

18

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | *Bly* explains that "adhesive 116B is configured such that adherent patch 110 and cover 162 can be breathable from the skin to above cover 162 and so as to allow moisture vapor and air to travel from the skin to outside cover 162. In many embodiments, adhesive 116B is applied in a pattern on adherent patch 110 such that ***the patch and cover can be flexible*** so as to avoid detachment with body movement." *Id.*, ¶106.  Furthermore, *Bly* discloses that patch 110 extends from beneath the housing 160.  *See, e.g.*, *id.*, Figure 1G. <br><br>  <br> Ex. 1003, Figure 1G. <br><br> *Bly* further discloses that the flexible layer comprises an electrode positioned on the bottom of the flexible layer. <br><br> "FIG. 1B shows a bottom view of adherent device 100 as in FIG. 1A comprising an adherent patch 110. Adherent patch 110 comprises a first side, or a lower side 110A, that is oriented toward the skin of the patient when placed on the patient.  In many embodiments, adherent patch 110 comprises a tape 110T which is a material, preferably breathable, with an adhesive 116A. Patient side 110A comprises adhesive 116A to adhere the patch 110 and adherent device 100 to patient P. Electrodes 112A, 112B, 112C and 112D are affixed to adherent patch 110. In many embodiments, at least four electrodes are attached to the patch, for example six electrodes." *Id.*, ¶57. <br><br>  |

19

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | *Id.*, Figure 1B. |
| | Finally, *Bly* includes electrodes positioned on the bottom of the flexible layer at a position distal from the housing. For example, *Bly* explains that "ECG circuitry 138 can be connected to electrodes 112A and 112D so as to ***increase spacing*** of the electrodes. The inner electrodes may be positioned near the outer electrodes to increase the voltage of the ECG signal measured by ECG circuitry 138." *Id.*, ¶70. |
| | Moreover, "the two inside electrodes [112B, 112C] may comprise force, or current electrodes, with a center to center spacing [of] about 50 mm," and "the two outside electrodes may comprise measurement electrodes, for example voltage electrodes, and a center-center spacing between adjacent voltage and current electrodes is … about 35 mm." *Id.*, ¶80. |
| | *Bly* discloses that cover 162 may be 4 inches in length. *Id.*, ¶99. As a result, electronics housing 160 may have a length shorter than 4 inches because the "electronics housing 160 may be disposed under cover 162." *Id.*, ¶72. Based on the spacing measurements and dimensions disclosed in *Bly*, the two outer electrodes (112A, 112D) must be located distal to electronics housing 162. In such embodiment, the outer electrodes of *Bly* would be positioned on the bottom of the flexible layer distal from the housing. |
| | To the extent not expressly disclosed by *Bly*, the measurements provided by *Bly* would at least render obvious the distal limitation under the broadest reasonable interpretation of the electrode being located "distal from the housing." For example, a POSITA would understand that the goal to "increase the voltage of the ECG signal measured by ECG circuitry 138" (*Id.*, ¶70) would motivate a POSITA to position the electrodes away from the housing, confirmed by the stated goal of "increase[ing the] spacing of the electrodes." *Id.* |
| **1[c].** wherein the flexible layer comprises a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the | *Bly* discloses a flexible layer comprising a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection. |

20

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection; | As introduced regarding claim element 1[b], *Bly* provides a housing positioned over a flexible layer, which extends from the housing.  In reference to Figure 1J1, the patch is the flexible layer and gel cover 180 is the polymer upper layer overlying an electrical connection.<br><br>First, *Bly* discloses that get cover 180 is a polymer upper layer.  "A gel cover 180, or gel cover layer, for example a polyurethane non-woven tape, can be positioned over patch 110 comprising the breathable tape."  *Id.*, ¶85.<br><br>"Gel cover 180 may comprise at least one of a polyurethane, polyethylene, polyolefin, rayon, PVC, silicone, non-woven material, foam, or a film.  In many embodiments gel cover 180 may comprise an adhesive, for example a acrylate pressure sensitive adhesive, to adhere the gel cover to adherent patch 110.  In specific embodiments gel cover 180 may comprise a polyurethane film with acrylate pressure sensitive adhesive." *Id.,* ¶87.<br><br><br><br>Ex. 1003, Figure 1J1 (annotated).<br><br>The gel cover (i.e., the polymer upper layer) adheres to a breathable tape.  "[G]el cover 180 may comprise an adhesive, for example a acrylate pressure sensitive adhesive, to adhere the gel cover to adherent patch 110." *Id.*, ¶87.  *Bly's* breathable tape is a polymer lower layer that underlies the electrical connection.  "In many embodiments, adherent patch 110 may comprise a layer of breathable tape 110T, for example a known breathable tape, such as tricot-knit polyester fabric.  In many embodiments, breathable tape 110T comprises a backing material, or backing 111, with an adhesive." *Id.*, ¶81.  As |

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | shown in Figure 1J1 above, connector 122A is positioned below gel cover 180 but above breathable tape 111.  *Id.*, Figure 1J1 (annotated). <br><br> Additionally, *Bly* discloses that "printed circuit board (PCB), for example flex printed circuit board 120, may be connected to electrodes 112A, 112B, 112C and 112D with connectors 122A, 122B, 122C and 122D.  Flex printed circuit board 120 can include traces 123A, 123B, 123C and 123D that extend to connectors 122A, 122B, 122C and 122D, respectively, on the flex printed circuit board."  *Id.*, ¶59; *see id.*, Figure 1J1 (annotated below). <br><br> As an example, *Bly* discloses that "electrodes 112A1, 112B1, 112C1 and 112D1 can be printed on a flexible connector 112F, such as silver ink on polyurethane…. ***The flexible connector 112F comprising the electrodes can extend from under the gel cover [180] to the printed circuit board to connect to the printed circuit boards and/or components supported thereon.***" *Id.*, ¶78. <br><br>  <br><br> *Id.*, Figure 1J1 (annotated). |
| **1[d].**  a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer; and | *Bly* discloses a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer. <br><br> For example, *Bly* discloses an adherent device comprising "a gel cover positioned over the breathable tape[.]"  Ex. 1003, ¶22. |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
|  | Gel cover 180 may be made of "at least one of a polyurethane, polyethylene, polyolefin, rayon, PVC, silicone, non-woven material, foam, or a film." *Id.*, ¶87.<br><br>Further, gel cover 180, annotated in blue, "***may comprise an adhesive, for example a acrylate pressure sensitive adhesive, to adhere the gel cover to adherent patch 110***" (adherent patch 110 which may comprise breathable tape 110T are annotated in orange). *Id.*, ¶87.<br><br><br><br>*Id.*, Figure 1J1 (annotated).<br><br>Accordingly, in this example, gel cover's 180 adhesive coating that connects gel cover 180 to adherent patch 110 is the connecting adhesive layer.<br><br>As another example, "[a]dherent patch 100 comprises a second side, or upper side 110B," and "[a]n adhesive 116B can be applied to upper side 110B to adhere structures, for example a breathable cover, to the patch such that the patch can support the electronics and other structures when the patch is adhered to the patient." *Id.*, ¶58. |

23

## REQUEST FOR EX PARTE REEXAMINATION OF
## U.S. PATENT NO. 12,274,554

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| |  |

<div align="center">

*Id.*, Figure 1I (annotated).

</div>

*Bly* discloses "adhesive 116B is coated on upper side 110A of adherent patch 110B, such that the electronics module can be adhered to and/or separated from the adhesive component." *Id.*, ¶109.

<div align="right">

*Id.*, Figure 1C (annotated).

</div>

Accordingly, in this second example, adhesive 116B (yellow) is the connecting adhesive layer positioned under gel cover 180 (blue) (i.e., polymer upper layer) and on top of a lower layer of the adherent patch 110 (i.e., polymer lower layer) and adhering gel cover 180 to adherent patch 110.

<div align="center">

24

</div>

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**



| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | *Id.*, Figure 1J1 (annotated). |
| **1[e].** a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user. | *Bly* discloses a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user.<br><br>For example, *Bly* discloses "an adhesive 116A, for example breathable tape adhesive comprising a layer of acrylate pressure sensitive adhesive, can be disposed on underside 110A of patch 110." Ex. 1003, ¶84.<br><br>*Id.*, Figure 1B (annotated).<br><br>The "adhesive 116A adheres adherent patch 110 comprising backing 111 to the skin of the patient[.]" *Id.*<br><br>Specifically, "[a]dherent patch 110 comprises a first side, or a lower side 110A, that is oriented toward the skin of the patient when placed on the patient. In many embodiments, adherent |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | patch 110 comprises a tape 110T which is a material, preferably breathable, with an adhesive 116A. ***Patient side 110A comprises adhesive 116A to adhere the patch 110 and adherent device 100 to patient P***." *Id.,* ¶57.<br><br><br><br>*Id.*, Figure 1I (annotated).<br><br><br><br>*Id.*, Figure 1A (annotated). |
| **2.** The electronic device of claim 1, further comprising a flap extending beneath the housing. | *Bly* discloses a flap extending beneath the housing.<br><br>For example, *Bly* discloses that "adherent patch 110 stretches and/or retracts with the skin of the patient." Ex. 1003, ¶95.<br><br>*Bly* specifies that "[e]lectronics components 130, printed circuit board 120, and electronics housing 160 are disposed between the stretchable breathable material of adherent patch 110 and the stretchable breathable material of cover 160 so as to allow the adherent patch 110 and cover 160 to stretch together while electronics components 130, printed circuit |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | board 120, and electronics housing 160 do not stretch substantially, if at all." *Id.*, ¶100.<br><br>As shown in Figures 1G, 1I, for example, adherent patch 110 extends beneath the electronics housing 160 and forms flaps (annotated in red) that are integral with the lateral edges of adherent patch 110.<br><br><br>*Id.*, Figure 1G (annotated).<br><br><br>*Id.*, Figure 1I (annotated).<br><br>*Bly* discloses that the patch is made of a thin, flexible material. For example, the "adhesive patch may comprise a ***thin, flexible, breathable*** patch[.]" *Id.*, ¶111.<br><br>Further, "[t]he breathable cover 162 and adherent patch 110 comprise breathable tape….    The breathable tape may comprise the ***stretchable breathable material*** with the adhesive …, such that both the adherent patch and cover can stretch with the skin of the patient." *Id.*, ¶94. |

27

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | The portion(s) of the adherent patch that extend wider and below the housing is a "flap" as recited in claim 2. The adherent patch is a thin material with freedom to stretch and flex. The patch is also connected to a larger body, which allows it to serve as an extension of the device with the ability to bend and flex due to the material. Thus, *Bly* discloses a flap under the broadest reasonable interpretation of this claim element.<br><br>In another example, *Bly* states that "the patch comprises two electrodes, for example two electrodes to measure the electrocardiogram (ECG) of the patient. Gel 114A, gel 114B, gel 114C and gel 114D can each be positioned over electrodes 112A, 112B, 112C and 112D, respectively, to provide electrical conductivity between the electrodes and the skin of the patient." Ex. 1003, ¶57. In this example embodiment, the gel is a flap that extends beneath the housing. *See id.*, Figure 1J.<br><br><br><br>Ex. 1003, Figure 1J.<br><br><br><br>Ex. 1003, Figure 1I. |
| **3.** The electronic device of claim 1, wherein the housing is rigid. | *Bly* discloses a rigid housing.<br><br>Additionally, *Bly* states that "the electronics layer may be encapsulated in electronics housing 160. Electronics housing |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | 160 may comprise an encapsulant, such as a dip coating, which may comprise a waterproof material, for example silicone and/or epoxy. In many embodiments, the PCB encapsulant protects the PCB and/or electronic components from moisture and/or mechanical forces. The encapsulant may comprise silicone, epoxy, other adhesives and/or sealants. In some embodiments, the electronics housing may comprising ***metal and/or plastic housing*** and potted with aforementioned sealants and/or adhesives." Ex. 1003, ¶90. In the disclosed embodiment of *Bly*, the plastic and metal materials used to construct the housing "to protect the printed circuit board and the electronic components from … mechanical forces" would be understood to be a rigid material in order to accomplish the stated protection. *Id.*, ¶21. This is confirmed by the fact it was well known to rely on rigid housings to protect components in long-term monitors. *See, e.g.* Ex. 1005, ¶2 (disclosing "a "HEARTCARD™ monitor [that] is intended for long-term use, and thus is enclosed in a durable ***rigid housing***, []provided with long-life batteries..."). In yet another example, figure 4B of *Matsumura* discloses the housing of the signal processor 10 sinking into the first sheet 1 (*see* reference numeral 10b). Ex. 1005, Figure 4b. To allow for such function, *Matsumura*'s housing is more rigid than the insulating material of the first sheet 1 into which the housing is pressed. *See id.*, ¶17-18.<br><br>Specifically, "FIG. 1F shows a top view of a cover 162 over the batteries, electronic components and flex printed circuit board as in FIGS. 1A to 1E. In many embodiments, an electronics housing 160 may be disposed under cover 162 to protect the electronic components, and in some embodiments electronics housing 160 may comprise an encapsulant over the electronic components and PCB. In some embodiments, cover 162 can be adhered to adherent patch 110 with an adhesive 164 on an underside of cover 162. In many embodiments, electronics housing 160 may comprise a water proof material, for example a sealant adhesive such as epoxy or silicone coated over the electronics components and/or PCB. In some embodiments electronics housing 160 ***may comprise metal and/or plastic***. Metal or plastic may be potted with a material such as epoxy or silicone." Ex. 1003, ¶72. |
| **4.** The electronic device of claim 1, wherein the housing | *Bly* discloses a housing configured to remain connected to the flexible layer when the housing is tilted at an angle relative the lower adhesive layer in response to movement of the user. |

29

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| is configured to remain connected to the flexible layer when the housing is tilted at an angle relative the lower adhesive layer in response to movement of the user. | For example, *Bly* states that "the electrodes can be connected to the PCB and/or electronics module with a flex PCB 120, such that the electrodes and adherent patch can move independently from the PCB module." Ex. 1003, ¶91.<br><br>Further, *Bly* discloses "cover 162 can attach the PCB module to adherent patch 110 with cover 162, so as to avoid interaction of adherent patch 110C with the PCB having the electronics mounted therein." *Id.*, ¶105.<br><br>A POSITA would have understood that air gap 169 allows housing 160 to tilt at an angle relative to the lower adhesive layer 116A in response to movement of the user. For example, device 100 adheres to a patient via adhesive layer 116A. If the patient's skin moves in an upward direction (e.g., in the upward direction of arrow 186 in the below figure), the height of air gap 169 decreases because printed circuit board 120 tilts. Thus, air gap 169 allows the printed circuit board 120 and electronic components 130 to move independently of adherent patch 110 (and adhesive layer 116). As *Bly* explains, this allows the patch to move with the patient's skin for patient comfort. For added clarity, an additionally zoomed in view of annotated Figure 1I is provided below.<br><br>Specifically, *Bly* explains that "[a]ir gap 169 may extend from adherent patch 110 to the electronics module and/or PCB, so as to provide patient comfort. Air gap 169 allows adherent patch 110 and breathable tape 110T to remain supple and move, for example bend, with the skin of the patient with minimal flexing and/or bending of printed circuit board 120 and electronic components 130, as indicated by arrows 186" in Figure 1I. Ex. 1003, ¶101.<br><br><br>FIG. 1I |

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | *Id.*, Figure 1I (annotated).<br><br>In reference to Figure 1I, as indicated by red arrows in Figure 1I above, electronics housing 160 is configured to remain connected to the adherent patch 110 (e.g., flexible layer) when the electronic housing (e.g., housing) and adhesive 116A (e.g., lower adhesive layer) are flexed or bent (e.g., tilted) relative to each other.<br><br>The electronics housing 160 (e.g., housing) is "adhered to at least one of the electronics components or the printed circuit board, such that the electronics housing is disposed between the cover and electronics components." *Id.*, ¶21. "Cover 162 [e.g., electrode-supporting section] can be attached to [] electronics housing 160 comprising over the encapsulated [printed circuit board]." *Id.*, ¶105. Moreover, the device includes "[c]onnectors 122A, 122B, 122C and 122D [] positioned on flex printed circuit board 120[.]" *Id.*, ¶59.<br><br>Figure 1I discloses the configuration of these elements and the air gap (annotated in green).<br><br><br>FIG. 1I<br><br>*Id.*, Figure 1I (annotated). |

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | <br>*Id.*, Figure 1I (annotated).<br><br>In reference to Figure 1I, movement of the user may cause 116A to move upward, decreasing the space of air gap 169, while the printed circuit board 120 and electronic components 130 independently move, which a POSITA would understand to render obvious the claimed "tilting" limitation.<br><br>Thus, the housing, electronics, and PCB are balanced on the connector 122A, which acts as a central balancing point. The air gap below allows the housing, electronics, and PCB freedom to move because nothing is blocking or resisting the motion. Thus, when a user wearing the device moves, the adherent device's center of mass will also shift and cause housing to tilt at an angle. In other words, the configuration of the device causes the housing to behave like a seesaw and tilt at an angle relative to the adhesive 116A (e.g., lower adhesive layer) in response to movement of the user.<br><br>Thus, when the device is moved based on a user's movement, the air gap 169 allows the housing and electronic components to "remain supple and move, for example bend, with the skin of the patient." *Id.*, ¶101. Movement of the patient will create slight shifts in the center of mass of the device, which will cause the housing to adjust at various angles as allowed by the air gap 169. |
| **5.** The electronic device of claim 1, further comprising a | *Bly* discloses the electronic device of claim 1, further comprising a hinge portion adjacent the housing. |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| hinge portion adjacent the housing. | *See* claim 4, which is incorporated by reference herein. As described in reference to claim element 4, *Bly's* device includes an air gap, which allows the housing to tilt at an angle relative to the lower adhesive layer in response to movement of the user. To provide such function, *Bly* further discloses a "hinge portion adjacent the housing" under the broadest reasonable interpretation of this claim element. <br><br> For example, as shown in Figure 1I1, *Bly* discloses a flexible connector 122A to provide strain relief. Ex. 1003, ¶78, Figure 1I1 (annotated), Figure 1I. <br><br>  <br><br> Ex. 1003, Figure 1I1 (annotated). <br><br> A POSITA would have understood that the housing, printed circuit board, and electronic components pivot via connector 122A when the described motion occurs. As described in reference to claim element 1[e], air gap 169 disposed below these elements allow the same to tilt in response to the lower to adhesive layer 116A moving with the skin of the patient. *See, e.g., id.*, ¶101 ("Air gap 169 allows adherent patch 110 and breathable tape 110T to remain supple and move, for example bend, with the skin of the patient with minimal flexing and/or bending of printed circuit board 120 and electronic components 130, as indicated by arrows 186."). |
| **6.** The electronic device of claim 1, wherein the lower adhesive layer comprises a hydrocolloid adhesive. | *Bly* discloses the lower adhesive layer comprising a hydrocolloid adhesive. <br><br> Specifically, *Bly* discloses "In many embodiments, ***adhesive 116A comprises*** at least one of acrylate, silicone, synthetic rubber, synthetic resin, ***hydrocolloid adhesive***, pressure sensitive adhesive (PSA), or acrylate pressure sensitive adhesive." <br><br> Further, adhesive 116A "can be disposed on underside 110A of patch 110." Thus, *Bly* discloses that the lower adhesive layer (adhesive 116A) comprises a hydrocolloid adhesive. |

33

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | |
| **7.** The electronic device of claim 1, wherein the physiologic data collection circuit is configured to collect cardiac rhythm data from the user. | *Bly* discloses the physiologic data collection circuit configured to collect cardiac rhythm data from the user.<br><br>Specifically, *Bly* discloses that "[e]lectronic components 130 comprise components to take physiologic measurements, transmit data to remote center 106 and receive commands from remote center 106." Ex. 1003, ¶60.<br><br>Further, "[e]lectronics components 130 comprise an activity sensor and activity circuitry 134, impedance circuitry 136 and ***electrocardiogram circuitry, for example ECG circuitry 136***." Ex. 1003, ¶60.<br><br>"System 10 can perform the following functions: initiation, programming, measuring, storing, analyzing, communicating, predicting, and displaying. The adherent device may contain a subset of the following physiological sensors: bioimpedance, respiration, respiration rate variability, heart rate (ave, min, max), ***heart rhythm***, hear rate variability (hereinafter "HRV"), heart rate turbulence (hereinafter "HRT"), heart sounds (e.g. S3), respiratory sounds, blood pressure, activity, posture, wake/sleep, orthopnea, temperature/heat flux, and weight." *Id.*, ¶54. |
| **8.** The electronic device of claim 1, wherein the polymer upper layer extends horizontally away from the housing beyond a boundary of the electrode. | *Bly* discloses the polymer upper layer extending horizontally away from the housing beyond a boundary of the electrode. *See* claim limitation 1[c].<br><br>*Bly* discloses "[a]n edge of the gel cover may extend from about 5 to about 15 mm beyond an edge of a gel over the at least one electrode." Ex. 1003, ¶22.<br><br>As shown in Figure 1J1, *Bly's* gel cover 180 (blue) (e.g., polymer upper layer) extends horizontally away from the electronics housing 160 (red) and beyond a boundary of the electrodes 112A1, 112A2, 112A3, 112A4. |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| |  *Id.*, Figure 1J1 (annotated). |
| **9.** The electronic device of claim 1, further comprising an upper adhesive layer positioned over the polymer upper layer. | *Bly* discloses an upper adhesive layer positioned over the polymer upper layer. For example, *Bly* discloses "cover 162 can be adhered to adherent patch 110 with an adhesive 164 on an underside of cover 162." Ex. 1003, ¶72. As shown in Figure 1J, cover 162 (green) is positioned over gel cover 180 (blue) (e.g., polymer upper layer), and therefore adhesive 164 (not shown) on the underside of cover 162 is also positioned over gel cover 180. *Id.*, Figure 1J1 (annotated). |

35

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | |
| **10.** The electronic device of claim 9, wherein the upper adhesive layer is positioned above the electrode. | *Bly* discloses the upper adhesive layer positioned above the electrode.<br><br>For example, *Bly* discloses "cover 162 can be adhered to adherent patch 110 with an adhesive 164 on an underside of cover 162." Ex. 1003, ¶72.<br><br>As shown in Figure 1J, cover 162 (green) is positioned above electrodes 112A1, 112A2, 112A3, 112A4, and therefore adhesive 164 (not shown) on the underside of cover 162 is also positioned above gel cover 180.<br><br><br><br>*Id.*, Figure 1J1 (annotated). |
| **11.** The electronic device of claim 10, wherein the upper adhesive layer extends horizontally away from the housing beyond a boundary of the polymer upper layer. | *Bly* discloses the upper adhesive layer extending horizontally away from the housing beyond a boundary of the polymer upper layer.<br><br>For example, *Bly* discloses "cover 162 can be adhered to adherent patch 110 with an adhesive 164 on an underside of cover 162." Ex. 1003, ¶72.<br><br>As shown in Figure 1J, cover 162 (green) is positioned over gel cover 180 (blue) (e.g., polymer upper layer) and extends horizontally away from a boundary of gel cover 180. Therefore, adhesive 164 (not shown) on the underside of cover |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
|  | 162 also extends horizontally beyond a boundary of gel cover 180.<br><br><br><br>*Id.*, Figure 1J1 (annotated).<br><br>Further, "the edge of the cover [162] may be adhered at the edge of the adherent patch [110]." *Id.*, ¶107. Thus, the cover 162 extends as far as the edge of the adherent patch 110, which means it extends beyond a boundary of gel cover 180 (e.g., polymer upper layer). |
| **12.** The electronic device of claim 1, wherein the lower adhesive layer extends at least partially below the housing. | *Bly* discloses the lower adhesive layer extending at least partially below the housing.<br><br>For example, *Bly's* adherent patch 110 includes a "lower side 110A" further including tape 110T, or adhesive 116A (e.g., lower adhesive layer). Ex. 1003, ¶57.<br><br>As shown in Figure 1I, adhesive 116A (green) extends at least partially below the housing (red).<br><br> |

37

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | *Id.*, Figure 1I (annotated). |

## IX.    GROUND II

To the extent the claims 1 to 12 of the '554 patent are not rendered obvious

by *Bly* alone, the combination of *Baker* with the above identified teachings of *Bly*

render obvious claims 1 to 12.  As set forth below, a POSITA would have been

motivated to modify *Bly* in view of *Baker* to accomplish the goals of *Bly* as it relates

to increased spacing and enhanced voltage pickup, and to adopt a structure such as

that of *Baker*, which accomplishes those goals.  A POSITA would have been able to

make this combination with an expectation of success.

### A.    Overview of *Baker*

*Baker* was filed as U.S. Application No. 11/591,619 on November 1, 2006.

Ex. 1004 at Title Page.  *Baker* is prior art to the '554 patent, which has a claimed

priority date of May 12, 2010, under 35 U.S.C. § 102(a).  Ex. 1001 at page 2 (noting

the claimed priority date for the '554 patent).  *Baker* provides a body-worn patient

monitoring device that adhesively attaches to a patient's skin for measuring

physiological signals.  Ex. 1004, Abstract, Cl. 1.  The body-worn patient monitoring

device includes computation-communication module 102 that attaches to disposable

electrode module 110.  *Id.*, Cl. 1, 4:58-5:4, Figure 2.  In Figure 2, the disposable

38

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

electrode module 110 includes electrode gels 103 for ECG monitoring. *Id.*, 5:17-24.

Figure 2 further shows the electrodes disposed on the two sides of disposable electrode module 110. *Id.*, 5:17-24, Figure 2.



Ex. 1004, Figure 2 (annotated).

### B.    *Bly* in View of *Baker* Renders Claims 1–12 Obvious

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| **1[pre].** An electronic device for long-term adhesion to a user, the device comprising: | *Bly* discloses an electronic device for long-term adhesion to a user.<br><br>For example, *Bly's* disclosure "may be applicable to many applications in which physiological monitoring and/or therapy is used for ***extended periods***, for example wireless ***physiological monitoring for extended periods***." Ex. 1003, ¶5.<br><br>In particular, *Bly* discloses a "patch configured for patient comfort, such that the patch can be ***worn and/or tolerated by*** |

39

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | *the patient for extended periods, for example 90 days or more*. The patch may be *worn continuously for at least seven days, for example 14 days*, and then replaced with another patch." *Id.*, ¶48. <br><br> Figure 1A shows that "[a]dherent device 100 can be *adhered to a patient* P at many locations, for example thorax T of patient P." *Id.*, ¶49. <br><br>  <br><br> Ex. 1003, Figure 1A (annotated). |
| **1[a].**  a housing comprising a physiologic data collection circuit, | *Bly* discloses an electronic device for long-term adhesion that includes a housing comprising a physiologic data collection circuit. <br><br> For example, *Bly* discloses "the adherent device comprises an *electronics housing* adhered to at least one of the electronics components or the printed circuit board, such that the electronics housing is disposed between the cover and electronics components.  The electronics housing may comprise a waterproof encapsulant to protect the printed circuit board and the electronic components from moisture and/or mechanical forces." Ex. 1003, ¶21. <br><br> The "electronics housing 160 may comprise a water proof material, for example a sealant adhesive such as epoxy or silicone coated over the electronic components and/or PCB." *Id.*, ¶72. |

40

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | Specifically, "[i]n many embodiments, an electronics housing 160 may be disposed under cover 162 to protect the electronic components, and in some embodiments electronics housing 160 may comprise an encapsulant over the electronic components and PCB." *Id.*, ¶72. |



*Id.*, Figure 1J (annotated).

For example, as shown in Figure 1D, "[e]lectronic components 130 can be connected to flex PCB 120 and/or mounted thereon. In some embodiments, electronic components 130 can be mounted on the additional PCB's [120A, 120B, 120C, 120D]. Electronic components 130 comprise components to ***take physiologic measurements***, transmit data to remote center 106 and receive commands from remote center 106." *Id.*, ¶¶59-60.

*Id.*, Figure 1D (annotated).

*Bly* discloses the electronics housing 160 comprising the electronic components 130 and further discloses "the electrodes are connected to the PCB with a flex connection, for example

41

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | trace 123A of flex PCB 120, so as to provide strain relive between the electrodes 112A, 112B, 112C and 112D and the PCB." *Id.*, ¶91; *see also id.*, Figure 1D.<br><br>*Bly* also discloses "ECG circuitry 138 can generate electrocardiogram signals and data from two or more of electrodes 112A, 112B, 112C and 112D in many ways." *Id.*, ¶70; *see also id.*, Figure 1D.<br><br>Accordingly, *Bly* discloses a housing 160 comprising electronic components 130, as well as various circuits for collecting physiological data.<br><br><br><br>FIG. 1I<br><br>*Id.*, Figure 1I. |
| **1[b].** the housing positioned over a flexible layer extending from beneath the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, | *Bly* discloses a housing positioned over a flexible layer extending from the housing.<br><br>For the same reasons as in Ground 1, *Bly* discloses a housing positioned over a flexible layer extending from the housing. Namely, *Bly* explains that "the two inside electrodes [112B, 112C] may comprise force, or current electrodes, with a center to center spacing [of] about 50 mm," and "the two outside electrodes may comprise measurement electrodes, for example voltage electrodes, and a center-center spacing between adjacent voltage and current electrodes is … about 35 mm." Ex. 1003, ¶80. Moreover, *Bly* discloses that cover 162, which is disposed over the housing, may be 4 inches in length. *Id.*, ¶¶72, 99. Based on this spacing, the two outer electrodes (112A, 112D) must be located distal to electronics housing 162.<br><br>To the extent that *Bly* alone does not disclose or render obvious claim element 1[b], the combination of *Bly* in view of *Baker* renders obvious claim element 1[b]. |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | *Bly* explains that the outer electrodes (112A and 112B) may be sense electrodes to "measure the impedance of the patient to determine respiration rate and/or the hydration of the patient." *Id.*, ¶67. A POSITA would have understood that the necessary separation distance between electrodes to maintain proper inter-electrode distances for effective signal acquisition would require at least a spacing of 4.5 inches (around 115 to 120 mm). *Bly's* disclosure further confirms the importance of such spacing, explaining that "ECG circuitry 138 can be connected to electrodes 112A and 112D *so as to increase spacing of the electrodes*." *Id.*, ¶70. |
| | To achieve proper signal acquisition (voltage reading), a POSITA would have understood that *Bly's* embodiments include outer electrodes that are distal from the housing or would have been motivated to ensure those outer electrodes are distal from the housing, which is further confirmed by *Baker's* disclosure. To achieve the maximum spacing goals (as stated by *Bly*), while minimizing the volume of material in the patch and the size of the patch, a POSITA would have been motivated to position the electrodes distal from the housing, as demonstrated in *Baker*. |
| | For example, *Baker* discloses computation module 102. Ex. 1004, Figure 1C (reproduced below). Additionally, electrodes 103, which adhere to the patient's skin, are positioned distal from the module. *Id.*, 5:33-37. Accordingly, consistent with both *Baker* and *Bly*, providing an electrode on the adhesive patch at a position distal from the housing (if not already disclosed in *Bly*), would have been obvious in view of *Bly* and *Baker*. |
| |  Ex. 1004, Figure 1. |
| **1[c].** wherein the flexible layer comprises a polymer upper layer overlying an | *Bly* discloses a flexible layer comprising a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the physiologic data collection circuit |

43

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| electrical connection, the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection; | to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection. |

As introduced regarding claim element 1[b], *Bly* provides a housing positioned over a flexible layer, which extends from the housing. In reference to Figure 1J1, the patch is the flexible layer and gel cover 180 is the polymer upper layer overlying an electrical connection.

First, *Bly* discloses that get cover 180 is a polymer upper layer. "A gel cover 180, or gel cover layer, for example a polyurethane non-woven tape, can be positioned over patch 110 comprising the breathable tape." *Id.*, ¶85.

"Gel cover 180 may comprise at least one of a polyurethane, polyethylene, polyolefin, rayon, PVC, silicone, non-woven material, foam, or a film. In many embodiments gel cover 180 may comprise an adhesive, for example a acrylate pressure sensitive adhesive, to adhere the gel cover to adherent patch 110. In specific embodiments gel cover 180 may comprise a polyurethane film with acrylate pressure sensitive adhesive." *Id.*, ¶87.



FIG. 1J1

Ex. 1003, Figure 1J1 (annotated).

The gel cover (i.e., the polymer upper layer) adheres to a breathable tape. "[G]el cover 180 may comprise an adhesive, for example a acrylate pressure sensitive adhesive, to adhere the gel cover to adherent patch 110." *Id.*, ¶87. *Bly's* breathable tape is a polymer lower layer that underlies the electrical connection. "In many embodiments, adherent patch 110 may

44

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | comprise a layer of breathable tape 110T, for example a known breathable tape, such as tricot-knit polyester fabric.  In many embodiments, breathable tape 110T comprises a backing material, or backing 111, with an adhesive." *Id.*, ¶81.  As shown in Figure 1J1 above, connector 122A is positioned below gel cover 180 but above breathable tape 111.  *Id.*, Figure 1J1 (annotated).<br><br>Additionally, *Bly* discloses that "printed circuit board (PCB), for example flex printed circuit board 120, may be connected to electrodes 112A, 112B, 112C and 112D with connectors 122A, 122B, 122C and 122D.  Flex printed circuit board 120 can include traces 123A, 123B, 123C and 123D that extend to connectors 122A, 122B, 122C and 122D, respectively, on the flex printed circuit board." *Id.*, ¶59; *see id.*, Figure 1J1 (annotated below).<br><br>As an example, *Bly* discloses that "electrodes 112A1, 112B1, 112C1 and 112D1 can be printed on a flexible connector 112F, such as silver ink on polyurethane….  ***The flexible connector 112F comprising the electrodes can extend from under the gel cover [180] to the printed circuit board to connect to the printed circuit boards and/or components supported thereon.***" *Id.*, ¶78.<br><br><br><br>*Id.*, Figure 1J1 (annotated). |
| **1[d].** a connecting adhesive layer positioned under the polymer upper layer, the | *Bly* discloses a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer. |

45

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| connecting adhesive layer adhering the polymer upper layer to the polymer lower layer; and | For example, *Bly* discloses an adherent device comprising "a gel cover positioned over the breathable tape[.]" Ex. 1003, ¶22.<br><br>Gel cover 180 may be made of "at least one of a polyurethane, polyethylene, polyolefin, rayon, PVC, silicone, non-woven material, foam, or a film." *Id.*, ¶87.<br><br>Further, gel cover 180, annotated in blue, "***may comprise an adhesive, for example a acrylate pressure sensitive adhesive, to adhere the gel cover to adherent patch 110***" (adherent patch 110 which may comprise breathable tape 110T are annotated in orange). *Id.*, ¶87.<br><br><br><br>*Id.*, Figure 1J1 (annotated).<br><br>Accordingly, in this example, gel cover's 180 adhesive coating that connects gel cover 180 to adherent patch 110 is the connecting adhesive layer.<br><br>As another example, "[a]dherent patch 100 comprises a second side, or upper side 110B," and "[a]n adhesive 116B can be applied to upper side 110B to adhere structures, for example a breathable cover, to the patch such that the patch can support the electronics and other structures when the patch is adhered to the patient." *Id.*, ¶58. |

46

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| |  *Id.*, Figure 1I (annotated).<br><br>*Bly* discloses "adhesive 116B is coated on upper side 110A of adherent patch 110B, such that the electronics module can be adhered to and/or separated from the adhesive component." *Id.*, ¶109.<br><br>*Id.*, Figure 1C (annotated).<br><br>Accordingly, in this second example, adhesive 116B (yellow) is the connecting adhesive layer positioned under gel cover 180 (blue) (i.e., polymer upper layer) and on top of a lower layer of the adherent patch 110 (i.e., polymer lower layer) and adhering gel cover 180 to adherent patch 110. |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| |  *Id.*, Figure 1J1 (annotated). |
| **1[e].** a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user. | *Bly* discloses a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user.<br><br>For example, *Bly* discloses "an adhesive 116A, for example breathable tape adhesive comprising a layer of acrylate pressure sensitive adhesive, can be disposed on underside 110A of patch 110." Ex. 1003, ¶84.<br><br>*Id.*, Figure 1B (annotated).<br><br>The "adhesive 116A adheres adherent patch 110 comprising backing 111 to the skin of the patient[.]" *Id.*<br><br>Specifically, "[a]dherent patch 110 comprises a first side, or a lower side 110A, that is oriented toward the skin of the patient when placed on the patient. In many embodiments, adherent |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | patch 110 comprises a tape 110T which is a material, preferably breathable, with an adhesive 116A. ***Patient side 110A comprises adhesive 116A to adhere the patch 110 and adherent device 100 to patient P***." *Id.,* ¶57.<br><br><br>*Id.,* Figure 1I (annotated).<br><br><br>*Id.,* Figure 1A (annotated). |
| **2.** The electronic device of claim 1, further comprising a flap extending beneath the housing. | *Bly* discloses a flap extending beneath the housing.<br><br>For example, *Bly* discloses that "adherent patch 110 stretches and/or retracts with the skin of the patient." Ex. 1003, ¶95.<br><br>*Bly* specifies that "[e]lectronics components 130, printed circuit board 120, and electronics housing 160 are disposed between the stretchable breathable material of adherent patch 110 and the stretchable breathable material of cover 160 so as to allow the adherent patch 110 and cover 160 to stretch together while electronics components 130, printed circuit board 120, and |

49

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
|  | electronics housing 160 do not stretch substantially, if at all." *Id.*, ¶100. <br><br> As shown in Figures 1G, 1I, for example, adherent patch 110 extends beneath the electronics housing 160 and forms flaps (annotated in red) that are integral with the lateral edges of adherent patch 110. <br><br>  <br> *Id.*, Figure 1G (annotated). <br><br>  <br> *Id.*, Figure 1I (annotated). <br><br> *Bly* discloses that the patch is made of a thin, flexible material. For example, the "adhesive patch may comprise a ***thin, flexible, breathable*** patch[.]" *Id.*, ¶111. <br><br> Further, "[t]he breathable cover 162 and adherent patch 110 comprise breathable tape…. The breathable tape may comprise the ***stretchable breathable material*** with the adhesive …, such that both the adherent patch and cover can stretch with the skin of the patient." *Id.*, ¶94. |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | The portion(s) of the adherent patch that extend wider and below the housing is a "flap" as recited in claim 2. The adherent patch is a thin material with freedom to stretch and flex. The patch is also connected to a larger body, which allows it to serve as an extension of the device with the ability to bend and flex due to the material. Thus, *Bly* discloses a flap under the broadest reasonable interpretation of this claim element.<br><br>In another example, *Bly* states that "the patch comprises two electrodes, for example two electrodes to measure the electrocardiogram (ECG) of the patient. Gel 114A, gel 114B, gel 114C and gel 114D can each be positioned over electrodes 112A, 112B, 112C and 112D, respectively, to provide electrical conductivity between the electrodes and the skin of the patient." Ex. 1003, ¶57. In this example embodiment, the gel is a flap that extends beneath the housing. *See id.*, Figure 1J.<br><br><br>Ex. 1003, Figure 1J.<br><br><br>Ex. 1003, Figure 1I. |
| **3.** The electronic device of claim 1, wherein the housing is rigid. | *Bly* discloses a rigid housing.<br><br>Specifically, *Bly* states that "the electronics layer may be encapsulated in electronics housing 160. Electronics housing |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
|  | 160 may comprise an encapsulant, such as a dip coating, which may comprise a waterproof material, for example silicone and/or epoxy. In many embodiments, the PCB encapsulant protects the PCB and/or electronic components from moisture and/or mechanical forces. The encapsulant may comprise silicone, epoxy, other adhesives and/or sealants. In some embodiments, electronics housing 160 ***may comprise metal and/or plastic***. Metal or plastic may be potted with a material such as epoxy or silicone." Ex. 1003, ¶90. Metal and plastic are rigid materials. In the disclosed embodiment of *Bly*, the plastic and metal materials used to construct the housing "to protect the printed circuit board and the electronic components from … mechanical forces" would be understood to be a rigid material in order to accomplish the stated protection. *Id*., ¶21. This is confirmed by the fact it was well known to rely on rigid housings to protect components in long-term monitors. *See e.g.* Ex. 1005, ¶2 (disclosing "a "HEARTCARD™ monitor [that] is intended for long-term use, and thus is enclosed in a durable ***rigid housing***, []provided with long-life batteries..."). In yet another example, figure 4B of *Matsumura* discloses the housing of the signal processor 10 sinking into the first sheet 1 (*see* reference numeral 10b). Ex. 1005, Figure 4b. To allow for such function, *Matsumura*'s housing is more rigid than the insulating material of the first sheet 1 into which the housing is pressed. *See id*., ¶17-18.<br><br>Moreover, "FIG. 1F shows a top view of a cover 162 over the batteries, electronic components and flex printed circuit board as in FIGS. 1A to 1E. In many embodiments, an electronics housing 160 may be disposed under cover 162 to protect the electronic components, and in some embodiments electronics housing 160 may comprise an encapsulant over the electronic components and PCB. In some embodiments, cover 162 can be adhered to adherent patch 110 with an adhesive 164 on an underside of cover 162. In many embodiments, electronics housing 160 may comprise a water proof material, for example a sealant adhesive such as epoxy or silicone coated over the electronics components and/or PCB. In some embodiments, electronics housing 160 ***may comprise metal and/or plastic***. Metal or plastic may be potted with a material such as epoxy or silicone." *Id.*, ¶72. |

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| **4.** The electronic device of claim 1, wherein the housing is configured to remain connected to the flexible layer when the housing is tilted at an angle relative the lower adhesive layer in response to movement of the user. | *Bly* discloses a housing configured to remain connected to the flexible layer when the housing is tilted at an angle relative the lower adhesive layer in response to movement of the user.<br><br>For example, *Bly* states that "the electrodes can be connected to the PCB and/or electronics module with a flex PCB 120, such that the electrodes and adherent patch can move independently from the PCB module." Ex. 1003, ¶91.<br><br>Further, *Bly* discloses "cover 162 can attach the PCB module to adherent patch 110 with cover 162, so as to avoid interaction of adherent patch 110C with the PCB having the electronics mounted therein." *Id.*, ¶105.<br><br>A POSITA would have understood that air gap 169 allows housing 160 to tilt at an angle relative to the lower adhesive layer 116A in response to movement of the user. For example, device 100 adheres to a patient via adhesive layer 116A. If the patient's skin moves in an upward direction (e.g., in the upward direction of arrow 186 in the below figure), the height of air gap 169 decreases because printed circuit board 120 tilts. Thus, air gap 169 allows the printed circuit board 120 and electronic components 130 to move independently of adherent patch 110 (and adhesive layer 116). As *Bly* explains, this allows the patch to move with the patient's skin for patient comfort. For added clarity, an additionally zoomed in view of annotated Figure 1I is provided below.<br><br>Specifically, *Bly* explains that "[a]ir gap 169 may extend from adherent patch 110 to the electronics module and/or PCB, so as to provide patient comfort. Air gap 169 allows adherent patch 110 and breathable tape 110T to remain supple and move, for example bend, with the skin of the patient with minimal flexing and/or bending of printed circuit board 120 and electronic components 130, as indicated by arrows 186" in Figure 1I. *Id.*, ¶101. |

## REQUEST FOR EX PARTE REEXAMINATION OF
## U.S. PATENT NO. 12,274,554

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| |  |

<div align="center">

*Id.*, Figure 1I (annotated).

</div>

In reference to Figure 1I, as indicated by red arrows in Figure 1I above, electronics housing 160 is configured to remain connected to the adherent patch 110 (e.g., flexible layer) when the electronic housing (e.g., housing) and adhesive 116A (e.g., lower adhesive layer) are flexed or bent (e.g., tilted) relative to each other.

The electronics housing 160 (e.g., housing) is "adhered to at least one of the electronics components or the printed circuit board, such that the electronics housing is disposed between the cover and electronics components." *Id.*, ¶21. "Cover 162 [e.g., electrode-supporting section] can be attached to [] electronics housing 160 comprising over the encapsulated [printed circuit board]." *Id.*, ¶105. Moreover, the device includes "[c]onnectors 122A, 122B, 122C and 122D [] positioned on flex printed circuit board 120[.]" *Id.*, ¶59.

Figure 1I discloses the configuration of these elements and the air gap (annotated in green).



*Id.*, Figure 1I (annotated).

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| |  *Id.*, Figure 1I (annotated). In reference to Figure 1I, movement of the user may cause 116A to move upward, decreasing the space of air gap 169, while the printed circuit board 120 and electronic components 130 independently move, which a POSITA would understand to render obvious the claimed "tilting" limitation. Thus, the housing, electronics, and PCB are balanced on the connector 122A, which acts as a central balancing point. The air gap below allows the housing, electronics, and PCB freedom to move because nothing is blocking or resisting the motion. Thus, when a user wearing the device moves, the adherent device's center of mass will also shift and cause housing to tilt at an angle. In other words, the configuration of the device causes the housing to behave like a seesaw and tilt at an angle relative to the adhesive 116A (e.g., lower adhesive layer) in response to movement of the user. Thus, when the device is moved based on a user's movement, the air gap 169 allows the housing and electronic components to "remain supple and move, for example bend, with the skin of the patient." *Id.*, ¶101. Movement of the patient will create slight shifts in the center of mass of the device, which will cause the housing to adjust at various angles as allowed by the air gap 169. |
| **5.** The electronic device of claim 1, further comprising a | *Bly* discloses the electronic device of claim 1, further comprising a hinge portion adjacent the housing. |

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| hinge portion adjacent the housing. | *See* claim 4, which is incorporated by reference herein.  As described in reference to claim element 4, *Bly's* device includes an air gap, which allows the housing to tilt at an angle relative to the lower adhesive layer in response to movement of the user.  To provide such function, *Bly* further discloses a "hinge portion adjacent the housing" under the broadest reasonable interpretation of this claim element. <br><br> For example, as shown in Figure 1I1, *Bly* discloses a flexible connector 122A to provide strain relief.  Ex. 1003, ¶78, Figure 1I1 (annotated), Figure 1I. <br><br>  <br><br> Ex. 1003, Figure 1I1 (annotated). <br><br> A POSITA would have understood that the housing, printed circuit board, and electronic components pivot via connector 122A when the described motion occurs.  As described in reference to claim element 1[e], air gap 169 disposed below these elements allow the same to tilt in response to the lower to adhesive layer 116A moving with the skin of the patient.  *See, e.g., id.*, ¶101 ("Air gap 169 allows adherent patch 110 and breathable tape 110T to remain supple and move, for example bend, with the skin of the patient with minimal flexing and/or bending of printed circuit board 120 and electronic components 130, as indicated by arrows 186."). |
| **6.**  The electronic device of claim 1, wherein the lower adhesive layer comprises a hydrocolloid adhesive. | *Bly* discloses the lower adhesive layer comprising a hydrocolloid adhesive. <br><br> Specifically, *Bly* discloses "In many embodiments, ***adhesive 116A comprises*** at least one of acrylate, silicone, synthetic rubber, synthetic resin, ***hydrocolloid adhesive***, pressure sensitive adhesive (PSA), or acrylate pressure sensitive adhesive." <br><br> Further, adhesive 116A "can be disposed on underside 110A of patch 110."  Thus, *Bly* discloses that the lower adhesive layer (adhesive 116A) comprises a hydrocolloid adhesive. |

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| **7.** The electronic device of claim 1, wherein the physiologic data collection circuit is configured to collect cardiac rhythm data from the user. | *Bly* discloses the physiologic data collection circuit configured to collect cardiac rhythm data from the user. <br><br> Specifically, *Bly* discloses that "[e]lectronic components 130 comprise components to take physiologic measurements, transmit data to remote center 106 and receive commands from remote center 106." Ex. 1003, ¶60. <br><br> Further, "[e]lectronics components 130 comprise an activity sensor and activity circuitry 134, impedance circuitry 136 and ***electrocardiogram circuitry, for example ECG circuitry 136***." Ex. 1003, ¶60. <br><br> "System 10 can perform the following functions: initiation, programming, measuring, storing, analyzing, communicating, predicting, and displaying. The adherent device may contain a subset of the following physiological sensors: bioimpedance, respiration, respiration rate variability, heart rate (ave, min, max), ***heart rhythm***, hear rate variability (hereinafter "HRV"), heart rate turbulence (hereinafter "HRT"), heart sounds (e.g. S3), respiratory sounds, blood pressure, activity, posture, wake/sleep, orthopnea, temperature/heat flux, and weight." *Id.*, ¶54. |
| **8.** The electronic device of claim 1, wherein the polymer upper layer extends horizontally away from the housing beyond a boundary of the electrode. | *Bly* discloses the polymer upper layer extending horizontally away from the housing beyond a boundary of the electrode. *See* claim limitation 1[c]. <br><br> *Bly* discloses "[a]n edge of the gel cover may extend from about 5 to about 15 mm beyond an edge of a gel over the at least one electrode." Ex. 1003, ¶22. <br><br> As shown in Figure 1J1, *Bly's* gel cover 180 (blue) (e.g., polymer upper layer) extends horizontally away from the electronics housing 160 (red) and beyond a boundary of the electrodes 112A1, 112A2, 112A3, 112A4. |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| |  *Id.*, Figure 1J1 (annotated). |
| **9.** The electronic device of claim 1, further comprising an upper adhesive layer positioned over the polymer upper layer. | *Bly* discloses an upper adhesive layer positioned over the polymer upper layer.<br><br>For example, *Bly* discloses "cover 162 can be adhered to adherent patch 110 with an adhesive 164 on an underside of cover 162." Ex. 1003, ¶72.<br><br>As shown in Figure 1J, cover 162 (green) is positioned over gel cover 180 (blue) (e.g., polymer upper layer), and therefore adhesive 164 (not shown) on the underside of cover 162 is also positioned over gel cover 180.<br><br>*Id.*, Figure 1J1 (annotated). |

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | |
| **10.** The electronic device of claim 9, wherein the upper adhesive layer is positioned above the electrode. | *Bly* discloses the upper adhesive layer positioned above the electrode.<br><br>For example, *Bly* discloses "cover 162 can be adhered to adherent patch 110 with an adhesive 164 on an underside of cover 162." Ex. 1003, ¶72.<br><br>As shown in Figure 1J, cover 162 (green) is positioned above electrodes 112A1, 112A2, 112A3, 112A4, and therefore adhesive 164 (not shown) on the underside of cover 162 is also positioned above gel cover 180.<br><br><br><br>*Id.*, Figure 1J1 (annotated). |
| **11.** The electronic device of claim 10, wherein the upper adhesive layer extends horizontally away from the housing beyond a boundary of the polymer upper layer. | *Bly* discloses the upper adhesive layer extending horizontally away from the housing beyond a boundary of the polymer upper layer.<br><br>For example, *Bly* discloses "cover 162 can be adhered to adherent patch 110 with an adhesive 164 on an underside of cover 162." Ex. 1003, ¶72.<br><br>As shown in Figure 1J, cover 162 (green) is positioned over gel cover 180 (blue) (e.g., polymer upper layer) and extends horizontally away from a boundary of gel cover 180. Therefore, adhesive 164 (not shown) on the underside of cover |

59

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Bly* |
|---|---|
| | 162 also extends horizontally beyond a boundary of gel cover 180.<br><br><br><br>*Id.*, Figure 1J1 (annotated). |
| **12.** The electronic device of claim 1, wherein the lower adhesive layer extends at least partially below the housing. | *Bly* discloses the lower adhesive layer extending at least partially below the housing.<br><br>For example, *Bly's* adherent patch 110 includes a "lower side 110A" further including tape 110T, or adhesive 116A (e.g., lower adhesive layer). Ex. 1003, ¶57.<br><br>As shown in Figure 1I, adhesive 116A (green) extends at least partially below the housing (red).<br><br><br><br>*Id.*, Figure 1I (annotated). |

60

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

## X.    GROUND III

### A.    Overview of *Matsumura*

*Matsumura* published on April 22, 2004, as Japanese Patent Publication 2004-121360.  Thus, the publication of *Matsumura* is prior art to the '554 patent, which has a claimed priority date of May 12, 2010, under 35 U.S.C. § 102(a) and (b).  Ex. 1001 at page 2 (noting the priority date for the '554 patent).

*Matsumura* describes a multi-layer wearable monitor for detecting bioelectric potential.  Ex. 1006, Abstract.  *Matsumura* further discloses that the device is for long-term wear, including that the "subject (patient) wears the bioelectric potential detector 11 on his/her chest at all times to detect electrocardiogram signals[,]" even while "tak[ing] a shower or a bath."  *Id.*, ¶¶36-37.  In reference to Figure 1, *Matsumura* provides a bioelectric potential detector 11 comprised of disposable pad 7 and reusable signal processor 10 (red).  Ex. 1006, ¶16.  Disposable pad 7 further comprises first sheet 1 (green), second sheet 4 (blue), electrical components (i.e., conductive material 2, hooks 3) (orange) located between first sheet 1 and second sheet 4, conductive gels 5 (purple), and double-sided adhesive tape 9.  Ex. 1006, ¶16, Figure 1 (annotated below).  Conductive material 2 creates a conductive path between conductive gel 5 and hooks 3, and hooks 3 provide a conductive path upwards through first sheet 1 and double-sided adhesive tape 9 to processor 10.  Ex. 1012, ¶19.  The device may be adhered to the user by removing release tape 8

61

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

(yellow) to expose an adhesive layer that has been applied to the bottom surface of

second sheet 4 (blue), which is then applied directly to the user.  Ex. 1006, ¶16; *see,*

*e.g.*, Figure 3.



Ex. 1006, Figure 1 (annotated).

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554

### B.    *Matsumura* Anticipates or Renders Obvious Claim 1

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| **1[pre].** An electronic device for long-term adhesion to a user, the device comprising: | *Matsumura* discloses an electronic device for long-term adhesin to a user.<br><br>Specifically, *Matsumura* discloses a "a bioelectric potential detector that can measure bioelectric potential (electrocardiograms)." Ex. 1006, Abstract. Further, "[t]he bioelectric potential detector 11 can be used as an electrocardiogram detector that is worn on the subject's chest to detect electrocardiogram signals." *Id.*, ¶24.<br><br>*Matsumura* explains that the "subject (patient) ***wears the bioelectric potential detector 11 on his/her chest at all times*** to detect electrocardiogram signals." *Id.*, ¶36. In this way, "the subject can take a shower or a bath 21 while wearing the waterproof bioelectric potential detector 11." *Id.*, ¶38.<br><br>*Matsumura* explains that an "adhesive, such as acrylic adhesive for example, is applied to the back surface of the second sheet 4." *Id.*, ¶18. Release sheet 8 is "peeled off" to expose the adhesive back surface of the second sheet 4, which is applied to directly to the patient's skin. *Id.*, ¶16; *see also id.* Figure 2 (below). |

63

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | [FIGURE 2]<br><br>Ex. 1006, Fig. 2 (annotated yellow indicating release sheet 8, and blue indicating the adhesive back). |
| **1[a].** a housing comprising a physiologic data collection circuit, | *Matsumura* discloses a housing comprising a physiologic data collection circuit.<br><br>Specifically, *Matsumura* explains that "the housing of signal processor 10[,]" is "the part that transmits bioelectric potential from the bioelectrode pad 7 to the signal processor 10" contained within the housing.  Ex. 1006, ¶27.<br><br>Figure 4 shows "housing 10c" (annotated in red below).  *Id.*, Figure 4. |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| |  *Id.*, Figure 4 (annotated).<br><br>*Matsumura* discloses that "[t]he signal processor 10 incorporates a processing circuit for filtering and amplifying detected bioelectric potential signals, a memory for storing the processed bioelectric potential signal, a circuit for modulating the processed bioelectric potential signal and transmitting it wirelessly, and a loop antenna. Furthermore, the housing of the signal processor 10 is waterproof." Ex. 1006, ¶25. |
| **1[b].** the housing positioned over a flexible layer extending from beneath the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, | *Matsumura* discloses the housing positioned over a flexible layer extending from beneath the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing.<br><br>As discussed above with respect to claim 1[a], *Matsumura* discloses that signal processor 10ch includes housing 10c. *See* cl. 1[a].<br><br>*Matsumura* further discloses a "bioelectrode pad 7 [] composed of a first sheet 1, a conductive material 2, a hook 3, a second sheet 4, a conductive gel 5, a third sheet 6, and double-sided adhesive tape 9." Ex. 1006, ¶16. |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | First sheet 1 and second sheet 4 "should be made of an insulating material that does not allow moisture to penetrate, for example, polyethylene foam, polyurethane foam, or polyurethane sheet." *Id.*, ¶¶17-18.  Insulating materials such as polyethylene foam, polyurethane foam, or polyurethane sheet are flexible materials.<br><br>"Between the first sheet 1 and the second sheet 4, two pieces of conductive material 2 and two hooks 3 are arranged to transmit the ***bioelectric potential detected by the conductive gel 5***, which is placed in the openings 4a of the second sheet 4." *Id.*, ¶19.  Accordingly, conductive gel 5 (annotated in purple) is an electrode.<br><br><br>[FIGURE 1] |

66

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | *Id.*, Figure 1 (annotated red indicating housing, and purple indicating conductive gel).

Accordingly, *Matsumura* discloses housing 10c (e.g., a housing) positioned over the bioelectrode pad (e.g., flexible layer), which extends from beneath the housing.  Further, *Matsumura* discloses electrode gel 5 (e.g., electrodes) that are positioned on the bottom of the bioelectrode pad and towards an outer edge of bioelectrode pad 7, not underneath the housing (e.g., at a position distal to the housing). |
| **1[c].**  wherein the flexible layer comprises a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection; | *Matsumura* discloses a flexible layer comprising a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection.

**First**, *Matsumura* discloses a flexible layer comprising a polymer upper layer overlying an electrical connection. *Matsumura* discloses a "bioelectrode pad 7 [] composed of a first sheet 1, a conductive material 2, a hook 3, a second sheet 4, a conductive gel 5, a third sheet 6, and double-sided adhesive tape 9." Ex. 1006, ¶16.

First sheet 1 and second sheet 4 "should be made of an insulating material that does not allow moisture to penetrate, for example, *polyethylene foam, polyurethane foam, or polyurethane sheet*." *Id.*, ¶¶17-18.

**Second**, *Matsumura* discloses the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection.

As shown in Figure 1 below, first sheet 1 (e.g., upper polymer layer) overlays electrode gel 5, conductive material 2, and hooks 3 (e.g., electronic connection), and these three components extend linearly from the signal processor (e.g., housing).  For example, *Matsumura* discloses "The pieces of c*onductive material 2 are rod-shaped*, one end of which has two holes 2a for contacting the conductive gel 5 and the other end of which has two holes 2a through which the protruding |

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | portions of the hook 3 are inserted.  The two hooks 3 are arranged so that the protruding portions of the hook 3 can be inserted through the holes 2a and 1a from the back side of the conductive material 2. With this configuration, the ***bioelectric potential detected by the conductive gel 5 are transmitted through the conductive material 2 and the hooks 3***." *Id.*, ¶19.<br><br>Each of these components are disclosed in Figure 1, as shown below.<br><br><br><br>*Id.*, Figure 1 (annotated). |
| **1[d].** a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer; and | *Matsumura* discloses a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer.<br><br>For example, *Matsumura* explains that "an adhesive or glue, such as an acrylic adhesive for example, is applied to the back surface of the first sheet 1" and "adhesive or glue, such as acrylic adhesive for example, is applied to the surface of the |

68

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | second sheet 4. The adhesive, such as acrylic adhesive for example, is applied to the back surface of the second sheet 4." Ex. 1006, ¶18. As shown in Figure 4, for example, the adhesive applied to the back surface of the first sheet 1 and the adhesive applied to the surface of second sheet 4 make up the connecting adhesive layer (indicated by red boxes) that adhere first sheet 1 (e.g., polymer upper layer) to second sheet 4 (e.g., polymer lower layer).<br><br><br><br>*Id.*, Figure 4(b) (annotated green indicating first sheet, blue indicating second sheet, and red boxes indicating connecting adhesive layer). |
| **1[e].** a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user. | *Matsumura* discloses a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user.<br><br>For example, the "adhesive, such as acrylic adhesive, for example, [that] is applied to the back surface of the second sheet 4" is a lower adhesive layer that adheres the electronic device to a user.<br><br>Specifically, *Matsumura* explains that release sheet 8 is a sheet of material that is attached to the back surface of second sheet 4 and removed before use. *Id.*, ¶16. Release sheet 8 is "peeled off" to expose the adhesive back surface of the second sheet 4, which is applied to directly to the patient's skin. *Id.*, ¶16; *see also id.* Figure 2 (below). |

69

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

| U.S. Patent No. 12,274,554 | *Matsumura* |
|---|---|
| | [FIGURE 2]<br><br>Ex. 1006, Figure 2 (annotated yellow indicating release sheet 8, and blue indicating the adhesive back).<br><br>Accordingly, *Matsumura* discloses a lower adhesive layer (e.g., adhesive, such as acrylic adhesive) positioned on second sheet 4 (e.g., the polymer lower layer portion of the flexible layer), that adheres the device to a user. |

70

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

## XI.    CONCLUSION

As discussed above, the prior art references anticipate or at least render

obvious the elements of claims 1 to 12 of the '554 patent.  Namely, *Bly*, *Baker*, and

*Matsumura* are all prior art to the '554 patent.  Moreover, the Patent Office did not

rely on *Bly*, *Baker*, or *Matsumura* during prosecution of the '554 patent and, while

the disclosure of a family member of *Bly*, the Japanese-language version of

*Matsumura*, and *Baker* were before the Patent Office, there is no evidence that these

references were properly considered by the Patent Office during prosecution.  For at

least the above reasons, the foregoing Request for Reexamination presents one or

more Substantial New Questions of Patentability and should therefore be granted.


Dated: September 8, 2025                    Respectfully submitted,


                          By:    */s/ Erik J. Halverson*
                                 Erik J. Halverson
                                 Reg. No. 73,552
                                 **K&L GATES LLP**
                                 Four Embarcadero Center, Suite 1200
                                 San Francisco, CA 94111
                                 T: (415) 882-8238
                                 F: (415) 882-8220

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,274,554**

## CLAIMS APPENDIX

1[pre]   An electronic device for long-term adhesion to a user, the device comprising:

1[a]   a housing comprising a physiologic data collection circuit,

1[b]   the housing positioned over a flexible layer extending from beneath the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing,

1[c]   wherein the flexible layer comprises a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection;

1[d]   a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer; and

1[e]   a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user.

[2]   The electronic device of claim 1, further comprising a flap extending beneath the housing.

[3]   The electronic device of claim 1, wherein the housing is rigid.

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,274,554

[4]     The electronic device of claim 1, wherein the housing is configured to remain connected to the flexible layer when the housing is tilted at an angle relative the lower adhesive layer in response to movement of the user.

[5]     The electronic device of claim 1, further comprising a hinge portion adjacent the housing.

[6]     The electronic device of claim 1, wherein the lower adhesive layer comprises a hydrocolloid adhesive.

[7]     The electronic device of claim 1, wherein the physiologic data collection circuit is configured to collect cardiac rhythm data from the user.

[8]     The electronic device of claim 1, wherein the polymer upper layer extends horizontally away from the housing beyond a boundary of the electrode.

[9]     The electronic device of claim 1, further comprising an upper adhesive layer positioned over the polymer upper layer.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

[10]    The electronic device of claim 9, wherein the upper adhesive layer is positioned above the electrode.

[11]    The electronic device of claim 10, wherein the upper adhesive layer extends horizontally away from the housing beyond a boundary of the polymer upper layer.

[12]    The electronic device of claim 1, wherein the lower adhesive layer extends at least partially below the housing.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,274,554**

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2025, a true and correct copy of the foregoing and supporting materials has been served at the following correspondence address of record for the subject patent via US Postal Service Certified Mail/Return Receipt Requested Mail at the following address:

> Knobbe, Martens, Olson & Bear, LLP
> 2040 Main Street
> Fourteeth Floor
> Irvine, California
> United States

By:   */s/ Erik J. Halverson*
      Erik J. Halverson
      Reg. No. 73,552

# Exhibit H



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

K&L Gates LLP - Chicago
Baxter
P.O. Box 1135
Chicago, IL 60690-1135

MAILED

OCT 1 7 2025

CENTRAL REEXAMINATION UNIT

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/015,504* .

PATENT UNDER REEXAMINATION *12274554* .

ART UNIT *3993* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Order Granting Request For Ex Parte Reexamination* | **Control No.** 90/015,504 | **Patent Under Reexamination** 12274554 |
|---|---|---|
| | **Examiner** CATHERINE S WILLIAMS | **Art Unit** 3993 | **AIA (FITF) Status** No |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed 09/08/2025 has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐   PTO-892,      b)☑  PTO/SB/08,      c)☐  Other: _____

1. ☑   The request for *ex parte* reexamination is GRANTED.

   RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

|  |  |  |
|---|---|---|
|  |  |  |

cc:Requester ( if third party requester )

## DECISION ON REQUEST FOR REEXAMINATION

A substantial new question (hereinafter "SNQ") of patentability affecting claims 1-12 of

United States Patent Number 12,274,554 (hereinafter "the '554 patent") is raised by the request

for *ex parte* reexamination.

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

### *Service of Papers*

After the filing of a request for reexamination by a third party requester, any document

filed by either the patent owner or the third party requester must be served on the other party (or

parties where two or more third party requester proceedings are merged) in the reexamination

proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550(f).

### *Extensions of Time*

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination

proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in

*ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

### *Amendment in Reexamination Proceedings*

Patent owner is notified that any proposed amendment to the specification and/or claims

in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally

presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR

1.20(c). See MPEP § 2250(IV) for examples to assist in the preparation of proper proposed

amendments in reexamination proceedings.

Application/Control Number: 90/015,504                                                Page 3
Art Unit: 3993

### *Submissions*

In order to insure full consideration of any amendments, affidavits or declarations or

other documents as evidence of patentability, such documents must be submitted in response to

the first office action on the merits (which does not result in a close of prosecution).

Submissions after the second office action on the merits, which is intended to be a final action,

will be governed by the requirements of 37 CFR 1.116, after final rejection and by 37 CFR 41.33

after appeal, which will be strictly enforced.

### *Notification of Concurrent Proceedings*

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a), to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving the

'554 patent throughout the course of this reexamination proceeding. Likewise, if present, the

third party requester is also reminded of the ability to similarly apprise the Office of any such

activity or proceeding throughout the course of this reexamination proceeding. See

MPEP §§ 2207, 2282 and 2286.

### *Waiver of Right to File Patent Owner Statement*

In a reexamination proceeding, Patent Owner may waive the right under 37 C.F.R. 1.530

to file a Patent Owner Statement. The document needs to contain a statement that Patent Owner

waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement and proof of service in

the manner provided by 37 C.F.R. 1.248, if the request for reexamination was made by a third

party requester, see 37 C.F.R. 1.550(f). The Patent Owner may consider using the following

statement in a document waiving the right to file a Patent Owner Statement:

---

**WAIVER OF RIGHT TO FILE PATENT OWNER STATEMENT**

Patent Owner waives the right under 37 C.F.R. § 1.530 to file a Patent Owner Statement.

---

Application/Control Number: 90/015,504                                    Page 4
Art Unit: 3993

### *Substantial New Question*

The SNQ is based on:

1. US Pub. No. 2009/0076363 to Bly et al. (hereinafter "Bly '363");
2. US Pat. No. 8,214,007 to Baker et al. (hereinafter "Baker '007"); and
3. JP2004/121360 to Matsumura (hereinafter "Matsumura").

A discussion of the specifics now follows:

### *Requester's Position*

1. Claims 1-12 are unpatentable over Bly '363 alone.

2. Claims 1-12 are unpatentable over Bly '363 taken with Baker '007.

3. Claim 1 is unpatentable over Matsumura alone.

### *Prosecution History – 18/936,888*

The '554 patent resulted from US Pat. Application 18/936,888 (hereinafter "the '888 application") and was filed on 11/04/2024 with claim 1. A preliminary amendment to the claims was then filed 12/11/2024 cancelling claim 1 and adding new independent claim 2 and claims 3-16 depending therefrom. A Non-Final Rejection was mailed 12/20/2024 rejecting claim 1 which had already been cancelled and did not address newly added claims 2-16. Applicant filed a response on 02/06/2025 indicating that a preliminary amendment had been filed 12/11/2024 cancelling claim 1 and adding claims 2-16. Subsequent to the response, a Notice of Allowance ("NOA") was mailed 03/05/2025 with an examiner's amendment including,

> 2. (Currently Amended) An electronic device for long-term adhesion to a user, the device comprising:
>
> a housing comprising a physiologic data collection circuit, the housing positioned over a flexible layer extending from beneath ~~beyond~~ the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, wherein the flexible layer comprises [[an]] a polymer upper layer

overlying an electrical connection, the electrical connection extending <u>linearly</u> from the
physiologic data collection circuit to the electrode <u>when viewed from above the</u>
<u>electronic device</u>, the <u>polymer</u> upper layer adhered to a <u>polymer</u> lower layer underlying
the electrical connection;

<u>a connecting adhesive layer positioned under the polymer upper layer, the</u>
<u>connecting adhesive layer adhering the polymer upper layer to the polymer lower layer;</u>
and

a lower adhesive layer positioned on the flexible layer and configured to adhere
the electronic device to a user.

Additionally, the NOA included a reasons for allowance stating,

### Reasons for Allowance

*The following is an examiner's statement of reasons for allowance:*

The closest prior art of record does not disclose nor render obvious the presently
claimed invention. The prior art of record is silent on the flexible layer being made of two
layers (upper and lower layers), its composition (polymers), and where everything is
located on the overall electronic device with respect to the other components. Each of
the layers and components were well-known individually at the time of invention,
however, the total combination of elements would not have been assembled as claimed
(above) without the express use of the Applicant's original disclosure as a blueprint for
doing so.

See the '888 Application, NOA mailed 03/05/2025, pages 2-4.

Therefore, it is understood that the '554 patent was allowed since the prior art did not
teach, among all the limitations, "the flexible layer comprises a polymer upper layer overlying an
electrical connection and adhered to a polymer lower layer underlying the electrical connection
and a connecting adhesive layer positioned under the polymer upper layer, the connecting
adhesive layer adhering the polymer upper layer to the polymer lower layer."

Application/Control Number: 90/015,504                                        Page 6
Art Unit: 3993

### *Analysis of the Prior Art Provided in the Request*

On November 2, 2002, Public Law 107-273 was enacted. Title III, Subtitle A, Section

13105, part (a) of the Act revised the reexamination statute by adding the following new last

sentence to 35 U.S.C. 303(a) and 312(a):

> The existence of a substantial new question of patentability is not precluded by
> the fact that a patent or printed publication was previously cited by or to the
> Office or considered by the Office.

For any reexamination ordered on or after November 2, 2002, the effective date of the

statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily

preclude the existence of a substantial new question of patentability (SNQ) that is based

exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance

shall be based upon a fact-specific inquiry done on a case-by-case basis.

In the present instance, both Bly '363, Baker '007 and Matsumura qualify as old art since

each were previously cited, applied and/or relied upon in rejections of the claims in the original

examination of the '888 application.

However, being "old art" does not necessarily preclude these references from establishing

a SNQ. A SNQ may be based solely on old art where the old art is being presented/viewed in a

new light, or a different way, as compared with its use in the earlier concluded examination(s), in

view of a material new argument or interpretation in in the request. See MPEP § 2242. These

references are now being presented and viewed in a new light, or in a different way, as compared

with their use in the earlier examinations as discussed in detail in this order. Accordingly, the

use of these references in this reexamination is proper. Below is a detailed analysis for each of

the references requester asserts raise an SNQ.

Bly '363 is considered "old art" to the reexamination of the '554 patent since USPN

8,116,841 to Bly (hereinafter "Bly '841"), the issued patent resulting from Bly '363, was

provided in an IDS in the '888 application.

However, neither Bly '363 nor Bly '841 were relied upon in a rejection of the claims in

the '888 application and/or any preceding applications to the '888 application.  Now, requester is

presenting Bly '363 in a new light as teaching a flexible layer including a polymer upper layer

overlying an electrical connection, the electrical connection extending linearly from the

physiologic data collection circuit to the electrode, the polymer upper layer adhered to a polymer

lower layer underlying the electrical connection where the adhesive layer is positioned under the

polymer upper layer, connecting the polymer upper layer to the polymer lower layer.  See

Request filed 09/08/2025, pages 20-24.  Therefore, Bly '363 is being applied in a new light than

its earlier use in the '888 application.

Baker '007 is considered "old art" to the reexamination of the '554 patent since the US

Publication of Baker '007 was relied upon in a rejection of the claims in US Application

13/106,750 (hereinafter "the '750 application").  US Pub. No. 2008/0139953 (hereinafter "Baker

'953") was used in rejections of claims 1-6, 11, 20, 22-25, 26-29, 31-33 and 38-41 in the Non-

Final Office Action mailed 10/02/2012, pages 5 and 7.  These rejections were maintained but

modified in the Final Rejection mailed 12/28/2012, pages 6-7.  Additionally, Baker '007 is

considered "old art" to the reexamination of the '554 patent since Baker '007 was provided in an

IDS in the '888 application.

In the '750 application, Baker '007 was relied upon for its teachings of "a housing (102)

containing electronics (101) and two wings (Figs. 1A, 1D and 2) with electrodes (404). An

adhesive (para. [0045]-[0046]) covers the bottom of the wings (on the barrier 105), but not the

Application/Control Number: 90/015,504                                          Page 8
Art Unit: 3993

electrodes (Fig. 2; para. [0046]).  The wings have flaps surrounding them, and the flaps are

connected together underneath the housing (Figs. 1D and 2), but they do not touch the housing

(held in cradle 104).  When assembled, the device is monolithic (Figs. 1A and 1C)."  Further,

Baker '007 is indicated to teach the "use of a barrier (105) between the wings and the adhesive

(Fig. 2).  Baker suggests using foam adhesive from Scapa Medical (para. [0046])…"  See the

'750 application, Non-Final Office Action mailed 10/02/2012, pages 5 and 7.[1]

        However, now Baker '007 is being presented in a different way.  Baker '007 is now

being presented as a secondary reference to Bly '363.   In the request, Baker '007 is relied upon

to specifically teach that the electrodes are positioned distal from the housing.  See Request for

Reexamination filed 09/08/2025, page 43.  Therefore, Baker '007 is being applied in a different

way than its earlier use in both the '888 and '750 applications.

        Matsumura is considered "old art" to the reexamination of the '554 patent since

Matsumura was provided in an IDS in the '888 application.  However, Matsumura was not relied

upon in a rejection of the claims in the '888 application and/or any preceding applications to the

'888 application.  Now, requester is presenting Matsumura in a new light as teaching a flexible

layer comprising a polymer upper layer overlying an electrical connection, the electrical

connection extending linearly from the physiologic data collection circuit to the electrode when

viewed from above the electronic device, the polymer upper layer adhered to a polymer lower

layer underlying the electrical connection and a connecting adhesive layer positioned under the

polymer layer upper layer and connecting the upper layer to the lower layer.  See Request filed

09/08/2025, pages 67-69.  Therefore, Matsumura is being applied in a new light than its earlier

use in the '888 application.

---

[1] It is noted that the rejection was maintained in the '750 application, Final Rejection, pages 6-7 and Baker was
additionally relied upon to teach "The adhesive is also separated from the housing (by barrier 105 and cradle 104)."

### *Proposed SNQ 1: Bly '363*

The consideration of Bly '363 raises an SNQ as to claims 1-12 of the '554 patent. As detailed above, during the prosecution of the '888 application the allowance of the claims resulted from the prior art failing to teach the claim limitation of "the flexible layer comprises a polymer upper layer overlying an electrical connection and adhered to a polymer lower layer underlying the electrical connection and a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer."

The request filed 09/08/2025 asserts that Bly '363 teaches this limitation resulting in the allowance of the '554 patent. Requester presents on pages 21-23 of their request that Bly '363 teaches,

> First, *Bly* discloses that get cover 180 is a polymer upper layer. "A gel cover 180, or gel cover layer, for example a polyurethane on-woven tape, can be positioned over patch 110 comprising the breathable tape." *Id.*, ¶85.

> "Gel cover 180 may comprise at least one of a polyurethane, polyethylene, polyolefin, rayon, PVC, silicone, non-woven material, foam, or a film. In many embodiments gel cover 180 may comprise an adhesive, for example a acrylate pressure sensitive adhesive, to adhere the gel cover to adherent patch 110. In specific embodiments gel cover 180 may comprise a polyurethane film with acrylate pressure sensitive adhesive." *Id.*, ¶87.

Application/Control Number: 90/015,504                                    Page 10
Art Unit: 3993

> The gel cover (i.e., the polymer upper layer) adheres to a
> breathable tape. "[G]el cover 180 may comprise an adhesive,
> for example a acrylate pressure sensitive adhesive, to adhere
> the gel cover to adherent patch 110." *Id.*, ¶87. *Bly's* breathable
> tape is a polymer lower layer that underlies the electrical
> connection. "In many embodiments, adherent patch 110 may
> comprise a layer of breathable tape 110T, for example a known
> breathable tape, such as tricot-knit polyester fabric. In many
> embodiments, breathable tape 110T comprises a backing
> material, or backing 111, with an adhesive." *Id.*, ¶81. As
>
> Further, gel cover 180, annotated in blue, "*may comprise an
> adhesive, for example a acrylate pressure sensitive adhesive,
> to adhere the gel cover to adherent patch 110*" (adherent patch
> 110 which may comprise breathable tape 110T are annotated
> in orange). *Id.*, ¶87.

Turning to Bly '363, the patent is directed to an adherent device to monitor a patient for

an extended period comprising a breathable tape. The appliance includes as outlined in para.

[0072], "FIG. 1F shows a top view of **a cover 162 over the batteries, electronic components

and flex printed circuit board** as in FIGS. 1A to 1E. In many embodiments, an electronics

housing 160 may be disposed under cover 162 to protect the electronic components, and in some

embodiments electronics housing 160 may comprise an encapsulant over the electronic

components and PCB. In some embodiments, **cover 162 can be adhered to adherent patch 110

with an adhesive 164 on an underside of cover 162.**" (emphasis added) Para. [0073] states,

"In some embodiments, **cover 162 may comprise** many known breathable materials, for

example **polyester, polyamide, nylon and/or elastane** (Spandex.TM.). The breathable fabric

may be coated to make it water resistant, waterproof, and/or to aid in wicking moisture away

from the patch." (emphasis added) Para. [0078] states, "The adherent device comprises

electrodes 112A1, 112B1, 112C1 and 112D1 configured to couple to tissue through apertures in

the breathable tape 110T. Electrodes 112A1, 112B1, 112C1 and 112D1 can be fabricated in

many ways. For example, electrodes 112A1, 112B1, 112C1 and 112D1 can be printed on a

flexible connector 112F, such as silver ink on polyurethane. Breathable tape 110T comprise

apertures 180A1, 180B1, 180C1 and 180D1. Electrodes 112A1, 112B1, 112C1 and 112D1 are

exposed to the gel through apertures 180A1, 180B1, 180C1 and 180D1 of breathable tape 110T.

Gel 114A, gel 114B, gel 114C and gel 114D can be positioned over electrodes 112A1, 112B1,

112C1 and 112D1 and the respective portions of breathable tape 11 OT proximate apertures

180A1, 180B1, 180C1 and 180D1, so as to couple electrodes 112A1, 112B1, 112C1 and 112D1

to the skin of the patient. The flexible connector 112F comprising the electrodes can extend from

under the gel cover to the printed circuit board to connect to the printed circuit boards and/or

components supported thereon. For example, flexible connector 112F may comprise flexible

connector 122A to provide strain relief, as described above." (emphasis added) Para. [0081]

states, "In many embodiments, **adherent patch 110 may comprise a layer of breathable**

**tape 110T,** for example a known breathable tape, such as tricot-knit polyester fabric. In many

embodiments, breathable tape 110T comprises a backing material, or backing 111, **with an**

**adhesive**. **In many embodiments, the patch adheres to the skin of the patient's body**, and

comprises a breathable material to allow moisture vapor and air to circulate to and from the skin

of the patient through the tape." (emphasis added)

There is a substantial likelihood that a reasonable examiner would consider the above

teachings, i.e., cover 162, adherent patch 110 with an adhesive 164 on an underside of cover 162,

and adhesive adhering the patch to the patient's skin as taught by Bly'363 important in

determining the patentability of the claims. Accordingly, requester has raised a substantial new

question of patentability in consideration of Bly'363, which question has not been decided in a

previous examination of the '554 patent.

Therefore, requester has raised a substantial new question of patentability in regards to claims 1-12 in consideration of Bly'363, which question has not been decided in a previous examination of the '554 patent.

### Proposed SNQ 2: Bly '363 in view of Baker '007

The consideration of Bly '363 raises an SNQ as to claims 1-12 of the '554 patent. As detailed above, during the prosecution of the '888 application the allowance of the claims resulted from the prior art failing to teach the claim limitation of "the flexible layer comprises a polymer upper layer overlying an electrical connection and adhered to a polymer lower layer underlying the electrical connection and a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer."

The request filed 09/08/2025 asserts that Bly '363 teaches this limitation resulting in the allowance of the '554 patent. See Request for Reexamination, pages 20-23. Baker '007 is used as a secondary reference. In the request, Baker '007 is relied upon to specifically teach that the electrodes are positioned distal from the housing. See Request for Reexamination filed 09/08/2025, page 43.

Therefore, the same new question of patentability with regards to claims 1-12 in consideration of Bly'363 is also the basis for Bly '363 taken with Baker '007, which question has not been decided in a previous examination of the '554 patent. Therefore, requester has raised a substantial new question of patentability in regards to claims 1-12 in consideration of Bly'363 and Baker '007, which question has not been decided in a previous examination of the '554 patent.

Application/Control Number: 90/015,504                                     Page 13
Art Unit: 3993

### *Proposed SNQ 3: Matsumura*

The consideration of Matsumura raises an SNQ as to claim 1 of the '554 patent. As

detailed above, during the prosecution of the '888 application the allowance of the claims

resulted from the prior art failing to teach the claim limitation of "the flexible layer comprises a

polymer upper layer overlying an electrical connection and adhered to a polymer lower layer

underlying the electrical connection and a connecting adhesive layer positioned under the

polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the

polymer lower layer."

The request filed 09/08/2025 asserts that Matsumura teaches this limitation resulting in

the allowance of the '554 patent. Requester presents on pages 67 of their request that

Matsumura teaches,

**First**, *Matsumura* discloses a flexible layer comprising a polymer upper layer overlying an electrical connection. *Matsumura* discloses a "bioelectrode pad 7 [] composed of a first sheet 1, a conductive material 2, a hook 3, a second sheet 4, a conductive gel 5, a third sheet 6, and double-sided adhesive tape 9." Ex. 1006, ¶16.

First sheet 1 and second sheet 4 "should be made of an insulating material that does not allow moisture to penetrate, for example, *polyethylene foam, polyurethane foam, or polyurethane sheet*." *Id.*, ¶¶17-18.

**Second**, *Matsumura* discloses the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection.

As shown in Figure 1 below, first sheet 1 (e.g., upper polymer layer) overlays electrode gel 5, conductive material 2, and hooks 3 (e.g., electronic connection), and these three components extend linearly from the signal processor (e.g., housing). For example, *Matsumura* discloses "The pieces of *conductive material 2 are rod-shaped*, one end of which has two holes 2a for contacting the conductive gel 5 and the other end of which has two holes 2a through which the protruding

For example, *Matsumura* explains that "an adhesive or glue, such as an acrylic adhesive for example, is applied to the back surface of the first sheet 1" and "adhesive or glue, such as acrylic adhesive for example, is applied to the surface of the

second sheet 4. The adhesive, such as acrylic adhesive for
example, is applied to the back surface of the second sheet 4."
Ex. 1006, ¶18. As shown in Figure 4, for example, the adhesive
applied to the back surface of the first sheet 1 and the adhesive
applied to the surface of second sheet 4 make up the connecting
adhesive layer (indicated by red boxes) that adhere first sheet 1
(e.g., polymer upper layer) to second sheet 4 (e.g., polymer
lower layer).



*Id.*, Figure 4(b) (annotated green indicating first sheet, blue
indicating second sheet, and red boxes indicating connecting
adhesive layer).

Turning to Matsumura[2], the patent is directed to a bioelectric potential detector and

biometric information system. The system includes a bioelectric disposable water proof

electrode pad that can be worn by the patient. See para. [0006]. Specifically, the pad 7 includes

a first sheet 1 and a second sheet 4. The first and second sheets can be made from a polyethylene

or polyurethane. See para. [0017-0018]. Conductive material 2 is between the first and second

sheets. Additionally, the second sheet 4 has an acrylic adhesive applied to the surface. See para.

[0018].

There is a substantial likelihood that a reasonable examiner would consider at least the

above teachings, i.e., first and second sheets and acrylic adhesive as taught by Matsumura

---

[2] It is noted that all citations to Matsumura are to the English Translation presented as exhibit 1006 with the Request
for Reexamination filed 09/08/2025.

important in determining the patentability of the claims.  Accordingly, requester has raised a

substantial new question of patentability in consideration of Matsumura, which question has not

been decided in a previous examination of the '554 patent.

Therefore, requester has raised a substantial new question of patentability in regards to

claim 1 in consideration of Matsumura, which question has not been decided in a previous

examination of the '554 patent.

### *35 USC 325(d)*

A review of the post grant history for the instant patent indicates that there have been no

other Office post grant challenges made to the patent (Reexamination Proceedings or *Inter*

*Partes* Review, Post Grant Review, Covered Business Method trials).  Accordingly, a

discretionary denial of reexamination pursuant to 35 USC 325(d) is not applicable.

### *Scope of Reexamination*

Since requester did not request reexamination of claim 13 and did not assert the existence

of a SNQ for such claims (see 35 U.S.C. § 311(b)(2); see also 37 CFR 1.915b and 1.923), such

claims will not be reexamined.  This matter was squarely addressed in *Sony Computer*

*Entertainment America Inc., et al. v. Jon W. Dudas*, Civil Action No. 1:05CV1447 (E.D.Va. May

22, 2006), Slip Copy, 2006 WL 1472462.  (Not Reported in F.Supp.2d.)  The District Court

upheld the Office's discretion to not reexamine claims in an *inter partes* reexamination

proceeding other than those claims for which reexamination had specifically been requested. The

Court stated:

> To be sure, a party may seek, and the PTO may grant, *inter*
> *partes* review of each and every claim of a patent.  Moreover,
> while the PTO in its discretion may review claims for which *inter*
> *partes* review was not requested, nothing in the statute compels it
> to do so.  To ensure that the PTO considers a claim for *inter*
> *partes* review, § 311(b)(2) requires that the party seeking

reexamination demonstrate why the PTO should reexamine each and every claim for which it seeks review. Here, it is undisputed that Sony did not seek review of every claim under the '213 and '333 patents. Accordingly, Sony cannot now claim that the PTO wrongly failed to reexamine claims for which Sony never requested review, and its argument that AIPA compels a contrary result is unpersuasive.

(Slip copy at page 9.)

The *Sony* decision's reasoning and statutory interpretation apply analogously to *ex parte* reexamination, as the same relevant statutory language applies to both *inter partes* and *ex parte* reexamination. 35 U.S.C. § 302 provides that the *ex parte* reexamination "request must set forth the pertinency and manner of applying cited prior art to every claim for which reexamination is requested" (emphasis added), and 35 U.S.C. § 303 provides that "the Director will determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request..." (Emphasis added). These provisions are analogous to the language of 35 U.S.C. § 311(b)(2) and 35 U.S.C. § 312 applied and construed in *Sony*, and would be construed in the same manner. As the Director can decline to reexamine non-requested claims in an *inter partes* reexamination proceeding, the Director can likewise do so in *ex parte* reexamination proceeding. See *Notice of Clarification of Office Policy To Exercise Discretion in Reexamining Fewer Than All the Patent Claims* (signed Oct. 5, 2006) 1311 OG 197 (Oct. 31, 2006). See also MPEP § 2240, Rev. 5, Aug. 2006.

Therefore, claim 13 will not be reexamined in this *ex parte* reexamination proceeding.

Application/Control Number: 90/015,504                                          Page 18
Art Unit: 3993

### *Correspondence*

A shortened statutory period of two months will generally be set for filing a response to

an Office action in an *ex parte* reexamination. An extension of time may be requested under 37

CFR 1.550(c).

All correspondence relating to this *ex parte* reexamination should be directed as follows:

By Patent Center:    Registered users may submit via the electronic filing system, Patent Center,
                     at: https://patentcenter.uspto.gov/

By Mail:             Mail Stop *Ex Parte* Reexam
                     ATTN: Central Reexamination Unit
                     Commissioner for Patents
                     U.S. Patent & Trademark Office
                     P.O. Box 1450
                     Alexandria, VA 22313-1450

By FAX:              (571)273-9900
                     Central Reexamination Unit

By hand:             Customer Service Window
                     Attn: Central Reexamination Unit
                     Knox Building, Lobby Level
                     501 Dulany Street
                     Alexandria, VA 22314

For <u>Patent Center transmissions</u>, 37 CFR 1.8(a)(1) (i)(C) and (ii) states that

correspondence (except for a request for reexamination and a corrected or replacement request

for reexamination) will be considered timely filed if: (a) it is transmitted via the Office's

electronic filing system in accordance with 37 CFR 1.6(a)(4); and, (b) includes a certificate of

transmission for each piece of correspondence stating the date of transmission, which is prior to

the expiration of the set period of time in the Office action.

Application/Control Number: 90/015,504                                    Page 19
Art Unit: 3993

Any inquiry concerning this communication or earlier communications from the

Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination

Unit (CRU) at telephone number: 571.272.7705. The CRU's fax number is: 571.273.9900.


/CATHERINE S WILLIAMS/
Reexamination Specialist, Art Unit 3993


Conferees:

/SARAH B MCPARTLIN/
Reexamination Specialist, Art Unit 3993


/EILEEN D LILLIS/
SPRS, Art Unit 3993

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /C.S.W/

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-25)
Approved for use through 11/30/2027. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|
| Application Number | | |
| Filing Date | 2024-11-04 | |
| First Named Inventor | Uday N. Kumar | |
| Art Unit | | |
| Examiner Name | | |
| Attorney Docket Number | 3726071.00380 | |

**U.S. PATENTS**    [Remove]

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Inventor of cited Document | Pages, Columns, Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 8214007 | B2 | 2012-07-03 | Baker et al. | [Exhibit 1004] |
| | 2 | 12274554 | B2 | 2025-04-15 | Kumar et al. | [Exhibit 1001] |

If you wish to add additional U.S. Patent citation information, please click the Add button.   [Add]

**U.S. PATENT APPLICATION PUBLICATIONS**    [Remove]

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Inventor or Applicant of cited Document | Pages, Columns, Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20090076363 | A1 | 2009-03-19 | Bly et al. | [Exhibit 1003] |
| | 2 | 20030069510 | A1 | 2003-04-10 | Semler | [Exhibit 1007] |

If you wish to add additional U.S. Published Application citation information, please click the Add button [Add]

**FOREIGN PATENT DOCUMENTS**    [Remove]

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages, Columns, Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2004-121360 | JP | A | 2004-04-22 | Nihon Kohden Corporation | [Exhibit 1005] | ☒ |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application Number | |
|---|---|---|
| | Filing Date | 2024-11-04 |
| | First Named Inventor | Uday N. Kumar |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 3726071.00380 |

| If you wish to add additional Foreign Patent Document citation information, please click the Add button | Add |
|---|---|

**NON-PATENT LITERATURE DOCUMENTS**   Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | Prosecution History of U.S. Patent Application No. 18/936,888 filed November 4, 2024, "DEVICE FEATURES AND DESIGN ELEMENTS FOR LONG-TERM ADHESION" - 2,513 pages. [Exhibit 1002] | ☐ |
| | 2 | English Translation of Japanese Patent Publication No. JP2004/121360 to Matsumura ("Matsumura"). [Exhibit 1006] | ☐ |

| If you wish to add additional non-patent literature document citation information, please click the Add button | Add |
|---|---|

**EXAMINER SIGNATURE**

| Examiner Signature | /CATHERINE S WILLIAMS/ | Date Considered | 10/06/2025 |
|---|---|---|---|

*EXAMINER: Initial if reference considered and whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application Number | |
|---|---|---|
| | Filing Date | 2024-11-04 |
| | First Named Inventor | Uday N. Kumar |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 3726071.00380 |

---

**TIMING STATEMENT**

Please see 37 CFR 1.97(e) to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached timing statement under 37 CFR 1.97(e).

☒ A timing statement under 37 CFR 1.97(e) is not submitted herewith.

**TIMING FEE**

☐ The fee set forth in 37 CFR 1.17(p) has been submitted herewith.

**COPIES**

☐ An identification of an earlier application pursuant to 37 CFR 1.98(d)(1) is attached.

**SIZE FEE ASSERTION**

Please see 37 CFR 1.17(v) and the IDS Auto-Load Instructions for completing this form to make the appropriate selection of an assertion under 37 CFR 1.98. For the information disclosure statement (IDS) submitted herewith, the applicant or patent owner certifies the following with respect to the cumulative number of applicant-provided or patent-owner provided items of information submitted to date including those in the accompanying IDS (select only one):

☒ No IDS size fee is required under 37 CFR 1.17(v) at this time.

☐ The IDS is accompanied by the IDS size fee under 37 CFR 1.17(v)(1).

☐ The IDS is accompanied by the IDS size fee under 37 CFR 1.17(v)(2).

☐ The IDS is accompanied by the IDS size fee under 37 CFR 1.17(v)(3).

**SIGNATURE**

A signature of the applicant or representative is required in accordance with 37 CFR 1.33 and 11.18. Please see 37 CFR 1.4(d) for the form of the signature.

| Signature | /Erik J. Halverson/ | Date (YYYY-MM-DD) | 2025-09-08 |
|---|---|---|---|
| Name/Print | Erik J. Halverson | Registration Number | 73,552 |

PC.1.19.25

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application Number | |
|---|---|---|
| | Filing Date | 2024-11-04 |
| | First Named Inventor | Uday N. Kumar |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket  Number | 3726071.00380 |

This collection of information is required by 37 CFR 1.97 and 1.98.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application.  Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14.  This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/ her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

# Exhibit I

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | 18/936888 |
|---|---|---|
| | Filing Date | November 04, 2024 |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | 3794 |
| *(Multiple sheets used when necessary)* | Examiner | Antiskay, Brian Michael |
| SHEET 1 OF 1 | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 1 | 4,623,206 | 11-18-1986 | Fuller | |
| | 2 | 12,133,731 | 11-05-2024 | Abercrombie II et al. | |
| | 3 | 12,133,734 | 11-05-2024 | Kumar et al. | |
| | 4 | 2007/0299325 | 12-27-2007 | Farrell | |
| | 5 | 2024/0382130 | 11-21-2024 | Bahney et al. | |
| | 6 | 2024/0382131 | 11-21-2024 | Bahney et al. | |
| | 7 | 2024/0398309 | 12-05-2024 | Kumar et al. | |
| | 8 | 2024/0398310 | 12-05-2024 | Kumar et al. | |
| | 9 | 2025/0009271 | 01-09-2025 | Bahney et al. | |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials | Cite No. | Foreign Patent Document<br>*Country Code-Number-Kind Code*<br>Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 10 | JP 2019-140680 | 08-22-2019 | PREFERRED NETWORKS INC. | | X |
| | 11 | JP 2019-528511 | 10-10-2019 | Mitsubishi Electric Corporation | | X |
| | 12 | JP 2024-164285 | 11-26-2024 | Irhythm Technologies, Inc. | | X |
| | 13 | JP 2025-000653 | 01-07-2025 | Irhythm Technologies, Inc. | | X |
| | 14 | WO 2019/070978 | 04-11-2019 | MAYO FOUND MEDICAL EDUCATION & RES | | |

### NON PATENT LITERATURE DOCUMENTS

| Examiner Initials | Cite No. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[1] |
|---|---|---|---|

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

# **Exhibit K**

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 1 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 1 | D408,541 | 04-20-1999 | Dunshee et al. | |
| | 2 | D429,336 | 08-08-2000 | Francis et al. | |
| | 3 | D492,607 | 07-06-2004 | Curkovic et al. | |
| | 4 | D567,949 | 04-29-2008 | Lash et al. | |
| | 5 | D584,414 | 01-06-2009 | Lash et al. | |
| | 6 | D618,357 | 06-22-2010 | Navies | |
| | 7 | D621,048 | 08-03-2010 | Severe et al. | |
| | 8 | D634,431 | 03-15-2011 | Severe et al. | |
| | 9 | D639,437 | 06-07-2011 | Bishay et al. | |
| | 10 | D645,968 | 09-27-2011 | Kasabach et al. | |
| | 11 | D659,836 | 05-15-2012 | Bensch et al. | |
| | 12 | D663,432 | 07-10-2012 | Nichols | |
| | 13 | D674,009 | 01-08-2013 | Nichols | |
| | 14 | D719,267 | 12-09-2014 | Vaccarella | |
| | 15 | D744,659 | 12-01-2015 | Bishay et al. | |
| | 16 | D759,653 | 06-21-2016 | Toth et al. | |
| | 17 | D766,447 | 09-13-2016 | Bishay et al. | |
| | 18 | D775,361 | 12-27-2016 | Vosch et al. | |
| | 19 | D773,056 | 11-29-2016 | Vlach | |
| | 20 | D780,914 | 03-07-2017 | Kyvik et al. | |
| | 21 | D793,566 | 08-01-2017 | Bishay et al. | |
| | 22 | D797,301 | 09-12-2017 | Chen | |
| | 23 | D797,943 | 09-19-2017 | Long | |
| | 24 | D798,170 | 09-26-2017 | Toth et al. | |
| | 25 | D798,294 | 09-26-2017 | Toth et al. | |
| | 26 | D810,308 | 02-13-2018 | Lind et al. | |
| | 27 | D811,610 | 02-27-2018 | Abel et al. | |
| | 28 | D811,611 | 02-27-2018 | Lind et al. | |
| | 29 | D811,615 | 02-27-2018 | Lind et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T¹ - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|
| | Application No. | Not Yet Assigned |
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 2 OF 41 | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 30 | D823,466 | 07-17-2018 | Marogil | |
| | 31 | D824,526 | 07-31-2018 | Ramjit et al. | |
| | 32 | D852,965 | 07-02-2019 | Bahney et al. | |
| | 33 | D854,167 | 07-16-2019 | Bahney et al. | |
| | 34 | RE43,767 | 10-23-2012 | Eggers et al. | |
| | 35 | 1,497,079 | 06-10-1924 | Gullborg | |
| | 36 | 2,179,922 | 11-14-1939 | Dana Arnold G. | |
| | 37 | 2,201,645 | 05-21-1940 | Epner | |
| | 38 | 2,311,060 | 02-16-1943 | Lurrain | |
| | 39 | 2,444,552 | 07-06-1948 | Brantingson Sigurd | |
| | 40 | 2,500,840 | 03-14-1950 | Lyons | |
| | 41 | 3,215,136 | 11-02-1965 | Holter et al. | |
| | 42 | 3,547,107 | 12-15-1970 | Chapman et al. | |
| | 43 | 3,697,706 | 10-10-1972 | Huggard | |
| | 44 | 3,870,034 | 03-11-1975 | James | |
| | 45 | 3,882,853 | 05-13-1975 | Gofman | |
| | 46 | 3,911,906 | 10-14-1975 | Reinhold | |
| | 47 | 4,023,312 | 05-17-1977 | Stickney | |
| | 48 | 4,027,664 | 06-07-1977 | Heavner, Jr. et al. | |
| | 49 | 4,082,087 | 04-24-1978 | Howson | |
| | 50 | 4,121,573 | 10-24-1978 | Crovella et al. | |
| | 51 | 4,123,785 | 10-31-1978 | Cherry et al. | |
| | 52 | 4,126,126 | 11-21-1978 | Bare | |
| | 53 | 4,202,139 | 05-13-1980 | Hong et al. | |
| | 54 | 4,274,419 | 06-23-1981 | Tam et al. | |
| | 55 | 4,274,420 | 06-23-1981 | Hymes | |
| | 56 | 4,286,610 | 09-01-1981 | Jones | |
| | 57 | 4,333,475 | 06-08-1982 | Moreno et al. | |
| | 58 | 4,361,990 | 12-07-1982 | Link | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | Application No. | Not Yet Assigned |
|---|---|---|---|---|
| | | | Filing Date | Herewith |
| | | | First Named Inventor | Kumar, Uday N. |
| | | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | | Examiner | Not Yet Assigned |
| SHEET 3 OF 41 | | | Attorney Docket No. | IRHYM.002C9 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 59 | 4,381,792 | 05-03-1983 | Busch | |
| | 60 | 4,438,767 | 03-27-1984 | Nelson | |
| | 61 | 4,459,987 | 07-17-1984 | Pangburn | |
| | 62 | 4,535,783 | 08-20-1985 | Marangoni | |
| | 63 | 4,537,207 | 08-27-1985 | Gilhaus | |
| | 64 | 4,572,187 | 02-25-1986 | Schetrumpf | |
| | 65 | 4,621,465 | 11-11-1986 | Pangburn | |
| | 66 | 4,622,979 | 11-18-1986 | Katchis et al. | |
| | 67 | 4,658,826 | 04-21-1987 | Weaver | |
| | 68 | 4,712,552 | 12-15-1987 | Pangburn | |
| | 69 | 4,736,752 | 04-12-1988 | Munck et al. | |
| | 70 | 4,855,294 | 08-08-1989 | Dinesh C. Patel | |
| | 71 | 4,925,453 | 05-15-1990 | Kannankeril, Charles P. | |
| | 72 | 4,938,228 | 07-03-1990 | Righter et al. | |
| | 73 | 4,981,141 | 01-01-1991 | Segalowitz | |
| | 74 | 5,003,987 | 04-02-1991 | Grinwald | |
| | 75 | 5,027,824 | 07-02-1991 | Dougherty et al. | |
| | 76 | 5,082,851 | 01-21-1992 | Appelbaum et al. | |
| | 77 | 5,086,778 | 02-11-1992 | Mueller et al. | |
| | 78 | 5,191,891 | 03-09-1993 | Righter | |
| | 79 | 5,205,295 | 04-27-1993 | Del Mar et al. | |
| | 80 | 5,226,425 | 07-13-1993 | Righter | |
| | 81 | 5,228,450 | 07-20-1993 | Sellers | |
| | 82 | 5,230,119 | 07-27-1993 | Woods et al. | |
| | 83 | 5,289,824 | 03-01-1994 | Mills et al. | |
| | 84 | 5,305,746 | 04-26-1994 | Fendrock | |
| | 85 | 5,309,909 | 05-10-1994 | Gadsby | |
| | 86 | 5,328,935 | 07-12-1994 | Van Phan | |
| | 87 | 5,365,935 | 11-22-1994 | Righter et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T[1]** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|
| | Application No. | Not Yet Assigned |
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 4 OF 41 | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 88 | 5,458,141 | 10-17-1995 | Neil | |
| | 89 | 5,483,967 | 01-16-1996 | Ohtake | |
| | 90 | 5,489,624 | 02-06-1996 | Kantner et al. | |
| | 91 | 5,511,548 | 04-30-1996 | Riazzi et al. | |
| | 92 | 5,511,553 | 04-30-1996 | Segalowitz | |
| | 93 | 5,515,858 | 05-14-1996 | Myllymaki | |
| | 94 | 5,536,768 | 07-16-1996 | Kantner et al. | |
| | 95 | 5,581,369 | 12-03-1996 | Righter et al. | |
| | 96 | 5,626,140 | 05-06-1997 | Feldman et al. | |
| | 97 | 5,634,468 | 06-03-1997 | Platt et al. | |
| | 98 | 5,645,063 | 07-08-1997 | Straka | |
| | 99 | 5,645,068 | 07-08-1997 | Mezack et al. | |
| | 100 | 5,730,143 | 03-24-1998 | Schwarzberg | |
| | 101 | 5,749,365 | 05-12-1998 | Magill | |
| | 102 | 5,749,367 | 05-12-1998 | Gamlyn et al. | |
| | 103 | 5,771,524 | 06-30-1998 | Woods et al. | |
| | 104 | 5,772,604 | 06-30-1998 | Langberg et al. | |
| | 105 | 5,776,072 | 07-07-1998 | Hsu et al. | |
| | 106 | 5,881,743 | 03-16-1999 | Nadel | |
| | 107 | 5,916,239 | 06-29-1999 | Geddes et al. | |
| | 108 | 5,931,791 | 08-03-1999 | Saltzstein et al. | |
| | 109 | 5,941,829 | 08-24-1999 | Saltzstein et al. | |
| | 110 | 5,957,854 | 09-28-1999 | Besson et al. | |
| | 111 | 5,959,529 | 09-28-1999 | Kail | |
| | 112 | 6,013,007 | 01-11-2000 | Root et al. | |
| | 113 | 6,032,060 | 02-29-2000 | Carim | |
| | 114 | 6,038,464 | 03-14-2000 | Axelgaard et al. | |
| | 115 | 6,038,469 | 03-14-2000 | Karlsson et al. | |
| | 116 | 6,044,515 | 04-04-2000 | Zygmont | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 5 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 117 | 6,093,146 | 07-25-2000 | Filangeri | |
| | 118 | 6,102,856 | 08-15-2000 | Groff et al. | |
| | 119 | 6,117,077 | 09-12-2000 | Del Mar et al. | |
| | 120 | 6,121,508 | 09-19-2000 | Katharina J. Bischof | |
| | 121 | 6,132,371 | 10-17-2000 | Dempsey et al. | |
| | 122 | 6,134,480 | 10-17-2000 | Minogue | |
| | 123 | 6,136,008 | 10-24-2000 | Becker et al. | |
| | 124 | 6,161,036 | 12-12-2000 | Matsumura et al. | |
| | 125 | 6,169,915 | 01-02-2001 | Krumbiegel et al. | |
| | 126 | 6,178,357 | 01-23-2001 | Gliner et al. | |
| | 127 | 6,200,265 | 03-13-2001 | Walsh et al. | |
| | 128 | 6,225,901 | 05-01-2001 | Kail | |
| | 129 | 6,232,366 | 05-15-2001 | Wang et al. | |
| | 130 | 6,238,338 | 05-29-2001 | DeLuca et al. | |
| | 131 | 6,248,115 | 06-19-2001 | Halk | |
| | 132 | 6,287,252 | 09-11-2001 | Lugo | |
| | 133 | 6,290,707 | 09-18-2001 | Street | |
| | 134 | 6,315,719 | 11-13-2001 | Rode et al. | |
| | 135 | 6,379,237 | 04-30-2002 | Gordon | |
| | 136 | 6,385,473 | 05-07-2002 | Haines et al. | |
| | 137 | 6,389,308 | 05-14-2002 | Shusterman | |
| | 138 | 6,416,471 | 07-09-2002 | Kumar et al. | |
| | 139 | 6,434,410 | 08-13-2002 | Cordero et al. | |
| | 140 | 6,441,747 | 08-27-2002 | Khair et al. | |
| | 141 | 6,454,708 | 09-24-2002 | Ferguson et al. | |
| | 142 | 6,456,871 | 09-24-2002 | Hsu et al. | |
| | 143 | 6,456,872 | 09-24-2002 | Faisandier | |
| | 144 | 6,464,815 | 10-15-2002 | Beaudry, Wallace J. | |
| | 145 | 6,493,898 | 12-17-2002 | Woods et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T[1]** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 6 OF 41 | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example:  1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 146 | 6,496,705 | 12-17-2002 | Ng et al. | |
| | 147 | 6,510,339 | 01-21-2003 | Kovtun et al. | |
| | 148 | 6,546,285 | 04-08-2003 | Owen et al. | |
| | 149 | 6,564,090 | 05-13-2003 | Taha et al. | |
| | 150 | 6,569,095 | 05-27-2003 | Eggers | |
| | 151 | 6,577,893 | 06-10-2003 | Besson et al. | |
| | 152 | 6,580,942 | 06-17-2003 | Willshire | |
| | 153 | 6,585,707 | 07-01-2003 | Cabiri et al. | |
| | 154 | 6,589,170 | 07-08-2003 | Flach et al. | |
| | 155 | 6,589,187 | 07-08-2003 | Dimberger et al. | |
| | 156 | 6,605,046 | 08-12-2003 | Del Mar et al. | |
| | 157 | 6,615,083 | 09-02-2003 | Kupper | |
| | 158 | 6,622,035 | 09-16-2003 | Merilainen | |
| | 159 | 6,626,865 | 09-30-2003 | Prisell | |
| | 160 | 6,656,125 | 12-02-2003 | Misczynski et al. | |
| | 161 | 6,664,893 | 12-16-2003 | Eveland et al. | |
| | 162 | 6,665,385 | 12-16-2003 | Rogers et al. | |
| | 163 | 6,690,959 | 02-10-2004 | Thompson | |
| | 164 | 6,694,177 | 02-17-2004 | Eggers et al. | |
| | 165 | 6,701,184 | 03-02-2004 | Henkin | |
| | 166 | 6,711,427 | 03-23-2004 | Ketelhohn | |
| | 167 | 6,730,028 | 05-04-2004 | Eppstein | |
| | 168 | 6,773,396 | 08-10-2004 | Flach et al. | |
| | 169 | 6,775,566 | 08-10-2004 | Nissila | |
| | 170 | 6,801,137 | 10-05-2004 | Eggers | |
| | 171 | 6,801,802 | 10-05-2004 | Sitzman et al. | |
| | 172 | 6,871,089 | 03-22-2005 | Korzinov et al. | |
| | 173 | 6,871,211 | 03-22-2005 | Labounty et al. | |
| | 174 | 6,875,174 | 04-05-2005 | Braun et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 7 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number *Number - Kind Code (if known)* Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 175 | 6,881,191 | 04-19-2005 | Oakley et al. | |
| | 176 | 6,893,396 | 05-17-2005 | Schulze et al. | |
| | 177 | 6,897,788 | 05-24-2005 | Khair et al. | |
| | 178 | 6,904,312 | 06-07-2005 | Bardy | |
| | 179 | 6,925,324 | 08-02-2005 | Shusterman | |
| | 180 | 6,940,403 | 09-06-2005 | Kail | |
| | 181 | 6,954,163 | 10-11-2005 | Toumazou et al. | |
| | 182 | 6,957,107 | 10-18-2005 | Rogers et al. | |
| | 183 | 6,987,965 | 01-17-2006 | Ng et al. | |
| | 184 | 7,002,468 | 02-21-2006 | Eveland et al. | |
| | 185 | 7,020,508 | 03-28-2006 | Stivoric et al. | |
| | 186 | 7,024,248 | 04-04-2006 | Penner et al. | |
| | 187 | 7,031,770 | 04-18-2006 | Collins et al. | |
| | 188 | 7,072,708 | 07-04-2006 | Andresen et al. | |
| | 189 | 7,072,709 | 07-04-2006 | Xue | |
| | 190 | 7,076,283 | 07-11-2006 | Cho et al. | |
| | 191 | 7,076,287 | 07-11-2006 | Rowlandson | |
| | 192 | 7,076,288 | 07-11-2006 | Skinner | |
| | 193 | 7,076,289 | 07-11-2006 | Sarkar et al. | |
| | 194 | 7,079,977 | 07-18-2006 | Osorio et al. | |
| | 195 | 7,082,327 | 07-25-2006 | Houben | |
| | 196 | 7,089,048 | 08-08-2006 | Matsumura et al. | |
| | 197 | 7,099,715 | 08-29-2006 | Korzinov et al. | |
| | 198 | 7,117,031 | 10-03-2006 | Lohman et al. | |
| | 199 | 7,120,485 | 10-10-2006 | Glass et al. | |
| | 200 | 7,130,396 | 10-31-2006 | Rogers et al. | |
| | 201 | 7,161,484 | 01-09-2007 | Tsoukalis | |
| | 202 | 7,171,166 | 01-30-2007 | Ng et al. | |
| | 203 | 7,179,152 | 02-20-2007 | Rhoades | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*Examiner: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 8 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

## U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number *Number - Kind Code (if known)* Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 204 | 7,186,264 | 03-06-2007 | Liddicoat et al. | |
| | 205 | 7,193,264 | 03-20-2007 | Lande | |
| | 206 | 7,194,300 | 03-20-2007 | Korzinov | |
| | 207 | 7,206,630 | 04-17-2007 | Tarler | |
| | 208 | 7,212,850 | 05-01-2007 | Prystowsky et al. | |
| | 209 | 7,222,054 | 05-22-2007 | Geva | |
| | 210 | 7,242,318 | 07-10-2007 | Harris | |
| | 211 | 7,266,361 | 09-04-2007 | Burdett | |
| | 212 | 7,316,671 | 01-08-2008 | Lastovich et al. | |
| | 213 | 7,349,947 | 03-25-2008 | Slage et al. | |
| | 214 | 7,354,423 | 04-08-2008 | Zelickson et al. | |
| | 215 | 7,387,607 | 06-17-2008 | Holt et al. | |
| | 216 | 7,444,177 | 10-28-2008 | Nazeri | |
| | 217 | 7,477,933 | 01-13-2009 | Ueyama | |
| | 218 | 7,478,108 | 01-13-2009 | Townsend et al. | |
| | 219 | 7,481,772 | 01-27-2009 | Banet | |
| | 220 | 7,482,314 | 01-27-2009 | Grimes et al. | |
| | 221 | 7,502,643 | 03-10-2009 | Farringdon et al. | |
| | 222 | 7,539,533 | 05-26-2009 | Tran | |
| | 223 | 7,542,878 | 06-02-2009 | Nanikashvili | |
| | 224 | 7,587,237 | 09-08-2009 | Korzinov et al. | |
| | 225 | 7,630,756 | 12-08-2009 | Linker | |
| | 226 | 7,632,174 | 12-15-2009 | Gringer et al. | |
| | 227 | 7,672,714 | 03-02-2010 | Kuo et al. | |
| | 228 | 7,715,905 | 05-11-2010 | Kurzweil et al. | |
| | 229 | 7,729,753 | 06-01-2010 | Kremliovsky et al. | |
| | 230 | 7,733,224 | 06-08-2010 | Tran | |
| | 231 | 7,815,494 | 10-19-2010 | Gringer et al. | |
| | 232 | 7,841,039 | 11-30-2010 | Squire | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*Examiner: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T¹ - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 9 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 233 | 7,889,070 | 02-15-2011 | Reeves et al. | |
| | 234 | 7,894,888 | 02-22-2011 | Chan et al. | |
| | 235 | 7,904,133 | 03-08-2011 | Gehman et al. | |
| | 236 | 7,907,956 | 03-15-2011 | Uhlik | |
| | 237 | 7,907,996 | 03-15-2011 | Prystowsky et al. | |
| | 238 | 7,941,207 | 05-10-2011 | Korzinov | |
| | 239 | 7,970,450 | 06-28-2011 | Kroecker et al. | |
| | 240 | 7,979,111 | 07-12-2011 | Acquista | |
| | 241 | 7,996,075 | 08-09-2011 | Korzinov et al. | |
| | 242 | 7,996,187 | 08-09-2011 | Nanikashvili et al. | |
| | 243 | 8,002,701 | 08-23-2011 | John et al. | |
| | 244 | 8,077,042 | 12-13-2011 | Peeters | |
| | 245 | 8,103,333 | 01-24-2012 | Tran | |
| | 246 | 8,108,036 | 01-31-2012 | Tran | |
| | 247 | 8,116,841 | 02-14-2012 | Bly et al. | |
| | 248 | 8,150,502 | 04-03-2012 | Kumar et al. | |
| | 249 | 8,156,945 | 04-17-2012 | Hart | |
| | 250 | 8,160,682 | 04-17-2012 | Kumar et al. | |
| | 251 | 8,170,639 | 01-05-2012 | Hauge | |
| | 252 | 8,200,319 | 06-12-2012 | Pu et al. | |
| | 253 | 8,214,007 | 07-03-2012 | Baker et al. | |
| | 254 | 8,244,335 | 08-14-2012 | Kumar et al. | |
| | 255 | 8,249,686 | 08-21-2012 | Libbus et al. | |
| | 256 | 8,261,754 | 09-11-2012 | Pitstick | |
| | 257 | 8,265,907 | 09-11-2012 | Nanikashvili et al. | |
| | 258 | 8,280,749 | 10-02-2012 | Hsieh et al. | |
| | 259 | 8,285,356 | 10-09-2012 | Bly et al. | |
| | 260 | 8,290,129 | 10-16-2012 | Rogers et al. | |
| | 261 | 8,290,574 | 10-16-2012 | Field et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 10 OF 41 | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 262 | 8,301,219 | 10-30-2012 | Chen et al. | |
| | 263 | 8,301,236 | 10-30-2012 | Baumann et al. | |
| | 264 | 8,311,604 | 11-13-2012 | Rowlandson et al. | |
| | 265 | 8,315,687 | 11-20-2012 | Cross et al. | |
| | 266 | 8,315,695 | 11-20-2012 | Sebelius et al. | |
| | 267 | 8,323,188 | 12-04-2012 | Tran | |
| | 268 | 8,326,394 | 12-04-2012 | Rowlandson et al. | |
| | 269 | 8,326,407 | 12-04-2012 | Linker | |
| | 270 | 8,328,718 | 12-11-2012 | Tran | |
| | 271 | 8,343,116 | 01-01-2013 | Ignon | |
| | 272 | 8,369,936 | 02-05-2013 | Farringdon et al. | |
| | 273 | 8,374,688 | 02-12-2013 | Libbus et al. | |
| | 274 | 8,386,009 | 02-26-2013 | Lindberg et al. | |
| | 275 | 8,388,543 | 03-05-2013 | Chon et al. | |
| | 276 | 8,406,843 | 03-26-2013 | Tiegs et al. | |
| | 277 | 8,412,317 | 04-02-2013 | Mazar | |
| | 278 | 8,417,326 | 04-09-2013 | Chon et al. | |
| | 279 | 8,425,414 | 04-23-2013 | Eveland | |
| | 280 | 8,449,471 | 05-28-2013 | Tran | |
| | 281 | 8,452,356 | 05-28-2013 | Vestel et al. | |
| | 282 | 8,460,189 | 06-11-2013 | Libbus et al. | |
| | 283 | 8,473,039 | 06-25-2013 | Michelson et al. | |
| | 284 | 8,473,047 | 06-25-2013 | Chakravarthy et al. | |
| | 285 | 8,478,418 | 07-02-2013 | Fahey | |
| | 286 | 8,483,809 | 07-09-2013 | Kim et al. | |
| | 287 | 8,500,636 | 08-06-2013 | Tran | |
| | 288 | 8,515,529 | 08-20-2013 | Pu et al. | |
| | 289 | 8,525,673 | 09-03-2013 | Tran | |
| | 290 | 8,535,223 | 09-17-2013 | Corroy et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 11 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example:  1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 291 | 8,538,503 | 09-17-2013 | Kumar et al. | |
| | 292 | 8,540,731 | 09-24-2013 | Kay | |
| | 293 | 8,560,046 | 10-15-2013 | Kumar et al. | |
| | 294 | 8,562,527 | 10-22-2013 | Braun et al. | |
| | 295 | 8,571,645 | 10-29-2013 | Wu et al. | |
| | 296 | 8,588,908 | 11-19-2013 | Moorman et al. | |
| | 297 | 8,591,430 | 11-26-2013 | Amurthur et al. | |
| | 298 | 8,591,599 | 11-26-2013 | Rahul R. Kaliki | |
| | 299 | 8,594,763 | 11-26-2013 | Bibian | |
| | 300 | 8,626,262 | 01-07-2014 | McGusty et al. | |
| | 301 | 8,639,319 | 01-28-2014 | Hugh et al. | |
| | 302 | 8,668,643 | 03-11-2014 | Kinast | |
| | 303 | 8,684,900 | 04-01-2014 | Tran | |
| | 304 | 8,684,925 | 04-01-2014 | Amurthur et al. | |
| | 305 | 8,688,189 | 04-01-2014 | Shennib | |
| | 306 | 8,688,190 | 04-01-2014 | Libbus et al. | |
| | 307 | 8,688,202 | 04-01-2014 | Brockway et al. | |
| | 308 | 8,718,742 | 05-06-2014 | Beck et al. | |
| | 309 | 8,718,752 | 05-06-2014 | Libbus et al. | |
| | 310 | 8,718,753 | 05-06-2014 | Chon et al. | |
| | 311 | 8,731,632 | 05-20-2014 | Sereboff et al. | |
| | 312 | 8,738,118 | 05-27-2014 | Moon et al. | |
| | 313 | 8,744,561 | 06-03-2014 | Fahey | |
| | 314 | 8,750,980 | 06-10-2014 | Katra et al. | |
| | 315 | 8,755,876 | 06-17-2014 | Chon et al. | |
| | 316 | 8,782,308 | 07-15-2014 | Vlach | |
| | 317 | 8,789,727 | 07-29-2014 | Mortazavi | |
| | 318 | 8,790,257 | 07-29-2014 | Libbus et al. | |
| | 319 | 8,795,174 | 08-05-2014 | Manicka et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 12 OF 41 | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 320 | 8,818,481 | 08-26-2014 | Bly et al. | |
| | 321 | 8,823,490 | 09-02-2014 | Libbus et al. | |
| | 322 | 8,838,218 | 09-16-2014 | Khair | |
| | 323 | 8,858,450 | 10-14-2014 | Chon et al. | |
| | 324 | 8,874,185 | 10-28-2014 | Sonnenborg | |
| | 325 | 8,903,477 | 12-02-2014 | Berkner | |
| | 326 | 8,903,484 | 12-02-2014 | Mazar | |
| | 327 | 8,909,328 | 12-09-2014 | Chon | |
| | 328 | 8,909,330 | 12-09-2014 | McCombie et al. | |
| | 329 | 8,909,332 | 12-09-2014 | Vitali et al. | |
| | 330 | 8,909,333 | 12-09-2014 | Rossi | |
| | 331 | 8,909,832 | 12-09-2014 | Vlach et al. | |
| | 332 | 8,926,509 | 01-06-2015 | Magar et al. | |
| | 333 | 8,945,019 | 02-03-2015 | Prystowsky et al. | |
| | 334 | 8,948,854 | 02-03-2015 | Friedman et al. | |
| | 335 | 8,954,129 | 02-10-2015 | Schlegel et al. | |
| | 336 | 8,956,293 | 02-17-2015 | McCombie et al. | |
| | 337 | 8,968,195 | 03-03-2015 | Tran | |
| | 338 | 8,972,000 | 03-03-2015 | Manera | |
| | 339 | 8,979,755 | 03-17-2015 | Szydlo-Moore et al. | |
| | 340 | 9,014,777 | 04-21-2015 | Woo | |
| | 341 | 9,015,008 | 04-21-2015 | Geva et al. | |
| | 342 | 9,017,255 | 04-28-2015 | Raptis et al. | |
| | 343 | 9,017,256 | 04-28-2015 | Gottesman | |
| | 344 | 9,021,161 | 04-28-2015 | Vlach et al. | |
| | 345 | 9,021,165 | 04-28-2015 | Vlach | |
| | 346 | 9,026,190 | 05-05-2015 | Shenasa et al. | |
| | 347 | 9,037,223 | 05-19-2015 | Oral et al. | |
| | 348 | 9,044,148 | 06-02-2015 | Michelson et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|
| | Application No. | Not Yet Assigned |
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 13 OF 41 | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 349 | 9,084,548 | 07-21-2015 | Bouguerra | |
| | 350 | 9,095,274 | 08-04-2015 | Fein et al. | |
| | 351 | 9,101,264 | 08-11-2015 | Acquista | |
| | 352 | 9,138,144 | 09-22-2015 | Geva | |
| | 353 | 9,149,228 | 10-06-2015 | Kinast | |
| | 354 | 9,173,670 | 11-03-2015 | Sepulveda et al. | |
| | 355 | 9,179,851 | 11-10-2015 | Baumann et al. | |
| | 356 | 9,211,076 | 12-15-2015 | Kim | |
| | 357 | 9,226,679 | 01-05-2016 | Balda | |
| | 358 | 9,241,649 | 01-26-2016 | Kumar et al. | |
| | 359 | 9,241,650 | 01-26-2016 | Amirim | |
| | 360 | 9,277,864 | 03-08-2016 | Yang et al. | |
| | 361 | 9,282,894 | 03-15-2016 | Banet et al. | |
| | 362 | 9,307,921 | 04-12-2016 | Friedman et al. | |
| | 363 | 9,345,414 | 05-24-2016 | Bardy et al. | |
| | 364 | 9,355,215 | 05-31-2016 | Vlach | |
| | 365 | 9,357,939 | 06-07-2016 | Nosrati | |
| | 366 | 9,364,150 | 06-14-2016 | Sebelius et al. | |
| | 367 | 9,364,155 | 06-14-2016 | Bardy et al | |
| | 368 | 9,398,853 | 07-26-2016 | Nanikashvili | |
| | 369 | 9,408,551 | 08-09-2016 | Bardy et al | |
| | 370 | 9,408,545 | 08-09-2016 | Felix et al. | |
| | 371 | 9,408,576 | 08-09-2016 | Chon et al. | |
| | 372 | 9,414,753 | 08-16-2016 | Chon et al. | |
| | 373 | 9,414,786 | 08-16-2016 | Brockway et al. | |
| | 374 | 9,433,367 | 09-06-2016 | Felix et al. | |
| | 375 | 9,433,380 | 09-06-2016 | Bishay et al. | |
| | 376 | 9,439,566 | 09-13-2016 | Arne et al. | |
| | 377 | 9,439,599 | 09-13-2016 | Thompson et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 14 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number *Number - Kind Code (if known)* Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 378 | 9,445,719 | 09-20-2016 | Libbus et al. | |
| | 379 | 9,451,890 | 09-27-2016 | Gitlin et al. | |
| | 380 | 9,451,975 | 09-27-2016 | Sepulveda et al. | |
| | 381 | 9,474,445 | 10-25-2016 | Eveland | |
| | 382 | 9,474,461 | 10-25-2016 | Fisher et al. | |
| | 383 | 9,478,998 | 10-25-2016 | Lapetina et al. | |
| | 384 | 9,492,084 | 11-15-2016 | Behar et al. | |
| | 385 | 9,504,423 | 11-29-2016 | Bardy et al. | |
| | 386 | 9,510,764 | 12-06-2016 | Li et al. | |
| | 387 | 9,510,768 | 12-06-2016 | Rossi | |
| | 388 | 9,526,433 | 12-27-2016 | Lapetina et al. | |
| | 389 | 9,545,204 | 01-17-2017 | Bishay et al. | |
| | 390 | 9,545,228 | 01-17-2017 | Bardy et al | |
| | 391 | 9,554,715 | 01-31-2017 | Bardy et al | |
| | 392 | 9,579,020 | 02-28-2017 | Libbus et al. | |
| | 393 | 9,585,584 | 03-07-2017 | Marek et al. | |
| | 394 | 9,597,004 | 03-21-2017 | Hughes et al. | |
| | 395 | 9,615,763 | 04-11-2017 | Felix et al. | |
| | 396 | 9,615,793 | 04-11-2017 | Solosko et al. | |
| | 397 | 9,619,660 | 04-11-2017 | Felix et al. | |
| | 398 | 9,642,537 | 05-09-2017 | Felix et al. | |
| | 399 | 9,655,518 | 05-23-2017 | Lin | |
| | 400 | 9,655,537 | 05-23-2017 | Bardy et al | |
| | 401 | 9,655,538 | 05-23-2017 | Felix | |
| | 402 | 9,662,030 | 05-30-2017 | Thng et al. | |
| | 403 | 9,675,264 | 06-13-2017 | Acquista et al. | |
| | 404 | 9,700,227 | 06-11-2017 | Bishay et al. | |
| | 405 | 9,706,938 | 07-18-2017 | Chakravarthy et al. | |
| | 406 | 9,706,956 | 07-18-2017 | Brockway et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|
| | Application No. | Not Yet Assigned |
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 15 OF 41 | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 407 | 9,713,428 | 07-25-2017 | Chon et al. | |
| | 408 | 9,717,432 | 08-01-2017 | Bardy et al | |
| | 409 | 9,717,433 | 08-01-2017 | Felix et al. | |
| | 410 | 9,730,593 | 08-15-2017 | Bardy et al | |
| | 411 | 9,730,604 | 08-15-2017 | Li et al. | |
| | 412 | 9,730,641 | 08-15-2017 | Felix et al. | |
| | 413 | 9,736,625 | 08-15-2017 | Landgraf et al. | |
| | 414 | 9,737,211 | 08-22-2017 | Bardy et al | |
| | 415 | 9,737,224 | 08-22-2017 | Bardy et al | |
| | 416 | 9,775,534 | 10-03-2017 | Korzinov et al. | |
| | 417 | 9,775,536 | 10-03-2017 | Felix et al. | |
| | 418 | 9,782,095 | 10-10-2017 | Ylostalo et al. | |
| | 419 | 9,782,132 | 10-10-2017 | Golda et al. | |
| | 420 | 9,788,722 | 10-17-2017 | Bardy et al | |
| | 421 | 9,801,562 | 10-31-2017 | Host-Madsen | |
| | 422 | 9,820,665 | 11-21-2017 | Felix et al. | |
| | 423 | 9,839,363 | 12-12-2017 | Albert | |
| | 424 | 9,888,866 | 02-13-2018 | Chon et al. | |
| | 425 | 9,907,478 | 03-06-2018 | Friedman et al. | |
| | 426 | 9,936,875 | 04-10-2018 | Bardy et al | |
| | 427 | 9,955,885 | 05-01-2018 | Felix et al. | |
| | 428 | 9,955,887 | 05-01-2018 | Hughes et al. | |
| | 429 | 9,955,888 | 05-01-2018 | Felix et al. | |
| | 430 | 9,955,911 | 05-01-2018 | Bardy et al | |
| | 431 | 9,986,921 | 06-05-2018 | Chon et al. | |
| | 432 | 9,968,274 | 05-15-2018 | Korzinov et al. | |
| | 433 | 10,004,415 | 06-26-2018 | Bishay et al. | |
| | 434 | 10,045,709 | 08-14-2018 | Bardy et al | |
| | 435 | 10,052,022 | 08-21-2018 | Bardy et al | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| | | | | Application No. | Not Yet Assigned |

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**

| | Value |
|---|---|
| Application No. | Not Yet Assigned |
| Filing Date | Herewith |
| First Named Inventor | Kumar, Uday N. |
| Art Unit | Not Yet Assigned |
| Examiner | Not Yet Assigned |
| Attorney Docket No. | IRHYM.002C9 |

*(Multiple sheets used when necessary)*

SHEET 16 OF 41

## U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 436 | 10,076,257 | 09-18-2018 | Lin et al. | |
| | 437 | 10,095,841 | 10-09-2018 | Dettinger et al. | |
| | 438 | 10,098,559 | 10-16-2018 | Hughes et al. | |
| | 439 | 10,111,601 | 10-30-2018 | Bishay et al. | |
| | 440 | 10,123,703 | 11-13-2018 | Bardy et al | |
| | 441 | 10,154,793 | 12-18-2018 | Felix et al. | |
| | 442 | 10,165,946 | 01-01-2019 | Bardy et al | |
| | 443 | 10,172,534 | 01-08-2019 | Felix et al. | |
| | 444 | 10,176,575 | 01-08-2019 | Isgum et al. | |
| | 445 | 10,251,575 | 04-09-2019 | Bardy et al | |
| | 446 | 10,251,576 | 04-09-2019 | Bardy et al | |
| | 447 | 10,264, 992 | 04-23-2019 | Felix et al. | |
| | 448 | 10,265,015 | 04-23-2019 | Bardy et al. | |
| | 449 | 10,270,898 | 04-23-2019 | Soli et al. | |
| | 450 | 10,299,691 | 05-28-2019 | Hughes et al. | |
| | 451 | 10,271,754 | 04-30-2019 | Bahney et al. | |
| | 452 | 10,271,755 | 04-30-2019 | Felix et al. | |
| | 453 | 10,327,657 | 06-25-2019 | Spencer et al. | |
| | 454 | 10,271,756 | 04-30-2019 | Felix et al. | |
| | 455 | 10,278,603 | 05-07-2019 | Felix et al. | |
| | 456 | 10,278,606 | 05-07-2019 | Bishay et al. | |
| | 457 | 10,278,607 | 05-07-2019 | Prystowsky et al. | |
| | 458 | 10,321,823 | 06-18-2019 | Chakravarthy et al. | |
| | 459 | 10,362,467 | 07-23-2019 | Landgraf et al. | |
| | 460 | 10,368,808 | 08-06-2019 | Lee et al. | |
| | 461 | 10,376,172 | 08-13-2019 | Kuppuraj et al. | |
| | 462 | 10,390,700 | 08-27-2019 | Bardy et al. | |
| | 463 | 10,398,344 | 09-03-2019 | Felix et al. | |
| | 464 | 10,405,799 | 09-10-2019 | Kumar et al. | |

| Examiner Signature | | Date Considered | |

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 17 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 465 | 10,413,205 | 09-17-2019 | Bardy et al. | |
| | 466 | 10,426,634 | 10-01-2019 | Al-Jazaeri et al. | |
| | 467 | 10,433,743 | 10-08-2019 | Felix et al. | |
| | 468 | 10,433,748 | 10-08-2019 | Bishay et al. | |
| | 469 | 10,433,751 | 10-08-2019 | Bardy et al. | |
| | 470 | 10,441,184 | 10-15-2019 | Baumann et al. | |
| | 471 | 10,463,269 | 11-05-2019 | Boleyn et al. | |
| | 472 | 10,478,083 | 11-19-2019 | Felix et al. | |
| | 473 | 10,499,812 | 12-10-2019 | Bardy et al. | |
| | 474 | 10,517,500 | 12-31-2019 | Kumar et al. | |
| | 475 | 10,555,683 | 02-11-2020 | Bahney et al. | |
| | 476 | 10,561,326 | 02-18-2020 | Felix et al. | |
| | 477 | 10,561,328 | 02-18-2020 | Bishay et a. | |
| | 478 | 10,568,533 | 02-25-2020 | Soli et al. | |
| | 479 | 10,588,527 | 03-17-2020 | McNamara et al. | |
| | 480 | 10,595,371 | 03-24-2020 | Gopalakrishnan et al. | |
| | 481 | 10,602,942 | 03-31-2020 | Shakur et al. | |
| | 482 | 10,602,977 | 03-31-2020 | Bardy et al. | |
| | 483 | 10,624,551 | 04-21-2020 | Bardy et al. | |
| | 484 | 10,660,520 | 05-26-2020 | Lin | |
| | 485 | 10,667,712 | 06-02-2020 | Park et al. | |
| | 486 | 10,729,361 | 08-04-2020 | Hoppe et al. | |
| | 487 | 10,758,139 | 09-01-2020 | Rapin et al. | |
| | 488 | 10,772,521 | 09-15-2020 | Korzinov et al. | |
| | 489 | 10,779,744 | 09-22-2020 | Rapin et al. | |
| | 490 | 10,813,565 | 10-27-2020 | Park et al. | |
| | 491 | 10,827,938 | 11-10-2020 | Fontanarava et al. | |
| | 492 | 10,866,619 | 12-15-2020 | Bushnell et al. | |
| | 493 | 10,869,610 | 12-22-2020 | Lu et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T**[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 18 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 494 | 10,987,018 | 04-27-2021 | Aga et al. | |
| | 495 | 11,004,198 | 05-11-2021 | Isgum et al. | |
| | 496 | 11,017,887 | 05-25-2021 | Finkelmeier et al. | |
| | 497 | 11,026,632 | 06-08-2021 | Narasimhan et al. | |
| | 498 | 11,051,738 | 07-06-2021 | Bahney et al. | |
| | 499 | 11,051,743 | 07-06-2021 | Felix et al. | |
| | 500 | 11,062,804 | 07-13-2021 | Selvaraj et al. | |
| | 501 | 11,083,371 | 08-10-2021 | Szabados et al. | |
| | 502 | 11,141,091 | 10-12-2021 | Uday et al. | |
| | 503 | 11,172,882 | 11-16-2021 | Upadhya et al. | |
| | 504 | 11,246,523 | 02-15-2022 | Abercrombie II et al. | |
| | 505 | 11,246,524 | 02-15-2022 | Szabados et al. | |
| | 506 | 11,253,185 | 02-22-2022 | Szabados et al. | |
| | 507 | 11,253,186 | 02-22-2022 | Szabados et al. | |
| | 508 | 11,276,491 | 03-15-2022 | Petterson et al. | |
| | 509 | 11,289,197 | 03-29-2022 | Park et al. | |
| | 510 | 11,324,420 | 05-10-2022 | Selvaraj et al. | |
| | 511 | 11,324,441 | 05-10-2022 | Bardy et al. | |
| | 512 | 11,331,034 | 05-17-2022 | Rapin et al. | |
| | 513 | 11,337,632 | 05-24-2022 | Abercrombie II et al. | |
| | 514 | 11,350,864 | 07-07-2022 | Abercrombie II et al. | |
| | 515 | 11,350,865 | 07-07-2022 | Abercrombie II et al. | |
| | 516 | 11,375,941 | 07-05-2022 | Szabados et al. | |
| | 517 | 11,382,555 | 07-12-2022 | Szabados et al. | |
| | 518 | 11,399,760 | 08-02-2022 | Abercrombie II et al. | |
| | 519 | 11,445,967 | 09-20-2022 | Felix et al. | |
| | 520 | 11,497,432 | 11-15-2022 | Szabados et al. | |
| | 521 | 11,504,041 | 11-22-2022 | Abercrombie II et al. | |
| | 522 | 11,589,792 | 02-28-2023 | Abercrombie II et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 19 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 523 | 11,605,458 | 03-14-2023 | Park et al. | |
| | 524 | 11,627,902 | 04-18-2023 | Bahney et al. | |
| | 525 | 11,660,037 | 05-30-2023 | Felix et al. | |
| | 526 | 11,678,832 | 06-20-2023 | Boleyn et al. | |
| | 527 | 11,751,789 | 09-12-2023 | Abercrombie II et al. | |
| | 528 | 11,756,684 | 09-12-2023 | Park et al. | |
| | 529 | 11,925,469 | 03-12-2024 | Szabados et al. | |
| | 530 | 2001/0056262 | 12-27-2001 | Cabiri et al. | |
| | 531 | 2002/0007126 | 01-17-2002 | Nissila | |
| | 532 | 2002/0026112 | 02-28-2002 | Nissila et al. | |
| | 533 | 2002/0067256 | 06-06-2002 | Kail | |
| | 534 | 2002/0082491 | 06-27-2002 | Nissila | |
| | 535 | 2002/0087167 | 07-04-2002 | Winitsky | |
| | 536 | 2002/0180605 | 12-05-2002 | Ozguz et al. | |
| | 537 | 2003/0069510 | 04-10-2003 | Semler | |
| | 538 | 2003/0083559 | 05-01-2003 | Thompson | |
| | 539 | 2003/0125786 | 07-03-2003 | Bradford Evan Gliner | |
| | 540 | 2003/0149349 | 08-07-2003 | Jensen | |
| | 541 | 2003/0176795 | 09-18-2003 | Harris et al. | |
| | 542 | 2003/0195408 | 10-16-2003 | Hastings | |
| | 543 | 2003/0199811 | 10-23-2003 | Sage, JR. et al. | |
| | 544 | 2003/0212319 | 11-13-2003 | Magill | |
| | 545 | 2004/0032957 | 02-19-2004 | Mansy et al. | |
| | 546 | 2004/0068195 | 04-08-2004 | Massicotte et al. | |
| | 547 | 2004/0077954 | 04-22-2004 | Oakley et al. | |
| | 548 | 2004/0082843 | 04-29-2004 | Menon | |
| | 549 | 2004/0187297 | 09-30-2004 | Te-Yeu Su | |
| | 550 | 2004/0199063 | 10-07-2004 | O'Neil | |
| | 551 | 2004/0215091 | 10-28-2004 | Lohman et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | Application No. | Not Yet Assigned |
|---|---|---|---|---|
| | | | Filing Date | Herewith |
| | | | First Named Inventor | Kumar, Uday N. |
| | | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | | Examiner | Not Yet Assigned |
| SHEET 20 OF 41 | | | Attorney Docket No. | IRHYM.002C9 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 552 | 2004/0236202 | 11-25-2004 | Burton | |
| | 553 | 2004/0254587 | 12-16-2004 | Park | |
| | 554 | 2004/0260189 | 12-23-2004 | Eggers et al. | |
| | 555 | 2005/0096513 | 05-05-2005 | Ozguz et al. | |
| | 556 | 2005/0101875 | 05-12-2005 | Semler et al. | |
| | 557 | 2005/0118246 | 06-02-2005 | Wong et al. | |
| | 558 | 2005/0119580 | 06-06-2005 | Eveland | |
| | 559 | 2005/0165323 | 07-28-2005 | Montgomery et al. | |
| | 560 | 2005/0204636 | 09-22-2005 | Azar et al. | |
| | 561 | 2005/0277841 | 12-15-2005 | Shennib | |
| | 562 | 2005/0280531 | 12-22-2005 | Fadem et al. | |
| | 563 | 2006/0030781 | 02-09-2006 | Shennib | |
| | 564 | 2006/0030782 | 02-09-2006 | Shennib | |
| | 565 | 2006/0047215 | 03-02-2006 | Newman et al. | |
| | 566 | 2006/0084883 | 04-20-2006 | Linker | |
| | 567 | 2006/0142648 | 06-29-2006 | Banet et al. | |
| | 568 | 2006/0142654 | 06-29-2006 | Rytky | |
| | 569 | 2006/0149156 | 07-06-2006 | Cochran et al. | |
| | 570 | 2006/0155173 | 07-13-2006 | Anttila et al. | |
| | 571 | 2006/0155183 | 07-13-2006 | Kroecker et al. | |
| | 572 | 2006/0155199 | 07-13-2006 | Logier et al. | |
| | 573 | 2006/0155200 | 07-13-2006 | Ng et al. | |
| | 574 | 2006/0161064 | 07-20-2006 | Watrous et al. | |
| | 575 | 2006/0161065 | 07-20-2006 | Elion | |
| | 576 | 2006/0161066 | 07-20-2006 | Elion | |
| | 577 | 2006/0161067 | 07-20-2006 | Elion | |
| | 578 | 2006/0161068 | 07-20-2006 | Hastings et al. | |
| | 579 | 2006/0167353 | 07-27-2006 | Nazeri | |
| | 580 | 2006/0224072 | 10-05-2006 | Shennib | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 21 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 581 | 2006/0264767 | 11-23-2006 | Shennib | |
| | 582 | 2007/0003695 | 01-04-2007 | Tregub et al. | |
| | 583 | 2007/0010729 | 01-11-2007 | Virtanen | |
| | 584 | 2007/0027388 | 02-01-2007 | Chou | |
| | 585 | 2007/0088419 | 04-19-2007 | Florina et al. | |
| | 586 | 2007/0156054 | 07-05-2007 | Korzinov et al. | |
| | 587 | 2007/0208266 | 09-06-2007 | Hadley | |
| | 588 | 2007/0225611 | 09-27-2007 | Kumar et al. | |
| | 589 | 2007/0249946 | 10-25-2007 | Kumar et al. | |
| | 590 | 2007/0255153 | 11-01-2007 | Kumar et al. | |
| | 591 | 2007/0270678 | 11-22-2007 | Fadem et al. | |
| | 592 | 2007/0285868 | 12-13-2007 | Lindberg et al. | |
| | 593 | 2007/0293776 | 12-20-2007 | Korzinov et al. | |
| | 594 | 2008/0039730 | 02-14-2008 | Pu et al. | |
| | 595 | 2008/0091089 | 04-17-2008 | Guillory et al. | |
| | 596 | 2008/0108890 | 05-08-2008 | Teng et al. | |
| | 597 | 2008/0114232 | 05-15-2008 | Gazit | |
| | 598 | 2008/0139953 | 06-12-2008 | Baker et al. | |
| | 599 | 2008/0167567 | 07-10-2008 | Bashour et al. | |
| | 600 | 2008/0214901 | 09-04-2008 | Gehman et al. | |
| | 601 | 2008/0275327 | 11-06-2008 | Faarbaek et al. | |
| | 602 | 2008/0281215 | 11-13-2008 | Alhussiny | |
| | 603 | 2008/0288026 | 11-20-2008 | Cross et al. | |
| | 604 | 2008/0309287 | 12-18-2008 | Reed | |
| | 605 | 2009/0048556 | 02-19-2009 | Durand | |
| | 606 | 2009/0062670 | 03-05-2009 | Sterling et al. | |
| | 607 | 2009/0062671 | 03-05-2009 | Brockway | |
| | 608 | 2009/0073991 | 03-19-2009 | Landrum et al. | |
| | 609 | 2009/0076336 | 03-19-2009 | Mazar et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 22 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 610 | 2009/0076340 | 03-19-2009 | Libbus et al. | |
| | 611 | 2009/0076341 | 03-19-2009 | James et al. | |
| | 612 | 2009/0076342 | 03-19-2009 | Amurthur et al. | |
| | 613 | 2009/0076343 | 03-19-2009 | James et al. | |
| | 614 | 2009/0076344 | 03-19-2009 | Libbus et al. | |
| | 615 | 2009/0076345 | 03-19-2009 | Manicka et al. | |
| | 616 | 2009/0076346 | 03-19-2009 | James et al. | |
| | 617 | 2009/0076349 | 03-19-2009 | Libbus et al. | |
| | 618 | 2009/0076350 | 03-19-2009 | Bly et al. | |
| | 619 | 2009/0076364 | 03-19-2009 | Libbus et al. | |
| | 620 | 2009/0076397 | 03-19-2009 | Libbus et al. | |
| | 621 | 2009/0076401 | 03-19-2009 | Mazar et al. | |
| | 622 | 2009/0076559 | 03-19-2009 | Libbus et al. | |
| | 623 | 2009/0182204 | 07-16-2009 | Semler et al. | |
| | 624 | 2009/0253975 | 10-08-2009 | Tiegs | |
| | 625 | 2009/0283300 | 11-19-2009 | Grunthaner | |
| | 626 | 2009/0292193 | 11-26-2009 | Wijesiriwardana | |
| | 627 | 2009/0292194 | 11-26-2009 | Libbus et al. | |
| | 628 | 2009/0306485 | 12-10-2009 | Bell | |
| | 629 | 2010/0001541 | 01-07-2010 | Sugiyama | |
| | 630 | 2010/0022864 | 01-28-2010 | Cordero | |
| | 631 | 2010/0042113 | 02-18-2010 | Mah | |
| | 632 | 2010/0049006 | 02-25-2010 | Magar et al. | |
| | 633 | 2010/0051039 | 03-04-2010 | Ferrara | |
| | 634 | 2010/0056881 | 03-04-2010 | Libbus et al. | |
| | 635 | 2010/0057056 | 03-04-2010 | Gurtner | |
| | 636 | 2010/0076533 | 03-25-2010 | Dar et al. | |
| | 637 | 2010/0081913 | 04-01-2010 | Cross et al. | |
| | 638 | 2010/0145359 | 06-10-2010 | Keller | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | | | |
|---|---|---|---|---|---|

| | Application No. | Not Yet Assigned |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 23 OF 41 | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 639 | 2010/0191310 | 07-29-2010 | Bly | |
| | 640 | 2010/0234716 | 09-16-2010 | Engel | |
| | 641 | 2010/0249625 | 09-30-2010 | Lin | |
| | 642 | 2010/0268103 | 10-21-2010 | McNamara et al. | |
| | 643 | 2010/0312131 | 12-09-2010 | Naware et al. | |
| | 644 | 2010/0331711 | 12-30-2010 | Krauss et al. | |
| | 645 | 2011/0021937 | 01-27-2011 | Hugh et al. | |
| | 646 | 2011/0087083 | 04-14-2011 | Poeze et al. | |
| | 647 | 2011/0098583 | 04-28-2011 | Pandia et al. | |
| | 648 | 2011/0119212 | 05-19-2011 | De Bruin et al. | |
| | 649 | 2011/0144470 | 06-16-2011 | Mazar et al. | |
| | 650 | 2011/0160601 | 06-30-2011 | Wang et al. | |
| | 651 | 2011/0166468 | 07-07-2011 | Prystowsky et al. | |
| | 652 | 2011/0190650 | 08-04-2011 | McNair | |
| | 653 | 2011/0218415 | 09-08-2011 | Chen | |
| | 654 | 2011/0237922 | 09-29-2011 | Parker, III et al. | |
| | 655 | 2011/0237924 | 09-00-2011 | McGusty et al. | |
| | 656 | 2011/0251504 | 10-13-2011 | Tereshchenko et al. | |
| | 657 | 2011/0279963 | 11-17-2011 | Kumar et al. | |
| | 658 | 2011/0306862 | 12-15-2011 | Hayes-Gill | |
| | 659 | 2012/0029307 | 02-02-2012 | Paquet et al. | |
| | 660 | 2012/0071730 | 03-22-2012 | Romero | |
| | 661 | 2012/0071731 | 03-22-2012 | Gottesman | |
| | 662 | 2012/0071743 | 03-22-2012 | Todorov et al. | |
| | 663 | 2012/0083670 | 04-05-2012 | Rotondo et al. | |
| | 664 | 2012/0088999 | 04-12-2012 | Bishay et al. | |
| | 665 | 2012/0101396 | 04-26-2012 | Solosko et al. | |
| | 666 | 2012/0108917 | 05-03-2012 | Libbus et al. | |
| | 667 | 2012/0108920 | 05-03-2012 | Bly et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 24 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 668 | 2012/0110226 | 05-03-2012 | Vlach et al. | |
| | 669 | 2012/0110228 | 05-03-2012 | Vlach et al. | |
| | 670 | 2012/0133162 | 05-31-2012 | Sgobero | |
| | 671 | 2012/0172676 | 07-05-2012 | Penders et al. | |
| | 672 | 2012/0197150 | 08-02-2012 | Cao et al. | |
| | 673 | 2012/0209102 | 08-16-2012 | Ylotalo et al. | |
| | 674 | 2012/0209126 | 08-16-2012 | Amos et al. | |
| | 675 | 2012/0215123 | 08-23-2012 | Kumar et al. | |
| | 676 | 2012/0220835 | 08-30-2012 | Chung | |
| | 677 | 2012/0259233 | 10-11-2012 | Chan et al. | |
| | 678 | 2012/0271141 | 10-25-2012 | Davies | |
| | 679 | 2012/0310070 | 12-06-2012 | Kumar et al. | |
| | 680 | 2012/0316532 | 12-13-2012 | McCormick | |
| | 681 | 2012/0323257 | 12-20-2012 | Sutton | |
| | 682 | 2012/0330126 | 12-27-2012 | Hoppe et al. | |
| | 683 | 2013/0023816 | 01-24-2013 | Bachinski et al. | |
| | 684 | 2013/0046151 | 02-21-2013 | Bsoul et al. | |
| | 685 | 2013/0041273 | 02-14-2013 | Houben et al. | |
| | 686 | 2013/0085347 | 04-04-2013 | Manicka et al. | |
| | 687 | 2013/0096395 | 04-18-2013 | Katra et al. | |
| | 688 | 2013/0116533 | 05-09-2013 | Lian et al. | |
| | 689 | 2013/0116585 | 05-09-2013 | Bouguerra | |
| | 690 | 2013/0144146 | 06-06-2013 | Linker | |
| | 691 | 2013/0150698 | 06-13-2013 | Hsu et al. | |
| | 692 | 2013/0158494 | 06-20-2013 | Ong | |
| | 693 | 2013/0172763 | 07-04-2013 | Wheeler | |
| | 694 | 2013/0184662 | 07-18-2013 | Aali et al. | |
| | 695 | 2013/0191035 | 07-25-2013 | Chon et al. | |
| | 696 | 2013/0225938 | 08-29-2013 | Vlach | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 25 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 697 | 2013/0225967 | 08-29-2013 | Esposito | |
| | 698 | 2013/0226018 | 08-29-2013 | Kumar et al. | |
| | 699 | 2013/0245415 | 09-19-2013 | Kumar et al. | |
| | 700 | 2013/0245472 | 09-19-2013 | Eveland | |
| | 701 | 2013/0253285 | 09-26-2013 | Bly et al. | |
| | 702 | 2013/0274584 | 10-17-2013 | Finlay et al. | |
| | 703 | 2013/0296680 | 11-07-2013 | Linker | |
| | 704 | 2013/0300575 | 11-14-2013 | Kurzweil et al. | |
| | 705 | 2013/0324868 | 12-05-2013 | Kaib et al. | |
| | 706 | 2013/0331663 | 12-12-2013 | Albert et al. | |
| | 707 | 2013/0331665 | 12-12-2013 | Bly et al. | |
| | 708 | 2013/0338448 | 12-19-2013 | Libbus et al. | |
| | 709 | 2014/0012154 | 01-09-2014 | Mazar | |
| | 710 | 2014/0058280 | 02-27-2014 | Chefles et al. | |
| | 711 | 2014/0088394 | 03-27-2014 | Sunderland | |
| | 712 | 2014/0094676 | 04-03-2014 | Gani et al. | |
| | 713 | 2014/0094709 | 04-03-2014 | Korzinov et al. | |
| | 714 | 2014/0100432 | 04-10-2014 | Golda et al. | |
| | 715 | 2014/0116825 | 07-31-2014 | Kurzweil et al. | |
| | 716 | 2014/0171751 | 06-19-2014 | Sankman et al. | |
| | 717 | 2014/0206976 | 07-24-2014 | Thompson et al. | |
| | 718 | 2014/0206977 | 07-24-2014 | Bahney et al. | |
| | 719 | 2014/0243621 | 08-28-2014 | Weng et al. | |
| | 720 | 2014/0275827 | 09-18-2014 | Gill et al. | |
| | 721 | 2014/0275840 | 09-18-2014 | Osorio | |
| | 722 | 2014/0275928 | 09-18-2014 | Acquista et al. | |
| | 723 | 2014/0303647 | 10-09-2014 | Sepulveda et al. | |
| | 724 | 2014/0330136 | 11-06-2014 | Manicka et al. | |
| | 725 | 2015/0005854 | 01-01-2015 | Said | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|
| | Application No. | Not Yet Assigned |
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 26 OF 41 | Attorney Docket No. | IRHYM.002C9 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 726 | 2015/0022372 | 01-22-2015 | Vosch | |
| | 727 | 2015/0057512 | 02-26-2015 | Kapoor | |
| | 728 | 2015/0073252 | 03-12-2015 | Mazar | |
| | 729 | 2015/0081959 | 03-19-2015 | Vlach et al. | |
| | 730 | 2015/0082623 | 03-26-2015 | Felix et al. | |
| | 731 | 2015/0087921 | 03-26-2015 | Felix et al. | |
| | 732 | 2015/0087922 | 03-26-2015 | Bardy et al. | |
| | 733 | 2015/0087923 | 03-26-2015 | Bardy et al. | |
| | 734 | 2015/0087933 | 03-26-2015 | Gibson et al. | |
| | 735 | 2015/0087948 | 03-26-2015 | Bishay et al. | |
| | 736 | 2015/0087949 | 03-26-2015 | Felix et al. | |
| | 737 | 2015/0087950 | 03-26-2015 | Felix et al. | |
| | 738 | 2015/0087951 | 03-26-2015 | Felix et al. | |
| | 739 | 2015/0088007 | 03-26-2015 | Bardy et al. | |
| | 740 | 2015/0088020 | 03-26-2015 | Dreisbach et al. | |
| | 741 | 2015/0094556 | 04-02-2015 | Geva et al. | |
| | 742 | 2015/0148637 | 05-28-2015 | Golda et al. | |
| | 743 | 2015/0157273 | 06-11-2015 | An et al. | |
| | 744 | 2015/0173671 | 06-25-2015 | Paalasmaa et al. | |
| | 745 | 2015/0193595 | 07-09-2015 | McNamara et al. | |
| | 746 | 2015/0223711 | 08-13-2015 | Raeder et al. | |
| | 747 | 2015/0238107 | 08-27-2015 | Acquista et al. | |
| | 748 | 2015/0289814 | 10-15-2015 | Magar et al. | |
| | 749 | 2015/0297134 | 10-22-2015 | Albert et al. | |
| | 750 | 2015/0327781 | 11-19-2015 | Hernandez-Silverira et al. | |
| | 751 | 2015/0351689 | 12-10-2015 | James W. Adams | |
| | 752 | 2015/0351799 | 12-10-2015 | Sepulveda et al. | |
| | 753 | 2015/0374244 | 12-31-2015 | Yoo et al. | |
| | 754 | 2016/0022161 | 01-28-2016 | Khair | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 27 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 755 | 2016/0029906 | 02-04-2016 | Tompkins et al. | |
| | 756 | 2016/0066808 | 03-10-2016 | Hijazi | |
| | 757 | 2016/0085927 | 03-24-2016 | Dettinger et al. | |
| | 758 | 2016/0085937 | 03-24-2016 | Dettinger et al. | |
| | 759 | 2016/0086297 | 03-24-2016 | Dettinger et al. | |
| | 760 | 2016/0098536 | 04-07-2016 | Dettinger et al. | |
| | 761 | 2016/0098537 | 04-07-2016 | Dettinger et al. | |
| | 762 | 2016/0113520 | 04-28-2016 | Manera | |
| | 763 | 2016/0120433 | 05-05-2016 | Hughes et al. | |
| | 764 | 2016/0120434 | 05-05-2016 | Park et al. | |
| | 765 | 2016/0128597 | 05-12-2016 | Lin et al. | |
| | 766 | 2016/0135746 | 05-19-2016 | Kumar et al. | |
| | 767 | 2016/0149292 | 05-26-2016 | Ganton | |
| | 768 | 2016/0157744 | 06-09-2016 | Wu et al. | |
| | 769 | 2016/0166155 | 06-16-2016 | Banet et al. | |
| | 770 | 2016/0192852 | 07-07-2016 | Bozza et al. | |
| | 771 | 2016/0192855 | 07-07-2016 | Geva et al. | |
| | 772 | 2016/0192856 | 07-07-2016 | Lee | |
| | 773 | 2016/0198972 | 07-14-2016 | Lee et al. | |
| | 774 | 2016/0232807 | 08-11-2016 | Ghaffari et al. | |
| | 775 | 2016/0262619 | 09-15-2016 | Marcus et al. | |
| | 776 | 2016/0278658 | 09-29-2016 | Bardy et al. | |
| | 777 | 2016/0287177 | 10-06-2016 | Huppert et al. | |
| | 778 | 2016/0287207 | 10-06-2016 | Xue | |
| | 779 | 2016/0296132 | 10-13-2016 | Bojovic et al. | |
| | 780 | 2016/0302725 | 10-20-2016 | Schultz et al. | |
| | 781 | 2016/0302726 | 10-20-2016 | Chang | |
| | 782 | 2016/0317048 | 11-03-2016 | Chan et al. | |
| | 783 | 2016/0317057 | 11-03-2016 | Li et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 28 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 784 | 2016/0359150 | 12-08-2016 | de Francisco Martin et al. | |
| | 785 | 2016/0361015 | 12-15-2016 | Wang et al. | |
| | 786 | 2016/0367164 | 12-22-2016 | Felix et al. | |
| | 787 | 2016/0374583 | 12-29-2016 | Cerruti et al. | |
| | 788 | 2017/0042447 | 02-16-2017 | Rossi | |
| | 789 | 2017/0055896 | 03-02-2017 | Al-Ali et al. | |
| | 790 | 2017/0056682 | 03-02-2017 | Kumar | |
| | 791 | 2017/0065823 | 03-09-2017 | Kaib et al. | |
| | 792 | 2017/0076641 | 03-16-2017 | Senanayake | |
| | 793 | 2017/0188872 | 07-06-2017 | Hughes et al. | |
| | 794 | 2017/0188971 | 07-06-2017 | Hughes et al. | |
| | 795 | 2018/0049698 | 02-23-2018 | James Artel Berg | |
| | 796 | 2018/0049716 | 02-22-2018 | Rajagopal et al. | |
| | 797 | 2018/0064388 | 03-08-2018 | Heneghan et al. | |
| | 798 | 2018/0110266 | 04-26-2018 | Lee et al. | |
| | 799 | 2018/0125387 | 05-10-2018 | Hadley et al. | |
| | 800 | 2018/0144241 | 05-24-2018 | Liu et al. | |
| | 801 | 2018/0146875 | 05-31-2018 | Friedman et al. | |
| | 802 | 2018/0161211 | 06-14-2018 | Samuel Beckey | |
| | 803 | 2018/0242876 | 08-30-2018 | Hughes et al. | |
| | 804 | 2018/0257346 | 09-13-2018 | Austin | |
| | 805 | 2018/0260706 | 09-13-2018 | Galloway et al. | |
| | 806 | 2018/0289274 | 10-11-2018 | Bahney et al. | |
| | 807 | 2018/0374576 | 12-27-2018 | Dettinger et al. | |
| | 808 | 2019/0021671 | 01-24-2019 | Kumar et al. | |
| | 809 | 2019/0038148 | 02-07-2019 | Valys | |
| | 810 | 2019/0046066 | 02-14-2019 | Hughes et al. | |
| | 811 | 2019/0069788 | 03-07-2019 | COLEMAN et al. | |
| | 812 | 2019/0090769 | 03-28-2019 | Boleyn et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | Application No. | Not Yet Assigned |
|---|---|---|---|---|
| | | | Filing Date | Herewith |
| | | | First Named Inventor | Kumar, Uday N. |
| | | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | | Examiner | Not Yet Assigned |
| SHEET 29 OF 41 | | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 813 | 2019/0097339 | 03-28-2019 | Lim et al. | |
| | 814 | 2019/0098758 | 03-28-2019 | Hassemer et al. | |
| | 815 | 2019/0099132 | 04-04-2019 | Mulinti et al. | |
| | 816 | 2019/0167143 | 06-06-2019 | Li et al. | |
| | 817 | 2019/0209022 | 07-11-2019 | Adam G. Sobol | |
| | 818 | 2019/0246928 | 08-15-2019 | Bahney et al. | |
| | 819 | 2019/0274574 | 09-12-2019 | Hughes et al. | |
| | 820 | 2019/0282178 | 09-19-2019 | Volosin et al. | |
| | 821 | 2019/0290147 | 09-26-2019 | Persen et al. | |
| | 822 | 2019/0298209 | 10-03-2019 | Persen et al. | |
| | 823 | 2019/0298201 | 10-03-2019 | Persen et al. | |
| | 824 | 2019/0298272 | 10-03-2019 | Persen | |
| | 825 | 2019/0374163 | 12-12-2019 | Faabaek et al. | |
| | 826 | 2019/0378617 | 12-12-2019 | Charles et al. | |
| | 827 | 2020/0060563 | 02-27-2020 | Rodney Boleyn | |
| | 828 | 2020/0093388 | 03-26-2020 | Bouguerra et al. | |
| | 829 | 2020/0100693 | 04-02-2020 | Velo | |
| | 830 | 2020/0121209 | 04-23-2020 | Kumar et al. | |
| | 831 | 2020/0170529 | 06-04-2020 | Bahney et al. | |
| | 832 | 2020/0178825 | 06-11-2020 | Weijia Lu | |
| | 833 | 2020/0178828 | 06-11-2020 | Bahney et al. | |
| | 834 | 2020/0108260 | 04-09-2020 | Haddad et al. | |
| | 835 | 2020/0193597 | 06-18-2020 | Fan et al. | |
| | 836 | 20,200,196,897 | 06-25-2020 | Biswas et al. | |
| | 837 | 2020/0214563 | 07-09-2020 | Lin | |
| | 838 | 2020/0214584 | 07-09-2020 | McNamara et al. | |
| | 839 | 2020/0289014 | 09-17-2020 | Park et al. | |
| | 840 | 2020/0337608 | 10-29-2020 | Garai et al. | |
| | 841 | 2020/0352489 | 11-12-2020 | Hoppe et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 30 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 842 | 2020/0367779 | 11-26-2020 | Korzinov et al. | |
| | 843 | 2020/0397313 | 12-24-2020 | Attia et al. | |
| | 844 | 2021/0038102 | 02-11-2021 | Boleyn et al. | |
| | 845 | 2021/0059612 | 03-04-2021 | Krebs et al. | |
| | 846 | 2021/0085215 | 03-25-2021 | Auerbach et al. | |
| | 847 | 2021/0085255 | 03-25-2021 | Vule et al. | |
| | 848 | 2021/0125722 | 04-29-2021 | Sherkat et al. | |
| | 849 | 2021/0153761 | 05-27-2021 | Jung et al. | |
| | 850 | 2021/0217519 | 07-15-2021 | Park et al. | |
| | 851 | 2021/0244279 | 08-12-2021 | Szabados et al. | |
| | 852 | 2021/0269046 | 09-02-2021 | Hashimoto et al. | |
| | 853 | 2021/0298688 | 09-30-2021 | Banerjee et al. | |
| | 854 | 2021/0304855 | 09-30-2021 | Ansari et al. | |
| | 855 | 2021/0315470 | 10-14-2021 | Wu et al. | |
| | 856 | 2021/0315504 | 10-14-2021 | Kumar et al. | |
| | 857 | 2021/0361218 | 11-25-2021 | Szabados et al. | |
| | 858 | 2021/0369178 | 12-02-2021 | Szabados et al. | |
| | 859 | 2021/0374502 | 12-02-2021 | Roth et al. | |
| | 860 | 2021/0378579 | 12-09-2021 | Doron et al. | |
| | 861 | 2021/0393187 | 12-23-2021 | Amos et al. | |
| | 862 | 2022/0022798 | 01-27-2022 | Soon-Shiong et al. | |
| | 863 | 2022/0031223 | 02-03-2022 | Li et al. | |
| | 864 | 2022/0039719 | 02-10-2022 | Abercrombie, II et al. | |
| | 865 | 2022/0039720 | 02-10-2022 | Abercrombie, II et al. | |
| | 866 | 2022/0039721 | 02-10-2022 | Abercrombie, II et al. | |
| | 867 | 2022/0039722 | 02-10-2022 | Abercrombie, II et al. | |
| | 868 | 2022/0079497 | 03-17-2022 | Bardy et al. | |
| | 869 | 2022/0093247 | 03-24-2022 | Park et al. | |
| | 870 | 2022/0095982 | 03-31-2022 | de SAINT VICTOR et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 31 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example:  1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 871 | 2022/0142493 | 05-12-2022 | Albert | |
| | 872 | 2022/0142495 | 05-12-2022 | De Marco et al. | |
| | 873 | 2022/0160279 | 05-26-2022 | Abercrombie, II et al. | |
| | 874 | 2022/0160285 | 05-26-2022 | Szabados et al. | |
| | 875 | 2022/0167905 | 06-02-2022 | Szabados et al. | |
| | 876 | 2020/0237309 | 07-30-2020 | Golda et al. | |
| | 877 | 2022/0280093 | 09-08-2022 | Abercrombie, II et al. | |
| | 878 | 2022/0296144 | 09-22-2022 | Abercrombie, II et al. | |
| | 879 | 2022/0330874 | 10-20-2022 | Szabados et al. | |
| | 880 | 2022/0330875 | 10-20-2022 | Szabados et al. | |
| | 881 | 2022/0361793 | 11-17-2022 | Abercrombie, II et al. | |
| | 882 | 2023/0056777 | 02-23-2023 | Abercrombie, II et al. | |
| | 883 | 2023/0172511 | 06-08-2023 | Abercrombie, II et al. | |
| | 884 | 2023/0172518 | 06-08-2023 | Szabados et al. | |
| | 885 | 2023/0200702 | 06-29-2023 | Sepulveda et al. | |
| | 886 | 2023/0207122 | 06-29-2023 | Park et al. | |
| | 887 | 2023/0248288 | 08-10-2023 | Bahney et al. | |
| | 888 | 2024/0145080 | 05-02-2024 | Park et al. | |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials | Cite No. | Foreign Patent Document<br>*Country Code-Number-Kind Code*<br>Example:   JP 1234567 A1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 889 | AU 2011252998 | 08-27-2015 | Irhythm Technologies, Inc. | | |
| | 890 | AU 2014209376 | 06-29-2017 | Irhythm Technologies, Inc. | | Eq. |
| | 891 | AU 2021218704 | 02-15-2024 | Irhythm Technologies, Inc. | | |
| | 892 | CA 2 651 203 | 09-19-2017 | The Board Of Trustees Of The Leland Stanford Junior University | | Eq. |
| | 893 | CA 2 752 154 | 08-19-2010 | Cardionet Inc. | | |
| | 894 | CA 2 797 980 | 08-08-2015 | Irhythm Technologies, Inc. | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 32 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 895 | CA 2 898 626 | 07-31-2014 | Irhythm Technologies, Inc. | | Eq. |
| | 896 | CA 2 966 182 | 06-09-2020 | Irhythm Technologies, Inc. | | |
| | 897 | CA 3 171 482 | 03-26-2024 | Irhythm Technologies, Inc. | | |
| | 898 | CN 102038497 | 07-18-2012 | Guangdong Biolight Meditech Co. Ltd. | | X |
| | 899 | CN 102883775 | 12-10-2014 | Cardiac Pacemakers Inc. | | |
| | 900 | CN 103997955 | 11-09-2016 | Houben et al. | | |
| | 901 | CN 107205679 | 09-26-2017 | Irhythm Technologies, Inc. | | X |
| | 902 | CN 108113647 | 06-05-2018 | Shenzhen Inst Adv Tech | | X |
| | 903 | CN 109363659 | 02-22-2019 | Ping An Tech Shenzhen Co Ltd | | X |
| | 904 | CN 110491500 | 11-22-2019 | Wang Man et al. | | X |
| | 905 | CN 110766691 | 02-07-2020 | Beijing Ande Yizhi Tech Co Ltd | | X |
| | 906 | CN 110890155 | 03-17-2020 | Univ Science & Technology China | | X |
| | 907 | CN 110974217 | 04-10-2020 | Univ Suzhou | | X |
| | 908 | CN 115426940 | 12-02-2022 | Irhythm Technologies, Inc. | | X |
| | 909 | CN 116322498 | 06-23-2023 | Irhythm Technologies, Inc. | | X |
| | 910 | CN 116530951 | 08-04-2023 | Irhythm Technologies, Inc. | | |
| | 911 | CN 303,936,805 | 11-23-2016 | Shenzhen Mindray Biomedical Electronics | | |
| | 912 | EM 001857966-0001 | 05-02-2011 | Primed Halberstadt Medizintechnik Cmbh | | |
| | 913 | EM 003611714-0001 | 01-09-2017 | Tricord Holdings | | |
| | 914 | EM 003611714-0002 | 01-09-2017 | Tricord Holdings | | |
| | 915 | EM 003611714-0003 | 01-09-2017 | Tricord Holdings | | |
| | 916 | EM 003611714-0004 | 01-09-2017 | Tricord Holdings | | |
| | 917 | EM 003611714-0005 | 01-09-2017 | Tricord Holdings | | |
| | 918 | EP 0509689 | 04-03-1992 | Paeth et al. | | |
| | 919 | EP 1738686 | 06-12-2006 | Virtanen et al. | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | Application No. | Not Yet Assigned |
|---|---|---|---|---|
| | | | Filing Date | Herewith |
| | | | First Named Inventor | Kumar, Uday N. |
| | | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | | Examiner | Not Yet Assigned |
| SHEET 33 OF 41 | | | Attorney Docket No. | IRHYM.002C9 |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 920 | EP 1782729 | 05-09-2007 | Hosand Technologies S.r.l. | | |
| | 921 | EP 1981402 | 10-22-2008 | The Board of Trustees of the Leland Stanford Junior University | | Eq. |
| | 922 | EP 2262419 | 12-22-2010 | Koninkl Philips Electronics NV | | Eq. |
| | 923 | EP 2395911 | 12-21-2011 | Cardionet Inc. | | |
| | 924 | EP 2568878 | 03-20-2013 | Irhythm Technologies, Inc. | | Eq. |
| | 925 | EP 2635179 | 09-11-2013 | Cardionet Inc. | | |
| | 926 | EP 2635180 | 09-11-2013 | Cardionet Inc. | | Eq. |
| | 927 | EP 2948050 | 12-02-2015 | Irhythm Technologies, Inc. | | Eq. |
| | 928 | EP 2983593 | 02-17-2016 | Irhythm Technologies, Inc. | | Eq. |
| | 929 | EP 3165161 | 05-10-2017 | Irhythm Technologies, Inc. | | |
| | 930 | EP 3212061 | 09-06-2017 | Irhythm Technologies, Inc. | | Eq. |
| | 931 | EP 3753483 | 12-23-2020 | Irhythm Technologies, Inc. | | |
| | 932 | EP 3387991 | 06-15-2022 | Irhythm Technologies, Inc. | | |
| | 933 | EP 4103051 | 12-21-2022 | Irhythm Technologies, Inc. | | |
| | 934 | GB 2 299 038 | 09-25-1996 | Minnesota Mining & Manufacturing Company | | |
| | 935 | GB 2 348 707 | 10-11-2000 | Healthcare Technology Limited | | |
| | 936 | IN 002592907-0001 | 12-08-2014 | Tricord Holdings | | |
| | 937 | JP D1596476 | 08-31-2018 | Eagle Matrix Consulting | | X-Abs |
| | 938 | JP S61-137539 | 06-25-1986 | Sekisui Chemical Co Ltd | | X |
| | 939 | JP H05-329123 | 12-14-1993 | Takemoto | | X |
| | 940 | JP H08-317913 | 03-12-1996 | Tsutomu | | X-Abs |
| | 941 | JP H08-322952 | 12-10-1996 | Medtronic Inc. | | X |
| | 942 | JP 1483906S | 10-11-2013 | Data Scope Corporation | | X-Abs |
| | 943 | JP 5203973 | 06-05-2013 | The Board of Trustees of the Leland Stanford Junior University | | X-Abs |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|

| | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 34 OF 41 | Attorney Docket No. | IRHYM.002C9 |

| FOREIGN PATENT DOCUMENTS | | | | | | |
|---|---|---|---|---|---|---|
| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
| | 944 | JP 5559425 | 07-23-2014 | Kumar et al. | | X-Abs |
| | 945 | JP 6198849 | 09-01-2017 | Irhythm Technologies, Inc. | | X-Abs |
| | 946 | JP 6336640 | 05-11-2018 | Irhythm Technologies, Inc. | | X |
| | 947 | JP 6491826 | 03-08-2019 | Irhythm Technologies, Inc. | | X |
| | 948 | JP 6495228 | 03-15-2019 | Irhythm Technologies, Inc. | | X |
| | 949 | JP 6766199 | 09-18-2020 | Irhythm Technologies, Inc. | | X-Abs |
| | 950 | JP 6901543 | 06-21-2021 | Irhythm Technologies, Inc. | | X |
| | 951 | JP 7431777 | 02-06-2024 | Irhythm Technologies, Inc. | | X |
| | 952 | JP 7406001 | 12-18-2023 | Irhythm Technologies, Inc. | | |
| | 953 | JP 2000-126145 | 05-09-2000 | Omron Tateisi Electronics Co. | | X-Abs |
| | 954 | JP 2001-057967 | 03-06-2001 | Advance Co. Ltd. | | X-Abs |
| | 955 | JP 2003-275186 | 09-30-2003 | Citizen Watch Co., Ltd. | | X |
| | 956 | JP 2004-121360 | 04-22-2004 | Nippon Koden Corp. | | X-Abs |
| | 957 | JP 2006-520657 | 09-14-2006 | Welch Allyn, Inc. | | X |
| | 958 | JP 2006-110180 | 04-27-2006 | Fukushima Prefecture | | |
| | 959 | JP 2006-136405 | 06-01-2006 | Harada Electronics Ind. | | X |
| | 960 | JP 2007-045967 | 02-22-2007 | Nitto Denko Corp. | | X-Abs |
| | 961 | JP 2007-503910 | 03-01-2007 | 3M Innovative Properties Co. | | X-Abs |
| | 962 | JP 2007-097822 | 04-19-2007 | Medical Electronic Science Inst. Co. Ltd. | | X-Abs |
| | 963 | JP 2007-296266 | 11-15-2007 | Physio Track KK | | X-Abs |
| | 964 | JP 2007-504917 | 03-08-2007 | Body Media Inc. | | X-Abs |
| | 965 | JP 2008-532596 | 08-21-2008 | CUTISENSE AS | | X |
| | 966 | JP 2008-200120 | 09-04-2008 | Tohoku University | | X |
| | 967 | JP 2009-518099 | 05-07-2009 | Koninklijke Philips N.V. | | X-Abs |
| | 968 | JP 2009-525816 | 07-16-2009 | The Board of Trustees of the Leland Stanford Junior University | | X-Abs |
| | 969 | JP 2011-519583 | 07-14-2011 | KoninKlijke Philips Electronics N.V. | | X-Abs |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|

| | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 35 OF 41 | Attorney Docket No. | IRHYM.002C9 |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 970 | JP 2013-517053 | 05-16-2016 | University of Leicester | | X |
| | 971 | JP 2013-521966 | 06-13-2013 | University of Leicester | | X |
| | 972 | JP 2014-236982 | 12-18-2014 | Irhythm Technologies, Inc. | | X-Abs |
| | 973 | JP 2016-504159 | 02-12-2016 | Irhythm Technologies, Inc. | | X-Abs |
| | 974 | JP 2017-136380 | 08-10-2017 | Irhythm Technologies, Inc. | | X-Abs |
| | 975 | JP 2018-153651 | 10-04-2018 | Irhythm Technologies, Inc. | | X-Abs |
| | 976 | JP 2018-504148 | 02-15-2018 | Irhythm Technologies, Inc. | | X |
| | 977 | JP 2020-058819 | 04-16-2020 | Irhythm Technologies, Inc. | | X-Abs |
| | 978 | JP 2021-166726 | 10-21-2021 | Irhythm Technologies, Inc. | | X |
| | 979 | JP 2023-508235 | 03-01-2023 | Irhythm Technologies, Inc. | | X |
| | 980 | JP 2023-536981 | 08-30-2023 | Irhythm Technologies, Inc. | | X |
| | 981 | JP 2023-536982 | 08-30-2023 | Irhythm Technologies, Inc. | | X |
| | 982 | JP 2024-026058 | 02-28-2024 | Irhythm Technologies, Inc. | | X-Abs |
| | 983 | JP 2024-050777 | 04-10-2024 | Irhythm Technologies, Inc. | | X |
| | 984 | KR 10-1513288 | 04-13-2015 | Irhythm Technologies, Inc. | | |
| | 985 | KR 10-2563372 | 07-31-2023 | Irhythm Technologies, Inc. | | |
| | 986 | KR 1020050055072 | 06-10-2005 | BODYMEDIA INC | | |
| | 987 | KR 1020140050374 | 04-29-2014 | DAEGU GYEONGBUK INST SCIENCE | | X |
| | 988 | KR 1020170133527 | 12-05-2017 | Irhythm Technologies, Inc. | | X-Abs |
| | 989 | KR 10-2023-0119036 | 08-14-2023 | Irhythm Technologies, Inc. | | X |
| | 990 | KR 3003784570000 | 03-29-2005 | Powerid Ltd | | |
| | 991 | KR 3008476060000 | 03-25-2016 | Submission M-Tech Co., Ltd. | | |
| | 992 | KR 3008476090000 | 03-25-2016 | Submission M-Tech Co., Ltd. | | |
| | 993 | KR 3008482960000 | 03-31-2016 | Wip Management | | |
| | 994 | KR 3008584120000 | 06-07-2016 | Submission M-Tech Co., Ltd. | | |
| | 995 | KR 3008953750000 | 02-16-2017 | Rayone Co., Ltd | | |
| | 996 | KR 3008953760000 | 02-16-2017 | Rayone Co., Ltd | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 36 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

| FOREIGN PATENT DOCUMENTS | | | | | | |
|---|---|---|---|---|---|---|
| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
| | 997 | KR 3008987790000 | 03-10-2017 | Industry Academic Cooperation of Gwangju University | | |
| | 998 | KR 3009445870000 | 02-09-2018 | Submission M-Tech Co., Ltd. | | |
| | 999 | KR 3009547690000 | 04-25-2018 | MPROS | | |
| | 1000 | KR 3009547710000 | 04-25-2018 | MPROS | | |
| | 1001 | WO 99/023943 | 05-20-1999 | Fachhochschule Offenburg | | X-Abs |
| | 1002 | WO 01/016607 | 03-08-2001 | Cordless Antistatic Res. Inc. | | X-Abs |
| | 1003 | WO 2003/043494 | 05-03-2003 | Medit AS | | |
| | 1004 | WO 2004/100785 | 11-24-2004 | Wireless Patient Recording Medical AS, Fensli, Rune, Gunnarson, Einar, Andersen, Jan, Einar | | |
| | 1005 | WO 2005/025668 | 03-24-2005 | 3M Innovative Properties Co. | | |
| | 1006 | WO 2005/037946 | 04-28-2005 | Hisamitsu Pharmaceutical Co., Inc. | | X-Abs |
| | 1007 | WO 2005/084533 | 09-15-2005 | Koninklijke Philips Electronics, N.V. | | X-Abs |
| | 1008 | WO 2006/094513 | 09-14-2006 | Coloplast A/S | | X-Abs |
| | 1009 | WO 2007/036748 | 04-05-2007 | Toumaz Tech. Ltd. | | |
| | 1010 | WO 2007/049080 | 03-03-2007 | Toumaz Tech. Ltd. | | |
| | 1011 | WO 2007/063436 | 06-07-2007 | KoninKlijke Philips Electronics N.V. | | |
| | 1012 | WO 2007/066270 | 06-14-2007 | Koninklijke Philips Electronics N.V. | | |
| | 1013 | WO 2007/071180 | 06-28-2007 | Chang-An Chou | | |
| | 1014 | WO 2007/072069 | 06-28-2007 | Toumaz Tech. Ltd. | | |
| | 1015 | WO 2007/092543 | 08-16-2007 | The Board of Trustees of the Leland Stanford Junior University | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 37 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 1016 | WO 2008/005015 | 01-10-2008 | Cardiovu, Inc. | | |
| | 1017 | WO 2008/005016 | 01-10-2008 | Cardiovu, Inc. | | |
| | 1018 | WO 2008/057884 | 05-15-2008 | Welch Allyn, Inc. | | |
| | 1019 | WO 2008/120154 | 10-09-2008 | Koekemoer, Hendrik, Lambert | | |
| | 1020 | WO 2009/055397 | 04-30-2009 | HMICRO, Inc. | | |
| | 1021 | WO 2009/074928 | 06-18-2009 | Koninklijke Philips Electronics, N.V. | | |
| | 1022 | WO 2009/112976 | 09-17-2009 | Koninklijke Philips Electronics, N.V. | | |
| | 1023 | WO 2009/112979 | 09-17-2009 | Koninklijke Philips Electronics N.V. | | |
| | 1024 | WO 2009/112972 | 09-17-2009 | Koninklijke Phillips Electronics | | |
| | 1025 | WO 2009/134826 | 11-05-2009 | 3M Innovative Properties Co. | | |
| | 1026 | WO 2010/093900 | 10-07-2010 | Cardionet, Inc. | | |
| | 1027 | WO 2010/014490 | 02-04-2010 | Ecardio Diagnostics LLC. | | |
| | 1028 | WO 2010/104952 | 09-16-2010 | Corventis, Inc. | | |
| | 1029 | WO 2010/105203 | 09-16-2010 | Corventis, Inc. | | |
| | 1030 | WO 2010/107913 | 09-23-2010 | Corventis, Inc. | | |
| | 1031 | WO 2011/077097 | 06-30-2011 | Intelesens Limited | | |
| | 1032 | WO 2011/084636 | 07-14-2011 | The John's Hopkins University | | |
| | 1033 | WO 2011/112420 | 09-15-2011 | Cardiac Pacemakers Inc. | | |
| | 1034 | WO 2011/143490 | 11-17-2011 | Irhythm Technologies, Inc. | | |
| | 1035 | WO 2011/149755 | 12-01-2011 | Bibian et al | | |
| | 1036 | WO 2012/003840 | 01-12-2012 | Neurodan A/S | | |
| | 1037 | WO 2012/009453 | 01-19-2012 | Mayo Foundation for Medical Education and Research | | |
| | 1038 | WO 2012/061509 | 05-10-2012 | Cardionet, Inc. | | |
| | 1039 | WO 2012/061518 | 05-10-2012 | Cardionet, Inc. | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|
| | Application No. | Not Yet Assigned |
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 38 OF 41 | Attorney Docket No. | IRHYM.002C9 |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 1040 | WO 2012/125425 | 09-20-2012 | Proteus Biomedical Inc. | | |
| | 1041 | WO 2012/140559 | 10-18-2012 | MEDIC4ALL AG | | |
| | 1042 | WO 2012/160550 | 11-29-2012 | SHL Telemedicine International Ltd. | | |
| | 1043 | WO 2014/047032 | 03-27-2014 | Worcester Polytechnic Institute | | |
| | 1044 | WO 2014/051563 | 04-03-2014 | Draeger Medical Systems, Inc. | | |
| | 1045 | WO 2014/055994 | 04-10-2014 | Rhythm Diagnostics Systems, Inc. | | |
| | 1046 | WO 2014/116825 | 07-31-2014 | Irhythm Technologies, Inc. | | |
| | 1047 | WO 2014/168841 | 10-16-2014 | Irhythm Technologies, Inc. | | |
| | 1048 | WO 2015/089484 | 06-18-2015 | ALIVECOR, INC. | | |
| | 1049 | WO 2016/044514 | 03-24-2016 | Preventice, Inc. | | |
| | 1050 | WO 2016/044515 | 03-24-2016 | Preventice, Inc. | | |
| | 1051 | WO 2016/044519 | 03-24-2016 | Preventice, Inc. | | |
| | 1052 | WO 2016/057728 | 04-14-2016 | Preventice, Inc. | | |
| | 1053 | WO 2016/070128 | 05-06-2016 | Irhythm Technologies, Inc. | | |
| | 1054 | WO 2016/181321 | 11-17-2016 | Ravi Bhogu | | |
| | 1055 | WO 2017/039518 | 03-09-2017 | Apaturambs AB | | |
| | 1056 | WO 2017/041014 | 03-09-2017 | The General Hospital Corporation | | |
| | 1057 | WO 2018/218310 | 12-06-2018 | Alerte Digital Health PTE.LTD. | | |
| | 1058 | WO 2019/071201 | 04-11-2019 | ALIVECOR, INC. | | |
| | 1059 | WO 2019/191487 | 10-03-2019 | Livmor, Inc. | | |
| | 1060 | WO 2020/013895 | 01-16-2020 | Livmor, inc. | | |
| | 1061 | WO 2020/0226852 | 11-12-2020 | Medtronic Inc. | | |
| | 1062 | WO 2020/041363 | 02-27-2020 | Eko Devices, Inc. | | |
| | 1063 | WO 2020/224041 | 11-12-2020 | Life Watch Tech Shanghai Inc. | | X-Abs |
| | 1064 | WO 2021/150122 | 07-29-2021 | Appsens AS | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

*Examiner:* Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 39 OF 41 | | Attorney Docket No. | IRHYM.002C9 |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example:  JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | **1065** | WO 2021/163331 | 08-19-2021 | Irhythm Technologies, Inc. | | |
| | **1066** | WO 2021/245203 | 12-09-2021 | Acorai AB | | |
| | **1067** | WO 2022/034045 | 02-17-2022 | HGF Limited | | |
| | **1068** | WO 2022/093709 | 05-05-2022 | ZOLL MEDICAL CORPORATION | | |
| | **1069** | WO 2023/114742 | 06-22-2023 | Irhythm Technologies, Inc. | | |
| | **1070** | WO 2024/102663 A2 | 05-16-2024 | Irhythm Technologies, Inc. | | |

**NON PATENT LITERATURE DOCUMENTS**

| Examiner Initials | Cite No. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[1] |
|---|---|---|---|
| | **1071** | 3M Corporation, "3M Surgical Tapes – Choose the Correct Tape" quicksheet (2004) | |
| | **1072** | Akram, Muhammad Usman, "Application of Prototype Based Fuzzy Classifiers for ECG based Cardiac Arrhythmia Recognition", January 1, 2008 retrieved from faculty.pieas.edu.pk/Fayyaz/_static/pubfiles/student/usman_thesis.pdf [retrieved on 2015-02-17] in 93 pages. | |
| | **1073** | Altini, et al., AN ECG PATCH COMBINING A CUSTOMIZED ULTRA-LOW-POWER ECG SOC WITH BLUETOOTH LOW ENERGY FOR LONG TERM AMBULATORY MONITORING, Conference: Proceddings of Wireless Health 2011, WH 2011, October 10-13, 2011 | |
| | **1074** | BRITISH-MADE EARLY WARNING MONITOR A "GAME CHANGER", healthcare-in-europe.com, March 31, 2014 | |
| | **1075** | Comstock, PROTEUS DIGITAL HEALTH QUIETLY LAUNCHES CONSUMER-FACING WEARABLE FOR ATHLETES, Mobile Health News, October 29, 2014 | |
| | **1076** | Coxworth, SMALL ADHESIVE PARTCH OUTPERFORMS TRADITIONAL TECH FOR DETECTING ARRHYTHMIA, Scripps, iRhythm Technologies, January 3, 2014 | |
| | **1077** | DEL MAR et al.; The history of clinical holter monitoring; A.N.E.; vol. 10; no. 2; pp. 226-230; April 2005 | |
| | **1078** | ENSELEIT et al.; Long-term continuous external electrocardiographic recording: a review; Eurospace; vol. 8; pp. 255-266; 2006 | |
| | **1079** | FENG-TSO SUN et al., "PEAR:  Power efficiency through activity recognition (for ECG-based sensing)", PERVASIVE COMPUTING TECHNOLOGIES FOR HEALTHCARE (PERVASIVEHEALTH) 2011 5TH INTERNATIONAL CONFERENCE ON, IEEE, MAY 23, 2011. PAGES 115-122. | |
| | **1080** | HOEFMAN et al.; Optimal duration of event recording for diagnosis of arrhythmias in patients with palpitations and light-headedness in the general practice; Family Practice; Dec. 7, 2006 | |
| | **1081** | HUYETT "Keystock & Shim Stock Catalog" page 9 Feb 2014. found at https://issuu.com/glhuyett/docs/gl-huyett-keystock-catalog/20 (Year: 2014) | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 40 OF 41 | Attorney Docket No. | IRHYM.002C9 |

## NON PATENT LITERATURE DOCUMENTS

| Examiner Initials | Cite No. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[1] |
|---|---|---|---|
| | 1082 | IKEDA Y. et al., "A Method for Transmission Data Reduction for Automated Monitoring System via CNN Distribution Process", Proceedings of the Symposium of Multi-media, Distribution, Coordination, and Mobile (DOCOMO2019), July 2019 | X |
| | 1083 | International Preliminary Report on Patentability and Written Opinion in PCT Application No.PCT/US2011/036335 (IRHYM.002WO), dated November 22, 2012. | |
| | 1084 | International Search Report and Written Opinion in PCT Application No. PCT/US2011/036335 (IRHYM.002WO), dated October 31, 2011. | |
| | 1085 | KENNEDY et al.; The history, science, and innovation of holter technology; A.N.E.; vol. 11; no. 1; pp. 85-94; 2006 | |
| | 1086 | "Mayo Alumni", MAYO CLINIC, Rochester, MN, Spring 2011, in 24 pages. | |
| | 1087 | MEDTRONIC LAUNCHES SEEQ WEARABLE CARDIAC MONITORING SYSTEM IN UNITED STATES, Diagnostic and Interventional Cardiology, October 7, 2014 | |
| | 1088 | MUNDT et al. "A Multiparameter Wearable Physiologic Monitoring System for Space and Terrestrial Applications" IEEE Transactions on Information Technology in Biomedicine, Vol. 9, No. 3, pp. 382-384, September 2005. | |
| | 1089 | Prakash, NEW PATCH-BASED WEARABLE SENSOR COMBINES ADVANCED SKIN ADHESIVES AND SENSOR TECHNOLOGIES, Advantage Business Marketing, July 17, 2012 | |
| | 1090 | RAJPURKAR ET AL, "Cardiologist-Level Arrhythmia Detection with Convolutinal Neural Networks," ARXIV.org, https://arxiv.org/abs/1707.01836, July 6, 2017 in 9 pages. | |
| | 1091 | REDJEM BOUHENGUEL ET AL, "A risk and Incidence Based Atrial Fibrillation Detection Scheme for Wearable Healthcare Computing Devices," Pervasive Computer Technologies for Healthcare, 2012 6th International Conference On, IEEE, pages 97-104, May 21, 2012 | |
| | 1092 | REIFFEL et al.; Comparison of autotriggered memory loop recorders versus standard loop recorders versus 24-hour holter monitors for arrhythmia detection; Am. J. Cardiology; vol. 95; pp. 1055-1059; May 1, 2005 | |
| | 1093 | Request for Reexamination of U.S. Patent No. 7,020,508 under 35 U.S.C. §§ 311-318 and 37 C.F.R. § 1.913 as submitted September 14, 2012 in 78 pages. | |
| | 1094 | Scapa Medical product listing and descriptions (2008) available at http://www.caapana.com/productlist.jsp and http://www.metplus.co.rs/pdf/prospekti/Samoleplijivemedicinsketrake.pdf; retrieved via WayBack Machine September 24, 2012 | |
| | 1095 | Strong, WEARABLE TECHNOLOGIES CONFERENCE 2013 EUROPE - NOTES AND ROUNDUP, Wearable Technologies Conference, February 8, 2013 | |
| | 1096 | Sumner, STANFORD ENGINEERS MONITOR HEART HEALTH USING PAPER-THIN FLEXIBLE 'SKIN', Stanford Report, May 14, 2013 | |
| | 1097 | WARD et al.; Assessment of the diagnostic value of 24-hour ambulatory electrocardiographic monitoring; Biotelemetry Patient monitoring; vol. 7; 1980 | |
| | 1098 | ZIEGLER et al.; Comparison of continuous versus intermittent monitoring of atrial arrhythmias; Heart Rhythm; vol. 3; no. 12; pp. 1445-1452; Dec. 2006 | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 41 OF 41 | Attorney Docket No. | IRHYM.002C9 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials | Cite No. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[1] |
| | 1099 | ZIMETBAUM et al.; The evolving role of ambulatory arrhythmia monitoring in general clinic practice; Ann. Intern. Med.; vol. 130; pp. 846-8556; 1999 | |
| | 1100 | ZIMETBAUM et al.; Utility of patient-activated cardiac event recorders in general clinical practice; The Amer. J. of Cardiology; vol. 79; Feb. 1, 1997 | |

| Examiner Signature | Date Considered |
|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

# Exhibit L

| U.S. Patent No. 12,303,277 | *Matsumura* |
|---|---|
| 1[pre]. An electronic device for long-term adhesion to a user, the device comprising: | *Matsumura* discloses an electronic device for long-term adhesion to a user.<br><br>Specifically, *Matsumura* discloses a "a bioelectric potential detector that can measure bioelectric potential (electrocardiograms)." Ex. 1005, Abstract. Further, "[t]he bioelectric potential detector 11 can be used as an electrocardiogram detector that is worn on the subject's chest to detect electrocardiogram signals." Matsumura, ¶24.<br><br>*Matsumura* explains that the "subject (patient) **wears the bioelectric potential detector 11 on his/her chest at all times** to detect electrocardiogram signals." *Id.*, ¶36. In this way, "the subject can take a shower or a bath 21 while wearing the waterproof bioelectric potential detector 11." *Id.*, ¶37.<br><br>*Matsumura* explains that an "adhesive, such as acrylic adhesive for example, is applied to the back surface of the second sheet 4." *Id.*, ¶18. Release sheet 8 is "peeled off" to expose the adhesive back surface of the second sheet 4, which is applied to directly to the patient's skin. *Id.*, ¶16; *see also id.* Figure 2 (below).<br><br><br><br>*Id.*, Fig. 2 (annotated). |
| 1[a]. a housing comprising a physiologic data collection circuit; | *Matsumura* discloses an electronic device for long-term adhesion to a user with a housing comprising a physiologic data collection circuit. |

|  | *Matsumura* discloses a signal processor 10 including a physiologic data collection circuit. The signal processor 10 is surrounded by a housing.<br><br>"The **signal processor 10 includes a processing circuit for [e.g. physiologic data collection circuit] filtering and amplifying the detected biopotential signal**, a memory for storing the processed biopotential signal, and a module for modulating the processed biopotential signal and wirelessly transmitting the modulated biopotential signal. A circuit and a loop antenna are incorporated. Further, the **housing of the signal processor 10** has a waterproof structure." *Id.*, ¶25.<br><br><br><br>*Id.*, Fig. 1 (annotated). |
|---|---|
| 1[b]. an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user; | *Matsumura* discloses an electronic device for long-term adhesion to a user with an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user.<br><br>*Matsumura* discloses that bioelectrode pad 7 is an electrode supporting section.<br><br>Further, *Matsumura* discloses that the "bioelectrode pad 7 includes **a first sheet 1 [e.g., second substrate layer]**, a conductive material 2, a hook 3, **a second sheet 4 [e.g., first substrate layer]**, a |

conductive gel 5 [e.g., electrodes] , a third sheet 6, and a double-sided adhesive tape 9." *Id.*, ¶16.

Figure 1 discloses the bioelectrode pad 7 (e.g., electrode supporting section) including the first sheet 1 (e.g., second substrate layer) and the second sheet 4 (e.g., first substrate layer).



*Id.*, Fig. 1 (the second substrate layer is annotated in green and the first substrate layer is annotated in blue).

Moreover, *Matsumura* discloses that an "***adhesive, such as acrylic adhesive, for example, is applied to the back surface of the second sheet 4***" is a lower adhesive layer that adheres the electronic device to a user.

Specifically, *Matsumura* explains that release sheet 8 is a sheet of material that is attached to the back surface of second sheet 4 and removed before use. *Id.*, ¶16. Release sheet 8 is "peeled off" to expose the adhesive back surface of the second sheet 4, which is applied directly to the patient's skin. *Id.*, ¶16; *see also id.* Figure 2 (below).

<table>
<tr><td></td><td>



Matsumura, Figure 2 (annotated yellow indicating release sheet 8, and blue indicating the adhesive back).

Accordingly, *Matsumura* discloses a lower adhesive layer (e.g., adhesive, such as acrylic adhesive) positioned on second sheet 4 (e.g., first substrate layer), that adheres the device to a user.

</td></tr>
<tr><td>

1[c]. an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and

</td><td>

*Matsumura* discloses an electronic device for long-term adhesion to a user with an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit.

*Matsumura* discloses conductive gel 5 (e.g., electrode) is positioned on the bottom surface of the bioelectrode pad 7 (e.g., electrode-supporting section). For example, Figure 1 discloses the conductive gel 5 (e.g., electrode) positioned on the bottom surface of the bioelectrode pad 7 (e.g., electrode-supporting section). The electrodes are annotated in yellow.

</td></tr>
</table>



*Id.*, Fig. 1 (the electrodes are annotated in yellow).

Further, *Matsumura* discloses conductive gel 5 (e.g., electrode) is electrically connected to the signal processor 10 (e.g. physiologic data collection circuit).

"A conductive material 2 and a hook are provided between the first sheet 1 and the second sheet 4 in order to derive a bioelectric potential detected by the conductive gel 5 disposed in the opening 4a of the second sheet 4. […] Two hooks 3 are arranged such that the protrusions of the hook 3 pass through the holes 2a and 1a from the back side of the conductive material 2. With this configuration, the biopotential detected by the conductive gel 5 is led out through the conductive material 2 and the hook 3." *Id.*, ¶18.

"Two hooks 3 are arranged such that the protrusions of the hook 3 pass through the holes 2a and 1a from the back side of the conductive material 2." *Id.*, ¶19.

"[T]he hook 3 projecting from the adhesive tape 9 is fitted to the hook fitting portion 10a on the bottom surface of the signal processor 10." *Id.*, ¶24.

Annotated figure 1 below discloses the electrical connection between the conductive gel 5 and the signal processor 10 represented by the flow of psychological data. The annotated figure below discloses the electrical connection between the conductive gel 5, hooks 3, and the signal processor 10.



*Id.*, Fig. 1 (annotated arrows show the flow of bioelectric potential from the electrodes to the housing comprising the physiologic data collection circuit, which are both annotated in yellow).

| | |
|---|---|
| 1[d]. wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and | *Matsumura* discloses an electronic device for long-term adhesion to a user wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode.<br><br>First, *Matsumura* discloses that the second sheet 4 (e.g., first substrate layer) is positioned over the conductive gel 5 (e.g., electrode). Figure 1 below discloses the second sheet 4 (e.g., first substrate layer) positioned over the conductive gel 5 (e.g., electrode). |



*Id.*, Fig. 1.

Second, *Matsumura* discloses that the conductive material 2 (e.g., first substrate layer) extends horizontally away from the housing beyond a boundary of the electrode. Specifically, as disclosed in annotated figure 1, the conductive material 2 extends outward from the housing and beyond a boundary of the conductive gel 5 (electrode). In other words, the conductive material 2 (e.g., first substrate layer) extends wider in the horizontal direction than both the housing and the electrodes.



*Id.*, Fig. 1 (the second sheet 4 is annotated in blue, the electrodes and housing are annotated in yellow, and the annotated arrows show the horizontal extensions).

| | |
|---|---|
| 1[e]. wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer. | *Matsumura* discloses an electronic device for long-term adhesion to a user wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer.<br><br>*Matsumura* discloses that the "second sheet 4 [e.g., first substrate layer] has the same outer shape as the first sheet 1 [e.g., second substrate layer][.]" *Id.*, ¶18. Figure 3 disclose the configuration of the first and second substrate layers. While sheets 1 and 4 have the same shape, there is no corresponding disclosure about the relative size of the two layers.<br><br><br><br>*Id.*, Fig. 1. |

# Exhibit M

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re U.S. Patent No.: | 12,303,277 | ) |
| Date of Issue: | May 20, 2025 | ) |
| Name of Patentee: | Kumar et al. | ) |
| Serial No.: | 18/806,584 | ) |
| | | ) Group Art Unit: Not yet assigned |
| Filed: | Aug. 15, 2024 | ) Examiner: Not yet assigned |
| Title: | Device Features and Design Elements for Long-term Adhesion | ) Box: *Ex Parte* Reexam |

## REQUEST FOR *EX PARTE* REEXAMINATION
## OF U.S. PATENT NO. 12,303,277

Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Examiner:

Reexamination under 35 U.S.C. § 302 and 37 C.F.R. § 1.510 is hereby requested for claims 1 to 10 of U.S. Patent No. 12,303,277 (the "'277 patent"), which issued on May 20, 2025, to iRhythm Technologies, Inc., the applicant and assignee of record.

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

# TABLE OF CONTENTS

I.      Claims for Which Reexamination is Required ...............................................1

II.     Other Proceedings .............................................................................................1

III.    Payment of Fees ................................................................................................1

IV.     Technology of the '277 Patent ..........................................................................1
   A.   Technological Overview ..................................................................................1

   B.   The '277 patent .................................................................................................3

   C.   Prosecution History ..........................................................................................4

V.      Level of Ordinary Skill .....................................................................................6

VI.     Claim Construction ...........................................................................................6

VII.    Identification of Patents and Printed Publications that Provide Substantial
        New Questions of Patentability .........................................................................7

VIII.   Ground 1 ............................................................................................................7
   A.   Overview of *Bly* ...............................................................................................10

   B.   Substantial New Questions of Patentability **Error! Bookmark not defined.**

   C.   Claims 1 to 10 are Obvious over *Bly* ..............................................................14

IX.     Ground II ...........................................................................................................32
   A.   Overview of *Matsumura* ..................................................................................32

   A.   Substantial New Questions of Patentability **Error! Bookmark not defined.**

   B.   *Matsumura* Anticipates or Renders Obvious Claim 1 ...................................33

X.      Conclusion .......................................................................................................42

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

## TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| Ex. 1001 | The '277 patent |
| Ex. 1002 | U.S. Patent Application 18/806,584 |
| Ex. 1003 | U.S. Pub. No. 2009/0076363 to Bly *et al.* ("*Bly*") |
| Ex. 1004 | Japanese Patent Publication No. JP2004-121360 to Matsumura ("*Matsumura*") |
| Ex. 1005 | English Translation of Japanese Patent Publication No. JP2004/121360 to Matsumura ("*Matsumura*") |
| Ex. 1006 | U.S. Pub. No. 2003/0069510 to Semler ("*Semler*") |

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

## I.    CLAIMS FOR WHICH REEXAMINATION IS REQUIRED

Reexamination is requested for Claims 1 to 10 ("Challenged Claims") of the '277 patent.  A copy of the '277 patent is enclosed as Ex. 1001.  Requestor is not aware of any certificate of correction or reexamination certificate for the '277 patent. The Challenged Claims are obvious over prior art not cited during examination of the '277 patent, including the reference relied on in this request, U.S. Patent Publication No. 2009/0076363 to Bly et al. ("*Bly*").

## II.    OTHER PROCEEDINGS

The '277 patent is presently asserted in *Bardy Diagnostics, Inc., v. iRhythm Techs., Inc.*, 24-1355-JDW (Dec. 10, 2024 D. Del.).

## III.    PAYMENT OF FEES

The appropriate fee for this Request for *ex parte* reexamination is included herewith.   Requestor does not believe that any additional fees are required. However, if any additional charges are due, Requestor hereby authorizes they be charged to Deposit Account 02-1818.

## IV.    TECHNOLOGY OF THE '277 PATENT

### A.    Technological Overview

The '277 patent relates to a device that adheres to a user to monitor and collect physiological data from the user such as cardiac rhythm data.  *See* Ex. 1001, 1:41-46 and 7:24-30.  Adherent devices to couple to the patient's skin and monitor

1

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

physiological data of a patient were known well before the May 2010 priority of the '277 patent. Ex. 1003, Title Page.

For example, devices to monitor patient data, such as electrocardiogram signals, were well known before May 2010 and typically include an exterior structure such as an adherent patch with a cover. *See id.*, ¶12. These patches included an adhesive to adhere the device to the patient's skin. *Id.*, ¶84. Further, they would include electrodes located on the bottom of the patch to collect patient data. *See id.*, ¶57 and Figure 1B.

And, because the electrode-skin contacts are critical for proper signal acquisition, devices often include features to promote patient compliance and decrease stress forces on the adhesive. For example, patient devices are configured to move with the skin of the patient in relation to the electronics. *See, e.g.*, *id.*, ¶84 (explaining that the patient device includes a gap, which allows to the device to "conform to the skin and not be restricted by structures supported with the tape, for example rigid structures such as the printed circuitry board"), *see also id.*, ¶101 (detailing an air gap between the adhesive portion and the electronic module "to provide patient comfort"). Accordingly, device electronics within a housing can move, or tilt, in relation to the adhesive layer that conforms to the patient's skin.

Typically, the devices include a protective cover to support the electrodes and protect other electrical components in the device. *Id.*, ¶72. To allow for long term

2

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

monitoring, the device—including the cover, patch with adhesive, and electrical

components—is designed for long-term wear. *Id*., ¶48.  Inside the device, under the

cover, one would expect to find a housing to protect the electronic components. *See*

*id*., ¶72.  These devices further include various layers, including adhesive layers,

layers to provide additional support to the device, and layers to enhance breathability

to the skin. *See id*., ¶¶76, 84-86, and Figure 1J1.



*Id*., Figure 1I1 (annotated).

## B.    The '277 patent

The '277 patent issued from U.S. App. No. 18/806,584 on May 20, 2025.  Ex.

1001, Title Page.  The '277 patent describes a device for long-term adhesion to the

check of a person for cardiac rhythm monitoring. *Id*., 7:24-30.

Specifically, the '277 patent describes a device with an exterior structure

including a patch and layers or covers. *Id*., 7:31-33 and 13:53-59.  The patch

includes an adhesive to adhere the device to the user's skin. *Id*., 8:1-2 ("an adhesive

3

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

layer 166 can coat the bottom of the patch 100 for attachment to the skin[.]").
Further, the patch also includes electrodes "positioned on a bottom surface of the
patch" to collect and monitor physiological data. *Id.*, 3:60-62.

An external layer surrounds the internal contents of the device and the patch.
*Id.*, 1:66-14:14. The device is designed with "various flexible portions and/or hinged
portions can compensate for stress[] caused as the skin stretches or bends" such that
the device "can provide long-term adhesion to the skin." *Id.*, 13:23-31. Further, the
interior of the device includes a "housing containing an electronic component[.]"
*Id.*, 2:10. The device also includes various layers. *Id.*, 10:17-29.



*Id.*, Figure 1C (annotated).

## C.    Prosecution History

The '277 patent was filed on August 15, 2024, with a Track One prioritized
examination request. Ex. 1001, Title Page; Ex. 1002, 1 to 29 and 732 to 733. The
originally filed claims only included independent claim 1. Ex. 1002, 28. Applicant

4

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

filed a preliminary amendment on September 26, 2024, which cancelled original claim 1 and added new claims 2 to 19.  Preliminary Amendment (Sept. 26, 2024) at 2-3.  Claims 2 and 10 are in independent form and are both directed to "an electronic device for long-term adhesion to a mammal." *Id*.  A Non-Final Rejection was mailed October 24, 2024, which rejected all claims as indefinite and as obvious over U.S. Patent Publication No. 2002/0082491 in view of U.S. Patent Publication No. 2007/0285868 and/or further in view of U.S. Patent Publication No. 2008/0288026.  Non-Final Rejection (Oct. 24, 2024) at 2-7.

On March 21, 2025, the Patent Office issued a Notice of Allowance, stating that "[t]here is insufficient teaching, suggestion or motivation to replace the conductive adhesive electrode with a separate conductive electrode and adhesive[.]" Notice of Allowance (March 21, 2025) at 3.

As set forth herein, these components, and the claimed patch as a whole, are nothing more than routine and well-understood components operating in accordance with their predictable function from the prior art.  *See* Ex. 1003, Title Page and ¶12-¶32.  The references relied upon in this paper present evidence that the claimed electronic device for long-term adhesion to a user configuration is well-known in the art.

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

## V.     LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art ("POSITA") is a hypothetical person who
is presumed to know the relevant prior art and has ordinary creativity when
interpreting and combining prior art.  *In re Coutts*, 726 F. App'x 791, 796 (Fed. Cir.
2018); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420-21 (2007).

With respect to the '277 patent, a POSITA as of May 2010, had, among other
attributes, a bachelor's degree in electrical engineering, electrophysiology,
biomedical engineering, or an equivalent degree, and at least two to three years of
experience designing wearable monitors that detect physiological signals with
mechanical and/or electrical elements.  Additional experience may substitute for
education and vice versa.  Such a POSITA would have had knowledge of design
considerations known in the industry and would have been familiar with then-
existing products and solutions.

## VI.     CLAIM CONSTRUCTION

During a reexamination proceeding, claims must be interpreted according to
the "broadest reasonable interpretation" standard (the "BRI standard").  *In re NTP,
Inc.*, 654 F.3d 1268, 1374-75, 99 U.S.P.Q.2d 1500 (Fed. Cir. 2011).  The Federal
Circuit explains that "[t]he broadest reasonable interpretation of a claim term may
be the same as or broader than the construction of a term under the *Phillips*

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

standard." *Facebook, Inc. v. Pragmatus AV, LLC*, 582 F. App'x 864, 869 (Fed. Cir.

2014) (non-precedential).

The analysis presented below renders the Challenged Claims obvious under

***any*** claim construction that might be applied as a broadest reasonable interpretation

of the claim terms.

## VII.  IDENTIFICATION OF PATENTS AND PRINTED PUBLICATIONS THAT PROVIDE SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY

This Request for Reexamination of claims 1 to 10 of the '277 patent is based

on substantial new questions of patentability as summarized above and set forth

below in detail.  The prior art cited herein was not relied upon during prosecution of

the '277 patent.

Requestor submits that the grounds (1 and 2) identified below, based on the

relied-on references as identified in the chart, raises a substantial new question of

patentability of the '277 patent.

| Ground | Challenged Claims | Basis | Prior Art |
|--------|-------------------|-------|-----------|
| I | 1 to 10 | §103 | *Bly* |
| II | 1 | §103 | *Matsumura* |

### A.    Substantial New Questions of Patentability

A substantial new question of patentability exists when the prior art "presents

a new, non-cumulative technological teaching that was not previously considered

7

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

and discussed on the record during the prosecution of the application that resulted in

the patent for which reexamination is requested." M.P.E.P. § 2216.

Additionally, the law requires a "common sense" approach to examining

whether the claimed invention is obvious to a person skilled in the art. *KSR Int'l Co.*

*v. Teleflex Inc.*, 550 U.S. 398, 419-22 (2007). "The combination of familiar elements

according to known methods is likely to be obvious when it does no more than yield

predictable results." *Id.*, 416. For example, when "there is a design need or market

pressure to solve a problem and there are a finite number of identified, predictable

solutions," those circumstances tend to support the conclusion that a person of

ordinary skill will have "good reason to pursue the known options within his or her

technical grasp." *Id.*, 421. Finally, and of particular relevance here, claims of a

patent are obvious if they are a rearrangement of known features that perform as

expected. *Id.*, 420-21.

While the issued patent that claims priority to the *Bly* reference used herein

was submitted to the USPTO during prosecution of the '277 patent, that reference

was submitted along with over 1,000 other references. *See, e.g.*, Ex. 1002 at 221

(submitting *Bly* within a list of 1,051 references, Cite No. 247). *Bly*, including the

issued patent submitted during prosecution, was not used in an actual rejection and

given the volume of references submitted, it is not surprising that the relevance of

*Bly* to the patentability was overlooked. Indeed, it is proper to rely on references

8

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

cited during prosecution when, as here, there is a demonstrated applicability of the reference to the patentability of the claims, thereby establishing a substantial new question of patentability. *See In re Swanson*, 540 F.3d 1368, 1375-76 (2008); *see also Ecto World, LLC v. RAI Strategic Holdings, Inc*, IPR2024-01280, paper 13 at *7 (PTAB May 19, 2025) (precedential) (indicating that 325(d) may not apply where "the IDS that includes the asserted prior art contains over 1,000 references, which is over 40 times the size of a typical IDS").

The English translation of *Matsumura* was not cited, and therefore not relied on, during prosecution of the '277 patent. Only the Japanese language version was cited in an IDS of over 1,000 other references, and never used in an actual rejection. *See, e.g.*, Ex. 1002 at 245 (submitting *Matsumura* within a list of 1,051 references, Cite No. 924). Like with *Bly* above, it is not surprising that the relevance of *Matsumura* to the patentability of the '277 patent was overlooked given the large volume of references submitted, and given that the applicant never submitted a certified English translation of *Matsumura* to the USPTO. It is proper to rely on references cited during prosecution when there is a demonstrated applicability of the reference to the patentability of the claims, thereby establishing a substantial new question of patentability. *See In re Swanson*, 540 F.3d at 1375-76.

9

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

## VIII. GROUND 1

### A. Overview of *Bly*

*Bly* was filed as a non-provisional application on September 12, 2008, which stemmed from a various provisional applications filed September 14, 2007, and May 23, 2008. Ex. 1003, Title Page. Then, *Bly* published as U.S. Patent Application Publication No. 2009/0076363 on March 19, 2009. *Id*. Thus, the publication of *Bly* is prior art to the '277 patent, which has a priority date of May 12, 2010, under 35 U.S.C. § 102(b). Ex. 1001, 2 (noting the priority date for the '277 patent).

References within the statutory terms of 35 U.S.C.A. § 102 qualify as prior art for an obviousness determination only when analogous to the claimed invention. *See In re Bigio*, 381 F.3d 1320, 1325, 72 U.S.P.Q.2d 1209 (Fed. Cir. 2004). Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *Id*.

*Bly* is from the same field of endeavor as the '277 patent. In this regard, *Bly* and the '277 patent pertain to the field of devices for patient monitoring for extended periods. Ex. 1001, 1:40-46; Ex. 1003, ¶5. Indeed, both describe devices that adhere to a patient using an adhesive for long term patient monitoring. Ex. 1001, Title Page;

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

Ex. 1003, Title Page.

*Bly* is also directed to a problem facing the inventors of the '277 patent. Specifically, *Bly* describes an adherent monitoring device, which provides enhanced comfort to the patient. *Id*., ¶8 ("In at least some instances, devices that are worn by the patient may be somewhat uncomfortable, which may lead to patients not wearing the devices and not complying with direction from the health care provider, such that data collection may be less than ideal."). Similarly, the '277 patent describes an adherent monitoring device to "withstand longer-term adhesion […] there is a need to implement device features and design elements that have the ability to enhance the likelihood of adhesion of a device to a human body for 24 hours or more[.]" Ex. 1001, 1:64-2:5.

*Bly*'s patient and a monitoring system comprising an adherent device is depicted in Figure 1A below.

11

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



FIG. 1A

Exhibit 1003, Figure 1A.

The device includes an adherent patch 110 with a breathable tape 110T layer and a gel cover 180 layer. *See id.*, ¶¶12, 22, and Figure 1J1. Moreover, *Bly*'s system includes a cover 162, which serves to "protect the electronic components, and […] the electronics housing 160[.]" Ex. 1003, ¶172. The "[p]atient side 110A [of the device] comprises adhesive 116A to adhere the patch 110 and adherent device 100 to patient P. Electrodes 112A, 112B, 112C and 112D are affixed to adherent patch 110." *Id.*, ¶57.

12

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1J1.

To ensure a proper connection between the adhesive layer and the skin of the patient, *Bly's* device includes a gap that extends between the breathable tape and printed circuit board 120. *Id.*, ¶15. This gap "allow[s] the tape to adhere to the body to conform to the skin and not be restricted by structures supported with the tape, for example rigid structures such as the printed circuitry board." *Id.* Additionally, the gap allows the rigid structure to move in relation to the adhesive portion, which increases patient comfort. *Id.*, ¶101. In reference to Figure 1I1, *Bly* explains that "[a]ir gap 169 allows adherent patch 110 and breathable tape 110T to remain supple and move, for example bend, with the skin of the patient with minimal flexing and/or bending of printed circuit board 120 and electronic components 130." *Id.*, Figure 1I1, reproduced below, identifies air gap 169 as the yellow layer.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



Ex. 1003, Figure 1I1 (annotated).

### B.    Claims 1 to 10 are Obvious over *Bly*

| U.S. Patent No. 12,303,277 | U.S. Pub. No. 2009/0076363 to Bly et al. ("*Bly*"). |
|---|---|
| 1[pre]. An electronic device for long-term adhesion to a user, the device comprising: | *Bly* discloses an electronic device for long-term adhesion to a user.<br><br>Specifically, *Bly*'s "adherent device" 100 is an electronic device. *See* Ex. 1003, Title Page. For example, the adherent device comprises various "[e]lectronic components[.]" *Id.* "[T]he adherent device comprises an electronics housing adhered to at least one of the electronics components or the printed circuit board, such that the electronics housing is disposed between the cover and electronics components." *Id.*, ¶21.<br><br>Further, *Bly*'s adherent device is designed to "monitor a patient for an extended period" (e.g., "long-term adhesion") and includes "breathable tape […] with an adhesive coating to adhere the breathable tape to a skin of the patient" (e.g., "to a user"). *Id.*, ¶13. Specifically, "the patch [of the adherent device] is configured for patient comfort, such that the patch can be worn and/or tolerated by the patient for extended periods, for example 90 days or more." *Id.*, ¶48.<br><br>*Bly*'s Figure 1A (below) discloses the adherent device (e.g., electronic device) adhered to the skin of the user. *Id.*, Figure 1A. Moreover, *Bly*'s Figure 1A also discloses the electronic monitoring system 10, "in which patient care can be monitored and implemented from the remote center in response to signals from the adherent device." *Id.*, ¶50. |

14

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1A (annotated).

| | |
|---|---|
| 1[a]. a housing comprising a physiologic data collection circuit; | *Bly* discloses an electronic device for long-term adhesion to a user with a housing comprising a physiologic data collection circuit.<br><br>*Bly* discloses "the adherent device (e.g., electronic device for long-term adhesion to a user) comprises an ***electronics housing" 160 (e.g., a housing)***. *Id.*, ¶21.<br><br>"In many embodiments, an electronics housing 160 may be disposed under cover 162 to protect the electronic components, and in some embodiments electronics housing 160 may comprise an encapsulant over the electronic components and PCB [printed circuit board]." *Id.*, ¶72.<br><br>"[T]he electronics housing can be affixed over the [printed circuit board] and electronics components, for example with dip coating, such that ***electronics components 130, printed circuit board 120 and electronics housing 160 are coupled together***." *Id.*, ¶100.<br><br>The electronics components include various circuits that collect physiologic data of the user.  For example, *Bly* discloses that the "[e]lectronics components 130 comprise an activity sensor and activity circuitry 134, impedance circuitry 136 and electrocardiogram circuitry, for example ECG circuitry 136. In some embodiments, electronic circuitry 130 may comprise a microphone and microphone circuitry 142[.]" *Id.*, ¶60.  "***Electronic components are electrically connected to the printed circuit board and coupled to the at least one electrode to measure physiologic signals of the patient***." *Id.*, ¶13.<br><br>*Bly* discloses the electronics housing 160 in Figures 1H and 1G. |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1H (annotated).



*Id.*, Figure 1G (annotated).

*Bly* discloses the electronics housing 160 and electronic components 130 and various circuits to collect physiologic data.



*Id.*, Figure 1I (annotated).

| 1[b]. an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing | *Bly* discloses an electronic device for long-term adhesion to a user with an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user.<br><br>Specifically, *Bly* discloses an electrode-supporting section, which includes, at least, "a breathable support, for example a breathable adherent patch, and breathable cover that can be used for extended |
|---|---|

16

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| adhesion to the skin of the user; | periods with improved patient comfort." *Id.*, ¶12.<br><br>Figure 1J of *Bly* is disclosed below, which includes the cover 162 and the adherent patch 110 comprising breathable tape 110T and gel cover 180. *Id.*, ¶96. These components form the electrode-supporting section, as annotated in yellow.<br><br><br><br>*Id.*, Figure 1J (annotated).<br><br>Figure 1I of *Bly* includes the electrode supporting section as constructed in the adherent device 100.<br><br><br><br>*Id.*, Figure 1I (annotated).<br><br>Moreover, *Bly* discloses that "[i]n many embodiments, electrodes 112A, 112B, 112C and 112D extend from lower side 110A through adherent patch 110 to upper side 110B." *Id.*, ¶58. Thus, *Bly*'s Figure 1B (below) discloses the electrode-supporting section, supporting electrodes 112A, 112B, 112C and 112D. |

17

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1B.

First, *Bly* discloses that **gel cover 180 is a first substrate layer**. "[T]he adherent device comprises a gel cover [180] positioned over the breathable tape to inhibit a flow of the gel through the breathable tape, and the printed circuit board is located over the gel cover such that the gel cover is disposed between the breathable tape and the printed circuit board." *Id.*, ¶22. The gel cover (e.g., first substrate layer) is annotated in below in green.



*Id.*, Figure 1J1 (annotated).

Second, *Bly* discloses that **cover 162 is a second substrate layer**. "[C]over 162 can encase the flex PCB and/or electronics and can be adhered to at least one of the electronics, the flex PCB or adherent patch 110, so as to protect at least the electronics components and the PCB. Cover 162 can attach to adherent patch 110 with adhesive 116B." *Id.*, ¶92. The cover (e.g., second substrate layer) is annotated below in yellow.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1J1 (annotated).

Finally, *Bly* discloses an adhesive 116A (e.g., a lower adhesive layer). Specifically, "*Bly* discloses "***an adhesive 116A*** […] comprising a layer of acrylate pressure sensitive adhesive, can be disposed on underside 110A of [adherent] patch 110." *Id.*, ¶84.

As noted above, the adhesive 116A (e.g., lower adhesive layer) is positioned on a bottom surface. *Id.* ("***an adhesive 116A*** […] comprising a layer of acrylate pressure sensitive adhesive, ***can be disposed on underside 110A of patch 110***"). Further, the adhesive 116A (e.g., lower adhesive layer) provides adhesion to the skin of the user. *Id.* ("***adhesive 116A adheres adherent patch 110 [] to the skin of the patient***, so as not to interfere with the functionality of the breathable tape").

*Bly*'s Figure 1I1 and Figure 1B disclose the electrode supporting section annotated in yellow and the ***adhesive 116A (e.g., a lower adhesive layer)*** located on the lower side 110A of the electrode supporting section.



*Id.*, Figure 1I1 (annotated).

19

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1B.

| 1[c]. an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and | *Bly* discloses an electronic device for long-term adhesion to a user with an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit.<br><br>*Bly*'s adherent device 100 (e.g., an electronic device for long-term adhesion to a user) includes a lower side 110A (e.g., bottom surface). The lower side 110A is located on the bottom of the electrode-supporting section. Electrodes 112A, 112B, 112C and 112D are positioned on the lower side 110A (e.g., bottom surface) of this lower side 110A. For example, the "[a]dherent patch 110 comprises a first side, or a lower side 110A, that is oriented toward the skin of the patient when placed on the patient." *Id.*, ¶57.<br><br>Further, "***electrodes 112A, 112B, 112C and 112D extend from lower side 110A*** through adherent patch 110 to upper side 110B." *Id.*, ¶58.<br><br>*Bly*'s "Figure 1K shows at least one electrode configured to electrically couple to a skin of the patient through a breathable tape[.]" *Id.*, ¶44. As disclosed, the electrodes are positioned on the lower side 110A (e.g., bottom surface) of the adherent device 100. Also disclosed is the adhesive 116A disposed on underside 110A of patch 110. |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



FIG. 1B

*Id.*, Figure 1B.

Further, electrodes 112A, 112B, 112C and 112D are connected to the physiologic data collection circuit. For example, *Bly* discloses that "[e]lectronic components electrically are connected to the printed circuit board and coupled to the at least one electrode to measure physiologic signals of the patient." *Id.*, Title Page.

| | |
|---|---|
| 1[d]. wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and | *Bly* discloses an electronic device for long-term adhesion to a user wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode.<br><br>*Bly*'s gel cover 180 (e.g., the first substrate layer) is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode.<br><br>For example, Figure 1I1 discloses the gel cover (e.g., the first substrate layer), annotated in green, extends horizontally away from the electronics housing 160 (e.g., housing). In other words, the gel cover 180 extends wider in the horizontal direction on the left and right side of the adherent device 100 than the housing 160.<br><br><br><br>FIG. 1I1<br><br>*Id.*, Figure 1I1 (annotated).<br><br>Further, as disclosed in Figure 1J1, the gel cover 180 (e.g., the first substrate layer), which spans the area of the layer disclosed in green, extends beyond the boundary of the electrode. "[T]he gel cover |

21

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277**

|  |  |
|---|---|
|  | stretches and tape stretch with the skin of the patient." *Id.*, ¶77. "Arrows 182 show stretching […] at least two dimensional along the surface of the skin of the patient." *Id.*, ¶94.<br><br><br><br>*Id.*, Figure 1J1 (annotated). |
| 1[e]. wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer. | *Bly* discloses an electronic device for long-term adhesion to a user wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer.<br><br>The cover 162 (e.g., the second substrate layer) is positioned over the gel cover 180 (e.g., the first substrate layer) and extends horizontally away from the housing beyond a boundary of the electrode.<br><br>For example, Figure 1I discloses the cover 162 (e.g., the second substrate layer), annotated in yellow, extending horizontally beyond a boundary of the gel cover 180 (e.g., the first substrate layer).  In other words, the cover 162 (e.g., the second substrate layer) is wider in a horizontal direction than the gel cover 180 (e.g., the first substrate layer)<br><br><br><br>*Id.*, Figure 1I1 (annotated).<br><br>Further, as also disclosed in Figure 1J1, the cover 162 (e.g., the second substrate layer), annotated in yellow, extends horizontally |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| | beyond a boundary of the gel cover 180 (e.g., the first substrate layer).<br><br>Further, "the edge of the cover [162] may be adhered at the edge of the adherent patch [110.]" *Id.*, ¶107. Thus, the cover 162 extends as far as the edge of the adherent patch 110.<br><br><br><br>*Id.*, Figure 1J1 (annotated). |
| 2. The electronic device of claim 1, wherein the electrode supporting section further comprises a third substrate layer adhered to the first substrate layer. | *Bly* discloses the electrode supporting section further comprises a third substrate layer adhered to the first substrate layer.<br><br>*Bly* discloses the electrode supporting section includes a breathable tape 110T (e.g., a third substrate layer), which is adhered to the gel cover 180 (e.g., the first substrate layer).<br><br>Specifically, *Bly* discloses that "[a] ***gel cover 180, or gel cover layer, for example a polyurethane non-woven tape, can be positioned over patch 110***[.]" *Id.*, ¶85.<br><br>The gel cover 180 includes an adhesive that adheres the gel cover 180 (e.g., the first substrate layer) to the breathable tape 110T (e.g., the third substrate layer) of the adherent patch 110. For example, *Bly* discloses that "gel cover 180 may comprise an adhesive, for example an acrylate pressure sensitive adhesive, to adhere the gel cover to adherent patch 110." *Id.*, ¶87.<br><br>Further, Figure 1J1 of *Bly* discloses the breathable tape 110T (e.g., the third substrate layer), disclosed in yellow, adhered to the gel cover 180 (e.g., the first substrate layer), disclosed in green, of the electrode supporting section. |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1J1 (annotated).

| | |
|---|---|
| 3. The electronic device of claim 1, further comprising an upper adhesive layer positioned on the underside of the first substrate layer. | *Bly* discloses an upper adhesive layer positioned on the underside of the first substrate layer.<br><br>In this regard, *Bly* discloses an adhesive 116B (e.g., an upper adhesive layer) positioned on the underside of the gel cover 180 (e.g., the first substrate layer).<br><br>For example, *Bly* discloses that "[a]dhesive 116B can be applied to upper side 110B of patch 110[.]" *Id.*, ¶106.<br><br>Figure 1I1 of *Bly* discloses the adhesive 116B (e.g., an upper adhesive layer), positioned on the underside of the gel cover 180 (e.g., first substrate layer)<br><br>*Id.*, Figure 1I1 (annotated).<br><br>Moreover, "gel cover 180 [e.g., first substrate layer] may comprise an adhesive, for example an acrylate pressure sensitive adhesive, to adhere the gel cover to adherent patch 110." *Id.*, ¶87. Thus, the gel cover includes its own adhesive layer, which adheres to the gel cover to the patch, which is located on the underside of the gel cover. *See* id., Figure 1I1. |
| 4. The electronic device of claim 1, wherein the lower adhesive layer extends at least partially below the housing. | *Bly* discloses the lower adhesive layer extends at least partially below the housing.<br><br>*Bly*'s adhesive 116A (e.g., the lower adhesive layer) extends at least partially below the electronics housing 160 (e.g., the housing). |

24

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

| | |
|---|---|
| | In this regard, *Bly* discloses "[e]lectronics components 130, printed circuit board 120, and electronics housing 160 are disposed between the stretchable breathable material of adherent patch 110 and the stretchable breathable material of cover 160[.]" *Id.*, ¶100. Further, "an adhesive 116A, for example breathable tape adhesive comprising a layer of acrylate pressure sensitive adhesive, can be disposed on underside 110A of patch 110." *Id.*, ¶84.<br><br>Thus, as disclosed in Figures 1G and 1H, the adhesive 116A (annotated in yellow) extends below the housing 160 (annotated in green). "FIG. 1G shows a side view of the adherent device[.]" *Id.*, ¶40. "FIG. 1H shown a bottom isometric view of the adherent device as in FIGS. 1A to 1G[.]" *Id.*, ¶41.<br><br><br>*Id.*, Figure 1G (annotated).<br><br><br>*Id.*, Figure 1H (annotated). |
| 5. The electronic device of claim 1, further comprising a flap extending beneath the housing. | *Bly* discloses a flap extending beneath the housing.<br><br>For example, *Bly* discloses that "adherent patch 110 stretches and/or retracts with the skin of the patient." Ex. 1003, ¶95.<br><br>*Bly* specifies that "[e]lectronics components 130, printed circuit board 120, and electronics housing 160 are disposed between the stretchable breathable material of adherent patch 110 and the stretchable breathable material of cover 160 so as to allow the |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

adherent patch 110 and cover 160 to stretch together while electronics components 130, printed circuit board 120, and electronics housing 160 do not stretch substantially, if at all." *Id.*, ¶100.

As shown in Figures 1G, 1I, for example, adherent patch 110 extends beneath the electronics housing 160 and forms flaps (annotated in red) that are integral with the lateral edges of adherent patch 110.



*Id.*, Figure 1G (annotated).



*Id.*, Figure 1I (annotated).

*Bly* discloses that the patch is made of a thin, flexible material. For example, the "adhesive patch may comprise a **thin, flexible, breathable** patch[.]" *Id.*, ¶111.

Further, "[t]he breathable cover 162 and adherent patch 110 comprise breathable tape…. The breathable tape may comprise the **stretchable breathable material** with the adhesive …, such that both the adherent patch and cover can stretch with the skin of the patient." *Id.*, ¶94.

26

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277**

The portion(s) of the adherent patch that extend wider and below the housing is a "flap" as recited in claim 2. The adherent patch is a thin material with freedom to stretch and flex. The patch is also connected to a larger body, which allows it to serve as an extension of the device with the ability to bend and flex due to the material. Thus, *Bly* discloses a flap under the broadest reasonable interpretation of this claim element..

In another example, *Bly* states that "the patch comprises two electrodes, for example two electrodes to measure the electrocardiogram (ECG) of the patient. Gel 114A, gel 114B, gel 114C and gel 114D can each be positioned over electrodes 112A, 112B, 112C and 112D, respectively, to provide electrical conductivity between the electrodes and the skin of the patient." Ex. 1003, ¶57. In this example embodiment, the gel is a flap that extends beneath the housing. *See id.*, Figure 1J.



Ex. 1003, Figure 1J.



Ex. 1003, Figure 1I.

| | |
|---|---|
| 6. The electronic device of claim 1, wherein the housing is rigid. | *Bly* discloses the housing is rigid.<br><br>*Bly* discloses that "[e]lectronics housing 160 may comprise an encapsulant, such as a dip coating […] silicone and/or ***epoxy***. In many embodiments, the PCB encapsulant protects the PCB and/or |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| | electronic components from moisture and/or mechanical forces. The encapsulant may comprise silicone, epoxy, other adhesives and/or sealants. In some embodiments, the electronics housing *may comprise metal and/or plastic* housing[.]" *Id.*, ¶90. In the disclosed embodiment of *Bly*, the plastic and metal materials used to construct the housing "to protect the printed circuit board and the electronic components from … mechanical forces" would be understood to be a rigid material in order to accomplish the stated protection. *Id.*, ¶21. This is confirmed by the fact it was well known to rely on rigid housings to protect components in long-term monitors. *See, e.g.* Ex. 1005, ¶2 (disclosing "a "HEARTCARD™ monitor [that] is intended for long-term use, and thus is enclosed in a durable *rigid housing*, []provided with long-life batteries..."). In yet another example, figure 4B of *Matsumura* discloses the housing of the signal processor 10 sinking into the first sheet 1 (*see* reference numeral 10b). Ex. 1005, Figure 4b. To allow for such function, *Matsumura's* housing is more rigid than the insulating material of the first sheet 1 into which the housing is pressed. *See id.*, ¶17-18. |
| 7. The electronic device of claim 1, wherein the housing is configured to remain connected to the electrode-supporting section when the housing is tilted at an angle relative the lower adhesive layer in response to movement of the user. | *Bly* discloses the housing is configured to remain connected to the electrode-supporting section when the housing is tilted at an angle relative to the lower adhesive layer in response to movement of the user.<br><br>Air gap 169 allows housing 160 to tilt at an angle relative to the lower adhesive layer 116A in response to movement of the user. For example, device 100 adheres to a patient via adhesive layer 116A. If the patient's skin moves in an upward direction (e.g., in the upward direction of arrow 186 in the below figure), the height of air gap 169 decreases because printed circuit board 120 tilts. Thus, air gap 169 allows the printed circuit board 120 and electronic components 130 to move independently of adherent patch 110 (and adhesive layer 116). As *Bly* explains, this allows the patch to move with the patient's skin for patient comfort. For added clarity, an additionally zoomed in view of annotated Figure 1I is provided below.<br><br>Specifically, *Bly* explains that "[a]ir gap 169 may extend from adherent patch 110 to the electronics module and/or PCB, so as to provide patient comfort. Air gap 169 allows adherent patch 110 and breathable tape 110T to remain supple and move, for example bend, with the skin of the patient with minimal flexing and/or bending of printed circuit board 120 and electronic components 130, as indicated by arrows 186" in Figure 1I. Ex. 1003, ¶101. |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1I (annotated).

In reference to Figure 1I, as indicated by red arrows in Figure 1I above, electronics housing 160 is configured to remain connected to the adherent patch 110 (e.g., flexible layer) when the electronic housing (e.g., housing) and adhesive 116A (e.g., lower adhesive layer) are flexed or bent (e.g., tilted) relative to each other.

The electronics housing 160 (e.g., housing) is "adhered to at least one of the electronics components or the printed circuit board, such that the electronics housing is disposed between the cover and electronics components." *Id.*, ¶21. "Cover 162 [e.g., electrode-supporting section] can be attached to [] electronics housing 160 comprising over the encapsulated [printed circuit board]." *Id.*, ¶105. Moreover, the device includes "[c]onnectors 122A, 122B, 122C and 122D [] positioned on flex printed circuit board 120[.]" *Id.*, ¶59.

Figure 1I discloses the configuration of these elements and the air gap (annotated in green).



*Id.*, Figure 1I (annotated).

29

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1I (annotated).

In reference to Figure 1I, movement of the user may cause 116A to move upward, decreasing the space of air gap 169, while the printed circuit board 120 and electronic components 130 stay stationary, which a POSITA would understand to render obvious the claimed "tilting" limitation.

Thus, the housing, electronics, and PCB are balanced on the connector 122A, which acts as a central balancing point. The air gap below allows the housing, electronics, and PCB freedom to move because nothing is blocking or resisting the motion. Thus, when a user wearing the device moves, the adherent device's center of mass will also shift and cause housing to tilt at an angle. In other words, the configuration of the device causes the housing to behave like a seesaw and tilt at an angle relative to the adhesive 116A (e.g., lower adhesive layer) in response to movement of the user.

Thus, when the device is moved based on a user's movement, the air gap 169 allows the housing and electronic components to "remain supple and move, for example bend, with the skin of the patient." *Id.*, ¶101. Movement of the patient will create slight shifts in the center of mass of the device, which will cause the housing to adjust at various angles as allowed by the air gap 169.

| 8. The electronic device of claim 1, further comprising a hinge portion adjacent the housing. | *Bly* discloses a hinge portion adjacent to the housing.

Specifically, *Bly* discloses a hinge portion adjacent to the housing configured to allow the device to bend.

*See* claim 7. As described in claim 7, *Bly*'s device is configured to include an air gap, which allows the housing to tilt at an angle |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| | relative to the lower adhesive layer in response to movement of the user. To provide such function, *Bly* further discloses a "hinge portion adjacent the housing" under the broadest reasonable interpretation of this claim element.<br><br>For example, as shown in Figure 1I1, *Bly* discloses a flexible connector 122A to provide strain relief. *Id.*, ¶78, Figure 1I1 (annotated), Figure 1I.<br><br><br><br>*Id.*, Figure 1I1 (annotated).<br><br>The housing, printed circuit board, and electronic components pivot via connector 122A when the described motion occurs. As described in reference to claim 7, air gap 169 disposed below these elements allow the same to tilt in response to the lower to adhesive layer 116A moving with the skin of the patient. *See id.*, ¶101 ("Air gap 169 allows adherent patch 110 and breathable tape 110T to remain supple and move, for example bend, with the skin of the patient with minimal flexing and/or bending of printed circuit board 120 and electronic components 130, as indicated by arrows 186."). |
| 9. The electronic device of claim 1, wherein the lower adhesive layer comprises a hydrocolloid adhesive. | *Bly* discloses the lower adhesive layer comprises a hydrocolloid adhesive.<br><br>"*[A]dhesive 116A [e.g., lower adhesive layer] comprises* at least one of acrylate, silicone, synthetic rubber, synthetic resin, *hydrocolloid adhesive*, pressure sensitive adhesive (PSA), or acrylate pressure sensitive adhesive." *Id.*, ¶84. |
| 10. The electronic device of claim 1, wherein the physiologic data collection circuit is configured to collect cardiac rhythm data from the user. | *Bly* discloses the physiologic data collection circuit is configured to collect cardiac rhythm data from the user.<br><br>"The adherent device may contain a subset of the following physiological sensors: bioimpedance, respiration, respiration rate variability, heart rate (ave, min, max), *heart rhythm*, hear rate variability (hereinafter "HRV"), heart rate turbulence (hereinafter "HRT"), heart Sounds (e.g. S3), respiratory Sounds, blood pressure, activity, posture, wake/sleep, orthopnea, temperature/heat flux, and weight." *Id.*, ¶54. |

31

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

| | |
|---|---|
| | Further, "the adherent device may continuously monitor physiological parameters, communicate wirelessly with a remote center, and provide alerts when necessary. The system may comprise an adherent patch, which attaches to the patient's thorax and contains sensing electrodes, battery, memory, logic, and wireless communication capabilities." *Id.*, ¶51. |

## IX.    GROUND II

### A.    Overview of *Matsumura*

*Matsumura* published on April 22, 2004, as Japanese Patent Publication 2004-121360. Thus, the publication of *Matsumura* is prior art to the '277 patent, which has a priority date of May 12, 2010, under 35 U.S.C. § 102(b). Ex. 1001, 2 (noting the priority date for the '277 patent).

*Matsumura* describes a multi-layer wearable monitor for detecting bioelectric potential. Ex. 1005, Abstract. *Matsumura* further discloses that the device is for long-term wear, including that the "subject (patient) wears the bioelectric potential detector 11 on his/her chest at all times to detect electrocardiogram signals[,]" even while "tak[ing] a shower or a bath." *Id.*, ¶¶36-37. In reference to Figure 1, *Matsumura* provides a bioelectric potential detector 11 comprised of disposable pad 7 and reusable signal processor 10 (red). *Id.*, ¶16. Disposable pad 7 further comprises first sheet 1 (green), second sheet 4 (blue), electrical components (i.e., conductive material 2, hooks 3 (orange) located between first sheet 1 and second sheet 4, conductive gels 5 (purple), and double-sided adhesive tape 9. *Id.*, ¶16, Figure 1 (annotated below). Conductive material 2 creates a conductive path

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

between conductive gel 5 and hooks 3, and hooks 3 provide a conductive path

upwards through first sheet 1 and double-sided adhesive tape 9 to processor 10. *Id.*,

¶19. The device may be adhered to the user by removing release tape 8 (yellow) to

expose an adhesive layer that has been applied to the bottom surface of second sheet

4 (blue), which is then applied directly to the user. *Id.*, ¶16; *see, e.g.*, Figure 3.



*Id.*, Figure 1 (annotated).

### B.    *Matsumura* Renders Obvious Claim 1

| U.S. Patent No. 12,303,277 | JP Pub. No. 2004-121360 to Matsumura et al. ("*Matsumura*"). |
|---|---|

33

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| 1[pre]. An electronic device for long-term adhesion to a user, the device comprising: | *Matsumura* discloses an electronic device for long-term adhesion to a user. |
| | Specifically, *Matsumura* discloses a "a bioelectric potential detector that can measure bioelectric potential (electrocardiograms)." Ex. 1005, Abstract. Further, "[t]he bioelectric potential detector 11 can be used as an electrocardiogram detector that is worn on the subject's chest to detect electrocardiogram signals." *Id.*, ¶24. |
| | *Matsumura* explains that the "subject (patient) **wears the bioelectric potential detector 11 on his/her chest at all times** to detect electrocardiogram signals." *Id.*, ¶36. In this way, "the subject can take a shower or a bath 21 while wearing the waterproof bioelectric potential detector 11." *Id.*, ¶37. |
| | *Matsumura* explains that an "adhesive, such as acrylic adhesive for example, is applied to the back surface of the second sheet 4." *Id.*, ¶18. Release sheet 8 is "peeled off" to expose the adhesive back surface of the second sheet 4, which is applied to directly to the patient's skin. *Id.*, ¶16; *see also id.* Figure 2 (below). |
| |  |
| | *Id.*, Fig. 2 (annotated). |
| 1[a]. a housing comprising a physiologic data collection circuit; | *Matsumura* discloses an electronic device for long-term adhesion to a user with a housing comprising a physiologic data collection circuit. |
| | *Matsumura* discloses a signal processor 10 including a physiologic data collection circuit. The signal processor 10 is surrounded by a housing. |

34

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

|  |  |
|---|---|
|  | "The ***signal processor 10 includes a processing circuit for [e.g. physiologic data collection circuit] filtering and amplifying the detected biopotential signal***, a memory for storing the processed biopotential signal, and a module for modulating the processed biopotential signal and wirelessly transmitting the modulated biopotential signal. A circuit and a loop antenna are incorporated. Further, the ***housing of the signal processor 10*** has a waterproof structure." *Id.*, ¶25.<br><br><br><br>*Id.*, Fig. 1 (annotated). |
| 1[b]. an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user; | *Matsumura* discloses an electronic device for long-term adhesion to a user with an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user.<br><br>*Matsumura* discloses that bioelectrode pad 7 is an electrode supporting section.<br><br>Further, *Matsumura* discloses that the "bioelectrode pad 7 includes ***a first sheet 1 [e.g., second substrate layer]***, a conductive material 2, a hook 3, ***a second sheet 4 [e.g., first substrate layer]***, a conductive gel 5 [e.g., electrodes] , a third sheet 6, and a double-sided adhesive tape 9." *Id.*, ¶16. |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

Figure 1 discloses the bioelectrode pad 7 (e.g., electrode supporting section) including the first sheet 1 (e.g., second substrate layer) and the second sheet 4 (e.g., first substrate layer).



*Id.*, Fig. 1 (the second substrate layer is annotated in green and the first substrate layer is annotated in blue).

Moreover, *Matsumura* discloses that an "***adhesive, such as acrylic adhesive, for example, is applied to the back surface of the second sheet 4***" is a lower adhesive layer that adheres the electronic device to a user.

Specifically, *Matsumura* explains that release sheet 8 is a sheet of material that is attached to the back surface of second sheet 4 and removed before use. *Id.*, ¶16. Release sheet 8 is "peeled off" to expose the adhesive back surface of the second sheet 4, which is applied directly to the patient's skin. *Id.*, ¶16; *see also id.* Figure 2 (below).

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| | <br><br>Ex. 1005, Figure 2 (annotated yellow indicating release sheet 8, and blue indicating the adhesive back).<br><br>Accordingly, *Matsumura* discloses a lower adhesive layer (e.g., adhesive, such as acrylic adhesive) positioned on second sheet 4 (e.g., first substrate layer), that adheres the device to a user. |
| 1[c]. an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and | *Matsumura* discloses an electronic device for long-term adhesion to a user with an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit.<br><br>*Matsumura* discloses conductive gel 5 (e.g., electrode) is positioned on the bottom surface of the bioelectrode pad 7 (e.g., electrode-supporting section). For example, Figure 1 discloses the conductive gel 5 (e.g., electrode) positioned on the bottom surface of the bioelectrode pad 7 (e.g., electrode-supporting section). The electrodes are annotated in yellow. |

37

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277**



*Id.*, Fig. 1 (the electrodes are annotated in yellow).

Further, *Matsumura* discloses conductive gel 5 (e.g., electrode) is electrically connected to the signal processor 10 (e.g. physiologic data collection circuit).

"A conductive material 2 and a hook are provided between the first sheet 1 and the second sheet 4 in order to derive a bioelectric potential detected by the conductive gel 5 disposed in the opening 4a of the second sheet 4. […] Two hooks 3 are arranged such that the protrusions of the hook 3 pass through the holes 2a and 1a from the back side of the conductive material 2. With this configuration, the biopotential detected by the conductive gel 5 is led out through the conductive material 2 and the hook 3." *Id.*, ¶18.

"Two hooks 3 are arranged such that the protrusions of the hook 3 pass through the holes 2a and 1a from the back side of the conductive material 2." *Id.*, ¶19.

"[T]he hook 3 projecting from the adhesive tape 9 is fitted to the hook fitting portion 10a on the bottom surface of the signal processor 10." *Id.*, ¶24.

Annotated figure 1 below discloses the electrical connection between the conductive gel 5 and the signal processor 10 represented by the flow of psychological data. The annotated figure below discloses the electrical connection between the conductive gel 5, hooks 3, and the signal processor 10.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| |  bioelectric potential is detected by the conductive gel 5, which runs through the hooks, and into the signal processor 10 <br><br> *Id.*, Fig. 1 (annotated arrows show the flow of bioelectric potential from the electrodes to the housing comprising the physiologic data collection circuit, which are both annotated in yellow). |
| 1[d]. wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and | *Matsumura* discloses an electronic device for long-term adhesion to a user wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode. <br><br> First, *Matsumura* discloses that the second sheet 4 (e.g., first substrate layer) is positioned over the conductive gel 5 (e.g., electrode). Figure 1 below discloses the second sheet 4 (e.g., first substrate layer) positioned over the conductive gel 5 (e.g., electrode). |

39

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Fig. 1.

Second, *Matsumura* discloses that the conductive material 2 (e.g., first substrate layer) extends horizontally away from the housing beyond a boundary of the electrode. Specifically, as disclosed in annotated figure 1, the conductive material 2 extends outward from the housing and beyond a boundary of the conductive gel 5 (electrode). In other words, the conductive material 2 (e.g., first substrate layer) extends wider in the horizontal direction than both the housing and the electrodes.

40

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Fig. 1 (the second sheet 4 is annotated in blue, the electrodes and housing are annotated in yellow, and the annotated arrows show the horizontal extensions).

| | |
|---|---|
| 1[e]. wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer. | *Matsumura* discloses an electronic device for long-term adhesion to a user wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer. <br><br> *Matsumura* discloses that the "second sheet 4 [e.g., first substrate layer] has the same outer shape as the first sheet 1 [e.g., second substrate layer][.]" *Id.*, ¶18. Figure 3 disclose the configuration of the first and second substrate layers. While sheets 1 and 4 have the same shape, there is no corresponding disclosure about the relative size of the two layers. <br><br>  <br><br> *Id.*, Fig. 1. |

41

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| | To the extent sheet 1 does not itself extend horizontally beyond a boundary of sheet 4, it would be obvious to modify the first sheet 1 (e.g., second substrate layer) to be slightly larger than the second sheet 4 (e.g., first substrate layer) to improve waterproofing effects. As detailed above, *Bly* provides one example in which a second substrate layer extends horizontally beyond a boundary of the first substrate layer, confirming that this modification would be routine and well understood. *See* Ground I, claim 1[e]. In this regard, the first sheet 1 (e.g., second substrate layer) is the outermost barrier that will come into contact with water or other environmental elements. By increasing the edge of the first sheet 1 (e.g., second substrate layer) to be slightly larger than the rest of the layers, this will provide sealing at the edges and improve the device's resistance to water or other environmental elements.<br><br>This shape would further *Matsumura*'s stated goal of functioning "even while a patient/subject is taking a shower or bath." *Id.* at Abstract; ¶7 ("the portion transmitting the bioelectric potentials from the bioelectrode pad to the signal processor is waterproof."), ¶8 ("the portion that transmits the bioelectric potentials from the bioelectrode pad to the signal processor is surrounded by adhesive tape, making the transmitting portion waterproof"). A POSITA would have understood that *Matsumura*'s desire to surround its electronics with waterproof tape would have further encouraged similar waterproofing around the various layers, thereby arriving at an upper sheet (sheet 1) that was adhesive and larger than the lower sheet (sheet 4) to ensure that no water leaked between the layers where the conductive rods 2 were.<br><br>*Matsumura* discloses that "[t]he first sheet 1 is preferably made of an insulating material that does not penetrate moisture." *Id.*, ¶17. Thus, the first sheet acts as a barrier between the device and outside factors. The barrier properties would only be enhanced by increasing the size of the first sheet 1. Further, this modification would not compromise the function of any of the inner layers. |

## X.    CONCLUSION

As discussed above, at least, the cited prior art references teach the elements

of claims 1 to 10 of the '277 patent. These references were published and/or filed

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

before the earliest operative priority date of the '277 patent and accordingly render

claims 1 to 10 obvious.  These prior art references were not used by the Patent Office

in the prosecution of the '277 patent and, while the disclosures were before the Patent

Office, there's no evidence that these disclosures were properly considered by the

Patent Office during prosecution.  For at least the above reasons, the foregoing

Request for Reexamination presents one or more Substantial New Questions of

Patentability and should therefore be granted.


Dated: September 8, 2025                    Respectfully submitted,

                                  By:    /s/ Erik J. Halverson
                                         Erik J. Halverson
                                         Reg. No. 73,552
                                         **K&L GATES LLP**
                                         Four Embarcadero Center, Suite 1200
                                         San Francisco, CA 94111
                                         T: (415) 882-8238
                                         F: (415) 882-8220

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

## CLAIM APPENDIX

[1pre]    An electronic device for long-term adhesion to a user, the device comprising:

[1a]    a housing comprising a physiologic data collection circuit;

[1b]    an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user;

[1c]    an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and

[1d]    wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and

[1e]    wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer.

[2]    The electronic device of claim 1, wherein the electrode supporting section further comprises a third substrate layer adhered to the first substrate layer.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

[3]      The electronic device of claim 1, further comprising an upper adhesive layer positioned on the underside of the first substrate layer.

[4]      The electronic device of claim 1, wherein the lower adhesive layer extends at least partially below the housing.

[5]      The electronic device of claim 1, further comprising a flap extending beneath the housing.

[6]      The electronic device of claim 1, wherein the housing is rigid.

[7]      The electronic device of claim 1, wherein the housing is configured to remain connected to the electrode-supporting section when the housing is tilted at an angle relative the lower adhesive layer in response to movement of the user.

[8]      The electronic device of claim 1, further comprising a hinge portion adjacent the housing.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

[9]     The electronic device of claim 1, wherein the lower adhesive layer comprises a hydrocolloid adhesive.

[10]    The electronic device of claim 1, wherein the physiologic data collection circuit is configured to collect cardiac rhythm data from the user.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2025, a true and correct copy of the

foregoing and supporting materials has been served at the following correspondence

address of record for the subject patent via U.S. Postal Service Certified Mail/Return

Receipt Requested Mail at the following address:

Knobbe, Martens, Olson & Bear, LLP
2040 Main Street
Fourteeth Floor
Irvine, California
United States

By:    <u>/s/ Erik J. Halverson</u>
Erik J. Halverson
Reg. No. 73,552

# Exhibit N

# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/015,505 | 09/08/2025 | 12303277 | 3726071.00381 | 1615 |

20995          7590          10/17/2025

Knobbe, Martens, Olson & Bear, LLP
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
|---|
| WILLIAMS, CATHERINE SERKE |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/17/2025 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

K&L Gates LLP - Chicago
Baxter
P.O. Box 1135
Chicago, IL 60690-1135

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/015,505* .

PATENT UNDER REEXAMINATION *12303277* .

ART UNIT *3993* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| ***Order Granting Request For Ex Parte Reexamination*** | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/015,505 | 12303277 |
| | Examiner | Art Unit | AIA (FITF) Status |
| | CATHERINE S WILLIAMS | 3993 | No |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed 09/08/2025 has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐  PTO-892,  b)☑  PTO/SB/08,  c)☐  Other: _____

1. ☑  The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

cc:Requester ( if third party requester )

## DECISION ON REQUEST FOR REEXAMINATION

A substantial new question (hereinafter "SNQ") of patentability affecting claims 1-10 of United States Patent Number 12,303,277 (hereinafter "the '277 patent") is raised by the request for *ex parte* reexamination.

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

### *Service of Papers*

After the filing of a request for reexamination by a third party requester, any document filed by either the patent owner or the third party requester must be served on the other party (or parties where two or more third party requester proceedings are merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550(f).

### *Extensions of Time*

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in *ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

### *Amendment in Reexamination Proceedings*

Patent owner is notified that any proposed amendment to the specification and/or claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR 1.20(c). See MPEP § 2250(IV) for examples to assist in the preparation of proper proposed amendments in reexamination proceedings.

Application/Control Number: 90/015,505                                          Page 3
Art Unit: 3993

### *Submissions*

In order to insure full consideration of any amendments, affidavits or declarations or other documents as evidence of patentability, such documents must be submitted in response to the first office action on the merits (which does not result in a close of prosecution). Submissions after the second office action on the merits, which is intended to be a final action, will be governed by the requirements of 37 CFR 1.116, after final rejection and by 37 CFR 41.33 after appeal, which will be strictly enforced.

### *Notification of Concurrent Proceedings*

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a), to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving the '277 patent throughout the course of this reexamination proceeding. Likewise, if present, the third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

### *Waiver of Right to File Patent Owner Statement*

In a reexamination proceeding, Patent Owner may waive the right under 37 C.F.R. 1.530 to file a Patent Owner Statement. The document needs to contain a statement that Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement and proof of service in the manner provided by 37 C.F.R. 1.248, if the request for reexamination was made by a third party requester, see 37 C.F.R. 1.550(f). The Patent Owner may consider using the following statement in a document waiving the right to file a Patent Owner Statement:

---

**WAIVER OF RIGHT TO FILE PATENT OWNER STATEMENT**

Patent Owner waives the right under 37 C.F.R. § 1.530 to file a Patent Owner Statement.

---

Application/Control Number: 90/015,505                                    Page 4
Art Unit: 3993

### *Substantial New Question*

The SNQ is based on:

1. US Pub. No. 2009/0076363 to Bly et al. (hereinafter "Bly '363"); and
2. JP2004/121360 to Matsumura (hereinafter "Matsumura").

A discussion of the specifics now follows:

### *Requester's Position*

1. Claims 1-10 are unpatentable over Bly '363 alone.

2. Claim 1 is unpatentable over Matsumura alone.

### *Prosecution History – 18/806,584*

The '277 patent resulted from US Pat. Application 18/806,584 (hereinafter "the '584

application") and was filed on 08/15/2024 with claim 1. A preliminary amendment to the claims

was then filed 09/26/2024 cancelling claim 1 and adding new independent claims 2 and 10 and

claims 3-9 and 11-19 depending respectively therefrom. A Non-Final Rejection was mailed

10/24/2024 rejecting:

- claims 2-7 and 9 as being unpatentable over US Pub. No. 2002/0082491 to Nissila

  (hereinafter "Nissila") in view of US Pub. No. 2007/0285868 to Lindberg (hereinafter

  "Lindberg");

- claims 8 and 18 as being obvious over Nissila in view of Lindberg and in further view of

  US Pub. No. 2008/0288026 to Cross.

Applicant filed a response on 01/24/2025 cancelling claims 1-9 and amending independent claim

10 replacing "extending horizontally away from the housing" to "extends" and other minor

amendments. Applicant argued the patentability of the claims stating,

Application/Control Number: 90/015,505                                               Page 5
Art Unit: 3993

*Claim 10 is Patentable*

Applicant amended Claim 10 to further clarify the subject matter of the claim. Further, to reach the subject matter of Claim 10, the Office Action combined Lindberg with Nissila "as predictable results would have ensued (affording a non-stretchable, breathable flexible layer for attachment to a user)." *Office Action*, page 6. However, amended Claim 10 recites, *inter alia*, "wherein the **second** substrate layer is positioned over the first substrate layer and extends beyond a boundary of the first substrate layer." **(emphasis** added). Applicant respectfully notes that Nissila

already provides a flexible breathable adhesive band (101) for adhering to a user. *Nissila*, para. [0033]. Therefore, there is no motivation or rationale for one of ordinary skill in the art to combine Lindberg with Nissila to solve a problem that does not exist in Nissila and/or make an un-needed improvement in Nissila. Further, as shown in Figure 2a of Lindberg below, the upper substrate of Lindberg (16) does not extend beyond a boundary of the lower substrate layer (12). *Lindberg*, Figure 2a. For at least these reasons, Applicant respectfully requests that the present rejections be withdrawn.

See the '584 Application, Remarks filed 07/23/2024, pages 4-5. Subsequent to the amendment, a

Notice of Allowance ("NOA") was mailed 03/21/2025 with a reasons for allowance stating,

Application/Control Number: 90/015,505                                         Page 6
Art Unit: 3993

### *Reasons for Allowance*

*The following is an examiner's statement of reasons for allowance:*

The closest prior art Gehman US Patent Application 2008/0214901 discloses an electronic device (10, Figure 2) with a housing (12) that contains a physiologic data collection circuit ([0024]), an electrode supporting section (the edges of the patch; see Figure 2) extend from the housing, an electrode (14) is positioned on a bottom surface the supporting section (Fig. 2, to make the wing), the electrode being connected to the collection circuit (via 13). Each wing has a second layer (20) over a top of the wing, and extending horizontally beyond the boundary of each wing. The electrode elements (14) can be conductive adhesives for adhering to skin ([0031]). If the adhesive electrode elements (14) are the electrodes, then Gehman fails to further disclose a first layer. If the adhesive electrode elements (14) are the first adhesive layer, then the electrode (13) is not on a bottom surface of the electrode supporting section. There is insufficient teaching, suggestion, or motivation to replace the conductive adhesive electrode with a separate conductive electrode and adhesive (both on the bottom surface of the electrode supporting section). Similar designs were known in the art. Libbus (US

Application/Control Number: 90/015,505                                              Page 7
Art Unit: 3993

2010/0056881) discloses a device with a center housing (160) and extended wings (Figures 1H, 1G, etc.) with electrodes (112A) and a first adhesive (116A) on the bottom surface. A second adhesive (164 on cover 162) extends over the top of the wings. However, the second layer does not extend horizontally beyond a boundary of the wing (see Figs. 11-1J), and there is insufficient teaching, suggestion, or motivation to modify the second adhesive layer. Gehman teaches that the top layer (adhesive) is useful for securing the device to the user, but the device of Libbus is already secured with the first layer/adhesive.

Oakley (US 2004/0077954), Durand (2009/0048556), and Axelgaard (US 6,038,464) also teach many of the recited features. The second adhesive (layer) of Durand functions as an adhesion guard and protects the first adhesive while extending horizontally beyond the first substrate layer/adhesive. However, the second layer is not positioned over the top of the wing, and there is insufficient teaching, suggestion, or motivation to move it from the bottom surface of the device. Similarly, the second layer of Axelgaard also functions as an adhesive guard and is over the first adhesive/layer. However, this second layer does not extend horizontally outward beyond the boundary of the wing or first layer. Moreover, there is insufficient motivation to modify the second layer of Axelgaard to extend beyond the wing because such a modification would negate the advantages of the design (particularly controlling the strength of adhesion to the skin).

See the '584 Application, NOA mailed 03/21/2025, pages 3-4.

Therefore, it is understood that the '277 patent was allowed since the prior art did not teach, among all the limitations, the combination of, "a first substrate layer…an electrode positioned on the bottom surface of the electrode-supporting section…the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer."

Application/Control Number: 90/015,505                                                    Page 8
Art Unit: 3993

### *Analysis of the Prior Art Provided in the Request*

On November 2, 2002, Public Law 107-273 was enacted. Title III, Subtitle A, Section

13105, part (a) of the Act revised the reexamination statute by adding the following new last

sentence to 35 U.S.C. 303(a) and 312(a):

> The existence of a substantial new question of patentability is not precluded by
> the fact that a patent or printed publication was previously cited by or to the
> Office or considered by the Office.

For any reexamination ordered on or after November 2, 2002, the effective date of the

statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily

preclude the existence of a substantial new question of patentability (SNQ) that is based

exclusively on that old art.  Rather, determinations on whether a SNQ exists in such an instance

shall be based upon a fact-specific inquiry done on a case-by-case basis.

In the present instance, both Bly '363, and Matsumura qualify as old art since each were

previously cited, applied and/or relied upon in rejections of the claims in the original

examination of the '584 application.

However, being "old art" does not necessarily preclude these references from establishing

a SNQ.  A SNQ may be based solely on old art where the old art is being presented/viewed in a

new light, or a different way, as compared with its use in the earlier concluded examination(s), in

view of a material new argument or interpretation in in the request.  See MPEP § 2242.  These

references are now being presented and viewed in a new light, or in a different way, as compared

with their use in the earlier examinations as discussed in detail in this order.  Accordingly, the

use of these references in this reexamination is proper.  Below is a detailed analysis for each of

the references requester asserts raise an SNQ.

Application/Control Number: 90/015,505                                    Page 9
Art Unit: 3993

Bly '363 is considered "old art" to the reexamination of the '277 patent since USPN

8,116,841 to Bly (hereinafter "Bly '841"), the issued patent resulting from Bly '363, was

provided in an IDS in the '584 application.

However, neither Bly '363 nor Bly '841 were relied upon in a rejection of the claims in

the '584 application and/or any preceding applications to the '584 application. Now, requester is

presenting Bly '363 in a new light as teaching a first substrate layer, an electrode positioned on

the bottom surface of the electrode-supporting section and the second layer being positioned over

the first substrate layer and extending beyond its boundary. See Request filed 09/08/2025, pages

16-23. Therefore, Bly '363 is being applied in a new light than its earlier use in the '584

application.

Matsumura is considered "old art" to the reexamination of the '277 patent since

Matsumura was provided in an IDS in the '584 application. However, Matsumura was not relied

upon in a rejection of the claims in the '584 application and/or any preceding applications to the

'584 application. Now, requester is presenting Matsumura in a new light as teaching a first

substrate layer, an electrode positioned on the bottom surface of the electrode-supporting section

and the second layer being positioned over the first substrate layer and extending beyond its

boundary. See Request filed 09/08/2025, pages 35-42. Therefore, Matsumura is being applied

in a new light than its earlier use in the '584 application.

### *Proposed SNQ 1: Bly '363*

The consideration of Bly '363 raises an SNQ as to claims 1-10 of the '277 patent. As

detailed above, during the prosecution of the '584 application the allowance of the claims

resulted from the prior art failing to teach the claim limitation of "a first substrate layer…an

electrode positioned on the bottom surface of the electrode-supporting section…the second

Application/Control Number: 90/015,505                                        Page 10
Art Unit: 3993

substrate layer is positioned over the first substrate layer and extends horizontally beyond a

boundary of the first substrate layer."

The request filed 09/08/2025 asserts that Bly '363 teaches this limitation resulting in the

allowance of the '277 patent. Requester presents on pages 18- of their request that Bly '363

teaches,

> Figure 1J of *Bly* is disclosed below, which includes the cover 162
> and the adherent patch 110 comprising breathable tape 110T and gel
> cover 180. *Id.*, ¶96. These components form the electrode-
> supporting section, as annotated in yellow.



*Id.*, Figure 1J (annotated).

> Figure 1I of *Bly* includes the electrode supporting section as
> constructed in the adherent device 100.



*Id.*, Figure 1I (annotated).

> Moreover, *Bly* discloses that "[i]n many embodiments, electrodes
> 112A, 112B, 112C and 112D extend from lower side 110A through
> adherent patch 110 to upper side 110B." *Id.*, ¶58. Thus, *Bly*'s Figure
> 1B (below) discloses the electrode-supporting section, supporting
> electrodes 112A, 112B, 112C and 112D.

First, *Bly* discloses that ***gel cover 180 is a first substrate layer***. "[T]he adherent device comprises a gel cover [180] positioned over the breathable tape to inhibit a flow of the gel through the breathable tape, and the printed circuit board is located over the gel cover such that the gel cover is disposed between the breathable tape and the printed circuit board." *Id.*, ¶22. The gel cover (e.g., first substrate layer) is annotated in below in green.



*Id.*, Figure 1J1 (annotated).

Second, *Bly* discloses that ***cover 162 is a second substrate layer***. "[C]over 162 can encase the flex PCB and/or electronics and can be adhered to at least one of the electronics, the flex PCB or adherent patch 110, so as to protect at least the electronics components and the PCB. Cover 162 can attach to adherent patch 110 with adhesive 116B." *Id.*, ¶92. The cover (e.g., second substrate layer) is annotated below in yellow.

Further, "***electrodes 112A, 112B, 112C and 112D extend from lower side 110A*** through adherent patch 110 to upper side 110B." *Id.*, ¶58.

Further, as also disclosed in Figure 1J1, the cover 162 (e.g., the second substrate layer), annotated in yellow, extends horizontally

beyond a boundary of the gel cover 180 (e.g., the first substrate layer).

Further, "the edge of the cover [162] may be adhered at the edge of the adherent patch [110]." *Id.*, ¶107. Thus, the cover 162 extends as far as the edge of the adherent patch 110.



*Id.*, Figure 1J1 (annotated).

Turning to Bly '363, the patent is directed to an adherent device to monitor a patient for an extended period comprising a breathable tape. The appliance includes as outlined in para. [0072], "FIG. 1F shows a top view of **a cover 162 over the batteries, electronic components and flex printed circuit board** as in FIGS. 1A to 1E. In many embodiments, an electronics housing 160 may be disposed under cover 162 to protect the electronic components, and in some embodiments electronics housing 160 may comprise an encapsulant over the electronic components and PCB. In some embodiments, **cover 162 can be adhered to adherent patch 110 with an adhesive 164 on an underside of cover 162**." (emphasis added) Para. [0073] states, "In some embodiments, **cover 162 may comprise** many known breathable materials, for example **polyester, polyamide, nylon and/or elastane** (Spandex.TM.). The breathable fabric may be coated to make it water resistant, waterproof, and/or to aid in wicking moisture away from the patch." (emphasis added) Para. [0078] states, "The adherent device comprises electrodes 112A1, 112B1, 112C1 and 112D1 configured to couple to tissue through apertures in

the breathable tape 110T. Electrodes 112A1, 112B1, 112C1 and 112D1 can be fabricated in

many ways. For example, electrodes 112A1, 112B1, 112C1 and 112D1 can be printed on a

flexible connector 112F, such as silver ink on polyurethane. Breathable tape 110T comprise

apertures 180A1, 180B1, 180C1 and 180D1. Electrodes 112A1, 112B1, 112C1 and 112D1 are

exposed to the gel through apertures 180A1, 180B1, 180C1 and 180D1 of breathable tape 110T.

Gel 114A, gel 114B, gel 114C and gel 114D can be positioned over electrodes 112A1, 112B1,

112C1 and 112D1 and the respective portions of breathable tape 11 OT proximate apertures

180A1, 180B1, 180C1 and 180D1, so as to couple electrodes 112A1, 112B1, 112C1 and 112D1

to the skin of the patient. The flexible connector 112F comprising the electrodes can extend from

under the gel cover to the printed circuit board to connect to the printed circuit boards and/or

components supported thereon. For example, flexible connector 112F may comprise flexible

connector 122A to provide strain relief, as described above." (emphasis added)  Para. [0081]

states, "In many embodiments, **adherent patch 110 may comprise a layer of breathable**

**tape 110T**, for example a known breathable tape, such as tricot-knit polyester fabric. In many

embodiments, breathable tape 110T comprises a backing material, or backing 111, **with an**

**adhesive. In many embodiments, the patch adheres to the skin of the patient's body**, and

comprises a breathable material to allow moisture vapor and air to circulate to and from the skin

of the patient through the tape." (emphasis added)

        There is a substantial likelihood that a reasonable examiner would consider the above

teachings, i.e., cover 162, adherent patch 110 with an adhesive 164 on an underside of cover 162,

and adhesive adhering the patch to the patient's skin as taught by Bly'363 important in

determining the patentability of the claims.  Accordingly, requester has raised a substantial new

Application/Control Number: 90/015,505                                      Page 14
Art Unit: 3993

question of patentability in consideration of Bly'363, which question has not been decided in a

previous examination of the '277 patent.

 Therefore, requester has raised a substantial new question of patentability in regards to

claims 1-12 in consideration of Bly'363, which question has not been decided in a previous

examination of the '277 patent.

### *Proposed SNQ 2: Matsumura*

 The consideration of Matsumura raises an SNQ as to claim 1 of the '277 patent. As

detailed above, during the prosecution of the '584 application the allowance of the claims

resulted from the prior art failing to teach the claim limitation of "a first substrate layer…an

electrode positioned on the bottom surface of the electrode-supporting section…the second

substrate layer is positioned over the first substrate layer and extends horizontally beyond a

boundary of the first substrate layer."

 The request filed 09/08/2025 asserts that Matsumura teaches this limitation resulting in

the allowance of the '277 patent. Requester presents on pages 35-41 of their request that

Matsumura teaches,

> Further, *Matsumura* discloses that the "bioelectrode pad 7 includes
> ***a first sheet 1 [e.g., second substrate layer]***, a conductive material
> 2, a hook 3, ***a second sheet 4 [e.g., first substrate layer]***, a
> conductive gel 5 [e.g., electrodes] , a third sheet 6, and a double-
> sided adhesive tape 9." *Id.*, ¶16.

> *Matsumura* discloses conductive gel 5 (e.g., electrode) is positioned
> on the bottom surface of the bioelectrode pad 7 (e.g., electrode-
> supporting section). For example, Figure 1 discloses the conductive
> gel 5 (e.g., electrode) positioned on the bottom surface of the
> bioelectrode pad 7 (e.g., electrode-supporting section). The
> electrodes are annotated in yellow.

> *Matsumura* discloses that the "second sheet 4 [e.g., first substrate layer] has the same outer shape as the first sheet 1 [e.g., second substrate layer][.]" *Id.*, ¶18. Figure 3 disclose the configuration of the first and second substrate layers. While sheets 1 and 4 have the same shape, there is no corresponding disclosure about the relative size of the two layers.

Turning to Matsumura[1], the patent is directed to a bioelectric potential detector and biometric information system. The system includes a bioelectric disposable water proof electrode pad that can be worn by the patient. See para. [0006]. Specifically, the pad 7 includes a first sheet 1 and a second sheet 4. The first and second sheets can be made from a polyethylene or polyurethane. See para. [0017-0018]. Conductive material 2 is between the first and second sheets. Additionally, the second sheet 4 has an acrylic adhesive applied to the surface. See para. [0018].

There is a substantial likelihood that a reasonable examiner would consider at least the above teachings, i.e., first and second sheets and acrylic adhesive as taught by Matsumura important in determining the patentability of the claims. Accordingly, requester has raised a substantial new question of patentability in consideration of Matsumura, which question has not been decided in a previous examination of the '277 patent.

Therefore, requester has raised a substantial new question of patentability in regards to claim 1 in consideration of Matsumura, which question has not been decided in a previous examination of the '277 patent.

### *35 USC 325(d)*

A review of the post grant history for the instant patent indicates that there have been no other Office post grant challenges made to the patent (Reexamination Proceedings or *Inter*

---

[1] It is noted that all citations to Matsumura are to the English Translation presented as exhibit 1006 with the Request for Reexamination filed 09/08/2025.

Application/Control Number: 90/015,505                                           Page 16
Art Unit: 3993

*Partes* Review, Post Grant Review, Covered Business Method trials). Accordingly, a

discretionary denial of reexamination pursuant to 35 USC 325(d) is not applicable.

### *Correspondence*

A shortened statutory period of two months will generally be set for filing a response to

an Office action in an *ex parte* reexamination. An extension of time may be requested under 37

CFR 1.550(c).

All correspondence relating to this *ex parte* reexamination should be directed as follows:


By Patent Center:    Registered users may submit via the electronic filing system, Patent Center,
                     at: https://patentcenter.uspto.gov/

By Mail:      Mail Stop *Ex Parte* Reexam
              ATTN: Central Reexamination Unit
              Commissioner for Patents
              U.S. Patent & Trademark Office
              P.O. Box 1450
              Alexandria, VA 22313-1450

By FAX:       (571)273-9900
              Central Reexamination Unit

By hand:      Customer Service Window
              Attn: Central Reexamination Unit
              Knox Building, Lobby Level
              501 Dulany Street
              Alexandria, VA 22314

For <u>Patent Center transmissions,</u> 37 CFR 1.8(a)(1) (i)(C) and (ii) states that

correspondence (except for a request for reexamination and a corrected or replacement request

for reexamination) will be considered timely filed if: (a) it is transmitted via the Office's

electronic filing system in accordance with 37 CFR 1.6(a)(4); and, (b) includes a certificate of

transmission for each piece of correspondence stating the date of transmission, which is prior to

the expiration of the set period of time in the Office action.

Application/Control Number: 90/015,505                                                    Page 17
Art Unit: 3993

      Any inquiry concerning this communication or earlier communications from the

Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination

Unit (CRU) at telephone number: 571.272.7705. The CRU's fax number is: 571.273.9900.


/CATHERINE S WILLIAMS/
Reexamination Specialist, Art Unit 3993


Conferees:

/SARAH B MCPARTLIN/
Reexamination Specialist, Art Unit 3993

/EILEEN D LILLIS/
SPRS, Art Unit 3993

# Exhibit O

PTO/SB/08 Equivalent

| | |
|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Application No. — 18/806584 |
| | Filing Date — August 15, 2024 |
| | First Named Inventor — Kumar, Uday N. |
| | Art Unit — 3794 |
| *(Multiple sheets used when necessary)* | Examiner — Antiskay, Brian Michael |
| SHEET 1 OF 1 | Attorney Docket No. — IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 1 | 4,623,206 | 11-18-1986 | Fuller | |
| | 2 | 12,133,731 | 11-05-2024 | Abercrombie II et al. | |
| | 3 | 12,133,734 | 11-05-2024 | Kumar et al. | |
| | 4 | 2007/0299325 | 12-27-2007 | Farrell | |
| | 5 | 2024/0331875 | 10-03-2024 | Hytopoulos et al. | |
| | 6 | 2024/0321455 | 09-26-2024 | Hytopoulos et al. | |
| | 7 | 2024/0382130 | 11-21-2024 | Bahney et al. | |
| | 8 | 2024/0382131 | 11-21-2024 | Bahney et al. | |
| | 9 | 2024/0398310 | 12-05-2024 | Kumar et al. | |
| | 10 | 2025/0009271 | 01-09-2025 | Bahney et al. | |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials | Cite No. | Foreign Patent Document<br>*Country Code-Number-Kind Code*<br>Example: JP 1234567 A1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 11 | JP 7551696 | 09-06-2024 | Irhythm Technologies, Inc. | | X |
| | 12 | JP 2019-140680 | 08-22-2019 | PREFERRED NETWORKS INC. | | X |
| | 13 | JP 2019-528511 | 10-10-2019 | Mitsubishi Electric Corporation | | X |
| | 14 | JP 2022-126807 | 08-30-2022 | Irhythm Technologies, Inc. | | X |
| | 15 | JP 2024-164285 | 11-26-2024 | Irhythm Technologies, Inc. | | X |
| | 16 | JP 2025-000653 | 01-07-2025 | Irhythm Technologies, Inc. | | X |
| | 17 | KR 10-2019-0114694 | 10-10-2019 | Samsung SDS Co., Ltd. | | |
| | 18 | WO 2019/070978 | 04-11-2019 | MAYO FOUND MEDICAL EDUCATION & RES | | |

### NON PATENT LITERATURE DOCUMENTS

| Examiner Initials | Cite No. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[1] |
|---|---|---|---|
| | 19 | YouTube.com, "Demonstration of Nintendo controller repair," https://www.youtube.com/watch?v=hzybDNChNeU, August 2010 | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

# Exhibit P

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 1 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 1 | D408,541 | 04-20-1999 | Dunshee et al. | |
| | 2 | D429,336 | 08-08-2000 | Francis et al. | |
| | 3 | D492,607 | 07-06-2004 | Curkovic et al. | |
| | 4 | D567,949 | 04-29-2008 | Lash et al. | |
| | 5 | D584,414 | 01-06-2009 | Lash et al. | |
| | 6 | D618,357 | 06-22-2010 | Navies | |
| | 7 | D621,048 | 08-03-2010 | Severe et al. | |
| | 8 | D634,431 | 03-15-2011 | Severe et al. | |
| | 9 | D639,437 | 06-07-2011 | Bishay et al. | |
| | 10 | D645,968 | 09-27-2011 | Kasabach et al. | |
| | 11 | D659,836 | 05-15-2012 | Bensch et al. | |
| | 12 | D663,432 | 07-10-2012 | Nichols | |
| | 13 | D674,009 | 01-08-2013 | Nichols | |
| | 14 | D719,267 | 12-09-2014 | Vaccarella | |
| | 15 | D744,659 | 12-01-2015 | Bishay et al. | |
| | 16 | D759,653 | 06-21-2016 | Toth et al. | |
| | 17 | D766,447 | 09-13-2016 | Bishay et al. | |
| | 18 | D775,361 | 12-27-2016 | Vosch et al. | |
| | 19 | D773,056 | 11-29-2016 | Vlach | |
| | 20 | D780,914 | 03-07-2017 | Kyvik et al. | |
| | 21 | D793,566 | 08-01-2017 | Bishay et al. | |
| | 22 | D797,301 | 09-12-2017 | Chen | |
| | 23 | D797,943 | 09-19-2017 | Long | |
| | 24 | D798,170 | 09-26-2017 | Toth et al. | |
| | 25 | D798,294 | 09-26-2017 | Toth et al. | |
| | 26 | D810,308 | 02-13-2018 | Lind et al. | |
| | 27 | D811,610 | 02-27-2018 | Abel et al. | |
| | 28 | D811,611 | 02-27-2018 | Lind et al. | |
| | 29 | D811,615 | 02-27-2018 | Lind et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 2 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 30 | D823,466 | 07-17-2018 | Marogil | |
| | 31 | D824,526 | 07-31-2018 | Ramjit et al. | |
| | 32 | D852,965 | 07-02-2019 | Bahney et al. | |
| | 33 | D854,167 | 07-16-2019 | Bahney et al. | |
| | 34 | RE43,767 | 10-23-2012 | Eggers et al. | |
| | 35 | 1,497,079 | 06-10-1924 | Gullborg | |
| | 36 | 2,179,922 | 11-14-1939 | Dana Arnold G. | |
| | 37 | 2,201,645 | 05-21-1940 | Epner | |
| | 38 | 2,311,060 | 02-16-1943 | Lurrain | |
| | 39 | 2,444,552 | 07-06-1948 | Brantingson Sigurd | |
| | 40 | 2,500,840 | 03-14-1950 | Lyons | |
| | 41 | 3,215,136 | 11-02-1965 | Holter et al. | |
| | 42 | 3,547,107 | 12-15-1970 | Chapman et al. | |
| | 43 | 3,697,706 | 10-10-1972 | Huggard | |
| | 44 | 3,870,034 | 03-11-1975 | James | |
| | 45 | 3,882,853 | 05-13-1975 | Gofman | |
| | 46 | 3,911,906 | 10-14-1975 | Reinhold | |
| | 47 | 4,023,312 | 05-17-1977 | Stickney | |
| | 48 | 4,027,664 | 06-07-1977 | Heavner, Jr. et al. | |
| | 49 | 4,082,087 | 04-24-1978 | Howson | |
| | 50 | 4,121,573 | 10-24-1978 | Crovella et al. | |
| | 51 | 4,123,785 | 10-31-1978 | Cherry et al. | |
| | 52 | 4,126,126 | 11-21-1978 | Bare | |
| | 53 | 4,202,139 | 05-13-1980 | Hong et al. | |
| | 54 | 4,274,419 | 06-23-1981 | Tam et al. | |
| | 55 | 4,274,420 | 06-23-1981 | Hymes | |
| | 56 | 4,286,610 | 09-01-1981 | Jones | |
| | 57 | 4,333,475 | 06-08-1982 | Moreno et al. | |
| | 58 | 4,361,990 | 12-07-1982 | Link | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| **\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. | | | |

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 3 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 59 | 4,381,792 | 05-03-1983 | Busch | |
| | 60 | 4,438,767 | 03-27-1984 | Nelson | |
| | 61 | 4,459,987 | 07-17-1984 | Pangburn | |
| | 62 | 4,535,783 | 08-20-1985 | Marangoni | |
| | 63 | 4,537,207 | 08-27-1985 | Gilhaus | |
| | 64 | 4,572,187 | 02-25-1986 | Schetrumpf | |
| | 65 | 4,621,465 | 11-11-1986 | Pangburn | |
| | 66 | 4,622,979 | 11-18-1986 | Katchis et al. | |
| | 67 | 4,658,826 | 04-21-1987 | Weaver | |
| | 68 | 4,712,552 | 12-15-1987 | Pangburn | |
| | 69 | 4,736,752 | 04-12-1988 | Munck et al. | |
| | 70 | 4,855,294 | 08-08-1989 | Dinesh C. Patel | |
| | 71 | 4,925,453 | 05-15-1990 | Kannankeril, Charles P. | |
| | 72 | 4,938,228 | 07-03-1990 | Righter et al. | |
| | 73 | 4,981,141 | 01-01-1991 | Segalowitz | |
| | 74 | 5,003,987 | 04-02-1991 | Grinwald | |
| | 75 | 5,027,824 | 07-02-1991 | Dougherty et al. | |
| | 76 | 5,082,851 | 01-21-1992 | Appelbaum et al. | |
| | 77 | 5,086,778 | 02-11-1992 | Mueller et al. | |
| | 78 | 5,191,891 | 03-09-1993 | Righter | |
| | 79 | 5,205,295 | 04-27-1993 | Del Mar et al. | |
| | 80 | 5,226,425 | 07-13-1993 | Righter | |
| | 81 | 5,228,450 | 07-20-1993 | Sellers | |
| | 82 | 5,230,119 | 07-27-1993 | Woods et al. | |
| | 83 | 5,289,824 | 03-01-1994 | Mills et al. | |
| | 84 | 5,305,746 | 04-26-1994 | Fendrock | |
| | 85 | 5,309,909 | 05-10-1994 | Gadsby | |
| | 86 | 5,328,935 | 07-12-1994 | Van Phan | |
| | 87 | 5,365,935 | 11-22-1994 | Righter et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T[1]** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 4 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example:   1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 88 | 5,458,141 | 10-17-1995 | Neil | |
| | 89 | 5,483,967 | 01-16-1996 | Ohtake | |
| | 90 | 5,489,624 | 02-06-1996 | Kantner et al. | |
| | 91 | 5,511,548 | 04-30-1996 | Riazzi et al. | |
| | 92 | 5,511,553 | 04-30-1996 | Segalowitz | |
| | 93 | 5,515,858 | 05-14-1996 | Myllymaki | |
| | 94 | 5,536,768 | 07-16-1996 | Kantner et al. | |
| | 95 | 5,581,369 | 12-03-1996 | Righter et al. | |
| | 96 | 5,626,140 | 05-06-1997 | Feldman et al. | |
| | 97 | 5,634,468 | 06-03-1997 | Platt et al. | |
| | 98 | 5,645,063 | 07-08-1997 | Straka | |
| | 99 | 5,645,068 | 07-08-1997 | Mezack et al. | |
| | 100 | 5,730,143 | 03-24-1998 | Schwarzberg | |
| | 101 | 5,749,365 | 05-12-1998 | Magill | |
| | 102 | 5,749,367 | 05-12-1998 | Gamlyn et al. | |
| | 103 | 5,771,524 | 06-30-1998 | Woods et al. | |
| | 104 | 5,772,604 | 06-30-1998 | Langberg et al. | |
| | 105 | 5,776,072 | 07-07-1998 | Hsu et al. | |
| | 106 | 5,881,743 | 03-16-1999 | Nadel | |
| | 107 | 5,916,239 | 06-29-1999 | Geddes et al. | |
| | 108 | 5,931,791 | 08-03-1999 | Saltzstein et al. | |
| | 109 | 5,941,829 | 08-24-1999 | Saltzstein et al. | |
| | 110 | 5,957,854 | 09-28-1999 | Besson et al. | |
| | 111 | 5,959,529 | 09-28-1999 | Kail | |
| | 112 | 6,013,007 | 01-11-2000 | Root et al. | |
| | 113 | 6,032,060 | 02-29-2000 | Carim | |
| | 114 | 6,038,464 | 03-14-2000 | Axelgaard et al. | |
| | 115 | 6,038,469 | 03-14-2000 | Karlsson et al. | |
| | 116 | 6,044,515 | 04-04-2000 | Zygmont | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T[1]** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 5 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 117 | 6,093,146 | 07-25-2000 | Filangeri | |
| | 118 | 6,102,856 | 08-15-2000 | Groff et al. | |
| | 119 | 6,117,077 | 09-12-2000 | Del Mar et al. | |
| | 120 | 6,121,508 | 09-19-2000 | Katharina J. Bischof | |
| | 121 | 6,132,371 | 10-17-2000 | Dempsey et al. | |
| | 122 | 6,134,480 | 10-17-2000 | Minogue | |
| | 123 | 6,136,008 | 10-24-2000 | Becker et al. | |
| | 124 | 6,161,036 | 12-12-2000 | Matsumura et al. | |
| | 125 | 6,169,915 | 01-02-2001 | Krumbiegel et al. | |
| | 126 | 6,178,357 | 01-23-2001 | Gliner et al. | |
| | 127 | 6,200,265 | 03-13-2001 | Walsh et al. | |
| | 128 | 6,225,901 | 05-01-2001 | Kail | |
| | 129 | 6,232,366 | 05-15-2001 | Wang et al. | |
| | 130 | 6,238,338 | 05-29-2001 | DeLuca et al. | |
| | 131 | 6,248,115 | 06-19-2001 | Halk | |
| | 132 | 6,287,252 | 09-11-2001 | Lugo | |
| | 133 | 6,290,707 | 09-18-2001 | Street | |
| | 134 | 6,315,719 | 11-13-2001 | Rode et al. | |
| | 135 | 6,379,237 | 04-30-2002 | Gordon | |
| | 136 | 6,385,473 | 05-07-2002 | Haines et al. | |
| | 137 | 6,389,308 | 05-14-2002 | Shusterman | |
| | 138 | 6,416,471 | 07-09-2002 | Kumar et al. | |
| | 139 | 6,434,410 | 08-13-2002 | Cordero et al. | |
| | 140 | 6,441,747 | 08-27-2002 | Khair et al. | |
| | 141 | 6,454,708 | 09-24-2002 | Ferguson et al. | |
| | 142 | 6,456,871 | 09-24-2002 | Hsu et al. | |
| | 143 | 6,456,872 | 09-24-2002 | Faisandier | |
| | 144 | 6,464,815 | 10-15-2002 | Beaudry, Wallace J. | |
| | 145 | 6,493,898 | 12-17-2002 | Woods et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 6 OF 39 | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example:  1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 146 | 6,496,705 | 12-17-2002 | Ng et al. | |
| | 147 | 6,510,339 | 01-21-2003 | Kovtun et al. | |
| | 148 | 6,546,285 | 04-08-2003 | Owen et al. | |
| | 149 | 6,564,090 | 05-13-2003 | Taha et al. | |
| | 150 | 6,569,095 | 05-27-2003 | Eggers | |
| | 151 | 6,577,893 | 06-10-2003 | Besson et al. | |
| | 152 | 6,580,942 | 06-17-2003 | Willshire | |
| | 153 | 6,585,707 | 07-01-2003 | Cabiri et al. | |
| | 154 | 6,589,170 | 07-08-2003 | Flach et al. | |
| | 155 | 6,589,187 | 07-08-2003 | Dimberger et al. | |
| | 156 | 6,605,046 | 08-12-2003 | Del Mar et al. | |
| | 157 | 6,615,083 | 09-02-2003 | Kupper | |
| | 158 | 6,622,035 | 09-16-2003 | Merilainen | |
| | 159 | 6,626,865 | 09-30-2003 | Prisell | |
| | 160 | 6,656,125 | 12-02-2003 | Misczynski et al. | |
| | 161 | 6,664,893 | 12-16-2003 | Eveland et al. | |
| | 162 | 6,665,385 | 12-16-2003 | Rogers et al. | |
| | 163 | 6,690,959 | 02-10-2004 | Thompson | |
| | 164 | 6,694,177 | 02-17-2004 | Eggers et al. | |
| | 165 | 6,701,184 | 03-02-2004 | Henkin | |
| | 166 | 6,711,427 | 03-23-2004 | Ketelhohn | |
| | 167 | 6,730,028 | 05-04-2004 | Eppstein | |
| | 168 | 6,773,396 | 08-10-2004 | Flach et al. | |
| | 169 | 6,775,566 | 08-10-2004 | Nissila | |
| | 170 | 6,801,137 | 10-05-2004 | Eggers | |
| | 171 | 6,801,802 | 10-05-2004 | Sitzman et al. | |
| | 172 | 6,871,089 | 03-22-2005 | Korzinov et al. | |
| | 173 | 6,871,211 | 03-22-2005 | Labounty et al. | |
| | 174 | 6,875,174 | 04-05-2005 | Braun et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 7 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 175 | 6,881,191 | 04-19-2005 | Oakley et al. | |
| | 176 | 6,893,396 | 05-17-2005 | Schulze et al. | |
| | 177 | 6,897,788 | 05-24-2005 | Khair et al. | |
| | 178 | 6,904,312 | 06-07-2005 | Bardy | |
| | 179 | 6,925,324 | 08-02-2005 | Shusterman | |
| | 180 | 6,940,403 | 09-06-2005 | Kail | |
| | 181 | 6,954,163 | 10-11-2005 | Toumazou et al. | |
| | 182 | 6,957,107 | 10-18-2005 | Rogers et al. | |
| | 183 | 6,987,965 | 01-17-2006 | Ng et al. | |
| | 184 | 7,002,468 | 02-21-2006 | Eveland et al. | |
| | 185 | 7,020,508 | 03-28-2006 | Stivoric et al. | |
| | 186 | 7,024,248 | 04-04-2006 | Penner et al. | |
| | 187 | 7,031,770 | 04-18-2006 | Collins et al. | |
| | 188 | 7,072,708 | 07-04-2006 | Andresen et al. | |
| | 189 | 7,072,709 | 07-04-2006 | Xue | |
| | 190 | 7,076,283 | 07-11-2006 | Cho et al. | |
| | 191 | 7,076,287 | 07-11-2006 | Rowlandson | |
| | 192 | 7,076,288 | 07-11-2006 | Skinner | |
| | 193 | 7,076,289 | 07-11-2006 | Sarkar et al. | |
| | 194 | 7,079,977 | 07-18-2006 | Osorio et al. | |
| | 195 | 7,082,327 | 07-25-2006 | Houben | |
| | 196 | 7,089,048 | 08-08-2006 | Matsumura et al. | |
| | 197 | 7,099,715 | 08-29-2006 | Korzinov et al. | |
| | 198 | 7,117,031 | 10-03-2006 | Lohman et al. | |
| | 199 | 7,120,485 | 10-10-2006 | Glass et al. | |
| | 200 | 7,130,396 | 10-31-2006 | Rogers et al. | |
| | 201 | 7,161,484 | 01-09-2007 | Tsoukalis | |
| | 202 | 7,171,166 | 01-30-2007 | Ng et al. | |
| | 203 | 7,179,152 | 02-20-2007 | Rhoades | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T**[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 8 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 204 | 7,186,264 | 03-06-2007 | Liddicoat et al. | |
| | 205 | 7,193,264 | 03-20-2007 | Lande | |
| | 206 | 7,194,300 | 03-20-2007 | Korzinov | |
| | 207 | 7,206,630 | 04-17-2007 | Tarler | |
| | 208 | 7,212,850 | 05-01-2007 | Prystowsky et al. | |
| | 209 | 7,222,054 | 05-22-2007 | Geva | |
| | 210 | 7,242,318 | 07-10-2007 | Harris | |
| | 211 | 7,266,361 | 09-04-2007 | Burdett | |
| | 212 | 7,316,671 | 01-08-2008 | Lastovich et al. | |
| | 213 | 7,349,947 | 03-25-2008 | Slage et al. | |
| | 214 | 7,354,423 | 04-08-2008 | Zelickson et al. | |
| | 215 | 7,387,607 | 06-17-2008 | Holt et al. | |
| | 216 | 7,444,177 | 10-28-2008 | Nazeri | |
| | 217 | 7,477,933 | 01-13-2009 | Ueyama | |
| | 218 | 7,478,108 | 01-13-2009 | Townsend et al. | |
| | 219 | 7,481,772 | 01-27-2009 | Banet | |
| | 220 | 7,482,314 | 01-27-2009 | Grimes et al. | |
| | 221 | 7,502,643 | 03-10-2009 | Farringdon et al. | |
| | 222 | 7,539,533 | 05-26-2009 | Tran | |
| | 223 | 7,542,878 | 06-02-2009 | Nanikashvili | |
| | 224 | 7,587,237 | 09-08-2009 | Korzinov et al. | |
| | 225 | 7,630,756 | 12-08-2009 | Linker | |
| | 226 | 7,632,174 | 12-15-2009 | Gringer et al. | |
| | 227 | 7,672,714 | 03-02-2010 | Kuo et al. | |
| | 228 | 7,715,905 | 05-11-2010 | Kurzweil et al. | |
| | 229 | 7,729,753 | 06-01-2010 | Kremliovsky et al. | |
| | 230 | 7,733,224 | 06-08-2010 | Tran | |
| | 231 | 7,815,494 | 10-19-2010 | Gringer et al. | |
| | 232 | 7,841,039 | 11-30-2010 | Squire | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 9 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 233 | 7,889,070 | 02-15-2011 | Reeves et al. | |
| | 234 | 7,894,888 | 02-22-2011 | Chan et al. | |
| | 235 | 7,904,133 | 03-08-2011 | Gehman et al. | |
| | 236 | 7,907,956 | 03-15-2011 | Uhlik | |
| | 237 | 7,907,996 | 03-15-2011 | Prystowsky et al. | |
| | 238 | 7,941,207 | 05-10-2011 | Korzinov | |
| | 239 | 7,970,450 | 06-28-2011 | Kroecker et al. | |
| | 240 | 7,979,111 | 07-12-2011 | Acquista | |
| | 241 | 7,996,075 | 08-09-2011 | Korzinov et al. | |
| | 242 | 7,996,187 | 08-09-2011 | Nanikashvili et al. | |
| | 243 | 8,002,701 | 08-23-2011 | John et al. | |
| | 244 | 8,077,042 | 12-13-2011 | Peeters | |
| | 245 | 8,103,333 | 01-24-2012 | Tran | |
| | 246 | 8,108,036 | 01-31-2012 | Tran | |
| | 247 | 8,116,841 | 02-14-2012 | Bly et al. | |
| | 248 | 8,150,502 | 04-03-2012 | Kumar et al. | |
| | 249 | 8,156,945 | 04-17-2012 | Hart | |
| | 250 | 8,160,682 | 04-17-2012 | Kumar et al. | |
| | 251 | 8,170,639 | 01-05-2012 | Hauge | |
| | 252 | 8,200,319 | 06-12-2012 | Pu et al. | |
| | 253 | 8,214,007 | 07-03-2012 | Baker et al. | |
| | 254 | 8,244,335 | 08-14-2012 | Kumar et al. | |
| | 255 | 8,249,686 | 08-21-2012 | Libbus et al. | |
| | 256 | 8,261,754 | 09-11-2012 | Pitstick | |
| | 257 | 8,265,907 | 09-11-2012 | Nanikashvili et al. | |
| | 258 | 8,280,749 | 10-02-2012 | Hsieh et al. | |
| | 259 | 8,285,356 | 10-09-2012 | Bly et al. | |
| | 260 | 8,290,129 | 10-16-2012 | Rogers et al. | |
| | 261 | 8,290,574 | 10-16-2012 | Field et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|
| | Application No. | Not Yet Assigned |
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 10 OF 39 | Attorney Docket No. | IRHYM.002C7 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 262 | 8,301,219 | 10-30-2012 | Chen et al. | |
| | 263 | 8,301,236 | 10-30-2012 | Baumann et al. | |
| | 264 | 8,311,604 | 11-13-2012 | Rowlandson et al. | |
| | 265 | 8,315,687 | 11-20-2012 | Cross et al. | |
| | 266 | 8,315,695 | 11-20-2012 | Sebelius et al. | |
| | 267 | 8,323,188 | 12-04-2012 | Tran | |
| | 268 | 8,326,394 | 12-04-2012 | Rowlandson et al. | |
| | 269 | 8,326,407 | 12-04-2012 | Linker | |
| | 270 | 8,328,718 | 12-11-2012 | Tran | |
| | 271 | 8,343,116 | 01-01-2013 | Ignon | |
| | 272 | 8,369,936 | 02-05-2013 | Farringdon et al. | |
| | 273 | 8,374,688 | 02-12-2013 | Libbus et al. | |
| | 274 | 8,386,009 | 02-26-2013 | Lindberg et al. | |
| | 275 | 8,388,543 | 03-05-2013 | Chon et al. | |
| | 276 | 8,406,843 | 03-26-2013 | Tiegs et al. | |
| | 277 | 8,412,317 | 04-02-2013 | Mazar | |
| | 278 | 8,417,326 | 04-09-2013 | Chon et al. | |
| | 279 | 8,425,414 | 04-23-2013 | Eveland | |
| | 280 | 8,449,471 | 05-28-2013 | Tran | |
| | 281 | 8,452,356 | 05-28-2013 | Vestel et al. | |
| | 282 | 8,460,189 | 06-11-2013 | Libbus et al. | |
| | 283 | 8,473,039 | 06-25-2013 | Michelson et al. | |
| | 284 | 8,473,047 | 06-25-2013 | Chakravarthy et al. | |
| | 285 | 8,478,418 | 07-02-2013 | Fahey | |
| | 286 | 8,483,809 | 07-09-2013 | Kim et al. | |
| | 287 | 8,500,636 | 08-06-2013 | Tran | |
| | 288 | 8,515,529 | 08-20-2013 | Pu et al. | |
| | 289 | 8,525,673 | 09-03-2013 | Tran | |
| | 290 | 8,535,223 | 09-17-2013 | Corroy et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | Application No. | Not Yet Assigned |
|---|---|---|---|---|
| | | | Filing Date | Herewith |
| | | | First Named Inventor | Kumar, Uday N. |
| | | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | | Examiner | Not Yet Assigned |
| SHEET 11 OF 39 | | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number *Number - Kind Code (if known)* Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 291 | 8,538,503 | 09-17-2013 | Kumar et al. | |
| | 292 | 8,540,731 | 09-24-2013 | Kay | |
| | 293 | 8,560,046 | 10-15-2013 | Kumar et al. | |
| | 294 | 8,562,527 | 10-22-2013 | Braun et al. | |
| | 295 | 8,571,645 | 10-29-2013 | Wu et al. | |
| | 296 | 8,588,908 | 11-19-2013 | Moorman et al. | |
| | 297 | 8,591,430 | 11-26-2013 | Amurthur et al. | |
| | 298 | 8,591,599 | 11-26-2013 | Rahul R. Kaliki | |
| | 299 | 8,594,763 | 11-26-2013 | Bibian | |
| | 300 | 8,626,262 | 01-07-2014 | McGusty et al. | |
| | 301 | 8,639,319 | 01-28-2014 | Hugh et al. | |
| | 302 | 8,668,643 | 03-11-2014 | Kinast | |
| | 303 | 8,684,900 | 04-01-2014 | Tran | |
| | 304 | 8,684,925 | 04-01-2014 | Amurthur et al. | |
| | 305 | 8,688,189 | 04-01-2014 | Shennib | |
| | 306 | 8,688,190 | 04-01-2014 | Libbus et al. | |
| | 307 | 8,688,202 | 04-01-2014 | Brockway et al. | |
| | 308 | 8,718,742 | 05-06-2014 | Beck et al. | |
| | 309 | 8,718,752 | 05-06-2014 | Libbus et al. | |
| | 310 | 8,718,753 | 05-06-2014 | Chon et al. | |
| | 311 | 8,731,632 | 05-20-2014 | Sereboff et al. | |
| | 312 | 8,738,118 | 05-27-2014 | Moon et al. | |
| | 313 | 8,744,561 | 06-03-2014 | Fahey | |
| | 314 | 8,750,980 | 06-10-2014 | Katra et al. | |
| | 315 | 8,755,876 | 06-17-2014 | Chon et al. | |
| | 316 | 8,782,308 | 07-15-2014 | Vlach | |
| | 317 | 8,789,727 | 07-29-2014 | Mortazavi | |
| | 318 | 8,790,257 | 07-29-2014 | Libbus et al. | |
| | 319 | 8,795,174 | 08-05-2014 | Manicka et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 12 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example:   1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 320 | 8,818,481 | 08-26-2014 | Bly et al. | |
| | 321 | 8,823,490 | 09-02-2014 | Libbus et al. | |
| | 322 | 8,838,218 | 09-16-2014 | Khair | |
| | 323 | 8,858,450 | 10-14-2014 | Chon et al. | |
| | 324 | 8,874,185 | 10-28-2014 | Sonnenborg | |
| | 325 | 8,903,477 | 12-02-2014 | Berkner | |
| | 326 | 8,903,484 | 12-02-2014 | Mazar | |
| | 327 | 8,909,328 | 12-09-2014 | Chon | |
| | 328 | 8,909,330 | 12-09-2014 | McCombie et al. | |
| | 329 | 8,909,332 | 12-09-2014 | Vitali et al. | |
| | 330 | 8,909,333 | 12-09-2014 | Rossi | |
| | 331 | 8,909,832 | 12-09-2014 | Vlach et al. | |
| | 332 | 8,926,509 | 01-06-2015 | Magar et al. | |
| | 333 | 8,945,019 | 02-03-2015 | Prystowsky et al. | |
| | 334 | 8,948,854 | 02-03-2015 | Friedman et al. | |
| | 335 | 8,954,129 | 02-10-2015 | Schlegel et al. | |
| | 336 | 8,956,293 | 02-17-2015 | McCombie et al. | |
| | 337 | 8,968,195 | 03-03-2015 | Tran | |
| | 338 | 8,972,000 | 03-03-2015 | Manera | |
| | 339 | 8,979,755 | 03-17-2015 | Szydlo-Moore et al. | |
| | 340 | 9,014,777 | 04-21-2015 | Woo | |
| | 341 | 9,015,008 | 04-21-2015 | Geva et al. | |
| | 342 | 9,017,255 | 04-28-2015 | Raptis et al. | |
| | 343 | 9,017,256 | 04-28-2015 | Gottesman | |
| | 344 | 9,021,161 | 04-28-2015 | Vlach et al. | |
| | 345 | 9,021,165 | 04-28-2015 | Vlach | |
| | 346 | 9,026,190 | 05-05-2015 | Shenasa et al. | |
| | 347 | 9,037,223 | 05-19-2015 | Oral et al. | |
| | 348 | 9,044,148 | 06-02-2015 | Michelson et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 13 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 349 | 9,084,548 | 07-21-2015 | Bouguerra | |
| | 350 | 9,095,274 | 08-04-2015 | Fein et al. | |
| | 351 | 9,101,264 | 08-11-2015 | Acquista | |
| | 352 | 9,138,144 | 09-22-2015 | Geva | |
| | 353 | 9,149,228 | 10-06-2015 | Kinast | |
| | 354 | 9,173,670 | 11-03-2015 | Sepulveda et al. | |
| | 355 | 9,179,851 | 11-10-2015 | Baumann et al. | |
| | 356 | 9,211,076 | 12-15-2015 | Kim | |
| | 357 | 9,226,679 | 01-05-2016 | Balda | |
| | 358 | 9,241,649 | 01-26-2016 | Kumar et al. | |
| | 359 | 9,241,650 | 01-26-2016 | Amirim | |
| | 360 | 9,277,864 | 03-08-2016 | Yang et al. | |
| | 361 | 9,282,894 | 03-15-2016 | Banet et al. | |
| | 362 | 9,307,921 | 04-12-2016 | Friedman et al. | |
| | 363 | 9,345,414 | 05-24-2016 | Bardy et al. | |
| | 364 | 9,355,215 | 05-31-2016 | Vlach | |
| | 365 | 9,357,939 | 06-07-2016 | Nosrati | |
| | 366 | 9,364,150 | 06-14-2016 | Sebelius et al. | |
| | 367 | 9,364,155 | 06-14-2016 | Bardy et al | |
| | 368 | 9,398,853 | 07-26-2016 | Nanikashvili | |
| | 369 | 9,408,551 | 08-09-2016 | Bardy et al | |
| | 370 | 9,408,545 | 08-09-2016 | Felix et al. | |
| | 371 | 9,408,576 | 08-09-2016 | Chon et al. | |
| | 372 | 9,414,753 | 08-16-2016 | Chon et al. | |
| | 373 | 9,414,786 | 08-16-2016 | Brockway et al. | |
| | 374 | 9,433,367 | 09-06-2016 | Felix et al. | |
| | 375 | 9,433,380 | 09-06-2016 | Bishay et al. | |
| | 376 | 9,439,566 | 09-13-2016 | Arne et al. | |
| | 377 | 9,439,599 | 09-13-2016 | Thompson et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 14 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 378 | 9,445,719 | 09-20-2016 | Libbus et al. | |
| | 379 | 9,451,890 | 09-27-2016 | Gitlin et al. | |
| | 380 | 9,451,975 | 09-27-2016 | Sepulveda et al. | |
| | 381 | 9,474,445 | 10-25-2016 | Eveland | |
| | 382 | 9,474,461 | 10-25-2016 | Fisher et al. | |
| | 383 | 9,478,998 | 10-25-2016 | Lapetina et al. | |
| | 384 | 9,492,084 | 11-15-2016 | Behar et al. | |
| | 385 | 9,504,423 | 11-29-2016 | Bardy et al. | |
| | 386 | 9,510,764 | 12-06-2016 | Li et al. | |
| | 387 | 9,510,768 | 12-06-2016 | Rossi | |
| | 388 | 9,526,433 | 12-27-2016 | Lapetina et al. | |
| | 389 | 9,545,204 | 01-17-2017 | Bishay et al. | |
| | 390 | 9,545,228 | 01-17-2017 | Bardy et al | |
| | 391 | 9,554,715 | 01-31-2017 | Bardy et al | |
| | 392 | 9,579,020 | 02-28-2017 | Libbus et al. | |
| | 393 | 9,585,584 | 03-07-2017 | Marek et al. | |
| | 394 | 9,597,004 | 03-21-2017 | Hughes et al. | |
| | 395 | 9,615,763 | 04-11-2017 | Felix et al. | |
| | 396 | 9,615,793 | 04-11-2017 | Solosko et al. | |
| | 397 | 9,619,660 | 04-11-2017 | Felix et al. | |
| | 398 | 9,642,537 | 05-09-2017 | Felix et al. | |
| | 399 | 9,655,518 | 05-23-2017 | Lin | |
| | 400 | 9,655,537 | 05-23-2017 | Bardy et al | |
| | 401 | 9,655,538 | 05-23-2017 | Felix | |
| | 402 | 9,662,030 | 05-30-2017 | Thng et al. | |
| | 403 | 9,675,264 | 06-13-2017 | Acquista et al. | |
| | 404 | 9,700,227 | 06-11-2017 | Bishay et al. | |
| | 405 | 9,706,938 | 07-18-2017 | Chakravarthy et al. | |
| | 406 | 9,706,956 | 07-18-2017 | Brockway et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | | | |
|---|---|---|---|---|---|

| | | | |
|---|---|---|---|
| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned | |
| | Filing Date | Herewith | |
| | First Named Inventor | Kumar, Uday N. | |
| | Art Unit | Not Yet Assigned | |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned | |
| SHEET 15 OF 39 | Attorney Docket No. | IRHYM.002C7 | |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 407 | 9,713,428 | 07-25-2017 | Chon et al. | |
| | 408 | 9,717,432 | 08-01-2017 | Bardy et al | |
| | 409 | 9,717,433 | 08-01-2017 | Felix et al. | |
| | 410 | 9,730,593 | 08-15-2017 | Bardy et al | |
| | 411 | 9,730,604 | 08-15-2017 | Li et al. | |
| | 412 | 9,730,641 | 08-15-2017 | Felix et al. | |
| | 413 | 9,736,625 | 08-15-2017 | Landgraf et al. | |
| | 414 | 9,737,211 | 08-22-2017 | Bardy et al | |
| | 415 | 9,737,224 | 08-22-2017 | Bardy et al | |
| | 416 | 9,775,534 | 10-03-2017 | Korzinov et al. | |
| | 417 | 9,775,536 | 10-03-2017 | Felix et al. | |
| | 418 | 9,782,095 | 10-10-2017 | Ylostalo et al. | |
| | 419 | 9,782,132 | 10-10-2017 | Golda et al. | |
| | 420 | 9,788,722 | 10-17-2017 | Bardy et al | |
| | 421 | 9,801,562 | 10-31-2017 | Host-Madsen | |
| | 422 | 9,820,665 | 11-21-2017 | Felix et al. | |
| | 423 | 9,839,363 | 12-12-2017 | Albert | |
| | 424 | 9,888,866 | 02-13-2018 | Chon et al. | |
| | 425 | 9,907,478 | 03-06-2018 | Friedman et al. | |
| | 426 | 9,936,875 | 04-10-2018 | Bardy et al | |
| | 427 | 9,955,885 | 05-01-2018 | Felix et al. | |
| | 428 | 9,955,887 | 05-01-2018 | Hughes et al. | |
| | 429 | 9,955,888 | 05-01-2018 | Felix et al. | |
| | 430 | 9,955,911 | 05-01-2018 | Bardy et al | |
| | 431 | 9,986,921 | 06-05-2018 | Chon et al. | |
| | 432 | 9,968,274 | 05-15-2018 | Korzinov et al. | |
| | 433 | 10,004,415 | 06-26-2018 | Bishay et al. | |
| | 434 | 10,045,709 | 08-14-2018 | Bardy et al | |
| | 435 | 10,052,022 | 08-21-2018 | Bardy et al | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

*\*Examiner: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.*

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 16 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example:  1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 436 | 10,076,257 | 09-18-2018 | Lin et al. | |
| | 437 | 10,095,841 | 10-09-2018 | Dettinger et al. | |
| | 438 | 10,098,559 | 10-16-2018 | Hughes et al. | |
| | 439 | 10,111,601 | 10-30-2018 | Bishay et al. | |
| | 440 | 10,123,703 | 11-13-2018 | Bardy et al | |
| | 441 | 10,154,793 | 12-18-2018 | Felix et al. | |
| | 442 | 10,165,946 | 01-01-2019 | Bardy et al | |
| | 443 | 10,172,534 | 01-08-2019 | Felix et al. | |
| | 444 | 10,176,575 | 01-08-2019 | Isgum et al. | |
| | 445 | 10,251,575 | 04-09-2019 | Bardy et al | |
| | 446 | 10,251,576 | 04-09-2019 | Bardy et al | |
| | 447 | 10,264, 992 | 04-23-2019 | Felix et al. | |
| | 448 | 10,265,015 | 04-23-2019 | Bardy et al. | |
| | 449 | 10,270,898 | 04-23-2019 | Soli et al. | |
| | 450 | 10,299,691 | 05-28-2019 | Hughes et al. | |
| | 451 | 10,271,754 | 04-30-2019 | Bahney et al. | |
| | 452 | 10,271,755 | 04-30-2019 | Felix et al. | |
| | 453 | 10,327,657 | 06-25-2019 | Spencer et al. | |
| | 454 | 10,271,756 | 04-30-2019 | Felix et al. | |
| | 455 | 10,278,603 | 05-07-2019 | Felix et al. | |
| | 456 | 10,278,606 | 05-07-2019 | Bishay et al. | |
| | 457 | 10,278,607 | 05-07-2019 | Prystowsky et al. | |
| | 458 | 10,321,823 | 06-18-2019 | Chakravarthy et al. | |
| | 459 | 10,362,467 | 07-23-2019 | Landgraf et al. | |
| | 460 | 10,368,808 | 08-06-2019 | Lee et al. | |
| | 461 | 10,376,172 | 08-13-2019 | Kuppuraj et al. | |
| | 462 | 10,390,700 | 08-27-2019 | Bardy et al. | |
| | 463 | 10,398,344 | 09-03-2019 | Felix et al. | |
| | 464 | 10,405,799 | 09-10-2019 | Kumar et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T¹ - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | Application No. | Not Yet Assigned |
|---|---|---|---|---|
| | | | Filing Date | Herewith |
| | | | First Named Inventor | Kumar, Uday N. |
| | | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | | Examiner | Not Yet Assigned |
| SHEET 17 OF 39 | | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 465 | 10,413,205 | 09-17-2019 | Bardy et al. | |
| | 466 | 10,426,634 | 10-01-2019 | Al-Jazaeri et al. | |
| | 467 | 10,433,743 | 10-08-2019 | Felix et al. | |
| | 468 | 10,433,748 | 10-08-2019 | Bishay et al. | |
| | 469 | 10,433,751 | 10-08-2019 | Bardy et al. | |
| | 470 | 10,441,184 | 10-15-2019 | Baumann et al. | |
| | 471 | 10,463,269 | 11-05-2019 | Boleyn et al. | |
| | 472 | 10,478,083 | 11-19-2019 | Felix et al. | |
| | 473 | 10,499,812 | 12-10-2019 | Bardy et al. | |
| | 474 | 10,517,500 | 12-31-2019 | Kumar et al. | |
| | 475 | 10,555,683 | 02-11-2020 | Bahney et al. | |
| | 476 | 10,561,326 | 02-18-2020 | Felix et al. | |
| | 477 | 10,561,328 | 02-18-2020 | Bishay et a. | |
| | 478 | 10,568,533 | 02-25-2020 | Soli et al. | |
| | 479 | 10,588,527 | 03-17-2020 | McNamara et al. | |
| | 480 | 10,595,371 | 03-24-2020 | Gopalakrishnan et al. | |
| | 481 | 10,602,942 | 03-31-2020 | Shakur et al. | |
| | 482 | 10,602,977 | 03-31-2020 | Bardy et al. | |
| | 483 | 10,624,551 | 04-21-2020 | Bardy et al. | |
| | 484 | 10,660,520 | 05-26-2020 | Lin | |
| | 485 | 10,667,712 | 06-02-2020 | Park et al. | |
| | 486 | 10,729,361 | 08-04-2020 | Hoppe et al. | |
| | 487 | 10,758,139 | 09-01-2020 | Rapin et al. | |
| | 488 | 10,772,521 | 09-15-2020 | Korzinov et al. | |
| | 489 | 10,779,744 | 09-22-2020 | Rapin et al. | |
| | 490 | 10,813,565 | 10-27-2020 | Park et al. | |
| | 491 | 10,827,938 | 11-10-2020 | Fontanarava et al. | |
| | 492 | 10,866,619 | 12-15-2020 | Bushnell et al. | |
| | 493 | 10,869,610 | 12-22-2020 | Lu et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|
| | Application No. | Not Yet Assigned |
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 18 OF 39 | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 494 | 10,987,018 | 04-27-2021 | Aga et al. | |
| | 495 | 11,004,198 | 05-11-2021 | Isgum et al. | |
| | 496 | 11,017,887 | 05-25-2021 | Finkelmeier et al. | |
| | 497 | 11,026,632 | 06-08-2021 | Narasimhan et al. | |
| | 498 | 11,051,738 | 07-06-2021 | Bahney et al. | |
| | 499 | 11,062,804 | 07-13-2021 | Selvaraj et al. | |
| | 500 | 11,083,371 | 08-10-2021 | Szabados et al. | |
| | 501 | 11,141,091 | 10-12-2021 | Uday et al. | |
| | 502 | 11,172,882 | 11-16-2021 | Upadhya et al. | |
| | 503 | 11,246,523 | 02-15-2022 | Abercrombie II et al. | |
| | 504 | 11,246,524 | 02-15-2022 | Szabados et al. | |
| | 505 | 11,253,185 | 02-22-2022 | Szabados et al. | |
| | 506 | 11,253,186 | 02-22-2022 | Szabados et al. | |
| | 507 | 11,276,491 | 03-15-2022 | Petterson et al. | |
| | 508 | 11,289,197 | 03-29-2022 | Park et al. | |
| | 509 | 11,324,420 | 05-10-2022 | Selvaraj et al. | |
| | 510 | 11,324,441 | 05-10-2022 | Bardy et al. | |
| | 511 | 11,331,034 | 05-17-2022 | Rapin et al. | |
| | 512 | 11,337,632 | 05-24-2022 | Abercrombie II et al. | |
| | 513 | 11,350,864 | 07-07-2022 | Abercrombie II et al. | |
| | 514 | 11,350,865 | 07-07-2022 | Abercrombie II et al. | |
| | 515 | 11,375,941 | 07-05-2022 | Szabados et al. | |
| | 516 | 11,382,555 | 07-12-2022 | Szabados et al. | |
| | 517 | 11,399,760 | 08-02-2022 | Abercrombie II et al. | |
| | 518 | 11,497,432 | 11-15-2022 | Szabados et al. | |
| | 519 | 11,504,041 | 11-22-2022 | Abercrombie II et al. | |
| | 520 | 11,589,792 | 02-28-2023 | Abercrombie II et al. | |
| | 521 | 11,605,458 | 03-14-2023 | Park et al. | |
| | 522 | 11,627,902 | 04-18-2023 | Bahney et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*Examiner: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 19 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 523 | 2001/0056262 | 12-27-2001 | Cabiri et al. | |
| | 524 | 2002/0007126 | 01-17-2002 | Nissila | |
| | 525 | 2002/0026112 | 02-28-2002 | Nissila et al. | |
| | 526 | 2002/0067256 | 06-06-2002 | Kail | |
| | 527 | 2002/0082491 | 06-27-2002 | Nissila | |
| | 528 | 2002/0087167 | 07-04-2002 | Winitsky | |
| | 529 | 2002/0180605 | 12-05-2002 | Ozguz et al. | |
| | 530 | 2003/0069510 | 04-10-2003 | Semler | |
| | 531 | 2003/0083559 | 05-01-2003 | Thompson | |
| | 532 | 2003/0125786 | 07-03-2003 | Bradford Evan Gliner | |
| | 533 | 2003/0149349 | 08-07-2003 | Jensen | |
| | 534 | 2003/0176795 | 09-18-2003 | Harris et al. | |
| | 535 | 2003/0195408 | 10-16-2003 | Hastings | |
| | 536 | 2003/0199811 | 10-23-2003 | Sage, JR. et al. | |
| | 537 | 2003/0212319 | 11-13-2003 | Magill | |
| | 538 | 2004/0032957 | 02-19-2004 | Mansy et al. | |
| | 539 | 2004/0068195 | 04-08-2004 | Massicotte et al. | |
| | 540 | 2004/0077954 | 04-22-2004 | Oakley et al. | |
| | 541 | 2004/0082843 | 04-29-2004 | Menon | |
| | 542 | 2004/0187297 | 09-30-2004 | Te-Yeu Su | |
| | 543 | 2004/0199063 | 10-07-2004 | O'Neil | |
| | 544 | 2004/0215091 | 10-28-2004 | Lohman et al. | |
| | 545 | 2004/0236202 | 11-25-2004 | Burton | |
| | 546 | 2004/0254587 | 12-16-2004 | Park | |
| | 547 | 2004/0260189 | 12-23-2004 | Eggers et al. | |
| | 548 | 2005/0096513 | 05-05-2005 | Ozguz et al. | |
| | 549 | 2005/0101875 | 05-12-2005 | Semler et al. | |
| | 550 | 2005/0118246 | 06-02-2005 | Wong et al. | |
| | 551 | 2005/0119580 | 06-06-2005 | Eveland | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T[1]** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | | | Application No. | Not Yet Assigned |
|---|---|---|---|---|---|---|

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 20 OF 39 | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 552 | 2005/0165323 | 07-28-2005 | Montgomery et al. | |
| | 553 | 2005/0204636 | 09-22-2005 | Azar et al. | |
| | 554 | 2005/0277841 | 12-15-2005 | Shennib | |
| | 555 | 2005/0280531 | 12-22-2005 | Fadem et al. | |
| | 556 | 2006/0030781 | 02-09-2006 | Shennib | |
| | 557 | 2006/0030782 | 02-09-2006 | Shennib | |
| | 558 | 2006/0047215 | 03-02-2006 | Newman et al. | |
| | 559 | 2006/0084883 | 04-20-2006 | Linker | |
| | 560 | 2006/0142648 | 06-29-2006 | Banet et al. | |
| | 561 | 2006/0142654 | 06-29-2006 | Rytky | |
| | 562 | 2006/0149156 | 07-06-2006 | Cochran et al. | |
| | 563 | 2006/0155173 | 07-13-2006 | Anttila et al. | |
| | 564 | 2006/0155183 | 07-13-2006 | Kroecker et al. | |
| | 565 | 2006/0155199 | 07-13-2006 | Logier et al. | |
| | 566 | 2006/0155200 | 07-13-2006 | Ng et al. | |
| | 567 | 2006/0161064 | 07-20-2006 | Watrous et al. | |
| | 568 | 2006/0161065 | 07-20-2006 | Elion | |
| | 569 | 2006/0161066 | 07-20-2006 | Elion | |
| | 570 | 2006/0161067 | 07-20-2006 | Elion | |
| | 571 | 2006/0161068 | 07-20-2006 | Hastings et al. | |
| | 572 | 2006/0167353 | 07-27-2006 | Nazeri | |
| | 573 | 2006/0224072 | 10-05-2006 | Shennib | |
| | 574 | 2006/0264767 | 11-23-2006 | Shennib | |
| | 575 | 2007/0003695 | 01-04-2007 | Tregub et al. | |
| | 576 | 2007/0010729 | 01-11-2007 | Virtanen | |
| | 577 | 2007/0027388 | 02-01-2007 | Chou | |
| | 578 | 2007/0088419 | 04-19-2007 | Florina et al. | |
| | 579 | 2007/0156054 | 07-05-2007 | Korzinov et al. | |
| | 580 | 2007/0208266 | 09-06-2007 | Hadley | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T[1]** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|
| | Application No. | Not Yet Assigned |
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 21 OF 39 | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example:  1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 581 | 2007/0225611 | 09-27-2007 | Kumar et al. | |
| | 582 | 2007/0249946 | 10-25-2007 | Kumar et al. | |
| | 583 | 2007/0255153 | 11-01-2007 | Kumar et al. | |
| | 584 | 2007/0270678 | 11-22-2007 | Fadem et al. | |
| | 585 | 2007/0285868 | 12-13-2007 | Lindberg et al. | |
| | 586 | 2007/0293776 | 12-20-2007 | Korzinov et al. | |
| | 587 | 2008/0039730 | 02-14-2008 | Pu et al. | |
| | 588 | 2008/0091089 | 04-17-2008 | Guillory et al. | |
| | 589 | 2008/0108890 | 05-08-2008 | Teng et al. | |
| | 590 | 2008/0114232 | 05-15-2008 | Gazit | |
| | 591 | 2008/0139953 | 06-12-2008 | Baker et al. | |
| | 592 | 2008/0214901 | 09-04-2008 | Gehman et al. | |
| | 593 | 2008/0275327 | 11-06-2008 | Faarbaek et al. | |
| | 594 | 2008/0281215 | 11-13-2008 | Alhussiny | |
| | 595 | 2008/0288026 | 11-20-2008 | Cross et al. | |
| | 596 | 2008/0309287 | 12-18-2008 | Reed | |
| | 597 | 2009/0048556 | 02-19-2009 | Durand | |
| | 598 | 2009/0062670 | 03-05-2009 | Sterling et al. | |
| | 599 | 2009/0062671 | 03-05-2009 | Brockway | |
| | 600 | 2009/0073991 | 03-19-2009 | Landrum et al. | |
| | 601 | 2009/0076336 | 03-19-2009 | Mazar et al. | |
| | 602 | 2009/0076340 | 03-19-2009 | Libbus et al. | |
| | 603 | 2009/0076341 | 03-19-2009 | James et al. | |
| | 604 | 2009/0076342 | 03-19-2009 | Amurthur et al. | |
| | 605 | 2009/0076343 | 03-19-2009 | James et al. | |
| | 606 | 2009/0076344 | 03-19-2009 | Libbus et al. | |
| | 607 | 2009/0076345 | 03-19-2009 | Manicka et al. | |
| | 608 | 2009/0076346 | 03-19-2009 | James et al. | |
| | 609 | 2009/0076349 | 03-19-2009 | Libbus et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 22 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example:  1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 610 | 2009/0076350 | 03-19-2009 | Bly et al. | |
| | 611 | 2009/0076364 | 03-19-2009 | Libbus et al. | |
| | 612 | 2009/0076397 | 03-19-2009 | Libbus et al. | |
| | 613 | 2009/0076401 | 03-19-2009 | Mazar et al. | |
| | 614 | 2009/0076559 | 03-19-2009 | Libbus et al. | |
| | 615 | 2009/0182204 | 07-16-2009 | Semler et al. | |
| | 616 | 2009/0253975 | 10-08-2009 | Tiegs | |
| | 617 | 2009/0283300 | 11-19-2009 | Grunthaner | |
| | 618 | 2009/0292193 | 11-26-2009 | Wijesiriwardana | |
| | 619 | 2009/0292194 | 11-26-2009 | Libbus et al. | |
| | 620 | 2009/0306485 | 12-10-2009 | Bell | |
| | 621 | 2010/0001541 | 01-07-2010 | Sugiyama | |
| | 622 | 2010/0022864 | 01-28-2010 | Cordero | |
| | 623 | 2010/0042113 | 02-18-2010 | Mah | |
| | 624 | 2010/0049006 | 02-25-2010 | Magar et al. | |
| | 625 | 2010/0051039 | 03-04-2010 | Ferrara | |
| | 626 | 2010/0056881 | 03-04-2010 | Libbus et al. | |
| | 627 | 2010/0057056 | 03-04-2010 | Gurtner | |
| | 628 | 2010/0076533 | 03-25-2010 | Dar et al. | |
| | 629 | 2010/0081913 | 04-01-2010 | Cross et al. | |
| | 630 | 2010/0145359 | 06-10-2010 | Keller | |
| | 631 | 2010/0191310 | 07-29-2010 | Bly | |
| | 632 | 2010/0234716 | 09-16-2010 | Engel | |
| | 633 | 2010/0249625 | 09-30-2010 | Lin | |
| | 634 | 2010/0268103 | 10-21-2010 | McNamara et al. | |
| | 635 | 2010/0312131 | 12-09-2010 | Naware et al. | |
| | 636 | 2010/0331711 | 12-30-2010 | Krauss et al. | |
| | 637 | 2011/0021937 | 01-27-2011 | Hugh et al. | |
| | 638 | 2011/0087083 | 04-14-2011 | Poeze et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T[1]** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 23 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 639 | 2011/0098583 | 04-28-2011 | Pandia et al. | |
| | 640 | 2011/0119212 | 05-19-2011 | De Bruin et al. | |
| | 641 | 2011/0144470 | 06-16-2011 | Mazar et al. | |
| | 642 | 2011/0160601 | 06-30-2011 | Wang et al. | |
| | 643 | 2011/0166468 | 07-07-2011 | Prystowsky et al. | |
| | 644 | 2011/0190650 | 08-04-2011 | McNair | |
| | 645 | 2011/0218415 | 09-08-2011 | Chen | |
| | 646 | 2011/0237922 | 09-29-2011 | Parker, III et al. | |
| | 647 | 2011/0237924 | 09-00-2011 | McGusty et al. | |
| | 648 | 2011/0251504 | 10-13-2011 | Tereshchenko et al. | |
| | 649 | 2011/0279963 | 11-17-2011 | Kumar et al. | |
| | 650 | 2011/0306862 | 12-15-2011 | Hayes-Gill | |
| | 651 | 2012/0029307 | 02-02-2012 | Paquet et al. | |
| | 652 | 2012/0071730 | 03-22-2012 | Romero | |
| | 653 | 2012/0071731 | 03-22-2012 | Gottesman | |
| | 654 | 2012/0071743 | 03-22-2012 | Todorov et al. | |
| | 655 | 2012/0083670 | 04-05-2012 | Rotondo et al. | |
| | 656 | 2012/0088999 | 04-12-2012 | Bishay et al. | |
| | 657 | 2012/0101396 | 04-26-2012 | Solosko et al. | |
| | 658 | 2012/0108917 | 05-03-2012 | Libbus et al. | |
| | 659 | 2012/0108920 | 05-03-2012 | Bly et al. | |
| | 660 | 2012/0110226 | 05-03-2012 | Vlach et al. | |
| | 661 | 2012/0110228 | 05-03-2012 | Vlach et al. | |
| | 662 | 2012/0133162 | 05-31-2012 | Sgobero | |
| | 663 | 2012/0172676 | 07-05-2012 | Penders et al. | |
| | 664 | 2012/0197150 | 08-02-2012 | Cao et al. | |
| | 665 | 2012/0209102 | 08-16-2012 | Ylotalo et al. | |
| | 666 | 2012/0209126 | 08-16-2012 | Amos et al. | |
| | 667 | 2012/0215123 | 08-23-2012 | Kumar et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | | | Application No. | Not Yet Assigned |
|---|---|---|---|---|---|---|

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 24 OF 39 | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 668 | 2012/0220835 | 08-30-2012 | Chung | |
| | 669 | 2012/0259233 | 10-11-2012 | Chan et al. | |
| | 670 | 2012/0271141 | 10-25-2012 | Davies | |
| | 671 | 2012/0310070 | 12-06-2012 | Kumar et al. | |
| | 672 | 2012/0323257 | 12-20-2012 | Sutton | |
| | 673 | 2012/0330126 | 12-27-2012 | Hoppe et al. | |
| | 674 | 2013/0023816 | 01-24-2013 | Bachinski et al. | |
| | 675 | 2013/0046151 | 02-21-2013 | Bsoul et al. | |
| | 676 | 2013/0041273 | 02-14-2013 | Houben et al. | |
| | 677 | 2013/0085347 | 04-04-2013 | Manicka et al. | |
| | 678 | 2013/0096395 | 04-18-2013 | Katra et al. | |
| | 679 | 2013/0116533 | 05-09-2013 | Lian et al. | |
| | 680 | 2013/0116585 | 05-09-2013 | Bouguerra | |
| | 681 | 2013/0144146 | 06-06-2013 | Linker | |
| | 682 | 2013/0150698 | 06-13-2013 | Hsu et al. | |
| | 683 | 2013/0158494 | 06-20-2013 | Ong | |
| | 684 | 2013/0172763 | 07-04-2013 | Wheeler | |
| | 685 | 2013/0184662 | 07-18-2013 | Aali et al. | |
| | 686 | 2013/0191035 | 07-25-2013 | Chon et al. | |
| | 687 | 2013/0225938 | 08-29-2013 | Vlach | |
| | 688 | 2013/0225967 | 08-29-2013 | Esposito | |
| | 689 | 2013/0226018 | 08-29-2013 | Kumar et al. | |
| | 690 | 2013/0245415 | 09-19-2013 | Kumar et al. | |
| | 691 | 2013/0245472 | 09-19-2013 | Eveland | |
| | 692 | 2013/0253285 | 09-26-2013 | Bly et al. | |
| | 693 | 2013/0274584 | 10-17-2013 | Finlay et al. | |
| | 694 | 2013/0296680 | 11-07-2013 | Linker | |
| | 695 | 2013/0300575 | 11-14-2013 | Kurzweil et al. | |
| | 696 | 2013/0324868 | 12-05-2013 | Kaib et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 25 OF 39 | Attorney Docket No. | IRHYM.002C7 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 697 | 2013/0331663 | 12-12-2013 | Albert et al. | |
| | 698 | 2013/0331665 | 12-12-2013 | Bly et al. | |
| | 699 | 2013/0338448 | 12-19-2013 | Libbus et al. | |
| | 700 | 2014/0012154 | 01-09-2014 | Mazar | |
| | 701 | 2014/0058280 | 02-27-2014 | Chefles et al. | |
| | 702 | 2014/0088394 | 03-27-2014 | Sunderland | |
| | 703 | 2014/0094676 | 04-03-2014 | Gani et al. | |
| | 704 | 2014/0094709 | 04-03-2014 | Korzinov et al. | |
| | 705 | 2014/0100432 | 04-10-2014 | Golda et al. | |
| | 706 | 2014/0116825 | 07-31-2014 | Kurzweil et al. | |
| | 707 | 2014/0171751 | 06-19-2014 | Sankman et al. | |
| | 708 | 2014/0206976 | 07-24-2014 | Thompson et al. | |
| | 709 | 2014/0206977 | 07-24-2014 | Bahney et al. | |
| | 710 | 2014/0275827 | 09-18-2014 | Gill et al. | |
| | 711 | 2014/0275840 | 09-18-2014 | Osorio | |
| | 712 | 2014/0275928 | 09-18-2014 | Acquista et al. | |
| | 713 | 2014/0303647 | 10-09-2014 | Sepulveda et al. | |
| | 714 | 2014/0330136 | 11-06-2014 | Manicka et al. | |
| | 715 | 2015/0022372 | 01-22-2015 | Vosch | |
| | 716 | 2015/0057512 | 02-26-2015 | Kapoor | |
| | 717 | 2015/0073252 | 03-12-2015 | Mazar | |
| | 718 | 2015/0081959 | 03-19-2015 | Vlach et al. | |
| | 719 | 2015/0082623 | 03-26-2015 | Felix et al. | |
| | 720 | 2015/0087921 | 03-26-2015 | Felix et al. | |
| | 721 | 2015/0087922 | 03-26-2015 | Bardy et al. | |
| | 722 | 2015/0087923 | 03-26-2015 | Bardy et al. | |
| | 723 | 2015/0087933 | 03-26-2015 | Gibson et al. | |
| | 724 | 2015/0087948 | 03-26-2015 | Bishay et al. | |
| | 725 | 2015/0087949 | 03-26-2015 | Felix et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 26 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example:  1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 726 | 2015/0087950 | 03-26-2015 | Felix et al. | |
| | 727 | 2015/0087951 | 03-26-2015 | Felix et al. | |
| | 728 | 2015/0088007 | 03-26-2015 | Bardy et al. | |
| | 729 | 2015/0088020 | 03-26-2015 | Dreisbach et al. | |
| | 730 | 2015/0094556 | 04-02-2015 | Geva et al. | |
| | 731 | 2015/0148637 | 05-28-2015 | Golda et al. | |
| | 732 | 2015/0157273 | 06-11-2015 | An et al. | |
| | 733 | 2015/0173671 | 06-25-2015 | Paalasmaa et al. | |
| | 734 | 2015/0193595 | 07-09-2015 | McNamara et al. | |
| | 735 | 2015/0223711 | 08-13-2015 | Raeder et al. | |
| | 736 | 2015/0238107 | 08-27-2015 | Acquista et al. | |
| | 737 | 2015/0289814 | 10-15-2015 | Magar et al. | |
| | 738 | 2015/0297134 | 10-22-2015 | Albert et al. | |
| | 739 | 2015/0351689 | 12-10-2015 | James W. Adams | |
| | 740 | 2015/0327781 | 11-19-2015 | Hernandez-Silverira et al. | |
| | 741 | 2015/0351799 | 12-10-2015 | Sepulveda et al. | |
| | 742 | 2015/0374244 | 12-31-2015 | Yoo et al. | |
| | 743 | 2016/0022161 | 01-28-2016 | Khair | |
| | 744 | 2016/0029906 | 02-04-2016 | Tompkins et al. | |
| | 745 | 2016/0066808 | 03-10-2016 | Hijazi | |
| | 746 | 2016/0085927 | 03-24-2016 | Dettinger et al. | |
| | 747 | 2016/0085937 | 03-24-2016 | Dettinger et al. | |
| | 748 | 2016/0086297 | 03-24-2016 | Dettinger et al. | |
| | 749 | 2016/0098536 | 04-07-2016 | Dettinger et al. | |
| | 750 | 2016/0098537 | 04-07-2016 | Dettinger et al. | |
| | 751 | 2016/0113520 | 04-28-2016 | Manera | |
| | 752 | 2016/0120433 | 05-05-2016 | Hughes et al. | |
| | 753 | 2016/0120434 | 05-05-2016 | Park et al. | |
| | 754 | 2016/0128597 | 05-12-2016 | Lin et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | |
|---|---|---|
| | Application No. | Not Yet Assigned |
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 27 OF 39 | Attorney Docket No. | IRHYM.002C7 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 755 | 2016/0135746 | 05-19-2016 | Kumar et al. | |
| | 756 | 2016/0149292 | 05-26-2016 | Ganton | |
| | 757 | 2016/0157744 | 06-09-2016 | Wu et al. | |
| | 758 | 2016/0166155 | 06-16-2016 | Banet et al. | |
| | 759 | 2016/0192852 | 07-07-2016 | Bozza et al. | |
| | 760 | 2016/0192855 | 07-07-2016 | Geva et al. | |
| | 761 | 2016/0192856 | 07-07-2016 | Lee | |
| | 762 | 2016/0198972 | 07-14-2016 | Lee et al. | |
| | 763 | 2016/0232807 | 08-11-2016 | Ghaffari et al. | |
| | 764 | 2016/0262619 | 09-15-2016 | Marcus et al. | |
| | 765 | 2016/0278658 | 09-29-2016 | Bardy et al. | |
| | 766 | 2016/0287177 | 10-06-2016 | Huppert et al. | |
| | 767 | 2016/0287207 | 10-06-2016 | Xue | |
| | 768 | 2016/0296132 | 10-13-2016 | Bojovic et al. | |
| | 769 | 2016/0302725 | 10-20-2016 | Schultz et al. | |
| | 770 | 2016/0302726 | 10-20-2016 | Chang | |
| | 771 | 2016/0317048 | 11-03-2016 | Chan et al. | |
| | 772 | 2016/0317057 | 11-03-2016 | Li et al. | |
| | 773 | 2016/0359150 | 12-08-2016 | de Francisco Martin et al. | |
| | 774 | 2016/0361015 | 12-15-2016 | Wang et al. | |
| | 775 | 2016/0367164 | 12-22-2016 | Felix et al. | |
| | 776 | 2016/0374583 | 12-29-2016 | Cerruti et al. | |
| | 777 | 2017/0042447 | 02-16-2017 | Rossi | |
| | 778 | 2017/0055896 | 03-02-2017 | Al-Ali et al. | |
| | 779 | 2017/0065823 | 03-09-2017 | Kaib et al. | |
| | 780 | 2017/0056682 | 03-02-2017 | Kumar | |
| | 781 | 2015/0005854 | 01-01-2015 | Said | |
| | 782 | 2017/0076641 | 03-16-2017 | Senanayake | |
| | 783 | 2017/0188971 | 07-06-2017 | Hughes et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

**T¹** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 28 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 784 | 2017/0188872 | 07-06-2017 | Hughes et al. | |
| | 785 | 2018/0049716 | 02-22-2018 | Rajagopal et al. | |
| | 786 | 2018/0049698 | 02-23-2018 | James Artel Berg | |
| | 787 | 2018/0064388 | 03-08-2018 | Heneghan et al. | |
| | 788 | 2018/0110266 | 04-26-2018 | Lee et al. | |
| | 789 | 2018/0125387 | 05-10-2018 | Hadley et al. | |
| | 790 | 2018/0144241 | 05-24-2018 | Liu et al. | |
| | 791 | 2018/0146875 | 05-31-2018 | Friedman et al. | |
| | 792 | 2018/0161211 | 06-14-2018 | Samuel Beckey | |
| | 793 | 2018/0242876 | 08-30-2018 | Hughes et al. | |
| | 794 | 2018/0257346 | 09-13-2018 | Austin | |
| | 795 | 2018/0260706 | 09-13-2018 | Galloway et al. | |
| | 796 | 2018/0289274 | 10-11-2018 | Bahney et al. | |
| | 797 | 2018/0374576 | 12-27-2018 | Dettinger et al. | |
| | 798 | 2019/0021671 | 01-24-2019 | Kumar et al. | |
| | 799 | 2019/0038148 | 02-07-2019 | Valys | |
| | 800 | 2019/0046066 | 02-14-2019 | Hughes et al. | |
| | 801 | 2019/0069788 | 03-07-2019 | COLEMAN et al. | |
| | 802 | 2019/0097339 | 03-28-2019 | Lim et al. | |
| | 803 | 2019/0098758 | 03-28-2019 | Hassemer et al. | |
| | 804 | 2019/0099132 | 04-04-2019 | Mulinti et al. | |
| | 805 | 2019/0167143 | 06-06-2019 | Li et al. | |
| | 806 | 2019/0209022 | 07-11-2019 | Adam G. Sobol | |
| | 807 | 2019/0246928 | 08-15-2019 | Bahney et al. | |
| | 808 | 2019/0274574 | 09-12-2019 | Hughes et al. | |
| | 809 | 2019/0282178 | 09-19-2019 | Volosin et al. | |
| | 810 | 2019/0290147 | 09-26-2019 | Persen et al. | |
| | 811 | 2019/0298209 | 10-03-2019 | Persen et al. | |
| | 812 | 2019/0298201 | 10-03-2019 | Persen et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 29 OF 39 | Attorney Docket No. | IRHYM.002C7 |

## U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number Number - Kind Code (if known) Example: 1,234,567 B1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 813 | 2019/0298272 | 10-03-2019 | Persen | |
| | 814 | 2019/0374163 | 12-12-2019 | Faabaek et al. | |
| | 815 | 2019/0378617 | 12-12-2019 | Charles et al. | |
| | 816 | 2020/0060563 | 02-27-2020 | Rodney Boleyn | |
| | 817 | 2020/0093388 | 03-26-2020 | Bouguerra et al. | |
| | 818 | 2020/0121209 | 04-23-2020 | Kumar et al. | |
| | 819 | 2020/0170529 | 06-04-2020 | Bahney et al. | |
| | 820 | 2020/0178825 | 06-11-2020 | Weijia Lu | |
| | 821 | 2020/0178828 | 06-11-2020 | Bahney et al. | |
| | 822 | 2020/0193597 | 06-18-2020 | Fan et al. | |
| | 823 | 20,200,196,897 | 06-25-2020 | Biswas et al. | |
| | 824 | 2020/0214563 | 07-09-2020 | Lin | |
| | 825 | 2020/0214584 | 07-09-2020 | McNamara et al. | |
| | 826 | 2020/0289014 | 09-17-2020 | Park et al. | |
| | 827 | 2020/0337608 | 10-29-2020 | Garai et al. | |
| | 828 | 2020/0352489 | 11-12-2020 | Hoppe et al. | |
| | 829 | 2020/0367779 | 11-26-2020 | Korzinov et al. | |
| | 830 | 2020/0397313 | 12-24-2020 | Attia et al. | |
| | 831 | 2021/0038102 | 02-11-2021 | Boleyn et al. | |
| | 832 | 2021/0059612 | 03-04-2021 | Krebs et al. | |
| | 833 | 2021/0085215 | 03-25-2021 | Auerbach et al. | |
| | 834 | 2021/0085255 | 03-25-2021 | Vule et al. | |
| | 835 | 2021/0125722 | 04-29-2021 | Sherkat et al. | |
| | 836 | 2021/0153761 | 05-27-2021 | Jung et al. | |
| | 837 | 2021/0217519 | 07-15-2021 | Park et al. | |
| | 838 | 2021/0244279 | 08-12-2021 | Szabados et al. | |
| | 839 | 2021/0269046 | 09-02-2021 | Hashimoto et al. | |
| | 840 | 2021/0298688 | 09-30-2021 | Banerjee et al. | |
| | 841 | 2021/0304855 | 09-30-2021 | Ansari et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

**T[1]** - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | Application No. | Not Yet Assigned |
|---|---|---|---|---|
| | | | Filing Date | Herewith |
| | | | First Named Inventor | Kumar, Uday N. |
| | | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | | Examiner | Not Yet Assigned |
| SHEET 30 OF 39 | | | Attorney Docket No. | IRHYM.002C7 |

### U.S. PATENT DOCUMENTS

| Examiner Initials | Cite No. | Document Number<br>*Number - Kind Code (if known)*<br>Example: 1,234,567 B1 | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | 842 | 2021/0315470 | 10-14-2021 | Wu et al. | |
| | 843 | 2021/0315504 | 10-14-2021 | Kumar et al. | |
| | 844 | 2021/0361218 | 11-25-2021 | Szabados et al. | |
| | 845 | 2021/0374502 | 12-02-2021 | Roth et al. | |
| | 846 | 2021/0393187 | 12-23-2021 | Amos et al. | |
| | 847 | 2022/0022798 | 01-27-2022 | Soon-Shiong et al. | |
| | 848 | 2022/0031223 | 02-03-2022 | Li et al. | |
| | 849 | 2022/0039719 | 02-10-2022 | Abercrombie, II et al. | |
| | 850 | 2022/0039720 | 02-10-2022 | Abercrombie, II et al. | |
| | 851 | 2022/0039721 | 02-10-2022 | Abercrombie, II et al. | |
| | 852 | 2022/0039722 | 02-10-2022 | Abercrombie, II et al. | |
| | 853 | 2022/0079497 | 03-17-2022 | Bardy et al. | |
| | 854 | 2022/0093247 | 03-24-2022 | Park et al. | |
| | 855 | 2022/0095982 | 03-31-2022 | de SAINT VICTOR et al. | |
| | 856 | 2022/0142493 | 05-12-2022 | Albert | |
| | 857 | 2022/0160279 | 05-26-2022 | Abercrombie, II et al. | |
| | 858 | 2022/0280093 | 09-08-2022 | Abercrombie, II et al. | |
| | 859 | 2022/0296144 | 09-22-2022 | Abercrombie, II et al. | |
| | 860 | 2022/0330874 | 10-20-2022 | Szabados et al. | |
| | 861 | 2022/0361793 | 11-17-2022 | Abercrombie, II et al. | |
| | 862 | 2023/0056777 | 02-23-2023 | Abercrombie, II et al. | |
| | 863 | 2023/0172511 | 06-08-2023 | Abercrombie, II et al. | |
| | 864 | 2023/0172518 | 06-08-2023 | Szabados et al. | |
| | 865 | 2023/0200702 | 06-29-2023 | Sepulveda et al. | |
| | 866 | 2023/0207122 | 06-29-2023 | Park et al. | |
| | 867 | 2023/0248288 | 08-10-2023 | Bahney et al. | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 31 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example:  JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 868 | AU 2011252998 | 08-27-2015 | Irhythm Technologies, Inc. | | |
| | 869 | AU 2014209376 | 06-29-2017 | Irhythm Technologies, Inc. | | Eq. |
| | 870 | CA 2 651 203 | 09-19-2017 | The Board Of Trustees Of The Leland Stanford Junior University | | Eq. |
| | 871 | CA 2 752 154 | 08-19-2010 | Cardionet Inc. | | |
| | 872 | CA 2 797 980 | 08-08-2015 | Irhythm Technologies, Inc. | | |
| | 873 | CA 2 898 626 | 07-31-2014 | Irhythm Technologies, Inc. | | Eq. |
| | 874 | CA 2 966 182 | 06-09-2020 | Irhythm Technologies, Inc. | | |
| | 875 | CN 102038497 | 07-18-2012 | Guangdong Biolight Meditech Co. Ltd. | | X |
| | 876 | CN 102883775 | 12-10-2014 | Cardiac Pacemakers Inc. | | |
| | 877 | CN 103997955 | 11-09-2016 | Houben et al. | | |
| | 878 | CN 107205679 | 09-26-2017 | Irhythm Technologies, Inc. | | X |
| | 879 | CN 115426940 | 12-02-2022 | Irhythm Technologies, Inc. | | X |
| | 880 | CN 116322498 | 06-23-2023 | Irhythm Technologies, Inc. | | X |
| | 881 | CN 116530951 | 08-04-2023 | Irhythm Technologies, Inc. | | |
| | 882 | CN 303,936,805 | 11-23-2016 | Shenzhen Mindray Biomedical Electronics | | |
| | 883 | EM 001857966-0001 | 05-02-2011 | Primed Halberstadt Medizintechnik Cmbh | | |
| | 884 | EM 003611714-0001 | 01-09-2017 | Tricord Holdings | | |
| | 885 | EM 003611714-0002 | 01-09-2017 | Tricord Holdings | | |
| | 886 | EM 003611714-0003 | 01-09-2017 | Tricord Holdings | | |
| | 887 | EM 003611714-0004 | 01-09-2017 | Tricord Holdings | | |
| | 888 | EM 003611714-0005 | 01-09-2017 | Tricord Holdings | | |
| | 889 | EP 0509689 | 04-03-1992 | Paeth et al. | | |
| | 890 | EP 1738686 | 06-12-2006 | Virtanen et al. | | |
| | 891 | EP 1782729 | 05-09-2007 | Hosand Technologies S.r.l. | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 32 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example:  JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 892 | EP 1981402 | 10-22-2008 | The Board of Trustees of the Leland Stanford Junior University | | Eq. |
| | 893 | EP 2262419 | 12-22-2010 | Koninkl Philips Electronics NV | | Eq. |
| | 894 | EP 2395911 | 12-21-2011 | Cardionet Inc. | | |
| | 895 | EP 2568878 | 03-20-2013 | Irhythm Technologies, Inc. | | Eq. |
| | 896 | EP 2635179 | 09-11-2013 | Cardionet Inc. | | |
| | 897 | EP 2635180 | 09-11-2013 | Cardionet Inc. | | Eq. |
| | 898 | EP 2948050 | 12-02-2015 | Irhythm Technologies, Inc. | | Eq. |
| | 899 | EP 2983593 | 02-17-2016 | Irhythm Technologies, Inc. | | Eq. |
| | 900 | EP 3165161 | 05-10-2017 | Irhythm Technologies, Inc. | | |
| | 901 | EP 3212061 | 09-06-2017 | Irhythm Technologies, Inc. | | Eq. |
| | 902 | EP 3753483 | 12-23-2020 | Irhythm Technologies, Inc. | | |
| | 903 | EP 3387991 | 06-15-2022 | Irhythm Technologies, Inc. | | |
| | 904 | EP 4103051 | 12-21-2022 | Irhythm Technologies, Inc. | | |
| | 905 | GB 2 299 038 | 09-25-1996 | Minnesota Mining & Manufacturing Company | | |
| | 906 | GB 2 348 707 | 10-11-2000 | Healthcare Technology Limited | | |
| | 907 | IN 002592907-0001 | 12-08-2014 | Tricord Holdings | | |
| | 908 | JP D1596476 | 08-31-2018 | Eagle Matrix Consulting | | X-Abs |
| | 909 | JP S61-137539 | 06-25-1986 | Sekisui Chemical Co Ltd | | X |
| | 910 | JP H05-329123 | 12-14-1993 | Takemoto | | X |
| | 911 | JP H08-317913 | 03-12-1996 | Tsutomu | | X-Abs |
| | 912 | JP H08-322952 | 12-10-1996 | Medtronic Inc. | | X |
| | 913 | JP 1483906S | 10-11-2013 | Data Scope Corporation | | X-Abs |
| | 914 | JP 5203973 | 06-05-2013 | The Board of Trustees of the Leland Stanford Junior University | | X-Abs |
| | 915 | JP 5559425 | 07-23-2014 | Kumar et al. | | X-Abs |
| | 916 | JP 6198849 | 09-01-2017 | Irhythm Technologies, Inc. | | X-Abs |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 33 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 917 | JP 6336640 | 05-11-2018 | Irhythm Technologies, Inc. | | X |
| | 918 | JP 6491826 | 03-08-2019 | Irhythm Technologies, Inc. | | X |
| | 919 | JP 6495228 | 03-15-2019 | Irhythm Technologies, Inc. | | X |
| | 920 | JP 6766199 | 09-18-2020 | Irhythm Technologies, Inc. | | X-Abs |
| | 921 | JP 2000-126145 | 05-09-2000 | Omron Tateisi Electronics Co. | | X-Abs |
| | 922 | JP 2001-057967 | 03-06-2001 | Advance Co. Ltd. | | X-Abs |
| | 923 | JP 2003-275186 | 09-30-2003 | Citizen Watch Co., Ltd. | | X |
| | 924 | JP 2004-121360 | 04-22-2004 | Nippon Koden Corp. | | X-Abs |
| | 925 | JP 2006-520657 | 09-14-2006 | Welch Allyn, Inc. | | X |
| | 926 | JP 2006-110180 | 04-27-2006 | Fukushima Prefecture | | X-Abs |
| | 927 | JP 2006-136405 | 06-01-2006 | Harada Electronics Ind. | | X |
| | 928 | JP 2007-045967 | 02-22-2007 | Nitto Denko Corp. | | X-Abs |
| | 929 | JP 2007-503910 | 03-01-2007 | 3M Innovative Properties Co. | | X-Abs |
| | 930 | JP 2007-097822 | 04-19-2007 | Medical Electronic Science Inst. Co. Ltd. | | X-Abs |
| | 931 | JP 2007-296266 | 11-15-2007 | Physio Track KK | | X-Abs |
| | 932 | JP 2007-504917 | 03-08-2007 | Body Media Inc. | | X-Abs |
| | 933 | JP 2008-532596 | 08-21-2008 | CUTISENSE AS | | X |
| | 934 | JP 2009-518099 | 05-07-2009 | Koninklijke Philips N.V. | | X-Abs |
| | 935 | JP 2009-525816 | 07-16-2009 | The Board of Trustees of the Leland Stanford Junior University | | X-Abs |
| | 936 | JP 2011-519583 | 07-14-2011 | KoninKlijke Philips Electronics N.V. | | X-Abs |
| | 937 | JP 2013-517053 | 05-16-2016 | University of Leicester | | X |
| | 938 | JP 2013-521966 | 06-13-2013 | University of Leicester | | X |
| | 939 | JP 2014-236982 | 12-18-2014 | Irhythm Technologies, Inc. | | X-Abs |
| | 940 | JP 2016-504159 | 02-12-2016 | Irhythm Technologies, Inc. | | X-Abs |
| | 941 | JP 2017-136380 | 08-10-2017 | Irhythm Technologies, Inc. | | X-Abs |
| | 942 | JP 2018-153651 | 10-04-2018 | Irhythm Technologies, Inc. | | X-Abs |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | |
|---|---|---|---|
| | Application No. | Not Yet Assigned | |
| | Filing Date | Herewith | |
| | First Named Inventor | Kumar, Uday N. | |
| | Art Unit | Not Yet Assigned | |
| (Multiple sheets used when necessary) | Examiner | Not Yet Assigned | |
| SHEET 34 OF 39 | Attorney Docket No. | IRHYM.002C7 | |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 943 | JP 2018-504148 | 02-15-2018 | Irhythm Technologies, Inc. | | X |
| | 944 | JP 2020-058819 | 04-16-2020 | Irhythm Technologies, Inc. | | X-Abs |
| | 945 | JP 2023-508235 | 03-01-2023 | Irhythm Technologies, Inc. | | X |
| | 946 | KR 10-1513288 | 04-13-2015 | Irhythm Technologies, Inc. | | |
| | 947 | KR 1020050055072 | 06-10-2005 | BODYMEDIA INC | | |
| | 948 | KR 1020170133527 | 12-05-2017 | Irhythm Technologies, Inc. | | X-Abs |
| | 949 | KR 3003784570000 | 03-29-2005 | Powerid Ltd | | |
| | 950 | KR 3008476060000 | 03-25-2016 | Submission M-Tech Co., Ltd. | | |
| | 951 | KR 3008476090000 | 03-25-2016 | Submission M-Tech Co., Ltd. | | |
| | 952 | KR 3008482960000 | 03-31-2016 | Wip Management | | |
| | 953 | KR 3008584120000 | 06-07-2016 | Submission M-Tech Co., Ltd. | | |
| | 954 | KR 3008953750000 | 02-16-2017 | Rayone Co., Ltd | | |
| | 955 | KR 3008953760000 | 02-16-2017 | Rayone Co., Ltd | | |
| | 956 | KR 3008987790000 | 03-10-2017 | Industry Academic Cooperation of Gwangju University | | |
| | 957 | KR 3009445870000 | 02-09-2018 | Submission M-Tech Co., Ltd. | | |
| | 958 | KR 3009547690000 | 04-25-2018 | MPROS | | |
| | 959 | KR 3009547710000 | 04-25-2018 | MPROS | | |
| | 960 | WO 99/023943 | 05-20-1999 | Fachhochschule Offenburg | | X-Abs |
| | 961 | WO 01/016607 | 03-08-2001 | Cordless Antistatic Res. Inc. | | X-Abs |
| | 962 | WO 2003/043494 | 05-03-2003 | Medit AS | | |
| | 963 | WO 2004/100785 | 11-24-2004 | Wireless Patient Recording Medical AS, Fensli, Rune, Gunnarson, Einar, Andersen, Jan, Einar | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | | Application No. | Not Yet Assigned |
|---|---|---|---|---|---|
| | | | | Filing Date | Herewith |
| | | | | First Named Inventor | Kumar, Uday N. |
| | | | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | | | Examiner | Not Yet Assigned |
| SHEET 35 OF 39 | | | | Attorney Docket No. | IRHYM.002C7 |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 964 | WO 2005/025668 | 03-24-2005 | 3M Innovative Properties Co. | | |
| | 965 | WO 2005/037946 | 04-28-2005 | Hisamitsu Pharmaceutical Co., Inc. | | X-Abs |
| | 966 | WO 2005/084533 | 09-15-2005 | Koninklijke Philips Electronics, N.V. | | X-Abs |
| | 967 | WO 2006/094513 | 09-14-2006 | Coloplast A/S | | X-Abs |
| | 968 | WO 2007/036748 | 04-05-2007 | Toumaz Tech. Ltd. | | |
| | 969 | WO 2007/049080 | 03-03-2007 | Toumaz Tech. Ltd. | | |
| | 970 | WO 2007/063436 | 06-07-2007 | KoninKlijke Philips Electronics N.V. | | |
| | 971 | WO 2007/066270 | 06-14-2007 | Koninklijke Philips Electronics N.V. | | |
| | 972 | WO 2007/071180 | 06-28-2007 | Chang-An Chou | | |
| | 973 | WO 2007/072069 | 06-28-2007 | Toumaz Tech. Ltd. | | |
| | 974 | WO 2007/092543 | 08-16-2007 | The Board of Trustees of the Leland Stanford Junior University | | |
| | 975 | WO 2008/005015 | 01-10-2008 | Cardiovu, Inc. | | |
| | 976 | WO 2008/005016 | 01-10-2008 | Cardiovu, Inc. | | |
| | 977 | WO 2008/057884 | 05-15-2008 | Welch Allyn, Inc. | | |
| | 978 | WO 2008/120154 | 10-09-2008 | Koekemoer, Hendrik, Lambert | | |
| | 979 | WO 2009/055397 | 04-30-2009 | HMICRO, Inc. | | |
| | 980 | WO 2009/074928 | 06-18-2009 | Koninklijke Philips Electronics, N.V. | | |
| | 981 | WO 2009/112976 | 09-17-2009 | Koninklijke Philips Electronics, N.V. | | |
| | 982 | WO 2009/112979 | 09-17-2009 | Koninklijke Philips Electronics N.V. | | |
| | 983 | WO 2009/112972 | 09-17-2009 | Koninklijke Phillips Electronics | | |
| | 984 | WO 2009/134826 | 11-05-2009 | 3M Innovative Properties Co. | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | | | |
|---|---|---|---|---|
| | Application No. | Not Yet Assigned | | |
| | Filing Date | Herewith | | |
| | First Named Inventor | Kumar, Uday N. | | |
| | Art Unit | Not Yet Assigned | | |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned | | |
| SHEET 36 OF 39 | Attorney Docket No. | IRHYM.002C7 | | |

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example: JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 985 | WO 2010/093900 | 10-07-2010 | Cardionet, Inc. | | |
| | 986 | WO 2010/014490 | 02-04-2010 | Ecardio Diagnostics LLC. | | |
| | 987 | WO 2010/104952 | 09-16-2010 | Corventis, Inc. | | |
| | 988 | WO 2010/105203 | 09-16-2010 | Corventis, Inc. | | |
| | 989 | WO 2011/077097 | 06-30-2011 | Intelesens Limited | | |
| | 990 | WO 2011/084636 | 07-14-2011 | The John's Hopkins University | | |
| | 991 | WO 2011/112420 | 09-15-2011 | Cardiac Pacemakers Inc. | | |
| | 992 | WO 2011/143490 | 11-17-2011 | Irhythm Technologies, Inc. | | |
| | 993 | WO 2011/149755 | 12-01-2011 | Bibian et al | | |
| | 994 | WO 2012/003840 | 01-12-2012 | Neurodan A/S | | |
| | 995 | WO 2012/009453 | 01-19-2012 | Mayo Foundation for Medical Education and Research | | |
| | 996 | WO 2012/061509 | 05-10-2012 | Cardionet, Inc. | | |
| | 997 | WO 2012/061518 | 05-10-2012 | Cardionet, Inc. | | |
| | 998 | WO 2012/125425 | 09-20-2012 | Proteus Biomedical Inc. | | |
| | 999 | WO 2012/140559 | 10-18-2012 | MEDIC4ALL AG | | |
| | 1000 | WO 2012/160550 | 11-29-2012 | SHL Telemedicine International Ltd. | | |
| | 1001 | WO 2014/047032 | 03-27-2014 | Worcester Polytechnic Institute | | |
| | 1002 | WO 2014/051563 | 04-03-2014 | Draeger Medical Systems, Inc. | | |
| | 1003 | WO 2014/055994 | 04-10-2014 | Rhythm Diagnostics Systems, Inc. | | |
| | 1004 | WO 2014/116825 | 07-31-2014 | Irhythm Technologies, Inc. | | |
| | 1005 | WO 2014/168841 | 10-16-2014 | Irhythm Technologies, Inc. | | |
| | 1006 | WO 2015/089484 | 06-18-2015 | ALIVECOR, INC. | | |
| | 1007 | WO 2016/044514 | 03-24-2016 | Preventice, Inc. | | |
| | 1008 | WO 2016/044515 | 03-24-2016 | Preventice, Inc. | | |
| | 1009 | WO 2016/044519 | 03-24-2016 | Preventice, Inc. | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| | | | |

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | Examiner | Not Yet Assigned |
| SHEET 37 OF 39 | Attorney Docket No. | IRHYM.002C7 |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials | Cite No. | Foreign Patent Document Country Code-Number-Kind Code Example:  JP 1234567 A1 | Publication Date MM-DD-YYYY | Name of Patentee or Applicant | Pages, Columns, Lines Where Relevant Passages or Relevant Figures Appear | T[1] |
|---|---|---|---|---|---|---|
| | 1010 | WO 2016/057728 | 04-14-2016 | Preventice, Inc. | | |
| | 1011 | WO 2016/070128 | 05-06-2016 | Irhythm Technologies, Inc. | | |
| | 1012 | WO 2016/181321 | 11-17-2016 | Ravi Bhogu | | |
| | 1013 | WO 2017/039518 | 03-09-2017 | Apaturambs AB | | |
| | 1014 | WO 2017/041014 | 03-09-2017 | The General Hospital Corporation | | |
| | 1015 | WO 2018/218310 | 12-06-2018 | Alerte Digital Health PTE.LTD. | | |
| | 1016 | WO 2019/071201 | 04-11-2019 | ALIVECOR, INC. | | |
| | 1017 | WO 2019/191487 | 10-03-2019 | Livmor, Inc. | | |
| | 1018 | WO 2020/013895 | 01-16-2020 | Livmor, inc. | | |
| | 1019 | WO 2020/041363 | 02-27-2020 | Eko Devices, Inc. | | |
| | 1020 | WO 2020/224041 | 11-12-2020 | Life Watch Tech Shanghai Inc. | | X-Abs |
| | 1021 | WO 2021/150122 | 07-29-2021 | Appsens AS | | |
| | 1022 | WO 2021/163331 | 08-19-2021 | Irhythm Technologies, Inc. | | |
| | 1023 | WO 2021245203 | 12-09-2021 | Acorai AB | | |
| | 1024 | WO 2022034045 | 02-17-2022 | HGF Limited | | |

## NON PATENT LITERATURE DOCUMENTS

| Examiner Initials | Cite No. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[1] |
|---|---|---|---|
| | 1025 | 3M Corporation, "3M Surgical Tapes – Choose the Correct Tape" quicksheet (2004) | |
| | 1026 | Altini, et al., AN ECG PATCH COMBINING A CUSTOMIZED ULTRA-LOW-POWER ECG SOC WITH BLUETOOTH LOW ENERGY FOR LONG TERM AMBULATORY MONITORING, Conference: Proceddings of Wireless Health 2011, WH 2011, October 10-13, 2011 | |
| | 1027 | BRITISH-MADE EARLY WARNING MONITOR A "GAME CHANGER", healthcare-in-europe.com, March 31, 2014 | |
| | 1028 | Comstock, PROTEUS DIGITAL HEALTH QUIETLY LAUNCHES CONSUMER-FACING WEARABLE FOR ATHLETES, Mobile Health News, October 29, 2014 | |
| | 1029 | Coxworth, SMALL ADHESIVE PARTCH OUTPERFORMS TRADITIONAL TECH FOR DETECTING ARRHYTHMIA, Scripps, iRhythm Technologies, January 3, 2014 | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:**  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Application No. | Not Yet Assigned |
|---|---|---|
| | Filing Date | Herewith |
| | First Named Inventor | Kumar, Uday N. |
| | Art Unit | Not Yet Assigned |
| (Multiple sheets used when necessary) | Examiner | Not Yet Assigned |
| SHEET 38 OF 39 | Attorney Docket No. | IRHYM.002C7 |

**NON PATENT LITERATURE DOCUMENTS**

| Examiner Initials | Cite No. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[1] |
|---|---|---|---|
| | 1030 | DEL MAR et al.; The history of clinical holter monitoring; A.N.E.; vol. 10; no. 2; pp. 226-230; April 2005 | |
| | 1031 | ENSELEIT et al.; Long-term continuous external electrocardiographic recording: a review; Eurospace; vol. 8; pp. 255-266; 2006 | |
| | 1032 | HOEFMAN et al.; Optimal duration of event recording for diagnosis of arrhythmias in patients with palpitations and light-headedness in the general practice; Family Practice; Dec. 7, 2006 | |
| | 1033 | HUYETT "Keystock & Shim Stock Catalog" page 9 Feb 2014. found at https://issuu.com/glhuyett/docs/gl-huyett-keystock-catalog/20 (Year: 2014) | |
| | 1034 | IKEDA Y. et al., "A Method for Transmission Data Reduction for Automated Monitoring System via CNN Distribution Process", Proceedings of the Symposium of Multi-media, Distribution, Coordination, and Mobile (DOCOMO2019), July 2019 | X |
| | 1035 | International Preliminary Report on Patentability and Written Opinion in PCT Application No.PCT/US2011/036335 (IRHYM.002WO), dated November 22, 2012. | |
| | 1036 | International Search Report and Written Opinion in PCT Application No. PCT/US2011/036335 (IRHYM.002WO), dated October 31, 2011. | |
| | 1037 | KENNEDY et al.; The history, science, and innovation of holter technology; A.N.E.; vol. 11; no. 1; pp. 85-94; 2006 | |
| | 1038 | "Mayo Alumni", MAYO CLINIC, Rochester, MN, Spring 2011, in 24 pages. | |
| | 1039 | MEDTRONIC LAUNCHES SEEQ WEARABLE CARDIAC MONITORING SYSTEM IN UNITED STATES, Diagnostic and Interventional Cardiology, October 7, 2014 | |
| | 1040 | MUNDT et al. "A Multiparameter Wearable Physiologic Monitoring System for Space and Terrestrial Applications" IEEE Transactions on Information Technology in Biomedicine, Vol. 9, No. 3, pp. 382-384, September 2005. | |
| | 1041 | Prakash, NEW PATCH-BASED WEARABLE SENSOR COMBINES ADVANCED SKIN ADHESIVES AND SENSOR TECHNOLOGIES, Advantage Business Marketing, July 17, 2012 | |
| | 1042 | REDJEM BOUHENGUEL ET AL, "A risk and Incidence Based Atrial Fibrillation Detection Scheme for Wearable Healthcare Computing Devices," Pervasive Computer Technologies for Healthcare, 2012 6th International Conference On, IEEE, pages 97-104, May 21, 2012 | |
| | 1043 | REIFFEL et al.; Comparison of autotriggered memory loop recorders versus standard loop recorders versus 24-hour holter monitors for arrhythmia detection; Am. J. Cardiology; vol. 95; pp. 1055-1059; May 1, 2005 | |
| | 1044 | Request for Reexamination of U.S. Patent No. 7,020,508 under 35 U.S.C. §§ 311-318 and 37 C.F.R. § 1.913 as submitted September 14, 2012 in 78 pages. | |
| | 1045 | Scapa Medical product listing and descriptions (2008) available at http://www.caapana.com/productlist.jsp and http://www.metplus.co.rs/pdf/prospekti/Samolepljivemedicinsketrake.pdf; retrieved via WayBack Machine September 24, 2012 | |
| | 1046 | Strong, WEARABLE TECHNOLOGIES CONFERENCE 2013 EUROPE - NOTES AND ROUNDUP, Wearable Technologies Conference, February 8, 2013 | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

**\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

T[1] - Place a check mark in this area when an English language Translation is attached.

PTO/SB/08 Equivalent

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | | Application No. | Not Yet Assigned |
|---|---|---|---|
| | | Filing Date | Herewith |
| | | First Named Inventor | Kumar, Uday N. |
| | | Art Unit | Not Yet Assigned |
| *(Multiple sheets used when necessary)* | | Examiner | Not Yet Assigned |
| SHEET 39 OF 39 | | Attorney Docket No. | IRHYM.002C7 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials | Cite No. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[1] |
| | 1047 | Sumner, STANFORD ENGINEERS MONITOR HEART HEALTH USING PAPER-THIN FLEXIBLE 'SKIN', Stanford Report, May 14, 2013 | |
| | 1048 | WARD et al.; Assessment of the diagnostic value of 24-hour ambulatory electrocardiographic monitoring; Biotelemetry Patient monitoring; vol. 7; 1980 | |
| | 1049 | ZIEGLER et al.; Comparison of continuous versus intermittent monitoring of atrial arrhythmias; Heart Rhythm; vol. 3; no. 12; pp. 1445-1452; Dec. 2006 | |
| | 1050 | ZIMETBAUM et al.; The evolving role of ambulatory arrhythmia monitoring in general clinic practice; Ann. Intern. Med.; vol. 130; pp. 846-8556; 1999 | |
| | 1051 | ZIMETBAUM et al.; Utility of patient-activated cardiac event recorders in general clinical practice; The Amer. J. of Cardiology; vol. 79; Feb. 1, 1997 | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|
| **\*Examiner:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant. | | | |

T[1] - Place a check mark in this area when an English language Translation is attached.

# Exhibit Q

US007206630B1

(12) **United States Patent**　　　　(10) **Patent No.:**　　**US 7,206,630 B1**

Tarler　　　　　　　　　　　　　　　　(45) **Date of Patent:**　　　**Apr. 17, 2007**

(54) **ELECTRODE PATCH AND WIRELESS PHYSIOLOGICAL MEASUREMENT SYSTEM AND METHOD**

(75) Inventor: **Matthew David Tarler**, Westlake, OH (US)

(73) Assignee: **Cleveland Medical Devices, Inc**, Cleveland, OH (US)

( * ) Notice:　　Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 64 days.

(21) Appl. No.: **10/879,666**

(22) Filed:　　**Jun. 29, 2004**

(51) **Int. Cl.**
　　　*A61B 5/04*　　　(2006.01)
　　　*A61B 5/0452*　　(2006.01)
(52) **U.S. Cl.** ..................... **600/509**; 600/508; 600/372; 600/393; 600/301; 128/903
(58) **Field of Classification Search** ........ 600/508–509, 600/545–546, 393–396, 372–373, 382–384, 600/301; 128/903
　　　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,082,087 A | | 4/1978 | Howson |
| 4,957,109 A | * | 9/1990 | Groeger et al. ............. 600/391 |
| 5,381,798 A | | 1/1995 | Burrows |
| 5,417,222 A | | 5/1995 | Dempsey et al. |
| 5,458,124 A | | 10/1995 | Stanko et al. |
| 5,511,553 A | * | 4/1996 | Segalowitz ................. 600/508 |
| 5,694,940 A | | 12/1997 | Unger et al. |
| 5,724,984 A | | 3/1998 | Arnold et al. |
| 5,862,803 A | | 1/1999 | Besson et al. |
| 5,957,854 A | | 9/1999 | Besson et al. |
| 6,073,046 A | | 6/2000 | Patel et al. |

| | | | |
|---|---|---|---|
| 6,162,101 A | | 12/2000 | Fischer et al. |
| 6,238,338 B1 | * | 5/2001 | DeLuca et al. ............. 600/300 |
| 6,289,238 B1 | | 9/2001 | Besson et al. |
| 6,363,274 B1 | | 3/2002 | Scalisi et al. |
| 6,597,946 B2 | * | 7/2003 | Avrahami et al. ............. 604/20 |
| 6,643,541 B2 | * | 11/2003 | Mok et al. .................. 600/546 |
| 6,768,920 B2 | * | 7/2004 | Lange et al. ................ 600/545 |
| 6,782,283 B2 | * | 8/2004 | Schmidt et al. ............. 600/372 |
| 6,865,409 B2 | * | 3/2005 | Getsla et al. ............... 600/393 |
| 6,897,788 B2 | * | 5/2005 | Khair et al. .......... 340/870.16 |
| 2002/0028991 A1 | * | 3/2002 | Thompson .................. 600/372 |
| 2002/0099277 A1 | * | 7/2002 | Harry et al. ................ 600/301 |
| 2003/0069510 A1 | * | 4/2003 | Semler ....................... 600/509 |
| 2004/0015058 A1 | | 1/2004 | Besson et al. |

OTHER PUBLICATIONS

Miller, Jodie, Interview with James M. Sweeny, Chairman and CEO, Cardionet, EP Lab Digest, Jul./Aug. 2002, vol. 2, No. 4, pp. 1-4.

(Continued)

*Primary Examiner*—Robert Pezzuto
*Assistant Examiner*—Shevon Johnson
(74) *Attorney, Agent, or Firm*—Brian M. Kolkowski

(57)　　　　　**ABSTRACT**

A wireless electrode patch and system for measuring the physiological condition of a subject, more particularly to an electrode patch for ECG monitoring, and a method of sensing, analyzing and/or transmitting or relaying a physiological signal. The wireless electrode patch and system is lightweight, compact and reusable. The wireless electrode patch provides a low, power system for extended battery life and use. The wireless electrode patch and system allows for good reliable measurement of physiological signals from the subject. The wireless electrode is simple enough to apply as a single patch but versatile enough to be reconfigured as more than one patch.

**18 Claims, 12 Drawing Sheets**



**US 7,206,630 B1**

Page 2

OTHER PUBLICATIONS

LIFECOR, Inc., Photos of LifeVest. www.lifecor.com.

Editor, Seeing Signs in a New Way, Medical Device and Diagnostic Industry, Jun. 2003.

Agilent Technologies, Telemetry Systems: integrated ccg and spO2, Jun. 5, 2001 5988-3214EN.

Medtronic—New Diagnostic Tool—Reveal Insertable Loop Recorder, www.medtronic.com/reveal/new.html.

Friesen, Gary M., A Comparison of the Noise Sensitivity of Nine QRS Detection Algorithms, IEEE Transactions on Biomedical Engineering, vol. 37, No. 1., Jan. 1990, pp. 85-98.

Trahanias, P.E., An Approach to QRS Complex Detection Using Mathematical Morphology, IEEE Transactions on Biomedical Engineering, vol. 40, No. 2., Feb. 1993, pp. 201-205.

Chu, Chee-Hung Henry, Impulsive Noise Suppression and Background Normalization . . . , IEEE Transactions on Biomedical Engineering, vol. 36, No. 2., Jan. 1989, pp. 262-273.

Ambrose, Mary Lou, ECG Interpretation Made Incredibly Easy, 1997, Springhouse Corporation, Springhouse, Pennsylvania.

Dunn, Marvin I., Lipman-Massie Clinical Electrocardiography, 1951, Year Book Medical Publishers, Inc, Chicago, London, Boca Raton.

El-Sherif, Nabil ed., High Resolution Electrocardiology, 1992, ISBN: 0-87993-3658. Futura Publishing Company, New York.

Lewis, John ed., Put On Your Private Paramedic, www.designnews.com, Jun. 3, 2003.

Simonsen, Michael. Disease monitoring, minimally invasive therapy stimulate market. Cardiovascular Device Update, vol. 8., No. 7, Jul. 2002. pp. 1-16.

* cited by examiner



Fig 1



FIG 2

Case 1:24-cv-01355-JDW    Document 142-11    Filed 01/22/26    Page 933 of 991 PageID #: 10127



Fig 3



FIG 4



Fig 5A



Fig 5B



22

16

14

20

20

12

Fig 5C

Case 1:24-cv-01355-JDW    Document 142-11    Filed 01/22/26    Page 938 of 991 PageID #: 10132



Fig 6



Fig 7



FIG 8



Fig 9



Fig 10

US 7,206,630 B1

**1**

ELECTRODE PATCH AND WIRELESS
PHYSIOLOGICAL MEASUREMENT SYSTEM
AND METHOD

The U.S. Government has a paid-up license in this invention and the right in limited circumstances to require the patent owner to license others on reasonable terms provided for by the terms of grant number 5R44HL065024-03 awarded by the National Institutes of Health.

BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention is related, in general, to an electrode patch and/or a wireless system for measuring the physiological condition of a subject, and more particularly to an electrode patch for ECG monitoring. The present invention further includes a method of sensing and analyzing a physiological signal.

2. Technical Background

Monitoring one or more physiological conditions of a patient is well known. Medical patient monitoring systems are highly sophisticated utilizing telemetry systems at a central receiving and monitoring station. ECG monitoring has the greatest applications.

According to present estimates, approximately 60 millions Americans have one or more types of cardiovascular disease including high blood pressure, coronary artery disease, stroke, rheumatic heart disease, congenital cardiovascular defects and congestive heart failure. Cardiovascular disease claims approximately one million lives in the United States each year, or approximately forty percent of all deaths. Since 1990, cardiovascular disease has been the number one killer in the United States every year other than 1918. More than 2,600 Americans die each day of cardiovascular disease, which is an average of 1 death every 33 seconds.

Because heart performance can deteriorate quickly, the key to effective cardiovascular disease management resides in early medical intervention. Patients often to not recognize subtle changes in cardiovascular disease symptoms and may not appreciate the importance of quickly reporting such changes to their physician. To make early intervention possible and prevent rehospitalization, healthcare providers need daily access to accurate information about patients' symptoms. There are many reasons a physician may want to monitor patients on a continuous or nearly continuous basis. These include the need to detect episodic arrhythmias, either to establish a diagnosis or to evaluate efficacy of therapy; the need to help evaluate syncope, in particular to detect any associated cardiac rhythm disorder or to assess therapy; the need to assess efficacy of therapy for atrial arrhythmias (this is especially important with atrial fibrillations in patients at risk for stroke or systemic embolism who can not take warfarin or similar drugs); the need in patients at increased risk for sudden arrhythmic death, particularly for example those patients with ventricular dysfunction who would benefit from prolonged (6 weeks to 6 months) ECG monitoring after serious events such as a myocardial infarction, an episode of cardiac decompensation, recent cardiac surgery or the onset of new therapy with an antiarrhythmic agent; and the need for providing patients with at home immediate access to 911 emergency help without patient action particularly for those patients who have had multiple myocardial infarctions.

A typical diagnostic process for any of these cardiovascular conditions may include one or more of the following

**2**

tests: ECG; Holter monitor; external loop recorder; implantable loop recorder; tilt table test; electrophysiology study; and a stress test. An ECG can be performed in a physician's office or a hospital setting. It is unlikely, however, a patient will undergo many of the symptoms associated with these conditions such as for example syncope or fibrillation in those few minutes. A Holter monitor is a device that measures and records heart rhythm, usually over 1 day but occasionally for 2 or more days. Holter monitors can miss recording a critical moment when a diagnosis could be made because the event doesn't happen during the recording, or because the patient took the device off to sleep. This is particularly important where patients do not want to wear the device to work for fear of discrimination if their employer or fellow employees know they have a health problem. An external loop recorder is a device that monitors heart rhythm and rate for up to a month. During this test, the patient wears a device on the wrist, around the chest or in a pocket. The patient must press a button on the device to make a recording of the heart activity during the period the symptoms occur such as fainting. Unfortunately, this only occurs if the patient is sufficiently aware that the event took place. Furthermore, the information collected must be downloaded periodically making in more difficult for the patient to comply. Implantable loop recorders are relatively new devices. These devices suffer from these same drawbacks as well as the possibility of infection due to the invasive procedure used to implant the device. A tilt table test is used to simulate conditions that may cause fainting. It enables the physician to gauge how blood pressure, heart rate and rhythm respond to a change in position from lying down to standing. This test is expensive and is generally only done in a large or teaching hospital setting. An electrophysiology study is an expensive and invasive procedure. This procedure threads a catheter into the heart to record the heart's own electrical impulses and to assess the response to pacing and extra beats. Other tests such as cardiac stress tests are expensive and generally are performed in a hospital setting.

Traditional tests leave large numbers of patients with recurrent, unexplained, undiagnosed cardiac problems after undergoing these tests. The primary reasons these tests fall short are: 1) They only monitor the heart for a relatively limited amount of time, or 2) They require the patient to wear a device in their daily living that is embarrassing and inconvenient to wear, and/or that requires them to perform a task after experiencing a symptom. Therefore, there is a need for a diagnostic tool that allows one to continuously monitor the heart's rhythm and rate for long periods of time, on the order of several months or more, and requires no action by the patient at the time of fainting.

While a number of technologies have been developed to allow for patient monitoring at home or on the go, each of these technologies suffer from one or more major drawbacks. U.S. Pat. No. 5,458,124 to Stanko et al. describes an electrode and wireless transmitter system for use in measuring the physiological condition of a subject. The system in Stanko due to the rigidity of the system doesn't allow for good electrode contact with the patient's skin. Furthermore, the system in Stanko doesn't provide a good means for data error detection, nor in process adjustment by an external source. U.S. Pat. Nos. 5,862,803; 5,957,854; and 6,289,239 to Besson et al. provides for a wireless electrode system for measuring various body conditions. This system, however, is cumbersome, overly complex and limiting in that among other things it requires separate electronics for each electrode, as well as, a source of power external to the electrode. Because of the unique power requirements, this system

US 7,206,630 B1

**3**

presumably doesn't allow for remote wireless monitoring at any great distance thereby creating an invisible tether to the receiver and limiting the versatility of the system.

The wireless technologies outlined above are interesting, but are not applicable for the easy measurement physiological signals and transmission over long periods of time. A compact, wireless physiological monitoring technology is needed for this purpose. It is therefore, an object of this invention to provide an electrode patch and wireless system for such a purpose. It is a further object of this invention to provide an electrode patch and wireless system with a feasible battery system. It is still a further object of this invention to provide an electrode patch and wireless system that allows for good measurement from two or more electrodes. It is still further an object of this invention to provide an electrode patch and wireless system that provided for data error correction. It is still further an object of this invention to provide an electrode patch and wireless system, which utilizes dry physiological electrodes for detecting the physiological signals.

SUMMARY OF THE INVENTION

The present invention is related, in general, to an electrode patch and/or a wireless system for measuring the physiological condition of a subject, and more particularly to an electrode patch for ECG monitoring. The present invention further includes a method of sensing, analyzing and/or transmitting or relaying a physiological signal.

The wireless system and/or electrode patch of the present invention is preferably lightweight and compact. The electrode patch preferably additionally provides a low, power system for extended battery life and use. The electrode patch and wireless system of the present invention still further preferably allows for good and reliable measurement of physiological signals form the subject. The electrode patch is still preferably simple to apply as a single patch, but versatile enough to be reconfigured as more than one patch.

In one embodiment, the present invention includes an electrode patch for sensing a physiological signal from a subject, the electrode patch comprising a base having an upper and a lower surface, the lower surface of the base comprising at least two electrodes for placing on a subjects skin and for sensing of a physiological signal from the subject; one or more electronic components for receiving the physiological signal and transmitting a signal corresponding to the physiological signal to a receiving unit or remote communication station, the one or more electronic components being attached to the base; and at least two electrical pathways connecting the at least two electrodes to the one or more electronic components which are not used as a primary means to mechanically attach the one or more electronic components to the base.

In another embodiment, the present invention includes an electrode patch for sensing a physiological signal from a subject, the electrode patch comprising a base having an upper and a lower surface, the lower surface of the base comprising at least two electrodes for placing on a subjects skin and for sensing of a physiological signal from the subject; one or more electronic components for receiving the physiological signal and transmitting a signal corresponding to the physiological signal to a receiving unit or remote communication station, the one or more electronic components; at least two electrical pathways connecting to the at least two electrodes; and a fastener for attaching the one or

**4**

more electronic components to the base and electrically connecting the at least two electrical pathways to the one or more electronic components.

In still another embodiment, the present invention includes an electrode patch for sensing a physiological signal from a subject, the electrode patch comprising a base having an upper and a lower surface, the lower surface of the base comprising at least two electrodes for placing on a subjects skin and for sensing of a physiological signal from the subject; and one or more electronic components for receiving the physiological signal from the at least two electrodes, transmitting a signal corresponding to the physiological signal to a receiving unit or remote communication station, and receiving a signal from a remote transmitter, the one or more electronic components being attached to the base.

In still another embodiment, the present invention includes a wireless system for monitoring at least one physiological condition of a subject, the system comprising an electrode patch comprising a base having an upper and a lower surface, the lower surface of the base comprising at least two electrodes for placing on a subjects skin and for sensing of a physiological signal from the subject; and one or more electronic components for receiving the physiological signal, transmitting a signal corresponding to the physiological signal to a receiving unit or remote communication station and receiving a signal from a remote transmitter, the one or more electronic components being attached to the base; and a receiving unit or remote communication station for receiving, re-transmitting and/or processing the signal corresponding to the physiological signal, the receiving unit or remote communication station comprising a computer, processor and/or one or more electronic parts.

In yet another embodiment, the present invention includes a method comprising the steps of sensing and analyzing a physiological signal comprising the steps of measuring a physiological signal from a subject; transmitting wirelessly the physiological signal from the subject to a remote communication station; and transmitting data formed in part from the physiological signal from the remote communication station wirelessly or via the internet to another computer or processor system.

In still yet another embodiment, the present invention includes a method comprising the steps of applying a wireless electrode patch to a subject; digitizing and/or analyzing a physiological signal measured from the subject with the electrode patch; transmitting wirelessly from the electrode patch the digitized and/or analyzed physiological signal from the subject to a remote communication station; and re-transmitting a signal based in part from the physiological signal from the remote communication station wirelessly or via the internet to another monitor, computer or processor system.

Additional features and advantages of the invention will be set forth in the detailed description which follows, and in part will be readily apparent to those skilled in the art from that description or recognized by practicing the invention as described herein, including the detailed description which follows, the claims, as well as the appended drawings.

It is to be understood that both the foregoing general description and the following detailed description are merely exemplary of the invention, and are intended to provide an overview or framework for understanding the nature and character of the invention as it is claimed. The accompanying drawings are included to provide a further understanding of the invention, and are incorporated in and constitute a part of this specification. The drawings illustrate various embodi-

US 7,206,630 B1

5

ments of the invention, and together with the description serve to explain the principles and operation of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1**. Plan cross-sectional view of the base of one embodiment of an electrode patch.

FIG. **2**. Plan cross-sectional view of the base of another embodiment of an electrode patch.

FIG. **3**. Plan cross-sectional view of an electrode patch utilizing base from FIG. **1**.

FIG. **4**. Exploded view of base laminate from FIG. **2**.

FIG. **5**. A), B), and C) are plan cross-sectional views of three embodiments of the reconfigurable electrical pathways of an electrode patches.

FIG. **6**. Plan cross-sectional view of another embodiment of a reconfigurable electrode of the present invention.

FIG. **7**. Plan cross-sectional view of another embodiment of the base of an electrode patch.

FIG. **8**. Plan cross-sectional view of one embodiment of a connector used with base laminate described in FIGS. **2** and **4**.

FIG. **9**. Schematic representation of one embodiment of a wireless monitoring system of the present invention.

FIG. **10**. Flow diagram of one embodiment of the one or more electronic components for the various devices and systems of the present invention.

DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention is related, in general, to an electrode patch and/or a wireless system for measuring the physiological condition of a subject, and more particularly to an electrode patch for ECG monitoring. The present invention further includes a method of sensing and analyzing a physiological signal.

The electrode patch and the wireless system of the present invention are preferably used for sensing or detecting a physiological signal from a subject. The subject from which a physiological signal is measured being a human or other form of animal. The electrode patch and the wireless system of the present invention can be used in a variety of applications including but not limited to electrocardiography (ECG), electroencephalography (EEG), electrical impedance tomography (EIT), electromyography (EMG), and electro-oculography (EOG). Preferably, the electrode patch and the wireless system of the present invention is used for electrocardiography (ECG).

The electrode patch, which is a part of the wireless system of the present invention comprise a base having an upper and lower surface. The lower surface of the base comprising at least two electrodes. The electrodes are used for sensing a physiological signal from a subject. The electrode patch further comprises one or more electronic components. The one or more electronic components are used to receive the physiological signal from the at least two electrodes. The one or more electronic components also transmit or store a signal corresponding to the physiological signal to a remote receiving unit. Preferably, the one or more electronic components can further receive signals from one or more remote, receiving units. In a number of embodiments, the electrode patch further comprises at least two electrical pathways connecting to the at least two electrodes to one or more electronic components for receiving the physiological signal.

6

The electrical pathways are preferably attached to the base. More preferably, the electrical pathways are a line of conductive ink, which is printed on the upper surface of the base. Even more preferably, the electrical pathways are printed on the upper surface of the base and are drawn to a connector. This allows for separate production of the electronic components of the electrode patch and further for reuse or recycling of the electronic components. Also preferably, any of the electronic components and their electrical connections can be printed on the base of the electrode patch. The electrical pathways of the present invention are preferably greater than about 0.25 inches in length, more preferably greater than about 0.5 inches in length, and most preferably greater than about 1.0 inches in length. Preferably, the electrical pathways are made from some conductive ink or coating material.

The subject(s) referred to in the present invention can be any form of animal. Preferably the subject(s) are mammal, and most preferably human. The base having an upper and a lower surface can be made from any materials known to those skilled in the art. Preferably the base is made from a material which has the mechanical features necessary for the at least two electrodes and for attaching to the one or more electronic components. More preferably, the base is a laminate. Even more preferably, the base incorporates some type of foamed or cellular material that allows a certain flexibility and depth necessary for wells or depressions to hold conductive electrode gels or pastes. Preferably, the base comprises a flexible spacer layer with a modulus of elasticity of less than about 500,000 psi, more preferably less than about 100,000 psi, and most preferably less than about 30,000 psi. The spacer layer can be made from any polymer known to those skilled in the art. Preferably, the spacer layer is a foam or celled structure. Most preferably, the spacer layer is a closed cell structure, which doesn't allow for absorption of biological contaminants. Preferably the spacer layer of the base is between about 0.001 to about 0.3 inches thick, more preferably between about 0.01 to about 0.2 inches thick, and most preferably between about 0.03 to about 0.15 inches thick. If an adhesive is used to attach the electrode patch to the subject, preferably the adhesive is biologically compatible to the subject. More preferably, a pressure sensitive adhesive is used. Even more preferably, a removable pressure sensitive adhesive is used. The adhesives used include but are not limited to for example natural rubber, butyl, styrenic block copolymer, SBR, acrylics, and silicone based adhesives. Preferably, if a base laminate is used, the base laminate comprises a more rigid upper surface wherein the upper surface has an elastic modulus greater than that of the spacer layer. This allows for a better surface on which to attach the one or more electronic components of various embodiments of the present invention.

The lower surface of the base, preferably, comprises at least two electrodes, more preferably more than at least three electrodes, and most preferably more than at least four electrodes. The at least two electrodes can be any type of electrode known to those skilled in the art for sensing a physiological signal. Preferably, the at least two electrodes of the present invention can be conventional electrodes known to those skilled in the art comprising a sensing element and a conductive gel for transmitting the signal between the subjects skin and the sensing element; or dry electrodes comprising a penetrator for detecting physiological signals below the surface of the skin as a sensing element. Dry physiological recording electrodes of the type described in U.S. patent application Ser. No. 09/949,055 are herein incorporated by reference. Dry electrodes provide the

US 7,206,630 B1

7

advantage that there is no gel to dry out, no skin to abrade or clean, and that the electrode can be applied in hairy areas such as on an animal or on a male human's chest. Alternatively, the subject(s) skin may be mechanically abraded, or an amplified electrode may be used. Preferably, the at least two electrodes are one signal electrode and one reference electrode. The at least two electrodes don't have to be of the same type, i.e., for example one could be a conductive gel electrode and the other a dry electrode. The at least two electrodes can be any shape known to be useful to those skilled in the art. For example the electrodes can be circular or non-circular in shape. Preferably, the at least two electrodes are in close proximity with no more than 9 inches between each of their sensing elements or their closest sensing elements, more preferably with no more than 6 inches between each of their sensing elements or their closest sensing elements, and most preferably with no more than 3 inches between each of their sensing elements or their closest sensing elements.

The electrode patch is attached to the subject by any method or means known to those skilled in the art. By way of example but not limitation, the electrode patch may be attached to the subject by adhesive on the lower surface of the base, by adhesive on the electrodes on the lower surface of the base, by an elastomeric band that is attached to the base and about the subject, or some combination thereof.

The electrode patch further comprises one or more electronic components for detecting the physiological signal from the at least two electrodes. While some of the electronic components such as the battery or antenna may be separate from the other electronic components, and in the case of the antenna may be printed right onto the base. One or more of the electronic components are mechanically attached to the base. Preferably, the one or more electronic components are mechanically attached to the upper surface of the base. The one or more electronic components can be attached by any means known to those skilled in the art including but not limited to hooks, hangers, Velcro, clips and the like. The one or more electronic components are, however, preferably not attached to the base by the electrical pathways. If, however, this is not possible preferably the one or more electronic components are attached with a connecter that corresponds to at least two electrical pathways.

The one or more electronic components for detecting the physiological signal from the at least two electrodes is a wireless device, which most preferably transmits the physiological signals to a remote receiving unit. The one or more electronic components also filter (and possibly amplify) the detected signal, and more preferably convert this detected physiological signal, which is in an analog form into a digital signal for transmission to the remote receiving unit. The one or more electronic components are attached to the subject as part of the electrode patch. Further preferably, the one or more electronic components can receive a signal from the remote receiving unit or other remote transmitters. The one or more electronic components may include circuitry for but are not limited to for example electrode amplifiers, signal filters, analog to digital converter, RF output antenna, RF input antenna, RF output/input antenna, subcarrier VCO, transmitter VCO, tuning crystal, phase-locked loop, frequency select switches, a DC power source and combinations thereof. The one or more electronic components may comprise one processing chip, multiple chips, single function components or combinations thereof, which can perform all of the necessary functions of detecting the physiological signal from the electrode, transmitting a signal corresponding to the physiological signal to

8

a receiving unit and optionally receiving a signal from a remote transmitter. These one or more electronic components can be assembled on a printed circuit board or by any other means known to those skilled in the art. Preferably, the one or more electronic components can be assembled on a printed circuit board or by other means so its imprint covers an area less than 4 in$^2$, more preferably less than 2 in$^2$, even more preferably less than 1 in$^2$, still even more preferably less than 0.5 in$^2$, and most preferably less than 0.25 in$^2$.

Preferably, the circuitry of the one or more electronic components is appropriately modified so as to function with any suitable miniature DC power source. More preferably, the DC power source is a battery. A preferred battery of the present invention are zinc-air hearing aid batteries. Zinc-air hearing aid batteries offer a high energy density and nearly constant output voltage during discharge, which is preferable. Preferably, a three-cell stack of zinc-air batteries are used, each cell offering a steady 1.2 V, and producing a stable and reliable 3.6 V. The most preferred battery of the present invention are Lithium-ion batteries. Lithium-ion batteries also offer a high energy density and nearly constant output voltage during discharge. Additionally, these commercially available batteries are readily available and inexpensive and a single battery produces slightly greater than 3 V, which is preferable. Alternatively, high frequency energy may be transmitted to the electrode patch from some external source to power the circuitry of the one or more electronic components through some type of capacitor.

Preferably, the circuitry of the one or more electronic components comprises data acquisition circuitry further including an electrode amplifier which detects the physiological signal from the at least two electrodes and integrates the detected physiological signals into a single signal and amplifies it to some power level. The data acquisition circuitry is designed with the goal of reducing size, lowering (or filtering) the noise, increasing the DC offset rejection and reducing the system's offset voltages. The data acquisition circuitry may be constrained by the requirements for extremely high input impedance, very low noise and rejection of very large DC offset and common-mode voltages, while measuring a very small signal of interest. Additional constraints arise from the need for a "brick-wall" style input protection against ESD and EMI. The exact parameters of the design, such as input impedance, gain and passband, can be adjusted at the time of manufacture to suit a specific application via a table of component values to achieve a specific full-scale range and passband.

More preferably, a low-noise, lower power instrumentation amplifier is used. The inputs for this circuitry is guarded with preferably, external ESD/EMI protection, and very high-impedance passive filters to reject DC common-mode and normal-mode voltages. Still preferably, the instrumentation amplifier gain can be adjusted from unity to approximately 100 to suit the requirements of a specific application. If additional gain is required, it preferably is provided in a second-order antialias filter, whose cutoff frequency can be adjusted to suit a specific application, with due regard to the sampling rate. Still preferably, the reference input of the instrumentation amplifier is tightly controlled by a DC cancellation integrator servo that uses closed-loop control to cancel all DC offsets in the components in the analog signal chain to within a few analog-to digital converter (ADC) counts of perfection, to ensure long term stability of the zero reference.

Preferably, the physiological signal is converted to a digital form. This can be achieved with an electronic component or processing chip through the use of an ADC. More

**9**

preferably, the ADC restricts resolution to 12-bits due to the ambient noise environment in such chips. Despite this constraint, the ADC remains the preferable method of choice for size-constrained applications such as with the present invention unless a custom data acquisition chip is used because the integration reduces the total chip count and significantly reduces the number of interconnects required on the printed circuit board.

Preferably, the circuitry of the one or more electronic components comprises a digital section. Part of this circuitry may include one or more chips preconfigured to perform some or all of the digital processing for use with existing wireless protocols including but not limited to wireless local area networks (IEEE 802.11 including WiFi), wireless personal area networks (IEEE 802.15 including Bluetooth and ZigBee), wireless metropolitan area networks (IEEE 802.16) or others known to those skilled in the art. More preferably, the heart of the digital section is the Micro-Chip™ PIC 16LC771 microcontroller or other comparable microcontrollers including microcontrollers from competing companies including Atmel and Texas Instruments. The preferable MicroChip™ PIC 16LC771 microcontroller or other comparable microcontroller would contain sufficient data and program memory, as well as peripherals, which allow the entire digital section as well as the ADCs to be neatly bundled into a single carefully programmed processing chip. Still preferably, the onboard counter/timer sections are used to produce the data acquisition timer, and can further be used to measure the VCO frequency and to confirm synthesizer lock. Still preferably, an onboard synchronous serial (SPI) port is used to control the synthesizer, to generate a RF data stream, and to communicate with external test equipment. Also preferably, an onboard main oscillator generates not only the microcontroller clock, but also the reference clock for the synthesizer. Additional digital outputs are used to control specific functions. Still preferably, one ADC input is dedicated to measurement of the VCO tune voltage to allow for automation of the final testing, and a separate function multiplexed onto this same pin allows limited direct control of the VCO tune voltage during automated final testing.

The synthesizer can induce distortion in the transmitted digital data when the data does not contain exactly equal numbers of ones and zeroes over a prolonged interval. This distortion arises because the synthesizer sees the modulation as error to be servoed out, and fights the modulation as it attempts to steer the VCO back to the nominal frequency. Preferably, the reference oscillator has the ability to modulate the reference frequency with any low-frequency content of the final transmitted digital data, with one of the results being that the reference and the VCO move in concert during modulation and therefore do not distort the data, and the low-frequency content of the designed data packet format should result in only minimal distortion. Optionally, this capability can be removed to reduce the imprint of the printed circuit board holding the one or more electronic components.

Preferably, the circuitry for the one or more electronic components is designed to provide for communication with external quality control test equipment prior to sale, and more preferably with automated final test equipment. In order to supply such capability without impacting the final size of the finished unit, one embodiment is to design a communications interface on a separate PCB using the SPI bus with an external UART and level-conversion circuitry to implement a standard RS-232 interface for connection to a personal computer or some other form of test equipment.

**10**

The physical connection to such a device requires significant PCB area, so preferably the physical connection is designed to keep the PCB at minimal imprint area. More preferably, the physical connection is designed with a break-off tab with fingers that mate with an edge connector. This allows all required final testing and calibration of the electrode patch, including the programming of the processing chip memory, can be carried out through this connector, with test signals being applied to the analog inputs through the normal connections which remain accessible in the final unit. By using an edge fingers on the production unit, and an edge connector in the production testing and calibration adapter, the electrode patch can be tested and calibrated without leaving any unnecessary electronic components or too large a PCB imprint area on the final unit.

Preferably, the circuitry for the one or more electronic components comprises nonvolatile, rewriteable memory. Alternatively, if the circuitry for the one or more electronic components doesn't comprise nonvolatile, rewriteable memory then an approach should be used to allow for reprogramming of the final parameters such as radio channelization and data acquisition and scaling. Without nonvolatile, rewriteable memory, the program memory can be programmed only once. Therefore one embodiment of the present invention involves selective programming of a specific area of the program memory without programming the entire memory in one operation. Preferably, this is accomplished by setting aside a specific area of program memory large enough to store several copies of the required parameters. Procedurally, this is accomplished by initially programming the circuitry for the one or more electronic components with default parameters appropriate for the testing and calibration of the electrode patch. When the final parameters have been determined, the next area is programmed with these parameters. If the final testing and calibration reveals problems, or some other need arises to change the values, additional variations of the parameters may be programmed. The firmware of various embodiments of the present invention scans for the first blank configuration block and then uses the value from the preceding block as the operational parameters. This arrangement allows for reprogramming of the parameters up to several dozen times, with no size penalty for external EEPROM or other nonvolatile RAM. The circuitry for the one or more electronic components has provisions for in-circuit programming and verification of the program memory, and this is supported by the break-off test connector. The operational parameters can thus be changed up until the time at which the test connector is broken off just before shipping the final unit. Thus the manufacturability and size of the circuitry for the one or more electronic components is optimized.

Preferably the circuitry of the one or more electronic components includes an RF transmitter. Still preferably includes a custom voltage controlled oscillator (VCO) made up of discrete electronic components, and a phase-locked loop (PPL) synthesizer built around commercially available electronic components. Still preferably, the whole radio section of the circuitry can be powered down independently of the digital section components. Still further preferably, the synthesizer is controlled by the firmware via the SPI bus, and uses a crystal oscillator to derive a precision clock.

In these embodiments, the VCO design is unique in several ways. A buffer is preferably required between the core VCO active element and the antenna, to minimize pulling of the VCO frequency by physical movement at or near the antenna. Still preferably, the VCO itself uses a negative-resistance oscillator configuration. Still preferably,

**11**

this is a stacked configuration to allow sharing between the VCO and the buffer. Still preferably, this configuration allows for two or more different configurations of the buffer with negligible size impact on the imprint of the circuitry of the one or more electronic components. In one configuration, the VCO and buffer are in a cascade configuration (common base amplifier), such that the buffer provides voltage gain and buffering. In another configuration, the configuration becomes a common-emitter buffer, with the potential to allow firmware control of the transmitted power during PLL lock by reducing the gain of the buffer during lock. Preferably, this capability is provided with no size or power impact in the common-emitter configuration and reduces the potential for interference with other units during unit startup. On the other hand, the cascade configuration preferably is more resistant to antenna pulling, so precharge of the tune voltage and careful sequencing and timing of the startup are required to prevent interference.

Preferably, tuning of the VCO is performed by using a unique architecture that minimizes power consumption while significantly reducing compared to more conventional approaches such as using a varactor to perform tuning in response to an applied voltage. Preferably, in various embodiments of the present invention, the PLL applies a tuning voltage to the top side of a varactor, reversing biasing of the varactor to the level required to achieve a desired oscillation frequency. Conventional designs mix the modulation with this tune voltage to modulate the carrier produced by the VCO. However, this mixing normally requires a summing junction plus a buffer, and the buffer generates significant 1/F noise, seriously degrading the phase noise performance of the VCO. In addition, the required swing of the modulation voltage is orders of magnitude smaller than that of the tune voltage. Preferably in various embodiments of the present invention, only the PLL tune voltage is injected at the top of the varactor, and the modulation voltage is injected at the bottom of the varactor. By pre-inverting the modulation voltage, a bias voltage is achieved across the varactor that is the arithmetic sum of the tune voltage and the modulation voltage without the undesirable interactions of the conventional approaches. Because the required swing of the modulation voltage is very small, a resistive divider can be used as the last step in applying the modulation voltage, thus keeping the signal amplitude very large right up until the final division, forcing any accompanying noise to also be divided down before application to the varactor. This enhances the signal-to-noise ratio in the modulation voltage. Additionally because the required swing is very small, the division ratio in the final divider is large, allowing for very low current draw while still providing extremely low Thevenin equivalent resistance and very low thermal noise at this sensitive node.

Another feature of the circuitry of the one or more electronic components preferably is an antenna. The antenna, preferably, is designed onto the upper surface of the base of the electrode patch and is integrated in the rest of the circuitry. The antenna can be configured in a number of ways, for example as a single loop, dipole, dipole with termination impedance, lagarithmic-periodic, dielectric, strip conduction, patch or reflector antenna. The antenna is designed to include but not be limited to the best combination of usable range, production efficiency and end-system usability. Preferably, the antenna consists of one or more conductive wires or strips, which are arranged in a pattern to maximize surface area. The large surface area will allow for lower transmission outputs for the data transmission. The large surface area will also be helpful in receiving high

**12**

frequency energy from an external power source for storage. Optionally, the radio transmissions of the present invention may use frequency-selective antennas for separating the transmission and receiving bands, if a RF transmitter and receiver are used on the electrode patch, and polarization-sensitive antennas in connection with directional transmission. Polarization-sensitive antennas consist of, for example, thin metal strips arranged in parallel on an insulating carrier material. Such a structure is insensitive to or permeable to electromagnetic waves with vertical polarization; waves with parallel polarization are reflected or absorbed depending on the design. It is possible to obtain in this way, for example good cross polarization decoupling in connection with linear polarization. It is further possible to integrate the antenna into the frame of a processing chip or into one or more of the other electronic components, whereby the antenna is preferably realized by means of thin film technology. The antenna can serve to just transfer electrode patch data or for both transferring data to and for receiving control data received from a remote communication station which can include but is not limited to a wireless relay, a computer or a processor system. Optionally, the antenna can also serve to receive high-frequency energy (for energy supply or supplement). In any scenario, only one antenna is required for transmitting data, receiving data and optionally receiving energy. Optionally, directional couples can be arranged on the transmitter outputs of the electrode patch and/or the remote communication station. The couplers being used to measure the radiated or reflected radio wave transmission output. Any damage to the antenna (or also any faulty adaptation) thus can be registered, because it is expressed by increased reflection values.

An additional feature of the present invention is an optional identification unit. By allocating identification codes—a patient code (for each electrode patch), the remote communication station is capable of receiving and transmitting data to several subjects, and for evaluating the data if the remote communication station is capable of doing so. This is realized in a way such that the identification unit has a control logic, as well as a memory for storing the identification codes. The identification unit of the electrode patch is preferably programmed by radio transmission of the control characters and of the respective identification code from the programming unit of the remote communication station to the electrode patch. More preferably, the electrode patch comprises switches in the electrode patch as programming lockouts, particularly for preventing unintentional reprogramming of the electrode patch.

In any RF link, errors are an unfortunate and unavoidable problem. Analog systems can often tolerate a certain level of error. Digital systems, however, while being inherently much more resistant to errors, also suffer a much greater impact when errors occur. Thus the present invention when used as a digital system, preferably includes an error control subarchitecture. Preferably, the RF link of the present invention is digital. RF links can be one-way or two-way. One-way links are used to just transmit data. Two-way links are used for both sending and receiving data.

If the RF link is one-way error control, then this is preferably accomplished at two distinct levels, above and beyond the effort to establish a reliable radio link to minimize errors from the beginning. At the first level, there is the redundancy in the transmitted data. This redundancy is performed by adding extra data that can be used at the remote communication station or at some station to detect and correct any errors that occurred during transit across the airwaves. This mechanism known as Forward Error Correc-

**13**

tion (FEC) because the errors are corrected actively as the signal continues forward through the chain, rather than by going back to the transmitter and asking for retransmission. FEC systems include but are not limited to Hamming Code, Reed-Solomon and Golay codes. Preferably, a Hamming Code scheme is used. While the Hamming Code scheme is sometimes maligned as being outdated and underpowered, the implementation in certain embodiments of the present invention provides considerable robustness and extremely low computation and power burden for the error correction mechanism. FEC alone is sufficient to ensure that the vast majority of the data is transferred correctly across the radio link. Certain parts of the packet must be received correctly for the receiver to even begin accepting the packet, and the error correction mechanism in the remote communication station reports various signal quality parameters including the number of bit errors which are being corrected, so suspicious data packets can be readily identified and removed from the data stream.

Preferably, at a second, optional level, an additional line of defense is provided by residual error detection through the use of a cyclic redundancy check (CRC). The algorithm for this error detection is similar to that used for many years in disk drives, tape drives, and even deep-space communications, and is implemented by highly optimized firmware within the electrode patch processing circuitry. During transmission, the CRC is first applied to a data packet, and then the FEC data is added covering the data packet and CRC as well. During reception, the FEC data is first used to apply corrections to the data and/or CRC as needed, and the CRC is checked against the message. If no errors occurred, or the FEC mechanism was able to properly correct such errors as did occur, the CRC will check correctly against the message and the data will be accepted. If the data contains residual errors (which can only occur if the FEC mechanism was overwhelmed by the number of errors), the CRC will not match the packet and the data will be rejected. Because the radio link in this implementation is strictly one-way, rejected data is simply lost and there is no possibility of retransmission.

More preferably, the RF link utilizes a two-way (bi-directional) data transmission. By using a two-way data transmission the data safety is significantly increased. By transmitting redundant information in the data emitted by the electrodes, the remote communication station is capable of recognizing errors and request a renewed transmission of the data. In the presence of excessive transmission problems such as, for example transmission over excessively great distances, or due to obstacles absorbing the signals, the remote communication station is capable of controlling the data transmission, or to manipulate on its own the data emitted by the electrode patch. With control of data transmission it is also possible to control or re-set the parameters of the electrode patch, e.g., changing the transmission channel. This would be applicable for example if the signal transmitted by the electrode patch is superimposed by other sources of interference then by changing the channel the remote communication station could secure a flawless and interference free transmission. Another example would be if the signal transmitted by the electrode patch is too weak, the remote communication station can transmit a command to the electrode patch increasing its transmitting power. Still another example would be the remote communication station causing the electrode patch to change the data format for the transmission, e.g., in order to increase the redundant information in the data flow. Increased redundancy allows transmission errors to be detected and corrected more easily.

**14**

In this way, safe data transmissions are possible even with the poorest transmission qualities. This technique opens in a simple way the possibility of reducing the transmission power requirements of the electrode patch. This also reduces the energy requirements of the electrode patch, thereby providing longer battery life. Another advantage of a two-way, bi-directional digital data transmission lies in the possibility of transmitting test codes in order to filter out external interferences such as, for example, refraction or scatter from the transmission current. In this way, it is possible to reconstruct falsely transmitted data. Due to the safe and effective one-way and two-way transmission of the various embodiments of the present invention between the electrode patch and the remote communication station, the present invention is particularly suitable for use at home or work, such as for example monitoring infants or heart patients, especially where no technical personnel are available.

The remote communication station of various embodiments of the present invention can be any device known to receive RF transmissions used by those skilled in the art to receive transmissions of physiological data from the electrode patch. The remote communication station by way of example but not limitation can include a communications device for relaying the transmission, a communications device for re-processing the transmission, a communications device for re-processing the transmission then relaying it to another remote communication station, a computer with wireless capabilities, a PDA with wireless capabilities, a processor, a processor with display capabilities, and combinations of these devices. Optionally, the remote communication station can further transmit data both to another device and/or back to the electrode patch. Further optionally, two different remote communication stations can be used, one for receiving transmitted physiological data from the electrode patch and another for sending data to the electrode patch. For example, with the wireless physiological monitoring system of the present invention, the remote communication system of the present invention can be a wireless router, which establishes a broadband internet connection with the electrode patch and transmits the physiological signal to a remote internet site for analysis, preferably by the subject's physician. Another example is where the remote communication system is a PDA, computer or cell phone, which receives the physiological data transmission from the electrode patch, optionally re-processes the information, and re-transmits the information via cell towers, land phone lines or cable to a remote site for analysis. Another example is where the remote communication system is a computer or processor, which receives the physiological data transmission from the electrode patch and displays the data or records it on some recording medium, which can be displayed or transferred for analysis at a later time.

Preferably, the wireless monitoring system of the present invention can be used to notify a doctor, monitoring service or an emergency medical dispatch team of a problem with the subject. To provide for the maximum flexibility of the subject preferably, the subject can be monitored by application of a wireless electrode patch to the subject. Preferably, the electrode patch provides electronics and a battery such that the battery or patch only need to be changed no more than 1 time a day, more preferably no more than once every two days, and most preferably no more than once every four days. The wireless electrode patch then digitizes and/or analyzing a physiological signal measured from the subject with the electrode patch. This digitized or analyzed physiological signal is then transmitting wirelessly from the

**15**

electrode patch to a remote communication station. This remote communication station allows the subject wide movement. Preferably, the remote communication station can pick up and transmit signals from distances of greater than about 5 feet from the subject, more preferably greater than about 10 feet from the subject, even more preferably greater than about 20 feet from the subject, still even more preferably greater than about 50 feet from the subject, still even more preferably greater than about 200 feet from the subject, and most preferably greater than about 500 feet from the subject. The remote communication station is used to re-transmit the signal based in part from the physiological signal from the remote communication station wirelessly or via the internet to another monitor, computer or processor system. This allows the physician or monitoring service to review the subjects physiological signals and if necessary to make a determination, which could include dispatching help.

Referring now to the drawings, FIG. 1 is a planar cross-sectional view of the base of an electrode patch. In FIG. 1, the electrode patch 10 comprises a base 12 having an upper 13 and lower surface (not shown). The base 12 comprises at least two electrodes 14 for placing on a subject's skin and for sensing a physiological signal from the subject. The at least two electrodes 14 can either be attached to the lower surface of the base 12, be incorporated into the lower surface of the base 12, or be formed into the base 12 itself. If the electrodes 14 are formed into the base itself then preferably the base 12 is a laminate. If the base 12 is a laminate then preferably the base 12 comprises a lower surface consisting of an adhesive layer, at least one spacer layer and an upper surface 13. The base is preferably multiple layers, and most preferably is a laminate. The electrode patch 10 in FIG. 1 consists of four electrodes 14—with one of those electrodes being used as a reference electrode 15. The electrode patch 10 also comprises at least one electrical pathway 20, the at least one electrical pathway for connecting the electrode 14 to a connector 18 or one or more electronic components (not shown) for transmitting the physiological signal detected by the electrodes 14 to a remote communication station (not shown). In addition to the electrical pathways 20, optionally the electrodes 14 may include other types of connectors such as the button type connector 16 or other mechanical connectors 16. This embodiment of the electrode patch 10 further comprises a mechanical weak-point 22 built into the base 12 to allow for separation of one of the electrodes 14 from the base 12.

FIG. 2 is a plan cross-sectional view of another embodiment of the base laminate used in the electrode patch of the present invention. In FIG. 2, the base laminate 12 comprises an upper 13 and a lower surface (not shown). The base 12 comprises at least two electrodes 14 for placing on a subject's skin and for sensing a physiological signal from the subject. The at least two electrodes 14 can either be attached to the lower surface of the base 12, be incorporated into the lower surface of the base 12, or be formed into the base 12 itself. If the electrodes 14 are formed into the base itself then preferably the base 12 is a laminate. If the base 12 is a laminate then preferably the base 12 comprises a lower surface consisting of an adhesive layer, at least one spacer layer and an upper surface 13. The base is preferably multiple layers, and most preferably is a laminate. The base laminate 12 in FIG. 2 consists of four electrodes 14—with one of those electrodes being used as a reference electrode 15. The base laminate 12 also comprises at least one electrical pathway 20, the at least one electrical pathway for connecting the electrode 14 to a connector (not shown) or one or more electronic components (not shown) for trans-

**16**

mitting the physiological signal detected by the electrodes 14 to a remote communication station (not shown). The base laminate 12 further contains two flexible arms 17 which allow for versatility in placement of the electrode patch 10 and for use with varying size subjects. This embodiment of the base laminate 12 provides for a connector (not shown) which snaps or connects over a spring portion 21 of the laminate. The spring portion further comprises electrical contacts 19 which connect the electrode patch 10 electrical components (not shown) with preferably the base laminate. The electrical components being housed in the connector.

FIG. 3 is a planar cross-sectional view an electrode patch. In addition to the features disclosed in FIG. 1 for the base, the embodiment of the electrode patch 10 shown in FIG. 3 includes one or more electronic components 34 further including a battery 32 and a single loop antenna 30.

FIG. 4. is an exploded view of the base laminate from FIG. 2. The base laminate 12 in this embodiment used for an electrode patch comprises an adhesive layer (not shown) a bottom layer 23 with a bottom surface 28, spacer layer 24, and a top layer 25 with an upper surface (not shown). The layers forming the base laminate can be any materials known to those skilled in the art. Preferably, the materials are those approved by the FDA for these types of applications. For this particular embodiment, preferably the bottom layer 23 is an adhesive formed from a removable/releasable type pressure sensitive adhesive. The space layer 24 is preferably formed from a low modulus polyurethane or some other thermoplastic material selected for its ability to be laminated, soft texture for patient comfort and suitability for other aspects of the particular applications of the present invention. Attached to the lower surface of the bottom layer 23 or disposed within the spacer layer 24 are at least two electrodes 14. The electrodes 14 in this particular embodiment are pre-gelled and incorporate a hypo-allergenic, silver/silver-chloride gel. The electrodes 14 are formed onto the top layer 25 with the bottom layer 23 and spacer layer 24 providing a well to hold the silver/silver chloride gel.

FIGS. 5 A), B), and C) are planar cross-sectional views of three embodiments of the reconfigurable electrical pathways of the electrode patches of the present invention. FIG. 5 A) is an electrode portion 14 of the base 12 of an electrode patch (not shown). The electrode 14 in this embodiment having both a mechanical connection 16 providing a potential electrical pathway, and an electrical pathway 20 wherein the electrical pathway 20 connects the electrode 14 to a connector (not shown) or directly to the electronic components (not shown) of the electrode patch. A mechanical weak-point 22 further being incorporated into the base to allow for separation of the electrode 14 from the base, and in this particular embodiment, breaks or disconnects the electrical pathway 20 connecting the electrode 14 to the connector or electronic components. FIG. 5 B) is another embodiment of an electrode portion 14 of the base 12 of an electrode patch. In this embodiment, the mechanical weak-point 22 allows the electrical pathway 20 connecting the electrode 14 to the connector or electronic components to be broken or disconnected, without separating the electrode 14 from the base 12. FIG. 5 C) is another embodiment of an electrode portion 14 of the base laminate 12 of an electrode patch. In this embodiment, there is an additional electrical pathway 20 such as an antenna or connecting to another electrode wherein the mechanical weak-point 22 allows this electrical pathway to be broken or disconnected.

FIG. 6 is a plan cross-sectional view of another embodiment of a reconfigurable electrode of the base of the electrode patch. In this embodiment, there are first and second

US 7,206,630 B1

17

electrodes, each electrode **14** being connected by an electrical pathway **20** to a connector **18** there being further one or more mechanical weak-points built into the base **12** wherein a certain portion of the base **12** can be separated without breaking either electrical pathway **20**. In this particular embodiment one of the electrical pathways **20** is permanently affixed or connected to the base **12** after a certain electrical pathway connection point **26**, but rather is a coiled or looped wire, which will enable the second electrode to be moved a distance from the first electrode after separation from the base allowing for different configurations of the electrode patch (not shown).

FIG. **7** is a plan cross-sectional view of another embodiment of the base of an electrode patch. In addition to the features disclosed and described in FIG. **1** for the base, the embodiment of the electrode patch **10** shown in FIG. **6** includes an additional electrical pathway **36**, which can be broken or disconnected by tearing or separating the base at one of the mechanical weak points **22** and hence the configuration change can be detected by the electronics attached to connector **18**.

FIG. **8** is a plan cross-sectional view of one embodiment of a connector, which is embedded into the housing for one or more electronic components, and can be used with a base laminate such as described in FIGS. **2** and **4**. The housing **88** with the embedded connector region **86** provides a locking mechanism **84** for holding the spring portion **21** of the base laminate **12**. The connector region **86** further provides one or more electrical contact pads, which connect the electrical components (not shown) in the housing **88** with the electrical contacts **19** of the base laminate **12**. The connector region **86** in this embodiment uses electrical contact pads **80** to make such connection.

FIG. **9** is a schematic representation of one embodiment of the wireless monitoring system of the present invention. In FIG. **9**, the subject **40** has an electrode patch **10** placed upon his or her chest **42**, and attached by adhesive or other means, in order to monitor the physiological electrical signals from the subject's heart. The electrode patch **10** is one embodiment of the present invention described elsewhere in this application. The electrode patch **10** comprises a base **12** having an upper **13** and lower (not shown) surface and includes at least two electrodes (not shown) for placing on the subject's **40** skin. The electrode patch **10** further comprising one or more electronic components **34** including in this embodiment a battery **32**. The one or more electronic components for receiving a physiological signal from the electrodes placed on the subject and for transmitting a signal corresponding to the physiological signal to a receiving unit **44**, or remote communications station or device. The corresponding signal being transferred preferably is via radio wave **48**. The receiving unit **44** being a PDA, cell phone or some other type of device that can relay and/or process the received signal and optionally transmit instructions back to the electrode patch **10**. In this embodiment the receiving unit **44** is a PDA which in turn is connected to a computer monitor **46** for processing the radio wave **48** signal and making decisions on whether to re-transmit the signal to another remote location such as a doctor's office or some other monitoring service, and whether to transmit a return signal to the one or more electronic components **34** of the electrode patch **10**.

FIG. **10** is a flow diagram for one embodiment of the one or more electronic components described for the present invention. In this flow diagram, the electrical pathways **20** carry an electrical signal from the electrodes to the electrical components. The electrode input **60** is then amplified with a

18

signal amplifier **62** and digitized **63** for further processing with a computer or microprocessor **64**. The computer or microprocessor **64** contains local memory **66**. The processed physiological signal is passed to a radio transceiver **70** and broadcast via radio antenna **74** for further analysis or transmission. The electrical components are powered by a power supply **68** which can be either AC or DC and preferably is a battery.

It will be apparent to those skilled in the art that various modifications and variations can be made to the present invention without departing from the spirit and scope of the invention. Thus, it is intended that the present invention cover the modifications and variations of this invention provided they come within the scope of the appended claims and their equivalents.

What is claimed is:

**1**. An electrode patch for sensing all electrophysiological signal from a subject, the electrode patch comprising:

a base having an upper and a lower surface, the lower surface of the base comprising at least two electrodes for placing on a subjects skin and for sensing of an electrophysiological signal from the subject;

one or more electronic components for receiving the electrophysiological signal and transmitting a signal corresponding to the electrophysiological signal to a receiving unit or remote communication station, the one or more electronic components being mechanically attached to the base; a battery separate from the one or more electronic components for powering the one or more electronic components; and

at least two electrical pathways connecting the at least two electrodes to the one or more electronic components which are not used as a primary means to mechanically attach the one or more electronic components to the base.

**2**. The electrode patch in claim **1**, wherein the at least two electrodes are dry physiological recording electrodes each comprising at least one penetrator.

**3**. The electrode patch in claim **1**, wherein the one or more electronic components are capable of receiving a signal from a remote transmitter and the received signal in part is used by the one or more electronic components to control the transmitted signal from the one or more electronic components.

**4**. The electrode patch in claim **3**, wherein the base is a laminate of at least two layers.

**5**. The electrode patch in claim **4**, wherein the lower surface of the base further comprises a foam material with a well formed in the foam material for each of the at least two electrodes and each of the wells contains a conductive gel.

**6**. The electrode patch in claim **1**, wherein the electrophysiological signal is an EKG signal.

**7**. An electrode patch for sensing an electrophysiological signal from a subject, the electrode patch comprising:

a base having an upper and a lower surface, the lower surface of the base comprising at least two electrodes for placing on a subjects skin and for sensing of an electrophysiological signal from the subject;

one or more electronic components mechanically attached to the upper surface of the base for receiving the electrophysiological signal and transmitting a wireless radio frequency signal corresponding to the electrophysiological signal to a receiving unit or remote communication station; a battery for powering the one or more electronic components;

US 7,206,630 B1

19

at least two electrical pathways connecting to the at least two electrodes; and

a connector for mechanically attaching the one or more electronic components to the upper surface of the base and electrically connecting the at least two electrical pathways to the one or more electronic components.

**8**. The electrode patch in claim **7**, wherein the at least two electrodes are dry physiological recording electrodes each comprising at least one penetrator.

**9**. The electrode patch in claim **7**, wherein the one or more electronic components are capable of receiving a wireless signal from a remote transmitter and the received signal in part is used by the one or more electronic components to control the transmitted wireless signal from the one or more electronic components.

**10**. The electrode patch in claim **9**, wherein the base is a laminate of at least two layers.

**11**. The electrode patch in claim **10**, wherein the lower surface of the base further comprises a foam material with a well formed in the foam material for each of the at least two electrodes and each of the wells contains a conductive gel.

**12**. The electrode patch in claim **7**, wherein the electrophysiological signal is an EKG signal.

**13**. A wireless system for monitoring at least one physiological condition of a subject, the system comprising:

an electrode patch comprising a base having an upper and a lower surface, the lower surface of the base comprising at least two electrodes for placing on a subjects skin and for sensing of an electrophysiological signal from the subject; and one or more electronic components for

20

receiving the electrophysiological signal, transmitting a wireless signal corresponding to the electrophysiological signal to a receiving unit or remote communication station, and receiving a wireless signal from a remote transmitter, the one or more electronic components being mechanically attached to the upper surface of the base; and

and a receiving unit or remote communication station for receiving, re-transmitting and/or processing the wireless signal corresponding to the electrophysiological signal, the receiving unit or remote communication station comprising a computer, processor and/or one or more electronic parts.

**14**. The wireless system in claim **13**, further comprising a battery for powering the one or more electronic components.

**15**. The wireless system in claim **14**, wherein the at least two electrodes are dry physiological recording electrodes each comprising at least one penetrator.

**16**. The wireless system in claim **15**, wherein the remote computer or processor system is a personal data assistant (PDA).

**17**. The wireless system in claims **16**, wherein the lower surface of the base further comprises a foam material with a well formed in the foam material for each of the at least two electrodes and each of the wells contains a conductive gel.

**18**. The wireless system in claim **13**, wherein the electrophysiological signal is an EKG signal.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,206,630 B1                                    Page 1 of  1
APPLICATION NO. : 10/879666
DATED                 : April 17, 2007
INVENTOR(S)       : Matthew David Tarler

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 18,
Line 18, delete "all electrophysiological" and insert -- an electrophysiological --.

Signed and Sealed this

Fifteenth Day of September, 2009

David J. Kappos
*Director of the United States Patent and Trademark Office*

# Exhibit R

US 20080139953A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2008/0139953 A1**

Baker et al.           (43) **Pub. Date:**   **Jun. 12, 2008**

(54) **BODY WORN PHYSIOLOGICAL SENSOR DEVICE HAVING A DISPOSABLE ELECTRODE MODULE**

(75) Inventors: **Steven D. Baker**, Beaverton, OR (US); **Eric T. McAdams**, Whitehead (GB); **James P. Welch**, Laguna Niguel, CA (US); **Norbert Ohlenbusch**, Andover, MA (US); **Thomas P. Blackadar**, Natick, MA (US)

Correspondence Address:
**MARJAMA MULDOON BLASIAK & SULLI-VAN LLP**
**250 SOUTH CLINTON STREET, SUITE 300**
**SYRACUSE, NY 13202**

(73) Assignee: **Welch Allyn, Inc.**, Skaneateles Falls, NY (US)

(21) Appl. No.: **11/591,619**

(22) Filed: **Nov. 1, 2006**

**Publication Classification**

(51) **Int. Cl.**
     *A61B 5/04*      (2006.01)
(52) **U.S. Cl.** ........................................................ **600/509**

(57)          **ABSTRACT**

A body worn patient monitoring device includes at least one disposable module including a plurality of electrical connections to the body. The body worn patient monitoring device also includes at least one communication-computation module, the communication-computation module having at least one microprocessor to actively monitor the patient and to perform a real-time physiological analysis of the physiological signals. A radio circuit communicates a raw physiological signal or a result of the physiological analysis at a predetermined time or on the occurrence of a predetermined event, via a radio transmission to a remote radio receiver, wherein the at least one disposable module is mechanically and electrically coupled directly to the at least one communication-computation module. The body worn patient monitoring device, including the at least one disposable module and the at least one communication-computation module, is directly non-permanently affixed to the skin surface of the patient.





**FIG.1A**



**FIG.1B**



**FIG.1C**



**FIG.1D**



FIG.2



**FIG.3**



FIG.4A



**FIG.4B**



**FIG.4C**



**FIG.4D**



FIG.5



**FIG.6**



**FIG.7A**



**FIG.7B**



FIG.8



FIG.8A



FIG.9

FIG.10



**FIG.11**

**FIG.12**

**FIG.13**



FIG.15



FIG.14



US 2008/0139953 A1

Jun. 12, 2008

1

## BODY WORN PHYSIOLOGICAL SENSOR DEVICE HAVING A DISPOSABLE ELECTRODE MODULE

### FIELD OF THE INVENTION

[0001]   This invention relates generally to a physiological monitor and more particularly to a body worn physiological monitor.

### BACKGROUND OF THE INVENTION

[0002]   Measurements of various physiological parameters are important to the study of the human condition. Physiological measurements can be particularly important in a health care setting, such as in a hospital. One of the more important physiological measurements performed on a patient is the electrocardiogram (ECG), showing the condition of the human heart.

[0003]   Portable patient monitors have evolved that allow patients to enjoy at least some mobility. Typically a battery operated monitor can be hung on a belt, shoulder strap, or carried by a patient using some other similar hanging arrangement. Sensors, such as ECG electrodes, are affixed to the patient's body, such as with tape, and connected to the battery operated monitor by wires. After a fixed interval of time, or at a low battery indication, the batteries can be replaced or recharged. One example of a portable patient monitor is the Micropaq wireless patient monitor, manufactured by Welch Allyn, Inc., that permits multi-parameter monitoring and patient alarm capabilities built in a small, rugged, lightweight, patient-wearable device.

[0004]   Another version of a portable physiological monitor is the heart rate monitor typically used by individuals engaged in an athletic activity. The monitor includes a sensor, which generally makes direct or indirect contact with an individual's chest to monitor heart beats and then by wires, or by wireless techniques, the sensor transmits the sensed heart beat to a nearby microcomputer based monitor and display. Such units generally measure only heart beat and are not capable of doing any of the traditional ECG analysis functions.

[0005]   A recurrent problem with the portable monitors typically used in healthcare applications is the need for wires from sensors situated on the patient's body to the portable unit. These wires can become tangled and cause discomfort or become unplugged when inadvertently pulled or tugged on. In addition, wire motion can increase ECG noise due to the triboelectric effect. Muscle movement can also increase ECG noise, due to the typical placement of ECG electrodes over major muscles. Moreover, portable monitor battery maintenance (e.g. battery recharging or replacement) can be time consuming and costly.

[0006]   Another problem is related to the requirement that a medical grade monitor survive multiple defibrillation cycles of at least 360 joules. Conventionally, this requirement has been met by one or more power resistors situated in series with the wire leads of a fixed or portable physiological monitor. The problem is that the physical volume of conventional power resistors is too large for use in a compact monitor application.

[0007]   Another shortcoming of small sensor devices is that these devices lack the intelligence to vary the amount and type of data transmitted, depending on patient condition. Exercise heart monitors do not transmit a full patient waveform for clinical analysis while medical monitors measure and trans-

mit the full patient waveform, even when the patient is healthy. While transmitting the full patient waveform is the preferred solution from a purely clinical standpoint, such transmission requires significant power to transmit large amounts of data and restricts the design from being small and inexpensive.

[0008]   Yet another problem is that arrhythmia analysis is a computationally intensive operation not well-suited to existing small portable monitors that presently have no ability to perform arrhythmia analysis.

[0009]   Therefore, there is a need for a body worn combined physiological sensor and monitor having a disposable sensor, but used and worn by a patient as a single unit directly and non-permanently affixed to a patient's body. Also, what is needed is a physically compact resistive element for protecting a body worn device from damage caused by multiple defibrillation cycles. Also, what is needed is a medical-grade monitor that can intelligently measure and transmit data only as required to alert clinicians that the patient needs additional attention. What is also needed is a body-worn device capable of running arrhythmia analysis through computationally efficient algorithms.

### SUMMARY OF THE INVENTION

[0010]   According to one aspect, a body worn patient monitoring device comprises at least one disposable module including a plurality of electrical connections to the body. The electrical connections are coupled to a skin surface of the patient to measure physiological signals of the patient. The at least one disposable module includes a disposable module connector. The body worn patient monitoring device includes at least one internal or external power source to power the body worn patient monitoring device. The body worn patient monitoring device also includes at least one communication-computation module, having a communication-computation module connector to receive physiological signals from the at least one disposable module via said disposable module connector. The communication-computation module also includes at least one microprocessor to actively monitor the patient and to perform a real-time physiological analysis of the physiological signals and a radio circuit to communicate a raw physiological signal or a result of the physiological analysis at a predetermined time or on the occurrence of a predetermined event, via a radio transmission to a remote radio receiver, wherein the at least one disposable module is mechanically and electrically coupled directly to the at least one communication-computation module. The body worn patient monitoring device, including the at least one disposable module and the at least one communication-computation module, is directly non-permanently affixed to the skin surface of the patient.

[0011]   According to another aspect, a method of providing high voltage circuit protection for a body worn monitor comprises the steps of: providing a substrate that supports one or more electrical connections to a patient's body; determining a print pattern and thickness of a first material having a first resistivity to be printed on the substrate; determining a print pattern and thickness of a second material having a second resistivity to be printed on the substrate; printing the first

material onto the substrate; and printing the second material onto the substrate wherein at least part of the second material overlays the first material.

BRIEF DESCRIPTION OF THE DRAWINGS

[0012]  For a further understanding of these and objects of the invention, reference will be made to the following Detailed Description which is to be read in connection with the accompanying drawings, in which:

[0013]  FIG. 1A shows an exemplary body worn physiological monitor having a disposable electrode module;

[0014]  FIG. 1B shows a partially unassembled side view of the body worn physiological monitor of FIG. 1A;

[0015]  FIG. 1C shows an assembled side view of the body worn physiological monitor of FIG. 1A;

[0016]  FIG. 1D shows a bottom view of the body worn physiological monitor of FIG. 1A;

[0017]  FIG. 2 shows an exploded perspective view of an exemplary body worn physiological monitor;

[0018]  FIG. 3 shows an exploded perspective view of an exemplary computation and communication module;

[0019]  FIG. 4A shows an exemplary disposable unit flexible circuit board;

[0020]  FIG. 4B shows a partial enlarged view of a portion of the flexible circuit board of FIG. 4A, further showing an exemplary resistive trace having a fillet;

[0021]  FIG. 4C shows a partial side elevated view of a portion of the flexible circuit board of FIG. 4A, further showing an exemplary conductive surface overlaying a resistive material;

[0022]  FIG. 4D shows a partial side elevational view of the circuit board of FIG. 4A, further showing an exemplary conductive surface having a snap receptacle;

[0023]  FIG. 5 shows a block diagram of one embodiment of a body worn physiological monitor having a power source in a disposable unit;

[0024]  FIG. 6 shows a block diagram of one embodiment of a body worn physiological monitor having a power source in or connected to the computation and communication module;

[0025]  FIG. 7A shows a schematic diagram of a direct connected reference electrode used in conjunction with a body worn physiological monitor;

[0026]  FIG. 7B shows a schematic diagram of a virtual reference electrode as used in conjunction with a body worn physiological monitor;

[0027]  FIG. 8 shows a schematic diagram depicting one embodiment of an analog switching arrangement provided on a body worn physiological monitor to select a reference electrode configuration;

[0028]  FIG. 8A shows an exemplary driven lead circuit topology for use with electrodes of a body worn physiological monitor;

[0029]  FIG. 9 shows an exemplary ESIS filter circuit topology with circuit protection;

[0030]  FIG. 10 shows an alternative circuit protection to that depicted in FIG. 9;

[0031]  FIG. 11 shows a flow chart for an algorithm utilized by a body worn physiological monitor to detect whether a patient has a pace maker;

[0032]  FIG. 12 shows a circuit topology of a high pass filter useful for baseline restoration;

[0033]  FIG. 13 shows seven graphs of amplitudes plotted versus frequency to illustrate exemplary operation of the circuit of FIG. 12;

[0034]  FIG. 14 shows two exemplary positions for a body worn ECG monitor to be non-permanently affixed directly to a patient's body;

[0035]  FIG. 15 shows a block diagram of a setup for simulating the effect of patient defibrillation on resistive traces;

[0036]  FIG. 16A symbolically shows resistive dots silk screened on a tray;

[0037]  FIG. 16B shows a histogram of an exemplary resistive distribution of baked resistive dots; and

[0038]  FIG. 17 shows an exemplary ECG waveform.

[0039]  Package styling varies slightly between the drawings. Such minor differences, e.g. the case styling of computation and communication module 102, illustrate minor variations in mechanical packaging suitable for use as body worn monitors. Drawings are not necessarily shown to scale.

DETAILED DESCRIPTION

[0040]  A "body worn" device is described herein with regard to certain exemplary embodiments. A "body worn" device is defined herein as a device that is directly, but non-permanently, affixed to a patient's body. A "body worn monitor" is a device that can be directly "worn" on the patient's body as a single unit, including one or more physiological sensors and a communications and computation module to perform at least initial processing of one or more physiological measurements made using one or more physiological sensors. Unlike prior art patient-wearable devices, at least one sensor can be incorporated into the device that makes a direct or indirect (such as by capacitive coupling) electrical connection with the patient's body without the use of external wires from sensors to the device. In addition and unlike prior art heart monitors, a "body worn" monitor can be a full functioning medical grade monitor, e.g. meeting the requirements of European Unions' Medical Device Directive and other applicable industry standards, such as EC-13 for an electrocardiograph. The body worn medical-grade monitor can include a device, for example, such as a pulse oximeter, $CO_2$ monitor, respiration monitor, or can function as an ECG monitor, incorporating physiological sensors, front end analog electronic signal conditioning circuits, and a microcomputer based computation unit with wireless reporting of measured physiological data, all contained within in a "body worn" package that can be non-permanently affixed directly to a patient's body. A body-worn medical-grade monitor can also include additional measurement capabilities beyond those mentioned here.

[0041]  FIGS. 1A-1D depict various views of an exemplary body worn physiological monitor 100 having a communication and computation module 102 and a disposable electrode module 110. In this exemplary embodiment, physiological monitor 100 is designed for use as an electrocardiogram (ECG) monitor for obtaining and recording and/or transmitting ECG information, including ECG waveforms and alarms for a person, such as a patient, wearing body worn physiological monitor 100.

[0042]  FIG. 1A shows an exemplary top view of body worn physiological monitor 100. A crescent shape allows the body worn physiological monitor 100 to be placed on the chest of a patient, and more specifically around the pectoralis major, to allow measurement of lead configuration I, II, or III, or to be placed on the patient's side allowing measurement using a V-lead configuration. Though not shown, multiple body worn physiological monitor 100 units can be used to effectively provide multiple leads. By placing electrodes around the

body so that they are not situated directly atop major muscles, both motion noise artifacts and muscle noise artifacts can be prevented. Moreover, by eliminating cables, noise due to cable motion or compression (i.e. triboelectric effect) can be eliminated.

[0043]    FIG. 1B shows a side elevated view of physiological monitor 100 having an exemplary attachment mechanism, such as a retention clip 104, to mechanically attach communications and computation module 102 to the top surface of the disposable electrode module 110. Flexible printed circuit layer 101 can be made from a thin insulating material, such as according to this embodiment, a 75 micron thick layer of Mylar®. Typically electrical traces (not shown in FIGS. 1A-1D) on flexible printed circuit layer 101 can be further protected by an insulating covering, analogous to a conformal coating. A formed plastic layer or a cloth with adhesive on one side thereof can be used to cover and protect flexible printed circuit layer 101, as well as to provide an aesthetic outer layer to make the body worn monitor 100 visually appealing.

[0044]    FIG. 1C shows a side view of physiological monitor 100 in which the communications and computation module 102 has been affixed to disposable electrode module 110. FIG. 1D depicts a view of the underside of exemplary physiological monitor 100 showing one embodiment of disposable electrode module 110 having electrodes 109. In this embodiment, each electrode 109 comprises electrode gel 103 and conductive surface 404 (FIG. 4). Together, electrode gel 103 and conductive surface 404 create a half-cell, such as, for example, a Silver/Silver Chloride half cell. Also and according to this embodiment, conductive surface 404 can directly accept the electrode gel 103.

[0045]    FIG. 2 shows an exploded assembly view of the exemplary body worn physiological monitor 100. As noted with regard to FIGS. 1A-1D, the body worn physiological monitor 100 includes a removable and reusable communications and computation module 102 and a disposable electrode module 110, the later including electrode gels 103 for ECG monitoring and batteries 204 to power communications and computation module 102. A flat planar insulating/adhesive member 105 includes a plurality of openings that are each sized to receive electrode gels 103. The insulating member 105 provides a bottom side cover for the flexible printed circuit layer 101 and augments adhesion to the human body. Electrode gel 103, when attached to an appropriate substrate such as silver-silver-chloride or other substrate, can be used to establish a relatively low impedance electrical connection between conductive surface 404 (FIG. 4) and the patient's skin.

[0046]    Electrode gels 103 can adhere to a patient's skin. While electrode gel 103 is typically an adhesive electrode gel, the adhesion offered by electrode gels 103 alone might not give a sufficient holding force for non-permanently affixing body worn physiological monitor 100 to a patient. To achieve a better adhesion of body worn monitor 100 to a patient's skin, insulating/adhesive member 105 can be used to non-permanently affix body worn physiological monitor 100 to a patient. Thus, body worn monitor 100 can be applied to a patient in the same way an adhesive strip is applied, such as for example, those adhesive strips sold under the brand name "BAND-AID®". One exemplary type of foam adhesive suitable for affixing a flexible circuit board to a patient is 1.6 mm adhesive foam from Scapa Medical of Bedfordshire, UK. As shown in FIGS. 1B and 1C (although not to scale), each of the electrode gels 103 extend sufficiently below adhesive layer

105 in order to ensure good electrical connection with a patient's skin surface (not shown). Tab 106, FIG. 1A, allows for easy removal of a protective backing 111 from adhesive layer 105.

[0047]    Flexible printed circuit layer 101 can include contacts, such as battery clips (not shown), to receive and connect to batteries 204. (It is contemplated that in some future embodiments, a single battery can provide sufficient electrical power.) In the exemplary embodiment, as shown in FIG. 2, batteries 204 can be mounted under respective battery flaps 205 arranged on opposite sides of the flexible printed circuit layer 101. Alternatively, battery clips (not shown) or battery holders (not shown) can be used to provide both mechanical support and electrical connections for each of the batteries 204. One type of battery holder suitable for such use, for example, is the model 2990 battery holder, manufactured by the Keystone Electronics Corp. of Astoria, N.Y. Battery cover 107 provides protection for batteries 204 as well as a surface to press upon when applying electrodes 103 to conductive surface 404. Retention clips 104 can comprise, for example, a plurality of spring fingers with latching clips. Retention clip 104, affixed to disposable electrode module 110, can be used to secure reusable communications and computation module 102 to disposable package 110. Reusable communications and computation module 102 is herein illustrated in a simplified representation, including cover 201, communications and computation printed circuit board assembly 202, and base 203.

[0048]    FIG. 3 shows a mechanical view of an exemplary reusable communications and computation module 102, as well as a preferred method for making an electrical connection between flexible printed circuit layer 101 in disposable electrical module 110 and communications and computation printed circuit board assembly 202 situated in reusable communications and computation module 102. In this exemplary embodiment, communications and computation printed circuit board assembly 202 can include a plurality of press fit and/or soldered conductive sockets 301 for receiving electrical plug 302, the plug having a corresponding plurality of conductive pins. Each conductive pin shown in plug 302 can correspond to an electrical connection pad on flexible printed circuit layer 101. A row of mechanical sockets 303 can receive the multi-pin row of plug 302. Thus, an electrical connection can be made between each pad of flexible printed circuit layer 101 having a conductive post on plug 302 and each corresponding conductive socket 301 on communications and computation printed circuit board assembly 202. Posts 304 can align and secure each of the cover 201, communications and computation printed circuit board assembly 202, and base 203. Note that in FIG. 3, a simplified drawing of cover 201 omits slots to receive retention clip 104 to affix communications and computation module 102 to disposable package 110. A body worn monitor 100 would typically also include retention clip 104 FIG. 2, or other suitable type of mechanical clip(s), in order to provide a secure mechanical connection between communications and computation module 102 and disposable electrode module 110.

[0049]    FIG. 4A shows one embodiment of flexible circuit board 101 in an expanded (e.g. unassembled) view. Flexible circuit board 101 is formed on a substrate 406. Substrate 406 can be cut, for example, from a Mylar sheet of suitable thickness. In this embodiment, one battery 204 can be mounted adjacent to an conductive surface 404. Conductive gel 103

4

(not shown in FIG. 4) can be mounted on the exposed conductive side of a conductive surface 404.

[0050] Conductive surface 404 can also be viewed as the electrode portion of a half cell and electrode gel 103 can be considered to be the electrolyte portion of a half cell. In conventional terms of art, the combination of electrode and electrolyte and ECG electrode is typically referred to as a half cell. For example, the combination of a conductive surface 404 and an electrolyte layer (e.g., electrode gel 103) forms a half cell. For convenient quick reference to a half cell structure, the term "electrode" (assigned reference designator "109") is used interchangeably with "half cell" herein. It is understood that in typical embodiments, electrode 109 comprises conductive surface 404 and electrode gel 103.

[0051] Typically, electrodes make use of a circular or square conductive surface. Increasing the ratio of the perimeter of the surface to the area of the surface affects current density distribution and defibrillation recovery.

[0052] For convenience, we define the term "annulus" herein and throughout as the region between two simple curves. A simple curve is a closed curve that does not cross itself. Under this definition, an annulus can include substantially square shapes, substantially rectangular shapes, substantially circular shapes, substantially oval shapes, as well as substantially rectangular shapes with rounded corners. Further we include in the definition of annulus, the case of a substantially "U" shaped surface as described by a single closed curve.

[0053] One exemplary electrode gel 103 suitable for such use on a body worn monitor is type LT00063 hydrogel supplied by Tyco Healthcare of Prague, Czech Republic. Typically, a conductive surface 404 creates the electrode portion of the half-cell. By increasing the ratio of perimeter to area of the circular electrode portion of the half cell, the signal to noise ratio of the input ECG signal can be increased.

[0054] As depicted herein on the exemplary circuit layout, two batteries 304 can be connected in series, with one polarity being made available at connection pad 407 from battery connection 402, battery connection 401 creating the series connection between the two batteries, and connection pad 410 providing the second polarity of the series connected batteries. Note that in some embodiments, a single battery alternatively may be used in lieu of the exemplary arrangement or two batteries can be also wired in parallel, depending on the voltage requirements of a particular communications and computation module 102.

[0055] Connection pads 408 and 409 electrically couple the signals from electrode gels 103 (not shown in FIGS. 4A-4D) via conductive surface 404 and resistive traces 412 to electrical plug 302 (not shown in FIGS. 4A-4D). Electrode contact pad 405 can be connected via resistive trace 413 to connection pad 411 to provide a direct-connected reference electrode (not shown in FIGS. 4A-4D). Traces 412 extending between conductive surface 404 and connection pads 408 and 409 and trace 413 extending between conductive surface 405 and connection pad 411 can be made from resistive materials including resistive metals, carbon, silver ink, powders, paints, or other material of determinable electrical resistance.

[0056] Resistive traces on flexible circuit board layer 101 replace the bulky power resistors needed by prior art monitors, having electrodes or sensors connected by wires or leads. These resistive traces should survive multiple defibrillation cycles such that body worn monitor 100 remains functional even after one or more attempts to re-start a patient's heart. In order to survive defibrillation, the resistive traces should dissipate that portion of the potentially damaging defibrillation energy that is coupled into the monitor. This fractional portion of the defibrillation energy typically enters body worn monitor 100 from electrodes 109, FIG. 1D (electrodes 109 including conductive surface 404 and electrode gel 103).

[0057] It is desirable that the resistances of the protective resistive traces be in a range between about 1 kilo ohm to about 10 kilo ohms. Below 1 kilo ohm, depending on the resistive material used, it can be more likely that the resistance of the resistive traces 412 and 413 will increase with each successive defibrillation pulse. Above 10 kilo ohms, a high resistance impairs the signal to noise ratio, specifically due to thermal noise, which has a mean square value of $4*k*T*R*BW$, where "k" is Boltzmann's constant, "T" is temperature measured in degrees Kelvin, "R" is resistance in ohms, and "BW" is bandwidth, in Hz, which becomes significant relative to the EC-13 requirement that the noise referred to input be less than 30 μV peak-to-valley.

[0058] Power dissipation in the herein described traces can be calculated by $E^2/R$, in which E refers to the potential across the trace and R is the resistance of the trace. R can be calculated by $\rho*L/A$, where $\rho$ is the resistivity of the material used to form the trace, L is the length of the trace, and A is the cross-sectional area of the trace.

[0059] In developing resistive traces for use on a flexible printed circuit layer 101, typically formed on a Mylar substrate 406, such as shown in FIG. 4A, various materials were tested. Silver, including silver inks, while useable, was found to be less desirable, because it was difficult to achieve sufficiently thin silver traces on Mylar to achieve high enough resistances. Carbon, including carbon pastes and carbon inks, was also tried and found to be suitable. In order to use carbon however, several additional problems had to be solved. At 1 kilo ohm, the power dissipated by the resistors caused them to degrade across multiple defibrillation cycles. The solution was to make carbon traces in the range of about 8 to 10 kilo ohms. 10 kilo ohm resistances proved to be a good compromise between noise levels, power dissipation by the resistors, and manufacturing tolerances for depositing carbon ink on a Mylar substrate to dissipate the power from multiple defibrillation cycles. To achieve the desired resistance of about 10 kilo ohms (interchangeably represented herein as "10 k" or "10 kΩ"), for a given resistivity of the carbon paste, and given trace width and thickness (height), the length of the trace is then defined. In some cases, such as for traces 412, the length needed for a trace run, as between conductive surface 404 and connection point 409, might be longer than the length defined for a particular trace resistance (typically 10 k). In this case, traces can be extended by lengths of silver conductive traces. There can be a short overlay distance, on the order of 5 to 10 mm, in which a silver trace overlaps the carbon trace to provide a more robust connection between the resistive and conductive portions of the traces. Where overlap is used, the overall length of the resistive portion can be adjusted slightly to maintain the desired overall resistance.

[0060] Another problem associated with carbon traces was arcing at the interface between the carbon and conductive traces. Arcing was particularly problematic at the abrupt connection between the carbon trace and conductive surface 404. Arcing was also observed to occur between the end section of the carbon trace and conductive surface 404. (Electrode gels 103 create the conductive path to the patient through conductive surface 404 and a layer of conductive gel.)

5

[0061] According to one solution to the above noted arcing problem, as shown in FIG. **4**B, a rounded (fillet) section **430** of carbon trace can be added at the interface to conductive surface **404**. A fillet or "tear drop" shape causes the carbon trace to become gradually wider as it connects to conductive surface **404** and relieves the electrical potential stress at the interface.

[0062] An alternative solution to the arcing problem is shown in FIG. **4**C, wherein carbon can be laid down beyond the trace (**412**) to include a pattern of conductive surface **404** formed from carbon. A carbon annulus pattern can be deposited before the conductive surface **404** is deposited. Conductive surface **404** can then be deposited as an overlay over the earlier formed carbon annulus shape. Finally, conductive gel **103** can be attached to the conductive surface layer (the carbon layer residing between conductive surface **404** and the Mylar substrate used as flexible circuit board **101**). Both of the aforementioned arcing solutions can be used together. It should also be noted that conductive surface **404** can be formed from suitable materials other than silver, including, for example, materials such as silver chloride.

[0063] Arcing can also occur between the resistive traces and other (typically silver) conductive traces on the flexible circuit board **101**. Trace to trace arcing can be suppressed by allowing sufficient spacing between the traces. Generally a minimum spacing of about 3 mm/kV, as required by ASNI/AAMI DF80:2003 57.10 BB, has been found to be sufficient to prevent trace to trace arcing from a defibrillation event. Closer trace spacing, as close as 0.01 mm/kV, can be employed successfully by first applying an insulating dielectric layer, similar to a conformal coating, over the surface of flexible circuit board **101** that covers most of the substrate and traces. The insulating dielectric layer can be prevented from forming or adhering to conductive surface **404**, such as by use of a mask during application of the insulating layer.

[0064] In an alternate embodiment, as depicted in FIG. **4**D, a snap device can be added to conductive surface **404** to accept a manufacture snap-on electrode (not shown), such as, for example, the ConMed Cleartrace line of ECG electrodes including the model 1700 Cleartrace electrode manufactured by the ConMed Corp. of Utica, N.Y. or similar type electrodes made by the 3M Corp. of St. Paul, Minn. When designed to accept a snap-on electrode, the conductive surface **404** is typically smaller than in the previous embodiment. A receptacle snap **432** for receiving the commercial snap-on electrode can be inserted by any suitable method, such as by press fitting or other fastening method, into conductive surface **404**, typically also penetrating through substrate **406**. In this embodiment, arcing can be similarly suppressed in this embodiment by adding a fillet to the carbon-conductive surface interface and/or deposing a conductive surface **404** over a carbon layer as previously described.

[0065] Example: Resistive traces and an annulus were tested on a substrate formed from CT3 heat stabilized treated polyester (75 microns thick), such as manufactured by the MacDermid Autotype Corp. of Schaumburg, Ill. Resistive traces were silk screened onto the substrate using 7102 carbon paste conductor from the DuPont Corporation of Wilmington, Del. The carbon paste conductor was deposited through a 43T silk screen mesh. The substrate containing the paste deposit was then cured inside a fan assisted air circulated oven at 120° C. for a period of 5 minutes. The traces formed were about 55 mm long and 2 mm wide, having an overall thickness of about 7.5 microns. The initial measured resistance of each trace was about 14 kilo ohms. After each trace was subjected to 3 defibrillation cycles, the measured resistance increased to about 15 kilo ohms. Over a 3 mm length, the trace widens to about 5 mm, terminating into a carbon annulus with an outer diameter of about 20 mm and an inner diameter of about 10 mm. A silver layer of PF-410 silver ink from the Norcote Corp. of Eastleigh Hampshire, UK was then deposited over the carbon annulus, also to an overall thickness of about 7.5 microns. The deposition of the silver layer was via the silk screen printing method, in which a 90T silk screen mesh was used. The substrate containing the deposited silver ink was then cured inside a fan assisted air circulated oven at 120° C. for a period of 15 minutes. A third dielectric insulating layer comprising SD2460, components A & B (dielectric and hardener), manufactured by Lackwerke Peters GmbH+Co KG of Kempen, Germany, and having a thickness of approximately 13 microns was then deposited over the traces and substrate, but not over the annulus. (The electrodes were formed by attaching a conductive gel to the annulus. The conductive gel used was LT00063 hydrogel from Tyco Healthcare of Prague, Czech Republic.) Again, the silk screen printing process was used to deposit the dielectric layer through a 90T screen mesh. The substrate was placed again into a fan assisted air circulated oven at 120° C. for a period of 30 minutes.

[0066] Example: Silver traces for use as conductive (not resistive) traces on a body worn monitor circuit substrate were formed from a silver paste that was silk screened onto a Mylar substrate. 45 mm long traces had a measured resistance in a range of 3.5 to 6 ohms, 75 mm traces had a measured resistance in a range of 6.5 to 13 ohms, and 105 mm traces had a measured resistance in a range of 10 to 16 ohms. The deposition of the silver layer was performed via the silk screen printing method in which a 90T silk screen mesh was used. The substrate containing the deposited silver ink was then cured inside a fan assisted air circulated oven at 120° C. for a period of 15 minutes.

[0067] FIG. **15** diagrammatically depicts an exemplary test setup used to simulate the effect of a patient defibrillation on resistive traces. Defibrillator **1501** was used to apply multiple defibrillation shocks of 360 Joules each to the 100 ohm resistor **1502**. The 100 ohm resistor according to this setup simulated a patient's body. Note that most of the defibrillation energy goes into the patient's body by design, to restart the patient's heart. Resistive traces **1503** and **1504** were wired across resistor **1502**, also as shown in FIG. **15**, in order to simulate the electrical circuit that would be formed between the resistive traces in a body worn monitor situated on a patient undergoing defibrillation. Neon bulbs **1506** were used as part of the protection circuitry that can be used with resistive traces in a body worn monitor. 400 ohm safety resistor **1505** was present as a precaution to limit short circuit current in the event of a test setup failure. Both the 100 ohm resistor (simulating human skin resistance) and the 400 ohm safety resistor were used in accordance with medical specification AAMI EC-13. Following 3 defibrillation shocks of 360 Joules each, the measured resistance of the 10 k carbon track changed from 10 k to 11 k following the first shock, to 13.1 k following the second shock, and to 13.2 k following the third shock. The measured resistance of the 9.7 k trace changed from 9.7 k to 11.6 k following the first shock, to 13.0 k following the second shock, and finally to 13.2 k, following the third shock. In a subsequent related test, the 100 ohm resistor was replaced by a closer simulation in the form of a

6

fresh (dead) chicken. The setup otherwise remained the same as shown in FIG. **15**. In this case, the resistance as measured on each of the test resistive traces changed from 10.7 k to 10.25 k, and from 8.5 k to 9.4 k, following multiple defibrillations. During testing, it was also noted that the change in measured resistance of the resistive traces was generally consistent. It was also noted that as a given resistive trace was increased, the (delta R {caused by defibrillation}/R {net trace resistance}) can be minimized.

[0068] The screen printing technique for laying down resistive traces was further investigated by printing a plurality of small carbon resistive dots **1601** of about 20 mm in diameter using a 7102 carbon ink applied by a screen printer (not shown). The carbon dots **1601** were laid out on a tray **1602** as shown in FIG. **16**A, for baking in an oven. A manually operated squeegee (not shown) was used to apply the resistive dots **1601** to the tray **1602** through a mask (not shown). It was determined that control of thickness during application was one important factor for controlling the distribution of resistance. It was noted that during manual application, the variation of resistance depended upon the distance between the plurality of dots **1601** and the person applying the resistive paste, and that the pressure applied using the squeegee could also affect the final resistance by a factor of two. It was further noted that "even" heating across the tray **1602** was advantageous during oven drying, although this factor was found to have less effect on the final dot resistance distribution. A resistance distribution of the baked and measured dots **1601** is shown in the histogram of FIG. **16**B. This testing indicated that production traces laid down on a substrate, such as Mylar, for use in a body worn monitor should preferably be printed using a semi-automatic screen print process, such as by a screen printing mechanical roller process. A digital multimeter ("DMM") with probes placed at each edge of a dot **1601** was used to measure the resistance from one edge of the dot to the other. It was found that uniform application of ink was important to keeping a tight distribution of resistance, with even heating having a smaller influence on the distribution of the resistance of the test dots. Since a trace with too low a resistance has a greater ΔR/R, and higher probability of failing and very high resistance traces result in worse S/N ratio, it is important to have a reasonably tight tolerance on the trace resistance.

[0069] FIG. **5** shows a block diagram representative of one embodiment of the body worn physiological monitor **100**. Physiological sensors **501** (such as electrodes **109** in FIG. **1**D) can be electrically coupled to electromechanical connector **502** (as by the resistive traces **412** shown in FIG. **4**). Connector **502** serves to electrically couple communications and computation module **102** to a disposable electrode module **110** (FIG. **2**). Secondary connector **503** can also electrically couple one or more additional sensors, which can be situated both on and off of disposable electrode module **110**, to electromechanical connector **502** for electrical coupling along with physiological sensor signals **501** to communications and computation module **102** (shown in FIG. **1**) via electromechanical connector **505**. Signals received by the communications and computation module **102** can be electrically coupled into communications and computation module **102** via electronic protection circuits **506** and/or filters, such as ESIS filters **507**.

[0070] Signals can be limited or clipped in amplitude, as needed, by protection circuit **506**, and filtered by filter **507**. One or more analog amplifiers **508** can be used to amplify the amplitude limited and filtered signals. In the exemplary body worn ECG monitor, amplifiers **508** can advantageously be differential amplifiers to amplify the difference signal (e.g. the ECG "vector") between two ECG electrodes. The electrical output of amplifiers **508** can be electrically coupled to both PACER circuits **509** and ECG circuits **510**. PACER circuits **509** are described further below. ECG circuits **510** perform several functions, including "trace restore", low pass filtering (anti-aliasing), high pass filtering, and amplification (gain). Low pass filtering filters signals according to the Nyquist criterion to avoid aliasing later when the signals are digitized by analog to digital converter (ADC) **516**. The high pass filter causes the input to be AC coupled from a roll off frequency of about 0.05 Hz, as specified by industry ECG standards. Gain is required to cause the small pre-amplified potentials from physiological sensors (such as electrodes **109**) to more closely match the available dynamic range of the digitizing ADC **516**. Note that ADC **516** can be a dedicated ADC chip or can be included in a microcomputer integrated circuit, such as a microcomputer serving as microprocessor **512**.

[0071] A microprocessor, such as microprocessor **512**, is defined herein as synonymous and interchangeable with the terms "microcomputer", "microcontroller", and "microprocessor". Such microprocessors are also interchangeably represented herein as "μP" or "μC". Further, any microprocessor disclosed herein can be replaced by any integrated device that can perform the function of a microprocessor, such as, but not limited to, a field programmable gate array ("FPGA") programmed to perform the functions of a microprocessor.

[0072] Typically, one or more differential amplifiers can be dedicated to particular difference voltages associated with physiological sensors **501** or **504**, but it should be noted that one or more amplifiers **508** can also be multiplexed by techniques as known in the art, to serve multiple physiological sensors using a lesser number of amplifiers. Similarly, one or more ADCs **516** can serve two or more signals from physiological sensors **501** or **504** using techniques such as multiplexing in time that is digitizing one physiological sensor difference signal at a time sending a digital result to a next stage one after the other. ECG circuits **510** and PACER circuits **509** are referred to in the plural, since there can be individual circuits for each measured physiological signal, such as for each measured ECG vector.

[0073] Electrical power from power source **515** can be regulated by regulator **514** and distributed as regulated voltage **517** to most function blocks (as represented herein by the label "POWER"). Each of these function blocks also has a control ("CTRL") input **511** from microprocessor **512**, allowing these circuits to be disabled, when not needed, in order to save battery power. When viewed over time, most of the ECG waveform does not contain useful information since there is significant "dead time" between heart beats. Therefore, for example, from the end of a "T wave" at the end of one heart beat to the beginning of a "P wave" at the beginning of the next heart beat, circuits can be powered down (in a device "sleep mode") to save on the order of 60% of the energy stored in the power source that would have otherwise been used during this dead time.

[0074] FIG. **17** shows an exemplary ECG waveform. In brief, the P wave can be related to the electrical current causing atrial contraction. The QRS complex can be related to ventricular contraction of the left and right ventricles. The Q wave can be related to electrical current traveling through the

7

intraventricular septum, while the R and S waves can be related to the ventricles contracting. The T-wave is due to the re-polarization of the ventricles. Usually, atrial re-polarization occurs atop the QRS complex, and being much smaller than the QRS complex, is not seen. The ST segment connects the QRS complex to the T-wave. Irregular or missing waves may be indicators of cardiac issues including: ischemic tissue, e.g. due to myocardial infarction, bundle branch block, atrial problems (specifically P-wave abnormalities), pericarditis, and electrolyte disturbance.

[0075] Generally, power source **515** can include one or more "button" cells typically disposed on disposable electrode module **110**; however, the block diagram of FIG. **6** shows an embodiment of a body worn physiological monitor **100** where power is supplied by a power source located on, or connected to communications and computation module **102** instead of residing within disposable electrode module **110**.

[0076] Beyond power saving considerations, it can also be desirable in some embodiments of body worn physiological monitor **100** to put the microcontroller and/or other circuits, including particularly digital circuits, into a sleep mode during an ADC conversion cycle to minimize pickup of self generated electrical noise and to minimize power use. Preferably, the A/D circuit can acquire multiple samples and buffer the samples, before awakening the microprocessor, which then can batch-process the data. Buffering can be set to match the patient's heart rate, as there is no significant clinical benefit to acquiring every sample as it is taken.

[0077] Turning back to the input circuits, typically amplifiers **508** are differential or instrumentation amplifiers useful to selectively amplify desired difference signals between connector terminals (such as an ECG vector), while rejecting common mode signals (such as interfering signals that appear simultaneously on both connector terminals). Beyond using a differential amplifier, other techniques can be advantageously used to further reduce common mode pickup (CMR) and thus to improve the common mode rejection ratio (CMRR) of the input amplifier stages of body worn physiological monitor **100**. CMR is of particular concern with regard to body worn physiological monitor **100** because of the proliferation of potentially interfering electromagnetic fields, such as from 50 Hz or 60 Hz AC power line distribution throughout a hospital. For example, many fluorescent ceiling lamp fixtures generate strong 60 Hz alternating current (AC) electromagnetic fields that can appear as common mode signals on physiological sensors **501**, such as ECG electrodes **109**.

[0078] FIG. **7A** shows one embodiment in which body worn physiological sensor **501** comprises a plurality of ECG electrodes **109** and **701**. Two electrodes **109** generate an ECG difference potential for patient **703**. A third electrode, reference electrode **701** can be electrically coupled to electronics common **704** (or other potential level) and can be used to improve CMR. In this embodiment, the electronics common **704** (shown as the negative terminal of the battery in FIG. **7A**) can be directly tied to the patient in the vicinity of electrodes **109**. Thus, the electronics common of the electronic circuits in communications and computation module **102** can be made to more closely follow any change in potential in the vicinity of electrodes **109**. Reference electrode **701** can be particularly helpful to ensure that inputs **109** remain within a reasonably narrow common mode range, such as by reducing a 60 Hz potential that would otherwise appear to move the electronics common **704** at 60 Hz with respect to electrodes **109**.

[0079] In another embodiment as shown in FIG. **7B**, virtual electrode **702** performs a similar function as previously described with regard to reference electrode **701**. In this embodiment, instead of creating a DC-coupled reference electrode, electrode **701** is replaced by the capacitive coupling between flexible printed circuit layer **101** and the patient **703**, resulting in a virtual electrode **702** with an AC coupled common. Such AC coupling increases with decreased distance between flexible printed circuit layer **101** and the patient and can advantageously reduce 60 Hz common mode signals (AC signals).

[0080] In yet another version of a directly connected electrode **701**, as shown in FIG. **8A**, electrode **701** can be actively driven by an electrical output from communications and computation module **102**. Typically, an operational amplifier (OpAmp) or other type of amplifier can be used to create a "driven lead". Driven lead circuits can be used to further improve CMR over passive electrodes **701** as shown in FIG. **7A**. An exemplary circuit suitable for use to drive an electrode **701** is shown in FIG. **8A**. Amplifiers (OpAmps) **810** and **811** buffer the high impedance signals from electrode **1** and **2** (exemplary electrodes **109**). Difference amplifier **508** conveys the difference signal (such as an ECG vector) as previously described. The two 10 kilo ohm resistors provide an average of the common mode signals appearing simultaneously at the inputs of buffer amplifiers **810** and **811**. The inverting low pass filter built around OpAmp **812** inverts the averaged common mode pickup signal (at electrodes **1** and **2**) and applies that signal out of phase (180 degree phase shifted) to a directly connected driven electrode (such as electrode **701**). By applying the average common mode signal to the driven electrode, amplifier **812** effectively suppresses common mode signals at electrodes **1** and **2** within the effective bandwidth of the negative feedback loop by active noise cancellation. In theory, a virtual electrode **702** could be similarly driven, but the voltage requirements to drive a capacitively coupled common electrode are high enough to make a "driven virtual electrode" a less practical option. Thus, it can be seen that a reference electrode can be a passive connection or an actively driven connection.

[0081] It can also be desirable to have more than one CMR technique available. For example, in a low noise environment, a lower power reference electrode might be used for CMR. Then if the noise increases to a level where the reference electrode provides insufficient CMR, the body worn monitor can switch to a driven lead more suitable for CMR in a high noise environment. In this embodiment, a particular CMR configuration can be selected by electronic switching. FIG. **8** shows one such exemplary switching block represented as reference electrode switch **801**. Microprocessor (μP) **512** can control reference electrode switch **801** to select direct connected electrode **701**, virtual electrode **702**, or directly connected electrode **701** additionally driven by a driven lead circuit **802**. It should also be noted that in the embodiment of FIG. **8**, when virtual electrode **702** provides sufficient CMR, electrode **701** can be used as a third electrode, thus allowing body worn monitor **100** to simultaneously measure two different heart vectors.

[0082] FIG. **9** shows one embodiment of an exemplary defibrillation protection circuit (**506**) and ESIS filter **507**. As shown in FIG. **9**, electrodes **109** can be connected via input resistors R**91** and R**92**. Gas discharge tubes, such as neon bulbs L**1** and L**2**, can be used for over voltage protection by firing at a designed voltage to prevent large potentials from

8

appearing at the input leads to amplifier **508**. The gas discharge tubes can be disposed on either disposable electrode module **110** or on the communication and computation module **102**. Defibrillation protection resistors R**91** and R**92** can further reside in disposable electrode module **110**, such as in the form of the resistance of traces **412**.

[0083] ESIS filters **507** can be used to satisfy AAMI standard EC13 on Electrosurgical Interference Suppression (ESIS). Standard EC13 addresses the ability of an ECG monitor to display and process ECG signals in a satisfactory manner while connected to a patient on whom an electrosurgical device is being used. Without such suppression, the high RF output of an electrosurgical device can render ECG monitoring impossible and or render the monitor unusable. Resistors R**93** to R**98** and capacitors C**91** to C**96** form cascaded low pass filter sections (e.g. R**93**-C**1**). Three cascaded single pole filters are shown on each input leg of amplifier **508** as an example; more or less stages can also be used. It is also not necessary for each section of the cascaded filter to have identical values or roll off points in the frequency domain to create a specific response, e.g., Bessel, Chebychev, or other filter response known to those skilled in the art. Also, ESIS filters are not limited to cascaded single pole filters and can take other forms as known in the art.

[0084] Test circuit **906** can provide a relatively sharp transient signal for testing the PACER circuit described below as part of a body worn monitor **100** "power on self test". Resistors R**99** and R**100** can pull the output of the differential amplifier **508** allowing the microcontroller (**512**) to detect which electrode, if any, has detached, much as a "lead failed" detection is accomplished by ECG monitors having leads. Body worn monitor **100** does not use leads, but it is still possible for one or both of the physiological sensors to move free of a patient's body. Such disconnects can occur in situations in which body worn monitor **100** partially moves away from the body to which it is non-permanently affixed. The input impedance at one or both of the electrodes **109** changes in a sensor off (sensor disconnect) event. When a patient is attached, amplifier **508** typically has an output voltage of near zero volts. However, if one of the electrodes **109** comes off, resistors R**99** or R**100** cause the output of amplifier **508** to move to a most positive output ("positive rail") or to a most negative output ("negative rail"). Note that the negative rail can be a small voltage near zero, in the case of single supply circuit operation, and that both inputs could be pulled to the same rail. Lead-fail detection can also be analyzed to determine when the device is attached to the patient and then to automatically enter full operational mode. Such analysis can be done at a low frequency.

[0085] The ESIS filter **507** also can cause a stretching in the time domain of a pacer pulse so that the event is recorded by at least one sample, even though the pacer pulse itself is of small duration compared to the ADC sample rate and the pacer pulse is likely to occur between samples.

[0086] FIG. **10** shows an alternative circuit to accomplish over voltage protection, such as is required during defibrillation. In FIG. **10**, diodes **1001** prevent the electrode potentials from going much more than one diode voltage drop above Vcc or below ground and resistors R**91** and R**92** limit current. Using circuit protection, such as gas discharge tubes L**1** and L**2** (FIG. **9**) and/or diodes **1001** (FIG. **10**) combined with resistances R**91** and R**92**, typically in the form of resistive traces **412**, a body worn device can survive multiple defibrillation cycles of at least 360 joules.

[0087] PACER circuit **509** detects pacemaker pulses. One reason to detect a pacemaker is to prevent the ECG circuitry from inadvertently registering the regular pulses from a pacemaker as an actual heart rhythm. Separation of a pacemaker signal from signals generated by the heart is important both to generate accurate ECG analysis results as well as to correctly detect the absence of an actual heart rhythm. For example, a pacemaker continues to function even where a human heart has completely failed.

[0088] A pacer event (pacemaker signal) is typically a narrow pulse typically less than 100 microseconds wide. Because of the capacitance between the pacer in a patient and an ECG circuit, an otherwise relatively square pacer pulse as administered at the patient's heart by a pacemaker, can appear to an ECG monitor as a pulse with a negative undershoot and an exponential return to zero that could inadvertently mimic a QRS signal. A pacer signal, however, can be recognized by an analog differentiator and alert microprocessor **512** to the presence of a pacer and to disregard the refractory period of the corresponding R-C recovery due to the pacer signal. The pacer detection circuit or PACER circuit can generate a microprocessor interrupt to inform the microprocessor that a pacer event occurred and to mark a corresponding physiological signal in time as related to a pacer event. PACER circuit **509** can also cause one or more pacer related circuits to automatically power down for power saving, where it is determined that a patient is not using a pacemaker.

[0089] FIG. **11** shows an algorithm useful to determine if the pacer circuit should be enabled. A typical PACER detection circuit uses a significant percentage of the energy available from a power source such as batteries **204**. If a PACER signal is not detected, such as at power up of body worn monitor **100**, the pacer circuit can be automatically disabled allowing for a longer battery life. Since typical PACER circuits can use several amplifiers (OpAmps), they can consume up to one third of the analog power, therefore securing the PACER circuits when they are not needed (i.e. the patient does not have a pace maker) can cause a significant improvement in battery life. The algorithm also can also provide checks to determine if a demand type pace maker begins operation (which might be inactive at power up of body worn monitor **100**) by analyzing beat variability. While it can be advantageous to have the body worn device automatically sense the presence of a pacemaker and to enable the PACER detection circuit, the choice as to whether to enable or disable the PACER circuit can also be done by externally configuring the body worn device. Such external configuration can be done through a hardwired communication connection cable or via communications and computation module **102**, in which communications and computation module **102** is a two-way radio transceiver communication device capable of receiving a configuration command sent for a remote radio transceiver. The radio could be 802.11 compliant, but generally would use a lighter-weight (simpler) protocol that can be more energy efficient. A suitable lighter weight protocol could be proprietary, or standards-based, such as ZigBee or Bluetooth. A body worn physiological monitor **100** is particularly well suited for use in hospital environment as part of an integrated wireless monitoring network. The details of such monitoring networks are disclosed in U.S. patent application Ser. No. 11/031,736 entitled, "Personal Status Physiological Monitor System and Architecture and Related Monitoring Methods", which is incorporated by reference herein in its entirety.

9

[0090]    FIG. 12 shows a high pass filter (HPF) suitable for use in ECG circuits block 510. An advantage of a 0.5 Hz HPF is faster recovery from DC offsets due to patient movement, defibrillation, electrocuatery, etc. However ST segment analysis is negatively impacted if HPF cutoff is greater than about 0.05 Hz. Thus, it is preferable to have the ability to change between a 0.5 and 0.05 Hz cutoff frequency. The high pass filter of FIG. 12 is implemented by a low pass filter configured as an inverting amplifier in a negative feedback circuit to give a net effective high pass transfer function from circuit input to output. The corner frequency of the composite filter can be adjusted by switching in resistor R2'. Alternatively, S1 can be switched at a periodic rate to place a duty cycle on C. Note that the frequency of switching of SI should be fast with respect to the corner frequency of the anti-aliasing low pass filter. The graphs A-D of FIG. 13 further illustrate the performance of the exemplary filter of FIG. 12. These graphs show normalized amplitude on the vertical axis plotted against frequency on the horizontal axis. FIG. 13, graph A represents a raw input signal. FIG. 13, graphs B and C are Bode Plots representing the high and low-pass filter sections. After applying filter responses B & C to input Data A, filtered data D is the result. The HPF cutoff can be 0.5 Hz or some lower value depending on whether R2' is switching in or if C is duty cycled.

[0091]    Another method to achieve this frequency change is to use digital filters implemented on Microprocessor 512 to reverse the effects of the 0.5 Hz HPF, then implement a digital HPF at a lower cutoff frequency, 0.05 Hz, for example. The response of the 0.5 Hz filter should be known to implement the inverse filter. This response can be measured using microprocessor 512 to trigger the test circuit 906 to create an impulse, H(s). The inverse response is the [1-H(s)] (FIG. 13, graph E) and this inverse filter can be digitally implemented by methods familiar to those skilled in the art. H'(s) is the frequency response of the new HPF with lower cutoff frequency, nominally 0.05 Hz. The digital filter for H'(s) is digitally generated (F) and applied along with [1-H(s)] (FIG. 13, graph E), resulting in the frequency response displayed in FIG. 13, graph G. A high pass filter suitable for use in ECG circuits block 510 can be implemented in full or in part by software that can run on microprocessor 512.

[0092]    FIG. 14 shows how a body worn monitor 100 configured as an ECG monitor can be situated on a patient in at least two different orientations to measure different heart vectors. A primary heart vector is measured by orientation from the patient's right shoulder to the left hip, as shown by position 1401. An alternative position 1402 can be more suitable where there is injury or where patient anatomy is such that it causes the preferred position 1401 to be less desirable. Also, body worn monitor 100 can be affixed to the side of patient 703 (similar to a measurement made by a conventional ECG "V" lead) or back of a patient 703 (such as where a patient needs to sleep on their stomach) to monitor still other ECG vectors (not shown). In effect, a body worn monitor 100 can be placed to pick a particular vector that can be traversed by the electrodes 109. For example at least the first three primary heart vectors, i.e. I, II, and III, can be made conveniently available in this manner.

[0093]    While illustrated with an internal battery, it is important to note that a body worn physiological monitor, 100 can be powered by either an internal power source only, an external power source only, or by an internal or an external power

source. An internal power source can be a renewable power source, such as a rechargeable battery.

[0094]    Another type of internal power source is a Peltier device operated in reverse, also called a Seebeck device. Seebeck discovered that a conductor generates a voltage when subjected to a temperature gradient. Thermoelectric couples are solid-state devices capable of generating electrical power from a temperature gradient, known as the Seebeck effect. (By contrast, the Peltier effect refers to the situation where electrical energy is converted into a temperature gradient.) A Seebeck device "couple" consists of one N-type and one P-type semiconductor pellet. The temperature differential causes electron flow from hot to cold in the N-type couple and hole flow from hot to cold in the P-type couple. To create an electromotive force (EMF), the following connections are made: On the cold side (i.e. the side that is exposed to room temperature) the pellets are joined and on the hot side (i.e. the patient side), the pellets are connected to a load, such as the computation and communication module 102. The open circuit voltage of a Seebeck device is given by $V = S \Delta T$, in which S is the Seebeck coefficient in volts/° K and $\Delta T$ is the temperature difference between the hot and cold sides. It is a challenge today to completely power the computation and communication module 102 from a Seebeck device that is of the same size as the computation and communication module 102. Presently, a Seebeck device may only provide supplementary power, but as electronics migrate toward lower power and Seebeck coefficients and thermocouple densities improve, a Seebeck device can be a viable long-term power solution for a patient-worn monitor. Other methods of generating energy, such as mechanical (as is used in some wrist watches) and solar, can also be viable methods for providing a renewable self-contained power source for a body worn monitor.

[0095]    Turning to analysis routines suitable for use on a body worn monitor, typically, ECG beat picking, such as by using wavelet or Fourier transforms and/or matched filter analysis in the time domain can be computationally expensive. Modeling the QRS pulse as three triangles with alternating polarities creates a rough matched filter for the QRS pulse. Taking the second derivative results in impulse functions at the peaks of the triangles (where the first derivative is discontinuous), and all other points are zero. The second derivative method also makes the convolution with incoming data extremely efficient as most of the multiplies have a 0 as the multiplicand and requires minimal computation. The result can then be integrated twice to produce a matched-filter output, which can be fed into the beat-picking algorithm that provides fiducial marks. Using a second matched filter that is sinusoidal in shape and with appropriate discriminators, the system can provide indications of Life Threatening Arrhythmias (LTA); that is, Asystole, Vfib, and Vtach. While the accuracy of this system is less competitive with a high-end Arrhythmia solutions such as those provided, for example, by Mortara, the filters can be tuned to err toward false positives and upon a positive LTA response, activate transmission of full waveforms.

[0096]    Research has also shown that analysis of the R-R portion of the ECG waveform interval statistics can provide a method to predict atrial flutter. Applying this and other low-computational cost methods can allow a body worn monitor device to begin transmitting full waveforms for either clinical or algorithmic analysis by a more powerful engine, when the probability of other arrhythmias is high. Transmitting only

the R-R intervals of ECG waveforms is an example of a lossy data compression method. R-R intervals comprise a string of data and the string of data can also be compressed. Lossless or lossy data compression of the entire waveform can be implemented to save battery life, including not transmitting (or perhaps not even sampling) data between the T and the P wave. Because data compression results in less data to transmit, the power saved may offset the computation cost of the data compression.

[0097] While we have referred often to ECG applications herein, the application of low-intensity computational methods as a power saving measure apply equally well to other types of low power-sensors, including, but not limited to EEG, SPO$_2$, temperature, and invasive or non-invasive blood pressure measurements. Whether the body-worn medical-grade monitor performs complex analysis or simply compares a single numeric value to a single numeric limit, the device can function in a low-power radio state until a predetermined threshold is exceeded. A body worn monitor can also periodically send data or send data upon external request. Additionally, external devices can send commands to modify the operating parameters and thresholds.

[0098] Turning to other communication matters, it may be that adverse events occur in which no uplink is available. In a case of no uplink (failed communications), the body worn monitor can buffer time-stamped waveforms corresponding to any adverse events. The buffers can also store waveforms for later analysis in which this storage is triggered by the patient when the patient recognizes a condition, such as chest pain. In the case of an alarm that occurs when there is no uplink, alarms can be configured to be latched until confirmed by a clinician. Preferably, non-continuous data are marked (time stamp, sample number) to allow correlation of non-continuous data with continuous data and data are also marked to indicate when an alarm was initiated for later data analysis, including algorithm performance analysis.

[0099] In those instances in which many body worn monitor devices are used in close proximity to one another, there can be concern that the reports from one body worn monitor might be interchanged with reports from another body worn monitor. The body worn monitor presented herein, can be configured with a patient context (i.e. name, room number, patient ID, age, etc) and can maintain that context for as long as the monitor is connected to the patient to avoid such problems. The body worn monitor can determine the status of its connection to the patient via a continuous vital signs monitor, pressure, temperature, galvanic response, or similar input. Upon detection of a loss of connection with a patient, the device can, depending upon different variable settings, either erase the patient context or when re-connected to the patient, require the care giver to confirm the patient context. When the body worn monitor is initially powered up or connected to a patient, it can have a time holdoff for alarms to prevent false alarms (e.g. low heart rate, lead-fail detection) while the system stabilizes.

[0100] Regarding firmware updates, where there are large numbers of body worn monitors in a hospital, it can be problematic to keep them all updated with the latest version of firmware. One solution to this problem is to provide a wireless update ability for downloading and installing new firmware and/or configurations into all of the body worn monitors.

[0101] While the present invention has been particularly shown and described with reference to the preferred mode as illustrated in the drawings, it will be understood by one

skilled in the art that various changes in detail may be effected therein without departing from the spirit and scope of the invention as defined by the following claims. It is further understood that several aspects of the invention, including, but not limited to, defibrillation protection resistors, pacer detect circuit disabling, methods for ECG signal high pass filtering, and various other low power modes are not limited to body worn monitors, and can be used in ECG monitors of any type.

We claim:

1. A body worn patient monitoring device comprising:

at least one disposable module including a plurality of electrical connections, the electrical connections couplable to a skin surface to measure physiological signals, the at least one disposable module including a disposable module connector;

at least one internal or external power source to power the body worn patient monitoring device; and

at least one communication-computation module, having a communication-computation module connector to receive physiological signals from the at least one disposable module via said disposable module connector, the communication-computation module including at least one microprocessor to actively monitor the patient and to perform a real-time physiological analysis of the physiological signals and a radio circuit to communicate an unprocessed physiological signal or a result of the physiological analysis at a predetermined time or on the occurrence of a predetermined event, via a radio transmission to a remote radio receiver, wherein the at least one disposable module is mechanically and electrically coupled directly to the at least one communication-computation module and the body worn patient monitoring device including the at least one disposable module and the at least one communication-computation module is directly non-permanently affixed to the skin surface of the patient.

2. The body worn device of claim 1, wherein the plurality of electrical connections to the body comprise at least one of direct electrical connections to the body and indirect electrical connections to the body.

3. The body worn device of claim 2, wherein the indirect electrical connections to the body comprise capacitive connections to the body.

4. The body worn device of claim 1, wherein the body worn patient monitoring device comprises an ECG monitor and at least two of the electrical connections are ECG electrodes.

5. The body worn device of claim 4, wherein the ECG electrodes comprise a material screened onto a flexible substrate.

6. The body worn device of claim 5, further comprising at least one series current-limiting resistor to protect the communication-computation module during a patient defibrillation event.

7. The body worn device of claim 6, wherein the least one series current-limiting resistor comprises a resistor screened on the flexible substrate.

8. The body worn device of claim 7, wherein the mechanical interface from the at least one series current-limiting resistor to the ECG electrode includes a filleted edge.

9. The body worn device of claim 7, wherein the mechanical interface from the at least one series current-limiting resistor to the ECG electrode comprises overlapped layers.

11

**10**. The body worn device of claim **9**, wherein the overlapped layers comprise a carbon resistive layer screened over a conductive surface, the carbon resistive layer having substantially the same shape as the conductive surface.

**11**. The body worn device of claim **6**, further comprising an insulating material overlaying the at least one series current-limiting resistor to prevent arcing.

**12**. The body worn device of claim **5**, wherein the ECG electrodes are formed substantially in the shape of an annulus.

**13**. The body worn device of claim **12**, wherein the annulus comprises a conductive ink.

**14**. The body worn device of claim **5**, wherein the substrate is shaped to allow placement on the patient to monitor at least one of a set of standard ECG vectors while simultaneously reducing motion and muscle artifact in the corresponding ECG vector signal.

**15**. The body worn device of claim **1**, wherein the at least one power source is a renewable power source internal to the body worn device.

**16**. The body worn device of claim **1**, wherein the at least one power source comprises a rechargeable battery or a one time use battery.

**17**. The body worn device of claim **1**, wherein the at least one power source is a battery contained within said disposable module.

**18**. The body worn device of claim **1**, wherein the at least one power source is a Seebeck device.

**19**. The body worn device of claim **1**, wherein one of the electrical connections is a reference electrode that can be used to improve common mode rejection (CMR).

**20**. The body worn device of claim **1**, further comprising a virtual electrode as a reference electrode to improve CMR.

**21**. The body worn device of claim **20**, wherein the virtual electrode is an electrode situated near the skin of the patient, but not directly connected to the skin.

**22**. The body worn device of claim **20**, wherein the virtual electrode comprises a capacitive coupling of a body of the communication-computation module to the skin surface of the patient to reduce power line frequency interference.

**23**. The body worn device of claim **20**, including a reference electrode switch for selectively choosing between using the virtual electrode as the reference electrode and a directly connected electrode as the reference electrode and wherein when the reference electrode switch selects the virtual electrode, the directly connected electrode can be used as an additional ECG electrode.

**24**. The body worn device of claim **20**, wherein the reference electrode is a passive electrical connection or the reference electrode is actively driven.

**25**. The body worn device of claim **1**, wherein the communication-computation module includes a pacer detection circuit.

**26**. The body worn device of claim **25**, wherein the pacer detection circuit generates a microprocessor interrupt to inform the microprocessor that a pacer event occurred.

**27**. The body worn device of claim **26**, wherein the microprocessor interrupt is used to mark a corresponding physiological signal in time as related to a pacer event.

**28**. The body worn device of claim **26**, wherein the device automatically determines if a patient has a pacemaker and only enables the pacer detect circuit when a pacemaker is present.

**29**. The body worn device of claim **26**, wherein the device is configured by an external input to enable or disable the pacer detect circuit.

**30**. The body worn device of claim **1**, wherein the body worn device includes circuit protection to allow the device to survive multiple defibrillation cycles of at least 360 joules.

**31**. The body worn device of claim **30**, wherein the circuit protection comprises a gas discharge tube or a plurality of diodes to clamp or limit the signals from the electrical connections.

**32**. The body worn device of claim **30**, wherein a plurality of components of the circuit protection are distributed between the disposable module and the communication-computation module.

**33**. The body worn device of claim **1**, further comprising a high pass filter with a selectable corner frequency to filter the physiological signals.

**34**. The body worn device of claim **33**, wherein the corner frequency is selected by a switch selectable resistance.

**35**. The body worn device of claim **33**, wherein the corner frequency is selected by one or more switching capacitors switched a rate higher than the corner frequency of a low pass anti-aliasing filter.

**36**. The body worn device of claim **33**, wherein the high pass filter is implemented in software running on the microprocessor.

**37**. The body worn device of claim **1**, wherein the body worn device self checks a pacer detection circuit by injecting a simulated pacer pulse into a front end amplifier to stimulate the pacer detection circuit by simulating the presence of a patient's pace maker.

**38**. The body worn device of claim **1**, wherein the communication-computation module includes circuit components to detect failure of contact of one or more of the electrical connections with the skin surface of the patient.

**39**. The body worn device of claim **1**, wherein the communication-computation module is protected from external high energy signals by electro-surgical isolation suppression circuits.

**40**. The body worn device of claim **1**, wherein the microprocessor automatically enters a sleep mode during a conversion cycle of an analog to digital converter (ADC) to minimize noise pickup from digital circuits on the body worn device.

**41**. The body worn device of claim **1**, wherein an algorithm running on a microprocessor in the body worn device causes the body worn device to enter a low power mode that disables at least one circuit of the body worn device, from the end of a "T wave" at the end of one heart beat to the beginning of a "P wave" at the beginning of the next heart beat, to save power.

**42**. The body worn device of claim **4**, including an ESIS filter having a low enough corner frequency such that the energy from a pacer pulse is recorded by at least one sample, even though the pacer pulse itself is of small duration compared to the sample rate and the pacer pulse occurs between samples.

**43**. The body worn device of claim **1**, wherein neon bulbs connected from the physiological sensors to an electronics common (ground) protect one or more internal circuits of the communication-computation module from a defibrillation pulse.

**44**. The body worn device of claim **1**, wherein a plurality of diodes disposed between the physiological sensors and an

12

electronics common (ground) protect one or more internal circuits of the communication-computation module from a defibrillation pulse.

**45.** A method of providing high voltage circuit protection for a body worn monitor comprising the steps of:

provide a substrate that supports one or more electrical connections to a patient's body;

determining a print pattern and thickness of a first material having a first resistivity to be printed on the substrate;

determining a print pattern and thickness of a second material having a second resistivity to be printed on the substrate;

printing the first material onto the substrate; and

printing the second material onto the substrate wherein at least part of the second the material overlays the first material.

**46.** The method of claim **45**, wherein both of the steps of determining a print pattern and thickness of both the first and second materials comprise the additional steps of determining a print pattern and thickness of both the first and second materials, including a filleted section.

**47.** The method of claim **45**, wherein both of the steps of determining a print pattern and thickness of both the first and second materials comprise the further steps of determining a print pattern and thickness of both the first and second materials to achieve a total resistance value.

**48.** The method of claim **45**, wherein both of the steps of determining a print pattern and thickness of both the first and second materials comprise the further steps of determining a print pattern and thickness of both the first and second materials to achieve a spacing between two or more electrical traces of the print pattern, and applying an insulating layer after the step of printing of the second material.

**49.** An ECG monitor comprising:

a plurality of electrical connections including at least one electrode, the electrical connections being couplable to a skin surface to measure patient heartbeat signals;

at least one internal or external power source to power the ECG monitor;

at least one current-limiting defibrillation protection resistor, said at least one current-limiting defibrillation protection resistor comprising a resistor screened onto a substrate; and

an ECG electronics module, to receive and process patient heartbeat signals from said plurality of electrical connections, wherein said at least one current-limiting defibrillation protection resistor is electrically disposed between at least one of said plurality of electrical connections and said ECG electronics module.

**50.** The ECG monitor of claim **49**, wherein said at least one current-limiting defibrillation protection resistor comprises a resistor screened onto a flexible substrate.

**51.** The ECG monitor of claim **49**, wherein a mechanical interface is defined from said at least one series current-limiting resistor to said at least one ECG electrode, said mechanical interface including a filleted edge.

**52.** The ECG monitor of claim **49**, wherein a mechanical interface is defined from the at least one series current-limiting resistor to said at least one ECG electrode, said mechanical interface including a plurality of overlapped layers.

**53.** The ECG monitor of claim **52**, wherein said plurality of overlapped layers comprise a carbon resistive layer screened over a conductive surface, the carbon resistive layer having substantially the same shape as said conductive surface.

**54.** An ECG monitor comprising:

a plurality of electrical connections, said plurality of electrical connections being couplable to a skin surface to measure patient heartbeat signals;

at least one internal or external power source to power the ECG monitor; and

an ECG electronics module to receive and process patient heartbeat signals from said plurality of electrical connections and including a pacer detect circuit to detect the presence or absence of a pacemaker, said ECG electronics module drawing power as an electrical load on said power source wherein said pacer detect circuit, upon detection of the absence of a pacemaker signal in a patient being monitored by the ECG monitor, causes said ECG electronics module to disable said pacer detect circuit in order to reduce said electrical load on said power source.

**55.** The ECG monitor of claim **54**, wherein said power source is a battery.

**56.** A method to improve ECG signal high pass filtering including the steps of:

providing an ECG monitor having a programmed microprocessor and a plurality of electrical connections to measure patient heartbeat signals;

filtering said measured heartbeat signals with an analog high pass filter having a analog high pass cutoff frequency;

removing the effects of said analog high pass filter with a digital inverse filter algorithm resulting in substantially unfiltered heartbeat signals;

filtering said substantially unfiltered heartbeat signals digitally using a digital filter having a digital high pass filter cutoff frequency lower than said analog cutoff frequency.

**57.** The method of claim **56**, wherein the step of filtering said measured heartbeat signals with an analog high pass filter comprises the step of filtering said measured physiological signals with an analog high pass filter having a 0.5 Hz analog high pass cutoff frequency, and the step of filtering said substantially unfiltered heartbeat signals digitally comprises the step of filtering said substantially unfiltered heartbeat signals digitally using a digital filter having a digital 0.05 Hz high pass filter cutoff frequency.

**58.** An ECG monitor comprising:

a plurality of electrical connections, said electrical connections being couplable to a skin surface to measure patient heartbeat signals;

at least one internal or external power source to power the ECG monitor; and

an ECG electronics module to receive and process heartbeat signals from said plurality of electrical connections, said ECG electronics module drawing power as an electrical load on said power source, said ECG electronics module including a microprocessor to process heartbeat signals, wherein an algorithm running on said microprocessor causes the ECG monitor to enter a low power mode that disables at least one circuit of the ECG electronics module, from the end of a "T wave" at the end of one heartbeat to the beginning of a "P wave" at the beginning of the next heartbeat, in order to reduce said electrical load on said power source.

\*   \*   \*   \*   \*

# Exhibit S

US 20020082491A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2002/0082491 A1**

Nissila (43) **Pub. Date:** **Jun. 27, 2002**

(54) **ELECTRODE STRUCTURE AND HEART RATE MEASURING ARRANGEMENT**

(76) Inventor: **Seppo Nissila**, Oulu (FI)

Correspondence Address:
**Charles R. Hoffmann. Esq.**
**HOFFMANN & BARON, LLP**
**6900 Jericho Turnpike**
**Syosset, NY 11791 (US)**

(21) Appl. No.: **09/952,046**

(22) Filed: **Sep. 13, 2001**

(30) **Foreign Application Priority Data**

Oct. 18, 2000 (FI)........................................... 20002304

**Publication Classification**

(51) Int. Cl.$^7$ ................................................. A61B 5/0408
(52) U.S. Cl. ........................................... 600/391; 600/393

(57) **ABSTRACT**

The invention relates to an electrode structure and a heart rate measuring arrangement for measuring an ECG signal on the skin of a person's chest. The electrode structure (**100**) comprises a band-like component (**101**) that is fitted against the skin (**102**) of the person's chest and that is made of soft and flexible material that follows the skin closely. At the ends of the electrode structure (**100**) there are electrodes (**118, 122**). The inner surface (**116**) of the electrode structure is an adhesive surface for attaching the electrode structure (**100**) on the skin (**102**) of the person's chest.





FIG.2



FIG.1





Case 1:24-cv-01355-JDW   Document 142-11   Filed 01/22/26   Page 986 of 991 PageID #: 10180



FIG.10

FIG.11

FIG.12

US 2002/0082491 A1

Jun. 27, 2002

1

# ELECTRODE STRUCTURE AND HEART RATE MEASURING ARRANGEMENT

## FIELD OF THE INVENTION

[0001]   The invention is applied to a device for non-invasive measurement of heart rate information, in particular to a heart rate monitor used in connection with exercise and sports.

## BACKGROUND OF THE INVENTION

[0002]   The measurement of heart beat frequency is an interesting field of application in connection with exercise. On the basis of the heart beat frequency, i.e. the heart rate, it is possible to obtain information e.g. on a person's stress level, recovery and development of physical condition, and consequently the proportion of training exercises and rest can be monitored and planned better.

[0003]   The heart rate is measured on a person's skin on the basis of an electrocardiographic (ECG) signal generated by a heart beat. Additional information on ECG is available in the following publication by Guyton, Arthur, C., *Human Physiology and Mechanisms of Disease,* third edition, W. B. Saunders Company, 1982, ISBN 4-7557-0072-8, Chapter 13: The Electrocardiogram, which is incorporated herein as reference. The electrocardiographic signal is an electromagnetic signal originating from a heart beat, which is detected on the body of a person to be measured. The signal is measured by means of electrodes, which are in contact with the body at least at two points. By a polarization vector, the electrode that is located closest to the heart often acts in practice as the actual measuring electrode, while the other electrode serves as ground potential, to which the voltage measured by the measuring electrode is compared as a function of time.

[0004]   The heart rate monitor electrodes to be placed on the chest are arranged in a known manner in a belt-like structure, i.e. a so-called electrode belt. The electrode belt is thus a ring-shaped attachment means that goes round the whole chest and can be tightened round the human chest. A structure of this kind is shown in FIG. 1. The electrode belts are known to have structures that comprise an electronic unit in the middle of the belt, with an electrode on both sides. The electrodes measure the electric pulse transmitted by the heart and transmit the measurement results to the electronic unit through an interface connecting the electrode and the electronic unit. The components included in the electrode belt, such as the electronic unit and the electrodes, are generally coated with plastic or rubber in order to protect the components against moisture, for instance. Depending on the structure of the electrode belt, the electronic unit often also comprises means for transmitting an electric pulse as an analog burst to a receiver and display unit worn on the wrist, for instance. Alternatively, the electrode belt itself may comprise the means for storing and displaying the electric pulses.

[0005]   In general, the electrode belts have a structure in which the rubber or plastic support structure covering the components of the electrode belt is relatively rigid. These electrode belts are, in general, poorly suited for long-term, continuous use, and they chafe the skin easily. The belt-like structure of the electrode belt also limits its optimal positioning substantially at the heart with persons having large quantities of muscular or other tissue in the chest area. Also slim adults and children have troubles in wearing the rigid electrode belt, because it does not bend sufficiently to follow the contours of a human body with a narrow chest. In some prior art solutions, the problem is approached such that the plastic support structure between the electronic unit and the electrode is pleated, whereby the electrode belt bends immediately outside the electronic unit. However, this solution only reduces rigidity in bending the electrode belt, because the electrode belt is still ring-shaped and attachable round the chest.

[0006]   The prior art solution has a serious drawback: it is difficult to fit the rigid electrode belt optimally round the chest to achieve the best measurement result, in particular in long-term, continuous use, when the electrode belt also chafes the skin easily.

## BRIEF DESCRIPTION OF THE INVENTION

[0007]   The object of the invention is to provide an improved electrode structure and heart rate measuring arrangement for measuring an electrical heart beat signal on a human body such that the above problems can be solved. This is achieved with the following electrode structure for measuring an ECG signal on the chest of a person. The electrode structure comprises a band-like component having an inner surface to be placed against the skin of the person's chest and an outer surface opposite thereto, and which electrode structure comprises a first electrode at a first end and a second electrode at a second end of the electrode structure, and the inner surface of the electrode structure is an adhesive surface for attaching the electrode structure to the skin of the person's chest, and the electrode structure is arranged to measure a potential difference between the first and the second electrodes caused by the ECG signal.

[0008]   The invention also relates to a heart rate measuring arrangement for measuring the ECG signal on the skin of a person's chest. The heart rate measuring arrangement comprises an electrode structure placed on a person's chest and a wrist-worn receiver unit, the electrode structure comprising a band-like component having an inner surface against the skin of the person's chest and an outer surface, opposite thereto, and which electrode structure comprises a first electrode at a first end and a second electrode at a second end of the electrode structure, the inner surface of the electrode structure being an adhesive surface for attaching the electrode structure to the skin of the person's chest, and the electrode structure being arranged to measure a potential difference between the first and the second electrodes caused by the ECG signal, the electrode structure further comprising ECG processing means communicating with the electrodes for measuring the potential difference between the first and the second electrodes caused by the ECG signal and for producing heart rate information on the basis of the measured potential difference, and the electrode structure further comprising a transmitter for transmitting the heart rate information to the wrist-worn receiver which comprises a receiver for receiving the heart rate information transmitted from the electrode structure, the wrist-worn receiver further comprising a display for presenting the heart rate information.

[0009]   The preferred embodiments of the invention are disclosed in the dependent claims.

2

[0010]   In the solution of the invention, it is intended that the electrode structure is placed on the skin of the user's chest. In one embodiment, the band-like component of the electrode structure is of flexible, soft material that fits the skin closely, and as a consequence it is comfortable and inconspicuous to wear and does not chafe the skin, and hence it is well suited for long-term use in ECG measuring. In one embodiment the band-like component of the electrode belt is continuous, in which both electrodes and their attachment means are integrated. The band-like component is disposable and economical to manufacture. In terms of design, it is a plaster-like sticker, for instance.

[0011]   The electrode structure has a first electrode at a first end and a second electrode at a second end. The first and the second electrodes of the electrode structure are electrically separated from one another in order to enable the measurement of the potential difference between the electrodes. For optimal measurement of the heart rate signal, the first and the second electrodes should be located sufficiently far apart from one another so as to detect an electric ECG signal generated by a heart beat. The electrodes are thus advantageously placed at the ends of the electrode structure. Naturally, there may be more than said two electrodes.

[0012]   According to a preferred embodiment, the inner surface of the electrode structure is an adhesive surface for attaching the electrode structure on the skin of the person's chest. An advantageous manner to implement the adhesive surface and the electrodes is the embodiment, in which the electrodes located at the ends of the band-like component of the electrode structure are made of electrically conductive adhesive. Hence, the adhesive attaches the electrode structure on the skin of the person's chest. In a second embodiment the first electrode and the second electrode of the electrode structure consist of an electrically conductive membrane at both ends of the electrode structure, at the electrode. On the inner surface of the membrane, which is placed against the person's skin there is an electrically conductive adhesive. The adhesive is preferably an electrically conductive glue. Further, a third manner to implement the electrodes and the adhesive surface is an embodiment, in which the first electrode and the second electrode of the electrode structure consist of an electrically conductive membrane at both ends of the electrode structure, at the electrode, and the electrodes at both ends of the electrode structure are narrower than the band-like component. Around the electrodes, on the outer edges of the band, on the inner surface thereof, there is an adhesive, with which the electrode structure is attached to the person's skin. In this case, the adhesive need not be electrically conductive. Because the inner surface of the electrode structure is that portion of the electrode structure which is against the person's skin, the electrodes are preferably located on the inner surface of the band. The electrode structure can also be designed such that the electrodes are partly or completely located on both the inner surface and the outer surface of the band. Further, the electrode structure can be designed such that the electrodes are located on the inner surface of the band, but they have interfaces also on the outer surface of the band.

[0013]   The electrode structure also comprises an electronic unit communicating with the electrodes. The electronic unit is an electronic component attached to the band-like part of the electrode structure with one or more

gripping means. The electrodes of the electrode structure communicate with the electronic unit. The electronic unit comprises ECG processing means, by which the potential difference caused by the ECG signal between the first and the second electrodes is measured, and an estimate for detected heart beat time instants is formed from the heart rate signals measured by the electrodes, and further the heart beat rate is calculated on the basis of the detected heart beat time instants. The electronic unit also comprises a transmitter for transmitting heart rate information to a wrist-worn receiver, which comprises a receiver for receiving the heart rate information transmitted from the electrode structure, and a display for presenting the heart rate information.

[0014]   The wrist-worn receiver is located in a watch-like device that the user wears on his wrist, such as a heart rate monitor or a wrist computer. Transmission of information between the electrode structure and the heart rate monitor is thus carried out in known manners, for example through a connecting line, optically or electromagnetically. In the embodiment in question, the display for presenting the heart rate information is also preferably located in the wrist-worn receiver.

[0015]   The electronic unit is preferably arranged in a casing which comprises one or more gripping means for attaching the electronic unit to the stap-like component of the electrode structure. The gripping means are most preferably located on that surface of the electronic unit casing which is against the person's skin. The preferable structures of the gripping means include attachment slots, a pivoted, clamping clip, or the like, that are in the central unit casing. The gripping means or the central unit casing comprises conductive connecting means, through which the ECG signal measured with the electrodes is applied from the electrodes to the electronic unit.

[0016]   The invention also has an advantage that the electrode structure is inconspicuous, comfortable and well suited for long-term use as compared with the known solutions.

BRIEF DESCRIPTION OF THE DRAWINGS

[0017]   In the following, the invention will be described in greater detail with reference to the attached drawings, wherein

[0018]   FIG. 1 shows a prior art transmitter electrode belt placed on a person's chest and a receiver unit worn on a wrist.

[0019]   FIG. 2 shows a heart rate measuring arrangement placed on a person's chest according to one embodiment of the invention,

[0020]   FIG. 3 shows an outer surface of one embodiment of an electrode structure according to the invention.

[0021]   FIG. 4 shows an inner surface of the electrode structure of FIG. 3,

[0022]   FIG. 5 shows a cross section of the electrode structure of FIG. 3,

[0023]   FIG. 6 shows a band-like part of the electrode structure of FIG. 3,

[0024]   FIG. 7 shows an inner surface of a second embodiment of the electrode structure according to the invention,

US 2002/0082491 A1

Jun. 27, 2002

3

[0025] **FIG. 8** shows a band-like part of the electrode structure of **FIG. 7**,

[0026] **FIG. 9** is a cross section of the electrode structure of **FIG. 7**, seen at the electrode,

[0027] **FIG. 10** is a side view of an embodiment of the electrode structure according to the invention,

[0028] **FIG. 11** is a cross section of one embodiment of a central unit of the electrode structure according to the invention, and

[0029] **FIG. 12** shows a device arrangement for providing a heart rate according to one embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

[0030] In the following the invention will be described by means of preferable embodiments, with reference to the attached drawings **2** to **12**.

[0031] **FIG. 2** shows a person whose heart rate is measured by means of an electrode structure **100** placed on the chest **102**. The heart rate is measured by means of two or more electrodes **118**, **122** in the electrode structure **100**, between which electrodes is formed a measurable potential difference as the heart beats.

[0032] The presented electrode structure **100** comprises a band-like component **101**. It is preferably a continuous band **101** having an inner surface **116** against the skin of the person's chest and an outer surface **120** opposite thereto. At a first end of the electrode structure **100** there is a first electrode **118** and at a second end of the electrode structure **100** there is a second electrode **122**. The first electrode **118** and the second electrode **122** of the electrode structure are electrically separated from one another by a separating zone **125** between the electrodes in the band **101** in order to enable the measurement of the potential difference between the electrodes. A measurable potential difference is thus produced between the first electrode **118** and the second electrode **122**, i.e. an ECG signal which is measured with the electrode structure **100**.

[0033] The inner surface **116** of the electrode structure is an adhesive surface, by which the electrode structure **100** is attached to the skin **102** of the person's chest. The band **101** of the electrode structure **100** is of flexible, soft material that fits the skin closely. For instance, the band **101** can be of plastic, textile fibre, a combination thereof or the like. Preferably, the band **101** is disposable.

[0034] According to one preferred embodiment, as in FIGS. **7** to **9**, the electrodes **118**, **122** of the electrode structure **100** are provided of electrically conductive adhesive **127** on the inner surface **116** of the band **101**, at both ends of the band **101**. The adhesive **127** is preferably an electrically conductive glue, such as electrically conductive Solgel or a conductive silicone glue.

[0035] According to a second embodiment, as in FIGS. **3** to **6**, the electrodes **118**, **122** of the electrode structure **100** consist of a membrane **119** that is located at both ends of the electrode structure **100**, at the electrode **118**, **122**, and is made of metal, electrically conductive plastic or a similar conductive material. The electrodes **118**, **122** at both ends of the electrode structure **100** can be equal or narrower in width

to the band-like component **101**. The membrane **119** can thus come into contact with the person's skin surface **102** or on the inner surface **116** of the membrane **119** which is against the person's skin there can be an electrically conductive adhesive **127**. The adhesive **127** is preferably a conductive glue, such as conductive Solgel or a conductive silicone glue. If the electrode **118**, **122** is narrower than the band-like component **101**, it is possible to use a non-conductive adhesive **127** on outer edges of the band **101**, on the inner surfaces thereof, outside the electrodes **118**, **122**.

[0036] Because the inner surface **116** of the electrode structure **100** is the portion which is against the person's skin, the electrodes **118**, **122** are preferably located on the inner surface **116** of the band **101**. The electrode structure **100** can also be designed such that the electrodes **118** and **122** are partly or completely on both the inner surface **116** and the outer surface **120** of the band. Further, the electrode structure **100** can be designed such that the electrodes **118**, **122** are located on the inner surface **116** of the band, but they have interfaces also on the top surface **120** of the band **101**.

[0037] According to **FIGS. 2**, **3**, **4**, **7**, **10** and **11**, the electrode structure **100** also comprises a central unit **202** that communicates with the electrodes **118**, **122**. The central unit **202** is a separate electronic part which is attached to the band-like part **101** of the electrode structure **100** with one or more gripping means **230**. The electronic unit **202** is arranged in a casing **203** which comprises one or more gripping means **230** for attaching the electronic unit **202** to the band-like component **101** of the electrode structure **100**. The gripping means **230** are preferably located on that surface of the electronic unit **202** casing **203** which is against the person's skin.

[0038] The electrodes of the electrode structure **100** have an electrically conductive connection to the central unit **202**. The connection is preferably implemented such that the gripping means **230** provide an electrical coupling between the electrodes **118**, **122** and the electronic unit **202**. The structures of the gripping means **230** include attachment slots, a pivoted, clamping clip, or the like, that are in the central unit casing. The gripping means **230** or the lower surface of the central unit casing **202** comprise conductive connecting means, through which the ECG signal measured with the electrodes **118**, **122** is applied from the electrodes **118**, **122** to the central unit **202**.

[0039] The central unit **202** comprises ECG processing means, by which the potential difference between the first and the second electrodes, caused by the ECG signal, is measured, and heart rate information, comprising a heart rate pulse, detection and calculation of heart beat intervals or a heart rate frequency, i.e. the heart rate, is formed from the heart rate signals measured by the electrodes. The central unit **202** further comprises a transmitter **208** for transmitting the heart rate information to a wrist-worn receiver **110** which comprises a receiver for receiving the heart rate information transmitted from the central unit **202**, and a display **112** for presenting the heart rate information to the user.

[0040] The wrist-worn receiver **110** is located in a watch-like device worn on the wrist, such as a heart rate monitor or a wrist computer. Transmission **108** of information between the electrode structure **100** and the heart rate monitor is thus carried out in known manners, for example through a connecting line, optically or electromagnetically.

4

In the embodiment in question, the display **112** for presenting the heart rate information is also preferably located in the wrist-worn receiver **110**.

[0041] Preferably, the ECG signal to be measured is processed, i.e. filtered, amplified and detected, in the electrode structure **100** by using known methods such that the heart beat can be detected from the ECG signal in order to be transmitted to the receiver unit **110**. In the heart beat detection the electrode structure **100** measures the inter-electrode potential difference or voltage. The heart rate detection is based, for instance, on a QRS complex detected from the heart signal, where the letters Q, R and S refer to the potential phases in the electric signal caused by the electric activation of the heart. In one embodiment the detection of QRS can be performed by means of an adapted filter, whereby a model complex is compared with the measured QRS complex in the electrode structure and if the comparison exceeds a given threshold value, the measured complex is accepted as the heart beat.

[0042] The heart rate information measured by the electrode structure **100** is conveyed telemetrically **108** to the wrist-worn, watch-like receiver unit **110**, such as heart rate monitor, wrist computer or the like. The electrode structure **100** comprises a transmitter for transmitting the heart rate information to the receiver unit **110**, which in turn comprises a receiver for receiving the information. For instance, in the case of telemetric, inductive transmission the transmitter and the receiver comprise a coil, whereby the transmission is performed in one or more magnetic pulses per each heart beat. Instead of the magnetic pulse transmission **108**, the heart rate signal information measured by the electrode structure **100** can be conveyed to the receiver unit **110**, for instance, optically, as an RF transmission, by means of a connecting line or in any other known manner.

[0043] In one embodiment the receiver unit **110** comprises feeding means **114** for giving commands to the equipment. The commands may include, for instance, commands to start/end measuring the heart rate, to set heart rate limits, to activate a light source, or other corresponding functions comprised by the heart rate monitors. It is clear that the necessary commands can be conveyed to the electrode structure correspondingly using the connection **108** as described in conjunction with the transmission of the heart rate information from the electrode structure **100** to the receiver unit **110**. In one embodiment the receiver unit **110** comprises a display **112** for presenting the produced heart rate information. The heart rate information refers here to information produced from heart beat frequency or information relating to exercise through heart beat, such as heart rate/minute, heart rate variance, set heart rate limits or duration of exercise within a given heart rate range.

[0044] The strength of the ECG signal on human skin varies mainly on a vector, whose maximum value is attained at the starting point of the vector, at the right shoulder, and the minimum value at the final point of the vector, in the left heel. Generally, the maximum ECG signal of a human being can be measured by placing the electrodes at the end points of said vector.

[0045] **FIG. 12** shows a structure of a device solution according to one preferred embodiment of the invention, in which all structures and functions required by the heart rate measuring, processing and presenting are placed in the electrode structure **100** on the skin **102** of the chest. An ECG signal is measured on the user's skin with the electrode structure and in particular the related electrodes **118**, **122**, and the signals are conveyed to an ECG processing unit **200**. In the ECG processing unit **200** the ECG signal is subjected to necessary signal processing operations such as filtering and amplifying. In the processing unit **200**, the heart rate is further detected from the ECG signal, for instance, by detecting an R peak of the QRS complex to be the strongest in the signal or by detecting a timing point of the QRS complex by means of an adapted filter. The provided heart rate indications are conveyed to a central unit **202**, which coordinates the operation of the electrode structure **100**, and the heart rate frequency can be calculated from said heart rate indications. On the basis of the heart beat frequency, i.e. heart rate, it is possible to form other calculated variables, i.e. heart rate information, in a calculating unit **206** which communicates with the central unit **202**. The heart rate information refers here to heart rate frequency, heart rate variance, heart rate change rate, heart rate limit or any corresponding variable. The electrode structure **100** acting as a heart rate monitor further comprises feeding means **114** for entering feeding data, such as an indication of the starting and ending moment of the heart rate measurement. The feeding means **114** can be implemented, for instance, by push buttons, touch-sensitive display, voice control or the like. The electrode structure **100** further comprises a memory **204**, consisting of a short-term RAM memory for storing the heart rate information and the like, and a ROM memory intended for storing the necessary programs.

[0046] The means needed in the device parts, e.g. in the central unit **202**, the calculating unit **206** and the control unit, are preferably implemented by means of software with a general-purpose microprocessor, but different equipment implementations are also possible, for instance, a circuit constructed of separate logic components, or one or more ASICs (Application Specific Integrated Circuit).

[0047] Even though the invention is described above with reference to the examples of the attached drawings, it is apparent that the invention is not restricted thereto but it can be modified in a variety of ways within the scope of the inventive idea disclosed in the accompanying claims.

  1. An electrode structure for measuring an ECG signal on the skin of a person's chest, wherein

  the electrode structure comprises a band-like component having

  an inner surface to be placed against the skin of the person's chest and an outer surface opposite thereto, and

  which electrode structure comprises a first electrode at a first end and a second electrode at a second end of the electrode structure,

  the inner surface of the electrode structure is an adhesive surface for attaching the electrode structure to the skin of the person's chest, and

  the electrode structure is arranged to measure a potential difference between the first and the second electrodes caused by the ECG signal.

5

**2**. An electrode structure as claimed in claim 1, wherein the band-like component of the electrode structure is a continuous band made of flexible and soft material that fits the skin closely.

**3**. An electrode structure as claimed in claim 1, wherein the first electrode and the second electrode of the electrode structure are electrically separated from one another.

**4**. An electrode structure as claimed in claim 1, wherein the electrodes of the electrode structure consist of an electrically conductive adhesive.

**5**. An electrode structure as claimed in claim 1, wherein the first electrode and the second electrode of the electrode structure consist of a conductive membrane located at both ends of the electrode structure, at the electrode.

**6**. An electrode structure as claimed in claim 5, wherein the width of the electrode at both ends of the electrode structure is less than the width of the band-like component.

**7**. An electrode structure as claimed in claim 5, wherein, at the electrode, on the inner surface to be placed against the person's skin there is an electrically conductive adhesive.

**8**. An electrode structure as claimed in claim 4, wherein the adhesive is an electrically conductive glue.

**9**. An electrode structure as claimed in claim 7, wherein the adhesive is an electrically conductive glue.

**10**. An electrode structure as claimed in any one of the preceding claims, wherein the band-like component of the electrode structure is disposable.

**11**. An electrode structure as claimed in claim 1, wherein the electrode structure comprises an electronic unit communicating with the electrodes so as to provide heart rate information on the basis of the ECG signal measured with the electrodes.

**12**. An electrode structure as claimed in claim 11, wherein the electronic unit is arranged in a casing which comprises one or more gripping means for attaching the electronic unit to the band-like component of the electrode structure.

**13**. An electrode structure as claimed in claim 12, wherein the gripping means are located on that surface of the electronic unit casing which is against the person's skin.

**14**. An electrode structure as claimed in claim 12, wherein the gripping means form an electric coupling between the electrodes and the electronic unit.

**15**. A heart rate measuring arrangement for measuring an ECG signal on the skin of a person's chest, wherein

the heart rate measuring arrangement comprises an electrode structure to be placed on the person's chest and a wrist-worn receiver unit, whereby

the electrode structure comprises a band-like component having

an inner surface to be placed against the skin of the person's chest and an outer surface opposite thereto, and

which electrode structure comprises a first electrode at a first end and a second electrode at a second end of the electrode structure,

the inner surface of the electrode structure is an adhesive surface for attaching the electrode structure to the skin of the person's chest, and

the electrode structure is arranged to measure a potential difference between the first and the second electrodes caused by the ECG signal, and

the electrode structure further comprises ECG processing means, which communicate with the electrodes, for measuring the potential difference caused by the ECG signal in the first and the second electrodes and for forming heart rate information on the basis of the measured potential difference, and

the electrode structure further comprises a transmitter for transmitting the heart rate information to a wrist-worn receiver which comprises a receiver for receiving the heart rate information transmitted from the electrode structure, the wrist-worn receiver also comprising a display for presenting the heart rate information.

**16**. A heart rate measuring arrangement as claimed in claim 15, wherein the band-like component of the electrode structure is a continuous band made of flexible, soft material that fits the skin closely.

**17**. A heart rate measuring arrangement as claimed in claim 15, wherein the electrode structure comprises an electrically separating part between the first electrode and the second electrode for separating the first electrode and the second electrode electrically from one another.

**18**. A heart rate measuring arrangement as claimed in claim 15, wherein the electrodes of the electrode structure are of electrically conductive adhesive.

**19**. A heart rate measuring arrangement as claimed in claim 15, wherein the first electrode and the second electrode of the electrode structure consist of a conductive membrane located at both ends of the electrode structure, at the electrode.

**20**. A heart rate measuring arrangement as claimed in claim 19, wherein the width of the electrode at both ends of the electrode structure is less than the width of the band-like component.

**21**. A heart rate measuring arrangement as claimed in claim 19, wherein, at the electrode, on the inner surface against the person's skin there is an electrically conductive adhesive.

**22**. A heart rate measuring arrangement as claimed in claim 18, wherein the adhesive is an electrically conductive glue.

**23**. A heart rate measuring arrangement as claimed in claim 21, wherein the adhesive is an electrically conductive glue.

**24**. A heart rate measuring arrangement as claimed in claim 15, wherein the ECG processing means communicating with the electrodes of the electrode structure comprise an electronic unit for providing heart rate information on the basis of the ECG signal measured with the electrodes.

**25**. A heart rate measuring arrangement as claimed in claim 24, wherein the electronic unit is arranged in a casing which comprises one or more gripping means for attaching the electronic unit to the band-like component of the electrode structure.

**26**. A heart rate measuring arrangement as claimed in claim 25, wherein the gripping means are located on that surface of the electronic unit casing which is against the skin of the person.

**27**. A heart rate measuring arrangement as claimed in claim 25, wherein the gripping means form an electric coupling between the electrodes and the electronic unit.

\* \* \* \* \*