IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **BARDY DIAGNOSTICS, INC.,**<br><br>*Plaintiff and Counter-Defendant,*<br><br>v.<br><br>**IRHYTHM TECHNOLOGIES, INC.,**<br><br>*Defendant and Counter-Plaintiff.* | **Case No. 1:24-cv-01355-JDW** |

## <u>MEMORANDUM</u>

Bardy Diagnostics, Inc. alleges that iRhythm Technologies, Inc., infringes four Bardy patents. iRhythm, in turn, claims that Bardy infringes five iRhythm patents. The Parties dispute the meaning of eleven claim terms across eight asserted patents: (1) U.S. Patent No. 12,161,473 (the '473 Patent); (2) U.S. Patent No. 12,171,562 (the '562 Patent); (3) U.S. Patent No. 12,285,261 (the '261 Patent); and (4) U.S. Patent No. 12,310,735 (the '735 Patent). iRhythm's asserted patents are: (5) U.S. Patent No. 12,133,734 (the '734 Patent); (6) U.S. Patent No. 12,274,554 (the '554 Patent); (7) U.S. Patent No. 12,303,277 (the '277 Patent); and (8) U.S. Patent No. 12,245,859 (the '859 Patent). I held a *Markman* hearing on January 15, 2026, and now resolve the disputed constructions.

I.    **LEGAL STANDARD**

A.    **Claim Construction**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quotation omitted). Claim construction is a matter of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015). "[T]here is no 'magic formula or catechism'" for construing a patent claim, nor is a court "barred from considering any particular sources or required to analyze sources in any specific sequence[.]" *Phillips*, 415 F.3d at 1324. Instead, a court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.* (citation omitted).

A court generally gives the words of a claim "their ordinary and customary meaning," which is the "meaning that the term would have to a person of ordinary skill in the art at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (quotations omitted). Usually, a court first considers the claim language; then the remaining intrinsic evidence; and finally, the extrinsic evidence in limited circumstances. *See Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331-32 (Fed. Cir. 2001). While "the claims themselves provide substantial guidance as to the meaning of particular claim terms[,]" a court also must consider the context of the surrounding words. *Phillips*, 415 F.3d at 1314. In addition, the patent specification "'is

always highly relevant to the claim construction analysis' and indeed is often 'the single best guide to the meaning of a disputed term.'" *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1330 (Fed. Cir. 2021) (quotation omitted).

But, while a court must construe claims to be consistent with the specification, the court must "avoid the danger of reading limitations from the specification into the claim ...." *Phillips*, 415 F.3d at 1323. This is a "fine" distinction. *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186–87 (Fed.Cir.1998). In addition, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Hill-Rom Svcs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quotation omitted) (alterations in original). "The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention. Rather, the court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution." *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) (citing *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371-77 (Fed. Cir. 2002)).  An invention may possess several advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.

A court may refer to extrinsic evidence only if the disputed term's ordinary and accustomed meaning cannot be discerned from the intrinsic evidence. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996). Although a court may not use extrinsic evidence to vary or contradict the claim language, extrinsic materials "may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995). Extrinsic evidence is used "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art[.]" *Phillips*, 415 F.3d at 1318. The Federal Circuit has cautioned against relying upon expert reports and testimony that is generated for the purpose of litigation because of the likelihood of bias. *Id.*; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.") (quotation omitted).

Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Renishaw PLC v. Marposs Societa' per Anzioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation[.]" *Modifine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Circ. 1996, abrogated on other grounds by, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Circ. 2000), vacated, 535 U.S. 722 (2002).

