# Exhibit M

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| In re U.S. Patent No.: | 12,303,277 | ) |
| | | ) |
| Date of Issue: | May 20, 2025 | ) |
| | | ) |
| Name of Patentee: | Kumar et al. | ) |
| | | ) |
| Serial No.: | 18/806,584 | ) |
| | | )   Group Art Unit:  Not yet assigned |
| | | ) |
| Filed: | Aug. 15, 2024 | )   Examiner:  Not yet assigned |
| | | ) |
| Title: | Device Features | )   Box: *Ex Parte* Reexam |
| | and Design | ) |
| | Elements for | ) |
| | Long-term | ) |
| | Adhesion | ) |
| | | ) |

## REQUEST FOR *EX PARTE* REEXAMINATION OF U.S. PATENT NO. 12,303,277

Mail Stop *Ex Parte* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Examiner:

Reexamination under 35 U.S.C. § 302 and 37 C.F.R. § 1.510 is hereby requested for claims 1 to 10 of U.S. Patent No. 12,303,277 (the "'277 patent"), which issued on May 20, 2025, to iRhythm Technologies, Inc., the applicant and assignee of record.

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

# TABLE OF CONTENTS

I.   Claims for Which Reexamination is Required ...............................................1

II.  Other Proceedings ...............................................................................1

III. Payment of Fees ................................................................................1

IV.  Technology of the '277 Patent .................................................................1
   A. Technological Overview .......................................................................1
   B. The '277 patent ..............................................................................3
   C. Prosecution History ..........................................................................4

V.   Level of Ordinary Skill .......................................................................6

VI.  Claim Construction ............................................................................6

VII. Identification of Patents and Printed Publications that Provide Substantial New Questions of Patentability .................................................................7

VIII. Ground 1 .....................................................................................7
   A. Overview of *Bly* ...........................................................................10
   B. Substantial New Questions of Patentability **Error! Bookmark not defined.**
   C. Claims 1 to 10 are Obvious over *Bly* .....................................................14

IX.  Ground II ....................................................................................32
   A. Overview of *Matsumura* ....................................................................32
   A. Substantial New Questions of Patentability **Error! Bookmark not defined.**
   B. *Matsumura* Anticipates or Renders Obvious Claim 1 ...................................33

X.   Conclusion ....................................................................................42

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

## TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| Ex. 1001 | The '277 patent |
| Ex. 1002 | U.S. Patent Application 18/806,584 |
| Ex. 1003 | U.S. Pub. No. 2009/0076363 to Bly *et al*. ("*Bly*") |
| Ex. 1004 | Japanese Patent Publication No. JP2004-121360 to Matsumura ("*Matsumura*") |
| Ex. 1005 | English Translation of Japanese Patent Publication No. JP2004/121360 to Matsumura ("*Matsumura*") |
| Ex. 1006 | U.S. Pub. No. 2003/0069510 to Semler ("*Semler*") |

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

## I.    CLAIMS FOR WHICH REEXAMINATION IS REQUIRED

Reexamination is requested for Claims 1 to 10 ("Challenged Claims") of the '277 patent.  A copy of the '277 patent is enclosed as Ex. 1001.  Requestor is not aware of any certificate of correction or reexamination certificate for the '277 patent.  The Challenged Claims are obvious over prior art not cited during examination of the '277 patent, including the reference relied on in this request, U.S. Patent Publication No. 2009/0076363 to Bly et al. ("*Bly*").

## II.    OTHER PROCEEDINGS

The '277 patent is presently asserted in *Bardy Diagnostics, Inc., v. iRhythm Techs., Inc.*, 24-1355-JDW (Dec. 10, 2024 D. Del.).

## III.    PAYMENT OF FEES

The appropriate fee for this Request for *ex parte* reexamination is included herewith.  Requestor does not believe that any additional fees are required.  However, if any additional charges are due, Requestor hereby authorizes they be charged to Deposit Account 02-1818.

## IV.    TECHNOLOGY OF THE '277 PATENT

### A.    Technological Overview

The '277 patent relates to a device that adheres to a user to monitor and collect physiological data from the user such as cardiac rhythm data.  *See* Ex. 1001, 1:41-46 and 7:24-30.  Adherent devices to couple to the patient's skin and monitor

1

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

physiological data of a patient were known well before the May 2010 priority of the '277 patent.  Ex. 1003, Title Page.

For example, devices to monitor patient data, such as electrocardiogram signals, were well known before May 2010 and typically include an exterior structure such as an adherent patch with a cover.  *See id.*, ¶12.  These patches included an adhesive to adhere the device to the patient's skin.  *Id.*, ¶84.  Further, they would include electrodes located on the bottom of the patch to collect patient data.  *See id.*, ¶57 and Figure 1B.

And, because the electrode-skin contacts are critical for proper signal acquisition, devices often include features to promote patient compliance and decrease stress forces on the adhesive.  For example, patient devices are configured to move with the skin of the patient in relation to the electronics.  *See, e.g., id.*, ¶84 (explaining that the patient device includes a gap, which allows to the device to "conform to the skin and not be restricted by structures supported with the tape, for example rigid structures such as the printed circuitry board"), *see also id.*, ¶101 (detailing an air gap between the adhesive portion and the electronic module "to provide patient comfort").  Accordingly, device electronics within a housing can move, or tilt, in relation to the adhesive layer that conforms to the patient's skin.

Typically, the devices include a protective cover to support the electrodes and protect other electrical components in the device.  *Id.*, ¶72.  To allow for long term

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

monitoring, the device—including the cover, patch with adhesive, and electrical components—is designed for long-term wear. *Id*., ¶48. Inside the device, under the cover, one would expect to find a housing to protect the electronic components. *See id*., ¶72. These devices further include various layers, including adhesive layers, layers to provide additional support to the device, and layers to enhance breathability to the skin. *See id*., ¶¶76, 84-86, and Figure 1J1.



*Id*., Figure 1I1 (annotated).

## B.    The '277 patent

The '277 patent issued from U.S. App. No. 18/806,584 on May 20, 2025. Ex. 1001, Title Page. The '277 patent describes a device for long-term adhesion to the check of a person for cardiac rhythm monitoring. *Id*., 7:24-30.

Specifically, the '277 patent describes a device with an exterior structure including a patch and layers or covers. *Id*., 7:31-33 and 13:53-59. The patch includes an adhesive to adhere the device to the user's skin. *Id*., 8:1-2 ("an adhesive

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

layer 166 can coat the bottom of the patch 100 for attachment to the skin[.]"). Further, the patch also includes electrodes "positioned on a bottom surface of the patch" to collect and monitor physiological data. *Id*., 3:60-62.

An external layer surrounds the internal contents of the device and the patch. *Id*., 1:66-14:14. The device is designed with "various flexible portions and/or hinged portions can compensate for stress[] caused as the skin stretches or bends" such that the device "can provide long-term adhesion to the skin." *Id*., 13:23-31. Further, the interior of the device includes a "housing containing an electronic component[.]" *Id*., 2:10. The device also includes various layers. *Id*., 10:17-29.



