**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BARDY DIAGNOSTICS, INC., | ) | |
| | ) | |
| Plaintiff/Counter Defendant, | ) | |
| | ) | C.A. No. 24-1355-JDW |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| IRHYTHM TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant/Counter Plaintiff. | ) | |

**PLAINTIFF BARDY DIAGNOSTICS, INC.'S SECOND AMENDED
ANSWER AND COUNTERCLAIMS TO DEFENDANT IRHYTHM
TECHNOLOGIES, INC.'S FOURTH AMENDED COUNTERCLAIMS**

Plaintiff Bardy Diagnostics, Inc. ("Bardy" or "Plaintiff"), by and through its undersigned

counsel, hereby answers Defendant iRhythm Technologies, Inc.'s ("iRhythm" or "Defendant")

Fourth Amended Counterclaims and asserts counterclaims as follows.

The headings in iRhythm's Counterclaims are reproduced herein for the convenience of

the reader. To the extent such headings include or infer allegations, they are denied.

## NATURE OF THE ACTION

1.     This is a civil action arising under the patent laws of the United States,
35 U.S.C. § 1 et seq., including specifically 35 U.S.C. § 271, seeking relief arising from Bardy's
infringement of U.S. Patent Nos. 12,133,734 (the "'734 patent"), 12,245,859 (the "'859 patent"),
12,245,860 (the "'860 patent"), 12,274,554 (the "'554 patent"), 12,303,277 (the "'277 patent"),
12,402,819 (the "'819 patent"), and 12,408,856 (the "'856 patent") (collectively, the "iRhythm
Asserted Patents").

**ANSWER:** Bardy admits that the Counterclaims purport to state a cause of action for

patent infringement of the '734 patent, the '859 patent, the '860 patent, the '554 patent, the '277

patent, the '819 patent, and the '856 patent. Bardy denies that any such claim is meritorious.

2.     iRhythm is the owner by assignment of the '734 patent. A copy of the '734 patent
is attached as Exhibit 1.

**ANSWER:** Bardy admits that Exhibit 1 contains a copy of U.S. Patent No. 12,133,734. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 2 and therefore denies them.

3.      iRhythm is the owner by assignment of the '859 patent. A copy of the '859 patent is attached as Exhibit 11.

**ANSWER:** Bardy admits that Exhibit 11 contains a copy of U.S. Patent No. 12,245,859. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 3 and therefore denies them.

4.      iRhythm is the owner by assignment of the '860 patent. A copy of the '860 patent is attached as Exhibit 12.

**ANSWER:** Bardy admits that Exhibit 12 contains a copy of U.S. Patent No. 12,245,860. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 4 and therefore denies them.

5.      iRhythm is the owner by assignment of the '554 patent. A copy of the '554 patent is attached as Exhibit 15.

**ANSWER:** Bardy admits that Exhibit 15 contains a copy of U.S. Patent No. 12,274,554. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 5 and therefore denies them.

6.      iRhythm is the owner by assignment of the '277 patent. A copy of the '277 patent is attached as Exhibit 18.

**ANSWER:** Bardy admits that Exhibit 18 contains a copy of U.S. Patent No. 12,303,277. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 6 and therefore denies them.

7.      iRhythm is the owner by assignment of the '819 patent. A copy of the '819 patent is attached as Exhibit 20.

**ANSWER:** Bardy admits that Exhibit 20 contains a copy of U.S. Patent No. 12,402,819. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 7 and therefore denies them.

8.      iRhythm is the owner by assignment of the '856 patent. A copy of the '856 patent is attached as Exhibit 21.

**ANSWER:** Bardy admits that Exhibit 21 contains a copy of U.S. Patent No. 12,408,856. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 8 and therefore denies them.

## THE PARTIES

9.      iRhythm is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 699 8th Street, Suite 600, San Francisco, CA 94103.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 9 and therefore denies them.

10.      On information and belief, Bardy is a corporation organized and existing under the laws of the State of Delaware since 2013.

**ANSWER:** Admitted.

11.      On information and belief, Bardy has its principal place of business at 220 120th Ave NE, Suite 100, Bellevue, WA 98005.

**ANSWER:** Admitted.

## JURISDICTION AND VENUE

12.      This action arises under the patent laws of the United States, 35 U.S.C. § 1, et seq., including specifically 35 U.S.C. § 271.

**ANSWER:** Bardy admits that the Counterclaim purports to state a claim under 35 U.S.C. § 1, et seq., including specifically 35 U.S.C. § 271. Bardy denies that any such claim is meritorious.

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER:** Admitted.

14.    On information and belief, as a corporation organized and existing under the laws of the state of Delaware, Bardy has substantial and continuous contacts with Delaware and has committed acts of infringement in Delaware sufficient to confer personal jurisdiction over Bardy. This Court also has personal jurisdiction over Bardy at least by virtue of Bardy filing the instant action in this Court.

**ANSWER:** The allegations contained in paragraph 14 contain legal conclusions to which no answer is required. To the extent a response is required, Bardy admits that it is a corporation organized and existing under the laws of the state of Delaware. Further, Bardy admits that this Court has personal jurisdiction over Bardy at least by virtue of Bardy filing the instant action in this Court. Bardy denies the remaining allegations contained in this paragraph.

15.    On information and belief, Bardy is a commercial entity that makes, uses, advertises, offers for sale, and/or sells ECG monitors and ECG monitoring services. On information and belief, Bardy manufactures, makes, uses, advertises, offers for sale, and/or sells the Carnation Ambulatory Monitor (the "CAM patch").

**ANSWER:** Bardy admits that it is a commercial entity that makes, uses, advertises, offers for sale, and/or sells the CAM patch. Bardy otherwise denies the allegations in this paragraph.

16.    On information and belief, Bardy sells and offers to sell ECG monitors and ECG monitoring services, including the CAM patch, throughout the United States, including in this judicial district.

**ANSWER:** Bardy admits that it sells and offers to sell the CAM patch. Bardy otherwise denies the allegations in this paragraph.

17.    On information and belief, Bardy makes the CAM patch available to healthcare providers and patients in Delaware.

**ANSWER:** Admitted.

18.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b) because Bardy is incorporated in the State of Delaware and therefore resides in this judicial district.

**ANSWER:** Admitted.

## BARDY AND BARDY'S CARNATION AMBULATORY MONITOR

19.    On information and belief, Bardy is an ambulatory ECG monitoring solutions company founded in 2013, around 7 years after iRhythm was founded in 2006 and after iRhythm had already launched the Zio XT monitor. *See* https://www.bardydx.com/.

**ANSWER:** Bardy admits that it was founded in 2013 and that it provides ambulatory ECG monitoring solutions. Bardy lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 19 and therefore denies them.

20.    On information and belief, Bardy received FDA approval for the CAM patch no earlier than Dec. 22, 2014. *See* https://www.accessdata.fda.gov/cdrh_docs/pdf14/K143067.pdf.

**ANSWER:** Bardy admits that it received FDA clearance for the CAM patch on December 22, 2014. Bardy otherwise denies the allegations in this paragraph.

21.    On information and belief, Bardy publicly launched and began commercializing the 2-day CAM patch in the United States no earlier than 2015.

**ANSWER:** Denied.

22.     On information and belief, Bardy continues to manufacture, use, sell, import, and/or offer to sell the 2-day CAM patch in the United States.

**ANSWER:** Admitted.

23.    On information and belief, Bardy publicly launched and began commercializing the 7-day CAM patch in the United States no earlier than 2015.

**ANSWER:** Denied.

24.    On information and belief, Bardy continues to manufacture, use, sell, import and/or offer to sell the 7-day CAM patch in the United States.

**ANSWER:** Admitted.

25.    On information and belief, Bardy publicly launched and began commercializing the 14-day CAM patch in the United States on or around January 23, 2020. *See* Exhibit 2, Bardy Diagnostics, Inc., "Bardy Diagnostics Announces Commercial Launch of the 14-day Carnation Ambulatory Monitor (CAM) Patch," PR Newswire (Jan. 23, 2020), https://www.prnewswire.com/news-releases/bardy-diagnostics-announces-commercial-launchof-the-14-day-carnation-ambulatory-monitor-cam-patch-300991978.html.

**ANSWER:** Bardy admits that it publicly launched the 14-day CAM patch on or around January 23, 2020. Bardy otherwise denies the allegations in this paragraph.

26.    On information and belief, Bardy continues to manufacture, use, sell, and offer to sell the 14-day CAM patch in the United States.

**ANSWER:** Admitted.

27.    The 2-day, 7-day, or 14-day CAM patch (collectively, the "CAM patch") is an ambulatory ECG monitor that adheres to a user's chest. *See, e.g.*, Exhibit 3, https://www.hillrom.com/en/products/cam-patch/.



**ANSWER:** Bardy admits that the CAM patch is an ambulatory ECG monitor that adheres to a user's chest. Bardy further admits that it describes the CAM patch on its website, accessible at https://www.hillrom.com/en/products/cam-patch/. Bardy otherwise denies the allegations in this paragraph.

28.    As shown below, the CAM patch includes electrodes that capture p-wave signals, "which enables differentiation between different types of atrial, as well as ventricular, arrhythmias." *Id.*; *see also* Exhibit 4, https://www.bardydx.com/wp-content/uploads/2023/06/DWG000781B-CAM-Instructions-for-Use.pdf. The CAM patch includes a purportedly "proprietary circuit" in a housing that is electronically connected to an electrode located on the patch. Exhibit 5, https://www.bardydx.com/wpcontent/uploads/2022/12/DN000601A-14Day-Half-fold-CAM-Brochure.pdf.



**ANSWER:** Bardy admits that the website https://www.hillrom.com/en/products/cam-patch/ states that "The CAM Patch is a long-term ambulatory ECG monitor that has been clinically proven to identify arrhythmias. It is engineered to optimize p-wave signal capture, which enables differentiation between different types of atrial, as well as ventricular, arrhythmias." Bardy further admits that the website https://www.bardydx.com/wp-content/uploads/2022/12/DN000601A-14Day-Half-fold-CAM-Brochure.pdf is a brochure for the Carnation Ambulatory Monitor™ that states, "Proprietary circuit design enabling optimal signal-to-noise." Bardy otherwise denies the allegations in this paragraph.

29.    On information and belief, and according to Bardy, the CAM patch provides a "[d]urable" adhesion that can last "[u]p to 2, 7, or 14 days." *See* Exhibit 4.

| Technical Specifications | 13 |
|---|---|

**TECHNICAL SPECIFICATIONS**

| ITEM | SPECIFICATION |
|---|---|
| **Performance Characteristics** | |
| ECG channels | 1 channel |
| Recording capacity | Up to 2, 7, or 14 days |
| Recording format | Continuous |
| Service life | Up to 2, 7, or 14 days |
| Shelf life | 24 months |

**ANSWER:** Bardy admits that its CAM patch can adhere to a patient for up to at least 14 days. Bardy otherwise denies the allegations in this paragraph.

30.    On information and belief, and according to Bardy, the CAM patch "captures P-wave signals" from the heart using electrodes and transmits those to a purportedly "[p]roprietary circuit" located on the patch. Exhibit 5; *see also* Exhibit 6, https://www.bardydx.com/wp-content/uploads/2023/07/DN000697B-BDx_CAM_SpecSheet.pdf.

**ANSWER:** Bardy admits that Exhibit 5 purports to be a brochure for the CAM patch that states, "Designed to be placed along the sternum — over the heart — to optimize P-wave signal capture, the CAM Patch results in improved ECG clarity, providing more information about heart rhythm that may lead to more clinically-actionable diagnoses compared to leading ECG monitors in the industry." Bardy further admits that Exhibit 5 states, "Proprietary circuit design enabling optimal signal-to-noise." Bardy otherwise denies the allegations in this paragraph.

31.    Given the facts alleged in this counterclaim, both stated above and set forth below and in Exhibit 7, 13, 14, 16, 17, 19, 22, and 23, Bardy's CAM patch directly infringes the claims of the iRhythm Asserted Patents, literally or under the doctrine of equivalents.

**ANSWER:** Denied.

**FIRST COUNTERCLAIM: PATENT INFRINGEMENT OF**

**U.S. PATENT NO. 12,133,734**

32.    iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 31 of Section I of iRhythm's Counterclaims and Answer.

8

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 31 as its answers to paragraph 32.

33.     The '734 patent duly and legally issued on November 5, 2024.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 and therefore denies them.

34.     iRhythm owns all right, title, and interest in the '734 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 and therefore denies them.

35.     Bardy makes, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim chart attached as Exhibit 7, Bardy directly infringes at least claim 1 of the '734 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in the United States. Bardy otherwise denies the allegations in this paragraph.

36.     Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '734 patent.

**ANSWER:** Denied.

37.     On information and belief, Bardy has had knowledge of the '734 patent since at least February 28, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the '734 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel referencing the '734 patent on February 28, 2025. Bardy otherwise denies the allegations in this paragraph.

38.     On information and belief, Bardy has had knowledge that the CAM patch infringes at least claim 1 of the '734 patent since at least February 28, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 7 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

39.     On information and belief, despite having knowledge of the '734 patent and knowledge that the CAM patch infringes at least claim 1 of the '734 patent since at least February 28, 2025, Bardy has continued to make, use, sell, and offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

40.     Bardy has willfully infringed the '734 patent by continuing to make, use, offer to sell, and sell the CAM patch in the United States after having knowledge of the '734 patent and knowledge that the CAM patch infringes at least claim 1 of the '734 patent.

**ANSWER:** Denied.

41.     As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

42.     This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '734 patent.

**ANSWER:** Denied.

43.     Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

44.     As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

### SECOND COUNTERCLAIM: PATENT INFRINGEMENT OF

### U.S. PATENT NO. 12,245,859

45.     iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 44 of Section I of iRhythm's Counterclaims and Answer.

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 44 as its answer to paragraph 45.

46.     The '859 patent duly and legally issued on March 11, 2025.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 46 and therefore denies them.

47.    iRhythm owns all right, title, and interest in the '859 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 and therefore denies them.

48.    Bardy makes, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim chart attached as Exhibit 13, Bardy directly infringes at least claim 1 of the '859 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in the United States. Bardy otherwise denies the allegations in this paragraph.

49.    Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '859 patent.

**ANSWER:** Denied.

50.    On information and belief, Bardy has had knowledge of the '859 patent since at least March 21, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the '859 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel referencing the '859 patent on March 21, 2025. Bardy otherwise denies the allegations in this paragraph.

51.    On information and belief, Bardy has had knowledge that the CAM patch infringes at least claim 1 of the '859 patent since at least March 21, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 13 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

52.    On information and belief, despite having knowledge of the '859 patent and knowledge that the CAM patch infringes at least claim 1 of the '859 patent since at least March 21, 2025, Bardy has continued to make, use, sell, and offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

53.    Bardy has willfully infringed the '859 patent by continuing to make, use, offer to sell, and sell the CAM patch in the United States after having knowledge of the '859 patent and knowledge that the CAM patch infringes at least claim 1 of the '859 patent.

**ANSWER:** Denied.

54.    As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

55.    This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '859 patent.

**ANSWER:** Denied.

56.    Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

57.    As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

## THIRD COUNTERCLAIM: PATENT INFRINGEMENT OF

## U.S. PATENT NO. 12,245,860

58.    iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 57 of Section I of iRhythm's Counterclaims and Answer.

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 57 as its answers to paragraph 58.

59.    The '860 patent duly and legally issued on March 11, 2025.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 59 and therefore denies them.

60.    iRhythm owns all right, title, and interest in the '860 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60 and therefore denies them.

61.     Bardy makes, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim chart attached as Exhibit 14, Bardy directly infringes at least claim 1 of the '860 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in the United States. Bardy otherwise denies the allegations in this paragraph.

62.     Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '860 patent.

**ANSWER:** Denied.

63.     On information and belief, Bardy has had knowledge of the '860 patent since at least March 21, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the '860 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel referencing the '860 patent on March 21, 2025. Bardy otherwise denies the allegations in this paragraph.

64.     On information and belief, Bardy has had knowledge that the CAM patch infringes at least claim 1 of the '860 patent since at least March 21, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 14 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

65.     On information and belief, despite having knowledge of the '860 patent and knowledge that the CAM patch infringes at least claim 1 of the '860 patent since at least March 21, 2025, Bardy has continued to make, use, sell, and offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

66.     Bardy has willfully infringed the '860 patent by continuing to make, use, offer to sell, and sell the CAM patch in the United States after having knowledge of the '860 patent and knowledge that the CAM patch infringes at least claim 1 of the '860 patent.

**ANSWER:** Denied.

67.     As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

68.     This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '860 patent.

**ANSWER:** Denied.

69.     Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

70.     As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

## FOURTH COUNTERCLAIM: PATENT INFRINGEMENT OF

## U.S. PATENT NO. 12,274,554

71.     iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 70 of Section I of iRhythm's Counterclaims and Answer.

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 70 as its answers to paragraph 71.

72.     The '554 patent duly and legally issued on April 15, 2025.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 and therefore denies them.

73.     iRhythm owns all right, title, and interest in the '554 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 73 and therefore denies them.

74.    Bardy makes, imports, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim charts attached as Exhibits 16 and 17, Bardy directly infringes at least claims 1 and 4 of the '554 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in

the United States. Bardy otherwise denies the allegations in this paragraph.

75.    Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '554 patent.

**ANSWER:** Denied.

76.    On information and belief, Bardy has had knowledge of the issued claims of the '554 patent since at least March 21, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the allowed claims of U.S. Patent Application No. 18/936,888, now issued as the claims of the '554 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel

referencing U.S. Patent Application No. 18/936,888 on March 21, 2025. Bardy further admits that

Exhibit C to the March 21, 2025, letter is titled "Allowed Claims of U.S. Patent Application

18/936,888." Bardy otherwise denies the allegations in this paragraph.

77.    On information and belief, Bardy has also had knowledge of the '554 patent since at least April 22, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the '554 patent.

**ANSWER:** Denied.

78.    On information and belief, Bardy has had knowledge that the CAM patch infringes at least claims 1 and 4 of the '554 patent since at least March 21, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 16 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

79.    On information and belief, Bardy has also had knowledge that the CAM patch infringes at least claims 1 and 4 of the '554 patent since at least April 22, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 17 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

80.    On information and belief, despite having knowledge of the '554 patent and knowledge that the CAM patch infringes at least claims 1 and 4 of the '554 patent since at least

March 21, 2025, Bardy has continued to make, use, sell, import, and/or offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

81.    On information and belief, despite having further knowledge of the '554 patent and knowledge that the CAM patch infringes at least claims 1 and 4 of the '554 patent since at least April 22, 2025, Bardy has continued to make, use, sell, import, and/or offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

82.    Bardy has willfully infringed the '554 patent by continuing to make, use, offer to sell, import, and/or sell the CAM patch in the United States after having knowledge of the '554 patent and knowledge that the CAM patch infringes at least claims 1 and 4 of the '554 patent.

**ANSWER:** Denied.

83.    As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

84.    This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '554 patent.

**ANSWER:** Denied.

85.    Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

86.    As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

## FIFTH COUNTERCLAIM: PATENT INFRINGEMENT OF

## U.S. PATENT NO. 12,303,277

87.    iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 86 of Section I of iRhythm's Counterclaims and Answer.

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 86 as its answers to paragraph 87.

88.    The '277 patent duly and legally issued on May 20, 2025.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88 and therefore denies them.

89.    iRhythm owns all right, title, and interest in the '277 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89 and therefore denies them.

90.    Bardy makes, imports, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim chart attached as Exhibit 19, Bardy directly infringes at least claim 1 of the '277 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in the United States. Bardy otherwise denies the allegations in this paragraph.

91.    Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '277 patent.

**ANSWER:** Denied.

92.    On information and belief, Bardy has had knowledge of the '277 patent since at least May 20, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the '277 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel referencing the '277 patent on May 20, 2025. Bardy otherwise denies the allegations in this paragraph.

93.    On information and belief, Bardy has had knowledge that the CAM patch infringes at least claim 1 of the '277 patent since at least May 20, 2025, when iRhythm's counsel sent the claim chart attached as Exhibit 19 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

94.     On information and belief, despite having knowledge of the '277 patent and knowledge that the CAM patch infringes at least claim 1 of the '277 patent since at least May 20, 2025, Bardy has continued to make, use, sell, import, and/or offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

95.     Bardy has willfully infringed the '277 patent by continuing to make, use, offer to sell, import, and/or sell the CAM patch in the United States after having knowledge of the '277 patent and knowledge that the CAM patch infringes at least claim 1 of the '277 patent.