**B.      Indefiniteness**

"Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." *Kyowa Hakka Bio, Co., Ltd. v. Ajinomoto Co., No. CV 17-313*, 2020 WL 3403207, at *5 (D. Del. June 19, 2020) (internal quotations omitted). "The internal coherence and context assessment of the patent, and whether it conveys claim meaning with reasonable certainty, are questions of law." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015). A party seeking to prove indefiniteness must do so by clear and convincing evidence. *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

"A patent's specification must 'conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention.'" *Teva*, 789 F.3d at 1340 (quoting 35 U.S.C. § 112, ¶ 2). A patent claim is indefinite if, "viewed in light of the specification and prosecution history, [it fails] to inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

## II.    CONSTRUCTION OF DISPUTED TERMS

### A.    Bardy's Patent Terms

#### 1.    "wireless transceiver"[1]

| Bardy's Construction | iRhythm's Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning, i.e., "a component that can transmit wirelessly" | "component that transmits electrocardiographic signals wirelessly" | "a component that can transmit wirelessly" |

The Parties dispute whether the term "wireless transceiver" applies only to a component that transmits electrocardiographic signals. It does not. Claim 1 recites "a wireless transceiver" and imposes only one express requirement, that it "draws power from the battery." ('473 Patent at 17:41-42.) By contrast, the same claim requires electrodes "configured to sense electrocardiographic signals" and a processor "configured to process" those signals. (*Id.* at 17:16-17, 17:37-38.) Moreover, several of the dependent claims specify that the wireless transceiver is "configured to communicate with an external device via Wi-Fi, mobile phone communication standards, or Bluetooth." (*Id.* at 17:46-48.) Others recite that electrocardiographic signals may be retrieved by an external device "via the wireless transceiver" after conversion to a different format. (*Id.* at 17:53-57.) These limitations address how the wireless transceiver communicates and what data it might communicate in certain embodiments. They would be unnecessary if,

---

[1] This term appears in Claims 8 and 15 of the '562 Patent and Claims 1, 8 and 15 of the '473 Patent.

as iRhythm suggests, transmission of electrocardiographic signals was inherent in the term "wireless transceiver" itself. Courts avoid constructions that render some portion of the claim language superfluous. *SimpleAir Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 429 (Fed. Cir. 2016).

The absence of an express definition of "wireless transceiver" in the '473 Patent does not alter my construction, as nothing in the specification suggests that the term is limited beyond its ordinary meaning.[2] To the contrary, the specification contemplates that the wireless transceiver may, but need not, provide certain functions, confirming that it can perform other functions as well. For example, the specification describes the wireless transceiver as an optional and interchangeable component that enables communication of "data or other information" with a range of external devices, including wearable sensors, mobile communications devices, servers, and personal computers. ('473 Patent at 4:28-29.) It also discloses embodiments in which wireless communication is unnecessary, including hardwired data transfer to a download station. (*See* '562 Patent at 15:52-61.) Although the specification describes some embodiments that will include a wireless transceiver that communicates electrocardiographic signals, a patent "need not include a working example of every possible embodiment to enable the full scope of the claims." *Bayer HealthCare LLC v. Baxalta Inc.*, 989 F.3d 964, 982 (Fed. Cir. 2021). Courts

---

[2] The Parties agree that the specification does not describe a wireless transceiver as a well-known or well-understood component.

may not confine claim scope to particular embodiments absent a clear intent to do so. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011).

iRhythm urges a narrower construction based on what it characterizes as the objective of the invention—electrocardiographic monitoring—and asks me to treat that objective as limiting the function of the wireless transceiver. That argument fails. In construing claims, courts may not import limitations based on the perceived purpose of an invention. *E-Pass Techs.*, 343 F.3d at 1370. Instead, it is "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention [that] will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1315. The purpose of the overall invention might be to provide electrocardiographic monitoring, but that doesn't mean that every component is limited to that function.

### 2. "vertically aligned"[3]

| Bardy's Construction | iRhythm's Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | "aligned along a patient's sternal midline when worn" | "aligned on an axis that connects the monitor recorder with the extended wear electrode patch" |

Claim 1 recites "a battery vertically aligned with a sealed housing," but it does not define the orientation against which to judge verticality. And the specification does not use any form of the word "vertical," let alone the phrase "vertically aligned." At the same

---

[3] This term appears in Claims 1, 15, 20 and 23 of the '473 Patent and Claims 9, 14, 20, 23 and 28 of the '562 Patent.

time, neither side argues that the term is indefinite (and with good reason). In that posture, I must "strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).