*Id*., Figure 1C (annotated).

## C.    Prosecution History

The '277 patent was filed on August 15, 2024, with a Track One prioritized examination request. Ex. 1001, Title Page; Ex. 1002, 1 to 29 and 732 to 733. The originally filed claims only included independent claim 1. Ex. 1002, 28. Applicant

4

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

filed a preliminary amendment on September 26, 2024, which cancelled original claim 1 and added new claims 2 to 19.  Preliminary Amendment (Sept. 26, 2024) at 2-3.  Claims 2 and 10 are in independent form and are both directed to "an electronic device for long-term adhesion to a mammal." *Id.*  A Non-Final Rejection was mailed October 24, 2024, which rejected all claims as indefinite and as obvious over U.S. Patent Publication No. 2002/0082491 in view of U.S. Patent Publication No. 2007/0285868 and/or further in view of U.S. Patent Publication No. 2008/0288026.  Non-Final Rejection (Oct. 24, 2024) at 2-7.

On March 21, 2025, the Patent Office issued a Notice of Allowance, stating that "[t]here is insufficient teaching, suggestion or motivation to replace the conductive adhesive electrode with a separate conductive electrode and adhesive[.]"  Notice of Allowance (March 21, 2025) at 3.

As set forth herein, these components, and the claimed patch as a whole, are nothing more than routine and well-understood components operating in accordance with their predictable function from the prior art.  *See* Ex. 1003, Title Page and ¶12-¶32.  The references relied upon in this paper present evidence that the claimed electronic device for long-term adhesion to a user configuration is well-known in the art.

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

## V.    LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art ("POSITA") is a hypothetical person who is presumed to know the relevant prior art and has ordinary creativity when interpreting and combining prior art. *In re Coutts*, 726 F. App'x 791, 796 (Fed. Cir. 2018); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420-21 (2007).

With respect to the '277 patent, a POSITA as of May 2010, had, among other attributes, a bachelor's degree in electrical engineering, electrophysiology, biomedical engineering, or an equivalent degree, and at least two to three years of experience designing wearable monitors that detect physiological signals with mechanical and/or electrical elements. Additional experience may substitute for education and vice versa. Such a POSITA would have had knowledge of design considerations known in the industry and would have been familiar with then-existing products and solutions.

## VI.    CLAIM CONSTRUCTION

During a reexamination proceeding, claims must be interpreted according to the "broadest reasonable interpretation" standard (the "BRI standard"). *In re NTP, Inc.*, 654 F.3d 1268, 1374-75, 99 U.S.P.Q.2d 1500 (Fed. Cir. 2011). The Federal Circuit explains that "[t]he broadest reasonable interpretation of a claim term may be the same as or broader than the construction of a term under the *Phillips*

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

standard." *Facebook, Inc. v. Pragmatus AV, LLC*, 582 F. App'x 864, 869 (Fed. Cir. 2014) (non-precedential).

The analysis presented below renders the Challenged Claims obvious under *any* claim construction that might be applied as a broadest reasonable interpretation of the claim terms.

## VII. IDENTIFICATION OF PATENTS AND PRINTED PUBLICATIONS THAT PROVIDE SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY

This Request for Reexamination of claims 1 to 10 of the '277 patent is based on substantial new questions of patentability as summarized above and set forth below in detail. The prior art cited herein was not relied upon during prosecution of the '277 patent.

Requestor submits that the grounds (1 and 2) identified below, based on the relied-on references as identified in the chart, raises a substantial new question of patentability of the '277 patent.

| Ground | Challenged Claims | Basis | Prior Art |
|--------|-------------------|-------|-----------|
| I | 1 to 10 | §103 | *Bly* |
| II | 1 | §103 | *Matsumura* |

### A. Substantial New Questions of Patentability

A substantial new question of patentability exists when the prior art "presents a new, non-cumulative technological teaching that was not previously considered

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

and discussed on the record during the prosecution of the application that resulted in the patent for which reexamination is requested."  M.P.E.P. § 2216.

Additionally, the law requires a "common sense" approach to examining whether the claimed invention is obvious to a person skilled in the art.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419-22 (2007).  "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."  *Id.*, 416.  For example, when "there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions," those circumstances tend to support the conclusion that a person of ordinary skill will have "good reason to pursue the known options within his or her technical grasp."  *Id.*, 421.  Finally, and of particular relevance here, claims of a patent are obvious if they are a rearrangement of known features that perform as expected.  *Id.*, 420-21.

While the issued patent that claims priority to the *Bly* reference used herein was submitted to the USPTO during prosecution of the '277 patent, that reference was submitted along with over 1,000 other references.  *See, e.g.*, Ex. 1002 at 221 (submitting *Bly* within a list of 1,051 references, Cite No. 247).   *Bly*, including the issued patent submitted during prosecution, was not used in an actual rejection and given the volume of references submitted, it is not surprising that the relevance of *Bly* to the patentability was overlooked.  Indeed, it is proper to rely on references

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

cited during prosecution when, as here, there is a demonstrated applicability of the reference to the patentability of the claims, thereby establishing a substantial new question of patentability. *See In re Swanson*, 540 F.3d 1368, 1375-76 (2008); *see also Ecto World, LLC v. RAI Strategic Holdings, Inc*, IPR2024-01280, paper 13 at *7 (PTAB May 19, 2025) (precedential) (indicating that 325(d) may not apply where "the IDS that includes the asserted prior art contains over 1,000 references, which is over 40 times the size of a typical IDS").

The English translation of *Matsumura* was not cited, and therefore not relied on, during prosecution of the '277 patent. Only the Japanese language version was cited in an IDS of over 1,000 other references, and never used in an actual rejection. *See, e.g.*, Ex. 1002 at 245 (submitting *Matsumura* within a list of 1,051 references, Cite No. 924). Like with *Bly* above, it is not surprising that the relevance of *Matsumura* to the patentability of the '277 patent was overlooked given the large volume of references submitted, and given that the applicant never submitted a certified English translation of *Matsumura* to the USPTO. It is proper to rely on references cited during prosecution when there is a demonstrated applicability of the reference to the patentability of the claims, thereby establishing a substantial new question of patentability. *See In re Swanson*, 540 F.3d at 1375-76.

9

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277

## VIII. GROUND 1

### A. Overview of *Bly*

*Bly* was filed as a non-provisional application on September 12, 2008, which stemmed from a various provisional applications filed September 14, 2007, and May 23, 2008. Ex. 1003, Title Page. Then, *Bly* published as U.S. Patent Application Publication No. 2009/0076363 on March 19, 2009. *Id*. Thus, the publication of *Bly* is prior art to the '277 patent, which has a priority date of May 12, 2010, under 35 U.S.C. § 102(b). Ex. 1001, 2 (noting the priority date for the '277 patent).