**ANSWER:** Denied.

96.     As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

97.     This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '277 patent.

**ANSWER:** Denied.

98.     Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

99.     As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

## SIXTH COUNTERCLAIM: PATENT INFRINGEMENT OF

## U.S. PATENT NO. 12,402,819

100.     iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 99 of Section I of iRhythm's Counterclaims and Answer.

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 99 as its answers to paragraph 100.

101.     The '819 patent duly and legally issued on September 2, 2025.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 and therefore denies them.

102.    iRhythm owns all right, title, and interest in the '819 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102 and therefore denies them.

103.    Bardy makes, imports, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim chart attached as Exhibit 22, Bardy directly infringes at least claim 1 of the '819 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in the United States. Bardy otherwise denies the allegations in this paragraph.

104.    Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '819 patent.

**ANSWER:** Denied.

105.    On information and belief, Bardy has had knowledge of the '819 patent since at least September 3, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the '819 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel referencing the '819 patent on September 3, 2025. Bardy otherwise denies the allegations in this paragraph.

106.    On information and belief, Bardy has had knowledge that the CAM patch infringes at least claim 1 of the '819 patent since at least September 3, 2025, when iRhythm's counsel sent an unredacted version of the claim chart attached as Exhibit 22 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

107.    On information and belief, despite having knowledge of the '819 patent and knowledge that the CAM patch infringes at least claim 1 of the '819 patent since at least September 3, 2025, Bardy has continued to make, use, sell, import, and/or offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

108.    Bardy has willfully infringed the '819 patent by continuing to make, use, offer to sell, import, and/or sell the CAM patch in the United States after having knowledge of the '819 patent and knowledge that the CAM patch infringes at least claim 1 of the '819 patent.

**ANSWER:** Denied.

109.    As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

110.    This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '819 patent.

**ANSWER:** Denied.

111.    Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

112.    As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

## SEVENTH COUNTERCLAIM: PATENT INFRINGEMENT OF

## U.S. PATENT NO. 12,408,856

113.    iRhythm restates and incorporates by reference each of the averments of paragraphs 1 through 112 of Section I of iRhythm's Counterclaims and Answer.

**ANSWER:** Bardy incorporates by reference, as though fully set forth herein, its answers to paragraphs 1 through 112 as its answers to paragraph 113.

114.    The '856 patent duly and legally issued on September 9, 2025.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 114 and therefore denies them.

115.    iRhythm owns all right, title, and interest in the '856 patent by assignment.

**ANSWER:** Bardy lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 115 and therefore denies them.

116.    Bardy makes, imports, uses, sells and/or offers to sell the CAM patch in the United States. Any of these individual activities is an act of infringement under 35 U.S.C. § 271 and, as set forth in the attached non-limiting claim chart attached as Exhibit 23, Bardy directly infringes at least claim 1 of the '856 patent, either literally or under the doctrine of equivalents.

**ANSWER:** Bardy admits that it makes, uses, sells and/or offers to sell the CAM patch in the United States. Bardy otherwise denies the allegations in this paragraph.

117.    Bardy has engaged in the foregoing conduct with respect to the patented invention in the United States without authority from iRhythm during the term of the '856 patent.

**ANSWER:** Denied.

118.    On information and belief, Bardy has had knowledge of the '856 patent since at least September 3, 2025, when iRhythm's counsel sent a letter to Bardy's counsel identifying the allowed claims of U.S. Patent Application No. 19/212,547, now issued as the claims of the '856 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel referencing U.S. Patent Application No. 19/212,547 on September 3, 2025. Bardy otherwise denies the allegations in this paragraph.

119.    On information and belief, Bardy has also had knowledge of the '856 patent since at least September 9, 2025, when iRhythm's counsel sent a letter to Bardy's counsel attaching a copy of the '856 patent.

**ANSWER:** Bardy admits that iRhythm's counsel sent a letter to Bardy's counsel referencing the '856 Patent on September 9, 2025. Bardy otherwise denies the allegations in this paragraph.

120.    On information and belief, Bardy has had knowledge that the CAM patch infringes at least claim 1 of the '856 patent since at least September 3, 2025, when iRhythm's counsel sent a claim chart identifying U.S. Patent Application No. 19/212,547 to Bardy's counsel, and also since at least September 9, 2025, when iRhythm's counsel sent an unredacted version of the claim chart attached as Exhibit 23 to this counterclaim to Bardy's counsel.

**ANSWER:** Denied.

121.    On information and belief, despite having knowledge of the '856 patent and knowledge that the CAM patch infringes at least claim 1 of the '856 patent since at least September 3, 2025, Bardy has continued to make, use, sell, import, and/or offer to sell the CAM patch in the United States.

**ANSWER:** Denied.

122.    Bardy has willfully infringed the '856 patent by continuing to make, use, offer to sell, import, and/or sell the CAM patch in the United States after having knowledge of the '856 patent and knowledge that the CAM patch infringes at least claim 1 of the '856 patent.

**ANSWER:** Denied.

123.    As a result of the acts of infringement by Bardy, Bardy is liable to iRhythm in an amount that compensates iRhythm for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as determined by the Court under 35 U.S.C. § 284.

**ANSWER:** Denied.

124.    This case is exceptional under 35 U.S.C. § 285, including due to Bardy's willful infringement of the '856 patent.

**ANSWER:** Denied.

125.    Bardy's acts of infringement are likely to cause and, unless restrained or enjoined, will continue to cause irreparable injury and damage to iRhythm for which there is no adequate remedy at law.

**ANSWER:** Denied.

126.    As a result of the acts of infringement by Bardy, iRhythm has suffered and/or will continue to suffer substantial damages in an amount to be proven at trial.

**ANSWER:** Denied.

## RESPONSE TO RELIEF REQUESTED

As to all Relief Requested in the Counterclaims, Bardy denies that iRhythm is entitled to any relief as alleged or otherwise. All other allegations in the Counterclaims not specifically admitted or denied are hereby denied.

## BARDY'S AFFIRMATIVE DEFENSES

Bardy incorporates by reference the claims detailed in its First Amended Complaint. Without conceding that any of the following necessarily must be pleaded as an affirmative defense, or that any of the following is not already at issue by virtue of the foregoing denials, and without prejudice to Bardy's right to plead and assert additional defenses as discovery into the facts of the matter warrant, Bardy asserts the following affirmative defenses:

### FIRST DEFENSE: NON-INFRINGEMENT ('734 PATENT)

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '734 patent. Bardy incorporates by reference the allegations of Count I of its Non-Infringement Counterclaim, below.

### SECOND DEFENSE: NON-INFRINGEMENT ('859 PATENT)

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '859 patent. Bardy incorporates by reference the allegations of Count II of its Non-Infringement Counterclaim, below.

### THIRD DEFENSE: NON-INFRINGEMENT ('860 PATENT)

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '860 patent. Bardy incorporates by reference the allegations of Count III of its Non-Infringement Counterclaim, below.

### FOURTH DEFENSE: NON-INFRINGEMENT ('554 PATENT)

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the

'554 patent. Bardy incorporates by reference the allegations of Count IV of its Non-Infringement Counterclaim, below.

## FIFTH DEFENSE: INVALIDITY ('734 PATENT)

The claims of the '734 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count V of its Invalidity Counterclaim, below.

## SIXTH DEFENSE: INVALIDITY ('859 PATENT)

The claims of the '859 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count VI of its Invalidity Counterclaim, below.

## SEVENTH DEFENSE: INVALIDITY ('860 PATENT)

The claims of the '860 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count VII of its Invalidity Counterclaim, below.

## EIGHTH DEFENSE: INVALIDITY ('554 PATENT)

The claims of the '554 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count VIII of its Invalidity Counterclaim, below.

**NINTH DEFENSE: [RESERVED]**

**TENTH DEFENSE: PROSECUTION LACHES**

iRhythm's claims are barred, in whole or in part, by prosecution laches. This doctrine may "render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution." *Symbol Techs., Inc. v. Lemelson Med, Educ. & Rsch. Found.*, 422 F.3d 1378, 1385 (Fed. Cir. 2005). While "[t]here are legitimate grounds for refiling a patent application which should not normally be grounds for a holding of laches," prosecution laches should apply in "egregious cases of misuse of the statutory patent system." *Id.* Such an egregious case is found here.

iRhythm filed the '081 application, to which the '734 patent purportedly claims priority, on May 12, 2010. The patent application from which the '734 patent issued was filed 11 years later on June 25, 2021. iRhythm filed U.S. Provisional Patent Application No. 61/756,326, to which the '859 and '860 patents purportedly claim priority, on January 23, 2013. The patent applications from which the '859 and '860 patents issued were filed 11.5 years later on July 29, 2024, and July 30, 2024, respectively.

Notably, for the first time in the application that led to the '734 patent, iRhythm filed and obtained claims directed to a "tilt" limitation, but the "tilt" limitation is not disclosed in the specification and was never claimed in any issued patent in the family in the 14 years of prosecuting this patent family.

With respect to the patent family that led to the issuance of the '859 and '860 patents and the patent family that led to the issuance of the '554 and '277 patents, iRhythm consistently sought claim coverage directed to an ECG monitor with two flexible wings and an electrode on each wing. Then, for the first time in the applications that led to the '859, '860, '554, and '277 patents, and well after Bardy released its CAM Patch, iRhythm broadened the scope of its claims with respect

to the electrode limitations in a plain attempt to cover Bardy's product that iRhythm now accuses of infringement.

Bardy was significantly prejudiced by iRhythm's delay at least because it made a substantial investment in and continued to independently develop the CAM patch, with no possibility of having notice of the expanded claim scope that now includes the tilt limitation ('734 patent), and the broadened electrode structure ('859, '860, '554, and '277 patents). These limitations were not disclosed in the specification of any earlier applications, making it impossible for Bardy to anticipate or avoid potential infringement. For at least the reasons set forth above, the iRhythm Asserted Patents are unenforceable under the doctrine of prosecution laches.

## ELEVENTH DEFENSE: PROSECUTION HISTORY ESTOPPEL

iRhythm is estopped from asserting any interpretation of any claims of the iRhythm Asserted Patents that covers the accused CAM patch as such scope was surrendered during, and/or is inconsistent with any statements, representations, or admissions made during prosecution of the patent applications that resulted in the iRhythm Asserted Patents or any applications related thereto.

## TWELFTH DEFENSE: GOOD FAITH

Bardy has engaged in all relevant activities in good faith, thereby precluding iRhythm, even if it prevails, from recovering its reasonably attorneys' fees or costs under 35 U.S.C. § 285.

## THIRTEENTH DEFENSE: DEDICATION TO THE PUBLIC

The relief sought by iRhythm is barred, in whole or in part, because iRhythm dedicated to the public all methods, systems, and products disclosed in the iRhythm Asserted Patents but not literally claimed therein.

**FOURTEENTH DEFENSE: LIMITATIONS ON DAMAGES AND COSTS**

iRhythm's claim for damages is barred, in whole or in part, by at least 35 U.S.C. § 286. Further, iRhythm's claims for damages for alleged infringement of the iRhythm Asserted Patents are limited under 35 U.S.C. § 287 because iRhythm has failed to adequately marks its patented products. As a result, iRhythm is not entitled to damages for any alleged infringement that occurred before iRhythm gave actual notice of alleged infringement to Bardy. To the extent any claim of the iRhythm Asserted Patents are invalid, iRhythm is barred from recovering costs by 35 U.S.C. § 288.

**FIFTEENTH DEFENSE: NO EXCEPTIONAL CASE FOR DEFENDANT**

Bardy has not engaged in any conduct that would make this an exceptional case that would entitle iRhythm to an award of attorneys' fees or enhanced damages.

**SIXTEENTH DEFENSE: NON-INFRINGEMENT ('277 PATENT)**

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '277 patent. Bardy incorporates by reference the allegations of Count IX of its Non-Infringement Counterclaim, below.

**SEVENTEENTH DEFENSE: INVALIDITY ('277 PATENT)**

The claims of the '277 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count X of its Invalidity Counterclaim, below.

**EIGHTEENTH DEFENSE: UNENFORCEABILITY ('554 PATENT)**

The '554 patent is unenforceable due to inequitable conduct. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). Upon information and belief, and before taking full discovery, Theodore Lopez and David Schmidt committed inequitable

conduct during prosecution of the '554 patent with a specific intent to deceive the United States Patent and Trademark Office ("USPTO"). Mr. Lopez committed inequitable conduct by withholding the Expert Declaration of Jason Heikenfeld and the full English translation of material, prior art reference, JP 2004-121360, from the USPTO during prosecution of U.S. Patent Application No. 18/936,888 (the "'888 application"), which issued as the '554 patent. Dr. Schmidt committed inequitable conduct by withholding the Expert Declaration of Jason Heikenfeld and failing to acquire and submit the full English translation of JP 2004-121360 to the USPTO during prosecution of '888 application, despite his awareness that such a translation existed within his client's possession.

On information and belief, Mr. Lopez knew of the existence and content of the Expert Declaration of Jason Heikenfeld (the "Heikenfeld Declaration") and the English translation of JP 2004-121360 (the "full English translation of Matsumura") because he reviewed and supervised the preparation and filing of five iRhythm *inter partes* review petitions (collectively, the "iRhythm IPRs"), which were submitted to the USPTO during the pendency of the '888 application. In the iRhythm IPRs, iRhythm challenged the validity of patents directed to and claiming ECG monitors based directly on the Heikenfeld Declaration and full English translation of Matsumura. Dr. Schmidt likewise knew of the Heikenfeld Declaration and full English translation of Matsumura during the pendency of the '888 application. The withheld information is "but-for" material to the patentability of the claims of the '888 application. Finally, a specific intent to deceive the USPTO by Mr. Lopez and Dr. Schmidt is the single most reasonable inference.

Defendant directly benefited from its failure to submit this "but-for" material information. At the time of filing the '888 application, Mr. Lopez and Dr. Schmidt collaborated to obtain patents from pending iRhythm patent applications to assert against Bardy in this litigation. Had Mr. Lopez

28

and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality would have stood in the way of Defendant's ability to obtain the claim scope it did via the issuance of the '554 patent. In addition, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately stand in the way of Defendant's ability to assert additional patents against Bardy by the June 2, 2025 deadline to amend the pleadings in this case. To obtain the '554 patent in an expedited manner to assert against Bardy (*e.g.*, the '888 application was filed on October 4, 2024 and issued on May 12, 2025 as the '554 patent), Mr. Lopez and Dr. Schmidt colluded to withhold information that was but for material to the claims of the '888 application.

### A.    The Duty to Disclose Information Material to Patentability

Under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." Individuals associated with the filing and prosecution of a patent application include "*[e]ach attorney* or agent who prepares or prosecutes the application" and "[e]very other person who is *substantively involved in the preparation or prosecution of the application* and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c).

Under MPEP 2001.06(c), an applicant that pursues subject matter that "is or has been involved in litigation and/or a trial proceeding, or the litigation and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the examiner." This section includes a requirement to disclose *inter partes* review proceedings and *any material information arising therefrom*. *See* MPEP 2001.06(c).

### B.     The Duty of Disclosure Applied to Dr. Schmidt and Mr. Lopez

The duty of disclosure applied to Dr. Schmidt because he was the prosecuting attorney for the '888 application. On October 4, 2024, iRhythm filed the '888 application, which issued as the '554 patent. iRhythm is the applicant on the Application Data Sheet, which was signed by David R. Schmidt, who is listed on the Power of Attorney. The correspondence address is Knobbe, Martens, Olson & Bear, LLP at 2040 Main Street, Fourteenth Floor, Irvine California, United States. Moreover, Dr. Schmidt testified that he was involved in the prosecution of the '888 application. *See* Deposition Transcript of David Schmidt Transcript (Sept. 12, 2025) (Ex. B) at 30:13-15 ("Q. And were you involved in the prosecution of the '554 patent? A. Yes."). Mr. Lopez also owed a duty of disclosure regarding the '888 application. Namely, Mr. Lopez, as iRhythm's Director of Global Intellectual Property, owed a duty of disclosure because he was substantively involved in the preparation and prosecution of the '888 application, stemming from his role in the company, the applicant of the '888 application. This is supported at least by "Knobbe, Martens, Olson & Bear LLP's Privilege Log in Response to Subpoena." (Ex. A). Between May 13, 2022, and November 28, 2024, Mr. Lopez and Dr. Schmidt exchanged numerous communications described as "[l]egal advice from counsel regarding patent prosecution." *See* Ex. A at 1-8. For example, on October 1, 2024, three days prior to the filing of the '888 application, Dr. Schmidt sent Mr. Lopez an "[e]mail communication reflecting legal advice from counsel regarding patent prosecution." Ex. A at 6.

The testimony of Dr. Schmidt also establishes that Mr. Lopez was substantively involved in the preparation and prosecution of the '888 application. First, Dr. Schmidt testified that Mr. Lopez was responsible for supervising the prosecution of iRhythm's portfolio. Ex. B at 44:8-12. Second, Dr. Schmidt testified that Mr. Lopez was responsible for approving patent claims in applications to be filed with the USPTO, including the patent claims that iRhythm now asserts

against Bardy. Ex. B at 22:5-15 ("Q. [W]ho was your contact at iRhythm that you were sending drafts to of claims? … I interacted with Mark Day at iRhythm and then also Ted Lopez."). Dr. Schmidt also testified that Mr. Lopez approved the claims in the '554 patent (*i.e.*, the '888 application) for filing with the USPTO. Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. ***Ted Lopez***.").

Mr. Lopez's practice of receiving claims from Dr. Schmidt, and approving those claims to be filed, is clear from Dr. Schmidt's testimony. Indeed, at the time of his deposition, Dr. Schmidt testified that Mr. Lopez approved the claims of all five (5) asserted patents (at that time) for filing. For the '734 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 24:20-25 ("Q. All right. Turning back to the '734 patent, which is Exhibit 1 to your deposition, do you recall who at iRhythm approved the claims for filing? … probably ***Ted Lopez***, so probably both of them."). For the '859 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 27:13-28:5 ("Q. Who approved the claim set [of the '859 patent] to be filed? A. ***Ted Lopez***."). For the '860 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 28:17-29:8 ("Q. And do you recall who approved the claims to be filed? A. ***Ted Lopez***."). For the '277 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. ***Ted Lopez.***").

In addition to approving claims to be filed, Dr. Schmidt testified that he regularly communicated with Mr. Lopez regarding iRhythm patent prosecution. Ex. B at 36:21-24.

In sum, Dr. Schmidt's testimony aligns with the privilege log and supports Mr. Lopez's substantial involvement in the preparation and prosecution of each patent that iRhythm now

asserts. Therefore, under 37 C.F.R. § 1.56, Mr. Lopez owed a duty of candor to the USPTO at least with regard to the '888 application, which issued as the '554 patent.

### C.    Dr. Schmidt and Mr. Lopez Knew About the Heikenfeld Declaration and the Full English Translation of Matsumura But Did Not Disclose Either During Prosecution of the '888 Application

Dr. Schmidt was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura while prosecuting the '888 application, which issued as the '554 patent. On December 24, 2024, iRhythm filed five *inter partes* review petitions, which challenged the validity of U.S. Patent No. 8,214,007 (IPR2024-00378); U.S. Patent No. 8,214,007 (IPR2024-00377); U.S. Patent No. 9,155,484 (IPR2024-00376); U.S. Patent No. 8,965,492 (IPR2024-00374); and U.S. Patent No. 10,159,422 (IPR2024-00363). The iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura. Matsumura was a primary reference in the IPRs and the subject of substantial analysis and claim charting. More specifically, across the five iRhythm IPRs, *Matsumura was used as a reference in twelve of the nineteen grounds that iRhythm advanced*. The extensive use of Matsumura in the iRhythm IPRs is likewise seen in the Heikenfeld Declaration (attached as Ex. C).