As a starting point, a POSA would understand "vertically" to have its plain English meaning of top-to-bottom. The specification informs a POSA that, for these purposes, the top is the face of the device, which faces away from the user when in use. Figure 4 illustrates the device, including the monitor recorder, which is item 14. The monitor recorder includes a sealed hosing. ('437 Patent at 9:42-43.) Then, Figure 5 is a view of the monitor recorder with a button that has a "**top** outer surface." (*Id.* at 9:56-58 (emphasis added).) Figure 6, in turn, illustrates the extended wear electrode patch that attaches to the skin and into which the monitor gets inserted. The specification explains that there is a battery compartment on the "**bottom** surface of the non-conductive receptacle." (*Id.* at 10:37-40 (emphasis added).) These and other, similar references in the specification demonstrate to a POSA that the top of the device, for these purposes, is the face of the device, and the bottom is the part that attaches to the extended wear electrode patch. A POSA would therefore know to assess vertical alignment on that axis.

This construction focuses on the orientation of the components of the device, regardless of how the device is used (or whether it is in use). It stands in contrast to

iRhythm's proposed construction, which would import a limitation from a particular embodiment and which would not determine verticality until a user wears the device. The claims do not necessarily require the device to be worn along the sternum, however, and they do not suggest that the internal alignment of the battery and sealed housing changes based on where the user places the device on the body.

### 3. "removably secured"[4]

| Bardy's Construction | iRhythm's Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning, *i.e.*, secured such that it may be removed | "secured such that it may be removed without destruction" | "secured in a manner that contemplates or intends for removal and potential reuse" |

The dispute over "removably secured" is not about whether the wearable housing can be taken out of the receptacle—it plainly can. ('261 Patent at 4:57-62.) Where the Parties part ways is whether the patent requires that removal be non-destructive. The claims do not say that, and the specification does not impose it. Claim 1 recites "a receptacle ... into which the wearable housing can be removably secured." That language describes a designed relationship between two components. The housing is held in place during use, but it is not permanently affixed. The claim says nothing about the manner of removal, the amount of force required, or the condition of the components after separation. It requires only that removal be contemplated by design. In addition, the specification makes clear that the purpose of removal is to permit further use, including

---

[4] This term appears in Claims 1 and 10 of the '261 Patent.

downloads of data, reprogramming, and "transfer to successive electrode patches to ensure continuity of monitoring." ('473 Patent at 9:65-67.)

Construing "removably secured" as "secured in a manner that contemplates or intends for removal and potential reuse" captures all aspects of the term and is in line with the intrinsic record. The housing must be *secured*, that is, intentionally retained within the receptacle, and it must be *removable* by design, which allows for its reuse. This construction aligns with the Federal Circuit's holding in *Dorel Juv. Grp., Inc. v. Graco Children's Prods., Inc.*, which explained that "'removably secured' mean[s] only that the seat and base 'are designed at some time or another to come apart'" and that the term carries "an implication that the detachment or unsecuring process not do violence to the [invention]." 429 F.3d 1043 (Fed. Cir. 2005).

iRhythm's proposed limitation that removal must occur "without destruction" finds no footing in the claims nor the specification. The patent never uses the word "destruction," nor does it draw a distinction between destructive and non-destructive removal. Introducing that qualifier would raise questions the patent does not pose, such as what qualifies as "destruction," whether damage to one component is sufficient, and how much damage or change is too much. The patent does not speak in those terms, and I will not supply them.

Bardy's construction, by contrast, does too little. Saying only that the housing is "secured such that it may be removed" risks draining the term of meaning. While the

Patent does not claim reusability of the housing, the housing is not merely placed in the receptacle in a way that allows theoretical removal under extreme conditions. The claims and specification describe an intentional securing mechanism, one that holds the housing in place during normal use while allowing disengagement when desired.

### 4. "distal/proximal"[5]

| Bardy's Construction | iRhythm's Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | Indefinite; alternatively "relative to the housing" | "distal" means "positioned farther relative to the monitor recorder"; "proximal" means "positioned nearer relative to the monitor recorder" |

The claim terms "distal" and "proximal" are not indefinite. "[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *See Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (quotations omitted). Although these terms are relative terms, they do not require a subjective assessment of extent or magnitude. Rather, they describe where a component is situated relative to an objective reference point. The absence of an express reference point in the claim language does not render the terms indefinite so long as the intrinsic record provides sufficient context to inform a POSA of their meaning with reasonable certainty or where the intrinsic evidence provides an objective reference point. *See Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395 (Fed. Cir. 2016).