References within the statutory terms of 35 U.S.C.A. § 102 qualify as prior art for an obviousness determination only when analogous to the claimed invention. *See In re Bigio*, 381 F.3d 1320, 1325, 72 U.S.P.Q.2d 1209 (Fed. Cir. 2004). Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *Id*.

*Bly* is from the same field of endeavor as the '277 patent. In this regard, *Bly* and the '277 patent pertain to the field of devices for patient monitoring for extended periods. Ex. 1001, 1:40-46; Ex. 1003, ¶5. Indeed, both describe devices that adhere to a patient using an adhesive for long term patient monitoring. Ex. 1001, Title Page;

10

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

Ex. 1003, Title Page.

*Bly* is also directed to a problem facing the inventors of the '277 patent. Specifically, *Bly* describes an adherent monitoring device, which provides enhanced comfort to the patient. *Id.*, ¶8 ("In at least some instances, devices that are worn by the patient may be somewhat uncomfortable, which may lead to patients not wearing the devices and not complying with direction from the health care provider, such that data collection may be less than ideal."). Similarly, the '277 patent describes an adherent monitoring device to "withstand longer-term adhesion […] there is a need to implement device features and design elements that have the ability to enhance the likelihood of adhesion of a device to a human body for 24 hours or more[.]" Ex. 1001, 1:64-2:5.

*Bly*'s patient and a monitoring system comprising an adherent device is depicted in Figure 1A below.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



FIG. 1A

Exhibit 1003, Figure 1A.

The device includes an adherent patch 110 with a breathable tape 110T layer and a gel cover 180 layer. *See id.*, ¶¶12, 22, and Figure 1J1. Moreover, *Bly*'s system includes a cover 162, which serves to "protect the electronic components, and […] the electronics housing 160[.]" Ex. 1003, ¶172. The "[p]atient side 110A [of the device] comprises adhesive 116A to adhere the patch 110 and adherent device 100 to patient P. Electrodes 112A, 112B, 112C and 112D are affixed to adherent patch 110." *Id.*, ¶57.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1J1.

To ensure a proper connection between the adhesive layer and the skin of the patient, *Bly's* device includes a gap that extends between the breathable tape and printed circuit board 120. *Id.*, ¶15. This gap "allow[s] the tape to adhere to the body to conform to the skin and not be restricted by structures supported with the tape, for example rigid structures such as the printed circuitry board." *Id.* Additionally, the gap allows the rigid structure to move in relation to the adhesive portion, which increases patient comfort. *Id.*, ¶101. In reference to Figure 1I1, *Bly* explains that "[a]ir gap 169 allows adherent patch 110 and breathable tape 110T to remain supple and move, for example bend, with the skin of the patient with minimal flexing and/or bending of printed circuit board 120 and electronic components 130." *Id.*, Figure 1I1, reproduced below, identifies air gap 169 as the yellow layer.

13

REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277



Ex. 1003, Figure 1I1 (annotated).

### B.    Claims 1 to 10 are Obvious over *Bly*

| U.S. Patent No. 12,303,277 | U.S. Pub. No. 2009/0076363 to Bly et al. ("*Bly*"). |
|---|---|
| 1[pre]. An electronic device for long-term adhesion to a user, the device comprising: | *Bly* discloses an electronic device for long-term adhesion to a user. <br><br> Specifically, *Bly*'s "adherent device" 100 is an electronic device. *See* Ex. 1003, Title Page. For example, the adherent device comprises various "[e]lectronic components[.]" *Id.* "[T]he adherent device comprises an electronics housing adhered to at least one of the electronics components or the printed circuit board, such that the electronics housing is disposed between the cover and electronics components." *Id.*, ¶21. <br><br> Further, *Bly*'s adherent device is designed to "monitor a patient for an extended period" (e.g., "long-term adhesion") and includes "breathable tape […] with an adhesive coating to adhere the breathable tape to a skin of the patient" (e.g., "to a user"). *Id.*, ¶13. Specifically, "the patch [of the adherent device] is configured for patient comfort, such that the patch can be worn and/or tolerated by the patient for extended periods, for example 90 days or more." *Id.*, ¶48. <br><br> *Bly*'s Figure 1A (below) discloses the adherent device (e.g., electronic device) adhered to the skin of the user. *Id.*, Figure 1A. Moreover, *Bly*'s Figure 1A also discloses the electronic monitoring system 10, "in which patient care can be monitored and implemented from the remote center in response to signals from the adherent device." *Id.*, ¶50. |

14

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1A (annotated).

| | |
|---|---|
| 1[a]. a housing comprising a physiologic data collection circuit; | *Bly* discloses an electronic device for long-term adhesion to a user with a housing comprising a physiologic data collection circuit.<br><br>*Bly* discloses "the adherent device (e.g., electronic device for long-term adhesion to a user) comprises an ***electronics housing*** *160 (e.g., a housing)*. *Id.*, ¶21.<br><br>"In many embodiments, an electronics housing 160 may be disposed under cover 162 to protect the electronic components, and in some embodiments electronics housing 160 may comprise an encapsulant over the electronic components and PCB [printed circuit board]." *Id.*, ¶72.<br><br>"[T]he electronics housing can be affixed over the [printed circuit board] and electronics components, for example with dip coating, such that ***electronics components 130, printed circuit board 120 and electronics housing 160 are coupled together***." *Id.*, ¶100.<br><br>The electronics components include various circuits that collect physiologic data of the user. For example, *Bly* discloses that the "[e]lectronics components 130 comprise an activity sensor and activity circuitry 134, impedance circuitry 136 and electrocardiogram circuitry, for example ECG circuitry 136. In some embodiments, electronic circuitry 130 may comprise a microphone and microphone circuitry 142[.]" *Id.*, ¶60. "***Electronic components are electrically connected to the printed circuit board and coupled to the at least one electrode to measure physiologic signals of the patient.***" *Id.*, ¶13.<br><br>*Bly* discloses the electronics housing 160 in Figures 1H and 1G. |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1H (annotated).



*Id.*, Figure 1G (annotated).

*Bly* discloses the electronics housing 160 and electronic components 130 and various circuits to collect physiologic data.



*Id.*, Figure 1I (annotated).

| 1[b]. an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing | *Bly* discloses an electronic device for long-term adhesion to a user with an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user.