Dr. Schmidt testified that he was aware of the iRhythm IPRs. Ex. B at 54:3-7 ("Q. And are you aware that iRhythm filed Inter Partes Reviews against patents asserted in the Welch Allyn case? MR. BUNKER: You can answer that yes or no. THE WITNESS: Yes."). Dr. Schmidt further testified that he reviewed these IPRs, including the Heikenfeld Declaration. Ex. B at 56:15-19 ("Q. Have you reviewed those IPRS? … THE WITNESS: Yes, very briefly."), 57:9-18 ("Q. Were you aware that iRhythm also submitted an expert declaration as part of its IPRs against Welch Allyn? … THE WITNESS: Yes. BY MS. BEANE: Q. Did you review that declaration? … THE WITNESS: Not in any great detail."). Although Dr. Schmidt reviewed the iRhythm IPRs, which relied upon the full English translation of Matsumura as a key reference—a reference that is "but-

for" material to claims that the Dr. Schmidt was currently prosecuting on behalf of iRhythm—Dr. Schmidt did not obtain this reference from his client, whom he knew had a copy of this reference, and he did not submit this reference to the USPTO. Ex. B at 58:2-6 ("Q. And just to confirm, you don't recall informing the USPTO as part of the '888 application about the English translation of JP2004-121360, correct? … THE WITNESS: No, I don't recall that."). Nor did Dr. Schmidt obtain this reference from the PTAB's website, https://ptacts.uspto.gov/ptacts/ui/home, which contained public copies of all of the exhibits that accompanied iRhythm's IPR filings.

Neither the Heikenfeld Declaration, the full English translation of Matsumura, or the iRhythm IPRs were submitted to the USPTO during prosecution of the '888 application. Dr. Schmidt, however, had notice that specific information existed (*i.e.*, the Heikenfeld Declaration, the full English translation of Matsumura, and the iRhythm IPRs) which may have been material to the patentability of the claims he was prosecuting in the '888 application, which were filed on behalf of iRhythm.

Upon information and belief, Mr. Lopez was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura during the time he supervised prosecution of the '888 application, which issued as the '554 patent. Mr. Lopez, as iRhythm's Director of Global Intellectual Property, supervised and was involved in filing the iRhythm IPRs. As mentioned above, the iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura.

The Heikenfeld Declaration extensively characterizes Matsumura, opines on changes that would have been obvious to a person of ordinary skill, and also characterizes the state of the art. In one example, Heikenfeld opines that "a POSA would understand that [Matsumura's] conductive gel 5 can detect 'bioelectric potentials' for transmission 'through the conductive material 2 and the

hooks 3' because the conductive gel 5 is embedded in second sheet 4." Ex. C, ¶482. Heikenfeld further concludes that these conductive gels are ECG electrodes. Ex. C, ¶560. Heikenfeld also opined that "Matsumura teaches that second sheet 4 and first sheet 1 are both made of 'an insulating material' such as 'polyethylene foam, polyurethane foam, or polyurethane sheet.'" Ex. C, ¶865. The over 500 pages of the Heikenfeld Declaration includes material information that should have been submitted to the USPTO to satisfy Dr. Schmidt and Mr. Lopez's duty of disclosure.

The '888 application was filed on October 4, 2024, and issued on May 12, 2025. *See* Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. ***Ted Lopez***."). The iRhythm IPRs were filed on December 24, 2024, just two and a half months after Mr. Lopez approved the claims for filing in the '888 application. Mr. Lopez concurrently supervised the prosecution of the '888 application and the iRhythm IPRs. Thus, Mr. Lopez was aware of both the Heikenfeld Declaration and the full English translation of Matsumura during prosecution of the '888 application. Mr. Lopez failed to disclose this same material information while actively pursuing similar subject matter in iRhythm's patent applications that he was substantively involved in overseeing.

Despite Mr. Lopez overseeing prosecution of subject matter that fell squarely within the disclosure of the full English translation of Matsumura and is now asserted against Bardy, Mr. Lopez did not send the full English translation of Matsumura to his prosecution counsel, Dr. Schmidt. Ex. B at 52:17-20 ("Q. At any point during the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360? A. No.").

###### D.    Both the Heikenfeld Declaration and the English Translation of Matsumura Are "But-For" Material to At Least Claim 1 of the '554 Patent

Upon information and belief, Mr. Lopez and Dr. Schmidt each breached their duty of disclosure and committed inequitable conduct during prosecution of the '554 patent by withholding material information from the USPTO. Mr. Lopez and Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration, which discussed the scope and content of the prior art and various reasons why certain references would have been combined, and also the full English translation of Matsumura. Both the Heikenfeld Declaration and the full English translation of Matsumura are "but-for" material to the patentability of the claims of the '554 patent, including, for example, claim 1. Issued claim 1 of the '554 patent recites:

> An electronic device for long-term adhesion to a user, the device comprising:
>
> a housing comprising a physiologic data collection circuit, the housing positioned over a flexible layer extending from beneath the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, wherein the flexible layer comprises a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection;
>
> a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer; and
>
> a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user.

'554 Patent at cl. 1.

The Notice of Allowance stated that the prior art allegedly was silent on "the flexible layer being made of two layers (upper and lower layers), its composition (polymers), and where everything is located on the overall electronic device with respect to the other components." Notice of Allowance (March 5, 2025) (Ex. D) at 4. Moreover, the Notice of Allowance stated that "[e]ach

of the layers and components were well-known individually at the time of invention." Ex. D at 4. The Notice of Allowance is predicated on the lack of disclosure of these layers and components in a single reference and on a lack of reason to combine these well-known layers and components. Based on these distinctions, the USPTO issued a Notice of Allowance.

The "but-for" materiality of the Heikenfeld Declaration in demonstrated in an example claim chart. *See* Heikenfeld Declaration Chart (Ex. E). Because discovery is ongoing, the Heikenfeld Declaration Chart provides a non-limiting example that illustrates the "but-for" materiality of the Heikenfeld Declaration. The left column reproduces each element of claim 1 of the '554 patent. The middle column cites the Heikenfeld Declaration, which characterizes Matsumura and cites to prior art reference Matsumura. The right column cites to the reasons for allowance in the Notice of Allowance, thereby showing how the full English translation of Matsumura and the Heikenfeld Declaration characterizing Matsumura is material to the USPTO's allowance of the '554 patent. The Heikenfeld Declaration was not cited during prosecution of the '888 application despite being in iRhythm's possession during the prosecution of the '888 application and prior to its issuance as the '554 patent.

The "but-for" materiality of the full English translation of Matsumura is also demonstrated in an example claim chart. *See* '554 Matsumura Chart (Ex. F). Again, discovery is ongoing, and thus the '554 Matsumura Chart provides a non-limiting example that illustrates the "but-for" materiality of the full English translation of Matsumura. The left column reproduces each element of claim 1 of the '554 patent while the right column includes exemplary disclosure of the full English translation of Matsumura. The full English translation of Matsumura was not cited during prosecution of the '888 application despite being in iRhythm's possession before the '888 application issued.

The USPTO's recent grant of an *ex parte* reexamination of the '554 patent further supports the "but-for" materiality of the Heikenfeld Declaration and the full English translation of Matsumura. Namely, on September 8, 2025, an *ex parte* reexamination request of the '554 patent was filed. Request for *Ex Parte* Reexamination of the '554 Patent (Ex. G) at 1. Ground III relied on the full English translation of Matsumura, and alleged that Matsumura raised a ***substantial new question of patentability*** as to claim 1 of the '554 patent. Ex. G at 9, 63-70.

The USPTO found, on October 17, 2025, that "Matsumura raises an SNQ [or "substantial new question" of patentability] as to claim 1 of the '554 patent." Order Granting Request for *Ex Parte* Reexamination of the '554 Patent (Ex. H) at 13. Moreover, the USPTO states that "[t]here is a substantial likelihood that a reasonable examiner would consider at least the above teachings, i.e., first and second sheets and acrylic adhesive as taught by Matsumura important in determining the patentability of the claims." Ex. H at 15-16. The USPTO's findings confirm the but-for materiality of the entire disclosure of Matsumura and its English translation, the very disclosure and the English translation that Mr. Lopez withheld from the USPTO, despite being aware of the reference, as evidenced by his prior familiarity with it from iRhythm's IPRs.

## E.    A Specific Intent to Deceive the USPTO by Mr. Lopez and Dr. Schmidt is the Single Most Reasonable Inference

At any point during prosecution of the '888 application, either Mr. Lopez or Dr. Schmidt could have satisfied the duty of candor to the USPTO and disclosed the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura. The USPTO has a form for disclosing references during patent prosecution, called an Information Disclosure Statement ("IDS"), and iRhythm disclosed other references using an IDS form. For example, iRhythm submitted an IDS on February 6, 2025, disclosing other references, but not the iRhythm IPRs, Heikenfeld Declaration, or the English translation of Matsumura. Ex. I (Information Disclosure

Statement of February 6, 2025). This IDS was signed by Dr. Schmidt. The single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '888 application and intended to deceive the USPTO by withholding such materials. This inference is supported by several considerations.

*First*, Mr. Lopez and Dr. Schmidt are sophisticated actors familiar with the duty to disclose material information to the USPTO under MPEP 2001.06(c) and 37 C.F.R. § 1.56. Both Dr. Schmidt and Mr. Lopez are registered patent attorneys, familiar with the rules for materiality. Dr. Schmidt has worked in patent prosecution for fourteen years and responded to "probably over a thousand" office actions and drafted hundreds of applications. Ex. B at 11:25-12:3. And, Mr. Lopez is an "[i]ntellectual Property attorney with 20+ years of experience protecting innovation and building patent portfolios, including preparing and executing strategic intellectual property plans for implementing business priorities and imperatives." *See* LinkedIn of Mr. Lopez (available at https://www.linkedin.com/in/theodore-lopez-92a420a/).

*Second*, iRhythm's submitted the foreign language version of Matsumura while withholding the full English translation. During prosecution of the '888 application, iRhythm submitted a foreign language version of Matsumura with only the English-translated abstract, demonstrating that iRhythm was aware of Matsumura's relevance to the pending claims. *See* Information Disclosure Statement of Nov. 4, 2024 (Ex. K) at 34 (citing JP 2004-121360 as Cite. No. 956). This IDS submission was signed by Dr. Schmidt. iRhythm advantageously used the full English translation of Matsumura in related litigation across its petitions while withholding the same during prosecution of its patent applications. This intentional decision leads to a single most

reasonable inference that the withholding of the full English translation of Matsumura was intentional.

*Third*, iRhythm directly benefited from its failure to submit the "but-for" material information. By October of 2024 (when the '888 application was filed), Defendant was already the subject of a four-patent lawsuit from Bardy's sister company, Welch Allyn, for similar infringing activities as in this case. In search of a response to that pending litigation, Mr. Lopez and Dr. Schmidt collaborated to obtain patents and assert them against Bardy. Namely, Dr. Schmidt testified that he monitored Bardy's portfolio and added limitations specifically to cover Bardy's CAM Patch. Ex. B at 64:11-66:20 ("Q. Okay, do you know whether the limitation was also added to cover the Bardy cam product? … Yes, it is my personal belief that that does cover the Bardy cam."), 59:14-20 ("Do you monitor Bardy Diagnostics' patent portfolio? … Yes."). Moreover, to increase the speed of prosecution, Mr. Lopez and Dr. Schmidt filed the '888 application under Track One, which requires a fee for the USPTO to prioritize the application. Ex. B at 64:11-66:20 ("Q. And the application that led to the '554 patent was filed with a Track 1 request, correct? A. Yes, I see a Track 1 prioritized examination request. Q. What are some of the advantages of a Track 1 request? … THE WITNESS: The main advantage is speed. Track 1 requests are essentially a pay-for-play program with the USPTO where you pay an additional fee so the USPTO will process the application more quickly.").

Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality of the withheld information would have either significantly delayed the prosecution of the '888 application or inhibited the claims of the '554 patent from issuing as they currently stand. These actions were driven by these two individuals' awareness that the Court in this case had a

deadline of June 2, 2025, to amend its pleadings. As a result, Mr. Lopez and Dr. Schmidt were incentivized ***not*** to submit material information to avoid delaying the issuance of the '554 patent.

In sum, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately hinder iRhythm's ability to obtain and assert additional patents in this case, including, for example, the '554 patent. To avoid that delay and to obtain the '554 patent in an expedited manner to assert against Bardy, Mr. Lopez and Dr. Schmidt colluded to withhold iRhythm's own litigation materials from the USPTO.

Based on these considerations, the single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '554 patent and he intended to deceive the USPTO by withholding such materials.

## NINETEENTH DEFENSE: UNENFORCEABILITY ('277 PATENT)

The '277 patent is unenforceable due to inequitable conduct. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). Upon information and belief, and before taking full discovery, Mr. Lopez and Dr. Schmidt committed inequitable conduct during prosecution of the '277 patent with a specific intent to deceive the USPTO. Mr. Lopez committed inequitable conduct by withholding the Heikenfeld Declaration and full English translation of material, prior art reference, Matsumura from the USPTO during prosecution of U.S. Patent Application No. 18/806,584 (the "'584 application"), which issued as the '277 patent. Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration and failing to acquire and submit the full English translation of Matsumura to the USPTO during prosecution of '584 application, despite his awareness that such a translation existed within his client, iRhythm's, possession.

On information and belief, Mr. Lopez knew of the existence and content of the Heikenfeld Declaration and the full English translation of Matsumura because he reviewed and supervised the preparation and filing of the iRhythm IPRs, which were submitted to the USPTO during the pendency of the '584 application. In the iRhythm IPRs, iRhythm challenged the validity of patents directed to and claiming ECG monitors based directly on the Heikenfeld Declaration and full English translation of Matsumura. Dr. Schmidt likewise knew of the Heikenfeld Declaration and full English translation of Matsumura during the pendency of the '584 application. The withheld information is "but-for" material to the patentability of the claims of the '584 application. Finally, a specific intent to deceive the USPTO by Mr. Lopez and Dr. Schmidt is the single most reasonable inference.

Defendant directly benefited from its failure to submit this "but-for" material information. At the time of filing the '584 application, Mr. Lopez and Dr. Schmidt collaborated to obtain patents from pending iRhythm patent applications to assert against Bardy in this litigation. Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality would have stood in the way of Defendant's ability to obtain the claim scope it did via the issuance of the '277 Patent. In addition, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately stand in the way of Defendant's ability to assert additional patents against Bardy by the June 2, 2025 deadline to amend the pleadings in this case. To obtain the '277 Patent in an expedited manner to assert against Bardy (*e.g.*, the '277 application was filed on August 15, 2024 and issued on May 20, 2025 as the '277 patent), Mr. Lopez and Dr. Schmidt colluded to withhold information that was but for material to the claims of the '584 application.

A.    **The Duty to Disclose Information Material to Patentability**

Under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a

patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." Individuals associated with the filing and prosecution of a patent application include "*[e]ach attorney* or agent who prepares or prosecutes the application" and "[e]very other person who is *substantively involved in the preparation or prosecution of the application* and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c).

Under MPEP 2001.06(c), an applicant that pursues subject matter that "is or has been involved in litigation and/or a trial proceeding, or the litigation and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the examiner." This section includes a requirement to disclose *inter partes* review proceedings and *any material information arising therefrom*. *See* MPEP 2001.06(c).

### B.    The Duty of Disclosure Applied to Dr. Schmidt and Mr. Lopez

The duty of disclosure applied to Dr. Schmidt because he was the prosecuting attorney for the '584 application. On August 15, 2024, iRhythm filed the '584 application, which issued as the '277 patent. iRhythm is the applicant on the Application Data Sheet, which was signed by David R. Schmidt, who is listed on the Power of Attorney. The correspondence address is Knobbe, Martens, Olson & Bear, LLP at 2040 Main Street, Fourteenth Floor, Irvine California, United States. Moreover, Dr. Schmidt testified that he was involved in the prosecution of the '584 application. *See* Ex. B at 31:25-32:9 ("Q. Were you involved in the prosecution of this patent application? A. Yes."). Mr. Lopez also owed a duty of disclosure regarding the '584 application. Namely, Mr. Lopez, as iRhythm's Director of Global Intellectual Property, owed a duty of disclosure because he was substantively involved in the preparation and prosecution of the '584

application, stemming from his role in the company, the applicant of the '584 application. This is supported at least by "Knobbe, Martens, Olson & Bear LLP's Privilege Log in Response to Subpoena." (Ex. A). Between May 13, 2022, and November 28, 2024, Mr. Lopez and Dr. Schmidt exchanged numerous communications described as "[l]egal advice from counsel regarding patent prosecution." *See* Ex. A at 1-8.

The testimony of Dr. Schmidt also establishes that Mr. Lopez was substantively involved in the preparation and prosecution of the '584 application. First, Dr. Schmidt testified that Mr. Lopez was responsible for supervising the prosecution of iRhythm's portfolio. Ex. B at 44:8-12. Second, Dr. Schmidt testified that Mr. Lopez was responsible for approving patent claims in applications to be filed with the USPTO, including the patent claims that iRhythm now asserts against Bardy. Ex. B at 22:5-15 ("Q. [W]ho was your contact at iRhythm that you were sending drafts to of claims? … I interacted with Mark Day at iRhythm and then also Ted Lopez."). Dr. Schmidt also testified that Mr. Lopez approved the claims in the '277 patent (*i.e.*, the '584 application) for filing with the USPTO. Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. ***Ted Lopez.***").

Mr. Lopez's practice of receiving claims from Dr. Schmidt, and approving those claims to be filed, is clear from Dr. Schmidt's testimony. Indeed, at the time of his deposition, Dr. Schmidt testified that Mr. Lopez approved the claims of all five (5) asserted patents (at that time) for filing. For the '734 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 24:20-25 ("Q. All right. Turning back to the '734 patent, which is Exhibit 1 to your deposition, do you recall who at iRhythm approved the claims for filing? … probably ***Ted Lopez***, so probably both of them."). For the '859 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 27:13-28:5 ("Q. Who approved the claim set [of the '859 patent] to be filed? A.

*Ted Lopez*.”). For the '860 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 28:17-29:8 (“Q. And do you recall who approved the claims to be filed? A. *Ted Lopez*.”). For the '554 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 30:19-21 (“Q. Who approved the claims to be filed of the '554 patent? A. *Ted Lopez*.”).

In addition to approving claims to be filed, Dr. Schmidt testified that he regularly communicated with Mr. Lopez regarding iRhythm patent prosecution. Ex. B at 36:21-24.

In sum, Dr. Schmidt's testimony aligns with the privilege log and supports Mr. Lopez's substantial involvement in the preparation and prosecution of each patent that iRhythm now asserts. Therefore, under 37 C.F.R. § 1.56, Mr. Lopez owed a duty of candor to the USPTO at least with regard to the '584 application, which issued as the '277 patent.

### C. Dr. Schmidt and Mr. Lopez Knew About the Heikenfeld Declaration and the Full English Translation of Matsumura But Did Not Disclose Either During Prosecution of the '584 Application

Dr. Schmidt was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura while prosecuting the '584 application, which issued as the '277 patent. On December 24, 2024, iRhythm filed five *inter partes* review petitions, which challenged the validity of U.S. Patent No. 8,214,007 (IPR2024-00378); U.S. Patent No. 8,214,007 (IPR2024-00377); U.S. Patent No. 9,155,484 (IPR2024-00376); U.S. Patent No. 8,965,492 (IPR2024-00374); and U.S. Patent No. 10,159,422 (IPR2024-00363). The iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura. Matsumura was a primary reference in the IPRs and the subject of substantial analysis and claim charting. More specifically, across the five iRhythm IPRs, *Matsumura was used as a reference in twelve of the nineteen grounds that iRhythm advanced*. The extensive use of Matsumura in the iRhythm IPRs is likewise seen in the Heikenfeld Declaration (attached as Ex. C).

Dr. Schmidt testified that he was aware of the iRhythm IPRs. Ex. B at 54:3-7 ("Q. And are you aware that iRhythm filed Inter Partes Reviews against patents asserted in the Welch Allyn case? MR. BUNKER: You can answer that yes or no. THE WITNESS: Yes."). Dr. Schmidt further testified that he reviewed these IPRs, including the Heikenfeld Declaration. Ex. B at 56:15-19 ("Q. Have you reviewed those IPRS? … THE WITNESS: Yes, very briefly."), 57:9-18 ("Q. Were you aware that iRhythm also submitted an expert declaration as part of its IPRs against Welch Allyn? … THE WITNESS: Yes. BY MS. BEANE: Q. Did you review that declaration? … THE WITNESS: Not in any great detail."). Although Dr. Schmidt reviewed the iRhythm IPRs, which relied upon the full English translation of Matsumura as a key reference—a reference that is "but-for" material to claims that the Dr. Schmidt was currently prosecuting on behalf of iRhythm—Dr. Schmidt did not obtain this reference from his client, whom he knew had a copy of this reference, and he did not submit this reference to the USPTO. Ex. B at 58:2-6 ("Q. And just to confirm, you don't recall informing the USPTO as part of the '888 application about the English translation of JP2004-121360, correct? … THE WITNESS: No, I don't recall that."). Nor did Dr. Schmidt obtain this reference from the PTAB's website, https://ptacts.uspto.gov/ptacts/ui/home, which contained public copies of all of the exhibits that accompanied iRhythm's IPR filings.