---

[5] This term appears in Claim 1 and 11 of the '735 Patent.

The intrinsic evidence supplies that reference point with consistency and clarity. Although the claims themselves do not state that the reference point is relative to the monitor recorder, the specification uses the monitor recorder (and not the sealed housing) as the structural anchor of the device. The specification describes the "proximal end" of the electrode patch as the end "located under the monitor recorder," while the "distal end" is the opposite end extending away from it. ('735 Patent at 5:63-6:2.) The figures reinforce this orientation, as they depict the monitor recorder positioned at one end of the device, with the flexible backing and electrodes extending from that point. (*See* '735 Patent at Figs. 5, 7.)

Read in light of the specification, the terms "distal" and "proximal" thus convey an objective spatial relationship that a POSA will understand. The claims do not leave open which end of the device is being referenced, nor do they require the reader to speculate about multiple competing baselines. Instead, the intrinsic evidence establishes a frame of reference that resolves any potential ambiguity.

### B.   iRhythm's Patent Terms

#### 1.   "electrical connection"[6]

| iRhythm's Construction | Bardy's Construction | Court's Construction |
| --- | --- | --- |
| Plain and ordinary meaning | "wire" | "a connection that permits the transmission of electricity" |

---

[6] This term appears in Claim 1 of the '734 Patent and Claim 1 of the '554 Patent.

A POSA, a jury, and I can understand that the term electrical connection means "a connection that permits the transmission of electricity." *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015). The electrical connection extends from the physiologic data collection circuit to the electrode and is positioned between a polymer upper layer and a polymer lower layer. ('734 Patent, 15:34-16:4.) While the claims define the electrical connection by what it does and where it is located, nothing in the claim language demonstrates a "clear intention" to limit the electrical connection to a wire or to any particular conductive structure. *See Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 906 (Fed. Cir. 2004). And although many embodiments describe wiring, the patent states that "wiring or other suitable" electrical connections can connect the electrodes with the electrical components. ('734 Patent at 8:49-51.) That language is deliberate. It makes clear that wiring is an example of an electrical connection, not its exclusive definition.

Bardy's proposed construction limiting "electrical connection" to a wire has no basis in the claim language, and the specification's express reference to other suitable electrical connections rules out that construction. Adopting it would improperly import a preferred embodiment into the claims and would exclude alternatives the patent contemplates. *Eko Brands, LLC v. Adrian Rivera Maynez Enters.*, Inc., 946 F.3d 1367, 1373 (Fed. Cir. 2020); *Apple Inc. v. Wi-Lan Inc.*, 25 F.4th 960, 967 (Fed. Cir. 2022). Bardy's reliance on prosecution arguments fares no better. Where, as here, the meaning of a

term is apparent from the claim language and reinforced by the specification, there is no

basis to narrow it.

    2.    **"[electrical connection] extending from the physiological data collection circuit to the electrode"[7]; "[electrical connection] extending linearly from the physiologic data collection circuit"[8]; and "[first substrate layer] extends horizontally away from the housing"[9]**

| Term | Bardy's Construction | iRhythm's Construction | Court's Construction |
|---|---|---|---|
| "[electrical connection] extending from the physiologic data collection circuit to the electrode"<br><br>"[electrical connection] extending linearly from the physiologic data collection circuit" | "originating at the physiological data collection circuit and continuing directly to the electrode without intervening components" | Plain and ordinary meaning | "[electrical connection] extending in the direction away from the physiologic data collection circuit to the electrode"<br><br>"[electrical connection] extending linearly in the direction away from the physiologic data collection circuit" |
| "[first substrate layer] extends horizontally away from the housing" | "originates at the housing and continues outward" | Plain and ordinary meaning | "[first substrate layer] extends in the direction horizontally away from the housing" |

    Because these terms employ the same structure and raise the same dispute about

whether "extending" imposes origin, direct, or intervening component requirements, I

---

[7] This term appears in Claim 1 of the '734 Patent.
[8] This term appears in Claim 1 of the '554 Patent.
[9] This term appears in Claim 1 of the '277 Patent.

address them together. The terms "[electrical connection] extending from the physiologic data collection circuit to the electrode" and "[electrical connection] extending linearly from the physiologic data collection circuit" describe the spatial and functional relationship among the electrical connection, the circuit, and the electrode. They require electrical continuity between the circuit and the electrode, but they do not require that the electrical connection originate at a particular point on the circuit, proceed directly, or exclude intervening components.