Specifically, *Bly* discloses an electrode-supporting section, which includes, at least, "a breathable support, for example a breathable adherent patch, and breathable cover that can be used for extended |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| adhesion to the skin of the user; | periods with improved patient comfort." *Id*., ¶12.<br><br>Figure 1J of *Bly* is disclosed below, which includes the cover 162 and the adherent patch 110 comprising breathable tape 110T and gel cover 180. *Id*., ¶96. These components form the electrode-supporting section, as annotated in yellow.<br><br><br><br>*Id*., Figure 1J (annotated).<br><br>Figure 1I of *Bly* includes the electrode supporting section as constructed in the adherent device 100.<br><br><br><br>*Id*., Figure 1I (annotated).<br><br>Moreover, *Bly* discloses that "[i]n many embodiments, electrodes 112A, 112B, 112C and 112D extend from lower side 110A through adherent patch 110 to upper side 110B." *Id*., ¶58. Thus, *Bly*'s Figure 1B (below) discloses the electrode-supporting section, supporting electrodes 112A, 112B, 112C and 112D. |

17

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1B.

First, *Bly* discloses that ***gel cover 180 is a first substrate layer***. "[T]he adherent device comprises a gel cover [180] positioned over the breathable tape to inhibit a flow of the gel through the breathable tape, and the printed circuit board is located over the gel cover such that the gel cover is disposed between the breathable tape and the printed circuit board." *Id.*, ¶22. The gel cover (e.g., first substrate layer) is annotated in below in green.



*Id.*, Figure 1J1 (annotated).

Second, *Bly* discloses that ***cover 162 is a second substrate layer***. "[C]over 162 can encase the flex PCB and/or electronics and can be adhered to at least one of the electronics, the flex PCB or adherent patch 110, so as to protect at least the electronics components and the PCB. Cover 162 can attach to adherent patch 110 with adhesive 116B." *Id.*, ¶92. The cover (e.g., second substrate layer) is annotated below in yellow.

18

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1J1 (annotated).

Finally, *Bly* discloses an adhesive 116A (e.g., a lower adhesive layer). Specifically, "*Bly* discloses "***an adhesive 116A*** […] comprising a layer of acrylate pressure sensitive adhesive, can be disposed on underside 110A of [adherent] patch 110." *Id.*, ¶84.

As noted above, the adhesive 116A (e.g., lower adhesive layer) is positioned on a bottom surface. *Id.* ("***an adhesive 116A*** […] comprising a layer of acrylate pressure sensitive adhesive, ***can be disposed on underside 110A of patch 110***"). Further, the adhesive 116A (e.g., lower adhesive layer) provides adhesion to the skin of the user. *Id.* ("***adhesive 116A adheres adherent patch 110 [] to the skin of the patient***, so as not to interfere with the functionality of the breathable tape").

*Bly*'s Figure 1I1 and Figure 1B disclose the electrode supporting section annotated in yellow and the ***adhesive 116A (e.g., a lower adhesive layer)*** located on the lower side 110A of the electrode supporting section.



*Id.*, Figure 1I1 (annotated).

19

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1B.

| 1[c]. an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and | *Bly* discloses an electronic device for long-term adhesion to a user with an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit. |
| --- | --- |
| | *Bly*'s adherent device 100 (e.g., an electronic device for long-term adhesion to a user) includes a lower side 110A (e.g., bottom surface). The lower side 110A is located on the bottom of the electrode-supporting section. Electrodes 112A, 112B, 112C and 112D are positioned on the lower side 110A (e.g., bottom surface) of this lower side 110A. For example, the "[a]dherent patch 110 comprises a first side, or a lower side 110A, that is oriented toward the skin of the patient when placed on the patient." *Id.*, ¶57. |
| | Further, "***electrodes 112A, 112B, 112C and 112D extend from lower side 110A*** through adherent patch 110 to upper side 110B." *Id.*, ¶58. |
| | *Bly*'s "Figure 1K shows at least one electrode configured to electrically couple to a skin of the patient through a breathable tape[.]" *Id.*, ¶44. As disclosed, the electrodes are positioned on the lower side 110A (e.g., bottom surface) of the adherent device 100. Also disclosed is the adhesive 116A disposed on underside 110A of patch 110. |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



FIG. 1B

*Id.*, Figure 1B.

Further, electrodes 112A, 112B, 112C and 112D are connected to the physiologic data collection circuit. For example, *Bly* discloses that "[e]lectronic components electrically are connected to the printed circuit board and coupled to the at least one electrode to measure physiologic signals of the patient." *Id.*, Title Page.

| | |
|---|---|
| 1[d]. wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and | *Bly* discloses an electronic device for long-term adhesion to a user wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode.<br><br>*Bly*'s gel cover 180 (e.g., the first substrate layer) is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode.<br><br>For example, Figure 1I1 discloses the gel cover (e.g., the first substrate layer), annotated in green, extends horizontally away from the electronics housing 160 (e.g., housing). In other words, the gel cover 180 extends wider in the horizontal direction on the left and right side of the adherent device 100 than the housing 160.<br><br><br><br>FIG. 1I1<br><br>*Id.*, Figure 1I1 (annotated).<br><br>Further, as disclosed in Figure 1J1, the gel cover 180 (e.g., the first substrate layer), which spans the area of the layer disclosed in green, extends beyond the boundary of the electrode. "[T]he gel cover |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

|  | stretches and tape stretch with the skin of the patient." *Id.*, ¶77. "Arrows 182 show stretching […] at least two dimensional along the surface of the skin of the patient." *Id.*, ¶94.  *Id.*, Figure 1J1 (annotated). |
|---|---|
| 1[e]. wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer. | *Bly* discloses an electronic device for long-term adhesion to a user wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer. The cover 162 (e.g., the second substrate layer) is positioned over the gel cover 180 (e.g., the first substrate layer) and extends horizontally away from the housing beyond a boundary of the electrode. For example, Figure 1I discloses the cover 162 (e.g., the second substrate layer), annotated in yellow, extending horizontally beyond a boundary of the gel cover 180 (e.g., the first substrate layer).  In other words, the cover 162 (e.g., the second substrate layer) is wider in a horizontal direction than the gel cover 180 (e.g., the first substrate layer)  *Id.*, Figure 1I1 (annotated). Further, as also disclosed in Figure 1J1, the cover 162 (e.g., the second substrate layer), annotated in yellow, extends horizontally |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| | beyond a boundary of the gel cover 180 (e.g., the first substrate layer). |
| | Further, "the edge of the cover [162] may be adhered at the edge of the adherent patch [110.]" *Id.*, ¶107. Thus, the cover 162 extends as far as the edge of the adherent patch 110. |
| |  |
| | *Id.*, Figure 1J1 (annotated). |
| 2. The electronic device of claim 1, wherein the electrode supporting section further comprises a third substrate layer adhered to the first substrate layer. | *Bly* discloses the electrode supporting section further comprises a third substrate layer adhered to the first substrate layer. |
| | *Bly* discloses the electrode supporting section includes a breathable tape 110T (e.g., a third substrate layer), which is adhered to the gel cover 180 (e.g., the first substrate layer). |
| | Specifically, *Bly* discloses that "[a] ***gel cover 180, or gel cover layer, for example a polyurethane non-woven tape, can be positioned over patch 110***[.]" *Id.*, ¶85. |
| | The gel cover 180 includes an adhesive that adheres the gel cover 180 (e.g., the first substrate layer) to the breathable tape 110T (e.g., the third substrate layer) of the adherent patch 110. For example, *Bly* discloses that "gel cover 180 may comprise an adhesive, for example an acrylate pressure sensitive adhesive, to adhere the gel cover to adherent patch 110." *Id.*, ¶87. |
| | Further, Figure 1J1 of *Bly* discloses the breathable tape 110T (e.g., the third substrate layer), disclosed in yellow, adhered to the gel cover 180 (e.g., the first substrate layer), disclosed in green, of the electrode supporting section. |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277**