Neither the Heikenfeld Declaration, the full English translation of Matsumura, or the iRhythm IPRs were submitted to the USPTO during prosecution of the '584 application. Dr. Schmidt, however, had notice that specific information existed (*i.e.*, the Heikenfeld Declaration, the full English translation of Matsumura, and the iRhythm IPRs) which may have been material to the patentability of the claims he was prosecuting in the '584 application, which were filed on behalf of iRhythm.

Upon information and belief, Mr. Lopez was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura during the time he supervised prosecution of the '584 application, which issued as the '277 patent. Mr. Lopez, as iRhythm's Director of Global Intellectual Property, supervised and was involved in filing the iRhythm IPRs. As mentioned above, the iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura.

The Heikenfeld Declaration extensively characterizes Matsumura, opines on changes that would have been obvious to a person of ordinary skill, and also characterizes the state of the art. In one example, Heikenfeld opines that "a POSA would understand that [Matsumura's] conductive gel 5 can detect 'bioelectric potentials' for transmission 'through the conductive material 2 and the hooks 3' because the conductive gel 5 is embedded in second sheet 4." Ex. C, ¶482. Heikenfeld further concludes that these conductive gels are ECG electrodes. Ex. C, ¶560. Heikenfeld also opined that "Matsumura teaches that second sheet 4 and first sheet 1 are both made of 'an insulating material' such as 'polyethylene foam, polyurethane foam, or polyurethane sheet.'" Ex. C, ¶865. The over 500 pages of the Heikenfeld Declaration includes material information that should have been submitted to the USPTO to satisfy Dr. Schmidt and Mr. Lopez's duty of disclosure.

The '584 application was filed on August 15, 2024, and issued on May 20, 2025. *See* Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. ***Ted Lopez.***"). The iRhythm IPRs were filed on December 24, 2024, while the '584 application was pending. Mr. Lopez concurrently supervised the prosecution of the '584 application and the iRhythm IPRs. Thus, Mr. Lopez was aware of both the Heikenfeld Declaration and the full English translation of Matsumura during prosecution of the '584 application. Mr. Lopez failed to disclose this same

material information while actively pursuing similar subject matter in iRhythm's patent applications that he was substantively involved in overseeing.

Despite Mr. Lopez overseeing prosecution of subject matter that fell squarely within the disclosure of the full English translation of Matsumura and is now asserted against Bardy, Mr. Lopez did not send the full English translation of Matsumura to his prosecution counsel, Dr. Schmidt. Ex. B at 52:17-20 ("Q. At any point during the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360? A. No.").

    **D.**    **Both the Heikenfeld Declaration and the English Translation of Matsumura Are "But-For" Material to At Least Claim 1 of the '277 Patent**

Upon information and belief, Mr. Lopez and Dr. Schmidt each breached their duty of disclosure and committed inequitable conduct during prosecution of the '277 patent by withholding material information from the USPTO. Mr. Lopez and Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration, which discussed the scope and content of the prior art and various reasons why certain references would have been combined, and also the full English translation of Matsumura. Both the Heikenfeld Declaration and the full English translation of Matsumura are "but-for" material to the patentability of the claims of the '277 patent, including, for example, claim 1. Issued claim 1 of the '277 patent recites:

> An electronic device for long-term adhesion to a user, the device comprising:
>
> a housing comprising a physiologic data collection circuit;
>
> an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user;
>
> an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and

> wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and

> wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer.

'277 Patent at cl. 1.

The "but-for" materiality of the full English translation of Matsumura is demonstrated in an example claim chart. *See* '277 Matsumura Chart (Ex. L). Again, discovery is ongoing, and thus the '277 Matsumura Chart provides a non-limiting example that illustrates the "but-for" materiality of the full English translation of Matsumura. The left column reproduces each element of claim 1 of the '277 patent while the right column includes exemplary disclosure of the full English translation of Matsumura. The full English translation of Matsumura was not cited during prosecution of the '584 application despite being in iRhythm's possession during the prosecution of the '584 application and prior to its issuance.

The USPTO's recent grant of an *ex parte* reexamination of the '277 patent further supports the "but-for" materiality of the Heikenfeld Declaration and the full English translation of Matsumura. Namely, on September 8, 2025, an *ex parte* reexamination request of the '277 patent was filed. Request for *Ex Parte* Reexamination of the '277 Patent (Ex. M) at 1. Ground II relied on the full English translation of Matsumura, and alleged that Matsumura raised a ***substantial new question of patentability*** as to claim 1 of the '277 patent. Ex. M at 7, 33-42.

The USPTO found, on October 17, 2025, that "Matsumura raises an SNQ [or "substantial new question" of patentability] as to claim 1 of the '277 patent." Order Granting Request for *Ex Parte* Reexamination of the '277 Patent (Ex. N) at 14. Moreover, the USPTO states that "[t]here is a substantial likelihood that a reasonable examiner would consider at least the above teachings, i.e., first and second sheets and acrylic adhesive as taught by Matsumura important in determining the patentability of the claims." Ex. N at 15. The USPTO's findings confirm the but-for materiality

of the entire disclosure of Matsumura and its English translation, the very disclosure and the English translation that Mr. Lopez withheld from the USPTO, despite being aware of the reference, as evidenced by his prior familiarity with it from iRhythm's IPRs.

**E.    A Specific Intent to Deceive the USPTO by Mr. Lopez and Dr. Schmidt is the Single Most Reasonable Inference**

At any point during prosecution of the '584 application, either Mr. Lopez or Dr. Schmidt could have satisfied the duty of candor to the USPTO and disclosed the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura. The USPTO has a form for disclosing references during patent prosecution, called an IDS, and iRhythm disclosed other references using an IDS form. For example, iRhythm submitted an IDS on January 27, 2025, disclosing other references, but not the iRhythm IPRs, Heikenfeld Declaration, or the English translation of Matsumura. Ex. O (Information Disclosure Statement of January 27, 2025). This IDS was signed by Dr. Schmidt. The single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '584 application and intended to deceive the USPTO by withholding such materials. This inference is supported by several considerations.

*First*, Mr. Lopez and Dr. Schmidt are sophisticated actors familiar with the duty to disclose material information to the USPTO under MPEP 2001.06(c) and 37 C.F.R. § 1.56. Both Dr. Schmidt and Mr. Lopez are registered patent attorneys, familiar with the rules for materiality. Dr. Schmidt has worked in patent prosecution for fourteen years and responded to "probably over a thousand" office actions and drafted hundreds of applications. Ex. B at 11:25-12:3. And, Mr. Lopez is an "[i]ntellectual Property attorney with 20+ years of experience protecting innovation and building patent portfolios, including preparing and executing strategic intellectual property plans

for implementing business priorities and imperatives." *See* LinkedIn of Mr. Lopez (available at https://www.linkedin.com/in/theodore-lopez-92a420a/).

*Second*, iRhythm's submitted the foreign language version of Matsumura while withholding the full English translation. During prosecution of the '584 application, iRhythm submitted a foreign language version of Matsumura with only the English-translated abstract, demonstrating that iRhythm was aware of Matsumura's relevance to the pending claims. *See* Information Disclosure Statement (Aug. 15, 2024) (Ex. P) at 33 (citing JP 2004-121360 as Cite No. 924). This IDS submission was signed by Dr. Schmidt. iRhythm advantageously used the full English translation of Matsumura in related litigation across its petitions while withholding the same during prosecution of its patent applications. This intentional decision leads to a single most reasonable inference that the withholding of the full English translation of Matsumura was intentional.

*Third*, iRhythm directly benefited from its failure to submit the "but-for" material information. By August of 2024 (when the '584 application was filed), Defendant was already the subject of a four-patent lawsuit from Bardy's sister company, Welch Allyn, for similar infringing activities as in this case. In search of a response to that pending litigation, Mr. Lopez and Dr. Schmidt collaborated to obtain patents and assert them against Bardy. Namely, Dr. Schmidt testified that he monitored Bardy's portfolio and added limitations specifically to cover Bardy's CAM Patch. Ex. B at 64:11-66:20 ("Q. Okay, do you know whether the limitation was also added to cover the Bardy cam product? … Yes, it is my personal belief that that does cover the Bardy cam."), 59:14-20 ("Do you monitor Bardy Diagnostics' patent portfolio? … Yes."). Moreover, to increase the speed of prosecution, Mr. Lopez and Dr. Schmidt filed the '584 application under Track One, which requires a fee for the USPTO to prioritize the application. Ex. B at 64:11-66:20

("Q. What are some of the advantages of a Track 1 request? … THE WITNESS: The main advantage is speed. Track 1 requests are essentially a pay-for-play program with the USPTO where you pay an additional fee so the USPTO will process the application more quickly.").

Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality of the withheld information would have either significantly delayed the prosecution of the '584 application or inhibited the claims of the '277 patent from issuing as they currently stand. These actions were driven by these two individuals' awareness that the Court in this case had a deadline of June 2, 2025, to amend its pleadings. As a result, Mr. Lopez and Dr. Schmidt were incentivized ***not*** to submit material information to avoid delaying the issuance of the '277 patent.

In sum, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately hinder iRhythm's ability to obtain and assert additional patents in this case, including, for example, the '277 patent. To avoid that delay and to obtain the '277 patent in an expedited manner to assert against Bardy, Mr. Lopez and Dr. Schmidt colluded to withhold iRhythm's own litigation materials from the USPTO.

Based on these considerations, the single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '277 patent and he intended to deceive the USPTO by withholding such materials.

## **TWENTIETH DEFENSE: NON-INFRINGEMENT ('819 PATENT)**

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '819 patent. Bardy incorporates by reference the allegations of Count XIII of its Non-Infringement Counterclaim, below.

## TWENTY-FIRST DEFENSE: INVALIDITY ('819 PATENT)

The claims of the '819 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count XIV of its Invalidity Counterclaim, below.

## TWENTY-SECOND DEFENSE: NON-INFRINGEMENT ('856 PATENT)

Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '856 patent. Bardy incorporates by reference the allegations of Count XV of its Non-Infringement Counterclaim, below.

## TWENTY-THIRD DEFENSE: INVALIDITY ('856 PATENT)

The claims of the '856 patent are each invalid for failure to comply with one or more of the requirements for patentability under United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112 and the rules, regulations, and laws pertaining thereto. Bardy incorporates by reference the allegations of Count XVI of its Invalidity Counterclaim, below.

## TWENTY-FOURTH DEFENSE: UNENFORCEABILITY ('856 PATENT)

The '856 patent is unenforceable due to inequitable conduct. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). The '856 patent is also unenforceable based on the doctrine of infectious unenforceability. *See, e.g.*, *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1230 (Fed. Cir. 2007) ("Because inequitable conduct with respect to one or more patents in a family can infect related applications, we find no abuse of discretion in the district court's holding the '345, '690, '067, and '342 patents unenforceable prior to determining whether the inequitable conduct related to each of those four patents should render additional related patents unenforceable as well.") (citations omitted). Upon information and

belief, and before taking full discovery, Mr. Lopez and Dr. Schmidt committed inequitable conduct during prosecution of the '856 patent with a specific intent to deceive the USPTO. Mr. Lopez committed inequitable conduct by withholding the Heikenfeld Declaration and full English translation of material, prior art reference, Matsumura from the USPTO during prosecution of U.S. Patent Application No. 19/212,547 (the "'547 application"), which issued as the '856 patent. Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration and failing to acquire and submit the full English translation of Matsumura to the USPTO during prosecution of '547 application, despite his awareness that his client, iRhythm had a full English translation of Matsumura in its possession and custody.

On information and belief, Mr. Lopez knew of the existence and content of the Heikenfeld Declaration and the full English translation of Matsumura because he reviewed and supervised the preparation and filing of the iRhythm IPRs, which were pending at the USPTO during the pendency of the '547 application. In the iRhythm IPRs, iRhythm challenged the validity of patents directed to and claiming ECG monitors based directly on the Heikenfeld Declaration and full English translation of Matsumura. Dr. Schmidt likewise knew of the Heikenfeld Declaration and full English translation of Matsumura during the pendency of the '547 application. The withheld information is "but-for" material to the patentability of the claims of the '547 application. Finally, a specific intent to deceive the USPTO by Mr. Lopez and Dr. Schmidt is the single most reasonable inference.

Defendant directly benefited from its failure to submit this "but-for" material information. At the time of filing the '547 application, Mr. Lopez and Dr. Schmidt collaborated to obtain patents from pending iRhythm patent applications to assert against Bardy in this litigation. Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality would have stood

in the way of Defendant's ability to obtain the claim scope it did via the issuance of the '856 Patent. In addition, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately stand in the way of Defendant's ability to assert additional patents against Bardy by the June 2, 2025 deadline to amend the pleadings in this case. To obtain the '856 Patent in an expedited manner to assert against Bardy (*e.g.*, the '547 application was filed on May 19, 2025 and issued on September 4, 2025 as the '856 patent), Mr. Lopez and Dr. Schmidt colluded to withhold information that was but for material to the patentability of the claims of the '547 application.

### A.    The Duty to Disclose Information Material to Patentability

Under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." Individuals associated with the filing and prosecution of a patent application include "*[e]ach attorney* or agent who prepares or prosecutes the application" and "[e]very other person who is *substantively involved in the preparation or prosecution of the application* and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c).

Under MPEP 2001.06(c), an applicant that pursues subject matter that "is or has been involved in litigation and/or a trial proceeding, or the litigation and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the examiner." This section includes a requirement to disclose *inter partes* review proceedings and *any material information arising therefrom*. *See* MPEP 2001.06(c).

### B.        The Duty of Disclosure Applied to Dr. Schmidt and Mr. Lopez

The duty of disclosure applied to Dr. Schmidt because he was the prosecuting attorney for the '547 application. On May 19, 2025, iRhythm filed the '547 application, which issued as the '856 patent. iRhythm is the applicant on the Application Data Sheet, which was signed by David R. Schmidt, who is listed on the Power of Attorney. The correspondence address is Knobbe, Martens, Olson & Bear, LLP at 2040 Main Street, Fourteenth Floor, Irvine California, United States. Moreover, Dr. Schmidt testified that he was involved in the prosecution of the '856 application. *See* Ex. B at 32:24-33:1 ("Q. Were you involved in the prosecution of the 856 patent? A. Yes."); 34:13-14 ("Q. Did you prepare the claims of the '856 patent? A. I did."). Mr. Lopez also owed a duty of disclosure regarding the '547 application. Namely, Mr. Lopez, as iRhythm's Director of Global Intellectual Property, owed a duty of disclosure because he was substantively involved in the preparation and prosecution of the '547 application, stemming from his position at iRhythm, the applicant of the '547 application. This is supported at least by "Knobbe, Martens, Olson & Bear LLP's Privilege Log in Response to Subpoena." (Ex. A). Between May 13, 2022, and November 28, 2024, Mr. Lopez and Dr. Schmidt exchanged numerous communications described as "[l]egal advice from counsel regarding patent prosecution." *See* Ex. A at 1-8.

The testimony of Dr. Schmidt also establishes that Mr. Lopez was substantively involved in the preparation and prosecution of the '584 application. First, Dr. Schmidt testified that Mr. Lopez was responsible for supervising the prosecution of iRhythm's portfolio. Ex. B at 44:8-12. Second, Dr. Schmidt testified that Mr. Lopez was responsible for approving patent claims in applications to be filed with the USPTO, including the patent claims that iRhythm now asserts against Bardy. Ex. B at 22:5-15 ("Q. [W]ho was your contact at iRhythm that you were sending drafts to of claims? … I interacted with Mark Day at iRhythm and then also Ted Lopez."). Dr. Schmidt also testified that Mr. Lopez instructed him to file the '856 patent application with the

USPTO. Ex. B at 36:20-24 ("Q. Great. Did you receive instructions to file the '856 patent application from Mr. Lopez? MR. BUNKER: Uh, you may answer that. THE WITNESS: Yes.").

Mr. Lopez's practice of receiving claims from Dr. Schmidt, and approving those claims to be filed, is clear from Dr. Schmidt's testimony. Indeed, at the time of his deposition, Dr. Schmidt testified that Mr. Lopez approved the claims of all five (5) asserted patents (at that time) for filing. For the '734 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 24:20-25 ("Q. All right. Turning back to the '734 patent, which is Exhibit 1 to your deposition, do you recall who at iRhythm approved the claims for filing? … probably ***Ted Lopez***, so probably both of them."). For the '859 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 27:13-28:5 ("Q. Who approved the claim set [of the '859 patent] to be filed? A. ***Ted Lopez***."). For the '860 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 28:17-29:8 ("Q. And do you recall who approved the claims to be filed? A. ***Ted Lopez***."). For the '554 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. ***Ted Lopez***.").

In addition to approving claims to be filed, Dr. Schmidt testified that he regularly communicated with Mr. Lopez regarding iRhythm patent prosecution. Ex. B at 36:21-24.

In sum, Dr. Schmidt's testimony aligns with the communications listed in iRhythm's privilege log and supports Mr. Lopez's substantial involvement in the preparation and prosecution of each patent that iRhythm now asserts. Therefore, under 37 C.F.R. § 1.56, Mr. Lopez owed a duty of candor to the USPTO at least with regard to the '547 application, which issued as the '856 patent.

C. **Dr. Schmidt and Mr. Lopez Knew About the Heikenfeld Declaration and the Full English Translation of Matsumura But Did Not Disclose Either During Prosecution of the '547 Application**

Dr. Schmidt was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura while prosecuting the '547 application, which issued as the '856 patent. On December 24, 2024, iRhythm filed five *inter partes* review petitions, which challenged the validity of U.S. Patent No. 8,214,007 (IPR2024-00378); U.S. Patent No. 8,214,007 (IPR2024-00377); U.S. Patent No. 9,155,484 (IPR2024-00376); U.S. Patent No. 8,965,492 (IPR2024-00374); and U.S. Patent No. 10,159,422 (IPR2024-00363).[1] The iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura. iRhythm relied upon Matsumura as primary reference in the IPRs and Matsumura was the subject of substantial analysis and claim charting by iRhythm. More specifically, across the five iRhythm IPRs, *Matsumura was used as a reference in twelve of the nineteen grounds that iRhythm advanced*. The extensive use of Matsumura in the iRhythm IPRs is likewise seen in the Heikenfeld Declaration (attached as Ex. C).

Dr. Schmidt testified that he was aware of the iRhythm IPRs. Ex. B at 54:3-7 ("Q. And are you aware that iRhythm filed Inter Partes Reviews against patents asserted in the Welch Allyn case? MR. BUNKER: You can answer that yes or no. THE WITNESS: Yes."). Dr. Schmidt further testified that he reviewed these IPRs, including the Heikenfeld Declaration. Ex. B at 56:15-19 ("Q. Have you reviewed those IPRS? … THE WITNESS: Yes, very briefly."), 57:9-18 ("Q. Were you aware that iRhythm also submitted an expert declaration as part of its IPRs against Welch Allyn?

---

[1]   iRhythm is also a defendant in *Welch Allyn, Inc. v. iRhythm Technologies, Inc.,* Case No. 24-cv-00224-MN (D. Delaware), filed on February 20, 2024. Welch Allyn is a sister company of Bardy Diagnostics, Inc. the Plaintiff in this case. In *Welch Allyn*, Plaintiff alleges that iRhythm's ECG monitors infringe six (6) additional U.S.patents owned by Welch Allyn. iRhythm filed IPRs (identified here) seeking to invalidate each of the asserted Welch Allyn patents. Institution of the IPRs was denied.