The claim language supports this construction. Claim 1 of the '554 patent separately adds a "linearly" limitation, confirming that "extending from" alone does not impose a requirement of directness. Reading such a limitation into "extending from" would render the "linearly" requirement superfluous. *SimpleAir Inc.*, 820 F.3d at 429. The specification likewise does not limit the electrical connection to a direct, uninterrupted path or one with intervening components. Although some figures and embodiments depict relatively straight wiring, the specification discloses alternative routing, including curved paths, conduits, slack, coils, and undulations, to accommodate flexion and movement of the device. (*See* '734 Patent at 8:66-9:1, Figs. 1, 2B, 2C.) These embodiments confirm that the invention permits variation in routing so long as it maintains electrical continuity.

Bardy's proposal improperly rewrites "extending from" as "originating at" and imposes additional limitations that appear nowhere in the claim language. Without clear

16

intent, embodiments should not limit an invention's scope, and generalized descriptions of advantages over the prior art do not amount to a clear and unmistakable disavowal. *See Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.,* 473 F.3d 1173, 1180–81 (Fed.Cir.2006); *Liebel–Flarsheim Co.,* 358 F.3d at 907-08. The same reasoning applies to the phrase "[first substrate layer] extends horizontally away from the housing," which likewise describes a relative spatial relationship without imposing requirements of origination or directionality beyond what the claim language itself states. Thus, I will not limit these terms by adding requirements such as "originating at," "continues directly," or "continues outward."

### 3.    "extending at least partially below the housing"[10]

| iRhythm's Construction | Bardy's Construction | Court's Construction |
| --- | --- | --- |
| Plain and ordinary meaning | "adhesive that extends partially, but not completely, below the housing" | Plain and ordinary meaning |

The term "at least partially" sets a minimum requirement, not a maximum. *See Quantum Corp. v. Rodime, PLC,* 65 F.3d 1577, 1581 (Fed. Cir. 1995); *Lantech, Inc. v. Keip Machine Co.,* 32 F.3d 542 (Fed.Cir.1994). An adhesive layer that extends partially below the housing satisfies the claim, and one that extends further does as well. Nothing in the claim language imposes an upper limit on how far the adhesive may extend. In fact, the specification indicates that the adhesive can extend completely below the housing. ('734

---

[10] This term appears in Claim 1 of the '734 Patent.

Patent at 7:63–67, 11:66–12:3, 12:8–10, Fig. 7B.) By limiting the adhesive to one that extends "partially, but not completely below the housing," Bardy adds a negative limitation that appears nowhere in the claim. If the patentee intended to prohibit adhesive from extending further beneath the housing, the claim could have said so. It did not, so I will not adopt that interpretation.

**4.    "configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user"[11]**

| iRhythm's Construction | Bardy's Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | Indefinite or "specifically designed to move into or out of a sloping relationship relative to the adhesive layer contacting the skin in response to movement of the user" | "designed to move at angles relative to the skin" |

The Parties disagree whether the claim language requires the housing itself to tilt or instead describes a relative angled orientation that occurs when the user moves. Although not indefinite, the term still requires construction because the dispute concerns how the claimed tilting occurs. I construe the term as "designed to move at angles relative to the skin." That construction captures the relative positional relationship described in the claim and is consistent with the specification's disclosure of how the device behaves during use.

---

[11] This term appears in Claim 1 of the '734 Patent.