|  |  |
|---|---|
|  | *Id.*, Figure 1J1 (annotated). |
| 3. The electronic device of claim 1, further comprising an upper adhesive layer positioned on the underside of the first substrate layer. | *Bly* discloses an upper adhesive layer positioned on the underside of the first substrate layer.<br><br>In this regard, *Bly* discloses an adhesive 116B (e.g., an upper adhesive layer) positioned on the underside of the gel cover 180 (e.g., the first substrate layer).<br><br>For example, *Bly* discloses that "[a]dhesive 116B can be applied to upper side 110B of patch 110[.]" *Id.*, ¶106.<br><br>Figure 1I1 of *Bly* discloses the adhesive 116B (e.g., an upper adhesive layer), positioned on the underside of the gel cover 180 (e.g., first substrate layer)<br><br>*Id.*, Figure 1I1 (annotated).<br><br>Moreover, "gel cover 180 [e.g., first substrate layer] may comprise an adhesive, for example an acrylate pressure sensitive adhesive, to adhere the gel cover to adherent patch 110." *Id.*, ¶87. Thus, the gel cover includes its own adhesive layer, which adheres to the gel cover to the patch, which is located on the underside of the gel cover. *See* id., Figure 1I1. |
| 4. The electronic device of claim 1, wherein the lower adhesive layer extends at least partially below the housing. | *Bly* discloses the lower adhesive layer extends at least partially below the housing.<br><br>*Bly*'s adhesive 116A (e.g., the lower adhesive layer) extends at least partially below the electronics housing 160 (e.g., the housing). |

24

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

|  | In this regard, *Bly* discloses "[e]lectronics components 130, printed circuit board 120, and electronics housing 160 are disposed between the stretchable breathable material of adherent patch 110 and the stretchable breathable material of cover 160[.]" *Id.*, ¶100.  Further, "an adhesive 116A, for example breathable tape adhesive comprising a layer of acrylate pressure sensitive adhesive, can be disposed on underside 110A of patch 110." *Id.*, ¶84. |
|  | Thus, as disclosed in Figures 1G and 1H, the adhesive 116A (annotated in yellow) extends below the housing 160 (annotated in green).  "FIG. 1G shows a side view of the adherent device[.]" *Id.*, ¶40.  "FIG. 1H shown a bottom isometric view of the adherent device as in FIGS. 1A to 1G[.]" *Id.*, ¶41. |
|  | <br>*Id.*, Figure 1G (annotated). |
|  | <br>*Id.*, Figure 1H (annotated). |
| 5. The electronic device of claim 1, further comprising a flap extending beneath the housing. | *Bly* discloses a flap extending beneath the housing.<br><br>For example, *Bly* discloses that "adherent patch 110 stretches and/or retracts with the skin of the patient."  Ex. 1003, ¶95.<br><br>*Bly* specifies that "[e]lectronics components 130, printed circuit board 120, and electronics housing 160 are disposed between the stretchable breathable material of adherent patch 110 and the stretchable breathable material of cover 160 so as to allow the |

**REQUEST FOR EX PARTE REEXAMINATION OF U.S. PATENT NO. 12,303,277**

adherent patch 110 and cover 160 to stretch together while electronics components 130, printed circuit board 120, and electronics housing 160 do not stretch substantially, if at all." *Id.*, ¶100.

As shown in Figures 1G, 1I, for example, adherent patch 110 extends beneath the electronics housing 160 and forms flaps (annotated in red) that are integral with the lateral edges of adherent patch 110.



*Id.*, Figure 1G (annotated).



*Id.*, Figure 1I (annotated).

*Bly* discloses that the patch is made of a thin, flexible material. For example, the "adhesive patch may comprise a ***thin, flexible, breathable*** patch[.]" *Id.*, ¶111.

Further, "[t]he breathable cover 162 and adherent patch 110 comprise breathable tape.… The breathable tape may comprise the ***stretchable breathable material*** with the adhesive …, such that both the adherent patch and cover can stretch with the skin of the patient." *Id.*, ¶94.

26

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

|  |  |
|---|---|
|  | The portion(s) of the adherent patch that extend wider and below the housing is a "flap" as recited in claim 2. The adherent patch is a thin material with freedom to stretch and flex. The patch is also connected to a larger body, which allows it to serve as an extension of the device with the ability to bend and flex due to the material. Thus, *Bly* discloses a flap under the broadest reasonable interpretation of this claim element.. |
|  | In another example, *Bly* states that "the patch comprises two electrodes, for example two electrodes to measure the electrocardiogram (ECG) of the patient. Gel 114A, gel 114B, gel 114C and gel 114D can each be positioned over electrodes 112A, 112B, 112C and 112D, respectively, to provide electrical conductivity between the electrodes and the skin of the patient." Ex. 1003, ¶57. In this example embodiment, the gel is a flap that extends beneath the housing. *See id.*, Figure 1J. |
|  |   Ex. 1003, Figure 1J.    Ex. 1003, Figure 1I. |
| 6. The electronic device of claim 1, wherein the housing is rigid. | *Bly* discloses the housing is rigid.  *Bly* discloses that "[e]lectronics housing 160 may comprise an encapsulant, such as a dip coating [...] silicone and/or ***epoxy***. In many embodiments, the PCB encapsulant protects the PCB and/or |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | electronic components from moisture and/or mechanical forces. The encapsulant may comprise silicone, epoxy, other adhesives and/or sealants. In some embodiments, the electronics housing ***may comprise metal and/or plastic*** housing[.]" *Id.*, ¶90. In the disclosed embodiment of *Bly*, the plastic and metal materials used to construct the housing "to protect the printed circuit board and the electronic components from … mechanical forces" would be understood to be a rigid material in order to accomplish the stated protection. *Id.*, ¶21. This is confirmed by the fact it was well known to rely on rigid housings to protect components in long-term monitors. *See, e.g.* Ex. 1005, ¶2 (disclosing "a "HEARTCARD™ monitor [that] is intended for long-term use, and thus is enclosed in a durable ***rigid housing***, []provided with long-life batteries..."). In yet another example, figure 4B of *Matsumura* discloses the housing of the signal processor 10 sinking into the first sheet 1 (*see* reference numeral 10b). Ex. 1005, Figure 4b. To allow for such function, *Matsumura*'s housing is more rigid than the insulating material of the first sheet 1 into which the housing is pressed. *See id.*, ¶17-18. |
|---|---|
| 7. The electronic device of claim 1, wherein the housing is configured to remain connected to the electrode-supporting section when the housing is tilted at an angle relative the lower adhesive layer in response to movement of the user. | *Bly* discloses the housing is configured to remain connected to the electrode-supporting section when the housing is tilted at an angle relative to the lower adhesive layer in response to movement of the user.<br><br>Air gap 169 allows housing 160 to tilt at an angle relative to the lower adhesive layer 116A in response to movement of the user. For example, device 100 adheres to a patient via adhesive layer 116A. If the patient's skin moves in an upward direction (e.g., in the upward direction of arrow 186 in the below figure), the height of air gap 169 decreases because printed circuit board 120 tilts. Thus, air gap 169 allows the printed circuit board 120 and electronic components 130 to move independently of adherent patch 110 (and adhesive layer 116). As *Bly* explains, this allows the patch to move with the patient's skin for patient comfort. For added clarity, an additionally zoomed in view of annotated Figure 1I is provided below.<br><br>Specifically, *Bly* explains that "[a]ir gap 169 may extend from adherent patch 110 to the electronics module and/or PCB, so as to provide patient comfort. Air gap 169 allows adherent patch 110 and breathable tape 110T to remain supple and move, for example bend, with the skin of the patient with minimal flexing and/or bending of printed circuit board 120 and electronic components 130, as indicated by arrows 186" in Figure 1I. Ex. 1003, ¶101. |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1I (annotated).