… THE WITNESS: Yes. BY MS. BEANE: Q. Did you review that declaration? … THE WITNESS: Not in any great detail."). Although Dr. Schmidt reviewed the iRhythm IPRs, which relied upon the full English translation of Matsumura as a key reference—a reference that is "but-for" material to claims that the Dr. Schmidt was currently prosecuting on behalf of iRhythm—Dr. Schmidt did not obtain this reference from his client, whom he knew had a copy of this reference, and he did not submit this reference to the USPTO. Nor did Dr. Schmidt obtain this reference from the PTAB's website, https://ptacts.uspto.gov/ptacts/ui/home, which contained public copies of all of the exhibits that accompanied iRhythm's IPR filings.

Neither the Heikenfeld Declaration, the full English translation of Matsumura, or the iRhythm IPRs were submitted to the USPTO during prosecution of the '547 application. Dr. Schmidt, however, had notice that this specific information existed (*i.e.*, the Heikenfeld Declaration, the full English translation of Matsumura, and the iRhythm IPRs) which may have been material to the patentability of the claims he was prosecuting in iRhythm's '547 application.

Upon information and belief, Mr. Lopez was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura during the time he supervised prosecution of the '547 application, which issued as the '856 patent. Mr. Lopez, as iRhythm's Director of Global Intellectual Property, supervised and was involved in filing the iRhythm IPRs. As mentioned above, the iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura.

The Heikenfeld Declaration extensively characterizes Matsumura, opines on changes that would have been obvious to a person of ordinary skill, and also characterizes the state of the art. In one example, Heikenfeld opines that "a POSA would understand that [Matsumura's] conductive gel 5 can detect 'bioelectric potentials' for transmission 'through the conductive material 2 and the

hooks 3' because the conductive gel 5 is embedded in second sheet 4." Ex. C, ¶482. Heikenfeld further concludes that these conductive gels are ECG electrodes. Ex. C, ¶560. Heikenfeld also opined that "Matsumura teaches that second sheet 4 and first sheet 1 are both made of 'an insulating material' such as 'polyethylene foam, polyurethane foam, or polyurethane sheet.'" Ex. C, ¶865. The over 500 pages of the Heikenfeld Declaration includes material information that should have been submitted to the USPTO to satisfy Dr. Schmidt and Mr. Lopez's duty of disclosure.

The '547 application was filed on May 19, 2025, and issued as the '856 patent on September 9, 2025. *See* Ex. B at 36:20-24 ("Q. Great. Did you receive instructions to file the '856 patent application from Mr. Lopez? MR. BUNKER: Uh, you may answer that. THE WITNESS: Yes."). The iRhythm IPRs were filed on December 24, 2024, before the '547 application was filed. Further, the iRhythm IPRs were concurrently pending during prosecution of the '547 application. Mr. Lopez concurrently supervised the prosecution of the '547 application and the iRhythm IPRs. Thus, Mr. Lopez was aware of both the Heikenfeld Declaration and the full English translation of Matsumura during prosecution of the '547 application. Mr. Lopez failed to disclose this same material information while actively pursuing subject matter in iRhythm's patent applications that was similar to the claims he was trying to invalidate through the IPR he was overseeing.

Despite Mr. Lopez overseeing prosecution of claims having a scope and subject matter that fell squarely within the disclosure of the full English translation of Matsumura, claims that are now being asserted against Bardy, Mr. Lopez did not provide the full English translation of Matsumura to his prosecution counsel, Dr. Schmidt. Ex. B at 52:17-20 ("Q. At any point during the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360 [Matsumura]? A. No.").

**D.     Both the Heikenfeld Declaration and the English Translation of Matsumura Are "But-For" Material to At Least One Claim of the '856 Patent**

Upon information and belief, Mr. Lopez and Dr. Schmidt each breached their duty of disclosure and committed inequitable conduct during prosecution of the '856 patent by withholding material information from the USPTO. Mr. Lopez and Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration, which discussed the scope and content of the prior art and various reasons why a person of skill in the art would have combined certain references, and also the full English translation of Matsumura. Moreover, two earlier patents in the same patent family as the '856 patent (*i.e.*, the '554 and '277 patents) are subject to *ex parte* reexamination. There, the USPTO already determined that Matsumura raises a substantial new question of patentability as to these earlier patents. *See* Ex. H at 13; Ex. N at 14. This further supports Matsumura's "but-for" materiality to the '856 patent, which shares the same specification and claims substantially the same subject matter as the '554 and '277 patents. The USPTO's finding of Matsumura as "but-for" material to the '554 and '277 patents also supports a finding of unenforceability as to the '856 patent based on the doctrine of infectious unenforceability. Thus, both the Heikenfeld Declaration and the full English translation of Matsumura are "but-for" material to the patentability of the claims of the '856 patent.

**E.     A Specific Intent to Deceive the USPTO by Mr. Lopez and Dr. Schmidt is the Single Most Reasonable Inference**

At any point during prosecution of the '547 application, either Mr. Lopez or Dr. Schmidt could have satisfied the duty of candor to the USPTO and disclosed the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura. The USPTO has a form for disclosing references during patent prosecution, called an IDS, and iRhythm disclosed other references using an IDS form. For example, iRhythm submitted an IDS on May 19, 2025, disclosing other references to the USPTO during the prosecution of the '547 application, but not

the iRhythm IPRs, Heikenfeld Declaration, or the English translation of Matsumura. Ex. T (Information Disclosure Statement of May 19, 2025). This IDS was signed by Dr. Schmidt. The single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '547 application and intended to deceive the USPTO by withholding such materials. This inference is supported by several considerations.

*First*, Mr. Lopez and Dr. Schmidt are sophisticated actors familiar with the duty to disclose material information to the USPTO under MPEP 2001.06(c) and 37 C.F.R. § 1.56. Both Dr. Schmidt and Mr. Lopez are registered patent attorneys, familiar with the rules governing the duty of candor and disclosure. Dr. Schmidt has prosecuted patent applications for fourteen years and responded to "probably over a thousand" office actions and drafted hundreds of applications. Ex. B at 11:25-12:3. And, Mr. Lopez is an "[i]ntellectual Property attorney with 20+ years of experience protecting innovation and building patent portfolios, including preparing and executing strategic intellectual property plans for implementing business priorities and imperatives." *See* LinkedIn of Mr. Lopez (available at https://www.linkedin.com/in/theodore-lopez-92a420a/).

*Second*, iRhythm disclosed the foreign language version of Matsumura to the USPTO while withholding the full English translation. During prosecution of the '584 application, iRhythm submitted a foreign language version of Matsumura with only the English-translated abstract, demonstrating that iRhythm was aware of Matsumura's relevance and materiality to the pending claims. *See* Information Disclosure Statement (May 19, 2025) (Ex. T) at 35 (citing JP 2004-121360 (Matsumura) as Cite No. 979). This IDS submission was signed by Dr. Schmidt. iRhythm advantageously used the full English translation of Matsumura in related litigation in each of its IPRs while withholding the same during prosecution of its own patent applications

containing claims of similar subject matter. This intentional decision leads to a single most reasonable inference that the withholding of the full English translation of Matsumura was intentional.

*Third*, iRhythm directly benefited from its failure to submit the "but-for" material information. By May 19, 2025 (when the '547 application was filed), Defendant was already facing allegations of patent infringement of a six-patent lawsuit from Bardy's sister company, Welch Allyn, accusing the same iRhythm ECG monitor of infringement as in this case. In search of a response to that pending litigation, Mr. Lopez and Dr. Schmidt collaborated to quickly obtain patents and assert them against Bardy. In this regard, Dr. Schmidt testified that he monitored Bardy's patent portfolio and added claims and limitations specifically to cover Bardy's ECG monitor, i.e., the CAM Patch. Ex. B at 64:11-66:20 ("Q. Okay, do you know whether the limitation was also added to cover the Bardy cam product? … Yes, it is my personal belief that that does cover the Bardy cam."), 59:14-20 ("Do you monitor Bardy Diagnostics' patent portfolio? … Yes."). Moreover, to increase the speed of prosecution, Mr. Lopez and Dr. Schmidt filed the '547 application under Track One, which requires a fee for the USPTO to prioritize the application. Ex. B at 64:11-66:20 ("Q. What are some of the advantages of a Track 1 request? … THE WITNESS: The main advantage is speed. Track 1 requests are essentially a pay-for-play program with the USPTO where you pay an additional fee so the USPTO will process the application more quickly.").

Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality of the withheld information would have either prevented the claims from issuing in their current form, or at the very least, significantly delayed the prosecution of the '547 application. These actions were driven by these two individuals' awareness that the Court in this case had a

deadline of June 2, 2025, to amend its pleadings. As a result, Mr. Lopez and Dr. Schmidt were incentivized ***not*** to submit material information to avoid delaying the issuance of the '856 patent.

In sum, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately hinder iRhythm's ability to obtain and assert additional patents in this case, including, for example, the '856 patent. To avoid that delay and to obtain the '856 patent in an expedited manner to assert against Bardy, Mr. Lopez and Dr. Schmidt colluded to withhold from the USPTO material prior art and an expert declaration characterizing that prior art, which it was extensively relying on in its efforts to invalidate Welch Allyn's asserted patents in a related litigation.

Based on these considerations, the single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '856 patent and they intended to deceive the USPTO by withholding such materials.

## OTHER DEFENSES RESERVED

Bardy reserves the right to assert any additional defenses, at law or equity, that may be available now or in the future based on discovery or any factual investigation in this case.

## BARDY'S COUNTERCLAIMS

Bardy Diagnostics, Inc. ("Bardy") hereby asserts the following counterclaims against iRhythm Technologies, Inc. ("iRhythm").

## THE PARTIES

1.      Bardy is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 220 120th Ave NE, Suite 100, Bellevue, WA.

2.       As alleged by iRhythm in paragraph 9 of iRhythm's Fourth Amended Counterclaims and Answer (ECF No. 148), iRhythm is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 699 8th Street, Suite 600, San Francisco, CA 94103.

## NATURE OF THE ACTION

3.       Bardy brought this action against iRhythm for the infringement of the U.S. Patent No. 12,161,473 (the "'473 Patent"), U.S. Patent No. 12,171,562 (the "'562 Patent"), U.S. Patent No. 12,285,261 (the "'261 patent"), and U.S. Patent No. 12,310,735 (the "'735 Patent") (collectively, the "Bardy Asserted Patents").

4.       iRhythm counterclaimed for a finding of infringement of the U.S. Patent Nos. 12,133,734 (the "'734 patent"), 12,245,859 (the "'859 patent), 12,245,860 (the "'860 patent"), and 12,274,554 (the '554 patent"), 12,303,277 (the "'277 patent") (collectively, the "iRhythm Asserted Patents") by Bardy.

## JURISDICTION AND VENUE

5.       The Court has subject matter jurisdiction over Bardy's Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

6.       The Court may properly exercise personal jurisdiction over iRhythm at least because iRhythm is deemed to reside in this judicial district by virtue of being incorporated in the State of Delaware, and because iRhythm has asserted the iRhythm Asserted Patents against Bardy in the Counterclaims in this jurisdiction.

7.       Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and/or 1400, and because iRhythm has asserted the iRhythm Asserted Patents against Bardy in the Counterclaims in this jurisdiction.

## COUNT I: DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF U.S. PATENT NO. 12,133,734

8.    Bardy incorporates by reference the allegations in Paragraphs 1-7 of these Counterclaims as though fully set forth herein.

9.    In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '734 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

10.    Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '734 patent.

11.    By way of example, and not by way of limitation, the '734 patent recites "wherein the housing is configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user." '734 patent, cl. 1. The CAM patch does not include a housing that is "configured to tilt at an angle relative to the lower adhesive layer in response to movement of the user," as required by claim 1 of the '734 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '734 patent.

12.    As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '734 patent.

13.    A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '734 patent is therefore necessary and appropriate to resolve this controversy.

14.    iRhythm knew or should have known that Bardy has not and is not in any way infringing the '734 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

## COUNT II: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 12,245,859

15.    Bardy incorporates by reference the allegations in Paragraphs 1-14 of these Counterclaims as though fully set forth herein.

16.    In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '859 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

17.    Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '859 patent.

18.    By way of example, and not by way of limitation, the CAM patch does not have the claimed spring contacts as required by claim 1 of the '859 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '859 patent.

19.    As evidenced by the allegations in the iRhythm Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '859 patent.

20.    A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '859 patent is therefore necessary and appropriate to resolve this controversy.

21.     iRhythm knew or should have known that Bardy has not and is not in any way infringing the '859 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

## COUNT III: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 12,245,860

22.     Bardy incorporates by reference the allegations in paragraphs 1-21 of these Counterclaims as though fully set forth herein.

23.     In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '860 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

24.     Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '860 patent.

25.     By way of example, and not by way of limitation, the CAM patch does not have the claimed spring contacts as required by claim 1 of the '860 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '860 patent.

26.     As evidenced by the allegations in the iRhythm Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '860 patent.

27.     A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '860 patent is therefore necessary and appropriate to resolve this controversy.

28.     iRhythm knew or should have known that Bardy has not and is not in any way infringing the '860 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

## COUNT IV: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 12,274,554

29.     Bardy incorporates by reference the allegations in Paragraphs 1-28 of these Counterclaims as though fully set forth herein.

30.     In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '554 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

31.     Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '554 patent.

32.     By way of example, and not by way of limitation, the CAM patch does not include the claimed "electrical connection" as required by claim 1 of the '554 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '554 patent.

33.     As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '554 patent.

34.     A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '554 patent is therefore necessary and appropriate to resolve this controversy.

35. iRhythm knew or should have known that Bardy has not and is not in any way infringing the '554 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

**COUNT V: DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 12,133,734**

36. Bardy incorporates by reference the allegations in Paragraphs 1-35 of these Counterclaims as though fully set forth herein.

37. Bardy maintains that each and every claim of the '734 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

38. As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '734 patent.

39. By way of example, and not by way of limitation, the claims of the '734 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent No. 7,206,630 (Ex. Q); U.S. Patent Publication No. 2008/0139953 (Ex. R); and/or U.S. Patent Publication No. 2002/0082491 (Ex. S).

40. A judicial declaration that the claims of the '734 patent are invalid is therefore necessary and appropriate to resolve this controversy.

**COUNT VI: DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 12,245,859**

41. Bardy incorporates by reference the allegations in Paragraphs 1-40 of these Counterclaims as though fully set forth herein.

42. Bardy maintains that each and every claim of the '859 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

43.     As evidenced by the allegations in the iRhythm Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '859 patent.

44.     By way of example, and not by way of limitation, the claims of the '859 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent No. 7,206,630 (Ex. Q); U.S. Patent Publication No. 2008/0139953 (Ex. R); and/or U.S. Patent Publication No. 2002/0082491 (Ex. S).

45.     A judicial declaration that the claims of the '859 patent are invalid is therefore necessary and appropriate to resolve this controversy.

### COUNT VII: DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 12,245,860

46.     Bardy incorporates by reference the allegations in Paragraphs 1-45 of these Counterclaims as though fully set forth herein.

47.     Bardy maintains that each and every claim of the '860 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

48.     As evidenced by the allegations in the iRhythm Counterclaims, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '860 patent.

49.     By way of example, and not by way of limitation, the claims of the '860 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent No. 7,206,630 (Ex. Q); U.S. Patent Publication No. 2008/0139953 (Ex. R); and/or U.S. Patent Publication No. 2002/0082491 (Ex. S).

50.     A judicial declaration that the claims of the '860 patent are invalid is therefore necessary and appropriate to resolve this controversy.

## COUNT VIII: DECLARATORY JUDGMENT OF
## INVALIDITY OF U.S. PATENT NO. 12,274,554

51.     Bardy incorporates by reference the allegations in Paragraphs 1-50 of these Counterclaims as though fully set forth herein.

52.     Bardy maintains that each and every claim of the '554 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

53.     As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '554 patent.

54.     By way of example, and not by way of limitation, the claims of the '554 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent No. 7,206,630 (Ex. Q); U.S. Patent Publication No. 2008/0139953 (Ex. R); and/or U.S. Patent Publication No. 2002/0082491 (Ex. S).

55.     A judicial declaration that the claims of the '554 patent are invalid is therefore necessary and appropriate to resolve this controversy.

## COUNT IX: DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF U.S. PATENT NO. 12,303,277

56.     Bardy incorporates by reference the allegations in Paragraphs 1-55 of these Counterclaims as though fully set forth herein.

57.     In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '277 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

58.     Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '277 patent.

59.     By way of example, and not by way of limitation, the CAM patch does not include the claimed "wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer" as required by claim 1 of the '277 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '277 patent.

60.     As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '277 patent.

61.     A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '277 patent is therefore necessary and appropriate to resolve this controversy.

62.     iRhythm knew or should have known that Bardy has not and is not in any way infringing the '277 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

## COUNT X: DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 12,303,277

63.     Bardy incorporates by reference the allegations in Paragraphs 1-62 of these Counterclaims as though fully set forth herein.

64.     Bardy maintains that each and every claim of the '277 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

65.     As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '277 patent.

66.     By way of example, and not by way of limitation, the claims of the '277 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent No. 7,206,630 (Ex. Q); U.S. Patent Publication No. 2008/0139953 (Ex. R); and/or U.S. Patent Publication No. 2002/0082491 (Ex. S).

67.     A judicial declaration that the claims of the '277 patent are invalid is therefore necessary and appropriate to resolve this controversy.

### COUNT XI: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. 12,274,554

68.     Bardy incorporates by reference the allegations in Paragraphs 1-67 of these Counterclaims as though fully set forth herein.

69.     The '554 patent is unenforceable due to inequitable conduct. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). Upon information and belief, and before taking full discovery, Theodore Lopez and David Schmidt committed inequitable conduct during prosecution of the '554 patent with a specific intent to deceive the United States Patent and Trademark Office ("USPTO"). Mr. Lopez committed inequitable conduct by withholding the Expert Declaration of Jason Heikenfeld and the full English translation of material, prior art reference, JP 2004-121360, from the USPTO during prosecution of U.S. Patent Application No. 18/936,888 (the "'888 application"), which issued as the '554 patent. Dr. Schmidt committed inequitable conduct by withholding the Expert Declaration of Jason Heikenfeld and failing to acquire and submit the full English translation of JP 2004-121360 to the USPTO during prosecution of '888 application, despite his awareness that such a translation existed within his client, iRhythm's, possession.

70.     On information and belief, Mr. Lopez knew of the existence and content of the Expert Declaration of Jason Heikenfeld (the "Heikenfeld Declaration") and the English translation of JP 2004-121360 (the "full English translation of Matsumura") because he reviewed and supervised the preparation and filing of five iRhythm *inter partes* review petitions (collectively, the "iRhythm IPRs"), which were submitted to the USPTO during the pendency of the '888 application. In the iRhythm IPRs, iRhythm challenged the validity of patents directed to and claiming ECG monitors based directly on the Heikenfeld Declaration and full English translation of Matsumura. Dr. Schmidt likewise knew of the Heikenfeld Declaration and full English translation of Matsumura during the pendency of the '888 application. The withheld information is "but-for" material to the patentability of the claims of the '888 application. Finally, a specific intent to deceive the USPTO by Mr. Lopez and Dr. Schmidt is the single most reasonable inference.

71.     Defendant directly benefited from its failure to submit this "but-for" material information. At the time of filing the '888 application, Mr. Lopez and Dr. Schmidt collaborated to obtain patents from pending iRhythm patent applications to assert against Bardy in this litigation. Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality would have stood in the way of Defendant's ability to obtain the claim scope it did via the issuance of the '554 patent. In addition, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately stand in the way of Defendant's ability to assert additional patents against Bardy by the June 2, 2025 deadline to amend the pleadings in this case. To obtain the '554 patent in an expedited manner to assert against Bardy (*e.g.*, the '888 application was filed on October 4, 2024 and issued on May 12, 2025 as the '554 patent), Mr. Lopez and Dr. Schmidt colluded to withhold information that was but for material to the claims of the '888 application.

### A.    The Duty to Disclose Information Material to Patentability

72.    Under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." Individuals associated with the filing and prosecution of a patent application include "*[e]ach attorney* or agent who prepares or prosecutes the application" and "[e]very other person who is *substantively involved in the preparation or prosecution of the application* and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c).

73.    Under MPEP 2001.06(c), an applicant that pursues subject matter that "is or has been involved in litigation and/or a trial proceeding, or the litigation and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the examiner." This section includes a requirement to disclose *inter partes* review proceedings and *any material information arising therefrom*. *See* MPEP 2001.06(c).