Claim 1 requires configuration of the housing so that it tilts at an angle relative to the lower adhesive layer in response to the user's movement. Read in context, the claim describes what occurs at the interface between the device and the wearer during ordinary movement. When the user moves, the adhesive layer remains attached to the skin while the housing can come into a non-parallel orientation. I do not adopt iRhythm's formulation to the extent it suggests that the housing is the active source of the movement. That articulation risks implying that the housing itself actively tilts, pivots, or rotates, an interpretation that the intrinsic record does not support. The housing does not actively tilt, pivot, or rotate under its own force. The user moves. The adhesive layer remains adhered. Other portions of the patch flex. As a result, the housing may assume an angled orientation relative to the skin. The claim is directed to that resulting relative position. A construction that treats the housing as the thing that "moves into" an angle risks obscuring what the claim requires.

Bardy's alternative construction rewrites the claim. Replacing "configured to" with "specifically designed to" imports an intent requirement that the claim language does not support. "Configured to" describes capability and arrangement, not subjective purpose. Bardy's additional "sloping relationship" language fares no better as it unnecessarily complicates the jury's task where "at an angle" already conveys a non-parallel orientation.

Bardy's indefiniteness argument is also unavailing. The claim provides an objective frame of reference, which is the orientation of the housing relative to the adhered layer when the user moves. The law does not require numerical precision as to angle or degree of tilt, and nothing in the intrinsic record suggests otherwise. The claim language at issue recites sufficiently definite structure to allow a POSA to determine the claimed scope of the patent with reasonable certainty.

5. **"the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer"**[12]

| iRhythm's Construction | Bardy's Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | "the second substrate layer entirely covers, and extends beyond the peripheral edge of, the first substrate layer" | "the second substrate layer is above the first substrate layer, and extends beyond the boundary of the first substrate layer" |

Claim 1 recites two distinct spatial relationships: (a) the second substrate layer is positioned over the first substrate layer, and (b) it extends horizontally beyond a boundary of the first substrate layer. Nothing in that language requires the second substrate layer to *entirely cover* the first substrate layer. Thus, I will construe the term as "the second substrate layer is positioned over the first substrate layer and extends

---

[12] This term appears in Claim 1 of the '277 Patent.

20

horizontally beyond a boundary of the first substrate layer," as per its plain and ordinary meaning.

Bardy's proposed construction adds an "entirely covers" requirement that appears nowhere in the claim. "Positioned over" describes relative placement, not complete coverage, and "extends horizontally beyond a boundary" requires extension past at least one edge, not all of them. Reading an "entire coverage" limitation into the claim would rewrite the language the patentee chose. The specification does not compel that result.

Although some embodiments depict full overlap, the claims are not limited to the embodiments shown. The absence of an embodiment depicting partial coverage does not justify importing a restriction the claim itself does not impose. *See Gemstar–TV Guide Int'l, Inc. v. Int'l Trade Comm'n,* 383 F.3d 1352, 1366 (Fed. Cir. 2004); *Phillips,* 415 F.3d at 1323.

### 6.    "electrical contact with"[13]

| iRhythm's Construction | Bardy's Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | Indefinite or "in physical contact with or in capacitive connection with" | "contact that conducts electricity" |

"Electrical contact" is clear on its face and is not indefinite. *See Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1291 (Fed. Cir. 2015).  It is a term with a settled and well-understood meaning, and both a POSA and a jury would have no difficulty

---

[13] This term appears in Claim 1 of the '859 Patent and Claim 1 of the '860 Patent.

understanding the term's meaning and limits. Bardy's alternative construction does not add anything of value. It recasts "electrical contact" as "physical contact or capacitive connection," but that reformulation does not narrow the term, clarify its scope, or resolve any ambiguity. Bardy concedes that "electrical contact" cannot mean mere physical contact, making its proposed construction internally inconsistent. The added reference to "capacitive connection" appears nowhere in the intrinsic record and would only inject uncertainty, not resolve it. Rewriting the claim to enumerate every possible form of electrical interaction does not make the term more clear to a POSA or to me, so I will not adopt it.

## III.    CONCLUSION

I will construe the disputed claims as described above, and I will adopt the Parties' agreed-upon construction. An appropriate Order follows.

BY THE COURT:

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

February 19, 2026