In reference to Figure 1I, as indicated by red arrows in Figure 1I above, electronics housing 160 is configured to remain connected to the adherent patch 110 (e.g., flexible layer) when the electronic housing (e.g., housing) and adhesive 116A (e.g., lower adhesive layer) are flexed or bent (e.g., tilted) relative to each other.

The electronics housing 160 (e.g., housing) is "adhered to at least one of the electronics components or the printed circuit board, such that the electronics housing is disposed between the cover and electronics components." *Id.*, ¶21. "Cover 162 [e.g., electrode-supporting section] can be attached to [] electronics housing 160 comprising over the encapsulated [printed circuit board]." *Id.*, ¶105. Moreover, the device includes "[c]onnectors 122A, 122B, 122C and 122D [] positioned on flex printed circuit board 120[.]" *Id.*, ¶59.

Figure 1I discloses the configuration of these elements and the air gap (annotated in green).



*Id.*, Figure 1I (annotated).

29

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Figure 1I (annotated).

In reference to Figure 1I, movement of the user may cause 116A to move upward, decreasing the space of air gap 169, while the printed circuit board 120 and electronic components 130 stay stationary, which a POSITA would understand to render obvious the claimed "tilting" limitation.

Thus, the housing, electronics, and PCB are balanced on the connector 122A, which acts as a central balancing point. The air gap below allows the housing, electronics, and PCB freedom to move because nothing is blocking or resisting the motion. Thus, when a user wearing the device moves, the adherent device's center of mass will also shift and cause housing to tilt at an angle. In other words, the configuration of the device causes the housing to behave like a seesaw and tilt at an angle relative to the adhesive 116A (e.g., lower adhesive layer) in response to movement of the user.

Thus, when the device is moved based on a user's movement, the air gap 169 allows the housing and electronic components to "remain supple and move, for example bend, with the skin of the patient." *Id.*, ¶101. Movement of the patient will create slight shifts in the center of mass of the device, which will cause the housing to adjust at various angles as allowed by the air gap 169.

| 8. The electronic device of claim 1, further comprising a hinge portion adjacent the housing. | *Bly* discloses a hinge portion adjacent to the housing.<br><br>Specifically, *Bly* discloses a hinge portion adjacent to the housing configured to allow the device to bend.<br><br>*See* claim 7. As described in claim 7, *Bly*'s device is configured to include an air gap, which allows the housing to tilt at an angle |

30

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

<table>
<tr>
<td></td>
<td>

relative to the lower adhesive layer in response to movement of the user. To provide such function, *Bly* further discloses a "hinge portion adjacent the housing" under the broadest reasonable interpretation of this claim element.

For example, as shown in Figure 1I1, *Bly* discloses a flexible connector 122A to provide strain relief. *Id.*, ¶78, Figure 1I1 (annotated), Figure 1I.



*Id.*, Figure 1I1 (annotated).

The housing, printed circuit board, and electronic components pivot via connector 122A when the described motion occurs. As described in reference to claim 7, air gap 169 disposed below these elements allow the same to tilt in response to the lower to adhesive layer 116A moving with the skin of the patient. *See id.*, ¶101 ("Air gap 169 allows adherent patch 110 and breathable tape 110T to remain supple and move, for example bend, with the skin of the patient with minimal flexing and/or bending of printed circuit board 120 and electronic components 130, as indicated by arrows 186.").

</td>
</tr>
<tr>
<td>

9. The electronic device of claim 1, wherein the lower adhesive layer comprises a hydrocolloid adhesive.

</td>
<td>

*Bly* discloses the lower adhesive layer comprises a hydrocolloid adhesive.

"*[A]dhesive 116A [e.g., lower adhesive layer] comprises* at least one of acrylate, silicone, synthetic rubber, synthetic resin, *hydrocolloid adhesive*, pressure sensitive adhesive (PSA), or acrylate pressure sensitive adhesive." *Id.*, ¶84.

</td>
</tr>
<tr>
<td>

10. The electronic device of claim 1, wherein the physiologic data collection circuit is configured to collect cardiac rhythm data from the user.

</td>
<td>

*Bly* discloses the physiologic data collection circuit is configured to collect cardiac rhythm data from the user.

"The adherent device may contain a subset of the following physiological sensors: bioimpedance, respiration, respiration rate variability, heart rate (ave, min, max), *heart rhythm*, hear rate variability (hereinafter "HRV), heart rate turbulence (hereinafter "HRT"), heart Sounds (e.g. S3), respiratory Sounds, blood pressure, activity, posture, wake/sleep, orthopnea, temperature/heat flux, and weight." *Id.*, ¶54.

</td>
</tr>
</table>

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | Further, "the adherent device may continuously monitor physiological parameters, communicate wirelessly with a remote center, and provide alerts when necessary. The system may comprise an adherent patch, which attaches to the patient's thorax and contains sensing electrodes, battery, memory, logic, and wireless communication capabilities." *Id.*, ¶51. |
|---|---|

## IX.    GROUND II

### A.    Overview of *Matsumura*

*Matsumura* published on April 22, 2004, as Japanese Patent Publication 2004-121360.  Thus, the publication of *Matsumura* is prior art to the '277 patent, which has a priority date of May 12, 2010, under 35 U.S.C. § 102(b).  Ex. 1001, 2 (noting the priority date for the '277 patent).