### B.    The Duty of Disclosure Applied to Dr. Schmidt and Mr. Lopez

74.    The duty of disclosure applied to Dr. Schmidt because he was the prosecuting attorney for the '888 application. On October 4, 2024, iRhythm filed the '888 application, which issued as the '554 patent. iRhythm is the applicant on the Application Data Sheet, which was signed by David R. Schmidt, who is listed on the Power of Attorney. The correspondence address is Knobbe, Martens, Olson & Bear, LLP at 2040 Main Street, Fourteenth Floor, Irvine California, United States. Moreover, Dr. Schmidt testified that he was involved in the prosecution of the '888 application. *See* Deposition Transcript of David Schmidt Transcript (Sept. 12, 2025) (Ex. B) at 30:13-15 ("Q. And were you involved in the prosecution of the '554 patent? A. Yes."). Mr. Lopez

also owed a duty of disclosure regarding the '888 application. Namely, Mr. Lopez, as iRhythm's Director of Global Intellectual Property, owed a duty of disclosure because he was substantively involved in the preparation and prosecution of the '888 application, stemming from his role in the company, the applicant of the '888 application. This is supported at least by "Knobbe, Martens, Olson & Bear LLP's Privilege Log in Response to Subpoena." (Ex. A). Between May 13, 2022, and November 28, 2024, Mr. Lopez and Dr. Schmidt exchanged numerous communications described as "[l]egal advice from counsel regarding patent prosecution." *See* Ex. A at 1-8. For example, on October 1, 2024, three days prior to the filing of the '888 application, Dr. Schmidt sent Mr. Lopez an "[e]mail communication reflecting legal advice from counsel regarding patent prosecution." Ex. A at 6.

75.    The testimony of Dr. Schmidt also establishes that Mr. Lopez was substantively involved in the preparation and prosecution of the '888 application. First, Dr. Schmidt testified that Mr. Lopez was responsible for supervising the prosecution of iRhythm's portfolio. Ex. B at 44:8-12. Second, Dr. Schmidt testified that Mr. Lopez was responsible for approving patent claims in applications to be filed with the USPTO, including the patent claims that iRhythm now asserts against Bardy. Ex. B at 22:5-15 ("Q. [W]ho was your contact at iRhythm that you were sending drafts to of claims? … I interacted with Mark Day at iRhythm and then also Ted Lopez."). Dr. Schmidt also testified that Mr. Lopez approved the claims in the '554 patent (*i.e.*, the '888 application) for filing with the USPTO. Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. ***Ted Lopez***.").

76.    Mr. Lopez's practice of receiving claims from Dr. Schmidt, and approving those claims to be filed, is clear from Dr. Schmidt's testimony. Indeed, at the time of his deposition, Dr. Schmidt testified that Mr. Lopez approved the claims of all five (5) asserted patents (at that time)

for filing. For the '734 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 24:20-25 ("Q. All right. Turning back to the '734 patent, which is Exhibit 1 to your deposition, do you recall who at iRhythm approved the claims for filing? … probably ***Ted Lopez***, so probably both of them."). For the '859 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 27:13-28:5 ("Q. Who approved the claim set [of the '859 patent] to be filed? A. ***Ted Lopez***."). For the '860 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 28:17-29:8 ("Q. And do you recall who approved the claims to be filed? A. ***Ted Lopez***."). For the '277 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. ***Ted Lopez***.").

77.    In addition to approving claims to be filed, Dr. Schmidt testified that he regularly communicated with Mr. Lopez regarding iRhythm patent prosecution. Ex. B at 36:21-24.

78.    In sum, Dr. Schmidt's testimony aligns with the privilege log and supports Mr. Lopez's substantial involvement in the preparation and prosecution of each patent that iRhythm now asserts. Therefore, under 37 C.F.R. § 1.56, Mr. Lopez owed a duty of candor to the USPTO at least with regard to the '888 application, which issued as the '554 patent.

**C.    Dr. Schmidt and Mr. Lopez Knew About the Heikenfeld Declaration and the Full English Translation of Matsumura But Did Not Disclose Either During Prosecution of the '888 Application**

79.    Dr. Schmidt was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura while prosecuting the '888 application, which issued as the '554 patent. On December 24, 2024, iRhythm filed five *inter partes* review petitions, which challenged the validity of U.S. Patent No. 8,214,007 (IPR2024-00378); U.S. Patent No. 8,214,007 (IPR2024-00377); U.S. Patent No. 9,155,484 (IPR2024-00376); U.S. Patent No. 8,965,492 (IPR2024-00374); and U.S. Patent No. 10,159,422 (IPR2024-00363). The iRhythm IPRs included

several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura. Matsumura was a primary reference in the IPRs and the subject of substantial analysis and claim charting. More specifically, across the five iRhythm IPRs, *Matsumura was used as a reference in twelve of the nineteen grounds that iRhythm advanced*. The extensive use of Matsumura in the iRhythm IPRs is likewise seen in the Heikenfeld Declaration (attached as Ex. C).

80.    Dr. Schmidt testified that he was aware of the iRhythm IPRs. Ex. B at 54:3-7 ("Q. And are you aware that iRhythm filed Inter Partes Reviews against patents asserted in the Welch Allyn case? MR. BUNKER: You can answer that yes or no. THE WITNESS: Yes."). Dr. Schmidt further testified that he reviewed these IPRs, including the Heikenfeld Declaration. Ex. B at 56:15-19 ("Q. Have you reviewed those IPRS? … THE WITNESS: Yes, very briefly."), 57:9-18 ("Q. Were you aware that iRhythm also submitted an expert declaration as part of its IPRs against Welch Allyn? … THE WITNESS: Yes. BY MS. BEANE: Q. Did you review that declaration? … THE WITNESS: Not in any great detail."). Although Dr. Schmidt reviewed the iRhythm IPRs, which relied upon the full English translation of Matsumura as a key reference—a reference that is "but-for" material to claims that the Dr. Schmidt was currently prosecuting on behalf of iRhythm—Dr. Schmidt did not obtain this reference from his client, whom he knew had a copy of this reference, and he did not submit this reference to the USPTO. Ex. B at 58:2-6 ("Q. And just to confirm, you don't recall informing the USPTO as part of the '888 application about the English translation of JP2004-121360, correct? … THE WITNESS: No, I don't recall that."). Nor did Dr. Schmidt obtain this reference from the PTAB's website, https://ptacts.uspto.gov/ptacts/ui/home, which contained public copies of all of the exhibits that accompanied iRhythm's IPR filings.

81.    Neither the Heikenfeld Declaration, the full English translation of Matsumura, or the iRhythm IPRs were submitted to the USPTO during prosecution of the '888 application. Dr. Schmidt, however, had notice that specific information existed (*i.e.*, the Heikenfeld Declaration, the full English translation of Matsumura, and the iRhythm IPRs) which may have been material to the patentability of the claims he was prosecuting in the '888 application, which were filed on behalf of iRhythm.

82.    Upon information and belief, Mr. Lopez was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura during the time he supervised prosecution of the '888 application, which issued as the '554 patent. Mr. Lopez, as iRhythm's Director of Global Intellectual Property, supervised and was involved in filing the iRhythm IPRs. As mentioned above, the iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura.

83.    The Heikenfeld Declaration extensively characterizes Matsumura, opines on changes that would have been obvious to a person of ordinary skill, and also characterizes the state of the art. In one example, Heikenfeld opines that "a POSA would understand that [Matsumura's] conductive gel 5 can detect 'bioelectric potentials' for transmission 'through the conductive material 2 and the hooks 3' because the conductive gel 5 is embedded in second sheet 4." Ex. C, ¶482. Heikenfeld further concludes that these conductive gels are ECG electrodes. Ex. C, ¶560. Heikenfeld also opined that "Matsumura teaches that second sheet 4 and first sheet 1 are both made of 'an insulating material' such as 'polyethylene foam, polyurethane foam, or polyurethane sheet.'" Ex. C, ¶865. The over 500 pages of the Heikenfeld Declaration includes material information that should have been submitted to the USPTO to satisfy Dr. Schmidt and Mr. Lopez's duty of disclosure.

84.    The '888 application was filed on October 4, 2024, and issued on May 12, 2025. *See* Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. ***Ted Lopez***."). The iRhythm IPRs were filed on December 24, 2024, just two and a half months after Mr. Lopez approved the claims for filing in the '888 application. Mr. Lopez concurrently supervised the prosecution of the '888 application and the iRhythm IPRs. Thus, Mr. Lopez was aware of both the Heikenfeld Declaration and the full English translation of Matsumura during prosecution of the '888 application. Mr. Lopez failed to disclose this same material information while actively pursuing similar subject matter in iRhythm's patent applications that he was substantively involved in overseeing.

85.    Despite Mr. Lopez overseeing prosecution of subject matter that fell squarely within the disclosure of the full English translation of Matsumura and is now asserted against Bardy, Mr. Lopez did not send the full English translation of Matsumura to his prosecution counsel, Dr. Schmidt. Ex. B at 52:17-20 ("Q. At any point during the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360? A. No.").

**D.    Both the Heikenfeld Declaration and the English Translation of Matsumura Are "But-For" Material to At Least Claim 1 of the '554 Patent**

86.    Upon information and belief, Mr. Lopez and Dr. Schmidt each breached their duty of disclosure and committed inequitable conduct during prosecution of the '554 patent by withholding material information from the USPTO. Mr. Lopez and Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration, which discussed the scope and content of the prior art and various reasons why certain references would have been combined, and also the full English translation of Matsumura. Both the Heikenfeld Declaration and the full English translation of Matsumura are "but-for" material to the patentability of the claims of the '554 patent, including, for example, claim 1. Issued claim 1 of the '554 patent recites:

An electronic device for long-term adhesion to a user, the device comprising:

a housing comprising a physiologic data collection circuit, the housing positioned over a flexible layer extending from beneath the housing, the flexible layer comprising an electrode positioned on the bottom of the flexible layer at a position distal from the housing, wherein the flexible layer comprises a polymer upper layer overlying an electrical connection, the electrical connection extending linearly from the physiologic data collection circuit to the electrode when viewed from above the electronic device, the polymer upper layer adhered to a polymer lower layer underlying the electrical connection;

a connecting adhesive layer positioned under the polymer upper layer, the connecting adhesive layer adhering the polymer upper layer to the polymer lower layer; and

a lower adhesive layer positioned on the flexible layer and configured to adhere the electronic device to a user.

'554 Patent at cl. 1.

87.    The Notice of Allowance stated that the prior art allegedly was silent on "the flexible layer being made of two layers (upper and lower layers), its composition (polymers), and where everything is located on the overall electronic device with respect to the other components." Notice of Allowance (March 5, 2025) (Ex. D) at 4. Moreover, the Notice of Allowance stated that "[e]ach of the layers and components were well-known individually at the time of invention." Ex. D at 4. The Notice of Allowance is predicated on the lack of disclosure of these layers and components in a single reference and on a lack of reason to combine these well-known layers and components. Based on these distinctions, the USPTO issued a Notice of Allowance.

88.    The "but-for" materiality of the Heikenfeld Declaration in demonstrated in an example claim chart. *See* Heikenfeld Declaration Chart (Ex. E). Because discovery is ongoing, the Heikenfeld Declaration Chart provides a non-limiting example that illustrates the "but-for" materiality of the Heikenfeld Declaration. The left column reproduces each element of claim 1 of the '554 patent. The middle column cites the Heikenfeld Declaration, which characterizes

Matsumura and cites to prior art reference Matsumura. The right column cites to the reasons for allowance in the Notice of Allowance, thereby showing how the full English translation of Matsumura and the Heikenfeld Declaration characterizing Matsumura is material to the USPTO's allowance of the '554 patent. The Heikenfeld Declaration was not cited during prosecution of the '888 application despite being in iRhythm's possession during the prosecution of the '888 application and prior to its issuance as the '554 patent.

89.     The "but-for" materiality of the full English translation of Matsumura is also demonstrated in an example claim chart. *See* '554 Matsumura Chart (Ex. F). Again, discovery is ongoing, and thus the '554 Matsumura Chart provides a non-limiting example that illustrates the "but-for" materiality of the full English translation of Matsumura. The left column reproduces each element of claim 1 of the '554 patent while the right column includes exemplary disclosure of the full English translation of Matsumura. The full English translation of Matsumura was not cited during prosecution of the '888 application despite being in iRhythm's possession before the '888 application issued.

90.     The USPTO's recent grant of an *ex parte* reexamination of the '554 patent further supports the "but-for" materiality of the Heikenfeld Declaration and the full English translation of Matsumura. Namely, on September 8, 2025, an *ex parte* reexamination request of the '554 patent was filed. Request for *Ex Parte* Reexamination of the '554 Patent (Ex. G) at 1. Ground III relied on the full English translation of Matsumura, and alleged that Matsumura raised a ***substantial new question of patentability*** as to claim 1 of the '554 patent. Ex. G at 9, 63-70.

91.     The USPTO found, on October 17, 2025, that "Matsumura raises an SNQ [or "substantial new question" of patentability] as to claim 1 of the '554 patent." Order Granting Request for *Ex Parte* Reexamination of the '554 Patent (Ex. H) at 13. Moreover, the USPTO states

that "[t]here is a substantial likelihood that a reasonable examiner would consider at least the above teachings, i.e., first and second sheets and acrylic adhesive as taught by Matsumura important in determining the patentability of the claims." Ex. H at 15-16. The USPTO's findings confirm the but-for materiality of the entire disclosure of Matsumura and its English translation, the very disclosure and the English translation that Mr. Lopez withheld from the USPTO, despite being aware of the reference, as evidenced by his prior familiarity with it from iRhythm's IPRs.

###### E.    A Specific Intent to Deceive the USPTO by Mr. Lopez and Dr. Schmidt is the Single Most Reasonable Inference

92.    At any point during prosecution of the '888 application, either Mr. Lopez or Dr. Schmidt could have satisfied the duty of candor to the USPTO and disclosed the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura. The USPTO has a form for disclosing references during patent prosecution, called an Information Disclosure Statement ("IDS"), and iRhythm disclosed other references using an IDS form. For example, iRhythm submitted an IDS on February 6, 2025, disclosing other references, but not the iRhythm IPRs, Heikenfeld Declaration, or the English translation of Matsumura. Ex. I (Information Disclosure Statement of February 6, 2025). This IDS was signed by Dr. Schmidt. The single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '888 application and intended to deceive the USPTO by withholding such materials. This inference is supported by several considerations.

93.    *First*, Mr. Lopez and Dr. Schmidt are sophisticated actors familiar with the duty to disclose material information to the USPTO under MPEP 2001.06(c) and 37 C.F.R. § 1.56. Both Dr. Schmidt and Mr. Lopez are registered patent attorneys, familiar with the rules for materiality. Dr. Schmidt has worked in patent prosecution for fourteen years and responded to "probably over

a thousand" office actions and drafted hundreds of applications. Ex. B at 11:25-12:3. And, Mr. Lopez is an "[i]ntellectual Property attorney with 20+ years of experience protecting innovation and building patent portfolios, including preparing and executing strategic intellectual property plans for implementing business priorities and imperatives." *See* LinkedIn of Mr. Lopez (available at https://www.linkedin.com/in/theodore-lopez-92a420a/).

94.     *Second*, iRhythm's submitted the foreign language version of Matsumura while withholding the full English translation. During prosecution of the '888 application, iRhythm submitted a foreign language version of Matsumura with only the English-translated abstract, demonstrating that iRhythm was aware of Matsumura's relevance to the pending claims. *See* Information Disclosure Statement of Nov. 4, 2024 (Ex. K) at 34 (citing JP 2004-121360 as Cite. No. 956). This IDS submission was signed by Dr. Schmidt. iRhythm advantageously used the full English translation of Matsumura in related litigation across its petitions while withholding the same during prosecution of its patent applications. This intentional decision leads to a single most reasonable inference that the withholding of the full English translation of Matsumura was intentional.

95.     *Third*, iRhythm directly benefited from its failure to submit the "but-for" material information. By October of 2024 (when the '888 application was filed), Defendant was already the subject of a four-patent lawsuit from Bardy's sister company, Welch Allyn, for similar infringing activities as in this case. In search of a response to that pending litigation, Mr. Lopez and Dr. Schmidt collaborated to obtain patents and assert them against Bardy. Namely, Dr. Schmidt testified that he monitored Bardy's portfolio and added limitations specifically to cover Bardy's CAM Patch. Ex. B at 64:11-66:20 ("Q. Okay, do you know whether the limitation was also added to cover the Bardy cam product? … Yes, it is my personal belief that that does cover the Bardy

cam."), 59:14-20 ("Do you monitor Bardy Diagnostics' patent portfolio? … Yes."). Moreover, to increase the speed of prosecution, Mr. Lopez and Dr. Schmidt filed the '888 application under Track One, which requires a fee for the USPTO to prioritize the application. Ex. B at 64:11-66:20 ("Q. And the application that led to the '554 patent was filed with a Track 1 request, correct? A. Yes, I see a Track 1 prioritized examination request. Q. What are some of the advantages of a Track 1 request? … THE WITNESS: The main advantage is speed. Track 1 requests are essentially a pay-for-play program with the USPTO where you pay an additional fee so the USPTO will process the application more quickly.").

96.     Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality of the withheld information would have either significantly delayed the prosecution of the '888 application or inhibited the claims of the '554 patent from issuing as they currently stand. These actions were driven by these two individuals' awareness that the Court in this case had a deadline of June 2, 2025, to amend its pleadings. As a result, Mr. Lopez and Dr. Schmidt were incentivized *not* to submit material information to avoid delaying the issuance of the '554 patent.

97.     In sum, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately hinder iRhythm's ability to obtain and assert additional patents in this case, including, for example, the '554 patent. To avoid that delay and to obtain the '554 patent in an expedited manner to assert against Bardy, Mr. Lopez and Dr. Schmidt colluded to withhold iRhythm's own litigation materials from the USPTO.

98.     Based on these considerations, the single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full

English translation of Matsumura were material to the patentability of the then-pending claims of the '554 patent and he intended to deceive the USPTO by withholding such materials.

## COUNT XII: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. 12,303,277

99.     Bardy incorporates by reference the allegations in Paragraphs 1-98 of these Counterclaims as though fully set forth herein.

100.     The '277 patent is unenforceable due to inequitable conduct. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). Upon information and belief, and before taking full discovery, Mr. Lopez and Dr. Schmidt committed inequitable conduct during prosecution of the '277 patent with a specific intent to deceive the USPTO. Mr. Lopez committed inequitable conduct by withholding the Heikenfeld Declaration and full English translation of material, prior art reference, Matsumura from the USPTO during prosecution of U.S. Patent Application No. 18/806,584 (the "'584 application"), which issued as the '277 patent. Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration and failing to acquire and submit the full English translation of Matsumura to the USPTO during prosecution of '584 application, despite his awareness that such a translation existed within his client, iRhythm's, possession.

101.     On information and belief, Mr. Lopez knew of the existence and content of the Heikenfeld Declaration and the full English translation of Matsumura because he reviewed and supervised the preparation and filing of the iRhythm IPRs, which were submitted to the USPTO during the pendency of the '584 application. In the iRhythm IPRs, iRhythm challenged the validity of patents directed to and claiming ECG monitors based directly on the Heikenfeld Declaration and full English translation of Matsumura. Dr. Schmidt likewise knew of the Heikenfeld Declaration and full English translation of Matsumura during the pendency of the '584 application.

The withheld information is "but-for" material to the patentability of the claims of the '584 application. Finally, a specific intent to deceive the USPTO by Mr. Lopez and Dr. Schmidt is the single most reasonable inference.

### A.    The Duty to Disclose Information Material to Patentability

102.    Under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." Individuals associated with the filing and prosecution of a patent application include "*[e]ach attorney* or agent who prepares or prosecutes the application" and "[e]very other person who is *substantively involved in the preparation or prosecution of the application* and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c).

103.    Under MPEP 2001.06(c), an applicant that pursues subject matter that "is or has been involved in litigation and/or a trial proceeding, or the litigation and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the examiner." This section includes a requirement to disclose *inter partes* review proceedings and *any material information arising therefrom*. *See* MPEP 2001.06(c).