*Matsumura* describes a multi-layer wearable monitor for detecting bioelectric potential.  Ex. 1005, Abstract.  *Matsumura* further discloses that the device is for long-term wear, including that the "subject (patient) wears the bioelectric potential detector 11 on his/her chest at all times to detect electrocardiogram signals[,]" even while "tak[ing] a shower or a bath."  *Id.*, ¶¶36-37.  In reference to Figure 1, *Matsumura* provides a bioelectric potential detector 11 comprised of disposable pad 7 and reusable signal processor 10 (red).  *Id.*, ¶16.  Disposable pad 7 further comprises first sheet 1 (green), second sheet 4 (blue), electrical components (i.e., conductive material 2, hooks 3 (orange) located between first sheet 1 and second sheet 4, conductive gels 5 (purple), and double-sided adhesive tape 9.  *Id.*, ¶16, Figure 1 (annotated below).  Conductive material 2 creates a conductive path

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277**

between conductive gel 5 and hooks 3, and hooks 3 provide a conductive path

upwards through first sheet 1 and double-sided adhesive tape 9 to processor 10. *Id.*,

¶19. The device may be adhered to the user by removing release tape 8 (yellow) to

expose an adhesive layer that has been applied to the bottom surface of second sheet

4 (blue), which is then applied directly to the user. *Id.*, ¶16; *see, e.g.*, Figure 3.



*Id.*, Figure 1 (annotated).

### B.    *Matsumura* Renders Obvious Claim 1

| U.S. Patent No. 12,303,277 | JP Pub. No. 2004-121360 to Matsumura et al. ("*Matsumura*"). |
| --- | --- |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| 1[pre]. An electronic device for long-term adhesion to a user, the device comprising: | *Matsumura* discloses an electronic device for long-term adhesion to a user.<br><br>Specifically, *Matsumura* discloses a "a bioelectric potential detector that can measure bioelectric potential (electrocardiograms)." Ex. 1005, Abstract. Further, "[t]he bioelectric potential detector 11 can be used as an electrocardiogram detector that is worn on the subject's chest to detect electrocardiogram signals." *Id.*, ¶24.<br><br>*Matsumura* explains that the "subject (patient) **wears the bioelectric potential detector 11 on his/her chest at all times** to detect electrocardiogram signals." *Id.*, ¶36. In this way, "the subject can take a shower or a bath 21 while wearing the waterproof bioelectric potential detector 11." *Id.*, ¶37.<br><br>*Matsumura* explains that an "adhesive, such as acrylic adhesive for example, is applied to the back surface of the second sheet 4." *Id.*, ¶18. Release sheet 8 is "peeled off" to expose the adhesive back surface of the second sheet 4, which is applied to directly to the patient's skin. *Id.*, ¶16; *see also id.* Figure 2 (below).<br><br><br><br>*Id.*, Fig. 2 (annotated). |
| 1[a]. a housing comprising a physiologic data collection circuit; | *Matsumura* discloses an electronic device for long-term adhesion to a user with a housing comprising a physiologic data collection circuit.<br><br>*Matsumura* discloses a signal processor 10 including a physiologic data collection circuit. The signal processor 10 is surrounded by a housing. |

34

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| | "The **signal processor 10 includes a processing circuit for [e.g. physiologic data collection circuit] filtering and amplifying the detected biopotential signal**, a memory for storing the processed biopotential signal, and a module for modulating the processed biopotential signal and wirelessly transmitting the modulated biopotential signal. A circuit and a loop antenna are incorporated. Further, the **housing of the signal processor 10** has a waterproof structure." *Id.*, ¶25.<br><br><br><br>*Id.*, Fig. 1 (annotated). |
| 1[b]. an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user; | *Matsumura* discloses an electronic device for long-term adhesion to a user with an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user.<br><br>*Matsumura* discloses that bioelectrode pad 7 is an electrode supporting section.<br><br>Further, *Matsumura* discloses that the "bioelectrode pad 7 includes **a first sheet 1 [e.g., second substrate layer]**, a conductive material 2, a hook 3, **a second sheet 4 [e.g., first substrate layer]**, a conductive gel 5 [e.g., electrodes] , a third sheet 6, and a double-sided adhesive tape 9." *Id.*, ¶16. |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

|  | Figure 1 discloses the bioelectrode pad 7 (e.g., electrode supporting section) including the first sheet 1 (e.g., second substrate layer) and the second sheet 4 (e.g., first substrate layer).



*Id.*, Fig. 1 (the second substrate layer is annotated in green and the first substrate layer is annotated in blue).

Moreover, *Matsumura* discloses that an "***adhesive, such as acrylic adhesive, for example, is applied to the back surface of the second sheet 4***" is a lower adhesive layer that adheres the electronic device to a user.

Specifically, *Matsumura* explains that release sheet 8 is a sheet of material that is attached to the back surface of second sheet 4 and removed before use. *Id.*, ¶16. Release sheet 8 is "peeled off" to expose the adhesive back surface of the second sheet 4, which is applied directly to the patient's skin. *Id.*, ¶16; *see also id.* Figure 2 (below). |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

|  |  |
|---|---|
|  | <br><br>Ex. 1005, Figure 2 (annotated yellow indicating release sheet 8, and blue indicating the adhesive back).<br><br>Accordingly, *Matsumura* discloses a lower adhesive layer (e.g., adhesive, such as acrylic adhesive) positioned on second sheet 4 (e.g., first substrate layer), that adheres the device to a user. |
| 1[c]. an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and | *Matsumura* discloses an electronic device for long-term adhesion to a user with an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit.<br><br>*Matsumura* discloses conductive gel 5 (e.g., electrode) is positioned on the bottom surface of the bioelectrode pad 7 (e.g., electrode-supporting section). For example, Figure 1 discloses the conductive gel 5 (e.g., electrode) positioned on the bottom surface of the bioelectrode pad 7 (e.g., electrode-supporting section). The electrodes are annotated in yellow. |

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**



*Id.*, Fig. 1 (the electrodes are annotated in yellow).

Further, *Matsumura* discloses conductive gel 5 (e.g., electrode) is electrically connected to the signal processor 10 (e.g. physiologic data collection circuit).

"A conductive material 2 and a hook are provided between the first sheet 1 and the second sheet 4 in order to derive a bioelectric potential detected by the conductive gel 5 disposed in the opening 4a of the second sheet 4. […] Two hooks 3 are arranged such that the protrusions of the hook 3 pass through the holes 2a and 1a from the back side of the conductive material 2. With this configuration, the biopotential detected by the conductive gel 5 is led out through the conductive material 2 and the hook 3." *Id.*, ¶18.

"Two hooks 3 are arranged such that the protrusions of the hook 3 pass through the holes 2a and 1a from the back side of the conductive material 2." *Id.*, ¶19.

"[T]he hook 3 projecting from the adhesive tape 9 is fitted to the hook fitting portion 10a on the bottom surface of the signal processor 10." *Id.*, ¶24.