### B.    The Duty of Disclosure Applied to Dr. Schmidt and Mr. Lopez

104.    The duty of disclosure applied to Dr. Schmidt because he was the prosecuting attorney for the '584 application. On August 15, 2024, iRhythm filed the '584 application, which issued as the '277 patent. iRhythm is the applicant on the Application Data Sheet, which was signed by David R. Schmidt, who is listed on the Power of Attorney. The correspondence address is Knobbe, Martens, Olson & Bear, LLP at 2040 Main Street, Fourteenth Floor, Irvine California,

United States. Moreover, Dr. Schmidt testified that he was involved in the prosecution of the '584 application. *See* Ex. B at 31:25-32:9 ("Q. Were you involved in the prosecution of this patent application? A. Yes."). Mr. Lopez also owed a duty of disclosure regarding the '584 application. Namely, Mr. Lopez, as iRhythm's Director of Global Intellectual Property, owed a duty of disclosure because he was substantively involved in the preparation and prosecution of the '584 application, stemming from his role in the company, the applicant of the '584 application. This is supported at least by "Knobbe, Martens, Olson & Bear LLP's Privilege Log in Response to Subpoena." (Ex. A). Between May 13, 2022, and November 28, 2024, Mr. Lopez and Dr. Schmidt exchanged numerous communications described as "[l]egal advice from counsel regarding patent prosecution." *See* Ex. A at 1-8.

105.    The testimony of Dr. Schmidt also establishes that Mr. Lopez was substantively involved in the preparation and prosecution of the '584 application. First, Dr. Schmidt testified that Mr. Lopez was responsible for supervising the prosecution of iRhythm's portfolio. Ex. B at 44:8-12. Second, Dr. Schmidt testified that Mr. Lopez was responsible for approving patent claims in applications to be filed with the USPTO, including the patent claims that iRhythm now asserts against Bardy. Ex. B at 22:5-15 ("Q. [W]ho was your contact at iRhythm that you were sending drafts to of claims? … I interacted with Mark Day at iRhythm and then also Ted Lopez."). Dr. Schmidt also testified that Mr. Lopez approved the claims in the '277 patent (*i.e.*, the '584 application) for filing with the USPTO. Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. ***Ted Lopez.***").

106.    Mr. Lopez's practice of receiving claims from Dr. Schmidt, and approving those claims to be filed, is clear from Dr. Schmidt's testimony. Indeed, at the time of his deposition, Dr. Schmidt testified that Mr. Lopez approved the claims of all five (5) asserted patents (at that time)

for filing. For the '734 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 24:20-25 ("Q. All right. Turning back to the '734 patent, which is Exhibit 1 to your deposition, do you recall who at iRhythm approved the claims for filing? … probably **Ted Lopez**, so probably both of them."). For the '859 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 27:13-28:5 ("Q. Who approved the claim set [of the '859 patent] to be filed? A. **Ted Lopez**."). For the '860 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 28:17-29:8 ("Q. And do you recall who approved the claims to be filed? A. **Ted Lopez**."). For the '554 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. **Ted Lopez**.").

107.    In addition to approving claims to be filed, Dr. Schmidt testified that he regularly communicated with Mr. Lopez regarding iRhythm patent prosecution. Ex. B at 36:21-24.

108.    In sum, Dr. Schmidt's testimony aligns with the privilege log and supports Mr. Lopez's substantial involvement in the preparation and prosecution of each patent that iRhythm now asserts. Therefore, under 37 C.F.R. § 1.56, Mr. Lopez owed a duty of candor to the USPTO at least with regard to the '584 application, which issued as the '277 patent.

### C.    Dr. Schmidt and Mr. Lopez Knew About the Heikenfeld Declaration and the Full English Translation of Matsumura But Did Not Disclose Either During Prosecution of the '584 Application

109.    Dr. Schmidt was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura while prosecuting the '584 application, which issued as the '277 patent. On December 24, 2024, iRhythm filed five *inter partes* review petitions, which challenged the validity of U.S. Patent No. 8,214,007 (IPR2024-00378); U.S. Patent No. 8,214,007 (IPR2024-00377); U.S. Patent No. 9,155,484 (IPR2024-00376); U.S. Patent No. 8,965,492 (IPR2024-00374); and U.S. Patent No. 10,159,422 (IPR2024-00363). The iRhythm IPRs included

several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura. Matsumura was a primary reference in the IPRs and the subject of substantial analysis and claim charting. More specifically, across the five iRhythm IPRs, *Matsumura was used as a reference in twelve of the nineteen grounds that iRhythm advanced*. The extensive use of Matsumura in the iRhythm IPRs is likewise seen in the Heikenfeld Declaration (attached as Ex. C).

110.    Dr. Schmidt testified that he was aware of the iRhythm IPRs. Ex. B at 54:3-7 ("Q. And are you aware that iRhythm filed Inter Partes Reviews against patents asserted in the Welch Allyn case? MR. BUNKER: You can answer that yes or no. THE WITNESS: Yes."). Dr. Schmidt further testified that he reviewed these IPRs, including the Heikenfeld Declaration. Ex. B at 56:15-19 ("Q. Have you reviewed those IPRS? … THE WITNESS: Yes, very briefly."), 57:9-18 ("Q. Were you aware that iRhythm also submitted an expert declaration as part of its IPRs against Welch Allyn? … THE WITNESS: Yes. BY MS. BEANE: Q. Did you review that declaration? … THE WITNESS: Not in any great detail."). Dr. Schmidt testified that he was not aware of having the full English translation of Matsumura during prosecution of at least the '888 application. Ex. B at 52:17-20 ("Q. At any point during the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360? A. No."). However, because Dr. Schmidt reviewed the iRhythm IPRs, which relied upon the full English translation of Matsumura as a key reference—a reference that is "but-for" material to claims that the Dr. Schmidt was currently prosecuting—Dr. Schmidt did not obtain this reference from his client, whom he knew had a copy of this reference, and submitted it to the USPTO. But Dr. Schmidt did not submit these materials to the USPTO. Ex. B at 58:2-6 ("Q. And just to confirm, you don't recall informing the

USPTO as part of the '888 application about the English translation of JP2004-121360, correct? … THE WITNESS: No, I don't recall that.").

111.    Neither the Heikenfeld Declaration, the full English translation of Matsumura, or the iRhythm IPRs were submitted to the USPTO during prosecution of the '584 application. Dr. Schmidt, however, had notice that specific information existed (*i.e.*, the Heikenfeld Declaration, the full English translation of Matsumura, and the iRhythm IPRs) which may have been material to the patentability of the claims he was prosecuting in the '584 application, which were filed on behalf of iRhythm.

112.    Upon information and belief, Mr. Lopez was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura during the time he supervised prosecution of the '584 application, which issued as the '277 patent. Mr. Lopez, as iRhythm's Director of Global Intellectual Property, supervised and was involved in filing the iRhythm IPRs. As mentioned above, the iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura.

113.    The Heikenfeld Declaration extensively characterizes Matsumura, opines on changes that would have been obvious to a person of ordinary skill, and also characterizes the state of the art. In one example, Heikenfeld opines that "a POSA would understand that [Matsumura's] conductive gel 5 can detect 'bioelectric potentials' for transmission 'through the conductive material 2 and the hooks 3' because the conductive gel 5 is embedded in second sheet 4." Ex. C, ¶482. Heikenfeld further concludes that these conductive gels are ECG electrodes. Ex. C, ¶560. Heikenfeld also opined that "Matsumura teaches that second sheet 4 and first sheet 1 are both made of 'an insulating material' such as 'polyethylene foam, polyurethane foam, or polyurethane sheet.'" Ex. C, ¶865. The over 500 pages of the Heikenfeld Declaration includes material information that

should have been submitted to the USPTO to satisfy Dr. Schmidt and Mr. Lopez's duty of disclosure.

114.    The '584 application was filed on August 15, 2024, and issued on May 20, 2025. *See* Ex. B at 31:25-32:15 ("Q. Who at iRhythm approved the filing of the ['277] claims? A. **Ted Lopez.**"). The iRhythm IPRs were filed on December 24, 2024, while the '584 application was pending. Mr. Lopez concurrently supervised the prosecution of the '584 application and the iRhythm IPRs. Thus, Mr. Lopez was aware of both the Heikenfeld Declaration and the full English translation of Matsumura during prosecution of the '584 application. Mr. Lopez failed to disclose this same material information while actively pursuing similar subject matter in iRhythm's patent applications that he was substantively involved in overseeing.

115.    Despite Mr. Lopez overseeing prosecution of subject matter that fell squarely within the disclosure of the full English translation of Matsumura and is now asserted against Bardy, Mr. Lopez did not send the full English translation of Matsumura to his prosecution counsel, Dr. Schmidt. Ex. B at 52:17-20 ("Q. At any point during the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360? A. No.").

### D.    Both the Heikenfeld Declaration and the English Translation of Matsumura Are "But-For" Material to At Least Claim 1 of the '277 Patent

116.    Upon information and belief, Mr. Lopez and Dr. Schmidt each breached their duty of disclosure and committed inequitable conduct during prosecution of the '277 patent by withholding material information from the USPTO. Mr. Lopez and Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration, which discussed the scope and content of the prior art and various reasons why certain references would have been combined, and also the full English translation of Matsumura. Both the Heikenfeld Declaration and the full

English translation of Matsumura are "but-for" material to the patentability of the claims of the '277 patent, including, for example, claim 1. Issued claim 1 of the '277 patent recites:

> An electronic device for long-term adhesion to a user, the device comprising:
>
> a housing comprising a physiologic data collection circuit;
>
> an electrode-supporting section comprising a first substrate layer, a second substrate layer, and a lower adhesive layer positioned on a bottom surface, the lower adhesive layer providing adhesion to the skin of the user;
>
> an electrode positioned on the bottom surface of the electrode-supporting section, the electrode electrically connected to the physiologic data collection circuit; and
>
> wherein the first substrate layer is positioned over the electrode and extends horizontally away from the housing beyond a boundary of the electrode; and
>
> wherein the second substrate layer is positioned over the first substrate layer and extends horizontally beyond a boundary of the first substrate layer.

'277 Patent at cl. 1.

117.    The "but-for" materiality of the full English translation of Matsumura is demonstrated in an example claim chart. *See* '277 Matsumura Chart (Ex. L). Again, discovery is ongoing, and thus the '277 Matsumura Chart provides a non-limiting example that illustrates the "but-for" materiality of the full English translation of Matsumura. The left column reproduces each element of claim 1 of the '277 patent while the right column includes exemplary disclosure of the full English translation of Matsumura. The full English translation of Matsumura was not cited during prosecution of the '584 application despite being in iRhythm's possession during the prosecution of the '584 application and prior to its issuance.

118.    The USPTO's recent grant of an *ex parte* reexamination of the '277 patent further supports the "but-for" materiality of the Heikenfeld Declaration and the full English translation of Matsumura. Namely, on September 8, 2025, an *ex parte* reexamination request of the '277 patent was filed. Request for *Ex Parte* Reexamination of the '277 Patent (Ex. M) at 1. Ground II relied

on the full English translation of Matsumura, and alleged that Matsumura raised a ***substantial new question of patentability*** as to claim 1 of the '277 patent. Ex. M at 7, 33-42.

119.    The USPTO found, on October 17, 2025, that "Matsumura raises an SNQ [or "substantial new question" of patentability] as to claim 1 of the '277 patent." Order Granting Request for *Ex Parte* Reexamination of the '277 Patent (Ex. N) at 14. Moreover, the USPTO states that "[t]here is a substantial likelihood that a reasonable examiner would consider at least the above teachings, i.e., first and second sheets and acrylic adhesive as taught by Matsumura important in determining the patentability of the claims." Ex. N at 15. The USPTO's findings confirm the but-for materiality of the entire disclosure of Matsumura and its English translation, the very disclosure and the English translation that Mr. Lopez withheld from the USPTO, despite being aware of the reference, as evidenced by his prior familiarity with it from iRhythm's IPRs.

### E.    A Specific Intent to Deceive the USPTO by Mr. Lopez and Dr. Schmidt is the Single Most Reasonable Inference

120.    At any point during prosecution of the '584 application, either Mr. Lopez or Dr. Schmidt could have satisfied the duty of candor to the USPTO and disclosed the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura. The USPTO has a form for disclosing references during patent prosecution, called an IDS, and iRhythm disclosed other references using an IDS form. For example, iRhythm submitted an IDS on January 27, 2025, disclosing other references, but not the iRhythm IPRs, Heikenfeld Declaration, or the English translation of Matsumura. Ex. O (Information Disclosure Statement of January 27, 2025). This IDS was signed by Dr. Schmidt. The single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '584 application

and intended to deceive the USPTO by withholding such materials. This inference is supported by several considerations.

121.    *First*, Mr. Lopez and Dr. Schmidt are sophisticated actors familiar with the duty to disclose material information to the USPTO under MPEP 2001.06(c) and 37 C.F.R. § 1.56. Both Dr. Schmidt and Mr. Lopez are registered patent attorneys, familiar with the rules for materiality. Dr. Schmidt has worked in patent prosecution for fourteen years and responded to "probably over a thousand" office actions and drafted hundreds of applications. Ex. B at 11:25-12:3. And, Mr. Lopez is an "[i]ntellectual Property attorney with 20+ years of experience protecting innovation and building patent portfolios, including preparing and executing strategic intellectual property plans for implementing business priorities and imperatives." *See* LinkedIn of Mr. Lopez (available at https://www.linkedin.com/in/theodore-lopez-92a420a/).

122.    *Second*, iRhythm's submitted the foreign language version of Matsumura while withholding the full English translation. During prosecution of the '584 application, iRhythm submitted a foreign language version of Matsumura with only the English-translated abstract, demonstrating that iRhythm was aware of Matsumura's relevance to the pending claims. *See* Information Disclosure Statement (Aug. 15, 2024) (Ex. P) at 33 (citing JP 2004-121360 as Cite No. 924). This IDS submission was signed by Dr. Schmidt. iRhythm advantageously used the full English translation of Matsumura in related litigation across its petitions while withholding the same during prosecution of its patent applications. This intentional decision leads to a single most reasonable inference that the withholding of the full English translation of Matsumura was intentional.

123.    *Third*, iRhythm directly benefited from its failure to submit the "but-for" material information. By August of 2024 (when the '584 application was filed), Defendant was already the

subject of a four-patent lawsuit from Bardy's sister company, Welch Allyn, for similar infringing activities as in this case. In search of a response to that pending litigation, Mr. Lopez and Dr. Schmidt collaborated to obtain patents and assert them against Bardy. Namely, Dr. Schmidt testified that he monitored Bardy's portfolio and added limitations specifically to cover Bardy's CAM Patch. Ex. B at 64:11-66:20 ("Q. Okay, do you know whether the limitation was also added to cover the Bardy cam product? … Yes, it is my personal belief that that does cover the Bardy cam."), 59:14-20 ("Do you monitor Bardy Diagnostics' patent portfolio? … Yes."). Moreover, to increase the speed of prosecution, Mr. Lopez and Dr. Schmidt filed the '584 application under Track One, which requires a fee for the USPTO to prioritize the application. Ex. B at 64:11-66:20 ("Q. What are some of the advantages of a Track 1 request? … THE WITNESS: The main advantage is speed. Track 1 requests are essentially a pay-for-play program with the USPTO where you pay an additional fee so the USPTO will process the application more quickly.").

124.    Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality of the withheld information would have either significantly delayed the prosecution of the '584 application or inhibited the claims of the '277 patent from issuing as they currently stand. These actions were driven by these two individuals' awareness that the Court in this case had a deadline of June 2, 2025, to amend its pleadings. As a result, Mr. Lopez and Dr. Schmidt were incentivized **_not_** to submit material information to avoid delaying the issuance of the '277 patent.

125.    In sum, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately hinder iRhythm's ability to obtain and assert additional patents in this case, including, for example, the '277 patent. To avoid that delay and to obtain the '277 patent in

an expedited manner to assert against Bardy, Mr. Lopez and Dr. Schmidt colluded to withhold iRhythm's own litigation materials from the USPTO.

126.    Based on these considerations, the single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '277 patent and he intended to deceive the USPTO by withholding such materials.

**COUNT XIII: DECLARATORY JUDGMENT OF**
**NON-INFRINGEMENT OF U.S. PATENT NO. 12,402,819**

127.    Bardy incorporates by reference the allegations in Paragraphs 1-126 of these Counterclaims as though fully set forth herein.

128.    In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '819 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

129.    Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '819 patent.

130.    By way of example, and not by way of limitation, the CAM patch does not include the claimed "second rigid housing that contains a second printed circuit board and a battery" as required by claim 1 of the '819 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '819 patent.

131.    As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '819 patent.

132.    A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '819 patent is therefore necessary and appropriate to resolve this controversy.

133.    iRhythm knew or should have known that Bardy has not and is not in any way infringing the '819 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

## COUNT XIV: DECLARATORY JUDGMENT OF
## INVALIDITY OF U.S. PATENT NO. 12,402,819

134.    Bardy incorporates by reference the allegations in Paragraphs 1-133 of these Counterclaims as though fully set forth herein.

135.    Bardy maintains that each and every claim of the '819 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

136.    As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '819 patent.

137.    By way of example, and not by way of limitation, the claims of the '819 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent Publication No. 2014/0094676 (Ex. U); and/or U.S. Patent No. 8,626,262 (Ex. V).

138.    A judicial declaration that the claims of the '819 patent are invalid is therefore necessary and appropriate to resolve this controversy.

## COUNT XV: DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF U.S. PATENT NO. 12,408,856

139.    Bardy incorporates by reference the allegations in Paragraphs 1-138 of these Counterclaims as though fully set forth herein.

140.    In its Counterclaims, iRhythm alleges that Bardy has infringed and continues to infringe the '856 patent, either literally or under the doctrine of equivalents, and that Bardy will continue to engage in these acts.

141.    Bardy has not infringed, and currently does not infringe, under any theory of infringement, including either literally or under the doctrine of equivalents, any valid, enforceable claim of the '856 patent.

142.    By way of example, and not by way of limitation, the CAM patch does not include the claimed "a housing formed from a polymer material, in which at least some substantially rigid electronic components are disposed, including a printed circuit board and a battery connected to the printed circuit board" as required by claim 1 of the '856 patent. Accordingly, the CAM patch does not infringe the sole independent claim of the '856 patent.

143.    As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '856 patent.

144.    A judicial declaration that Bardy does not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '856 patent is therefore necessary and appropriate to resolve this controversy.

145.    iRhythm knew or should have known that Bardy has not and is not in any way infringing the '856 patent. This is therefore an exceptional case entitling Bardy to an award of its attorney fees pursuant to 35 U.S.C. § 285.

**COUNT XVI: DECLARATORY JUDGMENT OF
INVALIDITY OF U.S. PATENT NO. 12,408,856**

146.    Bardy incorporates by reference the allegations in Paragraphs 1-145 of these Counterclaims as though fully set forth herein.

147.    Bardy maintains that each and every claim of the '856 patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in United States Code, Title 35, including without limitation 35 U.S.C. §§ 101, 102, 103, 112.

148.    As evidenced by the allegations in the iRhythm Counterclaim, there is now an actual, substantial, and continuing justiciable controversy between iRhythm and Bardy with respect to the alleged infringement of the '856 patent.

149.    By way of example, and not by way of limitation, the claims of the '856 patent are invalid under 35 U.S.C. §§ 102 and/or 103 over U.S. Patent Publication No. 2009/0076363 (Ex. W); and/or the full English translation of JP 2004-121360.

150.    A judicial declaration that the claims of the '856 patent are invalid is therefore necessary and appropriate to resolve this controversy.

### COUNT XVII: DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. 12,408,856

151.    Bardy incorporates by reference the allegations in Paragraphs 1-150 of these Counterclaims as though fully set forth herein.

152.    The '856 patent is unenforceable due to inequitable conduct. *See, e.g.*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). The '856 patent is also unenforceable based on the doctrine of infectious unenforceability. *See, e.g.*, *Nilssen v. Osram Sylvania*, *Inc.*, 504 F.3d 1223, 1230 (Fed. Cir. 2007) ("Because inequitable conduct with respect to one or more patents in a family can infect related applications, we find no abuse of discretion in the district court's holding the '345, '690, '067, and '342 patents unenforceable prior to determining whether the inequitable conduct related to each of those four patents should render additional related patents unenforceable as well.") (citations omitted). Upon information and belief, and before taking full discovery, Mr. Lopez and Dr. Schmidt committed inequitable conduct

during prosecution of the '856 patent with a specific intent to deceive the USPTO. Mr. Lopez committed inequitable conduct by withholding the Heikenfeld Declaration and full English translation of material, prior art reference, Matsumura from the USPTO during prosecution of U.S. Patent Application No. 19/212,547 (the "'547 application"), which issued as the '856 patent. Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration and failing to acquire and submit the full English translation of Matsumura to the USPTO during prosecution of '547 application, despite his awareness that his client, iRhythm had a full English translation of Matsumura in its possession and custody.