Annotated figure 1 below discloses the electrical connection between the conductive gel 5 and the signal processor 10 represented by the flow of psychological data. The annotated figure below discloses the electrical connection between the conductive gel 5, hooks 3, and the signal processor 10.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| |  bioelectric potential is detected by the conductive gel 5, which runs through the hooks, and into the signal processor 10<br><br>*Id.*, Fig. 1 (annotated arrows show the flow of bioelectric potential from the electrodes to the housing comprising the physiologic data collection circuit, which are both annotated in yellow). |
| 1[d]. wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and | *Matsumura* discloses an electronic device for long-term adhesion to a user wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode.<br><br>First, *Matsumura* discloses that the second sheet 4 (e.g., first substrate layer) is positioned over the conductive gel 5 (e.g., electrode). Figure 1 below discloses the second sheet 4 (e.g., first substrate layer) positioned over the conductive gel 5 (e.g., electrode). |

**REQUEST FOR EX PARTE REEXAMINATION OF
U.S. PATENT NO. 12,303,277**



*Id.*, Fig. 1.

Second, *Matsumura* discloses that the conductive material 2 (e.g., first substrate layer) extends horizontally away from the housing beyond a boundary of the electrode. Specifically, as disclosed in annotated figure 1, the conductive material 2 extends outward from the housing and beyond a boundary of the conductive gel 5 (electrode). In other words, the conductive material 2 (e.g., first substrate layer) extends wider in the horizontal direction than both the housing and the electrodes.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| | <br><br>*Id.*, Fig. 1 (the second sheet 4 is annotated in blue, the electrodes and housing are annotated in yellow, and the annotated arrows show the horizontal extensions). |
| 1[e]. wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer. | *Matsumura* discloses an electronic device for long-term adhesion to a user wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer.<br><br>*Matsumura* discloses that the "second sheet 4 [e.g., first substrate layer] has the same outer shape as the first sheet 1 [e.g., second substrate layer][.]"  *Id.*, ¶18.  Figure 3 disclose the configuration of the first and second substrate layers.  While sheets 1 and 4 have the same shape, there is no corresponding disclosure about the relative size of the two layers.<br><br><br><br>*Id.*, Fig. 1. |

41

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

| | |
|---|---|
| | To the extent sheet 1 does not itself extend horizontally beyond a boundary of sheet 4, it would be obvious to modify the first sheet 1 (e.g., second substrate layer) to be slightly larger than the second sheet 4 (e.g., first substrate layer) to improve waterproofing effects. As detailed above, *Bly* provides one example in which a second substrate layer extends horizontally beyond a boundary of the first substrate layer, confirming that this modification would be routine and well understood. *See* Ground I, claim 1[e]. In this regard, the first sheet 1 (e.g., second substrate layer) is the outermost barrier that will come into contact with water or other environmental elements. By increasing the edge of the  first sheet 1 (e.g., second substrate layer) to be slightly larger than the rest of the layers, this will provide sealing at the edges and improve the device's resistance to water or other environmental elements.<br><br>This shape would further *Matsumura*'s stated goal of functioning "even while a patient/subject is taking a shower or bath." *Id.* at Abstract; ¶7 ("the portion transmitting the bioelectric potentials from the bioelectrode pad to the signal processor is waterproof."), ¶8 ("the portion that transmits the bioelectric potentials from the bioelectrode pad to the signal processor is surrounded by adhesive tape, making the transmitting portion waterproof"). A POSITA would have understood that *Matsumura*'s desire to surround its electronics with waterproof tape would have further encouraged similar waterproofing around the various layers, thereby arriving at an upper sheet (sheet 1) that was adhesive and larger than the lower sheet (sheet 4) to ensure that no water leaked between the layers where the conductive rods 2 were.<br><br>*Matsumura* discloses that "[t]he first sheet 1 is preferably made of an insulating material that does not penetrate moisture." *Id.*, ¶17. Thus, the first sheet acts as a barrier between the device and outside factors. The barrier properties would only be enhanced by increasing the size of the first sheet 1. Further, this modification would not compromise the function of any of the inner layers. |

## X.    CONCLUSION

As discussed above, at least, the cited prior art references teach the elements

of claims 1 to 10 of the '277 patent.  These references were published and/or filed

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

before the earliest operative priority date of the '277 patent and accordingly render

claims 1 to 10 obvious.  These prior art references were not used by the Patent Office

in the prosecution of the '277 patent and, while the disclosures were before the Patent

Office, there's no evidence that these disclosures were properly considered by the

Patent Office during prosecution.  For at least the above reasons, the foregoing

Request for Reexamination presents one or more Substantial New Questions of

Patentability and should therefore be granted.


Dated: September 8, 2025                   Respectfully submitted,

                              By:    */s/* Erik J. Halverson
                                     Erik J. Halverson
                                     Reg. No. 73,552
                                     **K&L GATES LLP**
                                     Four Embarcadero Center, Suite 1200
                                     San Francisco, CA 94111
                                     T: (415) 882-8238
                                     F: (415) 882-8220

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

## <u>CLAIM APPENDIX</u>

[1pre]    An electronic device for long-term adhesion to a user, the device comprising:

[1a]    a housing comprising a physiologic data collection circuit;

[1b]    an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user;

[1c]    an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and

[1d]    wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and

[1e]    wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer.

[2]    The electronic device of claim 1, wherein the electrode supporting section further comprises a third substrate layer adhered to the first substrate layer.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

[3]     The electronic device of claim 1, further comprising an upper adhesive layer positioned on the underside of the first substrate layer.

[4]     The electronic device of claim 1, wherein the lower adhesive layer extends at least partially below the housing.

[5]     The electronic device of claim 1, further comprising a flap extending beneath the housing.

[6]     The electronic device of claim 1, wherein the housing is rigid.

[7]     The electronic device of claim 1, wherein the housing is configured to remain connected to the electrode-supporting section when the housing is tilted at an angle relative the lower adhesive layer in response to movement of the user.

[8]     The electronic device of claim 1, further comprising a hinge portion adjacent the housing.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

[9]     The electronic device of claim 1, wherein the lower adhesive layer comprises a hydrocolloid adhesive.


[10]    The electronic device of claim 1, wherein the physiologic data collection circuit is configured to collect cardiac rhythm data from the user.

**REQUEST FOR EX PARTE REEXAMINATION OF**
**U.S. PATENT NO. 12,303,277**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2025, a true and correct copy of the foregoing and supporting materials has been served at the following correspondence address of record for the subject patent via U.S. Postal Service Certified Mail/Return Receipt Requested Mail at the following address:

Knobbe, Martens, Olson & Bear, LLP
2040 Main Street
Fourteeth Floor
Irvine, California
United States

By:    <u>/s/ Erik J. Halverson</u>
Erik J. Halverson
Reg. No. 73,552