153.    On information and belief, Mr. Lopez knew of the existence and content of the Heikenfeld Declaration and the full English translation of Matsumura because he reviewed and supervised the preparation and filing of the iRhythm IPRs, which were pending at the USPTO during the pendency of the '547 application. In the iRhythm IPRs, iRhythm challenged the validity of patents directed to and claiming ECG monitors based directly on the Heikenfeld Declaration and full English translation of Matsumura. Dr. Schmidt likewise knew of the Heikenfeld Declaration and full English translation of Matsumura during the pendency of the '547 application. The withheld information is "but-for" material to the patentability of the claims of the '547 application. Finally, a specific intent to deceive the USPTO by Mr. Lopez and Dr. Schmidt is the single most reasonable inference.

154.    Defendant directly benefited from its failure to submit this "but-for" material information. At the time of filing the '547 application, Mr. Lopez and Dr. Schmidt collaborated to obtain patents from pending iRhythm patent applications to assert against Bardy in this litigation. Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality would have stood in the way of Defendant's ability to obtain the claim scope it did via the issuance

of the '856 Patent. In addition, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately stand in the way of Defendant's ability to assert additional patents against Bardy by the June 2, 2025 deadline to amend the pleadings in this case. To obtain the '856 Patent in an expedited manner to assert against Bardy (*e.g.*, the '547 application was filed on May 19, 2025 and issued on September 4, 2025 as the '856 patent), Mr. Lopez and Dr. Schmidt colluded to withhold information that was but for material to the patentability of the claims of the '547 application.

### A.    The Duty to Disclose Information Material to Patentability

155.    Under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." Individuals associated with the filing and prosecution of a patent application include "***[e]ach attorney*** or agent who prepares or prosecutes the application" and "[e]very other person who is ***substantively involved in the preparation or prosecution of the application*** and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c).

156.    Under MPEP 2001.06(c), an applicant that pursues subject matter that "is or has been involved in litigation and/or a trial proceeding, or the litigation and/or trial proceeding yields information material to currently pending applications, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the examiner." This section includes a requirement to disclose *inter partes* review proceedings and ***any material information arising therefrom***. *See* MPEP 2001.06(c).

**B.      The Duty of Disclosure Applied to Dr. Schmidt and Mr. Lopez**

157.     The duty of disclosure applied to Dr. Schmidt because he was the prosecuting attorney for the '547 application. On May 19, 2025, iRhythm filed the '547 application, which issued as the '856 patent. iRhythm is the applicant on the Application Data Sheet, which was signed by David R. Schmidt, who is listed on the Power of Attorney. The correspondence address is Knobbe, Martens, Olson & Bear, LLP at 2040 Main Street, Fourteenth Floor, Irvine California, United States. Moreover, Dr. Schmidt testified that he was involved in the prosecution of the '856 application. *See* Ex. B at 32:24-33:1 ("Q. Were you involved in the prosecution of the 856 patent? A. Yes."); 34:13-14 ("Q. Did you prepare the claims of the '856 patent? A. I did."). Mr. Lopez also owed a duty of disclosure regarding the '547 application. Namely, Mr. Lopez, as iRhythm's Director of Global Intellectual Property, owed a duty of disclosure because he was substantively involved in the preparation and prosecution of the '547 application, stemming from his position at iRhythm, the applicant of the '547 application. This is supported at least by "Knobbe, Martens, Olson & Bear LLP's Privilege Log in Response to Subpoena." (Ex. A). Between May 13, 2022, and November 28, 2024, Mr. Lopez and Dr. Schmidt exchanged numerous communications described as "[l]egal advice from counsel regarding patent prosecution." *See* Ex. A at 1-8.

158.     The testimony of Dr. Schmidt also establishes that Mr. Lopez was substantively involved in the preparation and prosecution of the '584 application. First, Dr. Schmidt testified that Mr. Lopez was responsible for supervising the prosecution of iRhythm's portfolio. Ex. B at 44:8-12. Second, Dr. Schmidt testified that Mr. Lopez was responsible for approving patent claims in applications to be filed with the USPTO, including the patent claims that iRhythm now asserts against Bardy. Ex. B at 22:5-15 ("Q. [W]ho was your contact at iRhythm that you were sending drafts to of claims? … I interacted with Mark Day at iRhythm and then also Ted Lopez."). Dr. Schmidt also testified that Mr. Lopez instructed him to file the '856 patent application with the

USPTO. Ex. B at 36:20-24 ("Q. Great. Did you receive instructions to file the '856 patent application from Mr. Lopez? MR. BUNKER: Uh, you may answer that. THE WITNESS: Yes.").

159. Mr. Lopez's practice of receiving claims from Dr. Schmidt, and approving those claims to be filed, is clear from Dr. Schmidt's testimony. Indeed, at the time of his deposition, Dr. Schmidt testified that Mr. Lopez approved the claims of all five (5) asserted patents (at that time) for filing. For the '734 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 24:20-25 ("Q. All right. Turning back to the '734 patent, which is Exhibit 1 to your deposition, do you recall who at iRhythm approved the claims for filing? … probably *Ted Lopez*, so probably both of them."). For the '859 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 27:13-28:5 ("Q. Who approved the claim set [of the '859 patent] to be filed? A. *Ted Lopez*."). For the '860 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 28:17-29:8 ("Q. And do you recall who approved the claims to be filed? A. *Ted Lopez*."). For the '554 patent, Dr. Schmidt testified that Mr. Lopez approved the claims to be filed. Ex. B at 30:19-21 ("Q. Who approved the claims to be filed of the '554 patent? A. *Ted Lopez*.").

160. In addition to approving claims to be filed, Dr. Schmidt testified that he regularly communicated with Mr. Lopez regarding iRhythm patent prosecution. Ex. B at 36:21-24.

161. In sum, Dr. Schmidt's testimony aligns with the communications listed in iRhythm's privilege log and supports Mr. Lopez's substantial involvement in the preparation and prosecution of each patent that iRhythm now asserts. Therefore, under 37 C.F.R. § 1.56, Mr. Lopez owed a duty of candor to the USPTO at least with regard to the '547 application, which issued as the '856 patent.

**C.    Dr. Schmidt and Mr. Lopez Knew About the Heikenfeld Declaration and the Full English Translation of Matsumura But Did Not Disclose Either During Prosecution of the '547 Application**

162.    Dr. Schmidt was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura while prosecuting the '547 application, which issued as the '856 patent. On December 24, 2024, iRhythm filed five *inter partes* review petitions, which challenged the validity of U.S. Patent No. 8,214,007 (IPR2024-00378); U.S. Patent No. 8,214,007 (IPR2024-00377); U.S. Patent No. 9,155,484 (IPR2024-00376); U.S. Patent No. 8,965,492 (IPR2024-00374); and U.S. Patent No. 10,159,422 (IPR2024-00363).[2] The iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura. iRhythm relied upon Matsumura as primary reference in the IPRs and Matsumura was the subject of substantial analysis and claim charting by iRhythm. More specifically, *Matsumura was used as a reference in twelve of the nineteen grounds that iRhythm advanced*. The extensive use of Matsumura in the iRhythm IPRs is likewise seen in the Heikenfeld Declaration (attached as Ex. C).

163.    Dr. Schmidt testified that he was aware of the iRhythm IPRs. Ex. B at 54:3-7 ("Q. And are you aware that iRhythm filed Inter Partes Reviews against patents asserted in the Welch Allyn case? MR. BUNKER: You can answer that yes or no. THE WITNESS: Yes."). Dr. Schmidt further testified that he reviewed these IPRs, including the Heikenfeld Declaration. Ex. B at 56:15-19 ("Q. Have you reviewed those IPRS? … THE WITNESS: Yes, very briefly."), 57:9-18 ("Q. Were you aware that iRhythm also submitted an expert declaration as part of its IPRs against Welch

---

[2]    iRhythm is also a defendant in *Welch Allyn, Inc. v. iRhythm Technologies, Inc.,* Case No. 24-cv-00224-MN (D. Delaware), filed on February 20, 2024. Welch Allyn is a sister company of Bardy Diagnostics, Inc. the Plaintiff in this case. In *Welch Allyn*, Plaintiff alleges that iRhythm's ECG monitors infringe six (6) additional U.S.patents owned by Welch Allyn. iRhythm filed IPRs (identified here) seeking to invalidate each of the asserted Welch Allyn patents. Institution of the IPRs was denied.

Allyn? … THE WITNESS: Yes. BY MS. BEANE: Q. Did you review that declaration? … THE WITNESS: Not in any great detail."). Although Dr. Schmidt reviewed the iRhythm IPRs, which relied upon the full English translation of Matsumura as a key reference—a reference that is "but-for" material to claims that the Dr. Schmidt was currently prosecuting on behalf of iRhythm—Dr. Schmidt did not obtain this reference from his client, whom he knew had a copy of this reference, and he did not submit this reference to the USPTO. Nor did Dr. Schmidt obtain this reference from the PTAB's website, https://ptacts.uspto.gov/ptacts/ui/home, which contained public copies of all of the exhibits that accompanied iRhythm's IPR filings.

164.    Neither the Heikenfeld Declaration, the full English translation of Matsumura, or the iRhythm IPRs were submitted to the USPTO during prosecution of the '547 application. Dr. Schmidt, however, had notice that this specific information existed (*i.e.*, the Heikenfeld Declaration, the full English translation of Matsumura, and the iRhythm IPRs) which may have been material to the patentability of the claims he was prosecuting in iRhythm's '547 application.

165.    Upon information and belief, Mr. Lopez was aware of the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura during the time he supervised prosecution of the '547 application, which issued as the '856 patent. Mr. Lopez, as iRhythm's Director of Global Intellectual Property, supervised and was involved in filing the iRhythm IPRs. As mentioned above, the iRhythm IPRs included several exhibits, including the Heikenfeld Declaration and the full English translation of Matsumura.

166.    The Heikenfeld Declaration extensively characterizes Matsumura, opines on changes that would have been obvious to a person of ordinary skill, and also characterizes the state of the art. In one example, Heikenfeld opines that "a POSA would understand that [Matsumura's] conductive gel 5 can detect 'bioelectric potentials' for transmission 'through the conductive

material 2 and the hooks 3' because the conductive gel 5 is embedded in second sheet 4." Ex. C, ¶482. Heikenfeld further concludes that these conductive gels are ECG electrodes. Ex. C, ¶560. Heikenfeld also opined that "Matsumura teaches that second sheet 4 and first sheet 1 are both made of 'an insulating material' such as 'polyethylene foam, polyurethane foam, or polyurethane sheet.'" Ex. C, ¶865. The over 500 pages of the Heikenfeld Declaration includes material information that should have been submitted to the USPTO to satisfy Dr. Schmidt and Mr. Lopez's duty of disclosure.

167.    The '547 application was filed on May 19, 2025, and issued at the '856 patent on September 9, 2025. *See* Ex. B at 36:20-24 ("Q. Great. Did you receive instructions to file the '856 patent application from Mr. Lopez? MR. BUNKER: Uh, you may answer that. THE WITNESS: Yes."). The iRhythm IPRs were filed on December 24, 2024, before the '547 application was filed. Further, the iRhythm IPRs were concurrently pending during prosecution of the '547 application. Mr. Lopez concurrently supervised the prosecution of the '547 application and the iRhythm IPRs. Thus, Mr. Lopez was aware of both the Heikenfeld Declaration and the full English translation of Matsumura during prosecution of the '547 application. Mr. Lopez failed to disclose this same material information while actively pursuing similar subject matter in iRhythm's patent applications that was similar to the claims he was trying to invalidate through the IPR he was overseeing.

168.    Despite Mr. Lopez overseeing prosecution of claims having a scope and subject matter that fell squarely within the disclosure of the full English translation of Matsumura, claims that are now being asserted against Bardy, Mr. Lopez did not provide the full English translation of Matsumura to his prosecution counsel, Dr. Schmidt. Ex. B at 52:17-20 ("Q. At any point during

the prosecution of the '888 application, are you aware of having an English translation of Cite No. 956 which is JP2004-121360 [Matsumura]? A. No.").

**D.    Both the Heikenfeld Declaration and the English Translation of Matsumura Are "But-For" Material to At Least One Claim of the '856 Patent**

169.    Upon information and belief, Mr. Lopez and Dr. Schmidt each breached their duty of disclosure and committed inequitable conduct during prosecution of the '856 patent by withholding material information from the USPTO. Mr. Lopez and Dr. Schmidt committed inequitable conduct by withholding the Heikenfeld Declaration, which discussed the scope and content of the prior art and various reasons why a person of skill in the art would have combined certain references, and also the full English translation of Matsumura. Moreover, two earlier patents in the same patent family as the '856 patent (*i.e.*, the '554 and '277 patents) are subject to *ex parte* reexamination. There, the USPTO already determined that Matsumura raises a substantial new question of patentability as to these earlier patents. *See* Ex. H at 13; Ex. N at 14. This further supports Matsumura's "but-for" materiality to the '856 patent, which shares the same specification and claims substantially the same subject matter as the '554 and '277 patents. The USPTO's finding of Matsumura as "but-for" material to the '554 and '277 patents also supports a finding of unenforceability as to the '856 patent based on the doctrine of infectious unenforceability. Thus, both the Heikenfeld Declaration and the full English translation of Matsumura are "but-for" material to the patentability of the claims of the '856 patent.

**E.    A Specific Intent to Deceive the USPTO by Mr. Lopez and Dr. Schmidt is the Single Most Reasonable Inference**

170.    At any point during prosecution of the '547 application, either Mr. Lopez or Dr. Schmidt could have satisfied the duty of candor to the USPTO and disclosed the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura. The USPTO has a form for disclosing references during patent prosecution, called an IDS, and iRhythm disclosed other

references using an IDS form. For example, iRhythm submitted an IDS on May 19, 2025, disclosing other references to the USPTO during the prosecution of the '547 application, but not the iRhythm IPRs, Heikenfeld Declaration, or the English translation of Matsumura. Ex. T (Information Disclosure Statement of May 19, 2025). This IDS was signed by Dr. Schmidt. The single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '547 application and intended to deceive the USPTO by withholding such materials. This inference is supported by several considerations.

171.    *First*, Mr. Lopez and Dr. Schmidt are sophisticated actors familiar with the duty to disclose material information to the USPTO under MPEP 2001.06(c) and 37 C.F.R. § 1.56. Both Dr. Schmidt and Mr. Lopez are registered patent attorneys, familiar with the rules governing the duty of candor and disclosure. Dr. Schmidt has prosecuted patent applications for fourteen years and responded to "probably over a thousand" office actions and drafted hundreds of applications. Ex. B at 11:25-12:3. And, Mr. Lopez is an "[i]ntellectual Property attorney with 20+ years of experience protecting innovation and building patent portfolios, including preparing and executing strategic intellectual property plans for implementing business priorities and imperatives." *See* LinkedIn of Mr. Lopez (available at https://www.linkedin.com/in/theodore-lopez-92a420a/).

172.    *Second*, iRhythm disclosed the foreign language version of Matsumura to the USPTO while withholding the full English translation. During prosecution of the '584 application, iRhythm submitted a foreign language version of Matsumura with only the English-translated abstract, demonstrating that iRhythm was aware of Matsumura's relevance and materiality to the pending claims. *See* Information Disclosure Statement (May 19, 2025) (Ex. T) at 35 (citing JP 2004-121360 (Matsumura) as Cite No. 979). This IDS submission was signed by Dr. Schmidt.

iRhythm advantageously used the full English translation of Matsumura in related litigation in each of its IPRs while withholding the same during prosecution of its own patent applications containing claims of similar subject matter. This intentional decision leads to a single most reasonable inference that the withholding of the full English translation of Matsumura was intentional.

173. *Third*, iRhythm directly benefited from its failure to submit the "but-for" material information. By May 19, 2025 (when the '547 application was filed), Defendant was already facing allegations of patent infringement of a six-patent lawsuit from Bardy's sister company, Welch Allyn, accusing the same iRhythm ECG monitor of infringement as in this case. In search of a response to that pending litigation, Mr. Lopez and Dr. Schmidt collaborated to quickly obtain patents and assert them against Bardy. In this regard, Dr. Schmidt testified that he monitored Bardy's patent portfolio and added claims and limitations specifically to cover Bardy's ECG monitor, i.e., the CAM Patch. Ex. B at 64:11-66:20 ("Q. Okay, do you know whether the limitation was also added to cover the Bardy cam product? … Yes, it is my personal belief that that does cover the Bardy cam."), 59:14-20 ("Do you monitor Bardy Diagnostics' patent portfolio? … Yes."). Moreover, to increase the speed of prosecution, Mr. Lopez and Dr. Schmidt filed the '547 application under Track One, which requires a fee for the USPTO to prioritize the application. Ex. B at 64:11-66:20 ("Q. What are some of the advantages of a Track 1 request? … THE WITNESS: The main advantage is speed. Track 1 requests are essentially a pay-for-play program with the USPTO where you pay an additional fee so the USPTO will process the application more quickly.").

174. Had Mr. Lopez and Dr. Schmidt complied with their duty of disclosure, the "but-for" materiality of the withheld information would have either prevented the claims from issuing

in their current form, or at the very least, significantly delayed the prosecution of the '547 application. These actions were driven by these two individuals' awareness that the Court in this case had a deadline of June 2, 2025, to amend its pleadings. As a result, Mr. Lopez and Dr. Schmidt were incentivized **not** to submit material information to avoid delaying the issuance of the '856 patent.

175.    In sum, Mr. Lopez and Dr. Schmidt knew that submitting the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura to the USPTO would slow prosecution and ultimately hinder iRhythm's ability to obtain and assert additional patents in this case, including, for example, the '856 patent. To avoid that delay and to obtain the '856 patent in an expedited manner to assert against Bardy, Mr. Lopez and Dr. Schmidt colluded to withhold from the USPTO material prior art and an expert declaration characterizing that prior art, which it was extensively relying on in its efforts to invalidate Welch Allyn's asserted patents in a related litigation.

176.    Based on these considerations, the single most reasonable inference is that Mr. Lopez and Dr. Schmidt knew that the iRhythm IPRs, the Heikenfeld Declaration, and the full English translation of Matsumura were material to the patentability of the then-pending claims of the '856 patent and they intended to deceive the USPTO by withholding such materials.

## **RELIEF REQUESTED**

WHEREFORE, Bardy requests that the Court enter a judgment in its favor granting the following relief:

A.    Dismissing iRhythm's Counterclaims with prejudice;

B.    Denying all relief requested by iRhythm;

C.    Granting all relief requested by Bardy;

D.    Declaring that Bardy has not infringed the iRhythm Asserted Patents;

E.    Declaring that the iRhythm Asserted Patents are invalid;

F.    Declaring that this is an exceptional case, and awarding Bardy its reasonable

attorneys' fees, costs, and expenses pursuant to 35 U.S.C. § 285; and

G.    Such other and further relief as this Court deems just and proper under the

circumstances.

## JURY DEMAND

Bardy demands trial by jury on all issues so triable.


                                       POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Jeffrey R. Gargano                     By: /s/ Philip A. Rovner
Melissa M. Haulcomb                        Philip A. Rovner (#3215)
Jared R. Lund                              Andrew M. Moshos (#6685)
Rebekah Hill                               P. Andrew Smith (#7117)
K&L GATES LLP                              Hercules Plaza
70 W. Madison St., Suite 3300              P.O. Box 951
Chicago, IL 60602                          Wilmington, DE  19899
(312) 372-1121                             (302) 984-6000
                                           provner@potteranderson.com
Erik J. Halverson                          amoshos@potteranderson.com
K&L GATES LLP                              asmith@potteranderson.com
4 Embarcadero Center, Suite 1200
San Francisco, CA 94111                *Attorneys for Plaintiff*
(415) 882-8200                         *Bardy Diagnostics, Inc.*

Dated: March 9, 2026
12801615